# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| **RICHARD COOEY,** | ) | **Case No. 2:04-cv-1156** |
| | ) | |
| *Plaintiff,* | ) | **District Judge Gregory L. Frost** |
| | ) | |
| **KENNETH W. SMITH (Inmate # 326-630),** | ) | **Magistrate Judge Mark R. Abel** |
| Franklin Medical Center | ) | |
| P.O. Box 23658 | ) | |
| Columbus, Ohio 43223 | ) | |
| **and** | ) | |
| **DONALD KETTERER (Inmate # 465-959),** | ) | |
| Mansfield Correctional Institution | ) | **Seventh Amended** |
| P.O. Box 788 | ) | **Complaint for Injunctive** |
| Mansfield, Ohio 44901 | ) | **Declaratory Relief, Attorney Fees** |
| **and** | ) | **and Costs of Suit Pursuant to** |
| **JONATHAN MONROE (Inmate # 383-816),** | ) | **42 U.S.C. § 1983 on behalf of** |
| **JEROME HENDERSON (Inmate # 357-869),** | ) | **Plaintiff Kenneth W. Smith** |
| **BILLY SLAGLE (Inmate # 203-172),** | ) | |
| **GRADY L. BRINKLEY (Inmate # 436-028),** | ) | |
| **JAMES T. CONWAY, III (Inmate # 457-203),** | ) | |
| **ROBERT W. BETHEL (Inmate # 455-970),** | ) | |
| **PHILLIP L. ELMORE (Inmate # 458-539), and** | ) | |
| Ohio State Penitentiary | ) | |
| 878 Coitsville-Hubbard Road | ) | |
| Youngstown, Ohio 44505, | ) | |
| | ) | |
| *Intervenor-Plaintiffs,* | ) | |
| **v.** | ) | |
| | ) | |
| **JOHN KASICH, Governor, State of Ohio** | ) | |
| 77 South High Street, 30th Floor | ) | |
| Columbus, Ohio 43215, | ) | |
| **GARY C. MOHR, Director, ODRC** | ) | |
| 770 West Broad St. | ) | |
| Columbus, Ohio 43222, | ) | |
| **DONALD MORGAN, Warden** | ) | |
| Southern Ohio Correctional Facility | ) | |
| 1724 State Route 728 | ) | |
| Lucasville, Ohio 45699, | ) | |
| | ) | |
| **and** | ) | |
| | ) | |

**ANONYMOUS EXECUTION TEAM**  )
**MEMBERS # 1-50 (Names and Addresses**  )
**unavailable to Plaintiffs),**  )
      **c/o Southern Ohio Correctional Facility**  )
      **1724 State Route 728**  )
      **Lucasville, Ohio 45699,**  )
        )
      *Defendants.*  )

---

**BRETT HARTMAN (Inmate # 357-869),**  )    Case No. 2:09-cv-242
    **Ohio State Penitentiary**  )
    **878 Coitsville-Hubbard Road**  )    **District Judge Gregory L. Frost**
    **Youngstown, Ohio 44505,**  )
      )    **Magistrate Judge**
    *Plaintiff,*  )    **E.A. Preston Deavers**
      )
**and**  )
**KENNETH W. SMITH (Inmate # 326-630),**  )
    **Franklin Medical Center**  )
    **P.O. Box 23658**  )
    **Columbus, Ohio 43223,**  )
      )
    *Intervenor-Plaintiffs,*  )
      )
    **v.**  )
      )
**JOHN KASICH, Governor, State of Ohio**  )    **Seventh Amended**
    **77 South High Street, 30th Floor**  )    **Complaint for Injunctive and**
    **Columbus, Ohio 43215,**  )    **Declaratory Relief, Attorney Fees,**
**GARY C. MOHR, Director, ODRC**  )    **and Costs of Suit Pursuant to**
    **770 West Broad St.**  )    **42 U.S.C. § 1983 on behalf of**
    **Columbus, Ohio 43222,**  )    **Plaintiff Kenneth W. Smith**
**DONALD MORGAN, Warden**  )
    **Southern Ohio Correctional Facility**  )
    **1724 State Route 728**  )
    **Lucasville, Ohio 45699,**  )
      )
**and**  )
      )
      )
      )
      )
      )
      )
      )

| | |
|---|---|
| **ANONYMOUS EXECUTION TEAM** | ) |
| **MEMBERS # 1-50 (Names and Addresses** | ) |
| **unavailable to Plaintiffs),** | ) |
|     **c/o Southern Ohio Correctional Facility** | ) |
|     **1724 State Route 728** | ) |
|     **Lucasville, Ohio 45699,** | ) |
| | ) |
|       *Defendants*. | ) |

---

| | |
|---|---|
| **ROMELL BROOM (Inmate # 187-343)** | )     Case No.  2:09-cv-823 |
|     **Ohio State Penitentiary** | ) |
|     **878 Coitsville-Hubbard Road** | )     District Judge Gregory L. Frost |
|     **Youngstown, Ohio 44505,** | ) |
| | )     Magistrate Judge Mark R. Abel |
|       *Plaintiff*, | ) |
| **and** | ) |
| **KENNETH W. SMITH (Inmate # 326-630),** | ) |
|     **Franklin Medical Center** | ) |
|     **P.O. Box 23658** | ) |
|     **Columbus, Ohio 43223,** | ) |
| | ) |
|       *Intervenor-Plaintiffs*, | ) |
| | ) |
| **v.** | ) |
| | )     **Seventh Amended** |
| **JOHN KASICH, Governor, State of Ohio** | )     **Complaint for Injunctive and** |
|     **77 South High Street, 30th Floor** | )     **Declaratory Relief, Attorney Fees,** |
|     **Columbus, Ohio 43215,** | )     **and Costs of Suit Pursuant to** |
| **GARY C. MOHR, Director, ODRC** | )     **42 U.S.C. § 1983 on behalf of** |
|     **770 West Broad St.** | )     **Plaintiff Kenneth W. Smith** |
|     **Columbus, Ohio 43222,** | ) |
| **DONALD MORGAN, Warden** | ) |
|     **Southern Ohio Correctional Facility** | ) |
|     **1724 State Route 728** | ) |
|     **Lucasville, Ohio 45699,** | ) |
| | ) |
| **and** | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

ANONYMOUS EXECUTION TEAM )
MEMBERS # 1-50 (Names and Addresses )
unavailable to Plaintiffs), )
  c/o Southern Ohio Correctional Facility )
  1724 State Route 728 )
  Lucasville, Ohio 45699, )
   )
   *Defendants*. )

---

LAWRENCE REYNOLDS, ) Case No. 2:10-cv-27
 )
  *Plaintiff*, ) District Judge Gregory L. Frost
 )
ARTHUR TYLER (Inmate # 175-637), ) Magistrate Judge
  Ohio State Penitentiary ) Terence P. Kemp
  878 Coitsville-Hubbard Road )
  Youngstown, Ohio 44505, )
and )
KENNETH W. SMITH (Inmate # 326-630), )
  Franklin Medical Center )
  P.O. Box 23658 )
  Columbus, Ohio 43223, )
 )
  *Intervenor-Plaintiffs*, ) Seventh Amended
 ) Complaint for Injunctive and
 ) Declaratory Relief, Attorney Fees,
v. ) and Costs of Suit Pursuant to
 ) 42 U.S.C. § 1983 on behalf of
JOHN KASICH, Governor, State of Ohio ) Plaintiff Kenneth W. Smith
  77 South High Street, 30th Floor )
  Columbus, Ohio 43215, )
GARY C. MOHR, Director, ODRC )
  770 West Broad St. )
  Columbus, Ohio 43222, )
DONALD MORGAN, Warden )
  Southern Ohio Correctional Facility )
  1724 State Route 728 )
  Lucasville, Ohio 45699, )
 )
and )
 )
 )
 )
 )
 )

ANONYMOUS EXECUTION TEAM )
MEMBERS # 1-50 (Names and Addresses )
unavailable to Plaintiffs), )
    c/o Southern Ohio Correctional Facility )
    1724 State Route 728 )
    Lucasville, Ohio 45699, )
     )
        *Defendants*. )

---

### Seventh Amended Complaint for Injunctive and Declaratory Relief, Attorney Fees, and Costs of Suit Pursuant to 42 U.S.C. § 1983 on behalf of Plaintiff Kenneth W. Smith

---

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ........................................................................... 1

II.    JURISDICTION AND VENUE ..................................................................... 9

III.   PARTIES ...................................................................................................... 10

    A.    Plaintiff .............................................................................................. 10

    B.    Defendants ......................................................................................... 11

IV.   EXHAUSTION OF ADMINISTRATIVE REMEDIES ............................ 12

V.    FACTS COMMON TO ALL CLAIMS AND RELIEF SOUGHT ............. 12

    A.    Plan A of Defendants' written execution protocol ............................ 24

    B.    Plan B of Defendants' written execution protocol ............................ 30

    C.    Problems with the written execution protocol ................................... 35

    D.    Defendants' pattern of deviations and/or variations from the written execution protocol ............................................................................ 51

    E.    Defendants' deviations, variations and irregularities in specific executions ....... 58

        1.    Wilford Berry ......................................................................... 58

        2.    Joseph Clark ............................................................................ 58

        3.    Christopher Newton ................................................................ 60

        4.    Daniel Wilson ......................................................................... 61

        5.    Marvallous Keene ................................................................... 61

        6.    Romell Broom ........................................................................ 61

        7.    Vernon Smith, a.k.a., Abdullah Sharif Kaazim Mahdi ............ 63

        8.      Michael Beuke ........................................................................ 65

        9.      Darryl Durr, and others since November 30, 2009 ................................. 65

VI.    CLAIMS FOR RELIEF ........................................................................... 67

First Claim: Eighth and Fourteenth Amendment Violations ........................................... 67

Second Claim: Fourteenth Amendment Due Process Violations .................................... 73

Third Claim: Violations of First, Sixth, Eighth and Fourteenth Amendment Rights of Access to Counsel, Access to Courts, Ability to Petition for Redress of Grievances, Due Process, and Privileges and Immunities of United States Citizenship. ..................................................................................................... 75

Fourth Claim: Fourteenth Amendment Equal Protection Violations ............................. 80

Fifth Claim: Violations of Fundamental Rights Arising Under The Principles Of Liberty and/or Natural Law Which Are Protected By The Ninth Amendment ................................................................................................... 86

Sixth Claim: First Amendment Free Speech Violations ................................................. 87

VII.   PRAYER FOR RELIEF ......................................................................... 90

CERTIFICATE OF SERVICE ................................................................................. 99

Plaintiff Kenneth W. Smith, by and through counsel and pursuant to Rules 15(a) and

15(d) of the Federal Rules of Civil Procedure, and having sought and been granted leave to

amend his complaint, hereby files this Seventh Amended Complaint for Injunctive and

Declaratory Relief, Attorney Fees, and Costs of Suit Pursuant to 42 U.S.C. § 1983 against

Defendants John Kasich, et al., (hereinafter the "Seventh Amended Complaint"), in each of the

applicable consolidated above-captioned cases.[1]  Smith alleges and avers as follows.


## I.    NATURE OF THE ACTION

1.    Plaintiff Smith brings this action under 42 U.S.C. § 1983 for violations and threatened

violations of his rights: to be free from cruel and unusual punishment under the Eighth

and Fourteenth Amendments to the United States Constitution; to be free from violations

of his substantive and procedural due process rights under the Fourteenth Amendment to

the United States Constitution; to unhindered access to counsel and the courts and to

petition the government for redress of grievances during the execution process under the

First, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution,

including the separate protections of the Due Process and Privileges and Immunities

Clauses of § 1 of the Fourteenth Amendment; to equal protection under the laws as

guaranteed by the Fourteenth Amendment of the United States Constitution; to be free

from violations of his unenumerated fundamental rights arising under the principles of

---

[1] Each Plaintiff in these consolidated lethal injection cases has filed varying numbers of amended complaints.  To avoid confusion inherent to having multiple different titles for the complaints filed September 28, 2011, all current Plaintiffs have designated their amended complaints as their "Seventh Amended Complaint," regardless of how many previous amendments each Plaintiff has filed.

liberty and natural law which are protected by the Ninth Amendment to the United States

Constitution; and to free speech guaranteed by the First Amendment to the United

States Constitution.

2.      Smith seeks equitable, injunctive, and declaratory relief.

3.      Defendants' policies, protocols, practices, customs, and procedures for executing Smith's

death sentence through lethal injection present a substantial risk of serious physical and

psychological pain to Smith, as well as an execution that will involve a torturous or

lingering death, and/or an objectively intolerable risk of harm that Defendants'

unjustifiably ignore, and such an execution will not accord with the "dignity of man" as

required by well-settled principles of the Eighth Amendment.[2]

4.      The substantial risk of serious, torturous, physical and psychological pain that is not in

accord with a dignified execution, in violation of Smith's rights under the Eighth and

Fourteenth Amendments, arises from Smith's individual, unique physical and mental

characteristics and Defendants' execution policy, and/or the substantial likelihood of

Defendants' maladministration of said execution policy including through deviations

and/or variations from the written protocol's mandates.  This includes, but is not limited

---

[2] To ensure clarity and to avoid confusion over similar but critically different terminology, Plaintiff adopts the Court's explanation and usage of the terms "execution policy" and "written execution protocol" provided in the July 8, 2011 injunctive order.  (Doc. No. 947, PageID 25963-65.)  According to the Court's understanding, Defendants have "an overarching execution policy and a notably subordinate written execution protocol."  (*Id.* at PageID 25963.)

Thus, Plaintiff will use the term "written execution protocol" to refer to DRC Policy 01-COM-11 and its requirements.  He will use the term "execution policy" to refer more broadly to all of Defendants' policies, practices, protocols and/or procedures related to executions, written or unwritten, formal or informal.

to, the delivery mechanisms used, the physical structures employed in Defendants'

policy, the personnel and training involved, Defendants' substantial and documented

pattern of repeated deviation and/or variation from the overarching execution policy and

the written execution protocol in administering executions regardless of the particular

policy in effect at the time, the functional nonexistence of the written policy's safeguards

as administered, the repeated inability to carry out an execution without encountering

serious problems, and the unfettered discretion granted in the policy to several of the

official actors involved.

5.     Smith will be subject to a substantial risk of serious physical and psychological pain, as

well as a torturous, lingering, and undignified execution, as a result of inclusion of the

drugs used in the policy's "Plan A" and "Plan B," in violation of his rights under the

Eighth and Fourteenth Amendments.

6.     Smith will be subject to a substantial risk of serious physical and psychological pain

and/or an objectively intolerable risk of harm that Defendants unjustifiably ignore as a

result of Defendants' administration of their execution policy and their written

execution protocol, in violation of his rights under the Eighth and

Fourteenth Amendments.

7.     Defendants' policies, protocol, practices, customs and procedures violate Smith's rights

under the Fourteenth Amendment because they will not provide a painless or quick death,

contrary to Smith's interests in expecting and receiving a quick and painless death.

These interests are created by Ohio law, Ohio Revised Code § 2949.22(A), vested in a

narrow class of individuals that includes Smith, and protected as rights under the

substantive and procedural elements of the Due Process Clause of the Fourteenth

Amendment. This denial of Smith's expectation and receipt of a quick and painless death violates his rights under the federal constitution's Fourteenth Amendment.

8. Defendants' policies, protocol, practices, customs and procedures violate Smith's rights to unhindered access to counsel, and to the courts, and to petition the government for redress of grievances and for other constitutional relief as may be necessary during his execution, in violation of the First, Sixth, Eighth, and Fourteenth Amendments, including Smith's rights protected by the Due Process Clause and the Privileges and Immunities Clause of § 1 of the Fourteenth Amendment.

9. Defendants have demonstrated a pattern of irrationally and arbitrarily deviating and/or varying from their informal and formal written policies, protocol, practices, customs and procedures, without any legitimate governmental interest. Combined with the nearly limitless discretion vested in certain actors in the execution process, this means that Smith's death sentence will be administered in a manner such that he will be arbitrarily and irrationally treated differently than similarly situated individuals, violating his rights as a class of one under the Fourteenth Amendment's Equal Protection Clause. Defendants' deviations and/or variations also burden the fundamental rights of the group of condemned inmates—which includes Smith—under the First, Sixth, Eighth, Ninth, and Fourteenth Amendments.

10. Defendants' September 18, 2011 written protocol codifies unequal treatment of similarly situated individuals, such as Smith, and it therefore facially violates his rights as a class of one under the Fourteenth Amendment's Equal Protection Clause. Defendants' written protocol also facially violates the Equal Protection Clause of the Fourteenth Amendment

because it burdens the fundamental rights of the group of condemned inmates—which includes Smith—under the First, Sixth, Eighth, Ninth, and Fourteenth Amendments.

11. Defendants have demonstrated that, by their administration of their written execution protocol and their overarching execution policy, they violate an inmate's unenumerated, fundamental rights arising from the principles of liberty and natural law, which rights are protected by the Ninth Amendment.

12. Defendants' written execution protocol and their overarching execution policy also impose impermissible content-based limitations, and violations of the public forum and limited public forum doctrines, all in violation of the First Amendment.

13. Unless enjoined, Defendants intend to violate Smith's constitutional rights by executing him using Defendants' execution policy.

14. The federal constitutional claims in this Complaint are cognizable under 42 U.S.C. § 1983. *Baze v. Rees*, 553 U.S. 35 (2008); *Hill v. McDonough*, 547 U.S. 573 (2006); *Nelson v. Campbell*, 541 U.S. 637 (2004).

15. Smith seeks, among other relief, preliminary and permanent prohibitive injunctions under federal law preventing Defendants from executing him by means of their execution policy, including the written execution protocol effective September 18, 2011, or any other execution policy, new or old, formal and/or informal which, as written and/or as administered, violates his federal constitutional rights in the same or similar manners as alleged herein.

16. Smith also seeks, among other relief, preliminary and permanent mandatory injunctions under federal law ordering Defendants to adopt, and adhere in their administration to, a facially constitutional written execution protocol in efforts to execute him.

5

17.     Smith also seeks, among other relief, preliminary and permanent prohibitive injunctions under federal law preventing Defendants from executing him by means of their execution policy, including the written execution protocol effective September 18, 2011, or any other execution policy, new or old, formal and/or informal that is facially unconstitutional.

18.     Smith also seeks, among other relief, preliminary and permanent prohibitive injunctions under federal law preventing Defendants from executing him by means of their written execution protocol to which they have failed to adhere in the same or similar manners as alleged herein.

19.     Smith also seeks, among other relief, preliminary and permanent prohibitive injunctions under federal law preventing Defendants from enforcing those provisions of their written execution protocol that violate Smith's First Amendment rights to free speech.

20.     Smith also seeks an Order declaring that Defendants' execution policy will subject him to a substantial risk of severe physical and psychological pain and suffering, and/or a torturous and lingering death that offends the dignity of man, resulting in cruel and unusual punishment, whether that method is through the policy's "Plan A" or "Plan B," and will thus violate Smith's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

21.     Smith also seeks an Order declaring that Defendants' substantial, documented and admitted pattern of deviations and/or variations from their written execution protocol and the safeguards contained therein, as applied in Defendants' overarching execution policy including their informal and formal policies, before, during and after administration of

the execution policy, creates an objectively intolerable risk of harm that violates Smith's rights under the Eighth and Fourteenth Amendments.

22. Smith also seeks an Order declaring that Defendants' execution policy violates his Fourteenth Amendment substantive and procedural due process-protected liberty, life, and property interests in expecting and receiving a quick and painless death, which interests are created under Ohio Revised Code § 2949.22 and protected as rights by the substantive and procedural elements of the Fourteenth Amendment's Due Process Clause.

23. Smith also seeks an Order declaring that a condemned inmate in Ohio has rights to access counsel throughout the entire execution process, including administration of the execution policy and the written execution protocol, and including the rights to access the courts and to seek redress of grievances from the courts, the Governor of Ohio or any other appropriate person of authority, under the First, Sixth, Eighth, Ninth and Fourteenth Amendments, including the Due Process Clause and/or the Privileges and Immunities Clause of the Fourteenth Amendment, and that Defendants' current execution policy violates these rights.

24. Smith also seeks an Order declaring that Defendants' substantial and demonstrated pattern of deviations and/or variations from their written execution protocol and their execution policy and the safeguards contained therein before, during and after administration of the policy, without any legitimate governmental interest, arbitrarily and irrationally treats or will treat him as a class of one differently than others similarly situated, in violation of his rights to equal protection under the Fourteenth Amendment to the United States Constitution.

25.     Smith also seeks an Order declaring that Defendants' substantial and demonstrated pattern of deviations and/or variations from their written execution protocol and their execution policy and the safeguards contained therein before, during and after administration of the policy substantially burden the fundamental rights of the class of persons of condemned inmates subject to a death sentence imposed in Ohio state courts—which includes Smith—under the First, Sixth, Eighth, Ninth and Fourteenth Amendments, in violation of his rights to equal protection under the Fourteenth Amendment to the United States Constitution.

26.     Smith also seeks an Order declaring that Defendants' written execution protocol facially violates Smith's rights as a class of one protected by the Fourteenth Amendment's Equal Protection Clause because it allows Defendants to treat similarly situated individuals differently, without any legitimate governmental interest, irrationally and arbitrarily.

27.     Smith also seeks an Order declaring that Defendants' written execution protocol facially violates Smith's rights protected by the Fourteenth Amendment's Equal Protection Clause because it allows Defendants to treat similarly situated individuals differently, such disparate treatment burdens the fundamental rights of the class of persons of condemned inmates subject to a death sentence imposed in Ohio state courts—which includes Smith—under the First, Sixth, Eighth, Ninth and Fourteenth Amendments, and it is not necessary to achieve a compelling state interest.

28.     Smith also seeks an Order declaring that he and other condemned inmates have fundamental, unenumerated rights that arise under the principles of liberty and natural law, which rights are protected by the Ninth Amendment to the United States Constitution, and that Defendants' administration of their execution policy, including

their written execution protocol, violates those fundamental rights in violation of the Ninth Amendment.

29. Smith also seeks an Order declaring that those portions of Defendants' written execution protocol that provide discretion to governmental actors to impose restrictions on the content and length of any last statement given before an execution attempt are, facially and as applied, impermissible content-based restrictions, and/or violations of the public forum and/or limited public forum doctrines, and therefore in violation of Smith's rights to free speech under the First Amendment.

30. Smith also seeks an Order declaring that the reasoning and analysis contained in the July 8, 2011 opinion issued by this Court temporarily and preliminarily enjoining Defendants from executing him applies equally to the benefit of Smith and any other individuals whom Defendants might otherwise attempt to execute.

31. Smith also seeks an Order declaring that the reasoning and analysis in any other prospective opinion issued by this Court temporarily and preliminarily enjoining Defendants from executing him or any other inmate applies to preclude Defendants from attempting any further executions until such time as the Court orders otherwise.

32. Smith also seeks, among other relief, preliminary and permanent prohibitive injunctions under federal law preventing Defendants from attempting to conduct any further executions until such time as the Court orders otherwise.

## II.     JURISDICTION AND VENUE

33. This action arises under 42 U.S.C. § 1983 for violations of the First, Sixth, Eighth, Ninth, and Fourteenth Amendments of the United States Constitution.  This Court has subject

9

matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights violations and equitable relief under an act of Congress), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (preliminary and permanent injunctive relief).

34. This Court has personal jurisdiction over Defendants as they are residents of the State of Ohio, and are presently located in the State of Ohio, and are elected or appointed officials of the State of Ohio or otherwise acting on behalf of the State of Ohio.

35. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

### III.    PARTIES

**A.    Plaintiff**

36. **Plaintiff Kenneth W. Smith** is a United States citizen and a resident of the State of Ohio.

37. Smith is currently a death-sentenced inmate in the custody of Defendants.

38. Smith is under the control and supervision of the State of Ohio Department of Rehabilitation and Correction ("DRC"), who have him incarcerated at the Franklin Medical Center, P.O. Box 23658, Columbus, Ohio, under Inmate # 326-630.

39. Plaintiff Smith does not have a scheduled execution date, and this Court has enjoined any attempt to execute Smith until further order from the Court.

40. If Plaintiff Smith's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

41. If Defendants attempt to execute him, Smith intends to make a last statement before any such attempted execution.

42.     Upon information and belief, it is the intention of Defendants, acting in concert with

        other state officials not named as defendants herein, to use their lethal injection execution

        policy described herein to execute Smith in the death house located on the grounds of the

        Southern Ohio Correctional Facility ("SOCF") in Lucasville, Ohio, which is operated and

        controlled by the Defendants.

### B.     Defendants

43.     **Defendant John Kasich** is the Governor of the State of Ohio and has been since on or

        about January 10, 2011.  He is the final executive authority in the state, statutorily and

        constitutionally responsible for the execution of all death sentences in Ohio and the

        manner in which those sentences are executed.  He is sued here in his official capacity for

        the purpose of obtaining declaratory and injunctive relief.

44.     **Defendant Gary C. Mohr** is the Director of DRC, a department of the State of Ohio that

        was created and is maintained pursuant to Ohio Revised Code § 5120.  Defendant Mohr

        is charged with and authorized under Ohio Revised Code § 5120.01 to prescribe and

        direct the promulgation of rules and regulations for the DRC, including the rules and

        regulations for the conduct of prison operations and execution procedures.  He is sued

        here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

45.     **Defendant Donald Morgan** is Warden of the Southern Ohio Correctional Facility

        ("SOCF"), a correctional institution of the DRC that was created and is maintained

        pursuant to Ohio Revised Code § 5120.05.  SOCF is the prison where Ohio carries out its

        death sentences.  Pursuant to Ohio Revised Code § 5120.38, Defendant Morgan, as the

        Warden of SOCF, is charged with management of SOCF and the oversight and conduct

of operations at SOCF, including executions carried out there. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

46. **The unnamed and anonymous execution team members** are individuals involved with administering Defendants' execution policy at SOCF. They are sued in their official capacities for the purpose of obtaining declaratory and injunctive relief.

47. Defendants, and each of them at all times relevant hereto, are acting in their respective official capacities with respect to all acts described herein, and are, in each instance, acting under the color and authority of state law.

48. Upon information and belief, unless preliminarily and permanently enjoined, the Defendants, and each of them, intend to act in their respective official capacities and under the authority of state law to execute Smith.

## IV.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

49. Pursuant to the Joint Stipulation filed on August 25, 2011, (Doc. No. 971), Defendants have affirmatively and explicitly waived any exhaustion defenses.

## V.     FACTS COMMON TO ALL CLAIMS AND RELIEF SOUGHT

50. Smith incorporates by reference each and every statement and allegation set forth throughout this Seventh Amended Complaint as if fully rewritten.

51. Defendants formally adopted a written lethal injection protocol with an effective date of November 30, 2009 and designated DRC Policy 01-COM-11, in which they adopted a new execution method.

Case 2:04-cv-01156-GLF-MRA Doc #: 1003 Filed: 09/28/11 Page: 19 of 105 PAGEID #: 27319

52.   That written protocol was superseded by the written protocol designated DRC Policy 01-COM-11 with an effective date of November 15, 2010.

53.   On February 7, 2011, Defendants gave formal notice that they intended to supersede the November 15, 2010 written protocol with another superseding version of DRC Policy 01-COM-11.

54.   That version of the written execution protocol was also designated DRC Policy 01-COM-11, and Defendants assigned it an "Effective Date" of March 9, 2011.  (Doc. No. 893.)

55.   On March 22, 2011, Defendants gave formal notice that they were again intending to supersede their then-effective written protocol with another new execution policy.

56.   This version of the written protocol was also designated DRC Policy 01-COM-11, and Defendants assigned it an "Effective Date" of April 11, 2011.  (Doc. No. 903-1.)

57.   On or about August 18, 2011, Defendants gave notice that they intended to supersede the April 11, 2011 written protocol with another superseding version of DRC Policy 01-COM-11, and the superseding protocol is identified with an "Effective Date" of September 18, 2011.  (Attached as Exhibit 1.)

58.   Upon information and belief, Defendants will employ an overarching execution policy that encompasses their informal execution policies, as well as the written execution protocol designated DRC Policy 01-COM-11 that is operable at the time, to execute Smith.

59.   Defendants' overarching execution policy includes admissions and representations Defendants or their predecessors have made in response to discovery requests propounded during the course of the instant litigation.

60. Defendants' overarching execution policy also includes representations they have made in various pleadings, motions and proceedings throughout the course of the instant litigation, including testimony presented in hearings before the Court.

61. Defendants had previously testified under oath that the written protocol's provisions are binding, administrative law.

62. Defendants recently testified under oath that their written protocol is actually considered more akin to discretionary "guidelines" rather than binding, mandatory law.

63. Defendants also recently testified under oath that the written protocol's provisions give them discretion to deviate from the written protocol as they deem necessary to complete an execution.

64. The September 18, 2011 written protocol explicitly allows Defendants to *deviate* from the written protocol if any member of the execution team determines for any reason that it is difficult, impractical or impossible to strictly follow the procedures in the written protocol.

65. The September 18, 2011 written protocol explicitly allows Defendants to *vary* from the written protocol if any situation arises that would make following the execution policy difficult, impractical or impossible.

66. The written protocol requires that any *deviations* from the protocol must be authorized by the Director of DRC.

67. The protocol is silent on whether the Director's authorization must be obtained before any deviation may occur.

68. The written protocol requires that any *variations* "of a substantial nature" must be approved by the Director of DRC.

69.     The protocol is silent on whether the Director's approval must be obtained before any variation may occur.

70.     The protocol is also silent on what constitutes a "substantial" variation.

71.     The written protocol is also silent on which actor or actors are vested with the discretion to determine whether a potential variation is "substantial" or something else.

72.     On or about August 17, 2010, and/or in a sworn affidavit signed by the Director of DRC on or about August 20, 2010, Defendants made several commitments which they represented are part of their "informal" execution policy.  (*See* Doc. No. 817; *see also* Doc. No. 817-1, PageID 17564-65.)  Several of these commitments were sworn and filed in the above-captioned cases.

73.     Among Defendants' informal execution policies are the following:

> ➤  Defendants will not commence any execution unless they have, on hand in the Death House at SOCF, at least 10 grams—*i.e.*, a full 5-gram dose and a full 5-gram back-up dose—of the lethal execution drug under the Plan A execution method.[3]

> ➤  If Defendants do not have 10 grams of the Plan A drug on hand in the Death House, Defendants will not commence an execution using the Plan B method.

> ➤  Defendants will not start an execution using Plan B; they will only use Plan B if Plan A is attempted and then abandoned.

> ➤  Defendants will not transfer a condemned inmate scheduled for execution to SOCF unless Defendants have 10 grams of the Plan A drug at SOCF.

> ➤  Defendants will not use imported execution drugs.

---

[3] These policies contemplated sodium thiopental as the Plan A drug, which Defendants used in the execution of Frank Spisak on February 17, 2011.  In the DRC Policy 01-COM-11 effective March 9, 2011, 5 grams of pentobarbital replaced the 5 grams of sodium thiopental. The September 18, 2011 written protocol maintains pentobarbital as the lethal drug under Plan A.

➢ Defendants will not use any execution drug that is expired at the time of the scheduled execution, according to the expiration date stamped on the original manufacturer's packaging.

➢ Defendants will use only execution drugs that are pure, unadulterated, unexpired, not compounded, and in the sealed, original manufacturer's packaging.

74.   Also among Defendants' informal execution policies are the following provisions

concerning Defendants' possession of a sufficient quantity of the Plan A execution drug.

Notably, these provisions are related, but they are discrete provisions with

different requirements:

➢ A "notice" provision stating that Defendants "will provide notice to a condemned inmate's counsel and plaintiffs' counsel (if different) within a reasonable time period (no less than 5 days) before an execution if [DRC] does not have in its possession at least 10 grams of thiopental sodium at that time," (Doc. No. 817-1, PageID 17564-65); and

➢ A "reprieve" provision stating that "[c]oncurrent with such notice to counsel, [Defendants] will also immediately seek a reprieve from the Governor related to that condemned inmate's execution," (*id.* at PageID 17565).

75.   Also among Defendants' informal execution policies are the following provisions related

to any intent or action by Defendants to change their written execution protocol.

Notably, these provisions are related, but they are discrete provisions with

different requirements:

➢ A "notice" provision stating that Defendants "will provide notice to the Court, to a condemned inmate's counsel and to plaintiffs' counsel (if different) within a reasonable time period (no less than 30 days) before an execution if [DRC] intends to change the written execution policy, ODRC Policy 01-COM-11," (Doc. No. 817-1, PageID 17565), and;

➢ A "reprieve" provision stating that "[c]oncurrent with such notice to counsel, [Defendants] will seek a reprieve from the Governor related to that condemned inmate's execution, *provided that* the execution is scheduled to take place less than thirty days *from the effective date* of the change in policy," (*id.* (emphases added)).

76. Defendants executed Johnnie Baston on March 10, 2011, under the provisions of a written execution protocol Defendants marked as having an effective date of March 9, 2011.

77. Defendants failed to seek a reprieve for Baston, notwithstanding the fact that his scheduled execution date was one day after the effective date of a newly adopted written execution protocol.

78. Defendants executed Clarence Carter on April 12, 2011, under the provisions of a written execution protocol Defendants marked as having an effective date of April 11, 2011.

79. Defendants failed to seek a reprieve for Carter, notwithstanding the fact that his scheduled execution date was one day after the effective date of a newly adopted written execution protocol.

80. Federal and/or state drug control laws strictly govern possession, transportation, transfer, use, dispensing, and other such aspects related to controlled substances which are listed on "schedules" under federal statutes and regulations.

81. The Controlled Substances Act creates a comprehensive, closed regulatory regime criminalizing the unauthorized manufacture, distribution, dispensing, and possession of substances.

82. The Controlled Substances Act allows prescription of drugs only if they have a currently accepted medical use," 21 U.S.C. § 812(b).

83. The Controlled Substances Act also requires a "medical purpose" for dispensing the least controlled substances of those on the schedules.  § 829(c).

84. The Controlled Substances Act, in its reporting provision, defines a "valid prescription" as one "issued for a legitimate medical purpose."  § 830(b)(3)(A)(ii).

17

85. Under the Controlled Substances Act, physicians are considered to be acting as practitioners under the statute if they dispense controlled substances "in the course of professional practice." § 802(21).

86. The enforcement provision of the Controlled Substances Act states that "[e]xcept as authorized . . . it shall be unlawful for any person knowingly or intentionally . . . to . . . distribute or dispense . . . a controlled substance." 21 U.S.C. § 841(a).

87. Schedule II substances are generally available only pursuant to a written, nonrefillable prescription by a physician. *See* 21 U.S.C. § 829(a).

88. The Supreme Court of the United States has held that, under the Controlled Substances Act, dispensing controlled substances without a valid prescription is a federal crime. *See Gonzales v. Oregon*, 546 U.S. 243, 250-57 (2006).

89. Pentobarbital is a Schedule II-N drug under the federal Controlled Substances Act, its implementing regulations and analogous or related federal and/or state laws such as the federal Food, Drug and Cosmetic Act.

90. Hydromorphone is a Schedule II drug under the federal Controlled Substances Act, its implementing regulations and analogous or related federal and/or state laws such as the federal Food, Drug and Cosmetic Act.

91. Midazolam is a Schedule IV-N drug under the federal Controlled Substances Act, its implementing regulations and analogous or related federal and/or state laws such as the federal Food, Drug and Cosmetic Act.

92. While it is generally a crime to dispense pentobarbital or hydromorphone, an exemption is made for duly licensed and registered physicians and other entities that may lawfully prescribe controlled substances. 21 U.S.C. § 829.

93.     The Attorney General of the United States has passed a regulation pursuant to the
        Controlled Substances Act requiring that every prescription for a controlled substance be
        issued for a legitimate medical purpose by an individual practitioner acting in the usual
        course of his professional practice.  *See* 21 CFR § 1306.04(a).

94.     Defendants, or others acting on Defendants' behalf, do not obtain or dispense the lethal
        execution drugs pursuant to a valid prescription.

95.     No physician participates in Defendants' execution protocol as a distributor or dispenser.

96.     Defendants' current written execution protocol contains two methods by which
        Defendants may administer a lethal injection execution: "Plan A" and "Plan B."

97.     Under Defendants' overarching execution policy and their written execution protocol,
        and regardless of whether Plan A or Plan B is used to inject the lethal drugs, a
        condemned inmate will be forced to lie down flat on his or her back for periods of time.

98.     Upon entering the execution chamber, a condemned inmate will be strapped to the
        execution bed flat on his or her back, unable to move, with arms outstretched at
        each side.

99.     Defendants will immobilize the condemned inmate by strapping him or her to the
        execution bed before the execution team begins attempted insertion of the peripheral IV
        catheters.

100.    Successfully achieving peripheral IV access has taken in the past, and, upon information
        and belief, will take in the future, at least several minutes and may take half an hour
        or more.

101. Defendants ensure that a condemned inmate lies flat on his or her back by employing "security team" members surrounding the inmate during efforts to establish IV access, and by strapping the inmate to the execution bed.

102. These security team and/or strap-down team members will physically ensure that an inmate remains flat on his back in a horizontal position throughout these procedures.

103. Smith no longer has a voicebox following a complete laryngectomy.

104. In order to speak, Smith must bring his hand to his throat to cover the stoma in the base of his neck.

105. Smith will be unable to speak at all following his entrance into the death chamber, because Defendants will restrain his arms and hands at all times after he enters the death chamber.

106. Thus, Defendants' policy will absolutely preclude Smith from communicating to counsel during the execution process.

107. Even if Defendants allow Smith free movement of his arms such that he could cover the stoma and be able to vocalize, he can only speak with the assistance of the TEP prosthetic device, and he cannot speak loudly enough to be heard through the wall and glass window without amplification.

108. And if Smith tries to speak while lying flat on his back horizontally, he will experience problems with the TEP, including dislocation/dislodging of the device, which will absolutely render him mute.

109. Thus, Defendants' policy will preclude Smith from communicating to counsel during the execution process in this way as well.

20

110.    If Smith is subjected to Defendants' execution policy and written execution protocol, he will experience sensations of drowning, suffocation, asphyxiation, choking and violent coughing due to his medical conditions.

111.    Executions are scheduled for 10:00 a.m., although Defendants may start later.

112.    Defendants' execution policy and written execution protocol will deny a condemned inmate access to counsel, and hence deny access through counsel to the courts, after 8:45 a.m. on the morning of a scheduled execution.

113.    Counsel for the condemned inmate is only permitted to witness some stages of the execution process if the inmate designates counsel as one of his three allotted witnesses.

114.    Observation of events in the death chamber is severely hindered by Defendants' closing the curtain to cover the observation window during attempts to establish IV access.

115.    During this time, counsel has only the view provided by a single fish-eye camera mounted in the ceiling directly above the execution bed and displayed on a flat-panel television monitor mounted on the wall in the witnesses' room.

116.    This view is obstructed by the bodies and heads of the execution team members surrounding and working on the inmate, and there is no audio signal that accompanies the picture feed on the television.

117.    The inmate is not able to access a microphone to communicate with counsel on the other side of the wall, requiring that the inmate speak very loudly for counsel to hear the inmate's attempts to communicate.

118.    Should counsel be alerted to a problem after the inmate enters the execution chamber, counsel must leave the witness room—breaking visual contact with events in the death

chamber, even if the curtain is open at that point—to use the wall-mounted telephone in the hallway.

119. Counsel will only be allowed to use that telephone to call co-counsel in another building on the grounds of SOCF, where co-counsel may have access to a telephone, laptop computer or other communication device, although no wireless internet signal is available.

120. Thus there will be a substantial lapse of time from when counsel observes a problem with the execution, attempts to consult with his or her client, contacts co-counsel in a different building, and then that co-counsel can communicate with the outside world.

121. This lengthy period of time is critical in the event that problems arise in the execution process and counsel must attempt to notify the courts or other governmental figures in order to halt the proceedings.

122. Thus, if an execution goes awry, a condemned inmate is denied either his access to his counsel or his right to access the courts and/or his right to petition the applicable authorities to seek redress of his grievances.

123. Should counsel need to access the federal or state courts or others such as the Governor of Ohio, counsel will be forced to leave the presence of the condemned inmate, thus denying the inmate's ability to consult and confer with his counsel at a critical juncture.

124. Smith must cover the stoma in the base of his neck in order to speak, but under Defendants' written protocol, his arms and hands will be restrained following his entry into the execution chamber.

125. Smith also cannot speak in a volume sufficient to be heard through the wall of the execution chamber

126.    In 2002, the Ohio Legislature changed the State's manner of execution from electrocution to lethal injection.

127.    At all times from 1994 to present, Ohio's statute governing lethal injection mandated that Defendants conduct a lethal injection execution such that it produces a "quick and painless" death.

128.    The factual basis, for statute of limitations purposes, for a number of the claims in this suit arose no earlier than on or about August 18, 2011 when Defendants emailed a copy of their new lethal injection protocol to counsel in these consolidated cases.[4]

129.    In the alternative and in accordance with the Sixth Circuit's controlling caselaw, the factual basis for this suit, for statute of limitations purposes, arose on September 18, 2011, when Defendants' new policy became effective.  *See Cooey v. Strickland*, 479 F.3d 412, 422, 424 (6th Cir. 2007) ("*Cooey II*") (holding that the statute-of-limitations period for these claims can be reset when the lethal injection policy changes in a way that relates to the "core complaints"); *Cooey (Beuke) v. Strickland*, 604 F.3d 939, 942 (6th Cir. 2010) (explaining that "[g]iven the change in policy, the statute of limitations to challenge the new procedure began to run anew").

130.    Defendants have previously conceded, during proceedings in this litigation on or about December 9, 2009, that a change in execution drugs is sufficient to restart a new statute of limitations period under *Cooey II*.

---

[4] As of the date of filing of this Complaint, Defendants had not yet officially filed the September 18, 2011 written protocol on the docket for these cases.

131. Upon information and belief, TM # 17 has a serious medical condition which can affect his job performance as one of the two Drug Administrators under the written protocol in such a way that it increases the risk of a violation of Smith's constitutional rights.

132. The same serious medical condition can affect TM # 17's ability to satisfy all training and execution rehearsal requirements under the written protocol.

A.      **Plan A of Defendants' written execution protocol**

133. Plan A in Defendants' written execution protocol effective September 18, 2011 requires a single 5-gram dose of pentobarbital, administered via peripheral IV injection, with a back-up 5-gram dose of pentobarbital on hand in the equipment room for use if necessary.

134. Defendants changed the Plan A drug from sodium thiopental to pentobarbital because they are no longer able to obtain domestically produced, unexpired, unadulterated, uncompounded sodium thiopental.

135. Upon information and belief, injection of five grams of pentobarbital via peripheral IV will not cause the condemned inmate to lose consciousness for a period of minutes following the commencement of the injection.

136. Upon information and belief, injection of five grams of pentobarbital via peripheral IV will cause a condemned inmate to experience substantial pain while still conscious.

137. On June 16, 2011, the State of Alabama executed Eddie Powell using pentobarbital as the first of three lethal drugs.

138. Following the administration of pentobarbital, Powell "raised his head and neck off the gurney. Seemingly confused and startled, he jerked his head to one side and began breathing heavily, his chest rose and contracted." Matthew Busch, *Powell Says He's*

24

*Sorry Before Death by Lethal Injection at Alabama's Holman Prison*, THE

BIRMINGHAM NEWS (June 16, 2011) (Attached as Exhibit 2.)  It took over 20 minutes

for Mr. Powell to die.  *Id.*

139.   One of Powell's attorneys, Christine Freeman, witnessed the execution.  Freeman

recalled that shortly after the chaplain stopped praying, "Mr. Powell violently jerked his

head up off of the gurney.  His eyes were wide open and looked glazed and confused.  He

seemed to be looking and he turned his head from side to side. His jaw muscles seemed

to clench.  He appeared to be in pain.  He lay his head back down, but his eyes still

appeared to be slightly open.  Because we were seated in an observation room on Mr.

Powell's side, it was difficult to tell how long this lasted, but his eyes appeared to remain

open in this position for quite a while.  The entire process lasted about 25 minutes and his

eyes remained open in this fashion until towards the end."  (Affidavit of Christine

Freeman, (July 14, 2011) ("Freeman Affidavit") at ¶ 12.)  (Attached as Exhibit 3.)

140.   Another of Powell's attorneys, Matt Schulz, stated in an affidavit that Powell "also

appeared to be clenching his teeth, and his blood appeared to be pumping quite strongly.

I could see his [left neck] artery expanding and contracting, and blood apparently

pumping into his face.")  (Affidavit of Matt D. Schulz (July 14, 2011) ("Schulz

Affidavit") at ¶ 3.)  (Attached as Exhibit 4.)  Schulz recalled that after the guard ran his

finger over Powell's eyelash to assess his consciousness, Powell's eyes were "slightly

open again, perhaps 20% of being fully open . . . They remained slightly open for at least

a few minutes."  *Id.*

141.   On June 23, 2011, the State of Georgia executed Roy Blankenship using pentobarbital as

the first of three lethal drugs.

142. Media coverage reported that according to witnesses, once the pentobarbital was administered, Blankenship "grimaced, jerked, lunged from side-to-side, gasped and appeared to yell out . . . ."  Rhonda Cook, *Attorney Asks Chief Justice, DOC to Investigate Execution Problems*, ATLANTA JOURNAL-CONSTITUTION (June 24, 2011)  (Attached as Exhibit 5.)

143. According to another witness account:

> Blankenship jerked his head several times, mumbled inaudibly and appeared to gasp for breath for several minutes… and that [a]s the injection began, Blankenship jerked his head toward his left arm and began rapidly blinking. He then lurched toward his right arm, lunging twice with his mouth wide open as if he were gasping for air. A minute later, he pushed his head forward while mouthing inaudible words. His eyes never closed. The movements stopped within three minutes, and he was declared dead 12 minutes later.

Greg Bluestein, *Ga. Execution is Fodder for Challenges to New Drug*, ASSOCIATED PRESS, June 28, 2011.  (Attached as Exhibit 6.)

144. Based on a review of these eyewitness accounts of the executions of Powell and Blankenship, Dr. Mark Heath has concluded that the reactions of these inmates were inconsistent with the statement of Dr. Mark Dershwitz that using pentobarbital in a lethal injection protocol will render an inmate unconscious quickly and cause the inmate's rapid and painless death.

145. The reactions demonstrated by Blankenship and Powell are also inconsistent with Dr. Dershwitz's previous pronouncements that an inmate would not experience any pain and suffering during the execution process.

146. In fact, following the executions of Powell and Blankenship, Dr. Dershwitz clarified that pentobarbital can sometimes cause pain even when properly injected.  *See* Bluestein (Attached as Exhibit 6.) ("Medical experts differ on whether the spasms indicate the

Case 2:04-cv-01156-GLF-MRA Doc #: 1003 Filed: 09/28/11 Page: 33 of 105 PAGEID #: 219

execution was improperly carried out. Dr. Mark Dershwitz, a University of Massachusetts anesthesiologist, said pentobarbital can sometimes cause pain and involuntary jerking movements even when it's properly injected.")

147. As of June 29, 2011, Defendants had in their possession approximately forty grams of pentobarbital for use in lethal injection executions, or the same amount of pentobarbital for use in executions was in the possession of those who supply the lethal injection execution drugs to Defendants.

148. Forty grams of pentobarbital is a sufficient quantity for Defendants to conduct no more than seven executions, because Defendants must have at least ten grams of the Plan A drug in their possession, on hand in the Death House, before they may commence an execution.

149. On or about July 12, 2011, Defendants or others acting on Defendants' behalf to obtain and provide lethal injection execution drugs, had obtained additional quantities of pentobarbital.

150. Lundbeck possess the only license to manufacture pentobarbital domestically in the United States.

151. As of July 1, 2011, Lundbeck instituted strict distribution controls on pentobarbital.

152. Upon information and belief, among the distribution controls Lundbeck has instituted are the requirement that recipients of pentobarbital must sign and verify that the pentobarbital is for therapeutic purposes only and will not be routed to those who carry out lethal injection executions.

153. These distribution controls make it impossible for Defendants to legitimately obtain any further supplies of pentobarbital.

154. Ohio has executed three inmates—Johnnie Baston, Clarence Carter and Daniel Bedford—using injection of pentobarbital under Plan A.

155. Since the retirement of Anonymous Execution Team Member ("TM") # 18, TM ## 9, 17, and 21 are the only individuals permitted under the written execution protocol to establish peripheral IV access on the inmate in an execution using Plan A.

156. Upon information and belief, TM ## 9, 17, and 21 are the only "Medical Team Members" as that term is defined in the September 18, 2011 written protocol and as it has been used informally in previous versions of the written protocol.

157. TM # 9 and TM # 17 have served on the medical team for several years.

158. Since the execution of John Fautenberry on July 14, 2009, the medical team personnel involved in establishing peripheral IV access has consisted of TM # 9, TM #17, and TM # 21, or some combination thereof.

159. During the execution of Kenneth Biros on December 8, 2009, approximately 30 minutes transpired from the initial attempt to the actual establishing of peripheral IV access under Plan A.

160. The team members responsible for establishing peripheral IV access under Plan A for Kenneth Biros's execution required approximately 9-10 needle sticks to establish and sustain a single IV site for him.

161. These same medical team members were unable to achieve and/or sustain access to Romell Broom's peripheral veins despite taking some two hours and multiple needle sticks in a failed effort to achieve access.

162. The Biros execution was the first execution Defendants conducted following the failed attempt to execute Broom.

163.    Additional executions since Broom and Biros have similarly demonstrated difficulty establishing peripheral IV access in the condemned inmate.

164.    Upon information and belief, TM # 9, TM # 17, and/or TM # 21 will be the individuals responsible for establishing peripheral IV site(s) in Smith.

165.    Upon information and belief, Smith's individual physical and psychological characteristics and conditions indicate that achieving peripheral IV access on him will present a situation analogous to previous efforts to achieve peripheral IV access on Romell Broom or on Kenneth Biros, or worse, resulting in severe, torturous pain that is objectively intolerable.

166.    Upon information and belief, Smith's individual physical and psychological characteristics and conditions indicate that employing Plan A to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable.

167.    Upon information and belief, Smith's individual physical and psychological characteristics and conditions mean there is a substantial risk that Smith will suffer from sensations of drowning, asphyxiation, suffocation, choking and violent coughing, and/or other breathing difficulties that create torturous physical and psychological pain and suffering, based on being forced to lie flat on his back horizontally during efforts to execute him, and that he will be conscious to experience these horrific sensations for several minutes or more if subjected to Plan A.

168.    This torturous physical and psychological pain and suffering will last throughout the time Smith is forced to lie horizontally, before he is rendered unconscious.

169. The evidence developed in Ohio and in other states, when compared to the testimony provided by Dr. Mark Dershwitz in Ohio and in other states, demonstrates that Dr. Dershwitz's testimony is inconsistent and unreliable, and that he has made faulty predictions, all of which undermine Dr. Dershwitz's credibility as an expert witness.

170. Further undermining Dr. Dershwitz's credibility is controversy surrounding his attempt to alter the minutes from two meetings with Tennessee officials where he discussed Tennessee's lethal injection protocol. Transcript of Testimony of Dr. Dershwitz, *Harbison* v. *Little*, No. 3:06-1206 (M.D. Tenn.), at 792-98, 807-09 (Attached as Exhibit 7.)

171. The original minutes reported that Dr. Dershwitz had provided a recommendation as to Tennessee's lethal injection protocol; however, American Medical Association guidelines "specifically prohibit[] physicians from acting as consultants for making recommendations or writing protocols . . . ." *Id*. at 795.

172. Accordingly, Dr. Dershwitz attempted to change the minutes to reflect that he did not provide a recommendation. *Id.*

173. According to Dr. Dershwitz, he altered the minutes because "did not want anyone to misconstrue [his] role in [the] discussions with the Tennessee committee." *Id.*

**B.**     **Plan B of Defendants' written execution protocol**

174. Plan B in Defendants written execution protocol provides for an intramuscular injection containing 10 mg of midazolam and 40 mg of hydromorphone.

175. Plan B has never been used in a human execution anywhere in the world.

176. Defendants have been reluctant to employ Plan B, even in the face of extended, repeated unsuccessful efforts to establish peripheral IV access.

177. Plan B will produce a slow transition to unconsciousness.

178. When drugs seep into the inmate's circulation from an intramuscular injection, the speed of onset of their effects is greatly reduced when compared with intravenous administration.

179. The transition from full consciousness to unconsciousness in Plan B will be slow, taking place over a time-frame of many minutes.

180. 40 mg of hydromorphone is not a dose of narcotic, anesthetic or barbiturate equivalent in function and effect to 5 grams of pentobarbital.

181. During the time it takes for the hydromorphone and midazolam to seep through the muscle tissue and into the circulatory system via the capillary vessels, the inmate will progress through increasingly severe impairments of his or her cognitive faculties.

182. The inmate may experience and display any of a broad suite of the manifestations of intoxication, including the following:

   ➢ Confusion
   ➢ Combativeness
   ➢ Disinhibited speech
   ➢ Delirium
   ➢ Anxiety
   ➢ Fear
   ➢ Euphoria
   ➢ Dysphoria
   ➢ Delusional ideation
   ➢ Hallucinations
   ➢ Sensory distortions
   ➢ Disorientation

183. Some inmates exposed to this Plan B will, through reasons beyond their control, produce a behavioral spectacle that is disturbing and offensive to the conscience of the witnesses, staff, citizenry, and courts.

31

184. Upon information and belief, an inmate exposed to Plan B will experience nausea and vomiting, which are recognized and documented side effects of opioid narcotics such as hydromorphone.

185. Thus, it is substantially likely that an inmate subjected to Plan B will suffer a spectacle, undignified execution as the inmate vomits violently during the process.

186. Opioids suppress the cough reflex by depressing cough centers in the medulla, the part of the brain that controls autonomic functions.

187. Thus, it is inevitable that a significant number of inmates who are subjected to Plan B will become nauseated and will vomit before they lose consciousness but after their cough reflex is depressed.

188. Among those inmates, it is an unacceptable if not inevitable risk that some of them, including Smith, will experience painful choking on their own vomit or other materials such as the contents of the inmate's stomach that have flowed back up his esophagus and into his airway.

189. Lacking a cough reflex, the inmate will inhale the vomitus.

190. When that vomitus contains particulate matter from a recent meal (*e.g.*, the breakfast served to the inmates on the morning of their 10:00 a.m. execution), it will cause death by asphyxiation.

191. When that vomitus does not contain particulate matter, it will cause extreme pain and suffering as the stomach acids come in contact with the upper airway passages.

192. Due to his unique physical characteristics, Smith is unable to generate the force necessary to successfully clear his airway through coughing. He must use his hands to clear his

airway of obstructions, including vomit. But his hands will be restrained extending out from his sides when the lethal drugs are administered.

193. These and other risks associated with the condemned inmate's ability to breath, and thus to not be tortured before unconsciousness sets in, are rendered all the more substantial and certain by the fact the inmate being executed using Plan B, like with Plan A, is immobilized in a supine position, thereby thwarting reflexive and instinctive self-preservation efforts, such as attempts to turn face down when vomiting.

194. The painful condition of biliary colic is a documented side effect of opioid narcotics such as hydromorphone.

195. Opioids cause contraction of the smooth muscle in the gall bladder and spasm of the sphincter of Oddi.

196. In some individuals this can precipitate biliary colic.

197. The pain caused by biliary colic is steady, starts rapidly and lasts at least 30 minutes and up to several hours. There may be radiation to the back and shoulders and other concomitant symptoms such as vomiting and diarrhea.

198. Thus, it is inevitable that a significant number of inmates who are subjected to Plan B will suffer the pain of biliary colic before they lose consciousness.

199. Upon information and belief, Plaintiff Smith's individual physical and psychological characteristics and conditions indicate that achieving peripheral IV access on him will present a situation analogous to previous difficulties achieving peripheral IV access on Romell Broom and/or Kenneth Biros in which Defendants struggled for extended periods of time to achieve peripheral IV access, or worse, resulting in a substantial risk that Defendants will need to resort to Plan B.

200. Upon information and belief, Smith's individual physical and psychological characteristics and conditions indicate that employing Plan B to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable.

201. Upon information and belief, Smith's individual physical and psychological characteristics and conditions mean there is a substantial risk that Plan B will not work on him as Defendants claim, resulting in a lingering death that is physically torturous and psychologically torturous.

202. Upon information and belief, Smith's individual physical and psychological characteristics and conditions mean there is a substantial risk that Smith will suffer from sensations of drowning, asphyxiation, suffocation, choking and violent coughing, and/or other breathing difficulties that create torturous physical and psychological pain and suffering, based on being forced to lie flat on his back horizontally during efforts to execute him, and that he will be conscious to experience these horrific sensations for several minutes or more if subjected to Plan B.

203. Upon information and belief, Smith's individual physical and psychological characteristics and conditions mean there is a substantial risk that he will endure biliary colic and/or aspirate his own vomitus, searing his upper airway tract with stomach acids and bile, and/or choking, drowning or asphyxiating on the vomit or experiencing horrific and terrifying sensations of the same, while suffering from a broad range of psychologically torturous symptoms such as dysphoria, fear, anxiety, and hallucinations.

204. Upon information and belief, Smith will be subjected to torturous physical and psychological pain and suffering which will last throughout the time Smith is forced to lie

34

horizontally in the death chamber, before he is rendered unconscious. This may be 15 minutes or more.

205. Upon information and belief, Plan B will subject Smith to a "spectacle execution" that is far from a dignified death that is in accord with the common decency of man.

206. Smith will also suffer serious physical and/or psychological pain and suffering and a lingering, slow death if Defendants first attempt to execute him via Plan A, then abandon Plan A after injecting some amount of pentobarbital, and implement Plan B.

### C.    **Problems with the written execution protocol**

207. The written execution protocol effective September 18, 2011 contains some additional text added since the April 11, 2011 written protocol, but those changes do not eliminate the constitutional problems with Defendants' execution policy including their administration of the written execution protocol.

208. The September 18, 2011 written protocol increases the likelihood that Defendants will not apply the written protocol consistently, because it dramatically enhances the amount of discretion afforded to several actors throughout the execution process.

209. The September 18, 2011 written protocol codifies unequal treatment of similarly situated individuals by, among other things, increasing the discretion allowed to various actors in the execution process.

210. The September 18, 2011 written protocol also codifies unequal treatment of similarly situated individuals by creating a distinction between deviations and variations from the written policy, with different standards and limits applicable to each type of non-compliance.

211. The September 18, 2011 written protocol expands the ways in which Defendants may act in non-compliance with the protocol.

212. The written protocol now prohibits four specific variations.

213. The written protocol contains no similarly prohibited deviations.

214. The September 18, 2011 written protocol allows non-compliance if following the written protocol would make it difficult to carry out an execution.

215. The September 18, 2011 written protocol allows non-compliance if following the written protocol would make it impractical to carry out an execution.

216. The September 18, 2011 written protocol allows non-compliance if following the written protocol would make it impossible to carry out an execution.

217. The written execution protocol provides that the DRC Director must approve any variations.

218. The written execution protocol does not require that the Director's approval must be obtained *before* a variation may occur.

219. The written execution protocol provides that the DRC Director must authorize any deviations.

220. The written protocol does not require that the Director's authorization must be obtained *before* a deviation may occur.

221. Defendants' written protocol now may provide that Defendants may start an execution with Plan B.

222. This contradicts Defendants' policy that they will not begin an execution or even move the condemned inmate to SOCF if they did not first have in their possession a full primary dose and a full back-up dose of the Plan A drug.

223.    Under Defendants' written protocol, an inmate's counsel must leave the scene of an execution gone awry to contact a second counsel in another building, who in turn must contact the courts and/or other government officials.

224.    An inmate such as Smith who is unable to speak loud enough to be heard through the wall of the execution chamber will be unable to access his counsel.

225.    And an inmate such as Smith who must use his hands to speak at all will be unable to access counsel, because his hands and arms will be strapped to the execution bed and/or restrained physically by members of the execution team.

226.    Defendants' execution policy continues to use untrained and insufficiently competent medical technicians to insert the IV catheters into the inmate's veins.

227.    Defendants have failed to adequately address the peripheral IV access issues encountered in Romell Broom's failed execution and in Kenneth Biros's execution, which implicated Defendants TM # 9, TM # 17 and TM # 21 as the team members who were unable to obtain and/or sustain viable IV access after numerous attempts over two hours in Broom, and who only obtained and sustained viable peripheral IV access after numerous attempts in Biros.

228.    Defendants' overarching execution policy, including their written execution protocol, lacks any restraint on the number of attempts at peripheral IV access or the length of time those pokes, sticks, and stabs to the inmate can persist under Plan A.

229.    Defendants have shown a willingness to engage in multiple, lengthy attempts at establishing and/or sustaining peripheral IV access.

230.    Defendants have explicitly stated that, based on their understanding of the written execution protocol, they may engage in efforts to complete an execution from the time

the Warden reads the death warrant up to midnight of the same day, when the death warrant expires.

231. Defendants' failure to have a time limit for attempting peripheral IV access continues to place the team members in an increasingly stressful situation, rendering the team members unable to constitutionally administer an execution.

232. The inmate's physical and mental suffering is not explicitly included in the written protocol's considerations for whether to halt further peripheral IV access attempts.

233. Defendants' execution policy, including the written protocol, fails to recognize that each inmate may present unique physical or psychological issues that may affect the efficacy of a particular execution method, whether Plan A or Plan B.

234. Defendants have failed to prepare, train, or adjust the drug dosages to account for the unique issues Smith or other condemned inmates may present.

235. Defendants' execution policy fails to require a physician to personally supervise and/or monitor the preparation, administration and/or disposal of the lethal drug(s).

236. Other states require the use of physicians during the execution process.

237. Defendants, during the previous botched attempt to execute Romell Broom, used a physician to participate in their unsuccessful efforts.

238. That physician was untrained in the Ohio execution policy, but Defendants summoned her to the Death House and involved her participation nevertheless contrary to the written protocol's provisions.

239. The physician who participated in the previous attempt to execute Broom, Dr. Carmelita Bautista, is licensed to practice medicine in Ohio, and she was working as a contract employee for Defendants at SOCF at the time.

240. Dr. Bautista had never participated in any execution team training that is required by Defendants' written protocol for execution team members.

241. Upon information and belief, Dr. Bautista has not suffered any professional disciplinary action or complaints, nor has she suffered any threat to her Ohio licensure as a result of her participation in the previous attempt to execute Broom.

242. Defendants have had physicians volunteer to assist in the execution process.

243. Defendants' September 18, 2011 written protocol provides for an "Auxiliary Team Member" in the form of a physician.

244. Defendants have not identified any individual who will carry out the role of the "Auxiliary Team Member."

245. Defendants' written protocol sets improperly low criteria for the professional experience for the medical team members responsible for starting IV lines, mixing drugs, and injecting drugs.

246. Under the terms of Ohio's written protocol, the personnel attempting to administer the policy may not have had any hands-on experience for many years, and may in fact not have the currency of practice necessary to maintain the manual skills and dexterity that are necessary to place peripheral IV lines.

247. Defendants' written protocol places improper reliance on licensure over actual competence and current/recent clinical experience.

248. Upon information and belief, the controlling statutes and regulations do not allow, or expressly prohibit, the current Medical Team Members and Drug Administrators, as those terms are defined in the September 18, 2011 written protocol, from administering any of the drugs involved in the execution policy.

249. Defendants were recklessly ignorant of this fact before, they were put on notice of this critical problem in general and as to the Plan B drugs before November 30, 2009, and yet the written protocol and the actors involved remain the same under the current execution policy.

250. Defendants' written protocol does not describe what the execution team should do if the pentobarbital injection in Plan A infiltrates.

251. The written protocol lacks instructions for detecting and correcting IV infiltration.

252. According to former DRC Director Terry Collins's affidavit, if the prisoner does not exhibit unconsciousness and lack of respiration, additional drugs under Plan A may be administered.

253. If the first dose of the Plan A drug failed to take effect because it infiltrated, however, administration of an additional dose would result in the further infiltration and accumulation of the Plan A drug in the tissue surrounding the vein.

254. This in turn would result in significant or agonizing pain to the prisoner.

255. Defendants have also shown a willingness to frequently, arbitrarily and irrationally deviate and/or vary their procedures from the written execution protocol during administration of the execution policy.

256. This willingness to deviate and/or vary from the written protocol has remained consistent regardless of the version of the written protocol that was or is in force.

257. Defendants' written protocol mandates that execution team members must receive specific training before they commence service on the execution team, and at least once a year.

258. This safeguard is a nullity, however; the written protocol and Defendants' execution policy lacks any enforcement mechanism or consequence for not having undergone this training.

259. Defendants' written protocol requires rehearsal training in advance of a particular execution for all execution team members who will participate in that execution.

260. This requirement is similarly a nullity; the written protocol and the overarching execution policy lacks any enforcement mechanism or consequence for missing one or any number of rehearsals in advance of a particular execution.

261. Various team members have failed to participate in the mandatory execution team training and/or execution rehearsals required by the written protocol, but those team members have still participated in subsequent executions.

262. Defendants have conducted multiple executions without the presence of personnel explicitly required by the written execution protocol.

263. Defendants' overarching execution policy provides essentially unfettered discretion to the team members and the supervisory personnel, contrary to the written execution protocol's purportedly mandatory provisions.

264. To the extent that the written protocol effective September 18, 2011 purports to prohibit deviations from the protocol, any such mandate is nullified by express provisions allowing deviations from the protocol.

265. To the extent that the written protocol effective September 18, 2011 purports to prohibit variations from the protocol, any such mandate is nullified by express provisions allowing variations from the protocol.

266. The September 18, 2011 written protocol codifies Defendants' approach revealed in the June 29, 2011 injunctive relief hearing in these cases, namely that they claim the ability to apply vast portions of the written protocol differently from execution to execution, because to consistently follow the written protocol will be difficult or impractical.

267. The September 18, 2011 written protocol also increases the amount of discretion granted to decision-makers, thereby virtually guaranteeing that Smith and other similarly situated inmates will be treated differently, based on arbitrary reasons.

268. The written protocol contains no consequence for any deviation or variance from the protocol's requirements.

269. Evidence from past administration of the written protocol demonstrates that Defendants do not view the written protocol, in any of its iterations, as imposing any functional limitation on their exercise of discretion.

270. The "medical" team members—namely TM # 9, TM # 17 and TM # 21—are still not undergoing all of the training and rehearsals required by the written protocol, and/or are not required to have used their IV-setting skills regularly.

271. Members of the execution team other than TM # 9, TM # 17 and TM # 21 are still not undergoing all of the training and rehearsals required by the written protocol.

272. TM # 9 is a phlebotomist employed by DRC who draws blood as part of her daily work.

273. TM # 9 does not set IV catheters as a part of her daily work.

274. TM # 9 is not authorized under Ohio law to administer medications via IV injection.

275. TM # 9 is not authorized under Ohio law to administer medications via IM injection.

276. TM # 9 is not authorized under Ohio law to prepare drugs for intravenous or intramuscular injection.

277. Drawing blood through a simple hollow needle is critically different from setting an IV with a needle housed in a catheter that must be set much more precisely within a vein so that the pressure of fluid infused—not simply blood flowing out under its own pressure—does not rupture the vein or dislodge the catheter.

278. TM # 17 is a full-time corrections officer employed by DRC.

279. TM # 17 does not set IV catheters as part of his regular scope of employment with DRC.

280. TM # 17 does not use his EMT-Intermediate training as part of his regular scope of employment with DRC.

281. The only exposure TM # 17 has to setting IVs, outside of his work as an execution team member, comes from his part-time work as a volunteer EMT-Intermediate.

282. TM # 17 is not authorized under Ohio law to inject via IV injection a Schedule II drug such as pentobarbital.

283. TM # 17 is not authorized under Ohio law to inject via IM injection a Schedule II drug such as hydromorphone.

284. TM # 21 is a full-time employee of DRC.

285. TM # 21 was formerly a corrections officer employed by DRC.

286. TM # 21 is currently employed as a Training Officer.

287. TM # 21 does not set IV catheters as part of his regular scope of employment with DRC.

288. TM # 21 is a licensed EMT-Paramedic or EMT-Instructor.

289. TM # 21 does not use his EMT-Paramedic or EMT-Instructor training as part of his regular scope of employment with DRC.

290. TM # 21's employment with DRC, outside of his work as an execution team member, does not require him to set IV catheters or use his EMT training on a daily or even regular basis.

291. By his own admission, TM # 21 has not worked as an EMT for several years.

292. Aside from his participation as a medical team member during executions since July 14, 2009, TM # 21 has not regularly set or administered IVs in live patients since approximately 2004.

293. TM # 21 testified in a deposition in 2009 in this case that he had not set an IV or administered drugs intravenously in any live patients for at least the previous year.

294. TM # 21 is not authorized under Ohio law to inject via IV injection a Schedule II drug such as pentobarbital.

295. TM # 21 is not authorized under Ohio law to inject via IM injection a Schedule II drug such as hydromorphone.

296. Defendants fail to ensure that each execution team member signs his or her name to verify that the team member has physically received a copy of the written execution protocol, as required by the written protocol.

297. Defendants fail to ensure that all execution team members have read the written protocol document or understand its contents.

298. Defendants fail to ensure that all execution team members fully understand the entire lethal injection execution policy, including the provisions of the written execution protocol.

299. There are no written examinations or assessments on the contents of the written protocol before a new team member joins the execution team.

300. Nor are there are such written examinations or assessments at any time of any active execution team member after a member joins the team.

301. Defendants' written protocol contains a critical safeguard whereby Defendants are to change the injection site in Plan A if problems are detected.

302. The current written protocol only requires Defendants to establish a single IV site.

303. This change renders the purported safeguard null and void by making an on-the-spot change in injection sites impossible or impracticable.

304. If the first peripheral IV site fails, the inmate will be forced to lie supine, strapped to the execution bed and in a state other than unconsciousness and struggling to breath, from the time when the failure of the single IV line occurs to the time a new injection is possible.

305. This includes the time for Defendants to deliberate about what to do, the time to establish a new peripheral IV injection site, and the time to prepare additional syringes of the Plan A drugs.

306. Defendants' written protocol is inherently contradictory in that it gives the Drug Administrator who is administering the execution drugs the sole, unfettered discretion to determine whether it is necessary to use another IV site. But the protocol also leaves no discretion to determine whether it is necessary to use another IV site, because the Drug Administrator must switch sites if any problem is detected.

307. The written protocol also requires approval of any "variations of a substantial nature," without any guidance on what rises to the level of "substantial."

308. The written protocol allows variations generally if a situation arises that would make following the written protocol "difficult, impractical, or impossible."

309. The written protocol also allows variations generally if any execution team member believes for any reason it is difficult, impractical, or impossible to strictly follow the written protocol.

310. The written protocol does not require Defendants or their agents to document variations from the protocol.

311. The written protocol also mandates that Defendants or their agents must document any deviation "as soon as possible," but the protocol leaves the task of documenting any deviation unassigned.

312. Thus, while the written execution protocol prohibits certain variations, it does not prohibit deviations related to the same subject matters and would presumably allow such deviations provided the DRC Director gave his approval or authorization before or even after the fact, and the deviations were documented at some point in time when some undetermined person decides that completing the documentation is "possible."

313. The September 18, 2011 written protocol dramatically decreases any functional oversight related to Defendants' acquisition, transportation, possession, distribution, and dispensing of the lethal execution drugs.

314. The written protocol allows designation of certain tasks related to the execution drugs without specifying that any such designee must be authorized him- or herself to order the scheduled substances required under the protocol.

315. The written execution protocol fails to contain any provision by which Defendants are able to ensure that they do not violate constitutional prohibitions on executing an incompetent individual in violation of *Ford v. Wainwright*, 477 U.S. 399 (1986) and *Panetti v. Quarterman*, 551 U.S. 930 (2007).

316.   The written execution protocol fails to contain any provision by which Defendants are able to ensure that they do not violate constitutional prohibitions on executing a mentally retarded inmate in violation of *Atkins v. Virginia*, 536 U.S. 304 (2002).

317.   The written execution protocol creates internally inconsistent standards to be applied to limits on an inmate's last words.

318.   The written protocol states that there shall generally be no restriction on the content of a prisoner's last statement.

319.   The written protocol also states that there shall be no unreasonable restriction on the duration of a prisoner's last statement.

320.   The two aforementioned provisions were not contained in the written protocol effective August 21, 2001.

321.   The two aforementioned provisions were added the written protocol in the version of the protocol effective September 11, 2001.

322.   Two days later, on September 13, 2001, an order was docketed in *Treesh v. Taft*, Case No. 99-624, dismissing pursuant to a dismissal entry submitted by the parties a case raising First and Fourteenth Amendment challenges to restrictions on an inmate's last statement.

323.   Following the execution of Michael Beuke on October 6, 2010, however, Defendants sought to include in the execution protocol additional restrictions related to an inmate's last statement.

324.   The provision of the written protocol immediately following the aforementioned two provisions states that the Warden may indeed impose restrictions on both the content and length of the prisoner's last statement.

325. The same provision also gives the Warden the power to terminate an inmate's statement based on the Warden's subjective interpretation of the contents of the inmate's last statement.

326. Defendants' written protocol is unclear about the nurse/healthcare administrator's duties and responsibilities.

327. The written protocol is also unclear about the Auxiliary Execution Team Member's duties and responsibilities.

328. Defendants' September 18, 2011 written protocol dramatically reduces the amount of information that must be reported and recorded on the execution timeline.

329. The September 18, 2011 written protocol requires that execution team members meet following an execution to compare documentation of the execution and to "identify any discrepancies" between the documents.

330. This "review" will thus ensure uniformity in the official documents produced by an execution, whitewashing any discrepancies that might otherwise reveal variations or deviations from the written policy's mandates.

331. Defendants' "training sessions" required under the written protocol in advance of an execution are more accurately termed "rehearsals," as no substantive "training" occurs.

332. Despite repeated and vivid problems involving establishing and maintaining peripheral IV access, Defendants' rehearsal sessions do not involve setting IVs in volunteer team members or otherwise practicing establishing IV access in a live subject.

333. Instead, according to deposition testimony, a maximum of two "medical" team members will "establish" an IV in the same dummy arm during a rehearsal session.

48

334. During the rehearsal sessions, one member sticks the dummy arm once during the first rehearsal, while a second team member sticks the dummy arm once during the second rehearsal that day.

335. In execution rehearsals, the team members push saline through the tubing such that it empties into a bucket or pan.

336. Team members do not push pentobarbital through the lines during an execution rehearsal.

337. There is a marked difference in the density and viscosity of saline as compared to pentobarbital, such that pushing pentobarbital through the tubes used for an execution will feel different than pushing saline through the same tubes.

338. The execution team walks through an execution rehearsal assuming everything works perfectly according to plan, despite demonstrated problems and deviations from the written protocol during administration of previous executions.

339. The team, as an ordinary course of things, ignores the mandate to "train" because they engage in few or no contingency training scenarios.

340. Defendants have not planned or provided for a situation in which a problem arises, or an execution is ordered halted, during administration of any of the drug(s).

341. No physicians are standing by to administer life-saving measures, and no equipment is present to intubate an inmate to ensure the inmate will not die while a problem is diagnosed, discussed, and actions taken to resolve it.

342. Defendants' written protocol continues to deny an inmate such as Smith necessary access to counsel, the necessity of which was made clear during the previous failed attempt to execute Romell Broom.

343. The "quality assurance review" provided in the written protocol fails to provide any meaningful protection against Defendants' maladministration or inconsistent administration of their written protocol.

344. The qualifications for the person appointed to be the "Special Assistant for Execution Policy and Procedures" are undefined.

345. The Special Assistant's explicitly defined scope of duties is limited to only "reviewing documentation, training, and professional qualifications."

346. The written protocol contains no consequence if the Special Assistant identifies deviations or variations from the written protocol.

347. The pertinent provision in the written protocol does not require that the Special Assistant acknowledge any discovered deviations or variations in the report following each execution.

348. The pertinent provision in the written protocol does not require that the Special Assistant be present for an execution, or for any portion of the entire execution policy before, during or after an execution.

349. The pertinent provision in the written protocol does not even require that the Special Assistant him- or herself actually do anything, since the protocol allows the Special Assistant to delegate this task to assistants.

350. The pertinent provision in the written protocol does not empower the Special Assistant to take any action before or during an execution to identify deviations or variations, or to stop an execution if deviations or variations are discovered.

### D. **Defendants' pattern of deviations and/or variations from the written execution protocol**

351.    The safeguards contained in Defendants' written execution protocol are critical to avoiding unconstitutional cruel and unusual punishment, and to ensuring Smith's fundamental rights protected under the Ninth Amendment are not violated.

352.    Defendants consistently and regularly deviate or vary from their written protocol in numerous ways, big and small, such that Defendants have a long-standing pattern of deviations and/or variations from their written protocol and informal policies, regardless of the particular written protocol in effect at the time.

353.    Defendants' pattern of deviations and/or variations continues to this day.

354.    These deviations and/or variations have occurred under several different effective versions of the written protocol, including the written protocols in effect before November 30, 2009, and the protocols effective November 30, 2009; November 14, 2010; March 9, 2011; April 11, 2011; and September 18, 2011.

355.    By these deviations and/or variations, Defendants ignore and/or recklessly disregard their written protocol's requirements and the requirements of their informal policies.

356.    Defendants' pattern of deviations and/or variations from their written execution protocol and their informal policies means that Defendants will arbitrarily and irrationally administer their written protocol and their execution policies differently each time they execute an inmate.

357.    There are no legitimate governmental or penological reasons for these deviations and/or variations.

358.    Defendants' deviations and/or variations are not necessary to achieve a compelling governmental interest.

359.    Upon information and belief, Defendants' pattern of deviations and/or variations from

their informal policies and their written execution protocol's requirements includes

the following:

> Defendants are required to seek a reprieve for any inmate whose scheduled
execution date is within thirty days of the *effective date* of a new written
execution protocol.  But they failed to follow this requirement with their March 9,
2011 written protocol, by failing to seek a reprieve for Johnnie Baston in light of
his scheduled execution date of March 10, 2011.

> Defendants failed to follow this requirement with their April 11, 2011 written
protocol, by failing to seek a reprieve for Clarence Carter in light of his scheduled
execution date of April 12, 2011.

> Defendants intended to disregard this requirement in their efforts to execute
Plaintiff Billy Slagle on September 20, 2011 by employing the written execution
policy with an effective date of September 18, 2011.

> Defendants fail to follow the written protocol's provisions related to the execution
drugs, including but not limited to the provisions controlling acquisition,
possession, delivery and the nature of the execution drugs.

Upon information and belief, this includes such non-compliance as multiple instances of:

obtaining execution drugs unlawfully from a third-party vendor by an execution team member

not legally allowed to posses or distribute the drugs; obtaining or using, as a primary dose or

backup dose, expired execution drugs; allowing unqualified persons to take possession of the

execution drugs from the health care administer immediately before final execution preparations

are made; allowing unqualified persons to prepare the execution drugs and/or to serve as the

required qualified witness to preparation; allowing unqualified persons to independently verify

the correct dosage and preparation of the execution drugs and/or failing to conduct any such

independent verification at all; and releasing the drugs to be used in an execution from the

institution pharmacy or infirmary at some time before the morning of the execution—at times

one or two days in advance of the execution date.

52

➢ Defendants fail to follow the written protocol's requirements that a Drug Administrator "shall be currently qualified under Ohio law to administer and prepare drugs for intravenous and intramuscular injections."

Defendants essentially equate "qualified under Ohio law" with "licensure under Ohio law" at several points in their written protocol. Yet none of TM # 9, # 17 or # 21 is authorized by the terms of their respective licensure to prepare or inject the lethal drugs used in Defendants' execution policy, which includes at least two drugs categorized as Schedule II controlled substances. Moreover, Defendants themselves have previously asserted that TM # 17 and TM # 21 are not acting under the auspices of their respective EMT licenses in their role as members of the execution team. Thus, they are not acting as individuals licensed, *i.e.*, "qualified," under Ohio law to administer and prepare drugs, making this deviation or variation plain on the face of the protocol.

➢ Defendants fail to follow the written protocol's unambiguous requirements related to the training and qualifications of personnel involved in an execution.

This includes a blatant, knowing and intentional disregard for the mandated presence of at least two team members who possess certain qualifications under Ohio law in the "equipment room" during administration of the lethal drugs, and for other execution-related tasks such as obtaining peripheral IV access, recording the events of the execution process, and handling, delivery, preparation and verification of the execution drugs.

This also includes involvement of non-qualified persons acting in the place of "medical" team members. Defendants admit that they do not follow these written protocol requirements, but they now argue these are not deviations or variations from the written protocol at all. Defendants claim in their testimony and in their new written protocol that they need not follow the written protocol's mandates if doing so presents a matter of inconvenience, if it makes

53

completing an execution difficult, impractical, or impossible, or otherwise hinders their efforts to

execute the condemned inmate.

> Defendants have failed to follow the written protocol's explicit mandates regarding vein assessments of the condemned inmate, despite demonstrated and repeated problems acquiring venous access in the condemned inmates.

> Defendants have failed to follow the written protocol's mandates to inject, via peripheral IV injection, the full amount of the required drug(s), as required under their various written protocols from the very inception of lethal injection executions in Ohio.

> Defendants have failed to inject, via peripheral IV injection, the proper concentration of the execution drug(s), as required under their various written protocols from the very inception of lethal injection executions in Ohio.

> Defendants fail to consistently follow the written protocol's mandate that they keep an adequate supply of the execution drug(s) on hand for use as full back-up dose(s) during an execution.

> Defendants have consistently failed to follow the written protocol's requirements to obtain a sufficient supply of the execution drug(s) as a contingency against the contamination or other inadvertent loss of any of the drug.

> The various actors involved in administering executions are unsure or incorrect in their understanding of what the written protocol requires regarding preparation of backup doses of the fatal drug(s) or any other backup execution method.

> Defendants fail to follow the written protocol's mandates regarding creation of a detailed and accurate "timeline" log that includes specific information and/or any and all events of significance from the time a condemned inmate arrives at SOCF the day before the scheduled execution.

> Defendants regularly and continuously fail to follow the written protocol's critical and explicit substantive training requirements.

Defendants readily admit that they fail to follow the substantive training requirements,

and claim the authority to waive non-compliance with the written protocol at will.  This also

includes the non-participation in required training by the executioners, TM # 17 and TM # 21,

the Execution Team Leader, TM # 10, and the current Warden, Defendant Morgan, despite his

responsibility to oversee the entire execution.

➢ Rather than abide by the written protocol's critical training requirements that explicitly and unambiguously apply to *all* members of the Execution Team, Defendants' deviate and/or vary from the written protocol such that their overarching execution policy is more accurately stated in their own admission that they merely provide training to "all *available* members of the Execution Team."

➢ Defendants know they are not following the written protocol's training requirements, but they claim the authority to simply not attend execution rehearsal training, and/or to waive these requirements whenever it is convenient.

➢ Defendants could not have conducted, and, upon information and belief, did not conduct, the required substantive training on the four required topics, (01-COM-11, p. 6 of 17, ¶ VI.B.4.b and previous written protocol analogs), in advance of the execution of Kenneth Biros on December 8, 2009, only one week after Defendants adopted a materially changed written protocol.

While trainers from within DRC came to SOCF to conduct training in the first three of the four required training topics under the May 14, 2009 written protocol, there is no evidence that anyone on the execution team ever received any of the required training under the former November 30, 2009 written protocol before Defendants executed Biros on December 8, 2009.

➢ Defendants could not have conducted, and, upon information and belief, did not conduct, the required minimum of four days of execution rehearsals in advance of the Biros execution given the compressed timeline between the effective date of the November 30, 2009 written protocol and Biros's execution on December 8, 2009.

➢ Upon information and belief, Defendants could not and did not conduct the required training on the four required substantive topics in advance of the execution of Baston.

Defendants became the first jurisdiction in the world to execute an individual using only pentobarbital when they executed Baston only one day after the effective date of Defendants' materially changed written protocol. This was just shortly after Defendants used the version of DRC Policy 01-COM-11 effective November 14, 2010, in the scheduled execution of Frank Spisak on February 17, 2010, which employed sodium thiopental rather than pentobarbital. Despite this critical change, Defendants failed to conduct the required substantive training on the new written execution protocol before executing Baston.

55

➢ Upon information and belief, Defendants could not have conducted and did not conduct the required minimum of four days of execution rehearsals in advance of the scheduled execution of Baston given the compressed timeline between the effective date of the March 9, 2011 written protocol and the March 10, 2011 execution of Baston.

➢ Upon information and belief, Defendants could not have conducted and did not conduct the required minimum of four days of execution rehearsals in advance of the scheduled execution of Clarence Carter, given the compressed timeline between the effective date of the April 11, 2011 written protocol and the April 12, 2011 execution of Carter.

➢ Defendants have failed to conduct the required minimum of four days of execution rehearsals in advance of other executions as well.

➢ Defendants have consistently permitted execution team members who have not received the mandatory substantive training and/or missed execution rehearsals to participate in the subsequent execution(s).

➢ Upon information and belief, TM # 21 still has not been provided all the training required under the written protocol, despite his direct participation in several recent executions and the Broom execution attempt.

➢ Upon information and belief, TM # 21 also did not participate in all of the required rehearsal sessions in advance of the Broom execution attempt.

➢ TM # 21 was one of the two team members primarily responsible for establishing and/or sustaining peripheral IV access in Broom on September 15, 2009, and at least two of the notable mishaps involved TM # 21.

➢ Former Warden Kerns did not participate in all of the Broom execution rehearsal sessions, despite his primary role in administering an execution.

➢ TM # 17 has also missed execution rehearsals, training sessions, and/or executions themselves, leaving TM # 21 alone to conduct at least two executions unsupervised and unchecked by another team member who possesses the qualifications under Ohio law as required by the written protocol.

➢ TM # 17's absence for at least two executions prompted the participation by TM # 9 who acted in TM # 17's place to carry out at least some of the duties that only TM # 17 and # 21 are permitted to perform under the written protocol.

➢ Current Warden Morgan has failed to attend all the substantive training sessions required under the various written protocols, despite his participation in executions first as a member of the execution team and now as the Warden of SOCF.

> Defendants claim the power under ¶ VI.B.4.o of the written protocol effective April 11, 2011 or its analog to waive or to deviate or vary from *any* of the written execution protocol's requirements, including attendance at an execution rehearsal session, if they so choose. Indeed, current Warden Morgan, like former Warden Kerns before him, has, in fact, waived these training requirements for recent executions.

> Defendants fail to follow their written protocol's mandates to properly document and verify correct drug preparation, dosage and disposal of the execution drugs.

> Defendants fail to keep accurate records involving the drug(s) used as required in the written protocol, or fail to create any records at all.

> Defendants fail to follow their written protocol when they fail to properly verify and document execution team members' credentials and certifications, either yearly or before the "initial training session" for each execution.

> Defendants fail to follow their written protocol when they fail to halt, assess and restart an execution as necessary if a problem is observed during administration of the written protocol.

> There is no evidence that Defendants plan to provide the mandatory, yearly training as specifically articulated in the written protocol.

> There is no evidence that Defendants abide by the various requirements related to reporting and/or verifying the ongoing validity of the medical team members' respective licensures.

360. There is no guarantee that all members of the execution team will have participated in the mandatory training/rehearsal proceedings that are such a critical part of the written protocol.

361. Defendants have added an additional member of the Execution Team by creating an "Auxiliary Team Member" position, but they do not require that new team member to attend all execution rehearsals in advance of a particular execution.

362. Evidence suggests that compliance with the training requirements in the written protocol is subject to the whims of the SOCF Warden or even to the discretion of the individual team member.

363.     Failure to participate in all the required rehearsals/training sessions, or failure to undergo the required initial training, has been overlooked and/or waived, and has not precluded participation in an execution by the team member.

364.     There is no standard for mandating that a team member participate in all training before participating in an execution.

365.     There is little if any standard for determining when a team member may or will deviate or vary from the written protocol during the course of an execution, such as involving a doctor or other persons untrained in the written execution protocol or untrained in the specific procedures to be used for a particular inmate's execution, or other such actions that are clearly outside the written protocol.

**E.     Defendants' deviations, variations and irregularities in specific executions**

366.     In addition to their deviations and/or variations in advance of or following executions, Defendants' history of administering executions in Ohio is marred by repeated irregularities, deviations and/or variations from the written protocol in the course of actual executions.

**1.     Wilford Berry**

367.     Defendants failed during Ohio's first execution in the modern era when they or their predecessors executed Wilford Berry in 1999.

368.     Upon information and belief, the members of Berry's execution team could not locate a vein for the IV line, so they resorted to violently beating his arms in order to raise a vein adequate to acquire an IV site for the transmission of the lethal drugs into his body.

**2.     Joseph Clark**

Case: 2:11-cv-01016-GLF-MRA Doc #: 1003 Filed: 09/28/11 Page: 65 of 105 PAGEID #: 2765

369. During the execution of Joseph Clark on May 2, 2006, Defendants failed to administer the required, and critical, full dose of two grams of sodium thiopental via peripheral IV injection.

370. Defendants also dispensed the execution drugs to an unknown person on May 1, 2006, the day before the execution, despite the written protocol's clear mandate that the execution drugs were to be dispensed on the day of the execution.[5]

371. Prison officials could find only one accessible vein in Clark's arms to establish a heparin lock instead of the required two sites.

372. Once Defendants and their agents began administering the first drug of the three-drug policy then employed, the vein collapsed.

373. Clark informed the execution team that the process was not working, and the execution was halted.

374. After more than 90 minutes of additional attempts to establish a viable IV injection site, including consideration of nontraditional injection sites, the execution team established one new IV site through which the lethal drugs were eventually administered.

375. But Defendants failed to follow their written protocol, which required that they order a sufficient quantity of the execution drug(s) as a contingency against the contamination or inadvertent loss of any of the drugs.[6]

---

[5] This deviation or variation also occurred for several other executions, including at least one execution in which the lethal drugs were dispensed at least two days before the execution date.

[6] Defendants similarly deviated or varied with at least twenty-three other executions, including but not limited to executions of inmates Getsy, Keene, Fautenberry, Bryant-Bey, Cooey, Newton, Filiaggi, Lundgren, Wilson, Ferguson, Barton, Benner, Hicks, Willie Williams, Ashworth, William Smith, Dennis, Mink, Vrabel, Zuern, Wickline, Roe, and Lewis Williams.

Case 2:04-cv-01156-GLF-MRA Doc #: 1003 Filed: 09/28/11 Page: 66 of 105 PAGEID #: 27366

376. The written protocol in effect at that time required peripheral IV injection of two grams of sodium thiopental to ensure the inmate was properly anesthetized before administration of the second (pancuronium bromide) and third (potassium chloride) drugs.

377. But Defendants obtained only a total of two grams of sodium thiopental in advance of the Clark execution, and they injected two full syringes—with one gram in each syringe—into the bad IV line.

378. This means that the drugs were not injected into Clark's peripheral veins as required by the written protocol.

379. Only one additional gram of sodium thiopental was dispensed from the SOCF pharmacy for use in Clark's execution.

380. Because of Defendants' failures regarding the first peripheral IV administration site, and because Defendants improperly started the execution with only two grams of sodium thiopental total, and used only three grams total, it was impossible for Defendants to administer to Clark a full two grams via peripheral IV injection before they administered drugs two and three.

381. Defendants injected into Clark only one gram of sodium thiopental via peripheral IV injection before they injected drugs two and three.

382. Thus it is extremely likely that Clark was not properly anesthetized before he was subjected to injections of pancuronium bromide and potassium chloride, in turn subjecting Clark to excruciating, torturous pain during his execution.

### 3. Christopher Newton

383. On May 24, 2007, Defendants executed Newton.

384. It took approximately twenty-two minutes to insert the first IV into Newton's arm.

385.    It took approximately one hour and fifteen minutes to place the second IV.

386.    Placing the IVs took so long that Newton had to take a short bathroom break.

### 4.    **Daniel Wilson**

387.    On June 3, 2009, Defendants executed Daniel Wilson.

388.    Despite the mandate in the then-applicable May 14, 2009 written protocol that required

        assessment of the inmate's veins on the morning of the scheduled execution, Defendants

        failed to conduct the required assessment of Wilson's veins the morning of the execution.

### 5.    **Marvallous Keene**

389.    Approximately one month later, Defendants again demonstrated a willingness to deviate

        and/or vary from the written protocol's requirements.

390.    The written protocol effective at the time explicitly required two functional IV sites at the

        start and during an execution, along with the related requirement that if one IV site

        became compromised, the execution must be stopped, if only to assess the situation.

391.    TM # 17 (the "executioner") and TM # 21 (the back-up executioner, and the observer on

        hand in the Equipment Room with TM # 17) were each aware of a problem with one IV

        bag and line during the Keene execution.

392.    But they deviated or varied substantially from the written protocol when they chose to

        ignore the problem and forged ahead with the execution, rather than halting as the written

        protocol required.

### 6.    **Romell Broom**

393.    On September 15, 2009, Defendants attempted to execute Romell Broom.

394. The evidence demonstrates myriad deviations and/or variations from the written protocol during the Broom execution attempt.[7]

395. Defendants failed to conduct the mandatory venous access assessments on Broom, just as they failed to do in the Wilson execution.

396. Defendants, namely TM # 9, TM # 17, and TM # 21, unsuccessfully attempted to insert IV lines in eighteen different spots on Broom's body, making approximately fifty needle insertions over the course of two hours.

397. Defendants attempted to establish an operable IV by repeatedly inserting IV catheters into the crooks of both of Broom's elbows (the antecubital area), his left biceps, his left wrist, the base of his thumb on each hand, over the knuckles on the back of his right hand, the top of his left foot, and his right medial malleolus (ankle bone on the inside part of the ankle).

398. During Defendants' repeated attempts to establish and/or sustain IV access in Broom, venous access was obtained on at least two different occasions. Upon information and belief, at least one of those instances failed when execution team members mishandled the IV apparatus after establishing a successful IV hook-up, resulting in the IV catheter being yanked out of Broom's vein.

399. In at least one other instance, execution team members established but then lost venous access by virtue of their actions following successful IV catheter insertion.

---

[7] The facts surrounding the failed Broom execution attempt are thoroughly set out in the deposition testimony taken in the weeks following September 15, 2009. (*See, e.g.*, Doc. Nos. 580, 598, Broom Dep., Oct. 5, 2009, which is incorporated by reference here in full.)

400. Personnel involved in attempting to execute Broom included at least one physician, Dr. Carmelita Bautista who was not part of the execution team and who was untrained in the written execution protocol.

401. Defendants have consistently asserted they are unable to procure participation of a physician in the execution process. The written protocol in effect at the time did not provide for physician participation, and Dr. Bautista's participation in the failed Broom execution came as a distinct surprise to participating execution team members.

402. After two hours of Defendants causing substantial, torturous physical and psychological pain to Broom, DRC Director Terry Collins requested that Governor Ted Strickland grant a reprieve to postpone the execution process for one week.

403. At no time was the pain and suffering that Broom was enduring considered as part of the discussion and factors for whether to halt the execution attempt.

404. The only concern was for the execution team members' well-being, concern about generating future litigation, and concern about avoiding subsequent, more embarrassing problems if the execution continued and IV administration of the lethal drugs failed.

405. Broom, during the course of this two-hour ordeal, requested to speak with his counsel on at least one occasion and perhaps more. Defendants denied these requests, citing their execution policy, and then denied counsel's request to speak with Broom.

406. At least one member of Broom's execution team explicitly stated that he was looking forward to seeing the State execute another particular inmate.

### 7. Vernon Smith, a.k.a., Abdullah Sharif Kaazim Mahdi

407. On January 7, 2010, Defendants executed Vernon Smith, a.k.a. Abdullah Sharif Kaazim Mahdi.

408.  On the day of Smith's execution, TM # 17 was in the hospital, so he could not and did not participate in the execution.

409.  Only TM's # 9, # 17, and # 21 are qualified under the written protocol to be part of the IV insertion team.

410.  TM # 9's participation ceases after the IVs are established.

411.  TM # 9 is not qualified under Ohio law to administer intravenous and intramuscular injections.

412.  Only TM's # 17 and # 21 are qualified under the written protocol to take numerous other actions related to the execution drugs which are reserved for members of the "medical" team.

413.  These tasks explicitly require certain qualifications under Ohio law, and also require the participation by not one but *two* such qualified execution team members.

414.  These tasks include procuring, taking possession of, preparing, verifying, injecting and administering, and disposing of the execution drugs, as well as monitoring and documenting all of the above.

415.  The written protocol requires participation of at least two individuals with certain qualifications under Ohio law for these critical responsibilities, but this was impossible during the Smith execution, due to TM # 17's absence.

416.  Defendants used TM # 9 in TM # 17's place.

417.  Defendants ignored the explicit mandates of their written execution protocol by executing Smith without a second individual with the necessary qualifications under the written protocol present in the Equipment Room to supervise or monitor the drug preparation, administration, and other related tasks,

64

418.  Defendants also ignored the explicit mandates of their written execution protocol by involving TM # 9 in TM # 17's stead to execute Smith, because TM # 9 is not qualified under Ohio law to carry out the tasks in question.

### 8.  Michael Beuke

419.  On May 13, 2010, Defendants executed Michael Beuke.

420.  Approximately one month before the Beuke execution, TM #17 notified Defendants that he would be absent on the day of the execution, because he needed to attend a doctor's appointment.

421.  Defendants made no alternative arrangements to replace TM # 17 within the confines of the written protocol.

422.  Defendants did not change Beuke's execution date by way of a reprieve from the Governor.

423.  Instead, Defendants chose to use TM # 9 as a replacement for TM # 17 again, just as they did in the Vernon Smith execution.

424.  During the Beuke execution, therefore, Defendants engaged in all of the same or similar deviations or variations from the Vernon Smith execution recounted above.

### 9.  Darryl Durr, and others since November 30, 2009

425.  As described more extensively in Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions for Summary Judgment, (Doc. No. 849), in Plaintiffs' Consolidated Sur-Reply Memorandum Regarding Defendants' Motions for Summary Judgment, (Doc. No. 864), in Plaintiffs' recent respective Memoranda in Opposition to Defendants' Motions for Summary Judgment (Doc. Nos. 924, 925, 926), in the evidence that arose during the June 29, 2011 injunctive relief hearing, in the briefing associated with Plaintiff Kenneth Smith's motion for injunctive relief, and in the Court's order granting injunctive

relief to Kenneth Smith, (Doc. No. 947), Defendants have deviated or varied from the mandates contained in their written protocol in numerous ways in executions other than the executions specifically discussed above.[8] (*See* Doc. No. 849, PageID 21194-217, incorporated herein.)

426. This includes deviations and/or variations during the executions of Kenneth Biros, Mark Brown, Lawrence Reynolds, Darryl Durr, Michael Beuke, William Garner, Roderick Davie, and Michael Benge.

427. This also includes newly disclosed deviations and/or variations, such as those that occurred in the execution of Frank Spisak, Johnnie Baston, and Michael Beuke.

428. This includes, but is not limited to, deviations and/or variations regarding written protocol mandates governing who may, and who must, participate at various points in the execution; deviations and/or variations related to acquisition, possession, distribution, delivery, and administration of the execution drugs; deviations and/or variations related to training requirements and/or execution rehearsals; and myriad others. (*See id.*; *see also* Doc. No. 864, PageID 21838-48.)

429. All of the executions or attempted executions listed above were conducted under the auspices of Defendants' written protocol and informal policies in effect at the relevant time. This lengthy pattern of deviations and/or variations remains consistent regardless of which written protocol was being administered at the time, and will continue under the written protocol effective September 18, 2011.

---

[8]For efficiency's sake, Plaintiff incorporates the factual allegations and/or findings contained in those filings, transcripts, and/or Court order in this Seventh Amended Complaint.

430. Defendants' demonstrated willingness to deviate and/or vary from their written protocol's mandated and constitutionally required safeguards is exacerbated by the vast amounts of unfettered discretion that their overarching execution policy vests in certain actors, including execution team members and supervisory officials.

431. The September 18, 2011 written execution policy provides even more discretion for different actors, including execution team members and supervisory officials.

432. All of these deviations and/or variations demonstrate a general sense of bureaucratic ennui rendering it the policy of Defendants that they adhere to their written execution protocol except when they do not.

## VI.   CLAIMS FOR RELIEF

### First Claim: Eighth and Fourteenth Amendment Violations

433. Smith incorporates by reference each and every statement and allegation set forth throughout this Seventh Amended Complaint as if fully rewritten.

434. Defendants have created, maintained and implemented a lethal injection execution policy which includes the written execution protocol effective September 18, 2011 and the administration of said written protocol and Defendants' informal policies, by which they intend to execute Plaintiff Smith on a date to be determined.

435. Defendants' execution policy manifests Defendants' deliberate indifference towards Smith's constitutional rights. The policy will violate Smith's constitutional rights to be free from an undignified, spectacle execution and arbitrary, capricious, cruel, and unusually painful punishment, physically and/or psychologically, which rights are secured and guaranteed to him by the Eighth and Fourteenth Amendments' limitations on

Defendants' powers while acting individually or under the color and authority of state law.

436.  Smith's unique, individual physical and psychological characteristics and conditions create a substantial risk that achieving peripheral IV access on him will present a problematic situation analogous to achieving IV access in the previous situations in which Defendants were unable to readily obtain IV access, which, in turn, creates a substantial risk that Smith will suffer severe, torturous physical and/or psychological pain that is objectively intolerable, and/or that creates an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

437.  Smith's unique, individual physical and psychological characteristics and conditions create a substantial risk that employing Plan A to execute him will subject him to a substantial risk of serious physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

438.  Smith's unique, individual physical and psychological characteristics and conditions create a substantial risk that employing Plan B to execute him will subject him to a substantial risk of serious physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

439.  There is a substantial risk that Defendants will fail to apply their written execution protocol and informal policies properly or in accordance with the requirements of said written protocol or informal policies, which in turn subjects Smith to a substantial risk of serious physical and/or psychological pain, needless suffering, and a torturous, lingering,

undignified death that is objectively intolerable, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

440.    Additionally, there is a substantial risk, based on specific or particularized claims related to administration of Defendants' policies, unique to Smith, such that he will be subjected to a substantial risk of serious physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable.

441.    Plaintiff Smith, due to his unique individual physical and psychological characteristics and regardless of whether Defendants attempt Plan A alone or Plan A followed by Plan B, or Plan B alone, will suffer a substantial risk of serious physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable when Defendants force him to lie flat on his back horizontally during events related to his scheduled execution, forcing him to suffer sensations of drowning, asphyxiation, suffocation, choking, violent coughing, and/or otherwise subjecting him to horrific torturous pain and suffering before he is rendered unconscious.

442.    Defendants' failure to abide by their written execution protocol and informal policies is a demonstrated reality rather than a mere possibility or attenuated speculation, as shown by the deviations and/or variations from key written protocol requirements during executions regardless of the written protocol effective at the time.

443.    Defendants' individual deviations and/or variations and Defendants' pattern of deviations and/or variations from the written protocol's safeguards—safeguards that are essential to alleviate Eighth and Ninth Amendment concerns—create a substantial risk that Smith and any and all others on whom Defendants administer the execution policy will not be sufficiently protected by those critical safeguards.

444. Defendants' individual deviations and/or variations and Defendants' pattern of deviations and/or variations from the written protocol's safeguards create an objectively intolerable risk of harm that Defendants ignore without any legitimate justification.

445. Defendants' admitted treatment of their written protocol's requirements as simple "guidelines" creates a substantial risk that Smith and any and all others on whom Defendants administer their execution policy will not be sufficiently protected by the written protocol's critical safeguards.

446. The deviations and/or variations, and the pattern of deviations and/or variations, from Defendants' written protocol by many of the actors involved, whether intentional or reckless, the amount of discretion that exists under the overarching execution policy and within the September 18, 2011 written protocol, Defendants' demonstrated belief that the written protocol is not mandatory but are instead guidelines, and the substantial evidence of Defendants' incompetence or inability to perform in the execution context, cumulatively point to an unacceptable and/or objectively intolerable risk of violating Smith's constitutional rights.

447. This includes intentional and/or willful and/or reckless disregard for the written protocol's requirements, as well as negligent, reckless, and/or willful failure to follow the written protocol's requirements in administration of Defendants' overarching execution policy.

448. Defendants' consistent failures, and pattern of failures, to properly and competently administer the written execution protocol renders the constitutionally critical safeguards contained in their written protocol null and functionally nonexistent. Thus these written safeguards do nothing to protect Smith's Eighth Amendment rights against being

70

subjected to a substantial risk of serious, torturous physical and/or psychological pain and a lingering, undignified death, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

449. Defendants' overarching execution policy, including their pattern of deviations and/or variations from their written protocol and the unlimited discretion they claim, is arbitrary, capricious, cruel, unjustifiably ignores an objectively intolerable risk of harm, and will violate Smith's rights under the Eighth and Fourteenth Amendments.

450. Defendants' execution policy presents a substantial risk of pain and/or an objectively intolerable risk of harm from maladministration that Defendants unjustifiably ignore and that will result in at least the substantial risk of infliction of serious, torturous physical and/or psychological pain leading to a lingering, undignified death, in violation of Smith's rights under the Eighth and Fourteenth Amendments.

451. Smith is subject to a substantial risk of serious, torturous physical and/or psychological pain and suffering in experiencing a lingering, undignified death and/or an objectively intolerable risk of harm which Defendants unjustifiably ignore, due to the drugs administered to cause his death under Defendants' written execution protocol, in violation of his rights under the Eighth and Fourteenth Amendments.

452. Defendants' procedures for obtaining intravenous access under their overarching policy, including their written protocol, have proven to cause serious, torturous physical and/or psychological pain and suffering over an extended period of time as personnel unsuccessfully attempt to obtain and maintain intravenous access.

453.   Defendants have failed to promulgate practices to respond to the numerous well-publicized problems and complications associated with administering their overarching execution policy.

454.   Deviations and/or variations from the written execution protocol demonstrate that problems with any one particular execution are not an unforeseeable isolated mishap or innocent misadventure for which no one is liable.  A long line of problematic executions involving typical condemned inmates makes future problems executing Smith foreseeable and highly likely.

455.   Based on evidence previously developed in this litigation and on information and belief, it is clear that Defendants' method of execution and overarching execution policy still violates the Eighth and Fourteenth Amendment prohibitions on cruel and unusual punishment, and that there exists a substantial risk of serious pain from maladministration, and/or an objectively intolerable risk of harm which Defendants unjustifiably ignore, by which Smith will experience excruciating physical and psychological pain before his death, that has not been addressed in Defendants' execution policy, including their written execution protocol.

456.   These problems are repetitious and foreseeable, yet their prevalence in Ohio makes their subsequent occurrence highly likely, especially in light of the constant presence of the same problematic actors.

457.   No government within the United States may employ a method of execution that carries with it such a significant risk of maladministration that will result in an arbitrary, cruel, inhumane, and undignified death, or subject the inmate to severe physical and/or

psychological pain, and/or a slow, lingering and/or prolonged death, as Defendants' execution policy does to Smith.

458.    Defendants' overarching execution policy, including the broad discretion to deviate and/or to vary from Defendants' written execution protocol, their lengthy pattern of deviations and/or variations from the written protocol and Defendants' informal policies, and Plan A and Plan B, is arbitrary, capricious and presents a substantial risk of serious physical and/or psychological pain, a torturous, lingering death that does not accord with the dignity of man, and/or creates an objectively intolerable risk of harm that Defendants unjustifiably ignore.

459.    Defendants' execution policy is therefore cruel and unusual punishment, and subjecting Smith to the execution policy will violate his rights under the Eighth and Fourteenth Amendments.

### Second Claim: Fourteenth Amendment Due Process Violations

460.    Smith incorporates by reference each and every statement and allegation set forth throughout this Seventh Amended Complaint as if fully rewritten.

461.    Defendants have created, maintained, and administered an overarching execution policy and written execution protocol that, if used to execute Smith's death sentence, will violate his constitutionally protected liberty, life, and property interests (as arising from Ohio Rev. Code § 2949.22(A)) in expecting and receiving a "quick and painless death."

462.    Ohio Revised Code § 2949.22(A) creates valid liberty, life, and property interests vested in Smith in expecting a "quick and painless" death.

463.    Ohio Revised Code § 2949.22(A) also creates valid liberty, life, and property interests vested in Smith in receiving a "quick and painless" death.

73

464. These interests are rights vested in a small class of individuals that have a legitimate claim of entitlement to expect and receive a quick and painless death. Smith, as a death row inmate, is a member of the only group that is the intended beneficiary of this statutory guarantee. Under the express terms of the statute, Defendants have no discretion in whether to provide a quick and painless death to Smith or some kind of death other than a quick and painless one.

465. These interests arising under state law are protected as rights under the substantive and procedural elements of the Due Process Clause of the Fourteenth Amendment.

466. Defendants, having granted Smith interests in expecting and receiving a quick and painless execution, may not deprive him of those rights in violation of procedural and substantive due process under the Fourteenth Amendment.

467. Defendants' denial of Smith's rights to expect and receive a quick and painless death is arbitrary and conscience-shocking.

468. The pattern of deviations and/or variations from Defendants' written execution protocol and informal policies engaged in by many of the actors involved, intentional or otherwise, combined with the amount of discretion that Defendants claim under their overarching execution policy and under the written protocol, along with substantial evidence of incompetence or inability to perform in the execution context, cumulatively point to an unacceptable risk of violating Smith's rights.

469. By what Defendants include and exclude from their overarching execution policy, their development of the written execution protocol, and their wholly discretionary and faulty administration of the execution policy, Defendants manifest deliberate indifference towards, or intentional deprivation of, Smith's statutorily created liberty, life, and

property interests in expecting and receiving a quick and painless death, interests protected as rights by the substantive and procedural elements of the Fourteenth Amendment's Due Process Clause.

470. These rights are separate and distinct from the rights protecting Smith against cruel and unusual punishment as provided in the Eighth Amendment.

### Third Claim: Violations of First, Sixth, Eighth and Fourteenth Amendment Rights of Access to Counsel, Access to Courts, Ability to Petition for Redress of Grievances, Due Process, and Privileges and Immunities of United States Citizenship.

471. Smith incorporates by reference each and every statement and allegation set forth throughout this Seventh Amended Complaint as if fully rewritten. This explicitly includes the factual details of the failed effort to execute Romell Broom on September 15, 2009.

472. Defendants have an overarching execution policy in place by which they intend to arbitrarily, irrationally, and without a compelling state interest, deny Smith the unhindered right to have his counsel present to witness Smith's execution, and to represent Smith's interests.

473. Defendants likewise have an overarching execution policy in place by which they intend to arbitrarily, irrationally, and without a compelling State interest, deny Smith the right to access his counsel so that counsel may give effect to Smith's rights to access the federal and/or state courts and to petition the authorities—including but not limited to the Governor of Ohio and the Supreme Court of Ohio—for redress of Smith's grievances if his execution goes awry.

474. Smith's rights to free speech, to access the courts and to petition the government for redress of his grievances and to be free from cruel and unusual punishment—rights which

are rendered null if Smith is denied access to counsel—are protected by the First, Sixth, and Eighth Amendments, as well as by the Privileges and Immunities Clause and the Due Process Clause of § 1 of the Fourteenth Amendment.

475. Defendants' policies related to a condemned inmate's access to counsel also violates a condemned inmate's due process rights, including Smith's individual due process rights under that provision of the federal constitution.

476. Defendants' policies related to a condemned inmate's access to counsel also violates a condemned inmate's rights under the privileges and immunities clause, including Smith's rights under that provision of the federal constitution.

477. An execution is the final, critical stage of a criminal proceeding.  As proven by problematic executions in Ohio, especially as compared to those in other states throughout the United States, an execution is a critical event at which the condemned inmate must have counsel at the ready to advocate on his behalf in the event something goes awry.

478. Defendants' overarching execution policy, including the written execution protocol, does not allow for counsel to be present to witness the execution unless Smith gives up one of his three allotted witnesses, nor does it allow for Smith's unhindered communication with his counsel in the event problems develop during the execution.

479. Defendants' execution policy does not provide an unhindered right for Smith's counsel to attend and witness Smith's execution.  Instead, Defendants' execution procedures permit counsel for Smith to be a witness only if the condemned inmate gives up one of the three witness seats allotted to him for family or other supporters.  *See* Ohio Rev. Code. § 2949.25(A)(5).

76

480.  ORC § 2949.25(A)(5)'s restrictions are impermissible because they infringe on the rights of a condemned inmate such as Smith to the privileges and/or immunities guaranteed under the Fourteenth Amendment by virtue of United States citizenship, including the rights to come to the seat of government by way of counsel to assert any claim he may have upon the government, to free access to the courts of justice, and to petition for redress of his grievances.

481.  Smith requires the presence of counsel to witness his attempted execution and represent his interests without having to sacrifice a space for another witness from among the three witnesses allotted to him.  Smith must be able to communicate with his counsel in the event problems develop during the execution.

482.  Defendants' written execution protocol permits counsel for Defendants and the sheriff from the county where the condemned inmate was convicted to witness the execution without requiring representatives of the victim to yield one of the three witness positions they are entitled to select under Ohio Rev. Code. § 2949.25(A)(6).

483.  Just as Defendants have counsel present at an execution, Smith is entitled to have his counsel present as a witness to ensure that he has an advocate present to represent his interests if something goes wrong during the execution.

484.  Smith has the right to have his counsel witness his execution just as counsel for Defendants, and law enforcement, have a right to witness the execution.  Smith must be able to exercise this right without being forced to choose between having counsel be a witness in lieu of one of the three persons he can otherwise choose to be witnesses under Ohio Rev. Code. § 2949.25(A)(5).

485. By imposing this burden on Smith, Defendants place conditions on Smith's rights; to have counsel present at a critical stage of criminal proceedings; to due process and the privileges and immunities guaranteed by virtue of Unites States citizenship; to free speech; to be free from cruel and unusual punishment, and others, as protected by the First, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

486. By restricting Smith's ability to communicate with counsel such that counsel might then be able to access the courts, Defendants are also violating his constitutional rights under the First, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

487. Defendants must adopt procedures, as part of their overarching execution policy, which makes communication between an inmate and his counsel feasible in the event problems develop during an execution.

488. Under Defendants' current written protocol, the only time an inmate may communicate with others outside the death chamber via microphone is during his last statement.

489. Under the written protocol, an inmate desiring to communicate with his counsel during the execution process must raise his voice to speak loudly enough that the inmate can be heard through the wall and glass window separating the witness viewing area and the death chamber.

490. Because of his unique medical conditions, Smith will be unable to speak at all following his entrance into the death chamber, because Defendants will restrain his arms and hands at all times after he enters the death chamber.

491. Thus, Defendants' policy will absolutely preclude Smith from communicating to counsel during the execution process.

492. Even if Defendants allow Smith free movement of his arms such that he could cover the stoma and be able to vocalize, he can only speak with the assistance of the TEP prosthetic device, and he cannot speak loudly enough to be heard through the wall and glass window without amplification.

493. And if Smith tries to speak while lying flat on his back horizontally, he will experience problems with the TEP, including dislocation/dislodging of the device, which will absolutely render him mute.

494. Thus, Defendants' policy will preclude Smith from communicating to counsel during the execution process in this way as well.

495. Counsel must have available means to communicate with those persons responsible for the execution, and the courts as well, in such a way that does not force an inmate to choose between conferring or consulting with his or her counsel and accessing the court or petitioning the authorities for redress of his grievances.

496. Even assuming Smith could communicate with his counsel after entering the death chamber under Defendants' protocol—which he cannot—counsel will be forced to choose between communicating with Smith and contacting co-counsel, since the location of the telephone counsel must use to contact co-counsel is located outside of the witness viewing area.

497. Smith is entitled to preliminary and permanent injunctive relief against any attempt by Defendants to execute him unless or until provisions have been made to insure that he has access to confidential consultation with his lawyers, that he has uninterrupted access to counsel if the execution process begins to go wrong, and he, through his counsel, has readily available access to the courts, or any other governmental officials, by providing

for the use of telephones or other communication devices from the Death House in such a way that counsel does not have to break communication between Smith and counsel to communicate problems to the courts and others.

### Fourth Claim: Fourteenth Amendment Equal Protection Violations

498. Smith incorporates by reference each and every statement and allegation set forth throughout this Seventh Amended Complaint as if fully rewritten.

499. Defendants' overarching execution policy, including their wholly discretionary approach to their written execution protocol and their informal policies, violates Smith's rights to equal protection under the law as guaranteed by the Fourteenth Amendment.

500. Smith, individually and as a member of a class of persons subject to a death sentence under Ohio law, has fundamental rights under the Eighth Amendment to be free from cruel and unusual punishment, and to not be subject to a torturous, lingering, or undignified death, which Defendants are violating.

501. Smith also has individual fundamental rights to privacy, personal dignity, bodily integrity and others that arise under the principles of liberty and/or natural law, and which are protected by the Ninth Amendment

502. Smith, individually and as member of a class of persons subject to a death sentence under Ohio law, also has fundamental rights, which Defendants are violating, to the protections afforded by the substantive and procedural elements of the Due Process Clause of the Fourteenth Amendment, which protect as rights created by the state Smith's life, liberty and property interests in expecting and receiving a "quick and painless" execution.

503. Smith, individually and as member of a class of persons subject to a death sentence under Ohio law, also has fundamental rights to access his counsel in order to access the courts,

to due process, to petition for redress of grievances and to the privileges and immunities guaranteed by United States citizenship under the First, Sixth, Eighth, and Fourteenth Amendments, which Defendants are violating.

504. Defendants' September 18, 2011 written execution protocol is facially violative of the Equal Protection Clause, because it codifies disparate treatment of similarly situated individuals, without sufficient justification, and in a way that is arbitrary, irrational, and capricious.

505. Defendants' pattern of deviations and/or variations from their written execution protocol and their informal policies treats each condemned inmate differently and such disparate treatment severely burdens the fundamental rights of the class of persons that includes Smith.

506. Defendants' disparate treatment is not necessary to achieve a compelling governmental interest.

507. Smith is also a "class of one," similarly situated with any other condemned inmate who has been or will be subjected to Defendants' execution policy, including Defendants' written protocol.

508. Defendants' pattern of deviations and/or variations from their written protocol arbitrarily treats Smith differently from similarly situated inmates. Such disparate treatment is irrational and not rationally related in any way to any legitimate state interest.

509. Thus, Smith has been or will be treated differently from other similarly situated individuals, burdening his fundamental rights as a member of a class of persons, and/or without any rational basis for the difference in treatment as a class of one, in violation of the guarantees of the Equal Protection Clause of the Fourteenth Amendment.

510. Equal protection requires "minimal procedural safeguards" such that there is at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied.

511. In their deviations and/or their variations, Defendants are violating the Equal Protection Clause's guarantee of equal treatment for similarly situated persons.

512. The Equal Protection Clause's rudimentary requirements are also important here, where the Supreme Court has clearly emphasized the necessity of procedural safeguards in a state's lethal injection execution policy, especially including the written protocol, to ensure against Eighth Amendment and Fourteenth Amendment violations.

513. The rudimentary requirements are also important when access to counsel is necessary for the class of condemned inmates—which includes Smith—to effectuate an inmate's First, Sixth, Eighth and Fourteenth Amendment rights involving access to the courts and the ability to seek redress of grievances from the appropriate governmental officials during the inmate's execution, including the inmate's rights guaranteed by the due process and privileges and immunities clauses of the Fourteenth Amendment.

514. The pattern of deviations and/or variations from Defendants' written protocol exhibited by many of the actors involved, intentionally and/or recklessly, combined with their wholly discretionary understanding and application of the written execution protocol and their informal policies, along with substantial evidence of incompetence or inability to perform in the execution context cumulatively point to an unacceptable risk of violating Smith's rights.

515. Defendants' actions administering their overarching execution policy show a pattern of deviations and/or variations from the written protocol, intentionally, recklessly and/or

arbitrarily, such that the written protocol's safeguards are applied to a particular inmate arbitrarily and disparately, and that such deviations and/or variations are irrational and/or not necessary to achieve a compelling governmental interest.

516. This denies Smith the guarantee that he will receive the full panoply of procedural safeguards in the written protocol, severely burdening his right to be free from a substantial risk of serious, torturous physical and psychological pain and suffering.

517. It also severely burdens Smith's rights to a guarantee that he will be able to expect and receive a quick and painless execution.

518. Smith has been or will be singled out arbitrarily and irrationally as a "class of one" who will not be afforded equal protection as represented by the procedural safeguards in Defendants' written execution protocol, when such written safeguards are disregarded, ignored, deemed discretionary or advisory only, or otherwise not followed, intentionally and/or otherwise, during administration of the overarching execution policy.

519. Defendants also treat or will treat Smith differently than other similarly-situated individuals (*i.e.*, other condemned inmates), without any legitimate governmental or penological interest, because there will be a difference in how Defendants will administer their execution policy to him, including how they will apply the written protocol's safeguards, as compared with how they will administer another inmate's execution and afford such other inmate the written protocol's safeguards.

520. Defendants' deviations and/or variations from their written protocol are not necessary nor are they the least restrictive means to achieve any compelling state interests.

521. Defendants' deviations and/or variations from their written protocol are arbitrary, they are irrational, they further no legitimate state interests, and/or there is no relationship between the deviations and/or variations and any legitimate state interest.

522. Any justifications that Defendants have offered for their deviations and/or variations are without any rational relationship to a particular condemned inmate.

523. Defendants' justifications for their deviations and/or variations amount to claims of administrative convenience, which is not a legitimate governmental interest.

524. Defendants' written protocol is considered binding state law, and thus Defendants violate state law when they fail to abide by the written protocol's explicit mandates.

525. Defendants have also violated federal and state law governing controlled substances through their deviations and/or variations from their written protocol.

526. State actions that are clearly contrary to law are irrational, and therefore Defendants' deviations and/or variations are irrational.

527. Condemned inmates subject to Defendants' execution policy and their written execution protocol—including Smith—are dissimilar only in immaterial respects as it relates to Defendants' pattern of deviations and/or variations, and/or Defendants' deviations and/or variations are not rationally founded on differences that are real and not illusory. To the contrary: Defendants' deviations and/or variations are explicitly *not* based on individual considerations specific to each condemned inmate.

528. Defendants' pattern of deviations and/or variations is irrational because it is arbitrary and capricious; it is a pattern of random deviations and/or variations that changes from execution to execution.

84

529. By arbitrarily and/or inconsistently following, deviating or varying from the procedural safeguards in Defendant's written execution protocol and informal policies, and without any justification related to any specific condemned inmate, Defendants are arbitrarily denying the fundamental rights of the class of inmates subject to a death sentence under Ohio—including Smith—under the First, Sixth, Eighth and Fourteenth Amendments, and arbitrarily treating Smith differently than other similarly situated inmates or irrationally singling him out as a class of one without any relation to differences between Smith and otherwise-similarly-situated individuals, contrary to law or otherwise without any rational relationship to a legitimate governmental interest.

530. By obtaining, distributing, dispensing and/or administering scheduled drugs without a valid, patient-specific prescription and for a non-medical purpose, Defendants are violating the Controlled Substances Act and analogous state drug control laws.

531. In doing so, Defendants treat Smith as a class of one disparately from others similarly situated, namely the general population of persons subject to the Controlled Substances Act and/or those persons intended to be protected by the Controlled Substances Act.

532. Defendants' violations of the Controlled Substances Act and analogous state laws treat the class of persons who are the intended beneficiaries of the CSA—which includes Smith—disparately from others similarly situated, namely the general population of persons subject to the Controlled Substances Act and/or those persons intended to be protected by the Controlled Substances Act.

533. Defendants' violations of the federal and state drug control laws substantially burdens the fundamental rights of the group of persons that includes Smith which are protected by the

Eighth, Ninth, and Fourteenth Amendments, without being necessary to achieve a compelling state interest.

534.  Defendants' violations of the federal and state drug control laws also violate Smith's rights as a class of one, arbitrarily and irrationally, without any rational relationship to any legitimate state interest.

535.  Accordingly, Defendants are violating Smith's rights to equal protection under the Fourteenth Amendment of the federal constitution.

### Fifth Claim: Violations of Fundamental Rights Arising Under The Principles Of Liberty and/or Natural Law Which Are Protected By The Ninth Amendment

536.  Smith incorporates by reference each and every statement and allegation set forth throughout this Seventh Amended Complaint as if fully rewritten.

537.  Defendants' application of their written protocol, as demonstrated through previous executions such as Clark, Newton, Biros, and Berry, and the failed execution of Broom, and as alleged above, will violate Smith's fundamental, unenumerated rights arising under the principles of liberty and/or natural law.

538.  These rights include rights such as Smith's right to privacy, his right to personal dignity, his right to bodily integrity and others inherent in the concepts of liberty and/or natural law.

539.  These fundamental rights, arising from the concepts of liberty and natural law that guided the Framers' understanding of the Ninth Amendment specifically and the Bill of Rights in general are deeply rooted in this Nation's history and tradition, and they are implicit in the concept of ordered liberty.

540.    Defendants will violate Smith's fundamental, unenumerated rights in violation of the Ninth Amendment through Defendants' haphazard and faulty administration of their written execution protocol including, but not limited to, Defendants' demonstrated inability to consistently obtain peripheral IV access quickly and with a minimum number of needle sticks.

541.    Defendants will violate Smith's fundamental, unenumerated rights in violation of the Ninth Amendment through their administration of execution drugs that will cause vomiting, choking, asphyxiating and other disturbing reactions, resulting in an undignified, spectacle execution offensive to an inmate's rights protected by the Ninth Amendment.

### Sixth Claim: First Amendment Free Speech Violations

542.    Smith incorporates by reference each and every statement and allegation set forth throughout this Seventh Amended Complaint as if fully rewritten.

543.    Defendants' written protocol places restrictions on the content and on the length of an inmate's last statement, and those restrictions are not necessary or the least restrictive means to achieve a compelling governmental interest.

544.    The restrictions will have a chilling effect on an inmate's expressive speech because the written protocol gives the Warden discretionary but unguided authority to impose restrictions on the content and length of an inmate's last statement, and to terminate a statement that the Warden subjectively believes is intentionally offensive to others, without any further explanation on how those restrictions are to be applied.

545. Smith has a fundamental right protected by the First Amendment, the Ninth Amendment, and the Fourteenth Amendments to the federal constitution to make a final statement free of the restrictions contained in Defendants' written protocol.

546. The restrictions in Defendants' written protocol related to an inmate's last words violate well-established First Amendment prohibitions on content-based discrimination in regulating speech.

547. The restrictions in Defendants' written protocol related to an inmate's last words violate well-established First Amendment prohibitions related to the public forum and/or limited public forum doctrines.

548. The restrictions in the written protocol related to an inmate's last words discriminate against an inmate's expressive speech on the basis of viewpoint, because the Warden may impose restrictions the Warden subjectively believes to be intentionally offensive.

549. The restrictions in the written protocol related to an inmate's last words are not reasonable in light of the purpose of an execution.

550. There are no governmental interests to justify the restrictions on an inmate's expressive speech provided in the written protocol.

551. The written protocol, facially and as applied to him, violates Smith's freedom of speech rights protected by the First, Ninth and Fourteenth Amendments.

552. Upon information and belief, the restrictions in Defendants' written protocol related to an inmate's last words also violate the terms of a settlement agreement to which some of the original Defendants in these consolidated cases were a party, in *Treesh v. Taft*, No. 99-624, S.D. Ohio.

Case: 2:04-cv-01156-GLF-MRA Doc #: 1003 Filed: 09/28/11 Page: 95 of 105  PAGEID #: 27395

553.    Upon information and belief, under the terms of the settlement agreement, Defendants'

protocol would place no restrictions on the content and/or the duration of an inmate's

last statement.

## VII.    PRAYER FOR RELIEF

A.    Smith requests that this Court grant him injunctive relief under federal law by granting a

preliminary and permanent prohibitory injunction barring Defendants from executing him

by means of their overarching execution policy, including the written execution protocol

effective September 18, 2011, and any other policy, new or old, formal and/or informal

which, as written and/or as administered, violates his federal constitutional rights in the

same or similar manners as alleged herein, in order to prevent Defendants from violating

Smith's federal constitutional rights under any or all of the First, Sixth, Eighth, Ninth and

Fourteenth Amendments to the United States Constitution.


B.    Smith requests that this Court grant him injunctive relief under federal law by granting a

preliminary and permanent mandatory injunction requiring Defendants to adopt, and

adhere in their administration to, a facially constitutional written execution protocol in

efforts to execute him.


C.    Smith requests that this Court grant him injunctive relief under federal law by granting a

preliminary and permanent prohibitive injunction preventing Defendants from executing

him by means of an execution policy, including the written execution protocol effective

September 18, 2011, or any other execution policy, new or old, formal and/or informal

that is facially unconstitutional.


D.    Smith requests that this Court grant him injunctive relief under federal law by granting a

preliminary and permanent prohibitive injunction preventing Defendants from executing

him by means of any otherwise facially constitutional written execution protocol to which they have failed to adhere in the same or similar manners as alleged herein.

E.      Smith requests that this Court grant him injunctive relief under federal law by granting a preliminary and permanent prohibitory injunction barring Defendants from executing him by a means that will deny his liberty, life, and property interests in the expectation and receipt of a quick and painless death, which interests are guaranteed by Ohio Rev. Code § 2949.22(A) and protected by the substantive and procedural elements of the Due Process Clause of the federal constitution's Fourteenth Amendment.

F.      Smith requests that this Court grant him injunctive relief under federal law by granting a preliminary and permanent prohibitory injunction barring Defendants from executing him unless Defendants allow him to exercise his rights, under the First, Sixth, Eighth, Ninth and Fourteenth Amendments, to choose an attorney to witness his execution without forcing him to choose to have counsel witness at the cost of using one of the three witness slots allotted by Ohio Rev. Code § 2949.25(A)(5).

G.      Smith requests that this Court grant him injunctive relief under federal law by granting a preliminary and permanent prohibitory injunction barring Defendants from executing him unless Defendants allow him to access his counsel without interruption before and during the execution process, such that counsel can immediately access the courts or seek redress for grievances with the government, or otherwise seek necessary relief, in

exercise of Smith's rights under the First, Sixth, Eighth, Ninth and Fourteenth
Amendments to the United States Constitution.

H.     Smith also requests that this Court grant him injunctive relief under federal law by
issuing a preliminary and permanent injunction requiring Defendants to comply with all
training and execution team personnel requirements set forth in the written protocol, and
prohibiting supervisory personnel from allowing execution team member participation in
any execution without full compliance with all of the written protocol's substantive
training requirements, execution rehearsal training requirements, and other
mandatory provisions.

I.     Smith also requests that this Court grant him injunctive relief under federal law by
granting a preliminary and permanent prohibitory injunction barring Defendants from
enforcing those provisions of their written execution protocol that violate Smith's First
Amendment rights to free speech.

J.     Smith also requests that this Court grant him injunctive relief under federal law by
granting a preliminary and permanent prohibitory injunction barring Defendants from
attempting to conduct any further executions until such time as the Court
orders otherwise.

K.     Smith also requests that this Court grant him declaratory relief under federal law by
issuing an Order declaring that Defendants' overarching execution policy, including their

written execution protocol, will subject him to a substantial risk of severe physical and

psychological pain and suffering, and a torturous and lingering death that offends the

dignity of man, and/or an objectively intolerable risk of such harm that Defendants are

unjustifiably ignoring, resulting in cruel and unusual punishment, whether that method is

through the policy's "Plan A" or "Plan B," and will thus violate Smith's rights under the

Eighth and Fourteenth Amendments to the United States Constitution.

L.       Smith also requests that this Court grant declaratory relief under federal law by issuing an

Order declaring that Defendants' substantial, documented and admitted pattern of

deviations and/or variations from their written execution protocol and the safeguards

contained therein, as applied in Defendants' overarching execution policy including their

informal and formal policies, before, during and after administration of the execution

policy, creates an objectively intolerable risk of harm that violates Smith's rights under

the Eighth and Fourteenth Amendments.

M.      Smith also requests that this Court grant him declaratory relief under federal law by

issuing an Order declaring that Defendants' overarching lethal injection execution policy,

including the written execution protocol and Defendants' wholly discretionary, arbitrary

and irrational application of said written execution protocol, violate the First, Sixth,

Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

N.       Smith also requests that this Court grant him declaratory relief under federal law by

issuing an Order declaring that Defendants' overarching execution policy, including their

written execution protocol, violates his Fourteenth Amendment substantive and

procedural due process-protected liberty, life, and property interests in expecting and

receiving a quick and painless death, which interests are created under Ohio Revised

Code § 2949.22 and protected as rights by the substantive and procedural elements of the

Fourteenth Amendment's Due Process Clause.

O.     Smith also requests that this Court grant him declaratory relief under federal law by

issuing an Order declaring that Smith has a right to access to counsel throughout the

execution process, including administration of the execution policy and the written

execution protocol, and including to access the courts and/or to seek redress of grievances

from the courts, the Governor of Ohio or any other appropriate person of authority, under

the First, Sixth, Eighth, and Fourteenth Amendments, including the Due Process Clause

and/or the Privileges and Immunities Clause of the Fourteenth Amendment, and that

Defendants' current execution policy and written execution protocol violates this right.

P.     Smith also requests that this Court grant him declaratory relief under federal law by

issuing an Order declaring that Defendants' substantial, documented and admitted pattern

of deviations and/or variations from their written execution protocol and their execution

policy and the safeguards contained therein, before, during and after administration of the

written protocol and execution policy, is arbitrary and/or irrational or not rationally

related to any legitimate governmental interest and treats or will treat Smith, as a class of

one, differently than others similarly situated, in violation of his rights to equal protection

under the law guaranteed by the Fourteenth Amendment to the United States Constitution.

Q.      Smith also requests that this Court grant him declaratory relief under federal law by
issuing an Order declaring that Defendants' substantial, documented and admitted pattern
of deviations and/or variations from their written execution protocol and their execution
policy and the safeguards contained therein, before, during and after administration of the
written protocol and execution policy substantially burden the fundamental rights of the
class of death-sentenced inmates, which includes Smith, under each and all of the First,
Sixth, Eighth, Ninth and/or Fourteenth Amendments, in violation of Smith's rights to
equal protection under the law guaranteed by the Fourteenth Amendment to the United
States Constitution.

R.      Smith also requests that this Court grant declaratory relief under federal law by issuing an
Order declaring that Defendants' written execution protocol facially violates Smith's
rights as a class of one protected by the Fourteenth Amendment's Equal Protection
Clause because it allows Defendants to treat similarly situated individuals differently,
without any legitimate governmental interest, irrationally and arbitrarily.

S.      Smith also requests that this Court grant declaratory relief under federal law by issuing an
Order declaring that Defendants' written execution protocol facially violates Smith's
rights protected by the Fourteenth Amendment's Equal Protection Clause because it
allows Defendants to treat similarly situated individuals differently, such disparate
treatment burdens the fundamental rights of the class of persons of condemned inmates
subject to a death sentence imposed in Ohio state courts—which includes Smith—under

the First, Sixth, Eighth, Ninth and Fourteenth Amendments, and it is not necessary to achieve a compelling state interest.

T.  Smith also requests that this Court grant him declaratory relief under federal law by issuing an Order declaring that he and other condemned inmates have fundamental, unenumerated rights that arise under the principles of liberty and natural law, which rights are protected by the Ninth Amendment to the United States Constitution, and that Defendants' administration of their execution policy, including their written execution protocol, violates those fundamental rights in violation of the Ninth Amendment

U.  Smith also requests that this Court grant him declaratory relief under federal law by issuing an Order declaring that those portions of Defendants' written execution protocol that provide discretion to governmental actors to impose restrictions on the content and length of any last statement given before an execution attempt are, facially and as applied, impermissible content-based restrictions, and/or a violation of the public forum and/or limited public forum doctrines, and therefore in violation of Smith's rights to free speech under the First Amendment.

V.  Smith also requests that this Court grant him declaratory relief under federal law by issuing an Order declaring that the reasoning and analysis contained in the July 8, 2011 opinion issued by this Court temporarily and preliminarily enjoining Defendants from executing him applies equally to the benefit of Smith and any other individuals whom Defendants might otherwise attempt to execute.

W.     Smith also requests that this Court grant him declaratory relief under federal law by
       issuing an Order declaring that the reasoning and analysis in any other, prospective
       opinion issued by this Court temporarily and preliminarily enjoining Defendants from
       executing him or any other inmate applies to preclude Defendants from attempting any
       further executions until such time as the Court orders otherwise.

X.     Smith requests that this Court grant such further relief as it deems just and proper.

Y.     Smith requests that this Court grant him reasonable attorney fees under 42 U.S.C. § 1988
       and the laws of the United States, as applicable.

Respectfully submitted,

*/s/ Allen L. Bohnert*
**Allen L. Bohnert (0081544)**
Office of the Federal Public Defender
for the Southern District of Ohio
Capital Habeas Unit
10 West Broad Street, Suite 1020
Columbus, OH 43215
614-469-2999
614-469-5999 (fax)
Email: Allen_Bohnert@fd.org
**Trial and Lead Counsel for Plaintiff
Kenneth W. Smith**

**and**

*/s/ Carol A. Wright*
**Carol A. Wright (0029782)**
Office of the Federal Public Defender
for the Southern District of Ohio
Capital Habeas Unit
10 West Broad Street, Suite 1020
Columbus, OH 43215
614-469-2999
614-469-5999 (fax)
Email: Carol_Wright@fd.org
**Co-Counsel for Plaintiff Smith**

*/s/ Sharon A. Hicks*
**Sharon A. Hicks (0076178)**
Office of the Federal Public Defender
for the Southern District of Ohio
Capital Habeas Unit
10 West Broad Street, Suite 1020
Columbus, OH 43215
614-469-2999
614-469-5999 (fax)
Email: Sharon_Hicks@fd.org
**Co-Counsel for Plaintiff Smith**

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2011, I electronically filed the foregoing **Seventh Amended Complaint for Injunctive and Declaratory Relief, Attorney Fees, and Costs of Suit Pursuant to 42 U.S.C. § 1983 on behalf of Plaintiff Kenneth W. Smith** with the Clerk of the United States District Court for the Southern District of Ohio using the CM/ECF system, which will send notification of such filing to the following at the e-mail address on file with the Court:

Mr. Charles L. Wille
Principal Assistant Attorney General
Trial Counsel for all Defendants
Office of the Ohio Attorney General
Criminal Justice Section, Capital Crimes Unit
150 E. Gay Street, 16th Floor
Columbus, Ohio 43215

Mr. Thomas E. Madden
Associate Assistant Attorney General
Co-Counsel for all Defendants
Office of the Ohio Attorney General
Criminal Justice Section, Capital Crimes Unit
150 E. Gay Street, 16th Floor
Columbus, Ohio 43215

Mr. Justin M. Lovett
Assistant Attorney General
Co-Counsel for all Defendants
Office of the Ohio Attorney General
Criminal Justice Section, Capital Crimes Unit
150 E. Gay Street, 16th Floor
Columbus, Ohio 43215

*/s/ Allen L. Bohnert*
Assistant Federal Public Defender
Trial and Lead Counsel for Plaintiff
Kenneth W. Smith