# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**IN RE: OHIO EXECUTION**
**PROTOCOL LITIGATION**
                                        **Case No. 2:11-cv-1016**
                                        **JUDGE GREGORY L. FROST**
                                        **Magistrate Judge Mark R. Abel**

**This document relates to: Charles Lorraine.**

### OPINION AND ORDER

This case is frustrating.

For close to eight years, the Court has dealt with inmate challenges to the constitutionality of Ohio's execution protocol.[1]  During that time, the litigation has morphed from focusing primarily on allegations of cruel and unusual punishment to allegations of equal protection violations.  Ohio has been in a dubious cycle of defending often indefensible conduct, subsequently reforming its protocol when called on that conduct, and then failing to follow through on its own reforms.  Occasionally in this litigation, state agents lie to the Court.  At other times, different state actors impress this Court with their sincere devotion to carrying out the unenviable task of executing death-sentenced inmates within constitutional parameters.  As a result of laudable effort by the various state actors involved–motivated either by duty, embarrassment, the decisions of this Court, or a combination of any of the foregoing–Ohio finally arrived at a protocol that on paper satisfies every Eighth and Fourteenth Amendment challenge thrown against it.  Then once again Ohio decided to carry out the protocol in a manner

---

[1]  The original execution protocol case dates back to 2004.  Over the years, various inmates filed additional cases.  By agreement of the parties, the Court ultimately consolidated all the execution protocol cases under case number 2:11-cv-1016 and closed the four original cases on the docket so that the parties would be able to proceed under only one case number.  *See* ECF No. 11.

that simply ignores a key component of the execution scheme.

The end result is that rather than proceeding to a final conclusion in this case that would enable Ohio to proceed to fulfill its lawful duty to execute inmates sentenced to death free from this ongoing litigation, Ohio has unnecessarily and inexplicably created easily avoidable problems that force this Court to once again stay an execution.

This is frustrating to the Court because no judge is a micro-manager of executions and no judge wants to find himself mired in ongoing litigation in which he must continually babysit the parties.  But the law is what it is, and the facts are what they are.  The Constitution demands that a judge honor the rights embodied in that document, that a judge appreciate the nuance involved in those rights rather than adopting a constitutionally irresponsible, "big-picture, close enough" approach, and that a judge follow the evidence presented by the parties to whatever principled conclusion it leads–no matter how easily avoided and frustrating that conclusion may be.  In other words, *if Ohio would only do what it says it will do*, everyone involved in this case can finally move on.

The captioned case is before the Court for consideration of Plaintiff Charles Lorraine's motion for a temporary restraining order and a preliminary injunction (ECF No. 7), Defendants' memorandum in opposition (ECF No. 39), Lorraine's reply memorandum (ECF No. 41), Lorraine's supplemental memorandum in support (ECF No. 50), and Defendants' supplemental memorandum in opposition (ECF No. 52).[2]  Also before this Court is Lorraine's motion to strike (ECF No. 53) and Defendants' memorandum in opposition (ECF No. 54).  The motion to strike

---

[2]  All pinpoint references to documents filed on the electronic docket shall be to the original page numbers of the documents involved, not to the page numbers assigned by the electronic filing system.

2

is meritless.  But because Lorraine has demonstrated a substantial likelihood of succeeding on his Equal Protection claim, this Court must find the motion for injunctive relief well taken and orders that Ohio cannot proceed to execute him under its current approach.

## I.  Background[3]

This litigation is a 42 U.S.C. § 1983 civil rights action brought by multiple inmates who challenge various facets of the execution protocol used by the State of Ohio.  Plaintiff Charles Lorraine is an inmate on Ohio's death row who is set to be executed on January 18, 2012.  On November 23, 2011, Lorraine filed a motion for a temporary restraining order and preliminary injunction to stay his execution.  (ECF No. 7.)  Pursuant to S. D. Ohio Civ. R. 65.1(a), the Court held an informal preliminary conference with the parties on December 1, 2011, at which the Court set a briefing schedule and a hearing date.  (ECF No. 10.)

The Court held the hearing on Plaintiff's motion for injunctive relief on January 3, 2012.  Both sides presented testimony and agreed to various stipulations.  The parties also proposed that this Court permit supplemental post-hearing briefing, which the parties agreed could present additional evidence and argument outside the in-court hearing context, and the Court accepted that joint proposal.  The parties have submitted their post-hearing briefs, and the motion for injunctive relief is now ripe for disposition.  While this Court was working on its injunctive relief decision, Lorraine then filed a motion to strike that Defendants oppose.

## II.  Motion to Strike Analysis

---

[3]  The findings of fact related to this Opinion and Order are not conclusive given that "findings of fact and conclusions of law made by a district court in granting a preliminary injunction are not binding at a trial on the merits."  *United States v. Edward Rose & Sons*, 384 F.3d. 258, 261 (6th Cir. 2004) (citing *University of Texas v. Camenisch*, 451 U.S. 390 395 (1981)).

On January 6, 2012, Defendants filed their supplemental memorandum in opposition. (ECF No. 52.)  Defendants failed to file this supplemental memorandum by the 5:00 p.m. deadline to which they agreed.  *See* ECF No. 51, 1/3/12 Hrg. Tr., at 42 ("And defendants have agreed to file their reply brief by five o'clock p.m. on Friday of this week.").  Given that Defendants managed to file the supplemental memorandum within under an hour of the agreed-upon deadline and the importance of the issues involved, however, this Court will consider the untimely filing.  The Court advises the parties to honor all future commitments they make to this Court, but given the history of this litigation, that statement perhaps rings as a hollow admonishment.

Lorraine seeks to strike "all or at least parts of Defendants' brief."  (ECF No. 53, at 1.) He argues that Defendants' supplemental memorandum contains false assertions of fact and other misleading representations, as well as presenting often self-contradicting legal arguments that fall outside the intended scope of the agreement permitting supplemental briefing.

This is a ridiculous argument.  The point of the supplemental briefing was to permit the parties to argue additional facts in regard to the relevant law.  Moreover, the solution for false or misleading contentions and for jumbled legal arguments is to let the Court do its job and parse the briefing to reach its own factual and legal conclusions.  Polite jurisprudence dictates qualifying as potentially hyperbolic the statement that if judges struck a document each time an attorney allegedly played fast and loose with the facts and the law, the docket of every case in every court in every corner of this country would likely consist primarily of entry of appearance filings and court orders striking documents.  Lawyering 101 and common sense suggest that just because an attorney does not like something in an opponent's brief does not mean that the brief

cannot be filed.

The Court notes that given its substantive content, Lorraine's motion to strike is essentially a reply memorandum submitted under the guise of a motion, a transparent end run around the prohibition on filing additional memoranda. This is not a clever technique. Defendants' memorandum in opposition similarly presents substantive content, although to a significantly lesser degree. Rather than strike the offending filings as impermissible briefing, the Court simply **DENIES** the motion to strike and moves on to the actual merits of the injunctive relief issue before this Court. (ECF No. 53.)

### III.  Injunctive Relief Analysis

#### A. Standard Involved

In considering whether injunctive relief staying Lorraine's execution is warranted, this Court must consider (1) whether Plaintiff has demonstrated a strong likelihood of success on the merits; (2) whether Plaintiff will suffer irreparable injury in the absence of equitable relief; (3) whether a stay would cause substantial harm to others; and (4) whether the public interest is best served by granting a stay. *Cooey v. Strickland*, 589 F.3d 210, 218 (6th Cir. 2009) (citing *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007); *Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)). As the Sixth Circuit has explained, " '[t]hese factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together.' " *Id.* (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)).

**B. Likelihood of Success[4]**

Lorraine's motion asserts arguments falling under his fourth claim, which is an Equal

Protection claim under 42 U.S.C. § 1983.  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State . . . subjects, or causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be liable to the
> party injured in an action at law, suit in equity, or other proper proceeding for redress
> . . . .

42 U.S.C. § 1983.  Thus, in order to prevail on his § 1983 claim, Lorraine must show that, while

acting under color of state law, Defendants deprived or will deprive him of a right secured by the

Federal Constitution or laws of the United States.  *See Alkire v. Irving*, 330 F.3d 802, 813 (6th

Cir. 2003).  Lorraine pleads that "Defendants' overarching execution policy, including their

wholly discretionary approach to their written execution protocol and their informal policies,

violates [his] rights to equal protection under the law as guaranteed by the Fourteenth

Amendment."  (ECF No. 4 ¶ 1077.)  He contends that the September 18, 2011 protocol is

facially invalid because it codifies disparate treatment of similarly situated individuals without

sufficient justification so as to be arbitrary, irrational, and capricious.  Lorraine also asserts that

he is a class of one subject to treatment that burdens his fundamental rights in a manner that is

not rationally related in any way to a legitimate state interest.

This Court has previously opined on similar arguments, although the evidence before the

Court has grown over time.  On July 8, 2011, the Court issued a decision in which it set forth at

---

[4]  By order of this Court and by continuing agreement of the parties, all references to
Ohio's execution team members are again by generic identifiers established by the parties and
employed to address anonymity and safety concerns.

6

length numerous deviations by state actors from the state execution protocol then in effect, including core deviations that subverted the key constitutional principles that control the execution process. *Cooey (Smith) v. Kasich*, Nos. 2:04-cv-1156, 2:09-cv-242, 2:09-cv-823, 2:10-cv-27, 2011 WL 2681193 (S.D. Ohio July 8, 2011).  This Court therefore enjoined Ohio and any person acting on its behalf from implementing an order for the execution of Plaintiff Kenneth Smith until further Order from the Court.

In response, Defendants revised Ohio's execution protocol and practices.  This resulted in the current iteration of the state's execution protocol, which became effective on September 18, 2011.  Ohio then proceeded to pursue the resumption of executions.

The next inmate seeking a stay via injunctive relief to come before this Court was Reginald Brooks.  Brooks' stay motion came on for a hearing from October 31, 2011 through November 2, 2011.  The Court took the motion under advisement and, after examining the new protocol and the proffered evidence of Defendants' practices in implementing that protocol, issued a November 4, 2011 Opinion and Order that explained that "[t]he dispositive questions . . . have been whether [Brooks] is correct that Defendants routinely deviate from mandated or core provisions set forth in the written protocol and whether [Brooks] has sufficiently proved that the protocol fails to address sufficiently varied constitutional concerns.  The answer to both questions is no." *Cooey (Brooks) v. Kasich*, Nos. 2:04-cv-1156, 2:09-cv-242, 2:09-cv-823, 2:10-cv-27, 2011 WL 5326141, at *12 (S.D. Ohio Nov. 4, 2011).

Notably, the crux of the rationale behind that decision is that Brooks failed to present evidence that he was likely to prove that Defendants are not doing what they say they are doing in conducting executions under the current protocol.  Of significance is that, unlike in the *Smith*

proceedings, Defendants were now saying that they got the message that it mattered that their actions matched their words.  *Trust us*, Defendants said, *we will not deviate from the core components of the protocol*.  This Court accepted that contention.  *Trust us*, Defendants continued, *we will let only the Director decide whether to allow any potentially permissible deviation from the non-core components of the protocol*.  This Court also accepted that statement.  As set forth below, Defendants have once again fooled the Court.

In addition to suggesting that this Court was simply wrong in the *Brooks* decision, Lorraine also argues that evidence previously not before the Court indicates that Defendants are once again nonsensically deviating from the protocol while telling this Court whatever it wants to hear in order to avoid execution stays.  Essentially, Lorraine's contentions present three basic issues for extended discussion: whether what happened during the Brooks execution proceedings prior to his arriving at Southern Ohio Correctional Facility ("SOCF") helps Lorraine, whether non-core deviations that occurred at SOCF during the Brooks execution help Lorraine, and whether the core deviation involving the manner in which the non-core deviations during the Brooks execution were handled helps Lorraine.

Lorraine makes much of the assessment planning revolving around Brooks prior to his transfer to SOCF.  Section VI(B)(3) of the protocol requires that Ohio conduct a parent institution assessment of an inmate within a specified period of time before his or her scheduled execution date.  This evaluation includes a vein assessment as part of a hands-on examination of the inmate, a review of his medical chart "by appropriately trained medical staff at the parent institution," and a mental health assessment conducted by "[a]n appropriate member of the mental health staff at the parent institution."  The purpose of the assessment is to identify vein

8

access problems and any individualized medical or mental health issues that might impact the execution process.

As the parent institution assessment deadline was approaching, Brooks was away from his parent institution.  Due to state court proceedings, Brooks was housed at a county jail and, as the deadline approached, various state actors involved in the execution process began to discuss and make plans for how they could meet the protocol requirement if Brooks was not returned to his parent institution by the deadline date.  One contingency plan discussed was for parent institution personnel to discuss with county jail personnel the assessments over the phone, with the county personnel conducting the examinations.  Some preliminary plans were made to carry out this plan, including the setting of a time for the assessments.  There is contradictory testimony as to whether Ohio Department of Rehabilitation and Correction Director Gary Mohr was informed of this contingency plan at that stage.  He states that he was, while his subordinates state that he was not.  The discrepancy is meaningless because the plan was ultimately not carried out.  It does not matter if there indeed was a failure to inform Director Mohr immediately of the contingency plan, because there was in the end no deviation that required his approval: Ohio retrieved Brooks from the county jail and returned him to the state institution in time to conduct the parent institution assessment.

Lorraine argues that this last fact does not render irrelevant that the contingency plan contemplated would in his opinion not have satisfied the protocol.   He posits that Defendants' mere contemplation and planning for an off-site assessment presents evidence of a disregard for the protocol that punctures Defendants' actual compliance with the protocol.  In other words, Lorraine presents a bad actor theory in which Ohio is guilty of unconstitutional conduct for what

9

various actors thought about doing, even if the contingency plan never reached culmination. Lorraine overreaches.

This Court does not care what Defendants *thought* about doing to satisfy the protocol's parent institution assessment of Brooks.  Nor does the Court care what various state actors *discussed* in contemplating how they could satisfy the requirement, what *preliminary steps* they undertook, or how that contingency plan scenario *might* have played out.  What the Court cares about is whether Defendants ultimately satisfied the parent institution component of the protocol. They did, and they did so in accordance with the protocol specifications.

Whatever plans were considered or started or abandoned or approved, what matters is whether parent institution assessment was completed.  How it might have been alternatively attempted and whether that contingency plan would have met the protocol requirements so as to render any constitutional concerns irrelevant is speculation that would only serve to provide an advisory opinion on a hypothetical course of action that in the end proved unnecessary.

This Court also notes that although it need not opine on whether the contingency plan would have met the protocol requirements so as to satisfy the constitutional issues involved, Mohr testified that under current circumstances, he would not have approved the contingency plan deviation.  That deviation may or may not have been fine, but the key point here is that the contingency plan would have ultimately been presented to Mohr, who would have had the final say on the protocol deviation.

Lorraine attempts to make much of the fact that Dr. Martin Escobar, the individual who conducted the assessment of Brooks, lied to this Court during the *Brooks* hearing.  By agreement of the parties, Escobar testified via telephone during that prior hearing.  In its November 4, 2011

10

Opinion and Order, the Court explained the importance of his testimony as follows:

> The new protocol calls for an assessment of an inmate within a specified number of days prior to his or her execution.  Belatedly disclosed hearing evidence indicates that Ohio conducted such evaluations, even if at least one of the individuals examining Plaintiff did not know the reasons for the evaluation until after the fact and even he only fulfilled the requirements of the assessment essentially by luck. The physician who conducted the hands-on examination of Plaintiff testified that he performed the IV assessment of Plaintiff's veins as a matter of course because he routinely does so in many physical evaluations.  Ohio thus fell into compliance with this protocol requirement.  It would have made much more sense [had] the doctor . . . been told beforehand that Ohio needed a pre-execution protocol for Plaintiff. Inexplicably, he was not, despite the fact that the doctor opined that as part of his duty to care for inmates, he believes that he could ethically perform such an assessment.  Regardless, the requisite assessment was completed.

*Cooey (Brooks)*, 2011 WL 5326141, at *10.  That prior analysis necessitates three comments.

First, Ohio apparently did *not* fall into protocol compliance.  Subsequent to the *Brooks* hearing, Lorraine deposed Escobar.  (Pl.'s Ex. 39, Escobar Dep.)  In his deposition, after asking whether he was going to get in trouble for his latest, "true" testimony, Escobar testified that he had known that he was assessing Brooks for an execution, that nurse Mary Helen Lapushansky had explained to him the purpose of the examination just prior to the assessment (contrary to Lapushansky's own deposition), and that he had previously testified to the contrary in order to protect himself and to assist Brooks' parent institution, Bobby, and Mohr in this litigation.

Second, Lorraine again overreaches when he seeks to inflate Escobar's falsehoods into a sweeping indictment presenting evidence of Ohio's impropriety.  The Court is not yet prepared to accept the premise that Escobar's conduct reflects a deceptive attitude necessarily attributable to Defendants or the premise that any defendant or agent thereof led Escobar to provide false testimony.  This Court will address the issue of Escobar's false testimony and Lapushansky's possible false testimony later.  The forthcoming consequences of their actions is tangential to

11

whether Lorraine warrants a stay of execution.

Third, regardless of the first two points, the important takeaway for purposes of Lorraine's injunctive relief motion is that Escobar performed the protocol assessment of Brooks. Whether by accident or intentionally, Ohio complied with the protocol.

Lorraine, similar to Brooks before him, questions the sufficiency of all of the examinations or assessments Ohio provides even if they were done in compliance with the protocol. He argues that by failing to inform some of the medical examiners of the purpose of the evaluations or of the details of the execution protocol. This Court explained in the *Brooks* Opinion and Order:

> Plaintiff questions the sufficiency of the assessment. He argues that the protocol requires that the execution team be informed of his physical condition, including high blood pressure that testimony indicated could result in Plaintiff's demise at nearly any moment. Plaintiff perhaps places more demands than either the protocol or the Constitution compel. Full information sharing would certainly make sense, even if not compelled by Ohio's rules or the Constitution. But in making the argument he does, Plaintiff overlooks a key fact: he is refusing to take his medication. Any risk related to his high blood pressure is in part self-inflicted, and Plaintiff has directed this Court to no authority supporting the proposition that a state violates equal protection when it fails to communicate every potential medical roadblock an inmate voluntarily creates to being healthy enough to execute. Other record evidence similarly supports the conclusion that Ohio conducted the requisite mental health evaluation, even if the conclusions reached did not necessarily agree with older conclusions reached prior to Plaintiff entering the system as a death-sentenced individual. It would make sense for the execution team to know as much detail as possible about an inmate's physical and mental condition. It does not violate the Constitution if they know less than everything.

*Cooey (Brooks)*, 2011 WL 5326141, at *10. The Court adheres to its prior analysis.

The foregoing discussion leads to the conclusion that Lorraine has failed to present Brooks-related evidence of pre-SOCF shortcomings that present constitutional infractions. The Court therefore turns to the second main topic presented by Lorraine's argument: Ohio's

commission of non-core deviations from the protocol once Brooks arrived at SOCF.

Lorraine points to a number of clear deviations in the Brooks execution from the protocol.  Section VI(H)(1)(c) provides that a second "Drug Administrator shall announce the start and finish times of each injection to the Command Center contact for capture on the timeline."  The evidence reflects that ODRC in-house counsel Greg Trout has issued a memorandum directing that the Equipment Room and Execution checklist recorder shall make the announcements.  Section VI(I)(10) of the protocol requires that "[t]he Team Leader . . . document the name or description, the expiration date, and the lot number of the execution drugs used."  Defendants did not adhere to this requirement in Brooks and had another individual perform this task; evidence indicates that the task has been assigned to Denise Dean in future executions.

Defendants concede several of these deviations, but argue that they are insubstantial because ultimately, someone performed or will perform the required functions.  In other words, they argue that substantial compliance is acceptable.

Other evidence indicates that Ohio failed to review Brooks' medical chart upon his arrival at SOCF, despite Section VI(E)(2) requiring this review.  There was no record of such review on the checklist Ohio has created to prove that it was done.  Defendants explain that "the boxes are located at the far left side [of the checklist] and may have been unintentionally missed."  (ECF No. 52, at 14.)  A mark that something was completed on the checklist is proof that it occurred, according to SOCF Warden Donald Morgan .  He then testified that the failure to check off an action does "not necessarily" mean that it did not occur.  Defendants thus attempt to shield themselves by demanding that Lorraine prove a negative, while concurrently holding up

the completed portions checklist as proof positive of protocol compliance.  This Court doubts that a file review was conducted.  There is no sensible reason for Defendants to offer no evidence that it was done, such as testimony by the person who allegedly did it.

Assuming *arguendo* that all of these deviations fall under the category of non-core deviations, this Court is not greatly concerned with the fact that one state actor fulfilled a function specifically assigned only to another actor by the protocol.  Such a deviation is a non-core variation that can properly occur under the protocol scheme accepted as constitutional by this Court in the Brooks proceedings.  The problem is that such deviations, as well as the lack of a file review, did not properly occur in the Brooks execution.  The reason they cannot be regarded as having properly occurred is because they were not approved in the only manner in which they could have been approved.  This is not to say that Ohio must perform all executions in a precisely identical manner.  All that is required is that Ohio apply the same overarching rules in every execution, with these rules allowing for necessary and approved non-core deviations.

The Court thus rejects Defendants' invitation to accept substantial compliance with non-core protocol provisions as acceptable.  The road to impermissible if not maddening micro-management consists of attempting to assign weight or value to each unapproved deviation, trying to gauge when a few deviations are fine but when too many are too much.  Moreover, the protocol itself rejects permissible non-core deviations that are not approved by the Director.  It is thus not the individual non-core deviations themselves or in the aggregate that lead to this Court's rejection of substantial compliance.  Rather, what is significant is the overarching core concern implicated that makes the non-core deviations errors as opposed to approved departures.

14

By the evidence presented at the *Brooks* testimony, Defendants presented this Court with what amounts to a fifth core component of the protocol: the Director and only the Director can approve non-core protocol deviations. This rule provides a coherence and equality to the protocol that, given the testimony in the Brooks hearing, would otherwise be lacking. The Sixth Circuit's explanation of the constitutional right involved provides the necessary context in which to view the salvaging effect of the protocol's chain-of-command practice:

> "The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws.' U.S. Const. amend. XIV, § 1. The Supreme Court has stated that this language 'embodies the general rule that States must treat like cases alike but may treat unlike cases accordingly.' " *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005) (quoting *Vacco*, 521 U.S. at 799, 117 S.Ct. 2293). To establish a claim for relief under the Equal Protection Clause, a plaintiff must demonstrate that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis. *Id.; see also TriHealth, Inc.*, 430 F.3d at 788.

*Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 298 (6th Cir. 2006). When the disparate treatment burdens a fundamental right, strict scrutiny applies. *Miller v. City of Cincinnati*, 622 F.3d 524, 538 (6th Cir. 2010). What this means is that any core deviation from the protocol is permissible only if it is narrowly tailored to a compelling governmental interest. *Cf. Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007).

The fundamental right involved in inmate claims such as Lorraine's claim is the right to be free from cruel and unusual punishment. As they have in the past, Defendants continue to attempt to transform Lorraine's Fourteenth Amendment claim into a pure Eighth Amendment claim. But as this Court has previously explained in its *Smith* Opinion and Order,

> the former claim sufficiently targets that sweeping core deviations would at least burden Plaintiff's fundamental right by negating some of the precise procedural

15

safeguards that this Court and the Sixth Circuit heralded in prior discussions of Eighth Amendment claims in this same litigation.  For present purposes, it does not matter whether there is a qualifying risk of severe pain–a conclusion rejected by the only medical expert who testified–but only the creation of unequal treatment impacting the fundamental protection involved.

*Cooey (Smith)*, 2011 WL 2681193, at *29.  The Court also explained the problem with core

deviations that lack any rational basis, noting:

> The Sixth Circuit has explained the class of one approach:
>
>> When a plaintiff does not allege that the government's actions burden a fundamental right or target a suspect class, the plaintiff is said to proceed on a so-called "class of one" theory and must prove that the government's actions lacked any rational basis.  *Radvansky*, 395 F.3d at 312.  Under rational basis scrutiny, government action amounts to a constitutional violation only if it "is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational." *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005).  A "plaintiff may demonstrate that the government action lacks a rational basis . . . either by negativing every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will." *Id.* at 711; *see also TriHealth, Inc.,* 430 F.3d at 788 (citing *Warren*, 411 F.3d at 710).
>>
>> Under rational basis review, the defendant "has no obligation to produce evidence to sustain the rationality of its actions; its choice is presumptively valid and 'may be based on rational speculation unsupported by evidence or empirical data.' "  *Id.* at 790 (quoting *Fed. Comm. Comm'n v. Beach Comm., Inc.,* 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)).  The burden falls squarely to the plaintiff, who must overcome the presumption of rationality by alleging that the defendant acted in a manner clearly contrary to law. *Id.*

*Id.* at *29-30 (quoting *Club Italia Soccer & Sports Org., Inc.*, 470 F.3d at 298).  Similar to Smith

and Brooks before him, Lorraine "also asserts that the only rationale for core deviations that

eliminate safeguards and introduce greater uncertainty into the execution process is to merely

complete the executions at all or nearly all costs." *Cooey (Brooks)*, 2011 WL 5326141, at *4.

Within this context, Defendants represented to this Court in the Brooks proceedings two fundamental precepts. One was that Ohio would not and in fact could not deviate from the core protocol provisions set forth in Section IV of the protocol. The other precept was that all non-core protocol deviations are permissible, but only if they are approved by the Director.

In regard to the first precept, the four core protocol provisions track this Court's articulation in *Smith* of prior deviations from core components of past protocols. The Court explained in the *Brooks* Opinion and Order:

> In [the *Smith*] Opinion and Order, this Court noted that "[t]he core components of the written protocol as set forth in the [then applicable] incarnation of the execution protocol are adequate even if capable of further refinement. It is only Ohio's implementation of these core components that is often grossly and inexplicably inadequate." Such flawed implementation manifested itself in what this Court described as four core deviations: (1) Ohio fails to document the preparation of the execution drugs, (2) Ohio fails to follow formalized procedures designed to ensure adequate preparation for the administration of drugs by IV, (3) Ohio fails to adhere to systemic redundancies that would minimize if not eliminate the possibility of human error, (4) Ohio fails to exercise control over who participates in an execution. The overarching issue underlying all of these problems was that Defendants perceived that they were free to ignore their own protocol due to convenience, pragmatism, or incompetence, which meant that Ohio would ignore the constitutional restraints on state actors' conduct.

> Things have changed. It does not matter to this Court whether Ohio has acted motivated by admirable intent or whether it has been begrudgingly dragged toward respectability. What matters is that as a result of state action, the written protocol is now binding, the possibility of variations from less core components has been curtailed and such variations now run to one decisionmaker, and the possibility of variations from the most essential or core components now lies outside the discretion of any decisionmaker because they are not possible. Moreover, Defendants have tightened procedures and have implemented checklists and safeguards extrinsic to the protocol that, effectively employed, will serve to reinforce the protocol requirements. Warden Donald Morgan correctly described the checklists as a checks and balances system that is not mentioned in the written protocol but assists in maintaining compliance with that protocol. Such practices that technically exist outside the written protocol constitute the same type of unwritten practices that in the

past served to prop up inferior execution protocol versions. Ohio would be foolish to now abandon them, and the state's implementation of these practices warrants positive recognition.

*Cooey (Brooks)*, 2011 WL 5326141, at *5 (citation omitted). Thus, the Court recognized that

Ohio had improved its protocol and practices:

> The net effect of Ohio's revised practices and revised protocol is essentially twofold. First, there is a return to viewing the protocol and unwritten practices as linked. Like other courts entertaining challenges to lethal injection protocols under § 1983, this Court followed for much of this litigation the parties' lead in "us[ing] the term 'protocol' to encompass not only the quantities, preparation, injection, and the actual drugs administered during the execution process, but also all policies, procedures, and staff qualification requirements." *Walker v. Epps*, 587 F. Supp. 2d 763, 766 n.3 (N.D. Miss. 2008). In the Smith decision, this Court discontinued use of the blanket term "protocol" in such a manner because it failed to capture the division that Defendants' Smith-era approach presented. The Smith evidence previously suggested an overarching execution policy and a notably subordinate written execution protocol. The contemporary evidence now supports that Defendants have returned to a protocol that embodies an expression of an overall concern for constitutional conduct. Moreover, the evidence indicates that unwritten policies and practices once again support the constitutionality of Ohio's execution practices, rendering the protocol more sound.

> The second effect of Ohio's recent efforts is that Plaintiff has failed to meet his burden of proof.

*Id.* at *5-6. The problem with reaching this same conclusion here is that by now again endorsing

a system in which non-core deviations can occur without approval and without consequence,

Ohio has punctured the practice that lent its new protocol the saving grace this Court afforded it

in the *Brooks* Opinion and Order.

This practice, or the second *Brooks* precept, is that Ohio has told this Court that a fifth

non-variable component of the protocol is that only the Director can approve non-core

deviations. Defendants then failed to follow that procedure for the non-core deviations set forth

above. This again presents every aspect of the protocol except for the specifically identified core

18

components as a set of preferred practices or suggestions subject to variable implementation

from inmate to inmate based on good reasons, bad reasons, or no reasons at all.

This result runs directly adverse to the rationale animating the *Brooks* decision, in which

the Court stated:

> [T]he written protocol is no longer a set of guidelines that can be set aside regardless of the constitutional effect of such action. This fact is perhaps best captured in the testimony of Regional Director Edwin Voorhies, who has changed his position once again, but this time to a position that favorably addresses constitutional concerns. Previously in this litigation, he testified that the written execution protocol carries the force of administrative law. The SOCF warden is required to follow the protocol, Voorhies testified in 2009, and former DRC Director and former SOCF warden Terry J. Collins, his then-supervisor, agreed. At the Smith hearing, Morgan, the latest SOCF warden, testified that the written protocol in effect at that time was merely a set of guidelines. Voorhies surprisingly agreed. This led the Court to conclude that Ohio's execution protocol was (and might have always been) an advisory compilation of guidelines subject to being ignored.

> The Brooks hearing presented a different story. Ohio Department of Rehabilitation and Correction Director Gary Mohr's testimony in particular indicated a rejection of the pervasive bureaucratic ennui that this Court has long targeted as notably troubling. He described the Smith decision as difficult to read, which concerned this Court and its law clerks until Mohr explained that he did not mean there was inept writing presenting a confusing Opinion and Order. Rather, Mohr testified, what he meant was that the criticism leveled at Ohio was troubling or uncomfortable. He explained that the new protocol and approach was intended to embrace a policy of strict compliance. Mohr also clarified protocol language so that the protocol's use of "variation" and "deviation" were revealed to mean the same thing–departures from the written protocol–and he testified that only he could approve a "variation of a substantial nature," or as he defined it, a variation that would have an impact on the execution itself. Mohr described variations from requisite training as intolerable.

> Morgan and Voorhies largely echoed Mohr. The new protocol strips the warden of much of his execution-related discretion in a sense, and Morgan evinced an understanding that he cannot delegate his execution duties to a team member. Like Mohr, Morgan testified that there is no difference in the written protocol between a variation and a deviation. Unlike Mohr, Morgan also testified that there is no difference between a substantial variation, or a variation of a substantial nature, and the terms "variation" or "deviation." In other words, Morgan understood the protocol to mean that a departure is a departure, and he explained that they all fall

above his pay grade.  Morgan testified that Mohr has made it clear that the protocol is to be faithfully, consistently, and strictly applied.

Voorhies now agrees.  He testified that although Section II of the written protocol still uses the term "guidelines," his approach is now quite different than the approach he expressed in the Smith hearing.  He agreed that the protocol went from binding administrative law to advisory to binding again.  Voorhies also testified that a deviation is the same as a variation under the protocol and that a team member cannot vary from the protocol.

The Court notes that Mohr testified that he understood the protocol to permit the warden to authorize protocol deviations.  This is of course incorrect.  It appears Mohr was crediting only Section V, the second unnumbered paragraph of which provides that "[a]ny variation of a substantial nature must be approved by the Director as described in this policy."  Section VI(A)(6) expressly provides, however, that "[o]nly the Director may authorize a deviation from the procedures in this policy directive."  Thus, one protocol provision leaves substantial variations only to the Director, and another provision leaves any variation or deviation to the Director. The end result is that *all* departures from the written protocol are up to the Director. The error on Mohr's part in recognizing the full scope of his responsibility does little for Plaintiff's cause for two reasons.

First, the only example non-substantial variation or deviation Mohr suggested (and the only one mentioned throughout the hearing) was when a warden would adjust inmate visitation.  Mohr correctly recognized this as falling within the warden's purview, even if he failed to explain or recognize why it is within the warden's ability.  Section VI(E)(7) specifically provides the warden with the discretion to increase visiting opportunities in the manner Mohr and others contemplated.  Increasing visitation time or frequency is therefore actually not a deviation from the written protocol, but is instead a commendable part of that protocol.  There can be no constitutional violation in giving an inmate more visitation and, more important for present purposes, there is technically no written protocol departure when a warden does so.

Second, both Morgan and Voorhies testified that variations or deviations were left to the Director.  Team Member # 10, the execution team leader, testified multiple times that he lacks the authority to authorize deviations.  Even if Mohr thought that select subordinates could authorize protocol departures, the subordinates do not, and any possible departure would consequently flow upward to the only decisionmaker empowered under the protocol to authorize or deny the departure. The end result is the same: as the protocol contemplates, only the Director ultimately passes judgment on protocol departures.  The Court also notes its suspicion that Mohr will no doubt recognize the mandate of Section VI(A)(6) following the filing of today's decision.

*Id.* at *6-7.  Based on this reasoning, the Court concluded in *Brooks* that irrational adherence was a thing of the past.  Lorraine's evidence from the Brooks execution suggests this Court was wrong.  It is therefore again no longer true that "the possibility of variations from less core components has been curtailed and such variations now run to one decisionmaker."  *Cooey (Brooks)*, 2011 WL 5326141, at *5.

Defendants have failed to present this Court with any evidence that the non-core deviations were presented to Mohr.  They have also failed to present this Court with any evidence that, recognizing the problem presented with failing to follow the chain of command and obtain permission for these non-core deviations, they have since corrected course in order to adhere to the core protocol component of asking first instead of seeking forgiveness later.  If there were testimony in this record that all such deviations would be presented to Mohr for those inmates following Brooks such as Lorraine, today's result would likely be different.  This is what frustrates the Court.  Do not lie to the Court, do not fail to do what you tell this Court you must do, and do not place the Court in the position of being required to change course in this litigation after every hearing.  It should not be so hard for Ohio to follow procedures that the state itself created.  Today's adverse decision against Defendants is again a curiously if not inexplicably self-inflicted wound.

This Court has no interest in micro-managing executions in Ohio.  That is not a judge's role and it is certainly not this Court's inclination.  By Ohio's own design, the ODRC Director is the designated micro-manager of the state's executions.  Defendants failed in the Brooks execution to present Mohr with the information he needed to fulfill this role.  Such conduct and Defendants' refusal to admit and remedy the error punctures one of the core components of the

21

protocol that safeguards the constitutionality of Ohio's execution process.

The latest events in this litigation invoke the saying that the more things change, the more they stay the same.  Ohio created a new protocol and its agents indicated that they would comply with that protocol, presenting this Court with an interpretation of the protocol in which there are five core components from which they cannot vary.  Ohio's failure to stand by its representation that all possible deviations flow up to the Director means that, once again, "[i]t is the policy of the State of Ohio that the State follows its written execution protocol, except when it does not. This [remains] nonsense." *Cooey (Smith)*, 2011 WL 2681193, at *1.  The first injunctive factor therefore weighs in Lorraine's favor.

### C. Irreparable Injury, Substantial Harm to Others, and the Public Interest

Given the weight the Court assigns to the first factor discussion presented above, this Court need not and shall not address the remaining factors in much detail.  The Court notes that the irreparable injury a constitutional violation presents is clear and favors a stay.  *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (explaining that "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated" and "a successful showing on the first factor mandates a successful showing on the second factor-whether the plaintiff will suffer irreparable harm"). This Court is not persuaded that issuance of injunctive relief will cause substantial harm to the State or others by comparison.  The Court also recognizes that the public interest is served only by enforcing constitutional rights and by the prompt and accurate resolution of disputes concerning those constitutional rights.  *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 274 F.3d 377, 400 (6th Cir. 2001) (" '[I]t is always in the public interest to prevent violation of a party's constitutional

22

rights.' " (quoting *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir. 1994))). By comparison, the public interest has never been and could never be served by rushing to judgment at the expense of a condemned inmate's constitutional rights. Finally, this Court declines to require a security bond for obvious reasons. *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (explaining that whether to require a bond is within the discretion of the court).

### IV. Conclusion

As in prior injunctive relief decisions, the Court does not conclusively hold today that Ohio's method of execution practices are constitutional or unconstitutional. Today's decision only recognizes that based on all of the record evidence, Lorraine has met his burden of persuading this Court that he is substantially likely to prove unconstitutionality and prevail in this litigation. Accordingly, the Court **DENIES** Lorraine's motion to strike (ECF No. 53) and **GRANTS** Lorraine's motion for a temporary restraining order and a preliminary injunction (ECF No. 7). It is thus **ORDERED**, **ADJUDGED**, and **DECREED** that the State of Ohio, and any person acting on its behalf, is hereby **STAYED** from implementing an order for the execution of Charles Lorraine issued by any court of the State of Ohio until further Order from this Court.

**IT IS SO ORDERED.**

         /s/ Gregory L. Frost
         GREGORY L. FROST
         UNITED STATES DISTRICT JUDGE