UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: OHIO EXECUTION
PROTOCOL LITIGATION                     Case No. 2:11-cv-1016
                                        JUDGE GREGORY L. FROST
                                        Magistrate Judge Mark R. Abel

This document relates to: Mark Wiles.

OPINION AND ORDER

Can Ohio now be trusted?

The context surrounding this question necessarily starts with the axiomatic proposition that the United States Constitution does not require a perfect execution. Its protections do not require perfect adherence to every single provision of Ohio's execution protocol without deviation, much less perfect adherence to every protocol provision in training sessions. But the Constitution does require that Ohio apply its protocol in a manner that does not offend constitutional protections.

Ohio has routinely offended these protections.

These offenses have not been simple errors of no importance. Mistakes happen. The random misadventure that can result when Ohio errs by not following its protocol may be regrettable but constitutional, depending upon the circumstances involved. What is not constitutional is a policy of sporadic adherence to the execution protocol that allows if not endorses institutional incompetence and presents aberrational state conduct endangering rights the Constitution confers on everyone, no matter how heinous a crime an inmate has committed. Thus, although Ohio does not need to follow each step in its protocol in an identical manner in every execution the state conducts, Ohio does need to apply the protocol under the same set of

permissible overarching rules for each capital inmate.

Ohio argues that regardless of what happened in the past, the state can now be trusted to do the right thing.

Against this backdrop, the captioned case is before the Court for consideration of Plaintiff Mark Wiles' motion for a temporary restraining order and a preliminary injunction (ECF No. 84) and Defendants' memorandum in opposition (ECF No. 95).  Plaintiff seeks a stay of his scheduled April 18, 2012 execution, while Defendants seek to persuade this Court once again that they are able to implement Ohio's execution protocol in a constitutional manner.

Ohio has time and again failed to follow through on its own execution protocol.  The protocol is constitutional as written and executions are lawful, but the problem has been Ohio's repeated inability to do what it says it will do.  As a result, this Court has dealt with inmate challenges to the constitutionality of Ohio's execution protocol for close to eight years.[1]  During that time, the litigation has morphed from focusing primarily on allegations of cruel and unusual punishment to allegations of equal protection violations.  And as this Court has previously stated, "Ohio has been in a dubious cycle of defending often indefensible conduct, subsequently reforming its protocol when called on that conduct, and then failing to follow through on its own reforms."  *In re Ohio Execution Protocol Litig. (Lorraine)*, No. 2:11-cv-1016, 2012 WL 84548, at *1 (S.D. Ohio Jan. 11, 2012).  Ohio has now come forward with yet another set of reforms to its practices that it assures this Court will remedy the state's unconstitutional conduct.

---

[1]  The original execution protocol case dates back to 2004.  Over the years, various inmates filed additional cases.  By agreement of the parties, the Court ultimately consolidated all the execution protocol cases under case number 2:11-cv-1016 and closed the four original cases on the docket so that the parties would be able to proceed under only one case number.  *See* ECF No. 11.

The Court is admittedly skeptical about Ohio's ability to following through on its latest reforms.  At the heart of these reforms is Ohio's promise that newly implemented chain-of-command and documenting procedures and a renewed if not newfound commitment to conducting constitutional executions finally mean that the state can carry out executions in a constitutional manner.

Thus, the question before the Court is whether it should believe Ohio's latest round of promises.  If this Court cannot, then the end result is a stay of the Wiles execution based on analysis that will likely lead to a court-ordered moratorium on executions in Ohio.  If this Court does believe Ohio, then the state can proceed to execute Wiles and this Court will soon learn whether it erred in believing Ohio once again and perhaps one time too many.

The answer to the foregoing question turns on the burden involved.  Wiles has the burden of convincing this Court that Ohio cannot be trusted, even in light of the new facts presented to the Court.  Because he has failed to meet that burden, with the evidence nearly if not completely equally balanced on whether this Court can trust Ohio, Ohio can proceed to fulfill its lawful duty to execute Wiles.

## I. Background[2]

This litigation is a 42 U.S.C. § 1983 civil rights action brought by multiple inmates who challenge various facets of the execution protocol used by the State of Ohio.  Most recently, various plaintiffs have sought to obtain stays of their execution dates based on claims that Ohio's

---

[2]  The findings of fact related to this Opinion and Order are not conclusive given that "findings of fact and conclusions of law made by a district court in granting a preliminary injunction are not binding at a trial on the merits."  *United States v. Edward Rose & Sons*, 384 F.3d. 258, 261 (6th Cir. 2004) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

execution protocol and practices violate the Equal Protection Clause of the United States Constitution.[3]

The Court issued one such stay in a July 8, 2011 decision in which it set forth at length numerous deviations by state actors from the state execution protocol then in effect, including core deviations that subverted the key constitutional principles that control the execution process. *Cooey (Smith) v. Kasich*, Nos. 2:04-cv-1156, 2:09-cv-242, 2:09-cv-823, 2:10-cv-27, 2011 WL 2681193 (S.D. Ohio July 8, 2011).  This Court enjoined Ohio and any person acting on its behalf from implementing an order for the execution of Plaintiff Kenneth Smith until further Order from the Court.

In response, Defendants revised Ohio's execution protocol and practices.  This resulted in the current iteration of the state's execution protocol, 01-COM-11, which became effective on September 18, 2011.  Ohio then proceeded to pursue the resumption of executions.

The next inmate seeking a stay via injunctive relief to come before this Court was Reginald Brooks.  Brooks' stay motion came on for a hearing from October 31, 2011 through November 2, 2011.  The Court took the motion under advisement and, after examining the new protocol and the proffered evidence of Defendants' practices in implementing that protocol, issued a November 4, 2011 Opinion and Order that explained that "[t]he dispositive questions . . . have been whether [Brooks] is correct that Defendants routinely deviate from mandated or core

---

[3] Many of the prior Orders of this Court inform today's decision.  A recent history of this litigation and its often frustrating factual developments can be found in the following Opinion and Orders, which this Court expressly incorporates herein by reference: *In re Ohio Execution Protocol Litigation (Lorraine)*, No. 2:11-cv-1016, 2012 WL 84548 (S.D. Ohio Jan. 11, 2012), *Cooey (Brooks) v. Kasich*, Nos. 2:04-cv-1156, 2:09-cv-242, 2:09-cv-823, 2:10-cv-27, 2011 WL 5326141, at *12 (S.D. Ohio Nov. 4, 2011), and *Cooey (Smith) v. Kasich*, Nos. 2:04-cv-1156, 2:09-cv-242, 2:09-cv-823, 2:10-cv-27, 2011 WL 2681193 (S.D. Ohio July 8, 2011).

provisions set forth in the written protocol and whether [Brooks] has sufficiently proved that the protocol fails to address sufficiently varied constitutional concerns. The answer to both questions is no." *Cooey (Brooks) v. Kasich*, Nos. 2:04-cv-1156, 2:09-cv-242, 2:09-cv-823, 2:10-cv-27, 2011 WL 5326141, at \*12 (S.D. Ohio Nov. 4, 2011).

Notably, the crux of the rationale behind the Brooks decision is that he failed to present evidence that he was likely to prove that Defendants are not doing what they say they are doing in conducting executions under the current protocol. Of significance is that, unlike in the *Smith* proceedings, Defendants were now saying that they got the message that their actions must match their words. *Trust us*, Defendants said, *we will not deviate from the core components of the protocol*. This Court accepted that contention. *Trust us*, Defendants continued, *we will let only the Director decide whether to allow any potentially permissible deviation from the non-core components of the protocol*. This Court also accepted that statement. Unfortunately, Defendants once again fooled the Court.

On January 11, 2012, this Court issued an Opinion and Order granting Plaintiff Charles Lorraine's motion for a temporary restraining order staying his execution scheduled for January 18, 2012. *In re Ohio Execution Protocol Litigation (Lorraine)*, No. 2:11-cv-1016, 2012 WL 84548 (S.D. Ohio Jan. 11, 2012). The Court identified three provisions of Ohio's execution policy from which the state had deviated during the November 15, 2011 execution of Brooks and emphasized that those deviations were constitutionally impermissible because they "were not approved in the only manner in which they could have been approved." *Id*. at \*8. This Court explained that "the Director and only the Director can approve non-core protocol deviations," which constitutes the fifth core component of the protocol. *Id*. at \*9. The Court proceeded to

5

criticize the state because it did not appear from evidence presented during the Lorraine injunctive relief hearing that any of the three Brooks deviations had been presented to Director Mohr or that the state at any point thereafter had recognized or corrected course.  Such deviation from the fifth core component of the protocol problematically suggested that the remaining four core components were open to similar disregard. *Id.* ("It is thus not the individual non-core deviations themselves or in the aggregate that lead to this Court's rejection of substantial compliance.  Rather, what is significant is the overarching core concern implicated that makes the non-core deviations errors as opposed to approved departures.").  Although the Court issued what can be fairly characterized as a stinging rebuke of Ohio's continued failure to follow its own protocol, the Court made clear once again that it had no interest in micro-managing Ohio's executions. *Id*. at *14.

The latest plaintiff to seek a stay is Mark Wiles, an inmate on Ohio's death row who is set to be executed on April 18, 2012.  On February 15, 2012, Wiles filed a motion for a temporary restraining order and preliminary injunction to stay his execution.  (ECF No. 84.)  Pursuant to S. D. Ohio Civ. R. 65.1(a), the Court held an informal preliminary conference with the parties on February 16, 2012, at which time the Court set a briefing schedule and a hearing date.  (ECF No. 87.)

The Court held the hearing on Wiles' motion for injunctive relief from March 20, 2012, through March 28, 2012.  The following witnesses testified: Team Member # 23, Team Member # 17, Ohio Department fo Rehabilitation and Correction ("ODRC") Planning Section Chief Ron Erdos, Southern Ohio Correctional Facility ("SOCF") Health Care Administrator Roseanna Clagg, Chillicothe Correctional Institution ("CCI") Health Care Administrator Beth Ann

Higginbotham, CCI attending physician Dr. Gary Krisher, SOCF Deputy Warden of Operations Michel Oppy, Pharmacological expert Dr. Mark Dershwitz, SOCF Deputy Warden of Special Services Anthony Cadogan, CCI Warden Norman Robinson, ODRC Deputy Planning Section Chief James Goodman, ODRC Director Gary Mohr, Team Member #10, and SOCF Warden Donald Morgan.[4]  Wiles and Defendants each presented approximately one-hundred document-exhibits.  This Court then held an additional telephone conference with the parties on March 29, 2012, at which various evidentiary issues were resolved.

The hearing testimony presented post-Lorraine factual developments.  Director Mohr testified during the Wiles hearing that he was "upset" upon reading the Court's decision regarding Lorraine.  He explained that "[t]his is my 38th year, July 1st is my 38th year, and I have never read anything that was quite as negative about an operation that I have been responsible for . . . ."  (Wiles Hr'g Tr., Vol. VI, at 40.)  Several days later, according to Director Mohr, ODRC East Regional Director Edwin Voorhies and ODRC in-house counsel Greg Trout pitched to him the idea of implementing Incident Command System ("ICS") into Ohio's execution process.  As set forth in an ICS training document that Wiles submitted during the hearing and about which Planning Section Chief Ron Erdos testified:

> The ICS is a management system designed to enable effective and efficient domestic incident management by integrating a combination of facilities, equipment, personnel, procedures, and communications operating within a common organization structure, designed to enable effective and efficient domestic incident management. A basic premise of ICS is that it is widely applicable.  It is used to organize both near-term and long-term field-level operations for a broad spectrum of emergencies, from small to complex incidents, both natural and manmade.  ICS is used by all

---

[4]  By order of this Court and by continuing agreement of the parties, all references to Ohio's execution team members are again by generic identifiers established by the parties and employed to address anonymity and safety concerns.

levels of government–Federal, State, local, and tribal–as well as by many private-sector and nongovernmental organizations.  ICS is also applicable across disciplines.  It is normally structured to facilitate activities in five major function areas: command, operations, planning, logistics, and finance and administration.

(Pl.'s Ex. 72.)

Director Mohr testified that he thought Regional Director Voorhies' suggestion of implementing ICS was a "great idea" because "[i]t is a uniform command system, which is exactly what this Judge is telling us that this Director better be doing to micromanage this process."  (Wiles Hr'g Tr. Vol. VI, at 42.)  Director Mohr testified that Regional Director Voorhies spent the weekend putting together a proposal (Defs.' Ex. 45) that Director Mohr reviewed on Monday, January 16, 2012.  (Wiles Hr'g Tr. Vol. VI, at 42-43.)  Director Mohr testified that after discussing the proposal in-house with ODRC Assistant Director Stephen Huffman, SOCF Warden Donald Morgan, ODRC in-house counsel Greg Trout, and ODRC Planning Section Chief Ron Erdos, as well as with the Governor's legal counsel and staff, "[m]y decision was to implement ICS as a supporting part of the execution protocol."  (Wiles Hr'g Tr. Vol. VI, at 45.)

For purposes of implementing ICS into Ohio's execution process, it was decided early in the planning process for the Webb execution that the time period leading up to each execution would be divided into two operational periods.  The first operational period would start at 8:00 a.m. approximately thirty (30) days out from a scheduled execution date and conclude at 7:00 a.m. on the day preceding that scheduled execution date.  The second operational period would begin at 7:00 a.m. on the day preceding the scheduled execution date and conclude at 1:00 p.m. the next day.  Thus, by way of illustration, the Webb execution, deemed an incident in ICS terminology, was scheduled for February 22, 2012, at 10:00 a.m.  The first operational period

8

began at 8:00 a.m. on January 23, 2012, and concluded at 7:00 a.m. on February 21, 2012.

(Defs.' Ex. 4.)  The second operational period began at 7:00 a.m. on February 21, 2012, and

concluded at 1:00 p.m. on February 22, 2012.  (Defs.' Ex. 18.)

According to the testimony and evidence, each operational period has its own distinct

organizational structure.  For each operational period of every execution, Director Mohr serves

as the Incident Commander ("IC").  According to Director Mohr's testimony, that meant that he

would be "ultimately responsible for approving the objectives, approving the incident action plan

and insuring that the resources are appropriate to carry out that incident action plan."  (Wiles

Hr'g Tr. Vol. VI, at 46.)  Turning again to the incident Webb execution, the organizational

structure was as follows: Director Mohr served as the IC.  His command staff consisted of

Assistant Director Stephen Huffman serving as the Deputy IC; Melissa Adkins serving as the

Recorder; JoEllen Smith serving as the Public Information Officer; and ODRC Chief Counsel

Greg Trout serving as Safety Officer.  Beneath the IC and his command staff, there existed four

sections: Operations, Planning, Finance, and Administration.  The latter two contained no

personnel.  The Planning Section was headed by ODRC Special Operations Commander Ron

Erdos serving as Planning Section Chief.

The Operations Section for the first operational period was headed by Regional Director

Edwin Voorhies serving as Operations Section Chief.  Serving under Operations Section Chief

Voorhies was SOCF Warden Donald Morgan, filling the role of the supervisor of all operations

at SOCF for the first operational period.  Beneath Warden Morgan was Team Member # 10, the

Execution Team Leader, serving as the execution team task force leader.  During the first

operational period, the primary activities assigned to SOCF personnel are the carrying out of

9

weekly execution rehearsals, as required by Section VI(B)(4) of Ohio's execution protocol with Team Member # 10 documenting among other matters attendance and absences, and reporting the same to SOCF Warden Morgan.  Warden Morgan would in turn recount those matters in detail during weekly meetings involving the IC, the IC's command staff, SOCF personnel, and CCI personnel.

Also serving under Operations Section Chief Voorhies was CCI Warden Norm Robinson, filling the role of the supervisor of all operations at CCI for the first operational period.  Beneath Warden Robinson were Dr. Gary Krisher, serving as the Medical Team Task Force Leader, and Rebecca Casto, serving as the Mental Health Task Force Leader.  (Eventually, a third task force was created called the Observation/Watch Task Force, with J. Netter serving as the Task Force Leader.  (Defs.' Ex. 53, at 8.)  According to documents, the Observation/Watch team will be tasked with moving the inmate to a new housing assignment approximately 72 hours prior to the scheduled execution, maintaining constant watch over the inmate, and completing a constant watch log.)  Dr. Krisher's task force consisted of Nurse Beth Ann Higginbotham, the CCI Health Care Administrator ("HCA").  Ms. Casto's task force included Dr. Jerome Gotthardt, CCI staff psychologist.  During the first operational period, Ohio's execution policy requires CCI personnel to perform a number of tasks, including but not limited to: providing notification of the confirmed execution date; performing specified hands-on vein and physical assessments, medical chart review, and mental health assessments, with each documented in the inmate's medical chart and any problems being reported immediate to the CCI Warden and SOCF Warden; and ensuring completion of the Execution Information Release form.

The first operational period was concluded by demobilization of the sections and units to

which tasks had been assigned upon completion of those tasks.  Planning Section Chief Ron

Erdos was responsible for Demobilization, which involved conducting debriefing sessions,

followed by the collection, review, and maintaining of documentation generated by the sections

and units in completing their assigned tasks, followed finally by the "release" of the personnel.

(Defs.' Ex. 17.)[5]

For the second operational period of the incident Webb execution, the organization

structure was as follows:  Director Mohr served as the IC.  His command staff consisted of

Assistant Director Stephen Huffman serving as the Deputy IC; Captain William Cool serving as

the Recorder; JoEllen Smith serving as the Public Information Officer; Regional Director Edwin

Voorhies serving as Safety Officer; and Robert Clagg serving handling Prison Management.

(Defs.' Ex. 20, at 176.)  Beneath the IC and his command staff, there existed four sections:

Planning, Logistics, Operations, and Finance.  The Finance Section contained no personnel.  The

Planning Section was headed by ODRC Special Operations Commander Ron Erdos serving as

Planning Section Chief.  James Goodman served as Deputy Planning Section Chief, while

Charlie Miller and Brenda Purtee were assigned to the Situation Unit.

The Logistics Section was headed by SOCF Deputy Warden Anthony Cadogan serving

as Logistics Section Chief.  Under the service unit within the Logistics Section, Chuck Bobst

---

[5]  The initial documents reflect that demobilization for the first operational period of the incident Webb execution occurred on February 3, 2012.  (Defs.' Ex. 17, at 306.)  According to testimony, during the early stages of implementing ICS into Ohio's execution process, it was thought that there would be three or four operational periods leading up to a scheduled execution.  Ultimately it was decided that there would be only two operational periods: the first capturing approximately thirty days preceding a scheduled execution and the second consisting of approximately twenty-four hours preceding and following that scheduled execution.  (Wiles Hr'g Tr. Vol. II, at 210-11.)

headed the communications unit and Sean Taylor headed the employee/inmate support services unit.

The Operations Section for the second operational period was headed by SOCF Warden Donald Morgan serving as Operations Section Chief. SOCF Deputy Warden Michel Oppy served as the Deputy Operations Section Chief. The Operations Section contained several divisions that were staffed with personnel. Team Member # 10, the Execution Team Leader, served as the Task Force leader for the Execution Strike Force/Task Force. His division included Team Member # 11. Jay Debold served as the Task Force leader for Transport. SOCF's Health Care Administrator, Rosie Clagg, served as the Medical Task Force Leader. Team Member # 23 served as the Task Force Leader for the medical team members of the execution team. Finally, Mike Williams served as the Mental Health Task Force Leader.

The initial step that Director Mohr took to implement ICS into the execution process consisted of a planning meeting that took place on January 19, 2012. (Defs.' Ex. 3, at 234.) According to Director Mohr, "we didn't have a lot of time." (Wiles Hr'g Tr. Vol. VI, at 45.) As Director Mohr explained, with the execution of Michael Webb scheduled for February 22, 2012, "we scheduled a planning meeting to launch this [ICS] process with the Webb execution." (*Id*. at 46.) The January 19, 2012 planning meeting included via telephonic conference the IC's Command Staff, CCI personnel, and SOCF personnel. From this point on, meetings were conducted no less than once per week. At *every* meeting, according to testimony, whether it is a planning meeting or a status briefing, Director Mohr has emphasized his expectation of strict compliance with Ohio's execution policy, his expectation that no one, including himself, could deviate or authorize a deviation from the four core components listed on page 3 of the protocol,

and his expectation that no one could deviate or authorize a protocol deviation from any non-core component without Director Mohr's approval.  Only the Director can approve a non-core deviation.

Implementing ICS into Ohio's execution process involved (and will continue to involve) the following procedures.  Turning again to the Webb execution by way of illustration, Planning Section Chief Ron Erdos began the process by developing a Formal Written Incident Action Plan and obtaining the IC's approval of that plan.  (Defs.' Exhs. 4 and 5.)  The documents he prepared included a form called the ICS 202 identifying objectives for the incident.  Those objectives were to prepare for the humane execution of Inmate Michael Webb and to conduct appropriate medical and mental health evaluations and reviews no later than 21 days before the scheduled deadline for those tasks, January 31, 2012.  (Defs.' Ex. 5.)  Erdos also prepared a form called the ICS 203 listing the organization summary for the first operational period, a form called the ICS 205 setting forth the communication plan, and a form called the ICS 206 setting forth the medical plan.  Task Force members received their assignments on forms called ICS 204's. (Defs.' Ex. 7.)  Each section's activities were documented on forms called ICS 214 Unit Logs. (Defs.' Exhs. 10, 11, 12, 13, 14.)  Section and Division chiefs communicated with each other, as well as to the IC and command staff, using forms called ICS 213's, documenting their progress on assigned tasks.  (Defs.' Exhs. 15 and 16.)

Returning to the initial planning meeting that took place on January 19, 2012, Director Mohr explained that the immediate focus turned to certain tasks that the protocol required to be carried out thirty (30) days prior to the scheduled execution date–namely, CCI Warden Robinson providing notification to the IC, as well as numerous other parties identified in Section VI.(B)(1)

13

of the protocol, of a "firm date" for the scheduled execution of an inmate and the CCI staff

moving the inmate to 30-day watch status for purposes of ensuring the inmate's safety.

Attention focused also on the tasks that the protocol required to be carried out no later than

twenty-one (21) days in advance of a scheduled execution.  According to Director Mohr:

> [T]he physical hands-on vein assessment, the medical chart review and assessment,
> and the mental health assessment are to be done within 21 days.  So, we talked about
> completion of those three to four days in advance of that 21-day period, which would
> mark our next status briefing at that point to insure that we had an update to confirm
> that those were done and documentation to support the fact that they were done.

(Wiles Hr'g Tr. Vol. VI, at 61.)  The planning and preparation process for the incident Webb

execution also included the conducting and documenting of the execution team's weekly

rehearsals at SOCF–specifically, one per week for four weeks preceding the scheduled execution

date.  (Wiles Hr'g Tr. Vol. VI, at 62-63; Defs.' Ex. 1, at 6.)

Next in the process was a status briefing on January 23, 2012, at which time Director

Mohr approved the written incident action plan for the first operational period of the incident

Webb execution.  (Wiles Hr'g Tr. Vol. VI, at 64.)  On that same date, CCI Warden Robinson

provided the 30-day notification required by 01-COM-11 and advised the IC of the same via an

ICS 213 form.  (Defs.' Ex. 1, at 5; Wiles Hr'g Tr. Vol. VI, at 66-67; Defs.' Ex. 16, at 294.)  The

following day, January 24, 2012, CCI Warden Robinson sent another ICS 213 form notifying the

IC that appropriate CCI personnel had completed all of the assessments and documentation

required by the policy–several days in advance of the 21-day deadline, as the IC and Warden

Robinson had discussed at the initial planning meeting.  However, because CCI had completed

those tasks before they had actually received their ICS 204's specifying their assigned tasks,

Director Mohr directed them to re-do all of those tasks *after* they received their 204's.  (Wiles

Hr'g Tr. Vol. VI, at 69.)

Before CCI could re-do those tasks, this Court on January 26, 2012, issued an order

staying the execution of Michael Webb.  Instead of aborting the process and planning for the

next scheduled execution, Director Mohr decided to continue the process for Webb as if the

execution were still scheduled to be carried out on February 22, 2012.  Of that decision, Director

Mohr explained:

> Everyone involved in this process, including this Director, needed to be
> trained and needed additional exposure and training as we were, one, insuring that
> we were compliant with the policy, and two, continuing to get used to some of the
> supporting documents like the checklist, and three, with incident command being
> made available as a supporting protocol, we all needed practice.

(Wiles Hr'g Tr. Vol. VI, at 55.)

Proceeding with the incident Webb execution as a training exercise, CCI re-did the

assessments and documentation required by the protocol to be completed no later than 21 days in

advance of the scheduled execution.  (Defs.' Ex. 16, at 300.)  Because the incident had become a

training exercise, the CCI personnel simulated those tasks rather than performing them again on

an inmate who no longer had an imminent execution date.  (Wiles Hr'g Tr. Vol. IV, at 184, 189;

Wiles Hr'g Tr. Vol. VI, at 70.)  Similarly, all of the resulting documentation included notations

clearly reflecting that they were a part of "training."  (Defs.' Ex. 16, at 302-04.)  One of the last

tasks that the protocol requires CCI, or the "parent institution," to carry out consists of the

warden of the parent institution ensuring that the condemned inmate completes an "Execution

Information Release"–a form ODRC 1808.  (Defs.' Ex. 1, at 7.)  CCI Warden Robinson sent an

ICS 213 message on February 14, 2012, indicating that CCI had completed that task.  (Defs.' Ex.

14, at 279.)

15

Weekly meetings continued, with status briefings held on January 27, 2012, February 1, 2012, and February 7, 2012.  Whenever possible, status briefings were conducted immediately preceding the execution rehearsals.  As Director Mohr explained, "it exposes more people, number one, and two, any direction that may come out can be conveyed to the entire team, any of that information, just enhanced communication."  (Wiles Hr'g Tr. Vol. VI, at 75.)  Thus, Director Mohr participated in many of the status briefings from SOCF in Lucasville, Ohio, rather than the central office in Columbus, Ohio.  Another status briefing and rehearsal were conducted on February 15, 2012.  That status briefing, according to Director Mohr, included the closing of "the Chillicothe loop" because CCI had completed all tasks that Ohio's execution policy required them to complete.  (Wiles Hr'g Tr. Vol. VI, at 76.)

The next step that occurred in the incident Webb execution training exercise was a planning meeting on February 17, 2012, to launch the second operational period that would commence on February 21, 2012, at approximately 7:00 a.m.  (Wiles Hr'g Tr. Vol. VI, at 77-78; Defs.' Exhs. 18-23.)  During that meeting, Planning Section Chief Ron Erdos presented a written incident action plan that he had developed and that Director Mohr had approved.  Director Mohr emphasized as he did at every meeting his expectations of strict compliance with the protocol. Everyone proceeded to discuss in detail the events that would take place at SOCF for the two days comprising the second operational period–February 21 and February 22, 2012.  (Wiles Hr'g Tr. Vol. VI, at 81.)  Further, Director Mohr approved several changes, the first of which consisted of moving Deputy Warden Oppy, who was serving as Warden Morgan's back-up or "shadow," from the Command Center to the Death House for execution rehearsals and actual executions.  The second change involved restricting Team Member # 21 from participating in the

16

February 22, 2012 rehearsal, due to the fact that contractual issues had prohibited Team Member # 21–a medical team member–from participating in the weekly rehearsals leading up to the February 22, 2012 execution training exercise.  Finally, Director Mohr approved a "procedural change" in the manner in which the execution drugs would be transported from the SOCF infirmary in one building to the Death House, which was a separate building.  Director Mohr explained an intention to have the pharmacist deliver the execution drugs from the SOCF safe to Heath Care Administrator Clagg in the SOCF infirmary.  Clagg would then turn those drugs over to the drug administrator assigned with the task of actually administering the drugs for the execution, witnessed by a second drug administrator, while still in the SOCF infirmary.  Those two drug administrators and Nurse Clagg would then walk the execution drugs from the SOCF infirmary to the Death House.  Previously, Clagg alone had transported the execution drugs from the infirmary to the Death House.

Testimony and evidence established that the execution rehearsal scheduled for February 22, 2012, would be not just a training session or rehearsal, but a "full-scale scenario."  Full-scale scenarios are intended to be as close to the real incident as possible.  Thus, whereas execution rehearsals typically commence with the SOCF Warden reading the Death Warrant to the condemned inmate-actor at the cell front in the Death House, the full-scale scenario for the Webb execution training exercise included such simulated tasks as the transport of Webb from CCI to SOCF on the morning of February 21, 2012, the assessments of Webb following his arrival at SOCF, and the transport of the drugs from the SOCF infirmary to the Death House. The full-scale scenario for the Webb execution training exercise also included such actual tasks as conducting a confirmed information briefing and transporting the execution drugs from the

17

infirmary to the Death House, albeit without using any actual drugs.  Testimony and evidence established that two execution run-throughs occurred on February 22, 2012, with the first being the full-scale scenario involving the "Plan A" intravenous administration of drugs (Defs.' Ex. 1, at 13-14) that concluded with the simulation of a funeral director taking possession of the inmate's body, and a second more informal run-through during which the team practiced the"Plan B" intramuscular administration of drugs (Defs.' Ex. 1, at 10, 14-15).

The February 22, 2012 Webb execution training exercise concluded with a debriefing and after action review.  (Defs.' Ex. 44, at 197.)  SOCF Warden Morgan subsequently sent to Director Mohr an After-Action Review report dated February 28, 2012.  (Defs.' Ex. 48.)  In an email from Director Mohr to SOCF Warden Morgan dated March 1, 2012, Director Mohr stated that he accepted Warden Morgan's February 28, 2012 report with the exception of two points. As Director Mohr set forth:

1. Please include in your After Action Report the Confirmed Information Briefing held prior to the commencement of the execution procedure at which time I confirmed that the elements contained in the policy had been completed, reviewed and approved.  This planned meeting that is to take place prior to the commencement of each execution and become a regular step in our protocol and confirmed in our after action report.

2. A security challenge was introduced prior to the rehearsal for Webb directing the Drug Administration Task Force Team Leader #23 not to call into the command center to report the drug preparation.  In fact, at the completion of the drugs being prepared, Drug Administrator #17 noticed that the Task Force Leader #23 did not report as he should and advised the Team Leader that the task had occurred and that it should be reported to the Command Center.  The Team Leader called the preparation of the drugs to the Command Center.  Please revise the After Action Report to reflect that I approved the variation in reporting the drug administrator's preparation of the drugs as a result of the security challenge, that the Team Leader called it in at the direction of Drug Administrator #17 and that the team leader communication is approved by the Director.

18

(Defs.' Ex. 49, at 1.)  SOCF Warden Morgan accordingly submitted a revised After-Action

Review report dated March 6, 2012.  (Defs.' Ex. 50.)

Testimony and evidence established that all involved personnel, from the IC and his

command staff, to the CCI personnel, to the SOCF personnel, currently are within the first

operational period preceding the Mark Wiles execution scheduled for 10:00 a.m. on April 18,

2012.  The IC and Planning Section Chief conducted a planning meeting on Friday, March 16,

2012, involving all personnel from the command staff, CCI, and SOCF.  The IC and Planning

Section Chief introduced a written incident action plan which the IC subsequently approved on

March 16, 2012, at 12:30 p.m.  (Defs.' Ex. 53, at 1.)  The planning meeting covered the incident

objectives, the organizational summary list, the ICS 204 task force assignment lists, the

communications plan, and the medical plan.  (Defs.' Ex. 53, at 1-15.)  All involved personnel

then participated in a status briefing the following Monday–March 19, 2012–at which time they

gauged their progress on completion of tasks required by the protocol and assigned to task force

members in the ICS 204 forms.

The first operational period for the Wiles execution thus began on March 19, 2012, at

8:00 a.m. and will conclude on April 17, 2012, at 7:00 a.m.  Testimony and evidence established

that certain tasks required by Ohio's execution policy leading up to the April 18, 2012 execution

date have been completed.  At SOCF, the execution team has been conducting the weekly

rehearsals required in Section VI.B.4. of the execution policy.  (Defs.' Ex. 1, at 6.)

CCI Warden Norm Robinson, approximately 30 days prior to the scheduled execution,

notified Director Mohr that a firm date–April 18, 2012–is scheduled for inmate Mark Wiles'

execution.  (Defs.' Ex. 1, at 5.)  CCI Warden Robinson sent a copy of that notification to

19

Planning Section Chief Ron Erdos, who subsequently sent notification to the Regional Director,

DRC Chief Counsel, Assistant Director, APA, Ohio State Highway Patrol (Portsmouth and

Jackson), and the Office of Victim Services. Following an "impromptu telephone conference"

on Friday March 23, 2012, involving the IC, Erdos, Robinson and others, CCI Warden Robinson

subsequently sent the notification again to the Regional Director, DRC Chief Counsel, Assistant

Director, APA, Ohio State Highway Patrol (Portsmouth and Jackson), and the Office of Victim

Services. Further, the hands-on vein assessment, medical chart review and physical assessment,

and the mental health assessment have been conducted at CCI, with documentation of the same

indicated in Wiles medical chart and no problems detected that might pose a problem carrying

out the execution or require contingency plans. (Defs.' Ex. 1, at 5.)

## II. Injunctive Relief Analysis

### A. Standard Involved

In considering whether injunctive relief staying Wiles' execution is warranted, this Court

must consider (1) whether Wiles has demonstrated a strong likelihood of success on the merits;

(2) whether Wiles will suffer irreparable injury in the absence of equitable relief; (3) whether a

stay would cause substantial harm to others; and (4) whether the public interest is best served by

granting a stay. *Cooey v. Strickland*, 589 F.3d 210, 218 (6th Cir. 2009) (citing *Workman v.

Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007); *Ne. Ohio Coal. for Homeless & Serv. Employees

Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)). The Sixth Circuit has

explained that " '[t]hese factors are not prerequisites that must be met, but are interrelated

considerations that must be balanced together.' " *Id.* (quoting *Mich. Coal. of Radioactive

Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)).

20

**B. Likelihood of Success**

Wiles' motion asserts arguments falling under his fourth claim, which is an Equal

Protection claim under 42 U.S.C. § 1983.  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Thus, in order to prevail on his § 1983 claim, Wiles must show that, while

acting under color of state law, Defendants deprived or will deprive him of a right secured by the

Federal Constitution or laws of the United States.  *See Alkire v. Irving*, 330 F.3d 802, 813 (6th

Cir. 2003).

Wiles pleads that "Defendants' overarching execution policy, including their wholly

discretionary approach to their written execution protocol and their informal policies, violates

[his] rights to equal protection under the law as guaranteed by the Fourteenth Amendment."

(ECF No. 4 ¶ 1077.)  He contends that the protocol is facially invalid because it codifies

disparate treatment of similarly situated individuals without sufficient justification so as to be

arbitrary, irrational, and capricious.

The Sixth Circuit has explained the inquiry this argument necessitates:

> "The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws.'  U.S. Const. amend. XIV, § 1.  The Supreme Court has stated that this language 'embodies the general rule that States must treat like cases alike but may treat unlike cases accordingly.' " *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005) (quoting *Vacco*, 521 U.S. at 799, 117 S.Ct. 2293).  To establish a claim for relief under the Equal Protection Clause, a plaintiff must demonstrate that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets

21

a suspect class, or has no rational basis.  *Id.; see also TriHealth, Inc.,* 430 F.3d at
788.

*Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 298 (6th

Cir. 2006).  When the disparate treatment burdens a fundamental right, strict scrutiny applies.

*Miller v. City of Cincinnati*, 622 F.3d 524, 538 (6th Cir. 2010).  What this means is that the state

action is permissible only if it is narrowly tailored to a compelling governmental interest.  *Cf.*

*Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007).

　　　One fundamental right involved in inmate claims such as that asserted by Wiles is the

right to be free from cruel and unusual punishment.  As they have in the past, Defendants

continue to attempt to transform this Fourteenth Amendment claim into a pure Eighth

Amendment claim.  But as this Court has previously explained in its *Smith* Opinion and Order,

> the former claim sufficiently targets that sweeping core deviations would at least
> burden Plaintiff's fundamental right by negating some of the precise procedural
> safeguards that this Court and the Sixth Circuit heralded in prior discussions of
> Eighth Amendment claims in this same litigation.  For present purposes, it does not
> matter whether there is a qualifying risk of severe pain–a conclusion rejected by the
> only medical expert who testified–but only the creation of unequal treatment
> impacting the fundamental protection involved.

*Cooey (Smith)*, 2011 WL 2681193, at *29.  This Court is again reluctant to hold that there can

only be an equal protection violation when there is an Eighth Amendment violation.

　　　There is relatively little authority in regard to the burden on a fundamental right that

would warrant strict scrutiny here.  Recently, the Ninth Circuit addressed a § 1983 equal

protection claim that implicated similar analysis in *Towery v. Brewer*, No. 12-15381, 2012 WL

627787 (9th Cir. Feb. 28, 2012).  After rejecting the argument that the state execution protocol at

issue violated the Eighth Amendment prohibition on cruel and unusual punishment–a protocol

that affords significantly more discretion than Ohio's protocol does–that court of appeals

22

explained:

> As we have already determined, the protocol as it will be implemented for [plaintiffs'] executions does not violate their right under the Eighth Amendment to be free from cruel and unusual punishment.  Where there is no Eighth Amendment violation, the district court ruled, that necessarily means that there has been no interference with fundamental rights sufficient to trigger strict scrutiny under the Equal Protection Clause.  *See Mass. Bd. of Ret. v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).  We do not need to adopt this broad proposition to conclude that given the ways the Director has chosen to exercise his discretion in the upcoming executions, there has been no showing here of any burden on the right to be free of cruel and unusual punishment.

*Id.* at *8.  Thus, the Ninth Circuit expressly declined to adopt the proposition that "burdens a fundamental right" means nothing less than a full violation of the fundamental right.

The Ninth Circuit explained:

> [Plaintiffs] argue otherwise, relying on *Bush v. Gore,* 531 U.S. 98, 105, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).  Urging that there is a distinction between state action that *violates* a fundamental right and state action that merely *burdens* a fundamental right, they proffer that the latter was sufficient to trigger strict scrutiny in *Bush* and should also be here.

> The right to vote, however, " 'can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.' "  *Id.* (quoting *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)).  A prisoner's right to be free of cruel and unusual punishment, in contrast, is not affected simply because that prisoner is treated less favorably than another, where one means of execution is no more likely to create a risk of cruel and unusual punishment than the other, and both are constitutionally available.  Treating one similarly situated prisoner differently from another with regard to punishment does not inherently impact the right to be free of cruel and unusual punishment (although it might for other reasons violate the Equal Protection Clause).

> That is not to say that there could not be exercises of discretion that do burden the right to be free of cruel and unusual punishment.  The contrast with the litigation surrounding Ohio's lethal injection protocol, invoked by [plaintiffs] in support of their fundamental rights Equal Protection argument, is instructive.  In those cases, plaintiffs were able to show an actual pattern of treating prisoners differently in ways that did affect the *risk* of pain to which they would be subjected, and therefore the *risk* of being subjected to cruel and unusual punishment. *See In re*

23

> *Ohio Execution Protocol Litig.,* ——F.Supp.2d ——, ——, 2012 WL 84548, at *9
> (S.D.Ohio Jan. 11, 2012), *motion to vacate stay denied,* —— F.3d at —— (6th
> Cir.2012).  Here, no such showing has been made, either generally or with respect
> to the planned application of the protocol to [plaintiffs'] executions.  The
> fundamental rights prong of Equal Protection analysis therefore cannot apply.

*Id.*  This analysis is instructive.  The prior deviations upon which various plaintiffs in this litigation previously focused often were "more likely to create a risk of cruel and unusual punishment" than an execution without the deviations and "did affect the *risk* of pain to which they would be subjected, and therefore the *risk* of being subjected to cruel and unusual punishment."  *Id.*  Many of the non-core deviations eliminated the procedural safeguards upon which the Sixth Circuit and this Court have expressly relied in the past in concluding that Ohio's execution procedures survived Eighth Amendment scrutiny.  And the practice of core deviations that arose once again in *Lorraine* undercuts the purported inability of Ohio to deviate from core deviations, pointing to at least a burden on the fundamental right involved if not outright disregard of that right.

To require an Eighth Amendment violation would suggest a narrow perspective that transforms the Equal Protection Clause into nothing more than a redundant backdoor route to the Eighth Amendment.  *Cf. Special Programs, Inc. v. Courter*, 923 F. Supp. 851, 855-56 (E.D. Va. 1996) (explaining that "it is mere impingement upon, not impermissible interference with, the exercise of a fundamental right that triggers strict scrutiny").  Moreover, the Sixth Circuit's express reliance in *Kasich v. Lorraine*, 132 S.Ct. 1306 (2012), on this Court's prior equal protection analysis points to partial if not full agreement with this Court's rationale.  Even if this Court is incorrect and no fundamental right is burdened here, there is still the possibility of rational basis review, discussed in the following text.

24

Wiles also asserts that he is a class of one subject to treatment that burdens his fundamental rights in a manner that is not rationally related in any way to a legitimate state interest. It is well settled that "the Supreme Court has recognized that a 'class-of-one' may bring an equal protection claim where the plaintiff alleges that: (1) he or 'she has been intentionally treated differently from others similarly situated'; and (2) 'there is no rational basis for the difference in treatment.' " *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011) (quoting *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)). Defendants' argument in opposition to Wiles' class-of-one claim is that because Ohio allegedly fails to apply its protocol consistently from execution to execution, as opposed to deviating intentionally in regard to any particular inmate, there is no equal protection violation. (ECF No. 95, at 7-8.)

Fairly characterized, Defendants' reasoning amounts to "because we consistently act inconsistently in regards to the protocol, we cannot be regarded as intentionally treating any specific capital inmate differently from others similarly situated." In other words, Defendants argue that overarching ineptness in applying the protocol provides a shield against the challenge that Ohio fails to apply its own protocol. This is the epitome of close enough for government work. The extant question is whether such a disappointing approach is good enough for the Constitution.

This Court has grown increasingly suspect about the vitality of a class-of-one claim in this context; there are issues surrounding the first prong of the test that present this Court with issues. The Ninth Circuit's discussion of such a claim in *Towery* perhaps provides some guidance, with the court of appeals explaining that

> [a]bsent any pattern of generally exercising the discretion in a particular manner while treating one individual differently *and* detrimentally, there is no basis for Equal Protection scrutiny under the class-of-one theory.  In other words, the existence of discretion, standing alone, cannot be an Equal Protection violation.  At the very least, there must be some respect in which the discretion is being exercised so that the complaining individual is being treated less favorably than others generally are.

*Towery*, 2012 WL 627787, at *9.  Discretion alone is therefore not a problem, but the exercise of that discretion in a detrimental manner would suggest a possible class-of-one claim.

Sometimes deviations occur and no one can explain why or how they happened, as this Court has discussed numerous times in prior orders.  Sometimes deviations are intentional, as in the failed execution of Rommell Broom when Defendants introduced a doctor into the execution proceedings who was not a member of the execution team (a direct violation of the protocol) and who promptly attempted to start an IV site only to hit the inmate's ankle bone in the process before the doctor fled from the room (and from a protocol violation that resulted in the infliction of pain by someone who was not supposed to even be in the building, much less an *ad hoc* member of the execution team).

Broom was certainly treated intentionally differently than other inmates.  Bringing in an unhelpful doctor to assist was in violation of the protocol, and the result was the imposition of pain caused by someone who should not have even been in the Death House.  The pattern of such deviations that past executions have revealed does not render Wiles' class-of-one claim ridiculous under this first prong.

The Sixth Circuit has explained the remaining prong of the class-of-one inquiry as follows:

> Under the rational basis test, courts will not overturn government action "unless the varying treatment of different groups or persons is so unrelated to the achievement

26

of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (internal quotation marks and citation omitted). There are two ways that a "class-of-one" plaintiff may demonstrate that a government action lacks a rational basis: (1) showing pure arbitrariness by negating every conceivable basis that might support the government's decision; or (2) showing an illegitimate motive such as animus or ill will. *Warren v. City of Athens, Ohio,* 411 F.3d 697, 711 (6th Cir. 2005).

*Green*, 654 F.3d at 651-52. Here, evidence has revealed a consistent pattern of arbitrary deviations from the protocol. The only real explanation for this pattern is that Ohio was trying to end an inmate's life under any procedure that might accomplish the task. Such a reason cannot suffice because it exists in every execution, as well as in every scenario in which a rational basis test would apply: there is always an ultimate goal. Some of the deviations with which this Court has dealt have failed to present a rational relationship to a legitimate state interest.

Notably, the Ninth Circuit did not outright reject a class-of-one claim in *Towery*. Rather, the court of appeals explained that under the specific circumstances presented, the claim was not viable:

> Even if we were to subject the protocol's grant of discretion to the Director to rational basis review, it would survive our consideration. It is rational for ADC to conclude that the Director is best situated to select the execution team from those available who meet the criteria listed in the protocol (assuming those criteria do not themselves create a risk of harm greater than that tolerable under the Eighth Amendment), or to decide that the Director should be the one to select which of the four possible drug sequences to use, or to assign to the Director and the IV Team Leader the task of selecting which IV site to use. It is entirely rational for these determinations to be made on a case-by-case basis, as they may well depend on individualized and changing factors such as the availability of particular people to participate in the execution, the supply of drugs available to the State at a given time, and the condition of the prisoner's veins. The Equal Protection claim, *as framed here*, cannot succeed on the merits.

*Towery*, 2012 WL 627787, at *9 (emphasis added).

27

Against these claims, Wiles points to Ohio's pattern of unintentional and intentional deviations and argues that the state actors involved in carrying out Ohio's protocol neither understand the protocol requirements nor are able or willing to fulfill their roles under the execution procedures.  He argues that the demonstrated pattern of deviations that this litigation has so often addressed evinces a continuing unwillingness or inability of Defendants to adhere to equal application of the protocol.

The underlying rationale behind such arguments is essentially twofold.  Wiles asserts that the evidence indicates that too few, if any, of the state actors truly understand the protocol, so that even if the protocol on its face is constitutional, this Court cannot take Defendants at their word that they are capable of following the protocol.  Beyond arguing simply this "junk in, junk out" rationale, Wiles also asserts that the plans for his execution present improper deviations that offend equal protection and that ICS cannot catch, much less prevent.

This Court disagrees that the evidence indicates that Defendants do not understand the protocol.  The Court also disagrees that the evidence indicates either that Defendants intend to violate the protocol or that ICS is likely ineffectual.

The evidence does suggest some inconsistency among select state actors as to what the protocol requires or what various components of ICS mean.  For example, Team Member # 23 had some notable difficulty remaining consistent in his usage of ICS terms, confusing the specific titles assigned to supervisors and groups within the ICS command structure.  This does not present sufficient evidence of an inability to adhere to the fundamental ICS principles that Defendants assert will remedy past issues with implementing the execution protocol.  Continued training under the relatively newly implemented ICS system will enable execution participants to

28

learn the system better.

Additionally, evidence indicated that key actors in the ICS command structure were considering utilizing a Powerpoint presentation to ensure that those individuals labeled "the doers"–those who are assigned the jobs of carrying out the actual tasks constituting action under the protocol–fully recognize who holds what positions and what those positions mean.  Mixing up terms such as "strike force" with "task force" or other similar misstatements does not necessarily mean that an individual does not know and understand his or her specific role in the ICS structure and the protocol duties that accompany that role.  Every state actor who testified, regardless of the depth of his or her understanding of ICS, appeared to understand the two-part mantra that Mohr and the execution team management have been emphasizing: there can be no deviation from any core component of the protocol, and any potential non-core deviation must flow up to the Incident Commander, who everyone recognized to be Mohr.

Wiles argues that even if everyone understands that these are the twin controlling precepts of the protocol scheme and its ICS-enhanced surrounding procedures, such understanding is worthless if the state actors do not actually understand what is a core deviation versus a non-core deviation.  In other words, simply saying the right words does not matter if the speakers do not understand what those words actually mean.  You cannot report that which you do not perceive.

Wiles argues that Defendants are attempting to circumvent recognition of deviations by talking around what the protocol requires.  At the hearing, much evidence focused on what Defendants deemed "procedural changes" versus protocol deviations.  Defendants characterized procedural changes as meaning changes in the procedures as to how a protocol task gets

29

accomplished.  This Court does not care what label a change receives.  What the Court does care about is the effect of that change.  In other words, semantics do not matter for purposes of today's inquiry.  What matters is that the procedural change cannot effectuate a substantive change in the protocol that creates a deviation from the requisite *what must be done*, but it can sometimes present a change in *how that something is accomplished* depending upon the specificity of whichever protocol provision is implicated in the change.

Depending upon the particular circumstances involved, there can be more than one permissible way of accomplishing a protocol task.  So long as there is no substantive departure from the protocol task, the label assigned to an alteration in the means employed to fulfill that task does not matter.  Wiles' attempt to conflate procedural change with altering the policy without altering the policy is therefore unfounded.  Far from presenting a system in which Defendants can do virtually anything they want so long as they deem it a procedural change and not a deviation, the evidence instead presents that there is an inherent restriction on the scope of what can be done as a procedural change.

Of greater concern to this Court is whether the state actors involved understand what constitutes a core deviation and a non-core deviation.  Some subordinate actors displayed confusion over this issue, and some displayed a dubious understanding of whether past executions presented deviations.  But everyone understands that every change flows to Mohr in his role as Incident Commander.  This finding necessitates making two points.

The first point is that the evidence does not rise to the level required for the Court to accept the contention that confusion invariably presents unconstitutionality.  Wiles argues that if the state actors involved do not understand what the protocol requires, then logic dictates that

30

they cannot recognize when there is a deviation (regardless of its core versus non-core nature). He posits that unrecognized deviations are unlikely to flow up the chain of command as the protocol requires and as ICS is meant to ensure.  The logical leap in this reasoning is that it presumes solitary actors who are not subject to constant and consistent corrective review.

An execution participant such as a doer may not recognize when he or she engages in a deviation of any nature, but an effectively implemented ICS system subjects that individual and the process to accountability by continual review.  Reporting of task-oriented actions flows upward, and the regular reviews that often include a plethora of checklists and other documentation presents a system of checks and balances in which a potential misstep is likely to be recognized even when the actor whose actions will constitute or have constituted a deviation is unaware of the deviation.  To obtain a stay on his lack-of-understanding argument, Wiles has the burden of establishing sufficiently that evidence of select confusion by various actors presents a substantial likelihood of a constitutional violation.  The evidence does not rise to this level.

The second requisite point is that Mohr has a fundamental understanding of his protocol sufficient to overcome any inadvertent or misguided mischaracterization he may possess.  This conclusion speaks to Mohr's construction of the third of five core components of the protocol. Section V of the protocol provides in part that "[f]unctions required to be performed by medically-qualified persons, as described in this policy, shall be performed by Medical Team Members."  Mohr testified that he construes the functions described in this core component to be medical functions. He is incorrect.  There is no adjective modifying "functions" so as to designate the functions targeted by this protocol provision to be only medical functions.  Nor is

31

there a restrictive clause following the term that narrows the scope of "functions" in such a manner. Although the language that immediately follows "functions" indeed serves to restrict the class of functions, it does so only insofar as the qualification confines the functions to those tasks "required to be performed by medically-qualified persons, as described in this policy." Thus, the restriction speaks to *what functions* out of all the functions set forth in the protocol, describing the tasks in terms of *what category of individuals must perform them*. This limited restriction does not break those tasks into a subset of medical functions as Mohr testified. The end result is that *any* function the protocol specifically assigns to a medically-qualified person can be performed only by a medically-qualified person, regardless of the nature of the function.

This misunderstanding of the third core component would be problematic for Defendants but for Mohr's expressed understanding of his role and the manner in which he intends to perform that role. The best example to explain this statement is related to one of three key asserted problems upon which Wiles relies. In an effort to demonstrate a dispositive flaw in Mohr's understanding of the protocol, Wiles points to two protocol provisions and the plans for carrying out those provisions.

Section VI(F)(4)(c) provides:

i.  The Drug Administrator who prepared the execution drugs and the Drug Administrator who witnessed the preparation shall complete form Order for Execution Medications (DRC2001).

ii.  A Drug Administrator shall inform the Command Center when the Execution Drugs are prepared, and the Command Center shall record in the Execution Timeline the time that the drugs were prepared.

These directives impose functions or duties that *only* a Drug Administrator can fulfill. Mohr's

testimony indicated that because he construes the term functions in the third core component of the protocol to mean only medical functions, he would incorrectly have no issue with a non-Drug Administrator informing the Command Center of when the executions drugs have been prepared.

What nullifies this inclination to err on the part of Mohr is his subsequent testimony concerning an analogous provision of the protocol. Section VI(H)(1)(c) provides that "[a] second Drug Administrator shall be present in the equipment room to observe the administration of the execution drugs. This Drug Administrator shall announce the start and finish times of each injection to the Command Center contact for capture on the timeline." Prior evidence related to the Brooks execution and discussed in the Court's January 11, 2012 Opinion and Order indicated that ODRC in-house counsel Greg Trout had issued a memorandum directing that the Equipment Room and Execution checklist recorder shall make the announcements. The Court found this problematic. *In re Ohio Execution Protocol Litig. (Lorraine)*, 2012 WL 84548, at *8.

Mohr testified at the Wiles hearing that he believes that it would make far more sense to have someone other than the second Drug Administrator looking at a clock in order to report the start and stop times, which would free that Drug Administrator to focus not on a clock but on his concurrent duty to watch the inmate and the IV insertion point for signs of possible infiltration. This is a wholly sensible approach. It is also not what the protocol permits under its third core component. Thus, it is significant that Mohr eventually testified that although the protocol is less than ideal in some aspects, such as the assignment of this task, he would adhere to the language of the protocol and require that the second Drug Administrator report the times.

Eventually Ohio may want to modify the protocol so that only medically qualified

33

individuals perform medical tasks, either by reworking the third core component or perhaps by taking the less risky course of simply modifying to whom functions are assigned throughout the protocol.  But that is not the protocol Ohio has at this time.  That protocol imposes a function on the Drug Administrator, and Mohr indicated that he and his subordinates would honor that duty. The rationale behind that conclusion informs the other Drug Administrator provision identified above–the drug preparation duty the protocol imposes on a Drug Administrator–so that this Court may logically and reasonably infer that Mohr similarly now recognizes what must be done to avoid a core deviation (even if Mohr once attempted to approve improper reporting in an email (Defs.' Ex. 49)).  Only Drug Administrators can do what the protocol says Drug Administrators must do, regardless of the nature of the function imposed.  Based on his correct understanding of how to fulfill his role, Mohr has remedied his own incorrect characterization of the third core component and Trout's impermissible directive that contravenes the protocol.

Mohr's initial interpretation of the protocol would provide for a core deviation and he must strictly follow the protocol language in regard to the third core component.

Mohr has also remedied another potential deviation to which Wiles points.  Section VI(F)(3) of the protocol provides:

a.  The institution Health Care Administrator or a person designated by the Warden who is a person qualified under Ohio law to administer drugs shall take possession of the drugs pentobarbital, midazolam, and hydromorphone from the institution pharmacy storage area, and shall document possession of the drugs by signing for Order for Execution Medications (DRC2001).  This person shall deliver the drugs to the Death House.

b.  The Health Care Administrator or qualified designee shall give possession of the drugs to a Drug Administrator, in the presence of a second Drug Administrator. These persons shall complete form Order for Execution Medications (DRC2001).

34

The protocol therefore sets out a fairly simple scheme for delivery of the executions drugs.  The Health Care Administrator or a qualified designee obtains the drugs from outside the Death House and delivers them to a Drug Administrator in the Death House, under the watchful eye of a second Drug Administrator.

Defendants came close to presenting a potential problem with implementing this scheme. Previously, the practice was for the Health Care Administrator to obtain the drugs and transport them to the Death House, where she would then turn them over to a Drug Administrator. Evidence indicates that at some point, the plan mutated into the Health Care Administrator obtaining the drugs outside the Death House, turning the drugs over to a Drug Administrator accompanying her in the presence of a second Drug Administrator, and then accompanying the Drugs Administrators to the Death House.  This is not literal compliance with the protocol, but this was the revised procedure followed during the Webb execution simulation.  As the hearing progressed, the decision was made for the actual exchange of drugs to again take place in the Death House.  Thus, the current procedure is for the Health Care Administrator or a qualified designee to obtain the drugs from outside the Death House while accompanied by two Drug Administrators, walk with the Drug Administrators to the Death House, and then deliver the drugs to a one Drug Administrator in the Death House while observed by a second Drug Administrator.

The current procedure complies with the protocol requirements.  The drugs change hands where the protocol calls for the exchange, and as various witnesses testified, the addition of accompanying Drug Administrators is a non-substantive procedural variation (designated a procedural deviation by Mohr and others) that does not offend any protocol requirement.

35

Wiles disagrees with this last conclusion. At the hearing, his counsel argued with a straight face that the fact that four Drug Administrators accompanied Clagg in and from the infirmary during a rehearsal for Webb violated the protocol. Counsel's rationale was that the protocol only permits the involvement of two Drug Administrators. This is a silly argument. The protocol mandates the involvement of two Drug Administrators, and it does not even require that they be present when the Health Care Administrator or designee transports the drugs to the Death House. Adding additional protections in the form of more observers does not violate the protocol, which does not set a limit on how many individuals can be present. Additionally, involving more members of the medical team can in no way prejudice an inmate's constitutional rights. Moreover, as discussed below, the practiced deviation occurred for purposes of training on a new procedure during a rehearsal, mooting its significance.

Equally unpersuasive but somewhat less annoying is Wiles' argument that the forms introduced into evidence purportedly characterize Clagg as both the Health Care Administrator and the warden's designee. This Court does not care if the forms indeed list Clagg as a designee when they also correctly indicated her role as the Health Care Administrator. The protocol approves performance of the task at issue by the Health Care Administrator. Defendants' planned implementation of that protocol provision has the Health Care Administrator acting. It therefore does not matter whether the warden can or did for rehearsal purposes also label the Health Care Administrator his designee.

Another non-deviation of the protocol that Wiles targets is the implementation of Section VI(B)(1) of the protocol, which provides:

The Warden of the institution where the prisoner is housed shall notify the Director

36

> by memo when a firm date is scheduled for a prisoner's execution with copies going
> to the Regional Director, DRC Chief Counsel, Assistant Director, APA, Ohio State
> Highway Patrol (Portsmouth and Jackson), and the Office of Victim Services.

Evidence indicates that CCI Director Robinson sent the requisite notification regarding Wiles to

Mohr, but acting pursuant to a directive by ODRC's in-house counsel Greg Trout, did not

provide the notice to the other individuals and entities listed in the protocol provision.  The

record is fairly unclear as to whether Mohr approved this action.  Two things are clear, however.

First, the intent was for Erdos to send the remaining notifications.  Second, after sitting in the

hearing for several days, Mohr directed that Robinson provide notification to everyone.

Robinson complied with this directive.

   This second round of notification by Robinson does not offend the protocol.  The heading

to Section VI(B) is "Execution Preparation – Approximately thirty (30) days prior to the

scheduled execution date."  Robinson's latter notifications came later than thirty days prior to the

execution, but fall within the *approximately* thirty-day window.  There was thus compliance with

the protocol timeline.  Additionally, Section VI(B)(1) does not require that Robinson send the

copies to the Regional Director, DRC Chief Counsel, Assistant Director, APA, Ohio State

Highway Patrol (Portsmouth and Jackson), and the Office of Victim Services.  That protocol

provision mandates only that Robinson (or the individual in his warden position) provide the

memorandum notice to the Director and that copies go to the others listed.  It does not expressly

assign the task of sending the copies to Robinson or anyone in particular.  That Mohr acted

cautiously to address what he perceived might potentially constitute a problem for this Court in

no way concedes that the first notification procedures actually presented a problem.

   Equally nonproblematic is Defendants' implementation of the protocol provision

37

mandating the documentation of the execution drugs used.  Section VI(I)(10) of the protocol provides that "[t]he Team Leader shall document the name or description, the expiration date, and the lot number of the execution drugs used."  Previously, there was an issue involving whether the execution team leader, Team Member # 10, had fulfilled this duty by photographing the drugs used or whether the task had been performed by another individual.  The Court noted in its January 12, 20102 Opinion and Order that "Defendants did not adhere to this requirement in Brooks and had another individual perform this task; evidence indicates that the task has been assigned to Denise Dean in future executions."  *In re Ohio Execution Protocol Litig. (Lorraine)*, 2012 WL 84548, at *8.

One document introduced at the Wiles hearing appeared to indicate that central pharmacist Denise Dean was indeed charged with performing the required documentation, although Defendants argued that the relevant portion of the document spoke to only expired drugs.  The context of the document undercuts that argument.  Another document did indicate that Dean was to document expired drugs, but this does not necessarily preclude her also performing a similar task for the used drugs, thereby deviating from the protocol.  The potential evidentiary conflict is moot, however, as is the issue of whether there has been approval of the potential deviation.  Team Member # 10 testified that documenting the drugs was a task he had performed and would continue to perform.  Moreover, although Wiles argued that a lack of clarity in photographs previously taken to document used drugs renders the attempted compliance with the protocol a failure, this does not mean that a such future photographs will be unclear and fail to fulfill the documentation requirement.

The next asserted improper deviations are related to documents prepared in the course of

38

rehearsals.  Wiles targets a litany of purported deviations or problems.  He points to the fact that some rehearsal information was kept on a flipchart during the rehearsals and then later transferred onto ICS forms that bore a "prepared on" date that was not the date the forms were actually prepared, but the date the activities documented in the forms actually occurred.  Wiles also notes that at least one team member signed a blank, uncompleted form when he should have signed the form only after completion (a practice Mohr rejected in his testimony).  Other ICS forms were altered after having been completed, with content being added, and one individual signed Team Member # 23's numerical signature to a form.  There was also a documentation inaccuracy that reflected Voorhies doing something he actually did not do.

Defendants offered credible explanations for some of these acts, while other actions were left unexplained.  These are certainly not good practice and might be problematic if these were forms documenting an actual execution.  But it is significant that no actual execution was involved.  This Court has previously explained why:

> [T]he recordkeeping issues Plaintiff raises target either conduct under old protocols and more permissive execution policies or conduct related to rehearsal issues to which the protocol does not apply in the same way as during an execution.  Neither the Constitution nor the protocol require a perfect or near perfect rehearsal.  The protocol demands appropriately trained and qualified members and mandates rehearsals, but it does not micromanage the rehearsals.  Voorhies correctly testified to this, explaining that the protocol does not define the full content of the rehearsal and that a deviation from the protocol in a rehearsal is not necessarily violating the protocol.  A rehearsal is a working laboratory for training and improvement; it is not intended as a *gotcha* opportunity that strictly construed can serve only to impede valuable experimentation and learning that could serve to improve Ohio's execution practices.  Prudence dictates and encourages making mistakes when they do not matter so as to increase the chance of avoiding mistakes when they do matter.  Nothing in the protocol establishes more than broad rehearsal content and absolutely nothing imposes the avoidance of any and all rehearsal errors that Plaintiff seeks to enforce.

39

> This is not to say that rehearsals should be sloppy or that they cannot be improved. It would make sense for at least the team leader if not his chain-of-command superiors to review rehearsal results more than they do, perhaps, for example, by reviewing the practice timelines for inaccuracies so that any issue can be addressed and the actual execution timelines will present a greater degree of reliability than they currently do.

*Cooey v. Kasich (Brooks)*, Nos. 2:04-cv-1156, 2:09-cv-242, 2:09-cv-823, 2:10-cv-27, 2011 WL 5326141, at *9 (S.D. Ohio Nov. 4, 2011). The same rationale applies today. Rehearsals are the time and place to make the errors about which Wiles complains so that they can be corrected for an actual execution. A rehearsal documenting error can never prejudice the constitutional rights of an inmate because it cannot affect the inmate in that context. The same error repeated in an actual execution might, however, and any such permissible deviations that are not properly approved during an actual execution would again suggest that the fifth core component is a hollow mandate, which would in turn suggest that none of the core components are of the requisite inviolate nature.

The Court understands that Wiles nonetheless seeks to use the rehearsal issues to demonstrate that Ohio still does not understand its protocol and cannot implement it properly. The underlying premise is that practice often is the best predictor of actual performance. But this is not invariably accurate, and permitting the bootstrapping of training missteps into condemnation of the protocol is a logical leap that is not only unwarranted under today's specific circumstances, but also would also be unfair to Ohio in light of this Court's prior treatment of rehearsals.

Toward the conclusion of the hearing, Wiles raised an additional point related to the asserted deviations from the protocol. His counsel noted with disapproval that Defendants had

changed various procedures or plans during the course of the hearing and that this had the effect of presenting a moving target and of benefitting Ohio in defending against a stay of execution. Such an argument is wholly without merit. Defendants have the right to continue preparing for an execution unless and until that execution is put on hold.  They also have the right and the responsibility to remedy potential problems during the course of their preparations, regardless of how those potential problems come to their attention.  Improving protocol-related practices and procedures can hardly prejudice the constitutional rights of any inmate, and Wiles' dubious attempt to transform this commendable action by Defendants into grounds for a stay is inane.

In summary, the asserted deviations of which Wiles complains fail to constitute problems that present a strong likelihood of Wiles succeeding on the merits.  The Court understands why Wiles argues that even if these are not dispositive deviations, Ohio's past practices should nonetheless entitle him to a stay of execution.  Wiles simply does not trust the state, and this is understandable.

A past pattern of consistent inconsistency does not invariably mean that Ohio can never get its act together.  The factual landscape can always change, both for the better and for the worse.  Wiles has failed to preclude the conclusion that the former scenario applies here.

This changed factual landscape arose to directly address a void previously recognized by the Court.  In its January 11, 2012 Opinion and Order, this Court stated:

> Defendants have failed to present this Court with any evidence that the non-core deviations were presented to Mohr.  They have also failed to present this Court with any evidence that, recognizing the problem presented with failing to follow the chain of command and obtain permission for these non-core deviations, they have since corrected course in order to adhere to the core protocol component of asking first instead of seeking forgiveness later.  If there were testimony in this record that all such deviations would be presented to Mohr for those inmates following Brooks

41

such as Lorraine, today's result would likely be different. This is what frustrates the Court. Do not lie to the Court, do not fail to do what you tell this Court you must do, and do not place the Court in the position of being required to change course in this litigation after every hearing. It should not be so hard for Ohio to follow procedures that the state itself created. Today's adverse decision against Defendants is again a curiously if not inexplicably self-inflicted wound.

*In re Ohio Execution Protocol Litig. (Lorraine)*, 2012 WL 84548, at *14. Defendants have now

returned to this Court, arguing that they respect what the protocol and the Constitution require

and that ICS is the course correction that was found to be lacking in the *Lorraine* decision.

Mohr in particular warrants credit for demonstrating significant leadership in this new

approach. More than one witness testified that Mohr's increased managing of the execution

process represents a sea change in Director involvement. Although Mohr testified that this Court

has imposed the duty of micro-managing executions on him, that is incorrect. As this Court

explained in its January 11, 2012 Opinion and Order:

> This Court has no interest in micro-managing executions in Ohio. That is not a judge's role and it is certainly not this Court's inclination. By Ohio's own design, the ODRC Director is the designated micro-manager of the state's executions. Defendants failed in the Brooks execution to present Mohr with the information he needed to fulfill this role. Such conduct and Defendants' refusal to admit and remedy the error punctures one of the core components of the protocol that safeguards the constitutionality of Ohio's execution process.

*In re Ohio Execution Protocol Litig. (Lorraine)*, 2012 WL 84548, at *14. Overseeing executions

is thus Mohr's duty expressly under the protocol and implicitly under his job description.

Whatever the source of this role, the Court has no doubt that Mohr sincerely recognizes the need

for improved professionalism in carrying out executions over past failures. If successfully

implemented, the reforms discussed herein can be a significant step toward bringing this

litigation to a conclusion in favor of Ohio.

42

Having addressed the purported deviations and what possible continuing effect the past pattern of failures presents, the Court is left with Wiles' argument that the protocol provision dealing with an inmate's last words presents an equal protection violation.  Unlike his deviation-related arguments, Wiles argues here that the protocol is unconstitutional on its face.  Section VI(G)(10) of the protocol generally permits a capital inmate to make a "last statement" via microphone while witnesses are present in the adjacent viewing room, while Section VI(G)(10)(b) specifically provides that "[t]he Warden may also terminate a statement that he or she believes is intentionally offensive to the witnesses."

Wiles asserts that this provision of the protocol "demonstrates that Defendants will treat each of these inmates–including Wiles–differently than other condemned inmates" and thus constitutes disparate treatment under the Equal Protection Clause.  (ECF No. 84, at 22.)  He argues that such disparate treatment "expressly codifies a burden on the inmate's free speech rights by vesting in the Warden discretion to cut off the inmate's last words based on the Warden's subjective interpretation of those words" and is therefore subject to strict scrutiny, which he asserts this part of the protocol cannot survive.  (*Id.* at 21.)

As stated earlier, "the existence of discretion, standing alone, cannot be an equal protection violation." *Towery*, 2012 WL 627787, at *9.  Even if it could, however, Wiles fails to establish that the challenged section of the protocol unconstitutionally burdens a fundamental right.  While freedom of speech generally may be a "fundamental right," an inmate retains only "those First Amendment rights that are not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  Thus, state regulations in the prison context are subject to a "lesser standard" of

43

review than strict scrutiny. *Turner v. Safley*, 482 U.S. 78, 81 (1987). Such regulations are valid if they are reasonable related to legitimate penological interests. *Id*. at 89. *See also Brown v. City of Pittsburgh*, 586 F.3d 263, 283 n.22 (3d Cir. 2009) (noting that if every regulation that burdened constitutionally protected speech were subject to strict scrutiny, the varying degrees of scrutiny that the First Amendment requires in different contexts would be "rendered obsolete").

Four factors are relevant to the "lesser" reasonableness standard that applies here. *Turner*, 482 U.S. at 89-90. The governmental objective underlying the regulation must be legitimate and neutral, and the regulation must be rationally related to that objective. *Id*. at 89-90. *See also Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989) (holding that, where prison officials drew distinctions between publications "solely on the basis of their potential implications for prison security," the regulations were "neutral" despite the fact that the determination "turn[ed], to some extent, on content"). Prison officials can and should exercise their discretion in applying these objectives. *See Thornburgh*, 490 U.S. at 416 (noting that where incoming publications could potentially "exacerbate tensions and lead indirectly to disorder . . . a regulation which gives prison authorities broad discretion is appropriate"). The *Turner* Court also considered whether alternative means of exercising the inmate's First Amendment rights remained available and whether accommodation of the asserted right would impact the guards, other inmates, or allocation of prison resources generally. *Turner*, 482 U.S. at 89-90. Finally, the *Turner* Court considered whether ready alternatives to the regulation were available, and if so, whether the challenged regulation was an "exaggerated response to prison concerns." *Id*. at 90.

Here, Ohio undoubtedly has an interest in maintaining prison security and performing

44

executions in an orderly manner.  *See, e.g., Thornburgh*, 490 U.S. at 411 (analyzing regulations in light of the proposed threat to "prison order and security").  An inmate's last words that the warden interprets as "intentionally offensive to the witness" are likely to cause disorder and disrupt the execution process.  *Cf. Kirkland v. Luken*, 536 F. Supp. 2d 857, 876 (S.D. Ohio 2008) (holding that the use of an offensive term during a city council meeting, directed at the audience, "was likely to incite the members of the audience during the meeting, cause disorder, and disrupt the meeting").  Allowing the warden to turn off the inmate's microphone is rationally related to Ohio's interest in preserving order.  *Cf. id.* (explaining that when a state official turned off an individual's microphone after he  made offensive statements at a city council meeting, the act was "narrowly tailored to achieve the compelling interest of preventing the [individual] from inciting those in attendance at the meeting to become unruly and to prevent the meeting from becoming disorderly").  The state's action in *Kirkland* satisfied strict scrutiny, *see id.* at 874-75, and the regulation here that permits a nearly identical action satisfies the lesser standard.

The remaining *Turner* factors further suggest that the challenged section of the protocol is reasonable.  The challenged regulation applies to a specific time and place—the death chamber—and does not preclude the inmate from expressing any type of communication during his tenure at the prison.  Allowing the inmate to speak offensively via microphone in the death chamber could also necessitate increased security (and a reallocation of resources) during the execution.  Finally, where the state could presumably forego last words entirely, allowing the warden to terminate an inmate's last words that are intentionally offensive to witnesses is not an exaggerated response to the goal of performing orderly executions.  The Court concludes that the challenged regulation is reasonable and appropriately vests necessary discretion in the warden.

45

The Court notes that Wiles does not appear to challenge the remaining portion of Section VI(G)(10) of the protocol in his motion.  (*See* ECF No. 84.)  The remaining portion of Section VI(G)(10)(b) provides that "[t]he Warden may impose reasonable restrictions on the content and length of the statement."  To the extent that Wiles believes he has challenged this provision, any such challenge is unlikely to succeed on the merits.  There is no evidence that the warden has or will implement any such restriction and Mohr testified that he could not foresee an instance in which the warden would do so.  (Wiles Hr'g Tr. Vol. VI, at 148-49.)  Without more, the Court will not speculate as to any potential First Amendment problems.  *See, e.g.*, *Pell v. Procunier*, 417 U.S. 817, 827 (1974) ("[I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.").  The Court therefore concludes that Wiles' First Amendment argument does not advance his equal protection argument in support of a stay.

### C. Irreparable Injury, Substantial Harm to Others, and the Public Interest

The Sixth Circuit has explained that in regard to the issue of whether injunctive relief should stay an execution date, "the absence of any meaningful chance of success on the merits suffices to resolve this matter."  *Workman*, 486 F.3d at 911.  Because this Court has concluded that the first factor weighs against injunctive relief, the Court need not and does not discuss the remaining factors.

### IV. Conclusion

The Sixth Circuit has held that Ohio

should do what it agreed to do: in other words it should adhere to the execution

protocol it adopted. . . . [W]hether slight or significant deviations from the protocol occur, the State's ongoing conduct requires the federal courts to monitor every execution on an ad hoc basis, because the State cannot be trusted to fulfill its otherwise lawful duty to execute inmates sentenced to death.

*In re Ohio Execution Protocol Litig.*, No. 12-3035, 2012 WL 118322, at *1. Guided by this directive–which the Sixth Circuit expressly based on this Court's July 8, 2011 Smith Opinion and Order and its January 11, 2012 *Lorraine* Opinion and Order, and which the Supreme Court of the United States declined to vacate in *Kasich v. Lorraine*, 132 S.Ct. 1306 (2012)–this Court has approached Wiles' motion cognizant that the fundamental issue here is deceptively simple: once again, can Ohio be trusted?

Either this Court should look at Ohio's repeated practice of ignoring its protocol and reforms and never again take the state's word that it can and will perform executions properly or the Court has to be willing to believe that Ohio can reform itself and fulfill its execution duties responsibly, competently, and constitutionally. Ohio's new procedures look good on paper. The words of those state agents who testified sound promising. No one questions their proper intentions. Procedures, promises, and purposes are of little value if they are not fulfilled.

Evidence indicates that ODRC's in-house counsel Greg Trout has labeled this litigation a "distressing distraction," a label that Mohr attempted to give a positive spin by explaining that Trout likely meant only that the protocol problems were worrisome and took time away from other ODRC concerns. That construction may be true, but coupled with Trout's statement that Defendants wanted to get the issues to the Sixth Circuit as soon as possible, it is more likely that his words reflect a sentiment that some state actors involved in this case have expressed in various ways–that this litigation is simply a hindrance. Such an oblivious approach ignores the

47

important constitutional concerns this Court has previously identified.

Regardless of the intent behind Trout's apparently flippant characterization of this case, other state actors involved in these proceedings appear to take their constitutional obligations far more seriously. For example, much to his credit, Mohr testified, "I am accountable to every stakeholder that is a part of this, from the governor to our staff to the inmates to . . . the victims [who] are all associated with this policy." (Wiles Hr'g Tr. Vol. VI, at 11.) This Court has no doubt that Mohr recognizes the seriousness of the issues involved and as noted credits his commendable commitment to improving the implementation of the protocol. To that end, Mohr and his subordinates have presented this Court with a revised execution process that has a chance at avoiding the embarrassments in which Ohio has engaged in the past. They must recognize the consequences that will ensue if they fail to succeed in conducting a constitutionally sound execution of Wiles. They must recognize what performing a constitutionally sound Wiles execution and then returning to the flawed practices of the past would mean.

Wiles in turn has at best presented evidence suggesting that it is an even question whether Defendants can or will do what they are telling this Court they will do. Defendants have presented evidence that suggests that the scale tips in their favor on this issue. The burden of proving entitlement to a stay falls on Wiles, and he has fallen just short of meeting that burden.

This Court is therefore willing to trust Ohio, just enough to permit the scheduled execution.

The Court reaches this conclusion with some trepidation, given Ohio's history of telling this Court what Defendants think they need to say in order to conduct executions (or in convincing themselves that things are *fine enough* when they are not) and then not following

through on promised reforms.  As in prior injunctive relief decisions, the Court does not conclusively hold here that Ohio's method of execution practices are constitutional or unconstitutional.  Today's decision only recognizes that based on all of the record evidence, Wiles has not met his burden of persuading this Court that he is substantially likely to prove unconstitutionality and prevail in this litigation.

This Court therefore **DENIES** Wiles' motion for a temporary restraining order and a preliminary injunction.  (ECF No. 84.)

**IT IS SO ORDERED.**

    /s/   Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE