# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| **IN RE: OHIO EXECUTION** | ) | **Case No. 2:11-cv-1016** |
| **PROTOCOL LITIGATION** | ) | **JUDGE GREGORY L. FROST** |
| | ) | **Magistrate Judge Mark R. Abel** |
| | ) | |
| **This document relates to:** | ) | **Amended Omnibus Complaint for** |
| **The following Plaintiffs** | ) | **Injunctive and Declaratory Relief,** |
| | ) | **Attorney Fees and Costs of Suit** |
| | ) | **Pursuant to 42 U.S.C. § 1983 on** |
| | ) | **Behalf of all Plaintiffs Individually** |
| | ) | |

**BENNIE ADAMS (Inmate # 560-125),**
**STANLEY ADAMS (Inmate # 420-071),**
**ABDUL AWKAL (Inmate # 267-328),**
**TYRONE BALLEW (Inmate # 261-875),**
**RICHARD BAYS (Inmate # 325-266),**
**MELVIN BONNELL (Inmate # 204-019),**
**DAVID BRADEN (Inmate # 380-366),**
**QUISI BRYAN (Inmate # 399-595),**
**ALVA CAMPBELL (Inmate # 354-963),**
**CEDRIC CARTER (Inmate # 262-433),**
**SEAN CARTER (Inmate # 356-659),**
**AUGUST CASSANO (Inmate # 145-242),**
**DAVEL CHINN (Inmate # 214-241),**
**DOUGLAS COLEY (Inmate # 361-444),**
**JERONIQUE CUNNINGHAM (Inmate #428-323),**
**ROLAND DAVIS (Inmate # 499-211),**
**ARCHIE DIXON (Inmate # 325-702),**
**JOHN DRUMMOND (Inmate # 462-868),**
**ANGELO FEARS (Inmate # 352-193),**
**STANLEY FITZPATRICK (Inmate # 419-722),**
**ANTONIO SANCHEZ FRANKLIN (Inmate # 363-374),**
**JAMES FRAZIER (Inmate # 497-904),**
**CLARENCE FRY (Inmate # 510-923),**
**LARRY GAPEN (Inmate # 413-724),**
**GERALD HAND (Inmate # 449-014),**
**DELANO HALE (Inmate # 490-551),**
**JAMES HANNA (Inmate # 152-169),**
**WARREN K. HENNESS (Inmate # 287-375),**
**DANNY HILL (Inmate # 189-528),**
**GENESIS HILL (Inmate # 250-830),**
**TIMOTHY HOFFNER (Inmate # 315-988),**
**GARY HUGHBANKS (Inmate # 362-032),**
**PERCY HUTTON (Inmate # 195-620),**
**AHMAD ISSA (Inmate # 364-585),**

**ANDRE JACKSON (Inmate # 203-859),**
**CLEVELAND JACKSON (Inmate # 429-404),**
**KAREEM JACKSON (Inmate # 354-156),**
**JUAN KINLEY (Inmate # 239-789),**
**LAWRENCE LANDRUM (Inmate # 189-982),**
**JERRY LAWSON (Inmate # 203-188),**
**DONALD LEWIS (Inmate # 225-685),**
**CARL LINDSEY (Inmate # 350-106),**
**CHARLES LORRAINE (Inmate # 194-013),**
**JOSE TRINIDAD LOZA (Inmate # 250-059),**
**RALPH LYNCH (Inmate # 382-728),**
**CLARENCE MACK (Inmate # 247-509),**
**DENNIS MCGUIRE (Inmate # 305-892),**
**FREDDIE MCNEILL, JR. (Inmate # 309-673),**
**SAMUEL MORELAND (Inmate # 190-490),**
**FREDERICK MUNDT (Inmate # 486-456),**
**TYRONE NOLING (Inmate # 222-599),**
**JAMES O'NEAL (Inmate # 325-132),**
**GARY OTTE (Inmate # 264-467),**
**KERRY PEREZ (Inmate # 509-017),**
**RON PHILLIPS (Inmate # 279-109),**
**WALTER RAGLIN (Inmate # 338-114),**
**WILLIAM SAPP (Inmate # 337-278),**
**MICHAEL DEAN SCOTT (Inmate # 387-350),**
**BOBBY T. SHEPPARD (Inmate # 315-284),**
**DUANE SHORT (Inmate # 525-858),**
**GEORGE SKATZES (Inmate # 173-501),**
**STEVEN T. SMITH (Inmate # 369-054),**
**DAVID SNEED (Inmate # 192-040),**
**WARREN SPIVEY (Inmate # 216-212),**
**JOHN DAVID STUMPF (Inmate # 181-258),**
**RAYMOND TIBBETTS (Inmate # 363-178),**
**FREDERICK TREESH (Inmate # 307-703),**
**JAMES TRIMBLE (Inmate # 494-014),**
**MICHAEL TURNER (Inmate # 438-811),**
**RAYMOND TWYFORD (Inmate # 275-069),**
**ROBERT VAN HOOK (Inmate # 186-347),**
**WARREN WADDY (Inmate # 199-737),**
**MICHAEL WEBB (Inmate # 246-589),**
**ANDRE WILLIAMS (Inmate # 209-534),**
**ROBERT WILLIAMS (Inmate # 381-764),**
**JEFFREY WOGENSTAHL (Inmate # 269-357),**
       **Chillicothe Correctional Institution,**
       **15802 State Route 104**
       **Chillicothe, Ohio 44601,**

**and**

**SIDDIQUE ABDULLAH HASAN (Inmate # 130-559),**
**KEITH LAMAR (Inmate # 317-117),**
**EDWARD LANG (Inmate # 532-018),**
**JASON ROBB (Inmate # 308-919),**
**JAMES WERE (Inmate # 173-245),**
> **Ohio State Penitentiary**
> **878 Coitsville-Hubbard Road**
> **Youngstown, Ohio 44505,**

**and**

**KEVIN SCUDDER (Inmate # 209-848),**
> **Franklin Medical Center**
> **P.O. Box 23658**
> **Columbus, Ohio 43223**

**and**

**TIMOTHY DUNLAP (Idaho Department of Correction Inmate # 35385),**
> **Idaho Maximum Security Institution**
> **P.O. Box 51**
> **Boise, Idaho 83634**

---

**Amended Omnibus Complaint for Injunctive and Declaratory Relief, Attorney Fees, and Costs of Suit Pursuant to 42 U.S.C. § 1983 on Behalf of All Plaintiffs Individually[1]**

---

[1] "All Plaintiffs" refers to all those Plaintiffs listed above.  It does not encompass, however, all those who are Plaintiffs in this litigation.

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................... 5

II.     JURISDICTION AND VENUE ............................................................ 17

III.    PARTIES ............................................................................................. 17

        A.     Plaintiffs ................................................................................... 17

               1.     Bennie Adams ................................................................ 17

               2.     Stanley Adams ............................................................... 18

               3.     Tyrone Ballew ................................................................ 19

               4.     Richard Bays .................................................................. 20

               5.     Melvin Bonnell .............................................................. 20

               6.     Quisi Bryan .................................................................... 20

               7.     Alva Campbell ................................................................ 21

               8.     Davel Chinn .................................................................... 21

               9.     Douglas Coley ................................................................ 21

               10.    Roland Davis ................................................................... 22

               11.    Archie Dixon ................................................................... 22

               12.    John Drummond .............................................................. 22

               13.    Angelo Fears ................................................................... 22

               14.    Antonio Sanchez Franklin ............................................. 23

               15.    James Frazier .................................................................. 23

               16.    Clarence Fry ................................................................... 24

               17.    Larry Gapen .................................................................... 25

               18.    Delano Hale .................................................................... 25

               19.    James Hanna ................................................................... 25

               20.    Siddique Abdullah Hasan ............................................... 26

               21.    Warren K. Henness ......................................................... 27

               22.    Danny Hill ...................................................................... 27

               23.    Timothy Hoffner ............................................................ 27

               24.    Percy Hutton ................................................................... 28

               25.    Andre Jackson ................................................................ 28

               26.    Cleveland Jackson .......................................................... 29

               27.    Kareem Jackson .............................................................. 30

28. Juan Kinley ................................................................................................ 30

29. Keith LaMar ............................................................................................... 31

30. Lawrence Landrum ..................................................................................... 32

31. Edward Lang ............................................................................................... 33

32. Donald Lewis .............................................................................................. 33

33. Carl Lindsey ............................................................................................... 34

34. Charles Lorraine ......................................................................................... 34

35. Jose Trinidad Loza ...................................................................................... 35

36. Ralph Lynch ............................................................................................... 35

37. Clarence Mack ........................................................................................... 36

38. Freddie McNeill, Jr. ................................................................................... 36

39. Samuel Moreland ....................................................................................... 36

40. Tyrone Noling ............................................................................................ 37

41. Gary Otte ................................................................................................... 37

42. Ron Phillips ............................................................................................... 38

43. Walter Raglin ............................................................................................. 38

44. Jason Robb ................................................................................................. 38

45. Michael Dean Scott .................................................................................... 38

46. Duane Short ............................................................................................... 39

47. Steven T. Smith ......................................................................................... 40

48. Warren Spivey ........................................................................................... 40

49. John David Stumpf ..................................................................................... 41

50. Raymond Tibbetts ...................................................................................... 42

51. James Trimble ............................................................................................ 43

52. Raymond Twyford ...................................................................................... 43

53. Robert Van Hook ....................................................................................... 44

54. Warren Waddy ........................................................................................... 45

55. James Were ................................................................................................ 45

56. Andre Williams .......................................................................................... 46

57. Robert Williams ......................................................................................... 46

58. Abdul Awkal ............................................................................................. 46

59. David Braden ............................................................................................. 47

60. Cedric Carter ............................................................................................. 47

61. Sean Carter ........................................................................................ 48

62. August Cassano ................................................................................. 49

63. Jeronique Cunningham ...................................................................... 49

64. Stanley Fitzpatrick ............................................................................ 50

65. Genesis Hill ....................................................................................... 51

66. Gary Hughbanks ................................................................................ 51

67. Jerry Lawson ..................................................................................... 51

68. Dennis McGuire ................................................................................ 51

69. Frederick Mundt ................................................................................ 52

70. Kerry Perez ....................................................................................... 53

71. William Sapp ..................................................................................... 53

72. Bobby T. Sheppard ........................................................................... 54

73. George Skatzes .................................................................................. 54

74. David Sneed ...................................................................................... 54

75. Frederick Treesh ............................................................................... 54

76. Michael Turner .................................................................................. 55

77. Jeffrey Wogenstahl ........................................................................... 55

78. Kevin Scudder ................................................................................... 55

79. Timothy Dunlap ................................................................................ 56

80. Gerald Hand ...................................................................................... 57

81. Ahmad Issa ........................................................................................ 57

82. James O'Neal ..................................................................................... 59

83. Michael Webb .................................................................................... 59

B. Defendants ................................................................................................ 60

IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES ................................................. 62

V. FACTS COMMON TO ALL CLAIMS AND RELIEF SOUGHT ................................... 62

A. Plan A of Defendants' written execution protocol ................................. 70

B. Plan B of Defendants' written execution protocol .................................. 77

C. Drugs in Plan A or Plan B are obtained, possessed, transported, transferred, used and/or dispensed in violation of the Controlled Substances Act, its implementing regulations and analogous or related federal and/or state laws such as the federal Food, Drug and Cosmetic Act. ....... 82

D. Defendants' execution policy and written execution protocol is flawed. ............ 84

E. Defendants' pattern of deviations and/or variations from the written execution protocol ................................................................................ 100

F. Defendants' deviations, variations and irregularities in specific executions ..... 106

    1. Wilford Berry .................................................................................. 106

    2. Joseph Clark ................................................................................... 107

    3. Christopher Newton ....................................................................... 109

    4. Daniel Wilson ................................................................................. 109

    5. Marvallous Keene .......................................................................... 109

    6. Romell Broom ................................................................................ 110

    7. Vernon Smith, a.k.a., Abdullah Sharif Kaazim Mahdi ........................ 112

    8. Michael Beuke ................................................................................ 113

    9. Darryl Durr, and others since November 30, 2009 ............................ 114

VI. CLAIMS FOR RELIEF ............................................................................... 115

First Claim: Eighth and Fourteenth Amendment Violations .......................................... 115

Second Claim: Fourteenth Amendment Due Process Violations ................................... 122

Third Claim: Violations of First, Sixth, Eighth and Fourteenth Amendment Rights of Access to Counsel, Access to Courts, Ability to Petition for Redress of Grievances, Due Process, and Privileges and Immunities of United States Citizenship. ............................................................................................ 124

    1. Defendants place impermissible conditions on Plaintiff's constitutional rights by forcing him to give up a lay witness in order to have counsel witness his execution. .......................................... 125

    2. Defendants deny Plaintiff's constitutional rights by denying him unhindered access to, and ability to communicate with, counsel. ......... 127

Fourth Claim: Fourteenth Amendment Equal Protection Violations ............................ 130

Fifth Claim: Violations of Fundamental Rights Arising Under The Principles Of Liberty and/or Natural Law Which Are Protected By The Ninth Amendment ............................................................................................ 137

Sixth Claim: First Amendment Free Speech Violations ................................................ 138

PRAYER FOR RELIEF ......................................................................................... 141

CERTIFICATE OF SERVICE ................................................................................ 155

Plaintiff, by and through respective counsel, hereby files this Amended Omnibus Complaint for Injunctive and Declaratory Relief, Attorney Fees, and Costs of Suit Pursuant to 42 U.S.C. § 1983 against Defendants John Kasich, et al., (hereinafter the "Amended Omnibus Complaint").[2]  Plaintiff alleges and avers as follows.[3]

## I.     NATURE OF THE ACTION

1.     Plaintiff brings this action under 42 U.S.C. § 1983 for violations and threatened violations of his rights: to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution; to be free from violations of his substantive and procedural due process rights under the Fourteenth Amendment to the United States Constitution; to unhindered access to counsel and the courts and to petition the government for redress of grievances during the execution process under the First, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, including the separate protections of the Due Process and Privileges and Immunities Clauses of § 1 of the Fourteenth Amendment; to equal protection under the laws as guaranteed by the Fourteenth Amendment of the United States Constitution; to be free

---

[2] The original Omnibus Complaint in this case was filed in lieu of myriad motions to intervene in *Cooey v. Kasich*, Case No. 2:04-1156, in accordance with discussions on October 24, 2011 and October 27, 2011 between the Court, counsel for Defendants, and some of the undersigned counsel.  Citations or references to ECF docket numbers in this Amended Omnibus Complaint refer to the docket in *Cooey v. Kasich*, or the docket in *In re Ohio Execution Protocol Litigation*, Case No. 2:11-1016, and will be designated as such.

[3] The defined term "Plaintiff" shall be used in the singular to refer to each and all inmates listed in the caption of this Amended Omnibus Complaint, unless otherwise specified as necessary for an individual inmate.  Notwithstanding the collective use of the term Plaintiff, each inmate individually raises the following allegations and claims.

from violations of his unenumerated fundamental rights arising under the principles of

liberty and natural law which are protected by the Ninth Amendment to the United States

Constitution; and to free speech guaranteed by the First Amendment to the United

States Constitution.

2.      Plaintiff seeks equitable, injunctive, and declaratory relief.

3.      The federal constitutional claims in this Complaint are cognizable under 42 U.S.C.

§ 1983.  *Baze v. Rees*, 553 U.S. 35 (2008); *Hill v. McDonough*, 547 U.S. 573 (2006);

*Nelson v. Campbell*, 541 U.S. 637 (2004).

4.      Defendants' formal and informal policies, protocols, practices, customs, and procedures

(collectively the execution policy and written execution protocol) for executing Plaintiff's

death sentence through lethal injection present a substantial risk of serious harm,

including severe physical and/or psychological pain, needless suffering, and a torturous,

lingering, undignified, and/or spectacle execution or attempted execution, and/or an

objectively intolerable risk of such harm that Defendants unjustifiably ignore, and such

an execution will not accord with the "dignity of man" as required by well-settled

principles of the Eighth Amendment.[4]

---

[4] To ensure clarity and to avoid confusion over similar but critically different terminology,
Plaintiff adopts the Court's explanation and usage of the terms "execution policy" and "written
execution protocol" provided in the July 8, 2011 injunctive order.  (*Cooey*, Doc. No. 947,
PageID 25963-65.)  According to the Court's understanding, Defendants have "an overarching
execution policy and a notably subordinate written execution protocol."  (*Id.* at PageID 25963.)
        Thus, Plaintiff will use the term "written execution protocol" to refer to DRC Policy 01-
COM-11 and its requirements.  He will use the term "execution policy" to refer more broadly to
all of Defendants' policies, practices, protocols and/or procedures related to executions, written
or unwritten, formal or informal.

5.    A violation of Plaintiff's rights under the Eighth and Fourteenth Amendments arises from a substantial risk of harm created by Plaintiff's individual, unique physical and/or psychological/mental characteristics and Defendants' execution policy; and/or from the substantial likelihood of Defendants' maladministration of said execution policy including through deviations and/or variations from the written protocol's mandates giving rise in turn to a substantial risk of harm to Plaintiff; and/or from Defendants' lack of procedural mechanisms to ensure that Defendants do not carry out an execution that violates the Eighth Amendment's prohibition on cruel and unusual punishment.

6.    Under Defendants' execution policy and written execution protocol, Plaintiff will be subject to a substantial risk of harm, including severe physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified, and/or spectacle execution or attempted execution, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, as a result of the following:

   a.   Defendants' failure to adequately account for Plaintiff's individual physical and/or mental characteristics;

   b.   Defendants' substantial and documented pattern of repeated deviation and/or variation from the overarching execution policy and the written execution protocol in administering executions regardless of the particular policy in effect at the time, and Defendants' repeated maladministration of their execution policy and written protocol, including their inability to carry out an execution without encountering serious problems;

   c.   employment of mechanisms in their execution policy and written protocol that are inadequate, faulty, misused, improper, nonexistent and/or ignored, which include, but

are not limited to, the mechanisms used for lethal injection drug delivery, the physical structures employed, the training of personnel, the qualifications and quantity of personnel, the unfettered discretion granted to several of the official actors involved, and the absence of functional safeguards as administered including Defendants' history of inconsistent application of Incident Command Systems (ICS) principles;

    d.  Defendants' use of drugs listed in the written protocol under both "Plan A" and "Plan B."

7.    Defendants execution policy and written execution protocol also violate Plaintiff's rights because, lacking adequate screening mechanisms or procedural safeguards to prevent Defendants from attempting to execute or executing one who is mentally retarded and/or incompetent to be executed, Defendants fail to ensure that they do not carry out an execution that would be a cruel and unusual punishment prohibited by the Eighth Amendment.

8.    Defendants' execution policy and written execution protocol also violate Plaintiff's rights under the Fourteenth Amendment because they will not provide a painless, quick, humane, or dignified death, contrary to Plaintiff's interests in expecting and receiving a quick, painless, humane and dignified death. These interests are created by Ohio law—Ohio Revised Code § 2949.22(A) and/or DRC Policy 01-COM-11—vested in a narrow class of individuals that includes Plaintiff, and protected as rights under the substantive and procedural elements of the Due Process Clause of the Fourteenth Amendment. This denial of Plaintiff's expectation and receipt of a quick, painless, humane and dignified death violates his rights under the federal constitution's Fourteenth Amendment.

9.    Defendants' execution policy and written execution protocol furthermore violate Plaintiff's rights to unhindered access to counsel, access to courts, and ability to petition the government for redress of grievances and for other constitutional relief as may be necessary during his execution, in violation of the First, Sixth, Eighth, and Fourteenth Amendments, including Plaintiff's rights protected by the Due Process Clause and the Privileges or Immunities Clause of § 1 of the Fourteenth Amendment.

10.    Defendants have demonstrated a pattern of irrationally and arbitrarily deviating and/or varying from their execution policy and written execution protocol without any legitimate governmental interest.  Combined with the nearly limitless discretion vested in certain actors in the execution process, this means that Plaintiff's death sentence will be administered in a manner such that he will be arbitrarily and irrationally treated differently than similarly situated individuals, violating his rights as a class of one under the Fourteenth Amendment's Equal Protection Clause.

11.    Defendants' execution policy and written execution protocol also facially violates Plaintiff's rights as a class of one under the Equal Protection Clause because they codify arbitrary and irrational unequal treatment of similarly situated individuals, such as Plaintiff, without any legitimate governmental interest.

12.    Defendants' execution policy and written execution protocol, as applied based on Defendants' repeated pattern of deviations/variations from the execution policy and written execution protocol, also violate the Equal Protection Clause of the Fourteenth Amendment because they burden the fundamental rights of the group of condemned inmates—which includes Plaintiff—under the First, Sixth, Eighth, Ninth, and Fourteenth Amendments, without being necessary to achieve a compelling governmental interest.

13.   Defendants' execution policy and written execution protocol also facially violates the Equal Protection Clause because they codify unequal treatment of similarly situated individuals in such a way that it burdens the fundamental rights of the group of condemned inmates—which includes Plaintiff—under the First, Sixth, Eighth, Ninth, and Fourteenth Amendments, without being necessary to achieve a compelling governmental interest.

14.   Defendants, by their administration of their execution policy and written execution protocol, violate an inmate's unenumerated, fundamental rights arising from the principles of liberty and natural law, which rights are protected by the Ninth Amendment.

15.   Defendants' execution policy and written execution protocol also impose impermissible content-based limitations, and violations of the public forum and limited public forum doctrines, all in violation of the First Amendment.

16.   Therefore, upon information and belief, unless enjoined, Defendants will violate Plaintiff's constitutional rights by attempting to or successfully executing him.

17.   Plaintiff seeks, among other relief, the following:

   a.   preliminary and permanent prohibitive injunctions under federal law preventing Defendants from executing him by means of their execution policy, including the written execution protocol effective September 18, 2011, or any other execution policy, new or old, formal and/or informal which, as written and/or as administered, violates his federal constitutional rights;

   b.   preliminary and permanent mandatory injunctions under federal law requiring Defendants to adopt, and adhere in their administration to, a facially constitutional written execution protocol in efforts to execute him, and that such written execution

10

protocol must formally adopt the Incident Command Systems principles and application in the execution context as a formal element of Defendants' written execution protocol;

c.  preliminary and permanent prohibitive injunctions under federal law preventing Defendants from executing him by means of their execution policy, including the written execution protocol effective September 18, 2011, or any other execution policy, new or old, formal and/or informal that is facially unconstitutional, including facial unconstitutionality for failure to ensure that an unconstitutional execution is not carried out;

d.  preliminary and permanent prohibitive injunctions under federal law preventing Defendants from executing him by means of an execution policy, including the written execution protocol effective September 18, 2011, or any other execution policy, new or old, formal and/or informal, that is unconstitutional as applied to him, including as-applied unconstitutionality for failure to ensure that an unconstitutional execution is not carried out;

e.  preliminary and permanent prohibitive injunctions under federal law preventing Defendants from executing him by means of their execution policy and written execution protocol to which they have failed to strictly adhere;

f.  preliminary and permanent prohibitory injunctions barring Defendants from executing him by a means that will deny his liberty, life, and property interests in the expectation and receipt of a quick, painless, humane and dignified death, which interests are guaranteed by Ohio Rev. Code § 2949.22(A) and DRC Policy 01-COM-

11

11 and protected by the substantive and procedural elements of the Due Process

Clause of the federal constitution's Fourteenth Amendment;

g.  preliminary and permanent prohibitory injunction barring Defendants from executing

him unless Defendants allow him to exercise his rights, under the First, Sixth, Eighth,

Ninth and Fourteenth Amendments, to choose an attorney to witness his execution

without forcing him to choose to have counsel witness at the cost of using one of the

three witness slots allotted by Ohio Rev. Code § 2949.25(A)(5);

h.  preliminary and permanent prohibitory injunctions barring Defendants from

executing him unless Defendants allow him to access his counsel confidentially

before the execution process, to access his counsel without interruption before and

during the execution process, and allow his counsel unencumbered ability to

communicate directly to Defendants in the death chamber and/or the equipment room

and directly to the courts and government officials, such that counsel can immediately

access the courts or seek redress for grievances with the government, or otherwise

seek necessary relief, in exercise of Plaintiff's rights under the First, Sixth, Eighth,

Ninth and Fourteenth Amendments to the United States Constitution;

i.  preliminary and permanent mandatory injunctions requiring Defendants to comply

with all training and Execution Team personnel requirements set forth in the written

execution protocol, and prohibiting supervisory personnel from allowing Execution

Team member participation in any execution without full compliance with all of the

written protocol's substantive training requirements, execution rehearsal training

requirements, and other mandatory provisions;

j.   preliminary and permanent prohibitive injunctions under federal law preventing Defendants from enforcing those provisions of their execution policy and written execution protocol that violate Plaintiff's First Amendment rights to free speech;

k.   preliminary and permanent prohibitive injunctions under federal law preventing Defendants from attempting to conduct any further executions until such time as the Court orders otherwise.

18.   Plaintiff also seeks, among other relief, the following:

a.   an Order declaring that Defendants' execution policy and written execution protocol will subject him to a substantial risk of harm, including severe physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified, and/or spectacle execution or attempted execution, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, resulting in cruel and unusual punishment, whether that method is through the policy's "Plan A" or "Plan B," and that Defendants' execution policy and written execution protocol fails to ensure against an execution that would constitute cruel and unusual punishment, and will thus violate Plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution;

b.   an Order declaring that Defendants' substantial, documented and admitted deviations and/or pattern of deviations and/or variations from their written execution protocol and the safeguards contained therein, as applied in Defendants' execution policy before, during and after administration of the execution policy, creates a substantial risk of harm, including severe physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified, and/or spectacle execution or attempted

13

execution, and/or an objectively intolerable risk of such harm that Defendants
unjustifiably ignore, in violation of Plaintiff's rights under the Eighth and
Fourteenth Amendments.

c. an Order declaring that Defendants' execution policy and written execution protocol
denies his life, liberty and property interests in expecting and receiving a quick,
painless, humane and dignified death, which interests are created under binding state
law in the form of Ohio Revised Code § 2949.22 and/or DRC Policy 01-COM-11,
and protected as rights by the substantive and procedural elements of the Fourteenth
Amendment's Due Process Clause, resulting in denial of his substantive and
procedural due process rights;

d. an Order declaring that Defendants' execution policy, their written execution protocol
and Ohio Revised Code § 2949.25(A) as applied and Ohio Rev. Code
§ 2949.25(A)(5) as written and applied impermissibly condition, restrict and/or deny
Plaintiff the unhindered right to have his counsel present to witness Plaintiff's
execution, and to represent Plaintiff's interests;

e. an Order declaring that a condemned inmate in Ohio has rights to access counsel
throughout the entire execution process, including the right to confidential
communication with counsel while still confined in the holding cell, including
administration of the execution policy and the written execution protocol, and
including the rights to access Defendants in the death chamber and/or the equipment
room, to access the courts and to seek redress of grievances from the courts, the
Governor of Ohio or any other appropriate person of authority, under the First, Sixth,

14

Eighth, Ninth and Fourteenth Amendments, including the Due Process Clause and/or the Privileges and Immunities Clause of the Fourteenth Amendment, and that Defendants' execution policy and written execution protocol violates these rights;

f. an Order declaring that Defendants' substantial and demonstrated deviations and/or pattern of deviations and/or variations from their execution policy and written execution protocol before, during and after administration of the policy and protocol is not necessary to achieve any compelling state interest, and that such deviations and/or variations substantially burden the fundamental rights of the class of persons of condemned inmates subject to a death sentence imposed in Ohio state courts— which includes Plaintiff—under the First, Sixth, Eighth, Ninth and Fourteenth Amendments, in violation of his rights to equal protection under the Fourteenth Amendment to the United States Constitution;

g. an Order declaring that Defendants' substantial and demonstrated deviations and/or pattern of deviations and/or variations from their execution policy and written execution protocol before, during and after administration of the policy and protocol, is unrelated to any legitimate governmental interest, and arbitrarily and irrationally treats or will treat Plaintiff as a class of one differently than others similarly situated, in violation of his rights to equal protection under the Fourteenth Amendment to the United States Constitution;

h. an Order declaring that Defendants' execution policy and written execution protocol facially violates Plaintiff's rights protected by the Fourteenth Amendment's Equal Protection Clause because it allows Defendants to treat similarly situated individuals

15

differently, such disparate treatment burdens the fundamental rights of the class of

persons of condemned inmates subject to a death sentence imposed in Ohio state

courts—which includes Plaintiff—under the First, Sixth, Eighth, Ninth and

Fourteenth Amendments, and it is not necessary to achieve a compelling

state  interest;

i.    an Order declaring that Defendants' execution policy and written execution protocol

      facially violates Plaintiff's rights as a class of one protected by the Fourteenth

      Amendment's Equal Protection Clause because it allows Defendants to treat Plaintiff

      different than similarly situated individuals, without any legitimate governmental

      interest, irrationally and arbitrarily;

j.    an Order declaring that he and other condemned inmates have fundamental,

      unenumerated rights that arise under the principles of liberty and natural law, which

      rights are protected by the Ninth Amendment to the United States Constitution, and

      that Defendants' execution policy and written execution protocol, as written and as

      applied, violates those fundamental rights in violation of the Ninth Amendment.

k.    an Order declaring that those portions of Defendants' execution policy and written

      execution protocol that provide discretion to governmental actors to impose

      restrictions on the content and length of any last statement given before an execution

      attempt are, facially and as applied, impermissible content-based restrictions, and/or

      violations of the public forum and/or limited public forum doctrines, and therefore in

      violation of Plaintiff's rights to free speech under the First Amendment.

16

l. an Order declaring that the reasoning and analysis in any prospective opinion issued by this Court temporarily and preliminarily enjoining Defendants from executing him applies to preclude Defendants from attempting any further executions until such time as the Court orders otherwise.

## II.     JURISDICTION AND VENUE

19. This action arises under 42 U.S.C. § 1983 for violations of the First, Sixth, Eighth, Ninth, and Fourteenth Amendments of the United States Constitution. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights violations and equitable relief under an act of Congress), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (preliminary and permanent injunctive relief).

20. This Court has personal jurisdiction over Defendants as they are residents of the State of Ohio, and are presently located in the State of Ohio, and are elected or appointed officials of the State of Ohio or otherwise acting on behalf of the State of Ohio.

21. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## III.     PARTIES

### A.     Plaintiffs

#### 1.     Bennie Adams

22. **Plaintiff Bennie Adams** is a United States citizen and a resident of the State of Ohio.

23. Adams is currently a death-sentenced inmate in the custody of Defendants.

24. Adams is under the control and supervision of the State of Ohio Department of Rehabilitation and Correction ("DRC"), which has him incarcerated at the Chillicothe

17

Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under

Inmate # 560-125.

25. Plaintiff Adams does not have a scheduled execution date.

26. If Plaintiff Adams's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

27. If Defendants attempt to execute him, Adams intends to make a last statement before any such attempted execution.

28. Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Adams in the death house located on the grounds of the Southern Ohio Correctional Facility ("SOCF") in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 2. Stanley Adams

29. **Plaintiff Stanley Adams** is a United States citizen and a resident of the State of Ohio.

30. Adams is currently a death-sentenced inmate in the custody of Defendants.

31. Adams is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 420-071.

32. Plaintiff Adams does not have a scheduled execution date.

33. If Plaintiff Adams's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

34. If Defendants attempt to execute him, Adams intends to make a last statement before any such attempted execution.

35. Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Adams in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

   **3.    Tyrone Ballew**

36. **Plaintiff Tyrone Ballew** is a United States citizen and a resident of the State of Ohio.

37. Ballew is currently a death-sentenced inmate in the custody of Defendants.

38. Ballew is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 261-875.

39. Plaintiff Ballew does not have a scheduled execution date.

40. If Plaintiff Ballew's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

41. If Defendants attempt to execute him, Ballew intends to make a last statement before any such attempted execution.

42. Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Ballew in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 4. Richard Bays

43.     Information specific to **Plaintiff Bays** is provided in his Supplemental Individual
Complaint.

### 5. Melvin Bonnell

44.     Information specific to **Plaintiff Bonnell** is provided in his Supplemental Individual
Complaint.

### 6. Quisi Bryan

45.     **Plaintiff Quisi Bryan** is a United States citizen and a resident of the State of Ohio.

46.     Bryan is currently a death-sentenced inmate in the custody of Defendants.

47.     Bryan is under the control and supervision of the DRC, which has him incarcerated at the
Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio,
under Inmate # 399-595.

48.     Plaintiff Bryan does not have a scheduled execution date.

49.     If Plaintiff Bryan's capital conviction or death sentence is not overturned in another
judicial proceeding or through executive clemency, then Defendants will attempt to
execute him.

50.     If Defendants attempt to execute him, Bryan intends to make a last statement before any
such attempted execution.

51.     Upon information and belief, it is the intention of Defendants, acting in concert with
other state officials not named as defendants herein, to use their lethal injection execution
policy described herein to execute Bryan in the death house located on the grounds of the
SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

**7.    Alva Campbell**

52.    Information specific to **Plaintiff Campbell** is provided in his Supplemental Individual Complaint.

**8.    Davel Chinn**

53.    Information specific to **Plaintiff Chinn** is provided in his Supplemental Individual Complaint.

**9.    Douglas Coley**

54.    **Plaintiff Douglas Coley** is a United States citizen and a resident of the State of Ohio.

55.    Coley is currently a death-sentenced inmate in the custody of Defendants.

56.    Coley is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 361-444.

57.    Plaintiff Coley does not have a scheduled execution date.

58.    If Plaintiff Coley's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

59.    If Defendants attempt to execute him, Coley intends to make a last statement before any such attempted execution.

60.    Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Coley in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 10. Roland Davis

61.    Information specific to **Plaintiff Davis** is provided in his Supplemental Individual Complaint.

### 11. Archie Dixon

62.    **Plaintiff Archie Dixon** is a United States citizen and a resident of the State of Ohio.

63.    Dixon is currently a death-sentenced inmate in the custody of Defendants.

64.    Dixon is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 325-702.

65.    Plaintiff Dixon does not have a scheduled execution date.

66.    If Plaintiff Dixon's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

67.    If Defendants attempt to execute him, Dixon intends to make a last statement before any such attempted execution.

68.    Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Dixon in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 12. John Drummond

69.    Information specific to **Plaintiff Drummond** is provided in his Supplemental Individual Complaint.

### 13. Angelo Fears

70.    **Plaintiff Angelo Fears** is a United States citizen and a resident of the State of Ohio.

71.     Fears is currently a death-sentenced inmate in the custody of Defendants.

72.     Fears is under the control and supervision of the DRC, which has him incarcerated at the

        Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio,

        under Inmate # 352-193.

73.     Plaintiff Fears does not have a scheduled execution date.

74.     If Plaintiff Fears's capital conviction or death sentence is not overturned in another

        judicial proceeding or through executive clemency, then Defendants will attempt to

        execute him.

75.     If Defendants attempt to execute him, Fears intends to make a last statement before any

        such attempted execution.

76.     Upon information and belief, it is the intention of Defendants, acting in concert with

        other state officials not named as defendants herein, to use their lethal injection execution

        policy described herein to execute Fears in the death house located on the grounds of the

        SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 14.     Antonio Sanchez Franklin

77.     Information specific to **Plaintiff Franklin** is provided in his Supplemental Individual

        Complaint.

### 15.     James Frazier

78.     **Plaintiff James Frazier** is a United States citizen and a resident of the State of Ohio.

79.     Frazier is currently a death-sentenced inmate in the custody of Defendants.

80.     Frazier is under the control and supervision of the DRC, which has him incarcerated at

        the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio,

        under Inmate # 497-904.

81.     Plaintiff Frazier does not have a scheduled execution date.

82.    If Plaintiff Frazier's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

83.    If Defendants attempt to execute him, Frazier intends to make a last statement before any such attempted execution.

84.    Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Frazier in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 16.    Clarence Fry

85.    **Plaintiff Clarence Fry** is a United States citizen and a resident of the State of Ohio.

86.    Fry is currently a death-sentenced inmate in the custody of Defendants.

87.    Fry is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 510-923.

88.    Plaintiff Fry does not have a scheduled execution date.

89.    If Plaintiff Fry's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

90.    If Defendants attempt to execute him, Fry intends to make a last statement before any such attempted execution.

91.    Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Fry in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 17.    Larry Gapen

92.    Information specific to **Plaintiff Gapen** is provided in his Supplemental Individual

Complaint.

### 18.    Delano Hale

93.    **Plaintiff Delano Hale** is a United States citizen and a resident of the State of Ohio.

94.    Hale is currently a death-sentenced inmate in the custody of Defendants.

95.    Hale is under the control and supervision of the DRC, which has him incarcerated at the

Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio,

under Inmate # 490-551.

96.    Plaintiff Hale does not have a scheduled execution date.

97.    If Plaintiff Hale's capital conviction or death sentence is not overturned in another

judicial proceeding or through executive clemency, then Defendants will attempt to

execute him.

98.    If Defendants attempt to execute him, Hale intends to make a last statement before any

such attempted execution.

99.    Upon information and belief, it is the intention of Defendants, acting in concert with

other state officials not named as defendants herein, to use their lethal injection execution

policy described herein to execute Hale in the death house located on the grounds of the

SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 19.    James Hanna

100.    **Plaintiff James Hanna** is a United States citizen and a resident of the State of Ohio.

101.    Hanna is currently a death-sentenced inmate in the custody of Defendants.

102.    Hanna is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 152-169.

103.    Plaintiff Hanna does not have a scheduled execution date.

104.    If Plaintiff Hanna's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

105.    If Defendants attempt to execute him, Hanna intends to make a last statement before any such attempted execution.

106.    Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Hanna in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 20.    Siddique Abdullah Hasan

107.    **Plaintiff Siddique Abdullah Hasan** is a United States citizen and a resident of the State of Ohio.

108.    Hasan is currently a death-sentenced inmate in the custody of Defendants.

109.    Hasan is under the control and supervision of the DRC, which has him incarcerated at the Ohio State Penitentiary, 878 Coitsville–Hubbard Road, Youngstown, Ohio, under Inmate # 130-559.

110.    Plaintiff Hasan does not have a scheduled execution date.

111.    If Plaintiff Hasan's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

112.    If Defendants attempt to execute him, Hasan intends to make a last statement before any such attempted execution.

113.    Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Hasan in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 21.    Warren K. Henness

114.    Information specific to **Plaintiff Henness** is provided in his Supplemental Individual Complaint.

### 22.    Danny Hill

115.    Information specific to **Plaintiff Danny Hill** is provided in his Supplemental Individual Complaint.

### 23.    Timothy Hoffner

116.    **Plaintiff Timothy Hoffner** is a United States citizen and a resident of the State of Ohio.

117.    Hoffner is currently a death-sentenced inmate in the custody of Defendants.

118.    Hoffner is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 315-988.

119.    Plaintiff Hoffner does not have a scheduled execution date.

120.    If Plaintiff Hoffner's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

121.    If Defendants attempt to execute him, Hoffner intends to make a last statement before any such attempted execution.

122.   Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Hoffner in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 24.   Percy Hutton

123.   **Plaintiff Percy Hutton** is a United States citizen and a resident of the State of Ohio.

124.   Hutton is currently a death-sentenced inmate in the custody of Defendants.

125.   Hutton is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 195-620.

126.   Plaintiff Hutton does not have a scheduled execution date.

127.   If Plaintiff Hutton's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

128.   If Defendants attempt to execute him, Hutton intends to make a last statement before any such attempted execution.

129.   Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Hutton in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 25.   Andre Jackson

130.   **Plaintiff Andre Jackson** is a United States citizen and a resident of the State of Ohio.

131.   Jackson is currently a death-sentenced inmate in the custody of Defendants.

132. Jackson is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 203-859.

133. Plaintiff Jackson does not have a scheduled execution date.

134. If Plaintiff Jackson's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

135. If Defendants attempt to execute him, Jackson intends to make a last statement before any such attempted execution.

136. Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Jackson in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 26. Cleveland Jackson

137. **Plaintiff Cleveland Jackson** is a United States citizen and a resident of the State of Ohio.

138. Jackson is currently a death-sentenced inmate in the custody of Defendants.

139. Jackson is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 429-404.

140. Plaintiff Jackson does not have a scheduled execution date.

141. If Plaintiff Jackson's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

142.  If Defendants attempt to execute him, Jackson intends to make a last statement before any such attempted execution.

143.  Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Jackson in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 27.  Kareem Jackson

144.  **Plaintiff Kareem Jackson** is a United States citizen and a resident of the State of Ohio.

145.  Jackson is currently a death-sentenced inmate in the custody of Defendants.

146.  Jackson is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 354-156.

147.  Plaintiff Jackson does not have a scheduled execution date.

148.  If Plaintiff Jackson's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

149.  If Defendants attempt to execute him, Jackson intends to make a last statement before any such attempted execution.

150.  Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Jackson in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 28.  Juan Kinley

151.  **Plaintiff Juan Kinley** is a United States citizen and a resident of the State of Ohio.

152.    Kinley is currently a death-sentenced inmate in the custody of Defendants.

153.    Kinley is under the control and supervision of the DRC, which has him incarcerated at

        the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio,

        under Inmate # 239-789.

154.    Plaintiff Kinley does not have a scheduled execution date.

155.    If Plaintiff Kinley's capital conviction or death sentence is not overturned in another

        judicial proceeding or through executive clemency, then Defendants will attempt to

        execute him.

156.    If Defendants attempt to execute him, Kinley intends to make a last statement before any

        such attempted execution.

157.    Upon information and belief, it is the intention of Defendants, acting in concert with

        other state officials not named as defendants herein, to use their lethal injection execution

        policy described herein to execute Kinley in the death house located on the grounds of

        the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

        **29.    Keith LaMar**

158.    **Plaintiff Keith LaMar** is a United States citizen and a resident of the State of Ohio.

159.    LaMar is currently a death-sentenced inmate in the custody of Defendants.

160.    LaMar is under the control and supervision of the DRC, which has him incarcerated at

        the Ohio State Penitentiary, 878 Coitsville–Hubbard Road, Youngstown, Ohio, under

        Inmate # 317-117.

161.    Plaintiff LaMar does not have a scheduled execution date.

162.    If Plaintiff LaMar's capital conviction or death sentence is not overturned in another

        judicial proceeding or through executive clemency, then Defendants will attempt to

        execute him.

163.    If Defendants attempt to execute him, LaMar intends to make a last statement before any such attempted execution.

164.    Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute LaMar in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 30.    Lawrence Landrum

165.    **Plaintiff Lawrence Landrum** is a United States citizen and a resident of the State of Ohio.

166.    Landrum is currently a death-sentenced inmate in the custody of Defendants.

167.    Landrum is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 189-982.

168.    Plaintiff Landrum does not have a scheduled execution date.

169.    If Plaintiff Landrum's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

170.    If Defendants attempt to execute him, Landrum intends to make a last statement before any such attempted execution.

171.    Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Landrum in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 31. Edward Lang

172. **Plaintiff Edward Lang** is a United States citizen and a resident of the State of Ohio.

173. Lang is currently a death-sentenced inmate in the custody of Defendants.

174. Lang is under the control and supervision of the DRC, which has him incarcerated at the Ohio State Penitentiary, 878 Coitsville–Hubbard Road, Youngstown, Ohio, under Inmate # 532-018.

175. Plaintiff Lang does not have a scheduled execution date.

176. If Plaintiff Lang's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

177. If Defendants attempt to execute him, Lang intends to make a last statement before any such attempted execution.

178. Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Lang in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 32. Donald Lewis

179. **Plaintiff Donald Lewis** is a United States citizen and a resident of the State of Ohio.

180. Lewis is currently a death-sentenced inmate in the custody of Defendants.

181. Lewis is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 225-685.

182. Plaintiff Lewis does not have a scheduled execution date.

183.    If Plaintiff Lewis's capital conviction or death sentence is not overturned in another

        judicial proceeding or through executive clemency, then Defendants will attempt to

        execute him.

184.    If Defendants attempt to execute him, Lewis intends to make a last statement before any

        such attempted execution.

185.    Upon information and belief, it is the intention of Defendants, acting in concert with

        other state officials not named as defendants herein, to use their lethal injection execution

        policy described herein to execute Lewis in the death house located on the grounds of the

        SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 33.    Carl Lindsey

186.    Information specific to **Plaintiff Lindsey** is provided in his Supplemental Individual

        Complaint.

### 34.    Charles Lorraine

187.    **Plaintiff Charles Lorraine** is a United States citizen and a resident of the State of Ohio.

188.    Lorraine is currently a death-sentenced inmate in the custody of Defendants.

189.    Lorraine is under the control and supervision of the DRC, which has him incarcerated at

        the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio,

        under Inmate # 194-013.

190.    Plaintiff Lorraine's execution is stayed and preliminarily enjoined by order of this Court.

191.    If Plaintiff Lorraine's capital conviction or death sentence is not overturned in another

        judicial proceeding or through executive clemency, then Defendants will attempt to

        execute him.

192.    If Defendants attempt to execute him, Lorraine intends to make a last statement before

        any such attempted execution.

193. Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Lorraine in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 35. Jose Trinidad Loza

194. Information specific to **Plaintiff Loza** is provided in his Supplemental Individual Complaint.

### 36. Ralph Lynch

195. **Plaintiff Ralph Lynch** is a United States citizen and a resident of the State of Ohio.

196. Lynch is currently a death-sentenced inmate in the custody of Defendants.

197. Lynch is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 382-728.

198. Plaintiff Lynch does not have a scheduled execution date.

199. If Plaintiff Lynch's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

200. If Defendants attempt to execute him, Lynch intends to make a last statement before any such attempted execution.

201. Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Lynch in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

35

### 37. Clarence Mack

202. Information specific to **Plaintiff Mack** is provided in his Supplemental Individual

Complaint.

### 38. Freddie McNeill, Jr.

203. **Plaintiff Freddie McNeill, Jr.** is a United States citizen and a resident of the State of

Ohio.

204. McNeill is currently a death-sentenced inmate in the custody of Defendants.

205. McNeill is under the control and supervision of the DRC, which has him incarcerated at

the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio,

under Inmate # 309-673.

206. Plaintiff McNeill does not have a scheduled execution date.

207. If Plaintiff McNeill's capital conviction or death sentence is not overturned in another

judicial proceeding or through executive clemency, then Defendants will attempt to

execute him.

208. If Defendants attempt to execute him, McNeill intends to make a last statement before

any such attempted execution.

209. Upon information and belief, it is the intention of Defendants, acting in concert with

other state officials not named as defendants herein, to use their lethal injection execution

policy described herein to execute McNeill in the death house located on the grounds of

the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 39. Samuel Moreland

210. Information specific to **Plaintiff Moreland** is provided in his Supplemental Individual

Complaint.

### 40.    Tyrone Noling

211.    **Plaintiff Tyrone Noling** is a United States citizen and a resident of the State of Ohio.

212.    Noling is currently a death-sentenced inmate in the custody of Defendants.

213.    Noling is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 222-599.

214.    Plaintiff Noling does not have a scheduled execution date.

215.    If Plaintiff Noling's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

216.    If Defendants attempt to execute him, Noling intends to make a last statement before any such attempted execution.

217.    Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Noling in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 41.    Gary Otte

218.    **Plaintiff Gary Otte** is a United States citizen and a resident of the State of Ohio.

219.    Otte is currently a death-sentenced inmate in the custody of Defendants.

220.    Otte is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 264-467.

221.    Plaintiff Otte does not have a scheduled execution date.

222.    If Plaintiff Otte's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

223.    If Defendants attempt to execute him, Otte intends to make a last statement before any such attempted execution.

224.    Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Otte in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 42.    Ron Phillips

225.    Information specific to **Plaintiff Phillips** is provided in his Supplemental Individual Complaint.

### 43.    Walter Raglin

226.    Information specific to **Plaintiff Raglin** is provided in his Supplemental Individual Complaint.

### 44.    Jason Robb

227.    Information specific to **Plaintiff Robb** is provided in his Supplemental Individual Complaint.

### 45.    Michael Dean Scott

228.    **Plaintiff Michael Dean Scott** is a United States citizen and a resident of the State of Ohio.

229.    Scott is currently a death-sentenced inmate in the custody of Defendants.

230.    Scott is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 387-350.

231.    Plaintiff Scott does not have a scheduled execution date.

232.    If Plaintiff Scott's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

233.    If Defendants attempt to execute him, Scott intends to make a last statement before any such attempted execution.

234.    Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Scott in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 46.    Duane Short

235.    **Plaintiff Duane Short** is a United States citizen and a resident of the State of Ohio.

236.    Short is currently a death-sentenced inmate in the custody of Defendants.

237.    Short is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 525-858.

238.    Plaintiff Short does not have a scheduled execution date.

239.    If Plaintiff Short's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

240.     If Defendants attempt to execute him, Short intends to make a last statement before any

         such attempted execution.

241.     Upon information and belief, it is the intention of Defendants, acting in concert with

         other state officials not named as defendants herein, to use their lethal injection execution

         policy described herein to execute Short in the death house located on the grounds of the

         SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 47.     Steven T. Smith

242.     **Plaintiff Steven T. Smith** is a United States citizen and a resident of the State of Ohio.

243.     Smith is currently a death-sentenced inmate in the custody of Defendants.

244.     Smith is under the control and supervision of the DRC, which has him incarcerated at the

         Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio,

         under Inmate # 369-054.

245.     **Plaintiff Smith has a scheduled execution date of May 1, 2013.**

246.     If Plaintiff Smith's capital conviction or death sentence is not overturned in another

         judicial proceeding or through executive clemency, then Defendants will attempt to

         execute him.

247.     If Defendants attempt to execute him, Smith intends to make a last statement before any

         such attempted execution.

248.     Upon information and belief, it is the intention of Defendants, acting in concert with

         other state officials not named as defendants herein, to use their lethal injection execution

         policy described herein to execute Smith in the death house located on the grounds of the

         SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 48.     Warren Spivey

249.     **Plaintiff Warren Spivey** is a United States citizen and a resident of the State of Ohio.

40

250. Spivey is currently a death-sentenced inmate in the custody of Defendants.

251. Spivey is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 216-212.

252. Plaintiff Spivey does not have a scheduled execution date.

253. If Plaintiff Spivey's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

254. If Defendants attempt to execute him, Spivey intends to make a last statement before any such attempted execution.

255. Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Spivey in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 49. John David Stumpf

256. **Plaintiff John David Stumpf** is a United States citizen and a resident of the State of Ohio.

257. Stumpf is currently a death-sentenced inmate in the custody of Defendants.

258. Stumpf is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 181-258.

259. Plaintiff Stumpf does not have a scheduled execution date.

260. If Plaintiff Stumpf's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

261. If Defendants attempt to execute him, Stumpf intends to make a last statement before any such attempted execution.

262. Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Stumpf in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 50. Raymond Tibbetts

263. **Plaintiff Raymond Tibbetts** is a United States citizen and a resident of the State of Ohio.

264. Tibbetts is currently a death-sentenced inmate in the custody of Defendants.

265. Tibbetts is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 363-178.

266. **Plaintiff Tibbetts has a scheduled execution date of October 15, 2014.**

267. If Plaintiff Tibbetts's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

268. If Defendants attempt to execute him, Tibbetts intends to make a last statement before any such attempted execution.

269. Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution

policy described herein to execute Tibbetts in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 51. James Trimble

270. **Plaintiff James Trimble** is a United States citizen and a resident of the State of Ohio.

271. Trimble is currently a death-sentenced inmate in the custody of Defendants.

272. Trimble is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 494-014.

273. Plaintiff Trimble does not have a scheduled execution date.

274. If Plaintiff Trimble's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

275. If Defendants attempt to execute him, Trimble intends to make a last statement before any such attempted execution.

276. Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Trimble in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 52. Raymond Twyford

277. **Plaintiff Raymond Twyford** is a United States citizen and a resident of the State of Ohio.

278. Twyford is currently a death-sentenced inmate in the custody of Defendants.

279. Twyford is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 275-069.

280. Plaintiff Twyford does not have a scheduled execution date.

281. If Plaintiff Twyford's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

282. If Defendants attempt to execute him, Twyford intends to make a last statement before any such attempted execution.

283. Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Twyford in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 53.    Robert Van Hook

284. **Plaintiff Robert Van Hook** is a United States citizen and a resident of the State of Ohio.

285. Van Hook is currently a death-sentenced inmate in the custody of Defendants.

286. Van Hook is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 186-347.

287. Plaintiff Van Hook does not have a scheduled execution date.

288. If Plaintiff Van Hook's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

289.  If Defendants attempt to execute him, Van Hook intends to make a last statement before any such attempted execution.

290.  Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Van Hook in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 54.  Warren Waddy

291.  Information specific to **Plaintiff Waddy** is provided in his Supplemental Individual Complaint.

### 55.  James Were

292.  **Plaintiff James Were** is a United States citizen and a resident of the State of Ohio.

293.  Were is currently a death-sentenced inmate in the custody of Defendants.

294.  Were is under the control and supervision of the DRC, which has him incarcerated at the Ohio State Penitentiary, 878 Coitsville–Hubbard Road, Youngstown, Ohio, under Inmate # 173-245.

295.  Plaintiff Were does not have a scheduled execution date.

296.  If Plaintiff Were's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

297.  If Defendants attempt to execute him, Were intends to make a last statement before any such attempted execution.

298.  Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution

policy described herein to execute Were in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 56.  Andre Williams

299. Information specific to **Plaintiff Andre Williams** is provided in his Supplemental Individual Complaint.

### 57.  Robert Williams

300. **Plaintiff Robert Williams** is a United States citizen and a resident of the State of Ohio.

301. Williams is currently a death-sentenced inmate in the custody of Defendants.

302. Williams is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 381-764.

303. Plaintiff Williams does not have a scheduled execution date.

304. If Plaintiff Williams's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

305. If Defendants attempt to execute him, Williams intends to make a last statement before any such attempted execution.

306. Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Williams in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 58.  Abdul Awkal

307. Information specific to **Plaintiff Awkal** is provided in his Supplemental Individual Complaint.

46

### 59. David Braden

308. **Plaintiff David Braden** is a United States citizen and a resident of the State of Ohio.

309. Braden is currently a death-sentenced inmate in the custody of Defendants.

310. Braden is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 380-366.

311. Plaintiff Braden does not have a scheduled execution date.

312. If Plaintiff Braden's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

313. If Defendants attempt to execute him, Braden intends to make a last statement before any such attempted execution.

314. Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Braden in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 60. Cedric Carter

315. **Plaintiff Cedric Carter** is a United States citizen and a resident of the State of Ohio.

316. Carter is currently a death-sentenced inmate in the custody of Defendants.

317. Carter is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 262-433.

318. Plaintiff Carter does not have a scheduled execution date.

319.   If Plaintiff Carter's capital conviction or death sentence is not overturned in another
judicial proceeding or through executive clemency, then Defendants will attempt to
execute him.

320.   If Defendants attempt to execute him, Carter intends to make a last statement before any
such attempted execution.

321.   Upon information and belief, it is the intention of Defendants, acting in concert with
other state officials not named as defendants herein, to use their lethal injection execution
policy described herein to execute Carter in the death house located on the grounds of the
SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 61.   Sean Carter

322.   **Plaintiff Sean Carter** is a United States citizen and a resident of the State of Ohio.

323.   Carter is currently a death-sentenced inmate in the custody of Defendants.

324.   Carter is under the control and supervision of the DRC, which has him incarcerated at the
Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio,
under Inmate # 356-659.

325.   Plaintiff Carter does not have a scheduled execution date.

326.   If Plaintiff Carter's capital conviction or death sentence is not overturned in another
judicial proceeding or through executive clemency, then Defendants will attempt to
execute him.

327.   If Defendants attempt to execute him, Carter intends to make a last statement before any
such attempted execution.

328.   Upon information and belief, it is the intention of Defendants, acting in concert with
other state officials not named as defendants herein, to use their lethal injection execution

policy described herein to execute Carter in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

**62.    August Cassano**

329.    **Plaintiff August Cassano** is a United States citizen and a resident of the State of Ohio.

330.    Cassano is currently a death-sentenced inmate in the custody of Defendants.

331.    Cassano is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 145-242.

332.    Plaintiff Cassano does not have a scheduled execution date.

333.    If Plaintiff Cassano's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

334.    If Defendants attempt to execute him, Cassano intends to make a last statement before any such attempted execution.

335.    Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Cassano in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

**63.    Jeronique Cunningham**

336.    **Plaintiff Jeronique Cunningham** is a United States citizen and a resident of the State of Ohio.

337.    Cunningham is currently a death-sentenced inmate in the custody of Defendants.

338.   Cunningham is under the control and supervision of the DRC, which has him

incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North,

Chillicothe, Ohio, under Inmate # 428-323.

339.   Plaintiff Cunningham does not have a scheduled execution date.

340.   If Plaintiff Cunningham's capital conviction or death sentence is not overturned in

another judicial proceeding or through executive clemency, then Defendants will attempt

to execute him.

341.   If Defendants attempt to execute him, Cunningham intends to make a last statement

before any such attempted execution.

342.   Upon information and belief, it is the intention of Defendants, acting in concert with

other state officials not named as defendants herein, to use their lethal injection execution

policy described herein to execute Cunningham in the death house located on the grounds

of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 64.   Stanley Fitzpatrick

343.   **Plaintiff Stanley Fitzpatrick** is a United States citizen and a resident of the State

of Ohio.

344.   Fitzpatrick is currently a death-sentenced inmate in the custody of Defendants.

345.   Fitzpatrick is under the control and supervision of the DRC, which has him incarcerated

at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe,

Ohio, under Inmate # 419-722.

346.   Plaintiff Fitzpatrick does not have a scheduled execution date.

347.   If Plaintiff Fitzpatrick's capital conviction or death sentence is not overturned in another

judicial proceeding or through executive clemency, then Defendants will attempt to

execute him.

348.   If Defendants attempt to execute him, Fitzpatrick intends to make a last statement before any such attempted execution.

349.   Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Fitzpatrick in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

**65.    Genesis Hill**

350.   Information specific to **Plaintiff Genesis Hill** is provided in his Supplemental Individual Complaint.

**66.    Gary Hughbanks**

351.   Information specific to **Plaintiff Hughbanks** is provided in his Supplemental Individual Complaint.

**67.    Jerry Lawson**

352.   Information specific to **Plaintiff Lawson** is provided in his Supplemental Individual Complaint.

**68.    Dennis McGuire**

353.   **Plaintiff Dennis McGuire** is a United States citizen and a resident of the State of Ohio.

354.   McGuire is currently a death-sentenced inmate in the custody of Defendants.

355.   McGuire is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 438-811.

356.   **Plaintiff McGuire has a scheduled execution date of January 16, 2014.**

357.   If Plaintiff McGuire's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

358.   If Defendants attempt to execute him, McGuire intends to make a last statement before any such attempted execution.

359.   Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute McGuire in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 69.    Frederick Mundt

360.   **Plaintiff Frederick Mundt** is a United States citizen and a resident of the State of Ohio.

361.   Mundt is currently a death-sentenced inmate in the custody of Defendants.

362.   Mundt is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 486-456.

363.   Plaintiff Mundt does not have a scheduled execution date.

364.   If Plaintiff Mundt's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

365.   If Defendants attempt to execute him, Mundt intends to make a last statement before any such attempted execution.

366.   Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution

policy described herein to execute Mundt in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 70.    Kerry Perez

367.    **Plaintiff Kerry Perez** is a United States citizen and a resident of the State of Ohio.

368.    Perez is currently a death-sentenced inmate in the custody of Defendants.

369.    Perez is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 509-017.

370.    Plaintiff Perez does not have a scheduled execution date.

371.    If Plaintiff Perez's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

372.    If Defendants attempt to execute him, Perez intends to make a last statement before any such attempted execution.

373.    Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Perez in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 71.    William Sapp

374.    **Plaintiff William Sapp** is a United States citizen and a resident of the State of Ohio.

375.    Sapp is currently a death-sentenced inmate in the custody of Defendants.

376.    Sapp is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 337-278.

377.    Plaintiff Sapp does not have a scheduled execution date.

378.    If Plaintiff Sapp's capital conviction or death sentence is not overturned in another

        judicial proceeding or through executive clemency, then Defendants will attempt to

        execute him.

379.    If Defendants attempt to execute him, Sapp intends to make a last statement before any

        such attempted execution.

380.    Upon information and belief, it is the intention of Defendants, acting in concert with

        other state officials not named as defendants herein, to use their lethal injection execution

        policy described herein to execute Sapp in the death house located on the grounds of the

        SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 72.    Bobby T. Sheppard

381.    Information specific to **Plaintiff Sheppard** is provided in his Supplemental Individual

        Complaint.

### 73.    George Skatzes

382.    Information specific to **Plaintiff Skatzes** is provided in his Supplemental Individual

        Complaint.

### 74.    David Sneed

383.    Information specific to **Plaintiff Sneed** is provided in his Supplemental Individual

        Complaint.

### 75.    Frederick Treesh

384.    Information specific to **Plaintiff Treesh** is provided in his Supplemental Individual

        Complaint.

### 76.    Michael Turner

385.  Information specific to **Plaintiff Turner** is provided in his Supplemental Individual

Complaint.

### 77.    Jeffrey Wogenstahl

386.  **Plaintiff Jeffrey Wogenstahl** is a United States citizen and a resident of the State

of Ohio.

387.  Wogenstahl is currently a death-sentenced inmate in the custody of Defendants.

388.  Wogenstahl is under the control and supervision of the DRC, which has him incarcerated

at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe,

Ohio, under Inmate # 269-357.

389.  Plaintiff Wogenstahl does not have a scheduled execution date.

390.  If Plaintiff Wogenstahl's capital conviction or death sentence is not overturned in another

judicial proceeding or through executive clemency, then Defendants will attempt to

execute him.

391.  If Defendants attempt to execute him, Wogenstahl intends to make a last statement before

any such attempted execution.

392.  Upon information and belief, it is the intention of Defendants, acting in concert with

other state officials not named as defendants herein, to use their lethal injection execution

policy described herein to execute Wogenstahl in the death house located on the grounds

of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 78.    Kevin Scudder

393.  **Plaintiff Kevin Scudder** is a United States citizen and a resident of the State of Ohio.

394.  Scudder is currently a death-sentenced inmate in the custody of Defendants.

395.    Scudder is under the control and supervision of the DRC, which has him incarcerated at the Franklin Medical Center, 1990 Harmon Ave, Columbus, Ohio, under Inmate # 209-848.

396.    Plaintiff Scudder does not have a scheduled execution date.

397.    If Plaintiff Scudder's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

398.    If Defendants attempt to execute him, Scudder intends to make a last statement before any such attempted execution.

399.    Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Scudder in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 79.    Timothy Dunlap

400.    Information specific to **Plaintiff Dunlap** is provided in his Supplemental Individual Complaint.

### 80. Gerald Hand[5]

401. Information specific to **Plaintiff Hand** is provided in his Supplemental Individual

Complaint.

### 81. Ahmad Issa[6]

402. **Plaintiff Ahmad Issa** is a United States citizen and a resident of the State of Ohio.

_____

[5] Gerald Hand filed a motion to intervene in *Cooey v. Kasich*, Case No. 2:04-cv-1156, (*Cooey*, Doc. No. 1059), which this Court granted, (*Cooey*, Doc. No. 1064), before this Court consolidated that case and others into *In re Ohio Execution Protocol Litigation*, Case No. 2:11-cv-1016. This Court stayed Defendants' deadline to file a response to Hand's complaint. (*Cooey*, Doc. No. 1064, at 6-7; *see also In re Ohio Execution Protocol Litig.*, Doc. No. 56, Pls.' Mot. to Stay Amended Pleading Deadline; *id.*, Doc. No. 62, Order granting motion to stay amended pleading deadline; *id.*, Doc. No. 75, Pl. Hand's Mot. to Stay Amended Pleading Deadline; *id.*, Doc. No. 77, Order granting motion to stay amended pleading deadline; *id.*, Doc. No. 117, Order continuing to stay all pleading deadlines.) Thus Defendants have not filed an answer to Hand's complaint.

In an order docketed on May 24, 2012, this Court explained that "if a plaintiff has filed a complaint to which no answer has been filed or is part of the omnibus complaint (to which no answer has been filed), that plaintiff may file an amended complaint *or join the filing of an amended omnibus complaint* without leave of this Court." (*In re Ohio Execution Protocol Litig.*, Doc. No. 117, ¶ (3)(b) (emphasis added).) In accordance with the Court's May 24, 2012 order, Hand hereby "join[s] the filing of [this] amended omnibus complaint" as a Plaintiff.

[6] Ahmad Issa filed a motion to intervene in *Cooey v. Kasich*, Case No. 2:04-cv-1156, (*Cooey*, Doc. No. 1052), which this Court granted, (*Cooey*, Doc. No. 1064), before this Court consolidated that case and others into *In re Ohio Execution Protocol Litigation*, Case No. 2:11-cv-1016. This Court stayed Defendants' deadline to file a response to Issa's complaint. (*Cooey*, Doc. No. 1064, at 6-7; *see also In re Ohio Execution Protocol Litig.*, Doc. No. 56, Pls.' Mot. to Stay Amended Pleading Deadline; *id.*, Doc. No. 62, Order granting motion to stay amended pleading deadline; *id.*, Doc. No. 63, Pls.' Mot. to Stay Amended Pleading Deadline; *id.*, Doc. No. 69, Order granting motion to stay amended pleading deadline; *id.*, Doc. No. 117, Order continuing to stay all pleading deadlines.) Thus Defendants have not filed an answer to Issa's complaint.

In an order docketed on May 24, 2012, this Court explained that "if a plaintiff has filed a complaint to which no answer has been filed or is part of the omnibus complaint (to which no answer has been filed), that plaintiff may file an amended complaint *or join the filing of an amended omnibus complaint* without leave of this Court." (*In re Ohio Execution Protocol Litig.*, Doc. No. 117, ¶ (3)(b) (emphasis added).) In accordance with the Court's May 24, 2012 order, Issa hereby "join[s] the filing of [this] amended omnibus complaint" as a Plaintiff.

403.    Issa is currently a death-sentenced inmate in the custody of Defendants.

404.    Issa is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # A364-585.

405.    Plaintiff Issa does not have a scheduled execution date.

406.    If Plaintiff Issa's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

407.    If Defendants attempt to execute him, Issa intends to make a last statement before any such attempted execution.

408.    Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Issa in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### 82.   James O'Neal[7]

409.   Information specific to **Plaintiff O'Neal** is provided in his Supplemental Individual

Complaint.

### 83.   Michael Webb[8]

410.   **Plaintiff Michael Webb** is a United States citizen and a resident of the State of Ohio.

411.   Webb is currently a death-sentenced inmate in the custody of Defendants.

_____

[7] James O'Neal filed a motion to intervene in *Cooey v. Kasich*, Case No. 2:04-cv-1156, (*Cooey*, Doc. No. 1049), which this Court granted, (*Cooey*, Doc. No. 1064), before this Court consolidated that case and others into *In re Ohio Execution Protocol Litigation*, Case No. 2:11-cv-1016.  This Court stayed Defendants' deadline to file a response to O'Neal's complaint. (*Cooey*, Doc. No. 1064, at 6-7; *see also In re Ohio Execution Protocol Litig.*, Doc. No. 56, Pls.' Mot. to Stay Amended Pleading Deadline; *id.*, Doc. No. 62, Order granting motion to stay amended pleading deadline; *id.*, Doc. No. 63, Pls.' Mot. to Stay Amended Pleading Deadline; *id.*, Doc. No. 69, Order granting motion to stay amended pleading deadline; *id.*, Doc. No. 117, Order continuing to stay all pleading deadlines.)  Thus Defendants have not filed an answer to O'Neal's complaint.

In an order docketed on May 24, 2012, this Court explained that "if a plaintiff has filed a complaint to which no answer has been filed or is part of the omnibus complaint (to which no answer has been filed), that plaintiff may file an amended complaint *or join the filing of an amended omnibus complaint* without leave of this Court."  (*In re Ohio Execution Protocol Litig.*, Doc. No. 117, ¶ (3)(b) (emphasis added).)  In accordance with the Court's May 24, 2012 order, O'Neal hereby "join[s] the filing of [this] amended omnibus complaint" as a Plaintiff.

[8] Michael Webb filed a motion to intervene, (*In re Ohio Execution Protocol Litig.*, Doc. No. 66), which Defendants did not oppose and which the Court granted, (*In re Ohio Execution Protocol Litig.*, Doc. No. 71).  This Court subsequently stayed Defendants' deadline to file a response to Webb's complaint.  (*In re Ohio Execution Protocol Litig.*, Doc. No. 94; *see also id.*, Doc. No. 56, Pls.' Mot. to Stay Amended Pleading Deadline; *id.*, Doc. No. 62, Order granting motion to stay amended pleading deadline; *id.*, Doc. No. 117, Order continuing to stay all pleading deadlines.)  Thus Defendants have not filed an answer to Webb's complaint.

In an order docketed on May 24, 2012, this Court explained that "if a plaintiff has filed a complaint to which no answer has been filed or is part of the omnibus complaint (to which no answer has been filed), that plaintiff may file an amended complaint *or join the filing of an amended omnibus complaint* without leave of this Court."  (*In re Ohio Execution Protocol Litig.*, Doc. No. 117, ¶ (3)(b) (emphasis added).)  In accordance with the Court's May 24, 2012 order, Webb hereby "join[s] the filing of [this] amended omnibus complaint" as a Plaintiff.

412.   Webb is under the control and supervision of the DRC, which has him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio, under Inmate # 246-589.

413.   This Court has stayed and enjoined any attempt to execute Webb until further order from the Court.

414.   If Plaintiff Webb's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

415.   If Defendants attempt to execute him, Webb intends to make a last statement before any such attempted execution.

416.   Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their lethal injection execution policy described herein to execute Webb in the death house located on the grounds of the SOCF in Lucasville, Ohio, which is operated and controlled by the Defendants.

### B.    Defendants

417.   **Defendant John Kasich** is the Governor of the State of Ohio and has been since on or about January 10, 2011.  He is the final executive authority in the state, statutorily and constitutionally responsible for the execution of all death sentences in Ohio and the manner in which those sentences are executed.  He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

418.   **Defendant Gary C. Mohr** is the Director of DRC, a department of the State of Ohio that was created and is maintained pursuant to Ohio Revised Code § 5120.  Defendant Mohr is charged with and authorized under Ohio Revised Code § 5120.01 to prescribe and

direct the promulgation of rules and regulations for the DRC, including the rules and regulations for the conduct of prison operations and execution procedures. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

419. **Defendant Donald Morgan** is Warden of the SOCF, a correctional institution of the DRC that was created and is maintained pursuant to Ohio Revised Code § 5120.05. SOCF is the prison where Ohio carries out its death sentences. Pursuant to Ohio Revised Code § 5120.38, Defendant Morgan, as the Warden of SOCF, is charged with management of SOCF and the oversight and conduct of operations at SOCF, including executions carried out there. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

420. **The unnamed and anonymous execution team members** are individuals involved with administering Defendants' execution policy at SOCF. They are sued in their official capacities for the purpose of obtaining declaratory and injunctive relief.

421. Each of Defendants, at all times relevant hereto, are acting in their respective official capacities with respect to all acts described herein, and are, in each instance, acting under the color and authority of state law.

422. Upon information and belief, unless preliminarily and permanently enjoined, each of Defendants intends to act in their respective official capacities and under the authority of state law to execute Plaintiff.

## IV.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

423.   Pursuant to the Joint Stipulation filed on August 25, 2011, (*Cooey v. Kasich*, Doc. No.

       971), Defendants have affirmatively and explicitly waived any exhaustion defenses.


## V.    FACTS COMMON TO ALL CLAIMS AND RELIEF SOUGHT

424.   Plaintiff incorporates by reference each and every statement and allegation set forth

       throughout this Amended Omnibus Complaint as if fully rewritten.

425.   In 2002, the Ohio Legislature changed the State's manner of execution from electrocution

       to lethal injection.

426.   At all times from 1994 to present, Ohio's statute governing lethal injection mandated that

       Defendants conduct a lethal injection execution such that it produces a "quick and

       painless" death.

427.   DRC Policy 01-COM-11 requires that all execution processes must be performed in a

       professional, humane, sensitive, and dignified manner.

428.   Defendants formally adopted a written lethal injection protocol with an effective date of

       November 30, 2009 and designated DRC Policy 01-COM-11, in which they adopted a

       new execution method.

429.   That written protocol was superseded by the written protocol designated DRC Policy 01-

       COM-11 with an effective date of November 15, 2010.

430.   On February 7, 2011, Defendants gave formal notice that they intended to supersede the

       November 15, 2010 written protocol with another superseding version of DRC

       Policy 01-COM-11.

431.    That version of the written execution protocol was also designated DRC Policy 01-COM-11, and Defendants assigned it an "Effective Date" of March 9, 2011. (*Cooey*, Doc. No. 893.)

432.    On March 22, 2011, Defendants gave formal notice that they were again intending to supersede their then-effective written protocol with another new execution policy. This version of the written protocol was also designated DRC Policy 01-COM-11, and Defendants assigned it an "Effective Date" of April 11, 2011. (*Cooey*, Doc. No. 903-1.)

433.    On or about August 18, 2011, Defendants gave notice that they intended to supersede the April 11, 2011 written protocol with another superseding version of DRC Policy 01-COM-11, and the superseding protocol is identified with an "Effective Date" of September 18, 2011. (Attached as Exhibit 1.)

434.    On or about March, 2012, Defendants testified that they had implemented Incident Command Systems as part of the execution policy.

435.    Defendants have previously conceded, during proceedings in this litigation on or about December 9, 2009, that a change in execution drugs is sufficient to restart a new statute of limitations period under *Cooey II*.

436.    All claims herein are timely filed under the applicable statute of limitations standards. *See, e.g.*, *Cooey v. Strickland*, 479 F.3d 412, 422, 424 (6th Cir. 2007) ("*Cooey II*") (holding that the statute-of-limitations period for these claims can be reset when the lethal injection policy changes in a way that relates to the "core complaints"); *Cooey (Beuke) v. Strickland*, 604 F.3d 939, 942 (6th Cir. 2010) (explaining that "[g]iven the change in policy, the statute of limitations to challenge the new procedure began to run anew").

437.     Upon information and belief, Defendants will employ an overarching execution policy
         that encompasses their informal execution policies, as well as the written execution
         protocol designated DRC Policy 01-COM-11 that is operable at the time, to
         execute Plaintiff.

438.     Defendants' overarching execution policy includes admissions and representations
         Defendants or their predecessors have made in response to discovery requests
         propounded during the course of the instant litigation.

439.     Defendants' overarching execution policy also includes representations that they have
         made in various pleadings, motions and proceedings throughout the course of the instant
         litigation, including testimony presented in hearings before the Court.

440.     One or more of Defendants have testified under oath that the written execution protocol's
         provisions are binding, administrative law.

441.     One or more of Defendants have testified under oath that the written execution protocol is
         actually considered more akin to discretionary "guidelines" rather than binding,
         mandatory law, and that the execution policy and written execution protocol gives
         Defendants discretion to deviate/vary from the policy and protocol's mandates to carry
         out an execution.

442.     The September 18, 2011 written protocol explicitly allows Defendants to *deviate* from
         the written protocol if any member of the Execution Team determines for any reason that
         it is difficult, impractical or impossible to strictly follow the procedures in the
         written protocol.

443. The September 18, 2011 written protocol explicitly allows Defendants to *vary* from the written protocol if any situation arises that would make following the execution policy difficult, impractical or impossible.

444. The written protocol requires that any *deviations* from the protocol must be authorized by the Director of DRC.

445. The written protocol is silent on whether the Director's authorization must be obtained before any deviation may occur.

446. The written protocol requires that any *variations* "of a substantial nature" must be approved by the Director of DRC.

447. The written protocol is silent on whether the Director's approval must be obtained before any variation may occur.

448. The written protocol is also silent on what constitutes a "substantial" variation.

449. The written protocol is also silent on which actor or actors are vested with the discretion to determine whether a potential variation is "substantial" or something else.

450. On or about August 17, 2010, including in a sworn affidavit signed by the Director of DRC on or about August 20, 2010, Defendants made several commitments which they represented are part of their "informal" execution policy.  (*See Cooey*, Doc. No. 817; *see also Cooey*, Doc. No. 817-1, PageID 17564-65.)  Several of these commitments were sworn and filed on the record of this case.

451.    Among Defendants' informal execution policies are the following:

> Defendants will not commence any execution unless they have, on hand in the Death House at SOCF, at least 10 grams—*i.e.*, a full 5-gram dose and a full 5-gram back-up dose—of the lethal execution drug under the Plan A execution method.[9]

> If Defendants do not have 10 grams of the Plan A drug on hand in the Death House, Defendants will not commence an execution using the Plan B method.

> Defendants will not start an execution using Plan B; they will only use Plan B if Plan A is attempted and then abandoned.

> Defendants will not transfer an inmate scheduled for execution to SOCF unless Defendants have 10 grams of the Plan A drug at SOCF.

> Defendants will not use imported execution drugs.

> Defendants will not use any execution drug that is expired at the time of the scheduled execution, according to the expiration date stamped on the original manufacturer's packaging.

> Defendants will use only execution drugs that are pure, unadulterated, unexpired, not compounded, and in the sealed, original manufacturer's packaging.

452.    Also among Defendants' informal execution policies are the following provisions

concerning Defendants' possession of a sufficient quantity of the Plan A execution drug.

Notably, these provisions are related, but they are discrete provisions with

different requirements:

> A "notice" provision stating that Defendants "will provide notice to a condemned inmate's counsel and Plaintiffs' counsel (if different) within a reasonable time period (no less than 5 days) before an execution if [DRC] does not have in its possession at least 10 grams of thiopental sodium at that time," (*Cooey*, Doc. No. 817-1, PageID 17564-65); and

---

[9] These policies contemplated sodium thiopental as the Plan A drug, which Defendants used in the execution of Frank Spisak on February 17, 2011. In the DRC Policy 01-COM-11 effective March 9, 2011, 5 grams of pentobarbital replaced the 5 grams of sodium thiopental. The September 18, 2011 written protocol maintains pentobarbital as the lethal drug under Plan A.

> A "reprieve" provision stating that "[c]oncurrent with such notice to counsel, [Defendants] will also immediately seek a reprieve from the Governor related to that condemned inmate's execution," (*id.* at PageID 17565).

453.    Also among Defendants' informal execution policies are the following provisions related to any intent or action by Defendants to change their written execution protocol. Notably, these provisions are related, but they are discrete provisions with different requirements:

> A "notice" provision stating that Defendants "will provide notice to the Court, to a condemned inmate's counsel and to Plaintiffs' counsel (if different) within a reasonable time period (no less than 30 days) before an execution if [DRC] intends to change the written execution policy, ODRC Policy 01-COM-11," (*Cooey*, Doc. No. 817-1, PageID 17565), and;

> A "reprieve" provision stating that "[c]oncurrent with such notice to counsel, [Defendants] will seek a reprieve from the Governor related to that condemned inmate's execution, *provided that* the execution is scheduled to take place less than thirty days *from the effective date* of the change in policy," (*id.* (emphases added)).

454.    Defendants executed Johnnie Baston on March 10, 2011, under the provisions of a written execution protocol Defendants marked as having an effective date of March 9, 2011.

455.    Defendants failed to seek a reprieve for Baston, notwithstanding the fact that his scheduled execution date was one day after the effective date of a newly adopted written execution protocol.

456.    Defendants executed Clarence Carter on April 12, 2011, under the provisions of a written execution protocol Defendants marked as having an effective date of April 11, 2011.

457.    Defendants failed to seek a reprieve for Carter, notwithstanding the fact that his scheduled execution date was one day after the effective date of a newly adopted written execution protocol.

458.   Conversely, Defendants properly sought a reprieve for inmate Billy Slagle's execution schedule for September 20, 2011 due to the effective date of their September 18, 2011 execution protocol.

459.   Under Defendants' overarching execution policy and their written execution protocol, and regardless of whether Plan A or Plan B is used to inject the lethal drugs, a condemned inmate will be forced to lie down flat on his or her back for periods of time.

460.   Upon entering the execution chamber, a condemned inmate will be strapped to the execution bed flat on his or her back, unable to move, with arms outstretched at each side.

461.   Defendants will immobilize the condemned inmate by strapping him or her to the execution bed before the execution team begins attempted insertion of the peripheral IV catheters.

462.   Successfully achieving peripheral IV access has taken in the past and, upon information and belief, will take in the future, at least several minutes and may take half an hour or more.

463.   Defendants ensure that a condemned inmate lies flat on his or her back by employing "security team" members surrounding the inmate during efforts to establish IV access, and by strapping the inmate to the execution bed.

464.   These security team and/or strap-down team members will physically ensure that an inmate remains flat on his back in a horizontal position throughout these procedures.

465.   Executions are scheduled to commence at 10:00 a.m., although Defendants may start later.

68

466.    Defendants' execution policy and written execution protocol will deny a condemned inmate access to counsel, and hence deny access through counsel to the courts, after 8:45 a.m. on the morning of a scheduled execution.

467.    Counsel for the condemned inmate is only permitted to witness some stages of the execution process if the inmate designates counsel as one of his three allotted witnesses.

468.    Observation of events in the death chamber is severely hindered by Defendants' closing the curtain to cover the observation window during attempts to establish IV access.

469.    During this time, counsel has only the view provided by a single fish-eye camera mounted in the ceiling directly above the execution bed and displayed on a small flat-panel television monitor mounted on the wall in the witnesses' room.

470.    This view is obstructed by the bodies and heads of the Execution Team members surrounding and working on the inmate, and there is no audio signal that accompanies the picture feed on the television.

471.    The inmate is not able to access a microphone to communicate with counsel on the other side of the wall, requiring that the inmate speak very loudly for counsel to hear the inmate's attempts to communicate.

472.    Should counsel be alerted to a problem after the inmate enters the execution chamber, counsel must leave the witness room—breaking visual contact with events in the death chamber, even if the curtain is open at that point—to use the wall-mounted telephone in the hallway.

473.    Counsel will be allowed to use only that telephone to call co-counsel in another building on the grounds of SOCF, where co-counsel may have access to a telephone, computer or

other communication device, although no internet connection is available to counsel at the prison.

474.     Should counsel need to access state or federal courts, or others able to stop the execution, such as the Governor of Ohio, counsel will be forced to leave the presence of the condemned inmate, thus denying the inmate's ability to consult and confer with his counsel at a critical juncture.

475.     Thus, there will be a substantial lapse of time from when counsel observes a problem with the execution, attempts to consult with his or her client, and contacts co-counsel in a different building, to when that co-counsel can communicate with the outside world.

476.     This lengthy period of time is critical in the event that problems arise in the execution process and counsel must attempt to notify the courts or other governmental figures in order to halt the proceedings.

477.     Thus, if an execution goes awry, a condemned inmate is denied either his access to his counsel or his right to access the courts and/or his right to petition the applicable authorities to seek redress of his grievances.

478.     Upon information and belief, if an execution goes awry, a condemned inmate will not be able to communicate in a timely manner any matter that requires the halting of the execution by law and therefore will be denied either his right to access counsel, his right to access the courts and/or his right to petition the applicable authorities to seek redress of his grievances.

**A.      Plan A of Defendants' written execution protocol**

479.     Plan A in Defendants' written execution protocol effective September 18, 2011 requires a single 5-gram dose of pentobarbital, administered via peripheral IV injection, with a

back-up 5-gram dose of pentobarbital on hand in the equipment room for use if necessary to change IV sites

480. Defendants changed the Plan A drug from sodium thiopental to pentobarbital when they were no longer able to obtain domestically produced, unexpired, unadulterated, uncompounded sodium thiopental.

481. Defendants are no longer able to obtain domestically produced, unexpired, unadulterated, uncompounded pentobarbital.

482. Upon information and belief, injection of five grams of pentobarbital via peripheral IV will not cause the condemned inmate to lose consciousness for a period of minutes following the commencement of the injection.

483. Upon information and belief, injection of five grams of pentobarbital via peripheral IV will cause a condemned inmate to experience substantial pain while still conscious.

484. On June 16, 2011, the State of Alabama executed Eddie Powell using pentobarbital as the first of three lethal drugs.

485. Following the administration of pentobarbital, Powell "raised his head and neck off the gurney. Seemingly confused and startled, he jerked his head to one side and began breathing heavily, his chest rose and contracted." Matthew Busch, *Powell Says He's Sorry Before Death by Lethal Injection at Alabama's Holman Prison*, THE BIRMINGHAM NEWS (June 16, 2011) (Attached as Exhibit 2.) It took over 20 minutes for Mr. Powell to die. *Id.*

486. One of Powell's attorneys, Christine Freeman, witnessed the execution. Freeman recalled that shortly after the chaplain stopped praying, "Mr. Powell violently jerked his head up off of the gurney. His eyes were wide open and looked glazed and confused. He

71

seemed to be looking and he turned his head from side to side. His jaw muscles seemed

to clench.  He appeared to be in pain.  He lay his head back down, but his eyes still

appeared to be slightly open.  Because we were seated in an observation room on Mr.

Powell's side, it was difficult to tell how long this lasted, but his eyes appeared to remain

open in this position for quite a while.  The entire process lasted about 25 minutes and his

eyes remained open in this fashion until towards the end."  (Affidavit of Christine

Freeman, (July 14, 2011) ("Freeman Affidavit") at ¶ 12.)  (Attached as Exhibit 3.)

487.    Another of Powell's attorneys, Matt Schulz, stated in an affidavit that Powell "also

appeared to be clenching his teeth, and his blood appeared to be pumping quite strongly.

I could see his [left neck] artery expanding and contracting, and blood apparently

pumping into his face.")  (Affidavit of Matt D. Schulz (July 14, 2011) ("Schulz

Affidavit") at ¶ 3.)  (Attached as Exhibit 4.)  Schulz recalled that after the guard ran his

finger over Powell's eyelash to assess his consciousness, Powell's eyes were "slightly

open again, perhaps 20% of being fully open . . . They remained slightly open for at least

a few minutes."  *Id.*

488.    On June 23, 2011, the State of Georgia executed Roy Blankenship using pentobarbital as

the first of three lethal drugs.

489.    Media coverage reported that according to witnesses, once the pentobarbital was

administered, Blankenship "grimaced, jerked, lunged from side-to-side, gasped and

appeared to yell out . . . ."  Rhonda Cook, *Attorney Asks Chief Justice, DOC to

Investigate Execution Problems*, ATLANTA JOURNAL-CONSTITUTION (June 24,

2011).  (Attached as Exhibit 5.)

490.   According to another witness account:

> Blankenship jerked his head several times, mumbled inaudibly and appeared to gasp for breath for several minutes… and that [a]s the injection began, Blankenship jerked his head toward his left arm and began rapidly blinking. He then lurched toward his right arm, lunging twice with his mouth wide open as if he were gasping for air. A minute later, he pushed his head forward while mouthing inaudible words. His eyes never closed. The movements stopped within three minutes, and he was declared dead 12 minutes later.

Greg Bluestein, *Ga. Execution is Fodder for Challenges to New Drug*, ASSOCIATED

PRESS, June 28, 2011.  (Attached as Exhibit 6.)

491.   Based on a review of these eyewitness accounts of the executions of Powell and

Blankenship, Dr. Mark Heath has concluded that the reactions of these inmates were

inconsistent with the statement of Dr. Mark Dershwitz that using pentobarbital in a lethal

injection protocol will render an inmate unconscious quickly and cause the inmate's rapid

and painless death.

492.   The reactions demonstrated by Blankenship and Powell are also inconsistent with Dr.

Dershwitz's previous pronouncements that an inmate would not experience any pain and

suffering during the execution process.

493.   In fact, following the executions of Powell and Blankenship, Dr. Dershwitz clarified that

pentobarbital can sometimes cause pain even when properly injected.  *See* Bluestein

(Exhibit 6.) ("Medical experts differ on whether the spasms indicate the execution was

improperly carried out. Dr. Mark Dershwitz, a University of Massachusetts

anesthesiologist, said pentobarbital can sometimes cause pain and involuntary jerking

movements even when it's properly injected.")

494.   As of December 31, 2012, Defendants had in their possession approximately sixty-five

grams of pentobarbital for use in lethal injection executions, or the same amount of

pentobarbital for use in executions was in the possession of those who supply the lethal injection execution drugs to Defendants.

495.    The latest-expiring supply of pentobarbital in Defendants' possession expires in September of 2013.

496.    Lundbeck formerly possessed the only license to manufacture pentobarbital domestically in the United States, and Lundbeck has since sold that license to Akorn.

497.    As of July 1, 2011, Lundbeck instituted strict distribution controls on pentobarbital, and Akorn has continued those distribution controls upon acquiring the license from Lundbeck.

498.    Upon information and belief, among the distribution controls Lundbeck instituted are the requirement that recipients of pentobarbital must sign and verify that the pentobarbital is for therapeutic purposes only and will not be routed to those who carry out lethal injection executions.

499.    These distribution controls make it impossible for Defendants to legitimately obtain any further supplies of pentobarbital for use in administering a Plan A execution

500.    Ohio has executed seven inmates—Johnnie Baston, Clarence Carter, Daniel Bedford, Reginald Brooks, Mark Wiles, Donald Palmer, and Brett Hartman—using injection of pentobarbital under Plan A.

501.    Since the retirement of Anonymous Execution Team Member ("TM") # 18, TM ## 9, 17, 21, 23 and 24 are the only individuals permitted under the written execution protocol to establish peripheral IV access on the inmate in an execution using Plan A.

502. Upon information and belief, TM ## 9, 17, 21, 23 and 24 are the only "Medical Team Members" as that term is defined in the September 18, 2011 written protocol and as it has been used informally in previous versions of the written protocol.

503. TM # 9 and TM # 17 have served on the medical team for several years.

504. Since the execution of John Fautenberry on July 14, 2009, the medical team personnel involved in establishing peripheral IV access has consisted of some combination of TM # 9, TM #17, TM # 21, TM # 23 and TM # 24.

505. None of TM # 9, TM # 17, TM # 21, TM # 23 and/or TM # 24 is qualified, trained, certified, possessing of the requisite skill or permitted under law to establish a central line to facilitate IV injection.

506. None of TM # 9, TM # 17, TM # 21, TM # 23 and/or TM # 24 is qualified, trained, certified, possessing of the requisite skill or permitted under law to perform a cut-down procedure to facilitate IV injection.

507. Upon information and belief, TM # 17 has a serious medical condition which can affect his job performance as one of the Drug Administrators under the execution policy and written execution protocol in such a way that it increases the risk of a violation of Plaintiff's constitutional rights.

508. The same serious medical condition can affect TM # 17's ability to satisfy all training and execution rehearsal requirements under the written protocol.

509. During the execution of Kenneth Biros on December 8, 2009, approximately 30 minutes transpired from the initial attempt to the actual establishing of peripheral IV access under Plan A.

510. The team members responsible for establishing peripheral IV access under Plan A for Kenneth Biros's execution required approximately 9-10 needle sticks to establish and sustain a single IV site for him.

511. These same medical team members were unable to achieve and/or sustain access to Romell Broom's peripheral veins despite taking some two hours and multiple needle sticks in a failed effort to achieve access.

512. The Biros execution was the first execution Defendants conducted following the failed attempt to execute Broom.

513. Additional executions since Broom and Biros have similarly demonstrated difficulty establishing peripheral IV access in the condemned inmate.

514. Upon information and belief, TM # 9, TM # 17, TM # 21, TM # 23 and/or TM # 24 will be the individuals responsible for establishing peripheral IV site(s) in Plaintiff.

515. Upon information and belief, Plaintiff's individual physical and/or psychological characteristics and conditions indicate that achieving peripheral IV access on him will present a situation analogous to previous efforts to achieve peripheral IV access on Romell Broom or on Kenneth Biros, or worse, resulting in serious harm that is objectively intolerable.

516. Upon information and belief, Plaintiff's individual physical and/or psychological characteristics and conditions indicate that employing Plan A to execute him will subject him to a substantial risk of serious harm, such as physical and/or psychological pain, an undignified, lingering, and/or spectacle execution or attempted execution that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants ignore.

517.    The evidence developed in Ohio and in other states, when compared to the testimony provided by Dr. Mark Dershwitz in Ohio and in other states, demonstrates that Dr. Dershwitz's testimony is inconsistent and unreliable, and that he has made faulty predictions, all of which undermine Dr. Dershwitz's credibility as an expert witness.

518.    Further undermining Dr. Dershwitz's credibility is controversy surrounding his attempt to alter the minutes from two meetings with Tennessee officials where he discussed Tennessee's lethal injection protocol.  Transcript of Testimony of Dr. Dershwitz, *Harbison* v. *Little*, No. 3:06-1206 (M.D. Tenn.), at 792-98, 807-09.  (Attached as Exhibit 7.)

519.    The original minutes reported that Dr. Dershwitz had provided a recommendation as to Tennessee's lethal injection protocol; however, American Medical Association guidelines "specifically prohibit[] physicians from acting as consultants for making recommendations or writing protocols . . . ."  *Id.* at 795.

520.    Accordingly, Dr. Dershwitz attempted to change the minutes to reflect that he did not provide a recommendation.  *Id.*

521.    According to Dr. Dershwitz, he altered the minutes because "did not want anyone to misconstrue [his] role in [the] discussions with the Tennessee committee."  *Id.*

**B.    Plan B of Defendants' written execution protocol**

522.    Plan B in Defendants written execution protocol provides for an intramuscular injection containing 10 mg of midazolam and 40 mg of hydromorphone.

523.    Plan B has never been used in a human execution anywhere in the world.

524.    Defendants have not employed Plan B, even in the face of extended, repeated unsuccessful efforts to establish peripheral IV access.

525.   Upon information and belief, Defendants have not adequately considered or discussed how a Plan B execution might proceed in light of the drugs to be used in Plan B.

526.   Defendants are unclear and/or do not have a functional understanding about when Plan B would be employed in an execution.

527.   No standard exists by which a decision to employ Plan B will be made.

528.   Defendants do not know or understand how long a Plan B execution will take.

529.   Plan B will produce a slow transition to unconsciousness.

530.   When drugs seep into the inmate's circulation from an intramuscular injection, the speed of onset of their effects is greatly reduced when compared with the speed of onset following intravenous administration.

531.   The transition from full consciousness to unconsciousness in Plan B will be slow, taking place over a time-frame of many minutes.

532.   40 mg of hydromorphone is not a dose of narcotic, anesthetic or barbiturate equivalent in function and effect to 5 grams of pentobarbital.

533.   During the time it takes for the hydromorphone and midazolam to seep through the muscle tissue and into the circulatory system via the capillary vessels, the inmate will progress through increasingly severe impairments of his or her cognitive faculties.

534.   The inmate may experience and display any of a broad suite of the manifestations of intoxication, including the following:

➢ Confusion
➢ Combativeness
➢ Disinhibited speech
➢ Delirium
➢ Anxiety
➢ Fear
➢ Euphoria

> ➤ Dysphoria
> ➤ Delusional ideation
> ➤ Hallucinations
> ➤ Sensory distortions
> ➤ Disorientation

535.  Some inmates exposed to this Plan B will, through reasons beyond their control, produce a behavioral spectacle that is disturbing and offensive to the conscience of the witnesses, staff, citizenry, and courts.

536.  Upon information and belief, an inmate exposed to Plan B will experience nausea and vomiting, which are recognized and documented side effects of opioid narcotics such as hydromorphone.

537.  Thus, it is substantially likely that an inmate subjected to Plan B will suffer a spectacle, undignified execution as the inmate vomits violently during the process.

538.  Opioids suppress the cough reflex by depressing cough centers in the medulla, the part of the brain that controls autonomic functions.

539.  Thus, it is inevitable that a significant number of inmates who are subjected to Plan B will become nauseated and will vomit before they lose consciousness but after their cough reflex is depressed.

540.  Among those inmates, it is an unacceptable if not inevitable risk that some of them will experience painful choking on their own vomit.

541.  Lacking a cough reflex, the inmate will inhale the vomitus.

542.  When that vomitus contains particulate matter from a recent meal (*e.g.*, the breakfast served to the inmates on the morning of their 10:00 a.m. execution), it will cause death by asphyxiation.

543. When that vomitus does not contain particulate matter, it will cause extreme pain and suffering as the stomach acids come in contact with the upper airway passages.

544. These and other risks associated with the condemned inmate's ability to breath, and thus to not be subjected to serious physical and/or psychological harm before unconsciousness sets in, are rendered all the more substantial and certain by the fact the inmate being executed using Plan B, like with Plan A, is immobilized in a supine position, thereby thwarting reflexive and instinctive self-preservation efforts, such as attempts to turn face down when vomiting.

545. The painful condition of biliary colic is a documented side effect of opioid narcotics such as hydromorphone.

546. Opioids cause contraction of the smooth muscle in the gall bladder and spasm of the sphincter of Oddi.

547. In some individuals this can precipitate biliary colic.

548. The pain caused by biliary colic is steady, starts rapidly and lasts at least 30 minutes and up to several hours. There may be radiation to the back and shoulders and other concomitant symptoms such as vomiting and diarrhea.

549. Thus, it is inevitable that a significant number of inmates who are subjected to Plan B will suffer the pain of biliary colic before they lose consciousness.

550. Upon information and belief, Plaintiff's individual physical and/or psychological characteristics and conditions indicate that achieving peripheral IV access on him will present a situation analogous to previous difficulties achieving peripheral IV access on Romell Broom and/or Kenneth Biros in which Defendants struggled for extended periods

of time to achieve peripheral IV access, or worse, resulting in a substantial risk that Defendants will need to resort to Plan B.

551.  Upon information and belief, employing Plan B to execute him will subject him to a substantial risk of serious harm, such as physical and/or psychological pain, an undignified, lingering, and/or spectacle execution or attempted execution that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants ignore.

552.  Upon information and belief, Plaintiff's individual physical and/or psychological characteristics and conditions mean there is a substantial risk that Plan B will not work on him as Defendants claim, subjecting him to a substantial risk of serious harm, such as physical and/or psychological pain, an undignified, lingering, and/or spectacle execution or attempted execution that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants ignore..

553.  Upon information and belief, Plaintiff's individual physical and/or psychological characteristics and conditions mean there is a substantial risk that he will endure biliary colic and/or aspirate his own vomitus, searing his upper airway tract with stomach acids and bile, and/or choking, drowning or asphyxiating on the vomit or experiencing horrific and terrifying sensations of the same, while suffering from a broad range of psychologically torturous symptoms such as dysphoria, fear, anxiety, and hallucinations.

554.  Upon information and belief, Plan B will subject Plaintiff to a "spectacle execution" that is far from a dignified death that is in accord with the common decency of man.

555.  Plaintiff will also suffer serious physical and/or psychological pain and suffering and a lingering, slow death if Defendants first attempt to execute him via Plan A, then abandon Plan A after injecting some amount of pentobarbital, and implement Plan B.

C. **Drugs in Plan A or Plan B are obtained, possessed, transported, transferred, used and/or dispensed in violation of the Controlled Substances Act, its implementing regulations and analogous or related federal and/or state laws such as the federal Food, Drug and Cosmetic Act.**

556. Defendants' current written execution protocol contains two methods by which Defendants may administer a lethal injection execution: "Plan A" and "Plan B."

557. Defendants' execution policy and written execution protocol require the use of the drugs pentobarbital to carry out lethal injection under Plan A, and hydromorphone and midazolam to carry out a lethal injection under Plan B.

558. Federal and/or state drug control laws strictly govern possession, transportation, transfer, use, dispensing, and other such aspects related to controlled substances which are listed on "schedules" under federal statutes and regulations.

559. The Controlled Substances Act creates a comprehensive, closed regulatory regime criminalizing the unauthorized manufacture, distribution, dispensing, and possession of substances.

560. Pentobarbital is a Schedule II-N drug under the federal Controlled Substances Act, its implementing regulations and analogous or related federal and/or state laws such as the federal Food, Drug and Cosmetic Act.

561. Hydromorphone is a Schedule II drug under the federal Controlled Substances Act, its implementing regulations and analogous or related federal and/or state laws such as the federal Food, Drug and Cosmetic Act.

562. Midazolam is a Schedule IV-N drug under the federal Controlled Substances Act, its implementing regulations and analogous or related federal and/or state laws such as the federal Food, Drug and Cosmetic Act.

563. The Controlled Substances Act allows prescription of drugs only if they have a currently accepted medical use.  21 U.S.C. § 812(b).

564. The Controlled Substances Act also requires a "medical purpose" for dispensing the least controlled substances of those on the schedules.  § 829(c).

565. The Controlled Substances Act, in its reporting provision, defines a "valid prescription" as one "issued for a legitimate medical purpose."  § 830(b)(3)(A)(ii).

566. Under the Controlled Substances Act, physicians are considered to be acting as practitioners under the statute if they dispense controlled substances "in the course of professional practice."  § 802(21).

567. The enforcement provision of the Controlled Substances Act states that "[e]xcept as authorized . . . it shall be unlawful for any person knowingly or intentionally . . . to . . . distribute or dispense . . . a controlled substance."  21 U.S.C. § 841(a).

568. Schedule II substances are generally available only pursuant to a written, nonrefillable prescription by a physician.  *See* 21 U.S.C. § 829(a).

569. The Supreme Court of the United States has held that, under the Controlled Substances Act, dispensing controlled substances without a valid prescription is a federal crime.  *See Gonzales v. Oregon*, 546 U.S. 243, 250-57 (2006).

570. While it is generally a crime to dispense pentobarbital or hydromorphone, an exemption is made for duly licensed and registered physicians and other entities that may lawfully prescribe controlled substances.  21 U.S.C. § 829.

571. The Attorney General of the United States has passed a regulation pursuant to the Controlled Substances Act requiring that every prescription for a controlled substance be

issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.  *See* 21 CFR § 1306.04(a).

572. Defendants, or others acting on Defendants' behalf, do not obtain or dispense the lethal execution drugs pursuant to a valid prescription.

573. No physician participates in Defendants' execution protocol as a distributor or dispenser.

   **D.    Defendants' execution policy and written execution protocol is flawed.**

574. The written execution protocol effective September 18, 2011 contains some additional text added since the April 11, 2011 written protocol, but those changes do not eliminate the constitutional problems with Defendants' execution policy including their administration of the written execution protocol.

575. Defendants' renewed implementation of ICS principles likewise fails to eliminate the constitutional problems with Defendants' execution policy and written execution protocol.

576. The written protocol increases the likelihood that Defendants will not apply the execution policy and written protocol consistently, because it dramatically enhances the amount of discretion afforded to several actors throughout the execution process.

577. The written protocol codifies unequal treatment of similarly situated individuals by, among other things, increasing the discretion allowed to various actors in the execution process.

578. The written protocol also codifies unequal treatment of similarly situated individuals by creating a distinction between deviations and variations from the written policy, with different standards and limits applicable to each type of non-compliance.

579.  The execution policy and written execution protocol make equal treatment of similarly situated individuals dependent upon the subjective interpretation of the written protocol held by any particular Director of DRC, which thus can and will change from Director to Director.

580.  The execution policy and written execution protocol expands the ways in which Defendants may act in non-compliance with the policy and protocol.

581.  The written execution protocol explicitly prohibits four specific variations.

582.  The written protocol facially contains no similarly prohibited deviations.

583.  The written execution protocol also contains a fifth element from which variation or deviation is allegedly prohibited.

584.  The execution policy and written execution protocol allow non-compliance if following the written protocol would make it difficult to carry out an execution.

585.  The execution policy and written execution protocol allow non-compliance if following the written protocol would make it impractical to carry out an execution.

586.  The execution policy and written protocol allow non-compliance if following the written protocol would make it impossible to carry out an execution.

587.  The execution policy and written execution protocol provides that the DRC Director must approve any variations.

588.  The written execution protocol does not explicitly require that the Director's approval must be obtained *before* a variation may occur, even if that is what the current Director's interpretation of the written protocol requires.

589.  The written execution protocol provides that the DRC Director must authorize any deviations.

85

590.   The written protocol does not explicitly require that the Director's authorization must be obtained *before* a deviation may occur, even if that is what the current Director's interpretation of the written protocol requires.

591.   Defendants' written protocol provides that Defendants may start an execution with Plan B, which contradicts Defendants' alleged policy that they will not begin an execution or even move the condemned inmate to SOCF if they did not first have in their possession a full primary dose and a full back-up dose of the Plan A drug.

592.   Defendants' execution policy continues to use untrained and insufficiently competent medical technicians to insert the IV catheters into the inmate's veins.

593.   Defendants have failed to adequately address the peripheral IV access issues encountered in Romell Broom's failed execution and in Kenneth Biros's execution, which implicated Defendants TM # 9, TM # 17 and TM # 21 as the team members who were unable to obtain and/or sustain viable IV access after numerous attempts over two hours in Broom, and who only obtained and sustained viable peripheral IV access after numerous attempts in Biros.

594.   Defendants' overarching execution policy and their written execution protocol lacks any restraint on the number of attempts at peripheral IV access or the length of time those pokes, sticks, and stabs to the inmate can persist under Plan A.

595.   Defendants are willing to engage in multiple, lengthy attempts at establishing and/or sustaining peripheral IV access.

596. Defendants have explicitly stated that, based on their understanding of the written execution protocol, they may engage in efforts to complete an execution from the time the Warden reads the death warrant up to midnight of the same day, when the death warrant expires.

597. Defendants' failure to have a time limit for attempting peripheral IV access continues to place the team members in an increasingly stressful situation, rendering the team members unable to constitutionally administer an execution.

598. The inmate's physical and mental suffering is not explicitly included in the written protocol's considerations for whether to halt further peripheral IV access attempts.

599. Defendants' execution policy, including the written protocol, fails to recognize that each inmate may present unique physical and/or psychological characteristics that may affect the efficacy of a particular execution method, whether Plan A or Plan B.

600. Defendants' execution rehearsals are not modified or tailored to address specific physical or psychological characteristics of any particular condemned inmate.

601. Defendants have failed to prepare, train, or adjust the drug dosages to account for the unique issues Plaintiff or other condemned inmates may present.

602. Defendants' execution policy fails to require a physician to personally supervise and/or monitor the preparation, administration and/or disposal of the lethal drug(s).

603. Other states require the use of physicians during the execution process.

604. Defendants, during the previous failed attempt to execute Romell Broom, used a physician to participate in their unsuccessful efforts.

605.　That physician was untrained in the Ohio execution policy, but Defendants summoned her to the Death House and involved her participation nevertheless contrary to the written protocol's provisions.

606.　The physician who participated in the failed attempt to execute Broom, Dr. Carmelita Bautista, is licensed to practice medicine in Ohio, and she was working as a contract employee for Defendants at SOCF at the time.

607.　Dr. Bautista had never participated in any execution team training that is required by Defendants' written protocol for execution team members.

608.　Upon information and belief, Dr. Bautista has not suffered any professional disciplinary action or complaints, nor has she suffered any threat to her Ohio licensure as a result of her participation in the failed attempt to execute Broom.

609.　Defendants have had physicians volunteer to assist in the execution process.

610.　Defendants' September 18, 2011 written protocol provides for an "Auxiliary Team Member" in the form of a physician.

611.　Defendants have not identified any individual who will carry out the role of the "Auxiliary Team Member."

612.　Defendants' written protocol sets improperly low criteria for the professional experience for the medical team members responsible for starting IV lines, mixing drugs, and injecting drugs.

613.　Under the terms of Ohio's written protocol, the personnel attempting to administer the policy may not have had any hands-on experience for many years, and may in fact not have the currency of practice necessary to maintain the manual skills and dexterity that are necessary to place peripheral IV lines.

614.   Defendants' written protocol places improper reliance on licensure over actual competence and current/recent clinical experience.

615.   Upon information and belief, the controlling statutes and regulations do not allow, or expressly prohibit, the current Medical Team Members and Drug Administrators, as those terms are defined in the September 18, 2011 written protocol, from administering any of the drugs involved in the execution policy.

616.   Defendants were recklessly ignorant of this fact before, they were put on notice of this critical problem in general and as to the Plan B drugs before November 30, 2009, and yet the written protocol and the actors involved remain the same under the current execution policy.

617.   Defendants' written protocol does not describe what the execution team should do if the pentobarbital injection in Plan A infiltrates.

618.   The written protocol lacks instructions for detecting and correcting IV infiltration.

619.   According to an affidavit from former DRC Director Terry Collins, if the prisoner does not exhibit unconsciousness and lack of respiration, additional drugs under Plan A may be administered.

620.   The written execution protocol, however, only provides for injection of syringes 3 and 4 when it is necessary to change IV sites.

621.   If the first dose of the Plan A drug failed to take effect because it infiltrated, administration of an additional dose would result in the further infiltration and accumulation of the Plan A drug in the tissue surrounding the vein.

622.   This in turn would result in significant or agonizing pain to the prisoner.

623.   Defendants have shown a willingness to frequently, arbitrarily and irrationally deviate and/or vary their procedures from the written execution protocol during administration of the execution policy.

624.   This willingness to deviate and/or vary from the written protocol has remained consistent regardless of the version of the written protocol that was or is in force.

625.   Defendants' written protocol mandates that execution team members must receive specific training before they commence service on the execution team, and at least once a year.

626.   This safeguard is a nullity, however; the written protocol and Defendants' execution policy lacks any enforcement mechanism or consequence for not having undergone this training.

627.   Defendants' written protocol requires rehearsal training in advance of a particular execution for all execution team members who will participate in that execution.

628.   This requirement is similarly a nullity; the written protocol and the overarching execution policy lacks any explicit enforcement mechanism or consequence for missing one or any number of rehearsals in advance of a particular execution.

629.   Various team members have failed to participate in the mandatory execution team training and/or execution rehearsals required by the written protocol, but those team members have still participated in subsequent executions.

630.   Defendants have conducted multiple executions without the presence of personnel explicitly required by the written execution protocol.

631. Defendants' overarching execution policy provides essentially unfettered discretion to the team members and the supervisory personnel, contrary to the written execution protocol's purportedly mandatory provisions.

632. To the extent that the written protocol purports to prohibit deviations from the protocol, any such mandate is nullified by express provisions allowing deviations from the protocol.

633. To the extent that the written protocol purports to prohibit variations from the protocol, any such mandate is nullified by express provisions allowing variations from the protocol.

634. The execution policy and written execution protocol codify Defendants' approach revealed in the June 29, 2011 injunctive relief hearing in this case, namely that Defendants claim the ability to apply vast portions of the written protocol differently from execution to execution, because to consistently follow the written protocol will be difficult or impractical.

635. The execution policy and written execution protocol increase the amount of discretion granted to decision-makers, thereby virtually guaranteeing that Plaintiff and other similarly situated inmates will be treated differently, based on arbitrary reasons.

636. The execution policy and written protocol contain no consequence for any deviation or variance from the protocol's requirements.

637. Evidence from past administration of the execution policy and written execution protocol demonstrates that Defendants do not view the written protocol, in any of its iterations, as imposing any functional limitation on their exercise of discretion.

638. The "Medical Team Members" as defined in the written protocol—namely TM # 9, TM # 17, TM # 21, TM # 23 and TM # 24—are still not undergoing all of the training and rehearsals required by the written protocol, and/or are not required to have used their IV-setting skills regularly.

639. Members of the Execution Team other than the Medical Team Members are still not undergoing all of the training and rehearsals required by the written protocol.

640. TM # 9 is a phlebotomist employed full time by DRC as a correctional officer who no longer draws blood as part of her daily work.

641. TM # 9 does not set IV catheters as a part of her daily work.

642. TM # 9 is not authorized under Ohio law to administer medications via IV injection.

643. TM # 9 is not authorized under Ohio law to administer medications via IM injection.

644. TM # 9 is not authorized under Ohio law to prepare drugs for intravenous or intramuscular injection.

645. Drawing blood through a simple hollow needle is critically different from setting an IV with a needle housed in a catheter that must be set much more precisely within a vein so that the pressure of fluid infused—not simply blood flowing out under its own pressure—does not rupture the vein or dislodge the catheter.

646. TM # 17 is employed full time by DRC as a correctional officer.

647. TM # 17 does not set IV catheters as part of his regular scope of employment with DRC.

648. TM # 17 does not use his EMT-Intermediate training as part of his regular scope of employment with DRC.

649. The only exposure TM # 17 has to setting IVs, outside of his work as an execution team member, comes from his part-time work as a volunteer EMT-Intermediate.

650.    TM # 21 is a full-time employee of DRC.

651.    TM # 21 was formerly a corrections officer employed by DRC.

652.    TM # 21 is currently employed as a Training Officer.

653.    TM # 21 does not set IV catheters as part of his regular scope of employment with DRC.

654.    TM # 21 is a licensed EMT-Paramedic or EMT-Instructor.

655.    TM # 21 does not use his EMT-Paramedic or EMT-Instructor training as part of his regular scope of employment with DRC.

656.    TM # 21's employment with DRC, outside of his work as an execution team member, does not require him to set IV catheters or use his EMT training on a daily or even regular basis.

657.    By his own admission, TM # 21 has not worked as an EMT for several years.

658.    Aside from his participation as a Medical Team Member during executions since July 14, 2009, TM # 21 has not regularly set or administered IVs in live patients since approximately 2004.

659.    Aside from his participation as a Medical Team Member during executions, TM # 21 has not an IV or administered drugs intravenously in any live patients for at least the previous year.

660.    None of TM # 17, TM # 21, TM # 23, or TM # 24 is authorized under Ohio law to inject via IV injection a Schedule II drug such as pentobarbital.

661.    None of TM # 17, TM # 21, TM # 23, or TM # 24 is authorized under Ohio law to inject via IM injection a Schedule II drug such as hydromorphone.

662. Defendants fail to ensure that each Execution Team member signs his or her name to verify that the team member has physically received a copy of the written execution protocol, as required by the written protocol.

663. Defendants fail to ensure that all Execution Team members have read the written protocol document or understand its contents.

664. Defendants fail to ensure that all Execution Team members fully understand the entire lethal injection execution policy, including the provisions of the written execution protocol and the implementation of ICS principles.

665. There are no written examinations or assessments on the contents of the written protocol before a new team member joins the Execution Team.

666. Nor are there are such written examinations or assessments at any time of any active Execution Team member after a member joins the team.

667. Defendants' written protocol contains a critical safeguard whereby Defendants are to change the injection site in Plan A if problems are detected.

668. The current written protocol only requires Defendants to establish a single IV site.

669. This change renders the purported safeguard null and void by making an on-the-spot change in injection sites impossible or impracticable.

670. If the first peripheral IV site fails, the inmate will be forced to lie supine, strapped to the execution bed and in a state other than unconsciousness and struggling to breath, from the time when the failure of the single IV line occurs to the time a new injection is possible.

671. This includes the time for Defendants to deliberate about what to do, the time to establish a new peripheral IV injection site, and the time to prepare additional syringes of the Plan A drugs.

94

672. Defendants' written protocol is inherently contradictory in that it gives the Drug Administrator who is administering the execution drugs the sole, unfettered discretion to determine whether it is necessary to use another IV site, but the protocol also leaves no discretion to determine whether it is necessary to use another IV site, because the Drug Administrator must switch sites if any problem is detected.

673. The execution policy and written protocol require approval of any "variations of a substantial nature," without any guidance on what rises to the level of "substantial."

674. The execution policy and written protocol allow variations generally if a situation arises that would make following the written protocol "difficult, impractical, or impossible."

675. The execution policy and written protocol allow variations generally if any execution team member believes for any reason it is difficult, impractical, or impossible to strictly follow the written protocol.

676. The written protocol does not require Defendants or their agents to document variations from the protocol.

677. The written protocol mandates that Defendants or their agents must document any deviation "as soon as possible," but the protocol leaves the task of documenting any deviation unassigned.

678. Thus, while the written execution protocol prohibits certain variations, it does not prohibit deviations related to the same subject matters and would presumably allow such deviations provided the DRC Director gave his approval or authorization before or even after the fact, and the deviations were documented at some point in time when some undetermined person decides that completing the documentation is "possible."

679.   The written protocol dramatically decreases any functional oversight related to Defendants' acquisition, transportation, possession, distribution, and dispensing of the lethal execution drugs.

680.   The execution policy and written protocol allow designation of certain tasks related to the execution drugs without specifying that any such designee must be authorized him- or herself to order the scheduled substances required under the protocol.

681.   The execution policy and written execution protocol fail to contain any provision by which Defendants are able to ensure that they do not violate constitutional prohibitions on executing an incompetent individual in violation of *Ford v. Wainwright*, 477 U.S. 399 (1986) and *Panetti v. Quarterman*, 551 U.S. 930 (2007).

682.   The execution policy and written execution protocol fail to contain any provision by which Defendants are able to ensure that they do not violate constitutional prohibitions on executing a mentally retarded inmate in violation of *Atkins v. Virginia*, 536 U.S. 304 (2002).

683.   The execution policy and written execution protocol create internally inconsistent standards to be applied to limits on an inmate's last words.

684.   The written protocol states that there shall generally be no restriction on the content of a prisoner's last statement.

685.   The written protocol also states that there shall be no unreasonable restriction on the duration of a prisoner's last statement.

686.   The two aforementioned provisions were not contained in the written protocol effective August 21, 2001.

687.　The two aforementioned provisions were added to the written protocol in the version of the protocol effective September 11, 2001.

688.　Two days later, on September 13, 2001, an order was docketed in *Treesh v. Taft*, Case No. 99-624, dismissing, pursuant to a dismissal entry submitted by the parties, a case raising First and Fourteenth Amendment challenges to restrictions on an inmate's last statement.

689.　Following the execution of Michael Beuke on October 6, 2010, however, Defendants sought to include in the execution protocol additional restrictions related to an inmate's last statement.

690.　The provision of the written protocol immediately following the aforementioned two provisions states that the Warden may indeed impose restrictions on both the content and length of the prisoner's last statement.

691.　The same provision also gives the Warden the power to terminate an inmate's statement based on the Warden's subjective interpretation of the contents of the inmate's last statement.

692.　The execution policy and  written protocol are unclear about the nurse/healthcare administrator's duties and responsibilities.

693.　The execution policy and written protocol are unclear about the Auxiliary Execution Team Member's duties and responsibilities.

694.　The September 18, 2011 written protocol dramatically reduces the amount of information that must be reported and recorded on the execution timeline.

695.   The execution policy and written protocol require that execution team members meet following an execution to compare documentation of the execution and to "identify any discrepancies" between the documents.

696.   This "review" will thus ensure uniformity in the official documents produced by an execution, whitewashing any discrepancies that might otherwise reveal variations or deviations from the execution policy's and written policy's mandates.

697.   Defendants' "training sessions" required under the execution policy and written protocol in advance of an execution are more accurately termed "rehearsals," as no substantive "training" occurs.

698.   Despite repeated and vivid problems involving establishing and maintaining peripheral IV access, Defendants' rehearsal sessions do not involve setting IVs in volunteer team members or otherwise practicing establishing IV access in a live subject.

699.   Instead, a maximum of two "medical" team members will "establish" an IV in the same dummy arm during a rehearsal session.

700.   In execution rehearsals, the team members push saline through the tubing such that it empties into a bucket or pan.

701.   Team members do not push pentobarbital through the lines during an execution rehearsal.

702.   There is a marked difference in the density and viscosity of saline as compared to pentobarbital, such that pushing pentobarbital through the tubes used for an execution will feel different than pushing saline through the same tubes.

703.   The execution team generally walks through an execution rehearsal assuming everything works perfectly according to plan, despite demonstrated problems and deviations from the written protocol during administration of previous executions.

704.    The team, as an ordinary course of things, ignores the mandate to "train" because they engage in few or no contingency training scenarios.

705.    Defendants have not planned or provided for a situation in which a problem arises, or an execution is ordered halted, during administration of any of the drug(s).

706.    There is no standard for mandating that a team member participate in all training before participating in an execution.  For example, Defendants have added an additional member of the Execution Team by creating an "Auxiliary Team Member" position, but they do not require that new team member to attend all execution rehearsals in advance of a particular execution.

707.    There is little if any standard for determining when a team member may or will deviate or vary from the written protocol during the course of an execution, such as involving a doctor or other persons untrained in the written execution protocol or untrained in the specific procedures to be used for a particular inmate's execution, or other such actions that are clearly outside the written protocol.

708.    No physicians are standing by to administer life-saving measures, and no equipment is present to intubate an inmate to ensure the inmate will not die while a problem is diagnosed, discussed, and actions taken to resolve it.

709.    Defendants' execution policy and written protocol continue to deny an inmate such as Plaintiff necessary access to counsel, the necessity of which was made clear during the previous failed attempt to execute Romell Broom.

710.    The "quality assurance review" provided in the written protocol fails to provide any meaningful protection against Defendants' maladministration or inconsistent administration of their execution policy and written protocol.

711. The qualifications for the person appointed to be the "Special Assistant for Execution Policy and Procedures" are undefined.

712. The Special Assistant's explicitly defined scope of duties is limited to only "reviewing documentation, training, and professional qualifications."

713. The written protocol contains no consequence if the Special Assistant identifies deviations or variations from the written protocol.

714. The pertinent provision in the written protocol does not require that the Special Assistant acknowledge any discovered deviations or variations in the report following each execution.

715. The pertinent provision in the written protocol does not require that the Special Assistant be present for an execution, or for any portion of the entire execution policy before, during or after an execution.

716. The pertinent provision in the written protocol does not even require that the Special Assistant him- or herself actually do anything, since the protocol allows the Special Assistant to delegate this task to assistants.

717. The pertinent provision in the written protocol does not empower the Special Assistant to take any action before or during an execution to identify deviations or variations, or to stop an execution if deviations or variations are discovered.

E.    **Defendants' pattern of deviations and/or variations from the written execution protocol**

718. The safeguards contained in Defendants' written execution protocol are critical to avoiding unconstitutional cruel and unusual punishment prohibited by the Eighth Amendment, and to ensuring Plaintiff's fundamental rights protected under the Ninth Amendment are not violated.

100

719.    Defendants consistently and regularly deviate or vary from their execution policy and written protocol in numerous ways, big and small, such that Defendants have a long-standing pattern of deviations and/or variations from their execution policy and written execution protocol, regardless of the particular written protocol in effect at the time.

720.    Defendants' pattern of deviations and/or variations continues to this day.

721.    These deviations and/or variations have occurred under several different effective versions of the written protocol, including the written protocols in effect before November 30, 2009, and the protocols effective November 30, 2009; November 14, 2010; March 9, 2011; April 11, 2011; and September 18, 2011.

722.    By these deviations and/or variations, Defendants ignore and/or recklessly disregard their execution policy's and written protocol's requirements.

723.    Defendants' pattern of deviations and/or variations from their execution policy and written execution protocol means that Defendants will arbitrarily and irrationally administer their execution policy and written execution protocol differently each time they execute an inmate.

724.    For instance, compliance with the training requirements in the written protocol is subject to the whims of the SOCF Warden or even to the discretion of the individual team  member.

725.    Failure to participate in all the required rehearsals/training sessions, or failure to undergo the required initial training, has been overlooked and/or waived, and has not precluded participation in an execution by the team member.

726.    There are no legitimate governmental or penological reasons for these deviations and/or variations.

727. Defendants' deviations and/or variations are not necessary to achieve a compelling governmental interest.

728. Upon information and belief, Defendants' pattern of deviations and/or variations from their informal policies and their written execution protocol's requirements includes the following:

> Defendants are required to seek a reprieve for any inmate whose scheduled execution date is within thirty days of the *effective date* of a new written execution protocol. But they failed to follow this requirement with their March 9, 2011 written protocol, by failing to seek a reprieve for Johnnie Baston in light of his scheduled execution date of March 10, 2011.

> Defendants failed to follow this requirement with their April 11, 2011 written protocol, by failing to seek a reprieve for Clarence Carter in light of his scheduled execution date of April 12, 2011.

> Defendants fail to follow the written protocol's provisions related to the execution drugs, including but not limited to the provisions controlling acquisition, possession, delivery and the nature of the execution drugs. Upon information and belief, this includes such non-compliance as multiple instances of: obtaining execution drugs unlawfully from a third-party vendor by an execution team member not legally allowed to possess or distribute the drugs; obtaining or using, as a primary dose or backup dose, expired execution drugs; allowing unqualified persons to take possession of the execution drugs from the health care administrator immediately before final execution preparations are made; allowing unqualified persons to prepare the execution drugs and/or to serve as the required qualified witness to preparation; allowing unqualified persons to independently verify the correct dosage and preparation of the execution drugs and/or failing to conduct any such independent verification at all; and releasing the drugs to be used in an execution from the institution pharmacy or infirmary at some time before the morning of the execution—at times one or two days in advance of the execution date.

> Defendants fail to follow the written protocol's requirements that a Drug Administrator "shall be currently qualified under Ohio law to administer and prepare drugs for intravenous and intramuscular injections." Defendants essentially equate "qualified under Ohio law" with "licensure under Ohio law" at several points in their written protocol. Yet none of TMs # 9, # 17, # 21, #23 or #24 is authorized by the terms of their respective licensure to prepare or inject the lethal drugs used in Defendants' execution policy, which includes at least two drugs categorized as Schedule II controlled substances. Moreover, Defendants themselves have previously asserted that TM # 17 and TM # 21 are not acting under the auspices of their respective EMT licenses in their role as members of

the execution team.  Thus, they are not acting as individuals licensed, *i.e.*, "qualified," under Ohio law to administer and prepare drugs, making this deviation or variation plain on the face of the written protocol

➢ Defendants fail to follow the written protocol's unambiguous requirements related to the training and qualifications of personnel involved in an execution.  This includes a blatant, knowing and intentional disregard for the mandated presence of at least two team members who possess certain qualifications under Ohio law in the "equipment room" during administration of the lethal drugs, and for other execution-related tasks such as obtaining peripheral IV access, recording the events of the execution process, and handling, delivery, preparation and verification of the execution drugs.  This also includes involvement of non-qualified persons acting in the place of what are now defined as "Medical Team Members."  Defendants admit that they do not follow these written protocol requirements, but they now argue these are not deviations or variations from the written protocol at all.  Defendants claim in their testimony and in their new written protocol that they need not follow the written protocol's mandates if doing so presents a matter of inconvenience, if it makes completing an execution difficult, impractical, or impossible, or otherwise hinders their efforts to execute the condemned inmate.

➢ Defendants have failed to follow the written protocol's explicit mandates regarding vein assessments of the condemned inmate, despite demonstrated and repeated problems acquiring venous access in the condemned inmates.

➢ Defendants have failed to follow the written protocol's mandates to inject, via peripheral IV injection, the full amount of the required drug(s), as required under their various written protocols from the very inception of lethal injection executions in Ohio.

➢ Defendants have failed to inject, via peripheral IV injection, the proper concentration of the execution drug(s), as required under their various written protocols from the very inception of lethal injection executions in Ohio.

➢ Defendants fail to consistently follow the written protocol's mandate that they keep an adequate supply of the execution drug(s) on hand for use as full back-up dose(s) during an execution.

➢ Defendants have consistently failed to follow the written protocol's requirements to obtain a sufficient supply of the execution drug(s) as a contingency against the contamination or other inadvertent loss of any of the drug.

➢ The various actors involved in administering executions are unsure or incorrect in their understanding of what the written protocol requires regarding preparation of backup doses of the fatal drug(s) or any other backup execution method.

➢ Defendants fail to follow the written protocol's mandates regarding creation of a detailed and accurate "timeline" log that includes specific information and/or any

and all events of significance from the time a condemned inmate arrives at SOCF the day before the scheduled execution.

➢ Defendants readily admit that they fail to follow the substantive training requirements of the execution policy and written execution protocol, and claim the authority to waive non-compliance with the written protocol at will.  This also includes the non-participation in required training by the executioners, TM # 17, TM # 21, TM # 23 and/or TM # 24, the Execution Team Leader, TM # 10, and the current Warden, Defendant Morgan, despite his responsibility to oversee the entire execution.

➢ Rather than abide by the written protocol's critical training requirements that explicitly and unambiguously apply to *all* members of the Execution Team, Defendants' deviate and/or vary from the written protocol such that their overarching execution policy is more accurately stated in their own admission that they merely provide training to "all *available* members of the Execution Team."

➢ Defendants know they are not following the written protocol's training requirements, but they claim the authority to simply not attend execution rehearsal training, and/or to waive these requirements whenever it is convenient, and those absences will be authorized by the DRC Director or, in some instances, by the Assistant DRC Director, contrary to the execution policy and written execution protocol.

➢ Defendants could not have conducted, and, upon information and belief, did not conduct, the required substantive training on the four required topics, (01-COM-11, p. 6 of 17, ¶ VI.B.4.b and previous written protocol analogs), in advance of the execution of Kenneth Biros on December 8, 2009, only one week after Defendants adopted a materially changed written protocol.  While trainers from within DRC came to SOCF to conduct training in the first three of the four required training topics under the May 14, 2009 written protocol, there is no evidence that anyone on the execution team ever received any of the required training under the former November 30, 2009 written protocol before Defendants executed Biros on December 8, 2009.

➢ Defendants could not have conducted, and, upon information and belief, did not conduct, the required minimum of four days of execution rehearsals in advance of the Biros execution given the compressed timeline between the effective date of the November 30, 2009 written protocol and Biros's execution on December 8, 2009.

➢ Upon information and belief, Defendants could not and did not conduct the required training on the four required substantive topics in advance of the execution of Baston.  Defendants became the first jurisdiction in the world to execute an individual using only pentobarbital when they executed Baston only one day after the effective date of Defendants' materially changed written protocol.  This was just shortly after Defendants used the version of DRC Policy

01-COM-11 effective November 15, 2010, in the scheduled execution of Frank Spisak on February 17, 2010, which employed sodium thiopental rather than pentobarbital.  Despite this critical change, Defendants failed to conduct the required substantive training on the new written execution protocol before executing Baston.

➢ Upon information and belief, Defendants could not have conducted and did not conduct the required minimum of four days of execution rehearsals in advance of the scheduled execution of Baston given the compressed timeline between the effective date of the March 9, 2011 written protocol and the March 10, 2011 execution of Baston.

➢ Upon information and belief, Defendants could not have conducted and did not conduct the required minimum of four days of execution rehearsals in advance of the scheduled execution of Clarence Carter, given the compressed timeline between the effective date of the April 11, 2011 written protocol and the April 12, 2011 execution of Carter.

➢ Defendants have failed to conduct the required minimum of four days of execution rehearsals in advance of other executions as well.

➢ Defendants have consistently permitted execution team members who have not received the mandatory substantive training and/or missed execution rehearsals to participate in the subsequent execution(s).

➢ Upon information and belief, TM # 21 also did not participate in all of the required rehearsal sessions in advance of the Broom execution attempt.

➢ TM # 21 was one of the two team members primarily responsible for establishing and/or sustaining peripheral IV access in Broom on September 15, 2009, and at least two of the notable mishaps involved TM # 21.

➢ Former Warden Kerns did not participate in all of the Broom execution rehearsal sessions, despite his primary role in administering an execution.

➢ TM # 17 has also missed execution rehearsals, training sessions, and/or executions themselves, leaving TM # 21 alone to conduct at least two executions unsupervised and unchecked by another team member who possesses the qualifications under Ohio law as required by the written protocol.

➢ TM # 17's absence for at least two executions prompted the participation by TM # 9 who acted in TM # 17's place to carry out at least some of the duties that only TM # 17 and # 21 are permitted to perform under the written protocol.

➢ Current Warden Morgan has failed to attend all the substantive training sessions required under the various written protocols, despite his participation in

executions first as a member of the execution team and now as the Warden of SOCF.

➤ Defendants claim the power under ¶ VI.B.4.o of the written protocol effective April 11, 2011 or its analog to waive or to deviate or vary from *any* of the written execution protocol's requirements, including attendance at an execution rehearsal session, if they so choose.  Indeed, current Warden Morgan, like former Warden Kerns before him, and the current Director and Assistant Director of DRC have, in fact, waived these training requirements for recent executions.

➤ Defendants fail to follow their written protocol's mandates to properly document and verify correct drug preparation, dosage and disposal of the execution drugs.

➤ Defendants fail to keep accurate records involving the drug(s) used as required in the written protocol, or fail to create any records at all.

➤ Defendants fail to follow their written protocol when they fail to properly verify and document execution team members' credentials and certifications, either yearly or before the "initial training session" for each execution.

➤ Defendants fail to follow their written protocol when they fail to halt, assess and restart an execution as necessary if a problem is observed during administration of the written protocol.

➤ There is no evidence that Defendants plan to provide the mandatory, yearly training as specifically articulated in the written protocol.

➤ There is no evidence that Defendants abide by the various requirements related to reporting and/or verifying the ongoing validity of the medical team members' respective licensures.

## F.    **Defendants' deviations, variations and irregularities in specific executions**

729.    In addition to their deviations and/or variations in advance of or following executions,

Defendants' history of administering executions in Ohio is marred by repeated

irregularities, deviations and/or variations from the written protocol in the course of

actual executions.

### 1.    **Wilford Berry**

730.    Despite applying ICS principles as a part of their execution policy at the time, Defendants

failed to strictly adhere to execution policy and the written execution protocol during

Ohio's first execution in the modern era when they or their predecessors executed Wilford Berry in 1999.

731.  Upon information and belief, the members of Berry's execution team could not locate a vein for the IV line, so they resorted to violently beating his arms in order to raise a vein adequate to acquire an IV site for the transmission of the lethal drugs into his body.

###  2.  Joseph Clark

732.  During the execution of Joseph Clark on May 2, 2006, Defendants failed to administer the required, and critical, full dose of two grams of sodium thiopental via peripheral IV injection.

733.  Defendants also dispensed the execution drugs to an unknown person on May 1, 2006, the day before the execution, despite the written protocol's clear mandate that the execution drugs were to be dispensed on the day of the execution.[10]

734.  Prison officials could find only one accessible vein in Clark's arms to establish a heparin lock instead of the required two sites.

735.  Once Defendants and their agents began administering the first drug of the three-drug policy then employed, the vein collapsed.

736.  Clark informed the execution team that the process was not working, and the execution was halted.

---

[10] This deviation or variation also occurred for several other executions, including at least one execution in which the lethal drugs were dispensed at least two days before the execution date.

107

737.    After more than 90 minutes of additional attempts to establish a viable IV injection site, including consideration of nontraditional injection sites, the execution team established one new IV site through which the lethal drugs were eventually administered.

738.    But Defendants failed to follow their written protocol, which required that they order a sufficient quantity of the execution drug(s) as a contingency against the contamination or inadvertent loss of any of the drugs.[11]

739.    The written protocol in effect at that time required peripheral IV injection of two grams of sodium thiopental to ensure the inmate was properly anesthetized before administration of the second (pancuronium bromide) and third (potassium chloride) drugs.

740.    But Defendants obtained only a total of two grams of sodium thiopental in advance of the Clark execution, and they injected two full syringes—with one gram in each syringe—into the bad IV line.

741.    This means that the drugs were not injected into Clark's peripheral veins as required by the written protocol.

742.    Only one additional gram of sodium thiopental was dispensed from the SOCF pharmacy for use in Clark's execution.

743.    Because of Defendants' failures regarding the first peripheral IV administration site, and because Defendants improperly started the execution with only two grams of sodium

---

[11] Defendants similarly deviated  or varied with at least twenty-three other executions, including but not limited to executions of inmates Getsy, Keene, Fautenberry, Bryant-Bey, Cooey, Newton, Filiaggi, Lundgren, Wilson, Ferguson, Barton, Benner, Hicks, Willie Williams, Ashworth, William Smith, Dennis, Mink, Vrabel, Zuern, Wickline, Roe, and Lewis Williams.

thiopental total, and used only three grams total, it was impossible for Defendants to administer to Clark a full two grams via peripheral IV injection before they administered drugs two and three.

744.    Defendants injected into Clark only one gram of sodium thiopental via peripheral IV injection before they injected drugs two and three.

745.    Thus it is extremely likely that Clark was not properly anesthetized before he was subjected to injections of pancuronium bromide and potassium chloride, in turn subjecting Clark to excruciating, torturous pain during his execution.

### 3.    Christopher Newton

746.    On May 24, 2007, Defendants executed Newton.

747.    It took approximately twenty-two minutes to insert the first IV into Newton's arm.

748.    It took approximately one hour and fifteen minutes to place the second IV.

749.    Placing the IVs took so long that Newton had to take a short bathroom break.

### 4.    Daniel Wilson

750.    On June 3, 2009, Defendants executed Daniel Wilson.

751.    Despite the mandate in the then-applicable May 14, 2009 written protocol that required assessment of the inmate's veins on the morning of the scheduled execution, Defendants failed to conduct the required assessment of Wilson's veins the morning of the execution.

### 5.    Marvallous Keene

752.    Approximately one month later, Defendants again demonstrated a willingness to deviate and/or vary from the written protocol's requirements.

753.    The written protocol effective at the time explicitly required two functional IV sites at the start and during an execution, along with the related requirement that if one IV site became compromised, the execution must be stopped, if only to assess the situation.

754.    TM # 17 (the "executioner") and TM # 21 (the back-up executioner, and the observer on hand in the Equipment Room with TM # 17) were each aware of a problem with one IV bag and line during the Keene execution.

755.    But they deviated or varied substantially from the written protocol when they chose to ignore the problem and forged ahead with the execution, rather than halting as the written protocol required.

### 6.    **Romell Broom**

756.    On September 15, 2009, Defendants attempted to execute Romell Broom.

757.    The evidence demonstrates myriad deviations and/or variations from the written protocol during the Broom execution attempt.[12]

758.    Defendants failed to conduct the mandatory venous access assessments on Broom, just as they failed to do in the Wilson execution.

759.    Defendants, namely TM # 9, TM # 17, and TM # 21, unsuccessfully attempted to insert IV lines in eighteen different spots on Broom's body, making approximately fifty needle insertions over the course of two hours.

760.    Defendants attempted to establish an operable IV by repeatedly inserting IV catheters into the crooks of both of Broom's elbows (the antecubital area), his left biceps, his left wrist, the base of his thumb on each hand, over the knuckles on the back of his right hand, the top of his left foot, and his right medial malleolus (ankle bone on the inside part of the ankle).

_____

[12] The facts surrounding the failed Broom execution attempt are thoroughly set out in the deposition testimony taken in the weeks following September 15, 2009.  (*See, e.g.*, *Cooey*, Doc. Nos. 580, 598, Broom Dep., Oct. 5, 2009, which is incorporated by reference here in full.)

761. During Defendants' repeated attempts to establish and/or sustain IV access in Broom, venous access was obtained on at least two different occasions. Upon information and belief, at least one of those instances failed when execution team members mishandled the IV apparatus after establishing a successful IV hook-up, resulting in the IV catheter being yanked out of Broom's vein.

762. In at least one other instance, execution team members established but then lost venous access by virtue of their actions following successful IV catheter insertion.

763. Personnel involved in attempting to execute Broom included at least one physician, Dr. Carmelita Bautista, who was not part of the execution team and who was untrained in the written execution protocol.

764. Defendants have consistently asserted they are unable to procure participation of a physician in the execution process. The written protocol in effect at the time did not provide for physician participation, and Dr. Bautista's participation in the failed Broom execution came as a distinct surprise to participating execution team members.

765. After two hours of Defendants causing substantial, torturous physical and psychological pain to Broom, DRC Director Terry Collins requested that Governor Ted Strickland grant a reprieve to postpone the execution process for one week.

766. At no time was the pain and suffering that Broom was enduring considered as part of the discussion and factors for whether to halt the execution attempt.

767. The only concern was for the execution team members' well-being, concern about generating future litigation, and concern about avoiding subsequent, more embarrassing problems if the execution continued and IV administration of the lethal drugs failed.

111

768. Broom, during the course of this two-hour ordeal, requested to speak with his counsel on at least one occasion and perhaps more.  Defendants denied these requests, citing their execution policy, and then denied counsel's request to speak with Broom.

769. At least one member of Broom's execution team explicitly stated that he was looking forward to seeing the State execute another particular inmate.

### 7.     Vernon Smith, a.k.a., Abdullah Sharif Kaazim Mahdi

770. On January 7, 2010, Defendants executed Vernon Smith, a.k.a. Abdullah Sharif Kaazim Mahdi.

771. On the day of Smith's execution, TM # 17 was in the hospital, so he could not and did not participate in the execution.

772. Only TM's # 9, # 17, and # 21 are qualified under the written protocol to be part of the IV insertion team.

773. TM # 9's participation ceases after the IVs are established.

774. TM # 9 is not qualified under Ohio law to administer intravenous and intramuscular injections.

775. Only TM's # 17 and # 21 are qualified under the written protocol to take numerous other actions related to the execution drugs which are reserved for members of the "medical" team.

776. These tasks explicitly require certain qualifications under Ohio law, and also require the participation by not one but *two* such qualified execution team members.

777. These tasks include procuring, taking possession of, preparing, verifying, injecting and administering, and disposing of the execution drugs, as well as monitoring and documenting all of the above.

778.    The written protocol requires participation of at least two individuals with certain qualifications under Ohio law for these critical responsibilities, but this was impossible during the Smith execution, due to TM # 17's absence.

779.    Defendants used TM # 9 in TM # 17's place.

780.    Defendants ignored the explicit mandates of their written execution protocol by executing Smith without a second individual with the necessary qualifications under the written protocol present in the Equipment Room to supervise or monitor the drug preparation, administration, and other related tasks,

781.    Defendants also ignored the explicit mandates of their written execution protocol by involving TM # 9 in TM # 17's stead to execute Smith, because TM # 9 is not qualified under Ohio law to carry out the tasks in question.

### 8.    __Michael Beuke__

782.    On May 13, 2010, Defendants executed Michael Beuke.

783.    Approximately one month before the Beuke execution, TM  #17 notified Defendants that he would be absent on the day of the execution, because he needed to attend a doctor's appointment.

784.    Defendants made no alternative arrangements to replace TM # 17 within the confines of the written protocol.

785.    Defendants did not change Beuke's execution date by way of a reprieve from the Governor.

786.    Instead, Defendants chose to use TM # 9 as a replacement for TM # 17 again, just as they did in the Vernon Smith execution.

787.    During the Beuke execution, therefore, Defendants engaged in all of the same or similar deviations or variations from the Vernon Smith execution recounted above.

113

### 9.    **Darryl Durr, and others since November 30, 2009**

788.    As described more extensively in Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions for Summary Judgment, (*Cooey*, Doc. No. 849), in Plaintiffs' Consolidated Sur-Reply Memorandum Regarding Defendants' Motions for Summary Judgment, (*Cooey*, Doc. No. 864), in Plaintiffs' respective Memoranda in Opposition to Defendants' Motions for Summary Judgment (*Cooey*, Doc. Nos. 924, 925, 926), in the evidence that arose during the briefing associated with several motions by Plaintiffs in this litigation for injunctive relief, the associated evidentiary hearings, and the Court's resultant orders, Defendants have deviated or varied from the mandates contained in their execution policy and written execution protocol in numerous ways in executions other than the executions specifically discussed above.

789.    This includes deviations and/or variations during the executions of Kenneth Biros, Mark Brown, Lawrence Reynolds, Darryl Durr, Michael Beuke, William Garner, Roderick Davie, Michael Benge, Frank Spisak, Johnnie Baston, Michael Beuke, Reginald Brooks, and others.

790.    This includes, but is not limited to, deviations and/or variations regarding execution policy and written protocol mandates governing who may, and who must, participate at various points in the execution; deviations and/or variations related to acquisition, possession, distribution, delivery, and administration of the execution drugs; deviations and/or variations related to training requirements and/or execution rehearsals; deviations and/or variations from one or more of the five "core" elements of the written protocol, and deviations from other "non-core" elements of the written protocol.

791.    All of the executions or attempted executions listed above were conducted under the auspices of Defendants' execution policy and written execution protocol in effect at the

relevant time.  This lengthy pattern of deviations and/or variations remains consistent regardless of which execution policy and written execution protocol was being administered at the time, and has continued and will continue under the execution policy and written protocol effective September 18, 2011.

792.     Defendants' demonstrated willingness to deviate and/or vary from their execution policy's and written execution protocol's mandated and constitutionally required safeguards is exacerbated by the vast amounts of unfettered discretion that their overarching execution policy vests in certain actors, including execution team members and supervisory officials.

793.     All of these deviations and/or variations demonstrate a general sense of bureaucratic ennui rendering it the policy of Defendants that they adhere to their written execution protocol except when they do not.


## VI.     CLAIMS FOR RELIEF

### First Claim: Eighth and Fourteenth Amendment Violations

794.     Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Omnibus Complaint as if fully rewritten.

795.     Defendants have created, maintained and implemented a lethal injection execution policy which includes the written execution protocol effective September 18, 2011 and the administration of said written protocol and Defendants' informal policies, by which they intend to execute Plaintiff.

796.     Defendants' execution policy and written execution protocol manifests Defendants' deliberate indifference towards Plaintiff's constitutional rights.  The execution policy and

written protocol violate Plaintiff's constitutional rights to be free from cruel and unusual punishment which rights are secured and guaranteed to him by the Eighth and Fourteenth Amendments' limitations on Defendants' powers while acting individually or under the color and authority of state law, and/or does not protect against or prevent Defendants from conducting an unconstitutional execution because of the lack of necessary procedural safeguards.

797.   Defendants' execution policy and written execution protocol must contain procedural safeguards critical to ensuring against Eighth Amendment violations.

798.   The execution of one who is mentally retarded or incompetent to be executed constitutes cruel and unusual punishment under the Eighth Amendment.

799.   Defendants' execution policy and written execution protocol thus constitute cruel and unusual punishment, facially and/or as applied, in violation of the Eighth Amendment, because there is no procedural safeguard or mechanism in the execution policy or written execution protocol by which Defendants ensure that a condemned inmate whose execution is imminent is not mentally retarded or incompetent to be executed. [13]

800.   Defendants' execution policy and written execution protocol also violate the Eighth Amendment because Plaintiff will suffer a substantial risk of serious harm, such as physical and/or psychological pain, an undignified, lingering, and/or spectacle execution or attempted execution that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants ignore.

_____

[13] This paragraph and other similar revisions within this Amended Omnibus Complaint are included in this Amended Omnibus Complaint to clarify the scope of the Eighth Amendment claims Plaintiff alleges.

116

801. Plaintiff's individual physical and/or psychological characteristics and conditions create a substantial risk that employing Plan A to execute him will subject him to a substantial risk of serious harm, including severe physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified, and/or spectacle execution or attempted execution, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

802. Plaintiff's individual physical and/or psychological characteristics and conditions create a substantial risk that achieving peripheral IV access on him will present a problematic situation analogous to achieving IV access in the previous situations in which Defendants were unable to readily obtain IV access, which, in turn, creates a substantial risk that Plaintiff will suffer serious harm, including physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified death, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

803. Plaintiff's individual physical and/or psychological characteristics and conditions create a substantial risk that employing Plan B to execute him will subject him to a substantial risk of serious harm, including severe physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified, and/or spectacle execution or attempted execution, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

804. There is a substantial risk that Defendants will fail to strictly apply their execution policy and written execution protocol properly or in accordance with the requirements of said written protocol or informal policies.

805.    Defendants' consistent failures, and pattern of failures, to properly and competently administer the written execution protocol renders the constitutionally critical safeguards— safeguards that are essential to alleviate Eighth and Ninth Amendment concerns— contained in Defendants' execution policy and written execution protocol null and functionally nonexistent.

806.    Defendants' consistent failures, and pattern of failures to properly and competently administer the written execution protocol, including Defendants' individual deviations and/or variations and Defendants' pattern of deviations and/or variations from the execution policy's and the written execution protocol's safeguards create a substantial risk that Plaintiff and any and all others on whom Defendants administer the execution policy will not be sufficiently protected by those critical safeguards.

807.    Defendants' admitted treatment of their written protocol's requirements as simple "guidelines" creates a substantial risk that Plaintiff and any and all others on whom Defendants administer their execution policy will not be sufficiently protected by the written protocol's critical safeguards.

808.    Defendants' consistent failures, and pattern of failures to properly and competently administer the written execution protocol, including Defendants' individual deviations and/or variations and Defendants' pattern of deviations and/or variations from the execution policy's and the written execution protocol's safeguards create, violates Plaintiff's Eighth and Fourteenth Amendment right to be free from cruel and unusual punishment because they create a substantial risk of serious harm, including physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified

death that is objectively intolerable, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

809. Defendants' failure to abide by their execution policy and written execution protocol is a demonstrated reality rather than a mere possibility or attenuated speculation, as shown by the deviations and/or variations from key execution policy and/or written execution protocol requirements during executions regardless of the execution policy and written protocol effective at the time, including under the current execution policy and written protocol.

810. Deviations and/or variations from the execution policy and written execution protocol demonstrate that problems with any one particular execution are not an unforeseeable isolated mishap or innocent misadventure for which no one is liable.  A long line of problematic executions in Ohio makes future problems executing Plaintiff foreseeable and highly likely

811. Defendants' inconsistent application of Incident Command Systems principles over time creates a substantial risk that Plaintiff will not be sufficiently protected by application of ICS principles to prevent a violation of Plaintiff's Eighth Amendment rights.

812. The deviations and/or variations, and the pattern of deviations and/or variations, from Defendants' execution policy and written execution protocol by many of the actors involved, whether intentional or reckless, the amount of discretion that exists under the overarching execution policy and within the written protocol, Defendants' demonstrated belief that the written protocol is not mandatory but is instead guidelines, the substantial evidence of Defendants' incompetence or inability to perform in the execution context, and the historical inconsistency in applying ICS principles in the execution context

119

cumulatively point to a substantial risk of serious harm and/or an objectively intolerable risk of harm, in violation of Plaintiff's Eighth and Fourteenth Amendment rights.

813. This includes intentional and/or willful and/or reckless disregard for the written protocol's requirements, as well as negligent, reckless, and/or willful failure to follow the written protocol's requirements in administration of Defendants' overarching execution policy.

814. Defendants' overarching execution policy, including their pattern of deviations and/or variations from their written protocol and the unlimited discretion they claim, is arbitrary, capricious, cruel and unusual, unjustifiably ignores an objectively intolerable risk of harm, and will violate Plaintiff's rights under the Eighth and Fourteenth Amendments.

815. Defendants' execution policy presents a substantial risk of harm and/or an objectively intolerable risk of harm from maladministration that Defendants unjustifiably ignore and that will result in at least the substantial risk of infliction of serious harm, including physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified death, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, in violation of Plaintiff's rights under the Eighth and Fourteenth Amendments.

816. Plaintiff is subject to a substantial risk of serious harm, including physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified death, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to the drugs administered to cause his death under Defendants' written execution protocol, in violation of his rights under the Eighth and Fourteenth Amendments.

120

817.   Defendants' procedures for obtaining intravenous access under their overarching policy, including their written protocol, have proven to cause serious harm, including torturous physical and/or psychological pain and needless suffering and an undignified, spectacle and/or a lingering death over an extended period of time, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, as personnel attempt to obtain and maintain intravenous access.

818.   Defendants have failed to promulgate formal practices to respond to the numerous well-publicized problems and complications associated with administering their overarching execution policy and written execution protocol, and any practices that may have been promulgated are not formally part of the written execution protocol and thus subject to the subjective interpretations given to them by any given Director of the DRC.

819.   These problems are repetitious and foreseeable, yet their prevalence in Ohio makes their subsequent occurrence highly likely, especially in light of the constant presence of the same problematic actors.

820.   Defendants' overarching execution policy, including the broad discretion to deviate and/or to vary from Defendants' written execution protocol, their lengthy pattern of deviations and/or variations from the written protocol and Defendants' informal policies, and Plan A and Plan B, is arbitrary, capricious and presents a substantial risk of serious harm, including physical and/or psychological pain, a torturous, lingering or spectacle death that does not accord with the dignity of man, and/or creates an objectively intolerable risk of harm that Defendants unjustifiably ignore, and/or fails to prevent Defendants from carrying out an unconstitutional execution.

821.    In all the foregoing ways, Defendants' execution policy and written execution protocol subject Plaintiff to violations of his rights under the Eighth and Fourteenth Amendments to the United States Constitution to be free from cruel and unusual punishment.

## Second Claim: Fourteenth Amendment Due Process Violations

822.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Omnibus Complaint as if fully rewritten.

823.    Defendants have created, maintained, and administered an overarching execution policy and written execution protocol that, if used to execute Plaintiff's death sentence, will violate his constitutionally protected liberty, life, and property interests (as arising from Ohio Rev. Code § 2949.22(A) and DRC Policy 01-COM-11) in expecting and receiving a "quick and painless death" and/or a humane and dignified execution.

824.    Ohio Revised Code § 2949.22(A) creates valid liberty, life, and property interests vested in Plaintiff in expecting a "quick and painless" death.

825.    Ohio Revised Code § 2949.22(A) also creates valid liberty, life, and property interests vested in Plaintiff in receiving a "quick and painless" death.

826.    DRC Policy 01-COM-11 is binding state law, and creates valid liberty, life, and property interests vested in Plaintiff in expecting a humane and dignified death.

827.    DRC Policy 01-COM-11 is binding state law, and creates valid liberty, life, and property interests vested in Plaintiff in receiving a humane and dignified death.

828.    These interests are rights vested in a small class of individuals that have a legitimate claim of entitlement to expect and receive a quick, painless, humane and dignified death. Plaintiff, as a death row inmate, is a member of the only group that is the intended beneficiary of these guarantees.  Under the express terms of § 2949.22(A) and DRC

Policy 01-COM-11, Defendants have no discretion in whether to provide a quick, painless, humane and dignified death to Plaintiff or some kind of death other than a quick, painless, humane and dignified one.

829.    These interests arising under state law are protected as rights under the substantive and procedural elements of the Due Process Clause of the Fourteenth Amendment.

830.    Defendants, having granted Plaintiff interests in expecting and receiving a quick, painless, humane and dignified execution, may not deprive him of those rights in violation of procedural and substantive due process under the Fourteenth Amendment.

831.    Defendants' denial of Plaintiff's rights to expect and receive a quick, painless, humane and dignified death is arbitrary and conscience-shocking.

832.    The pattern of deviations and/or variations from Defendants' execution policy and written execution protocol engaged in by many of the actors involved, intentional or otherwise, combined with the amount of discretion that Defendants claim under their overarching execution policy and under the written protocol, along with substantial evidence of incompetence or inability to perform in the execution context, cumulatively point to an unacceptable risk of violating Plaintiff's rights.

833.    By what Defendants include and exclude from their overarching execution policy, their development of the written execution protocol, and their wholly discretionary and faulty administration of the execution policy, Defendants manifest deliberate indifference towards, or intentional deprivation of, Plaintiff's statutorily created liberty, life, and property interests in expecting and receiving a quick, painless, humane and dignified death, interests protected as rights by the substantive and procedural elements of the Fourteenth Amendment's Due Process Clause.

834.    These rights are separate and distinct from the rights protecting Plaintiff against cruel and

unusual punishment as provided in the Eighth Amendment.

835.    In all the foregoing ways, Defendants violate Plaintiff's rights protected by the

Fourteenth Amendment to the United States Constitution.

> **Third Claim: Violations of First, Sixth, Eighth and Fourteenth Amendment
> Rights of Access to Counsel, Access to Courts, Ability to Petition for Redress
> of Grievances, Due Process, and Privileges and Immunities of United States
> Citizenship.**

836.    Plaintiff incorporates by reference each and every statement and allegation set forth

throughout this Amended Omnibus Complaint as if fully rewritten.  This explicitly

includes the factual details of the failed effort to execute Romell Broom on September

15, 2009.

837.    An execution is the final, critical stage of a criminal proceeding.  As proven by

problematic executions in Ohio, especially as compared to those in other states

throughout the United States, an execution is a critical event at which the condemned

inmate must have counsel at the ready to advocate on his behalf in the event something

goes awry.

838.    Defendants' overarching execution policy and written execution protocol and Ohio

Revised Code § 2949.25(A)(5) do not allow for counsel to be present to witness the

execution of Plaintiff unless Plaintiff gives up one of his three allotted witnesses.

839.    Similarly, Defendants' execution policy and written execution protocol do not allow for

Plaintiff's unhindered communication with his counsel before and during an execution,

even in the event problems develop during the execution.

840. Plaintiff requires the presence of counsel to witness his attempted execution and represent his interests without having to sacrifice a space for another witness from among the three witnesses allotted to him.

841. Plaintiff must be able to communicate with his counsel before and during his execution, especially in the event problems develop during the execution.

842. Upon information and belief, Plaintiff desires the presence at any attempt to execute him of his statutorily allotted three lay witnesses in addition to the presence of his counsel.

      **1.     Defendants place impermissible conditions on Plaintiff's constitutional rights by forcing him to give up a lay witness in order to have counsel witness his execution.**

843. Defendants' execution policy and written execution protocol and Ohio Revised Code § 2949.25(A) as applied and Ohio Rev. Code § 2949.25(A)(5) as written and applied arbitrarily, irrationally, and without a compelling state interest, deny Plaintiff the unhindered right to have his counsel present to witness Plaintiff's execution, and to represent Plaintiff's interests.

844. Instead, Defendants' execution policy and written execution protocol and Ohio Rev. Code § 2949.25(A) as applied and Ohio Rev. Code § 2949.25(A)(5) as written and applied permit counsel for Plaintiff to be a witness only if the condemned inmate gives up one of the three witness seats allotted to him for family or other supporters by Ohio Rev. Code § 2949.25(A)(5).

845. Under Ohio Rev. Code § 2949.25(A)(1), the Director of DRC could authorize counsel for Plaintiff to be present to witness an execution without forcing Plaintiff to exclude one or more of his three witnesses allotted by Ohio Rev. Code § 2949.25(A)(5), but Defendants do not apply § 2949.25(A) in that manner, arbitrarily, irrationally, and without a compelling state interest.

846. Defendants' execution policy and written execution protocol and Ohio Rev. Code § 2949.25(A) as written and/or as applied permit counsel for Defendants and the sheriff from the county where the condemned inmate was convicted to witness the execution without requiring representatives of the victim to yield one of the three witness positions they are entitled to select under Ohio Rev. Code. § 2949.25(A)(6).

847. Plaintiff has the right to have his counsel witness his execution just as counsel for Defendants, or law enforcement, have a right to witness the execution.

848. Just as Defendants have counsel present at an execution, Plaintiff is entitled to have his counsel present as a witness to ensure that he has an advocate present to represent his interests if something goes wrong during the execution.

849. Plaintiff must be able to exercise this right without being forced to choose between having counsel be a witness in lieu of one of the three persons he can otherwise choose to be witnesses under Ohio Rev. Code. § 2949.25(A)(5).

850. By imposing this burden on Plaintiff, Defendants' execution policy and written execution protocol and Ohio Rev. Code § 2949.25(A) as applied and Ohio Rev. Code § 2949.25(A)(5) as written and applied place impermissible conditions or restrictions on Plaintiff's rights: to free speech; to access the courts; to petition the government for redress of his grievances; to be free from cruel and unusual punishment; to the privileges or immunities guaranteed to citizens of the United States including the rights to come to the seat of government by way of counsel to assert any claim he may have upon the government, to free access to the courts of justice, and to petition for redress of his grievances; and to due process.  These rights are protected by the First, Sixth, and Eighth

Amendments, as well as by the Privileges or Immunities Clause and the Due Process

Clause of § 1 of the Fourteenth Amendment.

> **2.  Defendants deny Plaintiff's constitutional rights by denying him unhindered access to, and ability to communicate with, counsel.**

851.  Defendants' execution policy and written execution protocol, arbitrarily, irrationally, and

without a compelling state interest, deny Plaintiff the right to access his counsel and/or to

communicate with counsel so that counsel may give effect to Plaintiff's constitutional

rights before and during his attempted execution.  .

852.  Only through counsel may Plaintiff be able to assert his constitutional rights to access the

federal and/or state courts and to petition the authorities—including but not limited to the

Governor of Ohio and the Supreme Court of Ohio—for redress of Plaintiff's grievances if

problems arise before or during his attempted execution.

853.  Under Defendants' execution policy and written execution protocol, Defendants and/or

their agents constantly monitor/listen to and document communications between the

condemned inmate and counsel during attorney-client visits the evening before the

scheduled execution and the morning of the scheduled execution, regardless of the

circumstances of any particular execution or condemned inmate.

854.  Thus, Defendants' execution policy and written execution protocol do not allow for

confidential communication between Plaintiff and counsel at any time when Plaintiff is

at SOCF.

855.  Under Defendants' execution policy and written execution protocol, an inmate's access to

counsel and the inmate's ability to communicate with counsel is absolutely cut off at 8:45

a.m. on the morning of the scheduled execution, no communication between Plaintiff and

counsel is possible from that time until Defendants lead Plaintiff into the death chamber.

856.    Under Defendants' execution policy and written execution protocol, the only time an inmate, upon being led into the death chamber, may communicate with others outside the death chamber via microphone—including counsel if counsel's presence has been permitted—is during his last statement.

857.    Defendants' execution policy and written execution protocol provides no mechanism by which Plaintiff can communicate with counsel upon being led into the death chamber.

858.    Under Defendants' execution policy and written execution protocol, an inmate desiring to communicate with his counsel during the execution process must raise his voice to speak loudly enough that the inmate can be heard through the wall and glass window separating the witness viewing area and the death chamber.

859.    Defendants' execution policy and written execution protocol provides no mechanism by which Plaintiff can be assured uninterrupted access to counsel in the event that Defendants' attempt to execute him begins to go awry or to subject Plaintiff to unconstitutional harm.

860.    Defendants' execution policy and written execution protocol provides no mechanism by which counsel can communicate directly to those Defendants in the death chamber and/or the equipment room who are responsible for carrying out the execution.

861.    Defendants' execution policy and written execution protocol provides no mechanism by which Plaintiff's counsel can communicate directly with the federal and/or state courts or other governmental officials in the event that Defendants' attempt to execute Plaintiff begin to go awry or to subject Plaintiff to unconstitutional harm, when time is of the essence.

862.    Defendants' execution policy and written execution protocol allows counsel access to a telephone, but use of that telephone is highly restricted because counsel may not use it without close supervision by one or more Defendants or agents of Defendants, the telephone may only be used to call directly to another individual in the waiting area at SOCF, and the telephone is physically located outside the death chamber witness viewing area.

863.    Because of the close supervision by Defendants or their agents, counsel will not be able to communicate confidentially with co-counsel via telephone.

864.    The location of the telephone means counsel will also be forced to choose between communicating with Plaintiff and contacting co-counsel.

865.    Counsel must have available means to communicate with those persons responsible for the execution, and the courts as well, in such a way that does not force Plaintiff to choose between conferring or consulting with his or her counsel and accessing the court or petitioning the authorities for redress of his grievances.

866.    By denying or placing conditions or restrictions on Plaintiff's ability to communicate confidentially with counsel before his attempted execution, and by denying or placing conditions or restrictions on Plaintiff's ability to communicate even non-confidentially during his attempted execution, Defendants' execution policy and written execution protocol denies or places impermissible conditions or restrictions on Plaintiff's counsel's ability to access the courts.

867.    In all the foregoing ways, Defendants' execution policy and written execution protocol denies Plaintiff's rights protected by the First, Sixth, and Eighth Amendments to the United States Constitution, as well as by the Privileges or Immunities Clause and the Due

Process Clause of § 1 of the Fourteenth Amendment to the United States Constitution, including the right: to free speech; to access the courts; to petition the government for redress of his grievances; to be free from cruel and unusual punishment; to the privileges or immunities guaranteed to citizens of the United States including the rights to come to the seat of government by way of counsel to assert any claim he may have upon the government, to free access to the courts of justice, and to petition for redress of his grievances; and to due process.  .

### Fourth Claim: Fourteenth Amendment Equal Protection Violations

868. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Omnibus Complaint as if fully rewritten.

869. Equal protection under the law requires "minimal procedural safeguards" such that there is at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied.

870. The Equal Protection Clause's rudimentary requirements are important here, where the Supreme Court has clearly emphasized the necessity of procedural safeguards in a state's lethal injection execution policy, especially including the written protocol, to ensure against Eighth Amendment and Fourteenth Amendment violations.

871. The rudimentary requirements are also important when access to counsel is necessary for the class of condemned inmates—which includes Plaintiff—to effectuate an inmate's First, Sixth, Eighth and Fourteenth Amendment rights involving access to the courts and the ability to seek redress of grievances from the appropriate governmental officials during the inmate's execution, including the inmate's rights guaranteed by the due process and privileges or immunities clauses of the Fourteenth Amendment.

872.  Defendants' execution policy and written execution protocol is facially violative of the Equal Protection Clause, because it codifies disparate treatment of similarly situated individuals, without sufficient justification, and in a way that is arbitrary, irrational, and capricious.

873.  Defendants have applied Incident Command Systems principles at various times in their execution policy as a purported guarantee against deviations or variations from the written execution protocol, but application of ICS principles has been inconsistent over time and, upon information and belief, dependent on the subjective discretion of the Warden of SOCF and/or the Director of ODRC.

874.  In their deviations and/or their variations from their execution policy and written execution protocol, Defendants are violating the Equal Protection Clause's guarantee of equal treatment for similarly situated persons.

875.  The individual and/or pattern of deviations and/or variations from Defendants' execution policy and written execution protocol exhibited by many of the actors involved, intentionally and/or recklessly, combined with their wholly subjective, discretionary understanding and application of the execution policy and written execution protocol, along with substantial evidence of incompetence or inability to perform in the execution context cumulatively point to an unacceptable risk of violating Plaintiff's rights.

876.  Defendants' execution policy and written execution protocol, including their wholly discretionary approach thereto, violates Plaintiff's rights to equal protection under the law as guaranteed by the Fourteenth Amendment.

877.    By obtaining, distributing, dispensing and/or administering scheduled drugs without a valid, patient-specific prescription and for a non-medical purpose, Defendants are violating the Controlled Substances Act and analogous state drug control laws.

878.    Plaintiff has been or will be treated differently from other similarly situated individuals, burdening his fundamental rights as a member of a class of persons, without a compelling governmental interest, and/or without any rational basis for the difference in disparate treatment as a class of one irrationally and arbitrarily, in violation of the guarantees of the Equal Protection Clause of the Fourteenth Amendment.

879.    Plaintiff, individually and as a member of a class of persons subject to a death sentence under Ohio law, has fundamental rights under the Eighth Amendment to be free from cruel and unusual punishment, and to not be subject to a torturous, lingering, or undignified death, which Defendants are violating.

880.    Plaintiff, individually and as a member of a class of persons subject to a death sentence under Ohio law, also has individual fundamental rights to privacy, personal dignity, bodily integrity and others that arise under the principles of liberty and/or natural law, and which are protected by the Ninth Amendment

881.    Plaintiff, individually and as member of a class of persons subject to a death sentence under Ohio law, also has fundamental rights, which Defendants are violating, to the protections afforded by the substantive and procedural elements of the Due Process Clause of the Fourteenth Amendment, which protect as rights created by the state Plaintiff's life, liberty and property interests in expecting and receiving a quick, painless, humane and dignified execution.

882.    Plaintiff, individually and as member of a class of persons subject to a death sentence under Ohio law, also has fundamental rights, which Defendants are violating, to access his counsel in order to access the courts, to petition for redress of grievances, to the privileges or immunities guaranteed by United States citizenship, and to due process, which rights are protected under the First, Sixth, Eighth, and/or Fourteenth Amendments.

883.    Defendants' actions administering their execution policy and written execution protocol show a pattern of deviations and/or variations from the execution policy and/or written execution protocol, intentionally, recklessly and/or arbitrarily, such that the safeguards allegedly contained in Defendants' execution policy and written execution protocol are applied to a particular inmate arbitrarily and disparately, and that such deviations and/or variations are arbitrary and irrational, and/or not necessary to achieve a compelling governmental interest.

884.    This denies Plaintiff the guarantee that he will receive the full panoply of procedural safeguards in the written protocol, severely burdening his right to be free from a substantial risk of serious harm, including physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified death, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

885.    It also severely burdens Plaintiff's rights to a guarantee that he will be able to expect and receive a quick, painless, humane and dignified execution.

886.    Thus, Defendants' pattern of deviations and/or variations from their execution policy and written execution protocol results in each condemned inmate being treated differently and such disparate treatment severely burdens the fundamental rights of the class of persons that includes Plaintiff.

133

887. Defendants' disparate treatment arising from their individual and/or pattern of deviations and/or variations from their execution policy and written execution protocol are not necessary to achieve any compelling governmental interest, nor are they the least restrictive means to achieve any compelling governmental interests.

888. By arbitrarily and/or inconsistently following, deviating or varying from the procedural safeguards in Defendant's execution policy and written execution protocol, and without any justification related to any specific condemned inmate or to any compelling governmental interest, Defendants are arbitrarily denying the fundamental rights of the class of inmates subject to a death sentence under Ohio—including Plaintiff—under the First, Sixth, Eighth, Ninth, and Fourteenth Amendments.

889. In their violations of the Controlled Substances Act and analogous state laws, Defendants treat the class of persons who are the intended beneficiaries of the CSA—which includes Plaintiff—disparately from others similarly situated, namely the general population of persons subject to the Controlled Substances Act and/or those persons intended to be protected by the Controlled Substances Act.

890. Defendants' violations of the federal and state drug control laws substantially burdens the fundamental rights of the group of persons that includes Plaintiff which are protected by the Eighth, Ninth, and Fourteenth Amendments, without being necessary to achieve a compelling state interest.

891. Plaintiff is also a "class of one," similarly situated with any other condemned inmate who has been or will be subjected to Defendants' execution policy and written execution protocol.

892. Plaintiff has been or will be singled out arbitrarily and irrationally as a "class of one" who will not be afforded equal protection as represented by the procedural safeguards in Defendants' written execution protocol, when such written safeguards are disregarded, ignored, deemed discretionary or advisory only, or otherwise not followed, intentionally and/or otherwise, during administration of the overarching execution policy.

893. Defendants' individual and/or pattern of deviations and/or variations from their execution policy and written execution protocol arbitrarily and irrationally treat Plaintiff differently from similarly situated inmates.

894. Defendants' disparate treatment arising from their individual and/or pattern of deviations and/or variations from their execution policy and written execution protocol are arbitrary, they are irrational, they further no legitimate state interests, and/or there is no relationship between the deviations and/or variations and any legitimate state interest.

895. Any justifications that Defendants have offered for their deviations and/or variations are without any rational relationship to a particular condemned inmate.

896. Defendants' justifications for their deviations and/or variations amount to claims of administrative convenience, which is not a legitimate governmental interest.

897. Defendants' execution policy and written execution protocol are considered binding state law, and thus Defendants violate state law when they fail to abide by the explicit mandates of their execution policy and/or written execution protocol.

898. Upon information and belief, Defendants have also violated federal and/or state law governing controlled substances through their deviations and/or variations from their execution policy and written execution protocol.

899.  State actions that are clearly contrary to law are irrational, and therefore Defendants'
deviations and/or variations are irrational.

900.  Condemned inmates subject to Defendants' execution policy and their written execution
protocol—including Plaintiff—are dissimilar only in immaterial respects as it relates to
Defendants' pattern of deviations and/or variations, and/or Defendants' deviations and/or
variations are not rationally founded on differences that are real and not illusory.

901.  Defendants' pattern of deviations and/or variations is irrational because it is arbitrary and
capricious; it is a pattern of random deviations and/or variations that changes from
execution to execution.

902.  By arbitrarily and/or inconsistently following, deviating or varying from the procedural
safeguards in Defendants' execution policy and written execution protocol, Defendants
are arbitrarily treating Plaintiff differently than other similarly situated inmates or
irrationally singling him out as a class of one without any relation to differences between
Plaintiff and otherwise-similarly-situated individuals, contrary to law or otherwise
without any rational relationship to a legitimate governmental interest.

903.  In their violations of the Controlled Substances Act and analogous state drug control
laws, Defendants treat Plaintiff as a class of one disparately from others similarly
situated, namely the general population of persons subject to the Controlled Substances
Act and/or those persons intended to be protected by the Controlled Substances Act.

904.  Defendants' violations of the federal and state drug control laws also violate Plaintiff's
rights as a class of one, arbitrarily and irrationally, without any rational relationship to
any legitimate state interest.

136

905. In all the foregoing ways, Defendants violate Plaintiff's rights to equal protection under the law, in violation of the Fourteenth Amendment to the United States Constitution.

**Fifth Claim: Violations of Fundamental Rights Arising Under The Principles Of Liberty and/or Natural Law Which Are Protected By The Ninth Amendment**

906. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Omnibus Complaint as if fully rewritten.

907. Defendants' application of their execution policy and written execution protocol, as demonstrated through previous executions such as Clark, Newton, Biros, and Berry, and the failed execution of Broom, and as alleged above, will violate Plaintiff's fundamental, unenumerated rights arising under the principles of liberty and/or natural law.

908. These rights include rights such as Plaintiff's right to privacy, his right to personal dignity, his right to bodily integrity and others inherent in the concepts of liberty and/or natural law.

909. These fundamental rights, arising from the concepts of liberty and natural law that guided the Framers' understanding of the Ninth Amendment specifically and the Bill of Rights in general, are deeply rooted in this Nation's history and tradition, and they are implicit in the concept of ordered liberty.

910. Defendants will violate Plaintiff's fundamental, unenumerated rights in violation of the Ninth Amendment through Defendants' haphazard and faulty administration of their execution policy and written execution protocol, including, but not limited to, Defendants' demonstrated inability to consistently obtain IV access quickly and with a minimum number of needle sticks, and Defendants' inconsistent application of ICS principles over time.

911.   Defendants will violate Plaintiff's fundamental, unenumerated rights in violation of the Ninth Amendment through their administration of execution drugs that will cause vomiting, choking, asphyxiating and other disturbing reactions, resulting in an undignified, spectacle execution, or attempted execution, offensive to an inmate's rights protected by the Ninth Amendment.

912.   Defendants will violate Plaintiff's fundamental, unenumerated rights in violation of the Ninth Amendment through their application of their execution policy's and written execution protocol's various tasks in such a way as to result in an undignified, spectacle execution, or attempted execution, offensive to an inmate's rights protected by the Ninth Amendment.

913.   In all the foregoing ways, Defendants violate Plaintiff's fundamental, unenumerated rights in violation of the Ninth Amendment to the United States Constitution.

**Sixth Claim: First Amendment Free Speech Violations**

914.   Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Omnibus Complaint as if fully rewritten.

915.   Defendants' written protocol places restrictions on the content and on the length of an inmate's last statement, and those restrictions are not necessary or the least restrictive means to achieve a compelling governmental interest.

916.   The restrictions will have a chilling effect on an inmate's expressive speech because the written protocol gives the Warden discretionary but unguided authority to impose restrictions on the content and length of an inmate's last statement, and to terminate a statement that the Warden subjectively believes is intentionally offensive to others, without any further explanation on how those restrictions are to be applied.

917.    Plaintiff has a fundamental right protected by the First Amendment, the Ninth
        Amendment, and the Fourteenth Amendment to the federal constitution to make a final
        statement free of the restrictions contained in Defendants' written protocol.

918.    The restrictions in Defendants' written protocol related to an inmate's last words violate
        well-established First Amendment prohibitions on content-based discrimination in
        regulating speech.

919.    The restrictions in Defendants' written protocol related to an inmate's last words violate
        well-established First Amendment prohibitions related to the public forum and/or limited
        public forum doctrines.

920.    The restrictions in the written protocol related to an inmate's last words discriminate
        against an inmate's expressive speech on the basis of viewpoint, because the Warden may
        impose restrictions the Warden subjectively believes to be intentionally offensive.

921.    The restrictions in the written protocol related to an inmate's last words are not
        reasonable in light of the purpose of an execution.

922.    There are no governmental interests to justify the restrictions on an inmate's expressive
        speech provided in the written protocol.

923.    The written protocol, facially and as applied to him, violates Plaintiff's freedom of
        speech rights protected by the First, Ninth and Fourteenth Amendments.

924.    Upon information and belief, the restrictions in Defendants' written protocol related to an
        inmate's last words also violate the terms of a settlement agreement to which some of the
        original Defendants in these lethal injection cases, and at least one Plaintiff here, Plaintiff
        Treesh, were a party, in *Treesh v. Taft*, No. 99-624, S.D. Ohio.

925.    Upon information and belief, under the terms of the settlement agreement, Defendants'

protocol would place no restrictions on the content and/or the duration of an inmate's

last statement.

In all the foregoing ways, Defendants violate Plaintiff's rights to free speech protected by

the First Amendment to the United States Constitution.

## PRAYER FOR RELIEF

A.      Plaintiff requests that this Court grant him injunctive relief under federal law in the form

of the following:

      a.      preliminary and permanent prohibitive injunctions preventing Defendants from

executing him by means of their execution policy, including the written execution

protocol effective September 18, 2011, or any other execution policy, new or old,

formal and/or informal which, as written and/or as administered, violates his

federal constitutional rights;

      b.      preliminary and permanent mandatory injunctions requiring Defendants to adopt,

and adhere in their administration to, a facially constitutional written execution

protocol in efforts to execute him, and that such written execution protocol must

formally adopt the Incident Command Systems principles and application in the

execution context as a formal element of Defendants' written execution protocol;

      c.      preliminary and permanent prohibitive injunctions preventing Defendants from

executing him by means of their execution policy, including the written execution

protocol effective September 18, 2011, or any other execution policy, new or old,

formal and/or informal that is facially unconstitutional, including facial

unconstitutionality for failure to ensure that an unconstitutional execution is not

carried out;

      d.      preliminary and permanent prohibitive injunctions preventing Defendants from

executing him by means of an execution policy, including the written execution

protocol effective September 18, 2011, or any other execution policy, new or old,

formal and/or informal, that is unconstitutional as applied to him, including as-applied unconstitutionality for failure to ensure that an unconstitutional execution is not carried out;

e.   preliminary and permanent prohibitive injunctions preventing Defendants from executing him by means of their execution policy and written execution protocol to which they have failed to strictly adhere;

f.   preliminary and permanent prohibitory injunctions barring Defendants from executing him by a means that will deny his liberty, life, and property interests in the expectation and receipt of a quick, painless, humane and dignified death, which interests are guaranteed by Ohio Rev. Code § 2949.22(A) and DRC Policy 01-COM-11 and protected by the substantive and procedural elements of the Due Process Clause of the federal constitution's Fourteenth Amendment;

g.   preliminary and permanent prohibitory injunctions barring Defendants from executing him unless Defendants allow him to exercise his rights, under the First, Sixth, Eighth, Ninth and Fourteenth Amendments, to choose an attorney to witness his execution without forcing him to choose to have counsel witness at the cost of using one of the three witness slots allotted by Ohio Rev. Code § 2949.25(A)(5);

h.   preliminary and permanent prohibitory injunctions barring Defendants from executing him unless Defendants allow him to access his counsel confidentially before the execution process, to access his counsel without interruption before and during the execution process, and allow his counsel unencumbered ability to

communicate directly to Defendants in the death chamber and/or the equipment room and directly to the courts and government officials, such that counsel can immediately access the courts or seek redress for grievances with the government, or otherwise seek necessary relief, in exercise of Plaintiff's rights under the First, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution;

i.  preliminary and permanent mandatory injunctions requiring Defendants to comply with all training and Execution Team personnel requirements set forth in the written execution protocol, and prohibiting supervisory personnel from allowing Execution Team member participation in any execution without full compliance with all of the written protocol's substantive training requirements, execution rehearsal training requirements, and other mandatory provisions;

j.  preliminary and permanent prohibitive injunctions preventing Defendants from enforcing those provisions of their execution policy and written execution protocol that violate Plaintiff's First Amendment rights to free speech;

k.  preliminary and permanent prohibitive injunctions preventing Defendants from attempting to conduct any further executions until such time as the Court orders otherwise.

B.  Plaintiff requests that this Court grant him declaratory relief under federal law in the form of the following:

a. an Order declaring that Defendants' execution policy and written execution protocol will subject him to a substantial risk of harm, including severe physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified, and/or spectacle execution or attempted execution, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, resulting in cruel and unusual punishment, whether that method is through the policy's "Plan A" or "Plan B," and that Defendants' execution policy and written execution protocol fails to ensure against an execution that would constitute cruel and unusual punishment, and will thus violate Plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution;

b. an Order declaring that Defendants' substantial, documented and admitted deviations and/or pattern of deviations and/or variations from their written execution protocol and the safeguards contained therein, as applied in Defendants' execution policy before, during and after administration of the execution policy, creates a substantial risk of harm, including severe physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified, and/or spectacle execution or attempted execution, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, in violation of Plaintiff's rights under the Eighth and Fourteenth Amendments;

c. an Order declaring that Defendants' execution policy and written execution protocol denies his life, liberty and property interests in expecting and receiving a quick, painless, humane and dignified death, which interests are created under binding state law in the form of Ohio Revised Code § 2949.22 and/or DRC Policy

01-COM-11, and protected as rights by the substantive and procedural elements of the Fourteenth Amendment's Due Process Clause, resulting in denial of his substantive and procedural due process rights;

d.  an Order declaring that Defendants' execution policy, their written execution protocol and Ohio Revised Code § 2949.25(A) as applied and Ohio Rev. Code § 2949.25(A)(5) as written and applied impermissibly condition, restrict and/or deny Plaintiff the unhindered right to have his counsel present to witness Plaintiff's execution, and to represent Plaintiff's interests;

e.  an Order declaring that a condemned inmate in Ohio has rights to access counsel throughout the entire execution process, including the right to confidential communication with counsel while still confined in the holding cell, including administration of the execution policy and the written execution protocol, and including the rights to access Defendants in the death chamber and/or the equipment room, to access the courts and to seek redress of grievances from the courts, the Governor of Ohio or any other appropriate person of authority, under the First, Sixth, Eighth, Ninth and Fourteenth Amendments, including the Due Process Clause and/or the Privileges and Immunities Clause of the Fourteenth Amendment, and that Defendants' execution policy and written execution protocol violates these rights;

f.  an Order declaring that Defendants' substantial and demonstrated deviations and/or pattern of deviations and/or variations from their execution policy and written execution protocol before, during and after administration of the policy

145

and protocol is not necessary to achieve any compelling state interest, and that such deviations and/or variations substantially burden the fundamental rights of the class of persons of condemned inmates subject to a death sentence imposed in Ohio state courts—which includes Plaintiff—under the First, Sixth, Eighth, Ninth and Fourteenth Amendments, in violation of his rights to equal protection under the Fourteenth Amendment to the United States Constitution;

g.  an Order declaring that Defendants' substantial and demonstrated deviations and/or pattern of deviations and/or variations from their execution policy and written execution protocol before, during and after administration of the policy and protocol, is unrelated to any legitimate governmental interest, and arbitrarily and irrationally treats or will treat Plaintiff as a class of one differently than others similarly situated, in violation of his rights to equal protection under the Fourteenth Amendment to the United States Constitution;

h.  an Order declaring that Defendants' execution policy and written execution protocol facially violates Plaintiff's rights protected by the Fourteenth Amendment's Equal Protection Clause because it allows Defendants to treat similarly situated individuals differently, such disparate treatment burdens the fundamental rights of the class of persons of condemned inmates subject to a death sentence imposed in Ohio state courts—which includes Plaintiff—under the First, Sixth, Eighth, Ninth and Fourteenth Amendments, and it is not necessary to achieve a compelling state interest;

i.  an Order declaring that Defendants' execution policy and written execution protocol facially violates Plaintiff's rights as a class of one protected by the Fourteenth Amendment's Equal Protection Clause because it allows Defendants to treat Plaintiff different than similarly situated individuals, without any legitimate governmental interest, irrationally and arbitrarily;

j.  an Order declaring that he and other condemned inmates have fundamental, unenumerated rights that arise under the principles of liberty and natural law, which rights are protected by the Ninth Amendment to the United States Constitution, and that Defendants' execution policy and written execution protocol, as written and as applied, violates those fundamental rights in violation of the Ninth Amendment;

k.  an Order declaring that those portions of Defendants' execution policy and written execution protocol that provide discretion to governmental actors to impose restrictions on the content and length of any last statement given before an execution attempt are, facially and as applied, impermissible content-based restrictions, and/or violations of the public forum and/or limited public forum doctrines, and therefore in violation of Plaintiff's rights to free speech under the First Amendment;

l.  an Order declaring that the reasoning and analysis in any prospective opinion issued by this Court temporarily and preliminarily enjoining Defendants from executing him applies to preclude Defendants from attempting any further executions until such time as the Court orders otherwise.

C.      Plaintiff requests that this Court grant such further relief as it deems just and proper.

D.      Plaintiff requests that this Court grant him reasonable attorney fees under 42 U.S.C.

      § 1988 and the laws of the United States, as applicable.

Respectfully submitted,

*/s/ Allen L. Bohnert*           

**Allen L. Bohnert (0081544)**
Assistant Federal Public Defender
Office of the Federal Public Defender
for the Southern District of Ohio
Capital Habeas Unit
10 West Broad Street, Suite 1020
Columbus, Ohio 43215
614-469-2999
614-469-5999 (fax)
Email: Allen_Bohnert@fd.org
**Counsel for Richard Bays, Alva Campbell, Davel Chinn, Roland Davis, John Drummond, Timothy Dunlap, Larry Gapen, Warren K. Henness, Danny Hill, Genesis Hill, Carl Lindsey, Samuel Moreland, Walter Raglin, Jason Robb, Bobby T. Sheppard, George Skatzes, David Sneed, Michael Turner, Raymond Twyford, Warren Waddy, and Andre Williams**
**and Plaintiffs' Liaison Counsel,**

**and**

**/s/ Carol A. Wright   (per authorization)**

**Carol A. Wright (0029782)**
Supervising Attorney - CHU
Office of the Federal Public Defender
for the Southern District of Ohio
Capital Habeas Unit
10 West Broad Street, Suite 1020
Columbus, Ohio 43215
614-469-2999
614-469-5999 (fax)
Email: Carol_Wright@fd.org
**Counsel for Richard Bays, Alva Campbell, Davel Chinn, Roland Davis, John Drummond, Timothy Dunlap, Larry Gapen, Warren K. Henness, Danny Hill, Genesis Hill, Carl Lindsey, Samuel Moreland, Walter Raglin, Jason Robb, Bobby T. Sheppard, George Skatzes, David Sneed, Michael Turner, Raymond Twyford, Warren Waddy, and Andre Williams**

**/s/ James A. King  (per authorization)**

**James A. King (0040270)**
Porter, Wright, Morris & Arthur LLP
41 South High Street
Columbus, Ohio  43215
614-227-2051
614-227-2100 (fax)
Email: jking@porterwright.com
**Co-counsel for Richard Bays, Alva Campbell, Davel Chinn, Roland Davis, John Drummond, Timothy Dunlap, Larry Gapen, Warren K. Henness, Danny Hill, Genesis Hill, Carl Lindsey, Samuel Moreland, Walter Raglin, Jason Robb, Bobby T. Sheppard, George Skatzes, David Sneed, Michael Turner, Raymond Twyford, Warren Waddy, and Andre Williams**

**/s/ Randall Porter   (per authorization)**

**Randall Porter (0005835)**
Assistant State Public Defender
Office of the Ohio Public Defender
250 E. Broad Street
Suite 1400
Columbus, Ohio 43215
614-466-5394
614-728-3670 (fax)
Email: Randall.Porter@opd.ohio.gov
**Counsel for Melvin Bonnell, David Braden, Quisi Bryan, Cedric Carter, Sean Carter, Angelo Fears, Clarence Fry, Delano Hale, James Hanna, Gary Hughbanks, Andre Jackson, Kareem Jackson, Lawrence Landrum, Edward Lang, Jerry Lawson, Charles Lorraine, Ralph Lynch, Frederick Mundt, Tyrone Noling, Gary Otte, Kerry Perez, Ron Phillips, Duane Short, Steven T. Smith, James Trimble, James Were, and Jeffrey Wogenstahl**

*/s/ David C. Stebbins   (per authorization)*
**David C. Stebbins (0005839)**
Assistant Federal Public Defender Office of
the Federal Public Defender
for the Southern District of Ohio
Capital Habeas Unit
10 West Broad Street, Suite 1020
Columbus, Ohio 43215
614-469-2999
614-469-5999 (fax)
Email: David_Stebbins@fd.org
**Counsel for Alva Campbell, Roland Davis,
Warren Henness, Jason Robb, and
Michael Turner**


*/s/ David L. Doughten   (per authorization)*
**David L. Doughten (0002847)**
Law Offices of David L. Doughten
4403 St. Clair Avenue
Cleveland, Ohio 44103-1125
(216) 361-1112
(216)  881-3928 (fax)
E-Mail:  ddoughten@yahoo.com
**Counsel for James Frazier, Timothy
Hoffner, Percy Hutton, Keith LaMar,
Michael Dean Scott, and Raymond
Tibbetts**


*/s/ Gregory W. Meyers   (per authorization)*
**Gregory W. Meyers (0014887)**
Senior Assistant State Public Defender
Office of the Ohio Public Defender
250 E. Broad Street - Suite 1400
Columbus, Ohio 43215
(614) 466-5394
(614) 728-3670 (fax)
Email: Greg.Meyers@opd.ohio.gov
**Counsel for Melvin Bonnell, David
Braden, Quisi Bryan, Cedric Carter, Sean
Carter, Angelo Fears, Clarence Fry,
Delano Hale, James Hanna, Gary
Hughbanks, Andre Jackson, Kareem
Jackson, Lawrence Landrum, Edward
Lang, Jerry Lawson, Charles Lorraine,
Ralph Lynch, Frederick Mundt, Tyrone
Noling, Gary Otte, Kerry Perez, Ron
Phillips, Duane Short, Steven T. Smith,
James Trimble, James Were, and Jeffrey
Wogenstahl**


*/s/ Kathleen McGarry   (per authorization)*
**Kathleen McGarry (0038707)**
**McGarry Law Office**
**P.O. Box 310**
**Glorieta, New Mexico 87535**
**(505) 757-3989**
**(888) 470-6313 (fax)**
**E-Mail: kate@kmcgarrylaw.com**
**Counsel for Keith LaMar**

150

**/s/ Lori A. McGinnis   (per authorization)**
**Lori A. McGinnis (0060029)**
1209 East Main Street
Ashland , Ohio 44805
(419) 606-1278
(419) 289-8545 (fax)
Email:  mcginnil@yahoo.com
**Counsel for Raymond Tibbetts**


**/s/ R. Brian Moriarty   (per authorization)**
**R. Brian Moriarty (0064128)**
R. Brian Moriarty , LLC
2000 Standard Building
1370 Ontario Street
Cleveland, Ohio 44113
(216) 566-8228
(216) 623-7314 (fax)
Email:  bmoriartylaw@gmail.com
**Counsel for Abdul Awkal**


**/s/ Kevin Cafferkey   (per authorization)**
**Kevin Cafferkey (0031470)**
2000 Standard Building
1370 Ontario Street
Cleveland, Ohio 44113
(216) 363-6014
(216) 363-6013 (fax)
Email:  kmcafferkey@hotmail.com
**Counsel for Abdul Awkal**


**/s/ David Graeff   (per authorization)**
**David Graeff (0020647)**
P.O. Box 1948
Westerville, Ohio 43086
(614) 226-5991
(614) 443-9978 (fax)
Email:  socu10@aol.com
**Counsel for William Sapp**


**/s/ Gary W. Crim   (per authorization)**
**Gary W. Crim (0020252)**
943 Manhattan Avenue
Dayton, Ohio 45406-5141
(937) 276-5770
Email:  gary_crim@ameritech.net
**Counsel for Tyrone Ballew, Dennis**
**McGuire and Kevin Scudder**


**/s/ Jeffry F. Kelleher   (per authorization)**
**Jeffry F. Kelleher (0007784)**
Jeffry F. Kelleher & Assoc.
526 Superior Avenue, Suite 1540
Cleveland, Ohio 44114
(216) 241-0520
(216) 241-6961 (fax)
Email:  jfkelleher@route61.com
**Counsel for August Cassano and Robert**
**Williams**


**/s/ Keith Yeazel   (per authorization)**
**Keith Yeazel (0041274)**
5354 North High Street
Columbus, Ohio 43214
(614) 454-3574
(614) 569-8541 (fax)
Email:  yeazel@netwalk.com
**Counsel for Robert Van Hook and**
**Michael Webb**

*/s/ Spiros P. Cocoves   (per authorization)*
**Spiros P. Cocoves (0030396)**
Law Offices of Spiros P. Cocoves
610 Adams Street, 2nd Floor
Toledo, Ohio 43604-1423
(419) 241-5506
(419) 242-3442 (fax)
Email:  scocoves@gmail.com
**Counsel for Stanley Adams**


*/s/ Timothy F. Sweeney  (per authorization)*
**Timothy F. Sweeney (0040027)**
Law Office of Timothy Farrell Sweeney
The 820 Building, Suite 430
820 West Superior Avenue
Cleveland, Ohio 44113-1800
(216) 241-5003
(216) 241-3138 (fax)
Email:  Tim@timsweeneylaw.com
**Counsel for Clarence Mack, Frederick
Treesh and Ron Phillips**


*/s/ John B. Gibbons   (per authorization)*
**John B. Gibbons, Esq. (0027294)**
2000 Standard Bldg.
1370 Ontario Street
Cleveland, Ohio 44113
(216) 363-6086
(216) 363-6075 (fax)
jgibbons4@sbcglobal.net
**Counsel for Douglas Coley, Cleveland
Jackson and Clarence Mack**


*/s/ S. Adele Shank   (per authorization)*
**S. Adele Shank, Esq. (0022148)**
Law Office of S. Adele Shank
3380 Tremont Road, 2nd Floor
Columbus, Ohio 43221-2112
(614) 326-1217
(614) 326-1028 (fax)
Email:  shanklaw@att.net
**Counsel for Antonio Sanchez Franklin,
Kevin Scudder and Frederick Treesh**


*/s/ James P. Fleisher   (per authorization)*
**James P. Fleisher (0059509)**
Dayton, Ohio 45402-1908
Bieser, Greer, & Landis, LLP
400 National City Center
6 North Main Street (937) 223-3277
(937) 223-6339 (fax)
Email:  jpf@biesergreer.com
**Counsel for Antonio Sanchez Franklin**


*/s/ W. Joseph Edwards   (per authorization)*
**W. Joseph Edwards (0030048)**
341 South Third Street, Suite 200
Columbus, Ohio 43215
(614) 228-0523
(614) 228-0520 (fax)
E-mail:  jedwardslaw@live.com
**Counsel for Juan Kinley**


*/s/ Michael J. Benza   (per authorization)*
**Michael J. Benza (061454)**
The Law Office of Michael J. Benza, Inc.
17850 Geauga Lake Road
Chagrin Falls, Ohio 44023
(216) 319-1247
(440) 708-2627 (fax)
Michael.Benza@case.edu
**Counsel for Jeronique Cunningham and
Archie Dixon**


*/s/ Alan Freedman   (per authorization)*
**Alan Freedman**
Midwest Center for Justice
P.O. Box 6528
Evanston, Illinois 60204
(847) 492-1563
(847) 492-1861 (fax)
Email:  fbpc@aol.com
**Counsel for John David Stumpf**


152

*/s/ Carol R. Heise   (per authorization)*
**Carol R. Heise**
Midwest Center for Justice
P.O. Box 6528
Evanston, Illinois 60204
(847) 492-1563
(847) 492-1861 (fax)
Email: fbpc@aol.com
**Counsel for John David Stumpf**

*/s/ John Juhasz   (per authorization)*
**John Juhasz (0023777)**
7081 West Boulevard, Suite 4
Youngstown, Ohio 4512-4362
(330) 758-7700
(330) 758-7757 (fax)
Email: jbjuhasz@gmail.com
**Counsel for Bennie Adams and Warren Spivey**

*/s/ Lynn A. Maro   (per authorization)*
**Lynn A. Maro (0052146)**
7081 West Boulevard, Suite 4
Youngstown, Ohio 4512-4362
(330) 758-7700
(330) 758-7757 (fax)
Email: schoejlka@aol.com
**Counsel for Bennie Adams**

*/s/ Laurence E. Komp   (per authorization)*
**Laurence E. Komp (0060142)**
P.O. Box 1785
Manchester, Missouri 63011
(636) 207-7330
(636) 207-7351 (fax)
Email: lekomp@swbell.net
**Counsel for Siddique Abdullah Hasan, Donald Lewis, Jose Trinidad Loza and Freddie McNeill, Jr.**

*/s/ Robert A. Dixon   (per authorization)*
**Robert A. Dixon (0022466)**
4403 St. Clair Avenue
Cleveland, Ohio 44103
(216) 432-1992
(216) 881-3928 (fax)
Email: dixonlaws@aol.com
**Counsel for Donald Lewis and Freddie McNeill, Jr.**

*/s/ Jennifer M. Kinsley   (per authorization)*
**Jennifer M. Kinsley (0071629)**
The Law Office of Jennifer Kinsley
P.O. Box 19478
Cincinnati, Ohio 45219
(513) 708-2595
Email: jennifer@kinsleylawoffice.com
**Counsel for Gerald Hand**

153

*/s/ Lawrence J. Greger   (per authorization)*
**Lawrence J. Greger (0002592)**
Greger Law Office
120 West Second Street
Suite 1100
Dayton, Ohio 45402
(937) 223-3153
Email:  LGreger912@aol.com
**Counsel for Ahmad Fawzi Issa and James O'Neal**


*/s/ James Schuster   (per authorization)*
**James Schuster (0065739)**
644 Eden Park Drive
Cincinnati, Ohio 45202
(513) 702-8440
Email:  jschuster@OHcounsel.com
**Counsel for Stanley Fitzpatrick**

*/s/ Michael W. Krumholz (per authorization)*
**Michael W. Krumholz (0009099)**
Bieser, Greer & Landis
6 North Main Street
400 PNC Center
Dayton, Ohio 45402
937) 223-3277
(937) 223-6339 (fax)
Email:  mwk@bgllaw.com
**Counsel for Ahmad Fawzi Issa and James O'Neal**


*/s/ Kirstie N. Young   (per authorization)*
**Kirstie N. Young (0084007)**
Bieser, Greer & Landis
6 North Main Street
400 PNC Center
Dayton, Ohio 45402
937) 223-3277
(937) 223-6339 (fax)
Email:  mwk@bgllaw.com
**Counsel for Ahmad Fawzi Issa and James O'Neal**

154

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2013, I electronically filed the foregoing **Amended**

**Omnibus Complaint for Injunctive and Declaratory Relief, Attorney Fees and Costs of Suit**

**Pursuant to 42 U.S.C. § 1983 on Behalf of all Plaintiffs Individually** with the Clerk of the

United States District Court for the Southern District of Ohio using the CM/ECF system, which

will send notification of such filing to the following at the e-mail address on file with the Court:

Mr. Stephen C. Gray
Senior Assistant Attorney General
Trial Counsel for all Defendants
Office of the Ohio Attorney General
Criminal Justice section
150 E. Gay Street, 16th Floor
Columbus, OH 43215

Mr. Charles L. Wille
Principal Assistant Attorney General
Co-Counsel for all Defendants
Office of the Ohio Attorney General
Criminal Justice Section, Capital Crimes Unit
150 E. Gay Street, 16th Floor
Columbus, Ohio 43215

Mr. Thomas E. Madden
Associate Assistant Attorney General
Co-Counsel for all Defendants
Office of the Ohio Attorney General
Criminal Justice Section, Capital Crimes Unit
150 E. Gay Street, 16th Floor
Columbus, Ohio 43215

Mr. David M. Henry
Assistant Attorney General
Co-Counsel for all Defendants
Office of the Ohio Attorney General
Criminal Justice Section, Capital Crimes Unit
150 E. Gay Street, 16th Floor
Columbus, Ohio 43215

*/s/  Allen L. Bohnert*
**Plaintiffs' Liaison Counsel**