UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: OHIO EXECUTION
PROTOCOL LITIGATION

Case No. 2:11-cv-1016
JUDGE GREGORY L. FROST
Magistrate Judge Mark R. Abel

This document relates to: Ronald Phillips.

## OPINION AND ORDER

This matter is before the Court for consideration of a motion for a stay of execution, a temporary restraining order, and a preliminary injunction filed by Plaintiff Ronald Phillips (ECF No. 339) and a memorandum in opposition filed by Defendants (ECF No. 359). The motion presents the question of whether this Court believes that Ohio will not fulfill its duties under the Constitution so that the Court should stop the scheduled November 14, 2013 execution of Phillips. Because he has failed to meet his burden of proving that a stay is warranted, Ohio can proceed to fulfill its lawful duty to execute Phillips.

### I. Background[1]

This litigation is a 42 U.S.C. § 1983 civil rights action brought by multiple inmates who challenge various facets of the execution protocol used by the State of Ohio. Although this litigation originated as a challenge to the protocol under the Eighth Amendment, the primary focus of the action in recent years has been on claims that Ohio's execution protocol and

---

[1] The findings of fact related to this Opinion and Order are not conclusive given that "findings of fact and conclusions of law made by a district court in granting a preliminary injunction are not binding at a trial on the merits." *United States v. Edward Rose & Sons*, 384 F.3d. 258, 261 (6th Cir. 2004) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

practices violate the Equal Protection Clause of the United States Constitution.[2]  History has taught that these latter claims have not been without foundation.

Ohio has time and again failed to follow through on its own execution protocol.  The protocol is constitutional as written and executions are lawful, but the problem has been Ohio's repeated inability to do what it says it will do.  As a result, this Court has dealt with inmate challenges to the constitutionality of Ohio's execution protocol for coming up on a decade.[3]  During that time, the litigation has morphed from focusing primarily on allegations of cruel and unusual punishment to allegations of equal protection violations.  And as this Court has stated more than once, "Ohio has been in a dubious cycle of defending often indefensible conduct, subsequently reforming its protocol when called on that conduct, and then failing to follow through on its own reforms."  *In re Ohio Execution Protocol Litig. (Lorraine)*, 840 F. Supp. 2d 1044, 1046 (S.D. Ohio 2012).

One result of this cycle has been continual consideration of requests to stay executions.  Such review has been mandated by the Sixth Circuit, which in reviewing a stay of execution

---

[2]  Many of the prior Orders of this Court necessarily inform today's decision.  A recent history of this litigation and its often frustrating factual developments can be found in the following Opinion and Orders, which this Court expressly incorporates herein by reference: *In re Ohio Execution Protocol Litigation (Hartman)*, 906 F. Supp. 2d 759 (S.D. Ohio 2012), *In re Ohio Execution Protocol Litigation (Wiles)*, 868 F. Supp. 2d 625 (S.D. Ohio 2012), *In re Ohio Execution Protocol Litigation (Lorraine)*, 840 F. Supp. 2d 1044 (S.D. Ohio 2012), *Cooey (Brooks) v. Kasich*, Nos. 2:04-cv-1156, 2:09-cv-242, 2:09-cv-823, 2:10-cv-27, 2011 WL 5326141 (S.D. Ohio Nov. 4, 2011), and *Cooey (Smith) v. Kasich*, 801 F. Supp. 2d 623 (S.D. Ohio 2011).

[3]  The original execution protocol case dates back to 2004.  Over the years, various inmates filed additional cases.  By agreement of the parties, the Court ultimately consolidated all the execution protocol cases under case number 2:11-cv-1016 and closed the four original cases on the docket so that the parties would be able to proceed under only one case number.  *See* ECF No. 11.

issued by this Court, stated that the court of appeals

> agree[s] with the district court that the State should do what it agreed to do: in other words it should adhere to the execution protocol it adopted. . . . [W]hether slight or significant deviations from the protocol occur, the State's ongoing conduct requires the federal courts to monitor every execution on an ad hoc basis, because the State cannot be trusted to fulfill its otherwise lawful duty to execute inmates sentenced to death.

*In re Ohio Execution Protocol Litig. (Lorraine)*, 671 F.3d 601, 602 (6th Cir. 2012).  Guided by this directive–which the Sixth Circuit expressly based on this Court's July 8, 2011 *Smith* Opinion and Order and its January 11, 2012 *Lorraine* Opinion and Order, and which the Supreme Court of the United States declined to vacate in *Kasich v. Lorraine*, 132 S.Ct. 1306 (2012)–this Court has approached subsequent stay requests cognizant that the fundamental issue is deceptively simple: once again, can Ohio be trusted?

At times, this Court has unfortunately had to answer that question in the negative.  For example, the Court issued a stay in a July 8, 2011 decision that set forth at length numerous deviations by state actors from the state execution protocol then in effect, including core deviations that subverted the key constitutional principles that control the execution process. *Cooey (Smith) v. Kasich*, 801 F. Supp. 2d 623 (S.D. Ohio July 8, 2011).  This Court enjoined Ohio and any person acting on its behalf from implementing an order for the execution of Plaintiff Kenneth Smith until further Order from the Court.

In response, Defendants revised Ohio's execution protocol and practices.  This resulted in the iteration of the state's execution protocol, 01-COM-11, that became effective on September 18, 2011.  Ohio then proceeded to pursue the resumption of executions.

The next inmate seeking a stay via injunctive relief to come before this Court was Reginald Brooks.  Brooks' stay motion came on for a hearing from October 31, 2011 through

November 2, 2011. The Court took the motion under advisement and, after examining the new protocol and the proffered evidence of Defendants' practices in implementing that protocol, issued a November 4, 2011 Opinion and Order that explained that "[t]he dispositive questions . . . have been whether [Brooks] is correct that Defendants routinely deviate from mandated or core provisions set forth in the written protocol and whether [Brooks] has sufficiently proved that the protocol fails to address sufficiently varied constitutional concerns. The answer to both questions is no." *Cooey (Brooks) v. Kasich*, Nos. 2:04-cv-1156, 2:09-cv-242, 2:09-cv-823, 2:10-cv-27, 2011 WL 5326141, at *12 (S.D. Ohio Nov. 4, 2011).

Notably, the crux of the rationale behind the *Brooks* decision was that he failed to present evidence that he was likely to prove that Defendants are not doing what they say they are doing in conducting executions under the current protocol. Of significance is that, unlike in the *Smith* proceedings, Defendants were now saying that they got the message that their actions must match their words. *Trust us*, Defendants said, *we will not deviate from the core components of the protocol*. This Court accepted that contention. *Trust us*, Defendants continued, *we will let only the Director decide whether to allow any potentially permissible deviation from the non-core components of the protocol*. This Court also accepted that statement. Unfortunately, Defendants once again fooled the Court.

On January 11, 2012, this Court issued an Opinion and Order granting Plaintiff Charles Lorraine's motion for a temporary restraining order staying his execution scheduled for January 18, 2012. *In re Ohio Execution Protocol Litig. (Lorraine)*, 840 F. Supp. 2d 1044. The Court identified three provisions of Ohio's execution policy from which the state had deviated during the November 15, 2011 execution of Brooks and emphasized that those deviations were

4

constitutionally impermissible because they "were not approved in the only manner in which

they could have been approved." *Id*. at 1053.  This Court explained that "the Director and only

the Director can approve non-core protocol deviations," which the Court held constituted a fifth

core component of the protocol.  *Id*.  The Court proceeded to criticize the state because it did not

appear from evidence presented during the Lorraine injunctive relief hearing that any of the three

Brooks deviations had been presented to the Director or that the state at any point thereafter had

recognized or corrected course.  Such deviation from the fifth core component of the protocol

problematically suggested that the remaining four core components were open to similar

disregard.  *Id.* ("It is thus not the individual non-core deviations themselves or in the aggregate

that lead to this Court's rejection of substantial compliance.  Rather, what is significant is the

overarching core concern implicated that makes the non-core deviations errors as opposed to

approved departures.").  Although the Court issued what can be fairly characterized as a stinging

rebuke of Ohio's continued failure to follow its own protocol, the Court made clear once again

that it had no interest in micro-managing Ohio's executions.  *Id*. at 1058.

The next plaintiff to seek a stay was Mark Wiles, an inmate who was set to be executed

on April 18, 2012.  During a March 2012 hearing, the following witnesses testified: Team

Member # 23, Team Member # 17, Ohio Department of Rehabilitation and Correction

("ODRC") Planning Section Chief Ron Erdos, Southern Ohio Correctional Facility ("SOCF")

Health Care Administrator Roseanna Clagg, Chillicothe Correctional Institution ("CCI") Health

Care Administrator Beth Ann Higginbotham, CCI attending physician Dr. Gary Krisher, SOCF

Deputy Warden of Operations Michel Oppy, Pharmacological expert Dr. Mark Dershwitz, SOCF

Deputy Warden of Special Services Anthony Cadogan, CCI Warden Norman Robinson, ODRC

Deputy Planning Section Chief James Goodman, ODRC Director Gary Mohr, Team Member #10, and SOCF Warden Donald Morgan.[4]  Wiles and Defendants each presented approximately one-hundred document-exhibits.  This Court then held an additional telephone conference with the parties on March 29, 2012, at which various evidentiary issues were resolved.

The hearing testimony presented post-Lorraine factual developments and indicated a substantial development in this litigation.  Director Mohr testified during the Wiles hearing that he was "upset" upon reading the Court's decision regarding Lorraine.  He explained that "[t]his is my 38th year, July 1st is my 38th year, and I have never read anything that was quite as negative about an operation that I have been responsible for . . . ."  (Wiles Hr'g Tr., Vol. VI, at 40.)  Several days later, according to Director Mohr, ODRC East Regional Director Edwin Voorhies and ODRC in-house counsel Greg Trout pitched to him the idea of implementing Incident Command System ("ICS") into Ohio's execution process.  As set forth in an ICS training document that Wiles submitted during the hearing and about which Planning Section Chief Ron Erdos testified:

> The ICS is a management system designed to enable effective and efficient domestic incident management by integrating a combination of facilities, equipment, personnel, procedures, and communications operating within a common organization structure, designed to enable effective and efficient domestic incident management. A basic premise of ICS is that it is widely applicable.  It is used to organize both near-term and long-term field-level operations for a broad spectrum of emergencies, from small to complex incidents, both natural and manmade.  ICS is used by all levels of government–Federal, State, local, and tribal–as well as by many private-sector and nongovernmental organizations.  ICS is also applicable across disciplines. It is normally structured to facilitate activities in five major function areas: command, operations, planning, logistics, and finance and administration.

---

[4]  By order of this Court and by continuing agreement of the parties, all references to Ohio's execution team members are once again by generic identifiers established by the parties and employed to address anonymity and safety concerns.

(Pl.'s Ex. 72.)

Director Mohr testified that he thought Regional Director Voorhies' suggestion of implementing ICS was a "great idea" because "[i]t is a uniform command system, which is exactly what this Judge is telling us that this Director better be doing to micromanage this process." (Wiles Hr'g Tr. Vol. VI, at 42.)  Director Mohr testified that Regional Director Voorhies spent the weekend putting together a proposal (Defs.' Ex. 45) that Director Mohr reviewed on Monday, January 16, 2012.  (Wiles Hr'g Tr. Vol. VI, at 42-43.)  Director Mohr testified that after discussing the proposal in-house with ODRC Assistant Director Stephen Huffman, SOCF Warden Donald Morgan, ODRC in-house counsel Greg Trout, and ODRC Planning Section Chief Ron Erdos, as well as with the Governor's legal counsel and staff, "[m]y decision was to implement ICS as a supporting part of the execution protocol."  (Wiles Hr'g Tr. Vol. VI, at 45.)

For purposes of implementing ICS into Ohio's execution process, it was decided early in the planning process for the Webb execution that the time period leading up to each execution would be divided into two operational periods.  The first operational period would start at 8:00 a.m. approximately thirty (30) days out from a scheduled execution date and conclude at 7:00 a.m. on the day preceding that scheduled execution date.  The second operational period would begin at 7:00 a.m. on the day preceding the scheduled execution date and conclude at 1:00 p.m. the next day.  Thus, by way of illustration, the Webb execution, deemed an incident in ICS terminology, was scheduled for February 22, 2012, at 10:00 a.m.  The first operational period began at 8:00 a.m. on January 23, 2012, and concluded at 7:00 a.m. on February 21, 2012.  (Wiles Hr'g Defs.' Ex. 4.)  The second operational period began at 7:00 a.m. on February 21,

2012, and concluded at 1:00 p.m. on February 22, 2012.  (Wiles Hr'g Defs.' Ex. 18.)

According to the testimony and evidence, each operational period has its own distinct organizational structure.  For each operational period of every execution, Director Mohr serves as the Incident Commander ("IC").  According to Director Mohr's testimony, this means that he would be "ultimately responsible for approving the objectives, approving the incident action plan and insuring that the resources are appropriate to carry out that incident action plan."  (Wiles Hr'g Tr. Vol. VI, at 46.)  Turning again to the incident Webb execution, the organizational structure was as follows: Director Mohr served as the IC.  His command staff consisted of Assistant Director Stephen Huffman serving as the Deputy IC; Melissa Adkins serving as the Recorder; JoEllen Smith serving as the Public Information Officer; and ODRC Chief Counsel Greg Trout serving as Safety Officer.  Beneath the IC and his command staff, there existed four sections: Operations, Planning, Finance, and Administration.  The latter two contained no personnel.  The Planning Section was headed by ODRC Special Operations Commander Ron Erdos serving as Planning Section Chief.

The Operations Section for the first operational period was headed by Regional Director Edwin Voorhies serving as Operations Section Chief.  Serving under Operations Section Chief Voorhies was SOCF Warden Donald Morgan, filling the role of the supervisor of all operations at SOCF for the first operational period.  Beneath Warden Morgan was Team Member # 10, the Execution Team Leader, serving as the execution team task force leader.  During the first operational period, the primary activities assigned to SOCF personnel are the carrying out of weekly execution rehearsals, as required by Section VI(B)(4) of Ohio's execution protocol with Team Member # 10 documenting among other matters attendance and absences, and reporting

8

the same to SOCF Warden Morgan.  Warden Morgan would in turn recount those matters in detail during weekly meetings involving the IC, the IC's command staff, SOCF personnel, and CCI personnel.

Also serving under Operations Section Chief Voorhies was CCI Warden Norm Robinson, filling the role of the supervisor of all operations at CCI for the first operational period.  Beneath Warden Robinson were Dr. Gary Krisher, serving as the Medical Team Task Force Leader, and Rebecca Casto, serving as the Mental Health Task Force Leader.  Eventually, a third task force was created called the Observation/Watch Task Force, with J. Netter serving as the Task Force Leader.  (Wiles Hr'g Defs.' Ex. 53, at 8.)  According to documents, the Observation/Watch team will be tasked with moving the inmate to a new housing assignment approximately 72 hours prior to the scheduled execution, maintaining constant watch over the inmate, and completing a constant watch log.  Dr. Krisher's task force consisted of Nurse Beth Ann Higginbotham, the CCI Health Care Administrator ("HCA").  Ms. Casto's task force included Dr. Jerome Gotthardt, CCI staff psychologist.  During the first operational period, Ohio's execution policy requires CCI personnel to perform a number of tasks, including but not limited to: providing notification of the confirmed execution date; performing specified hands-on vein and physical assessments, medical chart review, and mental health assessments, with each documented in the inmate's medical chart and any problems being reported immediate to the CCI Warden and SOCF Warden; and ensuring completion of the Execution Information Release form.

The first operational period was concluded by demobilization of the sections and units to which tasks had been assigned upon completion of those tasks.  Planning Section Chief Ron Erdos was responsible for Demobilization, which involved conducting debriefing sessions,

followed by the collection, review, and maintaining of documentation generated by the sections and units in completing their assigned tasks, followed finally by the "release" of the personnel. (Wiles Hr'g Defs.' Ex. 17.)[5]

For the second operational period of the incident Webb execution, the organization structure was as follows: Director Mohr served as the IC. His command staff consisted of Assistant Director Stephen Huffman serving as the Deputy IC; Captain William Cool serving as the Recorder; JoEllen Smith serving as the Public Information Officer; Regional Director Edwin Voorhies serving as Safety Officer; and Roseanna Clagg handling Prison Management. (Wiles Hr'g Defs.' Ex. 20, at 176.) Beneath the IC and his command staff, there existed four sections: Planning, Logistics, Operations, and Finance. The Finance Section contained no personnel. The Planning Section was headed by ODRC Special Operations Commander Ron Erdos serving as Planning Section Chief. James Goodman served as Deputy Planning Section Chief, while Charlie Miller and Brenda Purtee were assigned to the Situation Unit.

The Logistics Section was headed by SOCF Deputy Warden Anthony Cadogan serving as Logistics Section Chief. Under the service unit within the Logistics Section, Chuck Bobst headed the communications unit and Sean Taylor headed the employee/inmate support services unit.

The Operations Section for the second operational period was headed by SOCF Warden

_____

[5] During the early stages of implementing ICS into Ohio's execution process, the plan was to have three or four operational periods leading up to a scheduled execution. Ultimately the state decided that there would be only two operational periods: the first capturing approximately thirty days preceding a scheduled execution and the second consisting of approximately twenty-four hours preceding and following that scheduled execution. (Wiles Hr'g Tr. Vol. II, at 210-11.)

Donald Morgan serving as Operations Section Chief.  SOCF Deputy Warden Michel Oppy served as the Deputy Operations Section Chief.  The Operations Section contained several divisions that were staffed with personnel.  Team Member # 10, the Execution Team Leader, served as the Task Force leader for the Execution Strike Force/Task Force.  His division included Team Member # 11.  Jay Debold served as the Task Force leader for Transport. SOCF's Health Care Administrator, Rosie Clagg, served as the Medical Task Force Leader. Team Member # 23 served as the Task Force Leader for the medical team members of the execution team.  Finally, Mike Williams served as the Mental Health Task Force Leader.

The initial step that Director Mohr took to implement ICS into the execution process consisted of a planning meeting that took place on January 19, 2012.  (Defs.' Ex. 3, at 234.) According to Director Mohr, "we didn't have a lot of time."  (Wiles Hr'g Tr. Vol. VI, at 45.)  As Director Mohr explained, with the execution of Michael Webb scheduled for February 22, 2012, "we scheduled a planning meeting to launch this [ICS] process with the Webb execution."  (*Id.* at 46.)  The January 19, 2012 planning meeting included via telephonic conference the IC's Command Staff, CCI personnel, and SOCF personnel.  From this point on, meetings were conducted no less than once per week.  At *every* meeting, according to testimony, whether it is a planning meeting or a status briefing, Director Mohr has emphasized his expectation of strict compliance with Ohio's execution policy, his expectation that no one, including himself, could deviate or authorize a deviation from the four core components listed on page 3 of the protocol, and his expectation that no one could deviate or authorize a protocol deviation from any non-core component without Director Mohr's approval.  Only the Director can approve a non-core deviation.

11

Implementing ICS into Ohio's execution process involved (and will continue to involve) the following procedures.  Turning again to the Webb execution by way of illustration, Planning Section Chief Ron Erdos began the process by developing a Formal Written Incident Action Plan and obtaining the IC's approval of that plan.  (Wiles Hr'g Defs.' Exhs. 4 and 5.)  The documents he prepared included a form called the ICS 202 identifying objectives for the incident.  Those objectives were to prepare for the humane execution of Inmate Michael Webb and to conduct appropriate medical and mental health evaluations and reviews no later than 21 days before the scheduled deadline for those tasks, January 31, 2012.  (Wiles Hr'g Defs.' Ex. 5.)  Erdos also prepared a form called the ICS 203 listing the organization summary for the first operational period, a form called the ICS 205 setting forth the communication plan, and a form called the ICS 206 setting forth the medical plan.  Task Force members received their assignments on forms called ICS 204's.  (Wiles Hr'g Defs.' Ex. 7.)  Each section's activities were documented on forms called ICS 214 Unit Logs.  (Wiles Hr'g Defs.' Exhs. 10, 11, 12, 13, 14.)  Section and Division chiefs communicated with each other, as well as to the IC and command staff, using forms called ICS 213's, documenting their progress on assigned tasks.  (Wiles Hr'g Defs.' Exhs. 15 and 16.)

Returning to the initial planning meeting that took place on January 19, 2012, Director Mohr explained that the immediate focus turned to certain tasks that the protocol required to be carried out thirty (30) days prior to the scheduled execution date–namely, CCI Warden Robinson providing notification to the IC, as well as numerous other parties identified in Section VI.(B)(1) of the protocol, of a "firm date" for the scheduled execution of an inmate and the CCI staff moving the inmate to 30-day watch status for purposes of ensuring the inmate's safety.

Attention focused also on the tasks that the protocol required to be carried out no later than twenty-one (21) days in advance of a scheduled execution.  According to Director Mohr:

> [T]he physical hands-on vein assessment, the medical chart review and assessment, and the mental health assessment are to be done within 21 days.  So, we talked about completion of those three to four days in advance of that 21-day period, which would mark our next status briefing at that point to insure that we had an update to confirm that those were done and documentation to support the fact that they were done.

(Wiles Hr'g Tr. Vol. VI, at 61.)  The planning and preparation process for the incident Webb execution also included conducting and documenting the execution team's weekly rehearsals at SOCF–specifically, one per week for four weeks preceding the scheduled execution date.  (Wiles Hr'g Tr. Vol. VI, at 62-63; Wiles Hr'g Defs.' Ex. 1, at 6.)

Next in the process was a status briefing on January 23, 2012, at which time Director Mohr approved the written incident action plan for the first operational period of the incident Webb execution.  (Wiles Hr'g Tr. Vol. VI, at 64.)  On that same date, CCI Warden Robinson provided the 30-day notification required by 01-COM-11 and advised the IC of the same via an ICS 213 form.  (Wiles Hr'g Defs.' Ex. 1, at 5; Wiles Hr'g Tr. Vol. VI, at 66-67; Wiles Hr'g Defs.' Ex. 16, at 294.)  The following day, January 24, 2012, CCI Warden Robinson sent another ICS 213 form notifying the IC that appropriate CCI personnel had completed all of the assessments and documentation required by the policy–several days in advance of the 21-day deadline, as the IC and Warden Robinson had discussed at the initial planning meeting.  However, because CCI had completed those tasks before they had actually received their ICS 204's specifying their assigned tasks, Director Mohr directed them to re-do all of those tasks *after* they received their 204's.  (Wiles Hr'g Tr. Vol. VI, at 69.)

Before CCI could re-do those tasks, this Court issued a January 26, 2012 stay of the

execution of Michael Webb, which Defendants did not oppose.  Instead of aborting the process

and planning for the next scheduled execution, Director Mohr decided to continue the process

for Webb as if the execution were still scheduled to be carried out on February 22, 2012.  Of that

decision, Director Mohr explained:

> Everyone involved in this process, including this Director, needed to be trained and needed additional exposure and training as we were, one, insuring that we were compliant with the policy, and two, continuing to get used to some of the supporting documents like the checklist, and three, with incident command being made available as a supporting protocol, we all needed practice.

(Wiles Hr'g Tr. Vol. VI, at 55.)

Proceeding with the incident Webb execution as a training exercise, CCI re-did the

assessments and documentation required by the protocol to be completed no later than 21 days in

advance of the scheduled execution.  (Wiles Hr'g Defs.' Ex. 16, at 300.)  Because the incident

had become a training exercise, the CCI personnel simulated those tasks rather than performing

them again on an inmate who no longer had an imminent execution date.  (Wiles Hr'g Tr. Vol.

IV, at 184, 189; Wiles Hr'g Tr. Vol. VI, at 70.)  Similarly, all of the resulting documentation

included notations clearly reflecting that they were a part of "training."  (Wiles Hr'g Defs.' Ex.

16, at 302-04.)  One of the last tasks that the protocol requires CCI, or the "parent institution," to

carry out consists of the warden of the parent institution ensuring that the condemned inmate

completes an "Execution Information Release"–a form ODRC 1808.  (Wiles Hr'g Defs.' Ex. 1,

at 7.)  CCI Warden Robinson sent an ICS 213 message on February 14, 2012, indicating that

CCI had completed that task.  (Wiles Hr'g Defs.' Ex. 14, at 279.)

Weekly meetings continued, with status briefings held on January 27, 2012, February 1,

2012, and February 7, 2012.  Whenever possible, status briefings were conducted immediately

preceding the execution rehearsals.  As Director Mohr explained, "it exposes more people, number one, and two, any direction that may come out can be conveyed to the entire team, any of that information, just enhanced communication."  (Wiles Hr'g Tr. Vol. VI, at 75.)  Thus, Director Mohr participated in many of the status briefings from SOCF in Lucasville, Ohio, rather than the central office in Columbus, Ohio.  Another status briefing and rehearsal were conducted on February 15, 2012.  That status briefing, according to Director Mohr, included the closing of "the Chillicothe loop" because CCI had completed all tasks that Ohio's execution policy required them to complete.  (Wiles Hr'g Tr. Vol. VI, at 76.)

The next step that occurred in the incident Webb execution training exercise was a planning meeting on February 17, 2012, to launch the second operational period that would commence on February 21, 2012, at approximately 7:00 a.m.  (Wiles Hr'g Tr. Vol. VI, at 77-78; Wiles Hr'g Defs.' Exhs. 18-23.)  During that meeting, Planning Section Chief Ron Erdos presented a written incident action plan that he had developed and that Director Mohr had approved.  Director Mohr emphasized as he did at every meeting his expectations of strict compliance with the protocol.  Everyone proceeded to discuss in detail the events that would take place at SOCF for the two days comprising the second operational period–February 21 and February 22, 2012.  (Wiles Hr'g Tr. Vol. VI, at 81.)  Further, Director Mohr approved several changes, the first of which consisted of moving Deputy Warden Oppy, who was serving as Warden Morgan's back-up or "shadow," from the Command Center to the Death House for execution rehearsals and actual executions.  The second change involved restricting Team Member # 21 from participating in the February 22, 2012 rehearsal, due to the fact that contractual issues had prohibited Team Member # 21–a medical team member–from

15

participating in the weekly rehearsals leading up to the February 22, 2012 execution training exercise.  Finally, Director Mohr approved a "procedural change" in the manner in which the execution drugs would be transported from the SOCF infirmary in one building to the Death House, which was a separate building.  Director Mohr explained an intention to have the pharmacist deliver the execution drugs from the SOCF safe to Heath Care Administrator Clagg in the SOCF infirmary.  Clagg would then turn those drugs over to the drug administrator assigned with the task of actually administering the drugs for the execution, witnessed by a second drug administrator, while still in the SOCF infirmary.  Those two drug administrators and Nurse Clagg would then walk the execution drugs from the SOCF infirmary to the Death House. Previously, Clagg alone had transported the execution drugs from the infirmary to the Death House.

Testimony and evidence established that the execution rehearsal scheduled for February 22, 2012, would be not just a training session or rehearsal, but a "full-scale scenario."  Full-scale scenarios are intended to be as close to the real incident as possible.  Thus, whereas execution rehearsals typically commence with the SOCF Warden reading the Death Warrant to the condemned inmate-actor at the cell front in the Death House, the full-scale scenario for the Webb execution training exercise included such simulated tasks as the transport of Webb from CCI to SOCF on the morning of February 21, 2012, the assessments of Webb following his arrival at SOCF, and the transport of the drugs from the SOCF infirmary to the Death House. The full-scale scenario for the Webb execution training exercise also included such actual tasks as conducting a confirmed information briefing and transporting the execution drugs from the infirmary to the Death House, albeit without using any actual drugs.  Testimony and evidence

16

established that two execution run-throughs occurred on February 22, 2012, with the first being

the full-scale scenario involving the "Plan A" intravenous administration of drugs (Wiles Hr'g

Defs.' Ex. 1, at 13-14) that concluded with the simulation of a funeral director taking possession

of the inmate's body, and a second more informal run-through during which the team practiced

the"Plan B" intramuscular administration of drugs (Wiles Hr'g Defs.' Ex. 1, at 10, 14-15).

The February 22, 2012 Webb execution training exercise concluded with a debriefing and

after action review.  (Wiles Hr'g Defs.' Ex. 44, at 197.)  SOCF Warden Morgan subsequently

sent to Director Mohr an After-Action Review report dated February 28, 2012.  (Wiles Hr'g

Defs.' Ex. 48.)  In an email from Director Mohr to SOCF Warden Morgan dated March 1, 2012,

Director Mohr stated that he accepted Warden Morgan's February 28, 2012 report with the

exception of two points.  As Director Mohr set forth:

> 1. Please include in your After Action Report the Confirmed Information Briefing held prior to the commencement of the execution procedure at which time I confirmed that the elements contained in the policy had been completed, reviewed and approved.  This planned meeting that is to take place prior to the commencement of each execution and become a regular step in our protocol and confirmed in our after action report.
>
> 2. A security challenge was introduced prior to the rehearsal for Webb directing the Drug Administration Task Force Team Leader #23 not to call into the command center to report the drug preparation.  In fact, at the completion of the drugs being prepared, Drug Administrator #17 noticed that the Task Force Leader #23 did not report as he should and advised the Team Leader that the task had occurred and that it should be reported to the Command Center.  The Team Leader called the preparation of the drugs to the Command Center.  Please revise the After Action Report to reflect that I approved the variation in reporting the drug administrator's preparation of the drugs as a result of the security challenge, that the Team Leader called it in at the direction of Drug Administrator #17 and that the team leader communication is approved by the Director.

(Wiles Hr'g Defs.' Ex. 49, at 1.)  SOCF Warden Morgan accordingly submitted a revised After-

Action Review report dated March 6, 2012.  (Wiles Hr'g Defs.' Ex. 50.)

Testimony and evidence established that all involved personnel, from the IC and his command staff, to the CCI personnel, to the SOCF personnel, currently were within the first operational period preceding the Mark Wiles execution scheduled for 10:00 a.m. on April 18, 2012.  The IC and Planning Section Chief conducted a planning meeting on Friday, March 16, 2012, involving all personnel from the command staff, CCI, and SOCF.  The IC and Planning Section Chief introduced a written incident action plan which the IC subsequently approved on March 16, 2012, at 12:30 p.m.  (Wiles Hr'g Defs.' Ex. 53, at 1.)  The planning meeting covered the incident objectives, the organizational summary list, the ICS 204 task force assignment lists, the communications plan, and the medical plan.  (Wiles Hr'g Defs.' Ex. 53, at 1-15.)  All involved personnel then participated in a status briefing the following Monday–March 19, 2012–at which time they gauged their progress on completion of tasks required by the protocol and assigned to task force members in the ICS 204 forms.

The first operational period for the Wiles execution thus began on March 19, 2012, and concluded on April 17, 2012.  Testimony and evidence established that certain tasks required by Ohio's execution policy leading up to the April 18, 2012 execution date had been completed.  At SOCF, the execution team had been conducting the weekly rehearsals required in Section VI(B)(4). of the execution policy.  (Wiles Hr'g Defs.' Ex. 1, at 6.)

CCI Warden Norm Robinson, approximately 30 days prior to the scheduled execution, notified Director Mohr that a firm date–April 18, 2012–is scheduled for inmate Mark Wiles' execution.  (Wiles Hr'g Defs.' Ex. 1, at 5.)  CCI Warden Robinson sent a copy of that notification to Planning Section Chief Ron Erdos, who subsequently sent notification to the

Regional Director, DRC Chief Counsel, Assistant Director, APA, Ohio State Highway Patrol

(Portsmouth and Jackson), and the Office of Victim Services. Following an "impromptu

telephone conference" on Friday March 23, 2012, involving the IC, Erdos, Robinson and others,

CCI Warden Robinson subsequently sent the notification again to the Regional Director, DRC

Chief Counsel, Assistant Director, APA, Ohio State Highway Patrol (Portsmouth and Jackson),

and the Office of Victim Services. Further, the hands-on vein assessment, medical chart review

and physical assessment, and the mental health assessment had been conducted at CCI, with

documentation of the same indicated in Wiles medical chart and no problems detected that might

have posed a problem carrying out the execution or require contingency plans. (Wiles Hr'g

Defs.' Ex. 1, at 5.)

Based on the foregoing record and in light of the constitutional concerns involved, yet

remaining cognizant of Ohio's long history of conducting bizarrely inept execution proceedings,

the Court with some skeptical trepidation denied Wiles' motion for a stay. (ECF Nos. 107, 108.)

Much to the credit of the state actors involved, Ohio proceeded to execute Wiles without

constitutional infirmity.

The month following that execution, Abdul Awkal and John Eley, two other plaintiffs,

also sought to stay their respective executions. (ECF No. 111.) This Court denied these stay

requests on the grounds that both men had failed to plead the claims upon which they dubiously

relied in pursuing injunctive relief. (ECF No. 116.) Awkal and Eley unsuccessfully sought

reconsideration of the denial. (ECF No. 120.) Ohio ultimately declined to carry out these

inmates' scheduled executions.

The next execution actually carried out involved Donald Palmer. Although not a party to

19

this litigation, Palmer had lodged a motion to intervene with this Court shortly before his execution date in the event that issues arose that would prompt him to seek a stay. (ECF No. 123.) Palmer did not pursue a stay, however, and Ohio executed him on September 20, 2012. (ECF No. 125.)

The next inmate set for execution, Brett Hartman, did seek a stay. (ECF No. 130.) Following a hearing on November 1, 2012, this Court concluded that "Ohio does not have a perfect execution system, but it has a constitutional system that it appears to be following." *In re Ohio Execution Protocol Litigation (Hartman)*, 906 F. Supp. 2d 759 (S.D. Ohio 2012) Accordingly, the Court denied Hartman's motion for a stay of execution and on November 13, 2012, the State of Ohio executed Hartman.

The State of Ohio next intended to execute Ronald Post on January 16, 2013. Post filed a November 19, 2012 motion requesting a stay of his execution. (ECF No. 139.) On December 17, 2012, days before the Court was set to conduct a hearing on Post's motion, Ohio Governor John Kasich commuted Post's death sentence to life in prison without parole. (ECF No. 149.) Post died in prison seven months later.

The next inmate set for execution, Frederick Treesh, was a plaintiff in this litigation but did not seek a stay of execution. The State of Ohio executed him on March 6, 2013.

Steven Smith was the next inmate set for execution. Although a plaintiff in this litigation, Smith also did not request a stay of execution. The State of Ohio executed him on May 1, 2013.

The next inmate scheduled for execution, Billy Slagle, was scheduled to be executed on August 7, 2013. Slagle was a plaintiff in this litigation but did not request a stay of execution.

Instead, Slagle committed suicide in his prison cell at approximately 5:00 a.m. on August 4, 2013–three days before he was to be executed and one hour before he was to fall under constant observation by ODRC personnel.

The next inmate set for execution, Harry Mitts, Jr., was a plaintiff in this litigation but did not seek a stay of execution.  The State of Ohio executed him on September 25, 2013.

It is important to note that Ohio apparently accomplished all of these executions without problems of the sort that had periodically plagued the execution process.  Much to their credit, Defendants were apparently following the protocol and accomplishing their tasks without running afoul of constitutional concerns.

Ohio's supply of pentobarbital then expired.  Presumably as a result, Ohio issued a new version of its execution policy, 01-COM-11, with an effective date of October 10, 2013.  (ECF No. 323.)  That protocol largely mirrors the protocol dated September 18, 2011, but also presents several notable changes, including but not limited to the following.  First, the new written protocol now includes a fifth core requirement–namely an express provision of what previously had been an implicit understanding that only the Director can authorize a variation from the procedures in the policy but not a variation from the other four core requirements.  (*Id*. at Page ID 9570.)  Another related change is that the new protocol now expressly provides that "Director," as used in the policy, refers to the current Director *or* the Director's designee.  (*Id*. at Page ID 9569.)  The new policy thus makes clear that the Director's designee has the authority to perform all of the duties and functions that the policy authorizes the Director to perform.  Another notable change in the new policy now permits ODRC to obtain execution drugs from a compounding facility.  (*Id*. at Page ID 9574-75, 9578.)  Finally, the new policy for the first time

21

allows ODRC to carry out an execution with an *intravenous* administration of midazolam and hydromorphone, in the event that a sufficient quantity of pentobarbital is not available.  (*Id*. at Page ID 9575.)

The first inmate who is set for execution under the new protocol is Ronald Phillips, who has an execution scheduled for November 14, 2013.  Phillips challenges application of the new protocol via his Second Amended Complaint (ECF No. 357), and he seeks to stay his execution via a motion for a stay of execution, a temporary restraining order, and a preliminary injunction (ECF No. 339).  Following the filing of that motion, this Court held an informal preliminary telephone conference with the parties on October 29, 2013, pursuant to S. D. Ohio Civ. R. 65.1(a).  (ECF No. 341.)  That conference resulted in an oral hearing that took place beginning on November 1, 2012, and concluding on November 4, 2013.  In addition to oral argument, the Court heard testimony from Team Member # 17, Phillips, Director Mohr, Morgan, Casto, Dr. Faisal Ahmed, Higginbotham, prisons suicide expert Lindsey Hayes, and Voorhies that covered the first operational phase for Phillips, the events surrounding the Slagle suicide and investigation, and related occurrences.  At the conclusion of the evidentiary hearing, this Court took the matter under advisement.

## II.  Injunctive Relief

### A. Standard Involved

In considering whether injunctive relief staying Phillips' execution is warranted, this Court must consider (1) whether Phillips has demonstrated a strong likelihood of success on the merits; (2) whether Phillips will suffer irreparable injury in the absence of equitable relief; (3) whether a stay would cause substantial harm to others; and (4) whether the public interest is best

served by granting a stay.  *Cooey v. Strickland*, 589 F.3d 210, 218 (6th Cir. 2009) (citing *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007); *Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)).  The Sixth Circuit has explained that " '[t]hese factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together.' "  *Id.* (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)).

### B.  Scope of Inquiry

"Are you lying now or were you lying then?"

Defendants' counsel began his November 4, 2013 closing argument with this question, which he stated was inapplicable to the inquiry this Court must undertake in regard to Phillips' motion for a stay.  Phillips disagrees, targeting recent testimony and other evidence with often conflicting prior testimony and other evidence.  The entire premise underlying Phillips' stay request is that Defendants cannot be trusted to implement Ohio's protocol in a constitutional way; in fact, Phillips argues, the new protocol is inherently unconstitutional.  But although both sides agree that the stay request essentially comes down to an issue of trust, the cases they presented at the hearing often could not have been more unrelated.  At times it seemed as if Defendants were defending against an entirely different case than the one Phillips was pursuing, which too often resulted in unnecessary argument and testimony on wholly irrelevant issues.  Thus, as a threshold concern, this Court must note what is and what is not before the Court today.  This is necessary for at least three global reasons.

First, review of Phillips' motion alone would almost invariably mislead anyone conducting such an inquiry into thinking that Phillips' stay request involves claims and

23

arguments that either the circumstances of the plan for executing Phillips have mooted or that Phillips has elected not to pursue.  Phillips filed his motion approximately thirty minutes after Defendants had filed a notice indicating that they would be utilizing intravenous administration of midazolam and hydromorphone to execute Phillips.  (ECF No. 338.)  Counsel for Phillips had therefore devoted considerable time and pages to arguing points that the notice rendered irrelevant.  Rather than delay proceedings by taking time to re-draft the motion, counsel understandably proceeded to file the document with the last-minute addition of a footnote recognizing the timing issue and suggesting that not all of the motion was relevant.  During the course of the hearing, Phillips then narrowed the scope of his arguments for a stay based on the clarified circumstances provided by the notice and in light of the evidence presented.

Second, anyone who watched the entirety of the Phillips' stay hearing or who reviews the hearing transcript would perhaps be confused by the lack of focus that pervaded much of the proceedings.  As suggested above, the parties–particularly Defendants–presented hours of testimony on issues that had become moot or that Phillips' motion never raised in the first place.  Some of this might have been the result of Defendants thinking that they had to build a fuller record on ICS in case Phillips' execution makes its way to the court of appeals, despite the fact that this Court's prior decisions fully addressed ICS and the fact that Phillips' arguments only reached a portion of that system.  Much of Defendants' litigation strategy escapes this Court.

Third, this Court wants to be clear in what it is and what it is not addressing herein so that no party misunderstands the limitations of today's Opinion and Order.

Not at issue is whether Ohio can execute Phillips.  The state can, provided it does so in a constitutional manner.  Therefore, today's Opinion and Order cannot be concerned with the

underlying circumstances of Phillips' horrific crime or the settled issue of whether his death sentence is just.

Today's decision is also largely not about the Eighth Amendment.  Phillips' stipulation during his hearing that he was withdrawing his pursuit of relief under the Eighth Amendment in regard to midazolam and hydromorphone removed from the discussion inquiries about the use and effects of these drugs, the intravenous administration of these drugs, and how Ohio obtained these drugs.  Several points accompany this conclusion.

Phillips' argument that Ohio has changed its position on the potential use of expired or imported drugs is largely inconsequential to his motion.  Previously in a precursor case to the captioned action, this Court addressed another inmate's challenge to the potential use of expired or imported drugs.  The Court explained:

> Testimony and other evidence pointed to the fact that unexpired drugs remain in the prison safe.  Pharmacy manager Denise Dean explained that these drugs remained in the safe at least in part in case there was a need to prove that Ohio still had the expired drugs and had not used them in an execution.  There is no evidence that Ohio has used expired drugs as part of an execution, and the Court accepts Mohr's testimony that Ohio will not use expired drugs even if the written protocol does not explicitly preclude such action.
>
> This last portion of testimony is another unwritten practice or policy that serves to supplement the written protocol, and Ohio is now bound by the representation its agent has made to this Court. The same applies to Mohr's representation that Ohio will not use imported drugs.  Granted, Mohr testified that there were no unwritten policies that were part of the execution policy, but this subjective assessment turns on perhaps a different use of terminology than that applied by this Court.  Mohr also testified that the use of expired drugs is "unconscionable" to him and would fly in the face of every policy behind the protocol.  Numerous instances of state practices described herein qualify as such unwritten policies to this Court, some of which aid Defendants.  Whether Mohr labels them unwritten policies is not important.  What matters is that Ohio follows them and that they serve the interests of constitutionality, not detract from these interests.

25

In light of the fact that the issue of Ohio's past use of expired drugs has been laid to rest and the binding concession presented to this Court, it would make sense for Ohio to promptly destroy the expired drugs and wholly obviate the risk that human error in recordkeeping or action will render this drugs of future concern in this or similar litigation.

*Cooey (Brooks) v. Kasich*, Nos. 2:04-cv-1156, 2:09-cv-242, 2:09-cv-823, 2:10-cv-27, 2011 WL 5326141, at *8-9 (S.D. Ohio Nov. 4, 2011).  The referenced prior testimony by Director Mohr is notable because he testified at the Phillips hearing that he did not know whether he had ever testified that Ohio would not use expired or imported drugs or that the Court held as such.  The forgotten or abandoned representations also do not square with a recent discovery response by Director Mohr in which he apparently opens the door to the use of expired or imported drugs.

Voorhies has also testified in the past regarding expired or imported drugs.  In the Opinion and Order related to Kenneth Smith's stay request, this Court summarized Voorhies' hearing testimony on these issues as follows:

> Questioning then turned to the procedures Ohio has employed to obtain sodium thiopental for executions.  Voorhies pointed to Defendants' Exhibit A as giving a warden knowledge of his authority to obtain the execution drug.  He explained the procurement process and its paperwork and then turned to the fact that Ohio had considered and rejected various alternatives for obtaining additional drugs. One such avenue was using imported drugs due to the concern that the drugs would lack FDA approval.  He also testified that Ohio had also rejected the option of compounding drugs or using expired drugs that had been given an extended expiration date.

*Cooey (Smith) v. Kasich*, 801 F. Supp. 2d 623, 640-41 (S.D. Ohio 2011).  Voorhies' understanding of Ohio's position thus aligned with Director Mohr's now-forgotten understanding.

Phillips argues that the conflicting evidence is significant because it *perhaps* indicates a

26

newfound willingness by Ohio to use expired or imported drugs.[6]  Implicit in this possibility is the debate over whether the effectiveness of such categories of drugs presents a substantial risk of severe pain issue that would constitute a cruel and unusual punishment infirmity.  But that is a potential issue that falls under the Eighth Amendment, and, as such, remains an issue for another day and in all likelihood for another inmate.

The only part of the apparent change in position that is relevant to today's equal protection inquiry is that, according to Phillips, it represents yet another example of Defendants telling this Court one thing and later backtracking on the representation.  Director Mohr's testimony thus only speaks to Phillips' cumulative mistrust argument, which the Court shall discuss below.

This same conclusion applies to the issue of compounding.  The new protocol expressly recognizes compounding as viable.  This represents a departure from Voorhies' *Smith* hearing testimony that Ohio had rejected the option of using compounded drugs.  As with most of the issues discussed in this section, the Court cannot say that the change matters absent evidence in the record explaining how and why it affects any constitutional concern.  There is no such evidence before this Court.  But any potential issue as to whether compounding presents a substantial risk of severe pain is an Eighth Amendment issue that falls outside today's equal protection inquiry.  Only the fact that Ohio has changed its mind in regard to compounding is relevant to that Fourteenth Amendment inquiry as discussed below.

_____

[6] There is little reason to believe that expired drugs have been or will be used.  If Ohio has indeed changed its position, the change has not been communicated to a key member of the medical team.  Team Member # 17, who has participated in the prior thirty-odd executions, denied in his testimony that he has or ever would use expired drugs.

27

Similarly outside the scope of the relevant analysis is any possible lack of training or instruction on the intravenous administration of midazolam and hydromorphone (but not rehearsals, because there have been such specific rehearsals). Director Mohr testified that he had received training on these drugs. Other testimony indicated that because the recent change permitting the intravenous administration of the two drugs together fell after this year's annual training cycle, the execution team had received little to no training or instruction on possible issues surrounding this method of execution. Team Member # 17 testified in fact that there had been no instruction on whether the drugs would work when administered in this manner, as opposed to the training he had received on use of these drugs in a Plan B intramuscular injection, but that he expected that death would result in anywhere from one to thirty minutes after intravenous administration. These may or may not ultimately prove to be matters of concern, but they directly target Eighth Amendment concerns and not the equal protection issues currently before the Court. The only indirect relevance of any lack of training or instruction is the inference Phillips suggests, which is that Ohio is not doing what it says it would do by providing proper and sufficient training. The additional inference Phillips asks the Court to draw from that inference is that if Defendants are not to be trusted in this regard, they are not to be trusted overall. This Court shall discuss any viable application of such inferences to today's equal protection inquiry in Section II(C)(2) below.

The last point warranting mention is how Phillips' stipulation places outside today's inquiry at least one component of his argument that the evaluations that the protocol requires he undergo were insufficient. Section VI(B)(3)(a) of the protocol provides for a medical evaluation of the inmate who is to be executed approximately twenty-one days prior to the execution. This

28

evaluation includes a hands-on vein assessment and a review of the inmate's medical chart, or file, to identify any unique factors that may impact the manner of execution.  Similarly, Section VI(B)(3)(e) of the protocol provides for a mental health evaluation of the inmate approximately twenty-one days prior to the execution.  This evaluation targets any mental issues that could affect the execution process.  Finally, Section VI(B)(3)(f) of the protocol provides for one or more evaluations of the inmate by mental health staff beginning approximately thirty days from the execution and lasting until the inmate's transfer from death row to SOCF.  This section targets the appropriate observation level for an inmate, the appropriate housing status, and the appropriate level of access to personal property.

Phillips attacks the sufficiency of the evaluations that occurred, even asserting that the mental health evaluations had never taken place.  In their closing argument, Defendants asserted that because there had been no expert testimony, Phillips could not complain about the sufficiency of the evaluations but could instead complain only about when they were done.  This is of course a ridiculous argument.  The more rational and narrow point is that because of his stipulation, Phillips cannot complain about the sufficiency of the evaluations for Eighth Amendment purposes as they relate to the intravenous administration of  midazolam and hydromorphone.

To the extent that it can be said that Phillips challenges the sufficiency of the physical, chart history, and mental health evaluations for Eighth Amendment purposes *not* in relation to the specific  intravenous administration of midazolam and hydromorphone, Phillips' drug-centered stipulation arguably does not reach such an issue.  This in turn means that a component of an Eighth Amendment argument remains as a potential basis for a stay.  What remains is that

29

if a failure to conduct the required evaluations leads to a substantial risk of severe pain that arises independent of the execution drugs used, Phillips may be entitled to a stay on Eighth Amendment grounds.

He is not.  Phillips presents a litany of issues in regard to his evaluations that fails to persuade.  For example, he asserts that there was an insufficient vein assessment.  Both Ahmed and Higginbotham testified that they fulfilled their protocol-derived duties and found useful veins, and the evaluation records agree with both of them.  Phillips disputes their version of the events and in fact asserts that Ahmed expressly stated that he could not find useful veins. Phillips then attacked the evaluators' credibility with evidence that during the time that they have been performing the required vein assessments, they have never found a problem with any inmate's veins.

The Court found Ahmed to be largely truthful and unnecessarily combative in his testimony.  In contrast, this Court found Phillips to be somewhat believable and not at all combative in his testimony.  Based on the testimony given and in light of Higginbotham's testimony and the documentary exhibits, the Court does not credit the testimony that Ahmed was unable to find suitable veins and documented otherwise.  There is no evidence that the evaluation records were falsified or that Higginbotham missed hearing Ahmed express an inability to find viable veins.  But even if all of that is true, there is still the forthcoming vein assessments of Phillips that would mitigate any risk of vein difficulty he might face.  This is not to say that any evaluation is unimportant or that any individual conducting an evaluation can do less than what is required by the protocol.  Rather, the Court is simply recognizing that even one hypothetically flawed assessment does not necessarily amount to an Eighth Amendment issue, and there is no

dispositive evidence of such a flawed assessment here.

Phillips next complains that there is no record of his having expressed a fear of needles. The Court is not certain whether he expressed such a fear, but assuming *arguendo* that he did, there is no evidence in this record that it would create a substantial risk of harm so as to present an Eighth Amendment violation.  At most, any failure to record this fear in the evaluation records is yet another component of Phillips' Ohio-cannot-be-trusted argument that speaks to his equal protection issues.

The Court is notably concerned about Ahmed's perception of the purpose and scope of the chart or file review.  Phillips argues that Ahmed's review was flawed because it failed to account for Risperdal, an anti-psychotic drug that Phillips previously took.  Ahmed remained adamant in his testimony that he did not err by failing to disclose this drug in his chart review. He testified that the mental health evaluation should address prior use of the drug, and review of the exhibits indicates that the 30-day mental health assessment did note that Phillips was taking Risperdal in 1996.

It appears Ahmed is in need of retraining so that he understands that the chart review is concerned with more than simply vein access issues.  It also appears that his narrow interpretation of the chart review is ultimately of no importance in the Eighth Amendment context here.  Phillips' stipulation removed any interaction concerns that even the present day use of the anti-psychotic drug in conjunction with the execution drugs would present, much less use from nearly a decade ago.  There is also no testimony as to how the prior or even current use of the anti-psychotic drug could otherwise create a substantial risk of severe pain regardless of the execution drugs utilized.

31

Similarly, there is no evidence of any mental issue that coupled with an insufficient mental health evaluation would present an Eighth Amendment problem.  This of course does not excuse any flawed mental assessment, but it does mitigate the constitutional importance of any such assessment here.

Two final points need to be made.  The first is specific to the mental health evaluation(s) required under Section VI(B)(3)(f) of the protocol.  This Court is convinced that Phillips and his counsel are misreading this protocol provision.  The crux of many of counsel's questions and argument on behalf of Phillips was that Defendants erred because they transferred him from one cell to another without satisfying a demonstrated mental health need for the move obtained through a Section VI(B)(3)(f) evaluation.  But that provision of the protocol states that "the prisoner shall be evaluated by mental health staff to determine the prisoner's appropriate observation level, housing status and access to personal property."  Nothing in that directive limits a transfer to a Section VI(B)(3)(f) evaluation.  Rather, prison management can transfer an inmate for a good reason, a bad reason, or no reason wholly independent of Section VI(B)(3)(f).  The protocol provision simply mandates that there be an assessment to determine whether any of three specified statuses or conditions should change due to a mental health reason.  This renders moot Phillips' curious focus and arguments concerning why he was previously transferred, and it obviates any Eighth Amendment or Fourteenth Amendment concerns related to that transfer.

The last point in need of mention is broader and pertains to the overlapping nature of many of the arguments that Phillips makes.  This Court is at times convinced that Phillips is sloppily conflating Eighth Amendment issues and evidence with Fourteenth Amendment issues and evidence.  At other times the separate analyses necessarily overlap given that they can

depend on evidence that informs both inquiries.  Parsing the former from the latter is not

necessary here, because the Court has given Phillips the benefit of the doubt whenever possible.

Consequently, the Court recognizes that Phillips' attack on the sufficiency of the evaluations can

be construed broadly to encompass another component of his equal protection argument.  The

reasoning would be that if Defendants did not perform the required evaluations or performed

them less effectively than required by the protocol, then this amounts to one more example of

why Defendants cannot be trusted.  As with the various dual purpose arguments noted above, the

Court shall also address this argument in Section II(C)(2) below.

### C.  Equal Protection

#### 1.  *Applicable Law*

Aside from the possible Eighth Amendment issue discussed in Section II(B) and from

Phillips' invocation of the All Writs Act addressed in Section III, Phillips' stay request is

predicated on his Equal Protection claim under 42 U.S.C. § 1983.  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State . . . subjects, or causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be liable to the
> party injured in an action at law, suit in equity, or other proper proceeding for redress
> . . . .

42 U.S.C. § 1983.  Thus, in order to prevail on his § 1983 claim, Phillips must show that, while

acting under color of state law, Defendants deprived or will deprive him of a right secured by the

Federal Constitution or laws of the United States.  *See Alkire v. Irving*, 330 F.3d 802, 813 (6th

Cir. 2003).

Similar to Wiles and Hartman before him, Phillips pleads that Defendants' wholly

discretionary approach to their written execution protocol and their informal policies violates his

33

right to equal protection under the law as guaranteed by the Fourteenth Amendment. He contends that the protocol is facially invalid because it codifies disparate treatment of similarly situated individuals without sufficient justification so as to be arbitrary, irrational, and capricious.

As this Court has noted previously, the Sixth Circuit has explained the inquiry such an argument necessitates:

> "The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws.' U.S. Const. amend. XIV, § 1. The Supreme Court has stated that this language 'embodies the general rule that States must treat like cases alike but may treat unlike cases accordingly.' " *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005) (quoting *Vacco*, 521 U.S. at 799, 117 S.Ct. 2293). To establish a claim for relief under the Equal Protection Clause, a plaintiff must demonstrate that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis. *Id.; see also TriHealth, Inc.*, 430 F.3d at 788.

*Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 298 (6th Cir. 2006). When the disparate treatment burdens a fundamental right, strict scrutiny applies. *Miller v. City of Cincinnati*, 622 F.3d 524, 538 (6th Cir. 2010). What this means is that the state action is permissible only if it is narrowly tailored to a compelling governmental interest. *Cf. Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007).

One fundamental right involved in inmate claims such as that asserted by Phillips is the right to be free from cruel and unusual punishment. Throughout this litigation, Defendants have attempted to transform the Fourteenth Amendment claim into a pure Eighth Amendment claim. But as this Court has previously explained, the equal protection claim sufficiently targets any deviations that would at least burden an inmate's fundamental rights. The burden could be by

34

negating some of the precise procedural safeguards that this Court and the Sixth Circuit heralded in prior discussions of Eighth Amendment claims in this same litigation.  For present purposes, it does not matter whether there is a qualifying substantial risk of severe harm, but only the creation of unequal treatment impacting the fundamental protection involved.  This Court remains reluctant to hold that there can only be an equal protection violation when there is an Eighth Amendment violation.

There is relatively little authority in regard to the burden on a fundamental right that would warrant strict scrutiny here.  The Ninth Circuit addressed a § 1983 equal protection claim that implicated similar analysis in *Towery v. Brewer*, 672 F.3d 650 (9th Cir. 2012).  After rejecting the argument that the state execution protocol at issue violated the Eighth Amendment prohibition on cruel and unusual punishment–a protocol that affords significantly more discretion than Ohio's protocol does–that court of appeals explained:

> As we have already determined, the protocol as it will be implemented for [plaintiffs'] executions does not violate their right under the Eighth Amendment to be free from cruel and unusual punishment.  Where there is no Eighth Amendment violation, the district court ruled, that necessarily means that there has been no interference with fundamental rights sufficient to trigger strict scrutiny under the Equal Protection Clause.  *See Mass. Bd. of Ret. v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).  We do not need to adopt this broad proposition to conclude that given the ways the Director has chosen to exercise his discretion in the upcoming executions, there has been no showing here of any burden on the right to be free of cruel and unusual punishment.

*Id.* at *8.  Thus, the Ninth Circuit expressly declined to adopt the proposition that "burdens a fundamental right" means nothing less than a full violation of the fundamental right.

The Ninth Circuit explained:

> [Plaintiffs] argue otherwise, relying on *Bush v. Gore,* 531 U.S. 98, 105, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).  Urging that there is a distinction between state action that *violates* a fundamental right and state action that merely *burdens* a

35

fundamental right, they proffer that the latter was sufficient to trigger strict scrutiny in *Bush* and should also be here.

The right to vote, however, " 'can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.' " *Id.* (quoting *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)). A prisoner's right to be free of cruel and unusual punishment, in contrast, is not affected simply because that prisoner is treated less favorably than another, where one means of execution is no more likely to create a risk of cruel and unusual punishment than the other, and both are constitutionally available. Treating one similarly situated prisoner differently from another with regard to punishment does not inherently impact the right to be free of cruel and unusual punishment (although it might for other reasons violate the Equal Protection Clause).

That is not to say that there could not be exercises of discretion that do burden the right to be free of cruel and unusual punishment. The contrast with the litigation surrounding Ohio's lethal injection protocol, invoked by [plaintiffs] in support of their fundamental rights Equal Protection argument, is instructive. In those cases, plaintiffs were able to show an actual pattern of treating prisoners differently in ways that did affect the *risk* of pain to which they would be subjected, and therefore the *risk* of being subjected to cruel and unusual punishment. *See In re Ohio Execution Protocol Litig.,* ——F.Supp.2d ——, ——, 2012 WL 84548, at *9 (S.D.Ohio Jan. 11, 2012), *motion to vacate stay denied,* —— F.3d at —— (6th Cir.2012). Here, no such showing has been made, either generally or with respect to the planned application of the protocol to [plaintiffs'] executions. The fundamental rights prong of Equal Protection analysis therefore cannot apply.

*Id.* This analysis continues to be instructive.

The prior deviations upon which various plaintiffs in this litigation previously focused often were "more likely to create a risk of cruel and unusual punishment" than an execution without the deviations and "did affect the *risk* of pain to which they would be subjected, and therefore the *risk* of being subjected to cruel and unusual punishment." *Id.* Many of the non-core deviations eliminated the procedural safeguards upon which the Sixth Circuit and this Court have expressly relied in the past in concluding that Ohio's execution procedures survived Eighth Amendment scrutiny. And the practice of core deviations that arose once again in *Lorraine*

36

undercuts the purported inability of Ohio to deviate from core deviations, pointing to at least a burden on the fundamental right involved if not outright disregard of that right.

To require an Eighth Amendment violation would suggest a narrow perspective that transforms the Equal Protection Clause into nothing more than a redundant backdoor route to the Eighth Amendment. *Cf. Special Programs, Inc. v. Courter*, 923 F. Supp. 851, 855-56 (E.D. Va. 1996) (explaining that "it is mere impingement upon, not impermissible interference with, the exercise of a fundamental right that triggers strict scrutiny").

Most significantly, the Sixth Circuit's express reliance on this Court's prior equal protection analysis points to partial if not full agreement with this Court's rationale. *See In re Ohio Execution Protocol Litig.*, 671 F.3d 601, 602 (6th Cir. 2012).

Even if this Court is incorrect and no fundamental right is burdened here, however, there is still the possibility of rational basis review. Like other plaintiffs, Phillips also asserts that he is a class of one subject to treatment that burdens his fundamental rights in a manner that is not rationally related in any way to a legitimate state interest. It is well settled that "the Supreme Court has recognized that a 'class-of-one' may bring an equal protection claim where the plaintiff alleges that: (1) he or 'she has been intentionally treated differently from others similarly situated'; and (2) 'there is no rational basis for the difference in treatment.' " *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011) (quoting *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000)).

This Court has more than once noted its increasing concern about the vitality of a class-of-one claim in this context; there are issues surrounding the first prong of the test. The Ninth Circuit's discussion of such a claim in *Towery* perhaps provides some guidance, with the court of

37

appeals explaining that

> [a]bsent any pattern of generally exercising the discretion in a particular manner while treating one individual differently *and* detrimentally, there is no basis for Equal Protection scrutiny under the class-of-one theory.  In other words, the existence of discretion, standing alone, cannot be an Equal Protection violation.  At the very least, there must be some respect in which the discretion is being exercised so that the complaining individual is being treated less favorably than others generally are.

*Towery*, 672 F.3d at 660-61.  Discretion alone is therefore not a problem, but the exercise of that discretion in a detrimental manner would suggest a possible class-of-one claim.

Discretion has long been at issue in this litigation.  Sometimes deviations occur and no one can explain why or how they happened, as this Court has discussed numerous times in prior orders.  Sometimes deviations are intentional, as in the failed execution of Rommell Broom when Defendants introduced a doctor into the execution proceedings who was not a member of the execution team (a direct violation of the protocol) and who promptly attempted to start an IV site only to hit the inmate's ankle bone in the process before the doctor fled from the room (and from a protocol violation that resulted in the infliction of pain by someone who was not supposed to even be in the building, much less an *ad hoc* member of the execution team).

Broom was certainly treated intentionally differently than other inmates.  Bringing in an unhelpful doctor to assist was in violation of the protocol, and the result was the imposition of pain caused by someone who should not have even been in the Death House under the version of the protocol then in effect.  The pattern of such deviations that past executions have revealed does not render an inmate's class-of-one claim ridiculous under this first prong.

The Sixth Circuit has explained the remaining prong of the class-of-one inquiry as follows:

> Under the rational basis test, courts will not overturn government action "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (internal quotation marks and citation omitted).  There are two ways that a "class-of-one" plaintiff may demonstrate that a government action lacks a rational basis: (1) showing pure arbitrariness by negativing every conceivable basis that might support the government's decision; or (2) showing an illegitimate motive such as animus or ill will.  *Warren v. City of Athens, Ohio,* 411 F.3d 697, 711 (6th Cir. 2005).

*Green*, 654 F.3d at 651-52.  Here, evidence has revealed a consistent pattern of arbitrary deviations from the protocol.  The only real explanation for this pattern is that Ohio was, at times, trying to end an inmate's life under any procedure that might accomplish the task.  Such a reason cannot suffice because it exists in every execution, as well as in every scenario in which a rational basis test would apply: there is always an ultimate goal.  Some of the deviations with which this Court has dealt have failed to present a rational relationship to a legitimate state interest.

Notably, the Ninth Circuit did not outright reject a class-of-one claim in *Towery*.  Rather, the court of appeals explained that under the specific circumstances presented, the claim was not viable:

> Even if we were to subject the protocol's grant of discretion to the Director to rational basis review, it would survive our consideration.  It is rational for ADC to conclude that the Director is best situated to select the execution team from those available who meet the criteria listed in the protocol (assuming those criteria do not themselves create a risk of harm greater than that tolerable under the Eighth Amendment), or to decide that the Director should be the one to select which of the four possible drug sequences to use, or to assign to the Director and the IV Team Leader the task of selecting which IV site to use.  It is entirely rational for these determinations to be made on a case-by-case basis, as they may well depend on individualized and changing factors such as the availability of particular people to participate in the execution, the supply of drugs available to the State at a given time, and the condition of the prisoner's veins.  The Equal Protection claim, *as framed*

*here*, cannot succeed on the merits.

*Towery*, 672 F.3d at 661 (emphasis added).

Against this legal landscape, Phillips points to Ohio's pattern of prior unintentional and intentional deviations and argues that the state actors involved in carrying out Ohio's protocol neither understand the protocol requirements nor are able or willing to fulfill their roles under the execution procedures. Similar to Wiles and Hartman before him, Phillips argues that the demonstrated pattern of deviations that this litigation has so often addressed evinces a continuing unwillingness or inability of Defendants to adhere to equal application of the protocol. In contrast to these other plaintiffs, Phillips now adds to this argument the new protocol changes and the evidence that Defendants have apparently once again changed their positions.

### 2. Likelihood of Success

"Can Ohio now be trusted?"

This Court began its Opinion and Order on the stay request of Mark Wiles with this question. *In re Ohio Execution Protocol Litigation (Wiles)*, 868 F. Supp. 2d 625, 626 (S.D. Ohio 2012). Now, just over nineteen months later, the question remains the dispositive issue in this litigation.

Phillips argues that because Defendants cannot be trusted to apply the protocol as it is written and in accordance with the unwritten, supportive policies and practices that they have communicated to this Court throughout this litigation, he has a strong likelihood of succeeding on his equal protection claim. To support this premise, Phillips offers two global arguments.

The first argument is that Defendants have either backpedaled on or previously deceived

40

this Court regarding the fifth of the core components of the protocol from which there can be no deviation.  As noted, the addition of this component into the written protocol was a change; previously, the fifth core component was an unwritten policy extrinsic to the actual document. This policy became in Section V of the new protocol the requirement that "[o]nly the Director can authorize a variation from the procedures states in this policy but not a variation from the four requirements listed immediately above in subsection V.1.2.3. and 4. of this policy."  Section V of the protocol also states that "[a]ny variations of a substantial nature must be approved by the Director as described in this policy."  Section IV of the protocol in turn provides that "[a]s used in the policy, the term 'Director' refers to the current Director of the Ohio Department of Rehabilitation and Correction or the Director's designee."

Phillips pounces on the fact that the protocol does not define "designee" and argues that it could be a warden, any ODRC employee, or even anyone off the street.  Moreover, Phillips reasons, the possibility of a designee acting in Director Mohr's place or in conjunction with Director Mohr introduces an impermissible variation from the fifth core element that all deviations flow up the chain of command to Director Mohr and Director Mohr only.  In making this argument, Phillips either willfully or accidently misses two points.

First, the testimony of Director Mohr and his designee, Voorhies, establish that the qualified designee will act only when Director Mohr is unable to perform his command duties. The testimony also establishes that if both Director Mohr and Voorhies are unavailable, a reprieve from the Governor will be sought.  This unwritten policy, like so many of the unwritten practices and policies that have existed in this litigation, serves to support, define, and limit the written protocol provisions.  Ohio: Do not vary from this procedure.  The delegation route is

finite and should not be pushed to find its limits.

Second, there is no constitutional requirement that only Director Mohr can serve as the ultimate decisionmaker.  Rather, the constitutional concern is equal protection, which simply precludes arbitrary application of the protocol.  It is important not to lose the forest amid the trees.  The goal here is a constitutional execution process.  One method of satisfying that goal, of preventing arbitrary deviations from the protocol, that has evolved throughout this litigation is to have substantial changes flow to a single decisionmaker, who happens to be Director Mohr.  The Director position is simply a tool, and the means should not become the ends.  Thus, no one particular individual is indispensable so that his or her being replaced by someone of the same qualifications punctures the protocol's constitutionality.  Such a result would be nonsensical.

No such nonsensical framework has ever invariably existed in this litigation, despite the terms in which this Court accepted expression of the fifth component.  In previously describing this component, the Court stated:

> By the evidence presented at the *Brooks* testimony, Defendants presented this Court with what amounts to a fifth core component of the protocol: the Director and only the Director can approve non-core protocol deviations.  This rule provides a coherence and equality to the protocol that, given the testimony in the Brooks hearing, would otherwise be lacking.

*In re Ohio Execution Protocol Litig. (Lorraine)*, 840 F. Supp. 2d 1044, 1053-54 (S.D. Ohio 2012).  After summarizing the equal protection landscape, the Court later stated:

> Within this context, Defendants represented to this Court in the Brooks proceedings two fundamental precepts.  One was that Ohio would not and in fact could not deviate from the core protocol provisions set forth in Section IV of the protocol.  The other precept was that all non-core protocol deviations are permissible, but only if they are approved by the Director.

42

*Id.* at 1055.  *See also id.* at 1056 ("This practice, or the second Brooks precept, is that Ohio has told this Court that a fifth non-variable component of the protocol is that only the Director can approve non-core deviations.").  These on-their-face absolute statements of solidification of authority in one *particular* individual must be read and understood in the context in which they were made.

This context teaches that it is not that the Director is critical, but that *one decisionmaker who was embodied by the Director* is critical.  The distinction is important and recognizes the context in which the fifth core component grew out of necessity.  This Court has addressed these origins several times, with the most recent being the Hartman Opinion and Order discussion:

> Of greater concern to this Court is whether the state actors involved understand what constitutes a core deviation and a non-core deviation.  Some subordinate actors previously displayed confusion over this issue, and some previously displayed a dubious understanding of whether past executions presented deviations.  But everyone understands that every change flows to Mohr in his role as Incident Commander.  This finding necessitates making two points.

> The first point is that the evidence again does not rise to the level required for the Court to accept the contention that the past confusion invariably presents unconstitutionality.  For example, Wiles argued that if the state actors involved do not understand what the protocol requires, then logic dictates that they cannot recognize when there is a deviation (regardless of its core versus non-core nature).  He posited that unrecognized deviations are unlikely to flow up the chain of command as the protocol requires and as ICS is meant to ensure.  The logical leap in this reasoning is that it presumed solitary actors who are not subject to constant and consistent corrective review.

> An execution participant such as a doer may not recognize when he or she engages in a deviation of any nature, but an effectively implemented ICS system subjects that individual and the process to accountability by continual review.  Reporting of task-oriented actions flows upward, and the regular reviews that often include a plethora of checklists and other documentation presents a system of checks and balances in which a potential misstep is likely to be recognized even when the actor whose actions will constitute or have constituted a deviation is unaware of the deviation.  To obtain a stay on his lack-of-understanding argument, Hartman has the

43

burden of establishing sufficiently that evidence of select confusion by various actors presents a substantial likelihood of a constitutional violation.  The evidence did not rise to this level for Wiles, and the same evidence does not satisfy the requisite threshold for Hartman.  Nor, as discussed below, does Hartman's new evidence provide what he needs.

*In re Ohio Execution Protocol Litig. (Hartman)*, 906 F. Supp. 2d 759, 780 (S.D. Ohio 2012).

*See also In re Ohio Execution Protocol Litig. (Wiles)*, 868 F. Supp. 2d 625, 642-43 (S.D. Ohio 2012).

The point is this: Ohio had blown it by treating protocol provisions as discretionary and not mandatory, and when some individuals involved in the process were clearly confused as to what was and what was not a permissible deviation, Ohio salvaged its protocol by placing in one decisionmaker responsibility for making the deviation decisions.  Defendants told this Court that this decisionmaker was the Director, and this Court accepted that representation and, in light of Director Mohr's testimony, found that the constitutional concerns were addressed.  This did not forever lock Ohio into a rigid system in which *only* the Director could perform that function.

There is some question as to whether use of a designee has always been contemplated.  Morgan testified, for example, that he has always had the understanding, even before the new protocol, that the Director has always had a designee.  For purposes of Phillips' equal protection challenge, it does not matter whether reliance on a designee was always possible under this Court's prior decisions or whether Defendants have effectuated a reasonable and rational change to provide a useful contingency plan in the event of Director Mohr's absence.  What matters is that deviations still flow upward to a single individual who can apply the protocol in a manner that passes constitutional muster.  The protection against ill-informed decisionmakers remains even with the addition of the designee language to the definition of Director, and the safeguard

against arbitrary application of the protocol remains in place.  There is now a formalized chain-of-command succession plan that sensibly if not necessarily provides for a backup.

Given the recognized but unwritten limitations on the implementation of the designee provision, which mean that only one qualified individual can serve as the designee and only in the inability of Director Mohr to act in the capacity as the controlling decisionmaker, this is if anything a laudable modification of the written protocol.  The Court shall discuss such innovation more fully below.

The second global equal protection argument that Phillips makes is that Defendants cannot be trusted because they routinely fail to do what they say they are going to do.  Perhaps the easiest analogy to this argument is the concept of cumulative error, which the Sixth Circuit has explained means in the criminal context that " '[t]he cumulative effect of errors that are harmless by themselves can be so prejudicial so as to warrant a new trial.' "  *United States v. Adams*, 722 F.3d 788, 832 (6th Cir. 2013) (quoting *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012)).

Here, while pointing to numerous asserted instances of intentional or unintentional impropriety as individually damning, Phillips also makes the overarching contention that even if the Court regards these issues as failing to reach constitutional magnitude in isolation, their cumulative effect presents a trust issue so pervasive that it establishes a constitutional infirmity.  In other words, Phillips presents a laundry list of alleged problems in an effort to convince this Court that a large enough list warrants a stay.  The alleged deviations presented to this Court today are qualitatively different than the cumulative problems addressed in prior decisions.

Phillips' "if there is smoke, there must be fire" approach is a smokescreen to mask a

dearth of dispositive evidence. To support his approach, Phillips asserts that the protocol is tainted by falsified records. He points to the falsified records of patrols uncovered in the state's investigation into the suicide of Billy Slagle. He points to the records of the vein assessment by Ahmed, who he asserts documented finding suitable veins while in fact finding none. He points to the records of the vein assessment by Higginbotham, who he asserts failed to document his professed fear of needles. And he points to the documentation of various mental health evaluations and disputes that they reflect what actually took place. But to paraphrase his own counsel's closing argument, this is sound and fury signifying nothing of constitutional consequence.

There is no question that two corrections officers falsified logs in order to indicate incorrectly that they had made assigned rounds when responsible for monitoring Slagle. They did not complete the rounds assigned to them under post orders, which are orders that direct the official duties of any individual in an assigned job in Ohio's correctional facilities. Director Mohr testified that post orders are not part of the protocol and that a failure to comply with such orders is therefore not a violation of the protocol. This is largely correct. Nowhere in the written protocol or in an any unwritten policy or practice presented to this Court is there any incorporation of post orders. The necessary qualification on Director Mohr's testimony is that in a particular instance, it *may* indeed be true that a specific post order and a protocol directive are the same so that a violation of a post order is also a violation of the protocol, but there is no basis for concluding that the violation of any post order is necessarily a violation of the protocol.

The violation of the post order related to Slagle is not a violation of the protocol here. When Slagle committed suicide, he was in the first operational phase of the execution scheme.

46

He was roughly an hour from falling under specific practices that might have hindered his plans–a fact of which he was apparently well aware–and he apparently acted when he did because the protocol was soon to close his window of opportunity.  The post orders violated in relation to the misconduct involved do not overlap with protocol directives.  There thus was no violation of the protocol.

Nor does the Slagle falsification issue serve to taint the entirety of ODRC.  It warrants mentioning that although then-existing redundancies did not prevent the falsifications, the falsification *was* caught by redundancies (even before additional safeguards that ODRC has put in place following the revelation of incidents of falsification) and that the falsifications were disclosed to the public, Phillips, and this Court.  This is hardly indicative of an organizational conspiracy to hide facts and falsify paperwork.  There has been no evidence presented that the violation of the post orders was anything more than the individualized misconduct of lousy employees as opposed to evidence of institutional policy or systemic practices.  It would be illogical and unfair to attribute to Defendants the bad acts of individuals outside of the protocol.

Also unpersuasive is the contention that any error in protocol-related recordkeeping is intentional falsification.  There is no convincing evidence to support such a proposition, even assuming *arguendo* that the evaluation paperwork fails to contain statements.  Additionally, this Court has already explained that a mere paperwork error does not necessarily rise to the level of a constitutional issue:

> What this litigation is about is the Constitution conferring rights on inmates that Ohio must honor.  It is not strictly about paperwork, even if paperwork has often served as a best indicator of practices that inform constitutional conduct and misconduct.  In other words, the fact that Clagg adopts an ICS form as her representation after verifying compliance with a protocol provision that protects a

47

> constitutional right is not just acceptable but laudable.  Similarly, Hartman's attempts
> to elevate particular ICS forms to serve more than their function conflates required
> actions and required documentation with supporting paperwork when neither the
> protocol nor the Constitution assign ICS forms such value.

*In re Ohio Execution Protocol Litig. (Hartman)*, 906 F. Supp. 2d 759, 791 (S.D. Ohio 2012).

Therefore, when Phillips, not unlike other plaintiffs before him, tries to elevate non-protocol

requirements and paperwork into protocol violations, he pursues an approach that this Court has

previously conclusively rejected.

Taken in isolation, none of the foregoing proves dispositive in Phillips' favor.  This Court

understands that is in fact partially Phillips' overarching point.  The core of Phillips' argument is

that Defendants will violate his equal protection rights because they cannot be trusted to do what

they say they will do, with the best evidence of this being the consistent pattern of inconsistency

that Defendants' cumulative changes of position, errors, omissions, and failures present.

Nothing alone may necessarily be a problem, Phillips posits, but taken together there is a

pervasive pattern that violates the Constitution.

Here is why that argument fails to persuade: The Constitution requires that protocol

practices satisfy protections and concerns that remain unchanging, but changes to protocol

practices do not necessarily conflict with those protections and concerns.  An equally true

conclusion is that not all errors are of constitutional significance.

Ohio had a constitutional protocol that Defendants were finally administering in a

constitutional manner.  Then circumstances changed, most notably the need to have execution

drugs amid a landscape in which select drugs exist in insufficient quantities or have otherwise

become unavailable.  In response, Ohio changed its protocol.  Some of the changes target the

drug issue, while other changes tweak the protocol in various ways or simply make express what was imputed.  The changes do not invariably result in the new protocol being unconstitutional.  Rather, it is presumptively constitutional until proven otherwise.

It is important to recognize that even when the changes affect parts of the protocol practices that helped an older version of the protocol satisfy constitutional concerns, the changes may result in no qualitative difference or may even be for the better.  Common sense teaches that context-free adherence to an acceptable protocol in the face of changed circumstances or the realization of even better practices would hinder improvement and could result in a protocol that becomes unconstitutional as time passes.  Change is therefore not only prudent, but also often necessary to continue to afford those condemned to death the humane executions the Constitution requires.

The Court fully understands why Philips and other plaintiffs and their counsel do not trust Defendants.  Some plaintiffs, and especially this Court, have been burnt by Defendants before.  More often than not, the conduct underlying the disreputable acts involved has been the result of inexplicable carelessness if not downright incompetence.  But the equal protection issue before this Court does not turn on focusing on only past failures.  Instead, it requires the context that comes with considering those past events alongside the practices of today and what Defendants ask this Court to trust will be their conduct tomorrow.

This brings the discussion back to the central question with which this Court began its merits discussion: "Can Ohio now be trusted?"  Perhaps Voorhies provided the most relevant approach to this issue when, in asked whether he trusts the individual actors who are part of the complex protocol operations, he said, "I trust, but I trust and verify."

49

With admitted caution, the Court has trusted Ohio since the *Wiles* hearing.  Various plaintiffs, including Phillips, have held the state to the verification that accompanies the trust that Defendants have earned.  Having now heard testimony intended to verify–or not–whether Defendants should indeed be trusted under the new protocol and its related practices, this Court again concludes that "Ohio does not have a perfect execution system, but it has a constitutional system that it appears to be following"–or, more specifically, that it is following in regard to the particular issues pursued by Phillips.  *In re Ohio Execution Protocol Litig. (Hartman)*, 906 F. Supp. 2d 759, 791 (S.D. Ohio 2012).

This is not to say that the question of the new protocol's constitutional propriety is conclusively resolved.  The Court is not without potential concerns regarding some of the choices that Ohio has apparently made or is contemplating making in its execution plans.  But these concerns relate to issues that either do not involve Phillips or that he has elected not to pursue.  Those issues will likely become the focus of another proceeding involving another inmate.

Based on the specific arguments that Phillips has made, however, he has failed to persuade this Court that Ohio cannot be trusted, which means that he has failed to persuade the Court that he is substantially likely to prevail on the merits of his claims.  Accordingly, the first factor weighs against granting injunctive relief.

### 3. Irreparable Injury, Substantial Harm to Others, and the Public Interest

The Sixth Circuit has explained that in regard to the issue of whether injunctive relief should stay an execution date, "the absence of any meaningful chance of success on the merits suffices to resolve this matter."  *Workman*, 486 F.3d at 911.  Because this Court has concluded

that the first factor weighs against injunctive relief, the Court need not and does not discuss the remaining factors.

### III.  All Writs Act

Similar to other plaintiffs throughout this litigation, Phillips argues that he is entitled to a stay of execution under the All Writs Act.  Both this Court and the Sixth Circuit have rejected such application of the Act.  *See Cooey (Biros) v. Strickland*, 589 F.3d 210, 234 (6th Cir. 2004).

### IV.  Conclusion

The Court **DENIES** Phillips' motion for a stay of execution.  (ECF No. 339.)  As in prior decisions, this Court does not conclusively hold here that Ohio's method of execution practices are constitutional or unconstitutional.  Today's decision only recognizes that based on all of the record evidence, Phillips has not met his burden of persuading the Court that he is substantially likely to prove unconstitutionality and prevail in this litigation.

**IT IS SO ORDERED.**

   /s/   Gregory L. Frost                
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE