UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: OHIO EXECUTION
PROTOCOL LITIGATION          Case No. 2:11-cv-1016
                                    JUDGE GREGORY L. FROST
                                    Magistrate Judge Michael R. Merz

This document relates to: All Plaintiffs.

**OPINION AND ORDER**

This matter is before the Court for consideration of the following filings:

(1) Defendants' motion for a protective order (ECF No. 530), Plaintiffs' memorandum in opposition (ECF No. 532), Defendants' reply memorandum (ECF No. 535), Plaintiffs' written closing arguments (ECF No. 549), and Defendants' written closing arguments (ECF No. 550);

(2) Plaintiffs' motion to exclude the testimony and declaration of J. Lawrence Cunningham (ECF No. 536) and Defendants' memorandum in opposition (ECF No. 544); and

(3) Defendants' motion to exclude the testimony and declaration of Randy P. Juhl (ECF No. 542).

For the reasons that follows, the Court **GRANTS** Defendants' motion for a protective order (ECF No. 530), **DENIES** Plaintiffs' motion to exclude the testimony and declaration of J. Lawrence Cunningham (ECF No. 536), and **DENIES** Defendants' motion to exclude the testimony and declaration of Randy P. Juhl (ECF No. 542).[1]

---

[1] Defendants had also previously filed a motion for judicial notice (ECF No. 541), which this Court orally denied at the beginning of the September 25, 2015 oral argument on the motion for a protective order. (ECF No. 548, at Page ID # 15094.) This Opinion and Order memorializes that decision.

## I. Discussion

### A. Standard Involved

Federal Rule of Civil Procedure 26(c)(1) provides that "[a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . ." Fed. R. Civ. P. 26(c)(1). The rule also provides that "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." *Id.* The Sixth Circuit Court of Appeals "has endorsed the view that to justify a protective order, one of Rule 26(c)(1)'s enumerated harms 'must be illustrated with a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.'" *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012) (quoting *Nemir v. Mitsubishi Motors Corp.*, 381 F.3d 540, 550 (6th Cir. 2004) (additional internal quotation marks omitted)). Thus, a party seeking a protective order must specify one of the harms listed in Rule 26(c)(1) to warrant issuance of such an order. *Id.*

### B. Analysis

The briefing before this Court presents a relatively straightforward issue: whether Defendants should have to disclose the identities of persons and entities needed to acquire execution drugs and related materials. Defendants argue that nondisclosure is imperative because, without it, they will not be able to obtain the drugs, materials, and testing necessary to carry out a lawful execution. This is because, according to Defendants, persons and entities who do not have anonymity would be subjecting themselves to risk of harassment, harm, or similar undesirable consequences that would chill if not preclude their willingness to supply the drugs or related assistance. Plaintiffs in turn argue that disclosure of the identities is directly relevant to

many if not all of their claims and is particularly critical to challenging the use of compounded drugs.  Specifically, Plaintiffs argue, if they cannot discover the source of the drugs, they cannot mount a meaningful challenge to a compounded drug's use.

As has often been the case in this enduring litigation, the parties have presented this issue as a battle of the experts.  On one side, Defendants offer the opinion evidence of security and threat assessment expert J. Lawrence Cunningham, who has found that a substantial risk of threats or harassment exists absent confidentiality.  On the other side, Plaintiffs offer the opinion evidence of security and threat assessment expert Thomas R. Parker, who has found that there is not a substantial risk of threats or harassment absent confidentiality.  Plaintiffs also offer the testimony of retired professor and pharmacist Randy P. Juhl, who offered his interpretation on federal and state laws as they relate to execution drugs and the asserted illegality of compounding pharmacists filling orders for such drugs, and of Sister Helen Prejean, who offered opinion testimony as an opponent of the death penalty and who opined on the beliefs and conduct of those involved in that movement.

All of these witnesses were only somewhat helpful.  The Court finds Cunningham perhaps more persuasive than Parker, although Parker placed much of Cunningham's testimony into a different context.  For the most part, these individuals cancelled one another out, leaving some of the evidence upon which they relied perhaps the most persuasive material for this Court.  Juhl was informative in some respects but presents an unusual view that the government itself has made executions by lethal injection impossible, a minority view that once again fails to persuade this Court.  Given the notably limited weight to be afforded these witnesses, the Court is inclined to dispose of the parties' attempt to strike testimony on *Daubert* concerns in the same

3

manner it was when it read the parties' motions, which is to say much ado about nothing. The parties devoted briefing to support striking or permitting evidence from several of the opinion witnesses, but the parties' arguments go more to the weight to be afforded the testimony and declarations then to the admissibility of the same. Given this fact and the ultimately limited value of the targeted testimony and evidence, extended discussion of the briefing would be unproductive. This Court **DENIES** the unnecessary motions to exclude. (ECF No. 536, 542.)

Although all the witnesses who were asked agree that there has not been a single known threat against a compounding pharmacy that might supply drugs to Ohio, their conclusions vary wildly. What the Court takes from all of the testimony involved is that some of Defendants' assertions of burdens or prejudice connected to disclosure are largely speculative or conclusory, if not outright hyperbolic. But the testimony also persuades the Court that this much is true: disclosure of the information sought indeed presents a tangible burden on Defendants and would be unduly prejudicial.

One of Plaintiffs' own witnesses, death penalty opponent Sister Helen Prejean, testified that she was not aware of any death penalty opponent who would use violence to advance his or her goals against the death penalty. She later stated that she had never met or experienced an opponent of the death penalty who was willing to use violence on any moral issue. In other testimony, however, Sister Prejean stated that "there will always be some extremist groups that take a beautiful principle of religion like pro life or loyalty and love of God and translate it in an extremist, violent way. You will find that it any group." (ECF No. 548, at Page ID # 15157.) After drawing a distinction between the extremists and those who share the same core opposition to the death penalty in a non-violent way, she testified that "[i]t will always be a mixed bag of

4

how people interpret and do things using the same label." (*Id.*)

The mere possibility of a fringe group of extremists does not invariably translate into a burden or prejudice sufficient to warrant issuance of a protective order. It is nonetheless some evidence that cannot be reasonably disregarded. Such a possibility then took a more concrete form during the oral argument in the form of Hearing Exhibit M.

That exhibit, which is an email sent to an Oklahoma compounding pharmacy by a citizen, evinces an undeniable (and perhaps even faith-based) risk to pharmacies or compounders, including the personnel that work at such entities. The exhibit reads:

> Your site says nothing about pentobarbitol. Do you compound it for the state of Missouri's department of corrections, as has been publicly alleged in an [Associated Press] story that ran this morning, and if so, now that the story has gone public, do you think that is prudent? Seems to me that manufacturing a drug expressly to kill people flies in the face of one of those commandments Moses got from Jehovah on Sinai, but maybe I'm just being old-fashioned. Still, were I you I'd at least want to beef up my security not that you've been put in the spotlight as a likely supplier and failed to issue a flat denial. As the folks at the federal building can tell you, it only takes one fanatic with a truckload of fertilizer to make a real dent in business as usual. In your place, I'd either swear to the nation that my company didn't make execution drugs of ANY sort, and then make dang sure that's true, or else openly accept the burden of putting my employees and myself at unacceptable (and possibly uninsurable) risk. Just sayin'.

(Defs. Hrg. Ex. M.) On its face, this email presents a reasonable inference, if not an express declaration, of a threat or intimidation. If the question is whether a reasonable pharmacy owner or compounder would feel burdened by receiving such an email, the answer is likely if not certainly yes. And by burdened this Court means likely scared to the point of electing not to help Ohio in the state's lawful quest to kill.

It would obviously have been more helpful to this Court if Defendants had presented evidence from pharmacy owners or compounders, for example, that these individuals or the

entities involved would not work with Ohio to enable the execution process knowing of this email or if they suspected that they would receive one like it.  But such evidence is unlikely because if pharmacy owners or compounders testified to such a position, they would be presenting the inference that, with nondisclosure guaranteed, they *would* assist Ohio.  Absent a guarantee that such testimony would be protected from disclosure, those who would fear recrimination would likely elect not to testify.

Without such testimony, the Court is left with two considerations.  One is the fact that Defendants have submitted to this Court a privilege log that indicates the existence of persons who have applied for statutory protection from disclosure.  The existence of such confidentiality rights applications informs the question of whether there are actually entities that likely do not want their identities disclosed and answers whether Defendants' concerns are wholly speculative.  The Court reaches such a qualified inference because some entities might apply for protection even if they might assist Ohio even if confidentiality were not obtained.  At the least, the Court accepts that there are entities with an interest in assisting Ohio and an interest in securing confidentiality.

The second core consideration is that, if an email such as the Oklahoma email (or the threat of such an email) would produce the likely result of necessary entities being scared to the point of electing not to help Ohio's execution endeavors, then Defendants have demonstrated the existence of a burden or prejudice that the discovery sought would cause.  Plaintiffs argue that the email is of little evidentiary value because there is no evidence that it was intended as a threat and, in fact, there is some evidence supporting that it was not so intended.  They note, for example, that the author of the email included his name, that he does not know anything about

6

making bombs, and that he allegedly intended the email to be a note of concern. But unlike Plaintiffs, a pharmacist is unlikely to have the benefits of a hired investigator to discover all of this. Actual intent is therefore not dispositive of the parties' debate, however, when apparent intent can provide the chilling effect on suppliers and others that Defendants seek to avoid. If a relevant person or entity would be frightened by such an email, regardless of how it was actually intended, then it simply does not matter whether the email's author intended to be frightening. The end result can be the same.

Plaintiffs' framing of the protective order issue nonetheless inherently poses the question of which must come first to warrant nondisclosure, disclosure with negative consequences or a risk of sufficient negative consequences stemming from disclosure. Plaintiffs select the former. But this binary paradigm rings false. It overlooks or under plays the chicken-or-the-egg nature of the issue before this Court today. Absent a record of prior disclosure, the question is not necessarily *just* whether there have been threats made, intimidation, or harassment in Ohio, or *just* whether there would likely be threats made, intimidation, or harassment if the information at issue were disclosed. Instead, everything is at issue, and the inquiry unavoidably involves some degree of estimating probabilities. Until information is disclosed, no one can say for a certainty whether that disclosure would without question lead to the issues that Defendants seek to avoid. To require absolute proof of problematic consequences of disclosure without there having been a disclosure therefore asks too much. There is an inherent degree of speculation that unavoidably accompanies both Defendants' and Plaintiffs' positions.

Potentially buttressing the evidence presented in favor of Defendants' burden and prejudice arguments is the fact that Ohio has passed secrecy legislation related to executions. In

7

another case, this Court previously explained that statutory scheme as follows:

> This statutory framework, enacted via Substitute House Bill No. 663 ("H.B. 663") in November 2014, amends Ohio Revised Code § 149.43 and creates two new statutes, Ohio Revised Code §§ 2949.221 and 2949.222.
>
> The amendment to § 149.43 modified the definition of "public record" so that it does not include "information and records that are made confidential, privileged, and not subject to disclosure under divisions (B) and (C) of section 2949.221 of the Revised Code." Ohio Rev. Code § 149.43(A)(1)(cc).
>
> The newly created § 2949.221 provides:
>
> (A) As used in this section:
>
> (1) "Person" has the same meaning as in section 1.59 of the Revised Code.
>
> (2) "Licensing authority" means an entity, board, department, commission, association, or agency that issues a license to a person or entity.
>
> (3) "Public office" has the same meaning as in section 117.01 of the Revised Code.
>
> (B) If, at any time prior to the day that is twenty-four months after the effective date of this section, a person manufactures, compounds, imports, transports, distributes, supplies, prescribes, prepares, administers, uses, or tests any of the compounding equipment or components, the active pharmaceutical ingredients, the drugs or combination of drugs, the medical supplies, or the medical equipment used in the application of a lethal injection of a drug or combination of drugs in the administration of a death sentence by lethal injection as provided for in division (A) of section 2949.22 of the Revised Code, notwithstanding any provision of law to the contrary, all of the following apply regarding any information or record in the possession of any public office that identifies or reasonably leads to the identification of the person and the person's participation in any activity described in this division:
>
> (1) The information or record shall be classified as confidential, is privileged under law, and is not subject to disclosure by any person, state agency, governmental entity, board, or commission or any political subdivision as a public record under section 149.43 of the

Revised Code or otherwise.

(2) The information or record shall not be subject to disclosure by or during any judicial proceeding, inquiry, or process, except as described in division (B)(4) of this section or in section 2949.222 of the Revised Code.

(3) The information or record shall not be subject to discovery, subpoena, or any other means of legal compulsion for disclosure to any person or entity, except as described in division (B)(4) of this section or in section 2949.222 of the Revised Code.

(4)(a) If the information or record pertains to the manufacture, compounding, importing, transportation, distribution, or supplying of any of the items or materials described in division (B) of this section, the person or entity that maintains the information or record shall disclose the information or record to the Ohio ethics commission and the commission may use the information or record, subject to division (B)(1) of this section, only to confirm the following:

(i) That the relationship between the person and the department of rehabilitation and correction is consistent with and complies with the ethics laws of this state;

(ii) That at the time of the specified conduct, the person has all licenses required under the laws of this state to engage in that conduct and the licenses are valid.

(b) If the Ohio ethics commission receives any information or record pursuant to division (B)(4)(a) of this section, the commission shall complete its use of the information or record for the purposes described in that division within fourteen days of its receipt and shall promptly report its findings to the director of rehabilitation and correction.

(C)(1) If, at any time prior to the day that is twenty-four months after the effective date of this section, an employee or former employee of the department of rehabilitation and correction or any other individual selected or designated by the director of the department participates or participated in the administration of a sentence of death by lethal injection, as provided for in division (A) of section 2949.22 of the Revised Code, subject to division (C)(2) of this section and notwithstanding any other provision of law to the contrary, the protections and limitations specified in divisions (B)(1),

9

(2), and (3) of this section shall apply regarding any information or record in the possession of any public office that identifies or reasonably leads to the identification of the employee, former employee, or other individual and the employee's, former employee's, or individual's participation in the administration of the sentence of death by lethal injection described in this division.

(2) Division (C)(1) of this section does not apply with respect to information or a record that identifies or reasonably leads to the identification of the director of rehabilitation and correction or the warden of the state correctional institution in which the administration of the sentence of death takes place.

(D) The protections and limitations specified in divisions (B)(1), (2), and (3) of this section regarding information and records that identify or may reasonably lead to the identification of a person described in divisions (B) or (C) of this section and the person's participation in any activity described in the particular division are rights that shall be recognized as follows:

(1) With respect to a person that is an individual, without any requirement for the person to take any action or specifically apply for recognition of such rights.

(2) With respect to a person that is not an individual, the rights do not exist unless the person requests to have the rights recognized by applying in writing to the director of rehabilitation and correction.

The director of rehabilitation and correction by rule shall establish the procedure according to which a person who is not an individual may apply in writing for the rights described in divisions (B)(1), (2), and (3) of this section. The director shall approve an application that is submitted in compliance with the rules. A person whose application is approved is entitled to the rights for twenty years after the person ceases the qualifying activity as contemplated by the first paragraph of division (B) of this section. The director shall notify any person, who is not an individual and who is entitled to the rights, of the application procedures.

(E) If a person or entity that, at any time prior to the day that is twenty-four months after the effective date of this section, participates in, consults regarding, performs any function with respect

10

to, including any activity described in division (B) of this section, or provides any expert opinion testimony regarding an execution by lethal injection conducted in accordance with division (A) of section 2949.22 of the Revised Code is licensed by a licensing authority, notwithstanding any provision of law to the contrary, the licensing authority shall not do any of the following as a result of that participation, consultation, performance, activity, or testimony by the person or entity:

(1) Challenge, reprimand, suspend, or revoke the person's or entity's license;

(2) Take any disciplinary action against the person or entity or the person's or entity's licensure.

(F) A person may not, without the approval of the director of rehabilitation and correction, knowingly disclose the identity and participation in an activity described in the particular division of any person to whom division (B) of this section applies and that is made confidential, privileged, and not subject to disclosure under that division or of an employee, former employee, or other individual to whom division (C)(1) of this section applies and that is made confidential, privileged, and not subject to disclosure under that division. Any person, employee, former employee, or individual whose identity and participation in a specified activity is disclosed in violation of this division has a civil cause of action against any person who discloses the identity and participation in the activity in violation of this division. In a civil action brought under this division, the plaintiff is entitled to recover from the defendant actual damages, punitive or exemplary damages upon a showing of a willful violation of this division, and reasonable attorney's fees and court costs.

(G) If division (B), (C), or (D) of this section applies to a person with respect to any conduct or activity of the person occurring at a time prior to the day that is twenty-four months after the effective date of this section, the expiration of that twenty-four month period does not affect, add to, or diminish the protections and limitations specified in division (B) or (C), division (D), and division (E) of this section with respect to their application to that person.

Ohio Rev. Code § 2949.221.

Finally, the newly enacted § 2949.222 provides:

(A) As used in this section, "seal a record" means to remove a record from the main file of similar records and to secure it in a separate file that contains only sealed records accessible only to the court.

(B) The court promptly shall order the immediate sealing of records containing information described in division (B) or (C) of section 2949.221 of the Revised Code and the person's participation in any activity described in the particular division, whenever the records come into the court's possession.

(C) If a record containing information described in division (B) or (C) of section 2949.221 of the Revised Code and the person's participation in any activity described in the particular division, is subpoenaed or requested by a court order, the director of rehabilitation and correction shall provide the record.  If the court determines that the record is necessary for just adjudication, the court shall order the director to appear at a private hearing with a copy of the record and any other relevant evidence.  The information is not otherwise subject to disclosure unless the court, through clear and convincing evidence presented in the private hearing, finds that the person whose identity is protected appears to have acted unlawfully with respect to the person's involvement in the administration of a lethal injection as contemplated by the first paragraph of division (B) and by division (C)(1) of section 2949.221 of the Revised Code.

Ohio Rev. Code § 2949.222.

*Phillips v. DeWine*, 92 F. Supp. 3d 702, 705-08 (S.D. Ohio 2015).  Interpreting these statutes,

this Court previously explained that "the statutory scheme simply cuts off Ohio and its

employees as a source of specific information for both proponents and opponents of the death

penalty."  *Phillips*, 92 F. Supp. 3d at 711.  It also specifically "cuts off government-provided

discovery as the source of the information."  *Id.* at 713.

What all this means is that the identities of persons–individuals and entities that are not

individuals but successfully apply for nondisclosure protection–would not be disclosed by Ohio

and its employees without running afoul of the statutory scheme.  *See* Ohio Rev. Code §§

12

2949.221(B), (C)(1), and (D)(1) and (2); Ohio Rev. Code § 2949.222(B) and (C). If the statutory scheme matters, then this operation matters because, at the outset of the oral hearing on the motion for a protective order, Defendants submitted to this Court a privilege log that featured such applications, evincing that there *are* actual and not just hypothetical entities that seek the protection from disclosure afforded by the statutory confidentiality rights. Absent a protective order, this Court would be compelling Defendants to violate the statutory scheme.

Plaintiffs urge this Court to disregard the statutory scheme on the grounds that the Court should not recognize a state privilege as controlling in this federal forum. Plaintiffs' premise is that a state privilege cannot apply in a federal question case, but this position arguably forgets that Plaintiffs have asserted numerous state law claims to which the state statutory scheme might be relevant. This Court need not resolve the state statute issue conclusively, however, because regardless of the statutory scheme, Defendants have presented good cause for a protective order. It is not because there is a state secrecy statute creating a privilege that Defendants are entitled to a protective order, but rather because the same concerns that apparently led to the creation of the statute exist: the burden on and prejudice to the state that disclosure presents. Any statutory protection is simply an add-on. To be clear, the Rule 26(c) considerations warrant a protective order, whether taken alone *or* in conjunction with Ohio's secrecy statute.[2]

Plaintiffs argue that Defendants are raising Rule 26(c) concerns by proxy, conflating burdens on and prejudice to non-party persons or entities with Defendants' interests. This contention ignores that the burden is on Defendants and the prejudice is a loss of the ability to

---

[2] This conclusion moots many of Plaintiffs' arguments regarding application of the state statutory scheme, including their retroactivity argument.

pursue, much less fulfill, a lawful duty.  A protective order is necessary in this case to protect Defendants from being unduly burdened and unfairly prejudiced by Plaintiffs obtaining via discovery the identities of those individuals and entities necessary to Ohio's securing the drugs or materials necessary to fulfill the lawful implementation of the death sentences imposed on Plaintiffs and other non-party inmates.  The Court does not reach this conclusion lightly, and as with many of the issues that have been manifest in this long litigation, today's issues presents a close call.  This Court is cognizant of the competing interests at issue here, both those presented by the claims asserted in this case and those overarching goals inherently underlying the instant dispute.

The surface dispute is clear.  Defendants seek to fulfill a legal duty, but can only do so if they obtain the drugs and materials necessary to enable the implementation of their execution protocol.  Plaintiffs in turn argue that Ohio cannot obtain drugs or materials without violating the law, and that even if they could, any meaningful challenge to the use of the drugs or materials obtained must by necessity include the practices of the entities involved.  In other words, Plaintiffs argue, if they cannot test the drugs or materials that Ohio obtains in light of the source and practices of the entities from which the drugs or materials are obtained, then they cannot know precisely what to look for and cannot consequently mount a truly meaningful challenge.

The underlying dispute is also clear.  Defendants argue that Plaintiffs are trying to do by extrinsic means that which they have been unable to do in this litigation–that is, to delay further or even end executions in Ohio by making it too logistically difficult or impossible for the state to obtain the necessary drugs and materials.  Such an end game is not the point of this litigation, at least not from this Court's view.  Plaintiffs focus on unproven premises such as the need for

14

source information to enable any meaningful testing of the execution drugs,[3] but certainly Plaintiffs know the extended consequences and likely chilling effect of what obtaining such source information would be.  But the Court is charged with resolving the claims brought before it and not with assisting any litigants with using the federal courts as a mechanism to obtain that which the law currently does not or cannot afford them.

At this juncture, Plaintiffs have failed to present a persuasive case for the proposition that source knowledge is necessary to mount a meaningful, much less comprehensive, challenge to Ohio's execution protocol.  Although the information Plaintiffs seek is undoubtedly of some relevance or likely to lead to the discovery of relevant evidence, the burden on and prejudice to Defendants as discussed above outweighs Plaintiffs' interests.

This is not to say that Defendants are entitled to carte blanche in their efforts to obtain drugs and materials for executions.  The parties have curiously left the issue of the full scope of any protective order outside much of their briefing and oral arguments.  But this Court is concerned about issuing a blanket protective order that enables Defendants to exceed the scope of Ohio's execution protocol and secrecy statute.  Given the overarching value of transparency that most often should accompany government action, this Court concludes that Defendants are

---

[3] There is scant evidence supporting Juhl's contention that source identification is necessary for the testing that would inform the constitutional and other issues involved in this litigation.  Although it may be true that this information would help in *some* testing, it remains unproven that such information is indispensable to *any* meaningful testing.  Moreover, the need for such testing, much less testing beyond that provided by the protocol, remains an assumption by Plaintiffs ill-supported by persuasive evidence.

Plaintiffs offer a number of other unavailing arguments against issuance of a protective order, including their everything-against-the-wall efforts to end executions by becoming enforcement agents of federal and state laws despite no apparent mechanism permitting such conduct.  These arguments and the claims behind them fail to defeat the undue burden on and prejudice to Defendants.

not entitled to a protective order that exceeds the scope of Ohio's execution protocol.  Rather, a limited protective order would serve the state's interests but also provide Plaintiffs and the public at large with information as to what course Ohio is pursuing, even if disclosure of the consequent details of that action are then necessarily curtailed.

The current execution protocol contemplates the use of pentobarbital and thiopental sodium.  (ECF No. 521-1, at page ID # 14167.)  Any other drug that Ohio tries to obtain for purposes of conducting executions exceeds that provided for in the Ohio Department of Rehabilitation and Correction policy that "establish[es] guidelines for carrying out a court-ordered sentence of death."  (*Id.* at Page ID # 14160.)  A core component of this policy, or protocol, from which there can be no departure is that "[t]he drugs required by this policy shall be used."  (*Id.* at Page ID # 14162.)  Thus, the moment Defendants pursue drugs or compounding materials other than those constituting pentobarbital and thiopental sodium, Defendants are pursuing drugs extrinsic to the protocol and are outside the protections necessary to implementation of that protocol.

Additionally, to whatever extent it matters, Defendants would also be operating outside the limited scope of the state secrecy statute.  Ohio Revised Code § 2949.221 provides that its protections extend to drugs and numerous materials "used in the application of a lethal injection of a drug or combination of drugs in the administration of a death sentence by lethal injection as provided for in division (A) of section 2949.22 of the Revised Code."  Ohio Rev. Code § 2949.221(B).  Any drug other than those provided for in Ohio's written protocol is not a drug that can be used in a lawful § 2949.22 execution.

If execution by lethal injection is legal, and the United States Supreme Court has

16

repeatedly said it is, then it follows that there must be some manner of carrying it out.  A court should then regard discovery that overly burdens or outright prevents a state from obtaining the drugs, materials, or assistance needed to execute by lethal injection as suspect and consequently drill down into the parties' arguments on each side of the issues.  The specific, albeit limited, evidence before this Court and Ohio's secrecy statute together present good cause for issuance of the requested protective order.  Having concluded that Rule 26(c) considerations, taken both alone and in conjunction with Ohio statutory law, support a protective order, this Court need not and does not discuss Defendants' moot and likely unpersuasive argument that a general public-interest confidentiality privilege supports nondisclosure of the protected information.

## II.  Conclusion

For the foregoing reasons, the Court **GRANTS** Defendants' motion for a protective order (ECF No. 530), **DENIES** Plaintiffs' motion to exclude the testimony and declaration of J. Lawrence Cunningham (ECF No. 536), and **DENIES** Defendants' motion to exclude the testimony and declaration of Randy P. Juhl (ECF No. 542).  The Court therefore **ORDERS** that any information or record in Defendants' possession, custody, or control that identifies or reasonably would lead to the identification of any person or entity who participates in the acquisition or use of the specific drugs, compounded or not, that Ohio indicates in its execution protocol it will use or will potentially seek to use to carry out executions is protected and not subject to discovery.[4]  This protective order is intended to extend to those persons who or entities

---

[4]  At this time, "the specific drugs, compounded or not, that Ohio indicates in its execution protocol it will use or will potentially seek to use to carry out executions" means pentobarbital and thiopental sodium, compounded or not.  If Ohio alters its execution protocol to include or substitute other drugs, those drugs would fall under the scope of this protective order unless Plaintiffs persuade this Court that the new drug(s) present some specific necessity for the

17

that have not waived or forfeited its protection and who manufacture, compound, import, transport, distribute, supply, prescribe, prepare, administer, use, or test the compounding equipment or components, the active pharmaceutical ingredients, the execution protocol drugs or combination of drugs, the medical supplies, or the medical equipment used in carrying out any execution under Ohio Revised Code § 2949.22.[5]  This protective order governs discovery *only in this litigation* and does not apply outside this litigation or (in the increasingly unlikely event) after this litigation concludes.[6]

Plaintiffs have asked that if this Court enters a protective order, it then certify the issue for immediate appeal under 28 U.S.C. § 1292(b).  Although a discovery order is at issue, the Court recognizes that the United States Supreme Court has held that "[t]he preconditions for § 1292(b) review . . . are most likely satisfied when a privilege ruling involves a new legal

_____

source-and identity information Plaintiffs would seek.

[5]  While arguing that the Court simply cannot rely on the state secrecy statute to *provide* Defendants the confidentiality they seek, Plaintiffs also ask this Court to rely on that same statute to *limit* any confidentiality ordered today.  Putting aside that curious cognitive dissonance, the Court is not inclined to tie the scope of its order to the statute in either regard.  Instead, the Court recognizes that if a party otherwise protected by today's order takes action evincing a disregard for its confidentiality, then that party has waived or forfeited coverage under this protection order.  This is because the Rule 26(c) considerations underlying today's decision would not apply to that individual or entity.  For example, if a compounding pharmacy engaged in advertising indicating an involvement with the execution process, for any reason including a desire to attract death penalty proponents who might patronize the business to support a supplier of execution drugs, then discovery could not be said to present a chilling effect supporting confidentiality for that compounding pharmacy.  Similarly, if a person other than an individual fails to request confidentiality under the statutory scheme, that entity not only falls outside the statute, but it also removes itself from the scope of today's protective order.

[6]  In other words, Defendants cannot assert after this case has ended that today's protective order enables them not to provide information sought by other litigants in future cases.  The Court has not recognized a perpetual privilege against disclosure, but has instead granted a limited protective order that remains subject to modification or discontinuation in this litigation.

question or is of special consequence, and district courts should not hesitate to certify an interlocutory appeal in such cases." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 110-11 (2009). This Court finds that this "order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Id.*

To conclude otherwise would be to ignore the debatable and unsettled issues surrounding today's decision and the importance of those issues to this litigation and to Ohio's ability to secure drugs for the executions set to resume in 2017. If Ohio is correct and it cannot procure the requisite execution drugs without confidentiality, then a decision against confidentiality might lead to the end of lethal injection in the state and the ultimate termination of this case based on mootness. The specific questions of law are apparent and include whether Ohio's secrecy statute applies in this litigation and whether Plaintiffs are correct that granting the motion for a protective order means that this Court has essentially and summarily immunized the unnamed pharmacy defendants and others from the claims asserted against them in this case. The consideration of these and other issues would not entail much, if any, review of the relevant portion of the record by the court of appeals. This Court is also cognizant that upon the undersigned's forthcoming retirement, this litigation will transfer to another judicial officer who, like the undersigned, would no doubt benefit substantially from the Sixth Circuit's guidance on the legal issues involved.

Accordingly, the Court **CERTIFIES** this Opinion and Order for interlocutory appeal and **STAYS** this Opinion and Order and all further proceedings before this Court pursuant to § 1292(b), except for consideration of the two pending motions for voluntary dismissal. (ECF

19

Nos. 552, 587.)  With the exception of the default briefing schedule related to these two motions, this Court **VACATES** all other case deadlines, including those related to the recent amended and supplemental pleadings.  If Plaintiffs do not effectuate a timely appeal, the Court shall hold a status conference and proceed to schedule new deadlines.

        **IT IS SO ORDERED.**

                                                                   _____/s/ Gregory L. Frost_____
                                                                GREGORY L. FROST
                                                                UNITED STATES DISTRICT JUDGE