```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE SOUTHERN DISTRICT OF OHIO
 2                               WESTERN DIVISION


 3      _____ )
                                             )
 4      IN RE:  OHIO EXECUTION               ) CASE NO. 2:11-cv-1016
        PROTOCOL LITIGATION                  )
 5      _____)  VOLUME IV


 6

 7                      PRELIMINARY INJUNCTION HEARING
                        BEFORE THE HONORABLE MICHAEL R. MERZ
 8                       UNITED STATES MAGISTRATE JUDGE
                        FRIDAY, JANUARY 6, 2017; 9:00 A.M.
 9                               DAYTON, OH


10

11      APPEARANCES:

        For the Plaintiff Ron Phillips:
12

13      TIMOTHY F. SWEENEY, ESQ.
        Law Office of Timothy Farrell Sweeney
14      The 820 Building, Suite 430
        820 Superior Avenue NW
15      Cleveland, OH  44113-1800


16      For the Plaintiff Raymond Tibbetts and Plaintiffs' Liaison
        Counsel:
17
        ALLEN L. BOHNERT, ESQ.
18      Office of the Federal Public Defender
        Capital Habeas Unit
19      10 West Broad Street
        Suite 1020
20      Columbus, OH  43215-3419


21      For the Plaintiffs Ron Phillips and Raymond Tibbetts:

22
        LISA M. LAGOS, ESQ.
23      Assistant State Public Defender
        Office of the Ohio Public Defender
24      250 East Broad Street
        Suite 1400
25      Columbus, OH  43215
```

```
 1   APPEARANCES (CONT.):

 2   For the Plaintiffs Raymond Tibbetts and Gary Otte:

 3   NADIA WOOD, ESQ.
     Office of the Federal Public Defender
 4   10 West Broad Street
     Suite 1020
 5   Columbus, OH  43215-3419

 6

     For the Plaintiff Raymond Tibbetts:
 7
     ERIN G. BARNHART, ESQ.
 8   Office of the Federal Public Defender
     Capital Habeas Unit
 9   10 West Broad Street
     Suite 1020
10   Columbus, OH  43215-3419

11

     For the Plaintiffs Ron Phillips and Raymond Tibbetts:
12
     JAMES A. KING, ESQ.
13   Porter, Wright, Morris & Arthur
     41 South High Street
14   Suite 2900
     Columbus, OH  43215
15
     CAROL ANN WRIGHT, ESQ.
16   Office of the Federal Public Defender
     Capital Habeas Unit
17   10 West Broad Street
     Suite 1020
18   Columbus, OH  43215-3419

19

     For Plaintiff Gary Otte:
20
     VICKI RUTH ADAMS WERNEKE, ESQ.
21   Office of the Federal Public Defender
     Capital Habeas Unit
22   1660 West 2nd Street
     Suite 750
23   Cleveland, OH  44113

24

25
```

```
 1     APPEARANCES (CONT.):

 2     For the State Defendants:

 3     THOMAS E. MADDEN, ESQ.
       Senior Assistant Attorney General
 4     Criminal Justice Section, Capital Crimes Unit
       150 E. Gay Street
 5     16th Floor
       Columbus, OH  45315
 6
       CHARLES L. WILLE, ESQ.
 7     Principal Assistant Attorney General
       Criminal Justice Section, Capital Crimes Unit
 8     150 E. Gay Street
       16th Floor
 9     Columbus, OH  45315

10     JOCELYN K. LOWE, ESQ.
       Assistant Attorney General
11     Criminal Justice Section, Capital Crimes Unit
       150 E. Gay Street
12     16th Floor
       Columbus, OH  45315

13

14     ALSO PRESENT:

15     Randall Porter, Esq.
       Gary Mohr
16     Stephen Gray

17

18

19

20

21

22

23

24

25
```

795

```
1                    INDEX OF WITNESSES

2                 DIRECT CROSS REDIRECT RECROSS RE-REDIRECT

3    PLAINTIFFS' CASE

4    Gary Mohr         796    875    906      914

5

6    DEFENDANTS' CASE

7    Daniel Buffington 925    958    984

8

9    REBUTTAL WITNESSES (PLAINTIFFS')

10   Craig Stevens     989   1019   1029

11

12                      *     *     *     *     *

13

14

15

16

17

18

19       Proceedings recorded by mechanical stenography,
     transcript produced by computer.
20
                     Mary A. Schweinhagen, RDR, CRR
21               Federal Official Court Reporter
                 200 W. Second Street, Suite 910
22                      Dayton, OH  45402

23                      *** *** *** ***

24

25
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1          P-R-O-C-E-E-D-I-N-G-S                    9:09 a.m.

2              THE COURT:  We're back on the record in Case

3     Number 2:11-cv-1016.

4          Plaintiffs may call their next witness.

5              MR. SWEENEY:  Your Honor, we call Director Mohr.

6       **GARY CLIFFORD MOHR, DEFENDANTS' WITNESS, SWORN**

7              MR. MADDEN:  Your Honor, the experts are still in

8     the -- we have a separation of witnesses for this.

9              THE COURT:  Sir, would you state your full name

10    and spell your last name for the record.

11             THE WITNESS:  Gary Clifford Mohr, M-O-H-R.

12             THE COURT:  The Court takes judicial notice that

13    you are currently employed as the Director of the Ohio

14    Department of Rehabilitation and Corrections.  Do I have

15    that right?

16             THE WITNESS:  That is correct.

17             THE COURT:  Your witness, Ms. Barnhart.

18                     <u>CROSS-EXAMINATION</u>

19    BY MS. BARNHART:

20    **Q.**  Good morning, Director Mohr.  We figured you had been

21    examined by Allen enough, so you get me now.

22         Director Mohr, at your deposition, you stated that you

23    didn't know enough about a BIS monitor to be able to say

24    whether the department could use it during an execution.  Do

25    you remember that?

Mohr - Cross (Barnhart)                                    797

1    **A.**    Yes.

2    **Q.**    You've now been sitting through this long hearing, and

3    you've heard a lot of testimony about BIS monitors; is that

4    correct?

5    **A.**    Yes.

6    **Q.**    Now, are you able to say whether that's something the

7    department could use during an execution?

8    **A.**    I could say.

9    **Q.**    You are able to say?

10   **A.**    Yes.

11   **Q.**    And what would your answer be?

12   **A.**    At this time, I am not confident that it would add a

13   level of sophistication to the consciousness check that

14   we're using.

15   **Q.**    Okay.  That sounded like you didn't think you needed to

16   use it?

17   **A.**    That's correct.

18   **Q.**    But could -- could the department use it?  Is it

19   something that's feasible for the department to use, in your

20   opinion?

21   **A.**    I'm not sure.  We've heard the term "proprietary" --

22   **Q.**    Um-hmm.

23   **A.**    -- before.  We have heard a number of things.  So at

24   this moment, I am not sure that we would have the ability to

25   use it.

Mohr - Cross (Barnhart)                                    798

 1   **Q.**   You think the department wouldn't be able to purchase

 2   one?

 3   **A.**   I am not sure legally with the word "proprietary."  I

 4   don't know whether we would be able to purchase one or not.

 5   **Q.**   If I were to represent to you that proprietary in this

 6   context refers to the sort of internal workings of the

 7   algorithm of the calculation, you know, when you do a Google

 8   search, you put in your words and the search comes out, but

 9   we don't know behind there what the calculation and

10   algorithms that are being run in the computer scripts,

11   right?

12   **A.**   Correct.

13   **Q.**   So if I were to represent to you that that's what the

14   term "proprietary" means with regard to the BIS monitors,

15   but that doesn't mean individuals or entities are prevented

16   from purchasing one to use.  Would that change your answer?

17   **A.**   It may.  It's part of the decision process that I would

18   use.

19   **Q.**   Um-hmm.  What are the other parts?

20   **A.**   What are the qualifications of the staff that would be

21   required to read this.  I've not been -- I'm not sure that

22   that's been clarified in this process.

23   **Q.**   I believe that there's been testimony from at least

24   Dr. Antognini that someone with the training of a paramedic

25   or an EMT would be capable of using a BIS monitor.

1    **A.**    Well, since you brought up Dr. Antognini, I also

2    notice --

3    **Q.**    I'm sorry.

4    **A.**    -- that he did not have confidence that it was

5    additive, a BIS in his mind, and he used the other more

6    traditional techniques that a paramedic would use.

7    **Q.**    Okay.  And I apologize.  I misspoke.  I meant

8    Dr. Bergese there.

9         And again I think that what your answer reflects is

10   whether you feel it would be useful.  I am not trying to get

11   to that.  I am just trying to determine whether it's

12   something that you believe the department could use.

13   **A.**    We could use it.

14   **Q.**    Okay.  Thank you.  I'd like to talk about the most

15   recent iteration of the protocol, the October 7th, 2016,

16   protocol.

17        Now, when did you decide to switch to the method that's

18   in that protocol?

19   **A.**    By "method," what do you mean?

20   **Q.**    The three-drug method that uses midazolam as the first

21   drug.

22   **A.**    It became -- when it became apparent that our efforts,

23   our extensive efforts to find thiopental sodium and

24   pentobarbital were not going to be successful.  At a point

25   where we looked at other options and my responsibility under

Mohr - Cross (Barnhart)                                    800

```
 1   Ohio law to carry out these executions, we were looking at
 2   other jurisdictions that were using three drugs.  So at some
 3   point prior to that.  It was not on a specific day.  It was
 4   a journey in terms of the decision-making process.
 5   Q.   And what was the time frame for when that journey took
 6   place?
 7   A.   It was several months.  And it became apparent -- when
 8   it became apparent to me that we were not likely to be
 9   successful in achieving one of those two drugs I just
10   mentioned, then we became focused on a three-drug protocol.
11   Q.   And when did it become apparent to you?
12   A.   Months before we enacted it.  I don't know the date.
13   And I don't know the -- because I don't know the exact date
14   that it became clear that we were not going to be
15   successful.  Those efforts in finding those single drugs
16   were not fruitful.
17   Q.   So have you abandoned the efforts to find the single
18   drugs?
19   A.   No.
20   Q.   Okay.  Would you say that -- I know you said you don't
21   remember an exact date.  Now, discovery in this case
22   indicates that the department was purchasing midazolam as
23   early as the beginning of July of last year.  Does that help
24   you pinpoint more specifically a date as to when it became
25   apparent to you that you would need to use midazolam?
```

Mohr - Cross (Barnhart)                                              801

1    A.    Oh, it -- I don't mean to be flippant, I really don't,

2    but it would have been a few months before the order took

3    place.

4    Q.    Okay.  So a few months before July?

5    A.    Yes.

6    Q.    And why didn't you decide to tell the Court or the

7    plaintiffs or the public about that decision until October

8    3rd of 2015?

9    A.    Because --

10   Q.    I am sorry -- of 2016.

11   A.    You know, I have based all of my interactions on our

12   protocol change, based on former Director Ernie Moore's

13   commitment to this Court that we would provide a protocol at

14   least 30 days in advance.  And I was -- quite frankly, I

15   remain hopeful that we are going to find those single drugs

16   at some point in time.  That at some point in time, be it

17   the federal government or whatever, is going to allow states

18   to be able to do what they -- to obtain those.

19        So, you know, I was just committed to comply with the

20   past practice of the agency and the commitment of the

21   agency, which was that we would provide the protocol at

22   least 30 days in advance.

23        And, quite frankly, just because the midazolam was

24   ordered at the date that you suggested -- and I don't have

25   recollection of that.  I trust that you are accurate.  The

Mohr - Cross (Barnhart)                                          802

1    protocol's a very complex piece.  I have never worked under

2    a three-drug protocol.  I have never been involved in that.

3    So just obtaining the drugs does not mean that we finalized

4    the process.

5        And I think the protocol being finalized needed to be

6    done before there was notification.

7    Q.   I see.  So the protocol wasn't finalized, but as you've

8    just testified, the decision to switch to the three-drug

9    protocol was several months before the drugs were ordered in

10   July?

11   A.   The decision to explore the three drugs certainly was a

12   few months in advance of that.

13   Q.   Um-hmm.

14   A.   I am not saying a decision was made.  A decision would

15   be made today, if I could get the single drug, to use a

16   single drug today.

17   Q.   Um-hmm.  Do you think that letting the Court and the

18   plaintiffs, at a minimum, know that you were exploring using

19   midazolam back in July or several months before that would

20   have allowed this process to take place in a more

21   deliberative manner?

22            MR. MADDEN:  Objection.  There was no discovery

23   obligations with --

24            MS. BARNHART:  That's not what I am asking.

25            MR. MADDEN:  The case was stayed.

1          THE COURT:  Right.  We understand the case was

2     stayed.  And the question -- the witness may answer the

3     question.

4          THE WITNESS:  All right, listen.  I'm a

5     correctional professional, 42-1/2 years.  And the

6     notification of the other side, I depend on a number of

7     people strategically to allow that to happen.  And so I

8     believe that what I did was appropriate.

9     BY MS. BARNHART:

10    Q.    Okay.  As a strategic decision in this case?

11    A.    Yes.

12    Q.    Now, who was involved in the decision to amend the

13    protocol, to switch to the three drug-midazolam method?

14    A.    There were a number of people.  Ultimately, I signed

15    the policy and I made the decision.

16    Q.    Um-hmm.

17    A.    Chief counsel, the Attorney General's Office through

18    those discussions --

19    Q.    And I don't want to ask about any privileged

20    attorney-client information.

21    A.    I hope they'll object if you do.

22    Q.    I'm sure.

23    A.    I'm waiting for somebody to get up.  Your Honor, I

24    haven't seen much action over there yet.  But anyway --

25    Q.    Just that you consulted with them.  Not the content of

Mohr - Cross (Barnhart)                                          804

1    the discussions.

2    A.    And I know I was not intimately involved in the -- I

3    wasn't involved in the process of securing the drugs.

4    Q.    Um-hmm.

5    A.    Or those processes.  I know that there was an

6    assemblage of the execution team members as we wrote the

7    protocol.  The governor's office was advised and involved

8    in -- involved in discussions as to the approach.  And in

9    terms of the other external stakeholders, I am not sure who

10   else was used by our chief legal counsel in putting that

11   together.

12   Q.    And you said you are not involved in securing the

13   drugs.  That's primarily your chief counsel, Steve Gray, and

14   Richard Theodore that secure the drugs, right?

15   A.    I asked our chief counsel to direct that, and he

16   directs that with the resources that he -- that he deems

17   necessary.

18   Q.    And so is your testimony that you don't know if Richard

19   Theodore is involved?

20   A.    No, Richard Theodore is, but I'm suggesting that there

21   may be others that I am not aware of.

22   Q.    Okay.  So among that group that you listed of counsel,

23   governor's office, and team members, are any -- which among

24   those, if any, have medical or scientific expertise into --

25   knowledge about midazolam and its use in a three-drug

Mohr - Cross (Barnhart)                                      805

1    protocol?

2    **A.**    Of the people that I mentioned, I'm not aware of any of

3    those having medical credentials.  But I am also not aware

4    of others that they sought input from.

5    **Q.**    So in making the decision to approve the protocol, you

6    didn't confirm or determine what sort of medical or

7    scientific advice was being relied upon?

8    **A.**    I met extensively with the group that was -- was

9    putting this together multiple times and in person.  I -- at

10   this moment, I do not know of any names of physicians or --

11   or whomever.  And as I understand, it's very difficult with

12   physicians, given their licensure, to be part of a process

13   that would support an execution.

14       So I'm not aware of other folks that --

15   **Q.**    You are not aware of any experts who gave advice about

16   this protocol or who were consulted about the protocol,

17   correct?

18   **A.**    Correct.

19   **Q.**    And so as you sit here today, you are not able to say

20   anybody, internal, external, that anybody provided medical

21   or scientific advice about this new protocol?

22       MR. MADDEN:  Objection, Your Honor.  He's already

23   answered that he has no knowledge.

24       THE COURT:  It's a good summary question.  I'll

25   allow it.

Mohr - Cross (Barnhart)                                      806

1           THE WITNESS:  Well, as we've talked, the medical

2    team obviously has medical experience and training.

3    BY MS. BARNHART:

4    Q.    Um-hmm.

5    A.    And as we've heard in this courtroom, one of those

6    individuals has 35 years of experience of administering to

7    people in crisis.  So I would -- I'm not going to discount

8    that they don't have medical training.

9    Q.    But if -- if those team members with medical training

10   testified that they did not provide that type of input into

11   amending the protocol, would you be in a position to

12   disagree with that?

13   A.    I would.  I met with them as we talked about rewriting

14   protocol 01-COM-11.  I was involved in meetings with them.

15   Q.    And in those meetings, you have personal knowledge that

16   they were providing their medical or scientific expertise in

17   advising about amending the protocol?

18   A.    I clearly know that their experience was used, and I

19   don't know --

20   Q.    How do you know that?

21   A.    Because I was with them.

22   Q.    So you observed their experience being used?

23           MR. MADDEN:  Objection, Your Honor.

24           THE COURT:  Sustained.

25           MR. MADDEN:  It's not what he testified.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Mohr - Cross (Barnhart)                                                807

1    BY MS. BARNHART:

2    **Q.**    I don't mean to put words in your mouth.  I am just

3    trying to determine the basis for your statement that their

4    medical and scientific expertise was given as input in

5    changing the protocol.

6    **A.**    I would -- I would, I guess, say to you in this way.

7    **Q.**    Um-hmm.

8    **A.**    I'm responding to you based on my experience as a

9    director in this period, so I would assume that you would

10   take my responses as utilizing the experience that I have.

11       I took their input in terms of our changing 01-COM-11

12   as their using their experience.  So they didn't state that

13   they had used their experience but --

14   **Q.**    That's fair.

15   **A.**    -- I assumed, much like we are doing here today.

16   **Q.**    Okay.  And what was that input then?  That you took as

17   being derived from their background and experience.

18   **A.**    That the protocol that was proposed was not as

19   desirable as having the single-drug protocol, which I think

20   is a unanimous consensus of ours.

21   **Q.**    Um-hmm.

22   **A.**    But the protocol that was in -- that was proposed and

23   is currently in place in our current protocol would work and

24   would work effectively.

25   **Q.**    And by work, what do you mean?

Mohr - Cross (Barnhart)                                    808

1     **A.**   Be successful at creating a humane execution.

2     **Q.**   It would prevent the inmate from feeling pain?

3     **A.**   That, yes.

4     **Q.**   Okay.  Now, what input, if any, did Richard Theodore

5     provide?

6     **A.**   He was engaged in the process.  He discussed, as he

7     does in the annual training, the general impact and the --

8     the impact of the drugs utilized.

9     **Q.**   Okay.  And what -- what did he say the general impact

10    of the drugs utilized was?

11    **A.**   Midazolam --

12              MR. MADDEN:  Objection, Your Honor.  Hearsay.

13    She's asking what Rich Theodore said.

14              THE COURT:  Not for the truth of what Mr. Theodore

15    said, but for what the director heard when he was deciding

16    the question, shall this protocol be adopted.

17        Objection overruled.

18              MS. BARNHART:  In addition, Your Honor,

19    Mr. Theodore is a defendant in this case.  It's a statement

20    of the party opponent.

21              MR. MADDEN:  It's not an opponent.  It's the same

22    party.

23              THE COURT:  The objection is overruled.  The

24    hearsay objection is overruled.

25              THE WITNESS:  I'm ready to answer the question

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    that Your Honor -- okay, okay.  Just checking.

2        Walk through the general purpose of the three drugs,

3    midazolam being a sedative --

4    BY MS. BARNHART:

5    **Q.**   Um-hmm.

6    **A.**   -- the rocuronium or pancuronium bromides --

7    **Q.**   Paralytics.

8    **A.**   The paralytics, thank you -- to reduce and eliminate,

9    stop the muscle movement.  And the potassium chloride, as I

10   think he used the word "electrolyte," not that I am

11   competent to use that word, to interact and stop the heart.

12   **Q.**   Now, I didn't hear you mention among that description

13   the painful effects of drugs two and three that's been

14   talked about in the hearing.  Was that input provided?

15   **A.**   It was indicated that drugs two and three both provide

16   some pain with them, and the pain is a bit different, and

17   I'm not sure I'm competent to describe what that is, other

18   than the burning with the paralytic, et cetera.  And that

19   was why the necessity for the first drug was put in place,

20   was to -- to render a person in a condition that they would

21   not experience the pain.

22   **Q.**   And you said it was indicated that was by Mr. Theodore?

23   **A.**   Mr. Theodore provided that input as well.  And it was a

24   general discussion among folks, and I can't remember, but he

25   was part of that discussion, as was I.

Mohr - Cross (Barnhart)                                      810

1    **Q.**   So the group generally acknowledged the fact that these

2    second and third drugs are painful if not -- if the first

3    drug isn't working properly, to prevent the inmate from

4    feeling pain?

5    **A.**   I didn't see any objections to the group when those

6    discussions were made.

7    **Q.**   Okay.  Now, is it your understanding that Mr. Theodore

8    trains the team members on this -- on that information about

9    the pain of the drugs?

10   **A.**   Yes.

11   **Q.**   It is.  Would it surprise you if Mr. Theodore testified

12   that he did not train about that?  He trains only about the

13   therapeutic uses of the drugs?

14   **A.**   It would.

15   **Q.**   And would it bother you as -- is it something that is

16   relevant to the protocol and to the training of the team

17   members?

18   **A.**   As you are aware, I do attend the annual training of

19   that.  And, in fact, this year attended both the cites at

20   Chillicothe and at Lucasville, two different sites.  And

21   the -- my recollection of what he trained started very

22   extensively in a very lengthy presentation with a comment of

23   the black box and the danger of the drugs, walking through

24   their impact or their influence on the body as I attempted

25   poorly to describe.

Mohr - Cross (Barnhart)                                          811

1    **Q.**    I just want to clarify, you were talking about drugs

2    two and three here, right?

3    **A.**    No, I'm not.  I'm talking about starting with

4    midazolam --

5    **Q.**    Okay.

6    **A.**    -- and its influence, and then going to the bromides

7    and discussion of all three of the bromides being similar

8    but, quite frankly, the different concentration with the

9    rocuronium chloride and then finally the potassium, and walk

10   through, quite frankly, at great length that information.

11   And unless I was imagining something, I heard a description

12   of the impact and the reason that we were using midazolam at

13   the beginning was to render a person unconscious.  And that

14   reason was to avoid the pain of the second and third drugs.

15   **Q.**    Okay.  So if team members following this training were

16   not aware of the pain of the second and third drugs, would

17   it be fair to say that either they weren't trained on it, or

18   that that training was ineffective?

19   **A.**    I can't -- I don't know the reason.  I will just tell

20   you as I said before, it's surprising having sat through two

21   trainings this year.

22   **Q.**    It's a problem.

23           MR. MADDEN:  Objection.

24   BY MS. BARNHART:

25   **Q.**    Is it a problem?

Mohr - Cross (Barnhart)                                    812

1          THE COURT:  That question is appropriate.

2      No.  Upon mature and considered and deliberate

3  reflection, the objection is overruled.

4          MS. BARNHART:  Sustained or overruled?  The first

5  objection?

6          MR. MADDEN:  She's allowed to ask that question?

7          THE COURT:  No, no.  Upon further reflection, the

8  objection is sustained.

9          MR. MADDEN:  Long week, Judge.

10          THE COURT:  It isn't over yet.

11          THE WITNESS:  What was the question?

12  BY MS. BARNHART:

13  Q.   Okay.  What's your assessment of that state of affairs

14  then?  So I am not putting words in your mouth.

15          MR. MADDEN:  Objection, Your Honor.  She's asking

16  for speculation about what other people are thinking, the

17  team members.

18          MS. BARNHART:  I'm asking --

19          THE COURT:  No.  That objection's overruled.

20  She's asking, as I understand it, whether it's a problem

21  from the director's perspective, what the state of mind of

22  the team members is.

23          MS. BARNHART:  Correct, Your Honor.

24  BY MS. BARNHART:

25  Q.   That's what I'd like to know.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Mohr - Cross (Barnhart)                                    813

1    A.   If that's a specific question, I do have real concern

2    about the state of mind of all of us involved in the

3    execution process.

4              MS. BARNHART:  Okay.  If I could get the slide

5    that would relate to these questions, which is a little out

6    of order.  If that's not possible, I can return to it later.

7         We'll just work within the AV that we've already

8    prepared.

9    BY MS. BARNHART:

10   Q.   All right.  Now, Director Mohr, just so the record

11   reflects this, you've been here every day for this hearing,

12   and were you listening carefully to all the testimony here?

13   A.   Absolutely.

14   Q.   So you heard Mr. Sweeney question Team Member 21 about

15   what will happen if an inmate -- and Mr. Sweeney used the

16   example of his client, Mr. Phillips -- is given a second

17   dose of midazolam -- so he gets the first, two syringes of

18   500, and then is given a second dose -- and then he still

19   fails the second consciousness check.  Do you remember that

20   line of questioning?

21   A.   I do remember that line of questioning.

22   Q.   And do you remember what Team Member 21 said would

23   happen in that event?

24   A.   I don't want to -- I don't want to guess.

25   Q.   If I represented to you that he said that he would --

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Mohr - Cross (Barnhart)                                    814

1   there would be a consultation at that point, does that sound

2   accurate to you?

3   **A.**   Yes.

4   **Q.**   And you agree that that's what would happen as well,

5   correct?

6   **A.**   Yes.

7   **Q.**   Now, during that consultation, you are going to rely on

8   the input from your team members, the ones with the medical

9   expertise, to help determine what to do?

10  **A.**   Yes.

11  **Q.**   And those team members, though, said that they are

12  going to turn to you to tell them what to do, correct?

13          MR. MADDEN:  Objection, Your Honor.  This

14  mischaracterizes their testimony.  Their testimony is they

15  were going to get together and deliberate, not that they

16  were going to have some kind of confusion among the two.

17          MS. BARNHART:  I --

18          THE COURT:  Understood.  The objection is

19  overruled.

20          THE WITNESS:  I want to be -- I really do want to

21  be responsive, but I think it was a yes-or-no question, but

22  I am not sure now.

23          THE COURT:  Let me try.

24          THE WITNESS:  Okay.

25          THE COURT:  At that point in time, if that

 1    happens, two doses totalling 1,000 milligrams of midazolam

 2    and the consciousness check does not reveal unconsciousness,

 3    the testimony of Team Member 21, I believe, was that there

 4    would be a consultation and who would be in that

 5    consultation.  And as I understand it, the question is,

 6    after that consultation, the decision about what to do next,

 7    is it yours or is it, like, everybody's consulting and, you

 8    know, six in favor, five against, and, you know, one

 9    abstention, or is it your decision?

10            THE WITNESS:  Your Honor, I'd be glad to answer

11    that.  That is my -- that is my decision.

12    BY MS. BARNHART:

13    Q.   And what I believe I heard Team Member 21 say is that

14    he was unable to predict what the decision would be because

15    it's not his decision.  There would be a consultation, and

16    he's looking to you to say what to do?

17            MR. MADDEN:  Objection.  I don't believe --

18    BY MS. BARNHART:

19    Q.   You nodded.

20            MR. MADDEN:  -- that was his testimony.

21            THE COURT:  I think it's close enough.

22            THE WITNESS:  Give me a question, and I'll

23    respond.  That was a statement, I thought.

24    BY MS. BARNHART:

25    Q.   Okay.  You agree -- you agree with my characterization

Mohr - Cross (Barnhart)                                           816

1    of his testimony?

2    **A.**    I agree that I would make a decision at that

3    discussion, at that deliberation, based on a number of

4    things.

5    **Q.**    I'm not trying to obfuscate this here.

6    **A.**    I want to respond, but I just want to respond to a

7    question.

8    **Q.**    I want you to understand our concerns.  We hear a bunch

9    of people saying that other people are going to make

10   decisions, that they can't say, in being posed a

11   hypothetical with specific components, your team members are

12   not able to say what they would suggest or what would

13   happen.

14              MR. MADDEN:  Objection, Your Honor.

15              THE COURT:  Sustained.  Number 21 wasn't asked

16   what he would suggest, he was asked what would happen next.

17   That at least is my recollection of the testimony.  And the

18   witness has answered plainly that it would be his decision

19   to make what would happen next.

20              MS. BARNHART:  All right, Your Honor.  Just

21   because I have a different recollection of the testimony, if

22   I could pose it as a hypothetical.

23              THE COURT:  Please.

24   BY MS. BARNHART:

25   **Q.**    If it is -- if it is in fact the case that your team

Mohr - Cross (Barnhart)                                    817

1    members say that they don't know what they would suggest at

2    that point, and it's your testimony that you are going to

3    rely on those team members' input --

4              THE COURT:  Finish your question.

5              MS. BARNHART:  Thank you.

6    BY MS. BARNHART:

7    Q.   -- I hope you can appreciate our dilemma, which is, we

8    don't understand how a decision's going to be made.  And I'd

9    like to give you an opportunity to allay our concern.

10   A.   Thank you.

11             MR. MADDEN:  Objection.  That's not a

12   hypothetical.  That was her version of the testimony.

13             MS. BARNHART:  Posed hypothetically.

14             THE COURT:  I'll allow it.  Go ahead.

15             THE WITNESS:  Thank you.  I mean, I think --

16   forgetting the legal stuff here, I want to respond to that

17   question.

18             THE COURT:  Please.

19             THE WITNESS:  So there is a number of -- Your

20   Honor, there is a number of factors that I would be asking

21   the medical team.  And let me just say, I have been here all

22   four days, and it will be five days, and I have gained a

23   tremendous amount of insight in terms to enhancements, not

24   to the protocol but to supporting the protocol.  One of

25   which is, as we do the consciousness checks, there will be

Mohr - Cross (Barnhart)                                          818

 1    two drug administrators in the room, in the death house --

 2    one, the drug administrator, and, two, the team leader -- so

 3    that there is further corroboration of the consciousness

 4    checks.

 5          As they come out and collaborate and I'm involved, I am

 6    going to be asking them this:  So what is the purposeful

 7    movement?  Is it -- is the person clearly conscious and

 8    cognitive and verbal and clearly aware?  And if that's the

 9    case, then my question would be, do you think that an

10    additional 500 milligrams of midazolam would, in fact,

11    render the person unconscious?  In fact, I would ask are you

12    confident that that would happen.

13          If I receive the answer, no, I am not confident, or if

14    I am not convinced that they are confident, I am going to

15    get on the phone -- the governor's on the phone.  I would

16    talk to the governor.  I said, "Governor, I am not confident

17    that we, in fact, can achieve a successful execution.  I

18    want to reverse the effects of this.  And I'm asking" -- and

19    this is a legal question -- "I'm asking for an intent to

20    reprieve."

21          If that happens, it won't be the medical team.  It will

22    be a response of the institution medical team, this is what

23    we are looking at doing, with the -- with the reactive drug,

24    the reversal drug to, in fact, do that.

25          Now, if in fact there is 100 milligrams that's been

Mohr - Cross (Barnhart)                                           819

1    administered and in this discussion the medical team says

2    I'm not sure if he's conscious or not.  The drugs have had a

3    significant effect.  I don't know that he is or not, I might

4    order -- and I am going to have an additional 500 milligrams

5    available in the room so there is not an additional delay,

6    because I understand the fast-acting effect of midazolam --

7    and I might order a third round of dose, which would be

8    equivalent to 1,500 milligrams of midazolam.  It is

9    dependent on that discussion.  That's why that discussion is

10   very important.

11        And we've spent now what?  Since 2012 discussing the

12   incident command system and the fact that I am director.

13   The fact of whether I like it or not, I am the director.  I

14   will make the decisions.  I'll make informed decisions and,

15   consistent with the incident command system, I am going to

16   use an informed, collaborative process to make the best

17   decision.  And under those circumstances, that's how I would

18   react.

19   BY MS. BARNHART:

20   Q.   Thank you for sharing those --

21   A.   Thanks for asking the question.

22   Q.   -- additional details.  So to make sure that I'm clear

23   on what you have said -- please correct me if I state

24   anything inaccurately -- you are going to, following the

25   consciousness checks, rely on your team.  And if their --

Mohr - Cross (Barnhart)                                    820

1    first of all, if they say he still is conscious, you are

2    going to deliver a second 500 dose of midazolam?

3    A.    I didn't say that.

4          THE COURT:  He said third.

5          THE WITNESS:  I did not say that.

6    BY MS. BARNHART:

7    Q.    Okay.  Go ahead.

8    A.    There was never a question about after the first dose.

9    It's always after the second.

10   Q.    Okay, okay, fine.  So after the second when he already

11   has 1,000 in, if they -- first of all, if they say he is

12   still conscious, you are going to have prepared and ready to

13   go a third 500-milligram dose, to bring the total to 1,500

14   milligrams?

15   A.    That's not what I said.

16   Q.    Okay.

17   A.    I said I would have those drugs -- I am not going to

18   have the drugs prepared and in a syringe.

19   Q.    Okay.

20   A.    The drugs will be available in the equipment room.

21   Q.    Okay.  And how long do you estimate it will take, if

22   you decide to use them, to get the drugs from the equipment

23   room and administered?

24   A.    The equipment room is where the drugs are administered.

25   Q.    Okay.

Mohr - Cross (Barnhart)                                           821

1    **A.**    So it is in the exact location where the administration

2    would take place.

3    **Q.**    So the step would just be filling the syringe and then

4    inserting -- administering the syringe?

5    **A.**    That is correct.

6    **Q.**    And you estimate that will take how long?

7    **A.**    Let me ask the question:  Are you involving the

8    conversation/deliberation, or is it exclusively the syringe?

9             THE COURT:  I understood the question to be from

10   the time you say another dose to the time that third dose is

11   administered, do you have an estimate of the amount of time

12   that would take?

13            THE WITNESS:  It would -- it would take a minute

14   or two to get into the -- into the lines.

15   BY MS. BARNHART:

16   **Q.**    So now I believe we have a clear answer if your team

17   says that he is still conscious.

18        Now, you also talked about if they are not confident,

19   if they are unsure whether he is or isn't conscious.  And at

20   that point, did you say one option would be to deliver that

21   third dose of 500?

22   **A.**    Yes.

23   **Q.**    Okay.  And did you also say that another option would

24   be to call the governor and call off the execution by

25   administering the reversal agent?

Mohr - Cross (Barnhart)                                              822

1    A.   That's close to what I said.  The governor, first of

2    all, is on the line.  So I don't have to call the governor.

3         And, second of all, I would -- I don't know that I just

4    have the ability to call it off.  I think there would need

5    to be a commitment on the part of the governor that there

6    would be a reprieve.  I think -- legally, I think that is

7    what is required.

8         So I would add those two parts to get to an affirmative

9    response to your question.

10   Q.   Okay.  So until the governor gives you that permission,

11   you don't have the power to tell your team to administer the

12   reversal agent?

13   A.   That's my understanding, and that's part of why we will

14   be using this as part of contingency training --

15   Q.   Um-hmm.

16   A.   -- that will, in fact, include the governor's office in

17   those discussions, to make sure.  And, in fact, we have had

18   discussions regarding this already, about the potential of

19   walking through that.  So we are in those discussions right

20   now.

21   Q.   So we will see that reflected in the training logs that

22   are produced going forward in discovery in this case before

23   Phillips' execution?

24   A.   Not only will you see that in the training logs, you

25   will see that in the 204s --

Mohr - Cross (Barnhart)                                            823

1    Q.    Um-hmm.

2    A.    -- from the medical team.  So it will be described to

3    them, yes.

4    Q.    Okay.  And so just to be clear, you -- the department

5    already has, or has plans, to order the reversal agent?

6    A.    We're exploring that right now.

7    Q.    So you haven't decided if you are going to order it

8    or --

9    A.    My intent is to order it.

10   Q.    Okay.

11   A.    We do not have it in our possession.  I want to be

12   clear about that.

13   Q.    Okay.  I appreciate that.  And when we are talking

14   about the reversal agent, we are talking about flumazenil?

15   A.    That's the only one I am familiar with.

16   Q.    Okay.  Now, is there a possibility that you would

17   consider speaking with the governor, asking for permission

18   for reprieve to administer the reversal agent earlier, after

19   either the first 500-milligram dose or the second 500-

20   milligram dose?

21   A.    It is possible, yes.

22   Q.    Okay.  Primarily thinking of it after, if you need to

23   do this third dose and things still aren't working?

24   A.    It is to achieve our incident objective of a humane

25   execution.  If -- if we believe during this process that an

Mohr - Cross (Barnhart)                                                824

1    event takes place -- that's why collaboration's important --

2    that would prevent us from having confidence in completing a

3    humane execution for whatever reason, that's reason for me

4    to have that discussion with the governor.

5    Q.    And what I'd like to know is what would qualify for one

6    of those events is if you saw the exact same things that

7    happened in the McGuire execution?

8    A.    No.

9    Q.    If -- what would qualify for that event would be if the

10   inmate speaks?

11   A.    My previous discussion has been that, one, it's going

12   to be a collaborative piece.

13   Q.    Um-hmm.

14   A.    So I am going to rely on the consciousness checks that

15   are being performed by people who do those regularly.  And

16   they will evaluate those things.  I am there to observe

17   what's happening as well, and ask questions about what I'm

18   seeing to get their feedback.

19         So -- so I didn't answer your question.  I do apologize

20   for that.  This one's on me, I think.

21   Q.    Well, I was asking if an inmate spoke -- and maybe to

22   save some time, because you keep going back to the

23   consultation --

24   A.    Yes.

25   Q.    -- perhaps it would be fair to say that there is no red

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Mohr - Cross (Barnhart)                                    825

1   line that could be -- that you could say in advance that

2   would be crossed where it doesn't matter what your team is

3   telling you, that you yourself are not willing to say that I

4   won't go forward?

5   A.    If I am -- if I am looking at an inmate who is

6   conversing, I mean conversing with someone in the room --

7   Q.    Um-hmm.

8   A.    -- after those doses of midazolam, I'm not going to go

9   forward.  I'm not -- I'm going to recommend that it not go

10  forward.

11  Q.    And by those doses, is it 1,500, 1,000, 500?

12  A.    After 1,000, if I see that kind of cognitive verbal

13  mechanical behavior, I'm going to recommend to the governor

14  that we don't.  Because at that point as the incident

15  commander, I am not going to have confidence --

16  Q.    Um-hmm.

17  A.    -- that we are going to be able to complete a

18  successful, humane execution.

19  Q.    Is there anything else -- now, when you say speaking,

20  does it this have to be -- can it be vocalization, such as

21  moan?

22        THE COURT:  He said conversation.

23        MS. BARNHART:  Yes, so --

24        THE COURT:  You can break it down.

25  BY MS. BARNHART:

1   Q.    Besides conversations, which I interpret to be words in

2   English, do you consider any other vocalizations to qualify?

3   A.    I think I used --

4            MR. MADDEN:  Objection.  Vague.

5            THE COURT:  I think it would be helpful to me -- I

6   don't know whether it would help either you or Director

7   Mohr, it would be helpful to me to know what examples, if

8   any, you are thinking about.

9            MS. BARNHART:  Could I ask the director --

10  BY MS. BARNHART:

11  Q.    What does that term mean to you, "vocalizations"?

12  A.    Noises.

13  Q.    So groans or moans?

14  A.    That would be a noise.

15  Q.    Are there any other noises that you have in mind?

16  A.    Just -- and I think Your Honor asked a question.  He is

17  trying to get some context behind this.  I consider a noise,

18  snoring or those kind of things, significantly different

19  than the cognitive process that would need to go on in a

20  conversation.  I think those are hugely different audible

21  sounds.

22           THE COURT:  I am remembering that there is some

23  testimony that Mr. McGuire said "I love you," or mouthed "I

24  love you."  I am not saying that that happened; I am saying

25  there is testimony that says that happened, which is

Mohr - Cross (Barnhart)                                           827

1    significantly different from snorting, snoring, gasping, or

2    groaning.  Can you respond to that possibility?

3           THE WITNESS:  Certainly, Your Honor.  And McGuire

4    did say that as the drugs were being placed in his body, not

5    after a dose, a full dose of drugs.  And not -- certainly

6    would not have been after 1,000 milligrams had been placed

7    in his body and after consciousness checks.

8        If that had happened, and if he had looked up and said

9    "I love you" after 1,000 milligrams of midazolam, I would

10   consider that a cognitive communication that I would

11   consider not moving forward.

12   BY MS. BARNHART:

13   Q.   At your deposition, you said you had not reviewed

14   accounts of other midazolam executions in other states.  Am

15   I correct about that?

16   A.   Yes.

17   Q.   At your deposition, you were presented information

18   about those other executions, correct?

19   A.   Yes.

20   Q.   And during this hearing, you heard from Dr. Bergese

21   about events at the other -- at those other executions that

22   he used in forming his opinion, correct?

23   A.   Yes.

24   Q.   And you have also heard other testimony from other

25   witnesses in this hearing to those other executions,

Mohr - Cross (Barnhart)                                    828

1    correct?

2    **A.**    Yes.

3    **Q.**    And then have you also read the plaintiffs' expert

4    reports from Dr. Bergese and Dr. Stevens as you pledged to

5    do that in your deposition, correct?

6    **A.**    Let me just say this:  I have never not complied with

7    Allen's request.  I not only read those, I read a total of

8    five reports, spending a whole day on the five reports that

9    I read, and took notes on them, Allen, so I did follow a

10   close loop on your request.

11            MR. BOHNERT:  Your Honor, could I make a request

12   for judicial notice that he will do whatever it is that I

13   request.

14            THE WITNESS:  I thought we were doing that the way

15   it's been going.

16            MS. BARNHART:  That's now incorporated in the

17   policy.

18            MR. MADDEN:  Objection.

19            THE COURT:  Too much levity.  I'm responsible.

20            THE WITNESS:  I'm sorry, Your Honor.

21            THE COURT:  No, I'm responsible for encouraging

22   it.

23   BY MS. BARNHART:

24   **Q.**    Both from those reports and from what you saw presented

25   by the experts at this hearing, both our experts and your

Mohr - Cross (Barnhart)                                    829

1    expert, Dr. Antognini, said that there is a ceiling effect

2    to midazolam, correct?

3            MR. MADDEN:  Objection.  Dr. Antognini didn't --

4    the suggestion that Dr. Antognini and their experts agree

5    that there is a ceiling effect, where that ceiling effect

6    is, is not accurate.

7            THE COURT:  That's true.  So rephrase the

8    question.

9    BY MS. BARNHART:

10   Q.   Dr. Antognini testified that there is a ceiling effect

11   to midazolam as to the receptor sites and the EEG.  Did you

12   hear that?

13   A.   Yes.

14   Q.   Having heard that from your expert and also from our

15   experts, do you believe there is a ceiling effect to

16   midazolam?

17   A.   I think there is.

18   Q.   And do you believe that that ceiling effect is below

19   500 milligrams?

20           MR. MADDEN:  Objection.

21           THE WITNESS:  I don't know.

22           MR. MADDEN:  That was not the testimony.

23           THE COURT:  It's answered anyway.

24           THE WITNESS:  I'm sorry.

25           THE COURT:  No, that's okay.

Mohr - Cross (Barnhart)                                    830

1    BY MS. BARNHART:

2    **Q.**    Do you believe that the ceiling effect will prevent

3    midazolam from causing an inmate to be in a state of general

4    anesthesia?

5    **A.**    I think it could.

6    **Q.**    Um-hmm, you think it could.  Thank you.

7         Because you believe that, what would be the utility of

8    giving up to 1500 milligrams of midazolam to an inmate?

9              MR. MADDEN:  Objection, Your Honor.  She is asking

10   him to render an expert opinion.

11             THE COURT:  Sustained.

12             MS. BARNHART:  I am not asking for an expert

13   opinion; I'm asking for his opinion.  He's testified that he

14   believes that after this hearing and the testimony in the

15   reports, that the department is going to have in the

16   equipment room a third dose of 500 milligrams of midazolam,

17   that would get up to 1,500 milligrams of midazolam.

18        I'm asking why he is doing that in light of the

19   information that he's heard and believes about the ceiling

20   effect.

21             THE COURT:  The witness has testified that he

22   believes there is a ceiling effect.  There is conflicted

23   testimony about what might -- what the dosage for that might

24   be, and so I stand by my ruling that the form of the

25   question is improper.

Mohr - Cross (Barnhart)                                          831

1              MS. BARNHART:  Your Honor, the witness also

2      testified he thought that it could prevent an inmate from

3      reaching a state of general anesthesia.

4              THE COURT:  He did.

5              MS. BARNHART:  So in light of that position, I'd

6      like to ask him what he thought -- what he thinks the

7      utility of having the third dose is.

8              THE COURT:  And I'm not going to argue with you

9      anymore, ma'am.  The form of the question is improper, and

10     the objection is sustained.

11             MS. BARNHART:  All right.  Thank you.

12     BY MS. BARNHART:

13     Q.   Do you believe that any inmate who's been executed with

14     midazolam suffered during his execution?

15             MR. MADDEN:  Objection, Your Honor.  She's not

16     being specific about which executions.

17             THE COURT:  All right.  I think she's asking in

18     general, does he know of any inmate who was executed with

19     the use of midazolam who suffered during the course of the

20     execution.

21             THE WITNESS:  Your Honor, I don't know that.

22     BY MS. BARNHART:

23     Q.   You heard testimony about -- well, first of all

24     about -- and you were there for McGuire's execution.  Do you

25     believe Mr. McGuire suffered?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Mohr - Cross (Barnhart)                                          832

```
1    A.    No.

2    Q.    You don't want to believe he suffered, right?

3    A.    No.

4              MR. MADDEN:  Objection, Your Honor.  It's

5    argumentative.

6              THE COURT:  It's proper cross.  Overruled.

7    BY MS. BARNHART:

8    Q.    And you don't want your team to have to wrestle with

9    the possibility that Mr. McGuire suffered, right?

10             MR. MADDEN:  Objection.

11             THE COURT:  That's sustained.

12   BY MS. BARNHART:

13   Q.    Do you want to believe that any inmate who's been

14   executed with midazolam in the country suffered?

15             MR. MADDEN:  Objection.  Same objection.

16             THE COURT:  I'll allow it.

17             THE WITNESS:  I don't want to believe that any

18   inmate suffers, whether they are being executed or not.  I

19   don't want to hear that.  I don't like to hear that.

20   BY MS. BARNHART:

21   Q.    Sure.  Do you believe that Joseph Wood in Oklahoma

22   suffered during his execution?

23             MR. MADDEN:  Objection.  First of all, Wood was

24   not in Oklahoma.

25             MS. BARNHART:  I'm sorry.  I meant Clayton Lockett
```

Mohr - Cross (Barnhart)                                    833

1    in Oklahoma.

2              MR. MADDEN:  Same objection.  He wasn't there, and

3    he doesn't -- no foundation.

4              THE COURT:  If he has an opinion about the Lockett

5    execution, he may give it.  I don't know whether -- I think

6    the director indicated that he had not read accounts from

7    other states.  So it's hypothetical.

8              MS. BARNHART:  The director heard testimony

9    from -- at this hearing about execution in other states.

10             THE COURT:  Right.  That's --

11             MR. MADDEN:  Of newspaper accounts, read

12   Dr. Bergese.  I don't believe there's been any testimony

13   about Lockett at all.

14             THE COURT:  Mr. Mohr, do you have an opinion about

15   whether Clayton Lockett suffered during his execution?

16             THE WITNESS:  Your Honor, I want to be direct with

17   you.  I would need to review documents to be able to make --

18   because there are multiple situations that have come up, and

19   I don't want to misspeak in this important proceeding.  So I

20   don't -- I don't know.

21   BY MS. BARNHART:

22   **Q.**  You are familiar with the *Glossip* case from the Supreme

23   Court?

24   **A.**  I have some familiarity with it.  I am not -- not to

25   your legal ilk here.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Mohr - Cross (Barnhart)                                                   834

 1    **Q.**   The *Glossip* case concerned evidence from Clayton

 2    Lockett's execution.  Based on that, do you -- are you

 3    refreshed as to which execution I am discussing?

 4                MR. MADDEN:  Objection.  Same objection.  He's

 5    already testified.

 6                THE COURT:  Sustained.

 7    BY MS. BARNHART:

 8    **Q.**   Are you aware of the Joseph Wood execution in Arizona

 9    that took over two hours?

10                MR. MADDEN:  Same objection, Your Honor.

11                THE COURT:  The witness can answer if he has

12    familiarity with that execution.

13                THE WITNESS:  I am familiar that Wood was executed

14    in Arizona, and I've heard accounts that it took two hours.

15    BY MS. BARNHART:

16    **Q.**   Do you have any reason to dispute those accounts?

17    **A.**   Perhaps.

18    **Q.**   And what are those?

19    **A.**   I've heard in this courtroom testimony about the

20    McGuire execution from an eyewitness that is in

21    contradiction to what I saw watching the execution.  So I

22    think it would depend on the source.

23    **Q.**   That would be Alan Johnson?

24    **A.**   He was not in Arizona.  The source, and I am not sure

25    who the source is.  I am not sure if it's a report.  And I

Mohr - Cross (Barnhart)                                    835

1    would be glad to review it if you have that, but I don't

2    have enough context about what happened in Arizona, other

3    than the two hours to -- that was stated to put an opinion.

4    Q.   Okay.  I just was trying to clarify.  You said you

5    heard testimony about the McGuire execution that conflicted

6    with your understanding, and was that the testimony from

7    Alan Johnson?

8              THE COURT:  Conflicted with his observation.

9              MS. BARNHART:  Yes, Your Honor.

10             THE WITNESS:  Yes.

11   BY MS. BARNHART:

12   Q.   And so, although, if I understand your position, there

13   is a possibility that the report of two hours is inaccurate,

14   you have no reason -- you are not aware of any information

15   to suggest that it's inaccurate?

16   A.   That's correct.

17   Q.   Do you believe that Joseph Wood suffered during that

18   execution?

19             MR. MADDEN:  Objection, Your Honor.  No

20   foundation.

21             THE COURT:  Sustained.

22   BY MS. BARNHART:

23   Q.   Do you believe hypothetically that an inmate whose

24   execution took over two hours, using all the hypothetical

25   facts of which you are aware relating to Joseph Wood's

Mohr - Cross (Barnhart)                                          836

1    execution, would have suffered?

2    A.    I think if -- and I am not -- I am sure I am aware, but

3    I don't have recollection of deciphering which one.  Let me

4    just be clear, because I do want to be responsive.  I think

5    if a person is conscious and the execution takes two hours,

6    it's inappropriate, and I would think that the person would

7    have suffered, physically or mentally.

8    Q.    The most recent Alabama execution, less than a month

9    ago, was Brooks, and you heard testimony about that

10   execution.  Do you believe hypothetically, if those facts

11   about the execution are accurate, that Mr. Brooks suffered?

12   I'm sorry.  I apologize.  Brooks was in January of last

13   year.  It's Smith who was in December.

14             THE COURT:  Ronald Smith.

15             MS. BARNHART:  Thank you.

16             THE WITNESS:  I said -- I'm sorry.  But these are

17   very confusing, being able to separate the events and

18   circumstances of these, and I don't want to respond to a

19   specific inmate if I don't have specific recollection of the

20   circumstances associated with that execution, and I just

21   don't.

22   BY MS. BARNHART:

23   Q.    You heard Spencer Hahn testify in this courtroom about

24   the Smith execution in Alabama in December.

25   A.    Yes.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Mohr - Cross (Barnhart)                                    837

1    **Q.**   If the facts of his testimony are accurate, do you

2    believe that Mr. Smith suffered during his execution?

3              MR. MADDEN:  Objection, Your Honor, as to his

4    testimony being accurate.

5              MS. BARNHART:  It was a hypothetical.

6              THE COURT:  It's a hypothetical.  I agree with

7    you, Ms. Barnhart.  The objection's overruled.

8              THE WITNESS:  Your Honor, if I could be refreshed

9    on the specific details of that testimony, then I would be

10   able to, I think, provide an opinion.  But, again, I don't

11   want to rely on my recollection of specific events because

12   there have been a lot of events discussed in this case.

13   And, quite frankly, detail is not an extraordinarily strong

14   point of mine.

15             THE COURT:  I think that's an appropriate

16   response.  The hypothetical needs to include the facts

17   rather than just you heard it a couple days ago.

18             MS. BARNHART:  Okay.

19             THE COURT:  It would be helpful to me, too.

20   BY MS. BARNHART:

21   **Q.**   Well, let me just put it this way:  Hypothetically, if

22   the testimony that you -- any of the testimony that you've

23   heard about any execution is accurate, have you heard

24   anything that would make you believe that an inmate who

25   exhibited that behavior suffered?

Mohr - Cross (Barnhart)                                              838

```
 1              MR. MADDEN:  That's the same vague -- that was the

 2    same problem we had.  Vague.

 3              THE COURT:  Sustained.

 4    BY MS. BARNHART:

 5    Q.   I'd like to return to talking about Mr. McGuire's

 6    execution.  Now, the protocol at the time of Mr. McGuire's

 7    execution required a specific amount of drugs to be

 8    administered, correct?

 9    A.   Yes.

10              MS. BARNHART:  And for the record, that was

11    01-COM-11, October 10th, 2013, and it's Plaintiffs' Exhibit

12    10 at Bates page 111, and we are going to blow it up on the

13    screen for ease of reference.

14              THE COURT:  And I will respectfully request that I

15    will be given a copy.

16              MR. MADDEN:  I still haven't received a copy from

17    the exhibits, I don't believe.  Did you guys send those to

18    me?

19              MS. WOOD:  I brought those in.  I was running a

20    little late trying to print all them, but I do have them and

21    we will mark them when we get to the evidence --

22              MS. BARNHART:  I am just talking about the

23    protocol at McGuire's execution.

24              MR. MADDEN:  Right.  There is a list of slides

25    here.
```

Mohr - Cross (Barnhart)                                          839

1              MS. BARNHART:  Exhibit 10.  The slides are just

2       pictures of the exhibit.  Everything I am going to use is an

3       exhibit.

4              THE COURT:  I just need to have the exhibit.

5              MR. MADDEN:  That's fine.  As long as they are

6       exhibits, I am fine with it.

7       BY MS. BARNHART:

8       **Q.**    So this is Plaintiffs' Exhibit 10 at Bates page 111,

9       and I believe it's section Roman Numeral VI(F)(4)(C).

10             THE COURT:  Whatever you have up there does not

11      reproduce page -- exhibit, page.  111.

12             MR. SWEENEY:  Well, Your Honor, this is a clip.

13      Bates page 111 is --

14             MS. BARNHART:  The part that is --

15             MR. MADDEN:  Yeah, they cut off.

16             THE COURT:  Whatever's on the screen is not Bates

17      page 111.  So somebody who made whatever's on the screen

18      needs to tell both me and the witness what it is that the

19      witness is being shown.

20             MR. SWEENEY:  This, Your Honor, is the protocol

21      that was in effect on October 10th of 2013.  The top of the

22      slide is just a clip from the protocol to show that, which

23      would be page 1 Exhibit 10, Plaintiffs' Exhibit 10.

24          The part that we are showing the witness is this part

25      down here, which, I believe, is from Bates page 111.

Mohr - Cross (Barnhart)                                      840

1              MR. MADDEN:  Your Honor, I would ask --

2              MR. SWEENEY:  I'm sorry.  101.  You guys have

3      these exhibits.

4              MR. MADDEN:  He should be given the entire

5      exhibit.

6              THE COURT:  Quiet.

7              MR. MADDEN:  I am trying to make it easier.  I

8      understand what's going on.

9              THE COURT:  So as I look at what's on the screen,

10     what I see is part of Bates page 101.

11             MR. SWEENEY:  Can I approach a minute, Your Honor,

12     just to show you?

13             MS. KONYA-GRABILL:  He's got it, Tim.

14             THE COURT:  Below the authentication box, which

15     purportedly bears the witness' signature -- that's your

16     signature, is it not?

17             THE WITNESS:  Yes.

18             THE COURT:  Right below that is another excerpt

19     from page 10 -- Bates page 101, Roman Numeral I, the

20     "Authority" section.

21         Then below the "Authority" section, there's a space

22     which represents an ellipses of many pages of Exhibit 1 --

23     Exhibit 10, I'm sorry -- and picks up on Bates page 111 with

24     paragraph "C," which reads, "If the warden determines," and

25     so forth.

1           Now, is my understanding accurate?

2               MR. SWEENEY:  That's right.  We are just trying to

3       show him this part right here.

4               THE COURT:  I understand.

5               MR. SWEENEY:  That's all we want to show.

6               THE COURT:  Go ahead and ask your question.

7               MR. MADDEN:  My objection, Your Honor, is I want

8       him to be provided the entire exhibit to look at.

9               MR. SWEENEY:  We can certainly do that.

10              THE COURT:  The record will reflect the Court has

11      furnished the witness with Volume I of the plaintiffs'

12      exhibits, including all of Exhibit 10.

13          Ms. Barnhart, are you ready with the question?

14              MS. BARNHART:  I am, Your Honor.

15              THE COURT:  Very good.

16      BY MS. BARNHART:

17      Q.   Director Mohr, directing your attention to page 111 of

18      this policy -- of the protocol, and the section is Roman

19      Numeral VI(F)(4)(C), does this section -- I'll read it

20      aloud, "Syringes 1 and 2, 10 milligrams of midazolam (under

21      whatever name it may be available from a manufacturer,

22      distributor, or compounding pharmacy) shall be administered

23      or prepared with a --"

24              THE COURT:  "Obtained or prepared."

25              MS. BARNHART:  Thank you, Your Honor.

Mohr - Cross (Barnhart)                                          842

1    BY MS. BARNHART:

2    Q.    "-- obtained or prepared with 5 milligrams over

3    milliliter concentration, 40 milligrams of hydromorphone

4    (under whatever name it may be available from a

5    manufacturer, distributor, or compounding pharmacy) shall

6    also be obtained or prepared with 10 milligrams/milliliter

7    concentration."

8         Director Mohr, did I read that accurately?

9    A.    Yes.

10   Q.    And does that reflect the required amount of drugs to

11   be administered to Mr. McGuire?

12   A.    Yes.

13   Q.    To your knowledge, was the required amount of drugs

14   administered to Mr. McGuire during his execution?

15   A.    Yes.

16   Q.    And on what basis do you make that determination?

17   A.    Two specifically.  First of all, in Ohio, compared to

18   other jurisdictions, we have a -- one individual that

19   actually prepares the drugs and a second certified drug

20   administrator under Ohio law that witnesses those, that

21   preparation and administration of those drugs; as well as

22   the disposal of the drugs, the handling of the drugs after

23   they are used.  And so there is a redundancy of

24   confirmation.

25        And there is a further confirmation of that on the DRC

Mohr - Cross (Barnhart)                                    843

1    201 form, which is the form that we utilize to follow the

2    path or the journey of the drugs through, from pharmacy

3    through the completion.

4    **Q.**    Now, in the case of Mr. McGuire's execution, Judge

5    Frost ordered that the vials in that execution to be

6    preserved, didn't he?

7    **A.**    Yes.

8    **Q.**    And the purpose of that preservation was that the vials

9    could be submitted to a lab to be tested, correct?

10   **A.**    I don't know.  I don't have reason to doubt that.

11   **Q.**    Okay.

12   **A.**    I don't know that I have direct knowledge of that,

13   though.

14   **Q.**    Do you have reason to doubt that those vials were sent

15   to a lab to be tested?

16   **A.**    No.

17   **Q.**    Are you aware of the results from the testing at that

18   lab?

19   **A.**    Not specifically, no.

20   **Q.**    I'd like you to turn to Exhibit 55, which is at Bates

21   page 562.

22             THE COURT:  He needs Volume II then, doesn't he?

23        The record will reflect that Volume II of plaintiffs'

24   exhibits has been furnished to the witness.

25   BY MS. BARNHART:

Mohr - Cross (Barnhart)                                          844

1   **Q.**   The defendants have warned us that they would be

2   objecting, so just to make the record clear, I'd like to ask

3   Director Mohr, have you -- do you recognize this document?

4   **A.**   First of all, I turned to the wrong page.

5   **Q.**   Okay.  Sure.

6           THE COURT:  Tab 55.  The bottom of the page reads

7   Plaintiffs' Preliminary Injunction Hearing Exhibits, Page

8   561.

9   BY MS. BARNHART:

10  **Q.**   And the document at the top has a symbol for NMS Labs.

11  Are you with us?

12  **A.**   Yes.

13  **Q.**   Do you recognize this document?

14  **A.**   No.

15          MR. MADDEN:  Objection, Your Honor, to any further

16  questions about this document.  This document is not the --

17  does not belong to the Department of Rehabilitation and

18  Corrections.  He's never seen this document.  This document

19  belongs to a lab that the other side picked for the testing.

20      No one has come in here to authenticate this lab

21  report.  It is hearsay.  Under no exception does it apply,

22  and it is inappropriate to have him testify about it.

23          THE COURT:  Well, I don't think there is a pending

24  question.  You can try.

25  BY MS. BARNHART:

Mohr - Cross (Barnhart)                                        845

1    **Q.**   Director Mohr, if your counsel had received a document

2    reflecting testing of the vials from McGuire's execution, is

3    that something that you would want to have seen?

4               MR. MADDEN:  Objection, Your Honor.

5               MS. BARNHART:  Hypothetical.

6               THE COURT:  That's perfectly appropriate.

7    Overruled.

8               THE WITNESS:  Just like the evidence in this case,

9    I would always be interested in input.

10   BY MS. BARNHART:

11   **Q.**   And if that document reflected that --

12              MR. MADDEN:  Objection, Your Honor.

13              THE COURT:  Such a document exists?

14              MS. BARNHART:  It does, Your Honor.  It's this

15   document here, Exhibit 55.

16              THE COURT:  You are representing to the Court and

17   to Mr. Mohr that this document was received by defendants'

18   counsel.  How are you -- are you making a representation

19   about how it got there?

20              MS. BARNHART:  One minute, Your Honor.  It's been

21   Mr. Bohnert who was involved in the litigation; at this time

22   I was not.

23              MR. BOHNERT:  Your Honor, when we had gotten the

24   court order to preserve the vials for testing from the

25   McGuire execution, we never possessed the vials.  The

Mohr - Cross (Barnhart)                                    846

1    defendants had the vials.  They filled out the

2    documentation.  We gave them the name of the place to send

3    the vials.  They -- they did that, and then the results were

4    sent, it is our understanding.

5              THE COURT:  The results were sent?

6              MR. BOHNERT:  The results were sent from the lab.

7    And what I am saying is it is our understanding that the

8    results were also sent to the defendants.  We, the

9    plaintiffs, received a letter from the lab with those

10   results.  It is our understanding that a letter was -- the

11   results were also sent to the defendants because I believe

12   they requested them.

13        I don't know that we were able to find that letter

14   addressed to the defendants in the discovery that has been

15   produced to us, which then meant we had to rely on the

16   letter that we received.  But it is our understanding that

17   the defendants were also provided the results of the

18   testing.

19             MR. MADDEN:  Your Honor, may I respond?

20             THE COURT:  Please.

21             MR. MADDEN:  They picked the lab.  Judge Frost,

22   the day before the execution, ordered us to preserve the --

23   preserve the vials after the execution.  For about a couple

24   of months, we decide -- Allen picked the lab, you know.  We

25   did some research on the lab.  I actually hired someone from

Mohr - Cross (Barnhart)                                    847

1    here in Dayton to go follow the drugs and watch the drugs

2    being tested just in case I had to call her as a witness.

3        Now when I got this witness list, I noticed there was

4    no witness from this laboratory to authenticate this

5    document.  So I didn't call my witness who went with the

6    drugs to, and it would be -- it's -- this is hearsay.

7            THE COURT:  Well, you are getting beyond yourself.

8            MR. MADDEN:  Even if it's a hypothetical, Your

9    Honor, you can only have hypotheticals with lay witnesses if

10   it's based on the evidence.  There is -- he's not an expert,

11   and certainly not an expert on testing of drugs.

12           MR. BOHNERT:  My question to you is are you

13   representing to us and to the Court --

14           MR. MADDEN:  No, I --

15           MR. BOHNERT:  -- that the lab never sent to you a

16   copy of this result?

17           MR. MADDEN:  The only --

18           MR. BOHNERT:  Because the agreement and the

19   materials that are provided to us in discovery by your side,

20   it's stipulated that those are authenticated.

21           MR. MADDEN:  No, no, no, no.  It's only stipulated

22   that DRC records that we turn over in discovery are

23   authenticated and admissible; not any, any records that you

24   get from a testing lab in Philadelphia is authenticated, no.

25           MR. BOHNERT:  I am saying the materials that you

Mohr - Cross (Barnhart)                                    848

1    sent to us, the agreement has always been --

2               MR. MADDEN:  No, no, no.

3               MR. BOHNERT:  -- if it was provided --

4               MR. MADDEN:  No --

5               THE COURT:  One at a time.

6               MR. MADDEN:  Your Honor, this is addressed to

7    them.  This is their record.  You know, I did receive a copy

8    of that -- I did receive a copy of that report, but there

9    needs to be a witness here to authenticate that record and

10   make it admissible.  I never consented to this drug -- this

11   record, who is not DRC's record, to be authenticated and

12   admissible.

13              THE COURT:  All right.  So, Director Mohr, have

14   you ever seen that document?

15              THE WITNESS:  No, sir.

16              THE COURT:  Very well.

17        Go ahead, Ms. Barnhart.

18              MS. BARNHART:  Your Honor, I'd just like to note

19   for the record, since Mr. Madden has represented that they

20   did receive this document, we did not receive a copy sent to

21   the defendants in discovery to us and --

22              THE COURT:  Go ahead.

23              MS. BARNHART:  And that's a problem.  We would

24   like to orally move to compel them to produce that to us.

25              THE COURT:  Denied.

1           MS. BARNHART:  Your Honor, I can also -- I can

2      call as a witness Carol Wright, whose --

3           THE COURT:  What's the point?

4           MS. BARNHART:  This document was addressed to.

5           THE COURT:  What's the point?

6           MS. BARNHART:  The point of what?

7           THE COURT:  You want to get into evidence the

8      content of this document?

9           MS. BARNHART:  Correct.

10          THE COURT:  No way.  Can't be done through Carol

11     Wright, Gary Mohr, Tom Madden, or Allen Bohnert.

12          MS. BARNHART:  All right.  Thank you, Your Honor.

13          MR. MADDEN:  I ask that it be taken down from the

14     screen.

15     BY MS. BARNHART:

16     **Q.**   Director Mohr, if the required amount of drugs were not

17     administered to Dennis McGuire during his execution, is that

18     something that you authorized in advance in writing?

19          MR. MADDEN:  Objection.  Lack of foundation.  No

20     evidence of that.

21          MS. BARNHART:  Hypothetical.

22          THE COURT:  We are into the problem of many

23     hypotheticals many propounded to this lay witness, and that

24     objection hadn't been raised before, but do you want to make

25     any argument about that, ma'am?  This is not an expert

Mohr - Cross (Barnhart)                                         850

1    witness.

2              MS. BARNHART:  No, Your Honor.

3              THE COURT:  The objection's sustained.

4    BY MS. BARNHART:

5    Q.   Director Mohr, if we could pull up on the screen, and

6    you can turn in your binder Plaintiffs' Exhibit 50, which is

7    at Bates page 549.

8         Are you there, Director?

9    A.   Yes.

10   Q.   And this is a letter that was sent to you, correct?

11   You recognize this letter?

12   A.   Yes.

13   Q.   It was sent to you from Warden Donald Morgan, correct?

14   A.   Yes.

15   Q.   And it's dated January 16, 2014, correct?

16   A.   Yes.

17             MS. BARNHART:  Your Honor, we'd move to admit this

18   exhibit into evidence.

19             THE COURT:  Any objection?

20             MR. MADDEN:  Let me just make sure if I recognize

21   it.

22             MS. BARNHART:  I am not sure it's necessary

23   because it is a DRC document.

24             MR. MADDEN:  It is a DRC document.

25             MS. LOWE:  It's in the binder.

```
1              MR. MADDEN:  It's in the binder, okay.

2    BY MS. BARNHART:

3    Q.   So, Director Mohr, this letter was prepared, and it

4    addresses the topic of the Dennis McGuire's execution,

5    correct?

6    A.   Yes.

7    Q.   And it says that everything went fine in his execution,

8    correct?

9    A.   Not exactly.

10   Q.   It says, quote, at the bottom the last paragraph, "The

11   process worked very well, and the execution was carried out

12   in compliance with 01-COM-11," correct?

13   A.   It does say that.

14   Q.   Thank you.  Next if you could turn to Exhibit 49, which

15   is at Bates pages 541 and 542.

16        Are you there?

17   A.   Um-hmm.

18   Q.   Do you recognize this document?  So the record is

19   clear, the slide is showing excerpts, as is indicated,

20   excerpts from both Bates page 541 and 42 of the Executive

21   Summary that is located at Exhibit 49.

22        Director Mohr, this exhibit is entitled "Executive

23   Summary," correct?

24   A.   Yes.

25   Q.   It's dated April 28, 2014, correct?
```

Mohr - Cross (Barnhart)                                    852

1    A.    Yes.

2    Q.    And if we could move to the next slide.

3          On page 542 of the exhibit, which is the second page

4    there, do you see the paragraph beginning with "Also as part

5    of its post-execution review"?

6    A.    Yes.

7    Q.    Does that paragraph continue that "DRC analyzed the use

8    of the combination of midazolam and hydromorphone.  DRC's

9    attorney and its assistant attorney generals discussed the

10   events and the observations of the McGuire execution with

11   its expert witness, Dr. Mark Dershwitz."

12         Do you see that?

13             MR. MADDEN:  Objection.  Relevance.

14             THE COURT:  Overruled.

15   BY MS. BARNHART:

16   Q.    Now, Director Mohr, Dr. Dershwitz was upset about these

17   statements, wasn't he?

18   A.    I don't know.

19   Q.    You don't know?

20   A.    No.

21   Q.    If you could turn to Tab 51 in the exhibit binder,

22   which is at Bates pages 550 and 551.

23         And for the record, our slide reproduces excerpts from

24   both of those pages beginning on page 550 with the top of a

25   letter dated April 30th, 2014, addressed to Mark Dershwitz.

Mohr - Cross (Barnhart)                                    853

1    And then the second part of the slide has the end of the

2    letter that bears Steve Gray's signature from Bates page

3    551.

4         Do you recognize this letter, Director Mohr?

5    **A.** I don't know that -- I don't recognize it from previous

6    experience, no.

7    **Q.** Okay.

8    **A.** I have not seen it.

9    **Q.** You are not aware that Stephen Gray, your chief

10   counsel, sent a letter to Dr. Dershwitz following the

11   release of the Executive Summary that we just looked at

12   right before this?

13        MR. MADDEN: Objection, Your Honor. That's not

14   what he said.

15        THE COURT: Sustained.

16   BY MS. BARNHART:

17   **Q.** Are you aware that Steve Gray sent a letter to

18   Dr. Dershwitz following the release of the Executive Summary

19   that we just looked at right before this exhibit?

20   **A.** I'm aware that Steve Gray communicated with

21   Dr. Dershwitz. I was not aware what form. And I did not

22   read this letter until now.

23   **Q.** Okay. Does this letter state, "The purpose of this

24   letter" -- this is in the second paragraph on the first

25   page. "The purpose of this letter is to make absolutely

Mohr - Cross (Barnhart)                                        854

```
 1   clear that you had no involvement whatsoever with DRC's

 2   decision to change the policy by increasing the amounts of

 3   the doses of midazolam and hydromorphone"?

 4   A.   That's what is stated.  That's what it states.

 5   Q.   And do you know why Steve Gray sent that letter to

 6   Dr. Dershwitz?

 7   A.   No.

 8            MR. MADDEN:  Objection, Your Honor.

 9            THE WITNESS:  Sorry.

10            THE COURT:  Overruled.  The answer is "No," and it

11   can stand.

12   BY MS. BARNHART:

13   Q.   And does the letter also say -- I'm sorry.  We're

14   moving back now to the Executive Summary, which is Exhibit

15   49, which is Bates page 541.  And the slide shows one

16   paragraph excerpt from that letter.  The paragraph begins,

17   "As part of that review."

18        Do you see that paragraph, Director Mohr?

19   A.   Yes.

20   Q.   And that paragraph states, "As part of that review, DRC

21   examined accounts from eyewitnesses, including nearly 20 DRC

22   employees and family members and media representatives."

23        Do you see that statement?

24   A.   I do.

25   Q.   Is it -- do you know that to be an accurate statement?
```

Mohr - Cross (Barnhart)                                      855

1   **A.**   I have no reason to believe it's not.

2   **Q.**   Do you know of any family members or media

3   representatives who were interviewed in the manner suggested

4   in this sentence?

5   **A.**   No, not specifically.

6   **Q.**   Would you have reason to dispute that no family members

7   and no media representatives were interviewed?

8   **A.**   I don't --

9            MR. MADDEN:  Objection.  He already testified he

10  doesn't have knowledge.

11           THE COURT:  Sustained.

12  BY MS. BARNHART:

13  **Q.**   Going back -- well, we're still on -- are you aware

14  of -- of anyone besides DRC employees being interviewed for

15  this after -- or this Executive Summary?  Do you have

16  personal knowledge of anyone besides a DRC employee who was

17  interviewed?

18  **A.**   I don't have personal knowledge.

19  **Q.**   Do you have any kind of knowledge?

20  **A.**   I understand --

21           MR. MADDEN:  Objection.  He's already said he

22  doesn't have personal knowledge.

23           THE COURT:  Also hearsay.  Sustained.

24  BY MS. BARNHART:

25  **Q.**   Director Mohr, the protocol at the time Dennis McGuire

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Mohr - Cross (Barnhart)                                    856

1   was executed, which we have looked at previously as

2   01-COM-11, October 10th, 2013, which is Exhibit 10.  It's

3   Bates page 107, and I'm looking at -- the slide shows the

4   section numbered 4, "Training," which is at the top of Bates

5   page 107.  Are you there --

6   A.    I am.

7   Q.    -- director?  And does this protocol state that

8   "Training shall be addressed" -- I'm sorry -- "training

9   shall address any accommodations or contingencies that might

10  be anticipated"?

11  A.    Yes.

12  Q.    And are you aware that Team Member Number 10

13  testified -- and we have his deposition testimony here.

14  This is document number 879-1 that was filed in this case.

15  The PageID is 28781.  And Team Member Number 10 testified

16  that he was surprised -- I believe he also testified as to

17  this during this hearing, which you have heard as well --

18  that he was surprised by the -- by what happened at

19  McGuire's execution.

20        And the question is, "You were not prepared for that

21  type of reaction from Mr. McGuire that he exhibited that

22  day, correct?"

23        And the answer is, "Correct."

24        Question:  "And so all the training that you had gone

25  on -- that had gone on up to the McGuire execution did not

Mohr - Cross (Barnhart)                                        857

1    prepare you for what you actually saw, right?"

2        Answer:  "That's correct."

3        Are you aware of that testimony from Team Member 10?

4    **A.**   Yes.

5    **Q.**   As the incident commander, you did not authorize in

6    advance a contingency that did not have to be addressed

7    regarding McGuire's execution, correct?

8        MR. MADDEN:  Objection.  That's a misleading

9    question.  And vague.  First of all, the part of the policy

10   she's referring to refers back to the 21-day assessment.

11   Unless she can relate it back to that, I am not sure that

12   this is relevant.

13       MS. BARNHART:  I am referring to the training part

14   of the policy.

15       MR. MADDEN:  That's right, the training part is

16   any contingencies brought about by the 21-day assessment.

17       THE COURT:  Tom, can you give me a page reference

18   you are referring to there?

19       MR. MADDEN:  Yes, Your Honor.

20       Yes, Your Honor, page 6 of 19, Plaintiffs' Exhibit

21   Number 10, Bates stamp Number 106.  And then 7 of 19, Bates

22   stamp 107.

23       MS. BARNHART:  Tom, you identified page 106 that

24   has --

25       THE COURT:  107.

1          MS. BARNHART:  107.  So 103 has the section

2    "Prisoner."  That's what you are referring to as the 21-day

3    assessment?

4          MR. MADDEN:  I'm talking about the 21-day at

5    the -- the 21-day assessment at CCI, which is 3a.

6          MS. BARNHART:  And I'm talking about the training,

7    which is not in Section 3, it's in Section 4.

8          MR. MADDEN:  Well, that's -- they are related.

9          THE COURT:  Okay.  I'm reading Section 4a, and it

10   reads, "The execution team shall begin conducting training

11   sessions no less than once per week until the scheduled date

12   of execution.  The training shall address any accommodations

13   or contingencies that might be anticipated."

14      I take it, Ms. Barnhart, your question, your use of the

15   word "contingency" refers to this paragraph?

16         MS. BARNHART:  That's correct, Your Honor.

17         THE COURT:  All right.  And the question,

18   Mr. Mohr, is, as the incident commander, you did not

19   authorize in advance a contingency as it's referred to here

20   in paragraph 4a, a contingency that did not have to be

21   addressed regarding McGuire's execution; is that correct?

22         MR. MADDEN:  My objection has been withdrawn, Your

23   Honor.

24         THE COURT:  Thank you.

25         THE WITNESS:  The two negatives are not --

Mohr - Cross (Barnhart)                                                859

```
 1              MS. BARNHART:  I can rephrase.
 2              THE WITNESS:  -- a question and I, quite frankly,
 3     don't know how to answer the thing.
 4              THE COURT:  All right.  Is there any contingency
 5     that you were aware of at the time that you told the
 6     execution team they didn't have to train for?
 7              THE WITNESS:  I did not.
 8              THE COURT:  Ms. Barnhart, your next question.
 9              MS. BARNHART:  Thank you.  I believe that answers
10     my question.
11              THE COURT:  Good.
12              MS. BARNHART:  Thank you, Your Honor.
13     BY MS. BARNHART:
14     Q.   Do you think you let your team down by not preparing
15     them for what they saw in the McGuire execution?
16     A.   No.
17     Q.   At your deposition, you told us that you believed the
18     State's expert, Dr. Dershwitz, over the plaintiffs' expert,
19     Dr. Waisel, as to what would transpire in the McGuire
20     execution, correct?
21     A.   Yes.
22     Q.   Did what Dr. Waisel predict would happen about the
23     inmate gasping and struggling for breath indeed happen
24     during McGuire's execution?
25     A.   No, it did not.
```

Mohr - Cross (Barnhart)                                    860

1    Q.   Do you know, following Dr. -- following Mr. McGuire's

2    execution, believe that Dr. Waisel's opinion was more

3    correct than Dr. Dershwitz's?

4    A.   No.

5    Q.   Thank you.  You testified previously that you removed

6    midazolam from Ohio's protocol in January of 2015 for -- I

7    think there was a two-part reason, and we have some of your

8    deposition testimony to help illustrate that, but -- okay,

9    we don't.

10        So I will just -- so this is from your deposition, two

11   weeks ago I believe now, and what you told us was that,

12   first, you made the decision to remove the combination of

13   hydromorphone and midazolam because you had some optimism

14   that you'd be able to obtain drugs that had been used

15   before, pento and sodium thiopental; is that accurate?

16   A.   Yes.

17   Q.   And then you went on to say, and this is if you want to

18   follow along, it's the next slide.  It's line 14.

19        "And then, finally, Allen, I think the combination of

20   hydromorphone and midazolam, I had lost some confidence."

21        And you were asked why.  And you said in the experience

22   of the other jurisdictions.  And you were asked to tell me a

23   bit more.  And you said that there had been a couple of

24   experiences that have taken either a very long time or

25   repeated doses in states that were in fact using a

Mohr - Cross (Barnhart)                                              861

1    three-drug protocol that seemed to be successful in

2    achieving a humane execution.

3          So it's fair to say that you had lost some confidence

4    in using hydromorphone and midazolam.  That's what you

5    testified to, correct?

6    A.    Yes.

7    Q.    And have you regained confidence today in hydromorphone

8    and midazolam?

9             MR. MADDEN:  Objection, Your Honor.  Relevance.

10   What we're talking about is a 500 milligram as an anesthetic

11   before the two drugs, not hydromorphone, which their own

12   expert testified has a synergistic effect.

13            THE COURT:  The question as put to the witness is

14   hypothetical, and the objection is sustained.

15   BY MS. BARNHART:

16   Q.    Had you previously lost confidence in midazolam?

17   A.    No.

18   Q.    Do you believe that the U.S. Supreme Court has said in

19   *Glossip* that Oklahoma protocol, which is the same protocol

20   that Ohio has currently adopted, is constitutional?

21   A.    I understand that to be the case.

22   Q.    Okay.  Now, I know you are not a lawyer, but even as a

23   lay person, you understand that the Supreme Court is kind of

24   at the top -- right? -- and all the courts below it has to

25   follow what it says, correct?

Mohr - Cross (Barnhart)                                    862

1    **A.**    Yes.

2    **Q.**    And so if the Supreme Court said something was

3    constitutional, a lower court isn't free then to decide

4    whether it is unconstitutional; is that correct?

5    **A.**    I am in speculative grounds here, Your Honor.  I think

6    that sounds reasonable.

7    **Q.**    If the Supreme Court had said that Oklahoma's protocol

8    was constitutional, do you believe we would be having this

9    hearing today?

10              MR. MADDEN:  Objection.

11              THE COURT:  Sustained.  Calls for a legal

12   conclusion.

13              MR. MADDEN:  Okay.

14   BY MS. BARNHART:

15   **Q.**    Okay.  Well, I'll just read to you something that Judge

16   Merz has said actually in his order that was denying a

17   motion to quash your deposition.  And he said that

18   "Defendants have objected that any information possible to

19   be obtained from Director Mohr would be irrelevant, and, in

20   part, that objection is based on the assertion that the

21   United States Supreme Court has --"

22              THE COURT:  A little slower.

23              MS. BARNHART:  Sorry.  Yes, Your Honor.

24   BY MS. BARNHART:

25   **Q.**    "-- that the United States Supreme Court has affirmed a

Mohr - Cross (Barnhart)                                    863

1    lethal injection protocol which is substantially similar to

2    Ohio's, and that the defendants' position is consistent with

3    your position that the Supreme Court said that that protocol

4    is constitutional."  Correct?

5    A.    I understand that.  I would agree with that.

6    Q.    Okay.  Judge Merz wrote that "That misstates the

7    holding in *Glossip*, because, in reaching that conclusion,

8    the Court reiterated a long-standing rule that the Supreme

9    Court reviews District Court factual findings for clear

10   error, and that that review is even more differential from

11   the factual findings that have been reviewed and affirmed by

12   an intermediate appellate court.  The Supreme Court does not

13   affirm protocols."

14             MR. MADDEN:  Objection, Your Honor.  This is a

15   legal argument, and it's best reserved for closing

16   arguments.  It's asking for a legal conclusion.

17             THE COURT:  I don't know that there is a question

18   there.

19   BY MS. BARNHART:

20   Q.    Judge Merz continued to say that "The Supreme Court did

21   not hold that a state cannot violate the Eighth Amendment if

22   it uses a lethal injection protocol similar or even

23   identical to that used by Oklahoma.  Perhaps plaintiff here

24   can make a better case against midazolam than the plaintiffs

25   in *Glossip*, but they have not yet had that opportunity since

Mohr - Cross (Barnhart)                                              864

```
 1    no lethal injection preliminary injunction motion has been

 2    heard in this case since Glossip was decided."

 3         Hearing that, Director Mohr, do you still believe that

 4    the Supreme Court held that Oklahoma's execution protocol

 5    was constitutional?

 6              MR. MADDEN:  Objection.  Calls for a legal

 7    conclusion and argumentative.

 8              THE COURT:  Sustained.

 9              MS. BARNHART:  Just so I can be clear as to what's

10    permissible, Director Mohr testified that he does believe

11    the Supreme Court held that the protocol was constitutional.

12              THE COURT:  Right.

13              MS. BARNHART:  And I may not ask him whether --

14              THE COURT:  Whether I have persuaded him to the

15    contrary?

16              MS. BARNHART:  Correct.

17              THE COURT:  No.

18              MS. BARNHART:  Thank you, Your Honor.

19    BY MS. BARNHART:

20    Q.   Director Mohr, what do you think the chance that Ohio's

21    inmates will suffer under Ohio's execution protocol is now

22    after you have heard the testimony in this case and

23    carefully reviewed all of the expert reports?

24              MR. MADDEN:  Objection.  Speculative.

25              THE COURT:  Overruled.
```

Mohr - Cross (Barnhart)                                    865

```
 1              THE WITNESS:  Did you say what do I think the

 2   chance?

 3   BY MS. BARNHART:

 4   Q.   I did.

 5              THE COURT:  What do you think the chance is that

 6   Ohio's inmates, presumably those death-row inmates executed

 7   under this protocol, will suffer under this execution

 8   protocol, what do you think that chance is now after you

 9   have heard the testimony in this case and carefully reviewed

10   all of the expert reports?

11              THE WITNESS:  I do not believe that they will

12   suffer pain.

13   BY MS. BARNHART:

14   Q.   A zero percent chance?

15   A.   I do not believe -- if I -- I don't believe they will

16   suffer pain.

17   Q.   So you are saying that the level of risk that is

18   acceptable to you is none?

19              MR. MADDEN:  Objection.

20              THE COURT:  Sustained.  Misstates the testimony.

21              MS. BARNHART:  Okay.  Thank you.  That's fair.

22   BY MS. BARNHART:

23   Q.   So you are saying that you believe there is no chance

24   the inmates will suffer?

25              MR. MADDEN:  Same objection.
```

Mohr - Cross (Barnhart)                                        866

```
 1              MS. BARNHART:  I thought --

 2              THE COURT:  Sustained.

 3              MS. BARNHART:  Could we --

 4              THE COURT:  It's a proper cross, but I don't think

 5    that's what he said.

 6              MS. BARNHART:  Okay.  Can we read back what he

 7    said?  I just may --

 8              THE COURT:  Yes.  "I do not believe -- I do not

 9    believe they will suffer pain."

10              MS. BARNHART:  Okay.  Oh, because I left out the

11    word "pain"?

12              THE COURT:  No, no.  That's his answer, "I do not

13    believe they will suffer pain."

14              MS. BARNHART:  Okay.

15              THE COURT:  You are trying to get -- as I

16    understand it, you are trying to get a quantification.

17              MS. BARNHART:  Thank you, yes.

18    BY MS. BARNHART:

19    Q.   So my question is what do you think the chance that the

20    inmates will suffer pain is?

21    A.   I drive to Lucasville from my home for these executions

22    always, having concern regardless of whether it's a single-

23    drug or multiple-drug approach, that something could go

24    wrong -- IV access, regardless of the protocol.  There is

25    tremendous pressure put on our team in a very difficult
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Mohr - Cross (Barnhart)                                    867

```
 1    situation.  Something could happen.

 2         I don't feel at this moment -- I don't know what a

 3    percentage is, but there's not been -- in 11 executions that

 4    I have conducted, there has not been a cavalier attitude

 5    that I think there is no chance, regardless of the protocol.

 6    And I think we've had something like eight or nine protocols

 7    in the last ten years of varying degrees.  There has not

 8    been a day that I don't worry.

 9         There is a chance regardless of the drugs being used

10    that someone could experience pain, but I'm not -- I would

11    not proceed if I believed that they would.  If I believed

12    that they would suffer, I would resign my position and not

13    go through with this, despite it being an Ohio law.

14    Q.   I appreciate that.  Thank you.

15         So I'd like to get an understanding of your belief.  If

16    it was more likely than not, so that would be anything over

17    50 percent, that the inmates would suffer, would that form

18    your belief --

19              THE COURT:  The question -- your question is

20    inmates, plural?

21              MS. BARNHART:  An inmate in an execution.

22              MR. MADDEN:  Asked and answered.  He's answered

23    this.

24              THE COURT:  Overruled.

25              THE WITNESS:  I would not proceed with an
```

Mohr - Cross (Barnhart)                                    868

1    execution.  I'd have a discussion with the governor to

2    determine whether -- not just the process or whether I am

3    the right person.  I would not proceed if I believed there

4    was a likelihood that I would cause an inmate to suffer.  I

5    would not proceed with that.

6    BY MS. BARNHART:

7    Q.   If it was -- if we just flipped it, if it was 51

8    percent that they wouldn't suffer and 49 percent chance that

9    they would, would that be a belief under which you would not

10   proceed?

11           MR. MADDEN:  He stated unequivocally that he would

12   not do that.  These percentages, the same answer's going to

13   be the same.  It's asked and answered.

14           THE COURT:  Well, I disagree, Mr. Madden.

15           THE WITNESS:  I don't know.  I'd have to -- I'd

16   have to ponder that more than a 30-second response.

17   BY MS. BARNHART:

18   Q.   Um-hmm.

19   A.   I don't know what the threshold is.

20   Q.   Okay.

21   A.   If I believed it was likely to happen, I would not

22   proceed with an execution, and I -- I don't know what a 30

23   percent or a 48 percent means right now.  I don't know.

24   This is too serious to give a flippant, one-minute pondering

25   of this.  I don't feel that that is worthy -- that this

1   issue is much more worthy than my response in that way.

2   Q.    Here's the reason why I am asking:  The burden on the

3   plaintiffs in this proceeding is much higher than 50

4   percent.  We must show, at least for the *Baze/Glossip*

5   claims, that there is a substantial risk of harm.

6         And so the reason why I am asking you this is to know

7   whether you will simply rely on the result -- the legal

8   result in this case as to whether plaintiffs prevail on that

9   higher burden, or whether, if plaintiffs had convinced you

10  to a lesser degree that doesn't meet substantial likelihood

11  of harm but is more likely than not, if that would cause you

12  not to go forward?

13  A.    Let me respond, and I'll respond, Your Honor -- I want

14  to be responsible.  But let me respond to a note that I

15  passed to this group of attorneys before I started.

16  Q.    Was it asking for legal advice?

17  A.    No, it was not.

18              THE COURT:  Go ahead.

19              THE WITNESS:  I think this is important.

20              THE COURT:  I do, too.

21              THE WITNESS:  And I think, Your Honor, you and I

22  might be the only ones in here on this page, maybe.  We're

23  all in this together.  The outcome of this, whether it is

24  successful or not, is not in my mind defined by Your Honor's

25  decision, one appellate decision at all.  It is based on the

Mohr - Cross (Barnhart)                                          870

1    outcome of an execution; and if, in fact, it is humane and

2    people are not suffering, regardless of which way it goes.

3         And so the decision here is minuscule in my mind

4    compared to the impact on people.  And people -- inmates are

5    people.

6         So I don't know where that goes in terms of the

7    responsiveness to this.  And that's why getting into these

8    percentages, quite frankly, demeans from me my fundamental

9    tenet that I do not want to proceed with an execution that I

10   believe when there is a likelihood that someone will suffer.

11   I will not do that.

12   BY MS. BARNHART:

13   Q.   And so if I'm hearing what you are saying then,

14   regardless of what the legal decision is, if you are

15   convinced that it's likely, more likely than not, that the

16   inmate will suffer, you will not go forward?

17   A.   And that has been my practice in six years, and it's

18   been my experience, and those folks know it with discussions

19   with the governor.  That has not been the end product of a

20   judicial proceeding, it has been what we believe is the

21   right thing to do, and that has been the overriding part of

22   our decision.

23        We will obviously comply with the legal proceedings,

24   but there's another level and another dimension to this that

25   I'll take to my grave.

Mohr - Cross (Barnhart)                                    871

1    **Q.**    Thank you.  Previously, for the McGuire execution, we

2    talked about how you believed the State's expert,

3    Dr. Dershwitz, over the plaintiffs' expert, Dr. Waisel.  Do

4    you believe the State's expert, Dr. Antognini, over the

5    plaintiffs' expert, Dr. Bergese, here?

6    **A.**    Yes.

7    **Q.**    Have you trained your team for any contingencies in the

8    upcoming execution?

9    **A.**    We have met --

10          THE COURT:  I am going to interrupt at this point.

11   That's a new topic, and we haven't taken a morning recess

12   yet, so we will do that for ten minutes.

13          THE COURTROOM DEPUTY:  All rise.  This court

14   stands in recess.

15       (Recess taken from 10:51 a.m. until 11:02 a.m.)

16          THE COURT:  Ms. Barnhart, you may resume your

17   examination.

18          MS. BARNHART:  Thank you, Your Honor.

19   BY MS. BARNHART:

20   **Q.**    Director Mohr, is the fact that Arizona recently

21   committed to never using midazolam again significant to you?

22       I see your counsel is not here.

23          THE COURT:  Let's wait.

24       (Off the record.)

25          THE COURT:  Ms. Barnhart, you may resume your

Mohr - Cross (Barnhart)                                          872

```
1    examination.

2              MS. BARNHART:  Thank you, Your Honor.

3    BY MS. BARNHART:

4    Q.    I'll ask you again, Director Mohr, for your counsel's

5    benefit.

6          Is the fact that Arizona recently committed to never

7    using midazolam again significant to you?

8    A.    Yes.

9    Q.    How so?

10   A.    Any input regarding lethal injection, whether it be in

11   this courtroom or from any other director that's sitting in

12   my shoes, is -- I hold as significant.

13   Q.    And is the same true of Florida?

14   A.    Any director that would make any change or any comment

15   is significant.

16   Q.    How many states would have to get rid of using

17   midazolam for Ohio to make that decision?

18   A.    I don't know.

19   Q.    Did you hear Dr. Bergese testify that a response to the

20   consciousness check that's intended to be used in Ohio's

21   protocol would reveal that the inmate is still conscious,

22   correct?

23   A.    I'm not sure that I --

24   Q.    I can see you are confused.

25   A.    Yeah, I am confused.
```

Mohr - Cross (Barnhart)                                        873

1    **Q.**   I was trying to break it up, but maybe that was the

2    wrong approach.  Dr. Bergese testified -- did you hear

3    Dr. Bergese testify that while a response to the

4    consciousness check would indicate consciousness, the same

5    could not be said of the lack of a response?  Just because

6    someone does not respond does not mean that they are

7    unconscious.  Did you hear that testimony?

8    **A.**   I did.

9               THE COURT:  Excuse me.

10              MS. BARNHART:  Did not mean that they are -- if

11   you don't respond.

12              THE COURT:  You are right.

13              MS. BARNHART:  Thank you, Your Honor.

14              THE COURT:  Complex grammar, but you are right.

15              MS. BARNHART:  Thank you.

16   BY MS. BARNHART:

17   **Q.**   And, of course, when we're talking about consciousness,

18   we're talking about being insensate to pain and unaware.

19   **A.**   Unconscious.

20   **Q.**   Yes.  Correct, thank you.

21        Do you believe Dr. Bergese?

22              MR. MADDEN:  Objection, Your Honor.  I don't think

23   she's laid foundation that he understands what she's asking.

24   Vague.

25              THE COURT:  As I understand the question, it is

Mohr - Cross (Barnhart)                                          874

1    that assuming Dr. Bergese is right that an inmate might not

2    respond to one of the consciousness checks but still be

3    conscious, do you agree with that?

4              THE WITNESS:  I agree that he said that.  I have

5    no reason to believe that -- I think that's possible, yes,

6    Your Honor.

7    BY MS. BARNHART:

8    Q.   You believe Dr. Bergese?

9              MR. MADDEN:  Objection.

10             THE COURT:  In that respect, yes, but you are

11   asking general.

12             THE WITNESS:  Yes.

13   BY MS. BARNHART:

14   Q.   Now, you've heard testimony from Dr. Bergese that the

15   paralytic, rocuronium bromide, is very painful if injected,

16   and you also testified that you understand it as well from

17   your training, correct?

18   A.   I understand it is painful, yes.

19   Q.   All right.  So would it be fair to say that if the

20   department were to remove the paralytic, the painful second

21   drug from the protocol, that that would eliminate the risk

22   of pain from that drug?

23   A.   Yes.

24   Q.   Thank you.

25             MS. BARNHART:  No further questions.

Mohr - Direct (Madden)                                              875

1              THE COURT:  Thank you.

2         Redirect at this point?

3              MR. MADDEN:  Yes, Your Honor.

4         Your Honor, at this time I am going to do a direct.

5                   **DIRECT EXAMINATION**

6    BY MR. MADDEN:

7    **Q.**   Could you briefly describe your duties as director of

8    DRC?

9    **A.**   As director of the Department of Rehabilitation and

10   Corrections for the last six years, we together have the

11   responsibility of managing an agency with 27 prisons, five

12   parole regions, 51,000 inmates, 36,000 people on parole

13   supervision, 40,000 people who have committed felonies or

14   under community supervision and not ours.

15        We have the responsibility for managing 1/4 of the

16   state work force, 12,300 employees, and 24-hour/7-day-a-week

17   operations.

18        We have the responsibility of a budget of approaching

19   $1.8 billion a year, which is too much, quite frankly, and

20   pushing legislative reform in this state to make sense and

21   support the logic and research that's out there.

22        And I know there are many other aspects to the job, but

23   it's significant.

24   **Q.**   Now, what is your objective in conducting an execution?

25   **A.**   The objective, not just verbally here but stated in

 1    every incident action plan that we do, and, quite frankly,

 2    stated at the beginning of every status briefing that we

 3    have, is to have -- establish a humane execution that is

 4    consistent with law and the expectations of the federal

 5    court.

 6    Q.    And kind of what does that mean to you?

 7    A.    Well, I've learned from Judge Frost over the years, and

 8    it's been public, that, one, humane means -- in my mind it

 9    means humane to every party involved.  First of all, to the

10    person being executed.

11          It also means, which is why I have fought further, more

12    explicit forms of the execution process, there needs to be

13    humane to those witnesses, those family members, those

14    victims' members that are present, to our team that has to

15    administrate -- administer this execution.  So I think there

16    is a humanity to the process.

17          And, further, I think we've been in court, and I

18    counted well over 2,000 pages of my own either deposition or

19    testimony in these proceedings.  We have to be absolutely

20    compliant with 01-COM-11, which is what the Court has

21    allowed us to proceed with federally.

22          And then I further have, in some cases, conflicting

23    responsibility of trying to comply with the Ohio law that

24    indicates that we are to commit executions on specific dates

25    as specified by the Ohio Supreme Court, and at some point

Mohr - Direct (Madden)                                                  877

1    they converge, and I guess we are converging here today on a

2    number of those dimensions.

3         But it means that there is humanity in this process to

4    everyone involved.

5    Q.   You understand that the -- what this Court says about

6    the Constitution, that that's the minimal standard that you

7    must meet as compared to other standards that you hold

8    higher?

9    A.   I understand that.

10   Q.   What does that mean?

11   A.   It means, one, we better take care of what the Court

12   says as a foundation, but it also means that the

13   intelligence that we've received here in four days of this,

14   from experts and from other people, all of that needs to be

15   taken into consideration to ensure that above the minimum

16   standard -- quite frankly, I believe you have to go above

17   the minimum Supreme Court standard to get to a process that

18   represents the humanity of all involved. And that's what we

19   strive to do, and that's what, you know, we think about.

20   That's what I think about, carrying this responsibility.

21   Q.   Do you expect the team to go beyond this standard?

22   A.   I expect it all the time. I expect -- we implemented

23   the incident command system to ensure quality in the

24   processes that we continue to try to enhance. Where we meet

25   and we talk. You know, I don't think the Constitution talks

Mohr - Direct (Madden)                                    878

 1    about having a planning meeting where incident objectives

 2    and control objectives and all of the parties are on the

 3    phone talking about not just the protocol and reminding us

 4    and, quite frankly, the five core components that we now

 5    have established in our protocol.  I don't know that

 6    there's -- I'm not legal.  I don't know that the Supreme

 7    Court has said there's five core standards.  But we -- we

 8    adopted the four.  I have expanded it to five in this

 9    process because of the importance of going beyond that.

10         We rehearse.  We train.  I was looking at Florida's

11    process.  They train once a quarter and then once before an

12    execution.  We go -- I assume that they are constitutionally

13    appropriate.  So the training and rehearsals and even our

14    policy protocol says we rehearse weekly at least four times

15    before an execution.  I can't remember the last time we've

16    rehearsed less than six times before an execution.

17    Q.   Do you expect the medical team to use multiple

18    consciousness checks?

19    A.   I expect them to use multiple consciousness checks.

20    And, quite frankly, what will be reflected in 204s will be

21    at least three consciousness checks, and one of those

22    consciousness -- at least one of those consciousness checks

23    will come from at least -- I don't know what the proper term

24    is.  I am calling it domains, like I know what I am talking

25    about.  I don't know the technology.  But it will be from --

1    it will be an audible alert, it will be a tactile or touch

2    reaction, and it will be a reflexive reaction.

3         And not only will that happen and not only will the

4    drug administrator do it, it will be witnessed by a second

5    drug administrator in the chamber to ensure that we observe

6    fully and have a broader understanding of any reaction that

7    goes on.

8         And that will be reflected in the 204s, the

9    instructional document that the teams get to instruct them

10   on their expectations of completing that assignment.

11   Q.   How many executions have you overseen?

12   A.   Eleven.

13   Q.   And what drugs were utilized in all but one of those

14   executions?  The last one being Dennis McGuire.

15   A.   Well, let me -- I want to be accurate, Tom.  The first

16   execution was Mr. Spisak, and we used thiopental sodium.

17   The next nine were pentobarbital.  And then the last one was

18   the combination of hydromorphone and midazolam.

19   Q.   And do you recall roughly when the last execution you

20   had using pentobarbital?  If I told you September of 2013,

21   does that sound right?

22   A.   I would have said 2013.  I didn't know when.

23             THE COURT:  Do you remember who that was?

24             MR. MADDEN:  Yes.

25             THE COURT:  Don Palmer?

1          MR. MADDEN:  No.  It was after him.  The guy who

2    shot all the cops.  Harry Mitts.

3    BY MR. MADDEN:

4    Q.   Why did you stop using pentobarbital?

5    A.   We can't get it.  We couldn't get it then, and as

6    recently as this week, we've not been able to obtain it.

7    Q.   Tell me -- tell me about that.  Tell the Court about

8    that.

9    A.   Well, number one, I've utilized a significant amount of

10   my chief counsel's time trying to determine where we could

11   obtain this.

12         MS. BARNHART:  Excuse me.  Objection, Your Honor.

13   I believe the director's testifying about efforts to procure

14   drugs, which the defendants have taken the position are

15   covered by a protective order and the plaintiffs are not

16   allowed to ask questions or obtain discovery about this

17   information.

18         THE COURT:  Well, the protective order doesn't say

19   you can't waive, does it?  If Mr. Madden brings it out on

20   direct examination?

21         MR. MADDEN:  Judge, I think he can testify without

22   waiving the -- he can testify about general efforts to

23   obtain the drugs without getting into specifics, without

24   waiving.

25         THE COURT:  Well, we'll see what he testifies to.

Mohr - Direct (Madden)                                881

1    It's peculiar to have plaintiffs' counsel raising

2    defendants' privilege objection.

3           MS. BARNHART:  Well, the reason, Your Honor, is

4    that defendants, if they are able to selectively waive the

5    protective order to establish that they can obtain the drugs

6    but then we're not allowed to ask any details to question

7    the accuracy of that information, we're put at a severe

8    disadvantage.

9           MR. MADDEN:  As long as they acknowledge that

10   that's their burden to produce evidence where these drugs

11   can be had then --

12          MS. BARNHART:  That's not -- we do not acknowledge

13   that.

14          THE COURT:  You may proceed, Mr. Madden.  We will

15   deal with how much waiver we get when we get recross.

16   BY MR. MADDEN:

17   **Q.**   If you had the barbiturates in your possession, would

18   you use them?

19   **A.**   Yes.

20          THE COURT:  As I understand it, Mr. Mohr, the

21   listing of options in the current protocol is not -- even

22   though the two barbiturates, thiopental sodium and

23   pentobarbital, are listed either first and second or second

24   and first, that's not intended to establish as a matter of

25   the protocol what order they have to be used in, is it?

Mohr - Direct (Madden)                                          882

```
 1              THE WITNESS:  Your Honor, it is not.  It just --
 2   and, you know, within 14 days the warden has to advise
 3   myself as well as the inmate of the intended drugs, but
 4   those are just a list of permissible drugs, and core
 5   component number 2 says simply that we will only use those
 6   drugs.
 7              THE COURT:  Right.
 8   BY MR. MADDEN:
 9   Q.   Do you have a preference, whether using a one-drug
10   protocol with the barbiturates or the three-drug protocol
11   that you currently intend to use, which would you use?
12   A.   I would clearly use the one-drug protocol,
13   pentobarbital or thiopental sodium.
14   Q.   And that is based on what?
15   A.   It's, one, based on my experience in the eleven
16   executions that we've had, number one.
17        And, number two, it is simpler in terms of the
18   pressure, you know, applied to the team with three drugs and
19   multiple syringes.  But, most importantly, and I guess most
20   importantly -- and I don't usually do this very often, but
21   to my humanity and I believe everyone else's, they have been
22   very successful in terms of resulting in death that has been
23   humane and peaceful.
24   Q.   Let's go back to January of 2014.  Do you recall the
25   Dennis McGuire execution?
```

Mohr - Direct (Madden)                                                    883

1    **A.**   I do.

2    **Q.**   Turn to Defendants' Exhibit 2.

3           THE COURT:   I don't know that he has that in front

4    of him.

5           MR. MADDEN:   Volume I.

6    BY MR. MADDEN:

7    **Q.**   Do you recognize this document?

8    **A.**   I'm looking at our policy 01-COM-11 that was in place

9    on October 10, 2013.

10   **Q.**   And what were the -- what were the drugs used for

11   Mr. McGuire?

12   **A.**   We used two drugs within a single injection, which were

13   hydromorphone and midazolam.

14   **Q.**   So the drugs were administered together; is that your

15   recollection?

16   **A.**   Yes.

17   **Q.**   Now, pursuant to the policy, had the execution team

18   performed the rehearsals prior to that execution?

19   **A.**   Yes.

20   **Q.**   How do you know that?

21   **A.**   There are multiple ways.  There are multiple ways, and

22   I'll try to be brief with this.  One, we -- as we conduct

23   our initial planning meeting, we identify the dates and

24   times and schedules of the scheduled training meetings.

25   Every week we have status briefings of which the operations

Mohr - Direct (Madden)                                884

1   chief, which is the warden at the Southern Ohio Correctional

2   Facility, Mr. Erdos, at this time Mr. Warden -- or Morgan,

3   reports out.

4        And I ask them in the status briefings about who

5   attended, the outcome of that for those rehearsals that I am

6   not in attendance at, and they report specific attendance

7   and specifically what they did.

8   Q.   When, where, and how are these meetings conducted?

9   A.   These meetings are most frequently telephonic, with

10  members of the entire team at Chillicothe, where they house

11  death row.  That's our Chillicothe division.  Our Lucasville

12  division, of the leadership at Lucasville, the leadership

13  that's involved in the execution team; the command staff,

14  which would include myself, the assistant incident

15  commander, Mr. Voorhies; chief legal counsel, Steve Gray;

16  our communications director; our victims' coordinator; our

17  planning chief, currently is Donny Morgan that manages that.

18       So it's usually about a 45-minute -- 35- to 40-minute

19  meeting.  Strict agenda.  We go over the core -- I go over

20  every time the five core elements of 01-COM-11.  And the

21  overarching objective.  We go through the control objectives

22  that specifically state what will be achieved and when.

23       And if that time is in place where that function is to

24  be done, they report out on that.  That's also reported on a

25  213, which is a written communication that describes the

Mohr - Direct (Madden)                                              885

1    specific procedure that was to be done in detail.  So we

2    have that access.

3        We have reports from Lucasville, from Chillicothe, and

4    from every member there.

5        And then we conclude with really a highlight of the

6    fifth core competency, or the fifth core component when I

7    ask is there anything at this moment in time, anything that

8    brings anyone any concern about any deviation from any of

9    the noncore components, I want to hear it now.

10   Q.   When do you have these unit meetings?

11   A.   They are weekly.  They are status briefings.  We have

12   them weekly.  Then they commence with the beginning of the

13   operational period.  We have two operational periods

14   traditionally, minimally starting in advance of 30 days

15   before the execution.  And then the final period, second

16   operational period starts 24 hours in advance of the

17   execution.

18       And it concludes with what I consider to be the most

19   important piece, which is the confirmation briefing where on

20   the wall we have these listing of all of the checklists of

21   everything that needs to be done, from vein assessments, to

22   the bringing of the drugs to the equipment room, to the

23   mixing of the drugs that only can be reported as we learn

24   clearly by the drug administrator that's prepared it.  It's

25   witnessed by a second drug administrator.  And every

1    particular -- from communication, from checking phones.  All

2    these checklists are on the wall before we commence, before

3    I give the -- say, okay, we're ready to proceed.

4         So I have talked so long I don't even know what the

5    darn question is.

6    Q.   Okay.  Turn to Defendants' Exhibit 22.

7         Do you recognize this document?

8    A.   I'm looking at the 214, which is a unit log, dated

9    December 16, 2013.

10   Q.   Go to page 199.  What is that document?

11   A.   It is a unit log from the operations section, with

12   Donny Morgan being the operations chief, dated January 15,

13   2014.

14   Q.   And this unit log pertained to what execution?

15   A.   It would be the McGuire execution.

16   Q.   And tell the Court what this -- take a look at the

17   document and tell the Court what this -- the entire

18   document.  I think there are several pages.

19   A.   Um-hmm.

20   Q.   And then tell the Court what you understand this to be.

21   A.   I went to page 200, just for the record, 199 and 200.

22   I assume that's it.

23        Every section -- the incident command system is based

24   on the incident commander, an assistant incident commander

25   in this case, or deputy.  I see Ed would correct me with

Mohr - Direct (Madden)                                          887

1   that, Mr. Voorhies.

2        In this particular execution, Donny Morgan, who was the

3   warden at the Southern Ohio Correctional Facility, was

4   operations chief.  The operations section under ICS, it was

5   developed originally by the forestry department to fight

6   forest fires, and adopted after the Lucasville riot.

7        The operations chief manages the doers, the people that

8   do the work.  In this particular case, this is a log of all

9   of the activities that related to the operations, the

10  execution team's preparation for the McGuire execution.  So

11  that's what I'm seeing here.  And then it lists the specific

12  tasks and steps and actions that were done.

13  Q.   Does it reflect what it -- what the discussions that

14  you had during -- about the rehearsals in preparation for

15  the -- for the McGuire execution?

16  A.   Yes.

17  Q.   Now, pursuant to 01-COM-11, had the 21-day medical

18  assessment of the prisoner, Dennis McGuire, been conducted

19  before his execution?

20  A.   Yes.

21  Q.   And tell the Court what occurs during a medical/mental

22  health assessment 21 days before an execution?

23  A.   Approximately -- at least 21 days in advance of an

24  execution, there is a requirement, and that's outlined in

25  our control objectives.  It's outlined in our initial

Mohr - Direct (Madden)                                          888

1    planning meeting so people know in advance the date that it

2    has to be done.  We have both -- both a -- taking place at

3    Chillicothe, which is the current housing area for death

4    row, a medical examination, and that consists of a full

5    review of the medical chart, the medical record, the

6    historic medical record, and in some cases, based on the

7    length of time, that could be multiple volumes of materials;

8    a physical examination of the inmate.  How you doing?  You

9    know, let's take a look at you.  But it always has to

10   include a hands-on vein assessment to address the -- any

11   perceived concerns with access to the veins.

12        And then, separately, there is a mental health

13   assessment that is done.  Same process:  looking at the

14   records, looking at the history, looking at medications that

15   are being used, as does the medical piece; looking for any

16   potential element that may be in place that the operations

17   chief, Mr. Morgan, who's supervising the execution training,

18   should be aware of to plug in as contingencies to consider

19   that may take place during the execution.

20   Q.   Why do you think that's important?

21   A.   Well, it's important for the overarching, the humane

22   execution.  Given, you know, Mr. -- we have had inmates that

23   have posed significant issues that those exams have provided

24   insight in terms of training.  I think of Mr. Smith.

25             THE COURT:  Kenneth Smith?

```
 1              THE WITNESS:  Your Honor, I don't want to -- who

 2    had the breathing issue where we built the -- or had the --

 3    practiced the wedge, because -- I don't think it's --

 4              UNIDENTIFIED:  It is Kenneth.

 5    BY MR. MADDEN:

 6    Q.   Wasn't the 21-day assessment done because of Mr. Smith?

 7    A.   I can't fully remember.  We had so many iterations and

 8    changes and enhancements.  It may have been.  I know that

 9    that was important as we planned for that execution.

10              THE COURT:  The reason I bring up Mr. Smith's name

11    is I have his case on the habeas corpus side.

12    BY MR. MADDEN:

13    Q.   How do you know these 21-day assessments are even done?

14    A.   Well, two things.  One, let me just be -- I trust that

15    we have good people that work for our agency, and we have

16    some, but, quite frankly, they are not portrayed well and

17    they are undeserving of that.  They are great public

18    servants.

19         Number two, we meet and talk, and they have to convince

20    every week at these status briefings.  They don't just

21    report out, well, we observed the mental health status of

22    Inmate Phillips.  There are questions.  We all ask

23    questions:  Okay, so does he appear to anticipate being

24    executed?  What's -- what's he talking about?  Is he

25    potentially suicidal?  How do you know?
```

Mohr - Direct (Madden)                                    890

```
 1        So that discussion.  And then those reports are
 2   conveyed to us, to the incident command team, and we call it
 3   a 213.
 4   Q.   Let's turn to that.  Let's turn to Defendants' Exhibit
 5   21, page 145.  I think it's -- yeah.
 6        Do you --
 7   A.   145?
 8   Q.   Yes, sir.
 9   A.   Okay.  I wish we had that on the screen.
10   Q.   Do you recognize that document?
11   A.   Yeah.  It's -- it is a written communication.  Norm
12   Robinson was what we call the CCI division leader, team
13   leader, that works under the operations chief, which would
14   at that time have been Mr. Morgan.  And it is from him.
15        And this particular 213 discusses the medical task
16   force examination.  It identifies the physician that was
17   involved in doing that, and the nurse as well.  It talks
18   about their qualifications.  Talks about what they did.  And
19   it describes at this particular case that there were not
20   unique factors that could impact the execution process from
21   the medical perspective.
22        And one of the things that's been a tenet throughout
23   this policy and throughout our commitment was to try to
24   continue to gain, in anticipation of vein assessment, of
25   whether or not the veins are palpable, whether or not the
```

Mohr - Direct (Madden)                                          891

1    veins -- we anticipate a problem with veins, vein access.

2    And they talk about that.  And that has to be hands-on.  It

3    can't be a visual check.

4    Q.   What's attached -- what comes attached to that

5    document?

6    A.   Well, it's the actual notes.  You know, we also require

7    that this be -- you are probably leading me on this -- but

8    we also require that all of the actions of the mental health

9    team be documented in a mental health file, and the medical

10   team in the medical file under notes.

11       And what you see here is a medical chart with a

12   chronological documentation of that.  You know, for example,

13   December 20th, Beth Higginbotham identified the hands-on

14   vein assessment.  And that is in a fairly significant

15   narrative of that activity.

16   Q.   And how many pages is that, for Mr. McGuire in

17   particular?

18   A.   It appears to be seven pages, if I counted those

19   correctly.

20   Q.   Okay.  And is this discussed during your unit meeting,

21   your 214 meeting?

22   A.   Well, it is discussed.  Without getting -- the status

23   briefings that are weekly, it is, in fact, discussed.  And

24   in this information, because the people are on the phone,

25   are then translated to the team leader, the operations chief

Mohr - Direct (Madden)                                              892

1    in this case, the doer chief.  And then those are relayed

2    and specifically identified in the instructions to the staff

3    on a 204 form.

4         We've got a lot of governmental forms here, I'm sorry.

5    Q.   And what -- what are -- what is a 204 form?

6    A.   It's basically an assignment description of the

7    activities that are to be performed by specific -- by

8    specific team members.

9    Q.   Would you give the Court some examples of those that

10   are done in the first operational period?

11   A.   Well, in training, for example, the operations chief

12   would identify:  We're going to conduct training, and we're

13   going to do this scenario and it's going to include this.

14        One of the most critical ones, quite frankly, happens

15   to be done on the day of the execution, somewhere between

16   8:30 and 9, where the medical team is assembled, and they

17   get a specific 204 that includes any anticipated issues,

18   specific functions, specific responsibilities, and who's to

19   carry those out.  And everyone's assembled.  So it's given

20   on paper, but it's also given as part of a verbal piece to

21   ensure if there is any questions, that those are raised.

22        But by the end -- by the end of this, by the final 204,

23   we should be continuing to refine the expectations to get to

24   a 204 on the day of the execution that is comprehensive and

25   is going to result in an outcome that is desirable.

1   **Q.**   If there is information out there that you don't know

2   about, could you have -- could you be expected to speak

3   about that at 214 meetings?

4   **A.**   If I know about it?

5   **Q.**   If you know about it.  What if you don't know about it?

6   **A.**   I don't think I can talk about it.

7   **Q.**   Okay.  So, for example, in the Dennis McGuire

8   execution, there was some reports that came out following

9   several of these unit meetings.  Could you speak about

10  those?

11  **A.**   No, sir.

12  **Q.**   Now, pursuant to policy, had Mr. McGuire's medical

13  chart been reviewed and had he received three vein

14  assessments the 24 hours leading up to the execution?

15  **A.**   Yes.  Those -- those were both completed.  In fact, two

16  on the day of his arrival at the Southern Ohio Correctional

17  Facility, and a third one completed by a member of the

18  medical team, which is, again, one of the refinements that

19  we've made over the years.

20  **Q.**   How do you know that?

21  **A.**   One, they are documented.  They are in the file.  A

22  person in the operations team has to review the

23  documentation that's placed in the medical file, confirm

24  that it's done.  It then gets reported to the command center

25  as documented, the time, and who did it on a checklist that

Mohr - Direct (Madden)                                    894

```
1    is posted around for my review before we ever proceed.

2    Q.   Okay.  Turn to document 29, 223.  I mean Defendants'

3    exhibit, excuse me.

4             THE COURT:  Exhibit 29?

5             MR. MADDEN:  Yes, sir.

6    BY MR. MADDEN:

7    Q.   Do you recognize that document?

8    A.   Is that page 219?

9    Q.   223, excuse me.

10   A.   Oh, I'm sorry.

11        Yes.

12   Q.   Do you recognize that document?

13   A.   I do.

14   Q.   And what is it?

15   A.   It is a communication, a general message, a 213 that

16   went to the operations chief from Nurse Clagg.  Nurse Clagg

17   is the healthcare administrator at the Southern Ohio

18   Correctional Facility, who's not on the execution team, but

19   it describes a review of the medical chart and other actions

20   of the vein assessment that was completed.  And it was

21   documented on the medical chart.

22        And then it was placed -- we do, upon arrival at the

23   Southern Ohio Correctional Facility, we start a timeline

24   where chronologically all of the activities, all of the

25   required activities, all of the activities in general,
```

Mohr - Direct (Madden)                                    895

 1    visitors, et cetera, that come in are placed chronologically

 2    on a timeline.

 3        So everyone -- in fact, that's the first thing, when I

 4    walk up in the morning and say hello to the warden and I

 5    walk into the conference room where that is -- that is a

 6    being demonstrated.  So the timeline is an important part of

 7    that confirmation.

 8    Q.   What -- what is portrayed in that document?  Did you

 9    already testify as to what was portrayed in that document?

10    A.   I did.  At 11:13, a medical evaluation and a first vein

11    assessment was completed as noted.  So this would have been

12    the first of three vein assessments, two of which are done

13    on the day of arrival.

14    Q.   Would you turn to 227 in the same exhibit?  Page.

15    A.   Yes.  This is another 213 that it says at 8:04 that

16    evening, upon his arrival, the second vein assessment was

17    completed by a Nurse Reiter with no issues or concerns

18    noted.  And it confirms that it was documented in the

19    medical chart and on the timeline that I talked about.

20    Q.   And is that provided to you before the execution

21    begins?

22    A.   Yes.

23    Q.   Was the prior document we talked about presented to you

24    before the execution begins?

25    A.   Yes, in a confirmed briefing that we have,

Mohr - Direct (Madden)                                              896

1      approximately 9 o'clock on that morning.

2      **Q.**   And are documents attached to that document and the

3      document we previously talked about?

4      **A.**   Yes.

5      **Q.**   And what are those?

6      **A.**   The following documents are the notes that were

7      recorded regarding the medical assessment that was performed

8      by the -- by the members.  And it discusses the medical

9      chart, it discusses blood pressure, and any other --

10     **Q.**   Let's go on to page 231.

11     **A.**   Yeah.

12     **Q.**   What is that document?

13     **A.**   It's a 213 communication from a member of the medical

14     team that is part of the execution team that states -- and

15     we've established that as a practice.  It was important to

16     me that people that were actually going to be involved in

17     the execution process with the vein, gaining vein

18     assessment, be part of the final vein assessment for a

19     couple reasons.  One, I want them to feel and to see.

20         And I don't have any research but it just seems to me

21     that it's important for the inmate to see and to understand

22     and to see who's involved.  And, quite frankly, that's why I

23     go in and talk to the inmate before this process starts.

24         But it documents that the third vein assessment was

25     completed, actually by multiple team members here, with no

Mohr - Direct (Madden)                                          897

 1    known issues.  And then it was documented in the medical

 2    chart in the timeline.

 3    Q.    So you had all this information.  You also received

 4    other 213s; is that right?

 5    A.    Yeah.

 6    Q.    About specific to other portions of the execution

 7    protocol?

 8    A.    Such as training and et cetera, yes.

 9    Q.    Okay.  And after this confirmation briefing, before the

10    McGuire execution, what did you do?

11    A.    At the confirmation briefing?

12    Q.    Yes.  Oh, no, after the confirmation briefing.  Excuse

13    me.

14    A.    After the confirmation briefing and after we had

15    looked, and I want to say there is usually eight or ten of

16    the critical team member, of the ICS members in the room,

17    and I always have -- I always have questions.  Just to

18    question and confirm different things.

19          I indicated that it was -- we've achieved this.  I

20    asked, is there any -- are there any deviations or

21    variations to non-core components of 01-COM-11, or do you

22    even think there might -- are you aware of anything that

23    might be defined as that that we need to talk about now.

24    Q.    Okay.  And --

25    A.    And then we proceed -- we proceed --

Mohr - Direct (Madden)                                          898

1   Q.   Let's talk specifically about the Dennis McGuire

2   execution.  You proceed from the confirmation briefing, and

3   where do you go?

4   A.   I first walk down and go into the visiting room, which

5   is the station where media is there.  And I usually make

6   a --

7   Q.   I hate to cut you off.  We're on a time limit.

8   A.   Okay.  I'm sorry.

9   Q.   Can you tell the Court what you saw during the Dennis

10  McGuire execution?

11  A.   Okay.  So after those things, we made it to the death

12  house.  And I'm in the equipment room within inches of the

13  drug administrators, looking directly at the gurney.  Once

14  the visitors were ordered okay to come over, I authorized

15  the warden to read the death warrant to commence the

16  execution, which is the commencing.  It goes from the

17  holding area, about 25 feet into the chamber.

18       Mr. McGuire was strapped down.  Acknowledged the people

19  in the room as he walked in.  The curtain was closed.  He

20  was restrained.

21       Medical team went in.  Created -- found two viable

22  veinal accesses.  As I recall there were two sticks in one

23  arm and one in the other.  And I could see from my

24  perspective the drip or the flow was strong to indicate

25  strong access.

1          The medical administrative team came out in the station

2     equipment room.  The curtain was opened.  Warden Morgan

3     offered the microphone to Dennis.  He said some things,

4     like -- I also can't remember that, what he said.  Gave the

5     microphone back.  It was hung up.  Mr. Morgan and Number 10

6     were stationed in the death house just beyond his head.

7          The signal was given.  The combination of drugs was in

8     one -- was together.  The drugs started, and it's a tubing

9     that goes from the equipment room.  Quite frankly, about

10    from here in the equipment room to where the podium starts

11    is about the gurney where Mr. McGuire was laying.

12         As the drugs were going in, Mr. McGuire looked over,

13    said -- what I think he said was "I love you."  It was

14    not -- that was not audible to me, but the mouth was pretty

15    clear that he was.  And leaned back down, and his head was

16    kind of straight.

17         And what I saw for the first five to six minutes was no

18    movement.  I saw, you know, after the first minute or so, no

19    movement.

20    Q.   Let me ask to stop you right there.  You have seen

21    executions with pentobarbital and thiopental sodium, and you

22    saw the McGuire execution with hydromorphone and midazolam.

23    What was your reaction to his -- him becoming unconscious?

24    A.   It was -- it was -- in my mind, it seemed quicker.  I

25    was concerned.  I understand Dr. Waisel indicating that

Mohr - Direct (Madden)                                                    900

1    first one to two minutes of concern, and I remember that

2    testimony, the first one or two minutes.  I didn't see that.

3         I saw in the pentobarbital -- and it's normal in the

4    first couple of minutes, maybe three minutes or so, to

5    continue to see some movement.  And maybe up to four

6    minutes.  And movement, in some cases the head turning

7    during that process, and then going to peace, with

8    pentobarbital and thiopental sodium.

9         In this particular case, it seemed to actually --

10   Mr. McGuire went to a motionless state even quicker to me.

11   And that's not a sign.  I don't have a watch, but it seemed

12   to me that that was the case.  And I saw that for about five

13   to six minutes into the execution.

14        And five to six minutes in -- and I'm looking right at

15   like you are there, only laying back on a tilted, looking

16   right at me.  And, I mean, I look at these things.  I

17   continue to look at the IV access, the arms, to make sure

18   that I don't see something wrong.  I know other people more

19   qualified are looking at it, but I'm looking at it.

20        And I'm looking, just like I looked at the

21   pentobarbital and thiopental sodium, I looked at the chest

22   raising, and I did, because it takes time.

23        After he was at peace and motionless, after I saw no

24   chest moving at all, I saw the stomach first.  I saw what

25   looked like a knot in the stomach, and I was looking right

Mohr - Direct (Madden)                                          901

1    here (indicating).  I could actually see a bit under his

2    shirt, see -- it looked like a knot and his stomach was

3    moving.  I had not seen that before.

4         And then I saw his mouth open, and I heard audible

5    sounds.  I don't know whether it was like a snore or a

6    snort, but it was a -- it was a gravelly, like you were

7    asleep.

8    Q.   Before all that started, before we -- we'll get back to

9    that.  Before that started, during that five minutes after

10   the drugs were administered, did you see him make any kind

11   of gesture to the visitors, the observers?

12   A.   I did as the drugs were going in.  As the drugs -- and

13   maybe for the first minute, that there was an acknowledgment

14   of the, you know, the visitors when he turned to say "I love

15   you."  And that as the drugs were going in.

16        But about a minute after that, which was quicker from

17   my recollection than the pentobarbital, I did not see

18   movement.

19   Q.   Okay.  Let's go back to when he started to have

20   movement.  You talked about the stomach protruding and

21   the -- him opening --

22   A.   The mouth opened.

23   Q.   -- the mouth, making audible sounds.  What else did you

24   observe?

25   A.   I heard that, and I didn't -- I didn't observe -- the

Mohr - Direct (Madden)                                                    902

 1    movements that I saw were his mouth and his stomach.  And

 2    they continued to -- the stomach continued to knot up and

 3    relax, or spasm or that.  And his mouth opened, and

 4    multiple, eight, ten groans -- or not groans.  They were

 5    like snorts or snoring.  That went on.

 6         And, quite frankly, I had not seen that.  Tom, I had

 7    not seen that before, and I was concerned.

 8         So I wanted to talk to the medical team about what I

 9    was seeing and what they were seeing.  So I convened a

10    meeting, and this -- I don't know the time, because at that

11    time I wasn't really worried about the clock.  I was not

12    looking at the clock, I was looking at Dennis.

13         We went out -- the equipment room, there is a little

14    hallway right next to the equipment room right at the entry

15    of the death house, so we were in this hallway.  Not in the

16    death house chamber, not in the death chamber and not in the

17    equipment room, and we convened.  I said, help me --

18    Q.   Now, who was in this conversation?

19    A.   The medical team members, Mr. Voorhies, Mr. Gray.

20    Q.   Now, without speaking about any of the attorney-client

21    conversations that you had with Mr. Gray, what was

22    discussed?

23    A.   I asked what are we seeing, to the medical team.  And

24    they were more reassuring.  Director, he's not aware.  We've

25    seen this in our experience.  I think we need to give him

1    more time for that medication, that dose drugs to work.  And

2    at that time I said, so what are you recommending?  And they

3    recommended a five-minute wait to see what happens; to see

4    if these, these actions that they indicated -- and, quite

5    frankly, they told me he's not here.  He's not aware.

6        So we moved back into the equipment room.  And I was

7    stationed again right behind the drug administrator looking,

8    and for the first minute or two that I walked back in I

9    still saw that.  I saw it slowing.  I didn't see it as

10   frequent.  But as the clock -- I want to say the last three

11   minutes of that five minutes, I saw no movement.

12   **Q.**   And then what happened?

13   **A.**   Well, at the end of the five minutes, I looked at -- I

14   was touching, literally, I think I probably was touching the

15   drug administrator physically.  I said, what do you think?

16   Because typically in those settings we would send the drug

17   administrator in to do an assessment of heart sounds and

18   breathing.  And he says, I think -- I think we should go in.

19   I said okay.

20       So the drug administrator went -- walked into the

21   chamber and did what appeared to me to be -- to take longer

22   to assess for breathing sounds and heart sounds.  It seemed

23   to me to be longer.  I don't know if it was or not.  I don't

24   know.

25       He said something to the warden when he finished, who

Mohr - Direct (Madden)                                           904

```
1    was --
2    Q.    Who's he?
3              THE COURT:  The drug administrator.
4              THE WITNESS:  The drug administrator.
5              THE COURT:  Not to be identified by name.
6              THE WITNESS:  Yes.  And came back into the
7    equipment room and said no heart sounds or no breathing
8    sounds.
9         Then, consistent with the way we've done all of the
10   other executions, we then called for the coroner to go in
11   and do --
12   BY MR. MADDEN:
13   Q.    Who is the coroner?  Don't give his name.  Just tell
14   me --
15   A.    It's the Scioto County.  That's his name.  I'm sorry.
16   Q.    The coroner of Scioto County?
17   A.    Coroner of Scioto County, yes -- to go in as we always
18   do, and he performed an extensive check that again seemed to
19   be at least -- I think it was longer.
20        And went to the warden, as is the practice, and the
21   warden then announced the time of death.
22   Q.    Let's move forward to January of 2015.
23             THE COURT:  Let's break.
24             MR. MADDEN:  Yes, sir.
25             THE COURT:  For lunch and come back at 1:30.
```

Mohr - Direct (Madden)                                          905

```
 1              MR. MADDEN:  Yes, sir.

 2              THE COURT:  And resume.

 3              MR. MADDEN:  Yes, sir.

 4              THE COURT:  We're in recess.

 5         (Luncheon recess at 12:01 p.m.)

 6         A-F-T-E-R-N-O-O-N S-E-S-S-I-O-N          1:31 p.m.

 7              THE COURT:  Mr. Madden, you may resume your

 8    examination.

 9              MR. MADDEN:  Thank you, Your Honor.

10    BY MR. MADDEN:

11    Q.    Director, if a three-drug -- you know, with this

12    three-drug protocol being used in the upcoming executions,

13    would you proceed with only one IV line established?

14    A.    No.

15    Q.    Could you explain that?

16    A.    It seems important to me, three drugs require more

17    syringes.  The time frame is longer.  It is, I think -- it

18    is -- the possibility seems from my non-medical position to

19    be greater to require a second -- a second vein access.  And

20    if we want to ensure -- unlike the -- I mean, certainly with

21    thiopental sodium and pentobarbital, our goal was always to

22    establish two sites.

23         With the three drug, it would be a requirement.  I

24    wouldn't proceed if we could only get one site.  I just

25    think that that kind of -- that safety net, to give the team
```

Mohr - Recross (Barnhart)                          906

1    effective use of that.  And, quite frankly, you know, the

2    pace of the drug midazolam to work and other kinds of

3    things, I don't want -- I don't want a lot of time lapse.

4         I just think that it's a reasonable safeguard.  And,

5    quite frankly, I know that I'm supported all the way up the

6    chain with that decision.

7              MR. MADDEN:  Your Honor, I have no further

8    questions.

9              THE COURT:  Recross?

10             MS. BARNHART:  Just one moment, Your Honor.

11                       **RECROSS-EXAMINATION**

12   BY MS. BARNHART:

13   **Q.**   Director Mohr, could I direct your attention to

14   Defendants' Exhibit 32, which I believe -- well, there's a

15   cover page on page 248.  That begins on page 249.

16             THE COURT:  Defendants' 32, yes, ma'am?

17             MS. BARNHART:  Yes, Your Honor.

18   BY MS. BARNHART:

19   **Q.**   And you testified about this exhibit with Mr. Madden.

20   **A.**   Yes.

21             THE COURT:  32?

22             MS. BARNHART:  Yes, Your Honor.  32.  It's the

23   interdisciplinary progress notes of the medical assessment

24   of Inmate McGuire.

25             THE COURT:  I'm sorry.

Mohr - Recross (Barnhart)                                    907

```
1              MS. BARNHART:  No problem.

2              THE COURT:  My notes don't reflect that.  The

3    cover page reads "Psychology Report/Medical Report"?

4              MS. BARNHART:  It does, Your Honor.

5              MR. MADDEN:  It's in two different spots.

6              MS. BARNHART:  I see.

7              MR. MADDEN:  The spot we used was in the 213,

8    which is Defendants' Exhibit 21.

9              THE COURT:  21 I have.  That's perfectly all right

10   if you want to use 32 --

11             MS. BARNHART:  That's all right.

12             THE COURT:  -- but I just wanted to make sure my

13   notes weren't incorrect.

14             MS. BARNHART:  Yes, we were just following along

15   on the wrong exhibit page during Mr. Madden's examination.

16   BY MS. BARNHART:

17   Q.   I want to find those same pages in Defendants' Exhibit

18   21 then that you looked at with Mr. Madden.  And I think

19   that starts on page 146 if I'm looking at it correctly.

20             THE COURT:  146 is certainly part of --

21             MS. BARNHART:  Right.

22             THE COURT:  -- Defendants' Exhibit 21.

23             MS. BARNHART:  And then I will page forth to the

24   one on January 15th.

25        I aplogize for the delay, Your Honor.
```

Mohr - Recross (Barnhart)                                    908

```
 1              THE COURT:  As long as you don't get a paper cut
 2    looking for the page we're okay.
 3              MS. BARNHART:  Thank you.
 4    BY MS. BARNHART:
 5    Q.   All right.  Let's just turn back to 32 then and use
 6    that one since I have that together.
 7         Anyway, Director Mohr, Exhibit 32, starting on page
 8    249, this is the medical assessment of Inmate McGuire before
 9    his execution, correct?
10    A.   Hold on just a minute.
11    Q.   No problem.
12    A.   I'm flipping back.
13         Yes.
14    Q.   Well, while we're looking for that, Director Mohr, I
15    will ask you about a different topic.
16         With regards to changing the protocol after Dennis
17    McGuire's execution, you were aware that there was a great
18    deal of press coverage following Mr. McGuire's execution,
19    correct?
20    A.   Yes.
21    Q.   And there were articles both locally in Columbus,
22    regionally, statewide, nationally, internationally, correct?
23    A.   I did not see an international one, but I would not --
24    I would assume that you are accurate.
25    Q.   All right.  And that coverage was not positive, right?
```

Mohr - Recross (Barnhart)                                    909

1    **A.**   No.

2    **Q.**   And you were concerned about what happened, concerned

3    enough to order an investigation into the execution,

4    correct?

5              MR. MADDEN:  Objection, Your Honor.  This goes

6    beyond the scope of cross.  I did not have time to get into

7    this, the after investigation.  They got into this on -- I

8    agree that they got into this in direct, but I was not -- I

9    didn't have enough time to get into it in cross.

10             MS. BARNHART:  This relates to the protocol

11   following McGuire.

12             MR. MADDEN:  And I didn't --

13             THE COURT:  I'm going to allow it.

14             MS. BARNHART:  Thank you, Your Honor.

15   BY MS. BARNHART:

16   **Q.**   And you had concerns about that negative press

17   coverage, correct?

18   **A.**   Not really.

19   **Q.**   Well, that press coverage reflected poorly on DRC,

20   correct?

21   **A.**   Some of it did.  Quite frankly, I have a tendency not

22   to be concerned about press coverage.

23   **Q.**   Okay.

24   **A.**   Yeah.

25   **Q.**   And that press coverage did not reflect well on you,

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Mohr - Recross (Barnhart)                                      910

```
 1    correct?

 2                MR. MADDEN:  Objection.  Relevance.

 3                THE COURT:  Sustained.

 4    BY MS. BARNHART:

 5    Q.   In any event, DRC revised its protocol following

 6    McGuire's execution, correct?

 7    A.   Yes.

 8    Q.   And increased the amount of midazolam in the protocol,

 9    correct?

10                MR. MADDEN:  Judge, I did not get into any of

11    this.

12                THE COURT:  I understand, Mr. Madden, but it's

13    Friday afternoon.

14        Go ahead.

15                THE WITNESS:  Yes.

16    BY MS. BARNHART:

17    Q.   And, in fact, ultimately DRC revised its protocol and

18    eliminated midazolam, correct?

19    A.   Yes.

20    Q.   And that experience -- and those revisions were at

21    least in part due to the experience of the McGuire

22    execution, were they not?

23    A.   Yes.

24    Q.   Thank you.  And now to return to the records.

25        All right.  So turning to Defendants' Tab 21, page 153.
```

Mohr - Recross (Barnhart)                                     911

1    This is a document entitled "Medical Chart Review, McGuire

2    Dennis."

3                THE COURT:  Page number again, please?

4                MS. BARNHART:  It's page 153 in the defendants'

5    exhibit binder.

6                THE COURT:  Thank you.

7    BY MS. BARNHART:

8    Q.   And are you familiar with this document, Director Mohr?

9    A.   Yes.

10   Q.   And this is the 21-day medical review of Inmate McGuire

11   before his execution.  And you can page through it.  I know

12   it continues on for some pages.

13   A.   Yes.

14   Q.   So you've just -- so the record reflects, you have just

15   been reviewing this document, paging through it?

16   A.   Yes.

17   Q.   Thank you.  Does that document reflect anywhere Dennis

18   McGuire having airway obstruction?

19   A.   If you will point it to me it will save time as opposed

20   to me re-reviewing this.

21   Q.   Sure.

22   A.   I didn't pick up on it as I was skimming through.

23   Q.   I represent that it does not.

24   A.   Okay.

25   Q.   I don't believe it does.  I just wanted to confirm that

Mohr - Recross (Barnhart)                                          912

1    for you.

2    **A.**    Okay.

3    **Q.**    And you, I believe, testified in your deposition that

4    you attended the preliminary injunction hearing for

5    Mr. McGuire prior to his execution, and you heard

6    Dr. Waisel.  That's correct, isn't it?

7    **A.**    That's true.

8    **Q.**    And at that -- you heard Dr. Waisel testify that Inmate

9    McGuire did present a risk of airway obstruction; is that

10   correct?

11   **A.**    Yes.

12   **Q.**    And, in fact, he talked about the acronym -- it's all

13   capital letters -- STOP-BANG, various different elements to

14   consider about an inmate that could present -- Dr. Waisel

15   said that could present a risk of air hunger, correct?

16   **A.**    Yes, he discussed air hunger.

17   **Q.**    Okay.  And Dr. Waisel was testifying at that hearing

18   about the opinion in his written report or declaration that

19   was submitted in the case, correct?

20   **A.**    Yes.

21   **Q.**    And that was submitted in the case prior to the

22   hearing, correct?

23   **A.**    I don't -- I don't know.  I don't know when it was

24   submitted.

25   **Q.**    Okay.  But you agree he was testifying at the hearing

Mohr - Recross (Barnhart)                                    913

1    about a report that he had previously submitted?

2    **A.**   Yes.

3    **Q.**   Okay.  And if I represented to you that that was

4    submitted on January 7th, 2014, you'd have no reason to

5    dispute that, correct?

6    **A.**   No.

7    **Q.**   One moment please.

8         My counsel wishes that I clarify that when I said

9    "correct" and you said "no," we just want the record to

10   reflect that you have no reason to dispute that that report

11   was filed on January 7th of 2014, prior to the preliminary

12   injunction hearing?

13            MR. MADDEN:  Objection.  Based beyond the scope of

14   his knowledge.

15            THE COURT:  Overruled.

16            THE WITNESS:  My answer is no.

17   BY MS. BARNHART:

18   **Q.**   You have no reason to dispute it?

19   **A.**   I thought that was your question.

20   **Q.**   I thought so, too.

21            MR. BOHNERT:  She said "is that correct" and you

22   said "no."  On the record it could be construed --

23            THE COURT:  Not correct.  Understood.

24            THE WITNESS:  My response is the same.

25            MS. BARNHART:  To everyone else in the courtroom

Mohr - Redirect (Madden)                                                914

```
 1    it was clear.  It is now also clear to Mr. Bohnert.
 2              MR. BOHNERT:  I just wanted to make sure the
 3    record is clear.
 4              THE COURT:  Understood, sir.
 5              MR. BOHNERT:  Appellate clerks will have to read
 6    this, sir.
 7              THE COURT:  Exactly right.
 8              MS. BARNHART:  Nothing further.
 9              THE COURT:  Thank you.
10         Recross -- I mean redirect, anything further?
11              MR. MADDEN:  Yes, sir.
12              THE COURT:  All right.
13                        REDIRECT EXAMINATION
14    BY MR. MADDEN:
15    Q.   You talked about changing the policy after the McGuire
16    execution.  Did DRC increase the dosages based in part on
17    the testimony of Dr. Waisel?
18    A.   Yes.
19    Q.   And what part of his testimony attributed to that
20    decision?
21    A.   I obviously can't replicate the technical discussion
22    that he had, but when asked about the volume or the quantity
23    of midazolam, there was a formula that I recall in his
24    description that discussed the fact that the midazolam rate
25    that we used, 10 milligrams, we would require at least three
```

Mohr - Redirect (Madden)                                                915

 1   times that, or 30 milligrams, to be satisfactory.  That's in

 2   my recollection.

 3   Q.    And if I represent to you that McGuire execution was on

 4   the 14th, you would agree with that?

 5             THE COURT:  14th?

 6             MR. MADDEN:  16th.

 7             THE COURT:  Thank you.

 8             MR. MADDEN:  Excuse me.

 9             THE WITNESS:  I am going with the Judge on this

10   one.  Yes.

11             THE COURT:  I don't -- like Mr. Bohnert, I'm

12   obsessive about the record.

13             MR. MADDEN:  Yes, sir.

14             THE COURT:  You don't disagree that it was the

15   16th?

16             MR. MADDEN:  I totally agree it was the 16th.  I

17   slipped.  I apologize.

18             THE COURT:  No, no.

19   BY MR. MADDEN:

20   Q.    And you would agree with me that Dr. Waisel testified

21   on January 7th; is that right?

22   A.    I would not have reason -- it was approximately that

23   time.  I can't remember the date.

24   Q.    And was a 21-day medical assessment -- what is your

25   recollection of when that was performed for the Dennis

1    McGuire execution?

2    **A.**   It was performed either 21 or 22, 23 days before.   It

3    achieved the 21 -- it achieved the 21-day requirement.

4           MR. MADDEN:  Thank you, Your Honor.  I have no

5    further questions.

6           THE COURT:  All right.  Director Mohr, you may

7    step down.

8       Plaintiffs' next witness.

9           MS. BARNHART:  At this time, Your Honor --

10          MR. BOHNERT:  Your Honor, I believe at this time

11   we were going to try to accommodate the defendants and let

12   them take one of their experts out of order.

13          THE COURT:  All right.

14          MS. WRIGHT:  We need to know, Your Honor, about

15   our rebuttal and whether it will move into Monday.

16          MR. BOHNERT:  The question, Your Honor, is about

17   the allocation of time and whether rebuttal time is

18   allocated such that it can be used on Monday, given the need

19   to try to accommodate the witnesses here today.

20          MS. BARNHART:  I think an additional question is,

21   based on the parties' calculations -- it's almost 2 o'clock

22   now.  The plaintiffs have three and a half hours for

23   rebuttal, the defendants have some time left for their case

24   in chief to present their expert, and so we're -- we don't

25   think that's going to get done all today.  So we are just

1    trying to figure out what the Court -- we've checked with

2    Dr. Bergese, and he is able to come back on Monday, so we

3    could tell him to leave now so that he could come back on

4    Monday if needed.

5              THE COURT:  Kelly, what does your time sheet show

6    for today so far?

7         By my calculation, the plaintiffs have 113 minutes

8    left, and the defendants have 104 minutes left.

9              MS. BARNHART:  For their case in chief, Your

10   Honor?

11             THE COURT:  No, total.  We added up the time.

12   When we reallocated the time, what we did was add up the

13   total amount of time available.  So if you look at the

14   amended time allocation order, we were supposed to be in the

15   plaintiffs' rebuttal case by now, which we are not.  And to

16   have allocated three and a half hours for that.  Three and a

17   half hours is 110 minutes.  You have far less than that

18   left, total.

19        Defendants' case in chief was to have commenced

20   yesterday and consume five and a half hours -- six and a

21   half hours, and to have come to a total of nine and a half

22   hours by noon today.  That hasn't happened.

23        So we need to discuss what we do with the time we have

24   left and how we allocate it.

25        So I am going to give folks ten minutes to talk about

918

```
1    that among themselves and then tell me what you want to do.

2              MR. MADDEN:  All of us together?

3              THE COURT:  Well, separately caucusing first, and

4    then together, yes.

5              MS. BARNHART:  Your Honor, just to be clear, there

6    is still two hours on Monday that had been taken out of

7    plaintiffs' case in chief.

8              THE COURT:  Right.

9              MS. BARNHART:  Okay.  We're just trying to make

10   sure our totals are accurate.

11             MR. SWEENEY:  Your Honor, how much time did you

12   say we used today?  I'm sorry.

13             THE COURT:  Read it out, Kelly.

14             THE COURTROOM DEPUTY:  106.

15             MR. SWEENEY:  106 today?

16             THE COURT:  Yes.

17             MR. SWEENEY:  Is that based on yesterday --

18   yesterday we were, based on my calculation, riding with

19   Kelly and listening to her throughout the week, 557 is where

20   we were after last night.  If we add another 106, we're at

21   670, roughly, and we are supposed to have 780.

22             THE COURTROOM DEPUTY:  We just went over

23   yesterday.  We didn't do a total of the week.

24             MR. SWEENEY:  But I did.  I just kept doing it.

25             THE COURT:  What do you have?
```

1          MR. SWEENEY:  I have it.  I have been trying to

2   have.  I had at the end of the day yesterday of 557.

3          THE COURT:  Right.

4          MR. SWEENEY:  For us, out of 780.

5          THE COURT:  Right.

6          MR. SWEENEY:  The 780, Your Honor was not counting

7   rebutting, because the 780 time was the case in chief time

8   that you allocated.

9       Part of the issue is some of the time it wouldn't add

10  up at the end of the day to a full day.

11         THE COURT:  You are right.  You are right.

12         MR. SWEENEY:  That's why.

13         THE COURT:  You are right.  Plaintiffs' case in

14  chief was allocated 4-1/2, plus 6-1/2, which is 11, plus 2

15  hours on January the 9th, which would be 13.  That's your

16  total of 780.

17         MR. SWEENEY:  That's the 780, correct, Your Honor.

18         MR. BOHNERT:  And then would there not be

19  additional rebuttal time that was broken out separate?

20         MR. SWEENEY:  Yes.  I wasn't counting that.

21  Rebuttal I am treating different.  The 780 -- so that's how

22  I got 557 last night, give or take, plus today, would bring

23  us, I thought -- I thought by now we were about at 670

24  maybe.

25         THE COURT:  663.

920

```
 1            MR. SWEENEY:  Yeah, and we still had to do
 2    Mr. Buffington's cross, so I thought we would probably have
 3    some time left over today, and we'd still have enough time
 4    for our witnesses on Monday.  And then still have our
 5    rebuttal time.
 6            THE COURT:  Two hours for the witnesses on Monday
 7    and then the rebuttal time.
 8            MR. SWEENEY:  Right.  That's what we were
 9    thinking.
10            THE COURT:  Except the rebuttal time was supposed
11    to be today.
12            MR. SWEENEY:  I know.  That was kind of what was
13    confusing about how the time was getting used and maybe just
14    disappearing.
15            THE COURT:  Disappearing into recesses.
16            MR. SWEENEY:  Yeah, that kind of stuff probably.
17            MS. WOOD:  And also we called Dr. Antognini out of
18    order, didn't we?
19            MR. MADDEN:  Not really.  We called him Thursday
20    morning.
21            THE COURTROOM DEPUTY:  It's all the same.
22            MS. BARNHART:  The issue is that the total amount
23    of time spent in the courtroom for the week is smaller than
24    the total amount of time allocated to the parties in the
25    court.
```

```
1              THE COURT:  120, not 106, right?

2              THE COURTROOM DEPUTY:  All day, because that's

3    this afternoon.

4              MR. SWEENEY:  We're still at about the same

5    ballpark.  And so the thought was if we had maybe

6    Mr. Buffington, or Dr. Buffington, it would probably be

7    about an hour and a half would be total, was kind of our

8    guess.  They'd probably take about an hour.  I don't think

9    they have much more time left than an hour.

10             MS. BARNHART:  Right.  They have 104 minutes left.

11             MR. SWEENEY:  And we'd do a cross, and then we'd

12   probably get to around 3:30, and perhaps would get in at

13   least two hours of that time if His Honor would be willing

14   to go to 5:30.

15             THE COURT:  I'm not.

16             MR. SWEENEY:  No, okay.  Well, 90 minutes.

17             THE COURT:  Somebody else has dictated what I am

18   going to do at 5:30.

19             MR. MADDEN:  We have 104 minutes in our case in

20   chief.

21             THE COURT:  Right.  Is it your intention to call

22   Dr. Buffington now?

23             MR. MADDEN:  Yes, sir.

24             THE COURT:  All right.

25             MR. MADDEN:  Yeah, he's got a plane to catch.
```

1          THE COURT:  Call Dr. Buffington.

2          MS. WERNEKE:  Your Honor, can I just bring in a

3    housekeeping matter?

4          THE COURT:  Sure.

5          MS. WERNEKE:  We talked about designating the

6    depositions that we wanted to introduce, and I have put them

7    on a flash drive as you had suggested.  And I have given to

8    Ms. Lowe a copy of it, and I have two copies for you.

9          THE COURT:  I don't want it from you.  I want it

10   from when Ms. Lowe is finished with her designations.  I

11   want that copy -- I want a copy of that.

12         MS. WERNEKE:  Okay.  You want her to make the

13   designation on here?

14         THE COURT:  Right.

15         MR. BOHNERT:  So does she need to give her all

16   three, all three so that whatever goes to the Court.

17         MS. WERNEKE:  Oh.  So I wanted to make sure what

18   was on the record.  What's on the record is the depositions,

19   and then we did a pleading that's a notice that says exactly

20   the pages that -- the PageID numbers of the whole deposition

21   but then what we've highlighted.

22        And then we've also put in there the prior testimony of

23   various proceedings that have happened in the course of this

24   case that we find irrelevant as well, and with a notice that

25   was courtesy filed on --

1          The other thing we have on the flash drive, Your Honor,

2     is all the prior testimony of the various depositions and

3     court hearings and things that have gone on over the years

4     in this case, the history of this case, even back when it

5     was Cooey that we think are relevant to the issues before

6     the Court.

7          We filed a notice on December the 27th of those

8     transcripts that we've designated that we think are

9     relevant, and we've just added those to the flash drive just

10    for the Court's convenience and the parties' convenience.

11               THE COURT:  All right.

12               MS. WOOD:  Your Honor, if I may.

13               THE COURT:  Go ahead.

14               MS. WOOD:  I'm sorry to press the issue, but we

15    really need a decision on allowing to do a rebuttal because

16    we have Dr. Bergese here in the courtroom, who has also been

17    here for several days, and if we are able to call him on

18    Monday, then we, frankly, need to request additional funds

19    from our boss because we are on a federal budget and it is a

20    lengthy process.  So if we are letting him go today -- we'd

21    like to be able to let him go and then to know what to do

22    for Monday.

23               THE COURT:  Let's pay attention to budget rather

24    than the time allocation done before.  Let's get

25    Dr. Buffington done, and then if Dr. Bergese needs to be

924

```
1    heard in rebuttal, we will hear him today so that we haven't
2    embarrassed the budget.  Is that what you are asking?
3              MS. WOOD:  But Dr. Stevens has to leave.
4              THE COURT:  Dr. Stevens has to leave.
5              MS. BARNHART:  We'd like to let Dr. Bergese leave
6    now, turn off the meter, go home, and then come back on
7    Monday.  And if that's acceptable, we will release him to do
8    that.
9              THE COURT:  Ms. Lowe?  Any objection?
10             MS. LOWE:  So I just want to -- I'm sorry.
11             THE COURT:  They want to release Dr. Bergese to go
12   home now and come back on Monday.
13             MS. LOWE:  For their rebuttal case --
14             THE COURT:  Right.
15             MS. LOWE:  -- on Monday so that we would
16   complete -- I don't think we have an objection to that.
17             THE COURT:  Good.
18             MS. LOWE:  Unless Mr. Wille disagrees since I do
19   report to him.
20             MR. WILLE:  Well, in this situation, actually
21   Mr. Madden is -- he's the lead attorney.
22        One moment, Your Honor.  I will only be a moment.
23             THE COURT:  All right.
24             MR. WILLE:  No objection, Your Honor.
25             THE COURT:  Very good.  All right.  We are ready
```

Buffington - Direct (Wille)                                925

1    to proceed.

2         **DANIEL BUFFINGTON, DEFENDANTS' WITNESS, SWORN**

3         THE COURT:  Sir, you have been sworn.  Would you

4    state your name and spell your last name for the record.

5         THE WITNESS:  Yes, sir, Dr. Daniel Buffington,

6    B-U-F-F-I-N-G-T-O-N.

7         THE COURT:  And what is your employment, sir?

8         THE WITNESS:  I am on faculty at the University of

9    South Florida, College of Medicine and Pharmacy.  I also

10   have a private practice, specialty practice called Clinical

11   Pharmacology Services.  And I also work for the United

12   States government for Department of Health and Human

13   Services with Medicare and the Healthcare Reform team.

14        THE COURT:  Thank you.  Mr. Wille, your witness.

15        MR. WILLE:  Thank you, Your Honor.

16                  <u>**DIRECT EXAMINATION**</u>

17   BY MR. WILLE:

18   **Q.**   Dr. Buffington, is it proper for me to refer to you as

19   a clinical pharmacology?

20   **A.**   That's correct.

21   **Q.**   Could you just tell me a little bit about your

22   background?  Recognizing that you've submitted a curriculum

23   vitae, but could you just describe a little bit your

24   education, your background, your training, and your

25   experience?

Buffington - Direct (Wille)                                    926

1    **A.**    Yes, sir.  My undergraduate training was in biology and

2    biochemistry at the University of South Florida.  I did a

3    Doctorate of Pharmacy degree, which is a pharmacology-based

4    degree, at Mercer University in Atlanta, Georgia.

5         Following that, I did a residency and clinical

6    pharmacology fellowship at Emory University in Indiana.

7    Subsequent to that, completed an MDA with a healthcare

8    focus.

9         Practice, as I just stated, includes academic

10   endeavors, teaching medical students, practicing physicians

11   of various specialties -- pharmacists, nursing students.

12        I have a clinical practice where patients are either

13   referred to our practice for issues related to high-risk

14   medications or chronic drug therapies, drug interactions,

15   pharmacogenetic testing.  Also provide consultative support

16   to physicians of various specialties, health plans, the

17   federal government, and law enforcement on forensic issues.

18   **Q.**    Doctor, could you just tell us a little bit, give us a

19   definition of pharmacology.

20   **A.**    Sure.  Pharmacology is the study of medications and

21   natural substances, so it could be synthetic or natural; and

22   what pharmacologic effects they have on the body to guide or

23   direct treatment or therapy.

24        But embodied in that is also toxicology.  So we have to

25   understand the positive attributes as well as the negative

Buffington - Direct (Wille)                                            927

1    attributes of pharmacologic substances.  And that can be

2    applied in a variety of ways.  So on an inpatient basis,

3    that may be a service directly guiding medical decision-

4    making and prescribing and patient monitoring for safety.

5    On an outpatient basis, it could be private practice or

6    consultative support for other practitioners.

7    Q.   You mentioned toxicology.  That's a term we often hear.

8    Could you just tell us, describe the difference between or

9    the -- how toxicology is related to pharmacology?

10   A.   Sure.  So it is the study of the negative attributes,

11   so things that are either the harms, the complications, the

12   adverse side effects, and understanding not only how they

13   occur but how to manage them in practice settings.

14   Q.   You've -- you heard Dr. Stevens testify.  Could you

15   just tell us briefly -- you can compare and contrast your

16   training, education, and experience with that of

17   Dr. Stevens?

18   A.   Sure.  From reviewing his CV and hearing the testimony,

19   it sounds like academically and profession roles are very

20   similar.

21        I think the difference between a PharmD is that a

22   Doctor of Pharmacy would be the highest clinical application

23   of pharmacology degree, where a Ph.D. would be a higher

24   degree with regards to research design.

25   Q.   Have you in the past been requested to testify as an

Buffington - Direct (Wille)                                      928

1    expert by attorneys or by courts?

2    **A.**   Yes, sir, routinely.

3    **Q.**   And have you been asked to testify as an expert in

4    cases involving the states' lethal injection protocols?

5    **A.**   Yes, sir, I have.

6    **Q.**   Could you just very briefly summarize the type and the

7    cases that you have done such expert testimony?

8    **A.**   Yes, sir.  There is cases in Alabama, *Grayson versus*

9    *Dunn*.  There -- I've had inquiries from our states with just

10   technical questions.  I have also testified for Virginia in

11   a recent case for them as well.

12            MR. WILLE:  Your Honor, I'd like to have the

13   witness take a look at -- or have at his ability to observe

14   Prosecution Exhibit 93, which I believe is -- or

15   prosecution, excuse me -- Defendants' Exhibit 93, which I

16   believe is his expert report, which includes his curriculum

17   vitae.

18            THE COURT:  The record will reflect the witness

19   has been handed the appropriate evidence binder.

20            MR. WILLE:  It should be Exhibit 93.

21            THE COURT:  I have it.

22            THE WITNESS:  Yes, sir.

23   BY MR. WILLE:

24   **Q.**   Just to have that for your perusal.  It does have your

25   curriculum vitae attached, I believe?

Buffington - Direct (Wille)                                          929

1    A.    Yes, sir, it is.

2    Q.    Does that curriculum vitae accurately describe your

3    professional training and experience?

4    A.    It does.

5    Q.    Tell us a little bit about what a clinical toxicologist

6    does.

7    A.    So in the course of my practice, I have patients who

8    are referred to our practice where we provide a thorough

9    drug regimen analysis, identifying if there's needs for

10   therapeutic monitoring, whether that's blood levels or other

11   types of genetic testing that look for potential variances

12   in one individual's ability to metabolize certain

13   medications versus another.  If there is adverse side

14   effects occurring, we are able to identify if one or

15   multiple of those medications may be the causative agent for

16   that.  So it's very much a detective or investigative role

17   for primary care or specialists as to what the issues may

18   be.

19        With toxicology, it may also involve doing some type of

20   ongoing monitoring that looks at patient safety.  So many

21   medications, we have to do blood level testing to be sure

22   that the patients are staying within a safe therapeutic

23   range.

24   Q.    Do you provide services directly to anesthesiologists?

25   A.    Absolutely.  I have actually had anesthesiologists as

1    partners in my practice.  And in addition, I do clinical

2    research.  I have done multiple consults that are at

3    hospitals in the emergency room, that are also -- I am

4    sorry -- in the operating room.  Also clinical trials that

5    we have done in the operating suite.

6         So, yes, I get consultations from anesthesiologists

7    with questions about high-risk patients.  It may be an issue

8    about their regular medications and a potential interaction

9    with the anesthesia.  It may be about patients who are high

10   risk with anesthesia, who we are looking at designing the

11   appropriate regimen for those patients.

12   **Q.**   Have you actually been in an operating room?

13   **A.**   Multiple times.

14   **Q.**   And do you -- not only just to anesthesiologists, but

15   do you also give consulting services to physicians, other

16   types of physicians?

17   **A.**   That's correct, other specialties as well.

18         MR. WILLE:  Your Honor, at this time I would like

19   to offer Dr. Buffington as an expert in toxicology and

20   pharmacology.

21         MR. KING:  Your Honor, we do object.  From what I

22   heard, and based on his CV, Dr. Buffington is a pharmacist.

23   He's not a pharmacologist.  And that's a distinction that

24   the case law has recognized under -- in evaluating the

25   qualifications of an expert, that a pharmacist is not a

1    pharmacologist.

2         A pharmacologist is somebody who holds a degree in

3    pharmacology.  Dr. Buffington does not hold one.  He does

4    not hold a degree in pharmacology.  He does not hold a

5    degree in toxicology.  He holds a degree in pharmacy.

6         And I'll just -- I can give you the case law.

7              THE COURT:  Please do.

8              MR. KING:  Well, I'll start off, *Newton versus*

9    *Roche Labs*, 243 F.Supp.2d, 672, Western District of Texas,

10   2002 decision.

11        *Devito versus SmithKline Beecham*, 2004, U.S. Dist.

12   LEXIS, 27374, Northern District of New York, 2004.

13        *Dellinger versus Pfizer*, 2005, U.S. Dist, D-I-S-T,

14   LEXIS, 96355, the Western Division of North Carolina, 2006.

15        *Wehling versus Sandoz Pharmaceuticals Corporation*,

16   1998, U.S. at LEXIS 38866, a Fourth Circuit decision from

17   1998.

18        Each of those decisions say a pharmacist, someone with

19   a degree in pharmacy, is not qualified to testify about

20   pharmacology.

21        I understand that he holds himself out as a clinical

22   pharmacologist.  And, in fact, in that Texas decision, a

23   very similar circumstance, where a pharmacist held himself

24   out as a pharmacologist.  The court said no can do.  You

25   have to have a degree in pharmacology in order to testify as

Buffington - Direct (Wille)                                    932

1    a pharmacologist.  The disciplines are distinct.

2         And so we do not believe that Dr. Buffington is

3    qualified to testify as either a pharmacologist or a

4    toxicologist.  He can testify as a pharmacist.

5         And I just want to give the case law -- I'll give you a

6    quote from the North Carolina decision, the *Dellinger versus*

7    *Pfizer*, and it's a theme that you see and the definitions

8    that you see throughout the cases.

9         It says, "Pharmacology can be described as the study of

10   the effect of drugs on living organisms, while pharmacy, on

11   the other hand, can be described as the profession of

12   reading prescription labels and disbursing drugs."

13        And then the court said, in regard to that expert,

14   "However, Keys is not a doctor and has a degree in pharmacy,

15   not pharmacology.  Without a degree in pharmacology, Keys is

16   not qualified to render a relevant or reliable

17   pharmacological opinion."

18             THE COURT:  Pharmacological opinion, right?

19             MR. KING:  Correct.

20             MR. WILLE:  Your Honor, may I address this?

21             THE COURT:  Please.

22             MR. WILLE:  Your Honor, the test for an expert

23   witness is whether the witness has specialized knowledge

24   which will assist the finder of fact in rendering a decision

25   on a relevant factual question.

Buffington - Direct (Wille)                                    933

1        The doctor's curriculum vitae shows that he has

2   specialized training in pharmacology with specific training

3   in terms of pharmacological issues with respect to the

4   prescription of medications and the use of medications.  We

5   would submit, Your Honor, that because he can demonstrate

6   specialized knowledge, what you've described formally as his

7   degree is not the controlling question, with all due respect

8   to the decisions of other courts, which I have not seen the

9   particular circumstances in those cases, but it is clear

10  here that the doctor has specialized knowledge and training

11  which would assist the Court in resolving factual questions

12  before it.

13          MR. KING:  Your Honor, I would just respond, he

14  does have specialized knowledge in pharmacy, not

15  pharmacology.  He doesn't have a degree, and I have heard

16  nothing about any training, any advanced training in

17  pharmacology.

18          THE WITNESS:  Fellowship.

19          MR. KING:  I don't see it on his CV.

20          MR. MADDEN:  Your Honor --

21          MR. KING:  I also don't believe the case law

22  study -- I understood he just murmured the word

23  "fellowship."  He does have, it looks like, on his resume a

24  research fellowship that he indicates he took for one year

25  at Emory.  I still don't believe the case law would allow

1    him to be qualified as a pharmacologist.

2        You know, bringing in expert testimony, as this court

3    knows in federal court, there is a fairly rigorous review of

4    the expert's qualifications.  I am sure, you know, he holds

5    himself out as a pharmacologist.  He has a business with the

6    term "pharmacological services" in it.  That's fine.  But

7    for purposes of these proceedings, he is not a

8    pharmacologist.

9              MR. WILLE:  Your Honor --

10             THE COURT:  When did the plaintiffs receive

11   Dr. Buffington's report?  Date?

12             MR. MADDEN:  Several weeks ago.

13             THE COURT:  Date?  When did you receive his

14   report?

15             MR. KING:  Well, I think the original version was

16   probably about two weeks ago.  Whatever the date -- whatever

17   the deadline was, I believe.

18             MR. MADDEN:  December 21st.  And also you had said

19   something, Judge, at the beginning of this:  Do we need to

20   have a *Daubert* hearing?  And then later on they get the

21   report.  No motion before this court questioning his

22   authority so that a *Daubert* hearing could be conducted, and

23   that Mr. Wille wouldn't be sandbagged with these cases and

24   not being able to answer them.

25             THE COURT:  We'll take a recess.  We'll read the

Buffington - Direct (Wille)                                  935

1     case law.  This time is chargeable to the plaintiffs.

2           THE COURTROOM DEPUTY:  All rise.  This court

3     stands in recess.

4           (Recess from 2:16 p.m. until 2:19 p.m.)

5           THE COURT:  Please, be comfortable.

6     We are waiting on Mr. Madden?

7     Okay.  Go ahead.  Is Mr. Madden coming?

8     Please, be comfortable.

9     The Court has not read the cases cited by plaintiffs'

10    counsel.  The Court has decided that plaintiff has waived

11    the objection by failing to file a motion in limine by the

12    deadline set by the Court.

13    The witness is found to be qualified as an expert.

14    Mr. Wille, you may resume your examination.

15    Whether it's *Daubert* or *Kuhmo Tire*, I think there is

16    adequate foundation laid.

17    BY MR. WILLE:

18    **Q.**   Dr. Buffington, have you had occasion to act or provide

19    expert consultation services to the federal government?

20    **A.**   Yes, sir, I'm currently and have been for the last

21    three years a specialty consultant on clinical pharmacology

22    and medication safety with the Department of Health and

23    Human Services to both the Medicare's Innovation Center,

24    which is the safety arm and research arm of the Healthcare

25    Reform Initiative; and also with the FDA.

Buffington - Direct (Wille)                                       936

1   **Q.**   Do you have knowledge as to how drugs are approved for

2   sale and use in the United States by the Food and Drug

3   Administration?

4   **A.**   Yes.  Throughout my entire career, I've served as a

5   principal investigator on the clinical research trials, and

6   that's working directly with the FDA sanction review, and

7   assisting in the review process.

8   **Q.**   Now, you have been asked to render expert opinions with

9   respect to midazolam, one of the drugs used in Ohio's

10  execution procedures.  Could you just tell us a little bit

11  about, just very briefly, what midazolam is, the type of

12  drug it's categorized as, some of its uses?

13  **A.**   Yes, sir.  It is a benzodiazepine, which is a central

14  nervous system depressant agent.  It is -- as we look at

15  classes of medications, the benzodiazepines have multiples.

16  Some have -- each of them have different characteristics.

17  Some are much longer in duration and effect.  Some have

18  unique advantages for certain types of conditions, whether

19  that's treating seizures or treating anxiety or sedation.

20  And also they vary in the length and duration of their

21  effects.

22  **Q.**   You are familiar with the term "drug label" or "package

23  insert," those terms?

24  **A.**   Absolutely.

25  **Q.**   And could you just review briefly what -- some of the

Buffington - Direct (Wille)                                    937

1    things that midazolam -- the package insert with respect to

2    midazolam includes?

3    A.   Yes, sir.  So I would refer to those as FDA-approved

4    indications.  Just for the Court's understanding, that's not

5    a limit of what the medication can be used for.  It's what

6    the manufacturer provided supporting data that the FDA

7    approves and that manufacturer can then market that product

8    for.  So it is a guideline for that information.

9         There is multiple different indications, therapeutic

10   indications, that are on the FDA-approved package insert for

11   midazolam, and they include the induction and maintenance

12   anesthesia; they include sedation for patients who are

13   intubated or ventilated; they include the treatment of

14   different types of seizures.

15   Q.   You may have mentioned this briefly before, but what

16   does the FDA do?  What kind of procedures do they use to --

17   before they make those indications on a package insert?

18   A.   Well, the FDA itself doesn't do the research.  The

19   pharmaceutical manufacturer or independent groups, if a

20   product is developed in that pathway, have to produce very

21   specific guidelines of information.  The FDA will assemble

22   therapeutic panels, experts within -- if it's an antibiotic,

23   they'd be experts in infections disease or anti --

24   infectants.  If it's a neurology product, those experts.

25   They would then review that product and look for both

1    therapeutic effectiveness, or efficacious, and they would

2    also look for complications and adverse side effects and

3    toxicities and the like.

4        And evaluate that information to give the FDA-approved

5    indication.  So the FDA could take information for ten

6    indications and only accept five.

7    **Q.**  Did you --

8    **A.**  And -- I'm sorry.

9    **Q.**  Did you mention that the approved application for

10   midazolam includes induction of anesthesia?

11   **A.**  It does.

12   **Q.**  Now, in speaking of anesthesia, could you just tell us

13   a little bit about your -- the way you used the terms

14   "sedation," "unconsciousness," "general anesthesia," could

15   you just review basically what you are going to -- what you

16   mean when you use those terms?

17   **A.**  Sure.  Well, the term "anesthesia" is a broad term, and

18   it could be medications that are topical or local effect to

19   block a specific nerve, it could be something that is

20   broader or regional, and it could be something that is

21   administered for global effect in the body.

22       So we've seen testimony in graphs and charts in this

23   case already that I think do an excellent job, and that

24   anesthesia is a continuum of sedation.  It starts at a low

25   level, minimal, then moderate, then deep sedation, and in

Buffington - Direct (Wille)                    939

1    its lowest level is general anesthesia.

2    Q.    Are you familiar with the term "noxious stimuli"?

3    A.    Yes.  It's a very broad term that is for something that

4    is offensive or disturbing or painful to an individual.  It

5    doesn't mean and shouldn't be interpreted to mean it's one

6    thing.  So that could be something of a verbal nature.  It

7    could be something that's shaking the patient to alert them.

8    It could be something of a painful nature.

9         The degree or intensity of noxious stimuli varies as

10   well.  So it's up to the practitioner, the type of

11   procedure, the practice setting, the types of medications

12   that are used to gauge what level of noxious, to create a

13   stimuli, to gauge the patients' level of sedation.

14   Q.    Is it possible, Doctor, that a drug can render a

15   patient sufficiently sedated as to be unaware of a noxious

16   stimuli and yet not reach what might be called a level of

17   general anesthesia?

18   A.    Absolutely.  That's what the minimal, moderate, and

19   deep sedation actually is.  And the definitions even in

20   *Miller's* acknowledge that when we talk about a stimulus,

21   we're really talking about not the term "analgesia" or

22   "pain."  Pain is a perception or an emotion or an emotional

23   response to a stimulus.

24        So what the correct terms to use would be

25   "nociception."  Nociception is an understanding of what a

Buffington - Direct (Wille)                                    940

 1    stimulus, whether it's a pinprick, a pinch, a pressure, a

 2    temperature is applied, and that signal then transponding

 3    through the nervous system to reach the brain to then be

 4    perceived.

 5        So to say noxious stimuli can mean many different

 6    things.

 7    Q.   Now, let's -- with respect to midazolam, is there a

 8    relationship between the degree of sedation that midazolam

 9    can produce and the dosage amount?

10    A.   Absolutely.  The --

11            MR. KING:  Excuse me, Your Honor.  Objection.

12    Foundation.  Can we learn more about his experience with

13    midazolam?

14            THE COURT:  Yes.

15    BY MR. WILLE:

16    Q.   Tell us a little bit about your experience with

17    midazolam.

18    A.   Yes, sir.  So given the age of this particular

19    medication in my career span, I've been able to see this

20    product used in a variety of practice settings -- it's been

21    out for several years -- and that's in both office space,

22    surgical centers, ambulatory surgery centers, plastic

23    surgery suites, all the way through operating rooms and OR

24    suites.

25    Q.   And based on your education, have you received

Buffington - Direct (Wille)                                    941

1    information, instruction with respect to the effects of

2    midazolam?

3    A.    Absolutely.  And provided expert testimony to various

4    state boards of medicine, and teach on the topic routinely.

5    Q.    And perhaps I should have asked this when -- lay this

6    foundational question, but does midazolam -- it produces

7    sedation?

8    A.    It does, and we have multiple publications to help us

9    to understand.  That is actually -- it is less used for the

10   other indications that we see the benzodiazepines used

11   because it has significant sedation and short effect that

12   it's -- because it's dose dependent, it can be used

13   strategically in very basic procedures.  It can be used at

14   higher doses for more advanced procedures.  It can be used

15   in combination.  We typically use it in combination with

16   other medications in the operating suite for general

17   induction and maintenance of general anesthesia for certain

18   procedures.  And it can be used in very high doses for

19   patients in a controlled setting because of the potential

20   for respiratory depression for treatment of life-threatening

21   seizures.

22   Q.    I think you have answered my previous question, but,

23   again, is there a relationship with respect to midazolam

24   between the dosage amount and its effects?

25   A.    No question.  And it is -- it is in all references

Buffington - Direct (Wille)                                    942

1    regarded as a dose-dependent effect, which means a smaller

2    dose will have an effect; a larger dose will render a larger

3    effect; a much larger does will render a much larger effect.

4    Q.    And, again, also --

5          THE COURT:  Hold.

6    BY MR. WILLE:

7    Q.    And then, again, Doctor, consistent to what you just

8    said, I take it your opinion is midazolam is capable of

9    rendering a relatively deep level of sedation?

10   A.    Absolutely, at larger doses.  Even at therapeutic doses

11   we have evidence through scientific studies that midazolam

12   is capable of producing BIS levels, which is a common metric

13   or measurement for EEGs, that is a correlate with levels of

14   sedation; that it's able to produce levels equivalent to BIS

15   levels of 40 to 60, and even at doses from 5 to 20

16   milligrams.

17   Q.    And that's -- those studies you refer to, do those

18   include a study entitled or roughly referred to as the Liu

19   study?

20   A.    The Liu, the Glass, the Bulock.

21   Q.    And, again, just to recap, those -- you point to those

22   studies to indicate the evidence that midazolam can be used

23   to produce a deep level of sedation?

24   A.    Yes, sir.  We clearly understand that midazolam is

25   pharmacologically capable of inducing deep respiratory

Buffington - Direct (Wille)                                      943

1    depression and sedation.

2    Q.    Now, Doctor, we've heard -- you've heard testimony, and

3    we've heard a number of references to the term "ceiling

4    effect."  Can you tell us what, in your -- in your knowledge

5    or in your opinion, what that term refers to?

6    A.    Yes, sir.  During the earlier testimony, what I heard

7    was a comparison of one drug to another.  That would be a

8    difference in potency of one drug to another, not a ceiling

9    effect.

10        Ceiling effect would be in the same medication, is

11   there a maximum effect that can be achieved regardless of a

12   dose, an increased dose administered, and we clearly have no

13   literature, no scientific study to support that premise for

14   midazolam.

15   Q.    Doctor, we've heard -- we've heard testimony that there

16   is a ceiling effect with respect to midazolam.  Could you

17   explain -- I mean, elaborate on what you just testified to.

18   Why do you say that there is not sufficient data to show

19   that midazolam has a ceiling effect or what that effect

20   might be?

21   A.    Well, as a correction, you did not hear that it has a

22   ceiling effect; you heard there is a theory that it has a

23   ceiling effect.

24        What we know in a dose-dependent increase is that

25   midazolam produces small effects at low doses and increasing

Buffington - Direct (Wille)                                944

1    effects of depths of sedation and depth in intensity of

2    respiratory depression.  If there were a ceiling dose to be

3    defined or an outcome, it would be death because we know

4    that midazolam is considered lethal at large doses.

5         So, therefore, if -- there is not a concept here --

6    there is only a concept being discussed, and it is not

7    studied.  It was something that was done with animal data.

8         The FDA is very clear, it is inappropriate to attempt

9    to opine human pharmacologic effect from animal or

10   laboratory data that hasn't been tested or validated in

11   humans.

12        We do not see a ceiling effect in humans, and I don't

13   discount the academic endeavors that we heard to look at,

14   and I encourage that.  However, that data was from a

15   receptor taken out of the human body, placed into a petri

16   dish in the presence of a chemical.  Dr. Stevens himself

17   stated that, and acknowledged that that does not reflect the

18   term that was used, "pharmacokinetics."  And that's a very

19   important term, something very important to he and I both,

20   and that is, that's the effects when you have the drug in

21   the body.

22        So it's an academic theory to test does the presence of

23   midazolam have an impact with the presence of GABA at the

24   receptor level.  It is interesting.  However, we have never

25   seen a ceiling.  And what we actually see is a capacity to

Buffington - Direct (Wille)                                    945

1    produce deep sedation to the equivalent level of general

2    anesthesia and the capacity to render death.

3    **Q.**   Now, Doctor, to your knowledge, or do you know that

4    midazolam is used as part of Ohio's lethal injection

5    protocol?

6    **A.**   Yes, I have reviewed the protocol.

7    **Q.**   And do you know what dosage level Ohio used with

8    respect to midazolam?

9    **A.**   Yes, sir.  It's 500 milligrams administered in two

10   separate syringes, 250 milligrams apiece, with a conscious

11   check and the ability to administer another round of 500.

12   **Q.**   Now, in your expert opinion, Doctor, if midazolam at

13   the dosage level called for in Ohio's execution protocol is

14   effectively administered, will it render a person

15   sufficiently insensate to the noxious stimuli that may

16   result from the administration of the second and third

17   drugs?

18   **A.**   That is correct.

19   **Q.**   And you are -- you are familiar with, or you know what

20   the second and third drugs are; is that right?

21   **A.**   Yes, rocuronium and potassium chloride.

22   **Q.**   And, again, it's your expert opinion, to a reasonable

23   degree of scientific certainty, that the amount of

24   midazolam, if successfully administered in Ohio's execution

25   protocol, would sedate a person sufficiently to render that

Buffington - Direct (Wille)                                      946

1   person unaware of the noxious stimuli produced by the second

2   and third drugs?

3   A.    Yes, sir.  And that's sedation balanced with its other

4   key attribute, and that's its amnestic effect.  And with

5   that, pain is not the stimulus.  The stimulus, whether it's

6   a pinprick, a pinch, those are nociceptive signals.  The

7   brain has to have the capacity to understand, and then each

8   of us react differently to pain.

9       I have seen no evidence in this case that's attempted

10  to discern or graduate, grade, any presence of pain from the

11  second or third.  While it's obviously possible if

12  misadministered, there is no assumption that you would, in

13  fact, have pain from the second and third, or that any such

14  nociceptive effect would have the patient sensitive or

15  sensate to that pain.

16      Even if there is an autonomic response.  And we heard

17  testimony that autonomic response could be a muscle twitch,

18  a change in blood pressure, a change in heart rate,

19  perspiration, making a guttural sound.  There are multiple

20  signals that a patient may be in a depth of anesthesia, a

21  depth of sedation, and be emerging, but emerging is not a

22  light switch.

23  Q.    Let me -- let me ask you --

24           THE COURT:  Hold on just a second.  Would you

25  please spell the word "nociceptive" for the record.

1          THE WITNESS:  Yes, sir.  N-O-C-I-C-E-P-T-I-V-E.

2          THE COURT:  Thank you.

3          THE WITNESS:  And we also refer to nociception as

4     a process.

5     BY MR. WILLE:

6     **Q.**    Doctor, let me follow that up.  Do you recall the slide

7     from the anesthesia text *Miller's* that depicted the signs --

8     depicting the signs of emerging from anesthesia?

9     **A.**    Yes.  But that -- that table would also be --

10         MR. KING:  Objection, Your Honor.  I understand

11    that he's been qualified as a clinical pharmacologist.  He

12    has not been qualified as an anesthesiologist, and he's

13    being asked about an anesthesiology text.

14         MR. WILLE:  Your Honor, again, Dr. Buffington, in

15    his expertise, has testified that he consults with

16    anesthesiologists.  He provides them consulting advice.

17    He's been in the operating room with anesthesiologists.  He

18    has extensive training in pharmacology.  As a matter of

19    fact, his vitae indicates that he has not simply an

20    undergraduate degree, but also a graduate training in

21    experience in pharmacology.

22         Again, I would submit, Your Honor, that he has more

23    than enough expertise to assist this Court with the issues

24    before it.

25         THE COURT:  I'll allow the testimony.

Buffington - Direct (Wille)                              948

```
1              THE WITNESS:  Thank you, Your Honor.
2         Could you repeat the question?
3    BY MR. WILLE:
4    Q.   Yes.  If you recall at this hearing, there was a slide
5    from the anesthetic textbook depicting the stages of
6    emergence.  Now, you also mentioned that emergence is not
7    like a switch where you are unconscious in one moment and
8    then you are conscious the next moment.
9    A.   That's correct.
10   Q.   Now, is it possible, in your opinion, that when a
11   patient is emerging from anesthesia, that there could be a
12   point where the level of sedation and effect is lesser but,
13   nevertheless, the patient is still not aware of some noxious
14   stimuli?
15   A.   Absolutely.
16             MR. KING:  Objection, Your Honor.
17             THE COURT:  Sustained.  Form of the question.
18   BY MR. WILLE:
19   Q.   Tell us a little bit, Doctor, about those stages of
20   coming out of the anesthesia and the signs that we saw.
21   Tell us about how that process works.
22             MR. KING:  Your Honor, objection.  I do think this
23   is outside the scope of his expertise.  I think this is more
24   appropriate for an anesthesiologist to be testifying about.
25             THE COURT:  Maybe so.
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Buffington - Direct (Wille)                    949

1      Can you point to some place in his report where he's

2  talked about this, Mr. Wille?

3           MR. WILLE:  Your Honor, he said that, in his

4  report, he's indicated that he consults with

5  anesthesiologists and provides them with his assistance.

6           THE COURT:  Objection sustained.

7           MR. MADDEN:  Judge, may I be heard on that part?

8           THE COURT:  Yes, sir.

9           MR. MADDEN:  The reason why we brought the experts

10  in here and had them watch each other is because, you know,

11  so they could comment on each other's testimony.  Their -- I

12  am sure that their experts are going to come here later on

13  this afternoon and have opinions about what our experts say

14  that may not be in their reports, and it would -- that

15  wouldn't be fair if their experts could comment about things

16  in my expert's report but my expert could not do the same.

17           MR. KING:  Your Honor, I don't think that's the

18  case.  They did file -- Dr. Antognini filed a supplemental

19  report.  They had that opportunity if they believed that

20  this testimony was responsive to the expert reports of our

21  experts, so I would disagree with Mr. Madden.

22           MR. WILLE:  May I just address this, too, Your

23  Honor?  Yes, Your Honor, granted there is going to -- there

24  are situations where something is not spelled out in an

25  expert report, but, nevertheless, it is clear from what is

Buffington - Direct (Wille)                                    950

1    in the expert report, and particularly with respect to the

2    overall opinions that are being issued, that it does -- it

3    would provide fair notice that this witness was prepared to

4    testify with respect to midazolam and its relationship to

5    anesthesiology.

6           MR. MADDEN:  And their expert didn't even talk

7    about emergence.  This was brought up from the first time

8    during Dr. Antognini's cross-examination.  I'm sure

9    Dr. Bergese in a minute is going to talk all about the signs

10   of emergence, and so I would ask that -- for leeway on this.

11          THE COURT:  Let the witness testify.  We'll decide

12   about weight later.

13          MR. WILLE:  Thank you, Your Honor.

14          THE WITNESS:  Yes, sir.  This is something that

15   I'm routinely consulted on by anesthesiologists to provide

16   them technical guidance on, and that is the duration and the

17   counterbalance effect of different medications and their

18   impact on emergence.  In fact, many patients, that's the

19   reason that I'm consulted before, is concerns over the

20   patient's ability to emerge from anesthesia.  So this is

21   part of a normal consultation, or what I teach as well.

22       In the course of that, emergence is -- well, first of

23   all, correction on your question.  You said "anesthesia."  I

24   reiterate again, anesthesia is the entire continuum of all

25   attempts to block awareness based on levels of sedation:  so

Buffington - Direct (Wille)                                    951

1    mild, moderate, deep, and general anesthesia.  So we have to

2    be careful in this case to use the appropriate terms when

3    we're speaking.

4        So with that, as a patient is emerging or coming up to

5    higher levels of awareness --

6            MR. KING:  Excuse me, Your Honor.  I apologize.  I

7    do have to object again on foundation.  I have heard that

8    he's consulted with anesthesiologists.  I haven't heard

9    anything about whether he's ever studied this concept of

10   emergence or ever witnessed emergence or whether he's just

11   talking about things that he's read.

12           THE COURT:  So anesthesiologists who pay lots of

13   money to insurance companies about malpractice say,

14   Dr. Buffington, should I use this drug or should I not

15   use this drug?  I think that's enough to satisfy *Kumho*

16   *Tire*.

17       Overruled.

18           THE WITNESS:  Yes, sir.  So this is part of my

19   base training.  It's also part of my professional

20   activities.  It's also something that I teach, to

21   anesthesiologists.

22   BY MR. WILLE:

23   **Q.**  Let me perhaps focus my inquiry a bit more.  In your

24   opinion, would -- would any of the signs of emergence that

25   you saw depicted on the exhibit, would any of those signs be

Buffington - Direct (Wille)                                              952

1    necessarily indicative that the patient has completely

2    emerged from the sedation of anesthesia?

3    **A.**   No, sir.  Putting that table into perspective and

4    reading the paragraphs before and after, what it helps to

5    explain, and could also be seen in another section where we

6    discuss nociceptive pain, is that the painful stimuli, the

7    patient's ability to elevate levels of consciousness, levels

8    of sedation increasing, as opposed to depth, is that those

9    are some of the autonomic symptoms.  And we have heard that

10   in testimony in this case already, that can be seen before a

11   patient is actually aware.

12        That table and a table in -- additional table in

13   *Miller's* helps to articulate that emergence is a three-phase

14   process.  And if you have ever heard of the word "post

15   anesthesia care unit" or "PACU" -- so anyone who's had a

16   surgery -- patients are moved from an OR suite to another

17   suite while they're observed.  And based on the one-, two-,

18   or three-drug combinations or more, that patient is having

19   time to go through the various phases of emergence.

20        So you could have a noxious stimuli while you are in

21   anesthesia, some level of anesthesia, and not be aware, but

22   your body can start to show physiologic symptoms or

23   autonomic responses:  the movement, the changes in blood

24   pressure.

25        Now, those are, as we heard from both

Buffington - Direct (Wille)                                    953

1   anesthesiologists, those are -- the moment of professional

2   expertise in the moment of a surgery is to decide how much

3   longer, what was observed, and then how much to give to

4   maintain a patient.  So when we hear induction and

5   maintenance, that's that maintenance phase.

6       When you're done with the procedure, then emergence

7   starts, and, yes, that table can show, and those occur in

8   the early phases of emergence.  Full consciousness doesn't

9   happen till the third phase of emergence.

10  **Q.**    Doctor, I want to follow up something that His Honor

11  just mentioned.  In consulting with physicians or

12  anesthesiologists concerning -- have -- you've consulted --

13  correct? -- in terms of the choice of perhaps a drug to be

14  used in anesthesia?

15  **A.**    Absolutely.

16  **Q.**    And to your -- to your experience or knowledge, are

17  there circumstances where there is -- a decision must be

18  made as to use one particular drug versus another?

19  **A.**    Yes.

20  **Q.**    And what are some of the considerations involved in

21  deciding whether to use one particular drug or another?

22  **A.**    Sure.  It could be the depth of anesthesia needed for

23  the type of procedure being performed; could be the

24  patient's clinical status, whether that means their cardiac

25  status pre-procedure or their respiratory status prior to;

Buffington - Direct (Wille)                                          954

1    could be from a history of complications or adverse side

2    effects that occurred while using a prior anesthetic and

3    then that now needs evaluated to make a safe choice of new

4    agent for any future procedures.

5         There is an abundance, but --

6    Q.   Excuse me, Doctor, but what about one drug is available

7    and the other drug isn't?  Is that a legitimate --

8              THE COURT:  That's too vague a question,

9    Mr. Wille.

10   BY MR. WILLE:

11   Q.   Let's be specific.

12             MR. WILLE:  You're right, Your Honor.

13   BY MR. WILLE:

14   Q.   Suppose that -- suppose that a drug -- say a physician

15   was contemplating using one type of anesthetic but learned

16   that the patient, due to some peculiar condition, that

17   anesthetic was not available.  Would at that point you

18   assist the doctor in selecting an alternative in that

19   instance?

20   A.   Yes, sir.  It could be an inventory issue.  It could be

21   what's available at a wholesaler, where medication are

22   shipped to, a hospital or surgery center.  It could be a

23   supply or production issue.  We have had many cases of drug

24   shortages across the country, including in this area.

25   Q.   Now, we heard testimony that the midazolam sometimes or

Buffington - Direct (Wille)                                          955

1  frequently is used in conjunction with another drug.  Do you

2  recall that testimony?

3  A.   I do.  And recommended in combined.

4  Q.   And used in combination with, say, an analgesic.  Do

5  you recall that testimony?

6  A.   I do.

7  Q.   Now, in your experience, could there be a situation in

8  which, due to a particular condition, an anesthesiologist

9  would reasonably decide that midazolam alone would be

10  preferable?

11  A.   Yes, or acceptable.  Either term.

12  Q.   Or acceptable.

13       Doctor, I want to go back a little bit to this idea of

14  ceiling effect.  Now, granted, your testimony seems to

15  indicate that you do not accept the data or the proof that

16  there is such an effect for midazolam.  That aside, in your

17  opinion, what is the relevance to the theoretical

18  possibility of a ceiling effect with respect to the use of

19  the dosage level of midazolam in Ohio's execution protocol?

20  A.   Yes, sir.  Well, on the first point, there is no proof.

21  So all we have is animal and laboratory data that looks at

22  the way midazolam attaches to one of the GABA receptors.  I

23  don't think we heard in the earlier testimony, just to be

24  transparent, there is no one GABA receptor.  There is $GABA_A$,

25  $GABA_B$, $GABA_C$, and then on each of those, there are multiple

Buffington - Direct (Wille)                                    956

1    subunits.

2         So the premise that there is a ceiling effect would

3    have to be based on, one, you knew you were occupying all

4    those receptors, and that's not what was demonstrated in the

5    laboratory data; and two is you would have to assume, and

6    that's where it becomes a theory as well, that you are

7    depleting the body of GABA, and it's one of the most common

8    neurotransmitters produced in the body.

9         So we have no data.

10   **Q.**   Now, aside from that, though, Your Honor -- aside from

11   that, though, Doctor -- and I understand your opinion on

12   that -- but just assuming -- let's assume for the sake of

13   argument that there could be a ceiling effect for midazolam

14   at some undefined point.  In your opinion, does that still

15   matter in the particular instances of applying the dosage

16   level called for in Ohio's execution protocol?

17   **A.**   Not at all.  Because we have nothing that would state

18   that there is a ceiling effect insufficient to produce deep

19   sedation and amnesia in an individual.  As a matter of fact,

20   what we know is that with larger doses, it's, in fact,

21   lethal.  So the ceiling effect in this case would be death.

22   **Q.**   Let's talk about that.  You just mentioned the

23   lethality or potential lethality.  Is -- can we call

24   midazolam a safe drug?

25   **A.**   Absolutely not.  Benzodiazepines are a significant

Buffington - Direct (Wille)                                        957

1    point of abuse, a significant point of administration

2    errors, and are, in fact, tracked by medical examiners,

3    state departments of health, federal agencies, control --

4    are considered a controlled or scheduled substance because

5    of the potential -- life-threatening potential side effects.

6         Are there other drugs who are worse?  Absolutely.  But

7    it's by no means considered a safe medication.

8    Q.   And just maybe perhaps one last question on this point.

9    If -- given the potential lethality of midazolam and the

10   dosage level that's called for in Ohio's execution protocol,

11   in your opinion, is there a substantial risk that the use of

12   midazolam could -- and with the follow-up drugs could result

13   in serious pain?

14   A.   No, sir.  There is not even a foundation in this case

15   that an individual would more likely than not have any pain

16   from either drug two or drug three.  Those would be

17   outliers, and predominantly from misadministration.

18   Q.   You mentioned earlier, Doctor, that there could be

19   circumstances where midazolam could be used alone.  Could

20   you just elaborate on what you would know of those

21   circumstances?

22   A.   Sure.  And I would just say that the majority of times,

23   so it would make sense, that the majority of the times it's

24   in cases where we don't need to put someone into full

25   general anesthesia.

Buffington - Cross (King)                                    958

```
 1        So if you are saying use midazolam alone, we would be

 2   looking at where it would logically be beneficial.  In those

 3   cases, it could be used for vasectomies.  It could be used

 4   for resetting bones following fractures.  It's frequently

 5   used with bone marrow transplant aspiration, when we take a

 6   large-bore needle and thrust it into an iliac crest, into

 7   your hip, to pull fresh bone marrow out to give as a donor

 8   to give to the other patient.  Placement of tubes,

 9   placements of implanted devices where you have to cut the

10   skin, create a pocket, place the item in.

11        The person doesn't have to be fully asleep.  They just

12   need to be able to not be sensate to the pain and remember

13   the experience.

14             MR. WILLE:  Thank you, Doctor.  That's all I have

15   for the moment.

16             THE COURT:  Cross.

17             MR. KING:  Thank you, Your Honor.

18                      CROSS-EXAMINATION

19   BY MR. KING:

20   Q.   Dr. Buffington, welcome to Ohio.

21   A.   Thank you.

22   Q.   A little colder than Florida?

23   A.   Much.

24   Q.   This isn't the first time, though, you have been to

25   Ohio, correct?
```

Buffington - Cross (King)                                959

1    **A.**    No, sir.

2    **Q.**    In fact, you have served as a, I guess, an expert or a

3    consultant to the Attorney General's Office and the

4    Department of Rehabilitation and Corrections with regard to

5    the lethal injection protocol; is that correct?

6    **A.**    That is this case.

7    **Q.**    Oh, that is this case, okay.  And am I correct that you

8    actually attended a training?

9    **A.**    I attended a date that was available to meet with

10   counsel, and they were in Lucasville on that date.

11   **Q.**    Okay.  So that was just a meeting with counsel.  It

12   wasn't to participate or attend any training on the lethal

13   injection protocol?

14   **A.**    I did get to see the facility, but it was not for the

15   purpose of that.

16   **Q.**    Okay.  And so to make sure I understand this, have you

17   consulted with the State of Ohio, the AG's office, or the

18   DRC with regard to the lethal injection protocols outside of

19   this case?

20   **A.**    Not that I'm aware.

21   **Q.**    Okay.  So the only protocol of which you have offered

22   any opinions regarding is the protocol that was, I guess,

23   promulgated in October of 2016?

24   **A.**    Yes, the current three-drug protocol.

25   **Q.**    And have you reviewed any other protocols -- previous

Buffington - Cross (King)

960

1    versions of the protocols for purposes of your consulting

2    work?

3    A.    No, sir.

4    Q.    We went through this before.  You don't have -- you

5    don't actually have a degree in pharmacology, correct?

6    A.    Yes.  The base domain of the PharmD degree is

7    pharmacology.

8    Q.    Okay.  So you are claiming -- you are claiming your

9    PharmD, your Doctor of Pharmacy degree, is the same thing as

10   a pharmacology degree?

11   A.    I'm saying it is the highest, largest volume of

12   pharmacology training degree, period.

13   Q.    And you don't have a degree in toxicology, do you?

14   A.    No, sir.  It is a subset domain of pharmacology.

15   Q.    And just to be clear for His Honor, you can actually,

16   though, get a degree in pharmacology, correct?

17   A.    You could, but if you look at the individuals that do

18   that, they are typically laboratory personnel who have gone

19   from running instruments to providing administrative

20   services in a laboratory.  So that would be different.

21   Q.    But you don't have one of those degrees, either a

22   master's degree or a Ph.D. in pharmacology, correct?

23   A.    No, sir.  That would be a different type of domain of

24   use.

25   Q.    And Mr. Wille, I think, indicated during your direct

Buffington - Cross (King)                                    961

1   that you actually have an undergraduate degree, I think he

2   said, in pharmacology if I recall correctly.  You actually

3   don't have an undergraduate degree, right?

4   A.   I have never said that.

5   Q.   I am sorry.  Mr. Wille asked you -- represented that.

6   I want to know.  You don't have a pharmacology -- you don't

7   have an undergraduate degree, correct?

8   A.   That is correct.  I did my undergraduate work in

9   biochemistry.  And he did not say that.  I listened

10  carefully.

11  Q.   Oh, you do have an undergraduate degree?

12  A.   I said I do not -- my undergraduate training --

13          MR. WILLE:  I object.  He mischaracterized my

14  question.

15          THE COURT:  Go ahead and answer the question, sir.

16          THE WITNESS:  Yes, sir.  My undergraduate

17  training, I was accepted under earlier admission into the

18  Doctor of Pharmacy program.

19  BY MR. KING:

20  Q.   I don't want to beat a dead horse.

21          THE COURT:  I understand that the witness has no

22  undergraduate degree, no bachelor's degree.

23          MR. KING:  Okay.  Got it, Your Honor.

24  BY MR. KING:

25  Q.   Now, am I correct that there -- have you ever heard of

Buffington - Cross (King)                                              962

```
 1    the American Board of Clinical Pharmacology?
 2    A.    Yes.
 3    Q.    And is that a -- is that an accrediting organization?
 4    A.    It is an accrediting organization for board
 5    certification.
 6    Q.    Board certification.  And are you certified in any way
 7    by the American Board of Clinical Pharmacology?
 8    A.    No, sir.  I am a member of the organization, but that
 9    is a different domain.
10    Q.    And actually, can a -- someone like yourself who has a
11    Doctor of Pharmacy, can you actually become board-certified
12    in clinical pharmacology?
13    A.    I don't think so.  I think that organization is
14    predominantly M.D., where I am a member of many others that
15    are PharmD.
16    Q.    And do you know what kind of accreditation one can get,
17    who has a Doctor of Pharmacy such as yourself, from the
18    American Board of Clinical Pharmacology?
19    A.    No, sir.  The -- from the American -- from the Board of
20    Pharmaceutical Specialties, of which I am on the board and
21    helped to write those board certifications.
22    Q.    Right.  Back to make sure I understand your answer.  Do
23    you know whether a Doctor of Pharmacy can get any
24    accreditation through the American Board of Clinical
25    Pharmacology?
```

Buffington - Cross (King)

963

1   A.   No, sir, nor would I expect it.

2   Q.   Have you ever heard of someone becoming cert -- excuse

3   me -- accredited in applied pharmacology?

4   A.   No, sir.

5   Q.   Dr. Buffington, you've never prescribed midazolam, have

6   you?

7   A.   Yes.

8   Q.   You have?

9   A.   Yes.

10  Q.   Have you administered it?

11  A.   Yes.

12  Q.   Okay.  Do you recall being -- you were an expert in a

13  case, and I don't know if you have the complete copy of his

14  deposition in the case of *Arthur versus Dunn*, a case that

15  was in the United States District Court for the Middle

16  District of Alabama.

17  A.   That is correct.  If you'll check the date on that, the

18  date of prescribing would be after the date of that

19  deposition.

20  Q.   I'm sorry.  The date of what?

21  A.   Prescribing was after the date of the deposition.

22  Q.   Oh, okay.  So after -- so this deposition was

23  actually -- took place on the 11th day of December, 2015, so

24  a little over a year ago.

25  A.   That is correct.

Buffington - Cross (King)                                    964

1    **Q.**    So before your December of 2015, you had not ever

2    prescribed midazolam?

3    **A.**    That's correct.  Only recommended during consultations.

4    **Q.**    Okay.  And then since then, how many times have you

5    prescribed it?

6    **A.**    I think probably three.

7    **Q.**    Three times.  And have you ever administered midazolam,

8    ever?

9    **A.**    Yes, during procedures.

10   **Q.**    And was that before or after -- well, for how long have

11   you been doing that?

12   **A.**    Probably same thing, two to three times in the last six

13   months.

14   **Q.**    If I could show you -- I'll give you a part of your

15   deposition, and counsel's got the complete version if you

16   want to see it.

17            MR. KING:  Your Honor, I will be happy to give you

18   an excerpt of the deposition.  We can give you a complete

19   version, Your Honor, if you'd like it.

20   BY MR. KING:

21   **Q.**    I'd like you to turn to -- if I get the right page

22   here.  If you'd turn to, it's actually page 8 of the

23   deposition.

24   **A.**    Is that a tab?

25   **Q.**    No, just page 8.  I am sorry, page 8 -- did I give it

Buffington - Cross (King)                                              965

1    to you?

2    **A.**   No, sir.

3            MR. MADDEN:  I am confused.  Is this the same

4    large document you gave us?

5            MR. KING:  That's the complete.  I didn't want to

6    give him the complete.  If you think I am reading something

7    out of context, you can give it to him.  I don't believe I

8    will be.

9    BY MR. WILLE:

10   **Q.**   Okay.  So you were deposed in the case of *Thomas D.*

11   *Arthur versus Jefferson S. Dunn*, correct?

12   **A.**   That's correct, in December of 2015.

13   **Q.**   December of 2015.  That was Civil Action 2:11-cv-00438

14   in the United States District Court for the Middle District

15   of Alabama, correct?

16   **A.**   Yes.

17   **Q.**   And you were testifying in this deposition as an expert

18   for the State of Alabama, correct?

19   **A.**   That is correct.

20   **Q.**   And that was in connection with their lethal injection

21   protocol?

22   **A.**   That's correct.

23   **Q.**   And at that deposition which took place on December 11,

24   2015, on page 8 -- if you could turn to page 8.  On page 8,

25   line 11, you were asked the following question:

Buffington - Cross (King)                                    966

1         "You have never prescribed or administered midazolam?"

2         13 -- or line 13, "Answer:  That is correct."

3         Did I read that correctly?

4    A.   You did.  And I also clarified for you that that was

5    predating those cases.

6    Q.   For prescribing, correct?

7    A.   And administering.

8    Q.   And administering.  I'm sorry.  So you did not

9    administer any midazolam before December 11th of 2015

10   either, correct?

11   A.   Where I directly did the push, no.

12   Q.   And at any time before December 11, 2015, have you --

13   had you ever prescribed or administered any benzodiazepine?

14   A.   I would have to go back and look.

15   Q.   Well, if you look at your deposition, going back

16   starting on page -- again, page 8 -- I'll just read the

17   whole thing.

18        Line 14, "Question:  You have not prescribed or

19   administered any barbiturate?

20        "Answer:  That is correct.

21        "Question:  Or any benzodiazepine?

22        "Answer:  That is correct."

23        Did I read that correctly?

24   A.   Yes.

25   Q.   All right.  And you, Dr. Buffington, you've never

Buffington - Cross (King)                                    967

1    administered general anesthesia to a patient, correct?

2    **A.**    That is correct.

3    **Q.**    You have never authored any papers that are specific to

4    midazolam, correct?

5    **A.**    That is correct.

6    **Q.**    And you have never authored any book chapters specific

7    to midazolam?

8    **A.**    That is correct.

9    **Q.**    And you have never conducted any scientific studies

10   that are specific to midazolam?

11   **A.**    That is correct.

12   **Q.**    Now, if you could turn to, again, your CV.  It's

13   Exhibit -- make sure I've got the right exhibit number.

14   It's Exhibit 93, right, Plaintiffs' Exhibit 93, which is

15   your report.  And if you turn to your curriculum vitae, and

16   it's on page -- let's first look at page 1704.  I hope you

17   have got the right page number.  That's your cover page?

18   **A.**    Yes.

19   **Q.**    And on page 1704, it says it's your CV, your name, and

20   then your present, CEO of this Clinical Pharmacology

21   Services, President of the American Institute of

22   Pharmaceutical Sciences, and then it says that you are the

23   clinical assistant professor of medicine at the University

24   of South Florida College of Medicine, College of Pharmacy,

25   right?

Buffington - Cross (King)                                          968

1    A.    That is correct.

2    Q.    And if I turn to page 1706 of your curriculum vitae, it

3    has a section here called -- labeled "Faculty Appointments."

4    Do you see that?

5    A.    That's correct.

6    Q.    Okay.  And, again, it lists your faculty appointments

7    at the University of South Florida, correct?

8    A.    Correct.

9    Q.    And it says you are on the department of internal

10   medicine as a clinical assistant professor of medicine,

11   correct?

12   A.    That is correct.

13   Q.    And then you have faculty level pending under the

14   College of Pharmacy.

15         And then what do you do for the college of nursing, I'm

16   sorry?

17   A.    I used to teach the pharmacology curriculum class for

18   the nurse practitioners.

19   Q.    Okay.  But you are still affiliated with the University

20   of South Florida Medical Center, right?

21   A.    Absolutely.

22   Q.    And the College of Medicine?

23   A.    Absolutely.

24   Q.    And the College of Pharmacy?

25   A.    Absolutely.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Buffington - Cross (King)

969

1   Q.   And help me.  I looked everywhere on their website for

2   your bio, for any reference to you, and I couldn't find it.

3   Is that --

4   A.   It's not there.  Many of the faculty members are not

5   listed on the website.

6   Q.   And that would include you?

7   A.   Yes, I am aware of that.

8   Q.   Okay.  And do they not list any clinical professors,

9   clinical assistants, or associate professors on their

10  website?

11  A.   I don't know.  You'd have to ask them.

12  Q.   Okay.  Do you receive a salary from the University of

13  South Florida?

14  A.   Yes, I do.

15  Q.   Is that the bulk of your income?

16  A.   No, sir.

17  Q.   Do you have a contract with the University of South

18  Florida?

19  A.   Yes.

20  Q.   And if I look at the next page, 1707, it also says that

21  you have an appointment at the University -- excuse me -- at

22  the University of Florida, College of Pharmacy, correct?

23  A.   That is correct.

24  Q.   Is that an appointment you still hold?

25  A.   Yes.

Buffington - Cross (King)                                    970

1    Q.   And you -- and you say you are an assistant clinical

2    professor?

3    A.   That is correct.

4    Q.   Again --

5    A.   We have students from the University of Florida on a

6    regular basis in our practice.

7    Q.   And, again, I looked at the website, tried to find some

8    more information about you, Dr. Buffington, and I saw no

9    reference, no mention of you anywhere on the University of

10   Florida's College of Pharmacy's website.  Is that --

11   A.   That's correct, nor would I expect to see it.

12   Q.   Is that because they don't -- to your knowledge, do

13   they not list clinical assistant professors on their

14   website?

15   A.   No.  There is actual faculty members, other faculty

16   members who aren't listed as well.

17   Q.   Okay.  Do you know whether, though, the University of

18   Florida, College of Pharmacy does not list assistant

19   clinical professors such as yourself on the website?

20   A.   No, sir.  I have never asked, nor questioned to be on

21   it.

22   Q.   Okay.  And would it surprise you that there are

23   assistant clinical professors who are listed on the faculty

24   pages of that website?

25   A.   No, sir.  As I stated, I have never asked, nor

Buffington - Cross (King)                                          971

1    requested to be present.

2    **Q.**    With regard to each of these various appointments at

3    least you current have -- Mercer University, Lake Erie

4    College of Osteopathic Medicine -- I am sorry.  Is that the

5    same Lake Erie College that's in Paintsville, Ohio, do you

6    know?  I am just curious.

7    **A.**    Yes, sir.

8    **Q.**    So Lake Erie College of Osteopathic Medicine, Florida

9    A&M, Palm Beach Atlantic University, Nova Southeastern,

10   Idaho State, Shenandoah University, Creighton University,

11   can we find your bio anywhere on the websites of any of

12   those organizations.

13   **A.**    No, sir.  Nor do I control what their policies are.

14   And I can explain what roles I provide for those.

15            THE COURT:  Perfectly all right, if he asks about

16   them.

17   BY MR. KING:

18   **Q.**    So as you indicated on your direct, you have -- you

19   have been engaged as an expert before?

20   **A.**    Yes, sir, numerous times.

21   **Q.**    Many times, correct?

22   **A.**    Yes.

23   **Q.**    And if I look at your expert report, Defendants'

24   Exhibit 93, if you'd go towards the back, starting on page,

25   it's the Bates number 1760.  And the first page is labeled

1    "Prior Forensic Review and Testimony," and then I think you

2    go -- it continues for about 12 pages or so.  And by my

3    count, there are -- if I have this right -- roughly 390

4    different matters for which you have served as an expert in

5    the past four years?

6    A.   Over, I think it's five years based on this report.

7    Q.   Oh, five years, since 2012.  So 390 different matters?

8    A.   Yes.  Not all those include testimony but they do

9    include some type of forensic inquiry.  So we have a -- in

10   our practice we have both a clinical drug information

11   support service and a forensics.

12   Q.   Is it fair to say, Dr. Buffington, that the bulk of

13   your income is derived by serving -- from serving as a

14   forensic reviewer and providing testimony as an expert?

15   A.   No, sir.  I would guesstimate maybe 15 percent.

16   Q.   But 390 cases over five years, that's a lot of cases,

17   wouldn't you agree?

18   A.   Yes, but it doesn't correlate to a lot of work.

19   Q.   Okay.  But it's enough, at least, for you to put it in

20   your CV, right?

21   A.   No, sir.  I was requested by your staff to produce it

22   for you.

23   Q.   And, in fact, in the -- that *Arthur versus Dunn* case,

24   you actually provided a similar list, right?

25   A.   I would assume so.  It is not an uncommon request, but

Buffington - Cross (King)                                973

1    it's not part of my CV.

2    Q.    Let's see if I have it.

3              MR. KING:  And I don't know what we're on.  What

4    are we on, 82?

5         I don't know, Your Honor, if I want to introduce this

6    but I want to mark it.

7              THE COURT:  PX 84.  The record will reflect the

8    witness has been handed, or is about to be handed, and now

9    has been handed a document marked as Plaintiffs' Exhibit 84.

10   BY MR. KING:

11   Q.    Dr. Buffington, I have handed you what's been marked

12   for identification as plaintiffs Exhibit 84.  Does that

13   document look familiar?

14   A.    It's a similar format, yes, sir.

15   Q.    And my understanding is that this is -- this came from

16   your expert report in the *Arthur versus Dunn* case.  Do you

17   have any reason to dispute that?

18   A.    No.  I would have to go back to validate it, but I

19   would assume so.  And this also goes back to 2011, where the

20   current one you requested goes to 2012 -- starts at 2012.

21   Q.    And this -- again, this is a similar case list.  Is

22   that for the roughly past four or five years?  I didn't

23   calendar it precisely, but it was a listing of your prior

24   forensic review and testimony over -- at least covering the

25   last four years?

Buffington - Cross (King)                                    974

1   A.   I would assume so.  And I don't compile the list, but

2   one of my staff does, and it looks like the same format.

3   Q.   Now, I'm sure you are aware that we had actually

4   requested a listing of each of the times in which you have

5   provided either expert testimony through a deposition or

6   trial and that we received a listing of the times over the

7   past four years in our case, the case here, where you have

8   actually provided testimony.  Do you remember that?

9   A.   For related cases, yes.

10  Q.   Well, where you actually provided expert testimony

11  either through a deposition or trial?

12  A.   Yes, sir.  But I don't maintain the lists that way, and

13  it was asked on the holiday, and there was insufficient

14  staff or time to try to remedy that.

15  Q.   Okay.  I understand.  In the listing that you -- that

16  at least counsel served on plaintiffs' counsel identified

17  six times when you've testified as an expert either through

18  deposition or at trial over the past four years, right?  No?

19  A.   I don't even follow the question.

20  Q.   Okay.  Let me step back.  It's getting late.  It's

21  Friday.

22       You understand that we had requested a listing of the

23  times in the past four years where you provided expert

24  testimony, either through a deposition or trial over the

25  past four years?

Buffington - Cross (King)                                      975

 1    A.    Yes.  And I don't maintain a list of that fashion.

 2    Q.    Okay.  But, nonetheless, is it your understanding that

 3    a list was supplied to us?

 4    A.    Yes.  I asked if the purpose of that list was for your

 5    ability to prepare for today, and that was related cases.  I

 6    could remember the few -- there were four -- plus two

 7    emerging cases, Ohio and Virginia, and I was able to put

 8    those on a list for you.

 9    Q.    Okay.  So the list that you gave us that only contains

10    six cases only refers to what were considered to be related

11    cases, right?

12    A.    That's all I could produce on a holiday, yes.

13    Q.    Okay.  So you don't have -- you can't tell us here

14    today how many times outside of these six cases where you

15    have actually provided deposition testimony or trial

16    testimony over the past four years?

17    A.    That is correct.  I do not maintain the list in that

18    fashion.

19    Q.    So if I recall in the *Dunn* case, at your deposition,

20    you said that with regard to the list that we marked as

21    Exhibit 84, that you actually had provided deposition or

22    trial testimony in 50 percent of those cases?

23    A.    I don't think I stated that.

24    Q.    Well, let me just refresh your recollection then.  If

25    you could look at your deposition again.  And if you could

Buffington - Cross (King)

976

```
 1   go to page 78 of your deposition.  I'll read the question

 2   and then I'll read the answer, and it says:

 3       "Question:  And we sort of -- to encapsulate it, if we

 4   had, looking at this list of testimony in the past four

 5   years, the prior forensic review and testimony list that

 6   your counsel submitted to the Court with your report, could

 7   you, looking at --"

 8   A.   I don't see where you are at.

 9            THE COURT:  Page 78.

10   BY MR. KING:

11   Q.   Page 78, line 7, okay?  You with me now?

12   A.   I am.

13   Q.   I will start again.  I apologize.

14       "And we sort of -- to encapsulate it, if we had,

15   looking at this list of testimony in the past four years,

16   the prior forensic review and testimony list that your

17   counsel submitted to the Court with your report, could you,

18   looking at this list of testimony in the past four years,

19   say approximately what portion of these cases you provided

20   deposition and/or trial testimony?

21       "Answer --"

22   A.   And I stated very clearly, "Not without going back to

23   the list."

24   Q.   "But I would --"

25   A.   "But I would --" I'm sorry.  Let me finish.
```

Buffington - Cross (King)                                          977

1   Q.   Let me finish the answer.

2            THE COURT:  Go ahead and finish your answer.

3            THE WITNESS:  Thank you, Your Honor.

4        "But I would say just in general trends, it would be

5   over 50 percent."

6   BY MR. KING:

7   Q.   Okay.  So in general trends it was over 50 percent.

8   That's what your testimony was?

9   A.   That was a guesstimate as obviously answered.

10       I also don't see the pages previous and following to

11  see the rest of the discourse.

12           THE COURT:  Right.  This is an excerpt.

13           THE WITNESS:  Yes, sir.

14  BY MR. WILLE:

15  Q.   And beyond the four or five years that are identified

16  in this, these forensic review and testimony lists, you've

17  provided other expert testimony, like in 2011, 2010; is that

18  correct?

19  A.   2008, 2004.

20  Q.   And it's true that at least in some of those cases your

21  opinions weren't accepted by the Court, right?

22  A.   I'm not aware of any.

23  Q.   Well, was there a case -- unless it's a different --

24  could be a different Buffington.  I'm not sure.  Did you

25  provide expert testimony in a case involving -- in

Buffington - Cross (King)                                        978

1    Connecticut involving the estate of Sandra Dallaire?

2    **A.**    I did.  I remembered it well.  Dr. Hsu.

3    **Q.**    And there was a case, and it's reported, it's Dallaire

4    versus Hsu, H-S-U.  It's found at 23 Atlantic 2d 792, 2011.

5    You actually offered expert opinions on behalf of the

6    plaintiff in that case, correct?

7    **A.**    Yes, sir.

8    **Q.**    And I don't know -- understand all the issues, but at

9    least one of the issues was whether -- it was a medical

10   malpractice case, and the plaintiff had actually -- it was

11   the estate bringing it.  The plaintiff had actually died.

12   And there was at least an issue of whether the decedent was,

13   I think it's opiate naive or opiate tolerant.  Does that

14   ring a bell --

15   **A.**    That's correct.

16   **Q.**    -- this issue?  And is it correct, the Court had said

17   that with regard to your opinions -- I think you concluded

18   that the decedent was opiate naive.  It says, "With

19   respect --" this is at 797 of the ruling.  It says, "With

20   respect to Buffington, the Court found that Buffington's

21   opinion that the decedent was opiate naive to morphine was

22   not tenable in light of the decedent's medical history and

23   that this conclusion undermines his credibility."

24        Do you remember that ruling?

25   **A.**    Yes, but your question that you asked me was has my

Buffington - Cross (King)                                    979

1    opinion or testimony ever been denied or rejected, and I

2    testified twice in that case, and it was. And that was an

3    appellate review.

4    **Q.** But the trial court didn't accept your opinions. It

5    didn't reject them, just didn't accept them, correct?

6    **A.** No, they did accept them, and they made a decision

7    based on their findings there. It wasn't rejected.

8           THE COURT: Mr. King, I will ask, rather than

9    having my law clerk scurry for it, under the District of

10   Ohio Rule 7.2, I will ask you for a copy of that opinion.

11          MR. KING: I will provide it to you, Your Honor.

12       Keeping track of our time, Your Honor.

13       I am going to mark this as Exhibit 85; is that right?

14          MR. MADDEN: Was this exhibit previously given to

15   us?

16          MR. KING: I don't think we are going to introduce

17   it. I think I have to mark everything. We are got going to

18   introduce it. I am just going to ask him about it.

19   BY MR. KING:

20   **Q.** Dr. Buffington, I hand you what's been marked for

21   identification as Exhibit 85. It's an affidavit. I think

22   it's your affidavit that was filed in the United States

23   District Court for the Middle District of Alabama, and it's

24   a series of -- I am not going to read every one. It looks

25   like the first plaintiff is *Grayson versus Dunn*, and it's a

Buffington - Cross (King)                                    980

```
 1   number of civil actions, 2:2-cv-316, et al., et seq.  And I

 2   just want to ask you a few questions about it.

 3       Do you recognize this document?

 4   A.   Yes.

 5   Q.   And this -- this affidavit, if I'm correct, was filed

 6   in a -- was it the same lethal injection case as where your

 7   deposition was taken, the --

 8           THE COURT:  Arthur versus Dunn?

 9   BY MR. KING:

10   Q.   Arthur versus Dunn, or is this a different case?

11   A.   It's my understanding they are related.

12   Q.   Okay.  They are related.  And at least with this case,

13   Grayson versus Dunn, you actually -- you testified in that

14   case; is that correct?  Or am I right or am I wrong?

15   A.   Well, are you defining testimony or deposition?

16   Q.   You're right.  Did you provide hearing testimony?

17   A.   Yes.

18   Q.   Okay.  And you also provided deposition testimony?

19   A.   I don't recall if it was twice.

20   Q.   Okay.  Well, if you -- just to refresh your

21   recollection, if I see it here -- if you look on paragraph

22   3, which is on the second page of this affidavit, it says

23   that, "I was deposed by counsel for the plaintiffs on March

24   17, 2016, in Birmingham, Alabama."

25       Does that refresh your recollection that you actually
```

Buffington - Cross (King)                                        981

1    gave a deposition?

2    **A.**   Yes, but that may have been the deposition for *Dunn*.

3    **Q.**   Would that have been in addition to the December 11th,

4    2015, deposition -- I mean, for *Dunn*.  That's a little

5    confusing.

6        This could have been in addition to the deposition that

7    you testified -- when I was asking you about, or a different

8    case?

9    **A.**   I would have to go back to the calendar to confirm.

10   **Q.**   All right.  But you do -- do you recall being deposed

11   sometime on or about March 17, 2016, in general?

12   **A.**   No, sir.

13   **Q.**   All right.  Do you ever remember giving any deposition

14   testimony about -- where you were asked questions about

15   whether you believed that it was possible to obtain

16   compounded pentobarbital?

17   **A.**   Yes.  I do recall that.

18   **Q.**   You do remember that.  And you provided that testimony,

19   and then after the deposition, if I understand it, you went

20   and contacted some compounding pharmacies of which -- that

21   you know of, and inquired -- made inquiry whether, in fact,

22   they could provide or would be willing to provide compounded

23   pentobarbital to the Alabama Department of Corrections?

24   **A.**   That is correct.  I was not commissioned to do that by

25   Alabama.  That was a request by opposing counsel.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Buffington - Cross (King)                                    982

1    **Q.**   Right, right.  And so you did that, and you contacted,

2    if I haven't said that already, about 15, is that right?

3    Roughly 15?

4    **A.**   I think I started with 10 and added 5 more calls.

5    **Q.**   And at least among those 15 that you contacted, you

6    didn't find anybody who was at least willing or capable of

7    providing compounded pentobarbital to Alabama?

8    **A.**   Not without further information.  So they weren't --

9    they were not comfortable saying put my name on the list and

10   providing it blindly back.

11   **Q.**   Despite that kind of informal survey you did, or

12   inquiry with the 15, you nonetheless stated in this

13   affidavit, which is dated the 22nd day of April, 2015, if

14   you look on page -- which is on page 4 of the -- is that

15   right?  Is that page 4?  Yeah, it looks like --

16   **A.**   I think I have got two copies.

17   **Q.**   That's okay.  Just look at page -- the last -- look at

18   the last page.  That will be easiest.

19   **A.**   Yes, sir.  Paragraph 8.

20   **Q.**   In paragraph 8, you said, despite your inquiry of these

21   15, you said, "I maintain my belief that there are

22   pharmacies in the United States that are able to compound --

23            THE COURT:  Pharmacists.

24   BY MR. WILLE:

25   **Q.**   I am sorry.  "I maintain my belief that there are

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Buffington - Cross (King)                                          983

1    pharmacists in the United States that are able to compound

2    pentobarbital for use in lethal injections because other

3    states have been reported to have obtained compounded

4    pentobarbital for use in executions."

5         Did I read that correctly?

6    **A.**   I do agree with that statement.

7    **Q.**   You can put -- you can put that down.

8         There's been some testimony about the bispectral -- if

9    I have this right -- the BIS value and the BIS index?

10   **A.**   By Covidien.

11   **Q.**   And the machine?

12   **A.**   By Covidien.

13   **Q.**   Covidien is actually the manufacturer.  The Court

14   actually had a question of who produced it, and it's

15   Covidien, C-O-V-I-D-I-E-N?

16   **A.**   It's A-N [sic].

17   **Q.**   A-N.  And that's actually a machine that is used to

18   monitor the consciousness, anesthetic depth, when a patient

19   goes -- undergoes anesthesia, right?

20   **A.**   It's used to measure EEG waves and correlate those

21   through an algorithm to levels of sedation.

22   **Q.**   In that -- that algorithm, do you know what it is?

23   **A.**   No, sir.

24   **Q.**   Is that -- that algorithm, to your knowledge, if you

25   know, proprietary to Covidien?

Buffington - Redirect (Wille)                                    984

```
1    A.    It is, and it's been tested in numerous studies.

2    Q.    And through that algorithm is how you come up with the

3    values that are on the BIS index?

4    A.    That's correct.

5    Q.    Have you ever operated a BIS machine?

6    A.    No.  I've been present, but not personally done the

7    operation.

8              MR. KING:  Nothing further, Your Honor.

9              THE COURT:  Redirect?

10             MR. WILLE:  Yes, Your Honor.  Briefly.

11                      REDIRECT EXAMINATION

12   BY MR. WILLE:

13   Q.    Doctor, explain again the process through which you

14   obtained your degree.  Tell us about that and with respect

15   to the -- elaborate on the whole process of going from

16   undergraduate to your doctorate program.

17   A.    Yes, sir.  So I was doing undergraduate studies.  I did

18   complete it over three years of a biology and biochemistry

19   degree at the University of South Florida in Tampa, at which

20   time I was accepted under early admission into the doctorate

21   program at Mercer in Atlanta.

22         And the Doctorate of Pharmacy program is the most

23   comprehensive.  If you think of a doctorate-level degree as

24   a clinician, as an M.D., as a Doctor of Medicine, this would

25   be the same to pharmacy and pharmacology being the domain
```

Buffington - Redirect (Wille)                                    985

```
 1   set.
 2            THE COURT:  It's a practicing degree as opposed to
 3   an academic degree.
 4            THE WITNESS:  That's correct.  We refer to them as
 5   professional degrees.
 6            THE COURT:  As do we.
 7            THE WITNESS:  Yes, sir.
 8            THE COURT:  It took us forever to get from the
 9   L.L.B. to the J.D. --
10            THE WITNESS:  Yes.
11            THE COURT:  -- in the  legal profession, whereas
12   the doctors had progressed from the M.B. to the M.D.
13   probably 100 years before we got there.  But the distinction
14   is one that you understand; it's a professional degree as
15   opposed to an academic degree.
16            THE WITNESS:  That is correct.
17            THE COURT:  All right.
18   BY MR. WILLE:
19   Q.   Is that a -- is that a common practice?  I mean, not
20   common in the sense it's easy, but is it a common practice
21   for persons who qualify to do this to be able to do this?
22   A.   Yes.
23   Q.   You don't --
24   A.   You mean to transition?
25   Q.   Yes.
```

Buffington - Redirect (Wille)                          986

1   **A.**    Yes.  It was an honor, actually, to be able to be

2   selected.  The vast majority of admissions candidate have

3   four-year degrees, so I was accepted based on my academic

4   performance and other attributes.

5         And completed that degree, which there is pharmacology

6   training in each of the four years.  And that includes

7   clinical practice.  It includes clinical research.  It

8   includes regulatory processes related to the profession as

9   well.

10  **Q.**    You were asked some questions with respect to, on your

11  curriculum vitae, listing your professorships, associate

12  professorships, et cetera.  Do you recall those questions?

13  **A.**    Yes, sir, I do.

14  **Q.**    Do you -- I guess, do you have any input or control

15  over how universities list professors and so forth on their

16  websites?

17  **A.**    No, sir.  And it is a bone of contention at all

18  universities.

19  **Q.**    And you are aware of instances where you know other

20  persons who have positions similar to yours aren't listed?

21  **A.**    Absolutely.

22  **Q.**    Now, in terms of your testimony as an expert, how many

23  times, in your estimation, has your testimony been accepted

24  at a trial level and appeal level?

25  **A.**    100 percent of the times.

Buffington - Redirect (Wille)                    987

```
 1   Q.   And can you give me -- give me, again, in terms of

 2   numbers, your -- give me a ballpark figure in terms of where

 3   you might have done some criminal -- maybe expert testimony

 4   in a criminal area?

 5        I'll withdraw the question.  One last question, Doctor.

 6   You were asked some questions about the availability of

 7   compound -- pharmacists who might compound pentobarbital or

 8   other drugs.  Do you have any specific knowledge about where

 9   Ohio can contact these compounders so we can employ them?

10   A.   Currently, no.

11             MR. WILLE:  Thank you.

12             THE COURT:  Recross?

13             MR. KING:  Nothing, Your Honor.

14             THE COURT:  Very good.  Dr. Buffington, you may

15   step down.

16             THE WITNESS:  Thank you, Your Honor.

17             MR. KING:  Actually, Your Honor, can I approach?

18   I don't have a stapler, but I do have an extra copy of this,

19   the decision to which I referred, and you can have it.

20             THE COURT:  Very good.  And speaking of this case

21   law, I have now had a chance to look at the four cases that

22   you cited to us, Mr. King.

23        Would you agree with me that in every one of those

24   cases, the expert who was excluded was excluded as a result

25   of a motion in limine?
```

Buffington - Redirect (Wille)                                    988

1              MR. KING:  Your Honor, yes.  And I apologize to

2      the Court for not -- for not filing something sooner.  I

3      will say -- it may not be an excuse.  I will say I wasn't

4      sure exactly for which area -- in which area he was going to

5      be questioned on.  We didn't have an opportunity to depose

6      him, and so I didn't know whether -- if he was going to be,

7      you know, qualified as a pharmacist, there would have been

8      nothing from me.  But I, in preparing for this, I came

9      across these cases.

10             THE COURT:  Understood.  I just wanted to backstop

11     my own point by noting that in each of these four cases, the

12     decision was made on a motion in limine.

13         So we're finished with Dr. Buffington.  Who's next?

14         Actually before we -- before we hear whoever's next, we

15     are going to take ten minutes.

16             THE COURTROOM DEPUTY:  All rise.  This court

17     stands in recess.

18         (Recess from 3:32 until 3:45 p.m.)

19             THE COURT:  Somebody tell me who our next witness

20     is.

21             MS. BARNHART:  Your Honor, the plaintiffs call

22     Dr. Stevens in rebuttal.

23             THE COURT:  Dr. Stevens in rebuttal.

24         Sir, please remember you are still under oath.

25             THE WITNESS:  Yes, Your Honor.

Stevens - Direct (Barnhart)                                    989

1          CRAIG W. STEVENS, PLAINTIFFS' WITNESS, RESUMED STAND

2                        REBUTTAL EXAMINATION

3                        DIRECT EXAMINATION

4    BY MS. BARNHART:

5    Q.    Welcome back to the witness stand, Dr. Stevens.

6    A.    Thank you.

7    Q.    You heard Dr. Buffington testify that benzodiazepines

8    can be used for the induction and maintenance of general

9    anesthesia.  Is that correct in your opinion?

10              MR. WILLE:  Objection, Your Honor.  I don't

11   believe he testified to that effect.

12              THE COURT:  I believe he did.  Go ahead.

13              THE WITNESS:  I believe under the FDA indications

14   it says for the induction of anesthesia.  I don't believe

15   under the actual indications it says for the maintenance,

16   though.

17   BY MS. BARNHART:

18   Q.    Now, midazolam might be used during anesthesia in

19   conjunction with something else?

20   A.    That's correct.

21   Q.    But alone can midazolam or any benzo that you know

22   of -- benzodiazepine -- be used for the maintenance of

23   general anesthesia?

24   A.    No, it cannot.

25   Q.    And is there testimony in either your initial report or

Stevens - Direct (Barnhart)                                    990

1   rebuttal -- not testimony -- I guess evidence or information

2   in your report that supports that view?

3   A.    Yeah, I actually created a table of the FDA indications

4   of midazolam and pentobarbital and other agents in my

5   original report.

6          MS. BARNHART:  Okay.  And could the witness have

7   the expert witness binder, expert exhibits.

8          THE COURT:  Which tab's it going to be, Erin?

9          MS. BARNHART:  His original report is under tab 1.

10  Conveniently the Bates pages match up with the pages of his

11  report.

12  BY MS. BARNHART:

13  Q.    And to speed things up, I believe we're talking about

14  Bates page 9, but I'll let Dr. Stevens confirm that.

15  A.    Actually page 11 of 32 on the bottom numbering system.

16         THE COURT:  Thank you.

17         THE WITNESS:  And you'll see Table 3, "Comparison

18  of therapeutic uses for 5 benzodiazepines and 5

19  barbiturates."

20  BY MS. BARNHART:

21  Q.    And how does this table support the opinion that you

22  just gave?

23  A.    If you look on the very first column on the left, it

24  shows the FDA therapeutic use is listed in the full

25  prescribing informations for those agents.  And you'll see,

Stevens - Direct (Barnhart)                                    991

1    for midazolam, which is fifth, fifth row down, it looks like

2    it starts, it's approved for preoperative sedation,

3    outpatient sedation, anesthesia induction, sedation for

4    intubated patients, and as a co-anesthetic.  So not as a

5    sole anesthetic, for example, under that middle -- middle

6    row there.

7    Q.   All right.  Now, Dr. Buffington testified that noxious

8    stimuli, he said it's not just one thing.  It could be

9    anything, including even a verbal stimulation or a shaking.

10   Does that meet what you consider to be noxious stimuli?

11   A.   No.  He was incorrect about that.

12   Q.   Okay.  And how so?

13   A.   Noxious stimuli has to at least activate what he was

14   talking about, nociceptive fibers, the pain fibers that

15   begin it:  certain hot, cold, electrical shock.  Those pain

16   fibers have to be activated for a stimulus to be noxious.

17   Definitely a verbal stimulus won't be noxious.  I mean,

18   obviously there's verbal abuse, but it's not really noxious.

19        THE COURT:  In that sense.  There was some

20   testimony -- I don't recall whether it was yours or not --

21   but there was some testimony that a noxious stimulus has to

22   be something that could cause tissue damage?

23        THE WITNESS:  Correct.  Pain is described --

24        THE COURT:  Let me ask, first of all.

25        THE WITNESS:  Yes.

Stevens - Direct (Barnhart)                              992

```
 1            THE COURT:  Is that your -- was that your

 2  testimony?

 3            THE WITNESS:  No, it wasn't, sir.

 4            THE COURT:  But you heard it from someone.

 5            THE WITNESS:  I did hear it from Dr. Antognini.

 6  He was talking about the International Association for the

 7  Society of Pain's definition.  He called it the IASP.  And

 8  they talk about pain being the either real or potential

 9  tissue damage.

10            THE COURT:  Okay.

11            MS. BARNHART:  Thank you, Your Honor.

12  BY MS. BARNHART:

13  Q.    So, then, Dr. Buffington said that he believed that

14  someone could be sufficiently sedated as to be unaware of a

15  noxious stimuli.  And I believe that was in reference -- and

16  I believe his opinion is in reference to midazolam

17  specifically could sufficiently sedate someone to be unaware

18  of a noxious stimuli.

19        Now, considering what we were just discussing about his

20  definition of noxious stimuli, do you believe that that

21  statement is relevant to the question in this case about

22  midazolam's appropriateness as the first drug in Ohio's

23  three-drug protocol?

24  A.    No.  I believe that he used the terms very confusingly.

25  He was talking about sedation could produce unawareness to
```

Stevens - Direct (Barnhart)                                    993

1    pain.  Well, we know from the anesthesiologist experts, the

2    ASA table, that you only get unawareness of pain when you

3    actually reach the state of general anesthesia.

4         So for him to confusingly use the term "sedation,"

5    which he did quite a bit when he was talking about general

6    anesthesia, and so that was confusing to me.

7    Q.   And that's something that you discuss in your rebuttal

8    expert report, the delay?

9    A.   Correct.

10   Q.   So he did that in his initial report, and you address

11   it in your rebuttal report.

12        But, specifically, if Dr. Buffington is defining

13   noxious stimuli as something as minimal as a verbal command

14   or shaking, and then he says that midazolam can render

15   someone sufficiently sedated as to be unaware of such a

16   noxious stimuli, does that help the Court at all figure out

17   whether midazolam can be effective as the first drug in

18   Ohio's three-drug protocol?

19   A.   No, it's not useful.

20   Q.   And why not?

21   A.   Because we're not talking about a verbal stimulus here

22   with the second and third drugs.  We're talking about known

23   discomfort, pain, intolerable pain in some cases.

24   Q.   And the type of pain that we're talking about from the

25   second and third drugs, your opinion is related to the pain

Stevens - Direct (Barnhart)                                    994

1    from those drugs.  Just to make it clear, I know Dr. Bergese

2    talks about other types of pain that might be associated

3    with the process of dying, or the drugs themselves.

4         But just for your purposes, are you aware of any

5    scientific data that would demonstrate that midazolam can

6    sufficiently sedate, if we are going to use the term

7    loosely, using Dr. Buffington's language, sufficiently

8    sedate someone as to be unaware of a noxious stimuli of the

9    level that would be experienced in a three-drug protocol

10   such Ohio's?

11   A.   I have not seen any data to support that.

12        THE COURT:  I apologize, Ms. Barnhart.  My English

13   here is troubling me.  A noxious stimulus.  Many noxious

14   stimuli.  And it's only because that term is so important

15   that if you are able to --

16        MS. BARNHART:  Thank you, Your Honor.

17        THE COURT:  -- keep the plural.  Because we have

18   had testimony about how the consciousness checks would

19   involve serial singular noxious stimuli.

20        MS. BARNHART:  Yes, that's correct, Your Honor.

21        THE COURT:  Thank you.

22   BY MS. BARNHART:

23   Q.   Dr. Buffington testified that your testimony about the

24   ceiling effect confused -- I think he said was -- that the

25   figure that is in your report on page 7 of your initial

1    report, that Figure 1, that's a typical textbook example of

2    the graph.  It has the straight line from barbiturates and

3    then it has the curved line that we discussed in detail

4    showing the trajectory for benzodiazepines, and we have

5    presented that as an illustration of the ceiling effect.

6         He said that this is confusing potency with a ceiling

7    effect.  Do you think he's right about that?

8    A.   No.  Potency is different.  Potency just depends on how

9    much of a drug you need to reach a given effect.  So, for

10   example, we see that line for barbiturates.  You might have

11   another line to the left of that.  That would be another,

12   more potent barbiturate that would reach you with lower

13   doses, for example.

14   Q.   But just to make that clear for the record, you are

15   suggesting that if we were to draw in a line that kind of

16   bisected that triangle that's formed by the vertical axis

17   and the -- and it looks like it's about a 45-degree angle

18   for the barbiturate line?

19   A.   Correct.

20   Q.   If we put a line in between those two, so -- my math

21   isn't sufficient enough to figure out what angle that would

22   be -- but you are saying that would be a demonstration of a

23   more potent drug?

24   A.   Right.  Usually it would be parallel to the first

25   line --

Stevens - Direct (Barnhart)                    996

1   Q.   Oh, I see.

2   A.   -- for drugs that had the same effect on receptors.

3   But, yeah, if you would shift the line parallel, and if that

4   one barbiturate line was already there would represent one

5   drug -- for example, thiopental -- and then pentobarbital is

6   drawn to the left of that as a more potent drug, that would

7   represent potency.

8        In this case, it doesn't matter the potency of a

9   benzodiazepine because it has to have GABA present to work,

10  it will always tail off because there is not an infinite

11  amount of GABA.  It's limited by our brain neurons in our

12  brain and everything else as far as nutrition.

13  Q.   And did it matter that Dr. Buffington said, well, there

14  is all types of GABA.  There's not just one type of a GABA

15  receptor.  There's $GABA_A$, $_B$, and $_C$.  Does that matter?

16  A.   No.  That was a little bit, I think, of a false red

17  herring maybe it's called, because it's only the $GABA_A$

18  receptor that the benzodiazepines produce this kind of a

19  effect.  They don't work at the $GABA_B$ receptor, which is a

20  whole different type of receptor that's used as drugs that

21  work on antispasticity, for example.  There is drugs that

22  work on $GABA_B$.

23       So it's only the $GABA_A$ receptors that are in question

24  here.

25  Q.   Okay.  And just so I make sure I understand what your

Stevens - Direct (Barnhart)                                    997

1    testimony was going back to the figure about a more potent

2    drug.  If there was an additional line to the left of that

3    existing barbiturate line, that would show more potency

4    because it would more quickly accelerate up the vertical

5    axis sooner as it traveled along the horizontal axis that's

6    the dose axis?

7    A.   Very good.  In other words, it would take a smaller

8    dose to reach the maximal effect than the drug to the right.

9    So, yes, that's a good way to put it.

10   Q.   Okay.  Thank you.  Dr. Buffington said -- well, this is

11   I guess kind of related here -- but he said in addition to

12   what we've just discussed about calling this graph really

13   having to do with potency instead of the ceiling effect, he

14   said there is no literature and no scientific data about

15   midazolam having a ceiling effect and that there is only a

16   theory of a ceiling effect.

17           THE COURT:  I would call his testimony as being

18   about no scientific data about ceiling effect in studies on

19   humans.

20           MS. BARNHART:  Thank you, Your Honor.  Yes, I

21   think he did say that later, and so I am happy to address

22   that now.

23   BY MS. BARNHART:

24   Q.   So I guess there is two parts.  As to whether there is

25   a ceiling effect in human -- in humans, Dr. Antognini agreed

Stevens - Direct (Barnhart)                                    998

```
 1    with you to the extent that there is a ceiling effect as to

 2    the EEG and the receptors, right?

 3    A.   That is correct.

 4    Q.   And would there be an EEG with cells in a petri dish?

 5    A.   No, there wouldn't.

 6              THE COURT:  The best question of the entire

 7    hearing.

 8              MS. BARNHART:  And on that note --

 9    BY MS. BARNHART:

10    Q.   So in addition to just sort of that general

11    understanding, if we turn to page -- I believe it's page 26

12    of your report.  If we look to the second full -- well,

13    maybe I guess it's -- you can tell me.  I think it's the

14    first full -- first two full paragraphs on that page.  Do

15    those paragraphs list scientific literature and data about

16    midazolam have a ceiling effect in humans?

17    A.   They do.

18    Q.   Now, I'd like to switch to your rebuttal report which

19    is at the end of that binder, and it's Bates page 1041.

20              THE COURT:  The end of the binder?

21              MS. BARNHART:  I believe it's towards the end of

22    the binder.  Not the last tab because some of the tabs are

23    empty, but the last tab with anything behind it.

24              THE WITNESS:  Tab 8.

25              THE COURT:  Tab 8.
```

Stevens - Direct (Barnhart)                                    999

1              THE WITNESS:  Thank you, Your Honor.

2              THE COURT:  You're welcome.

3              MS. BARNHART:  Is everyone there?

4              THE COURT:  Yes.

5    BY MS. BARNHART:

6    **Q.**   I'd like you to explain your opinion as reflected in

7    your report regarding Dr. Buffington's report and testimony

8    here today that midazolam can be lethal.

9    **A.**   Sure.  I guess first what I'd like to point out is the

10   table on what's numbered page 10 of 15 of my rebuttal report

11   at the bottom there, 10 of 15.

12   **Q.**   And that's Bates page 1041.

13   **A.**   Thank you.  Who's Bates anyway?  I don't know.

14   **Q.**   A machine, right?

15             THE COURT:  A prior courtroom deputy used to have

16   a cartoon of a woman nailing worms to documents, and the

17   lawyer says, "What are you doing?"  She said, "You told me

18   to Bates stamp these."

19        As we talk about the proprietary BIS monitor?

20             THE WITNESS:  Yes.

21             THE COURT:  There is a proprietary numbering

22   machine made by the Bates Manufacturing Company.  Should you

23   be at all interested either in looking at one or even

24   acquiring one, we would be glad to be of assistance.

25             THE WITNESS:  Thank you, sir.  Very interesting.

Stevens - Direct (Barnhart)                                        1000

1        So on this particular table -- and it came from a

2   reference that Dr. Buffington mentioned, Reganthal 1999

3   paper that you can actually see in the box there, the

4   journal and the citation.  What's very interesting is that,

5   if you notice, it has different plasma concentrations on the

6   top there.  The different categories are therapeutic, toxic,

7   and comatose-lethal.

8        On the first column going down, you see different

9   barbiturate compounds, including thiopental, pentobarbital,

10  and a number of other ones, and then you see diazepam and

11  midazolam.  And all -- both the barbiturates and the benzos

12  have therapeutic dose ranges as shown there.  We won't read

13  the numbers there.  They are all sort of toxic, those

14  ranges.  And if you notice, comatose-lethal --

15            MR. MADDEN:  Where are we at?

16            MS. BARNHART:  It's in Bates page 1041, which is

17  in his rebuttal report.

18            THE COURT:  Tab 8 of the expert witness binder.

19            MS. BARNHART:  Thank you, Your Honor.  1041.  The

20  expert --

21            MS. LOWE:  The binder that we were given doesn't

22  have the extra tabs in it.  I think you guys just handed

23  us --

24            THE COURT:  Ms. Lowe, would you bring that binder

25  that you are holding to me, please?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

```
 1              MS. LOWE:  Yes, Your Honor.

 2              THE COURT:  It may not be in the binder.  It was

 3   filed at document number 900-1.

 4              MS. LOWE:  Yes, Your Honor.

 5              MS. BARNHART:  We marked this during his --

 6              MR. MADDEN:  Your Honor, I believe we are getting

 7   into information -- getting into tests that were -- that he

 8   was not allowed to speak to in direct examination.

 9              MS. BARNHART:  These aren't tests.

10              MR. MADDEN:  If it's the ceiling effect because of

11   his analysis of BIS scores, that's what the Court would not

12   allow him to testify about the other day.

13              THE COURT:  It's not about that.

14              MR. MADDEN:  It's not about that.

15              THE COURT:  Go ahead, Ms. Barnhart.

16   BY MS. BARNHART:

17   Q.   So, Dr. Stevens, you were talking about this chart

18   which was in a study that Dr. Buffington cited?

19   A.   Correct.

20   Q.   And I forget how far you went.

21   A.   I was kind of getting to the main point.

22   Q.   Continue then.

23   A.   Which is fairly amazing when you think about a drug

24   class, because what you see for both of the benzodiazepines,

25   there is no toxic dose -- I mean, I am sorry -- there is no
```

Stevens - Direct (Barnhart)                                    1002

 1    comatose-lethal dose range.  So there is nothing there.  And

 2    I have enclosed that nothingness by a box.

 3              THE COURT:  That box is your addition to the

 4    table?

 5              THE WITNESS:  Correct.  And it says that

 6    somewhere --

 7              THE COURT:  Just as a matter of highlighting.

 8              THE WITNESS:  It is as a matter, yeah.  I might

 9    not -- somewhere I think I've said that, I enclosed the box.

10         But that is amazing.  There is very few drug classes

11    that do not have a lethal range.

12    BY MS. BARNHART:

13    Q.   But I thought Dr. Buffington said people can die from

14    midazolam?

15    A.   They can.  But the overwhelming majority of those are

16    when there is another drug on board, namely an opioid.

17    That's the number one death-producing combination.

18    Q.   I see.  And so this chart reflects benzos like

19    midazolam alone?

20    A.   Correct.  Very safe.

21    Q.   Dr. Buffington also said that midazolam is also --

22    often used alone in circumstances short of full general

23    anesthesia for procedures like vasectomies, resetting a bone

24    fracture, respiration having to do with bone marrow

25    transplants, and placements of tubes and devices.

Stevens - Direct (Barnhart)                                1003

1    A.    Yes, I heard that testimony.

2    Q.    And is midazolam the only drug administered to a

3    patient for procedures like those?

4    A.    I would think not.  For example, anytime, like a

5    vasectomy, there is an incision made, they are going to use

6    a local anesthetic, too.  So --

7              MR. MADDEN:  Objection as to -- I think he can

8    testify if he has personal knowledge, but I think not --

9              THE WITNESS:  Vasectomy.  Sorry.  Sorry, Judge.

10             THE COURT:  I don't know if I'd invite that error.

11   BY MS. BARNHART:

12   Q.    We have learned a lot about --

13   A.    Sorry.

14   Q.    -- the personal health histories of the parties and the

15   Court in this case.

16         All right.  So you were saying.

17   A.    I'm sorry.  So, yes, in my opinion, again, there would

18   be other drugs on board along with midazolam.

19   Q.    Okay.  Thanks.

20             THE COURT:  You've heard testimony, I think, and

21   you may have given some of it, about the use of midazolam to

22   permit intubation.  And I think somebody testified -- and I

23   know somebody testified that you'd use a higher dose for

24   that.  Was that either your testimony or --

25             THE WITNESS:  I didn't testify to the dose but I

Stevens - Direct (Barnhart)                              1004

```
 1   did testify to its use with an opioid in like a colonoscopy.

 2   I think we shared our experience.

 3              THE COURT:  Right.  But we are talking about --

 4              THE WITNESS:  Oh, intubation?  That was

 5   Dr. Antognini that talked about that.

 6              THE COURT:  Do you agree with his testimony about

 7   that?

 8              THE WITNESS:  I don't agree that as a sole agent.

 9              THE COURT:  Right, okay.

10   BY MS. BARNHART:

11   Q.   Dr. Buffington said that it was -- at one point he

12   referred to reaching a level of deep sedation that is

13   equivalent to the level of general anesthesia.

14   A.   Right.  Again, I found some of his testimony confusing

15   with regards to the terminology.

16   Q.   Could you elaborate on that?

17   A.   Sure.  And I think we've made clear on the previous

18   time I was here that the ASA, very authoritative

19   organization, American Society of Anesthesiology, has a very

20   nice table that shows mild sedation, moderate, deep

21   sedation.  Then you don't talk about sedation.  Then you

22   talk about general anesthesia.

23        So to say sedation can cause general anesthesia,

24   totally confusing and not consistent.

25   Q.   And so I believe one of the criticisms of plaintiffs'
```

Stevens - Direct (Barnhart)                                    1005

1    experts, including you, and the defendants' reports were

2    that we were referring to consciousness as all or not.  And

3    can you maybe put that sort of characterization in context

4    with the information that you are discussing about the ASA's

5    position on the levels of sedation versus general

6    anesthesia?

7    **A.**    Sure.  I think there is more of a gradation.  In other

8    words, harder to tell going from mild to moderate to deep

9    sedation.  But I think once you hit that general anesthesia,

10   there is a bright line.  That's a legal term, I think.  I've

11   learned that.

12        But -- and so that in that case, you do have

13   unconsciousness.  And once you get there, I think we've had

14   testimony earlier saying that that can be differentiated

15   from coma either by the EEG pattern or other signs that

16   anesthesiologists know.  So, yes, once you cross that bright

17   line of unconsciousness, there may be different levels going

18   deeper.

19   **Q.**    Okay.

20   **A.**    But not upward.

21   **Q.**    And so the bright line to which you refer -- and I

22   think if we could turn back to that ASA table, which now

23   this is on page 9 of your original report.

24   **A.**    Right.  Okay.

25   **Q.**    Which property -- or I think Dr. Antognini used the

Stevens - Direct (Barnhart)                                    1006

1    term "end point," you know, an end point of general

2    anesthesia, which he testified was immobility -- well, I

3    won't characterize his testimony.  But I know Dr. Bergese

4    testified that it's immobility, insensate to pain, and lack

5    of awareness, kind of the triad of three end points of

6    general anesthesia.  To which of those end points does the

7    bright line that you are referring to now pertain?

8                MR. MADDEN:  Objection.  No foundation as to his

9    knowledge of depths of anesthesiology.

10               THE COURT:  Overruled.

11               THE WITNESS:  I think as it shows in this table,

12   definitely the immobility would apply because it says

13   unarousable even with painful stimulus.  And then the second

14   thing that's noted underneath the table, they write, it's

15   only at the stage basically of general anesthesia that you

16   get a drug-induced loss of consciousness.

17         So that would also mean amnesia and loss of

18   consciousness.  So this isn't directly related to those

19   three.

20   BY MS. BARNHART:

21   Q.   I see.

22   A.   But the way they put it here I think is probably the

23   most important factors:  unarousable to painful stimulus and

24   loss of consciousness.

25   Q.   And only in the level of general anesthesia are you

1   unarousable to pain?

2   A.    That's correct.

3   Q.    Thank you.  Dr. Stevens, what did you think about

4   Dr. Buffington's testimony that he has I guess somewhat

5   recently both prescribed and administered midazolam?

6   A.    Well, I was shocked because my understanding is only

7   physicians can prescribe and administer drugs.  And, in

8   fact, midazolam being a controlled substance has even

9   another hurdle because you have to be registered with the

10  DEA.  So I immediately, like, wow, how could he do that?  Is

11  there a special deal going on in Florida?  I don't know.

12       I mean, there are some other classes besides just

13  physicians like some nurse practitioners have a limited

14  prescribing ability, but I don't believe it includes

15  controlled substances.  Of course, it's state by state.  But

16  in his case, I was very surprised when he stated that.

17  Q.    I'd like to discuss the purported analgesic properties

18  of midazolam, and I believe that your rebuttal report has

19  some information about that, which we can refer to and then

20  have you explain.

21  A.    Yes.

22             THE COURT:  Yes, back to Tab 8.

23             MS. BARNHART:  Yes, thank you.

24  BY MS. BARNHART:

25  Q.    What page?

Stevens - Direct (Barnhart)                                    1008

1    **A.**    I am on page 5 of 15.

2    **Q.**    And the Bates page for that?

3    **A.**    Bates page is 30147.

4    **Q.**    No, that's the PageID.  The Bates are at the bottom.

5              THE COURT:  036.

6              MS. BARNHART:  Thank you.

7              THE WITNESS:  Oh, I see it on there, yeah.  So he

8    actually stated, "Benzodiazepines, including midazolam,

9    possess analgesic properties."  And in that sense, he's

10   probably the farthest from the mainstream facts about

11   benzodiazepines, because textbooks, and especially *Miller's*

12   *Anesthesia*, shows -- and I have quotes there that you guys

13   can read, of course, and it definitely lacks analgesic

14   properties, must be used with other anesthetic drugs to

15   provide sufficient analgesia, and it goes on and talks about

16   midazolam/benzodiazepine.

17          And, in fact, I did a little bit of research and found

18   a paper that's recent, 2013 by Frolich, and that's above the

19   *Miller's* quotes there in that first full paragraph of page 5

20   of 15.  And they actually took human subjects, and they

21   said, you know, we are going to answer this question because

22   there might have been some controversy.  And they actually

23   took human volunteer subjects and gave them midazolam, or a

24   saline solution so there was a good control, and they saw

25   that after they also subjected them to pain tests -- cold

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Stevens - Direct (Barnhart)                                    1009

1    pain tests, the heat pain tests, and even electrical shock

2    pain tests -- midazolam not only was not analgesic, it

3    actually decreased the pain threshold.  So it made them

4    hyperalgesic.  It made them more sensitive to pain.

5              THE COURT:  Increased the pain threshold or

6    decreased?

7              THE WITNESS:  I am sorry, sir.  It decreased the

8    pain threshold and made them -- increased the pain or

9    produced hyperalgesia.  Thank you.

10   BY MS. BARNHART:

11   Q.    So they were more susceptible to pain?

12   A.    More sensitive to pain with midazolam compared to the

13   saline control solution.  So that, you know, really says the

14   analgesia in the past, sure, there might have been some

15   pre-clinical animal studies that suggested it was there.

16   But I think that study by Frolich and the fact that it's in

17   *Miller's Anesthesia* kind of closes the book on is it

18   analgesic or not.  And the overwhelming support is that it

19   is not in analgesic properties at all.

20   Q.    Okay.  Let's turn to Bates page 1042 to your rebuttal

21   report.

22   A.    Okay.

23   Q.    And I would just like to have you explain -- this is in

24   the one, two -- third, starting with the third full

25   paragraph on that page, which begins in the second paragraph

Stevens - Direct (Barnhart)                                    1010

```
 1    of Section 7.

 2                THE COURT:  I'm sorry.  I was making a note, and I

 3    forgot to pay attention to your page reference.

 4                MS. BARNHART:  1042.

 5                THE COURT:  Thank you.

 6                MS. BARNHART:  Under Tab 8.

 7                THE COURT:  I have it.

 8    BY MS. BARNHART:

 9    Q.   This is where you address Dr. Buffington's testimony or

10    opinion that in humans, midazolam can reach the level of

11    general sedation -- I am sorry -- general anesthesia.  And

12    I'd just like to give you an opportunity to explain your

13    critique of his use of the supporting data for that

14    position.

15    A.   Yes.  First, Dr. Buffington -- it's in the middle of

16    the page there -- talks about BIS values less than equals 60

17    are considered indicative of general anesthesia.  That's his

18    statement.

19         And then he goes on and talks about the Liu study,

20    which he says individuals became unresponsive to mild

21    prodding or shaking.  And from there he goes on to state

22    that midazolam produces general anesthesia from that study,

23    but at this point of sedation, an individual BIS value was

24    only 69.

25         So the fact that his own source demonstrates that
```

Stevens - Direct (Barnhart)                                    1011

1    midazolam only brought the BIS value down to 69 and produced

2    sedation is not general anesthesia.  So that's not

3    supportive of his point that it could produce even

4    unconsciousness at all.

5    Q.   Okay.  And that mild prodding or shaking, as each

6    individual noxious stimu --

7              THE COURT:  -- li.

8              MS. BARNHART:  Sorry.

9    BY MS. BARNHART:

10   Q.   -- related to the earlier discussion we were having

11   about the wide range of noxious stimuli, is that the kind of

12   noxious stimuli that we would -- that would be relevant to

13   the consideration of midazolam's use as the first drug in

14   Ohio's three-drug protocol?

15   A.   No.

16   Q.   All right.  And then would you like to continue?

17   A.   Well, then he talks about the Bulach's study which he

18   just mentioned, Bulach, et al., which is contained in the

19   next paragraph, and there are some individuals that got as

20   low as 66 with the BIS score.  But it wasn't the mean value,

21   which was 71.

22   Q.   Well, can you explain why that matters?

23   A.   Yeah.  I mean, every experiment's going to have

24   outliers.  It could be due to methodology or something.

25   Everyone's not going to respond exactly the same to a drug

Stevens - Direct (Barnhart)                                           1012

 1    obviously.  And scientists look at mean values.  That's how

 2    we compare data.  We do tests on the means, and we do

 3    different statistical tests based on the means and the

 4    variance, of course, too.

 5         So, yeah, having an outlier of 66 and pointing that one

 6    out, you know, you could have also pointed out the one that

 7    only went to 95, you know what I mean, and then, you know,

 8    selected data that way.

 9              THE COURT:  It is well above 60, is it not?

10              THE WITNESS:  Correct.  And it is still well above

11    60.  Thank you, Your Honor.

12         So this is not supportive of midazolam being able to

13    produce the BIS levels that are associated with general

14    anesthesia or, therefore, unconsciousness.

15    BY MS. BARNHART:

16    Q.   And did Dr. Buffington provide any study cited anywhere

17    in his report of references, to which you are aware, where

18    the BIS level hit 60 or below?

19    A.   No, I don't believe he did.

20    Q.   Incidentally, when we're on the topic of means and kind

21    of standard error, you remember that I believe it was

22    Dr. Antognini on the easel drew the curve of the ceiling

23    effect and drew those kind of Ts.

24    A.   Right.

25    Q.   And said, well, theoretically, you know, or maybe in

Stevens - Direct (Barnhart)                                    1013

1   reality at one point could be lower and one point could be

2   higher.  What do you think about that criticism?

3   A.    That criticism is true that it could be out there, but

4   what should also be noticed is that the mean value is where

5   the most likely values lie.  In other words, we might all

6   remember that bell-shaped curve from statistics.  Obviously

7   in the middle of that curve is where the most values are,

8   and then it tails out on both sides.  So the mean is still

9   representative of the most likely value.

10  Q.    And would that criticism apply to just basically any

11  kind of science we were doing in trying to plot a curve of

12  data?

13  A.    Sure.  And that's why scientists do statistical tests,

14  to show that they are really, truly different.  If there is

15  two drug treatments, for example.

16  Q.    Do you feel that's a valid criticism of the ceiling

17  effect?

18  A.    No, because there is still a ceiling effect.  I mean,

19  you can still see it after three or four doses.  And there

20  is other supporting data as well in many other studies.

21  Q.    Okay.  And both Drs. Antognini and Buffington testified

22  that benzos, like midazolam, are not safe drugs.  What's

23  your response to that testimony?

24  A.    Quite frankly, I find that a little disingenuous,

25  because benzodiazepines are probably one of the largest drug

1   classes that are used:  Ambien, Xanax, diazepam, Valium.  It

2   goes on and on.  And the reason they are so popular and so

3   commonly used is because they are safe.  They have replaced

4   the barbiturates because the barbiturates, not having a

5   ceiling effect, can much more easily produce respiratory

6   depression.

7   Q.   And they have replaced them in what -- for what use?

8   A.   For just about all clinical uses except maybe

9   anti-epileptic use.  So for anxiety, people no longer take

10  succinyls or reds or whatever they used to take in the '50s.

11  And so, you know, anxiety being a big one, being able to

12  sleep, people no longer take barbiturates for that.  So

13  clinically, benzodiazepines, you know, have been a real

14  godsend, in fact, being able to treat numerous people:

15  panic disorder, agoraphobia.  So they have largely replaced

16  the barbiturates because they are so safe.

17  Q.   And just to connect up with what you said earlier.

18  When they are unsafe, in a case where we say lethal outcome,

19  that was because?

20  A.   Overwhelming because they were involved with another

21  drug on board.  In that case, yes, the combination of

22  benzos, benzodiazepines and opioid, benzodiazepines and

23  ethanol, very dangerous.  Single use, therapeutic doses,

24  extremely safe.

25  Q.   And on the Bates page 1043, which is the next page, I

Stevens - Direct (Barnhart)                                    1015

1    think, from where we were, third full paragraph that begins

2    in Section 11, page 9 of Dr. Buffington's report.  There you

3    address Dr. Buffington has sort of a three-part, assumption

4    might not be the right word, but he calls them facts, Fact

5    A, Fact B, Fact C, and then he draws a conclusion.

6         Can you explain your criticism of that opinion from

7    Dr. Buffington, please.

8    A.   Yes.  He says based on the Fact A, a ceiling effect has

9    never been demonstrated in humans.  That's false.  Liu

10   study, Bulach study, other studies have shown that.  And

11   that's cited in my original report.  The authors themselves

12   in the Miyake study say greater doses of midazolam did not

13   produce greater effect.  I mean, it's known.  And that was a

14   human study, and so that's false.  Just simply not true.

15        Midazolam's pharmacological effects are known to be

16   dose related.  Well, yes, that's true.  You get more

17   sedation with a greater dose, but not necessarily pertinent

18   to the issue at hand.

19   Q.   And why is it not pertinent?

20   A.   Because we don't know anything about doses above the

21   therapeutic range.  And there is a ceiling effect.

22   Q.   The ceiling effect creates that, too?

23   A.   So obviously you get the ceiling effect.

24   Q.   Okay.  So the greater dose response, that has to do

25   with levels below the ceiling effect; is that accurate?

1    A.    That would be one way to state it, yeah, definitely.

2    You know, 1 milligram over triazolam or Xanax versus 2

3    milligrams, you are going to get more sedation, and so,

4    yeah.  But once you get a certain point, you are not going

5    to get any greater effect because you need GABA present to

6    work.  GABA's limited.

7          And then, C, midazolam is highly lipophilic, it is more

8    likely than not that doses of 500 milligrams or greater

9    would render BIS values progressively lower than 69.

10   Q.    First can you explain lipophilic?

11   A.    Lipophilic, yes.  That means fat loving.

12         THE COURT:  That would be me.

13         THE WITNESS:  That would be all of us, Your Honor.

14   BY MS. BARNHART:

15   Q.    So that's L-I-P-O-P-H-I-L-I-C?

16   A.    Right.

17   Q.    All right.  And what does that mean?

18   A.    That just means that it crosses the blood-brain barrier

19   quickly.  If you think of the body, basically we are a bag

20   of a lot of membranes, and so drugs that can cross

21   membranes, which are lipid, hold our water inside,

22   lipophilic drugs can cross it quicker.

23   Q.    And yesterday somebody was talking about it's got to be

24   free.  I think it was Dr. Antognini.  The midazolam has to

25   be free in the blood as opposed to bind up with the protein?

Stevens - Direct (Barnhart)                    1017

1    A.    This is the separation we see.

2    Q.    Okay.

3    A.    This has more just to do with the drug characteristic

4    itself, the chemistry of the drug.

5    Q.    Okay.

6    A.    So the point that it is lipophilic has nothing to do

7    with the incorrect statement that it could progressively

8    lower it to 69.  I mean, that's -- they're kind of separate,

9    separate deals there.  It's the drug action not being able

10   to get past a certain amount of effect that --

11   Q.    The drug action can't get past a certain amount

12   because?

13   A.    Of the ceiling effect and not being able to get beyond

14   a BIS of 69.  So I don't know why just because it's

15   lipophilic it would change.  I mean, we've been shown

16   midazolam studies, and that midazolam was as lipophilic as

17   any other midazolam, and they didn't get less than 69, so --

18   Q.    Whether it's lipophilic or not, once it gets into the

19   brain to the receptors, it still depends on the amount of

20   GABA that's there?

21   A.    Correct, 'Cause it always has to have GABA to work, and

22   not work by itself.

23   Q.    All right.  And so after addressing those three parts,

24   what's your opinion about the conclusion that he draws from

25   those three, what he calls, facts?

Stevens - Direct (Barnhart)                                    1018

1    A.   Well, I just think it's false.  It's contrary to any of

2    the clinical studies we have.  And we don't have a lot, but

3    we've got enough to at least say midazolam has shown

4    clinically not to produce a level of general anesthesia.

5    There is no indication of it.

6    Q.   Okay.  And was there anything else that you thought

7    would be helpful to the Court from what you heard from

8    Dr. Buffington or Dr. Antognini's testimony or his reports

9    that we didn't cover?

10   A.   I think we covered it all.  I just think -- it's

11   counterintuitive, I think, to a lot of people, including

12   myself, to think, well, if we just give more drug, we can

13   get a greater effect.  But, indeed, in pharmacology that's

14   not always true because receptors are limited.  In this case

15   the GABA's limited.

16       So we have to kind of think, maybe a little bit more

17   scientifically.  Just because we give more of something, we

18   can't change the effect necessarily.

19   Q.   I think in prior testimony -- and, again, I wasn't in

20   the case then -- but the plaintiffs' expert Dr. Waisel

21   talked about a glass of water, and he used the analogy that

22   once the glass of water was full, putting more water on it

23   doesn't make it any more wet because it's, like, saturated

24   or it's reached its limit?

25   A.   Right.

Stevens - Cross (Madden)                                        1019

1    Q.    Does that make sense to you?

2    A.    That's a good analogy.

3    Q.    And then at this time --

4              MS. BARNHART:  Oh, that's all the questions I

5    have.

6              THE COURT:  Thank you.  Cross.

7                        CROSS-EXAMINATION

8    BY MR. MADDEN:

9    Q.    You were in here when Dr. Buffington testified; is that

10   right?

11   A.    That's correct.

12   Q.    And when he said the FDA prohibits experts from

13   attempting to opine on the pharmacological effects based

14   solely on animal and laboratory studies, is that accurate?

15   A.    I'm not sure what he was talking about as far as --

16   I've never heard of an FDA prohibition of expert witnessing,

17   and I don't think they have ever mentioned that on their --

18   I'm not aware of his source for that statement.

19   Q.    Can -- does the FDA allow animal studies to be done --

20   test results from animal studies to then approve drugs for

21   public use?

22   A.    That's how they do it.  There is a whole pre-clinical

23   phase.  There is no drug that we use that hasn't been tested

24   on animals.

25   Q.    But is there a -- human trials in between?

Stevens - Cross (Madden)                                    1020

1    A.    No, they come after the animal trials.

2    Q.    Yes.  But between going to the public and the animal

3    trials, isn't there a phase when you do human trials as

4    well?

5    A.    There is three phases, phase one, phase two, phase

6    three, of clinical trials after the drug has been submitted

7    for a new drug application, an NDA.

8    Q.    Has any of this been done with -- as it pertains to

9    large doses that we're talking about, nontherapeutic doses

10   but rather large dosages of midazolam?

11   A.    No company that I am aware of has tried to get large

12   doses of midazolam approved by the FDA.

13   Q.    Now, your tests that you did with the in vivo, is that

14   right?  Or in vitro?

15   A.    In vitro would be in glass, like vitreous glass.

16   Q.    Okay.  Thank you.  And those tests were done as to a

17   particular part of GABA, right?  $GABA_A$?

18   A.    A particular receptor.

19   Q.    A particular receptor.

20   A.    Correct.

21   Q.    And there is $GABA_B$ and $GABA_C$; is that right?

22   A.    $GABA_B$ I know of.  It's a different type of receptor.

23   $GABA_C$ I am not as familiar of.  It might be more of a newly

24   discovered one; they are still kind of figuring it out.  But

25   I'm not -- it's not one that we have any drugs targeted to,

Stevens - Cross (Madden)                                          1021

1    $GABA_C$, so it might be more of a still-learning-about-it

2    stage.

3    Q.   So these tests were exclusive to that receptor on

4    $GABA_A$; is that right?

5    A.   The tests that we're looking at, the benzodiazepine

6    effects, were exclusive to the GABA receptor that

7    benzodiazepines bind to.  The benzodiazepines don't work at

8    the other types of GABA receptors.

9    Q.   What about underneath, is there -- on the other side of

10   $GABA_{A?}$ Is there other receptors on $GABA_A$?

11   A.   Well, there is different -- it's not like there is

12   other receptors.  The $GABA_A$ receptor is kind of a unitary

13   thing.  And on that receptor there is different binding

14   sites.

15   Q.   Yes.

16   A.   Where GABA binds to, benzodiazepines bind to,

17   barbiturates bind to, alcohol binds to.

18   Q.   And those receptors have not been tested, right?

19   A.   No, those are the $GABA_A$ receptors that were tested that

20   contain those sites.

21   Q.   So benzodiazepines don't attach to any other receptors

22   besides the one that's been tested on $GABA_A$?

23   A.   That's correct.  The best of my knowledge.

24   Q.   But you are sure of this?

25   A.   Yeah, that's the main target.  I mean, every textbook

Stevens - Cross (Madden)                                    1022

1    talks about GABA$_A$ as being the main target of

2    benzodiazepines, correct.  All the research.

3    Q.    And, you know, yesterday I asked you about an article

4    about the reuptake of GABA; is that right?

5    A.    You did.

6    Q.    And would you agree with me that there are

7    pharmacologists out there who do believe that midazolam

8    causes a reuptake in GABA?

9    A.    I haven't researched that, I am taking your word that

10   there are articles like that.  It's not by any means

11   mainstream as far as it really hasn't made it into too many

12   textbooks.

13   Q.    Did you look at that rat study we talked about, the one

14   that you signed on that I proposed quoted a reuptake in

15   GABA?  Did you --

16   A.    I didn't have access to that paper unfortunately.

17   Q.    Okay, so -- okay.

18   A.    Yeah.

19   Q.    Now, you would agree with me that a petri dish with

20   nonhuman --

21          THE COURT:  Tissue.

22   BY MR. MADDEN:

23   Q.    -- tissue cannot replicate what's in the human brain,

24   can it?

25   A.    Correct.  Now, they still have human receptors, so some

Stevens - Cross (Madden)                                         1023

1    of that part is kind of replicated.  But, yes, the cells

2    could be frog oocytes or rat spinal cord neurons, and they

3    are not human cells traditionally.  You can use human cells.

4    It's just that those studies didn't.

5    **Q.**   Now, you said -- when going back to the reuptake in

6    GABA, you said that you didn't -- you did not agree with me.

7    Are there other pharmacologists who believe that midazolam

8    causes a reuptake in GABA?

9    **A.**   Again, I'm trusting that you found some papers on that,

10   that they were valid, peer-reviewed papers, and I have not

11   researched the re -- possible GABA reuptake.  So I did my

12   research.  That did not -- wasn't a common kind of mechanism

13   of action of benzodiazepines.

14        It may be out there.  There may be some researchers

15   that are looking at that aspect of it, but by no means is it

16   a mainstream -- you know, if the medical students take a

17   board exam, "What's the mechanism of action of

18   benzodiazepines?" they are going to say, "Bind to the $GABA_A$

19   receptor in the presence of GABA to produce the effect."

20   **Q.**   So let's move on to the -- to another topic.  Let's go

21   to the part of your -- where you cite that you spoke about,

22   about general anesthesia.  I think it's page 9 or 7 of your

23   report.

24              THE COURT:  First report or rebuttal report, sir?

25              MR. MADDEN:  First report.  Excuse me, Judge.

Stevens - Cross (Madden)                                    1024

```
1    BY MR. MADDEN:

2    Q.    It's 9, sir.  I apologize.

3    A.    Page?

4    Q.    Page 9.

5    A.    9 of 32 or whatever, okay.  Okay.

6    Q.    Okay.  You agree with me that this table is exclusive

7    to therapeutic dosages?  They are not talking about

8    midazolam in massive dosages?

9    A.    I would assume that, yeah.  I mean, they don't say

10   exactly what you said, but it was done by the American

11   Society of Anesthesiologists, and would I assume that they

12   were thinking mostly for clinical use obviously.  So, I

13   mean, it wasn't explicitly stated like you said, but, yes, I

14   think mostly they were talking about therapeutic use of

15   drugs.

16   Q.    And there is no indication here that they are talking

17   about 500 milligrams of midazolam; is there?

18   A.    No.  That's correct.

19   Q.    Now, there is no dispute that midazolam, when used with

20   hydromorphone, causes anesthesia, is that -- can lead to

21   anesthesia; is that right?

22   A.    Well, I wouldn't necessarily say that.  I don't --

23   again, I haven't seen studies that they looked at that.

24   They either looked at BIS or did some study so --

25   Q.    Your expertise, you testified the other day that you,
```

Stevens - Cross (Madden)                                    1025

1    your -- your main focus is opioids, is it not?

2    **A.**    That's correct, which are analgesics.

3    **Q.**    Which are analgesics.  And an opioid with -- and

4    opioids are often used with benzodiazepines; is that right?

5    **A.**    Yes, to my knowledge.

6    **Q.**    For their synergistic effect?

7    **A.**    That's correct.

8    **Q.**    And you would say that when someone tries to compare

9    that, the combination of those two drugs, with a large dose

10   of midazolam, they are -- they are apples to oranges, right?

11   **A.**    Right.  The two-drug combination versus one, for

12   example?

13   **Q.**    Yeah.  Those are totally unrelated.  They are not

14   similar?

15   **A.**    Well, they are -- they might be on the same -- they

16   might produce the same effect, but the two drugs are going

17   to produce a greater effect than the one drug.  So it

18   depends kind of what you are talking about.

19            THE COURT:  And when you say one drug, you mean

20   either one of them used alone, right?

21            THE WITNESS:  Correct, sir.

22            THE COURT:  Thank you.

23   BY MR. MADDEN:

24   **Q.**    There's been a lot of testimony here that midazolam is

25   used alone for intubation, have you not?

Stevens - Cross (Madden)                                    1026

1    A.    I have heard that, yes.

2    Q.    And you are not disputing that?

3    A.    I am only -- I am not an anesthesiologist, so I don't

4    know the common practice of using midazolam for intubation.

5    Q.    You would agree with me that even though you are not an

6    expert on pain or noxious stimuli, you would agree with me

7    that intubation, if done without any kind of drug, would be

8    painful?

9    A.    If I tried just to imagine myself --

10   Q.    Yes.

11   A.    Not as obviously any expert.  As a lay person, it

12   sounds like it would be irritating.  I don't know how

13   painful it would be, like incisional pain, but it seems like

14   it might be irritating, putting a pipe down your windpipe or

15   whatever.

16            THE COURT:  You don't dispute the testimony that

17   we have heard here that it is -- whether painful or not,

18   that it is very noxious?

19            THE WITNESS:  Yes, I think it would definitely

20   cause a reaction, yeah.  Exactly.

21   BY MR. MADDEN:

22   Q.    And you agree, you said -- you brought up the term

23   "anti-analgesic," did you not?

24   A.    Hyperalgesia, I might have said, about midazolam having

25   a hyperalgesic effect?

Stevens - Cross (Madden)                                          1027

```
1    Q.    Yeah, yes.  Okay.  You didn't say anti-analgesic?

2              THE COURT:  No, he didn't.  I don't believe so.

3              MR. MADDEN:  Maybe I misheard.  I apologize.

4    BY MR. MADDEN:

5    Q.    Now, you said that you cannot overdose on midazolam.

6    Is that your testimony?

7    A.    Well, overdose is possible.  That would bring you

8    perhaps into the toxic range, yes.

9    Q.    So you would agree with me that there have been cases

10   at therapeutic doses where midazolam has led to death?

11   A.    I have not studied that.  And what I have read is that,

12   like in the midazolam general textbook or stuff is that

13   overdose death -- so, again, we have to differentiate.  When

14   you say overdose, that does not mean overdose death.

15   Overdose could send you to the ER; you could still live.  So

16   I just want to make that clear if you are talking about

17   overdose death or overdose, per se.

18   Q.    And you would agree with me that there is a black box

19   warning on midazolam, not midazolam and another drug, but

20   there is a black box warning on midazolam saying that this

21   drug is dangerous; is that accurate?

22   A.    It doesn't say the drug is dangerous.  It says you have

23   to be careful and watch out for these things basically.

24   Q.    Are you saying that --

25             MR. MADDEN:  I want to show the witness what is
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Stevens - Cross (Madden)                                    1028

1    Plaintiffs' Exhibit 3, Bates 888 to 890.  May I approach?

2              THE COURT:  Yes, sir.

3    BY MR. MADDEN:

4    Q.    If you could read this silently as I read aloud --

5    well, first of all, what does this appear to be?

6    A.    This looks like the prescription label information from

7    midazolam injection formulation from Akorn Laboratories.

8    Q.    Is this the black box that we have been referring to?

9    A.    Yeah.  I haven't really seen it in this format.

10   Usually it's a bigger page and not three columns.  But --

11   just wondering what the date of this one is.

12   Q.    See the part that says "warning"?

13   A.    Correct.

14   Q.    Please read silently as --

15             MS. BARNHART:  What was the page, the Bates page

16   for this?

17             MR. MADDEN:  888-890.

18             MS. BARNHART:  888.

19             MR. MADDEN:  To 890.

20             MS. LOWE:  It's Tab 3 in your expert exhibit

21   binder.

22             MS. BARNHART:  Are you saying the ECF number?

23             MS. LOWE:  No, it was the Bates stamp.

24             MS. BARNHART:  Okay.

25   BY MR. MADDEN:

Stevens - Cross (Madden)                                    1029

1    **Q.**    Please read silently as I read it aloud.  "Adult and

2    pediatric.  Intravenous midazolam has been associated with

3    respiratory depression and respiratory arrest, especially

4    when used for sedation in non-critical care settings.  In

5    some cases, where this was not recognized promptly and

6    treated effectively, death and hypoxic encephalopathy --"

7    **A.**    Encephalopathy.

8    **Q.**    I will take your word for it "-- has resulted."

9          Did I read that accurately?

10   **A.**    You did.

11              THE COURT:  Hypoxic, H-Y-P-O-X-I-C, encephalitis?

12              THE WITNESS:  Encephalopathy.

13              THE COURT:  Encephalopathy.  Thank you.

14   BY MR. MADDEN:

15   **Q.**    Did I read that accurately?

16   **A.**    You did.

17              MR. MADDEN:  Your Honor, I have no further

18   questions.

19              THE COURT:  Thank you.

20        Redirect?

21              MR. BOHNERT:  Your Honor, if I might be able to do

22   the questioning.

23                      **REDIRECT EXAMINATION**

24   BY MR. BOHNERT:

25   **Q.**    Doctor, the document that Mr. Madden just had you read,

Stevens - Redirect (Bohnert)                               1030

1  is that the black box warning that -- that would go with

2  midazolam?

3  A.    I believe it was.

4  Q.    Okay.  Assuming -- there was some discussion about the

5  reuptake in GABA that was discussed here.  Assuming for a

6  moment that reuptake occurs, is that relevant to

7  understanding the use of midazolam in Ohio's three-drug

8  execution protocol?

9  A.    No.

10 Q.    Now, there was also some discussion as a mention of a

11 new drug application a minute ago.  What is that?

12 A.    New drug application occurs when a pharmaceutical

13 company has done enough research, pre-clinical research to

14 file a new drug application, NDA, to the FDA, to get

15 approval to begin clinical trials.  So they do animal

16 research, mild chemical research, in-vitro research for

17 anywhere from five to ten to twelve years, and then file an

18 NDA, new drug application.  And then that allows them, if

19 the FDA approves it, to go ahead and start clinical trials.

20 Q.    So if there is a drug -- at the end of the approval

21 process, you end up with the FDA approved uses of a drug; is

22 that right?

23 A.    That's correct.

24 Q.    And if I want to use a drug for something that is not

25 listed in the FDA-approved uses of that drug, can I do that?

1          MR. MADDEN:  Objection.  Goes beyond the scope.

2          THE COURT:  Sustained.

3          MR. BOHNERT:  No further questions, Your Honor.

4          THE COURT:  Thank you.

5     You may step down, Dr. Stevens.

6          THE WITNESS:  Thank you very much, Your Honor.

7          THE COURT:  What's next?

8          MS. WOOD:  We still have those exhibits from

9  yesterday's presentation.

10         THE COURT:  Right, sure.

11         MS. WOOD:  They have not been reviewed.  And I

12  believe there is a matter of scheduling for Monday.

13         THE COURT:  Dr. Stevens, before you leave the

14  courtroom, I want to subject you to my favorite *New Yorker*

15  cartoon from last year.  It occurred to me when Mr. Madden

16  was talking about comparing apples and oranges.

17     Eve is standing in front of Adam.  She's holding out

18  the apple, and she says to him, "Will you please just try it

19  before you start comparing it to oranges?"

20     Have a pleasant weekend, sir.

21         THE WITNESS:  You, too.  Thank you.

22         THE COURT:  All right.  Exhibits from yesterday.

23         MS. WOOD:  Yes.

24         THE COURT:  All right.  What do you have for me?

25         MS. WOOD:  I marked them as plaintiffs' experts

1  exhibits in order as the first exhibit, and then the

2  supporting documents and studies that were included as

3  particular exhibits.  And I just wanted to make sure I have

4  done it correctly and to Your Honor's specifications.  I did

5  include first ten pages of the manual, which one page was

6  displayed to show what it is.

7            THE COURT:  Right.  For context, right.  May I

8  see?

9            MS. WOOD:  Yes.

10           MR. MADDEN:  No, I do now.  Thank you.

11       I am not sure all of these were referred to, were they?

12           MS. WOOD:  I should clarify that.  The last two

13  exhibits are from my presentation that we would like to show

14  during Dr. Bergese's rebuttal, which hopefully will be on

15  Monday.

16           THE COURT:  All right.

17           MS. WOOD:  So I preemptively marked those.

18           THE COURT:  And those would be 12 and 13?

19           MS. WOOD:  They are 18 and 19, the very last two

20  pages.

21           THE COURT:  Okay.

22           MS. WOOD:  They are pictures of BIS monitors.

23           THE COURT:  I see.  And you are representing to

24  the Court that what we have here in 9 through 17 are the

25  cross-examination documents you presented to witnesses -- a

1   witness yesterday; is that correct?

2            MS. WOOD:  Yes, Your Honor.

3            THE COURT:  Thank you, ma'am.

4        Is everybody ready to go home for the weekend?

5            RESPONSE:  Yes, Your Honor.

6            THE COURT:  I don't have any more *New Yorker*

7   cartoons to relay either, so we're in recess.

8            THE COURTROOM DEPUTY:  All rise.  This court

9   stands in recess.

10       (Proceedings concluded at 4:50 p.m.)

1034

1      CERTIFICATE OF REPORTER

2

3           I, Mary A. Schweinhagen, Federal Official Realtime

4      Court Reporter, in and for the United States District Court

5      for the Southern District of Ohio, do hereby certify that

6      pursuant to Section 753, Title 28, United States Code that

7      the foregoing is a true and correct transcript of the

8      stenographically reported proceedings held in the

9      above-entitled matter and that the transcript page format is

10     in conformance with the regulations of the Judicial

11     Conference of the United States.

12

13     s/Mary A. Schweinhagen

14     _____ January 12, 2017

15     MARY A. SCHWEINHAGEN, RDR, CRR
       FEDERAL OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25