UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: OHIO EXECUTION PROTOCOL LITIGATION | Case No. 2:11-cv-1016<br>CHIEF JUDGE EDMUND SARGUS JR.<br>Magistrate Judge Michael Merz |
| This document relates to: Otte | EXECUTION SCHEDULED FOR SEPTEMBER 13, 2017 |

PLAINTIFF OTTE'S MOTION FOR
STAY OF EXECUTION, TEMPORARY RESTRAINING ORDER,
AND A PRELIMINARY INJUNCTION

Because the Defendants have demonstrated that they are not equipped to perform an adequate and sufficient consciousness check on the condemned inmate, there is a sure or very likely, significant and substantial risk that Plaintiff Otte will suffer serious physical pain during the execution which would violate his rights under the Eighth and Fourteenth Amendments to the United States Constitution. *See Baze v. Rees*, 553 U.S. 35 (2008); *Glossip v. Gross*, 135 S.Ct. 2726 (2015).

Plaintiff Gary Otte filed his Fourth Amended Complaint (ECF Nos. 695 & 696) on October 26, 2016. Plaintiff Otte moves for a stay of execution, and, pursuant to Federal Rule of Civil Procedure 65(a) and (b), for a temporary restraining order ("TRO") and a preliminary injunction as to the First and Twelfth claims in his Fourth Amendment Complaint, and any other claim that would be appropriate. Mr. Otte moves to stay the death warrant issued by the Supreme Court of Ohio and to bar Defendants and each of them, and/or their agents, from acting jointly or severally to implement or otherwise facilitate any part of the Defendants' Execution Protocol as to him. Mr. Otte similarly seeks to bar the same from attempting to execute him on September 13, 2017, by

1

means of Defendants' Execution Protocol and policies which will deprive him of his rights in violation of the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

In light of Mr. Otte's imminent scheduled execution date, a temporary restraining order, preliminary injunction and stay of execution are necessary to allow Mr. Otte to litigate his claim before he is unconstitutionally executed.

Mr. Otte requests expedited discovery, oral argument and an evidentiary hearing with post-hearing briefing as the Court deems necessary on his motion. The reasons supporting this request are explained in the attached memorandum in support.

Counsel for Mr. Otte has not consulted with counsel for Defendants about this motion as the nature of this litigation reflects that Defendants will oppose the requested relief.

Respectfully submitted,

**Stephen Newman**
Federal Public Defender for the Northern District of Ohio
by

*/s/ Vicki Ruth Adams Werneke*
**Vicki Ruth Adams Werneke (0088560)**
Office of the Federal Public Defender
for the Northern District of Ohio
Capital Habeas Unit
1660 W. 2nd Street, Suite 750
Cleveland, Ohio 44113
216-522-4856
216-522-1951 fax
Email: Vicki_werneke@fd.org
**Trial counsel for Gary Otte**

**I.     Introduction**

Defendants intend to use a method of execution on Plaintiff Otte that requires IV injection of midazolam, followed by injections of a paralytic drug and potassium chloride. The revised three-drug execution method Defendants adopted in the 2016 Execution Protocol has proven to cause severe pain and suffering, which Defendants knew, but they adopted it anyway, ignoring the warnings.

Defendants' execution protocol, specifically the ineffective consciousness assessment, further creates a sure, or very likely, substantial risk of serious harm to Mr. Otte, and ignores alternatives that are known, readily available, and able to substantially reduce the risk that is inherent in the execution protocol.

Accordingly, this motion presents the following straightforward issue:

> Defendants plan to attempt to execute Mr. Otte on September 13, 2017. This case will ultimately be tried on the merits before this Court. If Mr. Otte can demonstrate a likelihood of success on the merits of his constitutional challenges to Defendants' execution policy to which he will be subjected, should his execution be stayed and Defendants temporarily and preliminarily enjoined from attempting to execute him on September 13, 2017?

Or, as phrased in the order granting injunctive relief to Plaintiff Kenneth Smith: has Plaintiff demonstrated that he is likely to succeed in establishing that Ohio has an unconstitutional execution policy so that he deserves a stay of execution that will afford him the chance to prove his case? *Cooey (Smith) v. Kasich*, 801 F. Supp. 2d 623, 624–25 (S.D. Ohio 2011); *see also In re Ohio Execution Protocol Litig. (Lorraine)*, 840 F. Supp. 2d 1044, 1047 (S.D. Ohio ___) (granting injunctive relief to Plaintiff Charles Lorraine), *aff'd*, *In re Ohio Execution Protocol Litig.(Lorraine)*, 671 F.3d 601, 602 (6th Cir. 2012) (denying motion to vacate stay of execution), *Kasich v. Lorraine*, 132 S. Ct. 1306 (2012) (application to vacate stay denied).

Granting Mr. Otte's motion is proper and necessary: Mr. Otte has a substantial likelihood of prevailing on the merits of his claim presented here; there is a threat of irreparable harm to him that only a stay of execution and injunctive relief can alleviate; an injunction will not cause substantial harm to others; and the public interest lies in favor of not subjecting Mr. Otte to an unconstitutional execution, and in ensuring that Defendants are required to abide by the federal Constitution in carrying out criminal sentences. Additionally, Mr. Otte has long been part of this litigation. He filed his Fourth Amended Complaint as soon as practicable following Defendants' adoption of a new written Execution Protocol and of Defendants' notice to him that they intend to use intravenously injected midazolam, a paralytic drug, and potassium chloride as the execution method in his scheduled execution. There is no undue delay on his part and thus no equitable presumption against a stay of execution.

## II.     Procedural Background

On September 2, 2015, the Supreme Court of Ohio issued an order setting Mr. Otte's execution for March 15, 2017. Governor Kasich issued two reprieves resetting the execution date for September 13, 2017. Defendants plan to execute him on that date at or about 10:00 a.m., at the Southern Ohio Correctional Facility. Defendants have represented they will use the Execution Protocol effective October 7, 2016. (ECF 715-1, PageID# 21755-75, DRC Policy 01-COM-11)

Mr. Otte has been litigating lethal injection in these consolidated §1983 proceedings since 2011, when Defendants' adoption of a new execution protocol on September 18, 2011, restarted the statute of limitations for him. Effective October 7, 2016, Defendants made significant changes to Ohio's execution protocol. Thereafter, and in accordance with this Court's scheduling order (ECF #658), Mr. Otte filed his Fourth Amended Complaint, which was filed October 26, 2016 (ECF #695 & #696). Mr. Otte's Fourth Amended Complaint provides a detailed account of the

4

long and winding history of this litigation and Defendants' actions associated with conducting lethal injection executions, as well as numerous allegations regarding the three-drug execution method and the midazolam, paralytic drug and potassium chloride with which Defendants intend to kill him, which Mr. Otte incorporates by reference here. (ECF 695, PageID# 20771–958.)

The changes and additions to the written execution protocol in the 2016 Execution Protocol dramatically affect Mr. Otte's rights and expose him to serious constitutional violations.

### III. This Court Should Grant Mr. Otte a Stay of Execution, a Temporary Restraining Order and a Preliminary Injunction.

The purpose of TRO and preliminary injunctive relief is to preserve the status quo until the rights of the parties can be fairly and fully litigated through a final hearing or trial on the merits of a request for a permanent injunction. *See Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held"); *Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1378 (6th Cir. 1995) (citations omitted). And a stay of execution is warranted when the inmate seeks additional time to raise his claims beyond what the inmate's scheduled execution date allows. *See Martiniano v. Bell*, 454 F.3d 616 (6th Cir. 2006).

In considering whether injunctive relief such as a TRO or a preliminary injunction is warranted, this Court must consider (1) whether Mr. Otte has demonstrated a strong likelihood of success on the merits; (2) whether Mr. Otte will suffer irreparable harm in the absence of equitable relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest will be advanced by issuing the injunction. *Miller v. City of Cincinnati*, 622 F.3d 524, 533 (6th Cir. 2010). No single factor is determinative. *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001). The four factors are to be balanced; they are not prerequisites to be met. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511

5

F.3d 535, 542 (6th Cir. 2007) (citing *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003) and *In re De Lorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985)).  Accordingly, the degree of likelihood of success required to obtain a preliminary injunction may depend on the strength of the other three factors.  *De Lorean Motor Co.*, 755 F.2d at 1229.

The same factors apply for a stay of execution, *Hill v. McDonough*, 547 U.S. 573, 584 (2006) (explaining that "like other stay applicants, inmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits"), although in considering whether to grant a stay of execution, the Court must also consider whether an inmate has delayed unnecessarily in bringing a claim, *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004).

Granting a stay of execution along with injunctive relief in the form of a TRO and preliminary injunction is proper.  *See Nken v. Holder*, 129 S. Ct. 1749, 1757-58 (2009) (distinguishing between a stay, which suspends the source of authority to act and "operates upon the judicial proceeding itself," and an injunction, which prohibits persons from taking any action because it "is directed at someone, and governs that party's conduct").

**A. The ineffectiveness of the consciousness assessment creates a sure or very likely significant and substantial risk of severe harm and pain during the execution process.**

Ronald Phillips was executed on July 26, 2017.  The Phillips execution was the first one in which ODRC utilized the "consciousness check" as reflected in the new execution protocol.  (ECF 1073-3, Deposition of Team Member 10, PageID #28760).  The protocol states that the medical team members will conduct a "consciousness check" without any details as to what that would entail.  The stated purpose of the "consciousness check" is to ensure that the inmate is sufficiently

unconscious and unable to feel pain. Director Mohr testified the execution would not proceed if the inmate was not unconscious. (ECF 868-1, PageID# 28026).

Team Member 10, the execution team leader, testified that there were six possible consciousness checks that the medical team members might use: 1) touching of the eyelid, 2) pressure point on the fingertip with a pen, 3) flicking or tickling of the earlobe, 4) verbal – speaking to the inmate, 5) sternum rub, and 6) squeezing the biceps or trapezius. (*Id.*, PageID #28761-62).

Director Mohr testified that in order for the requirement of the execution protocol to be satisfied, the "consciousness check" must be done reliably and indeed be able to determine whether the inmate is unaware and insensate to pain. (ECF 868-1, PageID #28054-55). Director Mohr relies solely on the medical team members to make that determination. (*Id.*, PageID #27974-75). Team Member 10 did not know what a consciousness check meant. "I mean that's solely determined by that medical team member. I don't know what they're looking for as far as what to them would determine consciousness or unconsciousness. That is strictly based on their qualifications and certifications and experience. They just tell me yes or no basically." (*Id.*, PageID #28768).

The decision as to which consciousness checks would be utilized at the Phillips execution, and presumably at any future executions, was left to the discretion of Team Members 17 and 21 who decided that the touching of the eyelid and the pressure point on the fingertip would be used for the Phillips execution. (*Id.*, PageID #28763). Those checks were simulated during the execution rehearsals. (*Id.*, PageID # 28764).

Upon knowledge and belief, Team Member 21 does not have the necessary training and experience to conduct an effective and reliable consciousness check. Team Member 21 is a licensed EMT. Team Member 21 was a full time employee of ODRC where his EMT training was

7

not a requirement for his position and he did not utilize that training on a daily basis. (S.D. Case No. 09-CV-823, ECF 40, PageID# 300). Team Member 21 conducted the "consciousness check" during Phillips's execution.

### B. A proper consciousness assessment requires the use of a medical monitoring device.

The District Court denied Plaintiffs' motion to allow a medically trained person to witness the execution. The Court though stated in the order that the condemned inmate could elect to select a medically trained person as one of his personal witnesses, and Plaintiff Phillips did so for his execution on July 26, 2017. (ECF 1105, PageID# 42762-66). He named Laura Depas, a certified and licensed nurse anesthetist ("CRNA") as one of his personal witnesses, and CRNA Depas attended Phillips's execution and served as a witness. She sat in the first row of chairs in the inmate's witness room, and she was just a few feet from the gurney. She had a clear view of the execution during all times the curtain was open, and until completion of the execution. CRNA Depas has been a licensed nurse since 1984. She has been a CRNA since 1989. (Exhibit 1, Declaration of Laura Depas with Curriculum Vitae).

A CRNA "assist(s) physicians during therapeutic and surgical procedures" and is responsible "for patient comfort and safety during these procedures." She notes that in a medical setting, "we have many monitors that are required to help us ensure patient safety and help us recognize if a patient is uncomfortable or aware. There is no way a person not trained in anesthesia without these specialized monitors could determine someone's awareness or consciousness." (*Id*., ¶ 3).

### C. The "consciousness check" conducted on Ronald Phillips was not a reliable and effective assessment of his state of awareness.

8

Shortly after the Phillips execution commenced, CRNA Depas stood immediately behind the glass window that separated the witness room from the execution chamber, and even leaning on the glass at times. For all times that the curtain was open, CRNA Depas was able "to observe Mr. Phillips fully and the execution team members in the chamber with him." (Id., ¶7). At times when the curtain was closed, CRNA Depas was able to, and did, watch the video feed on the monitor which was located just above where she was located.

CRNA Depas was familiar with the Execution Protocol and knew that a consciousness assessment was part of the process. She was especially interested in how that would be done during the execution.

When the consciousness check was to be performed, CRNA Depas noticed "a team member enter the chamber and sp[eak] into Mr. Phillips('s) left ear. This person then lifted [Phillips's] left eyelid and peered into his eye for about 2 seconds. Then, lastly, this person quickly pinched Mr. Phillips left hand. I saw no response from Mr. Phillips." (Id., ¶ 8).

According to CRNA Depas, this was not an adequate and reliable assessment of whether Mr. Phillips was conscious and aware.

> In my experience as a nurse anesthetist, these methods of consciousness checks are not in any way indicative of whether or not someone is aware of their surroundings. Even though Mr. Phillips did not give a visible response, that does not mean that he was not aware and conscious. The only way to ensure the person is unconscious is by using many monitors as we do in a clinical setting. These monitors would include SaO2, BP, EtCO2, EKG and BIS at a minimum.

(Id., ¶9).

CRNA Depas's observations confirm what Dr. Bergese opined during the preliminary injunction hearing that "consciousness checks" do "not involve the use of reliable instrumentation-based assessments of awareness and the ability to feel and experience pain, it is not an adequate

9

means of assessing whether an inmate is unaware and insensate before administration of the second and third lethal-injection drugs." (ECF 844-1, ¶24, PageID# 24947).

### D. In the recent past, the prison modified the execution protocol to incorporate the use of other medical devices in the process.

Defendants attempted to executed Romell Broom in September 2009, but after two hours and some 18 or more painful insertion attempts, the medical team was unable to obtain and maintain IV access to Broom's peripheral veins. After consulting with Director Terry Collins, Governor Ted Strickland finally halted the execution and granted a reprieve. *State v. Broom*, 146 Ohio St. 3d 60 (2016). At the time of the attempted Broom execution, the protocol stated that the execution team would insert the IV sites on the inmate in the death house holding cell and that they "shall be allowed as much time as is necessary to establish two cites." The protocol also allowed the execution team members to use "a non-invasive device such as a light, if desired, to assist in locating a vein." (Exhibit 2, 7(e), (f), (i)(v) ODRC 01-COM-11 5.14.2009). If there were any possible problems, then the Director could determine what a reasonable amount of time would be after consulting with the Warden and legal counsel.

When the execution protocol was revised in June 2015, a new paragraph was added to the section concerning "IV Site(s) Preparation & Establishment":

> The Execution Team may utilize any non-invasive device such as a light, illuminator **or ultrasound device**, if desired, to assist in locating a vein.

(ECF 715-18, PageID# 220088 [ODRC 01-COM-11 6/29/2015]). The same paragraph is part of the current execution protocol. (ECF 715-1, PageID# 21769 [ODRC 01-COM-11 10/7/2016]).

This is significant in the context of this litigation. Defendants resist the use of any consciousness monitoring device because it "is not necessary in [the execution] setting." (ECF 940, PageID# 31823). Dr. Bergese testified that the "checks" performed by Defendants do not

measure consciousness, and CRNA Depas agreed after witnessing those checks in actual practice during Phillips's execution. The only way to effectively assess consciousness is by an instrument such as a brain consciousness monitor, such as a BIS monitor.  (ECF 940, PageID# 31603-5).

Defendants have determined that a medical instrument like an ultrasound device is necessary to have available for an execution in order to assist with accessing the inmate's veins for the IV insertion.  Defendants have now acknowledged that a consciousness assessment is a critical element of the execution protocol, otherwise they would not have added that to the process. But for unexplained reasons, Defendants have refused to utilize a readily-available and easily-used medical instrument that will reliably determine consciousness. That is an Eighth Amendment violation as it places Mr. Otte at the risk of being executed while conscious and aware.

**IV.   Conclusion**

The issue raised in this motion is not that the Execution Protocol, or the execution drugs are improper, although that remains the position of Plaintiff Otte.  Rather the issue before the Court is that a specific aspect of the Execution Protocol, the consciousness check, is unreliable and inadequate, and there is a sure or very likely, significant and substantial risk, that Mr. Otte will suffer great pain during the execution and that would be cruel and unusual punishment that is prohibited by the Eighth Amendment.

The District Court stated in the order granting the preliminary injunction motion that "for this Court to attempt to prescribe what consciousness checks must be performed and what results must be obtained from them would have us back in the micro-management arena." (ECF 948, PageID# 32234). However, Plaintiff Otte is not requesting that this Court tell the Defendants how to do their job, but rather to inform them that the manner by which they are currently conducting themselves violates Mr. Otte's constitutional right to a humane execution.  As the situation stands

11

now, because of the inadequate and unreliable consciousness checks, there is a sure or very likely significant and substantial risk that Mr. Otte will suffer pain during the execution. Whether the Defendants choose to remedy the issue by employing more accurate and reliable consciousness assessment instruments is a decision for them.  In the meantime, this Court has the authority to conclude that the execution should not proceed as planned.

        Respectfully submitted,

        **Stephen Newman**
        Federal Public Defender for the Northern District of Ohio
        by

        */s/ Vicki Ruth Adams Werneke*
        **Vicki Ruth Adams Werneke (0088560)**
        Office of the Federal Public Defender
        for the Northern District of Ohio
        Capital Habeas Unit
        1660 W. 2nd Street, Suite 750
        Cleveland, Ohio 44113
        216-522-4856
        216-522-1951 fax
        Email: Vicki_werneke@fd.org
        **Trial counsel for Gary Otte**

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 22, 2017, a copy of the foregoing **PLAINTIFF OTTE'S MOTION FOR STAY OF EXECUTION, TEMPORARY RESTRAINING ORDER, AND A PRELIMINARY INJUNCTION** was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

*/s/ Vicki Ruth Adams Werneke*
VICKI RUTH ADAMS WERNEKE
Counsel for Plaintiff Gary Otte