# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION AT COLUMBUS

In re: OHIO EXECUTION
  PROTOCOL LITIGATION,

Case No. 2:11-cv-1016

Chief Judge Edmund A. Sargus, Jr.
Magistrate Judge Michael R. Merz

This Order relates to Plaintiff
  Gary Otte

Execution Scheduled: 09/13/2017

---

# DECISION AND ORDER DENYING MOTION FOR STAY AND PRELIMINARY INJUNCTION

---

This § 1983 capital case is before the Court on Plaintiff Gary Otte's Motion for Stay of Execution, Temporary Restraining Order, and a Preliminary Injunction (ECF No. 1168). The State Actor[1] Defendants have filed a Memorandum in Opposition (ECF No. 1182). Plaintiffs Tibbetts and Campbell eventually sought to join in the Motion and all three Plaintiffs filed a Joint Reply in Support (ECF No. 1190).

Tibbetts and Campbell were denied leave to join by separate order (ECF No. 1200). However, the Court has set a hearing on Campbell's Motion for Stay of Execution, Temporary Restraining Order, and Preliminary Injunction (ECF No. 1163) and Tibbetts' impending motion for the same relief for October 23, 2017 (Minutes of Scheduling Conference, ECF No.      ).

---

[1] As used in their own motion papers, the phrase "State Actor Defendants" refers to Ohio Governor John Kasich and Defendants Mohr, et al., from the Ohio Department of Rehabilitation and Correction. It does not refer to Defendants Unknown Drug Suppliers 1-25 and Unknown Pharmacists 1-100. Plaintiffs allege the unknown drug suppliers and pharmacists are state actors within the meaning of the Fourteenth Amendment and 42 U.S.C. § 1983. None of them have been identified or served with process. For ease of reading, the "State Actor Defendants" are referred to herein merely as "Defendants."

The Court separately denied the temporary restraining order portion of the Motion as unnecessary in light of the time available for a preliminary injunction hearing (ECF No. 1178).

Plaintiff Otte and the Defendants have consented to plenary magistrate judge jurisdiction under 28 U.S.C. § 636(c) and Chief Judge Sargus has referred the matter on that basis (ECF Nos. 732, 734, 938, 943).

The findings of fact and conclusions of law required by Fed. R. Civ. P. 52 for a preliminary injunction decision are embodied in this Decision. They are not binding at trial on the merits. *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2014), citing *Univ. of Texas v. Camenisch,* 451 U.S.390, 395 (1981). In preparing them, the Court has considered the Proposed Findings of Fact and Conclusions of Law filed by both parties (ECF Nos. 1213, 1217).

**Relief Sought**

Otte asks the Court to enjoin the Defendants from

> [A]cting jointly or severally to implement or otherwise facilitate any part of Defendants' Execution Protocol as to [them . . . and] to bar the same from attempting to execute him on September 13, 2017, by means of Defendants' Execution Protocol and policies which will deprive him of his rights in violation of the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

(Motion, ECF No. 1168, PageID 44125-46.) Although Otte references carrying out "any part" of the Execution Protocol, his actual claims in the Motion are limited to the consciousness assessment provided for in § VI.H.1.c.ii. of Ohio's Execution Protocol (01-COM-11) adopted October 7, 2016 (ECF No. 711-1, PageID 21467-68). Otte claims that the consciousness

assessment intended to be used in his execution, assuming it is the same or close to the same as that used in the execution of Ronald Phillips on July 26, 2017, will be "ineffective" and will therefore "create[] a sure or very likely, substantial risk of serious harm to him . . ., and ignore[s] alternatives that are known, readily available, and able to substantially reduce the risk that is inherent in the execution protocol." (Motion, ECF No. 1168, PageID 44127.) This claim, the only one litigated at the September 6, 2017, hearing, will be referred to herein as the "Ineffective Consciousness Assessment Claim."


**Procedural History (Abbreviated)**


Ohio adopted lethal injection as its sole method of execution in November 2001.[2] This case and its predecessor, Case No. 2:04-cv-1156, now captioned *Cooey v. Kasich*, have been pending continuously since shortly after the Supreme Court authorized using 42 U.S.C. § 1983 to challenge methods of execution in *Nelson v. Campbell*, 541 U.S. 637 (2004). Most of Ohio's death row inmates have been plaintiffs and there has been strong continuity of representation on both sides. District Judge Gregory Frost managed both cases until his retirement in May 2016. The Magistrate Judge reference in the case was transferred to the undersigned in September 2015 in anticipation of Judge Frost's retirement and parallel to the reference of most of the District's capital habeas corpus cases.[3]

---

[2] The change happened while this Court was adjudicating the John Byrd case on remand from the Sixth Circuit and was occasioned by Byrd's announcement that he would choose electrocution instead of lethal injection. The General Assembly promptly thwarted that choice.

[3] The undersigned has been referred the habeas corpus cases of Plaintiffs Bays, Campbell, Chinn, Davis, Fears, Franklin, Gapen, Hanna, Hasan (fka Sanders), Henness, LaMar, Landrum, Lynch, Moreland, Raglin, Tibbetts, Waddy, Cedric Carter, Fitzpatrick, Hughbanks, Lawson, McGuire, Sheppard, Skatzes, Turner, Wogenstahl, Kenneth Smith, Monroe, Henderson, Bethel, Conway, Elmore, O'Neal, Issa, Palmer, Jones, Webb, and Hand.

After the execution of Dennis McGuire in January 2014, there was a hiatus for several years as Ohio considered alternatives to the thiopental sodium or pentobarbital that had been used prior to McGuire's execution and to the particular method used in his execution. At a status conference on October 3, 2016, however, Ohio announced that it would shortly adopt a new execution protocol and would resume executions using that protocol[4] (Minute Entry, ECF No. 655). Judge Frost had stayed these proceedings pending appeal of his grant of a protective order to Defendants (ECF No. 629). After the status conference, the Court vacated the stay as to Plaintiffs Phillips, Tibbetts, and Otte and adopted a schedule to prepare for a preliminary injunction hearing (ECF No. 658). The new protocol was announced October 7, 2016 (ECF No. 667). The stay of proceedings was subsequently vacated as to all Plaintiffs (ECF No. _____).

After a five-day hearing in January 2017, this Court enjoined the executions of Plaintiffs Phillips, Tibbetts, and Otte. *In re Ohio Exec. Protocol Litig*., 235 F. Supp. 3d 892, 2017 U.S. Dist. LEXIS 11019 (S.D. Ohio 2017). That decision was upheld by a panel of the Sixth Circuit, *Fears v. Morgan (In re Ohio Execution Protocol)*, 853 F.3d 822 (6th Cir. 2017), but later reversed by the *en banc* court. *Fears v. Morgan (In re Ohio Execution Protocol)*, 860 F.3d 881 (6th Cir. 2017)("*Fears v. Morgan en banc*".) Phillips was executed on July 26, 2017, and the instant Motion followed on August 22, 2017 (ECF No. 1168).

---

[4] At that time Ohio had scheduled the execution of Ronald Phillips for January 12, 2017, of Raymond Tibbetts for February 15, 2017, and of Gary Otte for March 15, 2017 (See ECF No. 658, PageID 19732). The Governor subsequently reprieved those dates to July 26, 2017, for Phillips; September 13, 2017, for Otte; and October 18, 2017, for Tibbetts. On September 1, 2017, the Governor reprieved Tibbetts' execution until February 13, 2018. Defendants' counsel were unable at the September 6th hearing to provide a reason for the Tibbetts' reprieve which accompanied reprieves for many other Plaintiffs.

**General Standard for Preliminary Injunctive Relief in a Capital § 1983 Case**

42 U.S.C. § 1983, R.S. § 1979, was adopted as part of the Act of April 20, 1871, and reads, as amended:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

The statute creates a cause of action sounding essentially in tort on behalf of any person deprived of a constitutional right by someone acting under color of state law. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999); *Memphis Community School District v. Stachura*, 477 U.S. 299 (1986); *Carey v. Piphus*, 435 U.S. 247 (1978). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). In order to be granted relief, a plaintiff must establish that the defendant deprived or intends to deprive him of a right secured by the U.S. Constitution and the laws of the United States and that the deprivation occurred under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Parratt v. Taylor*, 451 U.S. 527, 535 (1981); *Flagg Brothers Inc. v. Brooks*, 436 U.S. 149, 155 (1978).

Otte's Fourth Amended Complaint (ECF No. 695), the operative pleading for present purposes, alleges that, unless restrained, the Defendants, acting on behalf of the State of Ohio and indeed under the compulsion of death warrants from the Ohio Supreme Court, will deprive him of his life in violation of the United States Constitution by executing him pursuant to Ohio's extant Execution Protocol, 01-COM-11 (10/07/2016).

In determining whether preliminary injunctive relief is merited in a capital § 1983 case, a trial or appellate court must apply the following established standards:

> (1) whether [plaintiff] has demonstrated a strong likelihood of success on the merits; (2) whether he will suffer irreparable injury in the absence of equitable relief; (3) whether the stay will cause substantial harm to others; and (4) whether the public interest is best served by granting the stay. *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007); *[N.E.]. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 153 (6th Cir. 1991).

*Cooey (Biros) v. Strickland*, 589 F.3d 210, 218 (6th Cir. 2009). These same criteria were applied by Judge Frost in a prior preliminary injunction decision in this case. *In re: Ohio Execution Protocol Litig. (Lorraine)*, 840 F. Supp. 2d 1044, 1048 (S.D. Ohio 2012). They are consistently applied by the Sixth Circuit to preliminary injunctive relief requests across subject matter areas, *Overstreet v. Lexington-Fayette Urban Co. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000); *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994); *NAACP v. City of Mansfield*, 866 F.2d 162, 166 (6th Cir. 1989); *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985).

Supreme Court case law is consistent:

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest.

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), *citing Munaf v. Geren*, 553 U.S. 674, 689-90 (2008); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982).

The four prongs of this standard are considered *seriatim* below.

## Eighth Amendment Claim:  Likelihood of Success on the Merits

The Motion says it is seeking preliminary injunctive relief on the First and Twelfth Causes of Action in Otte's Fourth Amended Complaint (Motion, ECF No. 1168, PageID 44125, citing Fourth Amended Complaint ["4AC,"] ECF No. 695).  As to the First Claim, the 4AC reads

> The First Cause of Action was previously withdrawn from the Third Amended Omnibus Complaint, to be, as applicable, re-alleged in parts or in whole in the various Plaintiffs' Amended Individual Supplemental Complaints. Claims alleging violations of the Eighth Amendment as incorporated against the states by the Fourteenth Amendment are now included below in this Fourth Amended Complaint for Plaintiff.

(ECF No. 695, PageID 20958, ¶ 998.)  That paragraph does not state a claim for relief under 42 U.S.C. § 1983 because the First Cause of Action has been withdrawn.[5]

---

[5] At the hearing Plaintiffs' counsel stated "withdrawn" does not mean abandoned, but rather that this claim was re-pleaded in the 4AC.  To avoid confusion, the Court has urged capital counsel to keep numbering the same as they replead claims.  The Court accepts counsel's explanation, but the fact remains that the First Cause of Action as pleaded in the 4AC does not state a claim.

The Twelfth Cause of Action purports to be brought under the Eighth Amendment and asserts that the Defendants will be deliberately indifferent to or will recklessly deny Otte necessary resuscitative health care after Defendants have declared the execution completed but when he is in fact not "clinically or statutorily dead." *Id*. at PageID 21020. Plaintiff's Ineffective Consciousness Assessment Claim does not fit within the Twelfth Cause of Action because the Protocol calls for the consciousness check to be administered after the first drug, midazolam[6], but before the paralytic and the potassium chloride and therefore before the execution is expected to be completed. In contrast, the Twelfth Cause of Action claims a denial Eighth Amendment rights if resuscitative care is not provided should Otte still be alive after receiving all three drugs.

To the casual reader, this distinction may seem overly technical, but it is the Plaintiffs in this case who have subdivided their claims in a process that resembles mitosis. Otte's Fourth Amended Complaint is 431 pages long and contains forty-nine separate causes of action,[7] many with sub-claims. The Eighth Amendment is pleaded as the basis for relief in the First, Third, Twelfth, Thirteenth, Twentieth through Twenty-Ninth, Thirty-Third, Thirty-Fifth through Forty-Second, and Forty-Fifth Causes of Action. Why Otte's Motion adverts only to the First (withdrawn) and Twelfth Causes of Action remains completely opaque to the Court.

Asked at the hearing what Causes of Action were relied upon, counsel answered that the Twentieth and Twenty-Second Causes of Action covered the Ineffective Consciousness Checks claim (Transcript, ECF No. 1225, 45088). While both of those Causes of Action are pleaded

---

[6] Midazolam is the generis name for a drug which is branded by the manufacturer as Versed (Transcript, ECF No. 1225, PageID 45112).
[7] Plaintiffs in this case continue to label their claims as "causes of action," a term replaced with "claim for relief" when the Federal Rules of Civil Procedure were adopted in 1938.

under the Eighth Amendment, neither mentions consciousness checks (See ECF No. 695, PageID 21061-64, 21067-70).

However, at ¶ 304 of the 4AC, Otte alleges:

> The specifics of the "consciousness check" mentioned in the Execution Protocol are undefined. But in any event, the consciousness check is insufficient to determine whether the condemned inmate has been, in fact, rendered unaware and unable to feel and experience pain. Responsive action by the inmate would indicate awareness, but advances in brain science establish that lack of responsive action is not evidence of lack of awareness, nor would lack of responsive action demonstrate the level of sedation is beyond that which is able to be overcome by noxious stimuli such as pain caused by the bodily effects of midazolam, or the feelings of suffocation and burning caused by the paralytic drug, or the intense burning sensations and painful heart attack caused by injection of a lethal dose of potassium chloride.

(ECF No. 695, PageID 20820) That paragraph is part of the 997 paragraphs, 198 pages of introductory matter in the 4AC which is then incorporated by reference in many of the Causes of Action thereafter (See, e.g., ¶¶ 999, 1025, 1189, etc.)

Regardless of whether the Ineffective Consciousness Assessment Claim fits within the First, Twelfth, Twentieth or Twenty-Second Cause of Action, on its face as stated in the Motion, it does purport to state a claim under the Eighth Amendment. The claim is that unless the initial injections of midazolam[8] render Otte unconscious or sufficiently insensate to pain, he will experience unconstitutionally severe pain from subsequent administration of the paralytic drug and the potassium chloride.

The Eighth Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660 (1962). The Supreme Court has approved using 42 U.S.C. § 1983 to challenge methods of execution as violating the

---

[8] The Protocol calls for two injections of 250 mg. each.

Constitution, including the Eighth Amendment. *Nelson, supra*; *Glossip v. Gross,* 135 S. Ct. 2726 (2015).

There has been dispute over exactly how to frame the governing Eighth Amendment standard. The *en banc* Sixth Circuit criticized this Court's formulation in its January 2017 preliminary injunction decision, writing

> [T]o challenge successfully a State's chosen method of execution, the plaintiffs must "establish that the method presents a risk that is *sure or very likely* to cause" serious pain and "needless suffering[.]" *Glossip*, 135 S.Ct. at 2737 (emphasis in original) (internal quotations [sic] marks omitted); *see also Baze*, 553 U.S. at 50 (same); *Cooey v. Strickland* (*Cooey II*), 604 F.3d 939, 944 (6th Cir. 2010) (same); *Cooey v. Strickland* (*Cooey I*), 589 F.3d 210, 220 (6th Cir. 2009) (same). Instead, the district court addressed only whether Ohio's procedure presents a "substantial risk of serious harm," *Baze*, 553 U.S. at 50 (internal quotation marks omitted). That standard is correct so far as it goes; but it elides the more rigorous showing—that the method of execution is *sure or very likely* to cause serious pain—that the Supreme Court and our court have repeatedly said is necessary to satisfy the "substantial risk" standard in the particular context present here.

*Fears v. Morgan en banc*, 860 F.3d at.886. Otte now concedes the standard is properly framed as whether execution by a particular protocol is "sure or very likely to cause severe pain." (Joint Reply, ECF No. 1190, PageID 44467, n. 1, citing *Fears v. Morgan en banc.*)

At the prior preliminary injunction hearing, this Court found as a matter of fact that administration of the second and third drugs in the current protocol – a paralytic and the potassium chloride – would cause severe pain to a person who is fully conscious and the *en banc* Sixth Circuit adopted that finding. *Fears v. Morgan en banc*, 860 F.3d at.886.

In the prior preliminary injunction hearing, Plaintiffs elicited extensive expert testimony about the meaning of "consciousness" in the context of surgical anesthesia, the efficacy of

various drugs and classes of drugs in inducing and maintaining anesthesia or sedation, and the utility of various methods of assessing levels of consciousness. This testimony is summarized extensively in the Court's decision, *In re: Ohio Execution Protocol Litig. (Phillips, Tibbetts & Otte)*, 235 F.Supp. 3d 892, 2017 U.S. Dist. LEXIS 11019, *58-179 (S.D. Ohio Jan. 26, 2017). Lay witnesses also testified to the employment of various consciousness checks in the McGuire execution and in executions in other States.

In their Proposed Findings of Fact for the prior hearing, Plaintiffs claimed the consciousness checks in the current Protocol were inadequate and that they constituted a deviation from the Protocol. The deviation was alleged to violate Plaintiffs' rights under the Equal Protection Clause (ECF No. 895-1, PageID 30107-08, ¶¶ 33-34). At the September 6 hearing, the Court confirmed that interpretation of the prior proceeding, to wit, that the consciousness check claim was made there only under the Equal Protection Clause and that Otte was relying now solely on the Eighth Amendment. The Court rejected the Equal Protection claim, writing:

> The last Equal Protection claim fares no better. It is that the consciousness checks intended to be used for the Phillips' execution will not perform their intended task of reliably determining whether the inmate to be executed is "unaware and insensate to pain." For this Court to attempt to prescribe what consciousness checks must be performed and what results must be obtained from them would have us back in the micro-management arena.

*Id.* at *192. Plaintiffs did not appeal that conclusion. Had the prior conclusion been made in a final judgment, Otte would be barred by *res judicata* from relitigating the same facts under a different legal theory.

Prior to the September 6 hearing, Otte designated prior deposition and hearing testimony in the case to be considered on the instant Motion as follows:

> Deposition of Execution Team Member 10 (ECF No. 1073-3)
>
> Transcript of Testimony from prior preliminary injunction hearing (ECF No. 922)
>
> Deposition of Execution Team Member 17 (ECF No. 1073-1)
>
> Deposition of Execution Team Member 21 (ECF No. 1073-2)
>
> Transcript of Testimony from prior preliminary injunction hearing (ECF No. 923)
>
> Prior deposition testimony of Execution Team Member 21 (ECF No. 1205-1)
>
> Deposition of ODRC Director Gary Mohr (ECF No. 868-1)
>
> Transcript of Testimony of Director Mohr from prior preliminary injunction hearing (ECF No. 941)
>
> Transcript of Testimony of Dr. Sergio Bergese from prior preliminary injunction hearing (ECF No. 923 & 940)
>
> Expert Report of Dr. Bergese (ECF No. 844-1)
>
> Transcript of Testimony of Dr. Sergio Bergese from prior preliminary injunction hearing (ECF No. 923 & 940)
>
> Transcript of Testimony of Dr. Joseph Antognini from prior preliminary injunction hearing (ECF No. 924)

(Plaintiff Gary Otte's Notice of Designation of Prior Hearing and Deposition Testimony, ECF No. 1207, and Notice of Supplemental Designation of Sealed Deposition Testimony, ECF No. 1206.)

The Defendants designated prior testimony to be considered as follows:

> Execution Team Member 21 – deposition testimony (ECF No. 1073-2) and testimony from the January 2017 preliminary injunction hearing (ECF No. 923).

> Execution Team Member 17 – deposition testimony (ECF No. 1073-1).

> ODRC Director Gary Mohr - January 2017 preliminary injunction hearing (ECF No. 941).

> Dr. Joseph Antognini - January 2017[9] preliminary injunction hearing (ECF No. 924).

> Dr. Sergio Bergeses - January 2017[10] preliminary injunction hearing (ECF No. 924).

> Dr. Mark Dershwitz – Testimony on 2009 evidentiary hearing in Case No. 2:04-cv-1156, ECF No. 481.

(Defendants' . . . Designation of Prior Testimony, ECF No. 1214, PageID 44824-25).

In response to Defendants' designations, Otte filed a Supplemental Designation as follows:

> Testimony of Mark Dershwitz, M.D., on March 27, 2009, in *Cooey (Biros) v. Strickland,* Case No.: 2:04-cv-01156, ECF No. 481, PageID 10386.

> Testimony of Sergio Bergese, M.D., at the January 2017 preliminary injunction hearing (ECF No. 923, PageID 31598-603)

(ECF No. 1221, PageID 45031-32.)

At the hearing, Otte presented live testimony from Laura Depas (Transcript, ECF No. 1225, PageID 45093, et seq.). She testified she has been a registered nurse anesthetist for

---

[9] Mistyped as "2016" in designation (ECF No. 1214, PageID 44825.
[10] Mistyped as "2016" in designation (ECF No. 1214, PageID 44825.

twenty-eight years. She has a bachelor of science degree in nursing and a master of science degree in allied health education, both from The Ohio State University, as well as certification and current licensure as a nurse anesthetist. She was retained by the Federal Public Defender for the Northern District of Ohio to consult in this case. As part of her assignment, she was an eyewitness to the execution of Ronald Phillips on July 26, 2017, as a result of permission from Mr. Phillips to fill one of the witness positions allotted to the inmate being executed. In her Declaration she testified that

> Early on in the execution I noticed a team member enter the chamber and spoke [sic] into Mr. Phillips left ear. This person then lifted his [Phillips'] left eyelid and peered into his eye for about 2 seconds. Then, lastly, this person quickly pinched Mr. Phillips' left hand. I saw no response from Mr. Phillips.

(Declaration, ECF No. 1168-1, PageID 44138.) At the hearing she consistently referred to the person in the death chamber with Phillips as "Person A." During Defendants' case, Execution Team Member No. 21 testified and identified himself as the person who performed the tasks that Nurse Depas observed Person A do.[11]

Ms. Depas declared that her function as a nurse anesthetist is

> [T]o assist physicians during therapeutic and surgical procedures. I am responsible for patient comfort and safety during these procedures. Historically, one of the most controversial entities [sic] of my job is to ensure that patients are comfortable during their procedure. Over the 28 years of my practice I have seen many drugs come and go. Many drugs remain in controversy as to their reliability in this process.

*Id.*

---

[11] Ms. Depas was not asked to identify Team member 21 because the Court has consistently preserved the anonymity of the execution team members. Team Member No. 21 testified from behind a screen which prevented persons in the Courtroom (except the judge, examining counsel, and court personnel) from seeing him.

She declared that "[i]n the medical world, we have many monitors that are required to help us ensure patient safety and help us recognize if a patient is uncomfortable or aware. *Id.* Her live testimony was consistent with her Declaration in this regard, but very limited. She did not describe the monitors in question by name or function. In her Declaration she had said that "[t]he only way to ensure that a person is unconscious is by using many monitors as we do in a clinical setting. These monitors would include Sa02, BP, EtC02, EKG [,] and BIS at a minimum."[12] She was not asked in detail what those machines measure or if there are additional machines that she thinks are needed, although she did testify briefly that when a person is conscious but appears to be unresponsive, there are physiologic changes that occur, e.g., in blood pressure and heart rate (Transcript, ECF No. 1225, PageID 45122). She did not testify as to whether these machines are available to be purchased for use in executions. In *Glossip,* the Supreme Court noted that Oklahoma was doing some sort of unidentified monitoring during executions, and noted that following its problematic Lockett execution, the State had revised its execution protocol to permit the use of an electrocardiograph to assist in monitoring an inmate's consciousness. 135 S.Ct. 2726, 2742, 2735. Of course the availability of manufactured products for use in executions at one point in time does not logically imply that they will be available later. Many drug manufacturers, as Judge Kethledge and Justice Alito have noted in *Fears* and *Glossip* respectively, have attempted to stop the use of their products in executions. Ms. Depas also did not testify what qualifications a person would need to operate or interpret the output of these machines. It is widely known that the American Medical Association and many other medicine-related professional associations have forbidden their members to participate in

---

[12] During her live testimony, Ms,. Depas also mentioned the surgical use of mass spectrometers (Transcript, ECF No. 1225, PageID 45121). The Court is familiar with the use of mass spectrophotometry in quantitative analysis of blood alcohol in cases involving driving while under the influence of alcohol. Ms. Depas merely mentioned the mass spectrometer, over Defendants' objection, and did not testify further about its used.

executions. She also did not relate any one of these monitors to the measurement of pain or susceptibility to the experience of pain. For example, she did not testify as to whether an increase in blood pressure means that pain is being experienced or is about to be experienced. Whether she could have testified to these relevant matters is not known because she was not asked the questions.

The plaintiffs in *Baze v. Rees*, 553 U.S. 35 (2008), argued that monitoring devices such as a Bispectral Index (BIS) monitor, blood pressure cuff, or EKG should be used during executions to aid the execution team in achieving an anesthetic depth with the first drug in a three-drug-protocol sufficient to render the inmate unconscious and insensate to the pain from administration of the second and third drugs. In a plurality opinion, Chief Justice Roberts emphasized that proper administration of the first drug, which in that case was sodium thiopental, obviates any concern that the inmate would not be sufficiently sedated, basing his observation on the unanimous agreement of all the experts who testified at the *Baze* hearing. *Id.* at 59. In addition, Chief Justice Roberts noted that the State's expert testified that a blood pressure cuff would be useless in assessing the inmate's level of consciousness since sodium thiopental depresses circulation. *Id.* As for the BIS monitor, as of 2008 when *Base* was decided, "the medical community ha[d] yet to endorse the use of a BIS monitor, which measures brain function, as an indication of anesthetic awareness." *Id.*, citing American Society of Anesthesiologists, Practice Advisory for Intraoperative Awareness and Brain Function Monitoring, 104 Anesthesiology 847, 855 (Apr. 2006), and *Brown v. Beck*, 445 F.3d 752, 754-755 (4th Cir. 2006) *Michael, J., dissenting). No evidence was presented at the hearing in this Court indicating that the medical community had since made such an endorsement, although Dr. Bergese in January expressed his opinion that it should be used. Chief Justice Roberts concluded

that "Petitioners have not shown that these supplementary procedures, drawn from a [clinical] . . . context, are necessary to avoid a substantial risk of suffering. *Id*. at 60.

Instead, Ms. Depas was asked her opinion on whether Ronald Phillips experienced pain during his execution. She admitted that the consciousness checks used by Team Member 21 were appropriate for checking responsiveness and that Phillips was unresponsive to any of the three checks that were done. But she opined consciousness and responsiveness and awareness are not equivalent (Transcript, ECF No. 1225, PageID 45128). Based on her experience and "current literature" (which she was not asked to identify), Ms. Depas gave the opinion that there was an 80% probability that Phillips was aware during injection of the second and third drugs in the Protocol.

Defendants moved to exclude this opinion because they had been given no notice that Ms. Depas would give such an opinion (Transcript, ECF No. 1225, PageID 45073).. Nothing like this appears in her Declaration. Ordered to provide a precis of expected testimony Plaintiffs wrote:

> Ms. Depas will testify about the consciousness/reflex checks performed during the execution of Ronald Phillips, whether those checks are sufficient to ensure the condemned inmate is unconscious, unaware and insensate before injection of the second and third execution drugs, and the technological monitoring devices used to assess one's level of consciousness, awareness and sensation.

(ECF No. 1195, PageID 44520.) The precis is broader than the Declaration, but gave the Defendants no notice Ms. Depas would be asked to opine on the ultimate question, whether it is sure or likely that Phillips experienced severe pain and Otte would because it was intended to use the same consciousness checks in his execution. In taking the testimony subject to objection, the Court advised Defendants that, under other circumstances, it would have granted them a

continuance so that they could fairly meet this opinion, but could not do so because of the imminence of Otte's execution, set for less than one week after the hearing. However, in fairness to the Defendants, the objection must be sustained and Ms. Depas' opinion on whether Phillips was likely to have been aware enough to experience severe pain is STRICKEN.

Based on her long experience, Ms. Depas offered the opinion that "[t]here is no way a person not trained in anesthesia without these specialized monitors could determine someone's awareness or consciousness." (Declaration, ECF No. 1168, PageID 44139*.)* Her statement can be read as cutting against Otte's interests here, however, because if someone "trained in anesthesia," presumably an anesthesiologist, nurse, or nurse anesthetist, is required to interpret the information provided by the monitoring devices, such individuals are ethically prohibited from participating in executions. See *Baze*, 553 U.S. at 59-60 (noting that the American Society of Anesthesiologists' ethical guidelines prohibit anesthesiologists from participating in capital punishment); American Nurses Association Position Statement, Capital Punishment and Nurses' Participation in Capital Punishment, 2016 (available at http://nursingworld.org/ FunctionalMenu Categories/MediaResources/PressReleases/ANA-Releases-New-PositionStatement.html); Code of Ethics for the Certified Registered Nurse Anesthetist, 2005 ed. (available at http://www.aana.com/resources2/professionalpractice/Pages/Code-of-Ethics.aspx). Regarding the consciousness checks performed on Ronald Phillips during his execution, she opined:

> In my experience as a nurse anesthetist, these methods of consciousness checks [that were used in the Phillips' execution] are not in any way indicative of whether or not someone is aware of their surroundings. Even though Mr. Phillips did not give a visible response, that does not mean that he was not aware and conscious. The only way to ensure that a person is unconscious is by using many monitors as we do in a clinical setting. These monitors would include Sa02, BP, EtC02, EKG [,] and BIS at a minimum.

18

*Id.* at PageID 44139.

As to whether Ohio's three-drug protocol is sure or very likely to cause severe pain, the evidence before this Court stands essentially where it did at the end of the January 2017 hearing as evaluated by the *en banc* Sixth Circuit: the second and third drugs will certainly cause pain if injected into a fully conscious person, but Otte still has not proven that he is certain or likely to experience that pain after having been injected with a 500 mg dose of midazolam.

As established in *Baze* and reinforced in *Glossip*, an inmate challenging a method of execution must plead and prove an alternative method of execution which is available, feasible, and readily implemented. *Fears v. Morgan en banc*, 860 F.3d at 890, quoting *Glossip*, 135 S. Ct. at 2717. Otte's argument is that his proposed alternative – the three-drug protocol with one or more electronic devices providing continuous monitoring of consciousness – is more likely to protect him from experiencing that pain, presumably because the devices will either show that the midazolam has not produced unconsciousness and therefore the second and third drugs will not be administered or that the midazolam has produced unconsciousness thus rendering him insensate to the pain caused by administration of the paralytic drug and potassium chloride.

The Court assumes Otte's proposal "counts" as an alternative method of execution under *Glossip*, *supra*. In discussing alternatives to the Oklahoma execution protocol, Justice Alito wrote of prior "methods" very different from lethal injection such as hanging, the gas chamber, electrocution, and the firing squad, but he also spoke of the use of different drugs in lethal injection executions as alternative methods, e.g., the use of sodium thiopental and pentobarbital. Otte's proposed alternative here does not involve changing the method of execution at a gross level (e.g., adopting the guillotine) or changing the drugs involved, but is at an even more detailed level. Otte says, at least for purposes of the instant Motion: use the same drugs, but

monitor the effectiveness of the sedative by using one or more machines such as are used in surgery. This is not an alternative method of execution in that the manner in which death is caused would be changed. It is, however, sufficiently different from the currently used method to count as an alternative. In contrast, one can imagine many minor changes to the Execution Protocol which would not count as "alternatives," e.g., requiring that execution team members wear white lab coats while carrying out executions.

The electronic monitoring devices referred to by Ms. Depas are apparently available on the open market and there is no evidence any manufacturer of those devices has refused to sell them to States for use in carrying out executions. Ohio should therefore be able to obtain one or more of them through "ordinary transactional effort." *Fears v. Morgan en banc*, 860 F.3d at 891.

As to whether this alternative can be readily implemented, however, there is no evidence about who must operate these devices to ensure their usefulness, , although Ms. Depas seems to suggest in her Declaration that "someone trained in anesthesia" would be required to interpret the information provided by the devices. (Declaration, ECF No. 1168-1, PageID 44138.) Nor was there evidence presented describing what it is each device measures and that measurement's relationship to the likelihood an inmate will experience severe pain.

To refute Otte's claim that monitoring devices are necessary to ensure he will not be subjected to severe pain, Defendants rely on *Harbison v. Little*, 571 F.3d 531 (6th Cir. 2009)(Transcript, ECF No. 1225, PageID 45079). There the District Court had concluded after trial on the merits that the Tennessee three-drug protocol – sedum thiopental, pancuronium bromide, and potassium chloride, was unconstitutional because it "did not provide a proper procedure for ensuring that the inmate was unconscious before administering the pancuronium

bromide." *Id.* at 536-37. A committee reviewing Tennessee's protocol had recommended a consciousness check before the second drug was administered. "Possible methods for determining consciousness included lightly brushing the eyelashes, lifting up am arm, or pinching a nipple." *Id.* at 537. These had not been adopted by Tennessee and the District Court found that rendered the protocol unconstitutional. The Sixth Circuit disagreed, holding:

> *Baze*, however, rejected the necessity of the procedures relied on by the district court. It noted at the outset that because a proper dose of sodium thiopental would render any check for consciousness unnecessary, "[t]he risks of failing to adopt additional monitoring procedures are thus even more 'remote' and attenuated than the risks posed by the alleged inadequacies of Kentucky's procedures designed to ensure the delivery of thiopental." *Baze*, 128 S. Ct. at 1536 (*citing Hamilton v. Jones*, 472 F.3d 814, 817 (10th Cir. 2007) (per curiam); *Taylor v. Crawford*, 487 F.3d 1072, 1084 (8th Cir. 2007)). While the plaintiffs in *Baze* argued that the state needed to adopt certain steps to ensure the prisoner's unconsciousness, including some of the same tests suggested by Harbison, the Court concluded that a visual inspection of the inmate by the warden was sufficient to protect the inmate's Eighth Amendment rights. *Id*. at 1536-37.

*Id.* Ohio's consciousness checks as employed in the Phillips' execution and intended to be employed in the Otte execution are more aggressive, more likely to evoke a response, (e.g., touching the eye sclera is much more noxious than brushing the eyelashes) than those found constitutionally unnecessary in *Little*.

In both the January and September hearings, there was a great deal of use of the words "consciousness," "awareness," and "responsiveness." The testimony from the medical experts was that these terms do not mean the same thing as one another in a surgical anesthesia setting. However, the experts did not agree among themselves on the meaning of the terms or their applicability in a surgical setting.

In objecting to proposed testimony from Execution Team Members about whether Phillips was conscious or not, Otte wrote:

> The term "consciousness" as used in this proceeding is a term of art. Miller's Anesthesia, "the most accepted textbook" in the field of anesthesia (ECF No. 948, PageID 32196), defines "consciousness" as a person's "subjective experience" and cautions against "indiscriminate use" of this term. Miller's Anesthesia 283 (8th ed. 2015). It specifically distinguishes between consciousness and responsiveness: "An individual may fully experience a stimulus (e.g., the command "Open your eyes!") but not be able to respond (as when a patient is paralyzed but conscious during surgery)." *Id.*
>
> To the extent consciousness is a subjective experience, none of the witnesses may testify as to what Mr. Phillips experienced during his execution. The state of mind or emotion of another person is not, in the nature of things, susceptible of the firsthand knowledge required by Rule 602 or rational perception as required by Rule 701(a).

(Motion to Exclude, ECF No. 1220, PageID 45022-23.) The Court draws the opposite conclusion from Miller. "Consciousness" is not a term of art in medicine or capital punishment law. Neither the Supreme Court nor the Sixth Circuit has defined the term in any way that relates it to the medical use of the term in the expert testimony this Court has heard. And neither court has adopted any particular degree of unconsciousness as constitutionally required in a lethal injection execution.

Having failed to show that the current three-drug protocol is certain or very likely to cause severe pain, Otte has also failed to show an alternative that is both available and feasible, assuming adding one or more monitoring devices to the Protocol counts as an alternative. Therefore his Motion fails on the first prong of the preliminary injunction test: he has not shown he is likely to prevail on the merits.

**Irreparable Injury**

On the second prong of the preliminary injunction test, the Court previously found that execution by an unconstitutional method would be an irreparable injury. *In re: Ohio Execution Protocol Litig. (Phillips, Tibbetts, & Otte),* 2017 U.S. Dist. LEXIS 11019, *197 (S.D. Ohio Jan. 26, 2017). That finding was consistent with Judge Frost's earlier conclusions in this case, for example, *In re: Ohio Execution Protocol Litig. (Lorraine)*, 840 F. Supp. 2d 1044, 1059 (S.D. Ohio 2012), *aff'd.* 671 F.3d 601 (6th Cir. 2012). The Defendants did not before and do not now contest this element and the Sixth Circuit did not disturb that holding on appeal.

**Balance of Equities**

In the prior preliminary injunction decision, the Court found Otte was diligent in challenging the new three-drug protocol on a schedule ordered by the Court. *In re: Ohio Execution Protocol Litig. (Phillips, Tibbetts, & Otte)*, 2017 U.S. Dist. LEXIS 11019, *197-98 (S.D. Ohio Jan. 26, 2017). Here he waited almost a month after the Phillips' execution to move for injunctive relief on his Ineffective Consciousness Check Claim and has allowed the Court less than a month to adjudicate it. This is thus a closer case than on the prior Motion. Nonetheless, he did present new evidence which was gained from the Phillips' execution and he has been far more diligent than the plaintiff in *Workman v. Bredesen*, 486 F.3d 896 (6th Cir. 2007), who made his claim only five days before his scheduled execution to procedures that had been in existence for almost ten years.

The Court concludes Otte has been sufficiently diligent in presenting his Ineffective Consciousness Check Claim.

**The Public Interest**

In the prior preliminary injunction decision, the Court concluded the interest of the public in having constitutional cases decided in a deliberate manner outweighed the state's interest in a speedy execution, given that delaying the execution until a trial could be held would not lessen deterrence much in executions already delayed for decades. *In re: Ohio Execution Protocol Litig. (Phillips, Tibbetts, & Otte)*, 2017 U.S. Dist. LEXIS 11019, *198-99 (S.D. Ohio Jan. 26, 2017). The *en banc* Sixth Circuit did not reach that issue, having concluded lack of likely success on the merits was dispositive.

Because the Court has determined Otte has little chance of success on his Ineffective Consciousness Check Claim, it concludes the public interest here favors not enjoining the execution until after trial on the merits.

**Conclusion**

Based on the foregoing analysis, Otte's Motion for Stay of Execution and Preliminary Injunction is DENIED.

September 8, 2017.

s/ *Michael R. Merz*
United States Magistrate Judge