**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| | **Case No. 2:11-cv-1016** |
| **IN RE: OHIO EXECUTION PROTOCOL LITIGATION** | **CHIEF JUDGE EDMUND A. SARGUS, JR.** |
| | **Magistrate Judge Michael R. Merz** |
| **This document relates to:** | |
| | **DEATH PENALTY CASE** |
| **Plaintiffs Campbell and Tibbetts** | |
| | **Execution scheduled for: November 15, 2017 (Campbell) February 13, 2018 (Tibbetts)** |

**Motion in Limine to Exclude Testimony of Daniel Buffington**

## INTRODUCTION

Defendants have identified Daniel Buffington as an expert they intend to call at the upcoming preliminary injunction hearing, (ECF No. 1270, PageID 46395), and filed his expert report. (ECF No. 1312-1, PageID 47546.) In this report, Buffington opines on the pharmacological properties of midazolam, induction of anesthesia, and lacrimation. Buffington is not qualified to offer these opinions.

Although he holds himself out as a "doctor" and owns a business offering "Clinical Pharmacology Services," Buffington has never earned an M.D., a Ph.D., or any degree in pharmacology or anesthesiology. Motion at 5, *Arthur v. Dunn*, No. 11-cv-438, ECF 301 (M.D. Ala. Dec. 30, 2015) (citing Buffington's deposition). In fact, his only claim to the title of "doctor" is based upon the completion of a "Pharm.D." program. *Id.* In the majority of pharmacy schools, however, the Pharm.D. degree is

"an entry-level degree" that pharmacists must have to even practice pharmacy.
*Newton v. Roche Labs., Inc.*, 243 F. Supp. 2d 672, 677 n.2 (W.D. Tex. 2002). In that
respect, Buffington is indistinguishable from the person dispensing medications at a
local Walgreens, CVS, or Rite-Aid.

Buffington never authored any papers that are specific to midazolam and
never conducted any scientific studies that are specific to midazolam. (Tr., ECF
941, PageID 32028–29.) He prescribed midazolam only three times in his life (and
even that admission is highly suspect, since as a pharmacist, he does not have
authorization to prescribe controlled substances). (*Id.* at PageID 32026; ECF No.
941, PageID 32069.) Buffington has never administered general anesthesia to a
patient. (*Id.* at PageID 32028–29.)

And yet, Buffington filed a report opining on the pharmacological properties
of midazolam, induction of anesthesia, and lacrimation. (Report, ECF No. 1312-1.)
These opinions exceed the scope of his expertise. Moreover, they are not based on
sufficient data or facts. For these reasons and as further explained below, Plaintiffs
ask that the Court preclude Buffington from testifying or, at the very least, limit his
testimony to the subject matter in which he is an expert, which is pharmacy, not the
different fields of pharmacology, cardiology, or anesthesiology.

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... i

APPLICABLE STANDARD ........................................................................................ 1

ARGUMENT ............................................................................................................... 2

    I.    Opinions outside of pharmacist's area of competence must be excluded. ........ 3

    II.    Buffington has no research experience specific to midazolam; he lacks training and experience in the fields of pharmacology or anesthesiology; thus, he cannot be qualified as an expert here. .................................................................... 5

        A.    Buffington lacks education and training in pharmacology, anesthesiology, or consciousness. .................................................................................................. 6

        B.    Buffington's work and teaching experience do not qualify him as an expert in this case. ............................................................................................................ 10

            1.    There is no such position as "Faculty Research Participant" with the "Center for Medicare and Medicaid Services, Innovation Center." ................ 10

            2.    There is no longer such entity as "North Shore Long Island Jewish Health System" and Buffington does not appear to be currently employed with its successor. ...................................................................................... 11

            3.    "American Institute of Pharmaceutical Sciences, Inc" is just another small family business. ...................................................................................... 12

            4.    Including the word "pharmacology" in the name of his business does not make Mr. Buffington an expert in pharmacology. ........................................... 12

            5.    Buffington's teaching experience does not provide for a sufficient link to pharmacology or anesthesiology. ............................................................... 13

        C.    Buffington tends to overstate his level of involvement and practical experience. ............................................................................................................. 14

        D.    Buffington's testimony about his specific experience with midazolam changes from case-to-case. .................................................................................. 16

CONCLUSION.......................................................................................................... 17

## APPLICABLE STANDARD

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

The Supreme Court has made clear that Rule 702 imposes a "gatekeeping role" on district courts to prevent the introduction of purported expert testimony that is insufficiently reliable. *See Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579, 589, 597 (1993). The objective of this "gatekeeping requirement" is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). As the Sixth Circuit noted, "[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). Allowing testimony beyond the scope of an expert's expertise is grounds for reversal on appeal. *Id.* at 1355; *see also Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (mandating that "a district

court must continue to perform its gatekeeping role by ensuring that the actual testimony does not exceed the scope of the expert's expertise" and holding that failure to do so is grounds for reversal on appeal).

## ARGUMENT

Allowing Buffington to testify about pharmacological or anesthetic properties of midazolam or anesthesia monitoring would exceed the limits of his expertise. The Sixth Circuit has upheld the district court's exercise of discretion to exclude testimony as inadmissible when it does not meet the standards for admission of scientific evidence under *Daubert* and its progeny. *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 248 (6th Cir. 2001). Likewise, other Circuits have found "no abuse of discretion in the limitation of the testimony of witnesses who, although considered experts in certain areas, were not well-versed in the particular discipline relevant to their testimony." *See, e.g.*, *Smith v. Rasmussen*, 249 F.3d 755, 759 (8th Cir. 2001) (listing cases). And lower courts concluded that even being "an eminently well qualified and respected clinician and surgeon" is not enough to offer an expert opinion on areas that may be related to, but nonetheless are outside of, that physician's expertise. *Avendt v. Covidien Inc.*, 314 F.R.D. 547, 562 (E.D. Mich. 2016).

Buffington, with a degree in pharmacy, may qualify as an expert for some matters under Federal Rule of Evidence 702. The real question, however, is "what is he an expert about?" *Wheeling Pittsburgh Steel Corp.*, 254 F.3d at 715. The field of pharmacy is simply not the same as the fields of pharmacology or anesthesiology.

Pharmacology can be described as the study of the effect of drugs on living organisms, while pharmacy, on the other hand, can be described as the profession of reading prescription labels and dispersing drugs. *Dellinger v. Pfizer Inc.*, No. 5:03CV95, 2006 WL 2057654, at *8 n.16 (W.D.N.C. July 19, 2006); *Newton v. Roche Labs., Inc.*, 243 F. Supp. 2d 672, 677 n.1 (W.D. Tex. 2002).  When a pharmacist like Buffington attempts to testify about the domain of pharmacology, such testimony is excluded.

## I.  Opinions outside of pharmacist's area of competence must be excluded.

Courts exclude testimony of pharmacists when they attempt to render an opinion regarding the effects of drugs on living organisms, because such opinion ventures into the realm of pharmacology, and, therefore, exceeds the scope of a pharmacist's expertise.  In *Newton v. Roche Labs.*, 243 F. Supp. 2d 672, 677 (W.D. Tex. 2002), the district court precluded a pharmacist with a Pharm.D. degree from testifying about pharmacological effects of a drug. The court held that a pharmacist, even one who "holds himself out" as a pharmacologist like Buffington does, lacks qualifications to render an opinion on pharmacological effects of the drug. *Id.*

Like Buffington, the proferred expert in *Newton* never earned an M.D., a Ph.D., or any degree in pharmacology. *Id.*  Like Buffington, that expert's claim to the title of "doctor" was based solely upon the completion of a "Pharm. D" program. Like Buffington, the *Newton* expert never performed even basic bench or clinical research on the drug at issue.  *Id.* at 678.  Like Buffington, the *Newton* expert based his opinion "solely on an incomplete review of existing literature."  *Id.*  The court

pointed out that "an individual's 'review of literature' in an area outside his field does 'not make him any more qualified to testify as an expert . . . than a lay person who read the same articles.'" *Id.* (quoting *United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999)). The *Newton* court held that the party could not present the pharmacist as an expert on the effects of the specific drug at issue on the human body and even as to presenting him as an expert pharmacologist "[q]uite frankly, the Court [found] . . . to be an extremely bold stretch." *Id.* at 679.

Another district court followed suit, and also prevented a pharmacist from testifying about the effects of a drug on a human body. *Dellinger v. Pfizer Inc.*, No. 5:03CV95, 2006 WL 2057654, at *8 (W.D.N.C. July 19, 2006). "Without a degree in pharmacology, Keys is not qualified to render a relevant or reliable pharmacological opinion regarding the effects of [a drug]." *Id.* The court also emphasized that, in addition to a lack of professional training in pharmacology, the would-be expert never performed independent research on the pharmacologic design, efficacy or mechanism of the drugs at issue. *Id.* Neither did Buffington in this case. Like Buffington's opinion, the proposed expert's opinion in *Dellinger* was not based on his own, preexisting, independent research. *Id.* at 10. For these reasons, the *Dellinger* court held that the opinion of a pharmacist is inadmissible on matters of pharmacology.

Similarly, the Fourth Circuit held that the district court did not abuse its discretion in excluding testimony, in its entirety, of a retired pharmacist and toxicologist because he was neither a pharmacologist nor a medical doctor. *Wehling*

4

*v. Sandoz Pharm. Corp.*, 1998 WL 546097, at *4 (4th Cir. 1998). Like Buffington, the pharmacist in *Wehling* developed a purported expertise in drug and alcohol testing, particularly in the context of automobile accidents. *Id.* The trial court concluded (and the court of appeals affirmed) that this experience was not relevant, and the pharmacist was not qualified to testify about the effects of the drug in question on the brain or drug interactions occurring in the human body. *Id.* Like other courts, the Fourth Circuit also held that "[w]ithout prior training, education, or experience in the field, [the proposed expert's] review of the literature, after he was retained as an expert witness in this suit, was insufficient to qualify him as an expert on the issues in dispute." *Id.*

Finally, the court in *Devito v. Smithkline Beecham Corp.*, No. 02-CV-0745NPM, 2004 WL 3691343, at *7 (N.D.N.Y. Nov. 29, 2004), similarly held that a pharmacist cannot opine to a "reasonable pharmacological certainty" about effects of a drug. And like the other courts, the *Devito* court eschewed "litigation-drive[n] expertise" obtained by selective review of the relevant literature. *Id.* The court precluded the testimony of the proposed "expert." *Id.* at *12.

## II. Buffington has no research experience specific to midazolam; he lacks training and experience in the fields of pharmacology or anesthesiology; thus, he cannot be qualified as an expert here.

Buffington never authored any papers that are specific to midazolam and never conducted any scientific studies that are specific to midazolam. (Tr., ECF 941, PageID 32028–29.) He does not induce anesthesia, nor does he do any research into induction of anesthesia, or regarding midazolam. And yet, Buffington

5

submitted a report discussing at length precisely those topics. Because he cannot be qualified on the basis of his education, training, or experience as an expert in these areas, his testimony should be precluded.

**A.    Buffington lacks education and training in pharmacology, anesthesiology, or consciousness.**

Like other pharmacists who were proposed as experts on pharmacological effects and whose testimony on this subject was excluded, Buffington lacks the necessary training, education, and experience in the field to testify about pharmacology, much less anesthesiology or cardiology. Buffington has never earned an M.D., a Ph.D., or any degree in pharmacology or anesthesiology. Motion at 5, *Arthur v. Dunn*, No. 11-cv-438, ECF 301 (M.D. Ala. Dec. 30, 2015) (citing deposition of Dr. Buffington).

By filing his CV, Mr. Buffington represented to this Court in December of 2016 that he completed a Clinical Pharmacokinetics Residency. (ECF No. 870-1, PageID 28177.) *See* illustration 1.

**EDUCATION:**

| Postgraduate | Emory University Hospital, Atlanta, GA |
| --- | --- |
| | **Clinical Research Fellowship**   07/1988 – 06/1989 |
| | **Clinical Pharmacokinetics Residency**   07/1987 – 06/1988 |

**Illustration 1.** (ECF No. 870-1, PageID 28177.)

In their interrogatory responses filed just a few weeks ago, Defendants also insisted that Mr. Buffington completed a "Clinical Pharmacokinetics Residency" at Emory University Hospital. (ECF No. 1285-1, PageID 46884.)

6

Mr. Buffington chose not to submit an updated CV with his new report filed today, (ECF No. 1312-1), so presumably, Mr. Buffington relies on his previously filed CV, (ECF No. 870-1, PageID 28177), which he incorporated by reference in today's report (ECF No. 1312-1, ¶ 4, PageID 47547.)

Contrary to Mr. Buffington's representations to this Court, Emory University Hospital's website[1] lists Mr. Buffington as an alumni of a "General Clinical" Residency.  (Ex. 1.)  While other residents chose specialized tracks, such as Oncology, or Nutritional Support, *see* Ex. 1, Mr. Buffington opted for the generic residency.  Emory University's website does not mention either a clinical pharmacology fellowship or a pharmacokinetics residency, only a clinical pharmacy residency. *See* Emory Healthcare, Pharmacy Residency Programs, http://www.rxresidency.emory.edu/programs/pharmacy.html (last accessed Oct. 19, 2017).  And the organization that tracks both accredited and registered clinical pharmacology training programs has no mention of one at Emory University.  *See* American Board of Clinical Pharmacology, Inc., http://www.abcp.net/training.html (last accessed Oct. 19, 2017).

When asked to produce documents that demonstrate he completed this residency, Mr. Buffington was unable to comply.  Instead, he appended a letter to his report from the current Assistant Director of Clinical and Educational Services at Emory Healthcare, that incorporates another letter from Mr. Buffington's mentor.  (ECF No. 1312-1, PageID 47569).  That letter within a letter avers that

---

[1] http://rxresidency.emory.edu/residents/alumni.html

7

even though Mr. Buffington completed "Clinical Pharmacy Practice" Residency, he specialized in Clinical Pharmacokinetics after all.

Even if this information about the "focus" of his Residency is accurate, that is not enough to qualify him as an expert here. Clinical pharmacokinetics represents a way to ensure that a patient is receiving an optimal dose of a given drug for a specific indication. Bedard & McLean, A regional pharmacokinetic consultation service, Can J Hosp Pharm. 1994 Dec; 47(6):268-76.[2] An Emory Pharmacy Resident is expected to answer the following questions: "What is the appropriate empiric antibiotic for this patient?" and "This drug concentration came back, what should I do?" (*See* Ex. 2, Emory Pharmacy Resident On-call Program.) A sample pharmacokinetic protocol reveals that pharmacist's job in performing a pharmacokinetic consult is to "include ordering and changing doses, as well as ordering serum concentration levels and relevant labs." (Ex. 3, Adult Institutional Pharmacokinetics Protocol.)

None of this is "research." None of this is a study of the effect of drugs on living organisms or its mechanisms, which is what pharmacology is. It certainly not training in anesthesiology. Instead, "pharmacokinetics consult" appears to amount to choosing the right drug, ordering labs to monitor the concentration of that drug in the blood stream, and making sure the number stays within appropriate range. It is not rocket science, and in fact, as one study demonstrated, "pharmacists from small community hospitals can be trained by one individual to provide clinical

---

[2] Abstract available at https://www.ncbi.nlm.nih.gov/pubmed/10139271.

pharmacokinetic services with minimal supervision." Bedard, 1994. Meaning, a pharmacist with no special training can easily learn how to provide "pharmacokinetic services."

Moreover, even the letter-within-a-letter—which is sole evidence of Mr. Buffington's credentials—admits that during that year, Mr. Buffington rotated through other services, including psychiatry and cardiology. (ECF No. 1312-1, PageID 47570.) Rotating through a service in pharmacokinetics, which deals with dosage of medications, does not make Mr. Buffington an expert in pharmacology or anesthesiology; at least no more than it makes him an expert in psychiatry or cardiology.

The letter also acknowledges that Mr. Buffington's fellowship focused on administrative and managerial tasks, such as "developing the structure of the Pharmacy Department clinical research program, develop[ing] clinical trial protocols, and participat[ing] in the management of clinical studies," rather than research into how drugs affect human body or how to anesthetize people. (ECF No. 1312-1, PageID No. 47570.)

In sum, Mr. Buffington cannot be qualified on the basis of his training or education to opine on pharmacological properties of midazolam or induction of anesthesia, and especially to opine on, diagnose, or suggest causes of medical conditions, such as lacrimation. Nor can he qualify as an expert on the basis of his work experience.

**B.**    **Buffington's work and teaching experience do not qualify him as an expert in this case.**

Mr. Buffington's work experience appears to be as difficult to verify as his education credentials.  On the basis of what could be uncovered, however, his work experience is insufficient to qualify him as an expert for the purposes of the upcoming hearing.

    **1.**    **There is no such position as "Faculty Research Participant" with the "Center for Medicare and Medicaid Services, Innovation Center."**

The first work experience that Mr. Buffington lists on his resume is "Faculty Research Participant" with the "Center for Medicare and Medicaid Services, Innovation Center." (ECF No. 870-1, PageID 28177.)  As laid out in detail in the Declaration of Investigator Pam Swanson, there is no such position, and Mr. Buffington does not work for that Center.  (Ex. 4.)  Mr. Buffington does have a part-time job as "expert consultant" with a related Center.  (*Id.*)  Upon learning how Mr. Buffington represents his employment on his CV, the Chief Medical Officer for Quality Improvement at the Centers for Medicare & Medicaid Services "repeated several times that he would speak to and insist that Mr. Buffington update his resume to reflect accurate information regarding his employment." (*Id.*)  Regardless of how it is portrayed in Mr. Buffington's CV, however, nothing in that job involves doing research, benzodiazepines, midazolam, anesthesia, or consciousness. (*Id.*)

2. **There is no longer such entity as "North Shore Long Island Jewish Health System" and Buffington does not appear to be currently employed with its successor.**

The second job Mr. Buffington has listed on his resume as his current employment is as the "Director of Pharmacy" with the "North Shore Long Island Jewish Health System" in New York, NY. (ECF No. 870-1, PageID 28177.) Such organization no longer exists. North Shore Long Island Jewish Health System changed the name to Northwell Health in September 14, 2015, or more than two years ago. (Ex. 5.) Moreover, all attempts to verify Mr. Buffington's employment at Northwell by a diligent investigator failed. (Ex. 6, Vickers Dec.) Searching for a Director of Pharmacy at Northwell yielded a Director of Pharmacy who is decidedly *not* Mr. Buffington. (Ex. 7.)

Mr. Buffington did provide a clue to his employment at Northwell during his recent testimony in Florida. (Hr'g Tr., *Florida v. Asay*, No. 1987-CV-6876 (Fla. Cir. Ct. July 26, 2017), excerpt enclosed for convenience as Ex. 8). Mr. Buffington admitted that despite representing to this Court that his employment with what is now Northwell is "current," he hasn't "been with them for a while." (Ex. 8 at 101.) He also testified that he was not an employee but a consultant. (*Id.*)

Most importantly, he shed the light on the nature of his consultation: helped "develop and design their prescription benefit program." (*Id.*)

In essence, prescription benefit programs determine how much employees of organization pay for a certain drug. The program places drugs in certain categories, such as Tier 1, Tier 2, etc. and sets the amounts of coverage and reimbursement for each tier. For example, Northwell's prescription benefit program mandates a $10

co-pay for a generic drug, and 20% up to $200 maximum for a "specialty drug." (Ex. 9.) Designing this prescription benefit program requires no research, specialized training on how drugs work in a human body, anesthesiology, or other areas Mr. Buffington opines on in his report.

### 3. "American Institute of Pharmaceutical Sciences, Inc" is just another small family business.

The next "current" employment on Mr. Buffington's CV is listed as the "President & CEO" of the "American Institute of Pharmaceutical Sciences, Inc." (ECF No. 870-1, PageID 28177.) Despite a grand title and a slick website, http://www.aips.net, Mr. Buffington appears to run this business with his wife and one "fellow" out of the same address as all his other "businesses," including various "expert" companies and what appears to be a defunct "Check Collection" business. (Ex. 10, 11.) Whatever this "charity" does, serving as its "President & CEO" does not qualify Buffington to opine as an expert in this case.

### 4. Including the word "pharmacology" in the name of his business does not make Mr. Buffington an expert in pharmacology.

Last but not least, Buffington lists "Clinical Pharmacology Services" on his CV. Including the word "pharmacology" in the name of his business does not make Mr. Buffington an expert in pharmacology. He previously testified that this business, Clinical Pharmacology Services, "provide[s] a consult service, again, for patients. We classify that as medication therapy management, where patients are either referred or self-referred to our practice to have their medications reviewed, to look for and identify any problem areas or opportunities for improving or optimizing

12

their drug regimen." Buffington Dep. 9:5-11, *Philadelphia Life Ins. Co. v. Buckles*, No. 7-cv-1743, ECF No. 75-6, PageID 1359 (M.D. Fla. Dec. 19, 2008).  Another service his business provides is "the drug information service, those are questions that come in from outside parties, could be patients, healthcare facilities or entities, and/or managed care organizations doing drug policy development." *Id.* Again, none of this has anything to do with the study of pharmacology or anesthesiology.

>        **5.    Buffington's teaching experience does not provide for a sufficient link to pharmacology or anesthesiology.**

Buffington's teaching experience does not provide for a sufficient link to pharmacology. In a 2008 deposition, in response to the question "Can you briefly describe for me the courses that you teach," Buffington responded "The areas that we focus on [are] . . . clinical pharmacology, so that's anything encompassing the prescription management, the prescribing skills. It also includes drug development and research and also includes drug policy development." Buffington Dep. 11:8-15, *Philadelphia Life Ins. Co. v. Buckles*, No. 7-cv-1743, ECF No. 75-6, PageID 1359 (M.D. Fla. Dec. 19, 2008). This teaching experience, despite being described as experience teaching "clinical pharmacology," is consistent with the study of **<u>pharmacy</u>**, which is about "reading prescription labels and dispersing drugs." *Dellinger v. Pfizer Inc.*, No. 5:03CV95, 2006 WL 2057654, at *8 n.16 (W.D.N.C. July 19, 2006). Pharmacology, however, is the study of the effect of drugs on living organisms. *Id.*

In sum, Mr. Buffington's CV lists inaccurate and outdated information regarding his employment. Despite being put on notice in July of 2017 during the hearing in Florida that he should update his resume since the name of his employer changed (not to mention his employment status), Mr. Buffington instead rests on his previously filed CV and continues to misrepresent his qualifications to the Court. What information can be surmised about his employment activities indicates that he is not qualified to opine about pharmacology of midazolam, induction of anesthesia, or lacrimation.

## C.   Buffington tends to overstate his level of involvement and practical experience.

In the past, Mr. Buffington also claimed that as a licensed pharmacist in Florida, he is permitted to diagnose and treat cardiovascular disease. Buffington Dep. 132–33, 136 (pages 9, 10 of 27), *Arthur v. Dunn*, No. 11-cv-438, ECF 301 (M.D. Ala. Dec. 30, 2015). Buffington testified that "in the Florida law [there] is something referred to as collaborative drug therapy management and those are practice parameters for pharmacists to diagnose, treat and manage drug therapy, which includes prescription, the initiation, the modification and the termination." *Id.* at 136.

That is not what Florida law actually says. Standards of practice for Drug Therapy Management allow a pharmacist to perform tasks beyond the pharmacist's typical scope of practice, *but only pursuant to a plan written by a physician*. Fla. Admin. Code. 64B16-27.830 (2013) ("The Prescriber Care Plan shall be written by a physician . . . [and] shall specify the conditions under which a pharmacist shall

14

order laboratory tests, interpret laboratory values ordered for a patient, execute drug therapy orders for a patient, and notify the physician.")

Thus, Buffington's alleged ability to treat and diagnose cardiovascular disease would far exceed his level of competence and what he is allowed to do under Florida law.  Nonetheless, in his report filed with Arkansas district court, he opined on the probability of ischemic cardiac damage and acute cardiac events. (Report at 9 ¶ 14, *McGehee v. Hutchison*, No. 17-cv-179 (D. Ark. Apr. 14, 2017), ECF No. 28-4. Perhaps it was the rotation through cardiology department during his residency as a pharmacist that also qualified him as a cardiologist?

Buffington also inflated his prescribing abilities. In a previous deposition, he claimed to have the ability, as a licensed pharmacist in Florida, to prescribe any and all medications, including controlled substances like midazolam. Buffington Dep. 132–33 (page 9 of 27), *Arthur v. Dunn*, No. 11-cv-438, ECF 301 (M.D. Ala. Dec. 30, 2015).  Prescribing drugs, just like diagnosing and treating disease, are functions normally reserved exclusively to physicians, and prescribing controlled substances requires a DEA registration.  (ECF 941, PageID 32069.)  It is true that in Florida, pharmacists may order and dispense certain drugs without involving a physician. Fl. Admin Code, Rule 64B8-36.003. These drugs, however, do not include controlled substances; they are limited to such items as acne products and medicated shampoo for treating head lice.[3]

---

[3] See complete list here:
https://www.flrules.org/gateway/notice_Files.asp?ID=5002986.

**D.      Buffington's testimony about his specific experience with midazolam changes from case-to-case.**

Buffington gave conflicting testimony in the past as to whether he prescribed midazolam. In a deposition taken two years ago, in December 2015, he testified at first that he never prescribed or administered midazolam or any other benzodiazepine. Buffington Dep. 8 (page 3 of 27), *Arthur v. Dunn*, No. 11-cv-438, ECF 301-1 (M.D. Ala. Dec. 30, 2015).  Later in the same deposition, Buffington testified under oath that he did, in fact, prescribe and administer midazolam for "a patient." *Id.* at 133 (page 9 of 27).

When he testified before this Court in January of 2017, Buffington again changed his testimony, this time saying he prescribed midazolam, but only after the deposition taken in 2015. (ECF 941, PageID 32025.)  Buffington reiterated again that before the deposition in December 2015, he never prescribed midazolam—contradicting his sworn statement in that case—but since then, he "think[s] probably three" is the number of times he prescribed and administered midazolam. (*Id.* at PageID 32026.)  The legal authority for those actions is not clear since, even taking Florida law into account, only physicians can prescribe and administer drugs, and only those registered with DEA can do so for controlled substances like midazolam. (*Id.* at PageID 32069.)

16

## CONCLUSION

Buffington's testimony on the pharmacological effects of midazolam greatly exceeds Buffington's field of expertise as a pharmacist, since it goes well beyond questions about reading prescription labels and dispensing drugs. Buffington's teaching, education, and experience have little to do with the study of the effects of drugs in the human body. His credentials appear to be mutable, unverifiable, and inaccurate at best, and his authority to diagnose and treat patients or prescribe and administer drugs, especially controlled substances, is—at a minimum—inflated.

Buffington may have reviewed some literature on midazolam and lacrimation after he was hired as a litigation expert, but that is the quintessential "litigation-driven expertise" that courts have consistently eschewed. Buffington admits that his opinions "expressed in [his] Affidavit are based on [his] review of the scientific and medical literature to date." (Report ¶ 13, ECF No. 1312-1, PageID 47552.) But whatever knowledge Buffington derived from reading studies after he has been retained to testify is not sufficient to render him an expert. "Without prior training, education, or experience in the field, [the proposed expert's] review of the literature, after he was retained as an expert witness in this suit, was insufficient to qualify him as an expert on the issues in dispute." *Wehling v. Sandoz Pharm. Corp.*, 1998 WL 546097, at *4 (4th Cir. 1998). Buffington lacks that requisite prior experience. His opinions on pharmacological effects of midazolam, anesthesia, consciousness, and lacrimation are outside of his competence and must be excluded.

17

Dated: October 19, 2017              Respectfully submitted,

*/s/ Allen L. Bohnert*
**Allen L. Bohnert (OH 0081544)**
Plaintiffs' Liaison Counsel

and

*/s/ Nadia Wood*
Nadia Wood (MN 0391334)

Erin G. Barnhart (OH 0079681)
David C. Stebbins (OH 0005839)
Carol A. Wright (OH 0029782)
Adam M. Rusnak (OH 0086893)

Office of the Federal Public Defender
for the Southern District of Ohio
Capital Habeas Unit
10 West Broad Street, Suite 1020
Columbus, Ohio 43215
614-469-2999
614-469-5999 (fax)
Allen_Bohnert@fd.org

**Co-Counsel for Plaintiffs**
**Tibbetts and Campbell**