# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION AT COLUMBUS

In re:  OHIO EXECUTION
  PROTOCOL LITIGATION,

Case No. 2:11-cv-1016

Chief Judge Edmund A. Sargus, Jr.
Magistrate Judge Michael R. Merz

This Order relates to Plaintiffs
  Alva Campbell
  and Raymond Tibbetts

Execution Scheduled 11/15/2017
Execution Scheduled 02/13/2018

---

# DECISION AND ORDER

This method-of-execution case, brought pursuant to 42 U.S.C. § 1983, is before the Court for decision of Plaintiff Tibbetts's Second Motion for a Stay of Execution, a Temporary Restraining Order, and a Preliminary Injunction (ECF No. 1261) and Plaintiff Campbell's Amended Motion for a Stay of Execution, a Temporary Restraining Order, and a Preliminary Injunction (ECF No. 1262). Defendants oppose the Motions (ECF Nos. 1282 & 1283) and Plaintiffs have filed a Joint Reply in support (ECF No. 1289). The Court heard testimony on the Motions October 23-27, 2017, and received written closing arguments (ECF Nos. 1354, 1355).

## Jurisdictional Statement

The Court has subject matter jurisdiction of this case under 28 U.S.C. §§ 1331 and 1343. Tibbetts and Campbell have each consented to plenary magistrate judge jurisdiction under 28 U.S.C. § 636(c)(ECF Nos. 732. 938); the Defendants have also consented as to these two

Plaintiffs (ECF Nos. 732, 942), and Chief Judge Sargus has referred the case on that basis (ECF Nos. 734, 943).

The relevant pleadings are Tibbetts's Fourth Amended Complaint ("Tibbetts 4AC", ECF No. 691) and Campbell's Fourth Amended Complaint ("Campbell 4AC", ECF No. 978).[1] Tibbetts pleads forty-eight Causes of Action, but his Motion is limited to seeking relief on his Fourth (Equal Protection), and Twentieth, Twenty-Second, Fortieth, and Forty-First (Eighth Amendment) claims. Campbell pleads forty-seven Causes of Action, but seeks relief in his Motion only on his Fourth (Equal Protection), and Twentieth and Twenty-First (Eighth Amendment) claims. At the end of the hearing on the motions, Campbell sought to add claims based on his individual physical characteristics (ECF No. 1350) which the Court has denied by separate order (ECF No. 1356)

The findings of fact and conclusions of law required by Fed. R. Civ. P. 52 are embodied in this Decision and Order. They are not binding at trial on the merits or at future preliminary injunction proceedings. *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2014), *citing Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981). Because of the prolixity of filings (ninety-five with 7,392 pages since the motions for preliminary injunction were filed) and the need for extreme haste in preparing this decision, it lacks the precision of reference to the record which this Magistrate Judge is accustomed to providing the reader.

---

[1] Campbell is named as a Plaintiff in the Omnibus Fourth Amended Complaint (ECF No. 1252), but his counsel confirmed during the October 2, 2017, conference call that his inclusion there was in error.

**Litigation History**

This case and its predecessors,[2] brought by most of Ohio's death row inmates, have been pending in this Court since very shortly after the Supreme Court allowed method-of-execution claims to be brought under § 1983. *Nelson v. Campbell,* 541 U.S. 637 (2004). District Judge Gregory Frost managed this litigation from its inception until his retirement in May 2016.

On December 5, 2011, with the agreement of counsel, Judge Frost consolidated all lethal injection method-of-execution § 1983[3] cases in this District, ordering:

> **Nature of agreement**. In light of the then-anticipated filing of new complaints by numerous additional Ohio death row inmates who were not currently involved in the existing litigation, counsel for many of the plaintiffs proposed adopting procedures culled from multidistrict litigation, class action litigation, and mass tort litigation. Given the sheer number of plaintiffs that were either going to attempt intervention or file a new case, the parties and the Court therefore agreed to the filing of a new case and bifurcated pleading in which the majority of the new plaintiffs would file one omnibus complaint that sets forth all common factual allegations and claims and individualized supplemental complaints that set forth individualized factual allegations and individualized claims. It was agreed that the Court would then consolidate all the execution protocol cases under that new case number and close the four original cases on the docket so that the parties would be able to proceed under only one case. This led to the November 2011 filing that created Case No. 2:11-cv-1016.

---

[2] *Cooey v. Kasich,* Case No. 2:04-cv-1156), *Hartman v. Kasich,* Case No. 2:09-cv-242, *Brown v. Kasich*, Case No. 2:09-cv-283, and *Reynolds v. Kasich*, Case No. 2:10-cv-027

[3] Many death row inmates have also pleaded method-of-execution claims in habeas corpus under *Adams v. Bradshaw*, 644 F.3d 481 (6th Cir. 2011); *Adams v. Bradshaw*, 817 F.3d 284 (6th Cir. March 15, 2016); and *Adams v. Bradshaw*, 826 F.3d 306 (6th Cir. June 13, 2016), *cert. den. sub. nom. Adams v. Jenkins*, 137 S. Ct. 814, 106 L. Ed. 2d 602 (2017), referred to herein as *Adams I, Adams II*, and *Adams III* respectively. The viability of these claims in habeas is gravely in doubt in light of *In re Campbell,* ___ F.3d ___, 2017 U.S. App. LEXIS 21094 (6th Cir. Oct. 25, 2017).

*Cooey v. Kasich*, Case No. 2:04-cv-1156, ECF No. 1067, PageID 31061-62.

In the same Order, Judge Frost set a bench trial date of August 13, 2012, but no trial has ever been held in this case or its predecessors. Over time since 2004, Judge Frost granted injunctive relief to some Plaintiffs and denied it to others, with varying results on appeal.[4] The pattern has been of hurried litigation of preliminary injunction motions, with executions when relief was denied either in this Court or on appeal, rendering moot the claims of those executed (*See, e.g.,* ECF Nos. 675, 1130, and 1251). There has never been a final judgment in the case;[5] appeals have all been on the grant or denial of preliminary injunctive relief, except for the interlocutory protective order appeal mentioned below.

There was a hiatus in Ohio executions after that of Dennis McGuire on January 16, 2014. Concerned about obtaining drugs for use in executions, the Ohio General Assembly, at the urging of Attorney General DeWine, adopted H.B. 663 (codified At Ohio Revised Code §§ 2949.221 and 2949.222) to provide confidentiality to suppliers of execution drugs and sought a protective order in this case for that information. Judge Frost upheld the constitutionality of the new statutes (*Phillips v. DeWine*, 92 F. Supp. 3d 702 (S.D. Ohio 2015), granted the protective order (ECF No. 629), certified that order for interlocutory appeal, and stayed the case pending appeal. *Id.* at PageID 19411-12.

---

[4] In his last preliminary injunction decision, *In re Ohio Execution Protocol Litigation (McGuire)*, 994 F. Supp. 2d 906, 908, n.2 (S.D. Ohio 2014), Judge Frost referred the reader to the following cases for history: *In re Ohio Execution Protocol Litigation (Phillips)*, No. 2:11-cv-1016, 2013 U.S. Dist. LEXIS 159680, 2013 WL 5963150 (S.D. Ohio Nov. 7, 2013); *In re Ohio Execution Protocol Litigation (Hartman)*, 906 F. Supp. 2d 759 (S.D. Ohio 2012); *In re Ohio Execution Protocol Litigation (Wiles)*, 868 F. Supp. 2d 625 (S.D. Ohio 2012); *In re Ohio Execution Protocol Litigation (Lorraine)*, 840 F. Supp. 2d 1044 (S.D. Ohio 2012); *Cooey (Brooks) v. Kasich*, Nos. 2:04-cv-1156, 2:09-cv-242, 2:09-cv-823, 2:10-cv-27, 2011 U.S. Dist. LEXIS 128192, 2011 WL 5326141 (S.D. Ohio Nov. 4, 2011); and *Cooey (Smith) v. Kasich*, 801 F. Supp. 2d 623 (S.D. Ohio 2011).

[5] Except that the Court issued a Fed. R. Civ. P. 54 (b) judgment on claims of Plaintiffs Campbell, Tibbetts, and Otte under the Ohio Corrupt Practices Act. *In re Ohio Execution Protocol Litig.*, 2017 U.S. Dist. LEXIS 107468, 115583 & 121545 (S.D. Ohio Jul 12, July 25, and Aug. 22017), *aff'd. sub. nom. Otte v. Kasich,* 2017 U.S. App. LEXIS 17436 (6th Cir. Sept. 7, 2017).

Without awaiting the results of either of those appeals, Ohio announced a new execution protocol October 7, 2016, and scheduled executions at approximately one-month intervals to begin in January 2017 with former Plaintiff Ronald Phillips.[6]  The Court[7] then vacated the stay as to Plaintiffs Phillips, Tibbetts, and Otte and set an aggressive schedule to prepare for a preliminary injunction hearing on those three Plaintiffs' motions in early January 2017.

On November 2, 2016, the Sixth Circuit held death row inmates lacked standing to attack H.B. 663, affirming Judge Frost's dismissal of the attack on that legislation. *Phillips v. DeWine*, 841 F.3d 405 (6th Cir. 2016), *cert den. sub nom. Tibbetts v. Dewine,* 2017 U.S. LEXIS 5564 (Oct. 2, 2017). The circuit court upheld the protective order. *Fears v. Kasich*, 845 F.3d 231 (6th Cir. 2016), *cert. den.* 2017 U.S. LEXIS 5875 (Oct. 2, 2017).

After hearing five days of testimony in January 2017, this Court preliminarily enjoined the executions of Phillips, Tibbetts, and Otte. *In re: Ohio Execution Protocol Litig.*, 235 F. Supp. 3d 892 (S.D. Ohio, Jan. 26, 2017). Although affirmed by the hearing panel, that decision was reversed by the *en banc* Sixth Circuit, *Fears v. Morgan*, 860 F.3d 881 (6th Cir. 2017); *cert den. sub nom. Otte v. Morgan,* ___ U.S. ___, 137 S. Ct. 2238 (2017). Phillips was executed the day after certiorari was denied. This Court denied Otte's renewed preliminary injunction motion (ECF No. 1168, denied at ECF No. 1226). He took no appeal and was executed September 13, 2017. The instant Motions were then filed on behalf of the next two Plaintiffs scheduled to be executed.[8]

---

[6] Phillips was then scheduled for January 12, 2017; Tibbetts for February 15, 2017; and former Plaintiff Gary Otte for March 15, 2017.
[7] After Judge Frost's retirement, the case was randomly reassigned to Chief Judge Sargus; the Magistrate Judge reference had earlier been transferred to the undersigned.
[8] Although Tibbetts had been scheduled for execution in October  2017, Governor Kasich reprieved him on September 1, 2017, to February 13, 2018 (ECF No. 1193).

**General Standard for Preliminary Injunctive Relief and Stay of Execution**

In determining whether preliminary injunctive relief is merited in a capital § 1983 case, a trial or appellate court must apply the following established standards:

> (1) whether [plaintiff] has demonstrated a strong likelihood of success on the merits; (2) whether he will suffer irreparable injury in the absence of equitable relief; (3) whether the stay will cause substantial harm to others; and (4) whether the public interest is best served by granting the stay. *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007); *[N.E.]. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 153 (6th Cir. 1991).

*Cooey (Biros) v. Strickland*, 589 F.3d 210, 218 (6ᵗʰ Cir. 2009). Judge Frost applied these criteria when granting relief to Plaintiff Charles Lorraine. *In re: Ohio Execution Protocol Litig.(Lorraine)*, 840 F. Supp. 2d 1044, 1048 (S.D. Ohio 2012). The Sixth Circuit consistently applies these criteria to preliminary injunctive relief requests across subject matter areas, *Overstreet v. Lexington-Fayette Urban Co. Gov't*, 305 F.3d 566, 573 (6ᵗʰ Cir. 2002); *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000); *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994); *NAACP v. City of Mansfield*, 866 F.2d 162, 166 (6ᵗʰ Cir. 1989); *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6ᵗʰ Cir. 1985); *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985).

Supreme Court case law is consistent:

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest.

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), *citing Munaf v. Geren*, 553 U.S. 674, 689-90 (2008); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 311–12 (1982).

The purpose of a preliminary injunction is to preserve a court's power to render a meaningful decision after a trial on the merits. *Alabama v. U.S. Army Corps of Engineers*, 424 F. 3d 1117, 1128 (11th Cir. 2005), *quoting* Wright, Miller & Kane, Federal Practice and Procedure: Civil, § 2946.

> Although the fundamental fairness of preventing irremediable harm to a party is an important factor on a preliminary-injunction application, the most compelling reason in favor of entering a Rule 65(a) order is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act. . . . [T]he preliminary injunction is appropriate whenever the policy of preserving the court's power to decide the case effectively outweighs the risk of imposing an interim restraint before it has done so.

*Id.* at § 2947.

Failure to enjoin an imminently pending execution will obviously render the case moot as to that inmate long before any trial can be held. As noted above, there has never been a trial in this case; Plaintiffs who failed to obtain preliminary injunctive relief have had their cases rendered moot by their executions.

Nevertheless, stays of execution are not to be granted routinely. A court must weigh the interest of a State in carrying out a lawful death sentence and its parallel interest in finality of criminal judgments. *Workman v. Bredesen*, 486 F.3d 896, 912-13 (6th Cir. 2007).

In reversing this Court's prior grant of preliminary injunctive relief to Phillips, Tibbetts, and Otte, the Sixth Circuit held the Plaintiffs failed to demonstrate likelihood of success on the merits, the first branch of the preliminary injunction test. *Fears v. Morgan*, 860 F.3d 881, 892 (6th Cir. 2017). This Court found for the Plaintiffs on the irreparable harm, balance of equities, and public interest branches. *In re Ohio Execution Protocol Litig.,* 235 F. Supp. 3d 892, 959-60 (S.D. Ohio Jan. 26, 2017). The Sixth Circuit did not disturb those conclusions on appeal and they apply here precisely as they did in the earlier decision. Therefore this Decision addresses only the likelihood of success on the merits branch of the test.

**General Standard for 42 U.S.C. § 1983 Relief**

42 U.S.C. § 1983, R.S. § 1979, was adopted as part of the Act of April 20, 1871, and reads in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

The statute creates a cause of action sounding essentially in tort on behalf of any person deprived of a constitutional right by someone acting under color of state law. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 709 (1999); *Memphis Community School District v. Stachura,* 477 U.S. 299 (1986); *Carey v. Piphus,* 435 U.S. 247 (1978). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v.*

*Cole*, 504 U.S. 158, 161 (1992). In order to be granted relief, a plaintiff must establish that the defendant deprived him of a right secured by the Constitution and the laws of the United States and that the deprivation occurred under color of state law. *See West v. Atkins,* 487 U.S. 42, 48 (1988); *Parratt v. Taylor*, 451 U.S. 527, 535 (1981); *Flagg Brothers Inc. v. Brooks*, 436 U.S. 149, 155 (1978).

Named and served as Defendants in this case are Ohio Governor John Kasich, Ohio Department of Rehabilitation and Corrections ("ODRC") Director Gary Mohr, and Director Mohr's subordinates in the ODRC Ronald Erdos, Donald Morgan, Stephen Gray, Edwin Voorhies, Richard Theodore, Charlotte Jenkins, John Coleman, and anonymous members of the Execution Team. These Defendants are referred to herein collectively as the State Defendants[9]. Each of them is sued in his or her official capacity and for acts done under color of state law (*See, e.g.,* Campbell 4AC, ¶ 27, ECF No. 978, PageID 36356.)

Actions against state officials in their official capacities are deemed actions against the State itself. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). A State is not a person within the meaning of § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989). An action against a state official in his official capacity for injunctive relief is not barred by the Eleventh Amendment. *Ex parte Young*, 209 U.S. 123 (1908); *Cory v. White*, 457 U.S. 85 (1982); *Thomson v. Harmony*, 65 F.3d 1314, 1320 (6th Cir. 1995), but declaratory relief regarding past conduct is barred by that Amendment, *Green v. Mansour*, 474 U.S. 64 (1985).

To impose liability on a governmental entity for the acts of one of its agents, a plaintiff must prove that the agent acted pursuant to custom or policy. *Monell v. New York City Dept. of*

---

[9] Plaintiffs have also named pseudonymously one hundred pharmacies, one hundred pharmacists, twenty-five drug suppliers, and twenty-five John Does who are "employed by or associated with the defendant pharmacies or drug suppliers. Although Plaintiffs allege these other Defendants are state actors within the meaning of § 1983 jurisprudence, none of them have ever been identified or served with process.

*Social Services,* 436 U.S. 658, 690 (1978). An unconstitutional governmental policy can be inferred from a single decision by the highest officials responsible for setting policy in a particular area of the government's business. *Owen v. City of Independence,* 445 U.S. 622 (1980); *Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986). On the other hand, official policy cannot be inferred from the single unauthorized act of a subordinate government agent, e.g., an unauthorized shooting by a police officer. *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 311 (6th Cir. 2005)("By itself, 'the wrongful conduct of a single officer without any policy-making authority did not establish municipal policy.'" *quoting Collins v. City of Harker Heights,* 503 U.S. 115, 121 (1992)).

**Law of the Case Doctrine**

Because this is a consolidated case with a long history, there have been many prior rulings, both of this Court and the Sixth Circuit, which may be applicable under law of the case doctrine. Both parties have relied on that doctrine in arguing the instant Motions.

Under the doctrine of law of the case, findings made at one point in litigation become the law of the case for subsequent stages of that same litigation. *United States v. Moored*, 38 F 3d 1419, 1421 (6th Cir. 1994), *citing United States v. Bell*, 988 F.2d 247, 250 (1st Cir. 1993). "As most commonly defined, the doctrine [of law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983), *citing* 1B Moore's Federal Practice ¶0.404 (1982); *Patterson v. Haskins*, 470 F.3d 645, 660-61 (6th Cir. 2006); *United States v. City of Detroit*, 401 F.3d 448, 452 (6th Cir. 2005). Judge Sutton recently gave the rationale: "If it is

important for courts to treat like matters alike in different cases, it is indispensable that they 'treat the same litigants in the same case the same way throughout the same dispute.'" *United States v. Charles*, 843 F.3d 1142, 1145 (6th Cir. 2016) *quoting* Bryan A. Garner, et al., The Law of Judicial Precedent 441 (2016).

However, "law of the case directs a court's discretion, it does not limit the tribunal's power." *Southern R. Co. v. Clift*, 260 U.S. 316, 319 (1922); *Messenger v. Anderson*, 225 U.S. 436 (1912)(Holmes, J.); *see also Gillig v. Advanced Cardiovascular Sys., Inc.*, 67 F.3d 586, 589-90 (6th Cir. 1995). "At the trial level, the doctrine of the law of the case is little more than a management practice to permit logical progression toward judgment. Prejudgment orders remain interlocutory and can be reconsidered at any time." Moore's Federal Practice at ¶0.404.

The Sixth Circuit has recently written about occasions when following the law of the case may be inappropriate.

> We generally will not disturb these [prior holdings] unless there is '(1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice.'" *Entm't Prods., Inc. v. Shelby Cnty.*, 721 F.3d 729, 742 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 906, 187 L. Ed. 2d 778 (2014) (quoting *Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009))

*Howe v. City of Akron*, 801 F.3d 718, 741 (6th Cir. 2015). These factors mirror those used in deciding a motion for reconsideration. *Meekison v. Ohio Dep't of Rehabilitation & Correction*, 181 F.R.D. 571, 572 (S.D. Ohio 1998)(Marbley, J.).

The mandate rule is a specific application of the law-of-the-case doctrine. The basic tenet of the mandate rule is that a district court is bound to the scope of the remand issued by the court of appeals. *United States v. Campbell,* 168 F.3d 263, 265 (6th Cir. 1999). The mandate rule is a distinct concept which preserves the hierarchy of the court system. *Scott v. Churchill,*

377 F.3d 565, 570 (6th Cir. 2004). Trial courts are obliged to follow precedent set by Supreme Court and Courts of Appeals. "Unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." *Hutto v. Davis*, 454 U.S. 370, 375 (1982).

In a consolidated case which has had over one hundred Plaintiffs, each with his life at stake, over 2,400 filings (comprising over 80,000 pages), twelve preliminary injunction hearings, and twenty appeals, the law of the case doctrine should play an important part. Soon after being assigned management of this case in October 2016, the Magistrate Judge sought the views of the parties and stated his own understanding of the law of the case doctrine (Notice, ECF No. 728, PageID 23044-46, relying largely on *Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006).) The Magistrate Judge has recently applied the doctrine to the shifting law in capital litigation in the Sixth Circuit. *Sheppard v. Jenkins*, 2017 U.S. Dist. LEXIS 170666, *4-5 (S.D. Ohio Oct. 16, 2017). The gist of this Court's present understanding is that prior rulings in the case, just like precedent from other courts, should be understood based on the context in which they were made and therefore applied with a great deal of nuance, and not like proof-texts.[10]

Part of that context is the speed with which decisions have necessarily been made. Many of the prior District Court and Sixth Circuit decisions in this case, like this one, have required more speed and less deliberation than far less weighty decisions facing judges. The speed with which decisions must be made and opinions written inevitably affects their utility in deciding future cases. *See* Daniel Kahneman, Thinking, Fast and Slow, for which Kahneman was awarded the Nobel Prize in economics.

---

[10] Proof-texting is the practice of using isolated out-of-context quotations to establish a proposition in eisegesis.

The law of the case is analyzed and applied separately below to the Eighth Amendment and Equal Protection claims litigated in this preliminary injunction proceeding.

**The Pending Motions for Injunctive Relief**

Plaintiff Tibbetts was a movant in the January 2017 preliminary injunctive proceedings where he sought relief on his Fourth, Thirty-Fifth, Thirty-Sixth, Thirty-Seventh, Thirty-Eighth, Fortieth, Forty-First, Forty-Third, and Forty-Fifth Causes of Action. He now seeks preliminary injunctive relief on his Fourth (Equal Protection), Twentieth, Twenty-Second, Fortieth, and Forty-First Causes of Action (Cruel and Unusual Punishment). Defendants have not questioned his procedural right to move for preliminary injunctive relief a second time.

Campbell was not a movant in the January 2017 preliminary injunction proceedings which were limited to those Plaintiffs who had consented to Magistrate Judge jurisdiction prior to the hearing. Campbell now seeks preliminary injunctive relief on his Fourth, Twentieth, and Twenty-Second Causes of Action which read identically to Tibbetts's Fourth, Twentieth, and Twenty-Second Causes of Action.

Because Plaintiffs argue their Eighth Amendment claims first, the Court will follow their order of presentation.

**EIGHTH AMENDMENT CRUEL AND UNUSUAL PUNISHMENT CLAIMS**

In their Twentieth and Twenty-Second Causes of Action, Campbell and Tibbetts assert that their executions pursuant to Ohio's current execution protocol, 01-COM-11 (revised October

7, 2016, hereinafter the "Execution Protocol") will subject them to cruel and unusual punishment

in violation of the Eighth Amendment to the United States Constitution.  Those claims read

> **Twentieth Cause of Action:** Eighth Amendment Violation Based
> On Substantial Risk Of Serious Harm In The Form Of Severe,
> Needless Physical Pain And Suffering Due To The Identity Of The
> Drugs In The Execution Protocol.

> **Twenty-Second Cause of Action:**  Eighth Amendment Violation
> Based On Substantial Risk Of Serious Harm In The Form Of
> Severe Mental Or Psychological Pain, Suffering And Torturous
> Agony Due To The Identity Of The Drugs In The Execution
> Protocol.

(Tibbetts 4AC, ECF No. 691, PageID 20025; Campbell 4AC, ECF No. 978, PageID 36344-45).


Tibbetts's additional Eighth Amendment claims read:

> **Fortieth Cause of Action:** Eighth Amendment Violation Based
> On DRC Defendants' Use Of A Three-Drug Execution Method
> With Midazolam As The First Of The Three Drugs.

> **Forty-First Cause of Action:** Eighth Amendment Violation Based
> On DRC Defendants' Use Of Midazolam In The Execution
> Protocol.

(Tibbetts 4AC, ECF No. 691, PageID 20026.)

**The Eighth Amendment Standard**

**First Branch:  Serious Pain and Needless Suffering Requirement**

To prevail on an Eighth Amendment challenge to a method of execution, Plaintiffs must prove that the challenged method "presents a risk that is sure or very likely to cause serious pain and needless suffering."  *Fears v. Morgan, supra,* at 886.

In *Fears* the Sixth Circuit criticized this Court's reliance on language from *Baze* as stating the standard:

> Yet here the district court's opinion was seriously flawed nonetheless. To begin with, that opinion did not apply the relevant legal standard, which by now the Supreme Court and our court have recited a total of four times. Specifically, to challenge successfully a State's chosen method of execution, the plaintiffs must "establish that the method presents a risk that is sure or very likely to cause" serious pain and "needless suffering[.]" *Glossip*, 135 S.Ct. at 2737 (emphasis in original) (internal quotations marks omitted); see also *Baze*, 553 U.S. at 50 (same); *Cooey v. Strickland (Cooey II)*, 604 F.3d 939, 944 (6th Cir. 2010) (same); *Cooey v. Strickland (Cooey I)*, 589 F.3d 210, 220 (6th Cir. 2009) (same). Instead, the district court addressed only whether Ohio's procedure presents a "substantial risk of serious harm," *Baze*, 553 U.S. at 50 (internal quotation marks omitted). That standard is correct so far as it goes; but it elides the more rigorous showing—that the method of execution is sure or very likely to cause serious pain— that the Supreme Court and our court have repeatedly said is necessary to satisfy the "substantial risk" standard in the particular context present here. Accord *McGehee*, 854 F.3d at 492.

*Fears, supra*, at 886.  This standard is now undoubtedly the law of this case and was so before *Fears* since the *Cooey I* and *Cooey II* appeals in this consolidated case.

Plaintiffs appear to acknowledge that "sure or very likely to cause severe pain and needless suffering" is the standard they must meet (Tibbetts's Motion, ECF No. 1261, PageID 46111, n. 3; Campbell's Motion, ECF No. 1262, PageID 46227-78). However, they continually use language to describe their claims which is confusingly similar but does not have the same meaning. For example, at the very beginning of his Eighth Amendment argument, Tibbetts asserts "[i]f subjected to Defendants' 2016 Execution Protocol, Tibbetts is sure or very likely to face a risk of serious harm – indeed, it is all but certain." (ECF No. 1261, PageID 46104.) Campbell uses identical language at the same place in his Motion (ECF No. 1262, PageID 46220). "Serious risk of harm" is, of course, the standard this Court used in the January 2017 decision which the circuit court rejected as not strict enough.

At PageID 46111, Tibbetts asserts he will suffer "mental pain." On the same page he asserts he must prove the Execution Protocol is sure or likely "to cause serious illness. . . ." At PageID 46113, he asserts that any drug used before the paralytic and the potassium chloride must render him "unconscious, unaware, and insensate" and keep him that way until he is dead. Without that effect from the first drug, the "death caused by one or both of these drugs will be agonizingly painful and torturous to Tibbetts, both physically and psychologically." *Id.* at PageID 46114. The pain and suffering from the paralytic alone "is nothing less than 'inhuman and barbarous' torture." *Id.* at PageID 46115, *quoting In re: Kemmler*, 136 U.S. 436, 447 (1890)(finding execution in the electric chair was not cruel or unusual).

Campbell's Motion (ECF No. 1262) parallels Tibbetts's, using the same selection of words which are asserted to be synonymous with "serious pain" and "needless suffering," but are not. *See, e.g.,* PageID 46220, PageID 46227.

These different ways of expressing the standard are not linguistically equivalent.

**Torture**

Black's defines torture as "[t]he infliction of intense pain to the body or mind to punish, to extract a confession or information, or to obtain sadistic pleasure." *Torture*, Black's Law Dictionary (10th ed. 2014). The definition implies the required mental state – the torturer must be acting intentionally. Although the Eighth Amendment does not mention torture, torture as here defined, if inflicted by a State as punishment, is prohibited by the Cruel and Unusual Punishment Clause. *Hudson v. McMillian,* 503 U.S. 1, 4 (1992); *Wilkins v. Gaddy*, 559 U.S. 34 (2010). A claim that an execution protocol will inflict "torturous pain" would be cognizable under the Eighth Amendment, but the Court heard no evidence of any action by any Defendant to torture any death row inmate, in the past or intended for the future. Dr. Ashish Sinha[11] gave it as his opinion that subjecting an inmate to a procedure that causes air hunger is equivalent to the torture technique called "waterboarding." However, while waterboarding is a form of torture within the Black's Law dictionary definition, air hunger that is the incidental consequence of an execution procedure is not. Use of the word "torturous" to describe an execution method adds nothing to the constitutional analysis, however powerful the rhetoric.

---

[11] Though highly qualified by training and experience to offer opinions on anesthesiology questions, Dr. Sinha often gave his opinions in very absolute terms without the reserve in expression and caution in drawing conclusions usually associated with scientific opinion. This tendency limits the credence the Court can give to his strongly expressed conclusions.

**Psychological Pain**

Psychological pain or mental suffering is a likely result of being sentenced to death and anticipating the execution, but that experience of psychological suffering could not by itself make a method of execution unconstitutional. Presumably all death row inmates suffer that pain, but the death penalty is not per se unconstitutional. *In re Campbell,* ___ F.3d ___, 2017 U.S. App. LEXIS 21094 *5, citing *Baze v. Rees*, 553 U.S. 35, 47 (2008). Unless accompanied by serious **physical** pain, the mental suffering associated with being under a sentence of death is not material to the Eighth Amendment inquiry under *Baze* and *Glossip*. It is not clear to this Court how a plaintiff could segregate anxiety from anticipated execution in general from anxiety about execution by a particular method. In any event, no evidence was offered to support a claim that either Campbell or Tibbetts suffers particular psychological pain associated with the Execution Protocol.

**Unconscious, Unaware, and Insensate**

Plaintiffs asked various witnesses whether midazolam would render an inmate "unconscious, unaware, and insensate." Those adjectives, according to Plaintiffs' expert witnesses Craig Stevens, Laura Depas, and Ashish Sinha, describe the state of a person under General Anesthesia[12], defined as that state of human consciousness in which the subject is unconscious, unaware, and insensate to pain (Stevens Opinion, PX 45, ECF No. 1323-15; Sinha Corrected Opinion, ECF No. 1295-1, PageID 47331). Plaintiffs repeat their assertion that an

---

[12] Dr. Stevens intentionally capitalized these two words, apparently intending to make them a defined term.

inmate must be "insensate to pain" in their Written Closing Arguments (ECF No. 1355, PageID 50422).

However, the Court is not aware of any precedent requiring that an inmate be in the state of General Anesthesia before injections of rocuronium bromide or potassium chloride, the second and third drugs in the Execution Protocol. In fact, the Supreme Court has recognized that some pain is incidental to any lethal injection procedure, but a person who is "insensate" would not experience any pain. *Baze v. Rees*, 553 U.S. 35, 47-48 (2008); *Glossip v. Gross*, 135 S. Ct. 2726, 2739-40 (2015); see also *Phillips v. Robinson*, 2013 U.S. Dist. LEXIS 108820 (N.D. Ohio 2013).


**What is Serious Pain?**


Dorland's Medical Dictionary (28th edition, 1994) defines pain as "a more or less localized sensation of discomfort, distress, or agony, resulting from the stimulation of specialized nerve endings." It has no definition of "serious" or "severe" pain.

Dr. Sinha opined on "assessing pain objectively using physiological markers." (Corrected Expert Opinion, ECF No. 1295-1, PageID 47342, et seq.) He notes that standards for basic anesthetic monitoring require monitoring heart rate, electrocardiogram, and blood pressure. *Id.,* ¶ 37, citing Miller's Anesthesia 1395 (8th ed. 2015). He then reports what various outputs of these monitoring devices tell a trained observer about whether a patient is experiencing pain, but he does not suggest they tell what level of pain a person is suffering.

The Sixth Circuit accepted in *Fears* this Court's finding that injection of a fully conscious person with rocuronium bromide and potassium chloride would cause severe pain sufficient to

meet the Eighth Amendment standard. 860 F.3d at 886. But it is clear that a person given even a clinical dose of midazolam is not "fully conscious."

Dr. Sinha criticized the *en banc* court's discussion of consciousness and clarified Dr. Bergese's January testimony, noting that the concept of consciousness is indeed a spectrum, but the concept of sensitivity to pain is not: "I think it's sensation that's binary. I mean, either the person's going to feel it or not feel it" and "that's a separate consideration from whether the person is conscious or unconscious" (Quoted at Written Closing Arguments, ECF No. 1355, PageID 50427).

Because the Execution Protocol calls for what it denominates as "consciousness checks," the checks actually used by ODRC Medical Team members were a focus of the preliminary injunction hearing for former Plaintiff Gary Otte in September 2017. In denying injunctive relief, the Court wrote that "[c]onsciousness' is not a term of art in medicine or capital punishment law." (ECF No. 1226, PageID 45251). The Court relied on the caution about use of the term in Miller's Anesthesia that consciousness is a person's subjective experience, to be distinguished from responsiveness: "An individual may fully experience a stimulus (e.g., the command "Open your eyes!") but not be able to respond (as when a patient is paralyzed but conscious during surgery)." (8th ed. 2015 at p. 283)[13]. The Court concluded

> Neither the Supreme Court nor the Sixth Circuit has defined the term in any way that relates it to the medical use of the term in the expert testimony this Court has heard. And neither court has adopted any particular degree of unconsciousness as constitutionally required in a lethal injection execution.

(ECF No. 1226, PageID 45251). That result was not changed by any medical testimony the Court heard in the October 23-27 hearing.

---

[13] Dr. Sinha confirmed that Miller's Anesthesia, on which he wrote a chapter in the current edition, is the leading treatise on the subject. It was referred to by many if not all of the expert witnesses.

In sum, the Eighth Amendment test is "sure or very likely to cause serious pain and needless suffering."  Proof of other perhaps associated phenomena, e.g., psychological pain or serious illness, is immaterial.

### Evidence on the Likelihood of Severe Pain and Needless Suffering Requirement

It is the law of the case[14] that the evidence presented to this Court in January 2017 is insufficient to prove that there is a strong likelihood or probability Plaintiffs will prevail at a trial on the merits in showing that their executions pursuant to the Execution Protocol will cause them to suffer severe pain and needless suffering.  There was disagreement by Plaintiffs' experts with the medical science reflected in that decision, but the Sixth Circuit's conclusions are binding on this Court in the most conclusive way a precedent can be binding; it is a published *en banc* circuit court decision in the same case and on which the Supreme Court denied review.[15]

The circuit court did not just conclude this Court applied the wrong Eighth Amendment standard to the evidence before it.  Had it done that, it should have remanded for application of the correct standard.  Instead, it concluded the evidence was insufficient to satisfy the correct standard, vacated the stay, and allowed former Plaintiffs Phillips and Otte to be executed.

The court held:

> In sum, we will grant that the plaintiffs have shown some risk that
> Ohio's execution protocol may cause some degree of pain, at least
> in some people. But some risk of pain "is inherent in any method
> of execution—no matter how humane[.]" *Baze*, 553 U.S. at 47.

---

[14] That is to say, it would have been a violation of the mandate rule at the very least for this Court, when it reacquired jurisdiction after the *en banc* decision, to say it was still persuaded by that evidence and re-enter the preliminary injunction.

[15] Denial of certiorari is said to have little precedential value in itself.  But denial of certiorari in this case must be given some weight, particularly in light of the closest possible vote in the Sixth Circuit, Justice Breyer's dissent in *Glossip,* and his failure to concur in Justice Sotomayor's dissent from denial of certiorari here.

> And the Constitution does not guarantee "a pain-free execution[.]"
> *Cooey I*, 589 F.3d at 220. Different people may have different
> moral intuitions as to whether—taking into account all the relevant
> circumstances—the potential risk of pain here is acceptable. But
> the relevant legal standard, as it comes to us, requires the plaintiffs
> to show that Ohio's protocol is "sure or very likely" to cause
> serious pain. *Glossip*, 135 S. Ct. at 2737, 2745. The district court
> did not meaningfully apply that standard here. And the plaintiffs
> have fallen well short of meeting it.

*Fears*, 860 F.3d at 890.

If the January 2017 evidence was insufficient, as the *en banc* court held, the question now before the Court is whether Campbell and Tibbetts have added sufficient evidence to the case to now show the Execution Protocol is sure or very likely to cause them severe pain and needless suffering. The Court concludes they have not.

Plaintiffs rely in part on the expert testimony of Craig Stevens, a professor of pharmacology at Oklahoma State University. Dr. Stevens offered opinions on the pharmacological effects of midazolam, the first drug in the Execution Protocol, gathered from his interpretation of the results of an extensive literature search relating to that drug. Although there was no time to conduct a *Daubert* hearing, Plaintiffs presented an adequate foundation in this hearing which, when coupled with what was presented in January, established a sufficient basis to find Dr. Stevens was qualified to offer opinions on the subjects on which he was presented so as to comply with Fed. R. Evid. 702.

Dr. Stevens reinforced his January opinion that midazolam is not capable of producing General Anesthesia, defined as that state of human consciousness in which the subject is unconscious, unaware, and insensate to pain (Stevens Opinion, PX 45, ECF No. 1323-15,

PageID 48935)[16].  He acknowledged that this opinion is inconsistent with that of Defendants' expert Dr. Joseph Antognini, an anesthesiologist[17], but characterized Dr. Antognini's opinion as an "outlier."  He also acknowledged on cross-examination that there are no clinical studies of the effects of midazolam in doses anywhere near the 500 mg Ohio uses; that dose is so far above any clinical dose ever used that experimentation with such doses would be unethical.

As a pharmacologist – an expert on the effects of drugs on the human subject – Dr. Stevens has never administered an anesthetic to a human person.  In the Court's opinion, this does not diminish the credibility of his testimony because he carefully limited himself to his area of expertise.

Dr. Stevens was particularly asked by Plaintiffs

> to provide expert opinions regarding the use of midazolam as the 1st drug in the lethal injection procedures employed by the State of Ohio Department of Rehabilitation and Corrections ("DRC"), focusing on the timing of the 2nd drug administration with respect to the onset time and peak effect time of midazolam's effect, and on the 'consciousness check' performed by the DRC after midazolam administration.

*Id.* at PageID 48933

Dr. Stevens usefully distinguished between induction and maintenance of anesthesia, the former being the process of bringing a subject to the state of being anethesthetized and the latter being the process of keeping the subject in that state despite painful stimuli which might arouse a person, e.g, being cut open with a scalpel.  He also helped by distinguishing a bolus injection, in which all of a dose of a drug is administered with one push of the syringe plunger, and infusion,

---

[16] The opinion was also filed when initially prepared at ECF No. 1288-1)
[17] Dr. Antognini is, in the Court's opinion, fully qualified to testify as an anesthesiologist under Fed. R. Evid. 702 despite the fact the he has retired from active practice.  The need for currency in practice largely stems from the requirement that witnesses in medical malpractice  cases be familiar with the current standards of practice.  That is not needed here because Ohio's Execution Protocol is not being measured against current standards of the practice of anesthesiology.

in which a drug is administered in a controlled flow, usually in a medical setting by a machine designed for that purpose. Ohio's injection drugs are all administered by bolus injection, but the distinction is useful in understanding the literature and Plaintiffs' reference to infusion in their proposed alternative methods.

Dr. Stevens' relevant opinions, repeated in testimony, are that intravenously-administered midazolam "takes a non-trivial period of time to begin to exert its pharmacological effects." *Id.* at PageID 48934. That timing is not dose-dependent. That is, the drug does not work any faster because a larger dose is given. The FDA-approved package insert (usually called the "label"[18]) for midazolam states that sedation in adults is achieved at 3-5 minutes after IV administration, and induction of anesthesia is achieved at 2-3 minutes. Dr. Stevens' acceptance of this distinction clarified some confusion the Court had about his January testimony.

Various clinical studies have been made of midazolam's effect on responses to so-called consciousness checks of various sorts, including loss of response to eyelash reflex, corneal touch, and verbal commands. *Id.* The onset time for midazolam's effect of loss of verbal and other non-reflexive responses ranges from 1.7 to 1.9 minutes after IV midazolam administration and for loss of the eyelid reflex from 2.0 to 3.7 minutes after IV midazolam administration. Midazolam's peak or maximum sedative effect, which again is not dose dependent, when measured by electroencephalogram (EEG), is reached from five to fifteen minutes after intravenous administration. *Id.*

Despite a good deal of pre-hearing sparring over the length of the IV tubing in use for executions, Plaintiffs were ultimately unable to present testimony on how the use of a long IV

---

[18] The 2017 version of this insert is in evidence as Court's Exhibit 3. The parties implicitly agreed to treat this version as the relevant one.

tube (from inside the equipment room in the death house to the inmate's body) would affect onset time.

Consciousness checks of the sort used by ODRC detect loss of response to verbal stimuli and eyelid or corneal reflex before loss of response to painful stimuli such as nail-bed pressure pain or pin prick. *Id.* Dr. Stevens also opined that lack of response to any of the ODRC consciousness checks would not "indicate that the inmate has reached a state of unconsciousness characterized by lack of awareness to pain," i.e. General Anesthesia. *Id.*

Laura Depas, a certified registered nurse anesthetist, was retained by Plaintiffs to observe the Ronald Phillips and Gary Otte, executions, report on what she saw, and render opinions on what she observed based on her extensive (twenty-eight years) experience. She was qualified to offer expert opinion based on her experience as approved in *Kumho Tire Co. v. Carmichael*, 526 U.S.137, 152 (1999).

Nurse Depas testified about Phillips' execution in the Otte preliminary injunction hearing in September and then about the Otte execution in this hearing. She had not met or observed Otte until she saw him walk into the execution chamber, but from his height and general body "habitus," she formed the opinion he was at risk of "obstructing." She and other witnesses testified that "obstructing" in this context means that the subject is experiencing an airway blockage. The blockage can be caused by a foreign body (e.g., a piece of meat which "goes down the wrong way" and may require the Heimlich maneuver to restore breathing). Or it can be caused by failure of the body's own tissues (e.g., the collapse of the throat muscles in persons suffering from sleep apnea). Whatever the cause, the subject will cease breathing until the blockage is cleared and will suffer "air hunger" – struggling to breathe – in the meantime. In the sleep apnea subject, this will cause the subject to awaken, interrupting sleep.

During the Otte execution on September 13, 2017, Nurse Depas observed what she understood, correctly, to be Warden Erdos's signal that the administration of the drugs should begin. Forty seconds later by her watch, she saw Mr. Otte turn his head from sharply left to ten to fifteen degrees closer to mid-line, then blink exaggeratedly as if trying to keep his eyes open. At some time shortly thereafter, she observed behavior on Otte's part which she interpreted as showing he was obstructing. She stated to Carol Wright, one of Mr. Otte's attorneys who was also witnessing the execution "He's obstructing." At that point Ms. Wright asked to be allowed to leave the witness room to contact the Court through her colleague, Attorney Allen Bohnert. When counsel reached the Court, they sought a temporary restraining order to prevent injection of the second and third drugs. The Court denied that motion for reasons stated in a subsequent memorandum opinion (ECF No. 1238; reported at *In re Ohio Execution Protocol Litig.*, 2017 U.S. Dist. LEXIS 150630 (S.D. Ohio Sept. 18, 2017)).

A great deal of emphasis was placed in the hearing on the phenomenon of "obstructing" and what that signifies about the condition of the person. However, testimony about "obstructing" was not at all a focus of the earlier hearings in January and September, even though they focused, as did this hearing, on the effects of midazolam. A fair amount of testimony from the January and September hearings was designated to be considered by the Court in deciding the instant Motions, but the paucity of testimony about "obstructing" in the prior hearings makes it difficult to see the relevance.

The eyewitnesses differed in their observations of Mr. Otte's breathing after the midazolam injection, with Execution Team members observing smaller differences from normal breathing than did Nurse Depas, Attorney Wright, and Attorney Vicki Ruth Adams Werneke.. Witnesses called by Plaintiffs observed what they referred to as "very labored breathing"

(Werneke), an obstructed pattern of breathing (Depas), and his "stomach moving violently" (Wright)(Written Closing Arguments, ECF No. 1355, PageID 50445). These observations were consistent with reports of abnormal breathing by witnesses to other executions using midazolam as the initiatory drug that were heard in January.

Plaintiffs also called Christine Freeman and Santino Coleman, attorneys with the Federal Defender in Montgomery, Alabama, who witnessed the execution of Torrey McNabb in that State on October 19, 2017, and reported their observations which included unusual body movements after injection of midazolam, including jerking one arm up at a right angle. While the Court did not exclude these witnesses in part because of the recency of their experiences and in part because they had traveled from Alabama to testify, their testimony added little weight to the Plaintiffs' case. In the first place, what they observed was only marginally different from other observations of bodily movements after 500 mg. of midazolam in other executions which were of record in the January and September hearings. Second, because the McNabb execution happened only three days before this hearing commenced, Defendants had been unable to obtain any evidence from Alabama authorities on how the McNabb execution proceeded or to cross-examine these witnesses in discovery. Even assuming there was no observer bias, the testimony was essentially cumulative of what the Court has heard before from eyewitnesses to executions where midazolam was the initiatory drug.[19]

Plaintiffs argue that this pattern of breathing shows Mr. Otte was in pain (Written Closing Arguments, ECF No. 1355, PageID 50446). Supplied with these descriptions of Mr. Otte's behavior, Dr. Sinha opined he had "all the STOP-Bang factors and he would screen positive for

---

[19] Dr. Sinha testified he would treat these types of reports (eyewitness reports of what was seen at executions), as "objective" evidence of what happened and he relied on these accounts as "objective" to ground expert opinions he offered. Such accounts by witnesses strongly identified with the inmate side of these disputes cannot be accepted as "objective" by the Court. Without doubting the utmost sincerity of these witnesses, perspective always colors observation and confirmation bias is a well-established phenomenon.

sleep apnea." *Id.* If required to lie flat on the execution gurney, he would not be able to breathe because of his tongue and muscle tone and would experience choking." *Id.* With the characteristic self-assurance he showed throughout his testimony, Dr. Sinha opined "If your intent is to choke this person to death, you are halfway there." *Id.*

This testimony was in support of Campbell and Tibbetts' argument that ODRC staff should have inferred the likelihood of apneic obstruction from a note in Mr. Otte's medical chart that he was morbidly obese and provided some accommodation for that fact. There was no testimony to show that Mr. Otte had ever been tested for sleep apnea or experienced its symptoms or that anyone acting on his behalf in this case ever raised this concern. The further inference suggested is that because ODRC staff did not make adequate accommodation for Mr. Otte, they will not do so for Mr. Campbell or Mr. Tibbetts and therefore the Court should enjoin the Campbell and Tibbetts' executions. This involves too many leaps of logic. To fail to provide a medical accommodation without notice or request does not amount to the intentional infliction of cruel and unusual punishment. And to fail under those conditions to make an accommodation for one inmate does not predict that failure will be repeated. There is no showing that ODRC has a policy of refusing to accommodate persons with undiagnosed conditions and without a policy or custom, there is no violation of § 1983. There was comment during the hearing about accommodations needed for Mr. Campbell's execution. While apparently no agreement was reached (except for providing a wedge-shaped pillow to elevate Mr. Campbell's upper body), the discussion belies any policy by ODRC to fail or refuse to accommodate medical conditions with adequate notice.

There was also testimony about "tears." Nurse Depas testified she saw "profuse" tearing from Mr. Otte's left eye during his execution; Ms. Wright also observed the tearing. ODRC staff

who were present saw one tear or maybe only a "wetness" or "moisture" at the corner of the left eye. Both Mrs. Depas and Dr. Sinha, persons with a great deal of experience in administering drugs for the purposes of medical anesthesia, interpreted this as meaning Mr. Otte was not deeply enough anesthetized. That is to say, if either of them saw this phenomenon in his or her clinical practice, whether it was one tear or many, in a person for whose care they were responsible, they would administer more medication. On the other hand, Dr. Sinha stated that in tens of thousands of patients, he has never experienced this phenomenon (Corrected Expert Report, ECF No. 1295-1, ¶ 31 – "10,000 or more"; oral testimony not yet transcribed - 20,000)

Plaintiffs argue that Mr. Otte's tears show he was in pain (Plaintiffs' Written Closing Arguments, ECF No. 1355, PageID 50447). While urging the Court to resolve discrepancies in the observational testimony in their favor, Plaintiffs ultimately conclude "[t]he fact that Mr. Otte produced tears *at all* is all that matters, not how many tears he produced." *Id.* This conclusion was supported by Dr. Sinha's testimony. He opined that the amount of tears does not matter:

> If he's tearing, he's tearing. Somebody sees three tears, somebody sees a stream, he's tearing. If somebody doesn't look, they didn't see a tear, there was no tearing. But enough it seems like multiple people said he was tearing. The only argument is how much was he tearing.

(Quoted at ECF No. 1355, PageID 50452.) Plaintiffs conclude from this that "[a]ccording to Dr. Sinha's testimony, tears are an objective sign of pain." *Id.* , citing Corrected Expert Report, ECF No. 1295-1, ¶¶ 29-30, which read:

> 29. One who is unconscious, unaware and insensate does not produce active tears. One who is in the state of unconsciousness, unawareness and insensation to pain akin to General Anesthesia does not produce active tears. See, e.g., Nair & White, Care of the eye during anaesthesia and intensive care, Opthalmic Anaesthesia (2014).

30. Or, put differently, one who is producing active tears is, without question, **not** unconscious, unaware, and insensate to pain.

(Emphasis sic.)

Plaintiffs have overstated Dr. Sinha's conclusion. He opines that Mr. Otte would not have been tearing if he were under General Anesthesia. Given Dr. Stevens' testimony, it was not to be expected that Mr. Otte was under General Anesthesia. But the fact that he was not insensate to pain does not prove he was experiencing pain or what level of pain he was experiencing. To infer that these tears evidenced pain would be for Dr. Sinha an overgeneralization – it was his first time to see (actually, hear that others had seen) active tear production in similar circumstances.

It is of course a commonplace of human experience that people cry when they are in physical pain, but they also cry for many other reasons. Plaintiffs were careful to elicit testimony from eyewitnesses that they did not see Mr. Otte cry during his last statement, hymn, and prayer. But there was no scientific evidence to tie the tear production to the experience of severe pain. The Court cannot recall any testimony from witnesses to other midazolam-initiated executions that the inmate produced tears, and none has been called to the Court's attention.

The Court agrees with Plaintiffs that Mr. Otte's tears are a newly observed phenomenon in a midazolam-initiated execution and that Mr. Otte was not under General Anesthesia when the tears occurred. But this does not prove the tears were produced by severe pain. It does indeed raise the level of uncertainty as to whether midazolam is an appropriate initiatory drug. But the Sixth Circuit has held uncertainty counts against the Plaintiffs, not in their favor. *Fears, supra*, at 887.

The Court believes Nurse Depas and Dr. Sinha's opinions were strongly conditioned by their professions, caring for persons undergoing painful and often complicated medical

procedures, and thus less credible when applied to the execution context. If they do not keep their patients sufficiently anesthetized, pain will result which may disrupt the procedure. Their professionalism, coupled with the compassion most people feel for others in pain, leads them to judge what should be done in the execution chamber by what would be done in an operating room. But while surgeries should be pain-free, there is no constitutional requirement that executions be painless. *Baze, supra, Fears, supra.* The goal of the anesthetist and anesthesiologist is to make patients unconscious, unaware, and insensate to pain – which is properly described as being in a state of General Anesthesia. But the Eighth Amendment does not require General Anesthesia before an execution.

In part the Court gives less weight to the summary conclusions of Nurse Depas and Dr. Sinha -- that subjecting inmates to execution by the current protocol will likely cause severe pain -- because both testified that using midazolam alone to induce anesthesia is not consonant with current medical practice. When the drug was introduced perhaps twenty years ago, it was an advance on prior drugs, particularly Valium, because it is fast acting and amnestic. But medical science has continued to develop. As good professionals, these experts offered opinions based on the current state of medicine. But because of ethical constraints imposed on doctors and those in allied professions, those being executed cannot necessarily receive what would be the best medicine to make them comfortable. The *en banc* Sixth Circuit quoted the Supreme Court on this point: "the fact that a low dose of midazolam is not the *best* drug for maintaining unconsciousness during surgery says little about whether a 500-milligram dose of midazolam is *constitutionally adequate* for purposes of conducting an execution." *Fears*, 860 F.3d at 887, *quoting Glossip*, 135 S. Ct. at 2742 (emphasis in *Glossip*.)

The testimony was also in conflict at this hearing, as it had been in January, over whether midazolam has any analgesic properties. Dr. Stevens testified convincingly that it does not, despite Dr. Antognini's opinion to the contrary. However, the dose of midazolam in use here, a multiple of the highest recommended clinical dose, appears to be sufficient to suppress consciousness to the extent that an inmate will not respond to the consciousness checks used by emergency medical technicians and used by Ohio, most recently on Mr. Otte. There is literature to which Dr. Stevens testified that shows a rank ordering of responses to such consciousness checks (i.e., some will elicit responses that others would not elicit). Ultimately, however, the presented science does not prove conclusively the inference Plaintiffs' experts drew that it was certain or very likely Mr. Otte experienced serious or severe pain.[20]

Testimony from Nurse Depas and Dr. Sinha questioned the ODRC's use of the particular "consciousness checks" employed in the Otte execution. In part this testimony was in support of the conclusion that midazolam had not rendered Otte insensate to pain and in part it was in support of parts of Plaintiffs' suggested alternative methods of execution which would require continuous electronic monitoring of various bodily signs throughout the execution process. Nurse Depas testified that untrained individuals cannot assess consciousness without the assistance of monitoring equipment (Noted at Written Closing Arguments, ECF No. 1355, PageID 50460). The medical team members of the ODRC execution team, of course, are not trained to interpret the output of those monitoring devices, although they are trained to administer and interpret the results of the "consciousness checks" provided for in the Execution Protocol.

---

[20] Dr. Sinha also opined that midazolam has a hyperalgesic effect, meaning it increases the experience of pain. The single study on which this conclusion was based had far too small a sample for it to be persuasive to the Court.

In its January preliminary injunction decision, the Court rejected the inadequate consciousness check argument because attempting to regulate those checks would involve the Court in micromanagement of the execution process. *In re: Ohio Execution Protocol Litig.(Phillips, Otte & Tibbetts)*, 235 F. Supp. 3d 892 (S.D. Ohio, 2017). This argument was again rejected in the Otte preliminary injunction hearing in September. *In re: Ohio Execution Protocol Litig. (Otte),* 2017 U.S. Dist. LEXIS 145432 *43 (S.D. Ohio Sept. 8, 2017)(copy at ECF No. 1226). Judge Frost also approved as adequate the consciousness checks now challenged. *Cooey v. Strickland,* 610 F. Supp. 2d 853, 924 (S.D. Ohio 2009). The checks used in the Phillips and Otte executions were more aggressive than those found constitutionally unnecessary in *Harbison v. Little,* 571 F.3d 531 (6th Cir. 2009), followed in *In re: Ohio Execution Protocol Litig. (Otte),* 2017 U.S. Dist. LEXIS 145432 at * 40 (S.D. Ohio Sept. 8, 2017).

This Court remains concerned that midazolam may not be the best drug for initiating a lethal injection execution. It appears from the historical record that barbiturates, for example, are better suited to that task because of their ability to achieve and maintain General Anesthesia. But General Anesthesia, particularly in the sense of rendering a subject completely insensate to pain, is not constitutionally required. Plaintiffs have not proven that injection of the second and third drugs in Ohio's will cause them to experience severe pain when midazolam at 500 mg. is the initial dose.

**Second Branch:  Alternative Method Requirement**


To succeed on a § 1983 challenge to a method of execution, a plaintiff must plead and prove that there exists a known and available, readily-implemented, method of execution that entails a significantly less substantial risk of severe pain and needless suffering.  *Glossip*, 135 S. Ct. at 2737.

In its prior decision, the Court found that the alternative of a one-drug, barbiturate-only method using either sodium thiopental or pentobarbital met the *Glossip* standard.  *In re:  Ohio Execution Protocol Litig. (Phillips, Tibbetts, & Otte)*, 235 F. Supp. 3d 892, 954(S.D. Ohio, 2017).  In reversing, the *en banc* Sixth Circuit also criticized this portion of the decision, writing:

> [T]he district court also erred in its analysis of *Glossip*'s second prong—which requires the plaintiffs to prove that an alternative method of execution is "available," "feasible," and can be "readily implemented," among other things. *Id.* at 2737. The court found this requirement met as to one of the plaintiffs' proposed alternatives, namely a one-drug, barbiturate-only method using either sodium thiopental or pentobarbital. The court acknowledged, however, that Ohio no longer has any supplies of these drugs, that "Ohio's efforts to obtain the drug from other States and from non-State sources have not met with success[,]" and that Ohio is "not likely" to overcome these obstacles anytime soon. R. 948 at 32229. Yet the court concluded that barbiturates are "available" to Ohio because "there remains the possibility" that Ohio can obtain the active ingredient of pentobarbital and have it made into injectable form by a compounding pharmacy. *Id.*
>
> The district court was seriously mistaken as to what "available" and "readily implemented" mean.

*Fears, supra*, at 890.  "[F]or that standard to have practical meaning, the State should be able to obtain the [alternative] drugs with ordinary transactional effort."  *Id.*  at 891.  In *Glossip*, the Supreme Court majority adopted what had been a plurality holding in *Baze*, to wit, that "the

Eighth Amendment requires a prisoner to plead and prove a known and available alternative."

135 S. Ct. at 2739.

Plaintiffs Tibbetts and Campbell present two alternative methods of execution in their

Motions:

### Alternative 1

a) DRC Defendants shall fully and formally adopt Incident Command Systems principles into their Execution Protocol as a Core Element.

b) DRC Defendants shall strictly comply with all portions of their Execution Protocol.

c) DRC Defendants shall not be permitted to use any method of execution that includes a paralytic drug and/or potassium chloride.

d) DRC Defendants shall not be permitted to use any method of execution that includes midazolam, whether as part of a one-drug or three-drug method or any other method.

e) DRC Defendant must instead use a one-drug, barbiturate-only method, such as DRC Defendants adopted in November 2009, and with sodium thiopental or pentobarbital as the barbiturate.

f) The administration of drugs in Tibbetts's execution shall not begin until two working IV sites have been started and remain viable in his peripheral veins.

g) In the event the DRC Defendants use compounded sodium thiopental or compounded pentobarbital for the one-drug method, DRC Defendants must meet all of the following requirements, otherwise said compounded drugs shall not be used:

i. DRC Defendants must use only those compounded execution drugs that are chemically and biologically identical to FDA approved versions of said drugs as currently or formerly sold in the United States (e.g., Nembutal).

ii. DRC Defendants must use only those compounded execution drugs that are properly compounded in strict compliance with all requirements of US Pharmacopeial Convention (USP) <797>, and manufactured in strict compliance with all requirements of Current Good Manufacturing Practices (cGMPs).

iii. DRC Defendants shall not use compounded execution drugs that are past their beyond-use date or that are otherwise adulterated.

iv. For any compounded execution drugs that are to be used in Plaintiff's execution, DRC Defendants and/or Drug Source Defendants, as applicable, must provide to Plaintiff, at least 30 days in advance of the execution date:

1. written, sworn verification of full compliance with all relevant manufacturing (cGMPs) or compounding (USP <797>) standards and requirements in the production of said execution drugs (including all requirements for matters such as sterile production, labeling, packing, shipping, storing, and using drug products as defined under the applicable set of standards), with such verification performed by a reputable, disclosed (to Plaintiff's counsel), independent third party, and such verification to include satisfactory assessment of all testing data and other data generated in the manufacturing or compounding process under the relevant standards;

2. written, sworn verification of satisfaction of rigorous preexecution analytical testing of the execution drug at a reputable, disclosed (to Plaintiff's counsel), independent analytical testing laboratory to ensure the finished drug product is in full compliance with USP <797> or cGMPs, as applicable; and

3. written, sworn verification of having submitted to the federal FDA an Investigational New Drug application for the use of the particular execution drug in the form and dosage to be used against Plaintiff, and/or provide Plaintiff a certified copy of that application.

h) DRC Defendants must not use execution drugs obtained from a Drug Source Defendant who has been found to be not in compliance with the full scope of the alternative methods and procedures proffered here, and DRC Defendants must present to Plaintiff in advance of execution, written, sworn verification of full compliance with all such alternative methods and procedures.

i) DRC Defendants must not use execution drugs obtained from a Drug Source Defendant who has been found to be not in compliance with USP <797> standards during any state inspection in the last five years, and DRC Defendants must identify that Drug Source Defendant to Plaintiff in advance of execution so that Plaintiff can ensure the relevant Drug Source Defendant has not been so found; alternatively, if Plaintiff is denied identification information for whatever reason, DRC Defendants must present to Plaintiff in advance of execution written, sworn verification that Drug Source Defendant in question has not been found to not be in compliance with USP <797> standards during any state inspection in the last five years.

j) DRC Defendants must not use execution drugs obtained from a Drug Source Defendant who has been found to not be in compliance with cGMP standards during any FDA or state inspection in the last five years, and DRC Defendants must identify that Drug Source Defendant to Plaintiff in advance of execution so that Plaintiff can ensure the relevant Drug Source Defendant has not been so found; alternatively, if Plaintiff is denied identification information for whatever reason, DRC Defendants must present to Plaintiff in advance of execution written, sworn verification that Drug Source Defendant in question has not been found to not be in compliance with cGMP standards during any FDA or state inspection in the last five years.

k) DRC Defendants must additionally test the final product and its components no more than two days before the scheduled execution, testing for identity, contaminants, bacterial endotoxins, pyrogens, concentration, sterility, proper pH level, potency, and purity. DRC Defendants must provide that data to counsel for Plaintiff immediately upon receipt. If the data generated by that analytical testing is outside the level acceptable under the applicable USP Monograph and any other authoritative source of standards for the drug, Defendants shall not proceed with the scheduled execution of Plaintiff for at least 60 days.

l) DRC Defendants must use accepted and scientifically reliable medical standards, equipment and techniques to assess the point at which irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the brain has occurred and Plaintiff is clinically and legally dead, and must continue repeated injections of 5 grams of the one-drug method barbiturate every three minutes until that point has been achieved;

    i. DRC Defendants must constantly monitor, from before first injection of the execution drug, Plaintiff's heart's electrical activity through an electrocardiogram, his blood pressure, his heart rate, and his respiratory gases through capnography[21].

    ii. DRC Defendants must constantly monitor, from before first injection of the execution drug, Plaintiff's brain's electrical activity using electroencephalography (EEG) with a product such as the StatNet™ headpiece.

    iii. These assessments and equipment must be employed by individuals who possess sufficient qualifications and experience to, and must, continuously engage them from within the execution chamber.

m) DRC Defendants shall have the following on hand in the Death House, as well as the means and personnel trained and capable of

---

[21] Defined as the monitoring of the concentration of exhaled carbon dioxide in order to assess the physiologic status of patients with acute respiratory problems or who are receiving mechanical ventilation and to determine the adequacy of ventilation in anesthetized patients. Dorland's Medical Dictionary, 28th edition.

administering or applying them to Plaintiff in the event Plaintiff is not clinically and legally dead after a reasonable period of time:

  i. supplies of oxygen;
  ii. resuscitative drugs;
  iii. ventilation equipment including a ventilation bag, valve and mask;
  iv. intubation equipment;
  v. any and all means necessary to maintain a patent (uncompromised) airway and support of ventilation;

n) DRC Defendants shall have on-site at SOCF a means to prepare and transport an inmate to an emergency health-care provider facility.

**Alternative 2**

a) DRC Defendants shall fully and formally adopt Incident Command Systems principles into their Execution Protocol as a Core Element.

b) DRC Defendants shall strictly comply with all portions of their Execution Protocol.

c) The paralytic drug shall not be used.

d) Any execution drugs used in Plaintiff's execution using the two-drug method involving midazolam and potassium chloride under this Alternative 2 shall be pharmaceutical grade for human use, FDAapproved, sterile and unexpired. As used here, the term "FDAapproved" includes both the drug itself (i.e., that the drug's formula is approved for distribution to consumers) and the process for manufacturing the drug.

e) The administration of drugs in Plaintiff's execution shall not begin until two working IV sites have been started and remain viable in Plaintiff's peripheral veins. One of the two peripheral IV lines must be reserved for injection of the initial bolus of midazolam, followed thereafter by a continuous titration of midazolam at the rate of 2 mg/minute. Administration of a constant

supply of midazolam at the rate of 2 mg/minute in that dedicated IV line shall continue from the initial injection of midazolam until Plaintiff is clinically and legally dead, including throughout the time when the potassium chloride is injected in the other IV line.

f) DRC Defendants must assign one or more execution team members or other persons under the Execution Protocol to be responsible for monitoring Plaintiff during the execution as further detailed below, to determine whether the midazolam has rendered him fully unconscious, unaware, and insensate to noxious stimuli such as pain and that Plaintiff remains unconscious, unaware, and insensate throughout the entire process following initial injection of the first drug. DRC Defendants must also use accepted and scientifically reliable medical standards, equipment and techniques, including the following, to assess the point at which irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the brain has occurred and Plaintiff is clinically and legally dead.

   i. These persons must possess sufficient qualifications and experience to, and must, continuously do the following from within the execution chamber:

   ii. monitor Plaintiff by constantly assessing him for clinical signs of awareness including purposeful and reflex movement, dilated pupils, tearing from the eyelids, sweating, and an elevated heart rate; and

   iii. monitor Plaintiff's heart's electrical activity through an electrocardiogram, his blood pressure, his heart rate, and his respiratory gases through capnography; and

   iv. monitor Plaintiff's brain's electrical activity using electroencephalography (EEG) with a product such as the StatNet™ headpiece.

g) The administration of the potassium chloride by the drug administrator shall not be started until these persons, using the appropriate equipment and making the necessary checks to monitor

Plaintiff, have determined that the midazolam has rendered Plaintiff fully insensate to pain and unaware and that he remains in that state until he is clinically and legally dead.

h) DRC Defendants shall have the following on hand in the Death House, as well as the means and personnel trained and capable of administering or applying them to Plaintiff in the event Plaintiff is not clinically and legally dead after a reasonable period of time:

i. supplies of oxygen;
ii. resuscitative drugs, such as the reversal agent or antidote called flumazenil for midazolam;
iii. ventilation equipment including a ventilation bag, valve and mask;
iv. intubation equipment;
v. any and all means necessary to maintain a patent (uncompromised) airway and support of ventilation;

i) DRC Defendants shall have on-site at SOCF a means to prepare and transport an inmate to an emergency health-care provider facility.

(ECF No. 1261, PageID 46157-63; ECF No. 1262, PageID 46280-85,)

**The Evidence on the Alternative Method Requirement**

Plaintiffs presented no evidence on their proposed alternatives except for several admissions made in discovery that Southern Ohio Correctional Facility, where the execution chamber is located, has a 12-lead EKG machine. In particular there was no attempted showing that any barbiturate is "available" to the State of Ohio within the meaning of that term as set by the Sixth Circuit in *Fears* ("ordinary transactional effort").

The Court had expected a good deal more testimony on the use of monitoring devices and particularly on interpretation of their output by persons not members of the medical

professions.[22]    Although Nurse Depas and Dr. Sinha testified about the standard, indeed professionally required, use of such devices in a clinical setting, neither testified that the results of using those devices could be readily interpreted by an EMT or anyone else not prohibited ethically from participating in executions.

Plaintiffs' second alternative, requiring the use of midazolam and potassium chloride without a paralytic but with EKG monitoring, would, if Plaintiffs' view of the science were correct, result in the State's intentionally inflicting a painful death on an inmate, an Eighth Amendment violation in itself, while gathering evidence to present in the next preliminary injunction hearing of what happens when no paralytic is administered.  It is difficult to credit this proposal as being made in good faith.

Aside from the different drugs involved in the alternatives, no proof was offered that the State could possibly comply with the rigid procedural requirements of these proposals, at least in a way that would prevent endless additional litigation, i.e. with ordinary litigation effort.  In particular the requirement for "strict compliance" with all provisions for the Execution Protocol without any administrative discretion, even with Director approval, seems unworkable.  The compounded barbiturates provisions are very detailed and stringent and Plaintiffs made no showing these could be readily complied with.  To date, so far as this Court has been informed, Ohio is no closer to having an import license from the Drug Enforcement Administration than it was in January.

In sum, Plaintiffs have failed to prove that either of their suggested alternative methods satisfies the *Glossip/Fears* standard.

---

[22] The reader should recall that every professional medical association has ethically forbidden its members to participate in executions.  Because of the stringency of this prohibition, Dr. Sinha had to restrict his testimony, even though he was testifying on behalf of the condemned.

**THE EQUAL PROTECTION CLAIMS**

Tibbetts's and Campbell's Fourth Causes of Action, as pleaded, set forth eighteen separate equal protection sub-claims[23], but only the very first of these is at issue on the preliminary injunction motions: Campbell and Tibbetts assert they are similarly situated to all other Ohio death row inmates, but they will be "treated disparately due to Defendants' deviations from their Execution Protocol. (Plaintiffs' Written Closing Arguments, ECF No. 1355, PageID 50471.)

Plaintiffs offer argument only on their "burden on fundamental rights" theory which is embodied in the Fourth Cause of Action, sub-claim A.1. They offered no evidence or argument that either of them is being singled out as a "class of one." This Decision therefore contains no analysis of the other nine "burden" sub-claims or the class-of-one theories which are pleaded in the last eight sub-claims of each Plaintiff.

**The Equal Protection Standard**

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. The Supreme Court has stated that this language "embodies the general rule that States must treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill*, 521 U.S. 793, 799 (1997). The States cannot make distinctions which either burden a fundamental right, target a suspect class, or intentionally treat one person differently from others similarly situated without

---

[23] Plaintiffs' full Equal Protection claims are found at Tibbetts 4AC, ECF No. 691, PageID 20279, and Campbell 4AC, ECF No. 978, PageID 36598.

any rational basis for the difference. *Id.; Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005). When the disparate treatment burdens a fundamental right, strict scrutiny applies. *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1 (1973); *Bible Believers v. Wayne County*, 805 F.3d 228, 256 (6th Cir. 2015)(en banc); *Miller v. City of Cincinnati*, 622 F.3d 524, 538 (6th Cir. 2010);

**Burden on Fundamental Rights**

Plaintiffs' Equal Protection sub-claim at issue here asserts that the State Defendants impose a burden on their fundamental rights when they "deviate" from the Execution Protocol, (Tibbetts 4AC, ECF No. 691, PageID 20279; Campbell 4AC, ECF No. 978, PageID 36598).

The fundamental rights protected from state-imposed burdening by the Equal Protection Clause are those rights from the Bill of Rights incorporated into the Fourteenth Amendment Due Process Clause as "inherent in the concept of liberty." Rotunda & Nowak, Treatise on Constitutional Law (4th ed.) § 18.39. Although not all of the Bill of Rights have been thus incorporated, the Eighth Amendment has. *McDonald v. Chicago*, 561 U.S. 742 (2010), *citing Robinson v. California*, 370 U.S. 660 (1962) (cruel and unusual punishment). Thus the right to be free from cruel and unusual punishment is a fundamental right protected from state-imposed burdens that treat similarly situated persons differently without proper justification.

**Judge Frost Addresses Equal Protection Claims**

Earlier in this litigation, Judge Frost recognized the distinction Plaintiffs make between a pure Eighth Amendment claim and an Equal Protection burden-on-fundamental-rights claim where the asserted underlying fundamental right is the right to be free from cruel and unusual punishment. In *Cooey (Smith) v. Kasich*, 801 F. Supp. 2d 623 (S.D. Ohio July 8, 2011), Judge Frost wrote that

> The equal protection theory upon which Plaintiff proceeded at the June 29, 2011 hearing is that Defendants' policy and pattern of deviations from the written execution protocol treat each condemned inmate differently, burdening his fundamental rights and constituting disparate treatment that is not rationally related in any way to a legitimate state interest. The threshold question is therefore whether Plaintiff is correct that Defendants routinely deviate from mandated or core provisions set forth in the written protocol. The brief answer is yes.

*Id.* at 642-43. "Although everything in the written protocol is important, not everything in that protocol is of equal importance for purposes of scrutiny in light of the Constitution." *Id.* at 644. Judge Frost then proceeded to find "at least four deviations from the core components of the written protocol" *Id.*

In *In re: Ohio Execution Protocol Litig.(Brooks),* 2011 WL 5316141 (S.D. Ohio Nov. 4, 2011), Judge Frost denied injunctive relief on the same two Equal Protection claims which had been successful in *Smith*, but adhered to the same Equal Protection analysis: deviations from Core Elements of the Execution Protocol would be found to be constitutional violations, but Brooks had not proven such deviations were likely to happen at his execution.

In *In re: Ohio Execution Protocol Litig. (Lorraine),* 840 F. Supp. 2d 1044 (S.D. Ohio 2012), Judge Frost again employed the same Equal Protection analysis. He noted that "[t]he

fundamental right involved in inmate claims is the right to be free from cruel and unusual punishment." *Id.* at 1054. He continued that the Equal Protection claim made by Lorraine

> sufficiently targets that sweeping core deviations[24] would at least burden Plaintiff's fundamental right by negating some of the precise procedural safeguards that this Court and the Sixth Circuit heralded in prior discussions of Eighth Amendment claims in this same litigation.

*Id.*, *quoting Cooey v. Strickland (Smith)*, 801 F. Supp. 2d 623 at 653 (S.D. Ohio 2011). Judge Frost granted Lorraine preliminary injunctive relief on finding constitutionally significant deviations from the protocol during the Brooks execution: "Defendants have failed to present this Court with any evidence that the non-core deviations were presented to [ODRC Director] Mohr." 840 S. Supp. 2d at 1058.

In *In re:  Ohio Execution Protocol Litig.(Wiles)*, 868 F. Supp. 2d 625 (S.D. Ohio Apr. 4, 2012), Judge Frost reiterated the same Equal Protection framework, but added the nuance, derived from *Towery v. Brewer*,  672 F.3d 650 (9th Cir. 2012), that the deviations on which various plaintiffs had focused "were more likely to create a risk of cruel and unusual punishment than executions without the deviations. *Id.* at 638-39. He read this as reinforcing the distinction he had been drawing between full-blown Eighth Amendment violations and state actions which increased the risk of an Eighth Amendment violation by removing a protection against one. He found Wiles was unlikely to prevail on his Equal Protection claims and denied injunctive relief. Wiles did not appeal and was executed.

In *In re:  Ohio Execution Protocol Litig. (Hartman)*, 906 F. Supp. 2d 759 *S.D. Ohio Nov. 5, 2012), Judge Frost employed the same Equal Protection analysis as in *Wiles*, but concluded that "the asserted deviations of which Hartman complains . . . fail to constitute

---

[24] In Judge Frost's usage, "core deviation" means deviation from a core element of the Execution Protocol.

problems that present a strong likelihood of his succeeding on the merits." Hartman did not appeal and was executed.

Finally, in *In re: Ohio Execution Protocol Litig. (Phillips)*, 2013 U.S. Dist. LEXIS 159680 (S.D. Ohio Nov. 7, 2013), Judge Frost again maintained the distinction between Eighth Amendment violations and state actions which burden the fundamental right to be free from cruel and unusual punishment. Again, however, Judge Frost found no equal protection violations and denied *Phillips*[25] injunctive relief. Phillips did not appeal.

Reciting this history, Tibbetts and Campbell conclude "[t]he Sixth Circuit's published decision in *Lorraine* definitively resolves, as a matter of law, that Plaintiffs' Equal Protection claims are distinct legally and analytically from their Eighth Amendment claims. . . .*Lorraine* is the law of this case." (Joint Reply, ECF No. 1289, PageID 47171). Tibbetts and Campbell regard it as "stunning" that Defendants do not mention "that directly on-point, binding caselaw" or Judge Frost's decisions in *Smith* and *Lorraine* which are argued to be "highly persuasive if not outright controlling." *Id.*

### The Law of the Case on Equal Protection

Plaintiffs thus have a very strong view of what the law of this case is on their equal protection claims. In their Written Closing Arguments they claim:

> Under the law of this case, any deviation from any of the five Core Elements is a per se Equal Protection Clause violation. If a deviation from any of the other provisions is not authorized in advance in writing by the Director, it constitutes a deviation from Core Element #5.

---

[25] This is the same Ronald Phillips to whom this Court granted injunctive relief in January 2017 which was later vacated by the *en banc* Sixth Circuit. Phillips was executed July 26, 2017.

(ECF No. 1355, PageID 50474).

This Court disagrees with this very broad reading of the law of this case as applied to the Equal Protection claims.

Plaintiffs first characterize as a "deviation" any failure to comply with any provision of the Execution Protocol which they say incorporates informal execution policies including "admissions and representations the ODRC Defendants have made in response to discovery requests, . . . representations that the ODRC Defendants have made in various pleadings, motions and proceedings throughout the course of this litigation, including testimony presented in hearings before the Court." (Plaintiffs' Written Closing Arguments, ECF No. 1355, PageID 50473).

That cannot be the law. Judge Frost himself refused to "constitutionalize" every provision of the Protocol, much less add to it everything any ODRC staff person had said in discovery or testimony. Even the most solemn of representations by the State to this Court and to the Sixth Circuit, to wit, that a paralytic drug and potassium chloride would never be used again, were held by the Sixth Circuit insufficient to support a judicial estoppel finding. *Fears, supra*, at 891-92. If a State representation sufficiently solemn to induce dismissal of an appeal is not somehow "added" to the Protocol, no more can other execution "policies" become binding as a matter of constitutional law.

Applying the general law of the case principles outlined above to its asserted application here, the Court deals first with *In re: Ohio Execution Protocol Litig. (Lorraine)*, 671 F.3d 601 (6th Cir. 2012). That published decision of the Sixth Circuit is a three-paragraph order denying the State of Ohio's emergency motion to vacate Lorraine's stay of execution. The Order is not a

48

full decision on appeal from Judge Frost's decision.  Nor does it discuss any of Plaintiffs' equal protection claims or their various theories of the Equal Protection Clause.  All it does is refuse to interfere, on an emergency basis[26], with the District Court's grant of preliminary injunctive relief.  Of course it is binding on this Court, but it should not be read for propositions broader than that for which it stands, to wit, that it was not error for Judge Frost to grant preliminary injunctive relief on the basis of the equal protection claims made by Lorraine.  That is the only appellate decision that supports Plaintiffs' equal protection theory

Turning to law of the case on equal protection at the district court level, two points must be observed.  First of all, every injunctive relief order that Judge Frost entered was for preliminary relief.  "An order granting or denying a preliminary injunction . . . rests on tentative findings that are subject to reconsideration, either at trial or during later stages of pretrial proceedings."  18B Wright, Miller, & Cooper, Federal Practice and Procedure:  Jurisdiction 2d § 4478.1.  In every one of his decisions, Judge Frost noted that the findings were not final.

Second, this is a consolidated case.  Cases consolidated under Fed. R. Civ. P. 42(a) retain their separate identity.  *Patton v. Aerojeet Ordnance Co.*, 765 F.2d 604 (6th Cir. 1985);  9 Wright & Miller, FEDERAL PRACTICE AND PROCEDURE:  CIVIL 3D § 2382. "[C]onsolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another."  *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496-97 (1933); *Lewis v. ACB Business Servs., Inc.,* 135 F.3d 389 (6th Cir. 1998).   Law of the case doctrine speaks principally to consistency in the treatment of one party to one case; its application is appropriately attenuated when dealing with the separate cases that have been consolidated here.

---

[26] The Order was entered January 13, 2012, two days after Judge Frost entered the injunction and five days before Lorraine's scheduled execution.

With those strictures in place, this Court believes that, consistent with law of the case doctrine, its rulings here should be consistent with Judge Frost's decisions in *Wiles*, *Hartman*, and *Phillips*, to wit,  (1) Eighth Amendment and Equal Protection analyses are analytically distinct; (2) intentional state action in connection with an execution which burdens an inmate's fundamental Eighth Amendment right by increasing the risk that he will suffer severe pain and needless suffering is actionable under the Equal Protection Clause but (3) not every "deviation" from the Execution Protocol increases that risk.

Therefore, to prove an Equal Protection violation, Plaintiffs must show an intentional state action (action properly attributable to the State under *Monell, supra*,) which treats one death row inmate disparately from others and burdens that inmate's Eighth Amendment right by increasing the risk he will suffer severe pain and needless suffering.

To meet the *Monell* branch of this test, Plaintiffs must show unconstitutional policy, not just past unconstitutional acts.  Judge Frost wrote the "Constitution [does] not require perfect adherence to every single provision of Ohio's execution protocol without deviation[.]" *In re Ohio Execution Prot. Lit. (Wiles),* 868 F. Supp. 2d 625, 626 (S.D. Ohio 2012). In fact, Judge Frost explained that "[m]istakes happen" and "random misadventures that can result when Ohio errs by not following its protocol may be regrettable but constitutional[.]" *Id.*

> "[E]vidence of prior accidents in the administration of an execution protocol does not render the protocol itself *per se* unconstitutional." *Cooey (Biros)*, 589 F.3d at 224. The deviations upon which the Court granted the relief in years past "often were 'more likely to create a risk of cruel and unusual punishment' than an execution without the deviations and 'did affect the *risk* of pain to which they would be subjected, and therefore the *risk* of being subjected to cruel and unusual punishment.'"

*Id.* at 638-39.   Campbell and Tibbetts cannot show a continuing violation which is likely to recur during their executions because "this Court has not found a single deviation establishing an equal protection violation and granted a stay since 2012."  ECF No. 1282, PageID 46764, citing *In re:  Ohio Execution Protocol Litig.*, 840 F. Supp. 2d 1044 (S.D. Ohio 2012).   In a portion of the January decision which Plaintiffs did not appeal the Court ruled against them on the four equal protection claims they made in those proceedings.

Plaintiffs must do more than merely establish that the Defendants have erred in the past (assuming *arguendo* that they did so), they must establish that the error is likely to reoccur and will affect the risk of pain. "Permitting constitutional challenges to lethal injection protocols based on speculative injuries and the possibility of negligent administration is not only unsupported by Supreme Court precedent but is also beyond the scope of . . . judicial authority." *Cooey (Biros), supra* at 225.

If Plaintiff can show state action and disparate treatment, the State can attempt to justify the differential treatment by showing it is narrowly tailored to serve a compelling governmental interest.  *Vacco, supra; Miller v. City of Cincinnati*, 622 F.3d 524, 538 (6th Cir. 2010).

When strict scrutiny applies, the state actors must justify disparate treatment by showing a compelling governmental interest.  *Citizens United v. Federal Election Comm.*, 558 U.S. 310, 340 (2010)(speech); *Johnson v. California*, 543 U.S. 499 (2005)(race); *Plyler v. Doe,* 457 U.S. 202, 216-17 (1982).

Plaintiffs assert that "[a]ny deviations from the Core Elements can *never* be said to be tailored to a compelling *governmental interest,* because Ohio's desire to execute its death-sentenced prisoners is not a compelling state interest.  (Motion, ECF No. 1261, PageID 46170-

71). They cite the characterization of that interest in *Baze, supra,* and *Nelson, supra.*, as "legitimate," rather than compelling.

The State's interest in these cases is not in execution per se, but in enforcement of the judgments of its courts. Each Plaintiff in this case will be executed, if at all, pursuant to a warrant issued by the Ohio Supreme Court on a conviction which has received the most thorough judicial review known to American jurisprudence. Ohio's compelling state interest is in having the judgments of its courts carried out. Absolutely core to the rule of law is that courts' judgments be executed, whether or not those judgments evince good public policy. To put it another way, whether or not executing those guilty of murdering others is desirable or important or even vitally necessary is beside the point in deciding whether there is a compelling governmental interest in carrying out court judgments.

Applying an extra protection for one prisoner (re-testing compounded pentobarbital) does not create an equal protection class-of-one right in other prisoners to obtain re-testing. *Wood v. Collier*, 836 F.3d 534 (5th Cir. 2016), relying on discretion discussion in *Engquist v. Oregon De't of Agric.*, 533 U.S. 591 (2008). To the same effect is *In re: Ohio Execution Protocol Litigation (Hartman),* 2012 U.S. Dist. LEXIS 158199 (S.D. Ohio Nov. 5, 2012), *quoting Towery v. Brewer*, 672 F.3d 650 (9th Cir. 2012). That rationale would apply to any extra accommodation given to one Ohio prisoner that was not made to others, e.g. the extra visitation time with his brother that the Warden accorded to Ronald Phillips on the day of his execution.

**Claimed Equal Protection Violations**

Despite the prolixity of their pleading, Plaintiffs pursue only four equal protection claims in the instant proceeding. They assert that their own executions must be enjoined because:

1.     Defendants did not accommodate Gary Otte's obesity;

2.     Defendants did not provide Attorney Wright with free access to the telephone during the Otte execution;

3.     Defendants did not perform the required number of consciousness checks on Otte; and

4.     Defendants did not properly document the Otte execution.

(Plaintiffs' Proposed Findings of Fact and Conclusions of Law, ECF No. 1319).

To prevail, Plaintiffs must show that each of these acts or omissions actually happened, was pursuant to policy or custom, burdened Otte's right to be free of cruel and unusual punishment, and is likely to be repeated for the Campbell and Tibbetts executions.


**Medical Accommodation**

Gary Otte's medical review on August 25, 2017, showed him as being morbidly obese (ECF No. 1262-2). Plaintiffs argue that that this fact made it "very likely" Otte would obstruct, that Defendants should have inferred that likelihood from the obesity, and that they should therefore have taken steps to prepare for it, including communicating any concerns the Execution Team had to the SOCF Warden.

This claim fails at several points.  First of all, no proof was offered that Defendants should have known morbid obesity creates a risk of obstructing.  Nurse Depas testified that she had made that inference, but it was not shown that this correlation is so well known that the medical team members would know it.  Nurse Depas is, after all, a nurse anesthetist with twenty-eight years experience.

Second, Plaintiffs have not shown that failure to accommodate Otte was pursuant to a policy of not accommodating similar concerns and is therefore likely to be repeated at the Campbell and Tibbetts' executions.  We know from the hearing that Defendants are aware of many of the medical difficulties Campbell faces, although none were shown for Tibbetts.  During the hearing the Court was advised of discussions among counsel about accommodating Campbell's breathing problems with a wedge to enable him to lie more erect during the execution.  Thus Plaintiffs have not proved whatever failure to accommodate occurred with Otte is likely to be repeated with Campbell and Tibbetts.

Third, Plaintiffs' manifest theory is that every failure to follow the Execution Protocol is a "deviation."  This failure to plan for dealing with Otte's morbid obesity is said to violate one of the non-core elements of the Protocol, but to have been done without prior authorization by Director Mohr.  Therefore the deviation is argued to be one of Core Element 5 which requires the Director's approval for all non-core "deviations."

The Core Elements of 01-COM-11 read as follows:

1. At least three Medical Team Members, two of whom are authorized to administer drugs under Ohio law, shall be used in the conduct of court-ordered executions.

2. The drugs required by this policy shall be used.

3. Functions required to be performed by medically-qualified persons, as described in this policy, shall be performed by Medical Team Members.

4. All Execution Team functions shall be performed by appropriately trained and qualified members of the Execution Team.

5. Only the Director can authorize a variation from the procedures stated in this policy but not a variation from the four requirements listed immediately above in subsection V.1.2.3. and 4. of this policy.

(PX1, ODRC Policy 01-COM-11, ¶¶ V. 1–5, October 7, 2016.)

The Protocol provisions from which the ODRC Defendants are alleged to have deviated read:

> Paragraph VI.B.3.c of the Execution Protocol requires Defendants to assess the condemned prisoner's "medical condition" "in order to identify any necessary accommodations or contingencies that may arise from the prisoner's medical condition or history" and to communicate as soon as possible to the SOCF Warden "[a]ny medical condition or history that may affect the performance of the execution." The SOCF Warden must "confer with others as necessary to plan" for problems in the execution.

> Paragraph VI.B.3.a requires the same with respect to the Defendants' review of the inmate's medical chart "to establish any unique factors which may impact the manner in which the Execution Team carries out the execution." The Protocol further mandates that "[p]otential problems shall be noted and discussed, and potential solutions considered, in advance of the execution." Further, any "potential issues shall be communicated to the" SOCF Warden "as soon as possible."

> Paragraph VI.B.3.d requires that "any concerns or plans for medical accommodations or contingencies shall be communicated to the Execution Team in order that these things may be discussed and addressed in execution trainings or rehearsals."

(Quoted at Plaintiffs' Written Closing Arguments, ECF No. 1355, PageID 50475.) These are not Core Elements, so the allegation is that they violate Core Element 5 because Director Mohr did not authorize them.

Plaintiffs argue the Defendants deviated from each of these requirements. They are said to have had constructive notice – from the "morbidly obese" note – that he was likely to obstruct. *Id.* Yet they failed to note likelihood of obstruction and air hunger as "potential problems," failed to notify the SOCF Warden of "concerns" and "potential issues," "failed to identify necessary accommodations or contingencies," and Warden Erdos failed to "confer with others" to "plan such accommodations or contingencies" as might be necessary/. *Id.* at PageID 50476.

Plaintiffs' analysis turns 42 U.S.C. § 1983 upside down. The policy of the State of Ohio as expressed in 01-COM-11 is that appropriate medical assessment and accommodation shall be made. If any of the ODRC staff who participated in Otte's execution did not provide that assessment and accommodation, it was not because they were following policy, but because they were not following policy. To put it another way, if Plaintiffs had shown that there was a custom or practice of ignoring the policy or if they had shown the person responsible for making policy, Director Mohr, had in effect told staff to ignore the medical assessment and accommodation provisions of the Protocol, they might have made out a case, at least as to Otte. Compare *Pembaur v. City of Cincinnati, Ohio,* 475 U.S. 469 (1986).

Ohio's Execution Protocol is not a strict liability statute. If one of the persons who is charged with carrying it out fails to perform one of his or her required functions, that is a failure that needs to be corrected, but that does not make the failure a violation of the Constitution.

It is anomalous to suggest that a failure to follow policy is a deviation which would somehow be authorized in advance by Director Mohr.  Presumably that is why Core Element 5 speaks of his authorizing "variations," not "deviations."

While negligently not carrying out a proper medical assessment and providing appropriate accommodation for Mr. Otte may have increased his risk of suffering severe pain, it was not a constitutional violation because it was not (or at least not shown to be) intentional state action.  Even if it had been a violation of Otte's constitutional rights, it would not justify enjoining the execution of either Alva Campbell or Raymond Tibbetts because there was no showing that the failure to do a proper medical assessment and provide appropriate accommodations will likely be repeated for them.


**Attorney Telephone Access**


The Execution Protocol also provides "Paragraph VI.G.2 If the prisoner chooses to have his or her counsel as a witness, at all times after counsel enters the witness room, counsel shall have free access to the phone near the entrance to the death house."

The testimony at the hearing established that Carol Wright was one of Gary Otte's counsel and that her identity as an attorney was known to Patrick Parsons, an SOCF staff person who escorted her as part of a group of people who would be in the inmate's witness room in the Death House, from the point where that group assembled to the relevant witness room.  Ms. Wright heard the door click after she entered the room and inferred the door was locked; she had witnessed prior executions and did not recall having had that experience before.

When Nurse Depas made the comment "he's obstructing," Ms. Wright arose and attempted to leave the room, but found the door locked. She communicated to the SOCF person on the outside of the door, designated as Door Man 3, and now identified as Jamie Woods, that she needed to leave. She did not identify herself to him as an attorney, nor did she state what she needed to leave for. He interpreted her request to leave as stating an intention to go back to the assembly point, knew that she would need an escort across the Yard, and went to communicate that need to Deputy Warden Cool. He then came from his location in the Death House, ascertained what Ms. Wright actually needed, and let her out of the witness room to use the telephone. As noted above, her purpose was to communicate what she and Nurse Depas had seen to her colleague, Attorney Allen Bohnert, in support of a request to the Court for an emergency temporary restraining order to prevent the execution's going forward. The delay in reaching the Court meant that by the time that occurred, Ms. Wright was observing behavior on Mr. Otte's part consistent with an end of the obstructing activity.

Plaintiffs argue

> Any interpretation of this provision mandating "free access" that would consider what happened with Ms. Wright not to have violated it is as credible as the Defendants' post-hoc interpretation of their promises that formed the basis of the judicial estoppel claim this Court considered in January.

(Written Closing Arguments, ECF No. 1355, PageID 50478). Plaintiffs' position here is strongly redolent of the most wooden versions of the plain meaning rule for interpreting written language. But ascertaining meaning is rarely if ever that simple. *See* Michael R. Merz, The Meaninglessness of the Plain Meaning Rule, 4 Univ. Dayton L. Rev. 31 (1979).

More importantly, rules do not apply themselves[27].  The plain meaning rule is often a formalist mask where the essence of the invoker's point is "Any damned fool can see this rule means what I think it means."   All rules need application by people and all rules need interpretation by their appliers.  Yes, the rule in question does require giving inmates' attorneys free access to the telephone in the hallway.  Yes, what Ms. Wright got was not "free access."  Yes, the free access rule appears to be intended[28] to deal with precisely the situation that arose here.  Yes, Patrick Parsons knew Ms. Wright was an attorney for Mr. Otte.  But the rule of free access conflicted with other rules that applied to the situation:  (1) doors in the Death House that were not being immediately used for ingress and egress are to be locked; (2) persons in the witness room may not leave the Death House without an escort to take them across the Yard.  To apply these rules in a way so as to resolve the conflicts between them, Door Man 3 had to know certain facts:  (1) that the person wanting out of the room was an attorney and (2) that that person wanted to use the telephone and not to leave the Death House.  As soon as Deputy Warden William Cool was brought to the door, he recognized Ms. Wright and knew her to be an attorney; he immediately gave her access to the telephone.  In other words, once a person who knew the relevant facts and who had authority to interpret and apply the rule was present, Ms. Wright was given access to the telephone.

Plaintiffs' approach here is again one of strict liability:  By their lights, all SOCF personnel present are bound to know the rule and all of the relevant facts and apply them

---

[27] "The application of a simple rule ought itself to be simple.  But that is not so, Aristotle says," noting the need to exercise practical judgment in the application of rules.  Lon Fuller, The Morality of Law, citing Nichomachean Ethics, Book V, 1137a.  See also Solum "Virtue Jurisprudence:  Towards an Aretaic Theory of Law, in Huppes-Cluysenaer and Coelho, Aristotle and the Philosophy of Law:  Theory, Practice and Justice "Practical wisdom or good judgment is required to insure that rules are applied correctly." *Id.* at 27.

[28] Plaintiffs claim this rule was "expressly established to provide witnessing counsel a way to contact the Court during an execution" (ECF No. 1355, PageID 50479).  But they provide no writing in which that expression is recorded.

instantaneously to produce the result Plaintiffs believe is correct. Any failure to perform to this standard is a "deviation," amounting to a violation of the Equal Protection Clause unless Director Mohr approved it in writing in advance. Of course Director Mohr did not approve this "deviation." Had he been asked to do so in advance, he presumably would have directed that Ms. Wright be let out at once, since that is the purpose of the rule.

Moreover, even if there had been a constitutional violation in Mr. Otte's case, that would not imply that the same violation would occur at either Campbell's or Tibbetts's execution. The Court was advised during the hearing that SOCF has taken steps to acquire badges to identify attorneys who will in Ms. Wright's position in the future. All that will be needed is for the attorney to announce her or his purpose (i.e., to use the telephone) and for Door Man 3 to be instructed to apply this portion of the Protocol to let attorneys with an announced proper purpose to exit immediately. That remedy does not require the positive injunctive relief of ordering those steps taken, much less the negative injunctive relief of prohibiting the executions.


**Failure to Perform Required Consciousness Checks**


Insufficient though they may be to assess the level of an inmate's anesthesia (see argument above), Plaintiffs still want the Execution Team to perform the consciousness checks required by the Protocol. Paragraph VI.H.1.c.ii provides "[f]ollowing administration of syringes 1 and 2 and before administration of the second and third drugs described in the subsection below, a Drug Administrator shall reenter the Execution Chamber to assess the prisoner's consciousness."

Here Plaintiffs do not rely on the plain meaning of the words in the Protocol. Instead, they rely on testimony from various team members of their intention to perform at least two of six different consciousness check techniques (Plaintiffs' Written Arguments, ECF No. 1355, PageID 50482, citing the testimony of various team members). Moreover, they cite Director Mohr's testimony that at least three consciousness checks will be performed. *Id.*

Director Mohr's testimony in this case does not become a part of the Protocol, and it is much less solemn than the commitment held insufficient by the Sixth Circuit on the judicial estoppel claim.

Apart from argument over interpretation, this claim can be resolved from the testimony. Team Member 17 testified that he performed three consciousness checks: calling Mr. Otte's name, lifting his eyelid and touching his eye, and providing hard object pressure to the bed of one of Otte's fingernails. This testimony was corroborated by Team Member 10 and Warden Erdos, both of whom were in the execution chamber.

Nurse Depas testified she only saw an eyelid lift without any touching of the eye, and neither of the other checks. Without questioning the sincerity of Nurse Depas, the Court credits the testimony of Team Member 17. He was much closer to the inmate than she and had no motive to reduce the number of consciousness checks performed, particularly because he knew he was being closely watched.

Plaintiffs assert that calling the inmate's name does not constitute issuing a verbal command as is allegedly required by best practices in administering these "consciousness checks." While an express command would apparently be the better practice, calling an inmate's name with a question inflection at the end would be generally understood as an implicit request for a response to show that the name caller has the named's attention; failure to acknowledge

would be considered at least rude..  The difference is immaterial for purposes of the Fourteenth Amendment.

This alleged failure to follow the Protocol has not been proved.

**Falsification of Documentation**

As their fourth asserted protocol violation, Plaintiffs assert the Otte execution paperwork was "falsified" in that (1) the accurate number of IV attempts in the right arm was misrecorded as one when in fact two attempts were made, (2) the documentation reflects three consciousness checks were performed when only one occurred, and (3) Mr. Otte's tears and Ms. Wright's attempt to get to the telephone were not documented.

Based on the testimony presented,  the Court finds that the records regarding the number of attempts at IV access was corrected and that the number of consciousness checks recorded was the number that actually occurred.  The Protocol requires recording acts or events that were not anticipated and Ms. Wright's difficulty getting to the telephone and Mr. Otte's tearing (to the extent Execution Team members observed this happening) were certainly not anticipated.  But failing to record events in a timeline is not a violation of the Constitution in that there is no showing it was intentionally done or done in Mr. Otte's case as part of discrimination against him.   And Plaintiffs presented no evidence to support a claim that these records were intentionally "falsified," as opposed to negligently completed.

**Conclusion**

Messrs. Campbell and Tibbetts have failed to show that they are likely to succeed at trial in proving either the alleged Eighth Amendment or Fourteenth Amendment violations. Their Motions for Preliminary Injunction and Stay of Execution are DENIED.

November 3, 2017.

s/ *Michael R. Merz*
United States Magistrate Judge