**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE:  OHIO EXECUTION PROTOCOL LITIGATION | ) ) | Case No. 2:11-cv-1016 |
| | ) | |
| This document relates to: Plaintiff Campbell | ) ) | CHIEF JUDGE EDMUND A. SARGUS |
| | ) | |
| ALVA CAMPBELL, JR. | ) | Magistrate Judge Michael R. Merz |
| (Inmate # 354-963), | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN KASICH, Governor, | ) | |
|     Defendant, | ) | |
| GARY C. MOHR, Director, | ) | |
|     Defendant, | ) | |
| RONALD ERDOS, Warden, | ) | |
|     Defendant, | ) | **FIFTH AMENDED COMPLAINT FOR** |
| DONALD MORGAN, | ) | **INJUNCTIVE AND DECLARATORY** |
|     Defendant, | ) | **RELIEF, ATTORNEY FEES AND** |
| STEPHEN GRAY, | ) | **COSTS OF SUIT PURSUANT TO 42** |
|     Defendant, | ) | **U.S.C. § 1983 AND OTHER RELATED** |
| EDWIN VOORHIES, | ) | **CAUSES OF ACTION**[1] |
|     Defendant, | ) | |
| RICHARD THEODORE, | ) | |
|     Defendant, | ) | **JURY TRIAL REQUESTED FOR ALL** |
| TIMOTHY SHOOP, Warden, | ) | **CLAIMS SUBJECT TO JURY TRIAL** |
|     Defendant, | ) | |
| JOHN COLEMAN, Warden, | ) | |
|     Defendant, | ) | |
| UNNAMED AND ANONYMOUS | ) | |
| EXECUTION TEAM MEMBERS, | ) | |

---

[1] Plaintiff files this Fifth Amended Complaint pursuant to the Court's Order of December 27, 2017, authorizing Plaintiff to amend and supplement certain claims, and to add additional claims, relating to Plaintiff's aborted execution on November 15, 2017.  (*See* Decision and Order, ECF No. 1405.)

      Defendants,                )

**UNKNOWN PHARMACIES #1-100,**     )

      Defendants,                )

                                )

**UNKNOWN PHARMACISTS #1-100,**   )

      Defendants,

**and**

**UNKNOWN DRUG SUPPLIERS #1-25**

      Defendants

**and**

**JOHN DOES #1-25**

      Defendants.

---

**Fifth Amended Complaint for Injunctive and Declaratory Relief, Attorney Fees, and Costs of Suit Pursuant to 42 U.S.C. § 1983 and Other Related Claims for Relief on Behalf of Plaintiff Campbell**

---

## TABLE OF CONTENTS

NATURE OF THE ACTION ............................................................................... 1

JURISDICTION AND VENUE ......................................................................... 2

PARTIES ............................................................................................................ 4

    A.    Plaintiff ............................................................................................ 4

    B.    Defendants ...................................................................................... 4

EXHAUSTION OF ADMINISTRATIVE REMEDIES .......................................... 13

JUSTICIABLE CASE OR CONTROVERSY ..................................................... 13

RELEVANT FACTS ....................................................................................... 14

    A.    Historical background of Ohio's execution protocol and its
            adoption of the current Execution Protocol. ............................... 19

    B.    Allegations regarding Drug Source Defendants' status as
            acting under color of law. ............................................................ 40

    C.    Allegations related to the requirements of DRC Defendants'
            Execution Protocol. .................................................................... 45

          1.    Plan 1 of Defendants' Execution Protocol – A One-Drug
                Method Using Pentobarbital ............................................. 61

          2.    Plan 2 of DRC Defendants' Execution Protocol – A One-
                Drug Method Using Sodium Thiopental ........................... 66

          3.    Plan 3 of DRC Defendants' Execution Protocol – A
                Three-Drug Method Using Midazolam, A Paralytic, and
                Potassium Chloride ......................................................... 71

    D.    Additional allegations related to midazolam. ............................. 79

    E.    Additional allegations related to pancuronium bromide,
            vecuronium bromide, and rocuronium bromide. ....................... 89

    F.    Additional allegations related to potassium chloride. ................. 90

    G.    Additional allegations related to using pentobarbital,
            thiopental sodium or midazolam for an execution. ..................... 90

    H.    Allegations related to compounded execution drugs. ............... 109

    I.    Allegations related to imported execution drugs. ..................... 147

    J.    Additional allegations regarding Ohio state law. ..................... 156

    K.    Allegations related to the definitions of "Director" and
            "Warden" in the Execution Protocol ........................................ 161

L.     Additional allegations related to the contents of Defendants' Execution Protocol. ........................................................... 170

M.    Defendants deviate or vary from the mandates of their written Execution Protocol, consistently fail to follow their informal execution policies, and falsify official documents and records. .......................................................... 185

N.    Allegations related to Plaintiff's individual characteristics. ....... 201

O.    Allegations involving examples of specific, relevant executions or execution attempts. ........................................... 205

    Unidentified execution in or about 2004 ................................. 205

    Wilford Berry .................................................................... 206

    Joseph Clark ..................................................................... 206

    Christopher Newton ........................................................... 210

    Daniel Wilson .................................................................... 210

    Marvallous Keene ............................................................... 211

    Romell Broom ................................................................... 211

    Vernon Smith, a.k.a., Abdullah Sharif Kaazim Mahdi ............. 215

    Michael Beuke ................................................................... 216

    Dennis McGuire ................................................................. 217

    Additional Ohio Executions ................................................. 224

    Ronald Smith .................................................................... 224

    Christopher Brooks ............................................................ 225

    Clayton Lockett ................................................................. 226

    Joseph Wood ..................................................................... 231

    Charles Warner .................................................................. 233

    Kelly Gissendaner .............................................................. 233

    Michael Lee Wilson ............................................................ 235

    Arnold Preito .................................................................... 235

    Kent Sprouse .................................................................... 236

    Manuel Garza .................................................................... 237

    Derrick Charles ................................................................. 237

    Gregory Russeau ............................................................... 237

    Jose Villegas ..................................................................... 238

    Eric Robert ....................................................................... 238

iv

P.    Allegations related to alternative execution methods or manners. ........................................................... 239

    1.    The alternative-method requirement violates Plaintiff's Fifth Amendment rights. ................................. 241

    2.    Plaintiff is insufficiently competent to be able to constitutionally satisfy the alternative-method requirement. ................................................. 241

FEDERAL LAW CLAIMS FOR RELIEF AGAINST DRC DEFENDANTS IN THEIR OFFICIAL CAPACITIES AND DRUG SOURCE DEFENDANTS.. 243

First Claim for Relief: Eighth and Fourteenth Amendment Violations ......... 243

Second Claim for Relief: Fourteenth Amendment Due Process Violations.... 243

Third Claim for Relief: Violations of First, Sixth, Eighth and Fourteenth Amendment Rights of Access to Counsel, Access to Courts, Ability to Petition for Redress of Grievances, Due Process, and Privileges or Immunities of United States Citizenship. ...................................... 249

Fourth Claim for Relief: Fourteenth Amendment Equal Protection Violations ................................................................. 249

A.    Equal Protection—Fundamental Rights ................................... 251

    1.    Equal Protection violation based on burdening of Plaintiff's fundamental rights by Defendants' deviations from the Execution Protocol......................... 253

    2.    Equal Protection violation based on burdening of Plaintiff's fundamental rights by Defendants' deviations from Ohio's execution statute. ...................... 260

    3.    Equal Protection violation based on burdening of Plaintiff's fundamental rights by Defendants' deviations from Ohio's Constitution. .............................. 262

    4.    Equal Protection violation based on burdening of Plaintiff's fundamental rights by Defendants' failing to follow federal and Ohio state laws related to imported drugs, unapproved drugs, misbranded drugs, adulterated drugs, controlled substances, and compounded drugs, including compounding sterile injectable controlled substances to be used as execution drugs. .......................................... 263

    5.    Equal Protection violation based on burdening of Plaintiff's fundamental rights by Defendants' deviations from Ohio's definition-of-death law. ............... 265

6.    Equal Protection violation based on burdening of Plaintiff's fundamental rights by Defendants' deviations from federal and Ohio state laws prohibiting non-consenting human experimentation. ........................ 266

7.    Equal Protection violation based on burdening of Plaintiff's fundamental rights by Defendants' use of an Execution Protocol and policies by which Defendants deny necessary medical and resuscitative care and permit a lingering death. ................................................. 268

8.    Equal Protection violation based on burdening Plaintiff's fundamental rights by Defendants' use of midazolam and the unavoidable variation inherent in midazolam's efficacy on individual people ....................... 270

9.    Equal Protection violation based on burdening Plaintiff's fundamental rights by Defendants' use of compounded execution drugs and the unavoidable variation inherent in compounded drugs. ....................... 272

10.   Equal Protection violation based on burdening Plaintiff's fundamental rights by Defendants' intentional removal of the drug concentrations from the Execution Protocol which creates a great likelihood that Defendants will inject Plaintiff with lesser or greater than the required amount of execution drugs. .... 275

B.    Equal Protection—"Class of One" Disparate Treatment ............ 278

1.    Equal Protection violation based on Defendants' unequal application of the Execution Protocol to Plaintiff as a class of one. ................................................. 279

2.    Equal Protection violation based on Defendants' unequal application of Ohio's execution statute to Plaintiff as a class of one. ................................................. 284

3.    Equal Protection violation based on Defendants' unequal application to Plaintiff, as a class of one, of federal and Ohio state laws related to imported drugs, unapproved drugs, misbranded drugs, adulterated drugs, controlled substances, or compounded drugs, including compounding sterile injectable controlled substances to be used as execution drugs. ..................... 285

4.    Equal Protection violation based on Defendants' unequal application of Ohio's definition-of-death law to Plaintiff as a class of one. ................................................. 287

5. Equal Protection violation based on Defendants' unequal application of federal and Ohio state laws prohibiting non-consenting human experimentation to Plaintiff as a class of one. ................................................. 288

6. Equal Protection violation based on Defendants' disparate denial of necessary medical care and permitting a lingering death. ........................................... 288

7. Equal Protection violation based on Defendants' use of midazolam and the unavoidable variation inherent in midazolam's efficacy on individuals, which treats Plaintiff unequally as a class of one. ............................... 289

8. Equal Protection violation based on Defendants' removal of any required concentration of the execution drugs which treats Plaintiff unequally as a class of one. .............................................................................. 290

Fifth Claim for Relief: Violations of Fundamental Rights Arising Under The Principles Of Liberty and/or Natural Law Which Are Protected By The Ninth Amendment. ............................................................... 291

Sixth Claim for Relief: First Amendment Free Speech Clause Violations ...... 295

Seventh Claim for Relief: Fourteenth Amendment Due Process Violation .... 297

Eighth Claim for Relief: Fourteenth Amendment Due Process Clause Violations For Experimenting On Non-Consenting Prisoners ............. 302

Ninth Claim for Relief: Fourteenth Amendment Privileges or Immunities Clause Violations For Experimenting on Non-Consenting Prisoners. . 308

Tenth Claim for Relief: Ex Post Facto Violation ........................................... 312

Eleventh Claim for Relief: Bill of Attainders Violation.................................. 316

Twelfth Claim for Relief: Eighth Amendment Violation—Deliberately Indifferent and/or Reckless Denial of Resuscitative Health Care After The Execution Is To Be Completed........................................... 317

Thirteenth Claim for Relief: Eighth Amendment Violation—Deliberate Indifference and/or Reckless Disregard Of Serious Medical Needs..... 321

Fourteenth Claim for Relief: Fourteenth Amendment Due Process Clause Violation. ....................................................................... 323

Fifteenth Claim for Relief: Violation of Racketeer Influenced and Corrupt Organizations Act (RICO) alleged against Drug Source Defendants only ..................................................................................................... 327

A. Introduction ........................................................................... 327

B. Predicate Acts under 18 U.S.C. § 1961(1)(A) (State law predicates) ............................................................................. 328

       1.     Retail sale and possession predicate ............................... 328

       2.     Compounding Pharmacists and Pharmacies predicate.... 330

       3.     Dispensing Pharmacist and Pharmacies predicate.......... 333

  C.    Predicate Acts under 18 U.S.C. § 1961(1)(D) (federal law predicates) .................................................................... 334

       1.     Unlawful Import predicate............................................... 334

       2.     Unlawful Dispensing predicate....................................... 336

       3.     Unlawful Compounding predicate .................................. 337

  D.    Other Predicates................................................................ 337

  E.    Pattern of Activity............................................................. 337

  F.    Interstate and Foreign Commerce ............................... 339

  G.    Substantive RICO Violations under 18 U.S.C. § 1962 ............. 339

  H.    Relief................................................................................ 340

STATE LAW CLAIMS FOR RELIEF AGAINST DEFENDANTS ....................... 340

Sixteenth Claim for Relief: Ohio Civil RICO claim against Drug Source Defendants ............................................................. 340

Seventeenth Claim for Relief: Claims for Declaratory Judgment Under Ohio Law Against All Defendants, and for Injunctive Relief Under Ohio Law Against Drug Source Defendants For Violations of Ohio Law. ................................................................................. 344

  A.    Rights of Civil Action Under Ohio Law ..................................... 344

  B.    Defendants' Violations of Ohio Laws ........................................ 346

  C.    Relief................................................................................ 354

Eighteenth Claim for Relief: Violation of Ohio Product Liability Act (Ohio Revised Code § 2307.71 et seq.) ......................................... 356

Nineteenth Claim for Relief: Violation of Ohio Consumer Sales Practices Act (Ohio Revised Code § 1345.01 et seq.) Against Drug Source Defendants ................................................................. 361

ADDITIONAL CLAIMS FOR RELIEF AGAINST ALL DEFENDANTS............... 365

Twentieth Claim for Relief: Eighth Amendment Violation Based On Sure or Very Likely Risk of Serious Harm In The Form Of Severe, Needless Physical Pain And Suffering Due To The Identity Of The Drugs In The Execution Protocol........................................................ 365

Twenty-First Claim for Relief: Eighth Amendment Violation Based On Substantial Risk Of Serious Harm In The Form Of Severe, Needless Physical Pain And Suffering Due To The Source Of The Drugs In The Execution Protocol. .................................................................. 370

Twenty-Second Claim for Relief: Eighth Amendment Violation Based On Sure or Very Likely Risk Of Serious Harm In The Form Of Severe Mental Or Psychological Pain, Suffering And Torturous Agony Due To The Identity Of The Drugs In The Execution Protocol.................... 374

Twenty-Third Claim for Relief: Eighth Amendment Violation Based On Substantial Risk Of Serious Harm In The Form Of Severe Mental Or Psychological Pain, Suffering And Torturous Agony Due To The Source Of The Drugs In The Execution Protocol. ............................... 378

Twenty-Fourth Claim for Relief: Eighth Amendment Violation Based On Sure or Very Likely Risk Of Serious Harm In The Form Of A Lingering Death. ............................................................................... 380

Twenty-Fifth Claim for Relief: Eighth Amendment Violation Based On Sure or Very Likely Risk Of Serious Harm In The Form Of Being The Subject Of An Undignified, Spectacle Execution Or Attempted Execution. ........................................................................... 384

Twenty-Sixth Claim for Relief: Eighth Amendment Violation Based on Substantial Risk of Serious Harm in the Form of Being Subjected to an Unwanted, Non-Consensual Human Experimentation of an Execution. ........................................................................... 388

Twenty-Seventh Claim for Relief: Eighth Amendment Violation Based on Substantial Risk of Serious Harm in the Form of Maladministration or Arbitrary Administration of the Execution Protocol. ........................................................................ 391

Twenty-Eighth Claim for Relief: Eighth Amendment Violation Based On Substantial Risk Of Serious Harm In The Form Of Being Subjected To An Execution Protocol That Is Facially Unconstitutional Because It Does Not Preclude The Execution Of An Inmate That Is Categorically Exempt From Execution............................... 400

Twenty-Ninth Claim for Relief: Eighth Amendment Violation Based on Deliberate Indifference or Reckless Disregard of Substantial Risk of Harm to Plaintiff. .............................................................. 402

Thirtieth Claim for Relief: Fourteenth Amendment Due Process Violation For Failure To Comply With Federal Investigational New Drug Application Regulations With Respect To The Method And Choice Of Drug To Be Used In Plaintiff's Execution. .................................... 409

Thirty-First Claim for Relief: Equal Protection Violations Related To Defendants' Failures To Comply With The IND Application Laws. ....... 416

Thirty-Second Claim for Relief: First Amendment Free Exercise Clause and RLUIPA Violation. ................................................................... 417

Thirty-Third Claim for Relief: Eighth Amendment Violations Based On Sure or Very Likely Risk of Serious Harm In The Form Of Severe, Needless Physical Or Mental/Psychological Pain And Suffering Due To Plaintiff's Unique, Individual Characteristics And Application Of The Execution Protocol. ................................................................... 418

Thirty-Fourth Claim for Relief: Equal Protection Violations Related To Plaintiff's Unique, Individual Characteristics And Application Of The Law, Including DRC Defendants' Execution Protocol and Ohio's Execution Statute. ................................................................ 425

Thirty-Fifth Claim for Relief: Eighth Amendment Violation Based On Purposeful or Knowing Adoption of a Lethal Injection Protocol Using A Three-Drug Method With Midazolam As The First Drug That Will Cause Severe Physical Pain and Torturous Mental Anguish and Suffering. ...................................................... 428

Thirty-Sixth Claim for Relief:  Eighth Amendment Violation Based On Purposeful or Knowing Adoption of a Lethal Injection Protocol Using Midazolam That Will Cause Severe Physical Pain and Torturous Mental Anguish and Suffering. ......................................... 430

Thirty-Seventh Claim for Relief: Eighth Amendment Violations Based on DRC Defendants Resurrecting Their Abandoned Three-Drug Method Even Though They Know It Causes Needless Pain And Suffering, And Had Abandoned It, At Least In Part, For That Reason. ...................................................................... 432

Thirty-Eighth Claim for Relief: Eighth Amendment Violation Based On Devolving Standards of Decency ......................................................... 438

Thirty-Ninth Claim for Relief: Eighth Amendment Violation Based On DRC Defendants' Use Of A Three-Drug Execution Method, Regardless Of The Identity Of The First Drug. .................................... 441

Fortieth Claim for Relief: Eighth Amendment Violation Based On DRC Defendants' Use Of A Three-Drug Execution Method With Midazolam As The First Of The Three Drugs. ..................................... 453

Forty-First Claim for Relief: Eighth Amendment Violation Based On DRC Defendants' Use Of Midazolam In The Execution Protocol. ................ 458

Forty-Second Claim for Relief: Eighth Amendment Violation Based On DRC Defendants Removal Of Any Required Concentration Of The Execution Drugs Which Is Removal Of A Safeguard That Creates A Substantial Risk That Plaintiff Will Experience Severe Pain And Suffering............................................................. 459

Forty-Third Claim for Relief: The Doctrines Of Judicial Estoppel And/Or Judicial Admission Bar DRC Defendants From Using The Three-Drug Method Against Plaintiff Campbell Or Any Other Plaintiff. ........ 463

Forty-Fourth Claim for Relief: Administrative Procedures Act Claims .......... 467

Forty-Fifth Claim for Relief: Eighth and Fourteenth Amendment Violations—A three-drug midazolam method of execution violates the Eighth Amendment's prohibition against cruel and usual punishment because it no longer comports with prevailing standards of decency, and thus its use as a method of execution must be categorically barred. ............................................................ 467

Forty-Sixth Claim for Relief: Ohio Corrupt Practices Act Claims Against Individual Defendants in Their Individual Capacity ........................... 478

Forty-Seventh Claim for Relief: Equal Protection Clause Violation based on violations of Administrative Procedures Act ................................... 479

    A.    Facts Relevant to Administrative Procedures Act (APA) Claims ................................................................... 479

    B.    Equal Protection Clause Allegations ......................................... 481

    C.    First Equal Protection Clause/Administrative Procedures Act Subclaim:  Defendants' Execution Protocol Is an Invalidly Adopted Rule ............................................................ 483

    D.    Second Equal Protection Clause/Administrative Procedures Act Subclaim: Enacting the Execution Protocol Exceeds the Scope of Authority Delegated to DRC and the Director of DRC ...................................................................... 489

    E.    Third Equal Protection Claim/Administrative Procedures Claim: Enactment of the Execution Protocol Is an Arbitrary and Capricious Action by an Agency Because It Fails to Comply With DRC Policy on Department Directives. ................ 492

    F.    Prayer for Relief for Equal Protection Clause/Administrative Procedures Act Claims ............................................................ 498

Forty-Eighth Claim for Relief: As-Applied Eighth Amendment Violations Following Defendants' Unsuccessful Attempts to Execute Plaintiff on November 15, 2017 .................................................... 499

    A.    Eighth Amendment violations based on Defendants' use of a method of execution that has caused, and will again cause, Plaintiff unconstitutional harm. ................................................. 504

    B.    Eighth Amendment violations based on Defendants' *purposeful* or *knowing* use of a method of execution that has caused, and will again cause, Plaintiff unconstitutional harm. .................................................................. 513

Forty-Ninth Claim for Relief: Eighth Amendment Violation Based on
    Deliberate Indifference to and/or Reckless Disregard of the Severe
    Physical and Mental Pain and Suffering Caused By Defendants'
    Abandoned Attempts To Use A Lethal Injection Execution Protocol
    On Him and Defendants' Intent to Attempt to Use A Lethal
    Injection Execution Protocol On Him Again. ..................................... 521

PRAYER FOR RELIEF ................................................................. 528

DEMAND FOR JURY TRIAL ....................................................... 539

CERTIFICATE OF SERVICE ....................................................... 541

Plaintiff, by and through counsel, hereby files this Fifth Amended Complaint for Injunctive and Declaratory Relief, Attorney Fees, and Costs of Suit Pursuant to 42 U.S.C. § 1983 and other related claims for relief against Defendants John Kasich, et al., (hereinafter the "Fifth Amended Complaint").[2] Plaintiff alleges and avers as follows.

## NATURE OF THE ACTION

1.      Plaintiff brings this action under 42 U.S.C. § 1983 for violations and threatened violations of his rights secured by the United States Constitution.

2.      Plaintiff also asserts claims for violation of the federal Racketeer Influenced and Corrupt Organizations Act (RICO), § 18 U.S.C. § 1961 *et seq.*

3.      Plaintiff also asserts claims under state law that form part of the same case or controversy as the federal claims.

4.      As to his § 1983 claims, Plaintiff seeks equitable, injunctive, and declaratory relief, as well as attorney's fees and costs of suit.

5.      As to his remaining federal or state law claims, Plaintiff seeks equitable, injunctive, and declaratory relief, as well as attorney's fees and costs of suit.

---

[2] Citations or references to ECF docket numbers in this Fifth Amended Complaint refer to the docket in *Cooey v. Kasich*, Case No. 2:04-1156, or the docket in *In re Ohio Execution Protocol Litigation*, Case No. 2:11-1016, and will be designated as such.

6.      In their Ohio Corrupt Practices Act (OCPA) claims, Plaintiff alleges
        that in carrying out their duties as they are required by DRC Policy
        01-COM-11, the five individuals identified below in the Forty-Sixth
        Claim for Relief violate the federal Controlled Substances Act.  The
        Ohio Corrupt Practices Act (OCPA) provides a private claim for relief to
        enjoin these violations.  Since these OCPA Defendants are being sued
        in their individual capacities under a state statute for injunctive and
        declaratory relief only, the defenses of sovereign and qualified
        immunity are not available to them.

7.      The federal constitutional claims in this Fifth Amended Complaint, as
        raised against all Defendants including the new Defendants, are
        cognizable under 42 U.S.C. § 1983.  *Baze v. Rees*, 553 U.S. 35 (2008);
        *Hill v. McDonough*, 547 U.S. 573 (2006); *Nelson v. Campbell*, 541 U.S.
        637 (2004); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970); *Lugar
        v. Edmondson Oil Co.*, 457 U.S. 922 (1982); *Dennis v. Sparks*, 449
        U.S. 24 (1980).

### JURISDICTION AND VENUE

8.      This action arises under 42 U.S.C. § 1983 for violations of the First,
        Sixth, Eighth, Ninth, and Fourteenth Amendments of the United
        States Constitution, as well as provisions of federal statutory or
        common law.  This Court has subject matter jurisdiction pursuant to
        28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights
        violations and equitable relief under an act of Congress), 18 U.S.C.

§ 1964(c) (jurisdiction over civil RICO actions), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (preliminary and permanent injunctive relief).

9.     This Court also has supplemental jurisdiction over RICO claims as well as state law claims including the OCPA claims under 28 U.S.C. § 1367 because they are so related to one or more claims in this action raised under 42 U.S.C. § 1983 for which this Court has original federal question jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10.    This Court has personal jurisdiction over Defendants as they are residents of the State of Ohio, or are presently located in the State of Ohio, or are elected or appointed officials of the State of Ohio or otherwise acting on behalf of the State of Ohio, or have sought confidentiality and other protections under Ohio law concerning activities which are the subject of this action, or conduct business in the State of Ohio.

11.    Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 (for RICO claims) and 28 U.S.C. § 1391(b) because this is where Defendants can be found and transact their affairs and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

### A.   Plaintiff

12.   **Plaintiff Alva Campbell** is a United States citizen and a resident of the State of Ohio.

13.   Campbell is currently a death-sentenced inmate in the custody of Defendants.

14.   Campbell is under the control and supervision of the State of Ohio Department of Rehabilitation and Correction ("DRC"), who have him incarcerated at the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio under Inmate #363-178.

15.   Plaintiff Campbell has a scheduled execution date of June 5, 2019.

### B.   Defendants

16.   **Defendant John Kasich** is the Governor of the State of Ohio and has been since on or about January 10, 2011.  He is the final executive authority in the state, statutorily and constitutionally responsible for the execution of all death sentences in Ohio and the manner in which those sentences are executed.  He is sued here in his official capacity for the purpose of obtaining equitable, declaratory and injunctive relief.

17.   **Defendant Gary C. Mohr** is the Director of the Ohio Department of Rehabilitation and Corrections ("DRC" or "ODRC"), a department of the State of Ohio that was created and is maintained pursuant to Ohio Revised Code § 5120.  DRC Defendants claim that Defendant

4

Mohr is charged with and authorized under Ohio Revised Code § 5120.01 to prescribe and direct the promulgation of rules and regulations for the DRC, including the rules and regulations for the conduct of prison operations and execution procedures. Director Mohr (or his designee) oversees all executions administered in Ohio. He is sued here in his official capacity for the purpose of obtaining equitable, declaratory and injunctive relief.

18. **Defendant Stephen Gray** is Chief Counsel of DRC. Upon information and belief, Defendant Gray has been tasked with creating rules and regulations for the conduct of prison operations and execution procedures, including the DRC policy designated 01-COM-11. Upon information and belief, Defendant Gray has also been tasked with identifying sources of execution drugs for DRC to use in carrying out a lethal-injection execution and/or obtaining or facilitating DRC's acquisition of execution drugs. He is sued here in his official capacity for the purpose of obtaining equitable, declaratory and injunctive relief.

19. **Ronald Erdos** is Warden of the Southern Ohio Correctional Facility, a correctional institution of the DRC that was created and is maintained pursuant to Ohio Revised Code § 5120.05. SOCF is the prison where Ohio carries out its death sentences. Pursuant to Ohio Revised Code § 5120.38, Defendant Erdos, as the Warden of SOCF, is charged with management of SOCF and the oversight and conduct of operations at

5

SOCF, including executions carried out there. He is sued here in his official capacity for the purpose of obtaining equitable, declaratory and injunctive relief.

20. **Defendant Donald Morgan** is an individual employed by DRC and, upon information and belief, an individual to whom has been delegated responsibility related to carrying out executions in Ohio. He is sued here in his official capacity for the purpose of obtaining equitable, declaratory and injunctive relief.

21. **Defendant Edwin Voorhies** is a Managing Director of Operations at DRC, and, upon information and belief, an individual to whom has been delegated responsibility related to carrying out executions in Ohio. Defendant Voorhies has also been identified as one to whom the Director delegates command authority as the Director's "designee" for carrying out an execution. He is sued here in his official capacity for the purpose of obtaining equitable, declaratory and injunctive relief.

22. **Defendant Richard Theodore** is a pharmacist employed by DRC and, upon information and belief, an individual to whom has been delegated responsibility for matters related to execution drugs. Except as otherwise designated in specific claims in which he is sued in his individual capacity, he is sued here in his official capacity for the purpose of obtaining equitable, declaratory and injunctive relief.

6

23.     **Defendant Timothy Shoop** is the Warden[3] at Chillicothe Correctional Center, a correctional institution of the DRC that was created and is maintained pursuant to Ohio Revised Code § 5120.05.  CCI is the prison where Ohio currently houses the majority of its death row inmates, including Plaintiff.  Pursuant to Ohio Revised Code § 5120.38, Defendant Shoop, as the Warden of CCI, is charged with management of CCI and the oversight and conduct of operations at CCI.  Pursuant to DRC Policy 01-COM-11, Defendant Shoop will be responsible for implementing some portions of the Execution Protocol before Plaintiff is transferred to SOCF the day before a scheduled execution.  He is sued here in his official capacity for the purpose of obtaining equitable, declaratory and injunctive relief.

24.     **Defendant John Coleman** is the Warden at Toledo Correctional Institution, a correctional institution of the DRC that was created and is maintained pursuant to Ohio Revised Code § 5120.05.  ToCI is the prison where, upon information and belief, Ohio houses or may soon house the majority of its death row inmates, including Plaintiff.  Pursuant to Ohio Revised Code § 5120.38, Defendant Coleman, as the Warden of ToCI, is charged with management of ToCI and the oversight and conduct of operations at TCI.  Pursuant to DRC Policy

---

[3] In keeping with this Court's recent Order recognizing that Timothy Shoop has succeeded Charlotte Jenkins as Warden of the Chillicothe Correctional Institution (ECF No. 1404), Plaintiff's Fifth Amended Complaint substitutes Warden Shoop in place of Warden Jenkins where appropriate.

01-COM-11, Defendant Coleman will be responsible for implementing some portions of the Execution Protocol before an inmate housed at ToCI is transferred to SOCF the day before a scheduled execution. He is sued here in his official capacity for the purpose of obtaining equitable, declaratory and injunctive relief.

25. **Defendants unnamed and anonymous execution team members** are individuals involved with administering Defendants' execution protocol, policies and procedures, and who are known to Defendants and have been previously identified by court order only by anonymous team member numbers. Except as otherwise designated in specific claims in which Drug Administrators # 17, #21, # 31 and #32 are sued in their individual capacities, the Execution Team Members are sued in their official capacities for the purpose of obtaining equitable, declaratory and injunctive relief.

26. For ease of reference herein, Defendants Kasich, Mohr, Gray, Morgan, Voorhies, Theodore, Shoop, Coleman, unnamed and anonymous execution team members, and their predecessors (including Strickland, Collins, Trout, Morgan, Kerns, and former execution team members) are hereinafter called the "**DRC Defendants**."

27. Each of the DRC Defendants, at all times relevant hereto, are acting in their respective official capacities and under the color and authority of state law with respect to all acts described herein.

8

28. **Defendants Unknown Pharmacies #1–100** are partnerships, corporations or other business entities organized and existing under the laws of the State of Ohio, or some other state of the United States of America, or some foreign jurisdiction, that are in the business of practice of pharmacy, and that are assisting DRC, either directly or through intermediaries, with obtaining drugs for the purposes of carrying out executions by lethal injection.

29. Plaintiff cannot discover the names of Defendants Unknown Pharmacies #1–100 because their identity and location are unknown at this time. Plaintiff is informed and has reason to believe that Defendants Unknown Pharmacies #1–100 are legally responsible, negligently or in some other actionable manner, for the events and occurrences described in this Fifth Amended Complaint. The true names and capacities of Defendants Unknown Pharmacies #1–100 are unknown to Plaintiff at this time, although they are known to one or more DRC Defendants, and Plaintiff has, therefore, sued these unknown Defendants under fictitious names. When the true names and capacities of the Defendants Unknown Pharmacies #1–100 have been ascertained, Plaintiff will seek leave to amend this Fifth Amended Complaint accordingly. Defendants Unknown Pharmacies # 1–100 are private persons or entities who are acting under the color of law, and they are sued for the purpose of obtaining equitable, declaratory and injunctive relief.

30.     **Defendants Pharmacists #1–100** are individuals engaged in the practice of pharmacy and that are assisting DRC, either directly or through intermediaries, with obtaining drugs for the purposes of carrying out executions by lethal injection.  Plaintiff cannot discover the names of Defendants Unknown Pharmacists #1–100 because their identity and location are unknown at this time.  Plaintiff is informed and has reason to believe that Defendants Unknown Pharmacists #1– 100 are legally responsible, negligently or in some other actionable manner, for the events and occurrences described in this Fifth Amended Complaint.  The true names and capacities of Defendants Unknown Pharmacists #1–100 are unknown to Plaintiff at this time, although they are known to one or more DRC Defendants, and Plaintiff has, therefore, sued these unknown Defendants under fictitious names.  When the true names and capacities of the Defendants Unknown Pharmacists #1–100 have been ascertained, Plaintiff will seek leave to amend this Fifth Amended Complaint accordingly.  Defendants Unknown Pharmacists #1–100 are private persons who are acting under the color of law, and they are sued for the purpose of obtaining equitable, declaratory and injunctive relief.

31.     **Defendants Drug Suppliers #1–25** are individuals, partnerships, corporations or other business entities organized and existing under the laws of the State of Ohio, or some other state of the United States of America, or some foreign jurisdiction, engaged in manufacturing,

procurement, transportation, import, export, sale (either retail or
wholesale), supplying, or other distribution of drugs and that are
assisting DRC, either directly or through intermediaries, with
obtaining drugs for the purposes of carrying out executions by
lethal injection.

32.    Plaintiff cannot discover the names of Defendants Drug Suppliers #1–
25 because their identity and location are unknown at this time.
Plaintiff is informed and has reason to believe that Defendants Drug
Suppliers # 1–25 are legally responsible, negligently or in some other
actionable manner, for the events and occurrences described in this
Fifth Amended Complaint.  The true names and capacities of
Defendants Drug Suppliers #1–25 are unknown to Plaintiff at this
time, although they are known to one or more DRC Defendants, and
Plaintiff has, therefore, sued these unknown Defendants under
fictitious names.  When the true names and capacities of the
Defendants Drug Suppliers #1–25 have been ascertained, Plaintiff will
seek leave to amend this Fifth Amended Complaint accordingly.
Defendants Drug Suppliers # 1–25 are private persons or entities who
are acting under the color of law, and they are sued for the purpose of
obtaining equitable, declaratory and injunctive relief.

33.    **Defendants John Does # 1–25** are individuals who are employed by
or are associated with those Defendants Pharmacies #1–100 or
Defendants Drug Suppliers # 1–25 who are not individuals.  The true

11

names and capacities of Defendants John Does # 1–25 are unknown to Plaintiff at this time, and Plaintiff has, therefore, sued these unknown Defendants under fictitious names.  When the true names and capacities of the Defendants John Does # 1–25 have been ascertained, Plaintiff will seek leave to amend this Fifth Amended Complaint accordingly.

34.    For ease of reference herein, Defendants Pharmacies #1–100, Compounding Pharmacists #1–100, Drug Suppliers # 1–25, and Defendants John Does # 1–25 are hereinafter collectively called the **"Drug Source Defendants"** unless otherwise noted.

35.    Each of the Drug Source Defendants, at all times relevant hereto, are acting under the color and authority of state law.

36.    Richard Theodore, and Execution Team Members #17, 21, 31, and 32, in their individual capacities, are collectively referenced as the **"OCPA Defendants"** for purposes of the Forty-Sixth Claim for Relief, as explained below in that section.

37.    The DRC Defendants and the Drug Source Defendants are hereinafter collectively called "**Defendants**."

38.    Upon information and belief, unless preliminarily and permanently enjoined, each of Defendants intends to act in their respective capacities and under the color and authority of state law to facilitate the execution of Plaintiff.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

39.  Pursuant to the Joint Stipulation filed on August 25, 2011 (*Cooey v. Kasich*, S.D. Ohio Case No. 04-1156, ECF No. 971), any exhaustion defenses have been affirmatively and explicitly waived.

## JUSTICIABLE CASE OR CONTROVERSY

40.  There is a real and justiciable case or controversy between the parties.

41.  The DRC Defendants have promulgated their formal execution protocol as DRC Policy 01-COM-11, and they have adopted informal execution policies and procedures as well. The version of the DRC Defendants' formal execution protocol that is effective as of the filing of this Fifth Amended Complaint was adopted effective October 7, 2016, and is hereinafter called "the 2016 Execution Protocol" or the "Execution Protocol."

42.  Upon information and belief, if Plaintiff's capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will attempt to execute him.

43.  It is the intention of Defendants, acting in concert and acting in concert with other state officials not named as defendants herein, to execute Plaintiff in the death house located on the grounds of the Southern Ohio Correctional Facility ("SOCF") in Lucasville, Ohio, which is operated and controlled by the DRC Defendants.

44.  Absent judicial intervention, Plaintiff will be executed pursuant to Defendants' arbitrary and capricious lethal injection protocol, policies

13

and procedures.  There is a justiciable case or controversy regarding the unconstitutionality of Defendants' execution protocol, policies and procedures.

45.    Plaintiff challenges the constitutionality of Defendants' lethal injection execution protocol and policies under 42 U.S.C. § 1983.  This lawsuit does not challenge the fact of his conviction or his death sentence.

46.    There is also a justiciable case or controversy regarding RICO claims under federal and state law, state-law claims against Drug Source Defendants, and Plaintiff's request for declaratory judgment under state law.

## RELEVANT FACTS

47.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully stated herein.

48.    Plaintiff is alleging constitutional violations based on Defendants' current Execution Protocol effective October 7, 2016; he is not alleging that Defendants can never execute him by any method.

49.    Defendants have created, maintained and implemented a lethal injection execution policy which includes the Execution Protocol and the administration of said written protocol and Defendants' informal policies, by which they intend to execute Plaintiff.

50.    Defendants' execution policy and written Execution Protocol manifests Defendants' deliberate indifference towards Plaintiff's constitutional

rights. The execution policy and Execution Protocol, as written and as applied, violate Plaintiff's constitutional rights to be free from cruel and unusual punishment which rights are secured and guaranteed to him by the Eighth and Fourteenth Amendments' limitations on Defendants' powers while acting individually or under the color and authority of state law, and/or does not protect against or prevent Defendants from conducting an unconstitutional execution because of the lack of necessary procedural safeguards.

51.     Defendants' execution policy and written Execution Protocol must contain procedural safeguards critical to ensuring against Eighth Amendment violations, and those safeguards must be followed.

52.     Plan 1 and Plan 2 and Plan 3 of the Execution Protocol and Defendants' unwritten practices violate Plaintiff's rights under the Eighth and Fourteenth Amendments.

53.     By adhering to Plan 1 or Plan 2 or Plan 3 of the Execution Protocol, Defendants will violate the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

54.     In accordance with the allegations related to imported execution drugs set out in Plaintiff's Complaint, the use of imported drugs in executions creates a substantial, objectively intolerable risk of serious harm, including physical and mental pain and torturous suffering, a lingering death, an undignified, spectacle execution, and being

15

subjected to an impermissible, unwanted, non-consensual human experimentation during Plaintiff's execution.

55.    In accordance with the allegations related to compounded execution drugs set out in Plaintiff's Complaint, the use of compounded drugs in executions creates a substantial, objectively intolerable risk of serious harm, including physical and mental pain and torturous suffering, a lingering death, an undignified, spectacle execution, and being subjected to an impermissible, unwanted, non-consensual human experimentation during Plaintiff's execution.

56.    An execution procedure that causes death by suffocation while the condemned inmate is conscious, or aware of or sensate to what he is experiencing violates the Eighth and Fourteenth Amendments to the Constitution of the United States.

57.    An execution procedure that causes death by heart attack while the condemned inmate is conscious, or aware of or sensate to what he is experiencing violates the Eighth and Fourteenth Amendments to the Constitution of the United States.

58.    An execution procedure that produces a substantial risk of psychologically or mentally torturous pain, agony and suffering violates the Eighth and Fourteenth Amendments to the Constitution of the United States.

59.    An execution procedure that produces a substantial risk of a lingering death violates the Eighth and Fourteenth Amendments to the

Constitution of the United States. *In re Kemmler*, 136 U.S. 436, 447 (1890); *see also Baze v. Rees*, 553 U.S. 35, 100 (2008) (Thomas, J. concurring).

60. An execution procedure that Defendants use with the purpose of causing severe physical pain or horrific mental suffering and anguish violates the Eighth and Fourteenth Amendments to the Constitution of the United States. And an execution procedure that Defendants use with the knowledge that it will cause needless, severe physical pain or horrific mental suffering and anguish violates the Eighth and Fourteenth Amendments to the Constitution of the United States. *Farmer v. Brennan*, 511 U.S. 825, 836–40 (1994); *Wilkerson v. Utah*, 99 U.S. 130, 136 (1879); *In re Kemmler*, 136 U.S. 436, 447 (1890).

61. An execution procedure that produces a substantial risk of causing an undignified death or a spectacle of an execution violates the Eighth and Fourteenth Amendments to the Constitution of the United States.

62. An execution procedure that creates a substantial risk of subjecting a condemned inmate to an impermissible experimental execution that is arbitrary and capricious violates the Eighth and Fourteenth Amendments to the Constitution of the United States.

63. An execution procedure that creates a substantial risk of subjecting a condemned inmate to maladministration or arbitrary and capricious administration of the execution protocol violates the Eighth and Fourteenth Amendments to the Constitution of the United States.

64.     An execution procedure that does not include sufficient safeguards or mechanisms in the execution policy or the Execution Protocol to prevent execution of a condemned inmate who is categorically barred from execution because he is intellectually disabled or incompetent to be executed creates a substantial risk that an ineligible person will be executed, and therefore facially violates the Eighth and Fourteenth Amendments to the Constitution of the United States.

65.     Plaintiff is scheduled for execution because he was convicted of aggravated murder. He greatly fears that any Drug Source Defendants who participate in his execution, in addition to lacking required skill and competence, will be unable to ignore the magnitude of Plaintiff's crime and will allow such considerations to subvert the work product.

66.     These fears are magnified many times over because the DRC Defendants have omitted any significant oversight, redundancies, and other reviews and checks of the work product, the manufacturing facilities, manufacturing protocols and other key facets of the drug manufacturing or compounding process used by the Drug Source Defendants.

67.     The DRC Defendants' allowance of so much unchecked power over the execution process to reside with unknown Drug Source Defendants is unconscionable, exposes as illusory the DRC Defendants' purported procedural protections and repeated assurances of a commitment to

18

an execution process that is humane and protective against human error, and is violative of Plaintiff's constitutional and statutory rights.

68. The existence of the known, foreseeable and objectively intolerable risks identified in Plaintiff's Complaint further substantially increases the likelihood that Plaintiff will be exposed to severe harm during his execution, all to his extreme prejudice and in violation of his constitutional and statutory rights.

69. In all the ways alleged in the Claims for Relief asserted below, Defendants' execution policy and written Execution Protocol subject Plaintiff to violations of his constitutional rights. The Execution Protocol is unconstitutional, facially and as applied to Plaintiff.

A. **Historical background of Ohio's execution protocol and its adoption of the current Execution Protocol.**

70. In 2001, the Ohio Legislature changed the State's manner of execution from electrocution to lethal injection.

71. At all times from 1994 to present, Ohio's statute governing lethal injection mandated that Defendants conduct a lethal injection execution such that it produces a "quick and painless" death. Ohio Rev. Code § 2949.22(A).

72. DRC Defendants have changed the execution protocol repeatedly since 1994.

73. The DRC Defendants' adoption of the 2016 Execution Protocol restarts any applicable statute of limitations for associated constitutional challenges.

19

74.     DRC Defendants' inclusion of compounded execution drugs as an option under the Execution Protocol is not simply a matter of swapping out one execution drug source for another.  Involvement of compounded execution drugs directly involves a health care practitioner and the laws that govern that health care practitioner's behavior.

75.     At all times relevant hereto, Ohio Revised Code § 2108.40 provided the legal definition of "death" under Ohio law: "An individual is dead if the individual has sustained either irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the brain, including the brain stem, as determined in accordance with accepted medical standards."

76.     By changing their execution protocol with great frequency, by using drugs or combinations of drugs and doses that are unsupported by any scientific studies or data, by contemplating the use of compounded execution drugs or unapproved drugs illegally imported from unreliable foreign manufacturers, and by resurrecting the revised three-drug method using midazolam as the experimental first drug of a three-drug procedure, Defendants are conducting experimental executions on each condemned inmate.

77.     DRC Defendants have designated DRC Policy 01-COM-11 as the DRC policy controlling human executions in Ohio.

78.     Policy 01-COM-11 carries the force of Ohio administrative law.

20

79.  Policy 01-COM-11 requires that all execution processes must be performed in a professional, humane, sensitive, and dignified manner.

80.  Policy 01-COM-11 requires that the Execution Protocol must be applied in accordance with all applicable policies, administrative regulations, and statutes.

81.  Since 1994, DRC Defendants have adopted a number of superseding written rules and policies as their execution protocol, originally designated as rule 001-09, and then designed DRC Policy 01-COM-11.  Versions of rule 001-09 were adopted as effective on the following dates: March 30, 1994; April 12, 2001; August 21, 2001; September 11, 2001; November 21, 2001; and July 17, 2003.  Versions of DRC Policy 01-COM-11 were adopted as effective on the following dates: January 8, 2004; July 10, 2006; October 11, 2006; May 14, 2009; November 30, 2009; November 15, 2010; March 9, 2011; April 11, 2011; September 18, 2011; October 10, 2013; April 28, 2014; January 9, 2015; June 29, 2015; and October 7, 2016.

82.  Each of the execution protocols before November 30, 2009 involved a three-drug method.  During all times until Romell Broom's attempted but failed execution on September 15, 2009, DRC Defendants conducted lethal injection executions under Policy 01-COM-11 (or a predecessor policy or rule) using a method that required the use of three drugs, administered successively, one after the other, through

an intravenous ("IV") catheter that had been inserted into one of the inmate's peripheral veins ("the original three-drug method").

83.  The three drugs of the original three-drug method, administered in this order of succession, were: (1) sodium thiopental, a barbiturate that is an ultra-short-acting anesthetic drug; (2) pancuronium bromide, a paralytic drug that paralyzes all voluntary muscles including, but not limited to, the arms, legs, mouth, neck, diaphragm, and muscles in the chest wall; and (3) potassium chloride, a drug that induces cardiac arrest.

84.  Paralytic drugs that have the same function and effect as pancuronium bromide, for relevant purposes, include rocuronium bromide and vecuronium bromide.  For ease of reference herein, pancuronium bromide, rocuronium bromide, and vecuronium bromide are referred to collectively as "the paralytic drug."

85.  DRC Defendants engaged in no meaningful analysis in selecting the original three-drug method.  DRC Defendants merely selected this method as its own because states such as Oklahoma and Texas had already adopted and applied these drugs in executions in their respective states.

86.  At the quantities used in the original three-drug method, both the paralytic drug and the potassium chloride are excruciatingly painful drugs.

87.     When administered intravenously through IV catheters in peripheral

        veins, these drugs inflict extreme, searing pain throughout the entire

        time they travel through the circulatory system and into the lungs

        and heart.

88.     The paralytic drug suppresses breathing, but does not hasten the

        death subsequently caused by potassium chloride, nor does it protect

        against the inmate's pain.

89.     The potassium chloride, once it reaches the heart, disrupts the heart's

        electrical activity, causing excruciatingly painful cardiac arrest

        and death.

90.     The experience of enduring IV-administered, execution-level doses of

        these two drugs is as, or more painful than, enduring a major surgical

        procedure while awake, without anesthesia, and while paralyzed

        layered with the additional pain of suffering sudden cardiac arrest.

91.     Unless the inmate is effectively rendered unconscious, unaware and

        insensate (unable to experience and feel pain) akin to being

        anesthetized to a surgical plane of general anesthesia before any

        injection of the paralytic drug and potassium chloride, and unless

        that level of unconsciousness, unawareness and insensate state is

        maintained until death, it is a certainty that the inmate will

        experience and suffer through the excruciatingly painful effects of the

        paralytic drug and potassium chloride, throughout the course of

        administration of these drugs, until death.

92.     Drugs that can reliably render a person unconscious, unaware and
        sufficiently insensate if injected as the first drug in a three-drug
        method can—if they are properly and lawfully manufactured and
        effectively administered, delivered, and maintained by skilled
        professionals—enable the human body not to experience the
        excruciatingly painful effects of the paralytic drug and potassium
        chloride or the pain and suffering from dying from those drugs.

93.     The original three-drug method called for using sodium thiopental, an
        ultra-short acting barbiturate as the first drug.

94.     Rendering a person unconscious, unaware and insensate so the
        person does not experience any of the excruciating effects of the
        second and third drugs is a difficult and complicated procedure.  It
        can only be done properly and reliably by persons with advanced
        medical training, using proper monitoring equipment, and who have
        the requisite experience, judgment, and skill to do so.

95.     The difficulty of delivering and maintaining general anesthesia with
        the original three-drug method was increased by the fact that the
        sodium thiopental was to be delivered intravenously, through the
        same peripheral IV line that was to be used for the two painful drugs,
        and through 10 to 15 feet of IV tubing that originated in a different
        room from where the inmate was being executed.

96.     The execution team members administering the sodium thiopental,
        and all the other drugs, were thus not with the inmate at the

execution gurney, but instead were some 10 to 15 feet away in another room, and observing only through glass.

97.     The difficulty of ensuring the condemned inmate was fully unconscious, unaware and insensate during injection of the second and third drugs under the original three-drug method was further increased by the fact that the paralytic drug rendered completely unavailable one of the most reliable means for assessing the effectiveness of the first drug: the bodily movements, sounds, and facial expressions of the inmate.

98.     Because the paralytic drug had the effect of paralyzing all voluntary muscles in the body, the inmate was physically unable to show signs of consciousness, pain or awareness, such as screaming, wincing or other facial expressions, or any other responsive movements or actions to express his internal distress.

99.     The paralytic drug thus served a pernicious purpose—to mask the searing pain caused by injection of the second and third drugs, the horrifying sensation of suffocation caused by the paralytic itself, the painful effects of the potassium chloride causing a heart attack, or the pain and suffering associated with dying from those drugs in a lethal injection.

100.    In effect, the paralytic drug served as a chemical curtain, masking whether the first drug was in fact effective in preventing the inmate

from suffering the unconstitutional, intense pain caused by both the heart-stopping drug and the paralytic itself.

101.    Any reliable assessment of whether the first drug was "working" such that the inmate was unconscious, unaware and insensate at all times after injection of the first drug, if such a thing is even truly possible, could only be made by qualified, highly trained medical personnel, using subtle means of assessment such as, for example, looking for dilated pupils, tearing from the eyelids, sweating, elevated heart rate, or a change in frequency of brain waves, using the appropriate monitoring equipment. That generally required greater medical skill and training than the level possessed by the Execution Team members.

102.    Assessing whether a condemned inmate was fully unconscious, unaware and insensate required exceptional competence and judgment to reliably exercise informed discretion as to the timing of the administration of the three drugs.

103.    DRC Defendants responsible for overseeing executions under the original three-drug method failed to include on the execution team any persons with the requisite levels of skill and training necessary to administer the first drug and effective monitor the inmate's level of consciousness, awareness and ability to feel and experience pain. Nor did they include any persons with the necessary medical skill,

26

competence, and judgment to reliably exercise informed discretion as to the timing of administration of the three drugs.

104.    Instead, DRC Defendants assigned these critical responsibilities to lesser skilled para-professionals such as emergency medical technicians ("EMT"), paramedics, and phlebotomists, or to DRC management-level employees such as the SOCF warden.

105.    None of these persons had the necessary skill and training to competently perform these responsibilities.  None of them possessed the necessary medical skill, competence, and judgment to reliably exercise informed discretion as to the timing of the administration of the three drugs.

106.    DRC Defendants also failed to use any of the monitoring equipment that is routinely used by medical professionals to assess and maintain the required level of a person's consciousness, awareness and ability to feel and experience pain, such as blood pressure cuffs, EKG's that monitor electrical activity in the heart, and BIS monitors that attempt to measure whether a person is conscious, or aware, or otherwise able to feel and experience noxious stimuli such as pain.

107.    DRC Defendants failed to provide such monitoring equipment even though it was readily available at a reasonable cost, and may have aided the still unqualified team members in avoiding even more harm to an inmate than without it.

108.    Because Ohio's use of the original three-drug method required the exercise of a level of skill and judgment that the Execution Team members lacked, and because the Execution Team regularly deviated from the applicable written execution protocol, executions conducted by that method regularly caused inmates to experience torturous and inhumane deaths, including suffering the pain of the second and third execution drugs without the benefit of properly administered general anesthesia that made them unaware, unconscious, and insensate to the pain.

109.    Further allegations regarding specific executions in which problems are known to have occurred (under DRC Defendants' execution protocols or using the same or similar protocols in other jurisdictions) are made in Section O below.  Upon information and belief, the problems were much more frequent than Plaintiffs in this litigation have been able to uncover to this point.

110.    Because of its critical reliance on successfully rendering the condemned inmate unconscious, unaware and insensate before injecting him with the paralytic drug and potassium chloride, the original three-drug method required those execution team members involved with IV establishment, drug administration, and inmate monitoring to perform tasks they are not qualified to perform, and at levels of competence they are incapable of meeting.  No amount of "training" by DRC Defendants could or did correct these inherent

deficiencies possessed, individually and collectively, by the team members.

111.    Those Execution Team members involved with IV establishment, drug administration, and inmate monitoring knew, or should have known, that they were neither competent nor qualified to capably and reliably perform the critical responsibilities assigned to them involving ensuring the inmate was sufficiently unconscious, unaware and insensate before injection of the second and third drugs.

112.    DRC Defendants also knew or should have known that they were requiring Execution Team members to perform those critical responsibilities for which those Team Members were neither qualified nor competent to perform.

113.    DRC Defendants knew or should have known that mistakes or failures by the Execution Team members charged with any of those critical responsibilities would almost surely cause the condemned inmate to suffer an inhumane and tortuous death.

114.    DRC Defendants knew or should have known that Execution Team members and others involved in carrying out executions using the original three-drug method regularly failed in those duties and regularly deviated from the written execution protocol, thereby regularly carrying out executions that were substantially likely to be unconstitutional upon injection of the second and third drugs.

115.    DRC Defendants also knew or should have known that the stress of carrying out executions and the complex tasks that were required under the original three-drug method further increased the likelihood that an inmate would suffer an inhumane and torturous death involving needless and substantial pain and suffering.

116.    That stress was only elevated after several high-profile botched executions received significant press coverage, and when this and other litigation began to draw back the curtain to expose previously unknown information about the original three-drug method and DRC Defendants' actions in carrying out executions using that method.

117.    On June 10, 2008, an Ohio state trial court held that the use of the three drugs, and particularly the used of the paralytic drug and potassium chloride, is "inconsistent with the intent of the General Assembly in enacting R.C. § 2949.22 and violates the duty of the Department of Rehabilitation and Correction, mandated by R.C. § 2949.22, to ensure the statutory right of the condemned person to an execution without pain, and to an expectancy that his execution will be painless." *State v. Rivera*, Case No. 04CR065940, Judgment Entry (Lorain C.P. June 10, 2008).

118.    In March 2009, this Court, by Judge Frost, conducted a five-day evidentiary hearing at which extensive evidence was adduced concerning the many problems with the original three-drug method and DRC Defendants' actions to carry out executions using that

30

method. Additional details about DRC Defendants' actions and the original three-drug method were uncovered during depositions in advance of that hearing.

119. On April 21, 2009, this Court issued a lengthy opinion that was sharply critical of DRC Defendants and the original three-drug method. *See, e.g.*, *Cooey v. Strickland*, Case No. 2:04-cv-1156, Opinion and Order, ECF No. 471, at pp. 158–59 (S.D. Ohio April 21, 2009).

120. By the end of August 2009, DRC Defendants had executed 32 inmates with the original three-drug method.

121. Based on the record in this case, and reasonable inferences therefrom, any number, including possibly all, of these 32 inmates suffered inhumane and tortuous deaths, involving needless and substantial pain and suffering, from enduring the excruciatingly painful paralytic drug and potassium chloride without sufficient anesthetic depth, and under circumstances where the paralysis induced by the paralytic drug concealed their internal distress.

122. On September 15, 2009, the DRC Defendants used the original three-drug method in an attempt to execute inmate Romell Broom. That attempt failed, as outlined in more detail in Section O below.

123. Following the Broom execution failure, this case was scheduled for trial starting November 2, 2009. The parties attended a final pretrial conference in this Court on October 19, 2009, before Judge Frost. At

that pretrial conference, the Court recognized that the Broom events necessitated additional discovery. DRC Defendants also represented to the Court that a change in the execution protocol was in the works. The Court urged the parties to work together, and with their respective experts, to see if that could be accomplished in a cooperative fashion.

124. Accordingly, the Court delayed the trial until July 12, 2010. The Court that day also entered, over a pro forma objection by DRC Defendants' counsel, a stay of the next-scheduled execution, Kenneth Biros, then set for December 8, 2009. DRC Defendants' counsel, with Plaintiffs' counsel, even helped draft the Court's stay order for Biros. DRC Defendants did not want the stay to be called an "injunction," but they were fine with the stay otherwise. (*See Cooey v. Strickland*, No. 2:04-cv-1156, ECF No. 590 (S.D. Ohio Oct. 19, 2009); *id.*, ECF No. 597 (S.D. Ohio Oct. 29, 2009).)

125. Less than a month later, on November 13, 2009, and without any prior consultation with or notice to the Plaintiffs or their counsel, DRC Defendants, in sworn representations to this Court and in public statements, abandoned the original three-drug execution method using a paralytic as the second drug and potassium chloride as the third drug.

126. DRC Defendants swore to this Court that, "going forward," neither a paralytic (including pancuronium bromide) nor potassium chloride

"will be used as part of the lethal injection process" in Ohio.  (See Affidavit of Terry Collins, *Cooey v. Strickland*, No. 2:04-cv-1156, ECF No. 601-1 (S.D. Ohio Nov. 13, 2009).)

127.   DRC Defendants gave notice that their revised execution protocol would be effective November 30, 2009, and it removed the original three-drug method in favor of a one-drug barbiturate method, with a backup of intramuscular injection of midazolam and hydromorphone.

128.   DRC Defendants also announced to the public on November 13, 2009 that "[p]ancuronium bromide and potassium chloride will no longer be used as part of the [execution] process" and that the "new execution protocol will . . . simplify the execution process."  *See* DRC Press Release, Nov. 13, 2009.

129.   The same day, DRC Defendants filed a motion for summary judgment in this Court.  In that filing they asked the Court to dismiss as moot all of the Plaintiffs' claims because of DRC Defendants' abandonment of the three-drug method and in particular the two painful drugs:

> By way of this civil rights action, various offenders condemned to death seek to change how Ohio implements its lethal injections procedures to execute condemned offenders in Ohio.  Ohio recently has decided unilaterally to alter its constitutionally sound procedures in a manner that renders moot all of the claims before the Court.
>
> **First, Ohio no longer will use a three drug protocol.** Instead, Ohio will use a lethal injection procedure that uses one chemical, thiopental sodium, in an amount sufficient to cause death, which even Plaintiff's own medical expert has posited can be accomplished.  That chemical will be injected via an intravenous connection

33

to the condemned offender. **Neither pancuronium bromide nor potassium chloride will be used as part of the lethal injection process.**

Second, Ohio will implement a lethal injection procedure that includes a back-up procedure, to be used if a suitable IV site cannot be attained or maintained. The back-up procedure will involve injecting a combination of two chemicals into the condemned offender through an intramuscular injection. The two chemicals to be used include midazolam and hydromorphone.

*Cooey*, No. 04-cv-1156, DRC Defendants' Motion for Summary Judgment, ECF No. 601, at 1 (emphasis added).

130.    Knowing that their mootness argument, to be legally viable under the "voluntary cessation" doctrine, required that the challenged conduct would never again recur, DRC Defendants willingly and unambiguously made that commitment to the Court as to the use of a three-drug method and the paralytic drug and potassium chloride:

It is readily apparent here that the recent changes to defendants' execution procedures have rendered moot plaintiffs' constitutional challenges to the "three-drug protocol" previously used by defendants to execute condemned prisoners. The issues presented by plaintiffs' complaints stem from the alleged risk of severe pain which could be caused by the use of pancuronium bromide and potassium chloride, the second and third drugs in the so-called "three-drug protocol," in the event that the first drug, thiopental sodium, is not properly administered. In view of the new procedures' elimination of the second and third drugs, the issues presented in plaintiffs' suits are no longer actionable. Indeed, defendants' intent to administer a five (5) gram does of thiopental sodium, and to eliminate the second and third drugs, corresponds to the relief actually requested by the plaintiffs.

34

Moreover, **there is *no* possibility here that the allegedly unconstitutional conduct will reoccur**, or that there is any lingering effects of previous allegedly unconstitutional conduct. There is absolutely no reason to believe that defendants will reinstate the previous "three-drug protocol" if the plaintiffs' suits were dismissed. And, more importantly, if defendants execute plaintiffs using the revised procedures, defendants cannot "go back to their old ways" and execute plaintiffs using the prior procedures. *See DeFunis v. Odegaar, supra*, 416 U.S. at 320 (student's challenge to admissions policy was moot because student was admitted during the litigation and would be permitted to graduate regardless of the outcome of the suit).

Finally, the gist of plaintiffs' claims is the risk of *future* harm, e.g., the severe pain they would suffer during their executions in the event of a failure to administer effectively the first drug in the "three-drug protocol." **As stated, pancuronium bromide and potassium chloride no longer will be used in Ohio's lethal injection process.** Thus, there is no issue here of remedying the effects of prior allegedly unconstitutional acts. In sum, plaintiffs' constitutional challenges to defendants' previous "three-drug protocol" are moot.

*Id.* at 4–5 (emphasis added).

131.    Defendants never informed the Court that any of these statements were inaccurate.

132.    In support of their motion, DRC Defendants submitted the affidavit of Director Collins referenced in paragraph 126 above, in which Director Collins testified that "going forward, pancuronium bromide no longer will be used as part of the lethal injection process.  Also, potassium chloride no longer will be used as part of the process."

133.    DRC Defendants then appealed the mutually agreed-upon October 19, 2009 order of this Court staying Biros's December 8, 2009 execution

date. DRC Defendants argued to the Sixth Circuit that Plaintiffs'
challenge to the original three-drug method was moot due to DRC
Defendants' abandonment of that method, and therefore the stay
should be vacated. DRC Defendants attached to their appellate filings
the same papers they had filed in the district court—the motion for
summary judgment and its accompanying affidavit of Terry Collins.

134.    Biros opposed DRC Defendants' mootness arguments. He argued,
among other things, that DRC Defendants could not be trusted to not
revert to their old ways and the original three-drug protocol including
potassium chloride and a paralytic drug, and that they had failed to
meet, with only Collins' affidavit, their heavy burden to demonstrate
the challenged conduct would not recur.

135.    But Biros lost. In an order dated November 25, 2009, the Sixth
Circuit found the Biros's claims to be moot based on DRC Defendants'
representations. *See Cooey v. Strickland (Biros)*, 588 F.3d 921, 923
(6th Cir. 2009). The Sixth Circuit thus vacated the Biros stay less than
two weeks before his scheduled execution. *See id.* at 922, 924.

136.    Biros mounted a rushed challenge to the new one-drug protocol, but
he was denied, in large part because the Sixth Circuit concluded that
DRC Defendants new changes were "designed to render capital
punishment in Ohio more humane" than using the original three-drug
method. *Cooey (Biros) v. Strickland*, 580 F.3d 210, 215 (6th Cir.
2009). The court placed significant emphasis on the fact that "[b]y

36

adopting a one-drug injection, Ohio purposely ceased using the [paralytic drug] and potassium chloride that had been the focus" of the constitutional challenges to the original three-drug method. *Id.*

137. In a later appeal arising from this same case, the Sixth Circuit again noted that DRC Defendants' rejection of the original three-drug method made "changes which were designed to make the State's capital punishment protocol more humane." *Cooey (Beuke) v. Strickland*, 604 F.3d 939, 942 (6th Cir. 2010).

138. In the years that followed, DRC Defendants used the one-drug barbiturate-only method first adopted on November 30, 2009 to execute nineteen (19) more Ohio inmates, many of whom, like Biros, were also plaintiffs in this litigation.

139. Several other executions did not proceed as scheduled, however, as some Plaintiffs demonstrated that DRC Defendants regularly failed to follow the written execution protocol. *See Cooey (Smith) v. Kasich*, 801 F. Supp. 2d 623 (S.D. Ohio 2011); *In re Ohio Execution Protocol Litig. (Lorraine)*, 840 F. Supp. 2d 1044, 1051-59 (S.D. Ohio 2012), *mot. to vacate stay denied*, 671 F.3d 601, 602 (2012), *app. to vacate stay denied*, *Kasich v. Lorraine*, 132 S. Ct. 1306 (2012).

140. DRC Defendants adopted revised execution protocols using a one- or two-drug method on several occasions. One such protocol revision introduced a two-drug option using midazolam and hydromorphone injected intravenously. DRC Defendants, ignoring strenuous

37

warnings of impending disaster, used that protocol to execute one inmate, Dennis McGuire, on January 16, 2014, in a horrifying spectacle of an execution during which McGuire lie gasping for air on the execution bed for approximately 26 minutes. *See* Section 823 below.

141. There was a lengthy delay in Ohio executions following the McGuire execution. During that time, and as a result of the triad of botched executions in 2014 using midazolam, DRC Defendants intentionally and deliberately removed midazolam from the execution protocol in a further protocol revision.

142. Then, at a status conference in this Court on October 3, 2016, counsel for DRC Defendants announced that DRC Defendants are resurrecting most of the abandoned three-drug method, including a paralytic drug and potassium chloride. They also announced they would use that three-drug method in the next three scheduled executions.

143. The next four executions are those of Plaintiff Raymond Tibbetts on February 13, 2018; William Montgomery on April 11, 2018; Plaintiff Robert Van Hook on July 18, 2018; and Plaintiff Cleveland Jackson on September 13, 2018.

144. The three drugs to be used, administered in order of succession, are: (1) midazolam hydrochloride, a drug in the benzodiazepine class (hereinafter "midazolam"); (2) a paralytic drug; and (3) potassium

38

chloride.  This three-drug method is hereinafter referred to as "the revised three-drug method."

145.  These three drugs, as with the original three-drug method, are still to be administered through an IV catheter in one of the inmate's peripheral veins, and from the same distance as before, by the drug administrator located in the equipment room some 10-15 feet away from the inmate.

146.  DRC Defendants' adoption of the revised three-drug method was promptly incorporated into a revised version of 01-COM-11, issued effective October 7, 2016, filed in this matter as ECF No. 667.

147.  In addition to the revised three-drug method, the Execution Protocol also provides that executions by lethal injection may be carried out using the one-drug barbiturate-only method, with either pentobarbital or sodium thiopental as the barbiturate.

148.  DRC Defendants represented to the Plaintiffs and this Court at the October 3, 2016 status conference that they will use the revised three-drug method, and not a one-drug method, to execute Campbell on June 5, 2019.

149.  DRC Defendants' decision to resurrect the three-drug method with its use of the paralytic drug and potassium chloride, after they had abandoned that method and those drugs in 2009, is directly contrary to the promises and representations these defendants made to this Court, the Sixth Circuit, the Plaintiffs, and the public.

**B.**  **Allegations regarding Drug Source Defendants' status as acting under color of law.**

150.   Plaintiff is informed and has reason to believe that Drug Source

Defendants will act in concert with the DRC Defendants to carry out

the mission-critical—but prohibited by law—task of procuring and

supplying controlled substances to the DRC Defendants to carry out

one or more executions.

151.   Plaintiff is informed and has reason to believe that Drug Source

Defendants are legally responsible, negligently or in some other

actionable manner, for the events and occurrences described in this

Fifth Amended Complaint.

152.   The Execution Protocol allows several different DRC Defendants or

their agents to order and obtain execution drug(s) from the Ohio

Pharmacy Services of the Ohio Department of Mental Health and

Addiction Services, a pharmacy, manufacturer, supplier, wholesaler,

or distributor, or from any other licensed pharmacist.

153.   The Execution Protocol does not expressly require—but implicitly

requires—that the DRC Defendants obtain the execution drugs from a

pharmacy, manufacturer, supplier, distributor, wholesaler,

pharmacist, or compounding pharmacy that is a legally operating

business entity located within Ohio (or even within the United States)

with all required federal and Ohio licenses and up-to-date regulatory

inspections.

154.    The Execution Protocol does not expressly require—but implicitly
        requires—that the DRC Defendants obtain the execution drugs from a
        pharmacist or compounding pharmacy licensed in Ohio (or even
        within the United States).

155.    The Execution Protocol does not expressly limit—but implicitly
        limits—the source of execution drugs to an Ohio-licensed pharmacist
        working in the scope of his or her employment at an Ohio-licensed
        pharmacy or compounding pharmacy.

156.    The DRC Defendants have now elected to involve, and, upon
        information and belief, are now recruiting or have already successfully
        recruited, one or more persons or entities—to wit, the Drug Source
        Defendants—who are appropriately described under the Execution
        Protocol as Support Staff because they have a specified role in the
        Execution Protocol—to provide the execution drugs.

157.    Upon information and belief, the DRC Defendants have elected to
        obtain or to seek to obtain execution drug(s) from any number of the
        Drug Source Defendants.

158.    Upon information and belief, Defendants plan to use or will use
        execution drug(s) for Plaintiff's execution that have been
        manufactured via compounding, or manufactured overseas and then
        imported into the United States, or supplied, distributed or otherwise
        provided to DRC Defendants by Drug Source Defendants.

159.     Carrying out a state-sanctioned execution in Ohio has historically been a power reserved to the State.  Likewise, procuring and providing to DRC drugs to use for a lethal-injection execution in Ohio has historically been a function performed exclusively by a State agency, to wit, the Ohio Department of Mental Health and Addiction Services (or its predecessor) and that agency's operations previously known as Central Pharmacy-Inpatient.

160.     The Drug Source Defendants are willful, joint—and indeed, indispensable—participants in overt actions with the DRC Defendants necessary to carry out an execution in Ohio, with a substantial degree of cooperation between the Drug Source Defendants and the DRC Defendants, solemnized by contract, to create or otherwise provide to DRC Defendants execution drugs and use them in an execution in violation of numerous state, federal and constitutional provisions.

161.     Recent amendments to the Ohio Revised Code confirm that Drug Source Defendants are considered by the State of Ohio to be "necessary" to the State's efforts to carrying out a lethal-injection execution, with virtually no difference in the eyes of the State of Ohio between DRC Defendants and Drug Source Defendants insofar as their respective necessity to carrying out an execution.

162.     Ohio Revised Code § 2949.221, by intentionally blurring into nonexistence any distinction between Drug Source Defendants and DRC Defendants for purposes of carrying out a lethal-injection

execution, unambiguously establishes that Drug Source Defendants are state actors acting under color of law.

163. Section 7(C) of the legislative enactment that adopted § 2949.221 (*i.e.*, HB 663, effective March 23, 2015) stated that the intent of the General Assembly in enacting § 2949.221 and related provisions of HB 663 is "to enable [DRC] to obtain the necessary assistance of persons in carrying out a court-ordered sentence of death by lethal injection or the drugs needed to administer such a sentence," by which was meant specifically the assistance of private persons and entities such as the Drug Source Defendants.

164. Upon information and belief, the Drug Source Defendants, by compounding, manufacturing, importing, or otherwise supplying execution drugs to the DRC Defendants to use in a state-administered execution, are performing and have assumed a function that was traditionally reserved to the State and performed by a public agency.

165. Because manufacturing, compounding, distributing, dispensing, introducing into interstate commerce, selling, delivering, holding or offering for sale, importing, and other actions related to the drugs identified in the Execution Protocol to be used as execution drugs are prohibited by numerous provisions of federal and state law, the Drug Source Defendants, by contracting or otherwise working with DRC Defendants, are jointly and willfully engaged with State officials in prohibited actions, and are thus acting under color of law.

43

166.    Upon information and belief, Defendants Unknown Pharmacies #1–
        100 and Defendants Unknown Pharmacists #1–100 and others of the
        Drug Source Defendants have contracted or otherwise agreed to work
        with DRC Defendants specifically for the purpose of providing
        specialized pharmaceutical services in the form of compounded drugs
        to be used for a lethal-injection execution, including for the planned
        execution of Plaintiff.

167.    Upon information and belief, Drug Source Defendants have
        contracted or otherwise agreed to work with DRC Defendants
        specifically for the purpose of providing services in the form of
        procuring any of the drugs in the Execution Protocol manufactured
        overseas and imported into the United States to be used for a lethal-
        injection execution, including for the planned execution of Plaintiff.

168.    The Drug Source Defendants are or will be aware of the purpose and
        intent for which they will specifically manufacture, compound,
        supply, distribute or otherwise provide the execution drug(s) sought
        by the DRC Defendants, namely the execution of one or more readily
        identifiable condemned inmates scheduled for execution on a
        particular date at a particular time for a particular crime.

169.    The Execution Protocol's delegation of a critical element of the
        execution process—manufacturing, compounding, importing,
        distributing or otherwise supplying the execution drug(s), to be used
        solely for executions on a known date and time and for a known

44

inmate or inmates—to the Drug Source Defendants vests tremendous responsibility and authority in the Drug Source Defendants.

170. Upon information and belief, the DRC Defendants have never before vested such tremendous responsibility and authority in any such unknown private parties with respect to the execution process, and certainly not since Ohio began conducting executions by lethal injections in 1999.

### C. **Allegations related to the requirements of DRC Defendants' Execution Protocol.**

171. In all respects relevant to the infliction of needless pain and suffering, the revised three-drug method is a substantially riskier and more dangerous three-drug method than the original three-drug method.

172. DRC Defendants knowingly, intentionally and purposefully reintroduced the needless, unacceptable harm of the paralytic drug and potassium chloride into the execution protocol again when they adopted the current Execution Protocol.

173. Moreover, DRC Defendants have knowingly, intentionally and purposefully reintroduced the needless, unacceptable harm of midazolam in the execution protocol.

174. Thus, not only have DRC Defendants resurrected a method they abandoned in part because there were much more humane options available, but they have now made changes to that abandoned method that make it even worse.

45

175.     Administration of the Execution Protocol to a particular condemned inmate, like with other recent versions of 01-COM-11, begins approximately thirty days in advance of the scheduled execution date.

176.     The Execution Protocol contains five Core Elements. Deviation or variation from any of those five Core Elements throughout Defendants' administration of 01-COM-11 to a particular inmate is prohibited by the terms of the Protocol itself, as well as by prior rulings in this litigation.

177.     The core elements of the Execution Protocol (hereinafter the "Core Elements") read as follows:

>    1. At least three Medical Team Members, two of whom are authorized to administer drugs under Ohio law, shall be used in the conduct of court-ordered executions.
>
>    2. The drugs required by this policy shall be used.
>
>    3. Functions required to be performed by medically-qualified persons, as described in this policy, shall be performed by Medical Team Members.
>
>    4. All Execution Team functions shall be performed by appropriately trained and qualified members of the Execution Team.
>
>    5. Only the Director can authorize a variation from the procedures stated in this policy but not a variation from the four requirements listed immediately above in subsection V.1.2.3. and 4. of this policy.

178.     The Core Elements purport to provide necessary, core constitutional protections which, among other things, purport to ensure that competent and properly trained actors are involved in key aspects of

the execution process and that the respective tasks performed by those actors in these key respects are subject to oversight, redundancies, and other built-in checks to eliminate mistakes and variations or deviations from the Protocol's protections.

179.    Strict compliance with the Core Elements is necessary for Defendants to carry out an execution that adequately protects the condemned inmate's constitutional rights.

180.    An execution that is not administered in strict compliance with the Core Elements will subject Plaintiff to violations of his constitutional rights and is unconstitutional.

181.    Under Defendants' overarching execution policy and the Execution Protocol, and regardless of the lethal drug(s) to be used, a condemned inmate will be forced to lie down flat on his or her back for periods of time.

182.    Upon entering the execution chamber, a condemned inmate will be strapped to the execution bed flat on his or her back, unable to move, with arms outstretched at each side.

183.    The DRC Defendants will immobilize the condemned inmate by strapping him or her to the execution bed before the execution team begins attempted insertion of the peripheral IV catheters.

184.    The DRC Defendants ensure that a condemned inmate lies flat on his or her back by employing "security team" members surrounding the inmate during efforts to establish IV access, and by strapping the inmate to the execution bed.

185.    These security team and/or strap-down team members will physically ensure that an inmate remains flat on his back in a horizontal position throughout these procedures.

186.    Although the DRC Defendants purportedly take only one to three minutes to establish peripheral IV access during execution rehearsals, successfully achieving peripheral IV access under the pressure and circumstances of a genuine execution has taken in the past and, upon information and belief, will take in the future, at least several minutes and may take half an hour or substantially more.

187.    In the case of DRC Defendants' attempt to execute Romell Broom, some or all of the same DRC Defendant-medical team members who are expected to be on duty for Plaintiff's attempted execution, were unable to successfully achieve and maintain peripheral IV access even after some two hours of trying.

188.    During DRC Defendants' execution of Kenneth Biros, it took approximately 30 minutes for DRC Defendants to obtain peripheral IV access.

189.    In the execution of Harry Mitts, Jr., the DRC Defendants required at least thirteen minutes to obtain peripheral IV access.

190.    In the execution of Dennis McGuire, the DRC Defendants required at least ten minutes to obtain peripheral IV access.[4]

191.    Under DRC Defendants' overarching execution policy and the Execution Protocol, DRC Defendants will fill the IV tubing running from the equipment room to the inmate's IV catheter with saline solution before injecting the execution drug(s).

192.    Under DRC Defendants' overarching execution policy and the Execution Protocol, DRC Defendants will inject the execution drug(s) into the IV tubing in the equipment room that is filled with saline solution.  Thereafter a low-pressure saline drip will be used to purportedly "flush" the contents of the IV lines into the inmate.

193.    The physical structures of DRC Defendants' execution chamber and the Equipment Room result in an extended length of IV tubing being used to inject the execution drug(s).  Furthermore, that IV tubing will have a dip in the lines similar to an "s-trap" used in plumbing household sinks, in which some amount of the execution drug(s) will be trapped for some period of time during an execution.

194.    Because of the volume of drugs involved, the length of the IV tubing and the traps in the IV lines, the execution drug(s) will be mixed with the saline solution already in the IV tubing and the saline solution

_____

[4] As explained more fully in the Twentieth Claim for Relief, below, on November 15, 2017, DRC Defendants were unable to obtain peripheral IV access on Plaintiff Alva Campbell after thirty minutes, and halted the execution.

dripped into the lines after the plunger on Syringe 1 is emptied, before it reaches the condemned inmate.

195.    Thus, DRC Defendants will be injecting the execution drug(s) into the condemned inmate at an inconsistent rate, and the drug(s) that the inmate will receive will be diluted by the saline solution.

196.    Under accepted medical standards (Ohio Rev. Code § 2108.40), a simple absence of heart and lung sounds—which is all DRC Defendants assess—does not amount to irreversible cessation of circulatory and respiratory functions, or to irreversible cessation of all functions of the brain, including the brain stem.

197.    Under accepted medical standards, visual monitoring and a stethoscope assessment of heart and lung sounds—which is all DRC Defendants do—is insufficient to determine whether an individual has sustained irreversible cessation of circulatory and breathing functions.

198.    Under accepted medical standards, visual monitoring and a stethoscope assessment of heart and lung sounds—which is all DRC Defendants do—is insufficient to determine whether an individual has sustained irreversible cessation of all functions of the brain, including the brain stem.

199.     DRC Defendants use only visual observations of the prisoner and a
check of heart and lung sounds by stethoscope to declare death. DRC
Defendants do not use any other monitoring instruments, devices, or
methods that are necessary to determine death "in accordance with
accepted medical standards" and Ohio law, Ohio Revised Code
§ 2108.40.

200.     DRC Defendants are unable to declare death in accordance with Ohio
law simply by watching the prisoner, or by listening for heart and
lung sounds with a stethoscope.

201.     Notwithstanding the events that occurred during previous problematic
executions in Ohio and in other states, under their Execution Protocol
and informal execution policies established by practice and custom,
Defendants still do not do any of the following related to a lethal
injection execution:

> use any vital-signs monitoring;

> use pulse-oximetry (pulse-ox) monitoring;

> have supplies of oxygen on hand in the Death House;

> have resuscitative drugs, such as the reversal agent or antidote
  called flumazenil for midazolam, sugammadex for rocuronium
  bromide and an acetylcholinesterase inhibitor for vecuronium
  bromide and pancuronium bromide, on hand in the Death
  House;

> have ventilation equipment such as ventilation bag, valve and
  mask, on hand in the Death House;

> have intubation equipment on hand in the Death House;

➢ have any way to maintain a patent (uncompromised) airway and support of ventilation;

➢ have any way to prepare and transport an inmate to an emergency health-care provider facility;

➢ have any other resuscitative measures readily available and employable in the event that a problem arises during an execution or in the event that a stay of execution is issued after injection of the execution drugs;

➢ train for any scenarios under which resuscitative measures would be necessary, or have any resuscitative plan of action at all.

202. If DRC Defendants attempt to execute him, Plaintiff intends to make a last statement before any such attempted execution.

203. DRC Defendants' overarching execution policy and the Execution Protocol lack any restraint on the number of attempts at peripheral IV access or the length of time those pokes, sticks, and stabs to the inmate can persist.

204. DRC Defendants are willing to engage in multiple, lengthy attempts at establishing and sustaining peripheral IV access.

205. DRC Defendants' policy and belief is that they are permitted to engage in efforts to complete an execution from the time the Warden reads the death warrant up to midnight of the same day, when the death warrant expires.

206. DRC Defendants' failure to have a time limit for attempting peripheral IV access places the team members in an increasingly stressful situation, rendering the team members unable to constitutionally administer an execution.

207. The inmate's physical and mental suffering is not explicitly included in the Execution Protocol's considerations for whether to halt further peripheral IV access attempts.

208. DRC Defendants' execution policy, including the Execution Protocol, fails to recognize that each inmate may present unique physical or psychological characteristics that may affect how a particular execution must be carried out while remaining within the bounds of the law.

209. DRC Defendants' execution rehearsals are not modified or tailored to address specific physical or psychological characteristics of any particular condemned inmate.

210. DRC Defendants have failed to prepare, train, or adjust the drug dosages to account for the unique issues any individual condemned inmate may present.

211. DRC Defendants' execution policy, including the Execution Protocol, fails to require a physician to personally supervise or monitor the preparation, administration or disposal of the lethal drug(s).

212. DRC Defendants' execution policy, including the Execution Protocol, fails to require a physician to personally insert a subclavian central line through which the lethal drug(s) may be injected.

213. DRC Defendants' execution policy, including the Execution Protocol, fails to require a physician or any other advanced-practitioner to be on hand to provide necessary medical care during the course of an execution attempt.

214. Other states require the use of physicians during the execution process.

215. A recent change in Ohio law protects an Ohio-licensed physician from any professional discipline that might arise from ethical violations from participating in an execution.

216. DRC Defendants, during the previous failed attempt to execute Romell Broom, used a physician to participate in their unsuccessful efforts.

217. DRC Defendants' execution policy, including the Execution Protocol, fails to contain any provision by which Defendants are able to ensure that they do not violate constitutional prohibitions on executing an incompetent individual in violation of *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Panetti v. Quarterman*, 551 U.S. 930 (2007).

218. DRC Defendants' execution policy, including the Execution Protocol, fails to contain any provision by which Defendants are able to ensure that they do not violate constitutional prohibitions established in *Atkins v. Virginia*, 536 U.S. 304 (2002), and reconfirmed in *Brumfield v. Cain*, 135 S. Ct. 2269, 192 L. Ed. 2d 356 (2015), on executing an inmate that is categorically ineligible for the death penalty due to his or her intellectual disability.

219.    The 2016 Execution Protocol is notable for what it lacks:

> any analytical testing of execution drugs other than a provision stating that any compounded execution drugs will be tested solely for identity and potency, notwithstanding that analytical testing for matters such as sterility, purity, the presence of pyrogens and others are required by USP <797> and, therefore, now required under Ohio law and, accordingly, now required by Defendants' Execution Protocol;

> any requirements or any point of reference for what constitutes a "sample from the batch" of execution drugs to be tested; whether such testing is even remotely relevant to the execution drugs to be used depends in part on the sample size and the batch size—for instance, will one vial in ten be tested?  One vial in 1000?;

> any provision expressly limiting the source of any API to be compounded into drugs for an execution to an FDA-registered facility, or expressly prohibiting the use of any API obtained on the grey or black markets;

> any provision to expressly ensure the API supply chain will be subject to inspection and mandatory documentation at each step in the supply chain to help assure that the raw API is not imported, is sterile, is unadulterated, is not contaminated with bacteria or fungus or any other substance, does not contain dangerous allergens or substances that may cause immediate anaphylactic reactions, or is otherwise anything other than pure, raw API for the execution drug in question;

> any provision expressly mandating pre-compounding analytical testing of the raw API to ensure the API is not imported, is sterile, is unadulterated, is not contaminated with bacteria or fungus or any other substance, does not contain dangerous allergens or substances that may cause immediate anaphylactic reactions, or is otherwise anything other than pure, raw API for the execution drug in question;

> any provision expressly for testing the pH level of compounded drugs;

➢ any provision expressly for testing compounded drugs for purity and sterility, such as for the presence of pyrogens or other bacteria or fungus, allergens or substances that may cause immediate anaphylactic reaction, or other contaminants; testing for identity and potency will not properly identify whether additional substances are contained in the compounded drug;

➢ any provision to expressly preclude using compounded drugs that are incorrect concentration, or in any way misbranded or adulterated in any way other than identity or potency;

➢ any provision expressly regarding the requisite minimum qualifications of any compounding pharmacy and any compounding pharmacist to be used, or any provision expressly setting out characteristics that would automatically disqualify a compounding pharmacy or a compounding pharmacist from performing any tasks related to execution drugs;

➢ any provision expressly regarding the requisite minimum qualifications for any analytical testing entity to be used, or any provision expressly setting out characteristics that would automatically disqualify a testing entity from performing any tasks related to execution drugs;

➢ any provision expressly requiring that any analytical testing of compounded execution drugs will be done as a separate oversight step by an outside, independent laboratory; that is, there is nothing to expressly preclude DRC from accepting any analytical testing performed by entities that are not truly independent from DRC, the Ohio Attorney General's Office or the local county prosecutor—such as the compounding pharmacy or pharmacist itself or Ohio's BCI crime lab—and which would, therefore, have a vested interest in a particular outcome of the analytical testing that undermines the credibility and reliability of any such testing;

➢ any provision expressly establishing the required testing protocols to be followed by any testing facility in conducting any analytical testing of execution drugs, or any provision expressly requiring the testing facility in question to even have any written testing protocols for execution drugs at all;

➢ any provision expressly requiring creation of any documentation of analytical testing allegedly completed, or any provision expressly requiring production of such documentation to any person or entity, let alone an independent expert, for independent verification of the validity of the testing protocol or the testing results;

➢ any provision expressly making matters related to analytical testing of compounded execution drugs a mandatory, "core" part of the Execution Protocols, thereby rendering it subject to deviation or variation on the whim of the Director or the Director's designee, whomever that happens to be at a given moment, if proceeding with an execution in strict compliance with the skeletal testing provisions in the protocol would be "difficult, impractical or impossible";

➢ any provision expressly requiring the compounder to adhere to current Good Manufacturing Practices ("cGMPs") for manufacturing the particular drug in question, or any provision expressly requiring the compounder to verify that it is properly set up to compound high-risk sterile injectables;

➢ any provision expressly requiring mandatory inspection of the compounding pharmacy or outsourcing facility and the entity's operations;

➢ any provision expressly requiring that the compounding pharmacy, outsourcing facility, or compounding pharmacist be licensed by the Ohio State Board of Pharmacy or, indeed, by any state's pharmacy licensing entity;

➢ any provision expressly requiring adherence to the Beyond-Use Date limits for compounded drugs established under Ohio law;

➢ any provision expressly recognizing that compliance with the United States Pharmacopeia chapter <797> is required by Ohio Admin. Code § 4729-16-03 for any compounded drugs used in executions;

➢ any provision expressly recognizing that compliance with section 503A of the Federal Food, Drug, and Cosmetic Act is required by Ohio Admin. Code § 4729-16-03 for any compounded drugs used in executions;

➢ any provision expressly establishing how compounded execution drugs will be transported, stored or otherwise maintained as required by the relevant state of the compounded drugs (frozen, refrigerated, or room temperature), or any provision expressly mandating that compounded drugs be transported, stored or otherwise maintained as necessary depending on the relevant state of the compounded drugs;

➢ any provision expressly setting out how the Drug Administrators will prepare compounded execution drugs that are stored in a frozen or refrigerated state, such as when or how frozen compounded execution drugs will be thawed, which is significant because improper procedures such as premature thawing or thawing using inappropriate methods substantially increase the risk of harm from using compounded execution drugs;

➢ any provision expressly mandating any kind of analytical testing or any other form of verification of identity, identity, adulteration, contamination, pH level, sterility, and other similar concerns related to any execution drug that is imported, whether in bulk form as raw API or in manufactured form;

➢ any provision expressly recognizing DRC Defendants are explicitly prohibited from using any imported execution drug that was exported by a non-FDA-registered facility, or any provision expressly recognizing DRC Defendants are explicitly prohibited from using any imported execution drug that comes from a grey or black market course, or any provision expressly recognizing DRC Defendants are prohibited from using any drug that is an "unapproved drug" under federal law;

➢ any provision expressly recognizing Defendants are prohibited from using execution drugs that are obtained, imported, purchased, prescribed, possessed, dispensed, distributed, or administered (and any other terms of art under the federal CSA, federal FDCA or Ohio law) in violation of federal and state laws;

➢ any provision to expressly ensure that the Warden's declaration of death of the condemned inmate is in accord with the point at which "death" occurs as defined and governed under Ohio law;

58

> ➢ any provision for use of any methods for genuinely assessing the inmate's consciousness level, awareness level, or any provision for use of any instrument—other than the implied use of a stethoscope by the two persons who will listen to the inmate for heart and lung sounds—to help determine whether the inmate is truly dead as that term is defined under Ohio law;

> ➢ any provision for additional injections of the execution drug before a significant period of time—likely at least 5 or more minutes—has passed;

> ➢ any provision for expressly ensuring emergency resuscitative equipment will be on hand in the Death House, or any provision expressly establishing procedures for, or any Execution Team training for, implementing emergency resuscitative measures when cessation of the inmate's circulatory and respiratory system is still reversible after the Warden has called "time of death."

220. The absence of the above-recited necessary safety and other prophylactic measures related to analytical testing renders the analytical testing provision in the Execution Protocol insufficient to reduce the substantial risk of serious harm presented by using imported or compounded execution drugs.

221. The absence of the above-recited necessary safety and other prophylactic measures substantially increases the risk of serious harm to the inmate when DRC Defendants' Execution Protocol is applied to him.

222. DRC Defendants' execution policy, including the Execution Protocol, fails to contain relevant oversight or procedural protection provisions as to the Drug Source Defendants themselves, or sufficient oversight or procedural protection provisions as to the drug(s) the Drug Source

Defendants provide for use in an execution pursuant to the Execution Protocol.

223. The Execution Protocol contains insufficient provisions by which DRC Defendants will ensure compliance with Core Element # 2, that all execution drugs to be used in a particular execution are, in fact, the specific execution drug type, quantity, sterility level, purity, origin, unadulterated, not misbranded, and legally obtained, as required to be used by the Execution Protocol, making it highly likely that Defendants will deviate from Core Element # 2.

224. The Execution Protocol contains insufficient provisions by which DRC Defendants will ensure compliance with all applicable federal and state statutes and administrative regulations, thus making it highly likely that Defendants will deviate from Core Element # 2's requirements by using execution drugs that are not the drugs required to be used by the Execution Protocol because they are not legally manufactured, imported, compounded, distributed, dispensed, or otherwise provided to DRC Defendants.

225. The Execution Protocol, although providing that a sample of compounded execution drugs will be "analytically tested [for identity and potency] before they are used," contains no explicit mandate that any execution drugs procured from the Drug Source Defendants must be tested for purity, contamination, concentration, pH levels, sterility, adulteration, expiration/beyond its use date, improper storage or

60

handling, or other factor that might affect an inmate's constitutional rights, making it highly likely that Plaintiff's constitutional rights will be violated through Defendants' use of compounded, imported, or otherwise-sourced execution drugs.

226. The Execution Protocol contains no explicit requirement for any inspections, quality-control verifications, licensure or background checks or any other verification of professional credentials, individual or professional character, qualifications, conflicts of interest, or anything else related to the Drug Source Defendants or facilities in which the Drug Source Defendants will manufacture, process, compound, package, ship, import, store or hold or offer for sale execution drug(s), and as a result of a lack of oversight, serious complications are foreseeable and substantially likely.

**1. Plan 1 of Defendants' Execution Protocol – A One-Drug Method Using Pentobarbital**

227. Plan 1 of DRC Defendants' Execution Protocol requires the peripheral intravenous injection, via two syringes of 2.5 grams each of pentobarbital, 100 ml of a 50 mg/mL solution, for a total of 5 grams of pentobarbital, followed by a saline solution flush. In practice, DRC Defendants fill the IV tubing with saline solution before injecting the execution drug, and they inject a saline solution flush following each syringe.

228. Five additional grams of pentobarbital, 100 ml of a 50 mg/mL solution, are required to be obtained and kept available in the

Equipment Room, to be drawn into two syringes and administered via peripheral IV injection if the primary five-gram dose of pentobarbital "proves to be insufficient for the procedure."

229. There is no provision in the Execution Protocol or DRC Defendants' informal execution policies for ensuring that additional quantities of pentobarbital are kept available in the Equipment Room to be used in an execution, and, upon information and belief, additional quantities of pentobarbital beyond 10 grams will not be present or available for DRC Defendants to use in an execution using Plan 1.

230. DRC Defendants contemplate using pentobarbital obtained under whatever name it may be available from Drug Source Defendants, and from whatever source they can.

231. Use of pentobarbital in an execution carries a substantial risk of creating a paradoxical reaction, which occurs when a drug does not work as intended.

232. A paradoxical reaction to pentobarbital would cause an individual to remain hyper-aware as the execution proceeds. As a result of that heighted state of awareness, such an individual would experience severe pain and needless suffering as the injected lethal drug does its work.

233. The risk of a paradoxical effect is even greater when the individual to whom the drug is being injected has suffered a brain injury or history of head trauma, or has a history of aggression or impulsivity, a history of substance abuse, a history of psychiatric disorders, or characteristics that suggest PTSD.

234. Eyewitness and media accounts of executions in other jurisdictions using pentobarbital suggest that condemned inmates have experienced substantial pain, suffering and an extended duration of execution.

235. Upon information and belief, injection of five grams of pentobarbital via peripheral IV will not cause the condemned inmate to lose awareness and consciousness for a period of minutes following the commencement of the injection.

236. Upon information and belief, injection of five grams of pentobarbital via peripheral IV will cause a condemned inmate to experience substantial pain while still aware or conscious.

237. DRC Defendants' own medical expert at the time, Dr. Mark Dershwitz, has presented testimony in this litigation admitting that pentobarbital can sometimes cause pain even when properly injected.

238. Using pentobarbital to kill in a lethal-injection execution creates a substantial likelihood the inmate will suffer a painful heart attack.

239. DRC Defendants know or should know that Plan 1 causes death by suffocation, unless death occurs by a painful heart attack.

240.    Two injections of 2.5 grams of the pentobarbital in a 50 mg/mL solution will not act directly to stop Plaintiff's heart.

241.    Two injections of 2.5 grams of the pentobarbital in a 50 mg/mL solution will suppress Plaintiff's breathing, creating a lack of oxygen to his heart.

242.    The lack of oxygen caused by two injections of 2.5 grams of the pentobarbital in a 50 mg/mL solution will suppress the beating of Plaintiff's heart.

243.    After two injections of 2.5 grams of pentobarbital in a 50 mg/mL solution have been completed, Plan 1 of the Execution Protocol calls for an Unnamed and Anonymous Execution Team Member ("Drug Administrator") to reenter the Execution Chamber to inspect the IV site for evidence of incontinence or infiltration and to listen to the prisoner for breathing and heart sounds.

244.    If the Drug Administrator does not hear any breathing or heart sounds, an "appropriate medical professional" (the County Coroner) shall evaluate the prisoner to confirm death.

245.    Though Plan 1 of DRC Defendants' Execution Protocol does not define the phrase "evaluate the prisoner to confirm death," upon information and belief, by practice, the County Coroner listens to the prisoner for breathing and heart sounds.

246.    Though Plan 1 of the Execution Protocol does not define the phrase "evaluate the prisoner to confirm death," upon information and belief, by practice, the County Coroner does not perform ECG or EEG examinations.

247.    Though Plan 1 of the Execution Protocol does not define the phrase "sufficient time for death to have occurred," by practice, the Drug Administrator's evaluation and the County Coroner's evaluation both occur within approximately ten minutes following the two injections of 2.5 grams of pentobarbital.

248.    Within approximately ten minutes after two injections of 2.5 grams of pentobarbital, Plaintiff's heart and breathing sounds will be undetectable.

249.    Under Plan 1 of the Execution Protocol, after the County Coroner confirms death, Defendant Warden will declare Plaintiff dead by announcing a time of death.

250.    At the time Defendant Warden will declare Plaintiff dead by announcing a time of death, there is a substantial risk that Plaintiff will still have rhythmic electrical cardiac activity that can be detected through an ECG examination.

251.    At the time Defendant Warden will declare Plaintiff dead by announcing a time of death, there is a substantial risk that Plaintiff will still have electrical activity in his brain that can be detected through an EEG examination.

65

252.    Where the activity described in the preceding two paragraphs is present, Plaintiff is clinically and legally alive.

253.    There is a substantial risk that Plaintiff's electrical cardiac activity and electrical brain activity will continue for as long as 45 minutes after breathing and heart sounds are undetected under Plan 1.

254.    There is a substantial risk that Plaintiff will not have sustained either irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the brain, including the brain stem, at the time Defendants declare him dead and take subsequent actions under the Execution Protocol.

255.    The 2016 Execution Protocol contains additional requirements relevant to Plan 1, allegations of which are incorporated here by reference.

### 2.    Plan 2 of DRC Defendants' Execution Protocol – A One-Drug Method Using Sodium Thiopental

256.    Plan 2 of DRC Defendants' Execution Protocol requires the peripheral intravenous injection, via five syringes, of five grams of thiopental sodium, 200 ml of a 25 mg/ml solution, followed by a saline solution flush.  In practice, DRC Defendants fill the IV tubing with saline solution before injecting the execution drug, and they inject a saline solution flush following each syringe.

257. Five additional grams of thiopental sodium, 200 ml of a 25 mg/ml solution, are required to be obtained and kept available in the Equipment Room, to be drawn into five separate syringes and administered via peripheral IV injection if the primary five-gram dose of thiopental sodium "proves to be insufficient for the procedure."

258. Beyond the 10 grams prepared as described above, nothing in the Execution Protocol or DRC Defendants' informal execution policies ensures that additional quantities of thiopental sodium are kept available in the Equipment Room to be used in an execution. Upon information and belief, additional quantities of thiopental sodium beyond these 10 grams will not be present or available for DRC Defendants to use in an execution using Plan 2.

259. Defendants contemplate using thiopental sodium obtained under whatever name it may be available from Drug Source Defendants, and from whatever source they can.

260. Use of thiopental sodium in an execution carries a substantial risk of creating a paradoxical reaction, which occurs when a drug does not work as intended.

261.    A paradoxical reaction to thiopental sodium would cause an individual to remain hyper-aware as the execution proceeds. As a result of that heighted state of awareness, such an individual would experience severe pain and needless suffering from a heart attack or other pain associated with the process as the injected lethal drug does its work.

262.    The risk of a paradoxical effect is even greater when the individual to whom the drug is being injected has suffered a brain injury or head trauma, or has a history of aggression or impulsivity, a history of substance abuse, a history of psychiatric disorders, or characteristics that suggest PTSD.

263.    Defendants know or should know that Plan 2 causes death by suffocation, unless death occurs as a result of a painful heart attack.

264.    Using thiopental sodium to kill in a lethal-injection execution creates a substantial likelihood the inmate will suffer a painful heart attack.

265.    Five injections of 1.0 grams of the thiopental sodium in a 25 mg/ml solution will not act directly to stop Plaintiff's heart.

266.    Instead, five injections of 1.0 grams of the thiopental sodium in a 25 mg/ml solution will suppress Plaintiff's breathing, creating a lack of oxygen to his heart.

267.    The lack of oxygen caused by five injections of 1.0 grams of the thiopental sodium in a 25 mg/ml solution will suppress the beating of Plaintiff's heart.

268.   After five injections of 1.0 grams of thiopental sodium in a 25 mg/ml solution have been completed, Plan 2 of DRC Defendants' Execution Protocol calls for an Unnamed and Anonymous Execution Team Member ("Drug Administrator") to reenter the Execution Chamber to inspect the IV site for evidence of incontinence or infiltration and to listen to the prisoner for breathing and heart sounds.

269.   If the Drug Administrator does not hear any breathing or heart sounds, an "appropriate medical professional" (the County Coroner) shall evaluate the prisoner to confirm death.

270.   Though Plan 2 of DRC Defendants' Execution Protocol does not define the phrase "evaluate the prisoner to confirm death," upon information and belief, by practice, the County Coroner listens to the prisoner for breathing and heart sounds.

271.   Though Plan 2 of the Execution Protocol does not define the phrase "evaluate the prisoner to confirm death," upon information and belief, by practice, the County Coroner does not perform ECG or EEG examinations.

272.   Though Plan 2 of the Execution Protocol does not define the phrase "sufficient time for death to have occurred," by practice, the Drug Administrator's evaluation and the County Coroner's evaluation both occur within approximately ten minutes following the five injections of 1.0 grams of thiopental sodium.

69

273. Within approximately ten minutes after five injections of 1.0 grams of thiopental sodium, Plaintiff's heart and breathing sounds will be undetectable.

274. Under Plan 2 of the Execution Protocol, after the County Coroner confirms death, Defendant Warden will declare Plaintiff dead by announcing a time of death.

275. At the time Defendant Warden will declare Plaintiff dead by announcing a time of death, there is a substantial risk that Plaintiff will still have rhythmic electrical cardiac activity that can be detected through an ECG examination.

276. At the time Defendant Warden will declare Plaintiff dead by announcing a time of death, there is a substantial risk that Plaintiff will still have electrical activity in his brain that can be detected through an EEG examination.

277. Where the activity described in the preceding two paragraphs is present, Plaintiff is clinically and legally alive.

278. There is a substantial risk that Plaintiff's electrical cardiac activity and electrical brain activity will continue for as long as 45 minutes after breathing and heart sounds are undetected under Plan 2.

279. There is a substantial risk that Plaintiff will not have sustained either irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the brain, including the brain

stem, at the time Defendants declare him dead and take subsequent actions under the Execution Protocol.

280. The Execution Protocol contains additional requirements relevant to Plan 2, allegations of which are incorporated here by reference.

### 3. Plan 3 of DRC Defendants' Execution Protocol – A Three-Drug Method Using Midazolam, A Paralytic, and Potassium Chloride

281. Plan 3 of DRC Defendants' Execution Protocol requires the peripheral intravenous injection, via two syringes, of 500 milligrams of midazolam hydrochloride. Those syringes are labeled Syringes 1 and 2.

282. An additional 500 milligrams of midazolam must be kept available in the Equipment Room. If that additional 500 milligrams is withdrawn into syringes for contingency use, those contingency syringes are labeled Syringes A and B.

283. At an undefined point after injection of both syringes of midazolam, a Drug Administrator must reenter the death chamber "to assess the prisoner's consciousness."

284. Upon information and belief, DRC Defendants believe a person who appears to "be asleep" is "unconscious," and that appearing superficially to be "unconscious" means the person is fully unconscious, fully unaware and unable to feel or experience noxious stimuli including pain to the level associated with general anesthesia.

285. The Execution Protocol fails to provide for how that check should or shall be done, or at what time following administration of the first two syringes the Drug Administrator shall enter the death chamber to perform that assessment.

286. Upon information and belief, Defendants intend to inject the paralytic agent very quickly after injection of midazolam, to paralyze the inmate and thus hide any outward signs that the inmate remains conscious, aware, or sensate to pain and suffering.

287. The Execution Protocol fails to provide for any genuine assessment of the inmate's level of consciousness, his awareness level or ability to experience and feel pain or other noxious stimuli.

288. If the inmate is found to be "unconscious," then DRC Defendants will commence with administration of the second and third drugs.

289. No Drug Administrator performs any inspection of the IV site(s) for evidence of incontinence or infiltration until after the third drug has been administered.

290. If the inmate is found to be "conscious" after injection of the first drug, then the Drug Administrator, the second Drug Administrator, the Warden, the Director and any Auxiliary Team Member will consult. The IV sites may be checked and changed at that time. The Warden will then decide how to proceed, and may simply wait for the passage of time, or request an additional undefined assessment by a Drug Administrator, or direct administration of Syringes A and B.

291. If contingency Syringes A and B are injected, then the Execution Protocol contemplates repeating the previously explained steps again.

292. Beyond the 500 or 1000 milligrams prepared as described above, nothing in the Execution Protocol or DRC Defendants' informal execution policies ensures that additional quantities of midazolam are kept available in the Equipment Room to be used in an execution. Upon information and belief, additional quantities of midazolam beyond these 1000 milligrams will not be present or available in the Equipment Room for DRC Defendants to use in an execution using Plan 3.

293. After injection of midazolam and purported confirmation that the inmate is "unconscious," a Drug Administrator will inject, via two syringes labeled Syringes 3 and 4, a paralytic drug.

294. Syringes 3 and 4 may contain 100 milligrams of vecuronium bromide; or 100 milligrams of pancuronium bromide; or 1000 milligrams of rocuronium bromide.

295. After injection of the paralytic drug, a Drug Administrator will inject, via two syringes labeled Syringes 5 and 6, 240 milliequivalents of potassium chloride.

296. Defendants use only a low-pressure saline drip during and following completion of the injections. They do not employ a saline flush following either syringe.

297.    Defendants contemplate using any of the drugs in Plan 3 obtained under whatever name each drug may be available from Drug Source Defendants, and from whatever source they can.

298.    Use of midazolam in an execution carries a substantial risk of creating a paradoxical reaction, which occurs when a drug does not work as intended.

299.    A paradoxical reaction to midazolam would cause an individual to remain hyper-aware as the execution proceeds. As a result of that heighted state of awareness, such an individual would experience severe pain and needless suffering from injection of the paralytic drug and potassium chloride, suffocation, or a heart attack or other pain associated with the process as the injected lethal drug does its work.

300.    The risk of a paradoxical effect is even greater when the individual to whom the drug is being injected has suffered a brain injury or head trauma, or has a history of aggression or impulsivity, a history of substance abuse, a history of psychiatric disorders, or characteristics that suggest PTSD.

301.    Defendants know or should know that Plan 3 causes death by suffocation or as a result of a painful heart attack.

302.    Using midazolam to kill in a lethal-injection execution creates a substantial likelihood the inmate will be conscious, aware and able to feel and experience the horror and pain of suffering a painful heart

attack or suffocating to death, or the pain and suffering associated with dying from the injection of those drugs in a lethal injection.

303. Using the paralytic drug to kill in a lethal injection execution creates an absolute certainty of unconstitutional pain and suffering if the inmate is not rendered fully unconscious, unaware and unable to feel and experience noxious stimuli such as pain.

304. Using the potassium chloride to kill in a lethal injection execution creates an absolute certainty of unconstitutional pain and suffering if the inmate is not rendered fully unconscious, unaware and unable to feel and experience noxious stimuli such as pain.

305. After injection of 500 mg. of midazolam has been completed, Plan 3 of DRC Defendants' Execution Protocol calls for an Unnamed and Anonymous Execution Team Member ("Drug Administrator") to reenter the Execution Chamber to "assess the prisoner's consciousness." No other assessment of the inmate's genuine level of consciousness, awareness and ability to experience and feel noxious stimuli will be conducted, and there are no procedures or provisions made to assess the inmate's consciousness level, awareness level and ability to experience and feel pain that might allow Defendants to even possibly make those determinations accurately.

306. The specifics of the "consciousness check" mentioned in the Execution Protocol are undefined. But in any event, the "consciousness check" is insufficient to determine whether the

75

condemned inmate has been, in fact, rendered fully unconscious, unaware and unable to feel and experience pain at the level associated with general anesthesia. Responsive action by the inmate would indicate consciousness or awareness, but advances in brain science establish that lack of responsive action is not evidence of lack of consciousness or awareness, nor would lack of responsive action demonstrate the state of general anesthesia, the level of anesthesia beyond that which is able to be overcome by noxious stimuli such as pain caused by the bodily effects of midazolam, or the feelings of suffocation and burning caused by the paralytic drug, or the intense burning sensations and painful heart attack caused by injection of a lethal dose of potassium chloride.

307. Once the paralytic drug is delivered, none of DRC Defendants are capable of making, and are not competent to make, any meaningful assessment of the paralyzed inmate without the assistance of mechanical aids such as EEG-based monitors and the other types of assessment methods mentioned throughout this Fifth Amended Complaint. Indeed, the Execution Protocol does not even require any "consciousness check" after the paralytic is administered.

308. Injection of 500 mg. of midazolam will not act directly to stop Plaintiff's heart.

309. Instead, 500 mg. of midazolam will suppress Plaintiff's breathing, creating a lack of oxygen to his heart.

310.   The lack of oxygen caused by 500 mg. of midazolam will suppress the beating of Plaintiff's heart.

311.   Injection of the paralytic drug will paralyze Plaintiff's musculature, causing him to suffocate because the muscles required to breathe cannot function.

312.   Injection of the potassium chloride will cause Plaintiff to suffer a massive heart attack.

313.   After injection of all three drugs in Plan 3 has been completed, the Execution Protocol calls for a Drug Administrator to reenter the Execution Chamber "to inspect the IV site for evidence of incontinence or infiltration and to listen to the prisoner for breathing and heart sounds."

314.   If the Drug Administrator does not hear any breathing or heart sounds, an "appropriate medical professional" (the County Coroner) shall evaluate the prisoner to confirm death.

315.   Though Plan 3 of DRC Defendants' Execution Protocol does not define the phrase "evaluate the prisoner to confirm death," upon information and belief, by practice, the County Coroner listens to the prisoner for breathing and heart sounds.

316.   Though Plan 3 of the Execution Protocol does not define the phrase "evaluate the prisoner to confirm death," upon information and belief, by practice, the County Coroner does not perform ECG or EEG examinations.

77

317. Though Plan 3 of the Execution Protocol does not define the phrase "sufficient time for death to have occurred," by practice, the Drug Administrator's evaluation and the County Coroner's evaluation both occur within approximately ten minutes following initiation of the injection of the execution drugs.

318. Within approximately ten or more minutes after injection of the three drugs in Plan 3, Plaintiff's heart and breathing sounds will be undetectable.

319. Under Plan 3 of the Execution Protocol, after the County Coroner confirms death, Defendant Warden will declare Plaintiff dead by announcing a time of death.

320. At the time Defendant Warden will declare Plaintiff dead by announcing a time of death, there is a substantial risk that Plaintiff will still have cardiac activity that can be detected through an ECG examination.

321. At the time Defendant Warden will declare Plaintiff dead by announcing a time of death, there is a substantial risk that Plaintiff will still have electrical activity in his brain that can be detected through an EEG examination.

322. Where the activity described in the preceding two paragraphs is present, Plaintiff is clinically and legally alive.

323.    There is a substantial risk that Plaintiff's electrical cardiac activity and electrical brain activity will continue for as long as 30 minutes or more after breathing and heart sounds are undetected under Plan 3.

324.    There is a substantial risk that Plaintiff will not have sustained either irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the brain, including the brain stem, at the time Defendants declare him dead and take subsequent actions under the Execution Protocol.

325.    The Execution Protocol contains additional requirements relevant to Plan 3, allegations of which are incorporated here by reference.

### D.    Additional allegations related to midazolam.

326.    Midazolam is a Schedule IV depressant under the Controlled Substances Act.  See 21 C.F.R. § 1308.14.

327.    Midazolam (also sold under the trade name Hypnovel™ and Versed™) is a short-acting, watersoluble benzodiazepine used most commonly as a premedication (*i.e.*, in advance of anesthesia) for sedation.  The FDA-approved intravenous dose for an adult patient is 1 milligram to 2.5 milligrams to induce sedation.  Labeling instructions caution that high doses (*e.g.*, more than 1 milligram) must be titrated (the "push rate") slowly in order to be effective.  Specifically, the FDA-approved label counsels that doses of 1-to-2 milligrams be administered over the course of three minutes.  To be effective, midazolam must be

79

stored at temperatures between 68 and 77 degrees Fahrenheit.  It typically has a shelf life of three years from manufacture.

328.    As the Wood, McGuire, Lockett and Smith executions (discussed below), and others, reveal, midazolam, alone or in combination with hydromorphone or any other drugs, is unsuitable for use in human executions, as DRC Defendants know or should know or recklessly disregard.

329.    Midazolam is particularly unsuitable as the first drug in a three-drug method that includes the paralytic drug and potassium chloride. Midazolam is much less suitable for that purpose than sodium thiopental or pentobarbital.  There is a high likelihood that midazolam will fail to render Plaintiff sufficiently unconscious, or unaware, or insensate, and that it will wear off before the paralytic drug and potassium chloride are completely administered.

330.    Unlike pentobarbital and sodium thiopental, midazolam is not a barbiturate.  It is a benzodiazepine, which can induce sedation and amnesia, but not general anesthesia as needed in an execution context.  One can still consciously experience one's surroundings and feel severe pain and horrific stimuli while under sedation using midazolam.  Based on known scientific information regarding its mechanism of action, midazolam is unable to ensure that Plaintiff will be, and will remain, in a state in which he will be unable to be conscious, aware and experience pain and suffering.

331. The amnestic effect of midazolam is irrelevant in an execution context; that only prevents the subject from remembering what he experienced, but does not prevent the subject from being aware of the experience as it is happening.  (*See* Decl. David Waisel, M.D., ECF No. 381, PageID 11590.)

332. Midazolam is not an analgesic—that is, it has no pain-relieving properties—and is not typically used as an anesthetic agent.  *Id.*

333. Injection of midazolam does not prevent awareness and feeling painful stimuli or render and maintain a person unconscious at the level of general anesthesia.  A person subjected to lethal injection using midazolam will be substantially likely to suffer severe physical pain and torturous mental suffering and anguish, and will be substantially likely to be aware of that pain and suffering.

334. One of the characteristics of midazolam is that it cannot relieve pain.  A person who is not rendered and maintained unconscious at the level of general anesthesia, or otherwise rendered superficially unconscious or unaware by midazolam, and then subjected to severe pain will return to awareness and experience that pain.  For that reason, midazolam is not suitable as a stand-alone anesthetic to render and maintain general anesthesia.

335. The FDA has not approved midazolam for use as a stand-alone anesthetic to render and maintain general anesthesia, and it is not used as such.

336. Due to the way in which midazolam operates in the brain, it begins to lose effectiveness very rapidly, much more quickly than barbiturates such as pentobarbital and sodium thiopental.

337. As recent executions in other states involving midazolam confirm, there is a high likelihood the midazolam will wear off sufficiently for Plaintiff to be conscious or aware or sensate at some level before the paralytic drug and potassium chloride have been completely administered to Plaintiff.  And that means there is a substantial likelihood that Plaintiff will be aware of feeling the indisputably excruciating pain cause by each of the second and third drugs.

338. Further, midazolam is subject to a phenomenon known as a "ceiling effect," which limits the effect of large doses.  It is not, at any dose, able to reliably keep a person unconscious, unaware and insensate during the administration of painful stimuli, nor can it render and maintain a level of unconsciousness, unawareness and insensation akin to general anesthesia.  Benzodiazepines like midazolam have no effect on the central nervous system (the brain and spinal cord) in amounts above their ceiling effect, because the receptors on which midazolam acts become saturated.  Upon information and belief, midazolam's ceiling effect level is in or about the range of 200 mg, which is substantially lower than the 500 or 1000 mg. injected under the Execution Protocol.

339.     Thus, administration of any midazolam above 200 mg. to Plaintiff will
         have no significance to whether Plaintiff will be conscious or aware
         and experience the effects of midazolam itself, the effects of the
         paralytic, and the effects of potassium chloride.

340.     At or about a dose of 200 mg. injected rapidly at the start of the final
         stage of the Execution Protocol, it is still substantially likely that
         Plaintiff will be or become aware and sensate when exposed to the
         noxious stimuli he will experience from air hunger, a painful heart
         attack, suffocation and the terror of being paralyzed from the paralytic
         drug or the sensation of being burned alive from the inside from
         potassium chloride.

341.     The high dose of midazolam required by the Execution Protocol is
         misleading for another reason: a significant portion—more than 50%
         and perhaps as much as 75%—of a large injected dose of midazolam,
         injected very rapidly into the bloodstream under the terms of the
         Execution Protocol, will precipitate, *i.e.*, fall out of the solution, at the
         site of injection as it is first diluted with blood.  This means that a
         reduced portion of the original 500 mg. dose of midazolam—and
         substantially likely to be less than the ceiling effect level of 200 mg—is
         available to exert action in the brain and render Plaintiff unconscious,
         unaware and insensate.

342.     The extent of precipitation of midazolam depends on the conditions of
         administration.  Administration in accordance with the

manufacturer's package insert so as to reduce or eliminate the chances of precipitation upon injection requires an injection/push rate of "at least 2 minutes" for a clinical dose, which equates to approximately 2 mg/minute. Injecting 500 mg as required under the Execution Protocol, at a rate needed to avoid precipitating the midazolam at the injection site, would require 250 minutes (over four hours), not including the additional time to switch between the two syringes.

343. A faster push rate virtually guarantees a substantial amount of the injected midazolam will precipitate upon injection.

344. A faster push rate also significantly increases the likelihood that a patent IV portal will fail ("blowing a vein") and thus significantly increases the risk of not administering the full dose of midazolam in the first place.

345. Upon information and belief, DRC Defendants will inject Plaintiff with midazolam at a push rate significantly faster than 2 mg/minute. Upon information and belief, DRC Defendants will inject Plaintiff with the full 500 mg. of midazolam in approximately 2-3 minutes (including the time required to switch between the two syringes), a push rate of approximately 166 mg./minute to 250 mg./minute, which is approximately 100 times faster than the 2 mg./minute push rate necessary to ensure against IV problems and precipitation upon injection.

346.    Defendants' use of midazolam in their execution protocol creates a substantial risk of air hunger and/or suffocation.  Air hunger is the inability to satisfy the physiologic and psychologic urge to breath, similar to suffocation.  It is the inability to take a breath to satisfy the body's involuntary drive to breathe.  Air hunger and/or suffocation is a terrifying, horrifying, and painful experience.  *In re Ohio Execution Protocol Litig.*, 994 F. Supp. 2d at 912.

347.    An intravenous injection of midazolam will not prevent Plaintiff from being conscious, or feeling and/or being aware of the severe pain, horrific sensation and agony of air hunger and/or suffocation, or the effects of dying from IV injection of the three drugs in Ohio's three-drug execution protocol.

348.    A large dose of midazolam, such as the 500 mg (or 1000 mg, if the contingency syringes are used) provided in the 2016 Execution Protocol, also carries a substantial risk of producing tonic-clonic seizures (generalized seizures that affect the entire brain) and convulsions.  Such conditions can result in severe pain and suffering.

349.    Use of midazolam (like with pentobarbital or thiopental sodium) also carries a substantial risk of paradoxical reaction, which occurs when a drug does not work as intended.

350.    A paradoxical reaction to the lethal drug(s) would cause an individual to remain hyper-aware as the execution proceeds.  As a result of that heighted state of awareness, such an individual would experience

85

severe pain and needless suffering as the injected lethal drug(s) do their work.

351. There is a substantial risk of paradoxical reaction when midazolam is administered in high doses to individuals like Plaintiff with a history of brain damage or head trauma, aggression or impulsivity, a history of alcohol or substance abuse, or other psychiatric disorders.

352. Injection of midazolam as directed by DRC Defendants' Execution Protocol will also create a substantial risk of the inmate being conscious, aware and able to experience the excruciating pain of a heart attack. Injection of 500 mg of midazolam will likely induce a rapid and dangerous reduction in blood pressure more quickly than it results in any sedation. After injection, a large dose of midazolam will enter the heart and then circulate around the body, resulting in the "flooding" of peripheral receptors in the blood vessels. Thus, the arterial system will be subject to the effects of the midazolam before the midazolam crosses the blood-brain barrier and exerts any sedative effects on the brain and central nervous system.

353. The drop in blood pressure will be substantially likely to cause acute myocardial ischemia and/or infarction (a heart attack). Individuals not appropriately rendered unconscious, unaware and unable to feel pain at that point in time will immediately experience significant pain and suffering, as do all individuals who suffer a heart attack.

354.    Midazolam's effects on lowering blood pressure will typically occur very rapidly, and much more rapidly than midazolam's sedative effects. Midazolam's sedative effects generally take 5 minutes or more to take effect, and those sedative effects can be overcome by noxious stimuli such as the searing pain of a heart attack.

355.    The objective risk of substantial harm to an inmate when using midazolam as part of a lethal-injection execution method was too great for Kentucky. Kentucky, which had "modeled its execution process on Ohio's," created regulations to use a combination of midazolam and hydromorphone in its executions, but Kentucky's Attorney General recently informed a Kentucky court that the Commonwealth would be eliminating the two-drug protocol from its regulations before ever using it, "cit[ing] 'recent events in other states.'" Associated Press, *Kentucky drops 2-drug executions, reworking method*, Daily Mail, Nov. 14, 2014.[5] According to the spokeswoman for the Commonwealth, "'Kentucky will not take any risks with its protocols for lethal injection; therefore, we are going to eliminate this methodology [of lethal injection] from our regulations.'" *Id.*

356.    Arizona, the state that executed Joseph Wood using a lethal injection method that included injection of approximately 750 mg. of

---

[5] Available at http://www.dailymail.co.uk/wires/ap/article-2834665/Kentucky-drops-2-drug-executions-reworking-method.html.

midazolam, recently informed a federal district court that it will be changing its execution protocol to remove midazolam from the protocol, and that the state will never again use midazolam as part of its execution protocol. *See Wood v. Ryan*, No. 2:14-cv-1447, ECF No. 145, p. 2 (D. Ariz. Oct. 17, 2016) (brief filed by defendants asserting that regardless of any matters related to availability, Arizona "has committed to removing midazolam as an option from [Arizona's execution protocol] and now unequivocally commits not to use midazolam again, even if it becomes available.").

357. On or about January 4, 2017, the State of Florida revised its lethal injection execution protocol, eliminating midazolam as the first drug in Florida's three-drug execution method. *See* http://www.dc.state.fl.us/oth/deathrow/lethal-injection-procedures-as-of_01-04-17.pdf.

358. Defendants have no scientific basis to include midazolam in the Execution Protocol, whether by itself or as the first of a three-drug execution method.

359. Defendants did not include midazolam in the Execution Protocol on the basis of any alleged belief that using midazolam to carry out a lethal injection execution is more humane, safer, or more effective than any FDA-approved barbiturate.

**E.** **Additional allegations related to pancuronium bromide, vecuronium bromide, and rocuronium bromide.**

360. Each of pancuronium bromide, vecuronium bromide and rocuronium bromide is a paralytic agent, causing a complete loss of control over a person's musculature, including the diaphragm.

361. By cutting off an inmate's ability to control his diaphragm, any of these paralytic agents prevents ventilation and, accordingly, the ability to breathe.

362. Even when administered effectively, these paralytic agents affect neither consciousness nor awareness nor the perception of pain, nor do they prevent the recipient from suffering a slow and excruciatingly painful death by asphyxiation.

363. Being injected with any of these three paralytic agents while still conscious or aware or able to feel pain will cause an inmate to experience the horrific and torturous feeling of being unable to move the muscles required for respiration and thus slowly suffocating to death while being unable to communicate that circumstance, similar to the experience of being buried alive.

364. Executing an inmate by way of a paralytic drug without first rendering that inmate unconscious and unaware and insensate will cause that inmate to experience unconstitutional physical pain and mental suffering.

365. Defendants have not included the paralytic drug in the Execution Protocol for the purpose of causing the inmate's death.

89

366.     Defendants have included the paralytic drug in the Execution Protocol for the purpose of masking the visible signs of the potassium chloride acting on the condemned inmate to give the misleading impression that the inmate is fully unconscious and unaware and insensate at all times following the injection of the lethal drugs.

**F.     Additional allegations related to potassium chloride.**

367.     Potassium chloride is an extremely caustic substance that will activate pain receptors in an inmate's venous system, and cause excruciating pain as the drug passes through the inmate's veins.

368.     Being injected with potassium chloride causes burning sensations. Being injected with potassium chloride at the levels provided in the Execution Protocol while the inmate is still conscious or aware or able to feel and experience pain will cause the inmate to experience the physical pain and torturous mental anguish and suffering on the level of being burned alive at the stake.

369.     Potassium chloride injected at the levels provided in the Execution Protocol will also cause an excruciatingly painful heart attack.

**G.     Additional allegations related to using pentobarbital, thiopental sodium or midazolam for an execution.**

370.     A "New Drug" under the federal Food, Drug & Cosmetic Act (21 U.S.C. § 321(p)) and Ohio Revised Code § 3715.01(9)(a), means a drug that is "not generally recognized . . . as safe for use under the conditions prescribed, recommended, or suggested in the labeling thereof."

90

371.    Thiopental sodium, pentobarbital and midazolam are Dangerous
        Drugs under Ohio law, for which Ohio law requires they may only be
        dispensed upon a prescription, Ohio Rev. Code § 4729.01(F)(1)(b), and
        for which Ohio law requires compliance with federal FDCA labeling
        and new drug approval requirements under 21 U.S.C. § 301, et seq.
        *See* Ohio Rev. Code §§ 3719.01(D), 3719(BB), 4729.01(F)(1)(a).

372.    The FDA must approve any New Drug before the drug is introduced
        into interstate commerce, 21 U.S.C. § 355(a), and before any drug is
        sold, delivered for sale, held for sale, or given away, Ohio Rev. Code
        § 3715.65.

373.    FDA approval of a New Drug must be for specific uses of a drug.  To
        obtain FDA approval, drug manufacturers are required to
        demonstrate, through clinical trials, the safety and efficacy of a New
        Drug for each intended use or indication.

374.    Any pentobarbital, thiopental sodium, midazolam, paralytic drug or
        potassium chloride DRC Defendants might use for a lethal-injection
        execution of Plaintiff would have been introduced into interstate
        commerce, or sold, delivered for sale, held for sale, or given away.

375.    Thiopental sodium has never been approved by FDA for any intended
        use, and is thus considered an unapproved New Drug such that all
        Defendants may not, regardless of the source, lawfully introduce
        thiopental sodium into interstate commerce, or sell, deliver for sale,
        hold for sale, or give away thiopental sodium.

91

376.    No drug is, or ever has been, approved by the FDA as safe and effective for the purpose of causing a "quick and painless" death required by Ohio's execution statute.

377.    Therefore, when used for the purpose of causing death in a human execution, Defendants' actions involving any of the execution drugs in Defendants' Execution Protocol constitute using unapproved New Drugs under the FDCA and Ohio state law. *See* 21 U.S.C. §§ 321(p), 355; Ohio Rev. Code § 3715.65(A).

378.    Before a New Drug can lawfully be administered to humans (other than through the doctor-patient relationship in the practice of medicine), an "investigational new drug application ('IND')" must be submitted by the entity administering the drug. *Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 697–98 (D.C. Cir. 2007).

379.    To obtain approval of an IND Application, the applicant must engage in clinical investigation. Thus, to administer any of the drugs in the Execution Protocol to inmates to cause their execution, DRC Defendants are required to submit an IND Application to the FDA and "shall not begin a clinical investigation . . . until the investigation is subject to an IND which is in effect." 21 C.F.R. § 312.20(a)–(b).

380.    DRC Defendants flout these federal and state laws. DRC Defendants have never submitted any IND Application to the FDA for using any of the drugs in the Execution Protocol. Nor have DRC Defendants ever

92

taken steps to submit an IND Application for using pentobarbital, thiopental sodium, midazolam, the paralytic drug, or potassium chloride in an execution, and neither Ohio's execution statute nor the Execution Protocol includes such a requirement.

381. DRC Defendants have not submitted and do not intend to submit an IND Application for any of the drugs Defendants plan to use under the Execution Protocol to attempt Plaintiff's lethal-injection execution.

382. Ohio's lethal-injection statute and the Execution Protocol, as written and as implemented, therefore purport to authorize DRC Defendants' use of unapproved New Drugs on a human in Plaintiff's attempted execution without satisfying the IND Application requirement established under the applicable federal and state regulations and statutes.

383. Federal and state laws prohibit introduction into commerce of any adulterated or misbranded product: "The manufacture, sale, or delivery, holding or offering for sale of any food, drug, device, or cosmetic that is adulterated or misbranded" is a "Prohibited Act." 21 U.S.C. § 331; Ohio Rev. Code § 3715.52(A)(1).

384. Under federal law, a product is misbranded if it is "health-endangering when used [as] . . . prescribed." 21 U.S.C. § 352(j).

385. Under Ohio state law, a product is misbranded if it "is dangerous to health when used [as] . . . prescribed." Ohio Rev. Code § 3715.64.

386.    Drug Source Defendants engage in a Prohibited Act under both state and Federal law by manufacturing, selling, delivering, holding or offering for sale any of the drugs in the Execution Protocol to DRC Defendants to be used for a lethal-injection execution—and thus Drug Source Defendants are violating federal and state law by engaging in such actions—because those drugs are, by definition, misbranded by virtue of being "health-endangering" and "dangerous to health" because they will be used to execute Plaintiff.

387.    Under federal law, a drug is adulterated if "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess." 21 U.S.C. § 351(a)(2)(B).

388.    A drug is also adulterated under federal law if "it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium." 21 U.S.C. § 351(b).

94

389.   Under Ohio state law, a drug is adulterated if it "purports to be or is represented as a drug the name of which is recognized in the United States pharmacopoeia and national formulary, or any supplement to them, and its strength differs from or its quality or purity falls below the standard set forth in those compendiums." Ohio Rev. Code § 3715.63(A)(5).

390.   The DRC Defendants previously recognized the importance of not using adulterated controlled substances for execution drugs, when they agreed they would not use adulterated thiopental sodium for executions. *See* ¶¶ 729–730 below.

391.   Drug Source Defendants engage in a Prohibited Act under federal law by manufacturing, selling, delivering, holding or offering for sale a drug product, namely any of the drugs in the Execution Protocol for DRC Defendants to use in a lethal-injection execution of Plaintiff, and those drugs are not manufactured, processed, packed or held in a facility that is in conformity with current good manufacturing practices, and thus Drug Source Defendants are violating federal and state law by engaging in such actions.

392. Drug Source Defendants engage in a Prohibited Act under both federal and Ohio state law by manufacturing, selling, delivering, holding for sale or offering for sale a drug product, namely any of the drugs in the Execution Protocol for DRC Defendants to use in a lethal-injection execution of Plaintiff, that is not the same strength, quality and purity as that drug as identified in the USP and national formulary, and thus Drug Source Defendants are violating federal and state law by engaging in such actions.

393. The standard of practice of pharmacy in Ohio requires "(5) Performing drug regimen reviews with individuals by discussing all of the drugs that the individual is taking and explaining the interactions of the drugs; (6) Performing drug utilization reviews with licensed health professionals authorized to prescribe drugs when the pharmacist determines that an individual with a prescription has a drug regimen that warrants additional discussion with the prescriber." Ohio Rev. Code § 4729.01(B).

394. Prospective Drug Utilization Reviews are intended to maximize potential therapeutic benefit while minimizing potential harm to the patient through a review of the patient's drug therapy regimen including the current prescription in question.

395. The pharmacist is directed to ultimately use "professional judgment whether and in the patient's best interest to dispense the prescription." Ohio Admin. Code § 4729-5-20.

396.    A pharmacist is required under Ohio law to perform the Prospective Drug Utilization Review.  Ohio Admin. Code § 4729-5-21(B)(2) ("A pharmacist when dispensing a prescription must . . . perform prospective drug utilization review pursuant to rule 4729-5-20 of the Administrative Code").

397.    Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 violate these responsibilities under Ohio law to the patient's best interests when the drug product they dispense is for the purpose of killing Plaintiff, and thus Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 violate state law by engaging in such actions.

398.    Ohio law also requires Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 to act "in a manner that is in the best interest of the patients served and to comply with all state and federal laws."  Ohio Admin. Code § 4729-9-02(A)(2), (B).

399.    Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 violate these state regulations by compounding, dispensing, distributing, or any other similar action the drugs for DRC Defendants to use to carry out a lethal-injection execution, because acting to facilitate the death of Plaintiff is not in his best interests, and because Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 violate several state and federal laws in the course of their actions related to execution drugs.

400. Controlled substances may not be dispensed without a valid prescription from a medical practitioner. 21 U.S.C. § 829(a)–(b).

401. Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100, like all pharmacists and pharmacies, may only dispense a prescription drug product on the receipt of a valid drug order (Prescription) from a licensed practitioner authorized to prescribe.

402. The Ohio Medical Practice Act (Ohio Admin. Code § 4731-11-02), states that physicians cannot utilize a controlled substance for other than "legitimate therapeutic purposes," (§ 4731-11-02(F)), which would preclude their writing a prescription for execution drugs.

403. The restrictions under Ohio law on what may constitute a "valid" prescription are so critical they are reiterated in two separate provisions of Ohio's Administrative Code: the regulation governing "Manner of processing a prescription" (Ohio Admin. Code § 4729-5-21), and the regulation governing "Manner of issuance of a prescription" (Ohio Admin. Code § 4729-5-30).

404. Ohio law governing the "manner of processing a prescription" requires that a "prescription, **to be valid**, **must be** issued for a **legitimate medical purpose** by an individual **prescriber** acting in the **usual course** of his/her **professional practice**." Ohio Admin. Code § 4729-5-21(A) (emphases added).

98

405. The "responsibility for the proper prescribing is upon the prescriber, but a corresponding responsibility rests with the pharmacist who dispenses the prescription. **An order purporting to be a prescription issued not in the usual course of bona fide treatment of a patient is not a prescription** and the person knowingly dispensing such a purported prescription, as well as the person issuing it, shall be subject to the penalties of law." *Id.* (emphasis added).

406. Ohio law governing the "manner of issuance of a prescription" similarly requires that a "prescription, **to be valid**, **must be** issued for a **legitimate medical purpose** by an individual **prescriber** acting in the **usual course** of his/her **professional practice**." Ohio Admin. Code § 4729-5-30 (emphases added).

407. An "order purporting to be a prescription issued not in the usual course of **bona fide treatment of a patient** is **not a prescription** and the person knowingly dispensing such a purported prescription, as well as the person issuing it, shall be subject to the penalties of law." *Id.* (emphases added)

408. Ohio law also requires that a prescription must "[b]e issued in compliance with all applicable federal and state laws, rules, and regulations." Ohio Admin. Code § 4729-5-30(18).

99

409.    Accordingly, these Ohio prescription requirements echo those of requirements set forth under the federal Controlled Substances Act's explanation of the "purpose of issue of prescription": "A prescription for a controlled substance to be effective **must** be issued for a **legitimate medical purpose** by an individual **practitioner** acting in the **usual course** of his professional practice.  The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.  **An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829)** and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."  21 C.F.R. § 1306.04(a) (emphases added).

410.    A pharmacist may not lawfully prepare and dispense a prescription drug product, such as controlled substances like pentobarbital or thiopental sodium or midazolam, for anything other than a legitimate medical purpose.

411.    The only valid prescription under federal and Ohio state law is one that is issued for a legitimate medical purpose, issued by an individual health-care practitioner with the requisite license to prescribe drugs, in the usual course of professional treatment or for legitimate or authorized research.

412.    None of those DRC Defendants involved in procuring execution drugs or the Chief Justice of the Ohio Supreme Court is, under the law, an individual practitioner acting in the usual course who might be authorized to prescribe prescription drugs.

413.    Execution is not a legitimate medical purpose.

414.    Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 are therefore violating federal and state law by preparing and dispensing a prescription drug product, namely any of the drugs in the Execution Protocol for DRC Defendants, to be used to carry out a lethal-injection execution of unspecified condemned inmates.

415.    General dispensing of controlled substances is also prohibited, because a valid prescription must be patient-specific.  *See* 21 C.F.R. § 1306.04(b) ("A prescription may not be issued in order for an individual practitioner to obtain controlled substances for supplying the individual practitioner for the purpose of general dispensing to patients.").

416.    DRC Defendants rely solely on a resolution issued by the Ohio State Board of Pharmacy, R-2012-051, to claim that a certified copy of a Death Warrant issued by the Ohio Supreme Court, ordering the execution of an inmate by lethal injection, has the same force and effect as a proper order for administration of the drug(s).

417.    The State of Ohio delegated to the Ohio State Board of Pharmacy authority to "adopt rules in accordance with Chapter 119 of the Revised Code, not inconsistent with the law, as may be necessary to carry out the purposes of and to enforce the provisions of this chapter."  Ohio Admin Code § 4729.26.  In turn, Chapter 119 of the Administrative Code sets out the requirements to follow the necessary administrative procedures.  Resolution R-2012-051 was not a validly enacted rule under that chapter, and is therefore invalid as a matter of Ohio state law.

418.    Additionally, Resolution R-2012-051 is invalid as a matter of law because it is "inconsistent with the law" to the extent that it purports to authorize Defendants to obtain, provide, compound, administer, dispense, or distribute controlled substances without a prescription that satisfies the minimum requirements for a valid prescription under federal statutes and regulations or state statute.

419.     The minimum requirements for what constitutes a valid prescription for prescription drugs established under federal law may not be overruled or disregarded by any provision in Ohio state law, regardless of whether any state statute or regulation was validly enacted under state law.

420.     DRC Defendants do not obtain new execution drugs for each individual execution; instead DRC Defendants obtain a supply whenever they can, to be used for future executions.

421.     This practice conflicts with the prohibition on "general dispensing" of controlled substances and thus DRC Defendants violate federal and state law by engaging in such actions.

422.     Drug Source Defendants do not produce, provide, distribute or dispense execution drugs for each execution specific to the particular condemned inmate, but rather produce, provide, distribute or dispense a large supply that is not individualized to a particular condemned inmate.  This practice conflicts with the prohibition on "general dispensing" of controlled substances and thus Drug Source Defendants violate federal and state law by engaging in such actions.

423.     Defendants are violating federal and state law by preparing and dispensing the drugs in the Execution Protocol other than to a single, identified individual when the execution drugs are prepared and dispensed for DRC Defendants to use to carry out one or more lethal-injection executions.

424.    The only FDA-approved form of pentobarbital is manufactured, sold and distributed as Nembutal.

425.    At all times relevant hereto until December of 2011, the only FDA-approved source of Nembutal was the pharmaceutical company Lundbeck ("Lundbeck").

426.    In July of 2011, Lundbeck instituted distribution controls to prevent the legitimate sale of Nembutal to departments of corrections in states that use lethal injection for capital punishment.

427.    In December, 2011, Lundbeck sold its interests in Nembutal to Akorn Pharmaceuticals ("Akorn").

428.    The only current FDA-approved source of Nembutal is Akorn. Akorn has retained Lundbeck's distribution controls.

429.    All stocks of Nembutal sold prior to the institution of the Lundbeck/Akorn controls have expired.

430.    Upon information and belief, Akorn has requested that supplies of the company's products that could be used for lethal injection be returned.

431.    Defendants therefore have no legitimate or legal source of Nembutal.

432.    Nembutal is available for purchase on the commercial market, however, regardless of whether it is available to DRC Defendants for executions.

433.    At least one other State has continued to be able to purchase Nembutal for use in executions even after Lundbeck/Akorn's distribution controls.[6]

434.    Any pentobarbital to be used in executing Plaintiff will come from Drug Source Defendants via either: (a) the illegal importation of pentobarbital, a Schedule II controlled substance; or, (b) the illegal compounding of pentobarbital.

435.    Federal and Ohio state drug control laws strictly govern possession, transportation, transfer, use, dispensing, and other such aspects related to controlled substances which are listed on "schedules" under federal statutes and regulations.

436.    The Controlled Substances Act creates a comprehensive, closed regulatory regime criminalizing the unauthorized manufacture, distribution, dispensing, and possession of substances.

437.    Pentobarbital is a Schedule II-N controlled substance under the federal Controlled Substances Act, its implementing regulations and analogous or related federal and/or state laws such as the federal Food, Drug and Cosmetic Act. 21 C.F.R. § 1308.12.

---

[6] *See* Chris McDaniel, *Missouri Execution Drug Purchases Revealed*, BuzzFeed News, Jan. 8, 2017, available at https://www.buzzfeed.com/chrismcdaniel/missouri-execution-drug-purchases-revealed?utm_term=.maW8zrOX9#.dxJbBV4Pn.

438.    By virtue of that fact, pentobarbital is a Controlled Substance under Ohio law.  *See* Ohio Rev. Code §§ 3719.01(C), 3719.41, 3719.43 and 3719.44.

439.    Thiopental sodium is a Schedule III controlled substance under the federal Controlled Substances Act, its implementing regulations and analogous or related federal laws such as the federal Food, Drug and Cosmetic Act.  *See* 21 U.S.C. §§ 801–814; 21 C.F.R. § 1308.13(c)(3).

440.    By virtue of that fact, sodium thiopental is a Controlled Substance under Ohio law.  *See* Ohio Rev. Code §§ 3719.01(C), 3719.41, 3719.43 and 3719.44.

441.    Midazolam is a Schedule IV controlled substance under the relevant statutes and implementing regulations and analogous or related federal laws.

442.    By virtue of that fact, midazolam is a Controlled Substance under Ohio law.  *See* Ohio Rev. Code §§ 3719.01(C), 3719.41, 3719.43 and 3719.44.

443.    Upon information and belief, the only manufacturers of FDA-approved midazolam have instituted strict end-user controls analogous to Akorn's restrictions on Nembutol.

444.    Defendants therefore have no legitimate or legal source of FDA-approved midazolam.

445.    Midazolam by its brand name is available for purchase on the
        commercial market, however, regardless of whether it is available to
        DRC Defendants for executions.

446.    Any midazaolam to be used in executing Plaintiff will come from Drug
        Source Defendants via: (a) the illegal importation of midazolam, a
        Schedule IV controlled substance; (b) the illegal compounding of
        midazolam; or (c) subterfuge and deception to fraudulently induce a
        source of the drug to make it available to Defendants for use
        in executions.

447.    The Controlled Substances Act allows prescription of drugs only if
        they have a currently accepted medical use.  21 U.S.C. § 812(b).

448.    The Controlled Substances Act also requires a "medical purpose" for
        dispensing the least controlled substances of those on the schedules.
        § 829(c).

449.    The Controlled Substances Act, in its reporting provision, defines a
        "valid prescription" as one "issued for a legitimate medical purpose."
        § 830(b)(3)(A)(ii).

450.    Under the Controlled Substances Act, physicians are considered to be
        acting as practitioners under the statute if they dispense controlled
        substances "in the course of professional practice."  § 802(21).

451.    The enforcement provision of the Controlled Substances Act states
        that "[e]xcept as authorized . . . it shall be unlawful for any person

107

knowingly or intentionally . . . to . . . distribute or dispense . . . a controlled substance." 21 U.S.C. § 841(a).

452.    Schedule II substances are generally available only pursuant to a written, nonrefillable prescription by a physician. *See* 21 U.S.C. § 829(a).

453.    The Supreme Court of the United States has held that, under the Controlled Substances Act, dispensing controlled substances without a valid prescription is a federal crime. *See Gonzales v. Oregon*, 546 U.S. 243, 250–57 (2006).

454.    Although it is generally a crime to dispense controlled substances, an exemption is made for duly licensed and registered physicians and other entities that may lawfully prescribe controlled substances. 21 U.S.C. § 829.

455.    The Attorney General of the United States has passed a regulation pursuant to the Controlled Substances Act requiring that every prescription for a controlled substance be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. *See* 21 CFR § 1306.04(a).

456.    Defendants, or others acting on Defendants' behalf, do not obtain or dispense the lethal execution drugs pursuant to a valid prescription.

457.    Upon information and belief, no duly licensed and registered physician or other entity prescribes the controlled substances DRC Defendants use to carry out a lethal-injection execution.

H. **Allegations related to compounded execution drugs.**

458.    Using compounded execution drugs creates a substantial risk of serious harm to Plaintiff, as identified in other paragraphs of this Fifth Amended Complaint.

459.    Modern day pharmacy practice relies almost entirely on pharmaceutical manufacturers to provide finished dosage forms (tablets, capsules, injectables, etc.) for the pharmacist's use.

460.    American healthcare providers and patients have long relied on the regulation of pharmaceutical manufacturers by the FDA in order to set the standard for identity, purity, potency, and efficacy of prescription medications.

461.    Manufacturers are heavily regulated to insure the quality of the dosage form and the safety and clinical effectiveness of the product.

462.    Extensive (and expensive) testing is required before marketing as well as with each new batch produced, to insure quality, safety and effectiveness.

463.    In very limited circumstances when a thoroughly tested commercial product will not fulfill a patient's needs, pharmacists are allowed to bypass the FDA quality requirements imposed on commercial manufacturers to extemporaneously prepare a personalized dosage form for a patient through the process called compounding.

464.    Some of the DRC Defendants' previous execution protocols permitted only the use of "trade name" or "generic" drugs for a lethal-injection execution.

465.    The DRC Defendants have eliminated those protective measures by including compounded drugs as among the execution drugs permitted under the Execution Protocol.

466.    Compounded execution drugs provided to DRC Defendants by any of the Drug Source Defendants will **not** be manufactured, mixed, assembled, packaged, labeled, distributed, transferred, dispensed, or administered:

   a)    pursuant to a prescription issued by a licensed health professional authorized to prescribe drugs, or

   b)    pursuant to a modification of a prescription made in accordance with a consult agreement, or

   c)    as an incident to research, teaching activities or chemical analysis, or

   d)    in anticipation of orders for drugs pursuant to valid prescriptions.

467.    Traditional pharmacy compounding is a practice of the profession of pharmacy by which a licensed pharmacist, using Active Pharmaceutical Ingredients (APIs) and inactive ingredients obtained from FDA-approved facilities, combines, mixes, or alters ingredients in response to a prescription to create a medication tailored to the individual medical/therapeutic needs of an individual patient when

that patient's individual needs cannot be met with an FDA-approved product.

468. On the other hand, non-traditional compounding pharmacy practice involved in the process of making lethal injection drugs resembles drug manufacturing more than it does practice of pharmacy. Non-traditional compounding involves the use of raw ingredients to manufacture a copy or substitute for an FDA-approved drug.

469. Even drugs made according to the enforceable sterile compounding standards issued by the United States Pharmacopeia (USP) Chapter 797 have a low standard of sterility assurance compared to the federal standard for manufactured, FDA-approved drugs.

470. The quality of raw bulk product, or Active Pharmaceutical Ingredients ("APIs"), used in compounding is suspect. Because of high profit margins and low quality controls in the compounding industry, the market for API attracts counterfeiters. These counterfeit bulk drugs pose a health hazard because their manufacturer is often unknown, impurity profile is unknown, and the age, storage, and manufacturing environment likewise remain a mystery.

471. Compounded drugs are not FDA-approved for any purpose. This means that the FDA does not verify the identity, purity, strength, potency, quality, safety, or effectiveness of compounded drugs. *See*

111

Sarah Sellers & Wulf H. Utian, *Pharmacy Compounding Primer for Physicians: Prescriber Beware*, 72 Drugs 2043, 20444–45 (2012).[7]

472. This also means that compounded drugs lack any FDA finding of safety, efficacy, and manufacturing quality. *Id.* at 2048.

473. Chemicals that have not have been manufactured in a FDA-registered facility under current Good Manufacturing Practices have no assurance of consistent quality from lot to lot or from container to container.

474. DRC Defendants previously recognized the importance of not using compounded controlled substances for execution drugs, when they agreed they would not use compounded thiopental sodium for executions.

475. When it became inconvenient for DRC Defendants to obtain controlled substances for use in an execution, Defendants knowingly disregarded their previous agreement to not use adulterated or compounded execution drugs.

476. Defendants involved in producing compounded drugs are subject to federal and state drug laws identified in preceding paragraphs, including those regulating misbranded or adulterated drugs or the prescription requirements.

---

[7] Available at
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3695671/.

477. Defendants involved in producing compounded drugs are also subject to regulations, both federal and state, specific to compounding. These federal and Ohio state laws and regulations define two categories of compounding:

(1) drugs compounded in a Pharmacy by a pharmacist, 21 U.S.C. § 353a and Ohio Admin. Code § 4729-16-03 (identified herein as a "503A Compounding Pharmacy"); or

(2) sterile drugs compounded in an Outsourcing Facility, 21 U.S.C. § 353b and Ohio Admin. Code 4729-16-02 (identified herein as a "503B Outsourcing Facility").

478. The New Drug provisions of the FDCA are waived for activities within these two categories. Outside of these two avenues, however, a compounded drug product is an unauthorized New Drug, which may not be introduced or delivered into interstate commerce (21 U.S.C. § 355(a)), or sold, delivered for sale, held for sale, or given away (Ohio Rev. Code § 3715.65).

479. Manufacture, sale, or delivery, holding or offering for sale compounded drugs by Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 to be used by DRC Defendants for an execution is a Prohibited Act under federal and Ohio state law—and thus Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 are violating federal and state law by engaging in such actions—because those compounded drugs would be misbranded and/or adulterated drug products.

480.    Defendants Unknown Pharmacies #1–100 and Defendants Unknown
Pharmacists #1–100, regardless of whether acting as a 503A
Compounding Pharmacy or a 503B Outsourcing Facility, are violating
the federal and Ohio state law by compounding, dispensing, and
distributing any execution drugs that are controlled substances.

481.    Pharmacies may only dispense, not manufacture or distribute,
controlled substances.  21 U.S.C. § 822(a)(2).

482.    Dispensing a controlled substance such as pentobarbital or thiopental
sodium or midazolam is prohibited except in certain circumstances.

483.    Under 21 U.S.C. § 802(10), "dispensing" a controlled substance
"means to deliver a controlled substance to an ultimate user or
research subject by, or pursuant to the lawful order of, a practitioner,
including the prescribing and administering of a controlled substance
and the packaging, labeling or compounding necessary to prepare the
substance for such delivery.  The term 'dispenser' means a
practitioner who so delivers a controlled substance to an ultimate
user or research subject."

484.    In an execution context, the inmate such as Plaintiff would be the
"ultimate user," which means that, under the law, only Plaintiff
himself would be able to legally take delivery of compounded
execution drugs from Defendants Unknown Pharmacies #1–100 and
Defendants Unknown Pharmacists #1–100.

114

485.     Because Defendants Unknown Pharmacies #1–100 and Defendants
         Unknown Pharmacists #1–100 will dispense the compounded
         controlled substance(s) to be used for an execution to a person or
         entity other than Plaintiff, Defendants Unknown Pharmacies #1–100
         and Defendants Unknown Pharmacists #1–100 are violating federal
         and state law.

486.     When pharmacies such as Defendants Unknown Pharmacies #1–100
         and Defendants Unknown Pharmacists #1–100 provide controlled
         substances to anyone but the ultimate user (*i.e.*, the patient or a
         member of the patient's household), those pharmacies are
         distributing, not dispensing controlled substances.

487.     Pharmacies such as Defendants Unknown Pharmacies #1–100 and
         Defendants Unknown Pharmacists #1–100 are prohibited from
         distributing any controlled substances under the CSA unless the
         amount of controlled substances distributed is strictly limited (5% or
         less of all units dispensed or distributed) and other specific criteria
         are met.  21 C.F.R. § 1307.11(a).  For example, the distribution must
         be "for the purpose of general dispensing by the practitioner to
         patients."  21 C.F.R. § 1307.11.

488.     Because Defendants Unknown Pharmacies #1–100 and Defendants
         Unknown Pharmacists #1–100 are not distributing pentobarbital or
         thiopental sodium or midazolam to a practitioner for general
         dispensing to patients, but rather distributing the drug to DRC

115

personnel to be used to kill Plaintiff and other condemned inmates, Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 are violating federal law by their actions.

489. Any distribution of compounded drugs to a prescriber is prohibited by Ohio law unless the drug is used "(a) [t]o treat an emergency situation; (b) [f]or an unanticipated procedure for which a time delay would negatively affect patient outcome; (c)[f]or diagnostic purposes." Ohio Admin. Code § 4729-9-25(A)(2).

490. Carrying out a lethal-injection execution is not an "emergency situation," nor is it "unanticipated" nor is the pentobarbital or thiopental sodium or midazolam used in an execution context "for diagnostic purposes." Thus, none of those exceptions apply in the execution context, and Defendants are also violating this provision of Ohio state law by their actions.

491. If Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 are operating as a 503A Compounding Pharmacy, they cannot compound, prepare, sell, dispense, or deliver drugs for DRC Defendants to use in an execution while remaining in compliance with all federal and state laws related to compounding.

492. If any of Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 are acting as a 503A Compounding Pharmacy, they cannot legally compound or dispense a drug product compounded for an execution because of restrictions on how and

when a 503A Compounding Pharmacy may compound and dispense drugs.

493.    Similar to requirements for the dispensing of commercially available products, Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 cannot compound or dispense or sell a compounded product—including execution drugs identified in Defendants' Execution Protocol—unless it is pursuant to ". . . a **valid prescription order** or a notation, approved by the **prescribing practitioner**, on the prescription order that a compounded product is **necessary for the identified patient** . . . ." 21 U.S.C. § 353a(a).

494.    Ohio law mandates compliance with federal § 353a. *See* Ohio Admin. Code § 4729-16-03(C).

495.    Ohio law also mandates that a "prescription shall be compounded and dispensed only pursuant to a specific order for an individual patient issued by a prescriber." Ohio Admin. Code § 4729-16-03(J). *See also* Ohio State Board of Pharmacy, *Compounding In Ohio*, updated May 20, 2015.[8]

496.    There can be no valid prescription for compounded execution drugs, for the reasons explained in previous paragraphs.

---

[8] Available at http://www.pharmacy.ohio.gov/Documents/TDDD/General/Compounding%20in%20Ohio.pdf.

117

497.    Nor can there be any "notation . . . that a compounded product is
        necessary for the identified patient" because a drug product intended
        to kill the identified patient is not "necessary for the identified patient"
        as required by law.

498.    Thus Defendants Unknown Pharmacies #1–100 and Defendants
        Unknown Pharmacists #1–100, if acting as a 503A Compounding
        Pharmacist, will lack a legitimate prescription or notation from the
        prescribing practitioners of the necessity for a compounded drug, and
        thus Defendants Unknown Pharmacies #1–100 and Defendants
        Unknown Pharmacists #1–100 are violating federal and state law by
        engaging in any preparation or provision of drugs to be used by DRC
        Defendants for a lethal injection execution.

499.    Defendants Unknown Pharmacies #1–100 and Defendants Unknown
        Pharmacists #1–100 are unable to satisfy the highly stringent
        requirements established in 21 U.S.C. § 353a(b), incorporated into
        Ohio law via Ohio Administrative Code § 4729-16-03(C), and thus
        Defendants Unknown Pharmacies #1–100 and Defendants Unknown
        Pharmacists #1–100 are violating those provisions of federal and state
        law by preparing and providing compounded sterile injectable
        controlled substances for DRC Defendants to use in carrying out
        an execution.

118

500.   If Defendants Unknown Pharmacies #1–100 and Defendants
       Unknown Pharmacists #1–100 are operating as a 503B Outsourcing
       Facility, they cannot compound, prepare, sell, dispense, or deliver
       drugs for DRC Defendants to use in an execution while remaining in
       compliance with all federal and state laws related to compounding.

501.   Compounding by a 503B Outsourcing Facility is subject to and
       regulated by the FDA's Current Good Manufacturing Practices
       (cGMP), the same set of requirements for quality assurance that are
       imposed on other commercial pharmaceutical manufacturers.

502.   Defendants Unknown Pharmacies #1–100 and Defendants Unknown
       Pharmacists #1–100 are violating federal and state law by failing to
       comply with cGMPs, such as the requirement that any manufacturer
       conduct its own analytical testing and other testing (such as for the
       presence of pyrogens or other contaminants) throughout the
       manufacturing process before the drug is released to any other entity.

503.   A 503B Outsourcing Facility is prohibited from producing drug
       products that are "essentially a copy of an approved drug."  21 U.S.C.
       § 353b(a)(5).

504.   Under the law, a compounded drug is "essentially a copy of an
       approved drug" if, in relevant part, it is identical or nearly identical to
       a drug with an approved New Drug Application (NDA) or an
       Abbreviated New Drug Application (ANDA).  21 U.S.C. § 353b(d)(2).

505. That restriction effectively prohibits a 503B Outsourcing Facility from producing and distributing copies of drugs which are FDA approved which may be used in an Ohio execution, *i.e.*, pentobarbital, midazolam, the paralytic drug, and potassium chloride.

506. At this time, none of pentobarbital, midazolam, or the paralytic drug appears on the FDA's drug shortage list, and thus the provision in federal law that might permit copies of approved drugs in short supply does not apply here for those drugs.

507. Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100, if acting as a 503B Outsourcing Facility, are violating federal and state law by producing any pentobarbital, midazolam, or the paralytic drug (for executions or for any other reason), because the compounded drug product would be identical or nearly identical to an FDA-approved drug that is not on the FDA's drug shortage list at this time.

508. 503B Outsourcing Facilities are also not permitted to compounded products using bulk drug substances that do not appear on a list established by the Secretary of the Department of Health and Human Services identifying bulk drug substances for which there is a clinical need, or the drug compounded from that bulk substance appears on the drug shortage list in effect under section 356e of this title at the time of compounding, distribution, and dispensing. 21 U.S.C. § 353b(a)(2)(A).

509.   At this time, pentobarbital, midazolam and the paralytic drug do not appear on the list identifying bulk drug substances for which there is a clinical need, nor does pentobarbital appear on the drug shortage list under 21 U.S.C. § 356e.

510.   Thus, Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100, if acting as a 503B Outsourcing Facility, are violating federal and state law by compounding pentobarbital, midazolam, or the paralytic drug because using bulk drug (API) of those drugs is prohibited by this provision of the law.

511.   Additionally, bulk drug substance may not be permissibly compounded by a 503B Outsourcing Facility if the bulk drug substance to be compounded is not accompanied by a valid certificate of analysis.  21 U.S.C. § 353b(a)(2)(D).

512.   Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 cannot and/or will not produce a valid certificate of analysis for any drugs compounded for DRC Defendants to use in carrying out a lethal-injection execution, and thus Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 are violating these provisions of federal and state law.

513.   Unlike FDA-approved drugs manufactured by a reliable manufacturer and intended for therapeutic uses, drugs manufactured, compounded, imported, other otherwise provided by the Drug Source Defendants to DRC Defendants for injection into a condemned inmate such as Plaintiff are intended solely to kill that condemned inmate.

514.   The Drug Source Defendants will know or will be able to readily ascertain the identity of the person or persons who are to be killed using the execution drugs they provide to DRC Defendants; they will know they are providing drugs that will be used to kill Plaintiff.

515.   The Drug Source Defendants will know or will be able to readily ascertain the nature of the crime for which Plaintiff is to be executed.

516.   There is no oversight, testing, checks, auditing or assessment for compliance with the law of the Drug Source Defendants themselves, their manufacturing or compounding facilities, their distribution, storage, packing, or anything else related to Drug Source Defendants' provision of drugs to be injected into a condemned inmate to carry out an execution.

517.   Just as important, the Drug Source Defendants *will know* that there
       is no such oversight, testing, checks, auditing or assessment of their
       compliance with the law, in general and as related to provision of
       execution drugs to be used to kill Plaintiff, because they have been
       assured anonymity and immunity from certain professional
       repercussions under Ohio state law for a period of years from the
       point at which their assistance to DRC Defendants ceases.

518.   Some Defendants—including at least one Drug Administrator—have
       admitted that they have thought of the inmate's victim and that
       victim's family while attempting to carry out an execution.

519.   Defendants Unknown Pharmacies #1–100 and Defendants Unknown
       Pharmacists #1–100, by each agreeing to violate his or her
       professional oaths, the relevant standards of care and federal and
       Ohio state law by manufacturing drugs exclusively to kill in a lethal-
       injection execution, necessarily lack the requisite ethical standards
       required of licensed pharmacists.

520.   Any of the drugs in the Execution Protocol that will be used for
       injections may be compounded only in a "sterile"
       compounding facility.

123

521.    Sterile compounding pharmacies located within the State of Ohio are
        subject to certain federal and state regulations and relevant United
        States Pharmacopeia guidelines as adopted by the Ohio Board of
        Pharmacy by rule or policy.  *See, e.g.*, Ohio Admin. Code
        § 4729-19-04.

522.    Compounding pharmacies are not regularly or consistently inspected.

523.    In fact, the Ohio Pharmacy Board does not track the number of
        compounding in-state pharmacies in Ohio, nor does Ohio require
        and/or provide training for inspectors to inspect
        compounding pharmacies.

524.    Ohio does not track the number of inspections of compounding
        pharmacies in the state within a given year, nor does Ohio track the
        number of concerns about compounding pharmacies any such
        inspections reveal.

525.    Ohio also does not track the number of disciplinary actions taken
        against in-state pharmacies for any reason over the last decade, nor
        does Ohio track the number of concerns with out-of-state
        compounding pharmacies that have been raised.

526.　Errors that occur at compounding pharmacies may be caused by factors including:  (a) use of substandard or contaminated APIs; (b) use of an incorrect formula to prepare a prescription drug; (c) maintenance of liquid dosages at inappropriately high temperatures, which may lead to chemical changes in the liquid; (d) failure to maintain a sterile facility and/or procedures; (e) failure to maintain manufacturing equipment in a sterile manner; (f) failure to properly store compounded products; (g) mislabeling medication; and (h) labeling medication with improper dispensing instructions for patient use.

527.　When errors occur in compounding sterile preparations, harm can result from microbial contamination, excessive bacterial endotoxins, variability in intended strength and pH levels, unintended chemical and physical contaminants, and ingredients of inappropriate quality.

528.　Bacteria and fungus are among the impurities commonly found in compounded injectable drugs, including the drugs identified in the Execution Protocol.

529.　Bacterial and/or fungal contamination will alter important attributes of the compounded execution drugs used in Plaintiff's execution, including the final pH.

530.　There is a substantial risk that alteration of the final pH of the compounded execution drugs used in Plaintiff's execution will create instability and/or incompatibility with human blood.

531.    There is a substantial risk that, should the pH of the compounded execution drugs used in Plaintiff's execution be incorrect, Plaintiff will experience a burning sensation as it is being injected.

532.    There is a substantial risk that, should the pH of the compounded execution drug(s) used in Plaintiff's executions be incorrect, it could form precipitates, or solid particles, of drug and other substances.

533.    Contamination with particulate matter is also common in compounded injectable drugs.

534.    Should solid, particulate matter of any kind be present in the compounded execution drug(s) used to execute Plaintiff, there is a substantial risk that Plaintiff will suffer unnecessary pain and suffering upon injection of the solution, including, but not limited to, the pain associated with a pulmonary embolism.

535.    Bacterial and/or fungal contamination in compounded injectable solution produces endotoxins and/or exotoxins.

536.    Endotoxins and/or exotoxins contained in compounded injectable solution can cause immediate and painful reactions associated with septic shock, including, but not limited to, a sudden rise in body temperature, a precipitous drop in blood pressure and seizure.

537.    Should endotoxins and/or exotoxins be present in the compounded execution drug(s) used to execute Plaintiff, there is a substantial risk that Plaintiff will suffer unnecessary pain and suffering upon injection of the solution.

126

538.    Bacteria and/or fungi commonly found in compounded injectable
        solution are growing organisms.

539.    The presence of growing organisms accelerates chemical degradation.

540.    Chemical degradation decreases the potency of injectable solutions
        such as pentobarbital and thiopental sodium.

541.    Should bacterial and/or fungal contamination reduce the potency of
        the execution drug(s) used to execute Plaintiff, there is a substantial
        risk Plaintiff will not receive an adequate dose of the execution drug,
        thereby inflicting unnecessary pain.

542.    The analytical testing provision in the Execution Protocol, stating that
        a sample of compounded execution drugs will be tested for potency
        and identity, will not resolve this problem.

543.    That testing will be done (according to the Execution Protocol)
        approximately 30 days before execution, leaving plenty of time
        between the testing date and the execution date for continued growth
        of bacterial and/or fungal contamination and thereby continued
        reduction in potency of the drug between testing date and
        execution date.

544.    The testing for potency and identity will not detect the presence of
        contaminants which would alert Defendants that, even though the
        potency standards might be sufficient 30 days in advance of the
        execution date, the compounded drug's potency will be reduced by the
        time the execution date arrives.

545.   FDA inspections of some Ohio compounding pharmacies over recent years have resulted in warning letters identifying numerous deviations from relevant regulations and established Good Manufacturing Practices which resulted in the distribution of drugs that were adulterated, including deviations such as failure to monitor and validate the manufacturing process, and a failure to reject product that was found to be incorrect in identity, strength, quality and/or purity.

546.   The Execution Protocol does not ensure the receipt, storage, control and distribution of any compounded execution drugs only in the full and actual charge of an appropriately licensed health care professional.

547.   The Execution Protocol, by its terms, allows receipt, storage, control and distribution of any compounded execution drug(s) by the Warden and the Drug Administrators, *i.e.*, persons other than an appropriately licensed health care professional, in violation of the relevant federal and State of Ohio laws.

548.   The Execution Protocol contains no provision requiring the proper storage or verification of "beyond use" dates for any compounded execution drugs that might be used for an execution.

549.    The problems with the lack of FDA oversight of compounding came to national attention following the tragic event in 2012 when a compounding pharmacy providing medical facilities in 20 states with compounded steroid injections contaminated with fungal meningitis, which resulted in 64 patients dying, with a total of 751 patients falling ill after injection with the compounded drugs.  *See* Centers for Disease Control and Prevention, *Multistate Outbreak of Fungal Meningitis and Other Infections* (Oct. 23, 2013).[9]

550.    As a result of the events of 2012, the FDA inspected some sterile compounding facilities and found serious quality-control problems, resulting in contaminated products.  "Numerous recalls of sterile products have been conducted, and numerous pharmacies chose to stop sterile compounding after [the FDA] identified problems with their sterile compounded processes."  *See* FDA, *Compounding—FDA Implementation of the Compounding Quality Act.*[10]

---

[9] Available at http://www.cdc.gov/hai/outbreaks/meningitis.html.

[10] Available at http://www.fda.gov/drugs/guidancecomplianceregulatoryinformation/pharmacycompounding/ucm375804.htm.

551.     In addition, the five main testing facilities used by 90% of all the
         nation's large-scale compounding pharmacies in order to verify the
         strength, sterility, and purity of the compounding drugs were
         inspected by the FDA shortly after the October 2012 incident.  *See*
         Kimberly Kindy, *Labs that test safety of custom-made drugs fall under
         scrutiny*, WashingtonPost.com, Oct. 5, 2013, *available at* 2013 WLNR
         24973227.

552.     Those labs were cited for more than 70 safety problems, including
         lack of sterile facilities and scientifically unsound testing.  *Id.*

553.     Various Ohio compounding entities have been found to have engaged
         in significant deviations from the applicable federal laws in ways that
         would constitute significant constitutional problems if done as part of
         the Execution Protocol.

554.     Without FDA approval of a drug and its manufacturing process, there
         is no reasonable assurance that the drug has the identity, purity,
         potency, and efficacy that it is represented to have.  *See* Sellers &
         Utian, *Pharmacy Compounding Primer for Physicians: Prescriber
         Beware, supra*, at 2048.

555.     With compounded drugs, there is a substantial risk that excipient
         (inactive) ingredients and APIs will be obtained from non-FDA-
         approved sources.

556.    Compounding pharmacies are substantially likely to obtain the API for compounding any of the execution drugs in the Execution Protocol from companies in India or China or Pakistan, or other overseas companies that are not registered with or inspected by the FDA.

557.    The API provided by these sources is highly suspect and there is no practical method to verify their quality, constitution, or uniformity in limited pharmacy settings such as retail compounding pharmacies.

558.    The sources from which compounding pharmacies obtain the API's for their drug concoctions are often part of the global grey market, which is one of the leading sources for counterfeit drugs entering the United States.

559.    In the unregulated market of APIs, a chemical labeled to represent a certain active ingredient may not actually contain the correct ingredient and it may contain harmful contaminants.

560.    There is a substantial risk that Defendants will use execution drugs manufactured by any of the Drug Source Defendants that compounded APIs obtained from non-FDA-registered facilities, *i.e.*, on the grey market.

561.    There is a substantial risk that the APIs obtained on the grey market in order to compound drugs for use in the Execution Protocol are impure, adulterated, sub-potent, and/or counterfeit.

562.    There is a substantial risk that grey market APIs will come from plants in China, India, and/or other countries lacking the oversight and control necessary to produce uncontaminated, unadulterated, fully potent, and genuine APIs.

563.    Plants in China providing APIs to the grey market have manufactured pesticides using the same equipment that is used to make APIs.

564.    Several studies, including a survey conducted by the FDA in 2001, report a high prevalence of quality problems with various pharmacy-compounded drugs, including sub-potency and contamination.

565.    A survey of compounded drug products was conducted by the FDA in 2006 to explore these issues further.  The results showed that thirty-three percent of the compounded drugs failed analytical testing using rigorously defensible testing methodology.

566.    A thirty-three percent quality failure rate of compounded drugs constitutes a substantial risk of harm.

567.    Testing by the Missouri Board of Pharmacy, which is the only state that regularly tests compounded drugs, reveals that compounded drugs fail tests for potency and purity on average around twenty-five percent of the time.

568.    A twenty-five percent quality failure rate of compounded drugs constitutes a substantial risk of harm.

569.    Pentobarbital and the other drugs in the Execution Protocol can be difficult to compound to the precise tolerances necessary to prevent an improper buffering (pH) level or to prevent the compounded drug from falling out of solution/precipitating.

570.    Injecting a compounded solution that is buffered to the incorrect pH level will cause extremely painful burning upon coming into contact with human blood.

571.    Injecting a drug that has precipitated or that will precipitate inside the recipient will cause the insides of the recipient's veins to feel burning, extremely painful sensations as if they are being scraped with sandpaper.

572.    The chance of precipitation of compounded execution drugs is substantial at the least.  For example, the solvent used in the typical formation of compounded pentobarbital is a water, propylene glycol, alcohol mixture (in a 50-40-10 ratio).  The presence of the propylene glycol and alcohol suggest that pentobarbital sodium is not completely water soluble.  This means if the compounded execution drug is mixed with additional water (thus diluting the alcohol and the propylene glycol), the pentobarbital will likely fall out of solution/precipitate, producing crystals of the drug floating in the container.

573.    Because blood is essentially water, injecting the compounded

pentobarbital rapidly, as DRC Drug Administrators do, will result in

the drug precipitating in the vein, causing significant pain to

the recipient.

574.    Only a few other states have used compounded drugs in executions,

and their experiences demonstrate that the use of compounded

execution drugs creates a very real and substantial risk that the

inmate will suffer severe, unnecessary and inhumane pain and a

lingering death.

575.    Defendants are unable to reduce said substantial risk or have made it

even greater because: (a) the manufacturer(s) of the APIs is/are

unknown; (b) the impurity profiles of the APIs are unknown; (c) the

age, storage, the manufacturing environment, or the manufacturing

method of the APIs are unknown; (d) Defendants want to hide the

identity of the compounding pharmacy and compounding pharmacist;

and (d) Defendants want to hide the identity of any laboratory that

conducts any analytical testing of the finished drug product under the

Execution Protocol.

576.    Within the grey market, secondary sources of APIs, *e.g.*, wholesalers

and/or distributors, frequently use ambiguous and/or false

statements in marketing APIs.

134

577.     Statements from such secondary sources provide no reliable assessment of the purity, potency, identity, and/or lack of contamination of grey market APIs.

578.     Intrinsic or extrinsic contaminants can be introduced during chemical manufacture or at any point during the chemical's synthesis.

579.     Even if the API obtained and used by any Drug Source Defendants is not counterfeit and is domestically produced, there is a significant chance that it could be contaminated, adulterated, hyperpotent or hypopotent, the improper concentration, non-sterile, or myriad other characteristics creating a substantial likelihood that the drug(s) is not the execution drug(s) mandated by Core Element # 2, and a substantial likelihood that the lethal injection process could be extremely painful, or harm or handicap Plaintiff without actually killing him.

580.     There is a substantial risk that Defendants will not identify the presence of harmful contaminants in compounded execution drugs that pose an immediate safety threat if administered intravenously.

581.     Defendants, including, but not limited to, the Drug Source Defendants, do not have the ability to trace the APIs back to the original manufacturers for information on quality, packaging, storage, shipment conditions and chains of custody from a chemical's cradle to grave.

135

582.   The Execution Protocol contains no express provision by which
       Defendants will ensure that the raw API in any compounded
       execution drug is not imported, is sterile, is unadulterated, is not
       contaminated, or is otherwise anything other than pure raw API for
       the specific execution drug.

583.   Testing drugs after they have been compounded does not compensate
       for the absence of reliable, FDA-approved raw materials obtained from
       reputable, ethical, duly registered suppliers because post-
       compounding testing alone is not designed to ensure sterility
       or purity.

584.   Any analytical testing results are invalid without any accompanying
       information about the testing protocols the testing facility employed,
       as well as information about the testing facility itself.  The facility, its
       employees, its protocols, its procedures, its API sources and more
       must be fully vetted before any analytical testing results might be
       considered valid.

585.   The United States Pharmacopeia and The National Formulary (USP-
       NF) General Chapter 797 provides the standards that pharmacies
       compounding sterile dosage forms of drugs (also referred to as
       compounded sterile preparations or CSPs), such as injectables like
       the drugs in the Execution Protocol, are supposed to follow.  See USP-
       NF Gen'l Ch. 797: Pharmaceutical Compounding—Sterile
       Preparations (June 2014).

586.  Any compounded execution drugs DRC Defendants would acquire

from Drug Source Defendants would be derived from non-sterile API,

and thus under USP-NF General Chapter 797 would be high-risk-level

CSPs.  *See* USP-NF Gen'l Ch. 797: Pharmaceutical Compounding—

Sterile Preparations (June 2014).

587.  Although all pharmacies performing sterile compounding are

supposed to follow USP-NF General Chapter 797, there is a lack of

enforcement of these standards.  The FDA defers enforcement of USP-

NF General Chapter 797 to individual states.  Jennifer Gudeman et

al., *Potential Risks of Pharmacy Compounding*, Drugs in R&D vol. 13,

iss. 1, at 3 (Mar. 23, 2013).

588.  Only a handful of states have fully incorporated USP-NF General

Chapter 797 into their regulations, and it is unclear whether any

states have conducted, much less regularly conduct, inspections of

any compounding pharmacies that sell CSPs to assure that they are

in compliance with USP-NF General Chapter 797.  *See id.*

589.  The Ohio State Board of Pharmacy has incorporated USP-NF General

Chapter 797 fully into its regulations, effective on January 1, 2015.

See Ohio Admin. Code § 4729-9-21(C)(2) (eff. Jan. 1, 2015).

590.  Accordingly, strict compliance with USP <797> is now required for an

Ohio-licensed compounding pharmacy.

591.  Defendants Pharmacies # 1–100 and Defendants Pharmacists # 1–100

violate the law when they fail to fully comply with USP <797>.  And

137

Defendants will deviate from the Core Elements of the Execution Protocol if Drug Source Defendants violate the law by failing to fully comply with USP <797>.

592.     If the pharmacy is a "non-resident" pharmacy—that is, it is a pharmacy located outside of Ohio—then the Ohio State Board of Pharmacy relies on the other state's board of pharmacy to inspect and enforce regulations.  *See* Ohio Admin. Code § 4729-10-04.  But again, other states might not require adherence to USP-NF General Chapter 797, much less regularly inspect pharmacies for compliance.  *See* Isaac Cohen, M.D., Isaac Cohen, MD, Rebuts—*Compounding Pharmacies: A Viable Option, or Merely a Liability*, Am. Academy of Phys. Med. & Rehab. 974, 980 (Nov. 2013).

593.     Even if compounding pharmacies do actually follow USP-NF General Chapter 797 standards, those standards are less stringent, and produce less reliable drugs, than the FDA Good Manufacturing Practices.  Jennifer Gudeman et al., *Potential Risks of Pharmacy Compounding, supra*, at 4 (comparing the failure rate of <2% for 3,000 FDA-approved commercial products tested from 1996 to 2001 to the failure rates ranging from 11% to 34% for compounded drugs randomly tested by the FDA, Missouri, and Texas).

594. Drugs compounded in accordance with USP-NF General Chapter 797 have a low standard of sterility assurance compared to the FDA standard. *Id.* ("USP <797> does not afford the same degree of sterility assurance for compounded drugs that GMPs provide for FDA-approved sterile products").

595. There is a substantial risk of harm from Defendants' use of unverified ingredients, including the administration of an entirely incorrect chemical or active ingredient, administration of sub- or super-potent execution drugs, contamination with dangerous allergens or substances that may cause immediate anaphylactic reactions, and/or contamination with bacteria or fungus with immediate excruciating effects before Plaintiff is unconscious, unaware and insensate, assuming it works even to that extent.

596. Even if the anesthetic drug is fully or partially effective, compounded drugs can cause serious harm and severe pain before loss of consciousness, awareness, and sensation.

597. Such harms include painful pulmonary embolisms resulting from deviations in potency or formation of precipitates within the body or from unanticipated drug incompatibilities; partial or complete lack of effect due to ingredient tampering; nausea and vomiting resulting from deviations in potency; suffocation and gasping for breath; immediate anaphylactic reactions or other excruciating effects resulting from contamination with dangerous allergens, bacteria,

139

fungus, or other impurities; and serious burning pain on injection, as a result of incorrect pH and/or the drug precipitating inside Plaintiff's veins.

598.    All of these circumstances would be expected to prolong the execution, make it a lingering death and a spectacle execution, and to multiply the pain and suffering beyond the objective of causing death.

599.    Defendants' use of compounded—as opposed to manufactured, FDA-approved—drugs in executions creates a substantial, objectively intolerable risk that the drug will be the wrong identity or pH level, prone to falling out of solution/precipitating, ineffective, sub-potent, contaminated, unsterile, or otherwise adulterated.

600.    There is a substantial, objectively intolerable risk that compounded execution drugs will be made using poor quality practices, and may be the incorrect identity, not buffered to the correct pH level, prone to falling out of solution/precipitating, ineffective, sub-potent, contaminated, unsterile, or otherwise adulterated.

601.    Defendants' use of compounded drugs in executions makes it highly likely that Defendants will deviate from Core Elements of the Execution Protocol, and/or will apply the law disparately to similarly situated inmates, arbitrarily and recklessly.

602.    Testing a sample of one solution made of a compounded drug, as Defendants' Execution Protocol calls for, is not reliable as to the identity, sterility, potency, or efficacy of the solution as a whole.

603.    Similarly, testing one solution of several made of a compounded drug is not reliable as to the identity, sterility, potency, or efficacy of the other solutions made.

604.    The risks associated with using execution drugs that are compounded in general are significantly enhanced by the risks associated with compounding performed by particular Drug Source Defendants.

605.    Upon information and belief, Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 are ill-equipped and lacking the expensive equipment necessary to compound sterile injectables.

606.    Upon information and belief, Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 are not possessing of the required high degree of skill, experience and training necessary to compound sterile injectables.

607.    Upon information and belief, Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100, are ethically compromised and thus substantially likely to overlook contaminants or other of the myriad problems associated with compounded sterile controlled substances.

608.    Upon information and belief, Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 are aware of and take offense at Plaintiff's crime of conviction.

609.    Upon information and belief, Defendants Unknown Pharmacies #1–
        100 and Defendants Unknown Pharmacists #1–100 know that what
        little oversight will be employed regarding the compounded execution
        drugs they concoct will be limited to identity and potency.

610.    Upon information and belief, Defendants Unknown Pharmacies #1–
        100 and Defendants Unknown Pharmacists #1–100 believe that Ohio
        state law provides blanket secrecy protection against any professional
        or legal ramifications for any harm done to Plaintiff by compounded
        execution drugs.

611.    Thus, upon information and belief, there is a substantial risk that
        Defendants Unknown Pharmacies #1–100 and Defendants Unknown
        Pharmacists #1–100 will include unknown and/or undetectable
        substances or materials in the compounded drugs to cause Plaintiff
        great suffering and pain upon injection.

612.    Accordingly, by DRC Defendants obtaining a particular batch of
        compounded execution drugs from Defendants Unknown Pharmacies
        #1–100 and Defendants Unknown Pharmacists #1–100 to be used for
        Plaintiff or others who immediately following on Defendants' execution
        schedule, there is a risk of harm that is even greater than the
        ordinary, substantial risk of harm from using compounded execution
        drugs in general.

613.    As with any matter involving the exercise of judgment and professional skill, the viability of drugs manufactured via compounding is dependent upon the skill, expertise, and judgment of the compounder, i.e., the Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100.

614.    And, in that sense, the Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 are as essential to Defendants' administration of the Execution Protocol as the Execution Team members, the Medical Team, the Drug Administrators, the Director, the SOCF Warden, the CCI Warden, or any other actors involved in any way in carrying out an execution.

615.    Indeed, the professional contributions of the Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 are just as important to the successful completion of an execution in a constitutional manner as that of any of the Execution Team members or other actors involved, including the Medical Team and Drug Administrators, the Director, and the Warden, if not more so.

616.  Upon information and belief, Defendant Kasich has endeavored to shut down all state audits of private contractors until the end of his second term in office, see Janet Reitman, *Where the Tea Party Rules*, ROLLING STONE, Oct. 14, 2014,[11] thereby potentially ensuring that there will be no state audit of Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100.

617.  Amendments to the Ohio Revised Code sought by Defendants and counsel for Defendants and signed into law by Defendant Kasich after an expedited process in a lame-duck legislative session, Ohio Rev. Code §§ 2929.221–.222, attempt to keep secret the identity of any Drug Source Defendants, including Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100, thereby eliminating any meaningful, independent oversight of Defendants as it relates to execution matters, including matters related to the execution drugs.

---

[11] Available at http://www.rollingstone.com/politics/news/where-the-tea-party-rules-20141014.

618.    The omission of any such oversight, redundancies, and other reviews and checks as to the Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 has created a blind spot in the execution process, one which enables any Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100 who might be unscrupulous, corrupt, and/or incompetent to intentionally or unintentionally subvert the process, as a result of negligence but also as a result of malice.

619.    There is thus a known, foreseeable and substantial, objectively intolerable risk, which Defendants have done nothing to eliminate or minimize, that compounded drugs used in the execution of Plaintiff will be defective in one or more of the following respects:

a)    the compounded execution drugs are not what they purport to be and are not the drug(s) required by the written execution protocol;

b)    the compounded execution drugs will not be the requisite potency and concentration for the intended usage, nor the potency and concentration required by the Execution Protocol;

c)    the compounded execution drugs are contaminated (such as with impurities or other drugs), are adulterated such as with other substances that would make the execution painful, are not sterile to the same degree as manufactured by a reliable manufacturer making an FDA-approved product;

d)    the compounded execution drugs are not fit for their intended usage; and/or

e)    the compounded execution drugs have not been manufactured, compounded, produced, procured, conveyed, stored, handled, and dispensed in strict compliance with all applicable Ohio and federal statutes, regulations, or other laws or requirements.

620.    Moreover, because they have omitted any oversight, redundancies, and other reviews and checks on the manufacturing facilities and/or work product of the Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100, the DRC Defendants will not determine in advance, if ever, whether a particular execution has been plagued or is about to be plagued by the negligence, incompetence, and/or malice of the Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100, including, for example, by the use of compounded execution drugs which include substances that intentionally or unintentionally cause the target of a particular execution to suffer something worse than the humane and dignified death to which he is entitled.

621.    Because no one is exercising oversight or otherwise reviewing the manufacturing facilities and/or work product of the Defendants Unknown Pharmacies #1–100 and Defendants Unknown Pharmacists #1–100, there is nothing to prevent such error or malfeasance from occurring and, what is just as bad, there is nothing to provide assurance to the intended target of the compounded execution drugs that such error or malfeasance cannot and will not occur in his execution.

622.    Defendants knew or should have known each fact alleged herein and they have acted and/or continue to act, with deliberate indifference to the same.

## I. __Allegations related to imported execution drugs.__

623.     Using imported execution drugs creates a substantial risk of serious harm to Plaintiff, because there is a substantial risk that such drugs are contaminated, adulterated, not of the correct identity, super- or sub-potent, or in myriad other ways not identical in make and quality to domestically produced execution drugs, because imported execution drugs have not been subject to the same stringent quality and manufacturing standards to which domestically produced drugs are subjected. Accordingly, there is a substantial risk of harm to Plaintiff, including serious physical and/or mental or psychological pain and suffering, a lingering death, a spectacle execution that is not dignified, and other risks that are objectively intolerable but which Defendants ignore.

624.     Imported thiopental sodium is, by definition, not ensured to be safe and effective because, as an unapproved drug, FDA have never found *any* thiopental sodium to be safe and effective.

625.     Drugs to be used for an execution may not be lawfully exported to the United States from any European Union country.

626.     Thus, any drugs to be used by DRC Defendants to carry out an execution under the Execution Protocol are likely to originate in third-world countries or countries without rigorous drug-manufacturing oversight, or exported from a European Union country illegally.

627.     Upon information and belief, drugs to be used for an execution that are manufactured overseas and exported to the United States by Drug Source Defendants have not been manufactured in an FDA-registered and –inspected facility under quality assurance procedures designed to produce a safe and effective product, such as current Good Manufacturing Practices.

628.     Upon information and belief, drugs to be used for an execution that are manufactured overseas and exported to the United States by Drug Source Defendants have not been shipped, handled, and stored under conditions that meet U.S. requirements to ensure the drugs' safety and effectiveness.

629.     Upon information and belief, drugs—and their ingredients—to be used for an execution that are manufactured overseas and exported to the United States by Drug Source Defendants have not been evaluated for safety and effectiveness with the same level of oversight used for drug approval in the United States.

630.     Upon information and belief, drugs to be used for an execution that have been manufactured overseas and exported to the United States by Drug Source Defendants do not contain all the required labeling information.

631.    Upon information and belief, drugs to be used for an execution that have been manufactured overseas and exported to the United States by Drug Source Defendants do not contain accurate, reliable labeling information, calling into question matters such as the true identity of a particular drug, and that drug's contents.

632.    Upon information and belief, drugs to be used for an execution that are manufactured overseas and exported to the United States by Drug Source Defendants are not manufactured to the tolerances required by the USP (United States Pharmacopeia).

633.    Upon information and belief, such drugs were manufactured to the lower tolerances contained in the IP (Indian Pharmacopeia), the EUP (European Union Pharmacopeia) or the BP (British Pharmacopeia).

634.    Under the IP, EUP and BP monographs for formulation of thiopental sodium, the API must be a minimum of 84% thiopental content and 10.5% sodium content, which is mixed with 6% sodium carbonate.

635.    Under the USP monograph, however, the API for thiopental sodium must be minimum 98% thiopental sodium (*i.e.*, not mixed with carbonate).

636.    Analytical testing of any imported execution drugs is not required by Defendants' Execution Protocol.

637.   Any discretionary analytical testing performed on imported execution drugs will be subject to the same fundamental problems and flaws identified above relating to analytical testing of Defendants' compounded execution drugs.

638.   Defendants' use of imported drugs in executions creates a substantial, objectively intolerable risk that the drug will be the wrong identity or pH level, the incorrect concentration, ineffective, sub-potent, super-potent, contaminated, unsterile, or otherwise adulterated or misbranded.

639.   There is a substantial, objectively intolerable risk that imported execution drugs will be made using poor quality practices, and may be the incorrect identity, the incorrect concentration, not buffered to the correct pH level, ineffective, sub-potent, super-potent, contaminated, unsterile, or otherwise adulterated or misbranded.

640.   The use of imported drugs in executions makes it highly likely that Defendants will deviate from the Core Elements of the Execution Protocol and/or will apply the law disparately to similarly situated inmates, arbitrarily and recklessly.

641.   Except for exceptions not applicable here, it is unlawful to import into the United States, and the FDA is required to refuse admission of, any misbranded or unapproved drugs.  *Cook v. FDA*, 733 F.3d 1, 3 (D.C. Cir. 2013) (citing 21 U.S.C. § 381(a)).

642.    A drug is "misbranded" under federal law if "it was 'manufactured, prepared, propagated, compounded, or processed in an establishment not duly registered' with the FDA." *Cook*, 733 F.3d at 3 (quoting 21 U.S.C. § 352(o)).

643.    Upon information and belief, any execution drugs Drug Source Defendants intend to import or have imported to provide to DRC Defendants to use in a lethal-injection execution will not come from an FDA-registered facility, rendering such execution drug(s) "misbranded" and therefore unlawful to import into the United States. Imported thiopental sodium will also be misbranded under federal and state law for the reasons identified herein.

644.    Thiopental sodium is an unapproved new drug that may not be lawfully introduced into interstate commerce under 21 U.S.C. § 355(a), because it is no longer "'generally recognized, among experts . . . as safe and effective' for its labeled use, [21 U.S.C.] § 321(p)(1)." *See Cook*, 733 F.3d at 3–4 (explaining that "[a]lthough thiopental has been used as an anesthetic since the 1930s, it is presently an unapproved new drug").

645.    Likewise, thiopental sodium is an unapproved new drug because "it is undisputed that the FDA has *never* approved or even reviewed" thiopental (imported or manufactured domestically) "for safety and effectiveness" under 21 U.S.C. § 355(d). *Beaty v. FDA*, 853 F. Supp.

151

2d 30, 34–35 & n.2 (D.D.C. 2012), affirmed in relevant part sub.

nom., *Cook*, 733 F.3d at 3–4.

646. Pentobarbital, midazolam, the paralytic drug, and potassium chloride are each an unapproved new drug as to their respective use for executions, because none of those drugs has ever been approved for use as an execution drug nor have any of those drugs ever been the subject of an Investigational New Drug application (either filed or granted).

647. Under the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 381(a), and the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), the FDA is required to refuse admission to thiopental sodium shipments coming into the United States.  *See Cook*, 733 F.3d at 10–11.

648. Under *Cook* and the relevant provisions of federal law, importing thiopental sodium into the United States is prohibited, and thus Defendants may not legally import thiopental sodium to use for an execution.

649. Upon information and belief, however, Defendants have taken actions to try to import thiopental sodium, despite being on notice that such imports are illegal.

650. Those actions generated a letter to DRC Director Gary Mohr from Captain Domenic J. Veneziano, the Director of the Division of Import

Operation, United States Public Health Service, which is part of the FDA.

651.    In that letter, dated June 26, 2015, Captain Veneziano reiterated to Director Mohr that the permanent injunction entered in *Beaty* enjoins FDA "from permitting the entry of, or releasing any future shipments of, foreign manufactured sodium thiopental that appears to be misbranded or an unapproved new drug in violation of 21 U.S.C. § 355.  Please note that there is no FDA approved application for sodium thiopental, and it is illegal to import an unapproved new drug into the United States."  Letter from Domenic J. Veneziano, Dir., Div. of Import Operation, U.S. Public Health Serv., Food and Drug Admin., Dep't of Health and Human Serv., to Gary C. Mohr, Dir., Ohio Dep't of Rehab. and Corr. (June 26, 2015), available online at Alan Johnson, *FDA warns Ohio not to illegally import execution drugs*, COLUMBUS DISPATCH, Aug. 19, 2015[12]; *see also* Chris McDaniel, *Ohio Intended To Illegally Import Execution Drugs, FDA Letter Says*, BUZZFEED NEWS (Aug. 18, 2015, 7:19 PM).[13]

652.    Even after being explicitly told by the FDA that importation of thiopental sodium is illegal, Defendants have taken further actions

_____

[12] Available at http://www.dispatch.com/content/stories/local/2015/08/19/FDA-letter-ohio-execution-drugs.html.

[13] Available at http://www.buzzfeed.com/chrismcdaniel/ohio-intended-to-illegally-import-execution-drugs-fda-letter#.iyEJXQjX2.

such as updating DRC's DEA registration to import thiopental sodium, and sending a responsive letter on October 9, 2015 to the FDA insisting that Ohio can, indeed, legally import thiopental sodium. Letter available online at Chris McDaniel, *Ohio Insists It Can Import Execution Drug Legally, After FDA Said It Couldn't*, BUZZFEED NEWS (Oct. 9, 2015).[14]

653.    Federal law, *see, e.g.*, 21 U.S.C. §§ 952(a), 957, 958, also establishes that any attempt by Defendants to import pentobarbital or midazolam to use for executions would be illegal, and DEA should seize such imports, because DRC Defendants do not possess the required DEA registration to legally import pentobarbital or midazolam.

654.    Federal law also establishes that if any person such as any Drug Source Defendant manufactures or distributes pentobarbital or midazolam intending or knowing that the drugs will be unlawfully imported into the United States, that person is also violating the Controlled Substances Act.  21 U.S.C. §§ 959, 960.

655.    Federal law prohibits knowingly or intentionally furnishing false or fraudulent information in the documentation required to be permitted to import controlled substances.  *See, e.g.*, 21 U.S.C. § 843(d); 19 U.S.C. §§ 1592, 542.

---

[14] Available at https://www.buzzfeed.com/chrismcdaniel/ohio-insists-it-can-import-execution-drug-legally-after-fda?utm_term=.gxp9Qa7vo#.bdzAJm1XE.

656.    Upon information and belief, Defendants will not be permitted to import execution drugs unless Defendants or their agents provide false or fraudulent information regarding the attempted importation; there is no authorization for Defendants or their agents to import pentobarbital or midazolam, and thiopental sodium may only be imported in limited situations that are not applicable to the execution context.

657.    Thus, any import of pentobarbital or midazolam by Defendants to use for executions would be necessarily based on fraudulent or false information.

658.    Similarly, any importation of thiopental sodium by Defendants to use for executions would require providing false or fraudulent information to fraudulently invoke one of the limited exceptions for importing that drug.

659.    Further, upon information and belief, Defendants or their agents provided false or fraudulent information in the course of applying for, and obtaining, a DEA Controlled Substance Registration for importing thiopental sodium by representing that procurement of execution drugs will be only in accordance with all applicable State and Federal Laws, licensing authorities, and ODRC policies and procedures.

660.    Defendants have been on notice that predates DRC Defendants' application for the import registration that procuring the controlled substances to use for an execution under Ohio's Execution Protocol is

impossible to do while remaining compliant with all applicable Ohio

and federal laws, licensing authorities, and/or ODRC policies

and procedures.

**J.    Additional allegations regarding Ohio state law.**

661.    It is a crime under Ohio state law for a person to knowingly obtain,

possess, or use a controlled substance.  Ohio Rev. Code § 2925.11(A).

If one is a drug manufacturer, licensed health professional authorized

to prescribe drugs, pharmacist, owner of pharmacies, or any other

person who performs these actions in compliance with Ohio Revised

Code Chapter 3719, 4715. 4723, 4729, 4730, 4731 and 4741,

subsection (A) does not apply.  Ohio Rev. Code § 2925.11(B)(1).

662.    If one is a person who obtained the controlled substance pursuant to

a lawful prescription issued by a licensed health professional

authorized to prescribe drugs, subsection (A) does not apply.  Ohio

Rev. Code § 2925.11(B)(4).

663.    Otherwise, whoever knowingly obtains, possesses, or uses a

controlled substance is guilty of a felony of varying degree ranging

from first to fifth depending on the amount of the drug involved.  Ohio

Rev. Code § 2925.11(C).

664.    It is a crime under Ohio state law for any person to deceive another to

procure the administration of, a prescription for, or the dispensing of,

a dangerous drug.  Ohio Rev. Code § 2925.22(A).  Whoever commits

156

such an Ohio crime is guilty of a felony of varying degree ranging from first to fifth.  Ohio Rev. Code § 2925.22(B).

665.     It is a crime under Ohio state law for a person by force, threat, or deception, administer to another or induce or cause another to use a controlled substance.  Ohio Rev. Code § 2925.02(A)(1).

666.     It is also a crime under Ohio state law for a person to, by any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person.  Ohio Rev. Code § 2925.02(A)(3).

667.     If the person who administers a controlled substance to another or induces or causes another person to use a controlled substance is a drug manufacturer, wholesaler, licensed health professional, pharmacist, pharmacy or any other person who performs these actions in compliance with Ohio Revised Code Chapter 3719, 4729, 4730, 4731 or 4741, subsections (A)(1) and (A)(3) do not apply. *See* Ohio Rev. Code § 2925.02(B).

668.     Otherwise, however, whoever commits any of these actions is guilty of a felony of varying degree ranging from first to fifth degree.  Ohio Rev. Code § 2925.02(C).

669.     It is a crime under Ohio state law for a person to, by any means, administer or furnish to another or induce or cause another to use a controlled substance with purpose to cause serious physical harm to the other person.  Ohio Rev. Code § 2925.02(A)(2).  There is no

exception to this criminal law, and whoever commits any of these actions is guilty of a felony of varying degree ranging from first to fifth degree.  Ohio Rev. Code § 2925.02(C).  If the controlled substance in question is a schedule II or schedule III drug, the crime is a second degree felony.  Ohio Rev. Code § 2925.02(C)(1)(a), (C)(2)(b).

670.    It is a crime under Ohio state law for any person, other than for lawful research, clinical, medical, dental or veterinary purposes, to obtain, possess or use a harmful intoxicant with the purpose to induce intoxication or similar physiological effects.  Ohio Rev. Code § 2925.31(A).  Whoever commits such an Ohio crime is guilty of a first-degree misdemeanor, unless the person has previously been convicted of a drug abuse offense, in which case violating § 2925.31(A) is a fifth-degree felony.

671.    It is a crime under Ohio state law for any person to knowingly dispense or distribute a harmful intoxicant to a person age eighteen or older if the person who dispenses or distributes it knows or has reason to believe that the harmful intoxicant will be used in violation of section 2925.31 of the Revised Code.  Ohio Rev. Code § 2925.32(A)(1).  Whoever commits such an Ohio crime is guilty of a fifth-degree felony, or a fourth degree felony if the person has previously been convicted of a drug abuse offense.  Ohio Rev. Code § 2925.32(D)(1).

672.     It is a crime under Ohio state law for any person to sell, deliver, offer for sale, hold for sale, or give away any new drug unless an application with respect to the drug has become effective under 21 U.S.C. § 355. Ohio Rev. Code §§ 3715.65(A), 3715.99(D). Whoever commits such an Ohio crime is guilty of a fourth degree misdemeanor for the first offense, and guilty of a second degree misdemeanor for each subsequent offense. Ohio Rev. Code § 3715.99(D).

673.     It is a crime under Ohio state law for any person to engage in Prohibited Acts as defined in Ohio Revised Code §§ 3715.52(A), 3715.99(D). Thus, it is a crime under Ohio state law to manufacture, sell, deliver, or hold or offer for sale any drug that is adulterated or misbranded, Ohio Rev. Code § 3715.52(A)(1), or to adulterate or misbrand any drug, Ohio Rev. Code § 3715.52(A)(2), or to receive in commerce any drug that is adulterated or misbranded and the delivery or proffered delivery of any adulterated or misbranded drug, for pay or otherwise, Ohio Rev. Code § 3715.52(A)(3). Whoever commits any of these Ohio crimes is guilty of a fourth degree misdemeanor for the first offense, and guilty of a second degree misdemeanor for each subsequent offense. Ohio Rev. Code § 3715.99(D).

674.    It is a crime under Ohio state law for an Ohio law enforcement official to negligently fail to prevent or halt the commission of an Ohio crime; for an Ohio law enforcement, ministerial, or judicial officer to negligently fail to perform a lawful duty in a criminal case or proceeding; for a public official to recklessly fail to perform a duty expressly imposed by law with respect to the public servant's office; or a public official to do an act expressly forbidden by law with respect to the public servant's office. *See* Ohio Rev. Code § 2921.44(A)–(E). Whoever commits any of these actions is guilty of a misdemeanor of the second degree. *See* Ohio Rev. Code § 2921.44(F).

675.    It is a crime under Ohio state law for any person to knowingly use or rely on an instrument that is not lawfully issued to assert jurisdiction over or determine the legal or equitable status, rights, duties, powers, or privileges of any person or property or to knowingly commit or facilitate the commission of a crime or for purposes of committing a felony. *See* Ohio Rev. Code §2921.52(B)(3)–(4). Whoever commits any of these actions is guilty of a felony in the third or fourth degree. *See* Ohio Rev. Code § 2951.52(D).

676.    Pursuant to Ohio Revised Code § 2921.45, no public servant, under color of his office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right. Whoever commits such actions is guilty of a misdemeanor of the first degree.

160

677.    It is a crime under Ohio state law for any person employed by, or associated with, any enterprise to conduct or participate in, directly or indirectly, the affairs of an enterprise through a pattern of corrupt activity. Ohio Rev. Code § 2923.32(A)(1). Whoever commits any of these actions is guilty of a felony in the second degree, or potentially the first degree. Ohio Rev. Code § 2923.32(B)(1).

678.    It is a crime under Ohio state law for any person who has knowingly received any proceeds derived, directly or indirectly, from a pattern of corrupt activity to use or invest, directly or indirectly, any part of those proceeds, or any proceeds derived from the use or investment of any of those proceeds, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise. Ohio Rev. Code § 2923.32(A)(3). Whoever commits any of these actions is guilty of a felony in the second degree, or potentially the first degree. Ohio Rev. Code § 2923.32(B)(1).

**K.    Allegations related to the definitions of "Director" and "Warden" in the Execution Protocol**

679.    The Execution Protocol allows the DRC Defendants by its terms—and the Drug Supplier Defendants by implication—to deviate/vary from the written protocol if for any reason it is difficult, impractical or impossible to strictly follow the procedures in the written protocol.

680. The Execution Protocol also allows the DRC Defendants by its terms, and the Drug Supplier Defendants by implication, to deviate/vary from the written protocol if any situation arises that would make strictly following the written protocol difficult, impractical or impossible.

681. The Execution Protocol is silent on whether approval must be obtained *before* any variation from the protocol may occur.

682. The Execution Protocol requires that any variation of a "substantial nature" must be approved by the Director of DRC.

683. A previous written execution protocol, effective September 18, 2011, required that *only* the Director of DRC may authorize a variation from the mandates of the written protocol, and this Court previously rejected motions for injunctive relief on the basis that the evidence demonstrated that all deviations from the execution protocol would flow to one person, and one person only—only the Director of DRC— and only that single person could authorize deviations, thus ensuring strict compliance with, and the mandatory nature of, the written protocol's mandates.

684. Core Element # 5 of the Execution Protocol requires that "only the Director" of DRC can authorize a variation from the written execution protocol's mandates.

685.     But since the DRC Defendants' adoption of the execution protocol

effective April 28, 2014 ("the 2014 Execution Protocol"), and

continuing through the present, the Execution Protocol has allowed

an indeterminate set of persons with undetermined qualifications or

experience to authorize deviations/variations from the written

protocol, because it defines "the Director" as "the Director" *or anyone*

*the Director designates.*

686.     The Execution Protocol defines "Director," as follows: "As used in the

policy the term 'Director' refers to the current Director of the Ohio

Department of Rehabilitation and Correction *or the Director's*

*designee.*" (ECF No. 521, Execution Protocol, Section IV, p. 2 (PageID#

14161) (emphasis added).)

687.     The term "Warden" is also redefined in the Execution Protocol to

include not only the SOCF Warden or his Deputy Warden, but also

"*the Director's designee.*"  (*Id.,* Section IV, p. 3 (emphasis added).)

688.     Accordingly, by the terms of the Execution Protocol, deviations from

the written protocol may flow to any of an undefined number of

persons, rather than to a single person as required under the previous

written protocol.

163

689.    Furthermore, nothing in the Execution Protocol provides how "the Director's designees" will be identified, selected, designated, qualified, informed of such designation, or anything else; the protocol is silent other than to extend the Director's execution-matter authority to an unknown set of persons without restrictions.

690.    Similarly, the Wardens at SOCF and CCI and TCI are delegated numerous critical tasks throughout the Execution Protocol, but "the Warden" does not mean just the Wardens at SOCF or CCI or TCI, but it also means *anyone the Director designates*.

691.    Thus, during all times since the 2014 Execution Protocol, the Execution Protocol has exposed the illusory nature of the Core Elements on which the DRC Defendants have in the past defended their execution protocol against constitutional challenge, by redefining the terms "Director" and "Warden" to include anyone the Director (or the Warden) chooses to designate for a particular task or function, and without any minimal requirements on the qualifications, training, or competence of the "Director's designee" or the "Warden's designee."

692.    This redefinition of key terms in such a material respect starting with the 2014 Execution Protocol has effectively caused a substantial diminution if not outright elimination of Core Element # 5 in the Execution Protocol, even while the DRC Defendants seek to maintain the pretense that all core protections still exist in the Execution Protocol.

164

693.    It used to be that the term "Director," as used in the written execution protocol, meant just that, i.e., the Defendant Director of DRC, in this case Defendant Gary Mohr.  It likewise used to be that the term "Warden," as used in the written execution protocol, meant just that, *i.e.,* the Defendant Warden of SOCF.

694.    Thus, when written execution protocols that preceded the 2014 Execution Protocol included as key provisions that the "Director" or the Warden" would be responsible for a certain task or function as set forth in the written execution protocol, including the Core Elements, there was no ambiguity as to who was responsible or where the accountability lay.  The buck stopped with the Director, and that meant the Director himself.

695.    Only the person of the Director himself was allowed to authorize a variation from the procedures stated in the written execution policy, although allegedly not even the Director could authorize a deviation or variation from any of the four Core Elements enumerated in such written execution protocols that preceded the 2014 Execution Protocol.

696.    But those protections and assurances were eliminated as a result of the DRC Defendants' definitional changes starting with the 2014 Execution Protocol and continuing in the Execution Protocol.

697.   The Execution Protocol now unambiguously allows the "Director" and the "Warden," as those terms are everywhere used in the Execution Protocol, to be one and the same person, "the Director's designee," and that person might be neither the actual Director nor the actual Warden.

698.   Or alternatively, these changes mean any of a wide variety of persons could function as "the Director" or "the Warden" at any given moment and at any given point during Defendants' administration of the Execution Protocol to a given inmate.

699.   "The Director" for purposes of authorizing one particular deviation from the written protocol might be different than "the Director" for purposes of authorizing a different deviation minutes, hours, days, or weeks later.

700.   Nowhere does the Execution Protocol impose any restrictions whatsoever on the delegation of functions to the "Director's designee." The delegation is not regulated or constrained in any way at all in the Execution Protocol.

701.   Nothing in the Execution Protocol provides how the Director's designee will be identified, selected, designated, qualified, informed of such designation, or anything else; the protocol is silent other than to extend the Director's execution-matter authority to an unknown set of persons without restrictions of any kind.

702.    The policy allows for any and all of the "Director's" and/or "Warden's" duties and responsibilities in the execution process, whether specified in the Execution Protocol or not, to be delegated to some unidentified designee or designees at any time, in any context, and for any reason. Delegation may thus occur in some executions, but not others; it may pertain to only some functions or it may pertain to every single function; all as the Defendant Director, or any successor Director, may in the exercise of unbridled discretion choose to allow for a particular execution.

703.    Not only are there no restrictions on the functions that can be delegated, but there are no restrictions or requirements on the competence, training, judgment, skill, or qualifications of who may be tabbed to be the "Director's designee."  No minimal requirements have been established.  There is no assurance that a "designee" has any knowledge of the execution process, much less that he/she is willing and/or able to enforce compliance with, and will not vary from, the Core Elements of the written execution protocol.  There is, in short, no accountability required by the Execution Protocol.

704.    A particular plaintiff being executed will have no clue as to which pattern of delegation, if any, will be used in *his* execution, because that is all a matter left to the arbitrary discretion of the Director or his designee.

705.    By this newly adopted allowance of unbridled and unrestrained delegation, the DRC Defendants have further guaranteed that similarly situated plaintiffs will not be treated the same, as some will have untrained, unaccountable, and/or unknown "Director's designees" making the key decisions in their execution, despite the facial assurances of the Execution Protocol, whereas others will have the Director himself.

706.    The hierarchical oversight structure which the DRC Defendants previously presented to this Court, which terminated at the top in a single individual to whom all responsibility, communications, and potential deviations from the written protocol ultimately flowed up, and from whom every single authorization required by the Core Elements flowed down, is now merely illusory, making all elements of the Execution Protocol more akin to guidelines than mandatory requirements from which deviation will not be allowed absent authorization by a single person.

707.   The use of untrained, unaccountable, and/or unknown "designees" in the execution process, and to perform the important duties of the Director and/or Warden, is itself a violation of one or more Core Elements of the Execution Protocol because, among other reasons, there is no assurance that such designees are willing and/or able to enforce the performance of an execution in a professional, humane, sensitive, and dignified manner and in accordance with, and without variance from, the Core Elements, and there is also no assurance that such designees will do so with the judgment, skill, and experience required for such a solemn task.

708.   And, even if not itself a violation of Core Elements of the Execution Protocol, the use of untrained, unaccountable, and/or unknown "designees" in the execution process, and to perform the important duties of the Director and/or Warden, is so offensive to the spirit, purpose, and intent of the Core Elements of the Execution Protocol that such use must be deemed a violation of such Core Elements.

709.   Defendants' execution policy and Execution Protocol now make equal treatment of similarly situated individuals dependent upon the subjective interpretation and application of the Execution Protocol by any undefined person at any time and at any point in administration of the Execution Protocol, for any reason.

710.    Similarly, equal treatment of similarly situated individuals is dependent upon the subjective interpretation and application of the Execution Protocol by any particular Director of DRC, which can and will change from Director to Director, and from "Director's designee" to "Director's designee," without restrictions, all from execution to execution.

711.    To the extent the Defendant Mohr has previously expressed his intention that he would only delegate Defendant Voorhies to act as the Director's designee for any purposes under the Execution Protocol, that intention has not been included or otherwise memorialized in the Execution Protocol.

712.    Additionally, the stated intentions of one Director, on such an important issue, are not sufficient to alleviate the deficiencies in the Execution Protocol, as identified in the preceding paragraphs, concerning the discretion conferred under the Execution Protocol for the Director to delegate all relevant duties and responsibilities to a Director's designee; DRC Defendants abide by previously stated sworn testimony until they decide not to.

**L.    Additional allegations related to the contents of Defendants' Execution Protocol.**

713.    The safeguards contained in Defendants' written Execution Protocol are critical to avoid violating Plaintiff's fundamental and constitutional rights in the course of an execution attempt.

170

714.    The Execution Protocol, by its own terms, must be applied "in accordance with all applicable policies, administrative regulations, and statutes." 2106 Execution Protocol, Sec. III at pp. 1 (ECF No. 667-1, Page ID 19812).

715.    Upon information and belief, Defendants will employ an overarching execution policy that encompasses their informal execution policies, as well as the written execution protocol designated DRC Policy 01-COM-11 that is operable at the time, to execute Plaintiff.

716.    Defendants' overarching execution policy includes admissions and representations the DRC Defendants or their predecessors have made in response to discovery requests propounded during the course of the instant litigation.

717.    Defendants' overarching execution policy also includes representations that the DRC Defendants have made in various pleadings, motions and proceedings throughout the course of the instant litigation, including testimony presented in hearings before the Court.

718.    Because the Execution Protocol must be applied in accordance with all applicable policies, administrative regulations, and statutes, the Core Elements of the Execution Protocol and their requirements must be construed subject to all applicable policies, administrative regulations, and statutes that have at least some element of overlap with those Core Elements.

719. Similarly, the Core Elements and their requirements must be construed subject to all applicable policies, administrative regulations, and statutes that have been incorporated explicitly in the Execution Protocol or implicitly through any unwritten policy or practice.

720. Deviation from overlapping applicable policies, administrative regulations, and statutes constitutes a deviation from relevant Core Elements.

721. Deviation from applicable policies, administrative regulations, and statutes that have been incorporated explicitly in the Execution Protocol or implicitly through any unwritten policy or practice constitutes a deviation from relevant Core Elements.

722. When there is substantial overlap and correlation between a Core Element and federal and Ohio state statutes and regulations, those federal and Ohio state statutes and regulations are implicitly incorporated into the Execution Protocol such that violation of the federal or state law constitutes a deviation from the relevant Core Element. *In re: Ohio Execution Protocol Litig. (Phillips)*, No. 2:11-cv-1016, 2013 WL 5963150, 2013 U.S. Dist. LEXIS 159680, *82–84 (S.D. Ohio Nov. 7, 2013). And if that deviation is not authorized in advance in writing by the Director, then that constitutes a deviation from Core Element # 5.

723.	When Defendants have made concessions or representations that amount to unwritten or informal policies or practices incorporated into the Execution Protocol, then violation of those unwritten or informal policies or practices constitutes deviation from the relevant portion of the Execution Protocol.  And if that deviation is not authorized in advance in writing by the Director, then that constitutes a deviation from Core Element # 5.

724.	DRC Defendants have incorporated into the Execution Protocol (which is an administrative rule or regulation), as a matter of law, the Ohio state statutes and their associated regulations including, but not limited to, those related to controlled substances, manufactured drugs, imported drugs, compounded drugs, adulterated or misbranded drugs, prescribing requirements, and the practice of pharmacy.  *See Cent. Ohio Joint Vocational School Dist. Bd. of Edn. v. Ohio Bur. of Emp. Servs.*, 487 N.E.2d 288, 292 (Ohio 1986) ("[A] a rule is invalid where it clearly is in conflict with any statutory provision."); *In re Wedgewood Health Care Realty, L.L.C.*, 892 N.E.2d 960, 967 (Ohio App. 2008) ("Where an administrative rule conflicts with a legislative pronouncement, the administrative rule is invalid."); *Hoffman v. State Med. Bd. of Ohio*, 865 N.E.2d 1259, 1262 (Ohio 2007) (citation omitted) ("[A]n administrative rule may not add to or subtract from a legislative enactment . . . If it does, it creates a clear conflict with the statute, and the rule is invalid."); *Sanford v. D & T Limousine*

*Serv., Inc.*, 671 N.E.2d 299, 304 (Ohio App. 1996) ("Any conflict, therefore, between a statute and administrative rule must be resolved in favor of the statute since administrative agencies are creatures of statute."); *State v. Vannest*, No. 94 CA 1645, 1995 WL 761453, at *4 (Ohio App. 4th Dist. Dec. 15, 1995) ("Administrative agencies possess rule-making powers pursuant to a statutory delegation of power, and an administrative rule that is issued pursuant to statutory authority generally has the force of law.  If, however, the administrative rule conflicts with a statute concerning the same subject matter, the statute takes precedence over the rule.").

725.   DRC Defendants have incorporated into the Execution Protocol, explicitly or implicitly through their unwritten policies or practices, the Ohio state statutes and regulations including, but not limited to, those related to controlled substances, manufactured drugs, imported drugs, compounded drugs, adulterated or misbranded drugs, prescribing requirements, and the practice of pharmacy.

726.   DRC Defendants have incorporated into the Execution Protocol, as a matter of law under the federal Constitution's Supremacy Clause, federal statutes and regulations including, but not limited to, those related to controlled substances, manufactured drugs, imported drugs, compounded drugs, adulterated or misbranded drugs, and prescribing requirements.

727.    DRC Defendants have made concessions or representations that amount to unwritten or informal policies or practices incorporated into the Execution Protocol.

728.    One or more of the DRC Defendants have testified under oath that they consider the written execution protocol to be more akin to discretionary "guidelines" rather than binding, mandatory law, and that they believe the execution policy and written execution protocol gives Defendants discretion to deviate/vary from the policy and protocol's mandates to carry out an execution.

729.    On or about August 17, 2010, including in a sworn affidavit signed by the Director of DRC on or about August 20, 2010, the DRC Defendants made several commitments which they represented are part of their "informal" execution policy.  (*See Cooey*, ECF No. 817; *see also Cooey*, ECF No. 817-1, PageID 17564–65.)  Several of these commitments were sworn and filed on the record of this case.

730.    Among Defendants' informal execution policies are the following:

a)    Defendants will not commence any execution unless they have, on hand in the Death House at SOCF, at least 10 grams—*i.e.*, a full 5-gram dose and a full 5-gram back-up dose—of the lethal execution drug.

b)    If Defendants do not have 10 grams of the barbiturate for the single-drug execution method on hand in the Death House, Defendants will not commence an execution.

c)    Defendants will not transfer an inmate scheduled for execution to SOCF unless Defendants have 10 grams of the intravenously injected execution drug at SOCF.

d)    Defendants will not use imported execution drugs.

e) Defendants will not use any execution drug that is expired at the time of the scheduled execution, according to the expiration date stamped on the original manufacturer's packaging.

f) Defendants will use only execution drugs that are pure, unadulterated, unexpired, not compounded, and in the sealed, original manufacturer's packaging.

731. These informal policies contemplated thiopental sodium as the drug to be administered via IV injection, which Defendants used in the execution of Frank Spisak on February 17, 2011.

732. Defendants' policies that explicitly apply to thiopental sodium remain binding as to Defendants' inclusion of thiopental sodium in the 2016 Execution Protocol.

733. The concerns that underpinned Defendants' informal policies as to thiopental sodium apply with equal weight to the use of pentobarbital, midazolam, a paralytic drug, potassium chloride, or any other execution drug(s) Defendants may contemplate.

734. DRC Defendants previously testified under oath and assured this Court that they would not use compounded execution drugs.

735. DRC Defendants have testified under oath and assured this Court that they would not use imported execution drugs.

736. DRC Defendants have previously testified under oath and assured this Court that they would not use expired execution drugs, and that they would not use expired execution drugs that have been given an extended expiration date.

737.    The Director of DRC has testified under oath that Defendants would not use expired or imported execution drugs for an execution, and this Court has held that Defendants are bound by that testimony.

738.    Using expired execution drugs or drugs that are past their use-by date or which have been given an extended expiration date creates a substantial risk of serious harm to Plaintiff, because there is a substantial risk that such drugs are contaminated, adulterated, not of the correct identity, super- or sub-potent, or in myriad other ways not identical to non-expired execution drugs.  And that, in turn, creates a substantial risk of serious harm to Plaintiff, including serious physical and/or mental or psychological pain and suffering, a lingering death, a spectacle execution that is not dignified, and other risks that are objectively intolerable but which Defendants ignore.

739.    There is substantial overlap and correlation between Core Element # 2, which establishes that "the drugs required by this policy shall be used," and the federal and Ohio state statutes and regulations related to controlled substances, manufactured drugs, imported drugs, compounded drugs, adulterated or misbranded drugs, prescribing requirements, and the practice of pharmacy, medicine and/or nursing, as those federal and state statutes and regulations tightly regulate, and/or control access to, the very drugs Defendants intend to use in the Execution Protocol, such that those federal and state

administrative regulations and statutes are implicitly incorporated into Core Element # 2.

740.     There is substantial overlap and correlation between Core Element # 1 which establishes that "three Medical Team Members, two of whom are authorized to administer drugs under Ohio law, shall be used in the conduct of court-ordered executions," and the federal and Ohio state statutes and regulations related to controlled substances, manufactured drugs, imported drugs, compounded drugs, adulterated or misbranded drugs, prescribing requirements, and the practice of pharmacy, as those federal and state statutes and regulations tightly regulate, and/or control access to, and the authorization to administer, the very drugs Defendants intend to use in the Execution Protocol, such that those federal and state administrative regulations and statutes are implicitly incorporated into Core Element # 1.

741.     There is substantial overlap and correlation between Core Element # 3, which establishes that "[f]unctions required to be performed by medically-qualified persons, as described in this policy, shall be performed by Medical Team Members," and the federal and Ohio state statutes and regulations related to controlled substances, manufactured drugs, imported drugs, compounded drugs, adulterated or misbranded drugs, prescribing requirements, and the practice of pharmacy, medicine and/or nursing, as those federal and

178

state statutes and regulations tightly regulate, and/or control access to, the very drugs Defendants intend to use in the Execution Protocol, and thus who can be considered "medically qualified" under those laws and as to which functions, such that those federal and state administrative regulations and statutes are implicitly incorporated into Core Element # 3.

742.  On or about September 18, 2015, Defendants represented to the Court that Defendants have not, and will not, illegally obtain execution drugs, thereby implicitly incorporating into the Execution Protocol, by concession or representation that amounts to an unwritten or informal policy or practice, all federal and state administrative regulations and statutes related to controlled substances, manufactured drugs, imported drugs, compounded drugs, adulterated or misbranded drugs, prescribing requirements, and the practice of pharmacy, medicine, and/or nursing, as those federal and state statutes and regulations tightly regulate, and/or control access to, the very drugs Defendants intend to use in the Execution Protocol.

743.  On or about September 18, 2015, Defendants represented to the Court that Defendants have not, and will not, illegally obtain execution drugs, thereby implicitly incorporating into the Execution Protocol, by concession or representation that amounts to an unwritten or informal policy or practice, all federal and state

administrative regulations and statutes that are overlapping with the Execution Protocol by virtue of regulating or otherwise controlling matters related to controlled substances, manufactured drugs, imported drugs, compounded drugs, adulterated or misbranded drugs, prescribing requirements, and the practice of pharmacy, medicine, and/or nursing, as those federal and state statutes and regulations tightly regulate, and/or control access to, the very drugs Defendants intend to use in the Execution Protocol.

744. Also among Defendants' informal execution policies that are implicitly incorporated into the Execution Protocol are the following provisions concerning Defendants' possession of a sufficient quantity of the intravenously injected execution drug. Notably, these provisions are related, but they are discrete provisions with different requirements:

g) A "notice" provision stating that DRC Defendants "will provide notice to a condemned inmate's counsel and Plaintiffs' counsel (if different) within a reasonable time period (no less than 5 days) before an execution if [DRC] does not have in its possession at least 10 grams of thiopental sodium at that time," (*Cooey*, ECF No. 817-1, PageID 17564–65); and

h) A "reprieve" provision stating that "[c]oncurrent with such notice to counsel, [DRC Defendants] will also immediately seek a reprieve from the Governor related to that condemned inmate's execution," (*id.* at PageID 17565).

745.     Also among Defendants' informal execution policies implicitly

incorporated into the Execution Protocol are the following provisions

related to any intent or action by DRC Defendants to change their

written execution protocol.  Notably, these provisions are related, but

they are discrete provisions with different requirements:

i)      A "notice" provision stating that DRC Defendants "will provide
notice to the Court, to a condemned inmate's counsel and to
Plaintiffs' counsel (if different) within a reasonable time period
(no less than 30 days) before an execution if [DRC] intends to
change the written execution policy, ODRC Policy 01-COM-11,"
(*Cooey*, ECF No. 817-1, PageID 17565), and;

j)      A "reprieve" provision stating that "[c]oncurrent with such
notice to counsel, [DRC Defendants] will seek a reprieve from
the Governor related to that condemned inmate's execution,
*provided that* the execution is scheduled to take place less than
thirty days *from the effective date* of the change in policy," (*id.*
(emphases added)).

746.     Also among Defendants' information execution policies implicitly

incorporated into the Execution Protocol are the November, 2009

sworn representations to this Court, the Sixth Circuit, the public and

Plaintiffs that Defendants would no longer use a paralytic drug or

potassium chloride as part of a lethal injection execution method.

747.     On or about March, 2012, DRC Defendants testified that they had

implemented Incident Command Systems as part of the execution

policy.  Accordingly, the processes, procedures and other

requirements of ICS are implicitly incorporated into Defendants'

Execution Protocol.

748.    The 2016 Execution Protocol allows "the Medical Team" the unfettered, unguided discretion to determine, at any time, which execution method will be used for any given inmate, by granting "the Medical Team" the unfettered, unguided discretion to determine, at any time, whether "available" execution drugs are "unusable."

749.    The Execution Protocol does not contain any substantive or procedural provisions by which execution drugs will be deemed "available," or "useable."

750.    The Execution Protocol contains no substantive or procedural provisions by which "the Medical Team" will reach its decisions, such as how many Medical Team members must make the decision, whether the decision must be unanimous or something else, whether any such decision may be unilateral by a single member of the Medical Team, or anything else.

751.    The Execution Protocol does not actually require that Defendants notify the condemned inmate of how he or she will be executed, since that determination can be made "at any time" by some unknown number of the Medical Team using an unknown, undefined decisional process.

752.    Defendants fail to conduct the evaluations required under the Execution Protocol sufficiently to ensure against the substantial risk of harm created by the intravenous administration of any of the drugs in the Execution Protocol.

182

753.   Defendants represented to this Court that they have not, and will not, illegally obtain execution drugs, but Defendants' purported adherence to that informal policy is undermined by, for example, recent evidence that Defendants took concrete steps to obtain imported execution drugs that Defendants knew or should have known are illegal to import.

754.   Defendants have demonstrated that they will alter their positions as related to execution drugs as Defendants deem necessary to carry out an execution.

755.   In light of Defendants' history of changing their positions on execution drugs that may be used for an execution, along with their previous refusal or failure to destroy or otherwise divest themselves of the expired execution drugs in their possession, and their simultaneous insistence that they will not and have not illegally obtained execution drugs when the available evidence suggests intentions otherwise, there is a substantial risk that Defendants, finding it difficult or impossible to carry out an execution using only non-imported, legally obtained and legally dispensed, distributed and administered execution drugs that are not expired and not past their use-by date, will resort to using drugs that are illegally obtained, dispensed, distributed or administered or expired or past their use-by date, despite previous sworn testimony and assurances to this Court.

756.    The changes to Defendants' execution protocol from the time that lethal-injection was first adopted as an execution method in Ohio increase the risks of harm associated with the protocol and Defendants' application of the execution protocol to Plaintiff.

757.    Recent revisions to the Ohio Revised Code, § 2949.221–222, that were specifically sought by Defendants and signed into law by Defendant Kasich significantly reduce, if not entirely eliminate, the procedural protections the Execution Protocol allegedly provides, by attempting to hide from disclosure (and thus any meaningful oversight) a wide variety of factual information related to Defendants and the administration of the Execution Protocol.

758.    When information was previously uncovered about DRC Defendants and their actions related to executions, troubling constitutional violations were revealed.  Defendants claim to strictly adhere to the Execution Protocol and to follow the law in carrying out executions, but only through meaningful independent oversight can that claim be assessed.  By drawing a cloak of secrecy over virtually everything related to executions, Defendants substantially increase the significant and demonstrated risk of unconstitutional and illegal activity in which Defendants engage related to executions.

**M.** **Defendants deviate or vary from the mandates of their written Execution Protocol, consistently fail to follow their informal execution policies, and falsify official documents and records.**

759. Defendants' actions involving execution drugs to be used under the Execution Protocol are "institutional policy" and "systemic practices" applicable to all Defendants; they are not merely individualized misconduct of poor employees or agents that cannot be fairly attributable to Defendants. *See In re: Ohio Execution Protocol Litig. (Phillips)*, No. 2:11-cv-1016, 2013 WL 5963150, 2013 U.S. Dist. LEXIS 159680, *82–84 (S.D. Ohio Nov. 7, 2013).

760. Accordingly, a violation of federal or Ohio state statutes and regulations, by or under the direction of any of the Defendants, related to Defendants' actions regarding execution drugs is a violation of Core Element # 2 that is attributable to all Defendants.

761. DRC Defendants deviate from Core Element # 2 by injecting the inmate with execution drugs that are not the dosage required to be used by the Execution Protocol.

762. For instance, it is substantially likely that Dennis McGuire was injected with drugs in the amount and concentration that were less than that required by 01-COM-11.

185

763. Defendants deviate from Core Element # 2 by using any of the drugs in the Execution Protocol as an execution drug, because there is no pending IND Application to use thiopental sodium, pentobarbital, midazolam, the paralytic drug, or potassium chloride as an execution drug submitted to FDA by any Defendants, and thus using any of those drugs violates the federal prohibition on using unapproved new drugs without a pending Investigational New Drug Application.

764. Defendants deviate from Core Element # 2 by using imported execution drugs, because DRC Defendants have previously conceded as part of an unwritten or informal policy or practice incorporated into the Execution Protocol that they will not use imported execution drugs as part of their execution protocol.

765. Defendants deviate from Core Element # 2 by using imported thiopental sodium as an execution drug, because thiopental sodium is not a drug approved by the federal FDA and therefore it may not be legally imported into the United States.

766. Defendants deviate from Core Element # 2 by using imported pentobarbital as an execution drug to the extent that Defendants do not possess a valid registration with DEA to import pentobarbital.

767.    Defendants deviate from Core Element # 2 by using imported execution drugs under the Execution Protocol, to the extent such execution drugs were manufactured overseas in a facility not registered with the FDA, because such drugs are considered "misbranded" and thus may not be legally imported into the United States.

768.    Defendants deviate from Core Element # 2 by using imported execution drugs under the Execution Protocol, to the extent that the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current Good Manufacturing Practices; such finished drug product would be considered adulterated under federal law, and therefore may not permissibly be manufactured, sold, delivered, or held or offered for sale under federal law.

769.    Defendants deviate from Core Element # 2 by using imported execution drugs under the Execution Protocol to the extent that the finished drug product's strength differs from, or its quality or purity falls below, applicable standards established in the United States Pharmacopeia and the national formulary; such finished drug product would be considered adulterated under federal and Ohio state law, and therefore may not permissibly be manufactured, sold, delivered, or held or offered for sale under federal and Ohio state law.

770.    Defendants deviate from Core Element # 2 by using compounded pentobarbital or compounded thiopental sodium or compounded midazolam as an execution drug, because none of those drugs may be permissibly compounded without a valid prescription, and obtaining a valid prescription for using controlled substances such as each of those three drugs in an execution is impossible under federal and Ohio law.  A prerequisite for a prescription for a controlled substance to be valid under federal law is that the order must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.  An order purporting to be a prescription that was not issued in the usual course of professional treatment or in legitimate and authorized research is not a valid prescription under federal law.  And under Ohio law, a prescription, to be valid, must also be issued for a legitimate medical purpose by an individual prescriber acting in the usual course of his/her professional practice.  An order purporting to be a prescription issued not in the usual course of bona fide treatment of a patient is not a valid prescription under Ohio law.

771.    Defendants deviate from Core Element # 2 by using adulterated thiopental sodium as an execution drug, because DRC Defendants have conceded as part of an unwritten or informal policy or practice incorporated into the Execution Protocol that they will not use adulterated thiopental sodium as part of their execution protocol.

772.    Defendants deviate from Core Element # 2 by using compounded pentobarbital or compounded thiopental sodium or compounded midazolam as an execution drug to the extent that the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current Good Manufacturing Practices; such finished drug product would be considered adulterated under federal law, and therefore may not permissibly be manufactured, sold, delivered, or held or offered for sale under federal law.

773.    Defendants deviate from Core Element # 2 by using compounded pentobarbital or compounded thiopental sodium or compounded midazolam as an execution drug to the extent that the finished drug product's strength differs from, or its quality or purity falls below, certain standards established in the United States Pharmacopeia and the national formulary; such finished drug product would be considered adulterated under federal and Ohio state law, and therefore may not permissibly be manufactured, sold, delivered, or held or offered for sale under federal and Ohio state law.

774.    Defendants deviate from Core Element # 2 by using compounded pentobarbital or compounded thiopental sodium or compounded midazolam as an execution drug, because each of those compounded drug products would be considered dangerous to health or health-

189

endangering when used as "prescribed" to execute Plaintiff, and therefore characterized as "misbranded" under federal law and Ohio law, and therefore may not permissibly be manufactured, sold, delivered, or held or offered for sale under federal and Ohio state law.

775. Defendants deviate from Core Element # 2 by using compounded pentobarbital or compounded thiopental sodium or compounded midazolam as an execution drug if it is compounded by a so-called 503A Compounding Pharmacist; under federal and Ohio state law, a 503A Compounding Pharmacy may only compound or dispense a compounded product pursuant to a valid prescription order or a notation on a valid prescription order that a compounded product is necessary for the identified patient.  Because a drug used to kill Plaintiff can never be said to be "necessary" for him under the law, a 503A Compounding Pharmacist would not have a legitimate prescription or notation from a prescribing practitioner of the necessity for a compounded drug, and thus could not prepare and dispense drugs to be used for a lethal-injection execution while remaining in compliance with federal and Ohio state law.

776. Defendants deviate from Core Element # 2 by using compounded pentobarbital or compounded midazolam as an execution drug if it is compounded by a so-called 503B Outsourcing Facility; a 503B Outsourcing Facility is prohibited from producing drug products that are "essentially a copy of an approved drug," such as pentobarbital and midazolam.

777. Defendants deviate from Core Element # 2 by using expired execution drugs, including drugs that are past their "beyond-use" date, because DRC Defendants have conceded as part of an unwritten or informal policy or practice incorporated into the Execution Protocol that they will not use expired execution drugs as part of their Execution Protocol.

778. Defendants deviate from Core Element # 2 by using non-sterile, impure, contaminated, adulterated, misbranded or illegally obtained execution drugs because the Execution Protocol does not allow for use of non-sterile, impure, contaminated, adulterated, misbranded or illegally obtained execution drugs.

779. Defendants deviate from Core Element # 2 by using adulterated execution drugs because DRC Defendants have conceded that they will not use adulterated execution drugs.

780. Defendants deviate from Core Element # 2 by using compounded drugs that have not been compounded in full compliance with USP <797>, and therefore are compounded in violation of Ohio law, including the requirements for analytical testing of purity, sterility, the presence of pyrogens and other potential contaminants, and other prophylactic measures that make strict compliance with USP <797> so demanding.

781. Defendants deviate from Core Element # 2 by using execution drugs that are not the exact type of drug, in the quantities mandated in the written protocol and in the concentrations as those drugs are manufactured in the FDA-approved form, because the written protocol does not allow for use of any execution drugs other than the specific type of drug in the specific quantities and concentrations mandated in the Execution Protocol.

782. Defendants deviate from Core Element # 2 by using execution drugs with an improper pH and/or any other defining characteristic of the drug found in the official U.S. Pharmacopeia Monograph for the drug, because DRC Defendants have conceded that "the applicable USP/NF monograph" is the appropriate standard for execution drugs used as part of the execution protocol.

783. Defendants deviate from Core Element # 2 by using the paralytic drug, because DRC Defendants represented in November 2009 to the public, and under oath to this Court, the Sixth Circuit, and the Plaintiffs, that they would no longer use the drug as part of their Execution Protocol.

784. Defendants deviate from Core Element # 2 by using potassium chloride, because DRC Defendants represented in November 2009 to the public, and under oath to this Court, the Sixth Circuit, and the Plaintiffs, that they would no longer use the drug as part of their Execution Protocol.

785. Defendants deviate from Core Element # 2 on every occasion when they carry out an execution that is experimental or that includes the use of experimental or unapproved drugs on an inmate, or otherwise engage in actions to administer the Execution Protocol that violate DRC policies such as 68-MED-11 and its associated protocols, 06-RES-01, or 06-RES-02, because those DRC policies are implicitly incorporated into the Execution Protocol.

786. For all of the reasons identified above by which Defendants deviate from Core Element # 2, they also deviate from Core Elements # 1 and # 3.

787.    This is because Core Elements # 1 and # 3 require that Medical Team Members who administer the drugs to Plaintiff for his execution must "be authorized to administer drugs under Ohio law," and, with respect to the "functions" such Medical Team Members are required to perform, they must be "medically-qualified persons."

788.    Any authorization any such Medical Team Members may possess to "administer drugs under Ohio law" includes, as a minimum requirement, express or implied, that their administration of such drugs not be in violation of Ohio law or federal law.  None of the Medical Team Members does or can meet that requirement if and to the extent any of the deviations identified above with respect to Core Element # 2 exist for any particular execution.  Each of the Medical Team Members exceeds, and therefore violates, his/her authorization to administer drugs under Ohio law in the circumstance of any execution in which any of the deviations identified above with respect to Core Element # 2 exist.

789.    Similarly, any qualifications any of the Medical Team Members may possess to perform the medical functions they are required to perform in an execution under the Execution Protocol include, as a minimum qualification, express or implied, that their performance of their medical functions complies with all governing and applicable laws and regulations, including the applicable ethics standards and applicable professional standards of practice.  When the performance of a

medical function under the Execution Protocol violates federal and/or Ohio law or applicable ethics or professional practice standards, there is no Medical Team Member who is "medically-qualified" to perform that function. The performance by a Medical Team Member of a medical function under the Execution Protocol, where the performance of that function is in violation of federal and/or Ohio law or applicable ethics or professional practice standards, is a medical function that no Medical Team Member is medically-qualified to perform. No Medical Team Member is medically-qualified to perform any medical function whose performance involves any of the deviations identified above with respect to Core Element # 2.

790. DRC Defendants deviate from Core Element # 5 on every occasion when they prematurely take actions under 01-COM-11 that are not supposed to occur until death has occurred, and when they fail to take actions required to be done until the prisoner is dead, and there is no record of the Director's written authorization to engage in such deviations.

791.    For example, it is substantially likely that Dennis McGuire was still clinically and statutorily alive when DRC Defendants took actions under 01-COM-11 to declare him dead, and when they took other actions that followed.  DRC Defendants acted to close the curtain to the Death Chamber and to evaluate McGuire by the "appropriate medical professional" to "confirm death" before "the completion of the process."

792.    DRC Defendants likewise acted before "a sufficient time for death to have occurred" when they closed the curtain ten minutes after injection, and when they took subsequent actions as to Dennis McGuire.

793.    Each of those actions was a deviation from 01-COM-11.

794.    There is no evidence that the Director authorized any deviation during the McGuire execution in any way, and certainly no evidence that the Director authorized those deviations in writing.

795.    DRC Defendants consistently and regularly deviate or vary from their execution policy and written protocol in numerous ways, big and small, such that DRC Defendants have a long-standing pattern of deviations and/or variations from their execution policy and written execution protocol.

796.  DRC Defendants' pattern of deviations and/or variations continues to this day. Ohio has a lengthy execution schedule. Each execution process presents yet another opportunity for Defendants to deviate from their Execution Protocol.

797.  The record in this case is replete with evidence of Defendants deviating or varying from the mandates of their written Execution Protocol and from their information execution policies. *See, e.g., Cooey v. Kasich (Kenneth Smith)*, 801 F. Supp. 2d 623, 625–52 (S.D. Ohio 2011), factual findings contained therein alleged here by reference; *In re Ohio Execution Protocol Litigation (Charles Lorraine)*, 840 F. Supp. 2d 1044, 1055–59 (S.D. Ohio 2012) (same); Amended Omnibus Compl., ECF No. 158, ¶728–790, allegations incorporated here by reference.

798.  This includes deviations from core requirements of the written Execution Protocol, as well as deviations which were core deviations because they were unauthorized deviations from non-core elements of the written Execution Protocol.

799.  By these deviations and/or variations, Defendants ignore and/or recklessly disregard their execution policy's and written Execution Protocol's requirements.

800.  Defendants' pattern of deviations and/or variations from their execution policy and written Execution Protocol means that Defendants will arbitrarily and irrationally administer their execution

197

policy and written Execution Protocol differently each time they execute an inmate.

801.    There are no legitimate governmental or penological reasons for these deviations and/or variations.

802.    Defendants' deviations and/or variations are not necessary to achieve a compelling governmental interest.

803.    DRC Defendants rely on ICS to immunize their execution method from constitutional challenge.

804.    But DRC Defendants do not strictly comply with the tasks and requirements established by their use of ICS as part of the execution policy.

805.    The veracity of the documents and records DRC Defendants create that purport to demonstrate strict compliance with the written Execution Protocol and informal execution policies is undermined by evidence of falsification of official records and documents, and by official records and documents that do not accurately reflect the proceedings that occurred or that seek to sanitize such proceedings.

806.    This includes the falsification and/or sanitization and/or incomplete character of official records and documents related to significant events involving inmates in DRC Defendants' control and subject to DRC Defendants' procedures.

807.    DRC Defendants or their agents falsified official records and documents following the suicide of former Plaintiff Billy Slagle during

the "First Operational Period" of DRC Defendants' administration of 01-COM-11 to Slagle.

808. Following Slagle's suicide, DRC Defendants claimed to have previously had in place a policy to facilitate attorney-client communication and access at all times, when no such policy existed at that time.

809. The official After-Action Review and other related documentation produced in accordance with DRC Defendants' alleged implementation of ICS for administering 01-COM-11 to Slagle contains falsehoods and misrepresentations.

810. Upon information and belief, the evidence of actions DRC Defendants took related to Slagle's suicide does not comport with the actions required under the relevant ICS documentation.

811. Official records and documents were falsified following the suicide of inmate Ariel Castro while in custody and control of DRC.

812. Spurious allegations about Castro—which might have placed the DRC Defendants and their agents in a better light—were included in an official report that had no basis in fact.

813. Investigators conducting the "investigation" into matters related to the execution of Dennis McGuire were not independent investigators at all, but rather two attorneys from the same division of the Ohio Attorney General's Office that represents DRC Defendants in this litigation.

814.    Yet the public impression DRC Defendants purposely conveyed was that the investigation was an independent investigation.

815.    The investigators entire "investigation" regarding the McGuire execution consisted of interviewing DRC employees (who, by the virtue of their employment as Defendants in this litigation and/or as DRC employees had a vested interest in minimizing the official account of what happened during that execution) and asking leading questions about what those employees witnessed.

816.    Upon information and belief, the "investigators" interviewed no independent witnesses of the McGuire execution as part of the "investigation," nor did "investigators" interview any of the witnesses present on behalf of McGuire.

817.    Nevertheless, the April 28, 2014 After-Action Review and Executive Summary related to the execution of McGuire strongly and repeatedly implies that investigators interviewed witnesses other than DRC employees.

818.    The same report significantly downplays the description of what occurred in the Death Chamber during the execution of McGuire.

819.    The same report implies that DRC Defendants and/or their counsel and/or the "investigators" from the Attorney General's Office corresponded and consulted with Dr. Dershwitz to reach their findings and recommendations.  But that is not true.

820.    DRC Defendants and/or their agents wrongly and misleadingly suggested that Dr. David Waisel "recommended" an execution method, and that DRC Defendants adopted their 2014 Execution Protocol based on that purported "recommendation," but Dr. Waisel emphatically did NOT in any way offer any recommendation, endorsement, suggestion, or anything else as to Defendants' new execution protocol.

821.    The Execution Timeline log that purportedly contains all significant events that took place during McGuire's execution lacks any entry describing the horrific spectacle that unfolded in the Death Chamber following injection of the execution drugs.

822.    The ICS documents created related to the McGuire execution falsely give the impression that there was nothing out of the ordinary that occurred during that execution.

## N. Allegations related to Plaintiff's individual characteristics.

823.    Upon information and belief, Plaintiff's individual physical characteristics and conditions indicate that employing Plan 1 of DRC Defendants' Execution Protocol to execute him will subject him to a substantial risk of serious harm, such as physical and/or psychological pain, an undignified, lingering, and/or spectacle execution or attempted execution, that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants ignore.

824.    Upon information and belief, Plaintiff's individual physical
characteristics and conditions indicate that employing Plan 2 of DRC
Defendants' Execution Protocol to execute him will subject him to a
substantial risk of serious harm, such as physical and/or
psychological pain, an undignified, lingering, and/or spectacle
execution or attempted execution, that is arbitrary and capricious, or
an objectively intolerable risk of such harm that Defendants ignore.

825.    Upon information and belief, Plaintiff's individual physical
characteristics and conditions indicate that employing Plan 3 of DRC
Defendants' Execution Protocol to execute him will subject him to a
substantial risk of serious harm, such as physical and/or
psychological pain, an undignified, lingering, and/or spectacle
execution or attempted execution, that is arbitrary and capricious, or
an objectively intolerable risk of such harm that Defendants ignore.

826.    Upon information and belief, Plaintiff has physical characteristics that
will increase the difficulty of achieving peripheral IV access on
Plaintiff, and/or will result in unique adverse reactions to the
injection of the execution drug(s) into him, therefore increasing the
substantial risk of serious harm to which he will be subjected during
any attempt by Defendants to execute him using their lethal-injection
Execution Protocol.

827.    Plaintiff's individual physical characteristics increase the risk that he
will experience a substantial risk of serious harms of the type alleged

throughout his Complaint if subjected to execution via DRC Defendants' Execution Protocol.  Upon information and belief, these physical characteristics include, but are not limited to, sarcoidosis, an inflammatory disease.  Sarcoidosis has impaired Plaintiff's lungs and respiratory tract.  Plaintiff also has a history of head trauma, psychiatric disorder, impulsive behaviors, alcohol and drug abuse, and a recent history of heart disease, lung cancer, thyroid cancer, prostate cancer, broken hip, and MRSA.  Plaintiff may have damage to his liver, which could result in the execution drugs being metabolized in an irregular manner.

828.    Plaintiff is a male over the age of 50, which puts Plaintiff at a greater risk of suffering the phenomenon of air hunger after being injected with the execution drugs.

829.    Upon information and belief, Plaintiff's current physical characteristics indicate that achieving peripheral IV access on him will subject him to a substantial risk of serious harm.  These physical characteristics include, but are not limited to, Plaintiff's history of hospitalization requiring IV treatment and/or other factors that will affect accessibility of his veins and/or muscle tissue or the viability of his veins to support an IV catheter.

830.    Plaintiff's individual mental/psychological characteristics may increase the risk that he will experience a substantial risk of serious

203

harms of the type alleged throughout his Complaint if subjected to execution via DRC Defendants' Execution Protocol.

831.  Moreover, Plaintiff may develop or may currently have additional physical and/or psychological characteristics increasing the substantial risk of serious harm caused by Defendants' Execution Protocol before his execution date.

832.  Defendants' execution policy, including the written Execution Protocol, fails to account for any unique physical characteristics of Plaintiff that may affect the efficacy of or the risk of harm caused by Defendants' Execution Protocol.

833.  Defendants' execution policy, including the written Execution Protocol, fails to account for any unique psychological/mental characteristics of Plaintiff that may affect the efficacy of or the risk of harm caused by Defendants' Execution Protocol.

834.  Upon information and belief, in addition to failing to account for the individual physical characteristics of inmates in the execution policy, including the written Execution Protocol, DRC Defendants have failed to properly prepare or train for any of the unique challenges Plaintiff's physical characteristics may present while carrying out an execution.

835.  Because Defendants do not account for any individual physical characteristics Plaintiff currently possesses or may develop before his scheduled execution date, his already substantial risk of serious harm will be greatly increased.

**O.** **Allegations involving examples of specific, relevant executions or execution attempts.**

**Unidentified execution in or about 2004**

836.    Former SOCF Warden James Haviland has testified in this case about an execution in which he participated when the three-drug method was used but problems developed.

837.    Haviland was standing next to the inmate (whose name he did not recall), as was his job as the warden at that time.  Team Member # 18 was administering the drugs from the "equipment room," a distance of approximately 10–15 feet from the inmate.  Haviland saw the inmate's arm above the IV site start to "balloon up," but he did not know what that meant nor did he do anything about it until after the execution when he raised the issue with Team Member # 18.

838.    Team Member # 18 told Haviland that he had felt pressure during the administration of the drugs so he decided to switch lines midstream. (Haviland Depo at 59-65, 78, 210; TM#18 Depo at 302-15.)

839.    That meant that some or all of the drugs administered in that first line never reached the inmate's circulatory system, and, thus, did not induce the level of anesthesia required.  As a result, when the rest of the drugs were "pushed" by TM #18 into the second line, the inmate experienced the painful drugs without sufficient, or possibly any, protection from the pain.

840.　　The fact that the inmate did not express pain was <u>not</u> because he did not feel pain, but, instead, because he was paralyzed and was unable to effectively communicate his internal distress.

**Wilford Berry**

841.　　DRC Defendants executed Wilford Berry on February 19, 1999 using a three-drug method.

842.　　Despite applying Incident Command Systems principles as a part of their execution policy at the time, Defendants failed to strictly adhere to execution policy and the written execution protocol during the execution.

843.　　Upon information and belief, the members of Berry's execution team could not locate a vein for the IV line, so they resorted to violently beating his arms in order to raise a vein adequate to acquire an IV site for the transmission of the lethal drugs into his body.

**Joseph Clark**

844.　　DRC Defendants executed Clark on May 2, 2006 using a three-drug method.

845.　　During the execution, Defendants failed to administer the required, and critical, full dose of two grams of sodium thiopental via peripheral IV injection before injecting the paralytic drug and potassium chloride.

846.   Execution team members were only able to establish and maintain one IV line.  Despite the protocol's requirement to establish two working IV sites, Defendants decided to start the execution anyway.

847.   Some amount of time after the drugs started flowing into the IV tubing, Clark raised his head and upper body off the table several times and said, "It don't work. It don't work."  According to media witnesses, Clark repeated this statement five times during his execution.

848.   The media who were present also reported that "[m]edical technicians returned and the curtain was closed at 10:37 a.m., blocking the view of authorized witnesses, who later heard what they described as 'moaning, crying out and guttural noises.'"  Alan Johnson, *'It don't work,' inmate says during botched execution*, COLUMBUS DISPATCH (May 3, 2006).

849.   It took more than 90 minutes for a new viable IV site to be established.  During that time, Clark moaned and suffered.  He was poked and stuck with needles at least 17 or 18 times, including in his neck and head.

850.   DRC Defendants eventually established an IV in one of Clark's arms only after one of the non-medical (security) team members, a former semi-pro football player, used his bare hands to squeeze Clark's arm so tightly that a vein popped out in Clark's right forearm.  An execution team member "stuck" that vein, and that site was then used as the sole site for the continued execution.

851.  The Execution Team was prepared to go until midnight if necessary, poking and sticking Clark, as former DRC Director Collins acknowledged.

852.  The Drug Administrator for the Clark execution saw no problem with the course of action DRC Defendants took during the Clark execution.

853.  The written protocol in effect at that time required peripheral IV injection of two grams of sodium thiopental, divided into two syringes, to ensure the inmate was properly made "unconscious" before administration of the second (pancuronium bromide) and third (potassium chloride) drugs.

854.  But DRC Defendants had dispensed the Clark execution drugs from the DRC pharmacy to an unknown person on May 1, 2006, the day *before* Clark's execution, despite the written protocol's clear mandate that the execution drugs were to be dispensed to Execution Team Members only on the day of the execution.[15]  And DRC Defendants had obtained only a total of two grams of sodium thiopental in advance of the Clark execution, contrary to the written execution protocol which required them to order a sufficient quantity of the

---

[15] This deviation or variation also occurred for several other executions, including at least one execution in which the lethal drugs were dispensed at least two days before the execution date.

execution drugs as a contingency against contamination or inadvertent loss of any of the drugs.[16]

855.    DRC Defendants injected two full syringes—with one gram in each syringe—into the bad IV line.  This means that the drugs were not injected into Clark's peripheral veins as required by the written Execution Protocol.

856.    There were no further supplies of sodium thiopental in the Equipment Room.  Only one additional gram of sodium thiopental was dispensed from the SOCF pharmacy for use in Clark's execution after the first IV site failed.  Because of DRC Defendants' failures regarding the first peripheral IV administration site, and because they improperly started the execution with only two grams of sodium thiopental total, and used only three grams total, it was impossible for DRC Defendants to administer to Clark a full two grams via peripheral IV injection before they administered drugs two and three.

857.    Thus it is extremely likely that Clark was not properly rendered unconscious, unaware and insensate before he was subjected to injections of pancuronium bromide and potassium chloride, in turn subjecting Clark to excruciating, torturous pain during his execution

---

[16] Defendants similarly deviated  or varied with at least twenty-three other executions, including but not limited to executions of inmates Getsy, Keene, Fautenberry, Bryant-Bey, Cooey, Newton, Filiaggi, Lundgren, Wilson, Ferguson, Barton, Benner, Hicks, Willie Williams, Ashworth, William Smith, Dennis, Mink, Vrabel, Zuern, Wickline, Roe, and Lewis Williams.

### Christopher Newton

858.    DRC Defendants executed Newton on May 24, 2007, using a three-
        drug method.

859.    It took approximately twenty-two minutes to insert the first IV into
        Newton's arm.

860.    It took approximately one hour and fifteen minutes to place the
        second IV.

861.    Placing the IVs took so long that Newton had to take a short
        bathroom break.

862.    Upon information and belief, the drug administration to Newton was
        not in accordance with the written Execution Protocol because of the
        faulty IV lines, but his pain and suffering was masked by the
        paralytic drug.

### Daniel Wilson

863.    DRC Defendants executed Daniel Wilson on June 3, 2009 using a
        three-drug method.

864.    Despite the mandate in the then-applicable May 14, 2009 written
        protocol that required assessment of the inmate's veins on the
        morning of the scheduled execution, DRC Defendants failed to
        conduct the required assessment of Wilson's veins the morning of
        the execution.

### Marvallous Keene

865.    DRC Defendants executed Keene on July 21, 2009 using a three-drug method.

866.    The written protocol effective at the time explicitly required two functional IV sites at the start and during an execution, along with the related requirement that if one IV site became compromised, the execution must be stopped, if only to assess the situation.

867.    TM # 17 was the "executioner" and TM # 21 was the back-up executioner, and the observer on hand in the Equipment Room with TM # 17 for Keene's execution.  Those two individuals are still listed as the Drug Administrators for the Execution Team.  Upon information and belief, TM # 17 and TM # 21 will be the Drug Administrators for Plaintiff's execution.

868.    Both individuals were aware of a problem with one IV bag and line during the Keene execution.  But they deviated or varied substantially from the written protocol when they chose to ignore the problem and forged ahead with the execution, rather than halting as the written protocol required.  Thus, it is likely that Keene also suffered the excruciating pain of being injected with the second and third drugs while still conscious, aware and able to experience that pain.

### Romell Broom

869.    DRC Defendants attempted to execute Romell Broom on September 15, 2009 using a three-drug method.

211

870.   Myriad deviations and/or variations from the written protocol during the Broom execution attempt, as Broom was subjected to torturous pain and suffering for over two hours.[17]

871.   DRC Defendants failed to conduct the mandatory venous access assessments on Broom, just as they failed to do in the Wilson execution.

872.   Defendants, including TM # 9, TM # 17, and TM # 21 (each of whom are still the primary Medical Team members and expected to be the primary Medical Team members for Plaintiff's execution), unsuccessfully attempted to insert IV lines in eighteen different spots on Broom's body, making approximately fifty needle insertions over the course of two hours.

873.   Defendants attempted to establish an operable IV by repeatedly inserting IV catheters into the crooks of both of Broom's elbows (the antecubital area), his left biceps, his left wrist, the base of his thumb on each hand, over the knuckles on the back of his right hand, the top of his left foot, and his right medial malleolus (ankle bone on the inside part of the ankle).

874.   During Defendants' repeated attempts to establish and/or sustain IV access in Broom, venous access was obtained on at least two different

---

[17] The facts surrounding the failed Broom execution attempt are thoroughly set out in the deposition testimony taken in the weeks following September 15, 2009.  (*See, e.g.*, *Cooey*, No. 2:04-cv-1156, ECF Nos. 580, 598, Broom Dep., Oct. 5, 2009, which is incorporated by reference here in full.)

occasions. Upon information and belief, at least one of those instances failed when execution team members mishandled the IV apparatus after establishing a successful IV hook-up, resulting in the IV catheter being yanked out of Broom's vein.

875. In at least one other instance, execution team members established but then lost venous access by virtue of their actions following successful IV catheter insertion.

876. Personnel involved in attempting to execute Broom included at least one physician, Dr. Carmelita Bautista. Dr. Bautista had never before been involved in an execution; she was not, and had never been, a member of the execution team, and she had never received any training in the execution protocol. Team Member # 9's reaction when Dr. Bautista entered the room is telling: "I look up and she's present [in the holding cell]. And I'm like, dear God, what is she doing here?"

877. Judge Frost wrote: "That is a question that requires an answer." *Cooey (Smith) v. Kasich*, 801 F. Supp. 2d 623, 650 (S.D. Ohio 2011).

878. At no time did DRC Defendants consider the pain and suffering that Broom was enduring as part of the discussion and factors for whether to halt the execution attempt. One Medical Team member testified that he was thinking about Broom's victim and the victim's family as he was repeatedly trying to obtain IV access.

879. After two hours of Defendants causing substantial, torturous physical and psychological pain to Broom, DRC Director Terry Collins

requested that Governor Ted Strickland grant a reprieve to postpone the execution process for one week.

880.  The only concern was for the execution team members' well-being, concern about generating future litigation, and concern about avoiding subsequent, more embarrassing problems if the execution continued and IV administration of the lethal drugs failed.

881.  Former Director Collins later testified that he did *not* recommend stopping Broom's execution out of concern for the physical and mental anguish that Broom was suffering.

882.  Instead, the decision was made based on three factors: (1) concern for the execution team; (2) Collins's belief, informed by discussions with the execution team members, that further attempts to gain venous access that day would be fruitless; and (3) Collins's concern that he would be "in a whole 'nother ballpark" of legal trouble if the team managed to establish two viable IV sites and started injecting the three drugs only to suffer yet another venous failure when they had no back-up plan.  (*See* T. Collins Depo. at 30-38, 60-72; E. Voorhies Depo. at 138.)

883.  Broom, during the course of this two-hour ordeal, requested to speak with his counsel on at least one occasion and perhaps more. Defendants denied these requests, citing their execution policy, and then denied counsel's request to speak with Broom.

884.    At least one member of Broom's execution team explicitly stated that he was looking forward to seeing the State execute another particular inmate.

**Vernon Smith, a.k.a., Abdullah Sharif Kaazim Mahdi**

885.    Defendants executed Vernon Smith, a.k.a. Abdullah Sharif Kaazim Mahdi, on January 7, 2010, using a one-drug method.

886.    On the day of Smith's execution, TM # 17 was in the hospital, so he could not and did not participate in the execution.

887.    Only TM's # 9, # 17, and # 21 were qualified under the written protocol at that time to be part of the IV insertion team.

888.    TM # 9's participation ceases after the IVs are established.

889.    TM # 9 is not qualified under Ohio law to administer intravenous and intramuscular injections.

890.    Only TM's # 17 and # 21 were qualified under the written protocol to take numerous other actions related to the execution drugs which are reserved for members of the "medical" team.

891.    These tasks explicitly require certain qualifications under Ohio law, and also require the participation by not one but *two* such qualified execution team members.

892.    These tasks include procuring, taking possession of, preparing, verifying, injecting and administering, and disposing of the execution drugs, as well as monitoring and documenting all of the above.

893.    The written protocol required (and still requires) participation of at least two individuals with certain qualifications under Ohio law for these critical responsibilities, but this was impossible during the Smith execution, due to TM # 17's absence.

894.    Defendants used TM # 9 in TM # 17's place.

895.    Defendants ignored the explicit mandates of their written execution protocol by executing Smith without a second individual with the necessary qualifications under the written protocol present in the Equipment Room to supervise or monitor the drug preparation, administration, and other related tasks,

896.    Defendants also ignored the explicit mandates of their written execution protocol by involving TM # 9 in TM # 17's stead to execute Smith, because TM # 9 is not qualified under Ohio law to carry out the tasks in question.

### Michael Beuke

897.    Defendants executed Michael Beuke on May 13, 2010, using a one-drug method.

898.    Approximately one month before the Beuke execution, TM #17 notified Defendants that he would be absent on the day of the execution, because he needed to attend a doctor's appointment.

899.    Defendants made no alternative arrangements to replace TM # 17 within the confines of the written protocol.

900.    Defendants did not change Beuke's execution date by way of a reprieve from the Governor.

901.    Instead, Defendants chose to use TM # 9 as a replacement for TM # 17 again, just as they did in the Vernon Smith execution.

902.    During the Beuke execution, therefore, Defendants engaged in all of the same or similar deviations or variations from the Vernon Smith execution recounted above.

### Dennis McGuire

903.    Defendants executed Dennis McGuire on January 16, 2014, using a two-drug method including midazolam.

904.    Defendants were warned on numerous occasions in advance of McGuire's execution of the substantial likelihood that McGuire's body habitus presented a substantial likelihood that McGuire would obstruct and suffocate if subjected to Defendants' execution protocol using midazolam.

905.    In advance of McGuire's execution, Defendants exchanged emails with various medical professionals about how the two-drug method with midazolam would work.  These emails and other documents revealed that Ohio was warned that these drugs could cause a prisoner to "gasp" and "hyperventilate" as he died, and that using these drugs to execute a person could end in "disaster," "a terrible, arduous, tormenting execution that is also an ugly visual and shameful spectacle," in part because, before losing consciousness, the patient

likely would be "subjected to the intoxicating effects of these drugs, which include hallucinations."  Ben Crair, *Exclusive Emails Show Ohio's Doubts About Lethal Injection*, NEW REPUBLIC, Aug. 17, 2014.[18]

906.    Despite additional and numerous warnings by McGuire's counsel and expert witness, the pre-execution physical assessments carried out pursuant to Defendants' execution protocol affirmatively stated that there were no problems that might affect the execution, and/or failed to note any possible problems that might affect the execution.

907.    Despite the warnings about the grave likelihood of problems that would arise during the McGuire execution if Defendants used midazolam and hydromorphone to kill McGuire, Defendant Mohr made public statements before the execution declaring to the effect that he was not worried and was confident there would be no problems at all.

908.    Despite significant warnings of impending problems with McGuire's execution, Defendants took no actions to have any kind of resuscitative measures on hand or in place in the Death House before they proceeded with the execution.

---

[18] Available at http://www.newrepublic.com/article/119068/exclusiveemails-reveal-states-worries-about-problematic-execution.

909.    Defendant Mohr and/or Defendant Gray explicitly confirmed just minutes before starting the execution of McGuire that Defendants had not put into place any kind of resuscitative measures and had no plan to do so for McGuire's execution.

910.    Approximately 26 minutes elapsed between the time when Defendants injected McGuire and when Defendant Warden Morgan declared the time of death.

911.    A death occurring over approximately 26 minutes is a lingering death.

912.    There is a substantial risk that McGuire remained clinically and statutorily alive at the time Defendant Warden Morgan declared him dead.

913.    There is a substantial risk that McGuire remained clinically alive for as long as 45 more minutes after the Warden announced a time of death.

914.    A death occurring over approximately 70 minutes is a lingering death.

915.    Even assuming that McGuire was clinically and statutorily dead at the time Defendant Warden Morgan declared him dead, McGuire suffered a lingering death as a result of Defendants' application of 01-COM-11.

916.    Descriptions of the scene in the death chamber during following Defendants' injection into McGuire of midazolam and hydromorphone characterized the scene as "ghastly," "disturbing," "inhumane," and horrendous as McGuire slowly suffocated to death while the

219

midazolam suppressed his respiratory response. As one witness described the scene: "he was fighting for breath, and I could see both of his fists were clenched the entire time. His gasps could be heard through the glass wall that separated us. Towards the end, the gasping faded into small puffs of his mouth. It was much like a fish lying along the shore puffing for that one gasp of air that would allow it to breathe." Lawrence Hummer, "*I witnessed Ohio's execution of Dennis McGuire. What I saw was inhumane,*" The Guardian (January 22, 2014).[19]

917.    Another witness described the scene as follows:

> Things appeared to be going as planned until about five minutes after the chemical cocktail began flowing into [McGuire's] veins. The state was using a two-drug combination that had never previously been used in the U.S. Suddenly, he began to gasp and appeared to choke. A minute later, he gasped so deeply that his stomach heaved up and down. It continued for nearly 15 minutes. McGuire clenched his fists repeatedly and several times appeared to try to rise up off the table, only to be prevented by the restraints on his chest and arms. His grown son and daughter looked on in horror, sobbing uncontrollably. The family members of Joy Stewart, the pregnant, 22-year-old victim, watched in stunned silence.

---

[19]Available at http://www.theguardian.com/commentisfree/2014/jan/22/ohio-mcguire-execution-untested-lethal-injection-inhumane.

220

Alan Johnson, *Dispatch reporter has watched twenty men die*,

COLUMBUS MONTHLY (August 2016 ed.).[20]

918.     McGuire's death was a spectacle, undignified, disgraceful execution as

a result of Defendants' 01-COM-11, as written and as applied to him.

919.     Despite these objective descriptions, Defendants' formal paperwork

related to the McGuire execution fails to acknowledge the spectacle

that unfolded in the death chamber.

920.     The "Timeline Log" that is supposed to document everything

significant that occurs during Defendants' execution process contains

no entries describing what occurred in the death chamber between

the time when the continuous flush of saline solution started at

10:28:28 and when Drug Administrator # 23 entered the death

chamber to "make an assessment" of McGuire at 10:48:47.

921.     The After-Action Review document completed on January 16, 2014

immediately following the McGuire execution included the question

"Were there acts or events that were identified in advance as

anticipated contingencies; if so, did those things occur?"  The official

answer in the January 16, 2014 After-Action Review was "No."

---

[20] Available at
http://www.columbusmonthly.com/content/stories/2016/08/these-eyes-have-watched-twenty-men-die.html.

922.     The January 16, 2014 After-Action Review included the following question: "Were there acts or events that were not anticipated in advance?"  Answer: "No."

923.     The January 16, 2014 After-Action Review included the following question: "How well did the process work?  Should changes to the process be considered?"  Answer: "The process worked very well and the execution was carried out in compliance with 01-COM-11."

924.     The "Executive Summary" completed on April 28, 2014 regarding McGuire execution asserts that McGuire's execution was "humane, dignified and [done in a] lawful manner."

925.     The Executive Summary allowed only that "[s]everal minutes after the administration of the[] drugs, McGuire appeared to be unconscious and exhibited some irregular movements in his abdomen and mouth," while subsequently reasserting that Defendants "remain[] confident in [their] belief that the McGuire execution was carried out consistent with DRC's policies and constitutional requirements."  There was no assessment of whether McGuire was conscious, aware and sensate while he slowly suffocated to death.

926.     The "After-Action Review" completed on April 28, 2014 also asserted that McGuire "was not conscious beginning a few minutes after the drugs were administered.  He did not experience pain, distress or air hunger after the drugs were administered or when the bodily movements and sounds occurred.  Therefore, his execution was

222

conducted in a constitutional manner consistent with the Policy." The "After-Action Review" provided no scientific basis for making the above assertions.

927.    Upon information and belief, the persons who conducted the "investigation" into the McGuire execution and declared that there were problems with it have previously been involved in defending this case or similar cases.

928.    Upon information and belief, the "investigators" spoke only with DRC employees, including some Defendants and Defendants' expert witness, Dr. Dershwitz, in the course of their "investigation." They did not speak to other third-party or otherwise objective eyewitnesses who had no incentive to whitewash the official version of the McGuire execution.

929.    McGuire's execution was the first in a series of high-profile botched executions that involved midazolam. *See, e.g.*, Associated Press, "Three executions gone wrong: Details of lethal injections in Arizona, Ohio, Oklahoma," Mercury News (July 24, 2014).

### Additional Ohio Executions

930. In addition to the deviations from execution policies and execution protocols identified herein, Defendants have deviated and varied from the execution policies and execution protocol during the executions of Kenneth Biros, Mark Brown, Lawrence Reynolds, Darryl Durr, William Garner, Roderick Davie, Michael Benge, Frank Spisak, Johnnie Baston, Reginald Brooks, and others.

931. This includes, but is not limited to, deviations and/or variations regarding execution policy and written protocol mandates governing who may, and who must, participate at various points in the execution; deviations and/or variations related to acquisition, possession, distribution, delivery, and administration of the execution drugs; deviations and/or variations related to training requirements and/or execution rehearsals; deviations and/or variations from one or more of the five "core" elements of the written protocol, and deviations from other "non-core" elements of the written protocol.

### Ronald Smith

932. On December 8, 2016, the State of Alabama executed Ronald Smith using a three-drug combination that included IV injection of 500 mg. midazolam, 600 mg. rocuronium bromide, and 240 mq. potassium chloride.

933. During the execution of Ronald Smith, he was moving his arms, clenching his hand or hands, attempting to talk, coughing, and

attempting to move for approximately fifteen minutes after being injected with 500 mg. of midazolam.  Upon information and belief, Smith was injected with a second dose of 500 mg. of midazolam approximately five minutes after the first injection, while he was still exhibiting the above-described behaviors.

934.    Smith was moving his head, hands and arms, coughing, and attempting to speak before and after the first "consciousness check." Smith moved his arm toward his body (away from the pinch) when he was pinched as part of the first "consciousness check."

935.    Smith reopened his eyes after a prison official performed a second "consciousness check" by pushing his eyelid closed.  He also moved his arm after the second consciousness check.

936.    It took approximately 35 minutes before Smith was declared dead following the first injection.  He heaved, moved and coughed for approximately 13 minutes during that time.

### Christopher Brooks

937.    On January 21, 2016, the State of Alabama executed Christopher Brooks using, upon information and belief, a three-drug combination that included IV injection of 500 mg. midazolam, 600 mg. rocuronium bromide, and 240 mq. potassium chloride.

938.    Upon information and belief, under Alabama's execution protocol, the executioners must wait until at least five minutes after injection of midazolam to perform a "consciousness" check before further

injecting any of the second and third drugs.  Following the "consciousness" checks and Brooks being declared "unconscious," Alabama officials injected the paralytic drug and potassium chloride. But according to an eyewitness account, Brooks opened his left eye after he was deemed "unconscious" and the second and third drugs were injected.  Brooks never closed his eye after that.

### Clayton Lockett

939.    On April 14, 2014, the State of Oklahoma adopted a new execution protocol that included the use of IV injection of 100 mg. midazolam as the first of a three-drug injection sequence.

940.    On April 29, 2014, just over three months after Defendants executed McGuire, the State of Oklahoma executed Clayton Lockett using a three-drug method that included IV injection of 100 mg. midazolam as the first drug, followed by a paralytic drug and potassium chloride.

941.    Lockett was not declared dead until 43 minutes after the start of his execution.

942.    Although Lockett initially appeared to be "unconscious," he was still conscious, aware, sensate and struggling to speak more than 20 minutes after the drugs had been administered.  He was reported as saying "Man," "I'm not," and "something's wrong."  Witnesses also reported that Lockett, at points, was "twitching" and "convulsing" so violently that "it looked like his whole upper body was trying to lift off

the gurney."  Greg Botelho and Dana Ford, *Oklahoma stops execution after botching drug delivery; inmate dies*, CNN (Oct. 9, 2014).[21]

943.    Officials then drew the blinds and discovered that the femoral catheter that was placed by the physician-executioner had, at some point during the execution, failed.  Rather than flowing through his veins, some of the drugs eventually massed in Lockett's tissue, creating a swelling under his skin "smaller than a tennis ball, but larger than a golf ball."  Because the insertion point had been obscured from the view of both the witnesses and the physicians, no one had noticed the swelling earlier.  The physician-executioner then tried to insert the IV into Lockett's left femoral vein, but penetrated Lockett's femoral artery instead, spraying himself with blood.  After all of this, the physician-executioner reported that Lockett's heart was still beating.  At that point, the execution was called off after receiving permission from Governor's counsel, 33 minutes after it had begun.  Ten minutes later, Lockett died.  Upon information and belief, execution officials never tried to take emergency resuscitative actions for Lockett.

944.    In many ways, the execution of Lockett was a replay of what Ohio had done to Joseph Clark as well as Dennis McGuire.  Lockett struggled, writhed, grimaced, kicked, bucked, shook, arched his back, tried to

---

[21] Available at http://www.cnn.com/2014/04/29/us/oklahoma-botched-execution/.

227

sit up, jerked, and gasped, even after he was allegedly "unconscious." *See generally, Warner v. Gross*, Case No. 5:14-cv-665, ECF No. 159, Plaintiffs' Proposed Findings of Fact and Conclusions of Law, at p. 10–44 of 83 (W.D. Okla. Dec. 12, 2014) (describing the horrific scene that unfolded during Lockett's execution); *see also* Cary Aspinwall & Ziva Branstetter, *Botched execution described as 'a bloody mess,' court filing shows*, TULSA WORLD (Dec. 14, 2014)[22]; Katie Fretland, *Scene at botched Oklahoma execution of Clayton Lockett was 'a bloody mess'*, THE GUARDIAN (Dec. 13, 2014)[23].

945.   Oklahoma officials who participated in or witnessed the execution described the scene as "like a horror movie," and that "shit's fucking with me." *Warner v. Gross, supra*, Plaintiffs' Proposed Findings of Fact and Conclusions of Law, at p. 43 of 83. A member of the execution team described the entire Lockett execution as a "cluster." *Id.*

946.   All of this demonstrates that Lockett's death was painful, lingering, undignified, and inhumane.

---

[22] Available at http://m.tulsaworld.com/news/investigations/botched-execution-described-as-a-cluster-court-filing-shows/article_a4b70b76-84f7-5ebd-a5f3-044c205d474a.html?mode=jqm.

[23] Available at http://www.theguardian.com/world/2014/dec/13/botched-oklahoma-execution-clayton-lockett-bloody-mess.

947.    Even though there was extensive evidence of infiltration or some other IV administration failure, an official autopsy report concluded that the concentration of midazolam located in Lockett's blood, even after the delay until an autopsy was performed, was still greater than the therapeutic level necessary to render an average person unconscious. *See* Oklahoma Department of Public Safety, The Execution of Clayton Lockett, Case No. 14-0189SI, at 14.[24]

948.    Toxicology reports also demonstrated a significant level of midazolam in Lockett's brain tissue despite the incompetent IV injection.  Thus, the Lockett execution demonstrates how unsuitable midazolam is as the first drug of a three-drug execution method involving a paralytic drug and potassium chloride.

949.    Additionally, because the paralytic drug's masking effect was substantially delayed by virtue of being injected into tissue in Lockett's execution rather than directly into the blood stream, the Lockett execution vividly demonstrates what Plaintiff and others will experience behind the veil of paralysis, namely, being conscious, aware or at least sensate when injected with the excruciating second and third drugs after midazolam.

950.    Ohio was directly involved in the Lockett execution because, following the McGuire execution, the "General Counsel in Ohio" provided advice

---

[24] Available at
http://deathpenaltyinfo.org/documents/LockettInvestigationReport.pdf.

to officials in Oklahoma, encouraging Oklahoma's use of midazolam as an execution drug and downplaying any concerns from Ohio's experience during the McGuire execution.  *See Warner v. Gross*, Case No. 5:14-cv-665, ECF No. 159, Plaintiffs' Proposed Findings of Fact and Conclusions of Law, at p. 8–9 of 83 (W.D. Okla. Dec. 12, 2014).

951. According to Michael Oakley, the General Counsel for Oklahoma's Department of Corrections at or around the time Oklahoma adopted its execution protocol that included midazolam, "General Counsel in Ohio" consulted with him about midazolam after Ohio executed McGuire.  *Id.*  This was also reported in the media: "Oakley asked his counterpart in Ohio about the state's experience with midazolam.  The media had exaggerated the problems, he was told.  Yes, the new drug took a little longer to put a person to sleep, but it wasn't as bad as everyone was saying."  Jeffery E. Stern, *The Cruel and Unusual Execution of Clayton Lockett*, THE ATLANTIC (June 2015).

952. So rather than warn others about the horrifying scene that was likely to unfold if a state used drugs in a lethal-injection execution similar to what Defendants had recently experienced with the McGuire execution, Defendants downplayed, discounted and ignored what occurred during the McGuire execution in consultation with officials in other states who were considering following Ohio's lead.

**Joseph Wood**

953.    On July 23, 2014, about six months after McGuire's botched midazolam two-drug execution, and just three months after Lockett's botched midazolam three-drug execution, the State of Arizona decided to use an execution protocol comprised of 50 mg. midazolam and 50 mg. hydromorphone injected intravenously to execute Joseph Wood.

954.    Following McGuire's execution, Ohio had increased the dosage of each drug, despite the fact it publicly maintained that nothing out of the ordinary, unanticipated or unexpected occurred during McGuire's execution.  The dosage of midazolam and hydromorphone required by Arizona's execution protocol used on Wood was the exact same amount of those drugs adopted by Ohio, as announced in its April 2014 "After Action Review" of McGuire's execution and associated revision of 01-COM-11.

955.    Upon information and belief, Arizona adopted its revised execution protocol after Arizona officials considered Ohio's execution protocol used to execute McGuire.

956.    The execution of Wood lasted almost two hours between the start of the first injection and when Wood was pronounced dead.  It was the longest lethal injection execution in United States history.

957.    During that two hours, Wood suffocated to death in a procedure that Senator John McCain described as a "bollocks-upped situation" that

"[was] torture."  Burgess Everett, *John McCain: Arizona execution 'torture'*, POLITICO (July 24, 2014).[25]

958.    One witness to the execution described Wood as "drowning in air," as suffering "death by apnea," and as gasping for air at least 640 times: Wood "gulped like a fish on land.  The movement was like a piston: The mouth opened, the chest rose, the stomach convulsed.  And when the doctor came in to check on his consciousness and turned on the microphone to announce that Wood was still sedated, we could hear the sound he was making: a snoring, sucking, similar to when a swimming-pool filter starts taking in air, a louder noise than I can imitate, though I have tried."  Michael Kiefer, *Reporter describes Arizona execution: 2 hours, 640 gasps*, ARIZONA REPUBLIC (July 26, 2014).[26]

959.    Arizona officials injected Wood with fifteen syringes of the midazolam/hydromorphone mixture over the course of the execution.  That means Wood was injected with a total of 750 mg. of hydromorphone and 750 mg. of midazolam, well above the 200 mg. ceiling effect level.

---

[25]Available at http://www.politico.com/story/2014/07/john-mccain-arizona-execution-109350.

[26] Available at http://www.azcentral.com/story/news/arizona/politics/2014/07/24/arizona-execution-joseph-wood-eyewitness/13083637/.

**Charles Warner**

960. On January 15, 2015, Oklahoma executed Charles Warner.

961. His last words were that his "body [wa]s on fire."  Andrew Buncombe, *Charles Warner execution: Oklahoma inmate's last words are 'my body is on fire' as state carries out first death penalty in nine months*, INDEPENDENT (Jan. 15, 2015).[27]

962. Despite having represented to Warner's counsel and, later, to the United States Supreme Court, that Warner was executed with a combination of midazolam, rocuronium bromide, and potassium chloride, Oklahoma's representations were later found to be false.

963. Rather than using potassium chloride, it was later revealed, the state somehow instead used potassium acetate.  That inexplicable mistake—which, not without irony, occurred during litigation about Oklahoma's claims of secrecy over the source and identity of the drugs it uses in executions—became apparent only after Oklahoma attempted to execute another prisoner, Richard Glossip, on September 30, 2015, again using potassium acetate.

**Kelly Gissendaner**

964. On or about March 2, 2015, the State of Georgia intended to execute Kelly Gissendaner using compounded pentobarbital, but ultimately

---

[27] Available at http://www.independent.co.uk/news/world/americas/charles-warner-execution-my-body-is-on-fire-9981842.html.

233

postponed the execution because of problems with the compounded pentobarbital.

965.  The pentobarbital to be used was sent to an independent testing laboratory, tested for potency and identity, and given a report that the drug was within the acceptable testing limits.  *See* Tracy Connor, *Georgia Execution of Kelly Gissendaner Postponed for Drug Issue*, Mar. 3, 2015[28]; Chris McDaniel, *Georgia Says "Cloudy" Execution Drug Was Just Too Cold, But Expert Gave A Second Possible Reason*, BUZZFEED NEWS (May 11, 2015)[29].

966.  Despite passing the analytical testing that may mirror Defendants' Execution Protocol testing, the compounded pentobarbital precipitated, or developed particles floating in the drug.

967.  The particulate in the compounded pentobarbital would have likely caused an unacceptable pH level in the final product which, in turn, would have caused severe pain upon being injected.

968.  Being compounded using incorrect compounding techniques or materials have been identified as a possible cause for the precipitation.

969.  Being shipped and/or stored at a temperature that was too low has also been identified as a possible cause for the precipitation.

---

[28] Available at http://www.nbcnews.com/news/us-news/georgia-execution-kelly-gissendaner-postponed-drug-issue-n315651.

[29] Available at http://www.buzzfeed.com/chrismcdaniel/georgia-says-cloudy-execution-drug-was-just-too-cold-but-exp#.cpqe8DRX5.

970.    Nothing in Defendants' Execution Protocol would prevent Defendants from using precipitated drugs in an execution in the same kind of circumstances, as the Gissendaner drugs had "passed" the analytical testing Defendants offer.

### Michael Lee Wilson

971.    On January 10, 2014, the State of Oklahoma executed Michael Lee Wilson using what is believed to be IV injection of compounded pentobarbital.  *See* Graham Lee Brewer, *Condemned man's last words lead to questions about lethal injection 'cocktail' in Oklahoma, U.S.*, The Oklahoman, Feb. 9, 2014.[30]

972.    Approximately twenty seconds after being injected with the execution drugs, Wilson stated "I feel my whole body burning."  *Id.*

973.    When pentobarbital is compounded from its raw API form to an injectable liquid, an incorrect compounding procedure will produce inappropriate pH levels which, when injected into the bloodstream, will cause intense burning pain.

### Arnold Preito

974.    Recent executions in Texas using what is believed to be compounded pentobarbital have taken significantly longer before death was declared than previous executions using manufactured, FDA-approved pentobarbital.

---

[30] Available at http://newsok.com/condemned-mans-last-words-lead-to-questions-about-lethal-injection-cocktail-in-oklahoma-u.s./article/3932043.

975.     Texas implemented a one-drug pentobarbital lethal-injection protocol on July 18, 2012, using FDA-approved pentobarbital.  Death Penalty Information Center, *State by State Lethal Injection*, http://www.deathpenaltyinfo.org/state-lethal-injection.

976.     Under that protocol, it took 12 minutes until Bobby Hines was declared dead on October 24, 2012.  *Texas executes convicted killer for 1991 slaying*, Associated Press, Oct. 24, 2012, http://newsok.com/texas-executes-convicted-killer-for-1991-slaying/article/feed/452560.

977.     But numerous executions have taken significantly longer since Texas began using pentobarbital from a compounding pharmacy in October, 2013.  Death Penalty Information Center, *State by State Lethal Injection*, *supra*.

978.     On January 21, 2015, it took at least 20 minutes before Arnold Prieto was declared dead from a lethal-injection using compounded pentobarbital.  Michelle Casady, *Killer of 3 executed, decades after turning down 30-year plea deal*, mysanantonio.com, Jan. 21, 2015.[31]

**Kent Sprouse**

979.     On April 9, 2015, it took at least 22 minutes before Kent Sprouse was declared dead from a lethal-injection using compounded

---

[31] Available at http://www.mysanantonio.com/news/local/crime/article/Convicted-killer-set-to-die-tonight-turned-down-6030235.php.

pentobarbital.  *Texas Executes Man for Police Officer's 2002 Shooting Death*, Associated Press, Apr. 9, 2015.[32]

### Manuel Garza

980.    On April 15, 2015, it took at least 26 minutes before Manuel Garza was declared dead from a lethal-injection using compounded pentobarbital.  Michael Graczyk, *Texas executes San Antonio man for killing police officer*, Associated Press, Apr. 15, 2015, http://bigstory.ap.org/article/467586558ac3423b86d7c450c9c61882/man-set-be-executed-killing-san-antonio-officer (last visited Sept. 4, 2015).

### Derrick Charles

981.    On May 12, 2015, it took at least 25 minutes before Derrick Charles was declared dead from a lethal-injection using compounded pentobarbital.  Michael Graczyk, *Texas executes Houston man convicted of killing his girlfriend, her mother and her grandfather*, Associated Press, May 12, 2015.[33]

### Gregory Russeau

982.    On June 18, 2015, it took at least 21 minutes before Gregory Russeau was declared dead from a lethal-injection using compounded

---

[32] Available at http://www.nytimes.com/aponline/2015/04/09/us/ap-us-texas-execution.html?_r=0.

[33] Available at http://globalnews.ca/news/1995091/texas-executes-houston-man-convicted-of-killing-his-girlfriend-her-mother-and-her-grandfather/.

pentobarbital.  *Texas executes man for murdering auto shop owner during crack cocaine binge*, Associated Press, June 18, 2015.[34]

### Jose Villegas

983.    On April 16, 2014, the State of Texas executed Jose Villegas, using what is believed to be compounded pentobarbital.

984.    After the injection started, Villegas is reported to have said "It does kind of burn." Associated Press, "'It does kind of burn,' Texas inmate Jose Villegas says as he gets lethal injection for murders of 3," Associated Press (April 15, 2014).[35]

### Eric Robert

985.    On or about October 16, 2012, the State of South Dakota executed Eric Robert, using compounded pentobarbital that post-execution analysis revealed was contaminated with fungus.

986.    After the injection started, Robert reportedly "appeared to be clearing his throat and then began gasping heavily.  He then snored for about 30 seconds.  His eyes remained opened throughout and his skin turned pale, eventually gaining a purplish hue."  Dave Kolpack and

---

[34] Available at http://www.dallasnews.com/news/state/headlines/20150618-texas-executes-man-for-murdering-auto-shop-owner-during-crack-cocaine-binge.ece.

[35] Available at http://www.nola.com/news/index.ssf/2014/04/it_does_kind_of_burn_texas_inm.html.

Kristi Eaton, "*Eric Robert Execution: South Dakota Executes Inmate Who Killed Prison Guard*," Associated Press, October 16, 2012.[36]

987.     Robert's eyes remained open throughout his execution.  That fact, according to some experts, is a sign that the compounded execution drugs did not work properly.  Stephanie Mencimer, *Does This Secret Drug Cocktail Work To Execute People? Oklahoma Will Find Out Tonight*, MOTHER JONES (April 29, 2014).[37]

988.     Robert was not declared dead until twenty minutes following injection of the compounded pentobarbital.

989.     This is consistent with being injected with sub-potent pentobarbital.

    **P.     Allegations related to alternative execution methods
             or manners.**

990.     To the extent that Plaintiff argues that the execution drug(s) planned to be used by Defendants in his execution or any other portion of the Execution Protocol will result in cruel and unusual punishment by creating a substantial risk of serious harm that is objectively unreasonable for Defendants to ignore, Plaintiff asserts the following allegations regarding a requirement that he must plead and prove a readily available and feasibly implemented alternative execution method or manner to prevail on such an Eighth Amendment

---

[36]Available at http://www.huffingtonpost.com/2012/10/16/eric-robert-execution_n_1969640.html.

[37]Available at http://www.motherjones.com/mojo/2014/04/double-execution-tonight-ok-using-secret-experimental-drug-protocol.

challenge and vindicate his fundamental constitutional rights (the "alternative-method requirement").

991.    The State of Ohio's recent adoption of the execution-secrecy provisions in Ohio Revised Code § 2949.221–222, and/or this Court's entry of the protective order dated October 26, 2015 (ECF No. 629)—to the extent such statute and/or order is/are applied to withhold from Plaintiff information that may be necessary to determine what is known, feasible, and/or readily implemented and available to Defendants—will substantially if not entirely impair Plaintiff's ability to allege and prove alternative execution methods and/or procedures. To the extent the statute and/or order is/are applied in such a way, Plaintiff reserves the right to argue that any alleged defects in his allegations and/or proof with respect to such issues are the result of the secrecy imposed by the statute and/or order, and not any failure by Plaintiff.

992.    In the event it is held that Plaintiff does not possess a Fifth Amendment right protecting him from being forced to provide an alternative method of execution; that the alternative-method requirement does not amount to an impermissible irrebuttable presumption; and that Plaintiff is competent to allege an alternative method of execution or to assist his attorney to identify an alternative method of execution, he alleges in his claims for relief, if applicable, readily available, feasibly implemented alternative execution

method(s) or manner(s) that substantially reduce the substantial risks of serious harm to which he will be subjected under the Execution Protocol.

### 1. The alternative-method requirement violates Plaintiff's Fifth Amendment rights.

993.    Notwithstanding any allegation of an alternative execution method or manner pleaded in this Fifth Amended Complaint, Plaintiff asserts his Fifth Amendment right against self-incrimination insofar as said constitutional right may permit him to decline to affirmatively plead an alternative method or manner for execution that would not be cruel and unusual.  *See United States v. Myers*, 123 F.3d 350, 359 (6th Cir. 1997) ("'[T]he privilege against self-incrimination can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory.'" (quoting *Maness v. Meyers*, 419 U.S. 449, 464 (1975))); *United States v. Rivera*, 201 F.3d 99, 101 (2d Cir. 1999) ("The Fifth Amendment provides a 'safeguard against judicially coerced self-disclosure,' and this safeguard extends to the sentencing phase of a criminal proceeding as well." (citation omitted) (quoting *Mitchell v. United States*, 526 U.S. 314, 322 (1999))).

### 2. Plaintiff is insufficiently competent to be able to constitutionally satisfy the alternative-method requirement.

994.    Notwithstanding any allegation of an alternative execution method or manner pleaded in this Fifth Amended Complaint, Plaintiff asserts he is unable to constitutionally allege an alternative method or manner of

execution because he is insufficiently competent to be able to knowingly and willingly instruct DRC Defendants how to kill him, and/or he is insufficiently competent to assist his attorney to identify an alternative method or manner of execution because he has insufficient medical training and knowledge to be able to identify such an alternative or because his mental health impairments or cognitive deficiencies or intellectual disabilities render him unable to do so.

## FEDERAL LAW CLAIMS FOR RELIEF AGAINST DRC DEFENDANTS IN THEIR OFFICIAL CAPACITIES AND DRUG SOURCE DEFENDANTS

### First Claim for Relief: Eighth and Fourteenth Amendment Violations

995.     The First Claim for Relief was previously withdrawn from the Third

Amended Omnibus Complaint, to be, as applicable, re-alleged in parts

or in whole in the various Plaintiffs' Amended Individual

Supplemental Complaints.  Claims alleging violations of the Eighth

Amendment as incorporated against the states by the Fourteenth

Amendment are now included below in this Fifth Amended Complaint

for Plaintiff.

### Second Claim for Relief: Fourteenth Amendment Due Process Violations.[38]

996.     As to each of the Due Process Clause violations alleged below, Plaintiff

incorporates by reference each and every statement and allegation set

forth throughout this Fifth Amended Complaint as if fully rewritten

here.

997.     An execution carried out using the drugs contemplated in the

Execution Protocol will not be "quick," nor will it be "painless,"

physically and/or mentally.

---

[38] Plaintiff recognizes that the Court previously granted Defendants' Motion to Dismiss with respect to Claims 2, 5–11, 14, 26–32, 35–41, 43, 45, and 47 of Plaintiff's Fourth Amended Complaint.  In order to preserve Plaintiff's ability to appeal their dismissal after a final judgment has been entered, however, those claims are included in this Fifth Amended Complaint.

998.    Defendants are aware that an execution using the Execution Protocol
        will almost certainly take more than thirty minutes following the
        injection of the execution drugs until the inmate is dead in
        accordance with Ohio law set forth in Ohio Revised Code § 2108.40,
        but they willingly and knowingly disregard this risk.

999.    Defendants are aware than an execution using the Execution Protocol
        will produce a lingering death as the condemned inmate slowly
        suffocates to death or suffers a heart attack over a period that is likely
        to be 10-15 minutes or more, but they willingly and knowingly
        disregard this risk.

1000.   Defendants are aware that an execution using intravenously injected
        paralytic drug and/or potassium chloride will subject the condemned
        inmate to searing, unconstitutionally painful burning sensations upon
        injection if the inmate has not been sufficiently rendered
        unconscious, unaware and unable to feel and experience pain, and
        they are aware of the significant risk/certainty that midazolam is
        incapable of doing just that, but they willingly and knowingly
        disregard those risks.

1001.   Defendants are aware that an execution using improperly
        compounded drug(s) will subject the condemned inmate to painful
        burning sensations upon injection intravenously, and they are aware
        of the significant risk of obtaining improperly compounded drug(s) to

use in an execution, but they willingly and knowingly disregard this risk.

1002. Defendants are aware that at least a not-insignificant number of Plaintiffs, including Plaintiff here, possess individual mental/psychological conditions and characteristics which make such them substantially likely to suffer from a paradoxical effect upon injection of the Execution Protocol's drugs, but Defendants willingly and knowingly disregard this risk.

1003. DRC Defendants have created, maintained, and administered an overarching execution policy and written Execution Protocol that, if used to execute Plaintiff's death sentence, will violate his constitutionally protected liberty, life, and property interests (as arising from Ohio Rev. Code § 2949.22(A) and DRC Policy 01-COM-11) in expecting and receiving a "quick and painless death" and/or a humane and dignified execution.

1004. Ohio Revised Code § 2949.22(A) creates valid liberty, life, and property interests vested in Plaintiff in *expecting* a "quick and painless" death.

1005. Ohio Revised Code § 2949.22(A) also creates valid liberty, life, and property interests vested in Plaintiff in *receiving* a "quick and painless" death.

1006. DRC Policy 01-COM-11 is binding state law, and creates valid liberty, life, and property interests vested in Plaintiff in *expecting* a humane and dignified death.

245

1007.   DRC Policy 01-COM-11 is binding state law, and creates valid liberty, life, and property interests vested in Plaintiff in *receiving* a humane and dignified death.

1008.   These interests are rights vested in a small class of individuals that have a legitimate claim of entitlement to expect and receive a quick, painless, humane and dignified death.

1009.   Plaintiff, as a death row inmate, is a member of the only group that is the intended beneficiary of these guarantees.

1010.   Under the express terms of § 2949.22(A) and DRC Policy 01-COM-11, Defendants have no discretion in whether to provide a quick, painless, humane and dignified death to Plaintiff or some kind of death other than a quick, painless, humane and dignified one.

1011.   These interests arising under state law are protected as rights under the substantive and procedural elements of the Due Process Clause of the Fourteenth Amendment.

1012.   Having granted Plaintiff interests in expecting and receiving a quick, painless, humane and dignified execution, Defendants may not deprive him of those rights in violation of procedural and substantive due process under the Fourteenth Amendment.

1013.   Defendants' denial of Plaintiff's rights to expect and receive a quick, painless, humane and dignified death is arbitrary and conscience-shocking.

1014.  The pattern of deviations and/or variations from Defendants'
execution policy and written Execution Protocol engaged in by many
of the actors involved, intentional or otherwise, combined with the
amount of discretion that Defendants claim under their overarching
execution policy and under the written protocol, along with
substantial evidence of incompetence or inability to perform in the
execution context, cumulatively point to an unacceptable risk of
violating Plaintiff's rights.

1015.  DRC Defendants' most recent discretionary, and unconscionable,
choice to resurrect an even worse version of the original three-drug
method for use in their Execution Protocol, after renouncing that
method in November 2009 and representing that it would never be
used again, and after discarding midazolam after three highly
publicized botched executions using that drug, is only the latest, and
perhaps most egregious, of the many of deviations and/or variations
they have made.  In making those representations in November 2009,
DRC Defendants assured the Court, the Sixth Circuit, the public, and
the Plaintiffs that the paralytic drug and potassium chloride would
not be used in Ohio executions going forward.  They also knowingly
rejected any further use of midazolam as an execution drug.  Those
drugs, in other words, shall no longer be among the drugs authorized
by the execution policy, and their use would thus be a violation of
Core Element # 2.

1016.   Yet now, seven years later, and in order to expeditiously execute Plaintiff, DRC Defendants have intentionally deviated from those binding representations, and have rewritten the policy to "authorize" the use of the very drugs DRC Defendants had previously renounced, as more fully alleged earlier throughout this Fifth Amended Complaint.

1017.   Defendants manifest deliberate indifference towards, or intentional deprivation of, Plaintiff's statutorily created liberty, life, and property interests in expecting and receiving a quick, painless, humane and dignified death, interests protected as rights by the substantive and procedural elements of the Fourteenth Amendment's Due Process Clause in the following ways:

➢ by what DRC Defendants include and exclude from their overarching execution policy;

➢  by their procedures and considerations for development of the written Execution Protocol;

➢ by their discretionary and faulty administration of the execution policy and the Execution Protocol; and

➢ by their willingness to shade or color the official record to keep secret critical details about an execution and those who acted outside the law to facilitate it.

1018.   Matters that DRC Defendants include or exclude from their overarching execution policy include, but are not limited to, the following:

➢ Defendants' contemplated use of execution drugs they had previously renounced or rejected for good cause

➢ Defendants' contemplated use of execution drugs manufactured and/or otherwise supplied by the Drug Source Defendants using compounding or illegally imported or otherwise sourced drugs;

➢ Defendants' intended use of the specific drugs in the Execution Protocol despite their knowledge of the risks those drugs create;

➢ Defendants' continued refusal to adequately prepare for and provide medical assistance as necessary in the execution context, even with full notice of that necessity.

1019.    Plaintiff's statutorily created liberty, life, and property interests in expecting and receiving a quick, painless, humane and dignified death that are protected as rights are separate and distinct from the rights protecting Plaintiff against cruel and unusual punishment as provided in the Eighth Amendment.

1020.    In all the foregoing ways, Defendants violate 42 U.S.C. § 1983 and Plaintiff's rights protected by the Fourteenth Amendment to the United States Constitution.

**Third Claim for Relief: Violations of First, Sixth, Eighth and Fourteenth Amendment Rights of Access to Counsel, Access to Courts, Ability to Petition for Redress of Grievances, Due Process, and Privileges or Immunities of United States Citizenship.**

1021.    The Third Claim for Relief was withdrawn in the Third Amended Omnibus Complaint.

**Fourth Claim for Relief: Fourteenth Amendment Equal Protection Violations**

1022.    As to each of the Equal Protection Clause violations alleged below, Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

249

1023.   Plaintiff has been or will be treated differently from other similarly situated individuals, burdening his fundamental rights as a member of a class of persons subject to execution at Defendants' hands, without a compelling governmental interest, and/or without any rational basis for the difference in treatment as a class of one, irrationally and arbitrarily, in violation of the guarantees of the Equal Protection Clause of the Fourteenth Amendment.

1024.   Defendants violate Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment to the federal Constitution by their Execution Protocol as written, and by their actions in applying the Execution Protocol and other binding federal and Ohio state laws relevant here.

1025.   Equal protection under the law requires "minimal procedural safeguards" such that there is at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied.

1026.   The Equal Protection Clause's rudimentary requirements are important here, where the United States Supreme Court has clearly emphasized the necessity of procedural safeguards in a state's lethal injection execution policy, especially including the written protocol, to ensure against violations of fundamental rights.

1027.   DRC Defendants' execution policy and written execution protocol is facially violative of the Equal Protection Clause, because it codifies

250

disparate treatment of similarly situated individuals, without sufficient justification, and in a way that is arbitrary, irrational, and capricious.

1028. DRC Defendants have shown an ongoing inability to consistently adhere to their execution policies, practices, procedures, and protocols, including the written Execution Protocol, which will result in the disparate treatment of Plaintiff during his execution compared to similarly situated inmates. *See Cooey v. Kasich*, 801 F. Supp. 2d 623, 656 (S.D. Ohio 2011) ("The perplexing if not often shocking departures from the core components of the execution process that are set forth in the written protocol not only offend the Constitution based on irrationality but also disturb fundamental rights that the law bestows on every individual under the Constitution, regardless of the depraved nature of his or her crimes.")

## A. <u>Equal Protection—Fundamental Rights</u>

1029. Plaintiff, individually and as a member of a class of persons subject to a death sentence under Ohio law, has fundamental rights under the Eighth Amendment to be free from cruel and unusual punishment, to not be subject to a torturous, horrifying, lingering, undignified, or spectacular death, and to be provided necessary medical care by Defendants.

1030. Plaintiff, individually and as a member of a class of persons subject to a death sentence under Ohio law, has individual fundamental rights

to privacy, to personal dignity, to bodily integrity, to not be the unwilling subject of forced, involuntary human experimentation conducted by Defendants, and other rights that arise under the principles of liberty and/or natural law, and which are protected by the Ninth Amendment.

1031. Plaintiff, individually and as member of a class of persons subject to a death sentence under Ohio law, has fundamental rights to the protections afforded by the substantive and procedural elements of the Due Process Clause of the Fourteenth Amendment, which protect as rights the following:

➢ Plaintiff's life, liberty and property interests in expecting and receiving a quick and painless execution, created by the State in § 2949.22;

➢ those rights created by the State in the written Execution Protocol's mandate that "all execution processes shall be performed in a professional, humane, sensitive, and dignified manner";

➢ Plaintiff's life, liberty and property interests in expecting and receiving a humane, sensitive and dignified execution; and

➢ Plaintiff's right to due process in the form of notice of how Defendants will attempt to execute him.

1032. Plaintiff, individually and as member of a class of persons subject to a death sentence under Ohio law, has fundamental rights under the Due Process Clause of the Fourteenth Amendment to the liberty and privacy rights one has in the integrity of one's body, as well as to not be the unwilling, non-consenting subject of human experimentation,

and to be free from government conduct that is shocking to the conscience.

1033.   Plaintiff, individually and as member of a class of persons subject to a death sentence under Ohio law, has a fundamental right under the Privileges or Immunities Clause of the Fourteenth Amendment to not be the unwilling, non-consenting subject of human experimentation.

1034.   Plaintiff has fundamental rights to free speech guaranteed by the First Amendment.

1035.   Carrying out an execution is not a compelling governmental interest.

1036.   Carrying out an execution at all costs is neither a compelling governmental interest nor a legitimate governmental interest.

   **1.    Equal Protection violation based on burdening of Plaintiff's fundamental rights by Defendants' deviations from the Execution Protocol.**

1037.   Plaintiff is similarly situated to other condemned inmates to whom Defendants will apply their Execution Protocol.

1038.   In applying their Execution Protocol, including in their deviations and/or their variations from their execution policy and written Execution Protocol and their deviations from Core Elements of the Execution Protocol as alleged throughout this Fifth Amended Complaint, Defendants are violating the Equal Protection Clause's guarantee of equal treatment for similarly situated persons by severely burdening Plaintiff's fundamental rights through increasing the likelihood that Plaintiff will:

253

(1) be denied the Eighth Amendment rights to be given necessary medical care while in DRC Defendants' custody, and to be free from a substantial risk of serious harm, including physical and/or psychological pain, needless suffering, a torturous, lingering, undignified, or spectacular death, and/or an objectively intolerable risk of such harm which Defendants unjustifiably ignore;

(2) suffer deprivation of his fundamental rights to privacy, to personal dignity, to bodily integrity, and to not be the unwilling, non-consenting subject of forced, involuntary human experimentation conducted by Defendants, as protected by the Ninth Amendment, the Fourteenth Amendment's Due Process Clause, or the Fourteenth Amendment's Privileges or Immunities Clause, and as demonstrated during the botched executions of Joseph Clark, Christopher Newton, Dennis McGuire, Clayton Lockett, Joseph Wood, and others, along with the failed execution of Romell Broom, and the experimental—but secretive—approach to executions with which Defendants now operate;

(3) not be free from suffering conscience-shocking, arbitrary and lawless actions by Defendants that increase the harm to which he will be subjected, in violation of the Fourteenth Amendment;

(4) be forced to suffer expecting and receiving an execution that is something other than quick and painless, be denied the expectation and receipt of an execution that is humane, and be denied the expectation and receipt of an execution that is dignified, protected by the Fourteenth Amendment; or

(5) be denied the chance to know sufficiently in advance how Defendants will try to kill him, and therefore denied a meaningful opportunity to come into court to challenge that method of execution, as protected by the Fourteenth Amendment

(6) be denied the fundamental right to Free Speech under the First Amendment, because the Execution Protocol vests in the Warden complete discretion to cut off the inmate's last words based on the Warden's subjective interpretation of those words as offensive or lengthy, but the Execution Protocol contains no standards by which to determine what is too offensive or lengthy.

1039. The individual and/or pattern of deviations and/or variations from DRC Defendants' Execution Policy and written execution protocol exhibited by many of the actors involved, intentionally and/or recklessly, combined with their wholly subjective, discretionary understanding and application of the execution policy and written Execution Protocol, along with substantial evidence of incompetence or inability to perform in the execution context, cumulatively point to an unacceptable risk of violating Plaintiff's rights.

1040. Defendants rely on Incident Command Systems principles to implement their Execution Protocol.

1041. Defendants have applied Incident Command Systems principles at various times in their execution policy as a shield, a purported guarantee against deviations or variations from the written execution protocol.

1042. And at other times Defendants have applied ICS as a sword by arguing that they need not strictly follow ICS since it is not officially incorporated into 01-COM-11.

1043. But by virtue of DRC Policy 310-SEC-14, ICS principles should be incorporated formally into Defendants' administration of 01-COM-11.

1044. Defendants' application of ICS principles has been inconsistent over time and, upon information and belief, is dependent on the subjective discretion of the Warden of SOCF, the Warden of the Institution where Plaintiff is housed, the Director of DRC, and/or others involved in the

execution process, and the identities of the individuals who occupy those positions change regularly.

1045.   Moreover, the veracity of documents Defendants produce is called into question, based on evidence of falsification of official records and documents and/or misrepresentations following incidents including or similar in significance to administration of 01-COM-11, including the McGuire "investigation" and report, and former Plaintiff Slagle's suicide during the time when he was subject to the Execution Protocol.

1046.   Core Element #5 of the 2016 Execution Protocol is no more than a sham.  Despite the seemingly mandatory, limiting language of Core Element # 5, the authority to authorize variations/deviations from the written protocol's requirements is, in fact, unfettered, because the Execution Protocol does not limit the sole authority to authorize deviations or variations from the written protocol to just a single person.

1047.   Instead, by the terms of 01-COM-11, any of an unidentified number of persons, with unknown experience, qualification and the like may be considered "the Director" at any given time, injecting more discretion into the execution protocol.

1048.   DRC Defendants claim that only a single person other than the DRC Director—that is, Defendant Voorhies—would ever be designated as the Director's designee.

256

1049.   But Defendants, given numerous chances to include that critical limit on discretion in their recent series of Execution Protocol amendments, declined to formalize that purported restriction.

1050.   Defendants' assurance that one, and only one, other person would ever be designated as the Director's designee bear no indicia of reliability when DRC Defendants have previously discarded sworn representations and positions when abiding by those sworn representations and positions became inconvenient.

1051.   DRC Defendants' most recent discretionary, and unconscionable, choice to resurrect an even worse version of the original three-drug method for use in their Execution Protocol, after renouncing that method in November 2009 and representing that it would never be used again, and after discarding midazolam after three highly publicized botched executions using that drug, is only the latest of the many of deviations and/or variations they have made.

1052.   In making those representations in November 2009, DRC Defendants assured the Court, the Sixth Circuit, the public, and the Plaintiffs that the paralytic drug and potassium chloride would not be used in Ohio executions going forward.  They also knowingly rejected any further use of midazolam as an execution drug.  Those drugs, in other words, shall no longer be among the drugs authorized by the execution policy, and their use would thus be a violation of Core Element # 2.

257

1053.    Yet now, seven years later, and in order to expeditiously execute at least three of Plaintiffs, DRC Defendants have intentionally deviated from those binding representations, and have rewritten the Execution Protocol to "authorize" the use of the very drugs DRC Defendants had previously renounced, as more fully alleged throughout this Fifth Amended Complaint.

1054.    Defendants' actions in aggressively seeking legislation to keep secret a great deal of information about their activities related to the Execution Protocol and their application of it will permit Defendants to hide deviations from the Execution Protocol, including violations of state and federal law, rather than affording open and meaningful oversight.

1055.    Defendants' actions administering their Execution Policy and written execution protocol show a pattern of intentional, reckless and/or arbitrary deviations and/or variations from the execution policy and/or written Execution Protocol, such that the safeguards allegedly contained in Defendants' execution policy and written Execution Protocol are applied to a particular inmate arbitrarily and disparately. Such deviations and/or variations are arbitrary and irrational, and/or not necessary to achieve a compelling governmental interest.

1056.    Upon information and belief, Defendants have also violated federal and/or state law governing drug manufacturing, compounding, and controlled substances through their deviations and/or variations from their execution policy and written Execution Protocol.

1057.   Defendants have also deviated from their Execution Protocol when they have violated or violate applicable federal and/or state statutory or regulatory laws discussed herein.

1058.   Defendants' actions deny Plaintiff the guarantee that he will receive the full panoply of procedural safeguards in the written Execution Protocol.

1059.   Thus, Defendants' pattern of deviations and/or variations from their execution policy and written Execution Protocol—including but not limited to their deviation from the November 2009 renouncement of the paralytic drug and potassium chloride and their resurrection of using midazolam in the Execution Protocol—results in each condemned inmate being treated differently.  Such disparate treatment severely burdens the fundamental rights of the class of persons that includes Plaintiff.

1060.   Defendants' disparate treatment of Plaintiff arising from their individual and/or pattern of deviations and/or variations from their execution policy and written Execution Protocol—including but not limited to their deviation from the November 2009 renouncement of the paralytic drug and potassium chloride and their resurrection of using midazolam in the Execution Protocol—is not necessary to achieve any compelling governmental interest, nor is it the least restrictive means to achieve any compelling governmental interests.

1061.    Defendants' execution policy and written Execution Protocol, as applied based on Defendants' repeated pattern of deviations/variations from the execution policy and written execution protocol, violate the Equal Protection Clause of the Fourteenth Amendment because they burden the fundamental rights of the group of condemned inmates—which includes Plaintiff—as articulated in the various allegations herein, without being necessary to achieve a compelling governmental interest.

1062.    Defendants' execution policy and written Execution Protocol facially violates the Equal Protection Clause because they codify unequal treatment of similarly situated individuals in such a way that it burdens the fundamental rights of the group of condemned inmates— which includes Plaintiff—as articulated in the various allegations herein, without being necessary to achieve a compelling governmental interest.

**2.      Equal Protection violation based on burdening of Plaintiff's fundamental rights by Defendants' deviations from Ohio's execution statute.**

1063.    Plaintiff is similarly situated to other condemned inmates to whom Defendants will apply Ohio's execution statute, Ohio Revised Code § 2949.22.

1064.    Ohio Revised Code § 2949.22(A) requires that "a death sentence shall be executed by causing the application to the person, upon whom the sentence was imposed, of a lethal injection of a drug or combination

of drugs of sufficient dosage to quickly and painlessly cause death. The application of the drug or combination of drugs shall be continued until the person is dead."

1065.   Defendants will apply § 2949.22 to Plaintiff disparately, in violation of the Equal Protection Clause's guarantee of equal protection of the laws.

1066.   Defendants will intentionally and/or recklessly deviate from § 2949.22, and therefore apply the law disparately without compelling governmental interest, by failing to ensure that Plaintiff's execution will be quick.

1067.   Defendants will intentionally and/or recklessly deviate from § 2949.22, and therefore apply the law disparately without a compelling governmental interest, by failing to ensure that Plaintiff's execution will be painless.

1068.   Defendants will intentionally and/or recklessly deviate from § 2949.22, and therefore apply the law disparately without a compelling governmental interest, by failing to continue application of the lethal injection drug(s) until Plaintiff is dead.

1069.   Defendants will intentionally and/or recklessly deviate from § 2949.22, and therefore apply the law disparately without a compelling governmental interest, by failing to administer a sufficient dosage of the lethal injection drug(s).

1070.   Defendants will intentionally and/or recklessly deviate from § 2949.22, and therefore apply the law disparately without a compelling governmental interest, by using unreliable, illegally sourced drugs, or by using drugs that are inappropriate and incapable of sufficiently protecting Plaintiff from experiencing the horrific pain and suffering of the paralytic and potassium chloride in the revised three-drug method.

1071.   Defendants' deviations from § 2949.22's non-discretionary mandates substantially burden the fundamental rights of the class of persons that includes Plaintiff by increasing the risks identified herein, without being necessary to achieve a compelling state interest.

   **3.    Equal Protection violation based on burdening of Plaintiff's fundamental rights by Defendants' deviations from Ohio's Constitution.**

1072.   Ohio's state Constitution, Section 9, Article I, prohibits inflicting "cruel and unusual punishments."

1073.   Plaintiff is similarly situated to other condemned inmates against whom Defendants will apply Ohio's execution statute, Ohio Revised Code § 2949.22 and the Execution Protocol.

1074.   Section 9, Article I of the Ohio Constitution may accord greater civil liberties and protections to individuals and groups than its federal counterpart.

1075. Defendants will apply Section 9, Article I of the Ohio Constitution to Plaintiff disparately, in violation of the Equal Protection Clause's guarantee of equal protection of the laws.

1076. Defendants will intentionally and/or recklessly deviate from the "cruel and unusual punishments" clause of Section 9, Article I of the Ohio Constitution, and therefore apply the law disparately without a compelling governmental interest, by failing to ensure that Plaintiff's execution will not be a cruel and unusual punishment under the state constitution's civil liberties and protections, which are greater than the federal Eighth Amendment.

1077. Defendants' deviations from the "cruel and unusual punishments" clause of Section 9, Article I of the Ohio Constitution substantially burden the fundamental rights of the class of persons that includes Plaintiff by increasing the risks identified herein, without being necessary to achieve a compelling state interest.

**4. Equal Protection violation based on burdening of Plaintiff's fundamental rights by Defendants' failing to follow federal and Ohio state laws related to imported drugs, unapproved drugs, misbranded drugs, adulterated drugs, controlled substances, and compounded drugs, including compounding sterile injectable controlled substances to be used as execution drugs.**

1078. Plaintiff is similarly situated to others in the general population of persons subject to the federal and Ohio state drug laws identified herein, and/or those persons intended to be protected by those laws,

and/or others in DRC Defendants' custody to whom drugs will be administered.

1079.    In violating federal and Ohio state laws as alleged herein, Defendants intentionally and/or recklessly treat the class of persons who are the intended beneficiaries of those laws—which includes Plaintiff—disparately from others similarly situated, namely the general population of persons subject to those laws and/or those persons intended to be protected by those laws, and/or others in DRC Defendants' custody to whom drugs will be administered.

1080.    By dramatically reducing the protections to Plaintiff's health from the possibility of harmful, dangerous, painful, adulterated, misbranded, or poorly compounded drugs, including controlled substances, that those laws were created to provide, Defendants' intentional and/or reckless violations of the federal and state drug laws as alleged herein substantially burden the fundamental rights identified herein of the group of persons that includes Plaintiff, without being necessary to achieve a compelling state interest.

1081.    Defendants' violations of the federal and state drug laws as alleged herein also intentionally and/or recklessly apply the law unequally to Plaintiff by purporting to permit Drug Source Defendants and DRC Defendants to engage in illegal activity to compound, import, dispense, distribute, administer, transport, transfer, purchase, or otherwise engage in a broad host of activities identified herein related

to controlled substances to be used as execution drugs, when such activity would ordinarily subject those Defendants to criminal prosecution in federal and/or state court or civil administrative enforcement sanctions for their actions.

1082. Defendants' tacit endorsement of illegal activity in the name of carrying out an execution at all costs is arbitrary and irrational, and especially when combined with Defendants' strong desire to keep secret their activities related to executions, it substantially burdens the fundamental rights of the group of persons that includes Plaintiff which are identified herein—especially Plaintiff's Due Process Clause right to be free from governmental activity that shocks the conscience, his Eighth Amendment right to be free from a substantial risk of serious harm, and his rights against being an unwilling, non-consenting subject of human experimentation—without being necessary to achieve a compelling state interest.

**5. Equal Protection violation based on burdening of Plaintiff's fundamental rights by Defendants' deviations from Ohio's definition-of-death law.**

1083. Plaintiff is similarly situated to others to whom Ohio's definition-of-death law, Ohio Revised Code § 2108.40, applies.

1084. DRC Defendants will intentionally and/or recklessly apply Ohio statutory law disparately to Plaintiff when they deviate from the statute that defines, for purposes of Ohio law, when death has occurred, by declaring Plaintiff's death following injection of the lethal

drugs under the Execution Protocol within the time when the
cessation of circulatory and respiratory functions or all functions of
the brain, including the brain stem, remains reversible with the
appropriate resuscitative care.

1085.　By using an Execution Protocol that they know will produce a
lingering death of indeterminate duration, Defendants are
intentionally and/or recklessly treating Plaintiff and other condemned
inmates disparately.

1086.　Instead of applying the statute, DRC Defendants and their agents will
declare death prematurely at a time to be determined at Defendants'
discretion, and then proceed as if Defendant is dead when he will not
be.

1087.　DRC Defendants' disparate application of Ohio's definition-of-death
statute substantially burdens the fundamental rights identified herein
of the group of persons that includes Plaintiff, without being
necessary to achieve a compelling state interest.

**6.　Equal Protection violation based on burdening of Plaintiff's
fundamental rights by Defendants' deviations from federal
and Ohio state laws prohibiting non-consenting human
experimentation.**

1088.　Plaintiff is similarly situated to others to whom federal and Ohio state
laws prohibiting non-consenting human experimentation protect,
including those who have a fundamental right against being the non-
consenting, unwilling subject of human experimentation by virtue of
being United States citizens, those who are protected by ODRC Policy

68-MED-11, Protocol Numbers E-1 through E-4, ODRC Policy 06-RES-01, and ODRC Policy 06-RES-02, by virtue of being in ODRC's custody, and those who are protected by the federal and state statutes and regulations related to new drugs, approved or unapproved drugs, or the Investigational New Drug Application requirements.

1089.   Defendants will intentionally and/or recklessly deviate from the federal and Ohio state laws identified herein by engaging in human experimentation on Plaintiff, an unwilling, non-consenting experimental subject, through experimenting with untested and unknown methods of execution in the Execution Protocol, and through Defendants' manufacturing, compounding, dispensing, administration, or other related actions of drugs that are not approved drugs under the law.

1090.   Defendants will intentionally and/or recklessly deviate from federal and Ohio state laws by engaging in human experimentation on Plaintiff, an unwilling, non-consenting experimental subject, through application of the Execution Protocol and Defendants' manufacturing, compounding, dispensing, administration, or other related actions of drugs that will be manufactured, compounded, shipped, stored, and subject to other actions without meaningful oversight.

1091.   Especially given the statutory efforts to cloak execution matters in secrecy that Defendants aggressively sought, there is no assurance that the drugs to be used for an execution will be the same from

267

execution to execution, making each execution an experiment on an non-consenting, unwilling human subject.

1092.   Defendants' disparate application of federal and Ohio state laws prohibiting administering drugs to an unwilling, non-consenting human subject substantially burdens the fundamental rights identified herein of the group of persons that includes Plaintiff— especially the fundamental right against being an unwilling, non-consenting human experimentation subject protected by the Fourteenth Amendment's Due Process Clause, the Ninth Amendment, and the Privileges or Immunities Clause of the Fourteenth Amendment—without being necessary to achieve a compelling state interest.

**7.   Equal Protection violation based on burdening of Plaintiff's fundamental rights by Defendants' use of an Execution Protocol and policies by which Defendants deny necessary medical and resuscitative care and permit a lingering death.**

1093.   Plaintiff is similarly situated to others in ODRC's custody for whom the State of Ohio, through ODRC and its employees and agents, are responsible under the Eighth Amendment to provide necessary medical care.

1094.   Defendants will intentionally and/or recklessly treat Plaintiff and other condemned inmates disparately as compared to other Ohio inmates in DRC Defendants' custody who require medical care, by failing to provide the necessary medical and resuscitative care to

268

Plaintiff after his sentence has been imposed by virtue of Defendant Warden declaring him dead, but before he is dead in accordance with Ohio law, Ohio Revised Code § 2108.40.

1095. At the point Defendant Warden declares the condemned inmate dead, the death warrant has been satisfied, but the inmate will still be statutorily and medically alive, and therefore entitled to necessary medical and resuscitative care that Defendants intentionally and/or recklessly deny.

1096. Defendants know or should know that human executions using midazolam have consistently taken significantly longer than executions using barbiturate drugs.

1097. Defendants know or should know that human executions using compounded execution drugs have consistently taken significantly longer than executions using domestically manufactured drugs.

1098. By using an Execution Protocol that they know will produce a lingering death of indeterminate duration and then refusing to provide necessary medical and resuscitative care after they declared death but before Plaintiff is legally and medically dead, Defendants will intentionally and/or recklessly treat Plaintiff and other condemned inmates disparately.

1099. Defendants' disparate application of necessary medical and resuscitative care to Plaintiff will substantially burden the fundamental rights identified herein—especially the fundamental right

269

to receive necessary medical care guaranteed by the Eighth

Amendment—of the group of persons that includes Plaintiff, without

being necessary to achieve a compelling state interest.

**8. Equal Protection violation based on burdening Plaintiff's fundamental rights by Defendants' use of midazolam and the unavoidable variation inherent in midazolam's efficacy on individual people.**

1100. Plaintiff is similarly situated to other condemned inmates to whom

Defendants will apply their Execution Protocol.

1101. There is no legitimate state interest in carrying out an

unconstitutional execution.

1102. Midazolam is incapable of producing consistent results in different

people. The variations inherent in midazolam's efficacy will render

Plaintiff's execution so unreliable that it will result in his disparate

treatment compared to similarly situated individuals (*i.e.*, others

subject to execution in the State of Ohio). This disparate treatment

directly and substantially burdens Plaintiff's fundamental rights

identified herein and is not narrowly tailored to achieve a compelling

state interest.

1103. Midazolam is not reliably effective as a means to block consciousness,

awareness and the ability to feel and experience noxious stimuli such

as pain at the level of general anesthesia.

1104. Midazolam has different effects on different people, and may reach a

saturation point before rendering a person sufficiently unconscious,

unaware and insensate to a level that noxius stimuli cannot overcome that state.

1105.   Midazolam can cause a paradoxical effect in people with Plaintiff's characteristics and history.  A paradoxical effect occurs when a drug does not work as intended.  A paradoxical reaction to midazolam would cause an individual to remain hyper-aware as the execution proceeds.  As a result of that heighted state of awareness, such an individual would be conscious and experience severe pain and needless suffering as the second and third lethal drugs are injected. It is highly likely, given Plaintiff's history and personal characteristics, that he will experience a paradoxical reaction if injected with midazolam under the Execution Protocol.

1106.   These variations, which Defendants have intentionally incorporated into the Execution Protocol through their intentional choice to use midazolam, cannot be controlled or eliminated, and they mean that the use of midazolam to execute Plaintiff will create a substantial, objectively intolerable risk that the drug will differ in efficacy for him as compared to other individuals subject to execution by the Defendants such that he is at a risk of constitutionally impermissible levels of pain from the second and third lethal drugs.  This risk of unreliable efficacy substantially burdens Plaintiff's fundamental rights.  Further, this burden is not narrowly tailored to achieve a compelling state interest.

271

9.  **Equal Protection violation based on burdening Plaintiff's fundamental rights by Defendants' use of compounded execution drugs and the unavoidable variation inherent in compounded drugs.**

1107.  Plaintiff is similarly situated to other condemned inmates to whom Defendants will apply their Execution Protocol.

1108.  The methods that will be used to produce compounded execution drugs, the process of obtaining, storing, testing, and using these drugs, and the actions and decisions involved in carrying out an execution using compounded execution drugs under the Execution Protocol are incapable of producing consistent results.  The variations inherent in these processes will render Plaintiff's execution so unreliable that it will result in his disparate treatment compared to similarly situated individuals (*i.e.*, others subject to execution at Defendants' hands).

1109.  This disparate treatment directly and substantially burdens Plaintiff's fundamental rights identified herein, and is not narrowly tailored to achieve a compelling state interest.

1110.  The risk of variations that produce unreliable results begins with the drugs that Defendants will obtain to execute Plaintiff.  As detailed elsewhere in this Fifth Amended Complaint, compounded drugs are not manufactured in an FDA-registered facility using current Good Manufacturing Practices, and have no assurance of consistent quality from lot to lot or from container to container.  Moreover, the API for compounded drugs that Defendants will use in an execution that is

obtained from unregistered and uninspected sources has no assurance of consistent quality, constitution, or uniformity, and testing drugs after they have been compounded cannot reliably detect such variations.  Further, no enforcement mechanism exists to ensure that compounding pharmacies are following any standards required to produce reliably consistent drugs.

1111.	In addition, the short shelf life of compounded execution drugs creates a substantial risk that compounded execution drugs will be made under different standards and conditions.  As a result, no two batches of execution drugs will be the same and each lethal-injection execution using compounded drugs will be unlike any before or after.

1112.	The risk of variations is further increased because reputable pharmacies have been unwilling to provide compounded execution drugs to Defendants, despite a secrecy law that the legislature passed to encourage cooperation from pharmacists.  Defendants' difficulty in securing a reputable and reliable source for execution drugs introduces more variability into the content of the drugs and the quality of the processes used to produce them.  It creates a substantial risk that compounded execution drugs will be made by ethically compromised Drug Source Defendants under different standards and conditions, meaning no two batches of drugs will be the same and each lethal-injection execution using compounded drugs will be unlike any before or after.

273

1113.   These variations mean that the use of any compounded execution drugs that Defendants will make or use to execute Plaintiff will create a substantial, objectively intolerable risk that the drug will be the wrong identity or pH level, ineffective, sub-potent, contaminated, unsterile, or otherwise adulterated.  This risk of unreliable drugs substantially burdens Plaintiff's fundamental rights.  Further, this burden is not narrowly tailored to achieve a compelling state interest.

1114.   The procedures required to properly transport, store, test, and administer these drugs after Defendants make or obtain them introduce additional risks of variations that will produce inconsistent results.  Variations in how multiple people handle the drugs between when they leave the pharmacy and are used in an execution will create a substantial, objectively intolerable risk that they will function differently in Plaintiff's execution than in those executions of others with whom he is similarly situated.  This additional risk of unreliability substantially burdens Plaintiff's fundamental rights and is not narrowly tailored to achieve a compelling state interest.

1115.   Finally, Defendants' deviations from Ohio Revised Code § 2949.22, their execution policies, and the written Execution Protocol introduce more variability into their lethal-injection system.  The inconsistent results due to this variability will constitute disparate treatment of Plaintiff during his execution compared to similarly situated individuals in a manner that substantially burdens Plaintiff's

274

fundamental rights and is not narrowly tailored to achieve a

compelling state interest.

> **10. Equal Protection violation based on burdening Plaintiff's fundamental rights by Defendants' intentional removal of the drug concentrations from the Execution Protocol which creates a great likelihood that Defendants will inject Plaintiff with lesser or greater than the required amount of execution drugs.**

1116. Plaintiff is similarly situated to other condemned inmates to whom

Defendants will apply their execution protocol.

1117. Defendants' planned use of the 2016 Execution Protocol severely

burdens Plaintiff's right to be free from cruel and unusual

punishment because Defendants removed certain safeguards present

in past execution protocols.

1118. Every execution protocol since at least January 8, 2004 has included

the concentration requirement in its execution drugs. Those protocols

include the prior two protocols using pentobarbital or thiopental

sodium and the prior protocols using midazolam and hydromorphone.

1119. Defendants' current Execution Protocol removes a prior safeguard

that required Defendants to use a certain concentration of the

execution drugs. The current Execution Protocol omits any reference

to the concentration of the solution from which any of the execution

drugs are obtained. (October 7, 2016 Protocol, VI.F.4.b–d.) For

example, in the June 29, 2015 Protocol, the Drug Administrator was

required to prepare syringes containing five (5) grams of

pentobarbital, 100 mml of a 50mg/ml solution. Alternatively, the

Drug Administrator was required to prepare syringes containing five (5) grams of thiopental sodium, 200 ml of a 25 mg/ml solution. Previous execution protocols likewise required specific concentrations for the applicable drugs in those protocols.

1120. This requirement existed because drugs in solutions, like the execution drugs, have various different concentrations and potencies. Potency refers to the amount of drug required to produce an effect. Some drugs produce a powerful effect at minute doses and others need a large dose to have any effect.

1121. Under the current Execution Protocol, if an execution drug is in a very weak solution, a large amount of solution may be required to obtain the desired effect.  Injecting a larger amount of solution will take longer or risk blowing out the IV.

1122. If the Drug Administrators measure the amount of drug to be injected based solely on the volume of solution, but the concentration is incorrect, the incorrect amount of the drug will be injected.

1123. If the execution drugs are obtained from a very strong solution requiring much less of the solution to obtain the designated amount of the drug, a very minute amount of solution may be required but Drug Administrators will likely still inject the mandated volume.

1124. It is likely that Drug Administrators will inject a subpotent injection of the first drug, but a superpotent injection of the second or third drug.

Thus the alleged effect of the midazolam may wear off before the paralytic is injected if the midazolam is in a weak solution.

1125.    The concentration of the lethal injection drug in the required syringes alters the total volume of the lethal injection dose.  This in turn affects the rate of delivery (the push rate) used for the IV administration, and makse it substantially likely that Drug Administrators will use too high of a push rate for the execution drugs.

1126.    Because it is substantially likely that Drug Administrators will use too high of a push rate for the execution drugs, there is a substantial likelihood that they will blow out a vein in the IV administration process, or that a significant amount of any midazolam injected will precipitate at the injection point, thus preventing the required amount of midazolam from reaching Plaintiff's brain before he will be injected with the second and third drugs.

1127.    This new unfettered discretion to use any concentration of execution drugs means each Plaintiff will be treated differently depending on what solution Defendants are able to obtain.  Thus, Defendants will intentionally treat Plaintiff differently than those persons previously executed with execution drugs drawn from a solution containing a certain concentration of drug and a known potency.

1128.    Additionally, Plaintiff will be treated differently from those persons subject to the execution following his execution as any solution with any concentration can be used at the complete discretion of the

Defendants. The failure to specify the concentration of execution drugs in the solution results in a risk that Plaintiff may suffer constitutionally impermissible levels of pain. This risk substantially burdens Plaintiff's fundamental rights as identified herein, and this burden is not narrowly tailored to achieve a compelling state interest.

**B.** **Equal Protection—"Class of One" Disparate Treatment**

1129. When an inmate does not allege that the government's actions in disparately carrying out a lethal-injection execution burden a fundamental right or target a suspect class, the inmate is said to proceed on a so-called "class of one" theory and must prove that the government's actions lacked any rational basis. *See Cooey*, 801 F. Supp. 2d at 653.

1130. To succeed on a "class-of-one" equal protection claim, a plaintiff must allege either disparate treatment from similarly situated individuals and that the government actors had no rational basis for the difference, *Assocs. of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 549 (6th Cir. 2007), or that the 'challenged government action was motivated by animus or ill-will,' *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 864 (6th Cir. 2012)." *Paterek v. Vill. of Armada*, No. 14-1894, 2015 U.S. App. LEXIS 15932, *43 (6th Cir. Sept. 8, 2015).

1131. Defendants will intentionally treat Plaintiff differently than similarly situated individuals by their deviations from or failure to follow the

278

relevant law in a manner that is detrimental to Plaintiff by increasing the risk of a burden on his various fundamental rights identified herein.

1132.  Defendants' disparate treatment of Plaintiff is so unrelated to achievement of any combination of legitimate purposes that it must be irrational and arbitrary.

1133.  Trying to carry out an execution under any procedure that might accomplish the task is not a sufficient basis to rationally justify Defendants' disparate treatment of Plaintiff.

1134.  Defendants' actions are pure arbitrariness—they are irrational and arbitrary by definition because they are in contravention of the law, which negatives any conceivable basis that might support Defendants' actions.

**1.  Equal Protection violation based on Defendants' unequal application of the Execution Protocol to Plaintiff as a class of one.**

1135.  Plaintiff is a "class of one," similarly situated with any other condemned inmate who has been or will be subjected to Defendants' execution policy and written Execution Protocol.

1136.  Plaintiff has been or will be singled out arbitrarily and irrationally as a "class of one" who will not be afforded equal protection as represented by the procedural safeguards in Defendants' written Execution Protocol, when such written safeguards are disregarded, ignored, deemed discretionary or advisory only, or otherwise not followed,

279

intentionally and/or otherwise, during administration of the overarching execution policy.

1137. Plaintiff has been or will be treated differently from other similarly situated individuals without any rational basis for the difference in treatment as a class of one, irrationally and arbitrarily, in violation of the guarantees of the Equal Protection Clause of the Fourteenth Amendment.

1138. Defendants' individual and/or pattern of deviations and/or variations from their execution policy and written Execution Protocol arbitrarily and irrationally treat Plaintiff differently from similarly situated inmates.

1139. Defendants have demonstrated a pattern of irrationally and arbitrarily deviating and/or varying from their execution policy and written execution protocol without any legitimate governmental interest. Combined with the nearly limitless discretion vested in certain actors in the execution process, this means that Plaintiff's death sentence will be administered in a manner such that he will be arbitrarily and irrationally treated differently than similarly situated individuals, to his detriment in the form of increased risk of violations of his fundamental rights, therefore violating his rights as a class of one under the Fourteenth Amendment's Equal Protection Clause.

1140. Defendants' disparate treatment of Plaintiff arising from their individual and/or pattern of deviations and/or variations from their

280

execution policy and written execution protocol is arbitrary, irrational, and furthers no legitimate state interests, and/or there is no relationship between the deviations and/or variations and any legitimate state interest.

1141.  Defendants' pattern of deviations and/or variations is irrational because it is arbitrary and capricious; it is a pattern of random deviations and/or variations that changes from execution to execution.

1142.  Defendants' arbitrary application of their Execution Protocol is all the more detrimental to Plaintiff because open oversight and scrutiny by Plaintiffs, this Court, and the public have been key in exposing significant constitutional violations regarding Defendants' execution processes and protocols.  But after Defendants sought, and Defendant Kasich signed, legislation creating Ohio Revised Code § 2949.221–222, there will be virtually no oversight of any actions related to carrying out the Execution Protocol, and Defendants subjectively believe that there will be virtually no oversight of their actions.

1143.  Reducing the level of protection against the risk of harms caused by the Execution Protocol is arbitrary and irrational.

1144.  Any justifications that Defendants have offered for their deviations and/or variations from the Execution Protocol are without any rational relationship to a particular condemned inmate.

1145. Defendants' justifications for their deviations and/or variations amount to claims of administrative convenience, which is not a legitimate governmental interest.

1146. By arbitrarily and/or inconsistently following, deviating or varying from the procedural safeguards in Defendant's execution policy and written Execution Protocol, and without any justification related to any specific condemned inmate or to any compelling or legitimate governmental interest, Defendants are arbitrarily denying or significantly burdening Plaintiff's fundamental rights as articulated herein.

1147. Defendants' execution policy and written Execution Protocol are considered binding state law, and thus Defendants violate state law when they fail to abide by the explicit mandates of their execution policy and/or written execution protocol.

1148. Upon information and belief, Defendants have also violated federal and/or state law governing drug manufacturing, compounding, and controlled substances through their deviations and/or variations from their execution policy and written Execution Protocol.

1149. Even if otherwise strictly abiding by their execution policy and written Execution Protocol, Defendants have still violated federal and state law governing drug manufacturing, compounding, and controlled substances in a way that disparately applies the law to Plaintiff as a class of one, irrationally.

1150.　Defendants have arbitrarily and irrationally deviated from their Execution Protocol, including from Core Elements of the Execution Protocol from which deviations are allegedly impermissible, when they have violated or violate applicable federal and/or state statutory or regulatory laws discussed herein, to Plaintiff's detriment.

1151.　State actions that are clearly contrary to law are irrational, and therefore Defendants' deviations and/or variations from, and disregard and violations of, binding law in the form of the Execution Protocol and other applicable federal and state statutes and regulations, are irrational.

1152.　Condemned inmates subject to Defendants' execution policy and their written Execution Protocol—including Plaintiff—are dissimilar in only immaterial respects as it relates to Defendants' pattern of deviations and/or variations, and/or Defendants' deviations and/or variations are not rationally founded on differences that are real and not illusory.

1153.　By arbitrarily and/or inconsistently following, deviating or varying from the procedural safeguards in Defendants' execution policy and written Execution Protocol, Defendants are arbitrarily and intentionally treating Plaintiff differently than other similarly situated inmates or irrationally singling him out as a class of one without any relation to differences between Plaintiff and otherwise-similarly-situated individuals, to Plaintiff's detriment and contrary to law or

otherwise without any rational relationship to a legitimate governmental interest.

1154. Defendants' execution policy and written Execution Protocol facially violates Plaintiff's rights as a class of one under the Equal Protection Clause because they codify arbitrary and irrational unequal treatment of similarly situated individuals, such as Plaintiff, without any legitimate governmental interest and in a manner detrimental to Plaintiff, and Defendants seek to hide this arbitrary and irrational unequal treatment from Plaintiffs, the media, the courts, and the general public.

**2. Equal Protection violation based on Defendants' unequal application of Ohio's execution statute to Plaintiff as a class of one.**

1155. Plaintiff is a "class of one," similarly situated with any other condemned inmate who has been or will be subjected to Ohio's execution statute, § 2949.22.

1156. Defendants' implementation of Ohio Rev. Code § 2949.22 and the Execution Protocol irrationally, intentionally and/or recklessly treats death-row inmates, including Plaintiff, disparately by arbitrarily subjecting inmates to painful, lingering, undignified, or spectacle executions despite its obligation to consistently provide quick and painless executions.

**3. Equal Protection violation based on Defendants' unequal application to Plaintiff, as a class of one, of federal and Ohio state laws related to imported drugs, unapproved drugs, misbranded drugs, adulterated drugs, controlled substances, or compounded drugs, including compounding sterile injectable controlled substances to be used as execution drugs.**

1157.   Plaintiff is a "class of one," similarly situated with those who are subject to the federal and Ohio state drug law or those who are intended to be protected and kept safe from exposure to harmful drug products by those laws—specifically, those persons who will be exposed to controlled substances, or drug products produced by manufacturers, foreign or domestic, or by compounding pharmacies or outsourcing facilities.

1158.   Defendants intentionally and/or recklessly treat Plaintiff as a class of one disparately from others similarly situated.

1159.   Defendants' intentional and/or reckless violations of federal and Ohio state drug laws intentionally violate Plaintiff's rights as a class of one, arbitrarily and irrationally, thereby exposing him to significant risks of harm from illegal and illegally sourced drugs and significantly burdening his fundamental rights as identified herein, without any rational relationship to any legitimate state interest, because state actions that are clearly contrary to law are irrational.

1160.   Any possible rational or legitimate state interest is "negatived" when Defendants' actions are in violation of the law and are, therefore, arbitrary and capricious by definition.

1161.   Defendants substantially burden Plaintiff's fundamental rights identified herein through their intentional and/or reckless violations of the federal and Ohio state drugs laws as alleged herein, which arbitrarily and irrationally exposes Plaintiff to the risks identified herein, to his detriment. Those violations dramatically reduce the protections to Plaintiff's health from the possibility of harmful, dangerous, painful, adulterated, misbranded, or poorly compounded drugs, including controlled substances, that those laws were created to provide.

1162.   That level of risk to Plaintiff is increased significantly due to the restrictions on oversight in Ohio Revised Code §§ 2949.221–222 that were recently created at Defendants' behest and signed into law by Defendant Kasich.

1163.   Defendants' violations of the federal and state drug laws as alleged herein also intentionally and/or recklessly apply the law unequally to Plaintiff by purporting to permit Drug Source Defendants and DRC Defendants to engage in illegal activity to compound, import, dispense, distribute, administer, transfer, transport, purchase, or otherwise engage in a broad host of activities identified herein related to controlled substances to be used as execution drugs, when such activity would ordinarily subject those Defendants to criminal prosecution in federal and/or state court or civil administrative enforcement sanctions for their actions.

1164.    Defendants' tacit endorsement of illegal activity in the name of carrying out an execution at all costs is arbitrary and irrational, and especially when combined with Defendants' strong desire to keep secret their activities related to executions, Plaintiff will be detrimentally affected by Defendants' lawless activities, including by substantially burdening his fundamental rights identified herein.

>    **4.    Equal Protection violation based on Defendants' unequal application of Ohio's definition-of-death law to Plaintiff as a class of one.**

1165.    Plaintiff is a "class of one," similarly situated to others to whom Ohio's definition-of-death law, Ohio Revised Code § 2108.40, applies.

1166.    DRC Defendants will intentionally and/or recklessly apply Ohio's definition-of-death law to him disparately if they apply it to him at all, to his detriment and irrationally because he will likely still be alive, statutorily and medically, at the time DRC Defendants declare him dead and proceed with steps in the Execution Protocol such as removing him from the execution chamber and loading him into a vehicle to deliver him to the person who is responsible for taking possession of Plaintiff's remains.

1167.    The range of times in which DRC Defendants declare death demonstrates an arbitrary and/or irrational application, if at all, of Ohio's definition-of-death law.

**5.   Equal Protection violation based on Defendants' unequal application of federal and Ohio state laws prohibiting non-consenting human experimentation to Plaintiff as a class of one.**

1168.   Plaintiff is a "class of one," similarly situated with those who are protected by from federal and state laws prohibiting human experimentation on non-consenting, unwilling human subjects.

1169.   DRC Defendants will intentionally and/or recklessly treat Plaintiff disparately by subjecting him to human experimentation to which Plaintiff has not and does not consent, as alleged herein, to Plaintiff's detriment.

1170.   DRC Defendants' disparate treatment is arbitrary and irrational because it violates applicable federal and state-law prohibitions on non-consenting human experimentation, as alleged herein.

**6.   Equal Protection violation based on Defendants' disparate denial of necessary medical care and permitting a lingering death.**

1171.   Plaintiff is a "class of one," similarly situated to others in ODRC's custody for whom the State of Ohio, through ODRC and its employees and agents, are responsible under the Eighth Amendment to provide necessary medical care.

1172.   Plaintiff is a "class of one," similarly situated to others to whom DRC Defendants will administer its Execution Protocol and thereby produce a lingering death.

1173.   DRC Defendants will treat him disparately, intentionally and/or recklessly, by failing to provide the necessary medical care and permitting a lingering death instead.

1174.   DRC Defendants' actions are arbitrary and irrational, as DRC Defendants have a duty under the Eighth Amendment to provide necessary medical care to one in their custody, and to prevent subjecting Plaintiff to a lingering death.

**7.    Equal Protection violation based on Defendants' use of midazolam and the unavoidable variation inherent in midazolam's efficacy on individuals, which treats Plaintiff unequally as a class of one.**

1175.   Plaintiff is a "class of one," similarly situated with any other condemned inmate who has been or will be subjected to execution in Ohio.

1176.   The unavoidable variability inherent in midazolam's efficacy, set out in this Fifth Amended Complaint, also violates the Equal Protection Clause because such deviation results in the disparate treatment of Plaintiff as a "class of one."  Defendants will intentionally treat Plaintiff differently than similarly situated individuals by its use of a drug so imbued with risks of variation that it cannot produce reliable results.  Plaintiff will suffer as a result of the unreliable efficacy of midazolam.

1177.   Defendants have no rational basis for the irrational and arbitrary difference in their treatment of Plaintiff that stems from using a drug whose effects on individuals are not reliably consistent.

1178.    Such disparate treatment constitutes a violation of Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment.

**8.    Equal Protection violation based on Defendants' removal of any required concentration of the execution drugs which treats Plaintiff unequally as a class of one.**

1179.    Plaintiff is a "class of one," similarly situated with any other condemned inmate who has been or will be subjected to execution in Ohio.

1180.    The variations created by Defendants' intentional removal of any required concentration of the execution drugs in the Execution Protocol, set out above, violates the Equal Protection Clause because such variation results in the disparate treatment of Plaintiff as a class of one.

1181.    Defendants intentionally treat Plaintiff differently than similarly situated individuals by their unregulated use of any concentration of execution drugs in solutions.

1182.    The complete lack of any required concentration of execution drugs in solutions cannot produce reliable results.

1183.    Plaintiff will suffer as a result of the lack of a required concentration of execution drugs in solutions.

1184.    Defendants have no rational basis for their intentional, irrational and arbitrary difference in their treatment of Plaintiff that stems from using any concentration of execution drugs in solutions.

1185.   Such disparate treatment constitutes a violation of Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment.

**Fifth Claim for Relief: Violations of Fundamental Rights Arising Under The Principles Of Liberty and/or Natural Law Which Are Protected By The Ninth Amendment.**

1186.   As to each of the constitutional violations alleged below, Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1187.   Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1188.   Defendants' application of their execution policy and written execution protocol, as demonstrated through previous executions such as Clark, Newton, Biros, Berry, McGuire, and the failed execution of Broom, and as alleged above, along with the facts alleged above related to executions of inmates in other states using execution protocols similar or identical to Defendants' protocol and procedures and Defendants' connection to those executions, will violate Plaintiff's fundamental, unenumerated rights arising under the principles of liberty and/or natural law that are protected by the Ninth Amendment.

1189.   These rights include rights such as Plaintiff's right to privacy, his right to personal dignity, his right to bodily integrity, his right to not

be the unwilling subject of forced, involuntary human experimentation conducted by Defendants, and others inherent in the concepts of liberty and/or natural law.

1190.   These fundamental rights, arising from the concepts of liberty and natural law that guided the Framers' understanding of the Ninth Amendment specifically and the Bill of Rights in general, are deeply rooted in this Nation's history and tradition, and they are implicit in the concept of ordered liberty.

1191.   Defendants will violate Plaintiff's fundamental, unenumerated rights in violation of the Ninth Amendment through Defendants' haphazard and faulty administration of their execution policy and written Execution Protocol, including, but not limited to, Defendants' demonstrated inability to consistently obtain IV access quickly and with a minimum number of needle sticks, Defendants' inconsistent application of ICS principles over time, Defendants' demonstrated willingness to discount evidence of significant problems during an execution, Defendants' demonstrated unwillingness to recognize the need for resuscitative medical care and equipment on hand and the corresponding need to accurately assess when an inmate has legally died, and Defendants' insistence to this Court that they have not and will not illegally obtain execution drugs even after evidence is revealed suggesting that they have tried to obtain execution drugs in violation

of the law; and Defendants' resurrection of a three-drug method that includes three drugs that DRC Defendants have previously rejected.

1192. Defendants will violate Plaintiff's fundamental, unenumerated rights in violation of the Ninth Amendment through their administration of execution drugs, compounded or otherwise, that will cause vomiting, choking, asphyxiating, suffocating, gasping, seizing, tremors, a heart attack, and other disturbing reactions, resulting in an undignified, spectacle execution, or attempted execution, offensive to an inmate's rights protected by the Ninth Amendment.

1193. Defendants will violate Plaintiff's fundamental, unenumerated rights in violation of the Ninth Amendment through their application of their execution policy's and written Execution Protocol's various tasks in such a way as to result in an undignified, spectacle execution, or attempted execution, offensive to an inmate's rights protected by the Ninth Amendment.

1194. Forcing a non-consenting prisoner to be the unwilling, involuntary subject of pharmaceutical or medical experimentation performed on him by those who hold him in custody has long been prohibited internationally, by the United States in accordance with binding international treaties and under controlling federal drug statutes and regulations, and is even prohibited by DRC Defendants' own departmental policies.  *See* ODRC Policy 68-MED-11, Protocol Number E-4, Pharmacy Distribution and Dispensing Operations,

293

¶ III.D, Experimental or Investigational Drugs; ODRC Policy 06-RES-01, Research Approval Process, ¶ V ("The participation of offenders under the jurisdiction of the [ODRC] in medical, pharmaceutical, and/or cosmetic research projects is prohibited unless there is a clear benefit for the inmate given his/her health status."); ODRC Policy 06-RES-02, Human Subjects Research Policy, ¶ VI.A.5.c (stating that investigational or experimental projects "that represent a risk to offenders are not allowed"); ¶ VI.C.1 (stating the "participation of offenders under the jurisdiction of the Department in medical, pharmaceutical, and/or cosmetic projects is prohibited unless there is clear benefit to the individual offender based on his/her need for a specific medical procedure or pharmaceutical that is not generally available. **Participation of offenders** in medical or **pharmaceutical testing purely for experimental** or research purposes **is not permitted**.") (emphasis added); ¶ VI.C.3; ¶ VI.C.6.

1195.    Defendants will violate Plaintiff's fundamental, unenumerated rights in violation of the Ninth Amendment through their application to him of experimental or investigational drugs, to which he does not and, indeed cannot, consent, thereby forcing him to become the unwilling, involuntary subject of forced human experimentation in violation of an inmate's rights protected by the Ninth Amendment.

1196.   In all the foregoing ways, Defendants violate Plaintiff's fundamental, unenumerated rights in violation of the Ninth Amendment to the United States Constitution and 42 U.S.C. § 1983.

**Sixth Claim for Relief: First Amendment Free Speech Clause Violations**

1197.   As to each of the constitutional violations alleged below, Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1198.   Defendants' written protocol places restrictions on the length and content of an inmate's last statement, and those restrictions are not necessary or the least restrictive means to achieve a governmental interest.

1199.   The restrictions will have a chilling effect on an inmate's expressive speech because the written protocol gives the Warden discretionary but unguided authority to impose restrictions on the length of an inmate's last statement, and to terminate a statement based on content, *i.e.*, to terminate a statement if the Warden subjectively believes it is intentionally offensive to others, without any further explanation on how those restrictions are to be applied.

1200.   Plaintiff has a fundamental right protected by the First Amendment, the Ninth Amendment, and the Fourteenth Amendment to the federal constitution to make a final statement free of the restrictions contained in Defendants' written protocol.

295

1201.   The restrictions in Defendants' written protocol related to an inmate's last words violate well-established First Amendment prohibitions on content-based discrimination in regulating speech.

1202.   The restrictions in Defendants' written protocol related to an inmate's last words violate well-established First Amendment prohibitions related to the public forum and/or limited public forum doctrines.

1203.   The restrictions in the written protocol related to an inmate's last words discriminate against an inmate's expressive speech on the basis of viewpoint, because the Warden may impose restrictions the Warden subjectively believes to be intentionally offensive.

1204.   The restrictions in the written protocol related to an inmate's last words are not reasonable in light of the purpose of an execution, and Plaintiff is provided no alternative way to communicate the entirety of his last words if the Warden restricts Plaintiff's speech.

1205.   There are no governmental interests to justify the restrictions on an inmate's expressive speech provided in the written protocol.

1206.   The written protocol, facially and as applied to him, violates Plaintiff's freedom of speech rights protected by the First, Ninth and Fourteenth Amendments.

1207.   Upon information and belief, the restrictions in Defendants' written protocol related to an inmate's last words also violate the terms of a settlement agreement to which some of the original Defendants in these lethal injection cases, and at least one former Plaintiff in this

action, Frederick Treesh, were a party, in *Treesh v. Taft*, No. 99-624, S.D. Ohio.

1208. Upon information and belief, under the terms of the settlement agreement, Defendants' protocol would place no restrictions on the content and/or the duration of an inmate's last statement.

1209. In all the foregoing ways, Defendants violate Plaintiff's rights to free speech protected by the First Amendment to the United States Constitution and 42 U.S.C. § 1983.

**Seventh Claim for Relief: Fourteenth Amendment Due Process Violation**

1210. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1211. DRC Defendants have failed to definitively inform Plaintiff about which method of execution they intend to apply to him in such a way that Plaintiff can be sure of which execution method Defendants will use on him, whether Plan 1, Plan 2 or Plan 3.

1212. DRC Defendants have not provided Plaintiff with the identification information of any of the Drug Source Defendants from whom they will obtain the execution drugs to be used at the Plaintiff's execution.

1213. Indeed, DRC Defendants were actively involved, in late 2014, in efforts to persuade the Ohio General Assembly to introduce and enact legislation, *i.e.*, HB 663, that would cause the identification information of Drug Source Defendants and others to be: (a) classified

as confidential, privileged under law, and not subject to disclosure by any person, state agency, governmental entity, board, or commission or any political subdivision as a public record under section 149.43 of the Ohio Revised Code or otherwise; (b) no longer subject to disclosure by or during any judicial proceeding, inquiry, or process, except as otherwise provided in the new law; and (c) no longer subject to discovery, subpoena, or any other means of legal compulsion for disclosure to any person or entity, except as otherwise provided in the new law.

1214. These efforts resulted in the enactment of HB 663, which became effective March 23, 2015, and the pertinent provisions referenced here are codified at Ohio Revised Code §§ 149.43(A)(1)(cc), 2949.221, and 2949.222.

1215. Under the purported authority of the referenced provisions of HB 663, DRC Defendants have refused to provide Plaintiff with the identification information of any of the Drug Source Defendants from whom DRC Defendants will obtain the execution drugs to be used at the Plaintiff's execution.

1216. "The fundamental requisite of due process of law is the opportunity to be heard. This right to be heard has little reality or worth unless one is informed that the matter is pending . . . ." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (internal citations omitted).

1217. "The right to be heard before being condemned to suffer grievous loss of any kind . . . is a principle basic to our society." *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 168 (1951 (Frankfurter, J., concurring).

1218. The only meaningful time when Plaintiff can challenge the method of his own execution is before he is executed.

1219. "Fundamental fairness, if not due process, requires that the execution protocol that will regulate a prisoner's death be forwarded to him in prompt and timely fashion." *Oken v. Sizer*, 321 F. Supp. 2d 658, 664 (D. Md. 2004), *stay vacated*, 542 U.S. 916 (2004).

1220. The Execution Protocol purports to provide timely notice to an inmate of the manner in which he or she will be executed including the execution drugs to be used, but that assurance is merely illusory.

1221. There is no definitive deadline in the written protocol by which the Warden must inform the inmate of what the Warden has decided, and the Medical Team can make a different determination at any time—including even the morning of a scheduled execution—without any further notice to the inmate required.

1222. Plaintiff's due process rights are violated when Defendants provide information about their Execution Protocol but then carry out the execution in a manner that differs from those representations.

1223. DRC Defendants fail and refuse to provide critically relevant information concerning the identification information of the Drug

299

Source Defendants and their experience, training, qualifications, credentials, and performance history.

1224. By failing to require and provide adequate notice of exactly which method of execution the Defendants will use, and of the identification information of the Drug Source Defendants, Defendants are depriving Plaintiff of his right to notice and an opportunity to be heard in the form of a constitutional challenge to Defendants' execution method, in violation of the Due Process Clause of the Fourteenth Amendment.

1225. Furthermore, because there is no requirement for background checks, credentialing, or anything of the sort related to which Drug Source Defendants with whom the DRC Defendants will work to manufacture execution drug(s), or Drug Source Defendants' drug manufacturing facilities, and because there is no mechanism by which any assessments or quality-control inspections, testing, analysis, or other similar procedures of any kind are done to ensure strict compliance with all relevant federal and State of Ohio laws and Core Elements ## 1, 2, and 3, Defendants are depriving Plaintiff of his right to notice and an opportunity to be heard, in violation of the Due Process Clause of the Fourteenth Amendment.

1226. Plaintiff will have no meaningful opportunity to challenge the involvement of Drug Source Defendants in a critical aspect of the written execution protocol if he is not informed in advance about the source of the execution drug(s) to be used for his execution, the

specific involvement of each and every Drug Source Defendant, and the identification information of such Drug Source Defendants.

1227.   Nor will he have a meaningful opportunity to challenge the use of execution drugs manufactured for the sole purpose of killing him which have a substantial, objectively intolerable risk of being something other than the pure, sterile, unadulterated, not-expired/not past their use-by date, not-imported drugs of the proper potency, content, pH level and other relevant characteristics, as required to be used by the 2016 Execution Protocol and Defendants' execution policies.

1228.   Defendants' history of their misadventures in carrying out executions and their history of making representations and then reneging on those representations, coupled with the essentially unlimited discretion the Execution Protocol purports to invest in the DRC Director, means that Defendants' ad hoc application of its Execution Protocol violates Plaintiff's right to due process.

1229.   In all the foregoing ways, Defendants violate Plaintiff's rights to due process protected by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

**Eighth Claim for Relief: Fourteenth Amendment Due Process Clause Violations For Experimenting On Non-Consenting Prisoners**

1230.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1231.    The Fourteenth Amendment protects the liberty and privacy right one has in the integrity of one's body.  *See Rochin v. California*, 342 U.S. 165, 169 (1952); *Hurtado v. People of California*, 110 U.S. 516, 536 (1884).

1232.    "[N]eedlessly severe intrusions of an individual's body, *even if that individual [i]s a felon and stripped of most of his liberty*, [are] impermissible under the Due Process Clause of the Constitution." *In re Cincinnati Radiation Litig.*, 874 F. Supp. 796, 818 (S.D. Ohio 1995).

1233.    Within the basic protections of individual liberty encapsulated in the Fourteenth Amendment are also the principles established in the Nuremberg Code.  *Id.* at 819–22.

1234.    The Nuremberg Code, developed to create universal standards for carrying out human experimentation, explicitly states that "[t]he voluntary consent of the human subject is absolutely essential.  This means that the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice . . . ." *United States of America v. Brandt* (the Medical Case), II

Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, at 181 (1949).

1235.    Ohio state administrative law prohibits administration of experimental or investigational drugs to an inmate unless that drug is the only option to treat a medical condition and written approval has been obtained from the DRC Bureau of Medical Services State Medical Director and the DRC Human Subjects Review Committee.  *See* ODRC Policy 68-MED-11, Protocol Number E-4, Pharmacy Distribution and Dispensing Operations, ¶ III.D, Experimental or Investigational Drugs.

1236.    Ohio state administrative law also prohibits participation of offenders in medical or pharmaceutical testing purely for experimental purposes.  ODRC Policy 06-RES-02, Human Subjects Research Policy, ¶ VI.C.1.

1237.    Ohio state administrative law also prohibits investigational or experimental projects "that represent a risk to offenders."  *Id.* at ¶ VI.A.5.c.

1238.    Other portions of Ohio administrative law in the form of ODRC policies likewise prohibit Defendants from subjecting Plaintiff to execution using experimental or investigational drugs without Defendants' having gone through the required, non-discretionary procedures to engage in experimental or investigational processes. *See, e.g.*, DRC Policy 06-RES-01.

1239. Upon information and belief, no written approval to administer experimental or investigational drugs to an inmate in the context of an execution has ever been sought or obtained from the DRC Bureau of Medical Services State Medical Director and the DRC Human Subjects Review Committee.

1240. The written application for approval to use experimental or investigational drugs must include the justification for use of the drug(s), as well as an informed consent statement signed by the inmate.

1241. Plaintiff has not signed an informed consent statement authorizing Defendants to use investigational or experimental drug(s) on him during a lethal-injection execution, nor is carrying out his death sentence reasonably considered a "medical condition" for which use of experimental or investigational drug(s) might be permissibly considered.

1242. Because of the lack of data, studies, physician expertise, and the variability of human response, every lethal injection that Defendants conduct is a human experiment. *See In re: Ohio Execution Protocol Litig.*, 994 F. Supp. 2d 906, 913 (S.D. Ohio Jan. 13, 2014).

1243. The timing of scheduled executions in Ohio, when compared with the use-by date mandated under Ohio law for compounded sterile injectables, means that Defendants—if they will not be using expired

drugs/drugs past their use-by date—will typically need to obtain a new order of compounded execution drugs before each execution.

1244.   Each execution conducted with a new batch of compounded execution drugs will be an experimental execution, because there is no guarantee that the drugs involved will be identical from execution to execution.

1245.   Any compounded execution drugs are also unapproved investigational New Drugs prohibited by the federal FDCA and Ohio state law, and thus experimental by definition.

1246.   Any imported execution drugs unapproved investigational New Drugs prohibited by the federal FDCA and Ohio state law, and thus experimental by definition.

1247.   Any manufactured drugs that are ordinarily considered "approved" drugs by the federal FDA are "unapproved" for purposes of using those drugs to carry out a human execution.

1248.   The experimental nature of each execution that Defendants conduct is amplified exponentially due to the element of variability added by use of compounded execution drugs, and amplified even further because those compounded execution drugs are made by pharmacists or other Drug Source Defendants who are, by definition, ethically compromised by virtue of being willing to violate their professional ethical standards to provide drugs to be used in a human execution, and amplified further still if any of said Drug Source Defendants are

305

permitted to remain anonymous thereby preventing Plaintiff and the Court from reasonable inquiry into and verification of the Drug Source Defendants' experience, training, qualifications, credentials, performance history, and adherence to the applicable federal and state laws.

1249. Similarly, the experimental nature of each execution that Defendants conduct is amplified exponentially due to the element of variability added by use of imported and/or misbranded execution drugs, and amplified even further because those imported and/or misbranded drugs were manufactured in facilities that do not comply with U.S. manufacturing standards and exported and imported by persons who are, by definition, ethically compromised by virtue of being willing to use subterfuge and other nefarious methods to smuggle unapproved, misbranded drugs illegally into Defendants' possession, and amplified further still if any of said Drug Source Defendants are permitted to remain anonymous thereby preventing Plaintiff and the Court from reasonable inquiry into and verification of the Drug Source Defendants' experience, training, qualifications, credentials, performance history, and adherence to the applicable federal and state laws.

1250. Prisoners cannot give voluntary consent to human experimentation because they lack the free power of choice.

1251. Plaintiff is a prisoner unable to exercise the free power of choice.

1252. Even if he could give consent, he does not: Plaintiff does not consent to being experimented on like a human guinea pig by Defendants' use of experimental lethal injection execution drugs.

1253. Defendants have no clinical basis for believing any drug combination that Defendants use to execute Plaintiff will cause death without a substantial, objectively intolerable risk of severe, unnecessary pain or suffering.

1254. Defendants have no clinical basis for believing any drug combination that Defendants use to execute Plaintiff will not cause a lingering death.

1255. Defendants have no clinical basis for believing any drug combination that Defendants use to execute Plaintiff will not cause a humiliating, degrading spectacle.

1256. Any execution of the Plaintiff conducted by Defendants under the Execution Protocol will constitute a human experiment without voluntary consent, using unapproved investigational new drugs illegally compounded and dispensed by an ethically compromised pharmacist, or unapproved, misbranded drugs manufactured in substandard facilities and exported and illegally imported by ethically compromised Drug Source Defendants, all in violation of Fourteenth Amendment. *See In re Cincinnati Radiation Litig.*, 874 F. Supp. 796, 818 (S.D. Ohio Jan. 11, 1995).

**Ninth Claim for Relief: Fourteenth Amendment Privileges or Immunities Clause Violations For Experimenting on Non-Consenting Prisoners.**

1257. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1258. Defendants' application of their execution policy and written execution protocol, as demonstrated through previous executions such as Clark, Newton, Biros, Berry, McGuire, and the failed execution of Broom, and as alleged above, along with the facts alleged above related to executions of inmates in other states using execution protocols similar or identical to Defendants' protocol and procedures and Defendants' connection to those executions, will violate Plaintiff's fundamental, unenumerated rights protected against infringement by the Privileges or Immunities Clause of the Fourteenth Amendment.

1259. These rights include rights such as Plaintiff's right to not be the unwilling subject of forced, involuntary human experimentation conducted by Defendants, which is a right secured for the citizens of the United States based on citizenship of the United States because it is a right secured by international treaties. *Slaughter-House Cases*, 83 U.S. 36, 80 (1873); *see also McDonald v. City of Chicago*, 561 U.S. 742, 851–855 (2010) (Thomas, J., concurring).

1260. The right against being subject to involuntary human experimentation is clear, established as it is in numerous international treaties to

which the United States is a party, including the Universal
Declaration of Human Rights, G.A. Res. 217A, U.N. Doc A/810, at 71
(1947); the International Covenant on Civil and Political Rights, G.A.
Res. 2200A, 21 U.N. GAOR, Supp. (No. 16) 49, 52, U.N. Doc. A/6316
(1966); the Geneva Convention, 6 U.S.T. 3316, T.I.A.S. 3364, 75
U.N.T.S. 135, Aug. 12, 1949; the Declaration on the Protection of all
Persons from Being Subjected to Torture and Other Cruel, Inhuman
or Degrading Treatment or Punishment, G.A. Res. 3452, Annex Art. 1
(Agenda Item 74), 30 U.N.GAOR, Supp. (No. 34) 91, U.N. Doc.
A/10408 (1975); and the Nuremberg Code, G.A. Res. 161, U.N. Doc.
A/PV55, at 2244 (1946).

1261.  Defendants' Execution Protocol constitutes a forced, involuntary
human experimentation conducted by Defendants because this Court
has explicitly characterized it as such: "There is absolutely no
question that Ohio's current [lethal- injection] protocol presents an
experiment in lethal injection processes.  The science involved, the
new mix of drugs employed at doses based on theory but
understandably lacking actual application in studies, and the
unpredictable nature of human response make today's inquiry at best
a contest of probabilities." *In re Ohio Execution Protocol Litig.*, No.
2:11-cv-1016, 2014 WL 130609, at *6 (S.D. Ohio Jan. 13, 2014).

1262.  Defendants' Execution Protocol also constitutes a forced, involuntary
human experimentation conducted by Defendants because

Defendants intend to administer pentobarbital, or thiopental sodium, or midazolam followed by a paralytic drug and potassium chloride, to Plaintiff to cause his death.  This administration falls outside any of those drugs' marketed, FDA-approved purposes and outside the course of medical practice, and therefore constitutes the use of "New Drugs" under the FDCA.  *See* 21 U.S.C. § 321(p).

1263.    The FDCA "generally prohibits access to new drugs unless and until they have been approved by the Food and Drug Administration." *Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 697 (D.C. Cir. 2007) (en banc) (citing 21 U.S.C. § 355(a)).

1264.    Before FDA approval, a new drug may only be used in humans through a clinical investigation.  A "clinical investigation" is "any experiment in which a drug is administered or dispensed to, or used involving, one or more human subjects.  For the purposes of this part, an experiment is any use of a drug except for the use of a marketed drug in the course of medical practice."  21 C.F.R. § 312.3(b).

1265.    Defendants' Execution Protocol's experimental use of pentobarbital, thiopental sodium, or midazolam followed by a paralytic drug and potassium chloride, to kill inmates constitutes a "clinical investigation"—that is, an experiment.

1266.    Plaintiff will be one of the involuntary, unwilling human "subjects" of Defendants' human experimentation as a recipient of the forcible

310

application to him of the experimental execution drugs.  21 C.F.R.
§ 312.3(b).

1267.   Plaintiff will also be an involuntary, non-consenting human
experimentation subject under Ohio's binding administrative law.  *See*
ODRC Policy 68-MED-11, Protocol Number E-4, Pharmacy
Distribution and Dispensing Operations, ¶ III.D, Experimental or
Investigational Drugs; ODRC Policy 06-RES-01, Research Approval
Process; ODRC Policy 06-RES-02, Human Subjects Research Policy.

1268.   Because Plaintiff will be an involuntary, non-consenting subject of
human experimentation based on (1) this Court's characterization of
Defendants' Execution Protocol; (2) the federal regulatory scheme for
approving investigational or experimental new drugs; and (3) Ohio's
regulatory scheme for administering experimental or investigational
drugs to inmates in DRC custody, and because Plaintiff's right against
being the unwilling subject of forced, involuntary human
experimentation is a fundamental right—a privilege or immunity—
guaranteed to him by virtue of being a United States citizen though
numerous international treaties to which the United States is a party,
Defendants' application of the Execution Protocol to him will violate
Plaintiff's rights protected by the Privileges or Immunities Clause of
the Fourteenth Amendment even under the most restrictive reading of
that clause.

**Tenth Claim for Relief: Ex Post Facto Violation**

1269.  Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1270.  Defendants' Execution Protocol, as written and as applied, violates the Ex Post Facto Clause of Article 1, Sections 9 and 10 of the federal Constitution.

1271.  Ohio Revised Code § 2949.22 is the provision of Ohio statutory law that establishes lethal injection as the execution method for Ohio death sentences to be carried out.

1272.  Lethal injection was first added to the Ohio death penalty statute in the version of § 2949.22 that was enacted on July 2, 1993, effective October 1, 1993.

1273.  The version of § 2949.22 that was effective October 1, 1993 contained the following language:

> [T]he person's death sentence shall be executed by causing the application to the person of a lethal injection of a drug or combination of drugs of sufficient dosage *to quickly and painlessly cause death* instead of by electrocution as described in division (a) of this section.  The application of the drug or combination of drugs shall be continued until the person is dead.

Ohio Rev. Code § 2949.22(B)(1) (version of statute effective Oct. 1, 1993).

1274.  The next revision of § 2949.22, enacted on July 7, 1994, effective October 6, 1994, contained the same language quoted above.

1275.   On November 21, 2001, the Ohio General Assembly enacted another amendment to § 2949.22, effective the same day.  The November 21, 2001 version of § 2949.22 remains the effective version of the statute today.

1276.   Section 2949.22(A), like the previously effective versions of Ohio's death penalty statute, requires a death sentence carried out by lethal injection to be administered by "the application to the person . . .  of a lethal injection of a drug or combination of drugs of sufficient dosage *to quickly and painlessly cause death*.  The application of the drug or combination of drugs shall be continued until the person is dead." Ohio Rev. Code, § 2949.22(A) (version effective Nov. 21, 2001) (emphasis added).

1277.   The first written execution protocol following the addition of lethal-injection to § 2949.22 was issued by the SOCF Warden on or about March 30, 1994.

1278.   The March 30, 1994 version of Ohio's lethal-injection written execution protocol stated that the purpose of the execution procedures rule was "to establish a process for carrying out executions that ensures compliance with" the relevant Ohio statutory and administrative law.

1279.   All subsequent versions of Ohio's written execution protocol, whether promulgated as a rule or as a DRC policy, have contained the same or

313

substantially similar language requiring that executions must be carried out in accordance with Ohio statutory and administrative law.

1280. Plaintiff is subject to the Ohio lethal-injection statute that requires that his death by lethal-injection be carried out "quickly and painlessly."

1281. Plaintiff is and has always been subject to a written execution policy requiring adherence to Ohio statutory and administrative law.

1282. The DRC Defendants have changed the law by adopting new and greater punishment than that which first applied to Plaintiff.

1283. The 2016 Execution Protocol and previously enacted versions including those effective October 10, 2013, April 28, 2014, January 9, 2015, and June 29, 2015, diverge from the requirements for a lethal-injection execution to which Plaintiff was previously subject.

1284. These versions of 01-COM-11, as written by their inclusion of compounded execution drugs and including a return to a three-drug protocol using midazolam, and as applied, now fail to guarantee that Plaintiff will be executed in a manner that will "quickly and painlessly" cause his death.

1285. Evidence from executions using compounded execution drugs and from using midazolam in an execution (including as the first drug in a three-drug execution method) demonstrates that the method of execution to be imposed on Plaintiff by Defendants will not be quick,

314

nor will it be painless, if it is carried out using compounded execution drugs.

1286. Instead, his execution will produce an agonizing, physically and mentally painful and torturous, lingering, degrading spectacle that will not ensure his death for an extended period of time.

1287. Evidence from executions using midazolam as one of the execution drugs demonstrates that a method of execution using midazolam to be imposed on Plaintiff by Defendants will not be quick, nor will it be painless if Plaintiff is subjected to execution using midazolam in any lethal injection method.

1288. As applied in these circumstances and as written, the 2016 Execution Protocol creates, in the form of physical and mental agony, degradation, serious injury, and/or a lingering and spectacle of death, a significant risk of increased punishment as compared to the statute that first adopted lethal-injection as a manner of execution in Ohio to which Plaintiff was originally subject.

1289. Plaintiff's death will be significantly more than quick and painless, a substantially greater punishment than that imposed by the statute that first adopted lethal-injection as a manner of execution in Ohio to which Plaintiff was originally subject.

1290. Accordingly, the 2016 Execution Protocol is an unconstitutional ex post facto punishment, and thus invalid as written and as applied.

1291.   In all the foregoing ways, Defendants violate Plaintiff's rights protected by the Ex Post Facto Clause of Article I, §§ 9 and 10 of the United States Constitution and 42 U.S.C. § 1983.

**Eleventh Claim for Relief: Bill of Attainders Violation**

1292.   Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1293.   01-COM-11, as applied in light of Ohio Revised Code § 2949.22(A), violates the Bill of Attainder Clause of Article I, Sections 9 and 10 of the federal Constitution.

1294.   The punishment of death must be imposed, under Ohio law, "quickly and painlessly."

1295.   A death sentence as carried out under the 2016 Execution Protocol implemented and administered by Defendants—employees and agents of an Ohio executive agency—will be neither quick nor painless.

1296.   Thus, the physical pain, the mental anguish, the lingering death and the undignified spectacle execution to which Plaintiff will be subjected under the 2016 Execution Protocol will be elements of punishment inflicted on Plaintiff by some authority other than a judicial authority, namely by executive agency authority.

1297.   Plaintiff, and other Ohio inmates sentenced to death, will be singled out for punishment at the hands of Defendants that will be neither quick nor painless.  Indeed, the recently passed HB 663 legislation

316

was passed explicitly to intentionally ensure that Plaintiff and other Ohio death row inmates are executed as quickly as possible, with procedural restrictions put into place by that legislation to attempt to cover up and hide some of the information relevant to whether Plaintiff's execution is or will be quick or painless.

1298.    Accordingly, the 2016 Execution Protocol and Defendants' informal execution procedures are an unconstitutional bill of attainder and invalid as written and as applied.

1299.    In all the foregoing ways, Defendants violate Plaintiff's rights protected by the Bill of Attainder Clause of Article I, §§ 9 and 10 of the United States Constitution and 42 U.S.C. § 1983.

**Twelfth Claim for Relief: Eighth Amendment Violation— Deliberately Indifferent and/or Reckless Denial of Resuscitative Health Care After The Execution Is To Be Completed.**

1300.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1301.    Under Defendants' Execution Protocol, Defendants will announce the point at which they believe the execution has been completed, *i.e.*, when Defendant Warden declares Plaintiff dead by announcing a time of death.

1302.    There is a substantial risk, of which Defendants are aware but which they recklessly disregard and/or to which they are deliberately indifferent, that if Plaintiff is executed under Defendants' Execution

317

Protocol he will not be clinically and statutorily dead when the execution has been declared completed.

1303. There is a substantial risk that Defendants will fail to plan, prepare for, or order medical treatment after heart and lung sounds are no longer detected and the inmate declared "dead" (and thus his death sentence completed), but when the inmate will still be alive and able to be resuscitated with proper medical care.

1304. Defendants have had ample time in advance of any execution and in advance of adopting the Execution Protocol to fully consider the substantial possibility that a condemned inmate will not be clinically and statutorily dead when the execution has been declared completed pursuant to the Execution Protocol, but have taken no corrective actions in that regard.

1305. A person's breathing and circulatory functions, and a person's brain stem functions, the irreversible cessation of which defines death under Ohio law, may be resuscitated through appropriate medical care for some period of time after receiving the execution drugs contemplated in Defendants' Execution Protocol.

1306. Upon information and belief, Defendants will not provide resuscitative care to Plaintiff after the time when his execution is concluded under Defendants' understanding of the Execution Protocol and its administration.

318

1307.   Defendants know but recklessly disregard and/or are deliberately indifferent to the fact that their Execution Protocol contains no provisions for the appropriate medical care of an inmate whose sentence of death has been carried out, but who remains clinically and statutorily alive.

1308.   Defendants make no provisions for emergency resuscitative care measures in the Death House, whether required by the Execution Protocol or otherwise, even after Defendants were put on notice of a significant risk of problems in advance of an execution, such as occurred involving the lingering, spectacle executions of Dennis McGuire, Clayton Lockett, or Joseph Wood.

1309.   Upon information and belief, Defendants are aware of the significant risk that problems may arise during an execution attempt, but they recklessly disregard and/or are deliberately indifferent to that risk by refusing to address the risk in their repeated revisions of the Execution Protocol.

1310.   Upon information and belief, Defendants are aware of the significant risk that an inmate to whom they apply their Execution Protocol will remain clinically and statutorily alive even following completion of the Execution Protocol as to that inmate, and Defendants recklessly disregard and/or are deliberately indifferent to that risk because Defendants do not provide appropriate medical care to inmates whose sentences of death have been carried out in accordance with

319

Defendants' Execution Protocol, even though they remain clinically and statutorily alive.

1311. Defendants' refusal to provide appropriate medical care to Plaintiff after he has been declared dead, but remains alive, constitutes deliberate indifference to unnecessary pain and suffering in violation of the Eighth and Fourteenth Amendments. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

1312. The need to resuscitate Plaintiff, after his sentence has been completed but when he remains clinically and statutorily alive, is a serious medical need Defendants are constitutionally obligated under the Eighth Amendment to satisfy, but which they recklessly disregard and with deliberate indifference fail to satisfy, thereby violating Plaintiff's rights protected by the Eighth Amendment.

1313. Plaintiff is not required to allege an alternative execution method for this Claim for Relief.

1314. However, should he be required to plead an alternative, Plaintiff incorporates by reference the Alternatives identified in the Thirty-Ninth Claim for Relief, below, incorporated here by reference, which are known, feasible, readily implemented and available alternative execution method(s) and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Claim for Relief. The foregoing alternative execution methods and procedures are available to and could be readily implemented by

320

Defendants.  None of the alternative methods require a physician for proper operation and implementation.

**Thirteenth Claim for Relief: Eighth Amendment Violation—Deliberate Indifference and/or Reckless Disregard Of Serious Medical Needs.**

1315. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1316. Under Defendants' Execution Protocol, controlled substances will be used to carry out a lethal-injection execution, namely pentobarbital and/or thiopental sodium, and/or midazolam.

1317. Dispensing a controlled substance such as pentobarbital or thiopental sodium or midazolam requires a valid patient-specific prescription, which may only be issued under federal and state law for a legitimate medical purpose, in the best interests of the patient.

1318. Upon information and belief, one or more Defendants will issue an order to procure or dispense or distribute or administer execution drugs.

1319. Upon information and belief, Defendants know that a serious risk to Plaintiff's serious medical needs will arise if Defendants and any of them issue an order to procure or dispense or distribute or administer drugs that are specifically intended to kill or help facilitate killing Plaintiff by causing him to suffocate to death or by causing him a painful heart attack.

321

1320.   Defendants are deliberately indifferent to, and recklessly disregard, Plaintiff's serious medical needs when Defendants and any of them issue an order to procure or dispense or distribute or administer drugs that are specifically intended to kill or facilitate killing Plaintiff by causing him to suffocate to death or by causing him a painful heart attack.

1321.   Defendants and any of them are deliberately indifferent to, and recklessly disregard, the fact that such an order is not a valid order under federal and state law because the drugs will not be used to treat a legitimate medical need nor will they be used to protect the best interests of the patient.

1322.   Defendants and any of them are deliberately indifferent to, and recklessly disregard that issuing an order related to execution drugs that will be compounded creates a substantial risk that Plaintiff will experience severe harm, including torturous physical pain and/or mental suffering and agony.

1323.   Defendants and any of them are deliberately indifferent to, and recklessly disregard, that issuing an order related to execution drugs that will be manufactured overseas and then illegally imported, i.e., smuggled, into Ohio creates a substantial risk that Plaintiff will experience severe harm, including torturous physical pain and/or mental suffering and agony.

1324.  By facilitating procurement, dispensing, distribution or administration of execution drugs used to kill Plaintiff by issuing an order related to those drugs, Defendants and any of them who issues such an order demonstrates deliberate indifference and a reckless disregard for Plaintiff's serious medical needs, in violation of Plaintiff's Eighth Amendment rights.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

1325.  Plaintiff is not required to plead an alternative execution method for this Claim for Relief.

1326.  However, should he be required to plead an alternative, Plaintiff incorporates by reference the Alternatives identified in the Thirty-Ninth Claim for Relief, below, incorporated here by reference, which are known, feasible, readily implemented and available alternative execution method(s) and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Claim for Relief.  The foregoing alternative execution methods and procedures are available to and could be readily implemented by Defendants.  None of the alternative methods require a physician for proper operation and implementation.

**Fourteenth Claim for Relief: Fourteenth Amendment Due Process Clause Violation.**

1327.  Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1328.   Plaintiff has a substantive due process right to "freedom from government actions that 'shock the conscience.'" *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 249–50 (6th Cir. 2003).

1329.   Governmental action that is "arbitrary and capricious" is governmental action that is conscience-shocking. *Id.* (citations omitted).

1330.   Governmental action that is in violation of state or federal law is the very definition of arbitrary and capricious.

1331.   Accordingly, Plaintiff has a substantive right to be free from governmental action that is arbitrary and capricious because, among other things, it violates federal or state law.

1332.   Defendants' Execution Protocol, as written and as applied, involves governmental action by Defendants that violates various state and federal laws related to drug products, and human experimentation, as identified throughout this Fifth Amended Complaint, in the course of carrying out a punishment for Plaintiff's violation of the law.

1333.   Defendants know of the violations of law that their Execution Protocol includes, and Defendants know of the violations of law that they commit or will commit in carrying out that Execution Protocol; for example, they know they will be violating the various federal and state drug laws, and that they will be violating the laws against non-consenting, involuntary human experimentation.

324

1334.    Defendants know about but recklessly disregard and/or are deliberately indifferent to the numerous violations of state and federal law their Execution Protocol requires and that Defendants commit in carrying out an execution under the Execution Protocol.

1335.    For instance, Defendants were on constructive notice regarding the prohibition on importing thiopental sodium to be used for a lethal-injection execution since the federal courts in 2012 and again in 2013 ordered FDA to seize and deny entry to the United States to any shipments of thiopental sodium.

1336.    Defendants were on actual notice regarding the ban on importing thiopental sodium to be used for a lethal-injection execution for at least a year if not longer before they adopted their Execution Protocol.

1337.    Nevertheless, upon information and belief, Defendants recently attempted to facilitate importing thiopental sodium to use for an execution under the Execution Protocol.

1338.    Defendants have also been on notice for over a year that their intentions to obtain and use compounded sterile injectable controlled substances as execution drugs under the Execution Protocol are prohibited by various provisions of federal and state law.

1339.    Nevertheless, upon information and belief, Defendants have attempted, and continue to attempt, to facilitate compounding pentobarbital or thiopental sodium to use for an execution under the Execution Protocol.

325

1340. Defendants have also been on notice for over a year that their Execution Protocol continues to constitute a human experimentation on an unwilling, non-consenting prisoner.

1341. Defendants have had ample time to fully consider the potential consequences of their conduct, but they chose to move forward with their current Execution Protocol nevertheless, and their repeated revisions of the Execution Protocol fail to even acknowledge the violations of law.

1342. Defendants are also aware of the facts that suggest a significant risk of harm to Plaintiff created by their use of pentobarbital or thiopental sodium or the three-drug execution method using midazolam, just as they were aware of the facts that suggested a significant risk of harm if they applied their previous execution protocol to Dennis McGuire.

1343. But Defendants recklessly disregard and/or are deliberately indifferent to these risks by retaining those drugs in their Execution Protocol and intending to use those drugs in an execution of Plaintiff.

1344. Defendants are also aware of the facts that suggest a significant risk of harm to Plaintiff created by their use of compounded execution drugs or the revised three-drug method.

1345. But Defendants recklessly disregard and/or are deliberately indifferent to these risks by retaining those drugs in their Execution Protocol and pursuing those drugs to use in an execution of Plaintiff.

326

1346.   Defendants are also aware of the facts that suggest a significant risk of harm to Plaintiff created by their use of imported execution drugs.

1347.   But Defendants recklessly disregard and/or are deliberately indifferent to these risks by retaining those drugs in their Execution Protocol and pursuing those drugs to use in an execution of Plaintiff.

1348.   For all of the foregoing reasons, Defendants' actions in recklessly and/or deliberately indifferently engaging in lawless behavior in pursuit of carrying out a punishment for breaking the law, and Defendants' actions in recklessly and/or deliberately indifferently attempting to obtain and use pentobarbital, or thiopental sodium, or midazolam followed by the paralytic drug and potassium chloride, including compounded or imported versions of those drugs, are arbitrary and capricious, they are shocking to the conscience, in violation of Plaintiff's rights protected by the substantive component of the Due Process Clause of the Fourteenth Amendment.

**Fifteenth Claim for Relief: Violation of Racketeer Influenced and Corrupt Organizations Act (RICO) alleged against Drug Source Defendants only**

1349.   Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

### A.    Introduction

1350.   Together with DRC defendants, Drug Source Defendants are part of a scheme to illegally obtain controlled substances and compounded

327

drugs. This scheme violates numerous federal and state laws and those violations serve as predicate offenses under § 1961 of the RICO statute. Drug Source Defendants derive income from these racketeering activities in violation of § 1962(a). Plaintiff has been injured in his business or property by the reasons described in this Claim for Relief. Federal courts have the jurisdiction under § 1964 to prevent and restrain RICO violations and Plaintiff asks for appropriate relief.

**B. Predicate Acts under 18 U.S.C. § 1961(1)(A) (State law predicates)**

1351. Under 18 U.S.C. § 1961(1), "racketeering activity" means (A) any act or threat involving . . . dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year.

1352. Pentobarbital, thiopental sodium, and midazolam are controlled substances under the CSA.

1353. Under Ohio law, all lethal injection drugs listed in the 2016 Execution Protocol are defined as "dangerous drugs," because they either require a prescription or are intended for intravenous injection. Ohio Rev. Code § 4729.01(F).

**1. Retail sale and possession predicate**

1354. Ohio law prohibits retail sales and possession of dangerous drugs for retail resale by anyone who is not a registered wholesale distributor of

328

dangerous drugs or a licensed terminal distributor of dangerous drugs.  Ohio Rev. Code § 4729.51(C)(1) and (2).

1355.　Violation of Ohio Rev. Code § 4729.51(C)(1) and (2) is chargeable under State law as a felony.  Ohio Rev. Code § 4729.99(E)(1) & (G).

1356.　Upon information and belief, Drug Source Defendants either possess the lethal injection drugs with intent to resell to DRC Defendants or already sold DRC Defendants drugs in a retail sale in violation of Ohio Rev. Code § 4729.51.

1357.　Specifically, Drug Source Defendants acting as importers purchased the drugs outside of the United States and are storing them for DRC Defendants, violating the "possession" provision of Ohio Rev. Code § 4729.51.

1358.　Alternatively, Drug Source Defendants acting as intermediaries obtained the drugs from manufacturers, pharmacies, veterinarians, or other sources, and are storing them for DRC Defendants, violating "possession" provision of Ohio Rev. Code § 4729.51.

1359.　Once the sale is complete and the DRC Defendants take possession of the drugs, Drug Source Defendants involved in the transaction violate the "retail sale" provision Ohio Rev. Code § 4729.51.

1360.　By knowingly engaging in conduct that violates provisions of Ohio Rev. Code § 4729.51, Drug Source Defendants commit a felony under Ohio Rev. Code § 4729.99, and thus engage in racketeering activity under 18 U.S.C. § 1961(1)(A).

329

### 2. Compounding Pharmacists and Pharmacies predicate

1361. Under Ohio Rev. Code § 4729.99 (E)(1), violation of Ohio Rev. Code § 4723.37 is also a felony.  This provision requires that prescriptions "may only be filled in accordance with the rules and regulations adopted by the state board of pharmacy."

1362. In turn, the Ohio State Board of Pharmacy requires that for all sterile compounded prescriptions, the pharmacy shall comply with the United States Pharmacopeia (USP) chapter 797 and with section 503A of the Federal Food, Drug, and Cosmetic Act.  Ohio Admin. Code 4729-16-03(B) & (C).

1363. Section 503A of the Federal Food, Drug, and Cosmetic Act is codified as 21 U.S.C. § 353a, and likewise requires compliance with USP standards for compounded drugs.  21 U.S.C. § 353a(b)(1)(A)(i).

1364. USP Chapter <797> places responsibility on compounding personnel for ensuring that Compounded Sterile Preparations (CSPs) "are accurately identified, measured, diluted, and mixed and are correctly purified, sterilized, packaged, sealed, labeled, stored, dispensed, and distributed."  USP on Compounding at 41.  It mandates that "[c]ompounding personnel shall ensure proper storage and security of CSPs prepared by or dispensed from the compounding facility until either their BUDs [beyond-use-dates] are reached or they are administered to patients."  *Id.* at 66.  It also demands that use and storage procedures, whether at compounding facility or in patient-

330

care setting, must "include daily monitoring and documentation of drug storage refrigerators to ensure temperatures between 2° and 8° and the monthly inspection of all drug storage locations by compounding personnel." *Id.* at 67.

1365.　USP Chapter <797> establishes three contamination categories for CSPs assigned primarily according to the potential for microbial contamination, which would subject patients to risk of harm. *Id.* at 42.　All compounded drugs that DRC Defendants intend to use fall into the high-risk category because they are compounded from nonsterile ingredients but must be made sterile before distribution. *Id.* at 44.　USP Chapter <797> also sets special testing and procedural requirements for high-risk CSPs.

1366.　Upon information and belief, Drug Source Defendants engaged in compounding and providing compounded drugs to DRC Defendants are violating USP provisions in the following manner:

    a.　by failing to follow verification procedures to check compounding accuracy and sterility, including testing for purity and sterility;

    b.　by failing to conduct and disclose the results of all testing required by USP Chapter 797 for high-risk CSPs;

    c.　by failing to follow and comply with all USP Chapter 797 provisions for high-risk CSPs;

    d.　by failing to ensure proper storage and security of CSPs prepared by them for DRC Defendants until their BUDs are reached or they are administered;

    e.  by failing to ensure that sterility, purity, and stability of CSPs is maintained during packaging, handling, and transport to DRC Defendants;

    f.  by failing to ensure that DRC Defendants implement appropriate operating procedures for storing and administering CSPs;

    g.  by failing to ensure that DRC Defendants implement and follow procedures specific to high-risk CSPs to comply with requirements of USP Chapter <797>;

    h.  by failing to ascertain that DRC Defendants are able to store the CSPs properly, including the use of a properly functioning refrigerator and freezer if CSPs are labeled for such storage;

    i.  by failing to conduct daily monitoring and documentation and monthly inspection of locations where DRC Defendants are storing the compounded drugs and to guarantee that the CSPs are stored in proper conditions even at DRC facilities;

    j.  by failing to demand that outdated and unused CSPs be returned to the compounding facility for disposition;

    k.  by failing to provide appropriate education, training, and supervision to DRC defendants;

    l.  by failing to ensure that DRC Defendants use single-dose CSPs within 1 hour after initial needle puncture of the container and discard the rest;

1367.  By failing to comply with USP mandates, those Drug Source Defendants engaged in compounding the drugs for use by DRC Defendants knowingly violate Ohio Admin. Code § 4729-16-03, compliance with which is required by Ohio Rev. Code § 4729.37, violation of which is a felony under Ohio Rev. Code § 4729.99(E)(1), and thus is a racketeering activity under 18 U.S.C. § 1961(1)(A).

### 3. Dispensing Pharmacist and Pharmacies predicate

1368. As discussed above, Ohio Rev. Code § 4729.37 requires that prescriptions "be filled in accordance with the rules and regulations adopted by the state board of pharmacy" and violation of this provision is a felony under Ohio Rev. Code § 4729.99(E)(1).

1369. The Ohio State Board of Pharmacy requires that a "prescription, to be valid, must be issued for a legitimate medical purpose by an individual prescriber acting in the usual course of his/her professional practice." Ohio Admin. Code § 4729-5-21(A); § 4729-5-30. The Board places the responsibility on the pharmacists who dispenses the prescription. Ohio Admin. Code § 4729-5-30(A). It also provides that "[a]n order purporting to be a prescription issued not in the usual course of bona fide treatment of a patient is not a prescription and the person knowingly dispensing such a purported prescription, as well as the person issuing it, shall be subject to the penalties of law." *Id.*

1370. In addition, the Ohio State Board of Pharmacy sets forth additional requirements for the manner in which the pharmacists must process a prescription in Ohio Admin. Code § 4729-5-21(A).

1371. Upon information and belief, Drug Source Defendants acting as either Dispensing or Compounding Pharmacists and Pharmacies, are violating Ohio laws by knowingly processing "prescriptions" for execution drugs in an unauthorized manner:

333

    a. without a valid prescription, because an order for drugs from DRC Defendants using a death warrant is not "a prescription";

    b. there is no legitimate medical purpose for the purported "order";

    c. an order for execution drugs is not issued by an individual prescriber acting in the course of his or her professional practices.

1372. This felonious conduct described above constitutes racketeering activity within the meaning of 18 U.S.C. § 1961(1)(A).

### C. Predicate Acts under 18 U.S.C. § 1961(1)(D) (federal law predicates)

1373. Under 18 U.S.C. § 1961(1), "racketeering activity" means (D) . . . the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States.

1374. Pentobarbital, thiopental sodium, and midazolam are controlled substances under the CSA.

### 1. Unlawful Import predicate

1375. 21 U.S.C. § 959 prohibits procession, manufacture, or distribution of controlled substances, with punishment set forth in 21 U.S.C. § 960, which contemplates an enhanced sentence of not less than 20 years if death results from the use of the imported drug.

1376. Likewise, 21 U.S.C. § 957 prohibits import into the customs territory of the United States from any place outside thereof any controlled substance unless "there is in effect with respect to such person a

registration issued by the Attorney General."  Penalties for violation of this section are also set forth in 21 U.S.C. § 960 and also contemplate enhanced sentence of not less than 20 years if death results from the use of the imported drug.

1377.  Finally, any person who attempts or conspires to commit any offense described in either § 957 or § 959 is subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

1378.  Upon information and belief, Drug Source Defendants acting as importers are violating provisions of 21 U.S.C. § 957 by importing controlled substances into the United States without effectively registering with the Attorney General and while not exempt from such registration under the applicable statutory provisions.

1379.  Upon information and belief, Drug Source Defendants acting as manufacturers, importers, or distributors of lethal injection drugs for DRC Defendants are violating 21 U.S.C. § 959(a) by manufacturing or distributing a Schedule II controlled substance intending or simply knowing that it will be unlawfully imported into the United States.

1380.  Upon information and belief, Drug Source Defendants acting as distributors of lethal injection drugs for DRC Defendants are violating 21 U.S.C. § 959(b) by possessing a controlled substance when boarding an aircraft with intent to distribute these controlled substances to DRC defendants.

1381.   Upon information and belief, Drug Source Defendants are violating 21 U.S.C. § 963 by conspiring with DRC Defendants to import or distribute controlled substances into the United States or by actually attempting to import or distribute controlled substances.

1382.   Each of these felonious acts of manufacturing, importing, receiving, concealing, buying, selling, or otherwise dealing in a controlled substance constitutes racketeering activity under 18 U.S.C. § 1961(1)(D).

### 2.    Unlawful Dispensing predicate

1383.   21 U.S.C. § 829(a) prohibits dispensing of a Schedule II control substance without the written prescription of a practitioner.

1384.   21 U.S.C. § 829(b) prohibits dispensing of Schedule III and IV controlled substances without the written prescription of a practitioner or an oral prescription, which is reduced promptly to writing and filed by the pharmacist, in compliance with 21 U.S.C. § 353(b).

1385.   Penalties for violations of the dispensing statute are set forth in 21 U.S.C. § 841 et seq.  Those penalties contemplate enhanced sentence if death results from the use of the drug.

1386.   Upon information and belief, Drug Source Defendants who are dispensing or compounding the drugs for use by DRC Defendants are doing so without a valid prescription.

1387.  This felonious act of dealing in a controlled substance constitutes racketeering activity under 18 U.S.C. § 1961(1)(D).

### 3.  Unlawful Compounding predicate

1388.  Section 503A of the Federal Food, Drug, and Cosmetic Act is codified as 21 U.S.C. § 353a, requires compliance with USP standards for compounded drugs.  Plaintiff incorporates by reference each and every statement and allegation related to USP violations enumerated above in Section B.2, Compounding Pharmacists and Pharmacies predicate, as if fully rewritten here.  Knowing violations of USP standards related to a controlled substance constitute racketeering activity under 18 U.S.C. § 1961(1)(D).

### D.  Other Predicates

1389.  Plaintiff alleges other predicates based on violations of federal and state laws as described elsewhere in this Complaint, including violations of the federal FDCA, the federal CSA, the Ohio Pure Food and Drug Act, the Ohio Controlled Substances Act, the Ohio Pharmacy Practice Act, and others.  Plaintiff reserves the right to add additional predicate acts upon further discovery.

### E.  Pattern of Activity

1390.  The Predicate Acts enumerated above are related by having the same purpose: delivering lethal injection drugs to DRC Defendants.

1391.  Although methods used in obtaining these drugs may differ—whether obtaining them from compounding pharmacies or importing them

from overseas—the goal of the scheme remains the same: to procure controlled substances and deliver them to DRC Defendants.

1392. This scheme is ongoing and continuing, because DRC Defendants have scheduled executions for the next four years.

1393. Other States who execute their residents have contracted with entities engaged in a similar pattern of activity.  At least four states bought the drug from a London-based company called Dream Pharma. Nebraska purchased sodium thiopental in August of 2015 from a distributor in India, Chris Harris of HarrisPharma, Llp.  At least one additional state and perhaps more—including, upon information and belief, DRC Defendants on behalf of the state of Ohio—have also engaged HarrisPharma, Llp to obtain thiopental sodium to use for executions.  And just recently, DRC Defendants received a warning letter from FDA that its plan to import drugs into the United States is illegal.

1394. Drug Source Defendants are willfully participating in the scheme to supply DRC Defendants with lethal injection drugs and are acting with full knowledge of illegality of their actions.  Dream Pharma has shut down.  The drugs purchased by Nebraska were returned by U.S. Customs and the Food and Drug Administration to the shipper in India used by HarrisPharma.  Other supplies of execution drugs being imported into the United States have been seized by the FDA.  Citing potential for legal concerns, the International Academy of

Compounding Pharmacists issued a statement discouraging its members from participating in the preparation, dispensing, or distribution of compounded medications for use in executions.   The American Pharmacists Association followed.

1395.   Upon information and belief, driven by the demand from the DRC Defendants and lured by the profits, Drug Source Defendants will continue to engage in these racketeering activities.

### F.   Interstate and Foreign Commerce

1396.   Drug Source Defendants are actively involved in interstate commerce by selling, transporting, producing, manufacturing, compounding, or receiving goods.

1397.   All Defendants are using instrumentalities of interstate and foreign commerce such as mail, phone, Internet, and transportation.

### G.   Substantive RICO Violations under 18 U.S.C. § 1962

1398.   Drug Source Defendants are deriving income from a pattern of racketeering activity as described above, in violation of 18 U.S.C. § 1962(a).  Their income comes from illegally selling, transporting, distributing, compounding, dispensing, or otherwise dealing in controlled substances destined for DRC Defendants to be used as execution drugs.  Drug Source Defendants, whether individuals or business entities, are culpable persons within the meaning of 18 U.S.C. § 1961(2).

1399.   Those Drug Source Defendants who are not individuals are business entities employing or associating with John Doe Defendants, and are enterprises within the meaning of 18 U.S.C. § 1961(4).

1400.   John Doe Defendants are knowingly conducting or participating in the affairs of these enterprises through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1401.   Drug Source Defendants have conspired with DRC Defendants to derive income through the pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

### H.   Relief

1402.   Plaintiff asks that the court prevent and restrain RICO violations by issuing appropriate orders, and for other relief, damages, and attorney's fees available under the RICO statute.

**STATE LAW CLAIMS FOR RELIEF AGAINST DEFENDANTS**

**Sixteenth Claim for Relief: Ohio Civil RICO claim against Drug Source Defendants**

1403.   Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

**First Predicate (incorporating Federal RICO)**

1404.   As described above in the Fifteenth Claim for Relief under federal civil RICO laws, Drug Source Defendants and John Doe Defendants are engaged in conduct defined as racketeering activity under 18 U.S.C. § 1961(1)(D).

340

1405. Engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in this conduct also constitutes corrupt activity within the meaning of Ohio Revised Code § 2923.31(I).

**Second Predicate (Counterfeit Drugs)**

1406. Ohio Revised Code § 2923.31(I)(2)(c) defines corrupt activity as "engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in" conduct in violation of O.R.C. § 2925.37.

1407. In turn, Ohio Revised Code § 2925.37 prohibits knowingly possessing, making, selling, offering to sell, or delivering "any substance that the person knows is a counterfeit controlled substance."

1408. As used in Chapter 2925, "Counterfeit controlled substance" means "Any drug that bears, or whose container or label bears, a trademark, trade name, or other identifying mark used without authorization of the owner of rights to that trademark, trade name, or identifying mark." Ohio Rev. Code § 2925.01(O)(1).

1409. As used in Chapter 2925, "drug" has "the same meaning[] as in section 4729.01 of the Revised Code." Ohio Rev. Code § 2925.01(C).

1410. In turn, Chapter 4729.01 defines "drug" as including, but not limited to "Any article recognized in the United States pharmacopoeia and national formulary, or any supplement to them, intended for use in

the diagnosis, cure, mitigation, treatment, or prevention of disease in humans or animals."  Ohio Rev. Code § 4729.01(E).

1411.   All drugs listed in the execution protocol are recognized in the United States Pharmacopeia (USP) and the National Formulary (NF).

1412.   Manufacturers of sodium thiopental, pentobarbital, midazolam, rocuronium bromide, pancuronium bromide, vecuronium bromide, and potassium chloride have put restrictions on distribution of these drugs.  Specifically, manufacturers limit the sale of these products to a select group of wholesalers, distributors, and direct purchasers under the condition that they will not resell these products to correctional institutions for use in lethal injections.  Government purchasing entities must certify that products they purchase or otherwise acquire are used only for medically prescribed patient care and not for any penal purposes.  Manufacturers further require that these Government purchasers certify that the product is for "own use" and will not resell or otherwise provide the restricted products to any other party.

1413.   Upon information and belief, Drug Source Defendants are violating manufacturers' restrictions on distribution and resale of drugs for use in lethal injection.  Since these drugs bear the manufacturers' trademarks or other identifying marks, used without authorization, these drugs are counterfeit controlled substances within the meaning of Ohio Revised Code § 2925.01(O)(1).

342

1414. Therefore, Drug Source Defendants are knowingly possessing, making, selling, offering to sell, and delivering counterfeit controlled substance within the meaning of Ohio Revised Code § 2925.37. They are thus involved in corrupt activity within the meaning of Ohio Revised Code § 2923.31(I)(2)(c).

## Corrupt Activities and Prayer for Relief

1415. Those Drug Source Defendants who are not individuals are business entities employing or associating with John Doe Defendants, and are enterprises within the meaning of Ohio Revised Code § 2923.31(C).

1416. John Doe Defendants are knowingly conducting or participating in the affairs of these enterprises through a pattern of corrupt activity in violation of Ohio Revised Code § 2923.32(A)(1).

1417. Drug Source Defendants are knowingly receiving and using or investing proceeds from a pattern of corrupt activity as described above, in violation of Ohio Revised Code § 2923.32(A)(3).

1418. Drug Source Defendants engaging in the pattern of corrupt activity is likely to result in Plaintiff's death.

1419. Plaintiff thus brings this action under Ohio Revised Code § 2923.34(A) as an individual threatened with injury by a violation of § 2923.32 of the Ohio Revised Code.

1420. Plaintiff asks that under Ohio Revised Code § 2923.34(A)(2) the Court impose reasonable restrictions upon the future activities of Drug

Source Defendants, including restrictions that prohibit them from engaging in corrupt activities.

1421. Plaintiff also asks the Court to grant injunctive relief pursuant to the authority of Ohio Revised Code § 2923.34(D), which provides for injunctive relief "without a showing of special or irreparable injury."

**Seventeenth Claim for Relief: Claims for Declaratory Judgment Under Ohio Law Against All Defendants, and for Injunctive Relief Under Ohio Law Against Drug Source Defendants For Violations of Ohio Law.**

1422. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

### A. Rights of Civil Action Under Ohio Law

1423. Under Ohio law, anyone subject to and injured by the criminal acts or activities of another has a right of a civil action against such person, including in respect to any, one or more of the Ohio crimes set forth in this Complaint. *See* Ohio Rev. Code § 2307.60.

1424. Under Ohio law, a person has a right of civil action under the state corrupt activities statute, Ohio Revised Code § 2923.34(A).

1425. Under Ohio law, a person has a right of a civil action in tort for negligence against a pharmacist or pharmacy that rises to negligence per se if that person shows damages, proximate cause and that the pharmacist or pharmacy violated any provision of the Ohio Pure Food and Drug Act, Ohio Revised Code § 3715 *et. seq. See Taugher v. Ling*, 127 Ohio St. 142, 146, syllabus paragraph 3 (1933) (holding that

"[t]he Pure Food and Drug Laws of Ohio are statutes passed for the protection of the public, and a violation of them is negligence *per se*."); *Donley v. Pinnacle Foods Group, LLC*, No. 2:09-cv-540, 2010 U.S. Dist. LEXIS 25144, *3–4, 7–9 (S.D. Ohio Mar. 17, 2010).

1426.   Ohio law permits Courts of Record to issue a Declaratory Judgment to declare rights, status and other legal relations, whether or not further relief is or could be claimed.  *See* Ohio Rev. Code § 2721.02(A).  No action or proceeding is open to objection on the ground that a declaratory judgment or decree is prayed for under this chapter.  *Id.* The declaration may be either affirmative or negative in form and effect.  *Id.*  The declaration has the effect of a final judgment or decree.  *Id.*

1427.   Ohio law enables Courts of Record to issue temporary orders restraining an act when it appears a person is entitled to the relief demanded, and such relief, or any part of it, consists in restraining the commission or continuance of such act, the commission or continuance of which, during the litigation, would produce great or irreparable injury to the plaintiff, or when, during the litigation, it appears that the defendant is doing, threatens or is about to do, or is procuring or permitting to be done, such act in violation of the person's rights respecting the subject of the action, and tending to render the judgment ineffectual.  *See* Ohio Rev. Code § 2727.02.

### B.    Defendants' Violations of Ohio Laws

1428.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1429.    Upon information and belief, Defendants would seek, manufacture, procure, acquire, produce, export, import, compound, supply, dispense, distribute, administer, provide, sell, deliver, offer for sale, hold for sale, and/or give away, or otherwise source drugs to carry out a human execution by lethal injection.

1430.    By disregarding the FDA, the federal CSA, the federal FDCA, the Ohio Pure Food and Drug Act, the Ohio Controlled Substances Act, the Ohio Pharmacy Practice Act, and the various other Ohio statutory and regulatory provisions cited herein, Defendants have not just undertaken a course and conduct for violating federal law; Defendants have committed and are in continued process of committing crimes under the laws of the State of Ohio.

1431.    Defendants or some number of them have undertaken a course and pattern and practice of conduct to engage in the violations of Ohio law identified elsewhere in this Complaint, as well as the following violations of Ohio law.

### Violations Related to Controlled Substances

1432.    For purposes of Chapter 2925, "controlled substance" has "the same meaning as in section 3719.01 of the Revised Code." Ohio Rev. Code

346

§ 2925.01(A). In turn, Ohio Revised Code § 3719.01(C) defines "controlled substance" as "a drug, compound, mixture, preparation, or substance included in schedule I, II, III, IV, or V."

1433. Therefore, sodium thiopental, pentobarbital, and midazolam, whether manufactured or compounded, are controlled substances within the meaning of Chapter 2925.

1434. Upon information and belief, Defendants Drug Administrators, none of whom qualify for the exception in § 2925.11(B)(1), will imminently violate Ohio Revised Code § 2925.11(A) by obtaining, possessing, or using a controlled substance.

1435. Upon information and belief, Defendants Execution Team Members, none of whom qualify for the exception in § 2925.11(B)(1), will imminently violate Ohio Revised Code § 2925.11(A) by using on Plaintiff a controlled substance without a lawful prescription issued by a licensed health professional authorized to prescribe drugs.

1436. Upon information and belief, Defendants Execution Team Members, none of whom qualify for the exception in § 2925.02(B), will imminently violate Ohio Revised Code § 2925.02(A)(1) by using force, threat or deception to administer a controlled substance to Plaintiff, who will be strapped to a table and forcibly injected with the execution drug(s).

1437. Upon information and belief, Defendants Execution Team Members, none of whom qualify for the exception in § 2925.02(B), will

imminently violate Ohio Revised Code § 2925.02(A)(3) by administering a controlled substance to Plaintiff and thereby cause him serious physical harm, including death.

1438.   Upon information and belief, other Defendants who do not qualify for the exception in § 2925.02(B), will imminently violate Ohio Revised Code § 2925.02(A)(3) by furnishing a controlled substance to be administered to Plaintiff and thereby cause him serious physical harm, including death.

1439.   Upon information and belief, Defendants Execution Team Members will imminently violate Ohio Revised Code § 2925.02(A)(2) by administering a controlled substance with the purpose to cause serious physical harm, including death, to Plaintiff.

1440.   Upon information and belief, other Defendants will imminently violate Ohio Revised Code § 2925.02(A)(2) by furnishing, with the purpose to cause serious physical harm, including death, a controlled substance to be administered to Plaintiff.

**Violations Related to Dangerous Drugs**

1441.   For purposes of Chapter 2925, "dangerous drugs" has "the same meaning[] as in section 4729.01 of the Revised Code." Ohio Rev. Code § 2925.01(C). Thus, under Ohio law, all lethal injection drugs listed in the 2016 Execution Protocol are defined as "dangerous drugs," because they either require a prescription or are intended for intravenous injection. Ohio Rev. Code § 4729.01(F).

348

1442.    Upon information and belief, Defendants or some number of them have violated or will imminently violate Ohio Revised Code § 2925.22(A), by illegally procuring the administration of, or the "prescription" of, or the dispensing of, dangerous drugs by deception, including, but not limited to, submitting false information in pursuit of a DEA license to import drugs; providing false or misleading paperwork to attempt to import drugs into the United States; using a court order for execution to obtain or compound execution drugs rather than the required prescription that is valid under federal and state law.

## Violations Related to Harmful Intoxicants

1443.    Ohio Revised Code § 2925.01(I) defines "harmful intoxicant" as "Any compound, mixture, preparation, or substance the gas, fumes, or vapor of which when inhaled can induce intoxication, excitement, giddiness, irrational behavior, depression, stupefaction, paralysis, unconsciousness, asphyxiation, or other harmful physiological effects."

1444.    Lethal injection drugs listed in the 2016 Execution Protocol are harmful intoxicants within the meaning of Chapter 2925.

1445.    Upon information and belief, Defendants will imminently violate Ohio Revised Code § 2925.31(A), by obtaining, possessing or using on Plaintiff a harmful intoxicant—lethal injection drugs—with the purpose to induce in Plaintiff intoxication or similar physiological

349

effects, other than for lawful research, clinical, medical, dental, or veterinary purposes.

1446.     Upon information and belief, Defendants will imminently violate Ohio Revised Code § 2925.32(A)(1) by knowingly dispensing or distributing a harmful intoxicant to Plaintiff, who is over age 18, when Defendants know or have reason to believe that the pentobarbital or thiopental sodium will be used for the purpose of inducing in Plaintiff intoxication or similar physiological effects.

### Violations Related to Pure Food and Drug Laws

1447.     Upon information and belief, Defendants will imminently violate Ohio Revised Code § 3715.65(A), by selling, delivering, offering for sale, holding for sale, or giving away a New Drug with respect to which there is no Investigational New Drug Application on file with FDA as required by 21 U.S.C. § 355 and which will be administered to Plaintiff to cause his death.

1448.     Upon information and belief, Defendants will imminently violate Ohio Revised Code § 3715.52(A)(1), by engaging in Prohibited Acts defined in that section, specifically: selling, delivering, offering for sale, holding for sale, or giving away lethal injection drugs that are adulterated or misbranded.

1449.     Upon information and belief, Defendants will imminently violate Ohio Revised Code § 3715.52(A)(2), by engaging in Prohibited Acts defined

in that section, specifically: adulterating or misbranding lethal injection drugs.

1450. Upon information and belief, Drug Supplier Defendants will imminently violate Ohio Revised Code § 3715.52(A)(3), by engaging in Prohibited Acts defined in that section, specifically: delivering or proffering delivery, for pay or otherwise, of adulterated or misbranded lethal injection drugs.

1451. Upon information and belief, DRC Defendants will imminently violate Ohio Revised Code § 3715.52(A)(3), by engaging in Prohibited Acts defined in that section, specifically: by receiving in commerce drugs that are adulterated or misbranded.

1452. Upon information and belief, Defendants Pharmacies #1–100 and Defendants Pharmacists # 1–100 are or will imminently engage in actions that amount to negligence per se because they are violating provisions of the Ohio Pure Food and Drug Act as identified herein to supply DRC Defendants with compounded drugs that will be administered to Plaintiff and which may or will eventually kill him as a proximate result of being injected with those compounded drugs.

### Other Violations

1453. Upon information and belief, Defendants or any of them have discussed, corresponded about, agreed, whether informally or formally or in principal or in contact, whether currently or for a future agreement, and contingently or otherwise, and taken steps to procure,

351

manufacture, produce, export, import, compound, supply, distribute, provide, sell, deliver, offer for sale, hold for sale, or give away or otherwise source the drugs to be used to carry out a human execution under the Execution Protocol.

1454.  Upon information and belief, DRC Defendants have or will imminently negligently fail to prevent or halt the commission of the crimes under Ohio law identified herein, in violation of Ohio Revised Code § 2921.44.

1455.  Upon information and belief, DRC Defendants have or will imminently negligently fail to perform their lawful duties to carry out a quick and painless execution of Plaintiff, in violation of Ohio Revised Code § 2921.44.

1456.  Upon information and belief, DRC Defendants have or will imminently recklessly fail to perform the duties expressly imposed by law with respect to their public servant's offices, such as duties related to carrying out Plaintiff's quick and painless lethal-injection execution in strict compliance with the Execution Protocol and all applicable federal and state policies, administrative regulations and statutes as identified herein.  DRC Defendants know about, but recklessly disregard, the allegations of illegal activity alleged herein.

1457.   Upon information and belief, Defendants have or will imminently perform acts with respect to carrying out a lethal-injection execution under the Execution Protocol that are expressly forbidden by law, as alleged herein.

1458.   The FDA made it clear to Defendants, including Drug Source Defendants through DRC Defendants, that Defendants were without legal authority to issue or take action in reliance upon any instrument to engage in transactions for or relating to the importation of thiopental sodium into the United States.

1459.   Drug Source Defendants have been on notice, constructive or actual, that Defendants were without legal authority to issue or take action in reliance upon any instrument to engage in transactions for or relating to the compounding of pentobarbital or thiopental sodium to use for an execution.

1460.   Defendants—including Drug Source Defendants—have criminally and unlawfully cast aside the Ohio Revised Code's requirements and prohibitions identified herein.  By doing so, Drug Source Defendants have undertaken to commit against Plaintiff various crimes identified and prohibited by Ohio law.  *See* Ohio Rev. Code § 2921.52(B)(3)–(4).

1461.   Pursuant to Ohio Revised Code § 2921.45, Defendants, under color of their office, employment, or authority, have undertaken to knowingly deprive, or conspire or attempt to deprive Plaintiff of a constitutional or statutory right, as alleged herein.

353

C.    **Relief**

1462.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1463.    Pursuant to Ohio Revised Code § 2307.60, Plaintiff has the right to a civil action to recover from and against Defendants the full costs, attorney's fees and damages, including, but not limited, to punitive damages, in respect to such actions of Defendants that are offenses against Plaintiff that are of a criminal nature.

1464.    Pursuant to Ohio law, Plaintiff has a right to a civil action under the state RICO statute.

1465.    Pursuant to Ohio law, Plaintiff has the right to a civil action in tort for negligence to recover from and against Defendants Pharmacies # 1–100 and Defendants Pharmacists # 1–100 for actions that are negligence per se because Defendants Pharmacies # 1–100 and Defendants Pharmacists # 1–100 have and will violate different provisions of the Ohio Pure Food and Drug Act, § 3715.01 *et seq.*, in the course of compounding and otherwise providing drugs to be administered to Plaintiff and that will kill him.

1466.    Plaintiff does not bring either a civil claim for relief under § 2307.60 or a civil tort claim in the above-captioned case against any of the Defendants.  Rather, he seeks a declaratory judgment under Ohio Revised Code § 2721.02 to declare his and Defendants' rights, status

354

and other legal relations—specifically a declaratory judgment that Defendants' actions violate the provisions of Ohio law as alleged herein, thus giving rise to Plaintiff's right to a civil claim for relief under § 2307.60 and to a right to tort claims under Ohio law.

1467. Plaintiff also seeks injunctive relief as against the Drug Source Defendants. Plaintiff is not, however, seeking in this suit injunctive relief against DRC Defendants under Ohio law for violations of Ohio law.

1468. Defendants' actions in respect to Plaintiff's execution by lethal injection, identified in the preceding paragraphs, are offenses by Defendants against Plaintiff under Ohio law that are of a criminal nature.

1469. Defendants' actions against Plaintiff include those that have been and are without privilege and are wanton and malicious, reckless, or negligent.

1470. Upon information and belief, the danger of Defendants' violations of Ohio state laws as against Plaintiff are present, actual and genuine; DRC Defendants intend to execute him using the Execution Protocol and, in the process, to violate Ohio state law as alleged herein.

1471. Pursuant to Ohio Revised Code § 2721.02(A), this Court has the authority to and should issue Declaratory Judgment for Plaintiff against Defendants, declaring that Defendants' actions and course of conduct to procure, manufacture, produce, process, export, import,

compound, dispense, supply, use, administer, package, ship, store, sell, give away, offer for sale, or hold for sale lethal injection drugs, and Defendants' negligent, knowing, reckless, or wanton and malicious failures under the law associated with those efforts, constitutes one or more violations of Ohio law.

1472. Pursuant to Ohio Rev. Code § 2727.02, this Court has the authority to and should issue temporary, preliminary and permanent injunctive relief in Plaintiff's favor against Drug Source Defendants to restrain Drug Source Defendants' commission and continuance of violations of Ohio law against Plaintiff as alleged herein.

1473. Absent Plaintiff's receipt of such relief, Plaintiff would suffer great or irreparable harm as a result of Drug Source Defendants' many violations of Ohio state law, *see* Ohio Rev. Code § 2727.02, including violations of Plaintiff's rights as alleged in this Fifth Amended Complaint, as well as death.

**Eighteenth Claim for Relief: Violation of Ohio Product Liability Act (Ohio Revised Code § 2307.71 et seq.)**

1474. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1475. Pursuant to Ohio Revised Code § 2307.71(A)(13), Ohio authorizes a"[p]roduct liability claim" to mean[] a claim or claim for relief that is asserted in a civil action pursuant to sections 2307.71 to 2307.80 of the Revised Code and that seeks to recover compensatory damages

from a manufacturer or supplier for death, physical injury to person, emotional distress, or physical damage to property other than the product in question, that allegedly arose from any of the following:  (a) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product."

1476.    Ohio Revised Code § 2307.74 defines defective in manufacture as "[a] product is defective in manufacture or construction if, when it left the control of its manufacturer, it deviated in a material way from the design specifications, formula, or performance standards of the manufacturer, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards."  Ohio Revised Code § 2307.77 defines conformance to representation: "[a]product is defective if it did not conform, when it left the control of its manufacturer, to a representation made by that manufacturer."

1477.    Ohio Revised Code § 2307.71(A)(9) defines manufacturer: "'Manufacturer' means a person engaged in a business to design, formulate, produce, create, make, construct, assemble, or rebuild a product or a component of a product."

1478.    Ohio Revised Code § 2307.71(A)(15) defines supplier:  "'Supplier' means, subject to division (A)(15)(b) of this section, either of the following:  (i) A person that, in the course of a business conducted for the purpose, sells, distributes, leases, prepares, blends, packages,

357

labels, or otherwise participates in the placing of a product in the stream of commerce."

1479. Ohio Revised Code § 2307.77 provides: "A product is defective if it did not conform, when it left the control of its manufacturer, to a representation made by that manufacturer.  A product may be defective because it did not conform to a representation even though its manufacturer did not act fraudulently, recklessly, or negligently in making the representation."

1480. Ohio Revised Code § 2307.78(A)(2) provides: "The product in question did not conform, when it left the control of the supplier in question, to a representation made by that supplier, and that representation and the failure to conform to it were a proximate cause of harm for which the claimant seeks to recover compensatory damages.  A supplier is subject to liability for such a representation and the failure to conform to it even though the supplier did not act fraudulently, recklessly, or negligently in making the representation."

1481. Upon information and belief, Drug Source Defendants manufactured drugs for sale to DRC Defendants for DRC Defendants' use to attempt to execute Plaintiff.

1482. Upon information and belief, Drug Source Defendants sold or attempted to sell drugs to DRC Defendants for DRC Defendants' use to attempt to execute Plaintiff.

1483.　Upon information and belief, Drug Source Defendants are either manufacturers of lethal injection drugs or they are suppliers of lethal injection drugs as defined in Ohio Revised Code § 2307.71 or both.

1484.　Upon information and belief, Drug Source Defendants misrepresented to DRC Defendants that the lethal injection drugs were manufactured to United States Pharmacopeia (USP) standards when indeed they were manufactured according to the lesser standards of the India Pharmacopeia (IP), the European Pharmacopeia (EUP, or the British Pharmacopeia (BP).

1485.　Such deception as to the quality of the manufacturing process on the part of Drug Source Defendants as either manufacturers or suppliers constitutes a misrepresentation as to the products conforming to the standard of manufacture which renders the lethal injection drugs defective products under Ohio Revised Code §§ 2307.77 and 2307.78(A)(2).

1486.　As either manufacturers or suppliers or both, Drug Source Defendants are liable for compensatory damages arising from the use of this defective product.  Plaintiff will be damaged by DRC Defendants' use of the defective products when DRC Defendants attempt to execute Plaintiff with a product that Drug Source Defendants misrepresented to be of a different manufacture and quality than that which was sold to DRC Defendants.

1487.  Plaintiff will experience severe, unnecessary, lingering, and inhumane pain and suffering from the defective execution drugs manufactured or supplied by Drug Source Defendants.

1488.  There is no practical method for Plaintiff to verify the quality, constitution, or uniformity of the execution drugs prior to being subjected to their lethal injection.

1489.  There exists a substantial, objectively intolerable risk that these drugs are the wrong identity or pH level, ineffective, sub-potent, contaminated, unsterile, or otherwise adulterated.

1490.  Accordingly, and for all the reasons discussed in this petition, use of execution drugs obtained from Drug Source Defendants for use under the Execution Protocol creates substantial, objectively intolerable risk of DRC Defendants inflicting unnecessary pain, suffering, degradation, humiliation, and/or disgrace because on plaintiffs when DRC Defendants attempts to execute them with these drugs.

1491.  Because there is no practical method to insure the purity of these defective drugs prior to their use, the use of any drugs manufactured or supplied by Drug Source Defendants must be permanently enjoined.

**Nineteenth Claim for Relief: Violation of Ohio Consumer Sales Practices Act (Ohio Revised Code § 1345.01 et seq.) Against Drug Source Defendants**

1492.   Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1493.   The Ohio Consumer Sales Practices Act (OCSPA) states in pertinent part:

> the act or practice of a supplier in representing any of the following is deceptive: [t]hat the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have; [t]hat the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not; and [t]hat the supplier has a sponsorship, approval, or affiliation that the supplier does not have.

Ohio Rev. Code §§ 1345.02(B)(1), (2), (9).

1494.   A "consumer transaction" is defined as "a sale . . . or other transfer of an item or goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things." Ohio Rev. Code § 1345.01(A). A "supplier" is defined as "a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer." Ohio Rev. Code § 1345.01(C).

1495.   The goal of the OCSPA is to protect consumers.  Therefore, it must be liberally construed in their favor.  *Einhorn v. Ford Motor Co.*, 48 Ohio St. 3d 27, 29 (1990).

1496.   "To establish a prima facie claim under the OCSPA, a plaintiff must 'show a material misrepresentation, deceptive act or omission' that impacted his decision to purchase the item at issue." *Reeves v. PharmaJet, Inc.*, 846 F. Supp. 2d 791, 798 (N.D. Ohio 2012) (citing *Temple v. Fleetwood Enters., Inc.*, 133 Fed. Appx. 254, 265 (6th Cir. 2006) (citations omitted)).

1497.   Under the OCSPA, deception is measured from the standpoint of the consumer asserting the claim.  *See Ferron v. Echostar Satellite, LLC*, 727 F. Supp. 2d 647 (S.D. Ohio 2009), *aff'd*, 410 Fed. Appx. 903 (6th Cir. 2010).

1498.   "In order to be deceptive, and therefore actionable, a seller's act must not only be at variance with the truth but must also concern a matter that is or is likely to be material to a consumer's decision to purchase the product or service involved."  *Richards v. Beechmont Volvo*, 127 Ohio App. 3d 188, 191 (1st Dist. 1998).

1499.   A consumer does not, however, need to prove intent or scienter in order to prevail on a claim under the OCSPA. *Karst v. Goldberg*, 88 Ohio App. 3d 413, 417 (10th Dist. 1993).

1500.    Upon information and belief, Drug Source Defendants have sold or attempted to sell to DRC Defendants execution drugs manufactured in a foreign country, including but not limited to India.

1501.    Under Ohio Rev. Code § 1345.01 this is a consumer transaction. Under Ohio Rev. Code 1345.01(C), Drug Source Defendants who have engaged in this activity are "suppliers" as they have sold or attempted to sell a product—execution drugs—to a consumer—DRC.

1502.    Upon information and belief, Drug Source Defendants have deceived DRC in selling or attempting to sell DRC execution drugs for use in Ohio executions.

1503.    Upon information and belief Drug Source Defendants represented to DRC that execution drugs that Drug Source Defendants were to or did or will supply to DRC were manufactured according to USP standards.

1504.    Upon information and belief, the execution drugs that Drug Source Defendants were selling or offering to sell to DRC were or will be actually manufactured to the lesser standards of Indian Pharmacopeia (IP) or European Pharmacopeia (EUP) or British Pharmacopeia (BP).

1505.    Upon information and belief, DRC purchased or attempted to purchase the execution drugs based on the misrepresentations of Drug Source Defendants that the drugs were manufactured according to USP standards.

1506.   Ohio Revised Code § 1345.01(B)(2) prohibits a supplier from misrepresenting "[t]hat the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not."

1507.   Upon information and belief, Drug Source Defendants misrepresented the standard, quality, grade or prescription of the lethal injection drugs that they sold or attempted to sell to DRC in violation of Ohio Revised Code § 1345.01(B)(2).

1508.   Plaintiff here is the ultimate consumer of the product sold by Drug Source Defendants to DRC and will be the ultimate party to suffer from the misrepresentations of Drug Source Defendants, as he will be the one who will physically suffer when DRC Defendants use these drugs to attempt to execute Plaintiff.

1509.   Upon information and belief, Drug Source Defendants misrepresent or misrepresented the purity of the lethal injection drugs to DRC yet the ultimate consumer who will be harmed by the impure drugs is Plaintiff.

1510.    The deceptive misrepresentations of Drug Source Defendants in misrepresenting that the lethal injection drugs that they claim to be manufactured to USP standards when in reality they are not must be enjoined to prevent ongoing harm to the ultimate consumers— Plaintiff, who will suffer when DRC Defendants attempt to execute him using impure execution drugs or drugs not manufactured to USP standards that were obtained from Drug Source Defendants.

1511.    Ohio Revised Code § 1345.09(D) provides:  "Any consumer may seek a declaratory judgment, an injunction, or other appropriate relief against an act or practice that violates this chapter."

1512.    Plaintiff therefore request that this Court enjoin Drug Source Defendants from misrepresenting the manufacturing standards for its drugs, and enjoin Drug Source Defendants from continuing to sell execution drugs to DRC that are not manufactured to USP standards.

**ADDITIONAL CLAIMS FOR RELIEF AGAINST ALL DEFENDANTS**

**Twentieth Claim for Relief: Eighth Amendment Violation Based On Sure or Very Likely Risk of Serious Harm In The Form Of Severe, Needless Physical Pain And Suffering Due To The Identity Of The Drugs In The Execution Protocol.**

1513.    Plaintiff incorporates by reference the allegations set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1514.    Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will face a substantial risk of serious harm in the form of severe, needless physical pain and suffering that is arbitrary and capricious, or an objectively intolerable

365

risk of such harm that Defendants unjustifiably ignore, due to the
identity of the drugs called for in the Execution Protocol.

1515.    Defendants know, or should know, or recklessly disregard the risk,
that the drugs in their Execution Protocol create a substantial risk of
severe physical pain and suffering from suffocation, a heart attack,
and/or from the searing physical pain upon injection of the drugs into
Plaintiff.

1516.    On November 15, 2017, the State of Ohio unsuccessfully attempted to
execute Plaintiff by lethal injection at the Southern Ohio Correctional
Facility ("SOCF").  For 30 minutes, and through the course of five or
more syringe insertions, Defendants attempted to obtain IV access
sufficient to proceed with Plaintiff's execution.  They failed.

1517.    Throughout the course of Defendants' aborted execution of Plaintiff,
Plaintiff did in fact suffer severe physical pain and mental torture,
caused not only by the painful needle insertions, at least one of which
struck bone, but also by the acute mental agony as Plaintiff
contemplated his own imminent death.

1518.    Due to Plaintiff's individual physical and psychological characteristics
and conditions, employing Defendants' Execution Protocol to execute
Plaintiff again poses a sure or very likely risk of serious harm in the
form of severe, needless physical pain and suffering that is arbitrary
and capricious, or an objectively intolerable risk of such harm that
Defendants unjustifiably ignore.

366

1519.   Plaintiff's individual physical and/or psychological characteristics and
conditions create a sure or very likely risk that achieving peripheral IV
access on him will be difficult if not impossible, as demonstrated by
the aborted execution attempt on November 15, 2017.  This in turn
creates a sure or very likely risk—if not a certainty—that Plaintiff will
suffer serious harm in the form of severe, needless physical pain and
suffering as Defendants stab him with needles repeatedly as occurred
on November 15, 2017, and that risk is arbitrary and capricious, or
objectively intolerable, which Defendants unjustifiably ignore.

1520.   Should the defendants obtain peripheral IV access, there still remains
a sure or very likely risk that Plaintiff's brain will begin to regain
consciousness or awareness of what is happening to him just minutes
after injection of midazolam as currently contemplated in the
Execution Protocol and as administered by DRC Defendants.

1521.   There is a sure or very likely risk that Plaintiff will not be rendered
fully unconscious, unaware and unable to feel or experience pain, and
thus he will be aware at some level while he is experiencing the
physical pain and suffering related to suffocating and/or suffering a
heart attack following injection of execution drug(s) under DRC
Defendants' Execution Protocol and/or the pain and suffering
associated with dying from a lethal injection of the drugs.

1522.   Due to his individual physical and/or psychological conditions, there
is a sure or very likely risk that Plaintiff will have an allergic or

367

paradoxical reaction to the execution drug(s), thereby increasing the already substantial risk that he will be aware of the physical pain and agony he will be suffering upon injection of the execution drug(s). Defendants' medical records on Plaintiff indicate that Plaintiff has developed an allergy to benzodiazepines, a type of drug that includes midazolam—the first drug that Defendants contemplate using to execute Plaintiff.

1523.   The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) and procedures that substantially reduce the sure or very likely risk of Plaintiff suffering the serious harms alleged here.

1524.   Among those readily implemented and available alternatives that would substantially reduce the risk of severe pain, Plaintiff offers the alternative method of execution of death by firing squad, following the same or similar procedures as defined in Section II, ¶¶ 10–12, Army Regulations No. 633-15, Procedures for Military Executions (Apr. 7, 1959).

1525.   This method is known, feasible, readily implemented and available alternative execution method and procedure that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Claim for Relief.

1526.   Moreover, this method is "available" in the legal sense, as well. Because an injunction under 42 U.S.C. § 1983 "would be an

injunction against the Ohio Department of Rehabilitation and Correction, forbidding it from killing Plaintiff by lethal injection," the State of Ohio "would simply need to find a method that comports with the Eighth Amendment"; the "fact that Ohio currently permits execution only by lethal injection does not change that fact. The Ohio legislature could, tomorrow, enact a statute reinstating the firing squad as an alternative method of execution." *In re Alva Campbell*, 874 F.3d 454, 465–66 (6th Cir. 2017) (per curiam); *cf.* Ohio Rev. Code § 2949.22(C) ("If a person is sentenced to death, and if the execution of a death sentence by lethal injection has been determined to be unconstitutional, the death sentence shall be executed by using any different manner of execution prescribed by law subsequent to the effective date of this amendment instead of by causing the application to the person of a lethal injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly cause death, provided that the subsequently prescribed different manner of execution has not been determined to be unconstitutional.").

1527. The foregoing alternative execution methods and procedures are available to and could be readily implemented by Defendants. None of the alternative methods require a physician for proper operation and implementation.

369

**Twenty-First Claim for Relief: Eighth Amendment Violation Based On Substantial Risk Of Serious Harm In The Form Of Severe, Needless Physical Pain And Suffering Due To The Source Of The Drugs In The Execution Protocol.**

1528.　Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1529.　Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a substantial risk of serious harm in the form of severe, needless physical pain and suffering that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to the source of the drugs called for in the Execution Protocol.

1530.　Defendants know, or should know, or recklessly disregard that using improperly compounded or illegally imported or otherwise illegally sourced execution drugs to administer their Execution Protocol creates a substantial risk of serve physical pain and suffering.

1531.　Plaintiff is subject to a substantial risk of serious harm in the form of severe, needless physical pain and suffering, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to insufficient procedural protections related to and concerns about identity, purity, contamination, concentration, pH levels, sterility, adulteration, misbranding, expiration/beyond use date, improper storage or handling, manufacturer, dosage or administration

370

method of the drugs to be administered to cause his death under the Execution Protocol.

1532.   The recent amendments to Ohio statutory code, codified in Ohio Revised Code § 2949.221, create a substantial risk of harm by themselves, and increase the risk of harm that is already substantial, by attempting to keep secret a broad range of information relevant to what Defendants will subject Plaintiff to in the course of carrying out his execution.

1533.   Compounded pentobarbital and compounded thiopental sodium have a significant potential to be extremely alkaline, which causes extreme pain upon interaction with the blood in a person's circulatory system.

1534.   There is a substantial, objectively intolerable risk that Drug Source Defendants will, whether intentionally or recklessly, manufacture or compound execution drug(s) to a pH level that is either too high or too low.

1535.   There is therefore a substantial, objectively intolerable risk that DRC Defendants will inject compounded execution drugs of the improper pH level into Plaintiff's bloodstream, thereby causing Plaintiff to experience intense, burning physical pain.

1536.   There is a substantial, objectively intolerable risk that Defendants Pharmacies # 1–100 and Pharmacists # 1–100 will, whether intentionally or recklessly, compound execution drug(s) that particulate or fall out of solution, which DRC Defendants will inject

into Plaintiff, and the injection of compounded execution drugs that have particulated or fallen out of solution will cause Plaintiff to experience intense, burning physical pain.

1537.    There is at least a substantial risk—and certainly an objectively intolerable risk—that the Drug Source Defendants will, whether intentionally or recklessly, include contaminant or some additional or unknown ingredient(s) in the execution drug(s) he or she manufactures or compounds which will not be visibly or otherwise detectable by analytical testing for potency or identity called for in the Execution Protocol, but which will, nevertheless, cause torturous physical pain and suffering to Plaintiff upon injection.

1538.    There is at least a substantial risk, and an objectively intolerable risk, that Defendants will improperly label, package, ship, store, and/or prepare execution drugs such that there is a substantial risk that the drugs as ultimately injected will cause Plaintiff torturous physical pain and suffering because they have become adulterated or are otherwise no longer precisely the product compounded or manufactured by Drug Source Defendants or no longer precisely the product tested by DRC Defendants.

1539.    There is at least a substantial risk, and an objectively intolerable risk, that Defendants will improperly package, ship, store, and/or prepare execution drugs such that the data obtained in analytical testing required approximately 30 days before execution by the Execution

Protocol will be critically incorrect, and the drugs injected into Plaintiff will be sub-potent or super-potent or otherwise adulterated or not precisely the drugs required by the Execution Protocol, therefore subjecting Plaintiff to a substantial risk of severe torturous physical pain and suffering.

1540. There is a substantial risk that Plaintiff will not be rendered fully unconscious, unaware and unable to experience or feel pain, and thus he will be conscious or aware at some level while he is experiencing the physical pain and suffering related to severe burning sensations following injection of improperly compounded or illegally imported or sourced execution drug(s) under DRC Defendants' Execution Protocol.

1541. Due to his individual physical and/or psychological conditions, there is a substantial risk that Plaintiff will have a paradoxical reaction to the improperly compounded or illegally imported or sourced execution drug(s), thereby increasing the already substantial risk that he will be conscious, aware of or sensate to the physical pain and agony he will be suffering upon injection of the improperly compounded or illegally imported execution drug(s).

1542. The foregoing risks are substantial when compared to the known and available alternatives.

1543. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution

373

method(s) and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Claim for Relief.

1544. These alternatives include the Alternatives identified in the Thirty-Ninth Claim for Relief, below, incorporated here by reference.

1545. The foregoing alternative execution methods and procedures are available to and could be readily implemented by Defendants. None of the alternative methods require a physician for proper operation and implementation.

**Twenty-Second Claim for Relief: Eighth Amendment Violation Based On Sure or Very Likely Risk Of Serious Harm In The Form Of Severe Mental Or Psychological Pain, Suffering And Torturous Agony Due To The Identity Of The Drugs In The Execution Protocol.**

1546. Plaintiff incorporates by reference the allegations set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1547. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of severe mental or psychological pain, suffering and torturous agony that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to the identity of the drugs in the Execution Protocol.

1548. Because consciousness or awareness of painful stimuli return rapidly, within a matter of minutes, after injection of midazolam, there is a

sure or very likely risk that Plaintiff will not be rendered fully unconscious, unaware and unable to experience or feel pain while he is experiencing the agonizing, terrifying and horrific mental pain and suffering related to suffocating and/or suffering a heart attack and/or the pain associated with injecting the paralytic drug and potassium chloride following injection of execution drug(s) under Defendants' Execution Protocol, and thus that Plaintiff's brain will be aware of what he is experiencing.

1549.   Defendants know, or should know, or recklessly disregard the risk, that using the drugs required in the Execution Protocol creates a sure or very likely risk of severe, terrifying, torturous, horrifying and agonizing mental torture, suffering and mental or psychological pain from anticipating and being aware of suffocating to death or suffering a painful heart attack or other torturous physical pain.

1550.   Due to Plaintiff's individual physical and/or psychological characteristics and conditions, employing Defendants' Execution Protocol to execute Plaintiff poses a sure or very likely risk of serious harm, in the form of severe mental or psychological pain, suffering and torturous agony that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

1551.   Plaintiff's individual physical and/or psychological characteristics and conditions create a sure or very likely risk that achieving peripheral IV access on him will be difficult if not impossible, as demonstrated by

375

the aborted execution attempt on November 15, 2017.  This in turn creates a sure or very likely risk—if not a certainty—that Plaintiff will suffer serious harm in the form of severe mental or psychological pain, suffering and torturous agony as Defendants stab him with needles repeatedly, and that risk is arbitrary and capricious, or the objectively intolerable risk of such harm that Defendants unjustifiably ignore.

1552.    Should the defendants obtain peripheral IV access, there still remains a sure or very likely risk that Plaintiff's brain will begin to regain consciousness or awareness of what is happening to him just minutes after injection of midazolam as currently contemplated in the Execution Protocol and as administered by DRC Defendants.

1553.    There is a substantial risk that Plaintiff will have an allergic or paradoxical reaction to the execution drug(s), thereby increasing the already nearly certain risk that he will be aware of the physical pain and agony he will be suffering upon injection of the execution drug(s), in turn elevating the sure or very likely risk that Plaintiff will experience agonizing, terrifying and horrific mental pain and suffering as a result.

1554.    Furthermore, Plaintiff's various psychiatric disorders, and his physical allergy to benzodiazepines, described above, place Plaintiff at even greater risk of suffering a paradoxical reaction if he is executed using the drugs in the Execution Protocol, thereby significantly

increasing the risk that he will be aware of suffering severe pain and needless suffering as the execution proceeds, as well as the accordant risk of severe, horrifying mental pain and suffering.

1555. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) and procedures that substantially reduce the sure or very likely risk of Plaintiff suffering the serious harms alleged here.

1556. These alternatives include the Alternatives identified in the Twentieth Claim for Relief, above, incorporated here by reference.

1557. The foregoing alternative execution methods and procedures are available to and could be readily implemented by Defendants.  None of the alternative methods require a physician for proper operation and implementation.

**Twenty-Third Claim for Relief: Eighth Amendment Violation Based On Substantial Risk Of Serious Harm In The Form Of Severe Mental Or Psychological Pain, Suffering And Torturous Agony Due To The Source Of The Drugs In The Execution Protocol.**

1558.   Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1559.   Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a substantial risk of serious harm in the form of severe mental or psychological pain, suffering and torturous agony that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants ignore, due to the source of the drugs in the Execution Protocol.

1560.   Defendants know, or should know, or recklessly disregard that using drugs in the Execution Protocol that are improperly compounded or illegally imported or otherwise illegally sourced execution drugs creates a variety of substantial risks of serve physical pain and suffering identified herein, of which Plaintiff is aware, thereby creating a substantial risk of severe, terrifying, torturous, horrifying and agonizing mental torture, suffering and mental and psychological pain from anticipating and being aware of his impending death at Defendants' hands using such drugs.

1561.   Because consciousness or awareness of painful stimuli comes back rapidly, within a matter of minutes after injection of pentobarbital or

378

thiopental sodium or midazolam, there is a substantial risk that Plaintiff will not be rendered sufficiently unconscious, unaware and unable to feel or experience pain while he is experiencing the agonizing, terrifying and horrific mental pain and suffering related to severe burning sensations or anaphylactic shock caused by improperly compounded or manufactured execution drugs following injection of such drug(s) under Defendants' Execution Protocol, and thus that Plaintiff's brain will be aware of what he is experiencing.

1562.    The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Claim for Relief.

1563.    These alternatives include the Alternatives identified in the Thirty-Ninth Claim for Relief,[39] below, incorporated here by reference.

1564.    The foregoing alternative execution methods and procedures are available to and could be readily implemented by Defendants.  None of

---

[39] Because Plaintiff sought leave to amend only the most relevant Claims for Relief which this Court had not previously dismissed (*see* ECF No. 1394), those claims that have not been amended still reference the alternative identified in Plaintiff's Thirty-Ninth Claim for Relief, rather than the new alternative identified in Plaintiff's amended and supplemented Twentieth Claim for Relief, i.e. firing squad.  The new alternative does not involve lethal injection and was necessitated by the inability of DRC to obtain and maintain intravenous vein access on Plaintiff.

the alternative methods require a physician for proper operation and implementation.

**Twenty-Fourth Claim for Relief: Eighth Amendment Violation Based On Sure or Very Likely Risk Of Serious Harm In The Form Of A Lingering Death.**

1565. Plaintiff incorporates by reference the allegations set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1566. A lethal-injection execution carried out under Ohio law is explicitly required to cause death "quickly and painlessly." Ohio Rev. Code § 2949.22.

1567. The drugs in DRC Defendants' Execution Protocol create an objectively intolerable risk of causing a lingering death that is prohibited by the Eighth Amendment. *See Baze v. Rees*, 553 U.S. 35, 49 (2008) (reasoning that "punishments are cruel when they involve torture or a lingering death") (internal quotation marks omitted); *see also In re Kemmler*, 136 U.S. 436, 447 (1890); *Wilkerson v. Utah*, 99 U.S. 130, 135 (1878).

1568. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff faces a sure or very likely risk of serious harm in the form of a lingering death that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

1569.   There is a sure or very likely risk under Ohio's Execution Protocol that Plaintiff will remain alive for a significant period of time after his execution begins, constituting a lingering death prohibited by the Eighth Amendment.

1570.   Defendants know, or should know, or recklessly disregard the risk, that administering Defendants' Execution Protocol creates a sure or very likely risk of harm in the form of a lingering death.

1571.   A death occurring over a period of ten minutes or more after administration of drug is a lingering death.

1572.   A death in which a condemned inmate remains clinically alive and statutorily alive for 26 minutes, 45 minutes or 70 minutes after injection of the lethal drugs is a lingering death.

1573.   Under DRC Defendants' current practices and Execution Protocol under Plan 3, it is believed that DRC Defendants will use no more than 500 mg of midazolam from an unknown source (a significant amount of which will immediately precipitate upon IV injection and therefore not act on the brain), followed at an indeterminate time by injections of a paralytic drug and potassium chloride, and then they will wait until breathing and heart sounds are not discernable, without further administration of any additional doses of any of the three drugs, even though one additional dose is contemplated, without using scientifically reliable methods to determine whether irreversible cessation of breathing and brain functions have occurred,

381

and without administration of any resuscitation efforts if the condemned inmate is still alive after 10 minutes or more.

1574.   Other than a change in the drugs used and some added steps as relevant, the procedures identified in the previous paragraph that will be used to administer DRC Defendants' Execution Protocol are the same or substantially similar procedures DRC Defendants employed during the execution of Dennis McGuire.

1575.   There is a sure or very likely risk that DRC Defendants' use of the procedures set out in the Execution Protocol to execute Plaintiff will produce a lingering death.  That risk is illustrated by the lingering death inflicted by DRC Defendants as they used essentially identical procedures when executing Dennis McGuire.  That risk is also illustrated by the lingering death inflicted on Clayton Lockett over 45 minutes using the same drugs Defendants will use in Plan 3.  That risk is also illustrated by the lingering death inflicted on Joseph Wood using an injection of at least 750 mg of midazolam (combined with a drug that allegedly caused the midazolam to act even faster than acting alone) over a two hour period.

1576.   Thus it is substantially likely that if an inmate does not experience obstruction after being injected with the execution drugs, his death will be a lingering death taking even longer than what occurred with the McGuire execution.

1577.   Because DRC Defendants believe that nothing noteworthy, abnormal, unexpected, inhumane, undignified, unlawful, or otherwise unconstitutional occurred during the McGuire execution, and that the process "worked well," there is a substantial risk that DRC Defendants will again administer their Execution Protocol procedures in a way that imposes a lingering death on Plaintiff.

1578.   Defendants know or should know or recklessly disregard the evidence related to the McGuire, Lockett and Wood executions that implicate significant operative parts of their Execution Protocol.

1579.   Due to Plaintiff's individual physical and/or psychological characteristics and conditions, employing Defendants' Execution Protocol to execute Plaintiff poses a sure or very likely risk of serious harm, in the form of a lingering death that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

1580.   Plaintiff's individual physical and/or psychological characteristics and conditions create a substantial risk that achieving peripheral IV access on him will be difficult if not impossible, as demonstrated by the aborted execution attempt on November 15, 2017.  This in turn, creates a sure or very likely risk—if not a certainty—that Plaintiff will suffer serious harm in the form of a lingering execution process leading to a lingering death as Defendants stab him with needles

repeatedly, and that risk is arbitrary and capricious, or the objectively intolerable risk of such harm that Defendants unjustifiably ignore.

1581.    The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) and procedures that substantially reduce the sure or very likely risk of Plaintiff suffering the serious harms alleged here.

1582.    These alternatives include the Alternatives identified in the Twentieth Claim for Relief, above, incorporated here by reference.

1583.    The foregoing alternative execution methods and procedures are available to and could be readily implemented by Defendants.  None of the alternative methods require a physician for proper operation and implementation.

**Twenty-Fifth Claim for Relief: Eighth Amendment Violation Based On Sure or Very Likely Risk Of Serious Harm In The Form Of Being The Subject Of An Undignified, Spectacle Execution Or Attempted Execution.**

1584.    Plaintiff incorporates by reference the allegations set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1585.    Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of being the subject of an undignified, spectacle execution or attempted execution that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

1586.   Defendants know, or should know, or recklessly disregard that their Execution Protocol creates a sure or very likely risk of harm in the form of an undignified or spectacle execution.

1587.   Defendants know, or should know, or recklessly disregard that using improperly compounded or illegally imported or sourced execution drugs creates a sure or very likely risk of harm in the form of an undignified or spectacle execution.

1588.   Plaintiff is subject to a sure or very likely risk of serious harm in the form of being the subject of an undignified, spectacle execution or attempted execution, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to the identity, sterility, concentration, manufacturer, dosage or administration method of the drugs to be administered to cause his death under the Execution Protocol.

1589.   An undignified, spectacle execution was the result of the executions of:

   a.  Dennis McGuire
   b.  Clayton Lockett
   c.  Joseph Wood
   d.  Joseph Clark
   e.  Christopher Newton

1590.   The attempted execution of Romell Broom was an undignified, spectacle of an attempted execution.

1591.   On November 15, 2017, the State of Ohio unsuccessfully attempted to execute Plaintiff by lethal injection at the Southern Ohio Correctional

Facility ("SOCF"). For 30 minutes, and through the course of five or more syringe insertions, Defendants attempted to obtain IV access sufficient to proceed with Plaintiff's execution. They failed.

1592. Throughout the course of Defendants' aborted execution of Plaintiff, Plaintiff did in fact suffer severe physical pain and mental torture, caused not only by the painful needle insertions, at least one of which struck bone, but also by the acute mental agony as Plaintiff contemplated his own imminent death.

1593. The attempted execution to which Plaintiff was subjected on November 15, 2017, was an undignified, spectacle of an attempted execution.

1594. Despite a change in execution drugs, DRC Defendants have not substantively changed the procedures used to carry out the execution of Dennis McGuire.

1595. It is substantially likely that if an inmate does not experience obstruction after being injected with the execution drugs, his death will be an undignified spectacle of an execution worse than what occurred with the McGuire execution.

1596. Because DRC Defendants believe that nothing noteworthy, abnormal, unexpected, inhumane, undignified, unlawful, or otherwise unconstitutional occurred during the McGuire execution, and that the process "worked well," there is a sure or very likely risk that DRC

Defendants will again administer their Execution Protocol procedures in a way that imposes an undignified death on Plaintiff.

1597.  Due to Plaintiff's individual physical and/or psychological characteristics and conditions, employing Defendants' Execution Protocol to execute Plaintiff poses a sure or very likely risk of serious harm, in the form of being the subject of an undignified, spectacle execution or attempted execution that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

1598.  Plaintiff's individual physical and/or psychological characteristics and conditions create a sure or very likely risk that achieving peripheral IV access on him will be difficult if not impossible, as demonstrated by the aborted execution attempt on November 15, 2017.  This in turn, creates a sure or very likely risk—if not a certainty—that Plaintiff will suffer serious harm in the form of being the subject of an undignified, spectacle execution or attempted execution as Defendants stab him with needles repeatedly, and that risk is arbitrary and capricious, or the objectively intolerable risk of such harm that Defendants unjustifiably ignore.

1599.  The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) and procedures that substantially reduce the sure or very likely risk of Plaintiff suffering the serious harms alleged here.

1600. These alternatives include the Alternatives identified in the Twentieth Claim for Relief, above, incorporated here by reference.

1601. The foregoing alternative execution methods and procedures are available to and could be readily implemented by Defendants. None of the alternative methods require a physician for proper operation and implementation.

**Twenty-Sixth Claim for Relief: Eighth Amendment Violation Based on Substantial Risk of Serious Harm in the Form of Being Subjected to an Unwanted, Non-Consensual Human Experimentation of an Execution.**

1602. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1603. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a substantial risk of serious harm in the form of being subjected to an unwanted, non-consensual human experimentation of an execution that that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, including for all the reasons alleged in Plaintiff's other claims for relief related to human experimentation executions.

1604. Defendants know, or should know, or recklessly disregard that Plan 1, using compounded or illegally imported execution drugs, creates a substantial risk of harm in the form of an impermissible human experimentation of an execution that is arbitrary and capricious.

1605.    Defendants know, or should know, or recklessly disregard that Plan 2, using compounded or illegally imported execution drugs, creates a substantial risk of harm in the form of an impermissible human experimentation of an execution that is arbitrary and capricious.

1606.    Defendants know, or should know, or recklessly disregard that Plan 3, using compounded or illegally imported execution drugs, creates a substantial risk of harm in the form of an impermissible human experimentation of an execution that is arbitrary and capricious.

1607.    Plaintiff's individual physical and/or psychological characteristics and conditions create a substantial risk that employing Defendants' Execution Protocol to execute him will subject him to a substantial risk of serious harm in the form of being subjected to an unwanted, non-consensual human experimentation of an execution that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

1608.    Defendants fail to train for an execution scenario that contemplates Plaintiff's unique characteristics.

1609.    Defendants fail to even recognize Plaintiff's unique characteristics as it relates to carrying out his execution.

1610.    Plaintiff's individual physical and/or psychological characteristics and conditions create a substantial risk that achieving peripheral IV access on him will present a problematic situation analogous to achieving IV access in the previous situations in which Defendants

389

were unable to readily obtain IV access, which, in turn, creates a substantial risk that Plaintiff will suffer serious harm in the form of being subjected to an unwanted, non-consensual human experimentation during his attempted execution as DRC Defendants stab him with needles repeatedly, and that risk is arbitrary and capricious, or the objectively intolerable risk of such harm that DRC Defendants unjustifiably ignore.

1611. Because of the scarcity of legally obtainable drugs for use in lethal-injection executions, when and whether Defendants will carry out Plaintiff's execution is a random, arbitrary, and capricious event.

1612. What drugs are used to conduct Plaintiff's execution and the efficacy of those drugs will be up to chance.

1613. Every execution of a death-row inmate will therefore be an individual experiment and each inmate, including Plaintiff, will therefore be subject to a substantial, objectively intolerable risk of severe, unnecessary pain, suffering, degradation, humiliation, and/or disgrace.

1614. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Claim for Relief.

1615. These alternatives include the Alternatives identified in the Thirty-Ninth Claim for Relief, below0 below, incorporated here by reference.

1616. The foregoing alternative execution methods and procedures are available to and could be readily implemented by Defendants. None of the alternative methods require a physician for proper operation and implementation.

**Twenty-Seventh Claim for Relief: Eighth Amendment Violation Based on Substantial Risk of Serious Harm in the Form of Maladministration or Arbitrary Administration of the Execution Protocol.**

1617. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1618. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a substantial risk of serious harm in the form of maladministration or arbitrary administration of the Execution Protocol that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

1619. There is a substantial risk that Defendants will fail to strictly apply their execution policy and written Execution Protocol properly or in accordance with the requirements of said written protocol or informal policies.

1620. There is a substantial risk that Defendants will use execution drugs compounded by Drug Source Defendants that are non-sterile, impure,

391

adulterated, sub-potent, hyper-potent, or in any other way not precisely the drugs required by Core Element # 2 of the Execution Protocol.

1621. A compounded drug that is contaminated or is sub-potent, or hyper-potent, or adulterated, or not the correct identity, or in any other way not the precise drug(s) required by the Execution Protocol poses a substantial risk of harm to Plaintiff when administered by Defendants.

1622. Defendants continue to use the same Medical Team members who have demonstrated an inability to consistently and reliably obtain peripheral IV access on condemned inmates in the execution context.

1623. Defendants' procedures for obtaining intravenous access under their overarching policy, including their written Execution Protocol, have proven to cause serious harm, including torturous physical and/or psychological pain and needless suffering and an undignified, spectacle and/or a lingering death over an extended period of time, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, as personnel attempt to obtain and maintain intravenous access.

1624. Defendants have failed to promulgate formal practices to respond to the numerous well-publicized problems and complications associated with administering their overarching execution policy and written Execution Protocol, and any practices that may have been

392

promulgated are not formally part of the written Execution Protocol and thus subject to the subjective interpretations given to them by any given Director of the DRC.

1625. These problems are repetitious and foreseeable, yet their prevalence in Ohio makes their subsequent occurrence highly likely, especially in light of the constant presence of the same problematic actors.

1626. Defendants' consistent failures, and pattern of failures, to properly and competently administer the written Execution Protocol renders the constitutionally critical safeguards—safeguards that are essential to alleviate constitutional concerns—contained in Defendants' execution policy and written Execution Protocol null and functionally nonexistent.

1627. Defendants' use of execution drugs of a different identity, concentration, purity, potency and other deviations from the drugs required by the Execution Protocol creates a substantial risk of harm, including severe, needless physical pain and suffering, severe mental or psychological pain, suffering and torturous agony, a lingering death, and an undignified, spectacle execution or attempted execution that is objectively intolerable, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

1628. Defendants' consistent failures, and pattern of failures to properly and competently administer the written Execution Protocol, including Defendants' individual deviations and/or variations and Defendants'

pattern of deviations and/or variations from the execution policy's and the written Execution Protocol's safeguards create a substantial risk that Plaintiff and any and all others on whom Defendants administer the Execution Protocol will not be sufficiently protected by those critical safeguards.

1629. DRC Defendants' previously admitted treatment of their written Execution Protocol's requirements as simple "guidelines," and their unlimited, open-ended redefinition of the terms "Director" and "Warden" in the Execution Protocol that reinforces that mindset, creates a substantial risk that Plaintiff and any and all others on whom Defendants administer their Execution Protocol will not be sufficiently protected by the Execution Protocol's critical safeguards.

1630. Defendants' consistent failures, and pattern of failures to properly and competently administer the written Execution Protocol, including Defendants' individual deviations and/or variations and Defendants' pattern of deviations and/or variations from the execution policy's and the written Execution Protocol's safeguards create, violates Plaintiff's Eighth and Fourteenth Amendment right to be free from cruel and unusual punishment because they create a substantial risk of serious harm, including physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified and/or spectacle death that is objectively intolerable, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

394

1631.    Defendants' failure to abide by their execution policy and written Execution Protocol is a demonstrated reality rather than a mere possibility or attenuated speculation, as shown by the deviations and/or variations from key execution policy and/or written Execution Protocol requirements during executions regardless of the execution policy and written protocol effective at the time, including under the current execution policy and written protocol.

1632.    Deviations and/or variations from the execution policy and written Execution Protocol demonstrate that problems with any one particular execution are not an unforeseeable isolated mishap or innocent misadventure for which no one is liable.  A long line of problematic executions in Ohio makes future problems executing Plaintiff foreseeable and highly likely.

1633.    DRC Defendants' inconsistent application of Incident Command Systems principles over time creates a substantial risk that Plaintiff will not be sufficiently protected by application of ICS principles to prevent a violation of Plaintiff's Eighth Amendment rights.

1634.    The deviations and/or variations, and the pattern of deviations and/or variations, from Defendants' execution policy and written Execution Protocol by many of the actors involved, whether intentional or reckless, the amount of discretion that exists under the overarching execution policy and within the written protocol, DRC Defendants' demonstrated belief that the written Execution Protocol is

395

not mandatory but is instead guidelines, the substantial evidence of Defendants' incompetence or inability to perform in the execution context, and the historical inconsistency in applying ICS principles in the execution context cumulatively point to a substantial risk of serious harm and/or an objectively intolerable risk of harm, in violation of Plaintiff's Eighth and Fourteenth Amendment rights.

1635. This includes intentional and/or willful and/or reckless disregard for the Execution Protocol's requirements, as well as negligent, reckless, and/or willful failure to follow the written protocol's requirements in administration of Defendants' overarching execution policy.

1636. Defendants, while making arbitrary and reckless deviations, nonetheless fail to take into account Plaintiff's physical health, mental health, and other individual characteristics that make him vulnerable to experiencing a substantial risk of serious pain and/or an objectively intolerable risk of harm.

1637. Defendants' overarching execution policy, including their pattern of deviations and/or variations from their written protocol and the unlimited discretion they claim, is arbitrary, capricious, cruel and unusual, unjustifiably ignores an objectively intolerable risk of harm, and will violate Plaintiff's rights under the Eighth and Fourteenth Amendments.

1638. Plaintiff's individual physical and/or psychological characteristics and conditions create a substantial risk that employing DRC Defendants'

396

Execution Protocol to execute him will subject him to a substantial risk of serious harm in the form of maladministration or arbitrary administration of the execution protocol that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

1639.  Plaintiff's individual physical and/or psychological characteristics and conditions create a substantial risk that achieving peripheral IV access on him will present a problematic situation analogous to achieving IV access in the previous situations in which Defendants were unable to readily obtain IV access, which, in turn, creates a substantial risk that Plaintiff will suffer serious harm in the form of maladministration or arbitrary administration of the execution protocol as Defendants stab him with needles repeatedly and deviate from strict compliance with the Execution Protocol in the high-stress context of an execution, and that risk is arbitrary and capricious, or the objectively intolerable risk of such harm that Defendants unjustifiably ignore.

1640.  Defendants' Execution Protocol presents a substantial risk of harm and/or an objectively intolerable risk of harm from maladministration that Defendants unjustifiably ignore and that will result in at least the substantial risk of infliction of serious harm, including physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified, spectacle death, and/or an objectively

intolerable risk of such harm that Defendants unjustifiably ignore, in violation of Plaintiff's rights under the Eighth and Fourteenth Amendments.

1641. Defendants' overarching execution policy, including the broad discretion to deviate and/or to vary from Defendants' written Execution Protocol, their lengthy pattern of deviations and/or variations from the Execution Protocol and Defendants' informal policies, is arbitrary, capricious and presents a substantial risk of serious harm, including physical and/or psychological pain, a torturous, lingering or spectacle death that does not accord with the dignity of man, and/or creates an objectively intolerable risk of harm that Defendants unjustifiably ignore, and/or fails to prevent Defendants from carrying out an unconstitutional execution.

1642. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Claim for Relief.

1643. These alternatives include the Alternatives identified in the Thirty-Ninth Claim for Relief, below, incorporated here by reference.

1644. The foregoing alternative execution methods and procedures are available to and could be readily implemented by Defendants. None of

the alternative methods require a physician for proper operation

and implementation.

**Twenty-Eighth Claim for Relief: Eighth Amendment Violation Based On Substantial Risk Of Serious Harm In The Form Of Being Subjected To An Execution Protocol That Is Facially Unconstitutional Because It Does Not Preclude The Execution Of An Inmate That Is Categorically Exempt From Execution.**

1645.  Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1646.  The execution of one who is intellectually disabled or incompetent to be executed constitutes cruel and unusual punishment under the Eighth Amendment.

1647.  An execution protocol that would facially allow Defendants to execute one who is categorically exempt from execution fails to fully ensure adherence to the Eighth Amendment's cruel and unusual punishments clause, and thus facially violates the Eighth Amendment.

1648.  An execution subject to a facially unconstitutional Execution Protocol violates the Eighth Amendment and is an unconstitutional execution.

1649.  Defendants' execution policy and written Execution Protocol contain no procedural safeguards or mechanisms by which Defendants ensure that a condemned inmate whose execution is imminent is not intellectually disabled or incompetent to be executed.

1650.  Defendants' Execution Protocol is therefore facially unconstitutional, and any execution carried out pursuant to the Execution Protocol is an unconstitutional execution.

1651.   Defendants know, or should know, or recklessly disregard that the Execution Protocol and their execution policy contain no procedures or mechanisms to ensure that no execution will be carried out that is unconstitutional because execution of a particular inmate is constitutionally prohibited because of the inmate's intellectual disability or incompetence at the time of execution.

1652.   There is a substantial risk of serious harm to Plaintiff that is arbitrary and capricious, or an objectively intolerable risk of serious harm that Defendants ignore, in the form of Plaintiff being subjected to execution using a facially unconstitutional and invalid execution protocol.

1653.   This Claim for Relief does not require Plaintiff to plead an alternative execution method.

1654.   To the extent Plaintiff must plead an alternative execution method as to this Claim for Relief, however, he alleges the following.

1655.   The foregoing risks are substantial when compared to the known and available alternatives which are feasibly implemented.

1656.   Ensuring that the Execution Protocol expressly includes mandatory procedural safeguards and screening mechanisms by which DRC Defendants must affirmatively confirm that an inmate subject to execution is neither intellectually disabled nor incompetent, and that DRC Defendants will seek executive clemency intervention or a stay of execution from the Supreme Court of Ohio if there is any reason to

believe that a condemned inmate to whom the Execution Protocol will be applied is either intellectually disabled or incompetent, will significantly reduce the substantial risk of Plaintiff being subjected to execution pursuant to a facially unconstitutional Execution Protocol.

1657. Because DRC Defendants are already subject to a statutory requirement to raise concerns about incompeetence of a condemned inmate, implementing such alternative procedures in Defendants' efforts to administer the Execution Protocol is feasible and readily implemented.

**Twenty-Ninth Claim for Relief: Eighth Amendment Violation Based on Deliberate Indifference or Reckless Disregard of Substantial Risk of Harm to Plaintiff.**

1658. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1659. All of the risks alleged in Plaintiff's Fifth Amended Complaint are substantial, objectively intolerable, and foreseeable, including substantial risks of suffering a severe, torturous physical pain; being subjected to agony and terror constituting severe mental or psychological suffering; suffering a lingering death; suffering an undignified, spectacle execution or attempted execution; and being subjected to unwanted, non-consensual human experimentation.

1660. DRC Defendants were on notice that the experimental execution of McGuire was likely to be a horrific, torturous, undignified spectacle of

402

an execution, but DRC Defendants proceeded with that execution anyway.

1661. DRC Defendants are aware that their institutional policies and practices in the form of the Execution Protocol and associated policies are experimental and investigational by virtue of using unapproved new drugs and by using drugs for which no Investigational New Drug application has been submitted.

1662. Drug Source Defendants are aware that their institutional policies and practices as it relates to producing execution drugs to DRC Defendants violate federal and state laws as articulated throughout this Complaint.

1663. Drug Source Defendants exhibit gross or systematic deficiencies in staffing, facilities, equipment and procedures for compounding, manufacturing, importing, shipping, storing, handling, packaging, labeling, dispensing, distributing, or administering execution drugs.

1664. DRC Defendants are aware that their institutional policies and practices in the form of the Execution Protocol and associated policies expose Plaintiff to significant risks of harm and to significant burdens on their fundamental rights based on the inclusion of compounded or imported execution drugs to carry out an execution, based on Drug Source Defendants' pattern of conduct in violating mandatory federal and state laws by compounding or importing execution drugs or their gross or systematic deficiencies in staffing, facilities, equipment and

procedures for compounding, manufacturing, importing, shipping, storing, handling, packaging, labeling, dispensing, distributing, or administering execution drugs.

1665.   Plaintiff will be subject to the psychological torture of anticipating a horrific, painful death as alleged in this Fifth Amended Complaint.

1666.   Plaintiff is aware of the horrific spectacle that occurred during Defendants' efforts to execute Dennis McGuire on January 16, 2014 that included procedures that are unchanged in the 2016 Execution Protocol.

1667.   DRC Defendants know, should know, or recklessly disregard, that the experimental executions of McGuire, Lockett and Wood were horrific, torturous, undignified spectacle executions, but DRC Defendants now intend to go forward with Plaintiff's execution using drugs and procedures that are similar in virtually all key respects with the circumstances in those botched executions.

1668.   Plaintiff is aware that Defendants do not believe that any problems or anything out of the ordinary occurred with the McGuire execution.

1669.   Plaintiff is aware of the horrific, agonizing execution of Clayton Lockett on April 29, 2014, in Oklahoma, and the similarly horrific execution of Joseph Wood on July 23, 2014, in Arizona, using an execution protocol and procedures that had received the input and positive assessment from some number of DRC Defendants and/or their counsel in this case.

404

1670.    In addition to the botched McGuire execution, Plaintiff is aware that DRC Defendants have botched other previous executions, such as the executions of Joe Clark on May 2, 2006, Christopher Newton on May 24, 2007, and the attempted execution of Romell Broom on September 15, 2009.

1671.    Plaintiff is aware of other executions using midazolam that have involved the inmate demonstrating actions inconsistent with being rendered to a state of general anesthesia, unconscious, unaware and insensate to pain.

1672.    Plaintiff is aware that DRC Defendants have deviated from the mandates of 01-COM-11 in significant ways in past executions.

1673.    Plaintiff is aware that any Drug Source Defendants will likely know for whom a particular batch of compounded execution drugs is being made, that any such Drug Source Defendants will likely know that a batch prepared in advance of Plaintiff's execution date is to be used to execute Plaintiff, and that any such Drug Source Defendants will likely know at least some basic facts about the crime for which Plaintiff is to be executed.

1674.    Plaintiff is aware that there is a substantial risk that he will be subjected to a physically painful, torturous, horrifying death if Defendants attempt to execute him using the Execution Protocol.

1675.    Plaintiff is aware that there is a substantial risk that he will be subjected to a lingering death that will take 30 or minutes or more

405

under Ohio law, if Defendants attempt to execute him using the Execution Protocol.

1676.    Plaintiff is aware that there is a substantial risk that he will be subjected to an undignified spectacle of an execution if Defendants attempt to execute him using the Execution Protocol.

1677.    Plaintiff is also aware that Defendants and/or their counsel, intentionally or unintentionally, made representations to Plaintiff's counsel or to the Court that ultimately proved to be untrue, such as when various DRC actors provided false sworn testimony, or when Defendants represented in more than one instance in their April 28, 2014 after-action review of the McGuire execution that they had "discussed the events and observations of the McGuire execution" with Dr. Dershwitz, when in fact no such discussions with Dr. Dershwitz took place.

1678.    Plaintiff is also aware that Defendants have callously disregarded concerns about lawless activity related to execution drugs, and attempt or will attempt instead to hide such lawlessness through invocation of the secrecy provisions in Ohio Revised Code § 2949.221–222, for which Defendant Mohr aggressively lobbied and which Defendant Kasich signed into law.

1679.    Plaintiff is aware of the risks alleged in this Complaint, well in advance of his execution, based on his knowledge about: Defendants' Execution Protocol; Defendants' track record in administering their

Execution Protocol; Defendants' inability to legally obtain any effective drugs that will not cause severe, unnecessary pain, suffering, degradation, humiliation, and/or disgrace; Plaintiff's own individual physical and mental/psychological characteristics; Drug Source Defendants' apparent willingness to flout scores of federal and Ohio state laws to unlawfully provide unapproved, investigational and experimental execution drugs to DRC Defendants under cloak of secrecy; and other information regarding Defendants' actions and regarding executions carried out in other states gleaned from court filings, news reports and other sources of information.

1680. Plaintiff is also aware that Defendants have been made aware of significant deficiencies in Defendants' scheme to obtain and use compounded or imported executions drugs that will not prevent a substantial risk of subversion by Drug Source Defendants, as identified throughout this Fifth Amended Complaint.

1681. Plaintiff is also aware that, over the course of the above-captioned litigation, Defendants have made representations and promises that were later discarded when abiding by those representations and promises became a hindrance to carrying out an execution.

1682. Plaintiff is aware of the horrific, botched executions, including executions in which the condemned was subjected to a lingering death or an undignified spectacle of an execution, in Ohio and other

States using protocols and procedures similar to those DRC

Defendants intend to use against him under the Execution Protocol.

1683.    Plaintiff is also aware that one or more of Defendants, or one or more

third parties, strongly desire to have his execution carried out as soon

as possible, and that Defendants are willing to go to extreme lengths

and extraordinary efforts to ensure that they will be able to attempt to

carry out his execution as currently scheduled.

1684.    Plaintiff is also aware that Defendants, even in light of all of the

above-alleged information, will intentionally apply their Execution

Protocol to him in an attempt to execute him.

1685.    Because Plaintiff is aware of all of these matters, there is no longer

just a substantial or objectively intolerable risk of severe mental or

psychological pain, suffering, terror, and anguish; instead, there is

the actual, current, objectively intolerable presence of severe,

torturous mental or psychological pain, suffering, horrific anxiety,

terror and anguish.

1686.    By their actions, Defendants are deliberately indifferent to and/or

recklessly disregard, in violation of the Eighth Amendment, a

substantial risk of subjecting Plaintiff to an unwanted, non-

consensual human experimentation, severe, needless physical pain

and suffering, severe mental or psychological pain, suffering and

torturous agony, a lingering death, or an undignified, spectacle

execution.

1687.     Because this claim raises allegations of current and ongoing harm,

not speculative or future risk of harm, the existence of an alternative

execution method is irrelevant for this claim.

**Thirtieth Claim for Relief: Fourteenth Amendment Due Process
Violation For Failure To Comply With Federal Investigational New
Drug Application Regulations With Respect To The Method And
Choice Of Drug To Be Used In Plaintiff's Execution.**

1688.     Plaintiff incorporates by reference each and every statement and

allegation set forth throughout this Fifth Amended Complaint as if

fully rewritten here.

1689.     Federal and Ohio state law prohibit marketing and distributing any

"new drug" in interstate commerce unless FDA has received and

approved a "new drug application" ("NDA") that demonstrates the drug

is safe and effective for a specific use or uses.  21 U.S.C. § 355(a),

Ohio Rev. Code § 3715.65.

1690.     If the sponsor of a new drug wishes to market the drug for additional

uses not previously approved by FDA—including for example different

combinations or doses—the sponsor is required to submit a separate

NDA to FDA.

1691.     There is no approved NDA for thiopental sodium.

1692.     The approved NDA for pentobarbital does not include its use for

lethal-injection human executions, and does not include its use at the

doses required by the Execution Protocol.

1693.    The approved NDA for midazolam does not include its use for lethal-injection human executions, and does not include its use at the doses required by the Execution Protocol.

1694.    The approved NDA for pancuronium bromide does not include its use for lethal-injection human executions, and does not include its use at the doses required by the Execution Protocol.

1695.    The approved NDA for vecuronium bromide does not include its use for lethal-injection human executions, and does not include its use at the doses required by the Execution Protocol.

1696.    The approved NDA for rocuronium bromide does not include its use for lethal-injection human executions, and does not include its use at the doses required by the Execution Protocol.

1697.    The approved NDA for potassium chloride does not include its use for lethal-injection human executions, and does not include its use at the doses required by the Execution Protocol.

1698.    Federal and Ohio state law provides an exception to the requirement of an approved NDA for clinical investigations of a new drug, including a new use of a previously approved drug.  21 U.S.C. § 355(i).

1699.    Federal law provides FDA with explicit authority to promulgate regulations for the conditions and procedures for this investigational drug use, which are incorporated in 21 C.F.R. Part 312.

1700.    Without such an exception, it would be illegal to move the drug in interstate commerce for purposes of a clinical investigation.

1701.    FDA's regulations state that 21 C.F.R. Part 312 applies to all "clinical

investigations" of new drugs.  21 C.F.R. § 312.1(a).

1702.    Section 312.3(b) defines a "clinical investigation" as follows:

> *Clinical investigation* means any experiment in which a
> drug is administered or dispensed to, or used involving,
> one or more human subjects.  For the purposes of this
> part, an experiment is any use of a drug except for the
> use of a marketed drug in the course of medical
> practice.

21 C.F.R. § 312.3(b) (emphasis in original).

1703.    This definition means that using a drug outside of medical practice

constitutes a "clinical investigation," and that even "medical practice"

is limited to "marketed drugs."

1704.    Using a drug in the course of a lethal-injection execution is not "use of

a marketed drug in the course of medical practice."

1705.    Under § 312.3(b), therefore, use of drugs under the Execution Protocol

constitutes a clinical investigation under federal law, and requires the

submission of an Investigational New Drug ("IND") application.

1706.    Part 312 requires that an IND application be submitted to FDA before

a clinical investigation of a new drug is undertaken: "A sponsor *shall*

submit an IND to FDA if the sponsor intends to conduct a clinical

investigation with an investigational new drug that is subject to

312.2(a)."  21 C.F.R. § 312.20(a) (emphasis added).

1707.    An "investigational new drug" is defined under the law as a "new

drug" used in a "clinical investigation."  21 C.F.R. § 312.2(a).

1708.   The "sponsor" is "a person who takes responsibility for and initiates a clinical investigation."  21 C.F.R. § 312.3(b).

1709.   Under this definition, DRC Defendants and/or Drug Source Defendants are a "sponsor" of a "clinical investigation" for the drugs' use in a lethal-injection execution, and are thus required by law to submit an IND to FDA for this investigational use.

1710.   Subpart B of Part 312 specifies the IND requirements, including the requirement that a protocol be submitted to FDA as part of the IND application.  21 C.F.R. § 312.23(a)(6).

1711.   DRC Defendants must include their Execution Protocol in the IND submission to FDA and ensure that the Execution Protocol complies with the applicable, detailed regulatory requirements.

1712.   Drug Source Defendants must include their relevant protocols in the IND submission to FDA and ensure that their protocols comply with the applicable, detailed regulatory requirements.

1713.   Defendants are not entitled to the statutory exception to the requirement of an IND application for clinical investigations of drugs that are "lawfully marketed" in the United States.  *See* 21 C.F.R. § 312.2(b)(iii)–(iv).

1714.   Drugs that are compounded are not considered "lawfully marketed" for purposes of the regulations related to the IND requirements:

> Studies that use a drug product that is prepared from *raw materials in place of the approved, finished product marketed by the manufacturer must be conducted under an IND* (21 C.F.R. part 312).  These studies cannot meet the criteria for an exemption from the IND requirements for marketed drugs (§312.2(b)) because the drug product manufactured by the investigator or research pharmacy *is not considered to be the lawfully marketed drug.*

FDA, Guidance for Clinical Investigators, Sponsors, IRBs: Investigational New Drug Applications (INDs)—Determining Whether Human Research Studies Can Be Conducted Without an IND (Sept. 2013) at 17 (emphasis added), available at

http://www.fda.gov/downloads/Drugs/Guidances/UCM229175.pdf.

1715.    In accordance with the law, Defendants must submit an IND application and comply with the other IND requirements 30 days before putting the Execution Protocol into effect for a lethal-injection execution.

1716.    The federal IND regulations preempt any Ohio state laws, including the Execution Protocol and § 2949.22(a), that are read to authorize Defendants to conduct lethal injections pursuant to protocols that have not first been submitted to FDA for review as part of an IND, because such Ohio state laws would be in direct and positive conflict with federal law.  1962 Drug Amendments, Pub. L. 87-781, 76 Stat. 780, 793, § 202.

1717.   The federal regulatory safeguards employed in the IND requirements were designed to ensure the rights and welfare of human subjects of experimentation and clinical investigation.

1718.   Plaintiff is the involuntary and coerced participant in Defendants' experimentation and clinical investigations, but he is, nevertheless, still the human subject of the clinical investigation and experimentation.

1719.   The IND regulations contain no exception to the mandatory IND application process for any drug on the basis that it is used in a human execution.

1720.   DRC Defendants are not exempt from the IND application regulations as it relates to execution drugs.

1721.   Drug Source Defendants that are acting as 503A compounders are not exempt from the IND application framework as it relates to execution drugs due to their failure to comply with all relevant and applicable statutes and regulations, including but not limited to the requirements of USP 797 and the requirements that compounded drug products produced by a 503A compounder may only be compounded pursuant to a legally valid prescription.

1722.   Drug Source Defendants that are acting as 503B outsourcing facilities are not exempt from the IND application framework as it relates to compounded pentobarbital due to their failure to comply with all relevant and applicable statutes and regulations, including but not

limited to the requirements of cGMPs and the prohibition on compounding any product that is a copy or essentially a copy of an approved drug.

1723. Until the moment of death, Plaintiff maintains a constitutionally protected residual life interest; all facets of the process by which Defendants seek to deprive him of that interest, therefore, must comply with the requirements of due process.

1724. Plaintiff has a due process right to be assured that Defendants have complied with the federal IND regulations with respect to the method and choice of drug to be used in his execution.

1725. Defendants know or should know that they are subject to the mandatory IND application regulations.

1726. Defendants intentionally, with deliberate indifference, and/or recklessly disregard the mandatory IND application regulations and have not submitted a satisfactory IND to the federal FDA regarding their experimental use of any of the execution drugs in their Execution Protocol, whether manufactured or compounded.

1727. Defendants intentionally, with deliberate indifference, and/or recklessly disregard the mandatory IND application regulations and, upon information and belief, will not submit a satisfactory IND to the federal FDA regarding their experimental use of any of the execution drugs in their Execution Protocol, whether manufactured or compounded.

1728.  Defendants' failure to comply with FDA's IND regulations related to the Execution Protocol deprive Plaintiff of a life interest without due process of law in violation of the Fourteenth Amendment.

**Thirty-First Claim for Relief: Equal Protection Violations Related To Defendants' Failures To Comply With The IND Application Laws.**

1729.  Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1730.  Plaintiff, individually and as a member of a class of persons subject to a death sentence under Ohio law, has fundamental rights, such as those identified herein, and the fundamental due process rights identified herein.

1731.  Plaintiff is similarly situated to others that will be human subjects of experimental and clinical investigations of Investigational New Drugs.

1732.  Defendants' failures to comply with mandatory federal and Ohio state laws related to the IND application requirements are deviations from Core Elements of the Execution Protocol for the same reasons articulated herein.

1733.  Defendants' intentional, deliberately indifferent, and/or reckless failure to follow the mandatory federal and Ohio state law IND application requirements treats Plaintiff disparately from others similarly situated, thereby substantially burdening Plaintiff's fundamental rights in the ways identified herein and by burdening his

416

fundamental right to a life interest in being assured that Defendants have complied with the federal IND regulations with respect to the method and choice of drug to be used in his execution before they attempt to execute him.

1734. Plaintiff is also a class of one, similarly situated with those protected from harm as subjects of human experimentation and clinical investigations by the federal IND application regulations.

1735. Defendants intentionally treat Plaintiff differently than similarly situated individuals by their arbitrary and irrational failure to follow the mandatory IND application regulations, thus irrationally subjecting Plaintiff to a heightened risk that he will suffer deprivations of his fundamental rights identified above without legitimate or rational reason.

**Thirty-Second Claim for Relief: First Amendment Free Exercise Clause and RLUIPA Violation.**

1736. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1737. With respect to Plaintiff's last words, the Execution Protocol contemplates that the Warden may "terminate a statement that he or she believes is intentionally offensive to the witnesses."

1738. This regulation is not reasonably related to legitimate penological interests and it abridges Plaintiff's constitutional and statutory rights protecting his sincerely held religious beliefs.

417

1739.   Because Plaintiff's last words may include prayer for atonement recounting details of his actions, the witnesses might find this speech offensive either because of the content or because their religion is different from Plaintiff's.

1740.   The Execution Protocol's restrictions regarding an inmate's last words do not contemplate least restrictive means of furthering any compelling government interests.

1741.   The Execution Protocol provisions that permit the Warden to terminate Plaintiff's speech therefore imposes a substantial, unjustified burden on the Plaintiff's exercise of his sincerely held religious beliefs in violation of Religious Land Use And Institutionalized Persons Act, 42 U.S.C. §§ 2000cc et seq. and Plaintiff's rights under the First Amendment's Free Exercise Clause.

**Thirty-Third Claim for Relief: Eighth Amendment Violations Based On Sure or Very Likely Risk of Serious Harm In The Form Of Severe, Needless Physical Or Mental/Psychological Pain And Suffering Due To Plaintiff's Unique, Individual Characteristics And Application Of The Execution Protocol.**

1742.   Plaintiff incorporates by reference the allegations set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1743.   In addition to the ways alleged throughout Plaintiff's Fifth Amended Complaint in which Plaintiff's individual characteristics increase the risk he will experience several different types of serious harm if subjected to DRC Defendants' Execution Protocol, his individual characteristics also increase the risks that he will also suffer serious

harm in the form of severe, needless physical and/or mental/psychological pain and suffering in the following ways. Defendants have unjustifiably ignored these risks, which are arbitrary and capricious, or objectively intolerable, and continue to do so by subjecting Plaintiff to their Execution Protocol.

1744.    Since 2003, Plaintiff's health has progressively, and acutely, worsened, with multiple severe and life-threatening ailments arising almost every year:  2003 – diagnosis of pulmonary hypertension; 2004 – diagnosis of increased scarring in the lungs and growing nodules in the upper lungs and severely worsening emphysema leading to concerns with air hunger; 2006 – diagnosis of Chronic Obstructive Pulmonary Disease (COPD) and emphysema classified as "end stage," diagnosis of collapsed lung and respiratory failure, sarcoidosis (for which there is no cure), coronary artery disease, atrial fibrillation, hypertension, deep vein thrombosis and pulmonary embolism; 2012 – hypoxemic respiratory failure (starving for oxygen), histoplasmosis, atrial fibrillation with rapid and out of rhythm heartbeats; 2014 – diagnosis of worsening COPD exacerbation, increasing nodules in lungs, emphysema increasing in lungs, discovery of an aortic aneurysm; 2015 – diagnosis of prostate cancer and surgical prostatectomy, spontaneous collapsed lung requiring a life flight to Ohio State University Hospital; and a diagnosis of MRSA while at Ohio State University Hospital; 2016 – hip replacement surgery after being

knocked down by another inmate, while at Ohio State University

Hospital staff discovered a gangrenous colon and 2 surgeries were

required to remove the colon and equip him with an external

colostomy bag; 2017 – diagnosis of pneumonia after being

hospitalized for coughing up blood.  In addition to these physical

characteristics that inhibit his ability to breathe, Plaintiff must take

breathing treatments four times a day in order to function, and he

relies on a walker for very limited mobility.

1745.   In particular, Plaintiff's medical conditions substantially impair his

ability to lie flat.  Ohio's method of execution by lethal injection

requires the inmate to lie flat on a gurney.  Requiring Plaintiff to lie

flat on the gurney is sure or very likely to cause Plaintiff severe and

needless pain and suffering.  Any attempt by Plaintiff to lie flat, for

even a few moments, with less than a 40-degree incline supporting his

head and upper half of his body will result in substantially increased

heart rate, blood pressure, agitation, anxiety, and mental and

physical distress.  Forcing Plaintiff to lie flat or at any angle less than

40 degrees for the entirety of his execution is sure or very likely to

result in Plaintiff's immediate suffering even before the beginning of

the administration of execution drugs, and will continue throughout

the execution procedure.[40]

---

[40] At the November 15, 2017 attempt to execute Plaintiff, Defendants
provided a wedge pillow that permitted Plaintiff to recline at a 42 degree angle,

1746.   Because Plaintiff presents with several risk factors for the STOP-Bang test, including his history of lung cancer, COPD, and sarcoidosis and necrotizing granulomas in his lungs, he is further at a significant risk of suffering obstructed breathing and the phenomenon known as "air hunger" upon injection of the lethal drugs.  There will be at least a period of time following administration of the drugs when Plaintiff will remain conscious or aware of what he is enduring, including as he regains consciousness or awareness after the initial injection.  He will struggle to breath but be unable to draw breath, suffering both intense physical pain and extreme mental terror and anguish.

1747.   In addition, Plaintiff's recent medical records note an allergy to benzodiazepines, a class of drug which includes midazolam. Midazolam is the first drug in Ohio's three-drug Execution Protocol, and was used in the two executions performed thus far under Ohio's Execution Protocol.

1748.   Although Plaintiff has received midazolam in the past, his records indicate that he last received midazolam in 2012, over 5 years ago, and in significantly smaller doses than Ohio intends to use in his execution.

---

facilitating his ability to breathe during the attempted execution. Such accommodations would be necessary in any future attempt by Defendants to execute Plaintiff.

1749. Furthermore, Plaintiff's recent medical records note extreme difficulties in obtaining vein access. Recent medical assessments performed by the Ohio Department of Rehabilitation and Correction show no suitable IV insertion sites in either arm or leg, with possible sites located in only one leg after extensive searching, the aid of ultra-violet light, and the application of tourniquets.

1750. On November 15, 2017, the State of Ohio unsuccessfully attempted to execute Plaintiff by lethal injection at the Southern Ohio Correctional Facility ("SOCF"). For 30 minutes, and through the course of five or more syringe insertions and with the use of an ultra-violet light, Defendants attempted to obtain IV access sufficient to proceed with Plaintiff's execution. They failed.

1751. Throughout the course of Defendants' aborted execution of Plaintiff, Plaintiff did in fact suffer severe physical pain and mental torture, caused not only by the painful needle insertions, at least one of which struck bone, but also by the acute mental agony as Plaintiff contemplated his own imminent death.

1752. Plaintiff's physical characteristics made it certain that the execution team would be unable to successfully establish and/or maintain peripheral IV access on him, thereby subjecting him to severe, needless physical and mental/psychological pain and suffering as Defendants stab him with needles repeatedly.

1753.  Plaintiff's physical characteristics make certain that the execution team will again be unable to successfully establish and/or maintain peripheral IV access on him, thereby subjecting him to severe, needless physical and mental/psychological pain and suffering as Defendants stab him with needles repeatedly.

1754.  Plaintiff's physical characteristics make sure or very likely that the execution team will again be unable to successfully establish and/or maintain peripheral IV access on him, thereby subjecting him to severe, needless physical and mental/psychological pain and suffering as Defendants stab him with needles repeatedly.

1755.  Plaintiff's many medical conditions are sure or very likely to increase the air hunger that Plaintiff will necessarily suffer as the result of the State's administration of *any* lethal injection drug, and increase the sure or near certain likelihood that Plaintiff will suffer a paradoxical reaction to the administration of *any* lethal injection drug.  As a result, any attempt of the State to execute him is unconstitutional.

1756.  Furthermore, Plaintiff's history of psychiatric disorders or mental health conditions significantly increases the already-substantial risk that Plaintiff will suffer extreme mental terror, anguish and suffering before and during his execution.  Plaintiff will contemplate experiencing each of the different types of serious harms alleged herein, including a lingering, undignified, spectacle of an execution that will be neither quick nor painless.  Plaintiff will further

423

contemplate experiencing the horrific, spectacular, undignified, lingering, and torturous execution experiences that he has already suffered on November 15, 2017 and that was endured by persons such as Romell Broom, Joseph Clark, Christopher Newton, Dennis McGuire, Joseph Wood, Clayton Lockett or other executed inmates who have reported feeling that they were being burned from the inside upon administration of the lethal drugs.

1757. Accordingly, Defendants' use of the Execution Protocol will create a situation in which Plaintiff *will* suffer torturous physical and psychological pain and suffering at DRC Defendants' hands in the execution process, let alone a "very likely risk" of that.

1758. Because this Claim for Relief alleges the certainty that severe harm will occur, rather than the substantial risk of harm, Plaintiff is not required under the law to plead an alternative execution method.

1759. However, should he be required to plead an alternative, Plaintiff offers the alternative method of execution of death by firing squad, as described in the Twentieth Claim for Relief, above, and incorporated here by reference.

1760. The foregoing alternative execution method and procedures are available to and could be readily implemented by Defendants. The alternative method of execution does not require the use of benzodiazepines, the use of which is unsuitable for Plaintiff due to his allergies; and further does not require IV access whatsoever, which

424

Defendants cannot obtain on Plaintiff without severe and gratuitous

suffering and torture.  The alternative method does not require a

physician for proper operation and implementation.

**Thirty-Fourth Claim for Relief: Equal Protection Violations Related To Plaintiff's Unique, Individual Characteristics And Application Of The Law, Including DRC Defendants' Execution Protocol and Ohio's Execution Statute.**

1761.    Plaintiff incorporates by reference the allegations set forth throughout

this Fifth Amended Complaint as if fully rewritten here.

1762.    Due to Plaintiff's unique, individual characteristics as alleged

throughout Plaintiff's Fifth Amended Complaint, and specifically as

alleged in the Thirty-Third Claim for Relief, above, Defendants did

apply the Execution Protocol and Ohio Revised Code § 2949.22(a)

disparately in a way that burdened Plaintiff's fundamental right to be

free from cruel and unusual punishment.

1763.    Due to Plaintiff's unique, individual characteristics as alleged

throughout Plaintiff's Fifth Amended Complaint, and specifically as

alleged in the Thirty-Third Claim for Relief, above, Defendants will

again apply the Execution Protocol and Ohio Revised Code

§ 2949.22(a) disparately in a way that burdens Plaintiff's fundamental

right to be free from cruel and unusual punishment.

1764.    Due to Plaintiff's unique physical characteristics, DRC Defendants will

not administer to Plaintiff the professional, humane, sensitive and

dignified execution which DRC Defendants have a duty to provide

Plaintiff under the Execution Protocol. Instead, Plaintiff's execution will be a spectacular, undignified execution.

1765. Due to Plaintiff's unique physical characteristics, DRC Defendants will not administer to Plaintiff the quick and painless execution which DRC Defendants have a duty to provide Plaintiff under § 2949.22(a). Instead, the attempted execution of Plaintiff by Defendants will be a lingering, torturous and horrifying spectacle.

1766. DRC Defendants will deviate from Core Elements of the Execution Protocol by failing to use "appropriately trained and qualified" persons.

1767. Core Element # 4 of the Execution Protocol requires that all functions to be performed by Execution Team Members must be performed by appropriately trained and qualified members of the Execution Team.

1768. DRC Defendants will not be appropriately trained to administer the Execution Protocol to Plaintiff in light of his unique characteristics as alleged herein—specifically the inability to locate viable veins for peripheral IV access—and the need to use scientifically and medically reliable assessment methods.

1769. DRC Defendants' disparate treatment of Plaintiff burdens the fundamental rights against cruel and unusual punishment of a class of individuals that includes Plaintiff, namely those subject to execution at DRC Defendants' hands.

1770.   Defendants must apply Ohio and federal laws equally to all similarly situated persons.  They do not, and will not with Plaintiff.

1771.   The disparate treatment of Plaintiff does not serve a compelling governmental interest, nor is it narrowly tailored to satisfy a compelling interest.

1772.   Defendants' claimed obligation to execute its death-sentenced prisoners is only a "legitimate" or, at most, a "significant" state interest, not a compelling state interest.

1773.   Defendants have no interest—let alone a legitimate interest—in carrying out an unconstitutional execution.

1774.   Thus, any deviations from the Core Elements of the Execution Protocol, even if directly related to Plaintiff's unique characteristics, cannot be said to be tailored to a compelling governmental interest. Nor can the deviations from § 2949.22(a), or the disparate impact on Plaintiff.

1775.   Defendants' disparate application of the Execution Protocol and § 2949.22(a) based on Plaintiff's unique characteristics, including their failure to actually assess and train to carry out an execution on Plaintiff in light of his unique characteristics, intentionally treats Plaintiff differently from others similarly situated—namely others subject to execution in Ohio—irrationally and arbitrarily, because that disparate treatment still involves unlawful state action which is, by definition under the law, irrational and arbitrary.

1776.   Defendants' irrational and arbitrary disparate treatment of him as a class of one is to Plaintiff's detriment because it will decrease the procedural protections that are so important to protect his dignity, his humanity and his fundamental rights under the Eighth Amendment and others as alleged in Plaintiff's Complaint.

**Thirty-Fifth Claim for Relief: Eighth Amendment Violation Based On Purposeful or Knowing Adoption of a Lethal Injection Protocol Using A Three-Drug Method With Midazolam As The First Drug That Will Cause Severe Physical Pain and Torturous Mental Anguish and Suffering.**

1777.   Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1778.   Defendants know, or should know, or recklessly disregard that injecting Plaintiff with the paralytic drug will cause horrific, torturous physical pain and mental suffering and anguish if he is not rendered unconscious, unaware and insensate before the paralytic drug is injected and throughout the duration of the paralytic drug's effects on Plaintiff.

1779.   Defendants know, or should know, or recklessly disregard that injecting Plaintiff with potassium chloride drug will cause horrific, torturous physical pain and mental suffering and anguish if he is not rendered unconscious, unaware and insensate before the potassium chloride is injected and throughout the duration of the paralytic drug's effects on Plaintiff.

428

1780.   Defendants know, or should know, or recklessly disregard that midazolam is so completely incapable of preventing the extreme and needless physical pain and torturous mental anguish and suffering that Plaintiff will experience if he injected with the second and/or third drugs in Defendants' three-drug execution method that such pain is essentially certain.

1781.   Defendants know about, should know, or recklessly disregard the horrific execution of Joseph Clark using a three-drug method. Defendants also know about, should know, or recklessly disregard the events of executions like that of Clayton Lockett in which midazolam has been used as the critical first drug in a three-drug execution method, as well as the various expert opinions that have been rendered regarding the suitability of using midazolam as the first in a three-drug execution method.  That information which Defendants know, should know, or recklessly disregard, establishes that Plaintiff will almost certainly experience that same extreme, objectively intolerable pain and suffering.

1782.   Defendants know that this result will follow, or recklessly disregard that likelihood, and intentionally and purposefully chose to re-introduce the three-drug method using midazolam anyway.

1783.   Defendants have thus adopted the three-drug execution method using midazolam as the critical first drug with the purpose or knowledge of

causing severe pain, in violation of the Eighth Amendment under *Wilkerson*, *Kemmler* and *Farmer*.

1784. The existence of an alternative execution method is irrelevant for this claim.  *See Baze*, 553 U.S. at 102 (Thomas, J., concurring in the judgment) (no "comparative analysis" in *Wilkerson* and *Kemmler*); *see also Warner v. Gross*, 135 S. Ct. 824, 826 (2015) (Sotomayor, J., dissenting); *Glossip*, 135 S. Ct. at 2795–97 (Sotomayor, J., principal dissent).

**Thirty-Sixth Claim for Relief:  Eighth Amendment Violation Based On Purposeful or Knowing Adoption of a Lethal Injection Protocol Using Midazolam That Will Cause Severe Physical Pain and Torturous Mental Anguish and Suffering.**

1785. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1786. Defendants know, or should know, or recklessly disregard that injecting Plaintiff with midazolam will cause horrific, torturous physical pain and mental suffering and anguish.

1787. Defendants know, or should know, or recklessly disregard that midazolam is so completely incapable of preventing the extreme and needless physical pain and torturous mental anguish and suffering from suffocating or experiencing air hunger or an agonizing heart attack that Plaintiff will experience if he is injected with midazolam that such pain and suffering is essentially certain.

1788.   Defendants know about, should know, or recklessly disregard the
events of several botched executions like Dennis McGuire and Joseph
Wood in which midazolam has been used, along with the various
expert opinions that have been rendered regarding the suitability of
using midazolam as part of a lethal injection execution method,
including testimony offered during the McGuire preliminary
injunction proceedings.  That information which Defendants know,
should know, or recklessly disregard, establishes that Plaintiff will
almost certainly experience extreme, objectively intolerable pain and
suffering if subjected to an execution using midazolam.

1789.   Defendants know that this result will follow, or recklessly disregard
that likelihood, and intentionally and purposefully chose to re-
introduce the use of midazolam anyway.

1790.   Defendants have thus adopted an execution method using midazolam
with the purpose or knowledge of causing severe pain, in violation of
the Eighth Amendment under *Wilkerson*, *Kemmler* and *Farmer*.

1791.   The existence of an alternative execution method is irrelevant for this
claim.  *See Baze*, 553 U.S. at 102 (Thomas, J., concurring in the
judgment) (no "comparative analysis" in *Wilkerson* and *Kemmler*); *see
also Warner v. Gross*, 135 S. Ct. 824, 826 (2015) (Sotomayor, J.,
dissenting); *Glossip*, 135 S. Ct. at 2795–97 (Sotomayor, J.,
principal dissent).

**Thirty-Seventh Claim for Relief: Eighth Amendment Violations Based on DRC Defendants Resurrecting Their Abandoned Three-Drug Method Even Though They Know It Causes Needless Pain And Suffering, And Had Abandoned It, At Least In Part, For That Reason.**

1792.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1793.    In adopting the Execution Protocol, and selecting the revised three-drug method to use for Plaintiff's execution, DRC Defendants made a deliberate choice to follow a course of action from among various alternatives.

1794.    In making that choice, DRC Defendants know and/or are charged with knowing that the revised three-drug method in the Execution Protocol does, in fact, expose condemned inmates, like Plaintiff, to needless pain and suffering, including because it is dependent upon the successful delivery and maintenance of drug-induced unconsciousness, unawareness and inability to feel or experience pain to a paralyzed person in circumstances of immense stress and where the state actors involved are known by DRC Defendants to lack the necessary experience, skill, judgment, and competence to reliably perform those difficult medical responsibilities.

1795.    DRC Defendants further know and/or are charged with knowing that the revised three-drug method in the Execution Protocol will subject Plaintiff, when executed by that method, and perhaps every inmate

432

executed by that method, to a death that is terrifying, inhumane, undignified, and/or extremely painful.

1796.   Because the paralytic drug does not serve any therapeutic purpose, it is critical the first drug is properly administered and that Plaintiff is rendered unconscious, unaware and insensate to pain to the level of general anesthesia.  DRC Defendants know and/or are charged with knowing that if Plaintiff is not properly rendered unconscious, unaware and insensate by the first drug, the paralytic will compound the terror and pain Plaintiff will experience during his execution by inducing an unnecessary paralysis of all his voluntary movements and, consequently, his ability to effectively communicate his internal distress.  Though aware or conscious at some level, Plaintiff will be trapped in his own body as the execution moves forward.  This is a chemical entombment akin to being buried alive.

1797.   DRC Defendants further know and/or are charged with knowing that if Plaintiff is not properly rendered unconscious, unaware and insensate by the first drug, and then is paralyzed by the second drug, the third drug, potassium chloride, will burn as it courses through Plaintiff veins, until it reaches his heart, ultimately stopping it by inducing cardiac arrest.  This searing pain, like liquid fire, is the chemical equivalent of being burned at the stake, and the heart attack Plaintiff will experience will likewise cause torturous pain and agony.

1798.    There is no governmental interest served by using a paralytic drug, and its use will deprive Plaintiff of his human dignity.  The paralytic drug, as used and/or intended to be used in the Execution Protocol, does not serve the statutory function of quickly and painlessly causing death, nor does it protect against Plaintiff experiencing pain.  The paralytic's suppression of breathing does not hasten the death subsequently caused by the potassium, nor does it protect against the prisoner's pain.  Because midazolam is not effective at rendering and maintaining unconsciousness, unawareness and rendering Plaintiff unable to feel and experience pain despite painful stimuli, the paralytic only serves a pernicious purpose—to mask the immense, burning pain caused by a lethal dose of potassium chloride, and the sensation of suffocation caused by the paralytic itself.  The paralytic prevents a prisoner from alerting observers, through sound or movement, that he is experiencing pain.  Alternatively, if midazolam, despite its ceiling effect, actually were effective at establishing and maintaining unconsciousness, unawareness and keeping the inmate insensate despite painful stimuli, then the paralytic would be an unnecessary, gratuitous, and arbitrary administration of an unwarranted and harmful chemical that has its own painful effects, amounting to an assault and a battery of the prisoner.

1799.    The pattern of deviations and/or variations from DRC Defendants' execution policy and written execution protocol engaged in by many of

the actors involved, combined with the amount of discretion that DRC Defendants claim under their overarching execution policy and under the written protocol, along with substantial evidence of incompetence or inability to perform in the execution context, cumulatively point to an undeniably high risk of violating an inmate's rights during any given execution under the three-drug method.

1800. It was in part because DRC Defendants, by November 2009, had actual knowledge of all of these foregoing problems and deficiencies with the original three-drug method that they made the decision then to forever renounce any further use of the three-drug method in Ohio executions, and they abandoned that method of lethal injection going forward.

1801. The revised three-drug method DRC Defendants have resurrected in the Execution Protocol retains all of the problems of the original three-drug method they foreswore in 2009, but adds even greater problems, relevant to the known infliction of needless pain and suffering, because of its use of midazolam as the first drug, its allowance of compounded drugs, and its tolerance of beginning an execution with only one IV site, all as previously addressed in this Fifth Amended Complaint.

1802. In resurrecting the three-drug method for Plaintiff's execution, and making that method even worse than what they renounced in 2009, DRC Defendants have knowingly, intentionally and purposefully

435

adopted a method of lethal injection known to cause needless pain and suffering to inmates subjected to it. Their chosen method for Plaintiff superadds layers of needless pain and suffering, and they know that it does so, and yet they are deliberately indifferent and/or consciously disregard that fact and/or possess a malicious or purposeful intent to inflict such needless pain and suffering upon Plaintiff.

1803. As a result of their knowing resurrection of the previously renounced three-drug method, and knowingly making it worse, DRC Defendants, in addition to subjecting Plaintiff to the experience of being executed by this unconstitutional method, are also forcing him to endure the psychological torment of preparing for his execution to be inflicted by that method. It super-adds elements of terror and torment to Plaintiff's punishment for DRC Defendants to knowingly and purposefully subject him to a method Defendants themselves previously renounced due in part to their own belief that it was too difficult for their team and did not meet their duty to reliably and consistently deliver a humane execution.

1804. DRC Defendants' adoption for Plaintiff's execution of the three-drug method they had previously renounced, and given their troubling history of conducting executions by lethal injection with that method, demonstrates defendants' malicious intent and/or conscious disregard and/or deliberate indifference and/or purposeful intention

436

for the consequences of that action, including but not limited to the needless pain and suffering they know their chosen course of action will inflict upon Plaintiff and other inmates executed by that method.

1805.   Plaintiff believes and therefore alleges that such an execution would be inhuman and barbarous, akin in its level of pain and suffering to being buried alive, burning at the stake, and other primitive methods long since abandoned by civilized society.  It is beyond dispute that being buried alive or burned at the stake are inherently cruel forms of punishment.  So is suffocation to death.  They are cruel for many reasons, including that the suffering they inflict is beyond what is necessary to cause death.  Simply because these punishments can now be carried out in a more sophisticated manner—using chemicals—than their more primitive analogs, does not mean that the resulting pain and suffering is any less cruel or any less intolerable under the Eighth Amendment.

1806.   For the foregoing reasons, DRC Defendants' revival of the abandoned three-drug method for Plaintiff's execution, including the paralytic and potassium chloride, violates Plaintiff's constitutional rights under the Eighth and Fourteenth Amendments.

1807.   DRC Defendants have no legitimate penological justification for their use of the revised three-drug method in the Execution Protocol, and its use at Plaintiff's execution will make it sure that Defendants will

needlessly and gratuitously inflict severe pain and a lingering death on Plaintiff.

1808.    Because DRC Defendants' constitutional violations alleged by Plaintiff in this Claim for Relief involve at least in part Defendants' knowing and deliberate use against Plaintiff of a previously renounced method known by Defendants to inflict needless pain and suffering, Plaintiff is not required to plead an alternative method of execution.

1809.    However, should he be required to plead an alternative, Plaintiff incorporates by reference the Alternatives identified in the Thirty-Ninth Claim for Relief, below, incorporated here by reference, which are known, feasible, readily implemented and available alternative execution method(s) and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Claim for Relief.  The foregoing alternative execution methods and procedures are available to and could be readily implemented by Defendants.  None of the alternative methods require a physician for proper operation and implementation.

**Thirty-Eighth Claim for Relief: Eighth Amendment Violation Based On Devolving Standards of Decency**

1810.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1811.    A state's punishment is assessed under the Eighth Amendment against the evolving standards of decency that mark the progress of a

438

maturing society.  An execution method can be unconstitutional if the method represents "devolution to a more primitive" method.  *Glossip*, 135 S. Ct. at 2795–97 (Sotomayor, J., principal dissent).

1812.    DRC Defendants, in sworn representations to this Court, the Sixth Circuit, the public and Plaintiffs, abandoned using a three-drug execution method using a paralytic as the second drug and potassium chloride as the third drug, averring that "going forward," neither a paralytic (including pancuronium bromide) nor potassium chloride "will be used as part of the lethal injection process" in Ohio.

1813.    DRC Defendants intentionally and deliberately abandoned the three-drug method and the second and third drugs, in favor of moving to what they believed and what they argued to this and other courts to be a more humane execution method using a single drug.

1814.    DRC Defendants knew that removing the paralytic and potassium chloride from a lethal injection method removes two sources of needless, unnecessary physical pain and torturous mental suffering and anguish from their execution protocol.

1815.    No other state has moved forward to a purportedly more humane method of lethal injection by removing the three-drug method but then reintroduced the three-drug method again later, which makes DRC Defendants' new execution protocol and their adoption of that protocol "unusual."

1816.   By reintroducing an execution protocol that permits them to use a three-drug protocol including a paralytic and potassium chloride, DRC Defendants have intentionally reneged on sworn representations that they would no longer use those dangerously unsafe drugs.

1817.   By intentionally reintroducing the second and third drugs back into DRC Defendants' execution protocol, DRC Defendants have intentionally, knowingly or recklessly moved backward to an execution method that reinserts even greater levels of substantial risk of harm and needless pain and suffering than the previous three-drug protocol, thereby contravening the evolving standards of decency in violation of Plaintiff's Eighth Amendment rights.

1818.   Following the horrific executions of McGuire, Lockett and Wood, DRC Defendants intentionally and deliberately abandoned the use of midazolam in their execution protocol, in favor of moving to what they believed to be a more humane execution method using a barbiturate single drug method.

1819.   DRC Defendants knew that removing midazolam from a lethal injection method removes a significant source of needless, unnecessary physical pain and torturous mental suffering and anguish from their execution protocol.

1820.   No other state has moved forward to a purportedly more humane method of lethal injection by removing midazolam from its execution protocol but then reintroduced midazolam into the protocol again

later, which makes DRC Defendants' new Execution Protocol and their adoption of that protocol "unusual."

1821. By reintroducing an execution protocol that permits them to use midazolam, DRC Defendants have intentionally gone back to a drug that they previously decided they would no longer use.

1822. By intentionally reintroducing midazolam back into DRC Defendants' Execution Protocol, DRC Defendants have intentionally, knowingly or recklessly moved backward to an execution method that reinserts even greater levels of substantial risk of harm and needless pain and suffering than the previous barbiturate-only protocol, thereby contravening the evolving standards of decency in violation of Plaintiff's Eighth Amendment rights.

1823. This Claim for Relief does not require Plaintiff to plead an alternative method or manner of execution.

**Thirty-Ninth Claim for Relief: Eighth Amendment Violation Based On DRC Defendants' Use Of A Three-Drug Execution Method, Regardless Of The Identity Of The First Drug.**

1824. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1825. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a substantial risk of serious harm in the form of severe, needless physical pain and suffering that is arbitrary and capricious, or an objectively intolerable

risk of such harm that Defendants unjustifiably ignore, due to
Defendants' use of the revised three-drug method, regardless of
whether the first drug is midazolam, sodium thiopental, or
pentobarbital but even more so if the first drug is midazolam.

1826. Defendants know, or should know, or recklessly disregard that the
revised three-drug method, including as specified in the Execution
Protocol creates a substantial risk of severe, needless physical pain
and suffering, including because:

1827. Defendants' know that their revised three-drug method makes critical
the induction and maintenance of reliable anesthetic depth so that
Plaintiff will be unconscious, unaware and insensate to pain
throughout the process, and will not experience the excruciatingly
painful effects of the midazolam, the paralytic drug and the potassium
chloride;

1828. Defendants' know that their three-drug method also makes it
critical—because of the importance of sustained anesthetic depth and
the need to assess that depth when the inmate is paralyzed by the
paralytic drug or experiences the injection of potassium chloride—that
any persons administering the drugs to Plaintiff and/or assessing his
consciousness, awareness and ability to experience and feel pain be
capable of skillfully performing those responsibilities and of exercising
informed judgment and discretion, including as to proper timing of
the three drugs;

1829.    Despite this actual knowledge, Defendants have knowingly and deliberately assigned these critical responsibilities to persons known by them to lack the necessary experience, skill, judgment, and competence to perform them, and for whom no amount of pre-execution "training" will alleviate the inherent deficiencies in experience, skill, judgment, and competence;

1830.    Defendants have assigned these critical responsibilities to persons known to be unqualified to perform them even though Defendants also know that the use of the three-drug method places enormous additional stress on said persons during an execution, well beyond that attendant to a one-drug barbiturate-only method, and such stress makes worse the already serious problems caused by the lack of necessary experience, skill, judgment, and competence;

1831.    Defendants unconscionably permit an execution using the three-drug method to commence and proceed with only one IV site;

1832.     Defendants have failed to provide monitoring equipment necessary to ensure that Plaintiff is unconscious, unaware and insensate to pain at all relevant times after the administration of the first drug, and before administration of the other two drugs, and continuing until death;

1833.    Defendants have no backup plan in the event IV access is lost midway through Plaintiff's execution and cannot promptly be reobtained;

1834.    Defendants know, or should know, or recklessly disregard that their revised three-drug method as specified in the Execution Protocol will

443

subject Plaintiff to the substantial risk that he will not be rendered fully unconscious, unaware and unable to experience or feel pain throughout the process until death, that he will not be insensate to pain at critical points in the process, that he will experience the excruciatingly painful effects of the midazolam, the paralytic drug and/or potassium chloride, and that he will be forced to endure that excruciating pain while paralyzed and thus unable to signal his distress.

1835. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Claim for Relief.

1836. These alternatives include:

### Alternative 1

a) DRC Defendants shall fully and formally adopt Incident Command Systems principles into their Execution Protocol as a Core Element.

b) DRC Defendants shall strictly comply with all portions of their Execution Protocol.

c) DRC Defendants must inject the lethal drugs bedside rather than from the equipment room through several yards of IV tubing filled with saline solution.

d) DRC Defendants shall not be permitted to use any method of execution that includes a paralytic drug and/or potassium chloride.

e) DRC Defendants shall not be permitted to use any method of execution that includes midazolam, whether as part of a one-drug or three-drug method or any other method.

f) DRC Defendant must instead use a one-drug, barbiturate-only method, such as DRC Defendants adopted in November 2009, and with sodium thiopental or pentobarbital as the barbiturate. Pentobarbital is available to Defendants because other States have been able to obtain it for use in executions; because Defendants have secrecy protections that shield the identity of a supplier of pentobarbital which Defendants said were necessary to obtain pentobarbital; and because Defendants have admitted that they continue to pursue pentobarbital from domestic and foreign sources and have taken overt actions towards that goal that are expected to be fruitful. Eliminating the use of a three-drug midazolam protocol by using a one-drug barbiturate protocol eliminates—and therefore substantially reduces—the risk of severe harm associated with using the three-drug midazolam protocol.

g) The administration of drugs in Plaintiff's execution shall not begin until two working IV sites have been started and remain viable in Plaintiff's peripheral veins.

h) In the event the DRC Defendants use compounded sodium thiopental or compounded pentobarbital for the one-drug method, DRC Defendants must meet all of the following requirements, otherwise said compounded drugs shall not be used:

    i. DRC Defendants must use only those compounded execution drugs that are chemically and biologically identical to FDA-approved versions of said drugs as currently or formerly sold in the United States (*e.g.*, Nembutal).

    ii. DRC Defendants must use only those compounded execution drugs that are properly compounded in strict compliance with all requirements of USP <797>, and manufactured in strict compliance with all requirements of cGMPs.

    iii. DRC Defendants shall not use compounded execution drugs that are past their beyond-use date or that are otherwise adulterated.

    iv. For any compounded execution drugs that are to be used in Plaintiff's execution, DRC Defendants and/or Drug Source

Defendants, as applicable, must provide to Plaintiff, at least 30 days in advance of the execution date:

1. written, sworn verification of full compliance with all relevant manufacturing (cGMPs) or compounding (USP <797>) standards and requirements in the production of said execution drugs (including all requirements for matters such as sterile production, labeling, packing, shipping, storing, and using drug products as defined under the applicable set of standards), with such verification performed by a reputable, disclosed (to Plaintiff's counsel), independent third party, and such verification to include satisfactory assessment of all testing data and other data generated in the manufacturing or compounding process under the relevant standards;

2. written, sworn verification of satisfaction of rigorous pre-execution analytical testing of the execution drug at a reputable, disclosed (to Plaintiff's counsel), independent analytical testing laboratory to ensure the finished drug product is in full compliance with USP <797> or cGMPs, as applicable; and

3. written, sworn verification of having submitted to the federal FDA an Investigational New Drug application for the use of the particular execution drug in the form and dosage to be used against Plaintiff, and/or provide Plaintiff a certified copy of that application.

b. DRC Defendants must not use execution drugs obtained from a Drug Source Defendant who has been found to be not in compliance with the full scope of the alternative methods and procedures proffered here, and DRC Defendants must present to Plaintiff in advance of execution, written, sworn verification of full compliance with all such alternative methods and procedures.

c. DRC Defendants must not use execution drugs obtained from a Drug Source Defendant who has been found to be not in compliance with USP <797> standards during any state inspection in the last five years, and DRC Defendants must identify that Drug Source Defendant to Plaintiff in advance of execution so that Plaintiff can ensure the relevant Drug Source Defendant has not been so found; alternatively, if Plaintiff is denied identification information for whatever reason, DRC Defendants must present to Plaintiff in advance of execution written, sworn verification that Drug Source

446

Defendant in question has not been found to not be in compliance with USP <797> standards during any state inspection in the last five years.

d. DRC Defendants must not use execution drugs obtained from a Drug Source Defendant who has been found to not be in compliance with cGMP standards during any FDA or state inspection in the last five years, and DRC Defendants must identify that Drug Source Defendant to Plaintiff in advance of execution so that Plaintiff can ensure the relevant Drug Source Defendant has not been so found; alternatively, if Plaintiff is denied identification information for whatever reason, DRC Defendants must present to Plaintiff in advance of execution written, sworn verification that Drug Source Defendant in question has not been found to not be in compliance with cGMP standards during any FDA or state inspection in the last five years.

e. DRC Defendants must additionally test the final product and its components no more than two days before the scheduled execution, testing for identity, contaminants, bacterial endotoxins, pyrogens, concentration, sterility, proper pH level, potency, and purity.  DRC Defendants must provide that data to counsel for Plaintiff immediately upon receipt.  If the data generated by that analytical testing is outside the level acceptable under the applicable USP Monograph and any other authoritative source of standards for the drug, Defendants shall not proceed with the scheduled execution of Plaintiff for at least 60 days.

f. DRC Defendants must use accepted and scientifically reliable medical standards, equipment and techniques to assess the point at which irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the brain has occurred and Plaintiff is clinically and legally dead, and must continue repeated injections of 5 grams of the one-drug method barbiturate every three minutes until that point has been achieved;

    i. DRC Defendants must constantly monitor, from before first injection of the execution drug, Plaintiff's heart's electrical activity through an electrocardiogram, his blood pressure, his heart rate, and his respiratory gases through capnography.

    ii. DRC Defendants must constantly monitor, from before first injection of the execution drug, Plaintiff's brain's electrical activity using electroencephalography (EEG) with a product such as the StatNet™ headpiece.

447

  iii. These assessments and equipment must be employed by individuals who possess sufficient qualifications and experience to, and must, continuously engage them from within the execution chamber.

 g. DRC Defendants shall have the following on hand in the Death House, as well as the means and personnel trained and capable of administering or applying them to Plaintiff in the event Plaintiff is not clinically and legally dead after a reasonable period of time:

  i. supplies of oxygen;

  ii. resuscitative drugs;

  iii. ventilation equipment including a ventilation bag, valve and mask;

  iv. intubation equipment;

  v. any and all means necessary to maintain a patent (uncompromised) airway and support of ventilation;

 h. DRC Defendants shall have on-site at SOCF a means to prepare and transport an inmate to an emergency health-care provider facility.

1837. In the event the Court does not accept Alternative 1 alleged by

Plaintiff above, then the following alternative shall be used by DRC

Defendants in Plaintiff's execution:

## Alternative 2

 a. DRC Defendants shall fully and formally adopt Incident Command Systems principles into their Execution Protocol as a Core Element.

 b. DRC Defendants shall strictly comply with all portions of their Execution Protocol.

 c. DRC Defendants must inject the lethal drugs bedside rather than from the equipment room through several yards of IV tubing filled with saline solution.

 d. The paralytic drug shall not be used.

 e. Any execution drugs used in Plaintiff's execution using the two-drug method involving midazolam and potassium chloride under this

448

Alternative 2 shall be pharmaceutical grade for human use, FDA-approved, sterile and unexpired.  As used here, the term "FDA-approved" includes both the drug itself (*i.e.*, that the drug's formula is approved for distribution to consumers) and the process for manufacturing the drug.

f.  The administration of drugs in Plaintiff's execution shall not begin until two working IV sites have been started and remain viable in Plaintiff's peripheral veins.  One of the two peripheral IV lines must be reserved for injection of the initial bolus of midazolam, followed thereafter by a continuous titration of midazolam at the rate of 2 mg./minute.  Administration of a constant supply of midazolam at the rate of 2 mg./minute in that dedicated IV line shall continue from the initial injection of midazolam until Plaintiff is clinically and legally dead, including throughout the time when the potassium chloride is injected in the other IV line.

g.  DRC Defendants must assign one or more execution team members or other persons under the Execution Protocol to be responsible for monitoring Plaintiff during the execution as further detailed below, to determine whether the midazolam has rendered him fully unconscious, unaware and insensate to noxious stimuli such as pain and that Plaintiff remains unconscious, unaware and insensate throughout the entire process following initial injection of the first drug.  DRC Defendants must also use accepted and scientifically reliable medical standards, equipment and techniques, including the following, to assess the point at which irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the brain has occurred and Plaintiff is clinically and legally dead.

   i.  These persons must possess sufficient qualifications and experience to, and must, continuously do the following from within the execution chamber:

   ii.  monitor Plaintiff by constantly assessing him for clinical signs of consciousness and awareness and sensation, including purposeful and reflex movement, dilated pupils, tearing from the eyelids, sweating, and an elevated heart rate; and

   iii.  monitor Plaintiff's heart's electrical activity through an electrocardiogram, his blood pressure, his heart rate, and his respiratory gases through capnography; and

    iv.  monitor Plaintiff's brain's electrical activity using electroencephalography (EEG) with a product such as the StatNet™ headpiece or other BIS monitor technology.

h.  The administration of the potassium chloride by the drug administrator shall not be started until these persons, using the appropriate equipment and making the necessary checks to monitor Plaintiff, have determined that the midazolam has rendered Plaintiff fully unconscious, insensate to pain and unaware and that he remains in that state until he is clinically and legally dead.

i.  DRC Defendants shall have the following on hand in the Death House, as well as the means and personnel trained and capable of administering or applying them to Plaintiff in the event Plaintiff is not clinically and legally dead after a reasonable period of time:

    i.  supplies of oxygen;

    ii.  resuscitative drugs, such as the reversal agent or antidote called flumazenil for midazolam;

    iii.  ventilation equipment including a ventilation bag, valve and mask;

    iv.  intubation equipment;

    v.  any and all means necessary to maintain a patent (uncompromised) airway and support of ventilation;

j.  DRC Defendants shall have on-site at SOCF a means to prepare and transport an inmate to an emergency health-care provider facility.

1838.    In the event the Court does not accept Alternative 1 or 2 alleged by Plaintiff above, then the following alternative shall be used by DRC Defendants in Plaintiff's execution:

## Alternative 3

a.  DRC Defendants shall fully and formally adopt Incident Command Systems principles into their Execution Protocol as a Core Element.

b.  DRC Defendants shall strictly comply with all portions of their Execution Protocol.

c. The paralytic drug shall not be used.

d. Any execution drugs used in Plaintiff's execution using the two-drug method involving midazolam and potassium chloride under this Alternative 3 shall be pharmaceutical grade for human use, FDA-approved, sterile and unexpired. As used here, the term "FDA-approved" includes both the drug itself (*i.e.*, that the drug's formula is approved for distribution to consumers) and the process for manufacturing the drug.

e. The administration of drugs in Plaintiff's execution shall not begin until two working IV sites have been started and remain viable in Plaintiff's peripheral veins. One of the two peripheral IV lines must be reserved for injection of the initial bolus of midazolam, followed thereafter by a continuous titration of midazolam at the rate of 2 mg./minute. Administration of a constant supply of midazolam at the rate of 2 mg./minute in that dedicated IV line shall continue from the initial injection of midazolam until Plaintiff is clinically and legally dead, including throughout the time when the potassium chloride is injected in the other IV line.

f. DRC Defendants must assign one or more execution team members or other persons under the Execution Protocol to be responsible for monitoring Plaintiff during the execution as further detailed below, to determine whether the midazolam has rendered him fully unconscious, unaware and insensate to noxious stimuli such as pain and that Plaintiff remains unaware and insensate throughout the entire process following initial injection of the first drug. DRC Defendants must also use accepted and scientifically reliable medical standards, equipment and techniques, including the following, to assess the point at which irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the brain has occurred and Plaintiff is clinically and legally dead.

  i. These persons must possess sufficient qualifications and experience to, and must, continuously do the following from within the execution chamber:

  ii. monitor Plaintiff by constantly assessing him for clinical signs of consciousness and awareness and sensation, including purposeful and reflex movement, dilated pupils, tearing from the eyelids, sweating, and an elevated heart rate; and

  iii. monitor Plaintiff's heart's electrical activity through an electrocardiogram, his blood pressure, his heart rate, and his respiratory gases through capnography; and

451

      iv.  monitor Plaintiff's brain's electrical activity using electroencephalography (EEG) with a product such as the StatNet™ headpiece or other BIS monitor technology.

  g.  The administration of the potassium chloride by the drug administrator shall not be started until these persons, using the appropriate equipment and making the necessary checks to monitor Plaintiff, have determined that the midazolam has rendered Plaintiff fully unconscious, insensate to pain and unaware and that he remains in that state until he is clinically and legally dead.

  h.  DRC Defendants shall have the following on hand in the Death House, as well as the means and personnel trained and capable of administering or applying them to Plaintiff in the event Plaintiff is not clinically and legally dead after a reasonable period of time:

      i.  supplies of oxygen;

      ii.  resuscitative drugs, such as the reversal agent or antidote called flumazenil for midazolam;

      iii.  ventilation equipment including a ventilation bag, valve and mask;

      iv.  intubation equipment;

      v.  any and all means necessary to maintain a patent (uncompromised) airway and support of ventilation;

  i.  DRC Defendants shall have on-site at SOCF a means to prepare and transport an inmate to an emergency health-care provider facility.

1839.  The foregoing alternative execution methods and procedures are available to and could be readily implemented by Defendants.  None of the alternative methods require a physician for proper operation and implementation.

452

**Fortieth Claim for Relief: Eighth Amendment Violation Based On DRC Defendants' Use Of A Three-Drug Execution Method With Midazolam As The First Of The Three Drugs.**

1840.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1841.    Defendants intend to use a three-drug protocol to execute Plaintiff, using midazolam as the first drug, a paralytic as the second, and potassium chloride as the third

1842.    Defendants know that absent a successful administration of a drug and maintenance of that drug's effects to render Plaintiff unconscious, unaware and insensate, administration of either and both of the paralytic drug and potassium chloride will unquestionably cause searing, torturous physical pain and horrific mental suffering and anguish.

1843.    Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a substantial risk of serious harm in the form of severe, needless physical pain and suffering and torturous mental anguish that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to Defendants' use of the revised three-drug method with midazolam as the first drug.

1844.   Defendants intend to deliberately conceal the effects of midazolam and potassium chloride behind a chemical curtain created by the paralytic drug.

1845.   Defendants' use of midazolam in a three-drug protocol cannot reliably ensure that Plaintiff will remain in a state in which he will be unable to experience pain caused by the paralytic drug.

1846.   It is substantially likely that following IV injection of 500 mg midazolam under the Execution Protocol, Plaintiff will be unconscious, or aware or at least sufficiently sensate to experience the indisputably unconstitutional pain and mental suffering of suffocation and paralysis caused by injection of the paralytic agent.

1847.   It is substantially likely that DRC Defendants will unsuccessfully inject the full 500 mg of midazolam into Plaintiff intravenously, making it even further likely that Plaintiff will be conscious, or aware or sufficiently sensate to experience the effects of the paralytic agent.

1848.   Consequently, whether Defendants inject the full 500 mg of midazolam or a lesser amount, Defendants' intended and imminent use of the paralytic in Plaintiff's execution will violate his rights under the Eighth and Fourteenth Amendment to be free from severe pain, experimentation, and the gratuitous invasion of the body.

1849.   There is no governmental interest served by using a paralytic.  The paralytic drug, as used in the state's protocol, does not serve the statutory function of causing death, nor does it protect against the

454

prisoner's experience of pain. If midazolam is not effective at maintaining unconsciousness despite painful stimuli, then the paralytic only masks the immense pain caused by the potassium chloride; if midazolam is effective, on the other hand, then the paralytic is, at best, a gratuitous and arbitrary administration of an unwarranted and harmful chemical that has its own, non-visible torturous effects.

1850. Defendants' use of midazolam in a three-drug protocol cannot reliably ensure that Plaintiff will remain in a state in which he will be unable to experience pain caused by the potassium chloride.

1851. It is substantially likely that following IV injection of 500 mg midazolam under the Execution Protocol, Plaintiff will be conscious, or aware or at least sufficiently sensate to experience the indisputably unconstitutional physical pain and mental suffering caused by injection of potassium chloride.

1852. It is substantially likely that DRC Defendants will unsuccessfully inject the full 500 mg of midazolam into Plaintiff intravenously, making it even further likely that Plaintiff will be conscious, or aware or sufficiently sensate to experience the effects of the potassium chloride.

1853. Consequently, whether Defendants inject the full 500 mg of midazolam or a lesser amount, Defendants' intended and imminent use of potassium chloride in Plaintiff's execution will violate his rights

455

under the Eighth and Fourteenth Amendment to be free from severe pain, experimentation, and the gratuitous invasion of the body.

1854.   Defendant' use of the revised three-drug method with midazolam as the first drug creates a substantial risk of serious harm because, among other reasons, there is a high likelihood that midazolam will fail to render Plaintiff insensate from the excruciatingly painful and agonizing effects of the second and third drugs in Defendants' revised three-drug method, including because:

1855.   There is high likelihood the midazolam will fail to reliably induce the sustained anesthetic state necessary for Plaintiff not to feel the intolerable pain associated with the paralytic drug and potassium chloride, or will wear off before the second and third drugs are completely administered.

1856.   Midazolam begins to lose effectiveness very rapidly, and much more quickly than barbiturates.  There is a high likelihood the midazolam will wear off before the paralytic drug and potassium chloride have been completely administered to Plaintiff.

1857.   Midazolam's "ceiling effect" means that the administration of a large dose on Plaintiff—*i.e.*, anything above a dose in or about the range of 200 mg—will have no appreciable effect with respect to the use of midazolam for anesthetic purposes.  It is thus not possible to overcome the inadequacy of midazolam's anesthetic properties by

456

giving Plaintiff a large dose, such as the 500 mg dose contemplated by the Execution Protocol.

1858.  Some significant amount of the midazolam will precipitate, *i.e.*, fall out of solution, at the site of injection, particularly because of the push rate Defendants will use that is approximately 100 times as fast as the safe titration level.  As a result, the volume of the drug available to exert its effects on Plaintiff's brain will be substantially lower than the amount in the injected dose and insufficient to render Plaintiff unconscious, unaware and unable to feel or experience the torturous pain that will follow injection of the first, second and third drugs in the Execution Protocol.

1859.  Administering 500 mg. of midazolam at the rate DRC Defendants will use creates a substantial likelihood that problems will develop with the IV during administration of the critical first drug, such that Plaintiff will be substantially likely to receive significantly less than the maximum effect dose, in turn creating a substantial likelihood that he will still be conscious, aware and sensate to experience and feel the torturous pain that will follow injection of the first, second and third drugs in the Execution Protocol.

1860.  Defendants know, or should know, or recklessly disregard that their revised three-drug method as specified in the Execution Protocol will subject Plaintiff to the substantial risk that midazolam will not function to deliver the effects necessary to render Plaintiff

457

unconscious, unaware and insensate to the pain of the paralytic drug and/or potassium chloride, and that he will thus be forced to endure that excruciating pain while paralyzed and thus unable to signal his distress.

1861. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Claim for Relief.

1862. These alternatives include the Alternatives identified in the Thirty-Ninth Claim for Relief, above, incorporated here by reference.

1863. The foregoing alternative execution methods and procedures are available to and could be readily implemented by Defendants. None of the alternative methods require a physician for proper operation and implementation.

**Forty-First Claim for Relief: Eighth Amendment Violation Based On DRC Defendants' Use Of Midazolam In The Execution Protocol.**

1864. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1865. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because, in all the ways alleged throughout this Fifth Amended Complaint, Defendants' use of midazolam in the

revised Execution Protocol will cause Plaintiff to suffer a substantial risk of serious harm in the form of severe, needless physical pain and suffering and torturous mental anguish that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

1866. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Claim for Relief.

1867. These alternatives include the Alternatives identified in the Thirty-Ninth Claim for Relief, above, incorporated here by reference.

1868. The foregoing alternative execution methods and procedures are available to and could be readily implemented by Defendants. None of the alternative methods require a physician for proper operation and implementation.

**Forty-Second Claim for Relief: Eighth Amendment Violation Based On DRC Defendants Removal Of Any Required Concentration Of The Execution Drugs Which Is Removal Of A Safeguard That Creates A Substantial Risk That Plaintiff Will Experience Severe Pain And Suffering.**

1869. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

459

1870.   Defendants' planned use of the 2016 Execution Protocol creates a substantial risk of serious harm because Defendants removed certain safeguards present in past execution protocols.

1871.   Defendants' current Execution Protocol removes a prior safeguard that required Defendants to use a certain concentration of the execution drugs.  For example, in the June 29, 2015 Protocol the Drug Administrator was required to prepare syringes containing five (5) grams of pentobarbital, 100 mml of a 50mg/ml solution. Alternatively, the Drug Administrator was required to prepare syringes containing five (5) grams of thiopental sodium, 200 ml of a 25 mg/ml solution.  The execution protocols that included midazolam, a paralytic drug, and potassium chloride also included specific concentrations for each of those drugs.

1872.   This requirement existed because drugs in solutions, like the execution drugs, have various different concentrations and potencies. Potency refers to the amount of drug required to produce an effect. Some drugs produce a powerful effect at minute doses and others need a large dose to have any effect.

1873.   Every execution protocol since at least January 8, 2004 has included the concentration requirement in its execution drugs.  Those protocols include the prior two protocols using pentobarbital or thiopental sodium and the prior protocols using midazolam and hydromorphone.

460

1874.   The current Execution Protocol omits any reference to the concentration of the solution from which any of the execution drugs are obtained.  (October 7, 2016 Protocol, VI.F.4.b–d.)

1875.   Under the current Execution Protocol if an execution drug is in a very weak solution, a large amount of solution may be required to obtain the desired effect.  Injecting a larger amount of solution will take longer or risk blowing out the IV.

1876.   If the Drug Administrators measure the amount of drug to be injected based solely on the volume of solution, but the concentration is incorrect, the incorrect amount of the drug will be injected.

1877.   If the execution drugs are obtained from a very strong solution requiring much less of the solution to obtain the designated amount of the drug, a very minute amount of solution may be required but Drug Administrators will likely still inject the mandated volume.

1878.   It is likely that Drug Administrators will inject a subpotent injection of the first drug, but a superpotent injection of the second or third drug. Thus the alleged effect of the midazolam may wear off if it is in a strong solution before the paralytic is injected, or alternatively the paralytic may take effect if it is in a strong solution after the midazolam wears off.

1879.   These are but two of numerous severely painful scenarios permitted by the failure of the protocol to specify the concentration of the solution from which the drugs are obtained.

1880.   The concentration of the lethal injection drug in the required syringes alters the total volume of the lethal injection dose. This in turn affects the rate of delivery (the push rate) used for the IV administration, and make it substantially likely that Drug Administrators will use too high of a push rate for the execution drugs.

1881.   Because it is substantially likely that Drug Administrators will use too high of a push rate for the execution drugs, there is a substantial likelihood that they will blow out a vein in the IV administration process, or that a significant amount of any midazolam injected will precipitate at the injection point, thus preventing the required amount of midazolam from reaching Plaintiff's brain before he will be injected with the second and third drugs.

1882.   The removal in Defendants' revised Execution Protocol of any concentration of execution drugs in the solution creates a substantial risk of serious harm in the form of severe, needless physical pain and suffering and torturous mental anguish that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

1883.   The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Claim for Relief.

1884.    These alternatives include reinserting the expressly required
concentrations of the execution drugs into the Execution Protocol.

1885.    The foregoing alternative execution methods and procedures are
available to and could be readily implemented by Defendants.

**Forty-Third Claim for Relief: The Doctrines Of Judicial Estoppel And/Or Judicial Admission Bar DRC Defendants From Using The Three-Drug Method Against Plaintiff Campbell Or Any Other Plaintiff.**

1886.    Plaintiff incorporates by reference each and every statement and
allegation set forth throughout this Fifth Amended Complaint as if
fully rewritten here.

1887.    Having represented to this Court and the Sixth Circuit that the three-
drug method, and its two painful drugs, would not be used again as
part of Ohio's execution process, and that there was no possibility it
would recur, those representations are binding upon DRC
Defendants, have the force and effect of law, and bar their resumption
of the abandoned method against any plaintiff including Campbell.

1888.    DRC Defendants are barred by the doctrines of judicial admission
and/or judicial estoppel from disavowing their deliberate, clear,
unequivocal, and unambiguous prior concessions that, "going
forward," Ohio's execution process would no longer include the three-
drug method, including the paralytic drug and potassium chloride,
and that there was "no possibility" these methods would return.

1889.    DRC Defendants made these concessions and/or admissions in 2009,
when they were on the brink of an imminent bench trial in this action

that would have adjudicated the constitutionality of their original three-drug method under the Eighth and Fourteenth Amendments. At that time DRC Defendants knew and believed that the record, including the facts of the Clark execution and Broom events, and other facts, made it highly likely they would lose at that trial and that the method would be permanently enjoined. These concessions and/or admissions were part of a deliberate strategy by DRC Defendants to avoid that trial, and the public embarrassment and accountability they knew it would involve.

1890. DRC Defendants also made these concessions and/or admissions as part of a deliberate and calculated effort to prevail on the legal position they were then pursuing in this litigation, in both this Court and the Sixth Circuit. That legal position included at least two significant contentions by DRC Defendants. First is their contention that their voluntary change to the one-drug method had caused all of Plaintiffs' claims, challenging the three-drug method, to become moot, thereby mandating that all of Plaintiffs' claims be dismissed. And second, their contention that they had the legal authority to thus proceed to immediately execute former plaintiff Biros on his assigned execution date using the one-drug method and that any order of this Court purporting to stop Biros's execution, or any such execution, was contrary to law to the extent premised on challenges to the abandoned three-drug method.

1891.  DRC Defendants prevailed on these legal positions due substantially, if not exclusively, to the subject concessions and/or admissions made by them or on their behalf.  And because of DRC Defendants' successful use of the subject concessions and/or admissions to strategically advance their own position in this litigation, many plaintiffs in the litigation, _e.g._, Biros, suffered prejudice as a result, including having their executions carried out using a new method claimed by said plaintiffs to be unconstitutional but which they were denied any meaningful chance to contest.

1892.  Now, seven years later, DRC Defendants intend to resurrect the abandoned method they told this Court, the Sixth Circuit, the public, and Plaintiffs they would never use again.

1893.  In those ensuing seven years, memories have dimmed, witnesses have died (including Terry Collins), and other witnesses have left the State's employment or have retired (including Strickland, Trout, and Kerns).  Also, Judge Frost retired in May 2016, and one of his law clerks has moved on to private practice.  Much of the institutional knowledge derived from Judge Frost's management of this litigation for over a decade has been lost.

1894.  For these reasons, Plaintiffs' ability to litigate at trial the unconstitutionality of the three-drug method, which they were prepared to do in 2009, has been substantially impaired, through no fault of Plaintiffs.

465

1895.   Defendants removed a paralytic drug and potassium chloride from their execution protocol in 2009. They removed midazolam from their execution protocol in June of 2015. Thus, there was no reason after those points for DRC Defendants to seek and obtain any midazolam, paralytic drug or potassium chloride unless they had plans to use those three drugs to carry out lethal injection executions using a revised three-drug method under a revised Execution Protocol. Defendants did not adopt their 2016 Execution Protocol until October 7, 2016.

1896.   DRC Defendants took into their possession a supply of each of midazolam, rocuronium bromide and potassium chloride on or about September 9, 2016. Thus, upon information and belief, the DRC Defendants were working in concert with Drug Source Defendants for more than one month—and almost certainly longer—before they adopted their 2016 Execution Protocol.

1897.   Thus, Defendants knew for at least one month and almost certainly longer before they provided notice to this Court and to Plaintiffs they would be regressing back to a protocol using two drugs they swore they would never use again and a third drug that was deliberately removed after it was used in three botched executions in less than one year (including one at DRC Defendants' hands).

1898.   As they did with Biros, DRC Defendants once again, and in bad faith, seek to rush the execution of a plaintiff, who had been diligently

466

engaged in challenging the existing method, by switching methods so soon before that plaintiff's scheduled execution date that said plaintiff is effectively denied any meaningful chance to contest the now-prevailing method.  Campbell is one such plaintiff.

1899.  Under these circumstances, and on this unique record, to be more fully established at trial, it would be a grave injustice to allow DRC Defendants to take contrary positions now, and seek to resurrect the three-drug method and the two painful drugs.

1900.  The doctrines of judicial admission and/or judicial estoppel bar DRC Defendants from using the revised three-drug method on Campbell or any other plaintiff, at this time or at any other time in the future.

**Forty-Fourth Claim for Relief: Administrative Procedures Act Claims**

1901.  Plaintiff previously withdraw his Forty-Fourth Claim for Relief.  (*See* ECF No. 1021, PageID 40031–32.)

**Forty-Fifth Claim for Relief: Eighth and Fourteenth Amendment Violations—A three-drug midazolam method of execution violates the Eighth Amendment's prohibition against cruel and usual punishment because it no longer comports with prevailing standards of decency, and thus its use as a method of execution must be categorically barred.**

1902.  Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully stated here.

1903.  The use of a three-drug midazolam method of execution violates the Eighth Amendment's prohibition against cruel and usual punishment

because it no longer comports with prevailing standards of decency,
and thus its use as a method of execution must be
categorically barred.

1904.   The State may not impose a death sentence upon any inmate using
an unconstitutional method of execution.

1905.   Accordingly, there is no requirement to plead an alternative method of
execution when making a claim, such as this, that a method of
punishment is categorially unconstitutional.  "Irrespective of the
existence of alternatives, there are some risks 'so grave that it violates
contemporary standards of decency to expose *anyone* unwillingly to'
them."  *Glossip v. Gross*, ___U.S.___, 135 S. Ct. 2726, 2793 (2015)
(Sotomayor, J., dissenting, joined by Ginsburg, J., Breyer, J., and
Kagan, J.) (quoting *Helling v. McKinney*, 509 U. S. 25, 36 (1993)
(emphasis in original)).

1906.   For purposes of this claim, Plaintiff does not concede there is a way to
constitutionally carry out a lethal injection execution that uses a
three-drug midazolam method.  Plaintiff believes that such an
execution is *per se* unconstitutional.  This distinguishes Plaintiff from
the inmate in *Baze*.

1907.   Plaintiff, thus, is not required to plead or prove any alternative
method of execution in order to prevail on this claim.  However,
should the Court still find that an alternative method is required,
Plaintiff incorporates by reference as if fully set forth here the

468

alternative methods and procedures proposed in his Thirty-Ninth Claim for Relief.

1908.   The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  It guarantees individuals the right not to be subjected to excessive sanctions.  *Atkins v. Virginia*, 536 U.S. 304, 311 (2002). In other words, an individual has the right to be free from cruel and usual punishment.  This fundamental right springs from one of the basic "precepts of justice that punishment for crime should be graduated and proportioned to [the] offense."  *Id.* (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)).

1909.   In order to determine which punishments are so disproportionate as to be cruel and unusual, the Supreme Court has "established the propriety and affirmed the necessity of referring to 'the evolving standards of decency that mark the progress of a maturing society.'" *Roper v. Simmons*, 543 U.S. 551, 560-61 (2005) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-101 (1958) (plurality opinion).)  "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment.  The standard itself remains the same, but its applicability must change as the basic mores of society change.'"  *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008) (quoting *Furman v. Georgia*, 408 U.S. 238, 382 (1972) (Burger, C. J., dissenting)).

469

1910. All execution processes and methods shall be performed in a professional, humane, sensitive, and dignified manner. Human dignity must be respected by the State in carrying out executions. "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Roper*, 543 U.S. at 560.

1911. The Court has taken the following approach in cases adopting categorical rules. First, it "considers objective indicia of society's standards, as expressed in legislative enactments and state practice, to determine whether there is a national consensus against the sentencing practice at issue. Next, guided by the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose, the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution." *Graham v. Florida*, 560 U.S. 48, 61 (2010) (internal citations and quotation marks omitted).

1912. The Court also considers and is guided by scientific knowledge or other expertise that bear upon the issue. *See Hall v. Florida*, 134 S. Ct. 1986 (2014) (relying upon informed assessment of medical experts); *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (relying upon scientific and sociological studies regarding juvenile and adolescent development).

1913.  A national consensus can exist against a punishment even though it
is statutorily permitted by a majority of states.  The mere infrequency
of a particular punishment suffices to establish a national consensus
against the practice.

1914.  An examination of actual execution practices in jurisdictions where
the infliction of the death sentence by the method in question is
permitted discloses a consensus against its use.  While all states that
permit capital punishment provide for lethal injection as a manner of
execution, only a small fraction of those states actually carry out their
executions using a three-drug midazolam method.  Therefore,
execution by a three-drug midazolam method of execution is unusual
by Eighth Amendment standards.

1915.  As of October 19, 2016, 19 states have executed 335 inmates by
lethal injection since the decision in *Baze* was issued in April 2008.
These states (and the number of inmates executed by each state) are:
Texas (133); Florida (28); Ohio (27); Georgia (27); Oklahoma (26);
Missouri (21); Alabama (19); Arizona (14); Mississippi (13); Virginia
(10); South Carolina (5); Delaware (2); South Dakota (2); Tennessee
(2); Idaho (2); Indiana (1); Kentucky (1); Louisiana (1); Washington (1).

1916.  Nearly 95% of these post-*Baze* executions were conducted using
drugs other than midazolam.

1917.   Only two executions have ever been conducted in the U.S. using midazolam as part of a two-drug method of lethal injection—that of Dennis McGuire by the state of Ohio and Joseph Wood by Arizona.

1918.   Only 16 executions have ever been conducted using midazolam as part of a three-drug method of lethal injection.  These executions were carried out by Florida (13); Oklahoma (2—Charles Warner and Clayton Lockett); and Alabama (1).  These executions represent about 1% of all lethal injection executions (1,264) ever carried out in the United States (0.013%).

1919.   All other executions by lethal injection since *Baze* have been carried out using either a one-drug or three-drug method of execution using a barbiturate (either sodium thiopental or pentobarbital) as either the first or only drug.

1920.   As of July 1, 2016, there were 2,905 inmates on death row in the United States.

http://www.naacpldf.org/files/publications/DRUSA_Summer_2016.pdf

1921.   Over a quarter of U.S. death row inmates (25.5%)—741—are incarcerated in the state of California.  *See id.*

1922.   In November 2015, California officials announced a new proposed execution method for that state using a one-drug barbiturate method.  In proposing that new lethal injection method, corrections officials said they sought "a humane and dignified execution."

472

http://www.latimes.com/politics/la-me-pol-ca-execution-protocol-20151105-story.html. California's proposed protocol would also require the use of one of four barbiturates, including pentobarbital. *Id.* California has no scheduled executions. California has not executed an inmate in over a decade.

1923. As of July 1, 2016, Texas had 254 inmates on their death row, constituting 8.7% of the U.S. death row population. *See id.* Texas conducts its executions by lethal injection using a one-drug barbiturate method (compounded pentobarbital). There are currently six executions scheduled in the state of Texas.

https://www.themarshallproject.org/next-to-die/tx; http://www.deathpenaltyinfo.org/upcoming-executions.

1924. Other states actively executing inmates with a one-drug barbiturate method include Georgia (68 death row inmates, 2.3% of U.S. death row population) and Missouri (26 death row inmates, 0.09% of U.S. death row population). Georgia has no scheduled executions. https://www.themarshallproject.org/next-to-die/ga. Missouri has one scheduled execution. https://www.themarshallproject.org/next-to-die/mo.

1925. Arizona has 126 inmates on their death row (4.3% of U.S. death row population). That state has publically stated, in judicial proceedings, that it will not use midazolam as part of a three-drug execution method. Joseph Wood was the last inmate to be executed by the state

473

of Arizona (July 2014).  There are no executions currently scheduled in the state of Arizona. https://www.themarshallproject.org/next-to-die/az.

1926.  As of July 1, 2016, Florida had 396 inmates on death row, totaling 13.6% of the U.S. death row population.  While a three-drug midazolam method of execution was formerly available in Florida executions, decisions this year by the U.S. Supreme Court (*Hurst v. Florida*) and that state's supreme court this month (October 2016) have respectively found the state's former death penalty law, and newly enacted death penalty law, unconstitutional.  Thus Florida's ability to execute any inmate sentenced under their death penalty scheme is in question.  Currently, there are no scheduled executions in Florida.  https://www.themarshallproject.org/next-to-die/fl. Moreover, Florida recently abandoned midazolam in its newly revised execution protocol, adopted on or about January 4, 2017.  So no further Florida inmates will be executed using midazolam.

1927.  There are 194 inmates on Alabama's death row (6.7% of U.S. death row population).  Alabama has used a three-drug midazolam method once, on January 21, 2016.  Alabama has two scheduled executions. https://www.themarshallproject.org/next-to-die/al.

1928.  As of July 1, 2016, Ohio has 142 inmates on death row (4.9% of the U.S. death row population).  Ohio has 24 scheduled executions.  It has announced that the four inmates next in line for execution

474

(Phillips, Campbell, Tibbetts, and Otte) will be executed using a three-drug method with midazolam as the first drug.

1929. No other state but Ohio has moved forward to a purportedly more humane method of lethal injection, by removing midazolam from its execution protocol, but then reintroduced midazolam into the protocol again later.  That makes Defendants' new Execution Protocol and their adoption of that protocol "unusual."

1930. Likewise, no other state has ever taken the step backwards of adopting and implementing a less humane three-drug method of execution after using a one-drug execution method. Ohio will be the first to devolve in such a way.

1931. Another fact demonstrating that it is unusual to conduct executions using a three-drug method with midazolam as the first drug is that only six inmates nationwide—Phillips, Tibbetts, Campbell, and Otte in Ohio, plus two inmates in Alabama—currently face a scheduled execution by a three-drug midazolam method.  These men make up 0.0017% of the U.S. death row population.

1932. There are only three other states with executions presently scheduled in addition to Ohio and Alabama.  Oregon has one execution scheduled in January 2017; however, there is a governor imposed moratorium in that state.  And Texas and Missouri both use a one-drug barbiturate method of execution.

1933.    Execution by a three-drug midazolam method of execution is unusual.  The rarity of the punishment constitutes objective indicia of a national consensus against the use of that punishment.

1934.    Community consensus is entitled to great weight when determining whether a punishment is cruel and unusual.  The proper analysis also requires that the Court apply its "own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose," to "determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution."  *Graham*, 560 U.S. at 61 (internal citations and quotation marks omitted).

1935.    The penological justifications for the sentencing practice are also relevant to the analysis.  This is, in part, because a sentence lacking any legitimate penological justification is by its nature disproportionate to the offense.

1936.    Use of a three-drug midazolam method of execution, involving a paralytic and potassium chloride, lacks any legitimate penological justification and, thus, is by its nature disproportionate to the offense.

1937.    All relevant scientific and other expertise, applied to the three-drug midazolam method, confirms its cruelty, as addressed throughout this Fifth Amended Complaint.

1938.    The paralytic ceases all movement within the inmate's control, and his ability to breathe or open and close his eyes.  If not rendered

insensate to pain by the midazolam, he will experience the pain and fear caused by the paralysis, which includes, but it not limited to, suffocation induced by the arresting of his respiratory system.  To be conscious of this paralysis creates a condition where Plaintiff will be trapped within his own body, akin to being buried alive.  This is a cruel punishment.  It is also unusual.

1939.    If not properly rendered insensate to pain by the midazolam, the paralytic compounds the substantial risk that the inmate will be tortured during his execution by inducing an unnecessary paralysis of all his voluntary movements and, consequently, his ability to effectively communicate his internal distress to anyone.  Though conscious, the paralyzed inmate will be trapped in his own body as the execution progresses.  The paralytic does not serve any therapeutic purpose.  Therefore, if still not properly rendered insensate by midazolam, the potassium chloride will burn as it courses through the inmate's veins, until it reaches and ultimately stops his heart by inducing cardiac arrest.  This will be the chemical equivalent of being burned at the stake.  This is a cruel punishment. It is also unusual.

1940.    To avoid subjecting a condemned inmate to the known excruciating pain of the paralytic and potassium chloride, it is essential that midazolam work as an effective drug to render the inmate insensate to pain throughout the process.  But, as addressed throughout this Fifth

Amended Complaint, midazolam is unsuitable for that crucial purpose. Its unsuitability is demonstrated by reliable medical and scientific expertise, and by the many botched executions that have resulted from its use. Midazolam will not reliably if ever render the inmate insensate to the pain of the paralytic and potassium chloride.

1941. These risks of being exposed to primitive forms of punishment constitute wanton exposure to objectively intolerable risk.

1942. The "Eighth Amendment *categorically* prohibits the infliction of cruel and unusual punishments." *Penry v. Lynaugh*, 492 U. S. 302, 330 (1989) (emphasis added). Therefore, because the use of a three-drug midazolam method of execution is cruel and unusual punishment, the Eighth Amendment bars its application against Plaintiff, and categorically, against all death row inmates.

**Forty-Sixth Claim for Relief: Ohio Corrupt Practices Act Claims Against Individual Defendants in Their Individual Capacity**

1943. The Court previously dismissed Plaintiff's Forty-Sixth Claim for Relief. (ECF No. 1138.)[41]

---

[41] At Plaintiff's request, the Court entered final judgment on its dismissal, and Plaintiff took immediate appeal. (*See* ECF No. 1138, PageID 43360; ECF No. 1149.) The Sixth Circuit affirmed the dismissal on September 7, 2017. *Otte v. Kasich*, Nos. 17-3800, 17-3834 (6th Cir. Sep. 7, 2017) (per curiam). Accordingly, Plaintiff will not re-plead this Claim for Relief.

**Forty-Seventh Claim for Relief: Equal Protection Clause Violation based on violations of Administrative Procedures Act**

1944. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Fifth Amended Complaint as if fully rewritten here.

1945. Adopting a new execution protocol in an arbitrary manner that violates Ohio state law burdens Plaintiff's fundamental rights of access to courts and the right to be free from cruel and unusual punishment.

1946. If Ohio's Execution Protocol is considered a "rule" under state law, then it was adopted in a manner that violates Ohio state law because it was not promulgated as a rule and because the Ohio Department of Rehabilitation and Correction (DRC) exceeded its delegated authority in enacting it. If the protocol is considered a departmental policy, then the protocol's enactment constitutes arbitrary and capricious action because it does not comply with the Department's own Directive on enacting Policies.

### A. Facts Relevant to Administrative Procedures Act (APA) Claims

1947. Defendants filed the latest Execution Protocol with this Court on October 7, 2016.

1948. The Execution Protocol is numbered DRC Policy 01-COM-11 and stated as superseding 01-COM-11 dated June 29, 2015.

1949. The effective date of the protocol is listed as October 7, 2016.

479

1950.   DRC refers to the execution protocol as a "policy" and groups it with "communication policies" on its website, http://www.drc.ohio.gov/policies/communications (last accessed Feb. 3, 2017).

1951.   In the Authority section of the protocol, DRC states that "This policy is issued in compliance with Ohio Revised Code 5120.01 which delegates to the Director of the Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as the Director prescribes."

1952.   Ohio Revised Code § 5120.01 states:

> The director of rehabilitation and correction is the executive head of the department of rehabilitation and correction. All duties conferred on the various divisions and institutions of the department by law or by order of the director shall be performed under the rules and regulations that the director prescribes and shall be under the director's control. Inmates committed to the department of rehabilitation and correction shall be under the legal custody of the director or the director's designee, and the director or the director's designee shall have power to control transfers of inmates between the several state institutions included under section 5120.05 of the Revised Code.

1953.   Ohio Revised Code § 5120.01 does not mention the death penalty or executions.  Therefore, the execution protocol enlarges the scope of the statute, rather than interprets it.

1954.    The protocol appears to have been signed as "approved" by Defendant Gary Mohr, Director of DRC.

1955.    The protocol discusses the rights and responsibilities of the warden, the DRC Director, execution team members, physicians, pharmacists, nurses, clergy, attorneys, visitors, victims' family members, prisoners' family and friends, representatives of the news media, the Adult Parole Authority, the Ohio State Highway Patrol, the office of Victim Services, the Attorney General, and the Governor's Office.

1956.    For each of the following claims below, Plaintiff incorporates by reference each and every allegation set forth in this Complaint as if set forth in full below.

### B.    Equal Protection Clause Allegations

1957.    Plaintiff is similarly situated with those citizens who are protected from arbitrary agency action by the Ohio laws on promulgation of rules and policies.

1958.    Plaintiffs is also similarly situated with other inmates subject to DRC policies and rules.

1959.    DRC Defendants intend to execute Plaintiff using a void Execution Protocol that was adopted in violation of state laws and exceeds statutory authority delegated to DRC.

1960.    By subjecting Plaintiff to an Execution Protocol that is void and not validly adopted, Defendants are treating Plaintiff disparately in a way that substantially burdens the fundamental rights of those on death

row (including Plaintiff) of access to courts and due process and the fundamental right to be free from cruel and unusual punishment as alleged elsewhere in other Equal Protection and Due Process claims for relief in this Fifth Amended Complaint.

1961.   Without an injunction, DRC Defendants might unlawfully change the protocol at any time, including mere days before Plaintiff's execution, as it has done in the past.  Rocky Barton was executed on July 12, 2006, 2 days after the protocol was changed on July 10, 2006; Daniel Wilson was executed on June 3, 2009, barely two weeks after the protocol was changed on May 14, 2009; Ken Biros was executed on December 9, 2009, just over a week after the protocol was changed on November 30, 2009; Johnnie Baston was executed on March 10, 2011, one day after the protocol was changed on March 9, 2011.  This sudden change is particularly likely in the event of adverse rulings from the courts.

1962.   If DRC Defendants were to suddenly change the Execution Protocol without following procedure on legislative review and therefore denying Plaintiff a meaningful chance to challenge the protocol, that would burden Plaintiff's fundamental rights of access to courts and due process, and the fundamental right to be free from cruel and unusual punishment as alleged elsewhere in other Equal Protection and Due Process claims for relief in this Fifth Amended Complaint.

### C. First Equal Protection Clause/Administrative Procedures Act Subclaim:  Defendants' Execution Protocol Is an Invalidly Adopted Rule

1963.    The Director of the DRC is empowered to make rules and regulations in aid of "[a]ll duties conferred on the various divisions and institutions of the department by law or by order of the director." Ohio Rev. Code § 5120.01.

1964.    The grant of authority in Ohio Revised Code § 5120.01 does not exempt the Director or the Department from Ohio rulemaking procedures.

1965.    When the legislature does not intend for every directive to be subject to promulgation procedures, it explicitly grants the managing officer executive charge of the institution.  *See, e.g.*, *Arbogast v. Peterson,* 91 Ohio App. 3d 22, 25, 631 N.E.2d 673 (Ohio 9th Ct. App. 1993) (holding that a no-smoking policy falls within the executive charge granted by the legislature and is therefore exempt from the promulgation requirements of O.R.C. 111.15); *see also* Ohio Rev. Code § 5120.38, granting the entire executive charge to the warden: "The managing officer, under the director of rehabilitation and correction, shall have entire executive charge of the institution for which the managing officer is appointed."

1966.    The grant of authority to the Director in Ohio Revised Code § 5120.01 does not include a grant of the entire executive charge that would exempt the Director from rulemaking procedures.

1967.   The Ohio Department of Rehabilitation and Correction is a governmental entity of the state created by statute, Ohio Revised Code § 121.02(P).

1968.   Except for enumerated exceptions, governmental entities of the state are statutorily mandated to comply with provisions of Ohio Revised Code § 111.15 when promulgating rules.

1969.   Specifically, under § 111.15(A)(2), "'[a]gency' means any governmental entity of the state and includes . . . any . . . department."

1970.   Ohio Revised Code § 111.15(A)(2) excludes only "the general assembly, the controlling board, the adjutant general's department, or any court" from its definition of "agency."

1971.   Ohio Revised Code § 111.15(A)(2) does **not** exclude Ohio Department of Rehabilitation and Correction from its definition of "agency."

1972.   DRC is an agency within the meaning of § 111.15(A)(2).

1973.   Ohio Revised Code § 111.15(A)(1) defines "rule" to include "any rule, regulation, bylaw, or standard having a general and uniform operation adopted by an agency under the authority of the laws governing the agency; any appendix to a rule; and any internal management rule."

1974.   Ohio courts have held that a rule has "general and uniform operation" for purposes of this statute if it is a "rule be uniformly applied by the promulgating agency to those affected by the rule." *Ohio Assn. of Cty. Bds. of Mental Retardation & Developmental Disabilities v. Pub. Emp. Ret. Sys.*, 61 Ohio Misc. 2d 836, 843 (Com. Pl. 1990); *see also B&T*

*Express, Inc. v. Pub. Util. Comm.*, 763 N.E.2d 1241 (Ohio App. 10 Dist. 2001).

1975.    DRC asserts that it applies the Execution Protocol uniformly to all those affected by it.

1976.    DRC asserts that it adopted the rule under the authority of the law governing the agency.

1977.    Defendant Director Mohr testified under oath that he intends to apply the current Execution Protocol uniformly to everyone affected by it. (ECF No. 868-1, PageID 28074.)

1978.    Defendant Director Mohr also testified under oath that the Execution Protocol's "current version to my knowledge, is consistently administered to everyone." (ECF No. 868-1, PageID 28074.)

1979.    Further, Defendant Director Mohr testified that to the best of his knowledge, the current protocol was adopted by DRC under the authority of the laws governing the agency. (*Id.*)

1980.    The execution protocol therefore satisfies the definition of a rule within the meaning of § 111.15(A)(1).

1981.    Ohio Revised Code § 111.15(B)(1) specifies that the rule becomes effective "on the tenth day after the day on which the rule" was properly filed.

1982.    The October 7, 2016 Execution Protocol states that it became effective on the same day DRC filed it with the court, October 7, 2016.

1983.  Ohio Revised Code § 111.15(B)(1) requires that "[a]ny rule, other than a rule of an emergency nature," in its final form, be "filed in electronic form with both the secretary of state and the director of the legislative service commission" and "with the joint committee on agency rule review."

1984.  DRC failed to file the Execution Protocol in electronic form with either the secretary of state, the director of the legislative service commission, or with the joint committee on agency rule review (JCARR).

1985.  Before the required filings, § 111.15 also imposes a requirement of legislative review for the proposed rule, with few exceptions.  Namely, Ohio Revised Code § 111.15(D) also requires that, at least 65 days before any department files a rule under division (B)(1), "it shall file the full text of the proposed rule in electronic form with the joint committee on agency rule review, and the proposed rule is subject to legislative review and invalidation under section 106.021 of the Revised Code."

1986.  DRC failed to submit the Execution Protocol for legislative review by filing it with the joint committee on agency rule review 65 days in advance.

1987.  Ohio Revised Code § 111.15(D), the legislative review requirement, does not apply to a proposed rule of an emergency nature, *see* Ohio

486

Revised Code § 111.15(D)(1), or an internal management rule, *see* Ohio Revised Code § 111.15(D)(4).

1988.　Ohio Revised Code § 111.15 defines "rule of an emergency nature" as one "necessary for the immediate preservation of the public peace, health, or safety."  It also requires that the emergency rule "state the reasons for the necessity."  An emergency rule becomes invalid at the end of the one hundred twentieth day it is in effect.  *See* Ohio Revised Code § 111.15(B)(2).  Although an emergency rule does not need to go through legislative review, it must still "be filed in electronic form with the secretary of state, the director of the legislative service commission, and the joint committee on agency rule review."  *Id.*

1989.　The Execution Protocol is not a rule of an emergency nature.  It is not necessary for the immediate preservation of the public peace, health, or safety.

1990.　The Execution Protocol is not exempt from legislative review as an emergency rule.

1991.　Even if it were a rule of emergency nature, the Execution Protocol would still have to be filed in electronic form with the secretary of state, the director of the legislative service commission, and the joint committee on agency rule review.

1992.　"Internal management rule" means any rule, regulation, bylaw, or standard governing the day-to-day staff procedures and operations within an agency.  Ohio Revised Code § 111.15(A)(3).

487

1993.  Like a rule of an emergency nature, an internal management rule must be filed with the secretary of state, the director of the legislative service commission, and the joint committee on agency rule review. Ohio Rev. Code § 111.15(B)(1).

1994.  The Execution Protocol is not an internal management rule.  The executions are not a day-to-day affair.  They require planning, preparation, and training.

1995.  Even if it were an internal management rule, the Execution Protocol would still have to be filed in electronic form with the secretary of state, the director of the legislative service commission, and the joint committee on agency rule review.

1996.  Ohio courts require strict adherence to the filing requirements.  The Tenth District Court of Appeals reasoned that "[o]ne of the primary purposes behind the filing requirements set forth in R.C. 111.15(B)(1) and (D) is to provide JCARR with an opportunity to review the substantive portions of new rules to determine whether the rules exceed the scope of the adopting agency's authority, conflict with other rules, or conflict with the legislative intent of the statute pursuant to which the rules are being adopted."  *B&T Express, Inc. v. Pub. Util. Comm.*, 763 N.E.2d 1241, 1249 (Ohio 10th App. 2001).

1997.  Ohio courts do not hesitate to invalidate the rules when the agency failed to comply with these requirements in the enactment of the rules at issue.  In *State ex rel. Bd. of Edn. of N. Canton Exempted Village*

*School Dist. v. Holt*, 186 N.E.2d 862 (Ohio 1962), the Ohio Supreme Court held that a rule adopted by the Ohio School Employees Retirement Board was invalid because the rule had not been filed as required by Ohio Revised Code § 111.15.  The court required strict adherence to § 111.15's filing requirements despite the fact that the party seeking to invalidate the rule had actual notice of the rule's content and adoption.  In so holding, the court noted that § 111.15 had been enacted to protect the public from "bureaucratic red tape created by regulations and rules of administrative agencies."

1998.    DRC failed to comply with the legislative review and filing requirements of Ohio Revised Code § 111.15.

1999.    The Execution Protocol is an invalidly adopted rule and is therefore void.

2000.    Accordingly, by applying an invalid and void Execution Protocol to execute Plaintiff, Defendants are applying the law disparately against Plaintiff and Defendants are substantially burdening Plaintiff's fundamental rights.

### D.    Second Equal Protection Clause/Administrative Procedures Act Subclaim: Enacting the Execution Protocol Exceeds the Scope of Authority Delegated to DRC and the Director of DRC

2001.    An administrative agency has only such regulatory power as is delegated to it by the General Assembly.  Authority that is conferred by the General Assembly cannot be extended by the administrative agency.

489

2002.   The Ohio Supreme Court has held that "the intention of the grant of
        power, as well as the extent of the grant, must be clear; that in case of
        doubt that doubt is to be resolved not in favor of the grant but against
        it." *State ex rel. A. Bentley & Sons Co. v. Pierce*, 117 N.E. 6, 7 (1917).

2003.   Where the legislature did not grant an agency authority to promulgate
        certain regulations, Ohio courts have consistently found that the
        agency exceeded its rule-making authority and usurped the power
        delegated to the General Assembly.  *See, e.g.*, *D.A.B.E., Inc. v. Toledo-
        Lucas Cty. Bd. of Health*, 773 N.E.2d 536, 546 (2002).

2004.   The legislature granted DRC authority to enact rules "so as to fully
        meet the requirements, intents, and purposes of Chapter 5120."  Ohio
        Revised Code § 5120.42.

2005.   Chapter 5120 does not encompass the death penalty.

2006.   This grant of rule-making authority to DRC does not include the
        authority to make rules concerning carrying out death penalty.

2007.   The enactment of an execution protocol therefore exceeds the grant of
        power to DRC.

2008.   The Director of DRC is empowered to make rules and regulations in
        aid of "[a]ll duties conferred on the various divisions and institutions
        of the department by law or by order of the director."  Ohio Rev. Code
        § 5120.01.

2009.   The grant of power in § 5120.01 does not mention executions or the
        death penalty.

2010.   The duty to carry out the death penalty is not delegated to a division or institution of the department.

2011.   Instead, Ohio Revised Code § 2949.24 and a death warrant issued by the Supreme Court of Ohio specifically direct the warden to carry out a sentence of death.

2012.   The legislature did not grant the DRC Director power to promulgate rules regarding executions.

2013.   Instead, along with the duty to carry out death sentences, the legislature granted the warden "the entire executive charge" for the institution for which he is appointed.  Ohio Rev. Code § 5120.38.

2014.   Relying on authority of § 5120.38, the Warden—not the DRC Director—made the execution policy in the past.

2015.   The General Assembly circumscribed the warden's authority by specifying that the Warden's control over the institution is "[s]ubject to the rules of the department of rehabilitation and correction."  Ohio Rev. Code § 5120.38.  But because the legislature limited DRC's authority to enact rules to only those that further the purposes of Chapter 5120, DRC does not have authority to enact rules that would in any way affect the warden's authority to carry out a death sentence.

2016.   At some point, Defendant DRC Director usurped the power the legislature granted the Warden to promulgate the execution protocol.

Defendant DRC Director began promulgating the execution protocol without a grant of authority from the legislature to do so.

2017.    DRC and Defendant DRC Director Mohr exceeded the scope of delegated authority in enacting 01-COM-11 dated October 7, 2016. That protocol is therefore void.

**E.    Third Equal Protection Claim/Administrative Procedures Claim: Enactment of the Execution Protocol Is an Arbitrary and Capricious Action by an Agency Because It Fails to Comply With DRC Policy on Department Directives.**

2018.    Even if DRC Defendants were free to disregard the provisions of Ohio Revised Code § 111.15 and enact the Execution Protocol as a policy, they have not followed DRC's policy on enacting policies, 01-COM-01, in doing so.

2019.    Policy 01-COM-01 sets a schedule for reviewing and updating DRC policies, prohibits revisions outside of the review period except in urgent situations, and requires involvement of stakeholders in the process.  Because DRC Defendants failed to follow the required procedures on revising a policy when it revised 01-COM-11, the current Execution Protocol enactment is arbitrary and capricious.

2020.    DRC Defendants have a policy on Department Directives, 01-COM-01. The purpose of this policy is "to establish a coordinated system for the drafting, review, and dissemination of written agency policies, procedures, and operations manuals.  Guidelines shall be set for the development and revision process to ensure input from appropriate stakeholders."  In effect, 01-COM-01 is a Policy on Policies.

492

2021.  Policy 01-COM-01, the Policy on Policies, does not explicitly exclude 01-COM-11, the Execution Protocol, from its procedures.

2022.  Policy 01-COM-01, the Policy on Policies, does not contain an exception for "non-routine policies."

2023.  Policy 01-COM-01, the Policy on Policies, p. 8, Section VI(H), contains an exception for "non-routine policy revisions."  This provision states in its entirety:

> In the event of a non-routine situation, the Operation Support Center PRT chairperson/designee shall have the ability to coordinate an immediate policy revision outside of the annual review schedule using an abbreviated version of the policy process.  *This type of revision shall be extremely limited to only valid urgent situations* and only after the policy owner met with and received authorization from the Operation Support Center PRT chairperson/designee to proceed with the revision.

(emphasis added).

2024.  Executions are scheduled many months, or even years, in advance. The Defendant Governor has the power to change the execution schedule by issuing reprieves.

2025.  Executions do not present a "valid urgent situation" that would justify the use of a non-routine policy revision for 01-COM-11, the Execution Protocol.

2026.  Defendant Director Mohr testified that in his opinion, "a valid urgent situation" that precipitated changes to the execution policy was the "inability to achieve [sic] drugs that were in our policy and the continued requirement that we have an execution statute and

Supreme Court orders to execute individuals, so the inability to obtain

drugs has caused a change." (ECF No. 868-1, PageID 28071.)

Defendant Director Mohr testified that DRC has not been able to

obtain the drugs for a period of two or three years. (*Id.*)

2027. In the Policy Analysis of the most recent Execution Protocol, DRC

Defendants indicated a Non-Routine method of policy revision was

used.

2028. Upon information and belief, DRC Defendants failed to obtain the PRT

chairperson/designee's authorization to proceed with the revision of

the protocol that resulted in the October 7, 2016 protocol.

2029. Both actions taken by DRC Defendants in enacting the October 7,

2016 Execution Protocol—using a non-routine method of revision

without a valid urgent situation, and the failure to obtain

authorization—are inconsistent with 01-COM-01, the DRC Policy on

Policies, p. 8, Section VI(H).

2030. DRC Defendants violated numerous other provisions of 01-COM-01 in

enacting the October 7, 2016 Execution Protocol.

2031. Specifically, 01-COM-01, Section VI(C)(1), decrees that "Each

department policy and operations manual shall be reviewed annually,

divided into a quarterly review schedule."

2032. 01-COM-01, Section VI(C)(2), mandates that "[r]evisions to existing

policies and operations manuals shall only be initiated during the

assigned quarterly review period or in valid, urgent situations that are

494

discussed with and approved by the Operation Support Center PRT

chairperson/designee."

2033.     DRC Defendants failed to comply with the provisions of 01-COM-01

on policy review scheduling in the course of adopting the

Execution Protocol.

2034.     In addition, 01-COM-01, Section VI(C)(10)(a) also requires that "the

policy administrator shall determine the appropriate stakeholders and

coordinate an in-person policy review team hearing on the draft policy

if warranted."

2035.     Even for minor revisions, 01-COM-01, Section VI(C)(10)(b) requires

that stakeholders "have approximately fourteen (14) calendar days to

review the proposed policy revisions and submit any

comments/concerns back to the policy administrator who shall

compile the comments/concerns and submit to the policy owner for

consideration."

2036.     01-COM-01 defines "stakeholder" as "[a]ny person or group with a

direct interest, involvement, or investment in the policy area."

2037.     The Execution Protocol affects attorneys, visitors, victims' family

members, prisoners' family and friends, representatives of the news

media, the Adult Parole Authority, the Ohio State Highway Patrol, the

office of Victim Services, the Attorney General, and the Governor's

Office, all of whom are mentioned in the Execution Protocol and would

appropriately be classified as "stakeholders" within the meaning of 01-COM-01, the Policy on Policies.

Defendant Director Mohr testified that in his opinion, stakeholders are limited to "legal counsel[,] team members, including medical team members, and people that actually participate in that process." (ECF No. 868-1, PageID 28068.)

2038. Defendant Director Mohr acknowledged, however, that a person being executed is also "a person with a direct interest in this policy area," as well as counsel for that person, and the public. (*Id.*)

2039. Defendant Director Mohr admitted that none of these persons, who are stakeholders by the DRC's definition, were consulted or involved in the process of enacting the current Execution Protocol. (*Id.*)

2040. Most of the stakeholders were not even notified about a pending Execution Protocol revision.

2041. Most of the stakeholders were not given an opportunity to review and comment on the proposed Execution Protocol revision.

2042. In enacting the Execution Protocol without input by most of the stakeholders as defined under the law, DRC Defendants acted contrary to the provisions of 01-COM-01, the Policy on Policies in a way that was arbitrary and that substantially burdens the fundamental rights of Plaintiff and others on Ohio's death row to access to the courts, due process, and against being subjected to cruel and unusual punishment.

496

2043. Moreover, 01-COM-01, Section VI(C)(9) requires that a DRC Policy Impact Analysis be completed for all policy revisions. It requires that the Policy Impact Analysis "shall be completed in its entirety showing the revision made to the policy, the factors supporting the revision, and the anticipated impact on DRC operations." This impact analysis must be completed before submitting it to the policy administrator. *See* 01-COM-01, Section VI(C)(10).

2044. The October 7, 2016 Execution Protocol was enacted before DRC Defendants completed the DRC Policy Impact Analysis, which was signed October 12, 2016.

2045. The October 12, 2016, Impact Analysis omits factors supporting the revision. The Impact Analysis form states in bold and underlined font that the drafter "**must provide a summary of the major changes including the reason for the change.**" Changing the execution drugs to include the three-drug execution method, however, is a major change to the protocol. DRC Defendants failed to state any reasons for the recent changes to the Execution Protocol.

2046. Finally, 01-COM-01 sets forth numerous other procedures that must be followed for revising DRC policies, including but not limited to those enumerated in Section VI(C)(3)–(11) & (D)(1)–(4). These procedures are hereby incorporated by reference as if set forth in full in this paragraph. Upon information and belief, DRC Defendants

497

failed to comply with most of these procedures in their adoption of the October 7, 2016 Execution Protocol.

2047. By repeatedly disregarding its own Directive on Policies, DRC Defendants acted arbitrarily and capriciously when they enacted the October 7, 2016 Execution Protocol.  The protocol is void.

2048. Subjecting Plaintiff to execution under the invalidly adopted, void October 7, 2016 Execution Protocol treats Plaintiff disparately as compared to similarly situated individuals, in a way that burdens his fundamental rights as identified herein.

## F.    Prayer for Relief for Equal Protection Clause/Administrative Procedures Act Claims

2049. Plaintiff asks that the Court find that by changing the Execution Protocol through a unilateral action by the Defendant DRC Director, Defendants violate Plaintiff's rights to equal protection under the law.

2050. Plaintiff also asks that the Court find that Defendants deny Plaintiff's rights under the Equal Protection Clause by adopting a new Execution Protocol when both DRC and the Director lack the grant of authority necessary to promulgate rules regarding executions.

2051. Plaintiff asks that the Court permanently enjoin any DRC Defendants from invalidly enacting Execution Protocols in the future to prevent future violations of his constitutional rights.

2052. If the Court finds that either the Defendant DRC Director or DRC itself has the authority to promulgate rules regarding executions, Plaintiff asks that, to enforce his federal constitutional rights:

    a. The Court declare that DRC Defendants must comply with the Ohio Revised Code § 111.15 legislative review and filing requirements.

    b. The Court declare that because DRC Defendants failed to comply with Ohio Revised Code § 111.15's requirements, 01-COM-11 effective October 7, 2016 is an invalidly enacted rule.

    c. The Court enjoin DRC Defendants from carrying out executions using an invalid Execution Protocol.

    d. The Court order that for future Execution Protocol revisions, DRC Defendants must comply with the legislative review and filing requirements of Ohio Revised Code § 111.15.

2053. In alternative, if the Court finds that DRC Defendants acted arbitrarily and capriciously in enacting the Execution Protocol, Plaintiff asks that, to enforce his federal constitutional rights:

    a. The Court declare the Execution Protocol void;

    b. The Court enjoin DRC Defendants from carrying out executions using a void Execution Protocol;

    c. The Court order DRC Defendants to comply with all provisions of 01-COM-01 in enacting future execution protocols.

2054. Plaintiff also requests any other relief this Court finds just.

**Forty-Eighth Claim for Relief: As-Applied Eighth Amendment Violations Following Defendants' Unsuccessful Attempts to Execute Plaintiff on November 15, 2017.**

2055. Plaintiff incorporates by reference the allegations set forth throughout this Fifth Amended Complaint as if fully rewritten here.

2056. Defendants made "attempts to carry out" Plaintiff's death sentence on November 15, 2017, but those attempts were "unsuccessful due to an inability to achieve intravenous vein ("IV") access necessary to" carry

out a lethal injection execution under Ohio Rev. Code § 2949.22 and

DRC Policy 01-COM-11.  (Warrant of Reprieve, ECF No. 1376-1.)

2057.  That inability to achieve IV access on Plaintiff was due primarily to

Plaintiff's unique health characteristics, specifically that his

peripheral veins are impossible for any of Defendants (or any person

within the description, education, training, and qualifications of a

"Medical Team Member" under 01-COM-11) to access with an IV

catheter and maintain that access for the duration of an execution

under 01-COM-11.

2058.  Defendants' inability to achieve IV access on Plaintiff was also due in

part to the lack of skill of the Execution Team members, none of

whom are highly trained at obtaining IV access, and some of whom

were the same persons involved in the unsuccessful attempts to

execute Romell Broom on September 15, 2009.

2059.  Before Defendants attempted to execute Plaintiff on November 15,

2017, they had repeated warnings that it would be difficult to

impossible to achieve and maintain sufficient IV access on Plaintiff in

order to carry out the execution.

2060.  Defendants were warned and otherwise had notice, constructive or

actual, by the following:

> a.  Plaintiff's counsel provided notice to Defendants on September
>     29, 2017.
> b.  Plaintiff's counsel provided additional notice to Defendants by
>     follow-up letter on October 9, 2017;

    c. Defendants' agent, Dr. James McWeeney, M.D., documented issues relating to Plaintiff's breathing difficulties and vein access concerns on October 23, 2017, after an assessment conducted on October 19, 2017.

    d. Defendants' agent, Nurse Beth Higgenbotham, R.N., documented similar concerns on October 23, 2017, after vein-access assessments conducted on October 19 & 20, 2017.

    e. Plaintiff's counsel provided renewed notice to Defendants on October 24, 2017;

    f. Plaintiff's counsel provided additional notice to Defendants in their Motion for Leave to File Amendment and Supplement (ECF No. 1350), filed October 26, 2017;

    g. Plaintiff's counsel provided further notice to Defendants in an in-person meeting with counsel for Defendant Governor Kasich on October 26, 2017;

    h. Plaintiff's counsel provided further notice to Defendants in their oral argument on the motion for leave to amend and supplement on October 27, 2017.

2061. Even following their failures of November 15, 2017, Defendants still intend to try again to execute Plaintiff using their 01-COM-11 lethal injection execution method. (*See* Warrant of Reprieve, ECF No. 1376-1.)

## Legal Framework

2062. The Supreme Court in *Baze v. Rees* made clear that a claim for relief under the Eighth Amendment exists to challenge methods of execution as cruel and unusual not only in "actually inflicting pain," but also by "subjecting individuals to a risk of future harm." 553 U.S. at 49–50.

2063. When the question is the quantum of risk of future harm, the risk must be substantial—that is, it must be "sure or very likely to cause

serious illness and needless suffering," and give rise to "sufficiently imminent dangers." *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 33, 34–35 (1993)).

2064. To prevail on a claim of future risk of harm presented by an execution method, "there must be a substantial risk of serious harm, an objectively intolerable risk of harm that *prevents prison officials from pleading that they were subjectively blameless* for purposes of the Eighth Amendment." *Baze*, 553 U.S. at 50 (emphasis added) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846, and n.9 (1994)) (internal quotation marks omitted).

2065. As the Court in *Baze* and then *Glossip*, 135 S. Ct. 2726 (2015), explained, one way by which a prison official can be shown to be something other than "subjectively blameless for purposes of the Eighth Amendment" can be drawn from the standards identified in *Wilkerson*, *Kemmler*, and *Resweber*, under which certain actions by prison officials, or certain methods or manners of execution (or their analogs), are inherently prohibited by the Eighth Amendment.

2066. But *Baze* and *Glossip* also drew on the line of cases that includes the trio of *Farmer*, *Helling*, and *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992), to show another way by which prison officials can be considered "subjectively blameworthy" for Eighth Amendment purposes: In that trio of cases, the Court set the threshold level for Eighth Amendment liability at "deliberate indifference" or something

more, such as "purpose or knowledge" of the risk of serious harm. Under a showing that satisfies any of these standards, from "deliberate indifference" on up to a higher standard of knowledge, a prison official would be subjectively blameworthy, and thus liable, for the harm to the prisoner.

2067. *Baze* expressly reconfirmed that *Farmer*, *Helling*, and *Hudson* remain valid law applicable to method-of-execution cases. The Court in *Glossip* confirmed the analysis of <u>*Baze*</u> as to the remaining validity of *Farmer*, *Helling*, and *Hudson*. *See Glossip*, 135 S. Ct. at 2737–38. Indeed, the Court there made clear that the *Baze* decision was addressed at "grounds such as those asserted [in *Baze*]"—that is, comparative analysis involving an alternative, a claim different than those asserted in other Eighth Amendment cases in which there was no consideration of an alternative condition of one's sentence. *Glossip*, 135 S. Ct. at 2737.

2068. The Court in *Glossip* instead confirmed that there remain some types of challenges involving a method of execution that go beyond the claims at issue in *Baze* or *Glossip* because of the nature of the execution method or the mental state of the prison officials in selecting or administering a particular execution method with intent, purpose, or knowledge of causing pain. *See Glossip*, 135 S. Ct. at 2746 (rejecting as "simply not true" the dissent's suggestion that, after

503

*Glossip*, all method of execution challenges must include an alleged available alternative method).

2069. As such, an actionable Eighth Amendment claim, different from the so-called "*Baze/Glossip* claim," will lie, if the circumstances are such that prison officials cannot plead they are "subjectively blameless" for the unacceptable harm imposed on the prisoner; or if the punishment itself is of a type that is per se impermissible under the Eight Amendment, such as one imposing a "superadded" punishment, *Wilkerson*, 99 U.S. at 135, for example a torturous, lingering, or spectacle death.

2070. The claims alleged in this Forty-Eighth Claim for Relief are therefore not the type of claims that require Plaintiff to allege an alternative execution method; they are raised under *Wilkerson*, *Kemmler*, and *Farmer* line of Supreme Court precedent prohibiting (a) the intentional, purposeful, or knowing imposition of serious harm; as well as (b) punishments that are inherently prohibited, such as torture, or those causing a lingering death, an undignified or spectacle execution.

A. **Eighth Amendment violations based on Defendants' use of a method of execution that has caused, and will again cause, Plaintiff unconstitutional harm.**

2071. Plaintiff incorporates by reference the allegations set forth throughout this Fifth Amended Complaint as if fully rewritten here.

2072.  *Baze v. Rees*, 553 U.S. 35, 48–50 (2008), recognized that Eighth Amendment claims related to executions can arise from the law established in *In re Kemmler*, 136 U.S. 436, 447 (1890), and *Wilkerson v. Utah*, 99 U.S. 130, 135–36 (1879).

2073.  *Baze* confirmed that manners and methods of execution that would be unconstitutional under *Kemmler* or *Wilkerson* would still be unconstitutional today.  And the Court in *Glossip v. Gross*, 135 S. Ct. 2726, 2737–38 (2015), reaffirmed the validity of the *Baze* analysis of *Wilkerson* and *Kemmler* in method-of-execution cases.

2074.  *Baze* reiterated *Wilkerson*'s explanation that "it is safe to affirm that punishments of torture . . . and all others in the same line of unnecessary cruelty, are forbidden by the Eighth Amendment."  553 U.S. at 48 (quoting *Wilkerson*, 99 U.S. at 136 (internal quotation marks omitted)).  Sentences in which "terror, pain, or disgrace" are added are prohibited by the Eighth Amendment.  *Wilkerson*, 99 U.S. at 135–36.

2075.  Attempting again to execute Plaintiff will constitute a sentence to which terror, pain and disgrace was added, by virtue of Defendants' unsuccessful attempts to execute him on November 15, 2017.  The terror, pain and disgrace Defendants imposed on Plaintiff that day will be added to the terror, pain, and disgrace to be imposed when Defendants try again to execute Plaintiff using 01-COM-11's lethal injection method.  That terror, pain and disgrace will be further

enhanced by the fact that Plaintiff's current health characteristics – especially the conditions of his veins - will only worsen, not improve.

2076. *Baze* also reiterated the *Kemmler* Court's explanation that "punishments are cruel when they involve torture or a lingering death," and that 'cruel, within the meaning of that word as used in the Constitution . . . implies there is something inhuman and barbarous, something more than the mere extinguishment of life." 553 U.S. at 48–49 (quoting *Kemmler*, 136 U.S. at 447–49 (internal quotation marks omitted)).

2077. Attempting to execute Plaintiff on November 15, 2017, when Defendants had clear notice that they would be unable to achieve and maintain IV access necessary to execute him under 01-COM-11, was more than an attempt at the "mere extinguishment of life."

2078. Any further attempt(s) to execute Plaintiff using 01-COM-11 are similarly more than the mere extinguishment of life; they will be attempts to extinguish Plaintiff's life that will be both unsuccessful yet severely painful, mentally and physically—akin to torture.

2079. Subjecting Plaintiff to the severe physical and mental pain and suffering of repeated execution attempts under 01-COM-11, when those attempts will be sure or very likely to fail, is inhumane and barbarous.

2080. Defendants will no longer be attempting to carry out a criminal judgment; they will be subjecting Plaintiff to severe physical and

mental pain and suffering for no legitimate, important, or compelling reason.

2081.    That severe physical and mental pain and suffering is not simply the general anxiety from an anticipated execution.  (*See* ECF No. 1362, PageID 51336.)  Rather, it is severe mental pain and suffering associated with the trauma Plaintiff has already endured, in addition to the anxiety associated with Defendants' intention to attempt to execute him using their Execution Protocol, which will be severely painful, physically and mentally, and yet ultimately again unsuccessful.

2082.    Defendants are not subjectively blameless, but are instead subjectively blameworthy and thus liable—under *Baze*, *Glossip*, and other Eighth Amendment precedent, including *Wilkerson* and *Kemmler*.  Where, as here, an execution method will amount to a punishment akin to torture, or unnecessary cruelty, imposes terror, pain, or disgrace, or involves a lingering death, or a spectacle or undignified execution, or an execution that involves something more than the mere extinguishment of life, Defendants cannot be not subjectively blameless.

2083.    Under *Wilkerson* and *Kemmler*, as reiterated in *Baze* and *Glossip*, a method of execution which, by its nature will cause a lingering death, or an undignified death, or involves "superadded" pain and suffering,

prison officials like Defendants are not subjectively blameless regardless of the subjective intent of prison officials.

2084.    Defendants' use of their 01-COM-11 lethal injection execution method on Plaintiff will be lingering, undignified, and involve superadded mental and physical pain and suffering.

2085.    The abandoned attempts to execute Plaintiff on November 15, 2017, establish that an execution under the current protocol will inflict serious physical and mental pain and suffering on Plaintiff.  Plaintiff's veins and compromised health characteristics will only get worse, not better, as he ages, and Defendants currently know, should know, or recklessly disregard, that fact.  Defendants currently know, should know, or recklessly disregard, that using 01-COM-11's lethal-injection execution method on Plaintiff again will be unsuccessful to execute him due to the inability to achieve and maintain IV access on him.

2086.    Nor can Defendants claim that their failed attempt to execute Plaintiff, or their future attempts, have been or will be merely an "innocent misadventure," or an "unforeseeable accident," or an "isolated mishap," or a single execution event that would not "suggest cruelty" by state officials.  *Baze*, 553 U.S. at 50 (citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947)).

2087.    Defendants had repeated warnings that Plaintiff's unique characteristics would make it sure or very likely that Defendants would be unable to achieve and maintain IV access on Plaintiff, and

508

that Defendants would therefore be sure or very likely to be unsuccessful in their attempts to execute Plaintiff using lethal injection under 01-COM-11.

2088.    In fact, Defendants' failed attempts to execute Plaintiff were eminently foreseeable. Defendants' failed attempts were not due to an accident, or an isolated mishap, or an "innocent misadventure." Those failed attempts were not, for example, due to faulty equipment such as bad IV catheters or drugs or syringes or any other form of execution equipment. Nor were those failed attempts due to any other malfunctions or maladministration that was unforeseeable. And in light of Ohio's track record of problematic lethal injection executions, Plaintiff's failed execution was not an isolated mishap.

2089.    To the extent the failed attempts were due to maladministration in the form of the Execution Team members' insufficient level of skill, training, or competence, that maladministration was foreseeable. Especially insofar as it involved Execution Team members who were involved in the failed attempt to execute Romell Broom, and the other Ohio executions in which achieving and maintaining IV access proved to be problematic, such as the executions of Joseph Clark, Christopher Newton, Kenneth Biros, and others alleged in Plaintiff's Fifth Amended Complaint.

2090.    When Defendants attempt to execute Plaintiff again using their lethal injection execution protocol, they will have even more notice that they

509

will be sure or very likely to be unable to achieve and maintain IV access on Plaintiff, and thus be sure or very likely to be unable to carry out his lethal injection execution.  That notice makes a subsequent failed execution attempt entirely foreseeable; Defendants will not be able to claim that subsequent failed attempts will have been accidents, isolated mishaps, or innocent misadventures.

2091.   It follows that any efforts to again try to execute Plaintiff using 01-COM-11's lethal injection method will inflict unnecessary and severe physical and mental pain and suffering.

2092.   To the extent that Plaintiff's unique physical characteristics are at the root of Defendants' inability to execute him using 01-COM-11, the "mental anguish and physical pain" suffered by Plaintiff is unique. The "mental anguish and physical pain" suffered by Plaintiff before his November 15, 2017 execution attempt and until any subsequent attempt to execute him by 01-COM-11's lethal injection method differs significantly from the level of pain or anguish suffered by any other condemned inmate, because it flows directly from Plaintiff's personal characteristics.  *Cf. Resweber*, 329 U.S. at 464.

2093.   The Eighth Amendment protects against "cruelty inherent in the method of punishment."  *Resweber*, 329 U.S. at 464.  Because Plaintiff's unique characteristics make is sure or very likely that Defendants will never be able to achieve and maintain IV access on him to carry out a lethal injection execution under 01-COM-11, there

is cruelty inherent in trying to execute him using a method of execution that will not be successful.

2094. Any subsequent attempt(s) to execute Plaintiff under 01-COM-11 would be, in the words of Justice Frankfurter's concurrence in *Resweber*, another one or more in a "series of abortive attempts," or a "single, cruelly willful attempt" at executing Plaintiff that would be similarly prohibited by the Eighth Amendment. *See Resweber*, 329 U.S. at 471; *Baze*, 553 U.S. at 50.

2095. The harms to which Plaintiff will be subjected are, by their very nature, inherently prohibited under *Wilkerson* and *Kemmler* and the Eighth Amendment. Defendants are therefore subjectively blameworthy.

2096. When prison officials are subjectively blameworthy under the terms of *Wilkerson* or *Kemmler*, there is an inherent Eighth Amendment violation for which the existence of an alternative is irrelevant. *See Baze*, 553 U.S. at 102 (Thomas, J., concurring in the judgment) (no "comparative analysis" in *Wilkerson* and *Kemmler* when execution methods or manners are inherently unconstitutional); *see also Warner v. Gross*, 135 S. Ct. 824, 826 (2015) (Sotomayor, J., dissenting); *Glossip*, 135 S. Ct. at 2795–97 (Sotomayor, J., principal dissent).

2097. Plaintiff need not plead an alternative execution method as to this claim.

2098.   Nevertheless, to the extent Plaintiff must plead an alternative execution method as to this claim, he alleges firing squad, as identified and described above in his Twentieth Claim for Relief.

2099.   The possibility of this alternative method of execution, which does not involve any need to achieve or maintain IV access, further renders needless any suffering caused by Defendants using a lethal-injection method of execution on Plaintiff, and virtually eliminates the unconstitutional lingering death and other severe physical and mental pain and suffering to which Plaintiff will be subjected under 01-COM-11's lethal injection execution method.  This alternative method of execution, by eliminating any need for IV access at all, substantially reduces the risk of severe pain and suffering as compared to Defendants' current execution method.

2100.   The Sixth Circuit Court of Appeals has concluded that firing squad is "available" as a means of execution because the "Ohio legislature could, tomorrow, enact a statute reinstating [sic] the firing squad as an alternative method of execution."  *In re Campbell*, 874 F.3d at 465–66.

2101.   For all of these reasons, Plaintiff's Eighth Amendment rights against cruel and unusual punishment will be violated if Defendants attempt again to execute him using their 01-COM-11 execution method.

### B.  Eighth Amendment violations based on Defendants' *purposeful* or *knowing* use of a method of execution that has caused, and will again cause, Plaintiff unconstitutional harm.

2102.   Plaintiff incorporates by reference the allegations set forth throughout this Fifth Amended Complaint as if fully rewritten here.

2103.   Defendants are not subjectively blameless—they are subjectively blameworthy and thus liable—under *Baze*, *Glossip*, and other Eighth Amendment precedent, such as *Hudson*, *Farmer*, and *Helling*, if they act purposefully to inflict harm.  *See, e.g.*, *Hudson*, 503 U.S. at 6–7.

2104.   And Defendants are also not subjectively blameless—they are subjectively blameworthy and thus liable—if using a particular execution method would "suggest cruelty, or [if] the procedure at issue gives rise to a 'substantial risk of serious harm.'" *Baze*, 553 U.S. at 50.

2105.   Thus, under *Hudson*, *Farmer*, *Helling*, and as reiterated in *Baze* and *Glossip*, Defendants are not subjectively blameless because they will *purposely* use their 01-COM-11 lethal injection execution protocol to execute Plaintiff;' their use of that execution protocol on Plaintiff suggests cruelty in light of their previous unsuccessful attempts to execute Plaintiff, and the fact that at least one of the primary reasons for that failure—Plaintiff's inadequate veins—will not improve.

2106.   Further, Defendants are not subjectively blameless—they are subjectively blameworthy and thus liable—under *Baze*, *Glossip*, and other precedent, if a method of execution was used and officials had a

513

"knowing willingness that [harm]" would occur.  *Hudson*, 503 U.S. at 6 (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

2107.　Either mental state—purpose or knowledge—is sufficient for liability under the Eighth Amendment and relevant Supreme Court precedent. Indeed, the *Farmer* Court clarified that a claimant "must show that officials applied force 'maliciously and sadistically for the very purpose of causing harm,' *[Hudson,]* 503 U.S. at 6 (internal quotation marks and citations omitted), *or*, that officials used force with 'a knowing willingness that [harm] occur,' *id.*, at 7 (internal quotation marks and citation omitted)." *Farmer*, 511 U.S. at 835–36 (emphasis added).  As the Court explained, "deliberate indifference" lies "somewhere between the poles of negligence at one end and purpose *or* knowledge at the other . . . ." *Id.* at 836 (emphasis added).

2108.　Defendants have conceded that they made unsuccessful attempts to execute Plaintiff using their 01-COM-11 lethal injection execution method, because of an inability to achieve IV access on Plaintiff.

2109.　Defendants will purposely apply 01-COM-11's lethal injection execution method to Plaintiff when they attempt again to execute him.

2110.　Because Plaintiff's veins will only worsen with age, future efforts to execute him by Defendants' 01-COM-11 execution method are virtually certain—they are sure or very likely—to be similarly unsuccessful.

2111.　To the extent that Defendants failed to successfully complete Plaintiff's execution on November 15, 2017 due to maladministration, Defendants purposely used the same key Execution Team members who also had substantial difficulties administering other Ohio executions, including those of Broom, Newton, Clark, Biros, and others.

2112.　The abandoned attempt to execute Plaintiff on November 15, 2017, and Plaintiff's physical problems that will only worsen, establish that another execution under 01-COM-11 would be so likely to inflict serious physical and mental pain and suffering on Plaintiff that purpose may be inferred.

2113.　Accordingly, attempting to execute Plaintiff using Defendants' 01-COM-11 lethal injection execution method makes Defendants subjectively blameworthy under *Farmer*, *Hudson*, *Helling*, and other related Eighth Amendment precedent.

2114.　Furthermore, before Defendants attempted to execute Plaintiff on November 15, 2017, they knew, should have known, or recklessly disregarded, that using 01-COM-11's lethal-injection execution method on Plaintiff would be unsuccessful to execute him due to inability to achieve and maintain IV access on him, and that using 01-COM-11's lethal-injection execution method on Plaintiff would cause him to suffer:

    a.  severe physical and mental pain;

    b.  an unsuccessful but lingering attempted execution;

    c.  an undignified but unsuccessful attempted execution; and

    d.  terror, pain, or disgrace above and beyond the terror, pain and disgrace that might be characterized as the "inescapable consequence of death" by lethal injection in the executions of other individuals who lack Plaintiff's unique characteristics. *See Baze*, 553 U.S. at 50.

2115.    The abandoned attempt to execute Plaintiff establishes that an execution under the current protocol would be so likely to inflict serious physical and mental pain and suffering on Plaintiff that the use of it will necessarily be using that method of execution while knowing the sure or very likely outcome.

2116.    Because Defendants have already tried, and failed, to carry out Plaintiff's execution by lethal injection under 01-COM-11, and subjected Plaintiff to severe physical and mental pain and suffering in the process, Defendants know, should know, or recklessly disregard, the sure or very likely risk of subjecting Plaintiff to additional harms identified above when they make further attempts to execute him using lethal injection under 01-COM-11.

2117.    Defendants currently know, should know, or recklessly disregard, that using 01-COM-11's lethal-injection execution method on Plaintiff again will cause him to suffer:

    a.  severe physical and mental pain;

    b.  an unsuccessful but lingering attempted execution;

    c.  an undignified but unsuccessful attempted execution;

    d.  suffer terror, pain, or disgrace above and beyond the terror, pain and disgrace that might be characterized as the

"inescapable consequence of death" by lethal injection in the executions of other individuals who lack Plaintiff's unique characteristics. *See Baze*, 553 U.S. at 50

2118. Defendants intend to carry out Plaintiff's execution knowing that severe physical pain and suffering will occur. Despite this knowledge, Defendants intend to make further attempts to execute Plaintiff using 01-COM-11's lethal injection execution method.

2119. Indeed, Defendants had ample actual and constructive notice before November 15, 2017, that they would be unable to access Plaintiff's veins and thus be unable to carry out his execution using the 01-COM-11 lethal injection execution method. Accordingly, any suffering Plaintiff endured was "needless" suffering because Defendants had notice that they would never be able to obtain and maintain IV access on him to use 01-COM-11's lethal-injection execution method.

2120. And because Defendants will, unless enjoined, try again to administer 01-COM-11's lethal injection execution method to Plaintiff on June 5, 2019, or some time thereafter, and will be sure or very likely to be unsuccessful in their attempts to execute him again, any such attempt to execute Plaintiff using 01-COM-11's lethal injection execution method will surely or very likely needlessly subject Plaintiff only to severe physical and mental pain and suffering, without actually executing him.

2121. There is no need to subject Plaintiff to any severe physical and mental pain and suffering caused by an execution attempt using 01-COM-

11's lethal injection execution method, because any such attempt will be unsuccessful.  Any pain and suffering will, therefore, be needless.

2122.  An execution method that would be "sure or very likely to cause serious illness and needless suffering" is vulnerable to constitutional challenge.  *Glossip*, 135 S. Ct. at 2737 (citing *Baze*, 553 U.S. at 50 (in turn quoting *Helling*, 509 U.S. at 33, 34–35)).

2123.  Defendants are therefore not subjectively blameless—they are subjectively blameworthy and thus liable—under *Baze*, *Glossip*, *Farmer*, *Helling*, *Hudson*, and other Eighth Amendment precedent because they will surely or very likely subject Plaintiff to needless suffering that is severe.

2124.  Plaintiff also suffers current and ongoing Eighth Amendment harm, based on the needless suffering to which Defendants subjected him and continue to subject him.

2125.  Plaintiff knows the factual matters alleged herein; he is aware that Defendants have knowledge of the sure or very likely risks posed to him, and he knows further that Defendants nevertheless intend to attempt again to execute him under 01-COM-11.

2126.  Plaintiff therefore presently suffers severe mental pain and suffering, as he contemplates the severe physical and mental pain and suffering that awaits when Defendants try once again to execute him using 01-COM-11's lethal injection execution method, which is also needless.

2127.    When prison officials purposely use a method of execution that will cause severe pain and needless suffering, there is an inherent Eighth Amendment violation for which the existence of an alternative is irrelevant.  *See Baze*, 553 U.S. at 102 (Thomas, J., concurring in the judgment) (no "comparative analysis" in *Wilkerson* and *Kemmler* when execution methods or manners are inherently unconstitutional); *see also Warner v. Gross*, 135 S. Ct. 824, 826 (2015) (Sotomayor, J., dissenting); *Glossip*, 135 S. Ct. at 2795–97 (Sotomayor, J., principal dissent).

2128.    When prison officials knowingly use a method of execution that will cause serious harm—such as severe physical or mental pain and suffering, or a lingering death, or a spectacle execution, an undignified execution, or other such harms—that is an inherent Eighth Amendment violation for which the existence of an alternative is irrelevant.  *See Baze*, 553 U.S. at 102 (Thomas, J., concurring in the judgment) (no "comparative analysis" in *Wilkerson* and *Kemmler* when execution methods or manners are inherently unconstitutional); *see also Warner v. Gross*, 135 S. Ct. 824, 826 (2015) (Sotomayor, J., dissenting); *Glossip*, 135 S. Ct. at 2795–97 (Sotomayor, J., principal dissent).

2129.    Plaintiff need not plead an alternative execution method as to this claim.

2130.   Nevertheless, to the extent Plaintiff must plead an alternative execution method as to this claim, he alleges firing squad, as identified and described above in his Twentieth Claim for Relief.

2131.   The possibility of this alternative method of execution, which does not involve any need to achieve or maintain IV access, further renders needless any suffering caused by Defendants using a lethal-injection method of execution on Plaintiff, and further demonstrates that Defendants are purposely using their lethal injection execution method that will subject Plaintiff to unconstitutional harm.

2132.   This alternative method of execution, by eliminating any need for IV access at all, substantially reduces the risk of severe pain and suffering as compared to Defendants' current execution method that requires achieving and maintaining IV access on Plaintiff.

2133.   The Sixth Circuit Court of Appeals has that firing squad is "available" as a means of execution because the "Ohio legislature could, tomorrow, enact a statute reinstating [sic] the firing squad as an alternative method of execution."  *In re Campbell*, 874 F.3d at 465–66.

2134.   For all of these reasons, Plaintiff's Eighth Amendment rights against cruel and unusual punishment will be violated if Defendants attempt again to execute him using their 01-COM-11 execution method.

**Forty-Ninth Claim for Relief: Eighth Amendment Violation Based on Deliberate Indifference to and/or Reckless Disregard of the Severe Physical and Mental Pain and Suffering Caused By Defendants' Abandoned Attempts To Use A Lethal Injection Execution Protocol On Him and Defendants' Intent to Attempt to Use A Lethal Injection Execution Protocol On Him Again.**

2135.    Plaintiff incorporates by reference the allegations set forth throughout this Fifth Amended Complaint as if fully rewritten here.

2136.    DRC Defendants had numerous warnings ahead of November 15, 2017, that they would find it virtually impossible to achieve and maintain IV access on Plaintiff to carry out his lethal injection execution under 01-COM-11.  Defendants were on notice, and it was foreseeable, that their attempts to execute Plaintiff via lethal injection were sure or very likely to be unsuccessful.

2137.    DRC Defendants made attempts to execute Plaintiff on November 15, 2017, but those attempts to carry out his death sentence by lethal injection under 01-COM-11 were unsuccessful due to Defendants' inability to achieve and maintain IV vein access.

2138.    DRC Defendants subjected Plaintiff to severe physical and mental pain and suffering during their attempts to execute him and thereafter, including that which he currently suffers and will suffer if Defendants again attempt to execute him using lethal injection.

2139.    DRC Defendants were previously subjectively aware that achieving and maintaining IV access on Plaintiff was sure or very likely to be unsuccessful and would cause Plaintiff severe physical and mental pain and needless suffering.

521

2140. DRC Defendants are presently subjectively aware that achieving and maintaining IV access on Plaintiff when they attempt to execute him again is sure or very likely to be unsuccessful and will cause Plaintiff severe physical and mental pain and needless suffering.

2141. The *Farmer* Court explained that there is a legal distinction for Eighth Amendment purposes between "deliberate indifference" and "purpose or knowledge," and that "deliberate indifference" is a lower standard to satisfy; the "standard of purposeful or knowing conduct is not . . . necessary to satisfy the *mens rea* requirement of deliberate indifference." *Farmer*, 511 U.S. at 836.

2142. Under *Farmer*, a "deliberate indifference" Eighth Amendment claim requires a "substantial risk of serious harm" and is not available for uses of force that "are typically made in haste, under pressure, and without the luxury of a second chance." *Farmer*, 511 U.S. at 834–35 (citations and internal quotation marks omitted).

2143. Defendants had ample warning of the difficulties that awaited if they tried to execute Plaintiff using their lethal injection execution method, and yet they proceeded anyway.

2144. Defendants' attempts to execute Plaintiff on November 15, 2017, did not result from a decision made in haste, nor from a decision made under pressure, without the luxury of a second chance.

2145. When Defendants attempt to execute Plaintiff again, that will be the definition of a "second chance," with even more warning that their

efforts will be unsuccessful and subject Plaintiff to severe mental and physical pain and suffering without carrying out his execution.

2146. Defendants currently intend to try again to execute Plaintiff on June 5, 2019 (at the earliest).  Thus, the decision to attempt again to execute Plaintiff using lethal injection will not be one made in haste, nor under pressure without the luxury of a second chance.

2147. "Deliberate indifference" is less than—and different as a matter of law than—"purpose or knowledge," for purposes of an Eighth Amendment method-of-execution challenge.

2148. Instead, "deliberate indifference" for Eighth Amendment conditions-of-confinement claims is equivalent to "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 839–40.

2149. If a prison official "acted or failed to act despite his knowledge of a substantial risk of serious harm," then an Eighth Amendment violation is demonstrated.  *Farmer*, 511 U.S. at 842.  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (internal citations and parentheticals omitted).

2150. Defendants had ample notice of the substantial risk of serious harm to which Plaintiff would be subjected if they attempted to execute him

using their lethal injection execution method.  That risk was objectively serious before November 15, 2017, and it is even more objectively serious—it is an established current fact, not a future risk—after the unsuccessful attempts to execute Plaintiff that day.

2151.   As alleged herein, there is direct evidence—including evidence created by Defendants and/or their agents—that Defendants had subjective knowledge of a substantial risk that they would not be able to achieve and maintain IV access on Plaintiff and thus that they would be unable to carry out his lethal injection execution but they decided to go forward with the execution attempt anyway.

2152.   Plaintiff's veins are unsuitable to support IV access, and they will only get worse with age; they will not improve going forward, which Defendants know or recklessly disregard.

2153.   That Defendants were unable to achieve and maintain IV access on Plaintiff on November 15, 2017, is further direct evidence of an objectively serious, substantial risk of severe harm, a sure or very likely risk of severe physical and mental pain and suffering, to Plaintiff when Defendant attempt again to execute him by lethal injection.

2154.   Accordingly, the risk of serious harm to Plaintiff posed by lethal injection execution is now obvious and well-known; that very fact alone establishes that Defendants have the subjective knowledge of

the risks to Plaintiff when they proceed to again attempt to execute him.

2155.  Defendants also concluded from the available facts that there was indeed a substantial risk of serious harm posed by their attempts to use a lethal injection execution method.  For instance, Defendants' After-Action Review asserted that there were no events or acts that occurred that were not anticipated in advance, establishing that Defendants anticipated a substantial risk of being unable to successfully achieve and maintain IV access and thus failing to actually execute Plaintiff.  Defendants' own healthcare providers noted that Plaintiff's veins were not accessible for an IV.

2156.  That same state of affairs will remain applicable in Defendants' subsequent attempt to execute Plaintiff using lethal injection; Defendants will subjectively know about Plaintiff's unique characteristics and the previous failed attempts to execute Plaintiff.

2157.  Thus Defendants do and will subjectively know about the substantial risk of serious harm, the sure or very likely risk of severe physical and mental pain and suffering to which they will subject Plaintiff by attempting to execute him by their lethal injection execution method.

2158.  By specifically choosing to move forward with attempts to execute Plaintiff by lethal injection on November 15, 2017, in the face of numerous and ample warnings from Plaintiff and from Defendants and their own agents, Defendants recklessly disregarded the risk of

serious harm that was foreseeable, deliberately disregarding Plaintiff's constitutional rights against cruel and unusual punishment.

2159. By choosing to move forward with another attempt to execute Plaintiff by lethal injection, in the face of numerous and ample warnings, Defendants will recklessly disregard the risk of serious harm that was foreseeable, deliberately disregarding Plaintiff's constitutional rights against cruel and unusual punishment and deliberately disregarding Plaintiff's serious medical need to not be subjected to repeated needle sticks and the mental trauma of having Defendants attempt to execute him yet again by a method that has already proven impossible once and will be even more so in the future, in violation of Plaintiff's Eighth Amendment rights.

2160. Plaintiff need not plead an alternative execution method as to this claim.

2161. Nevertheless, to the extent Plaintiff must plead an alternative execution method as to this claim, he alleges firing squad, as identified and described above in his Twentieth Claim for Relief.

2162. The possibility of this alternative method of execution, which does not involve any need to achieve or maintain IV access, further renders needless any suffering caused by Defendants using a lethal-injection method of execution on Plaintiff, and further demonstrates that Defendants are deliberately indifferent to the sure or very likely risk of serious harm to which Plaintiff will be subjected under 01-COM-11.

2163.   This alternative method of execution, by eliminating any need for IV access at all, substantially reduces the risk of severe pain and suffering as compared to Defendants' current execution method that requires achieving and maintaining IV access on Plaintiff.

2164.   The Sixth Circuit Court of Appeals has concluded that firing squad is "available" as a means of execution because the "Ohio legislature could, tomorrow, enact a statute reinstating [sic] the firing squad as an alternative method of execution." *In re Campbell*, 874 F.3d at 465–66.

2165.   For all of these reasons, Plaintiff's Eighth Amendment rights against cruel and unusual punishment will be violated if Defendants attempt again to execute him using their 01-COM-11 execution method.

## PRAYER FOR RELIEF

A.   Plaintiff requests that this Court grant him injunctive relief under federal law in the form of the following:

    a.   preliminary and permanent prohibitive injunctions preventing Defendants from executing him by means of any part of their execution policy, including the 2016 Execution Protocol or any other execution policy, new or old, formal or informal which, as written or as administered, violates his federal constitutional rights;

    b.   preliminary and permanent mandatory injunctions requiring Defendants to adopt, and adhere in their administration to, a facially constitutional written execution protocol in efforts to execute him, and that such written execution protocol must formally adopt the Incident Command Systems principles and application in the execution context as a formal element of Defendants' written execution protocol;

    c.   preliminary and permanent prohibitive injunctions preventing Defendants from executing him by means of their execution policy, including the 2016 Execution Protocol or any other execution policy, new or old, formal and/or informal that is facially unconstitutional, including facial unconstitutionality for failure to ensure that an unconstitutional execution is not carried out;

d. preliminary and permanent prohibitive injunctions preventing Defendants from executing him by means of an execution policy, including the 2016 Execution Protocol or any other execution policy, new or old, formal and/or informal, that is unconstitutional as applied to him, including as-applied unconstitutionality for failure to ensure that an unconstitutional execution is not carried out;

e. preliminary and permanent prohibitive injunctions preventing Defendants from executing him by means of an execution policy, including the 2016 Execution Protocol or any other execution policy, new or old, formal or informal, that involves or allows any use of execution drugs manufactured by compounding or using compounding methods, or that involves or allows any use of pharmacists or pharmacies to manufacture the execution drug(s) via compounding, or that involves or allows any use of execution drugs manufactured by any pharmacist or pharmacy;

f. preliminary and permanent prohibitive injunctions preventing Defendants from executing him by means of an execution policy, including the 2016 Execution Protocol or any other execution policy, new or old, formal and/or informal, that involves or allows any use of execution drugs manufactured by compounding or using compounding methods, or that involves or allows any use of pharmacists or pharmacies to manufacture the execution drug(s)

529

via compounding, or that involves or allows any use of execution drugs manufactured by any pharmacist or pharmacy when such pharmacist and the relevant drug-making facility have not been before use in any execution, inspected, investigated, tested and analyzed in ways detailed in this Fifth Amended Complaint;

g. preliminary and permanent prohibitive injunctions preventing Defendants from executing him by means of an execution policy, including the 2016 Execution Protocol or any other execution policy, new or old, formal and/or informal, that involves or allows any use of execution drugs manufactured by compounding or using compounding methods, or that involves or allows any use of pharmacists or pharmacies to manufacture the execution drug(s) via compounding, or that involves or allows any use of execution drugs manufactured by any pharmacist or pharmacy, when such drugs and Defendants' related actions have not been, before use in any execution, inspected, tested and analyzed by an independent entity approved by Plaintiff, to ensure that the drugs are pure, unadulterated, uncontaminated, not expired or beyond-use-date, of the exact type, potency, and concentration, not imported (including not manufactured using imported raw API), and not manufactured, prepared, mixed, assembled, labeled, packaged, stored, transferred, distributed, acquired, or any other such matter, in a way that violates any federal or State of Ohio laws;

530

h. preliminary and permanent prohibitive injunctions preventing Defendants from executing him by means of their execution policy and written Execution Protocol to which they have failed to strictly adhere;

i. preliminary and permanent prohibitory injunctions barring Defendants from executing him by a means that will deny his liberty, life, and property interests in the expectation and receipt of a quick, painless, humane and dignified death, which interests are guaranteed by Ohio Rev. Code § 2949.22(A) and DRC Policy 01-COM-11 and protected by the substantive and procedural elements of the Due Process Clause of the federal constitution's Fourteenth Amendment;

j. preliminary and permanent prohibitory injunctions barring Defendants from execution him by a means that will deny any other fundamental rights as alleged herein;

k. preliminary and permanent mandatory injunctions requiring Defendants to comply with all training and Execution Team personnel requirements set forth in the written Execution Protocol, and prohibiting supervisory personnel from allowing Execution Team member participation in any execution without full compliance with all of the written protocol's substantive training requirements, execution rehearsal training requirements, and other mandatory provisions;

l.  preliminary and permanent prohibitory injunctions as necessary to effectuate Campbell's entitlement to relief under the doctrines of judicial estoppel, judicial admission and/or promissory estoppel, and barring Defendants from executing Campbell using the three-drug method;

m.  preliminary and permanent prohibitive injunctions preventing Defendants from enforcing those provisions of their execution policy and written Execution Protocol that violate Plaintiff's First Amendment rights to free speech;

n.  preliminary and permanent prohibitive injunctions preventing Defendants from executing him by means of an execution policy, including the 2016 Execution Protocol or any other execution policy, new or old, formal and/or informal, that fails to ensure and protect his Due Process right to know, well in advance, the method of execution by which Defendants will attempt to execute him; the source of the drug(s) with which Defendants will attempt to execute him; all relevant information regarding the involvement of any Drug Source Defendants; whether the drug(s) to be used to execute him are pure, unadulterated, uncontaminated, not expired/beyond their labeled use date, of the exact type, potency, and concentration, not imported (including not manufactured using imported raw API), and not manufactured, prepared, mixed, assembled, labeled, packaged, stored, transferred, distributed,

532

acquired, or any other such matter, in a way that violates any federal or State of Ohio laws;

o. preliminary and permanent prohibitive injunctions preventing Defendants from attempting to conduct any further executions until such time as the Court orders otherwise;

p. preliminary and permanent injunctions prohibiting Drug Source Defendants from supplying DRC Defendants with drugs that do not comply with all federal and state law

q. Preliminary and permanent injunctions prohibiting Drug Source Defendants from engaging in actions that violate federal and Ohio state law.

B. Plaintiff requests that this Court grant him declaratory relief under federal law in the form of the following:

a. an Order declaring that Defendants' execution policy and written execution protocol will subject him to a substantial risk of harm, including severe physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified, and/or spectacle execution or attempted execution, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, resulting in cruel and unusual punishment, whether that method is through the policy's Plan 1, Plan 2 or Plan 3, and that Defendants' execution policy and written Execution Protocol fails to ensure against an execution that would constitute cruel and unusual

punishment, and will thus violate Plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution;

b. an Order declaring that Defendants' substantial, documented and admitted deviations and/or pattern of deviations and/or variations from their written Execution Protocol and the safeguards contained therein, as applied in Defendants' execution policy before, during and after administration of the execution policy, creates a substantial risk of harm, including severe physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified, and/or spectacle execution or attempted execution, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, in violation of Plaintiff's rights under the Eighth and Fourteenth Amendments;

c. an Order declaring that Defendants' execution policy and written Execution Protocol denies his life, liberty and property interests in expecting and receiving a quick, painless, humane and dignified death, which interests are created under binding state law in the form of Ohio Revised Code § 2949.22 and/or DRC Policy 01-COM-11, and protected as rights by the substantive and procedural elements of the Fourteenth Amendment's Due Process Clause, resulting in denial of his substantive and procedural due process rights;

534

d. an Order declaring that Defendants' substantial and demonstrated deviations and/or pattern of deviations and/or variations from their execution policy and written Execution Protocol before, during and after administration of the policy and protocol are not necessary to achieve any compelling state interest, and that such deviations and/or variations substantially burden the fundamental rights of the class of persons of condemned inmates subject to a death sentence imposed in Ohio state courts—which includes Plaintiff—under the First, Sixth, Eighth, Ninth and Fourteenth Amendments, in violation of his rights to equal protection under the Fourteenth Amendment to the United States Constitution;

e. an Order declaring that Defendants' substantial and demonstrated deviations and/or pattern of deviations and/or variations from their execution policy and written execution protocol before, during and after administration of the policy and protocol, are unrelated to any legitimate governmental interest, and arbitrarily and irrationally treat or will treat Plaintiff as a class of one differently than others similarly situated, in violation of his rights to equal protection under the Fourteenth Amendment to the United States Constitution;

f. an Order declaring that Defendants' execution policy and written Execution Protocol facially violate Plaintiff's rights protected by the Fourteenth Amendment's Equal Protection Clause because they

allow Defendants to treat similarly situated individuals differently, such disparate treatment burdens the fundamental rights of the class of persons of condemned inmates subject to a death sentence imposed in Ohio state courts—which includes Plaintiff—under the First, Sixth, Eighth, Ninth and Fourteenth Amendments, and it is not necessary to achieve a compelling state interest;

g. an Order declaring that Defendants' execution policy and written Execution Protocol facially violate Plaintiff's rights as a class of one protected by the Fourteenth Amendment's Equal Protection Clause because they allows Defendants to treat Plaintiff differently than similarly situated individuals, without any legitimate governmental interest, irrationally and arbitrarily;

h. an Order declaring that Plaintiff and other condemned inmates have fundamental, unenumerated rights that arise under the principles of liberty and natural law, and these rights are protected by the Ninth Amendment to the United States Constitution, and that Defendants' execution policy and written Execution Protocol, as written and as applied, violate those fundamental rights in violation of the Ninth Amendment;

i. an Order declaring that Plaintiff and other condemned inmates have a fundamental right against being forced to be unwilling, non-consenting subjects of human experimentation that is guaranteed by the fact of their status as United States citizens and protected

by the Privileges or Immunities Clause of the Fourteenth

Amendment, and that Defendants' Execution Protocol, as written

and as applied, violates that fundamental right;

j.   an Order declaring that those portions of Defendants' execution

policy and written Execution Protocol that provide discretion to

governmental actors to impose restrictions on the content and

length of any last statement given before an execution attempt are,

facially and as applied, impermissible content-based restrictions,

and/or violations of the public forum and/or limited public forum

doctrines, and therefore in violation of Plaintiff's rights to free

speech under the First Amendment;

k.   an Order declaring that Plaintiff's right to due process requires

that Defendants notify him no less than 30 days before his

scheduled execution of: which method of execution Defendants will

use; whether Defendants will use execution drugs manufactured

by compounding methods and/or manufactured by a pharmacist

or pharmacy; which pharmacist will make the execution drug(s) to

be used for his execution; and all other relevant information;

l.   an Order requiring full testing, investigation, analysis, and

inspection related to any compounded execution drug(s) and any

Drug Source Defendants and their manufacturing facility to be

involved in any way related to an execution in Ohio, to be done by

an independent party not affiliated or connected or related in any

537

way to the government of the State of Ohio or any Defendants or their agents under 01-COM-11;

m. an Order declaring that the reasoning and analysis in any prospective opinion issued by this Court temporarily and preliminarily enjoining Defendants from executing him applies to preclude Defendants from attempting any further executions until such time as the Court orders otherwise;

n. an Order declaring that Defendants are barred under the doctrines of judicial estoppel, judicial admission and/or promissory estoppel from executing Campbell using the three-drug method; and

o. Such other declaratory relief as Plaintiff may subsequently request.

C.   Plaintiff requests that this Court grant him declaratory relief under Ohio state law in the form of a declaration that Defendants' actions related to execution drugs are violating or will violate federal and state statutes and administrative regulations.

D.   Plaintiff requests that this Court grant such further relief as otherwise requested herein.

E.   Plaintiff requests that this Court grant such further relief as it deems just and proper.

F.   Plaintiff requests that this Court grant him reasonable attorney fees under 42 U.S.C. § 1988 and the laws of the United States, as applicable.

538

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,

**Deborah L. Williams**
Federal Public Defender

by


*/s/ Allen L. Bohnert*
**Allen L. Bohnert (0081544)**
Trial Counsel

David C. Stebbins (0005839)
Adam M. Rusnak (0086983)

Office of the Federal Public Defender
for the Southern District of Ohio
Capital Habeas Unit
10 West Broad Street, Suite 1020
Columbus, Ohio 43215
614-469-2999
614-469-5999 (fax)
Allen_Bohnert@fd.org
David_Stebbins@fd.org
Adam_Rusnak@fd.org

**Counsel for Plaintiff Alva Campbell**

**CERTIFICATE OF SERVICE**

I hereby certify that on January 4, 2018, I filed the foregoing **FIFTH AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, ATTORNEY FEES AND COSTS OF SUIT PURSUANT TO 42 U.S.C. § 1983 AND OTHER RELATED CAUSES OF ACTION ON BEHALF OF PLAINTIFF CAMPBELL** electronically with the Clerk of the United States District Court for the Southern District of Ohio using the CM/ECF system, which will send notification of such filing to the following opposing counsel at the e-mail address on file with the Court:

Thomas Madden
Senior Assistant Attorney General

Charles L. Wille
Principal Assistant Attorney General

Jocelyn Lowe
Assistant Attorney General

Zoe A. Saadey
Assistant Attorney General

Counsel for all DRC Defendants
Office of the Ohio Attorney General
Criminal Justice Section, Capital Crimes Unit
150 East Gay Street, 16th Floor
Columbus, Ohio 43215-3428

*/s/  David C. Stebbins*
**Counsel for Plaintiff Campbell**