# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: OHIO EXECUTION PROTOCOL LITIGATION**<br><br>**This document relates to: PLAINTIFF DAVEL CHINN** | **Case No. 2:11-cv-1016**<br><br>**CHIEF JUDGE EDMUND A. SARGUS, JR.**<br>**Magistrate Judge Michael R. Merz**<br><br>**DEATH PENALTY CASE**<br>**No Execution Date Currently Scheduled** |

## Plaintiff Davel Chinn's
## Second Amended Individual Supplemental Complaint

Plaintiff Davel Chinn, by and through counsel and pursuant to Rules 15(a) and 15(d) of the Federal Rules of Civil Procedure, and pursuant to this Court's Orders of July 8, 2015, (ECF No. 523), and August 13, 2015, (ECF No. 527), as subsequently modified (*see* ECF No. 1395, PageID 52196, granted by notation order, ECF No. 1396), hereby files this Second Amended Individual Supplemental Complaint (the "Individual Supplemental Complaint") pursuant to 42 U.S.C. § 1983 for injunctive and declaratory relief, attorney fees, and costs of suit against the Defendants in the above-captioned consolidated matter.

This Individual Supplemental Complaint fully incorporates by reference each and every statement, allegation, and claim set forth in the Fourth Amended Omnibus Complaint (ECF No. 1252, PageID 45405–45877). **The totality of this Individual Supplemental Complaint and the Fourth**

**Amended Omnibus Complaint comprises Plaintiff's entire Complaint in this case.** The statements, allegations, and claims alleged within this Individual Supplemental Complaint are those that are particular to Plaintiff and they supplement—not supplant—the joint statements, allegations, and claims in the Fourth Amended Omnibus Complaint.  Accordingly, for convenience and efficiency of the Court, any statements, allegations, and claims included in the Fourth Amended Omnibus Complaint are not generally repeated here, but they apply to Plaintiff nonetheless.  This includes, but is not limited to, the prayer for relief, the statement of the case, and the allegations in the Fourth Amended Omnibus Complaint establishing subject matter jurisdiction, venue, the Defendants as Parties, the claimed Causes of Action alleged therein, exhaustion of administrative remedies, the demand for jury trial, and myriad other factual allegations.  For purposes of Plaintiff's individual Complaint in this case, the contents of the Fourth Amended Omnibus Complaint are incorporated by reference here, and the allegations in this Individual Supplemental Complaint are incorporated by reference into the Fourth Amended Omnibus Complaint.

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................... 3

INCORPORATION OF ALLEGATIONS IN THE FOURTH AMENDED
    OMNIBUS COMPLAINT BY REFERENCE .............................. 8

ADDITIONAL RELEVANT FACTS ..................................................... 8

I.    Allegations related to Plaintiff's individual characteristics. .................... 8

II.    Allegations related to requirement to plead alternative execution
    methods or manners........................................................................... 12

    A.    The alternative-method requirement violates Plaintiff's Fifth
        Amendment rights.................................................................... 13

    B.    The alternative execution method requirement, if defined to
        be limited to just different methods of lethal injection,
        creates an impermissible irrebuttable presumption that ORC
        § 2949.22, and DRC Policy 01-COM-11 which amplifies it,
        are constitutional. .................................................................. 13

    C.    Plaintiff is insufficiently competent to be able to
        constitutionally satisfy the alternative-method requirement....... 28

    D.    The alternative-method requirement violates Plaintiff's
        religious liberty rights because it substantially burdens his
        exercise of his sincerely held religious beliefs, does not
        further a compelling governmental interest, and is not the
        least restrictive way for the government to accomplish what
        it desires to do in method-of-execution cases............................ 29

III.    Allegations of alternative execution method(s) or manner. ................... 35

FEDERAL LAW CLAIMS FOR RELIEF AGAINST DRC DEFENDANTS IN
    THEIR OFFICIAL CAPACITIES AND DRUG SOURCE DEFENDANTS.... 35

First Cause of Action: Eighth and Fourteenth Amendment Violations. .......... 35

Second Cause of Action: Fourteenth Amendment Due Process Violations. .... 36

Third Cause of Action: Violations of First, Sixth, Eighth and Fourteenth
    Amendment Rights of Access to Counsel, Access to Courts, Ability
    to Petition for Redress of Grievances, Due Process, and Privileges
    or Immunities of United States Citizenship. ....................................... 36

Fourth Cause of Action: Fourteenth Amendment Equal Protection
    Violations. ........................................................................................ 36

Fifth Cause of Action: Violations of Fundamental Rights Arising Under
    The Principles Of Liberty and/or Natural Law Which Are Protected
    By The Ninth Amendment.................................................................. 36

Sixth Cause of Action: First Amendment Free Speech Clause Violations. ....... 36

Seventh Cause of Action: Fourteenth Amendment Due Process Violation. ...... 36

Eighth Cause of Action: Fourteenth Amendment Due Process Clause
Violations For Experimenting On Non-Consenting Prisoners. .............. 37

Ninth Cause of Action: Fourteenth Amendment Privileges or Immunities
Clause Violations For Experimenting on Non-Consenting Prisoners. ... 37

Tenth Cause of Action: Ex Post Facto Violation. ............................................ 37

Eleventh Cause of Action: Bill of Attainders Violation. ................................. 37

Twelfth Cause of Action: Eighth Amendment Violation—Deliberately
Indifferent and/or Reckless Denial of Resuscitative Health Care
After The Execution Is To Be Completed. ............................................... 37

Thirteenth Cause of Action: Eighth Amendment Violation—Deliberate
Indifference and/or Reckless Disregard Of Serious Medical Needs. ...... 42

Fourteenth Cause of Action: Fourteenth Amendment Due Process
Clause Violation. ..................................................................................... 44

Fifteenth Cause of Action: Violation of Racketeer Influenced and Corrupt
Organizations Act (RICO) alleged against Drug Source Defendants
only. .......................................................................................................... 44

STATE LAW CLAIMS FOR RELIEF AGAINST DEFENDANTS ......................... 44

Sixteenth Cause of Action: Ohio Civil RICO claim against Drug
Source Defendants. ................................................................................. 44

Seventeenth Cause of Action: Claims for Declaratory Judgment Under
Ohio Law Against All Defendants, and for Injunctive Relief Under
Ohio Law Against Drug Source Defendants For Violations of Ohio
Law. .......................................................................................................... 44

Eighteenth Cause of Action: Violation of Ohio Product Liability Act (Ohio
Revised Code § 2307.71 et seq.). ......................................................... 44

Nineteenth Cause of Action: Violation of Ohio Consumer Sales Practices
Act (Ohio Revised Code § 1345.01 et seq.) Against Drug Source
Defendants. ............................................................................................. 45

ADDITIONAL CAUSES OF ACTION AGAINST ALL DEFENDANTS.................. 45

Twentieth Cause of Action: Eighth Amendment Violation Based On
Exposure To Sure Or Very Likely Serious Harm In The Form Of
Severe, Needless Physical Pain And Suffering Due To The Identity
Of The Drugs In The Execution Protocol. .............................................. 45

Twenty-First Cause of Action: Eighth Amendment Violation Based On Exposure To Sure Or Very Likely Serious Harm In The Form Of Severe, Needless Physical Pain And Suffering Due To The Source Of The Drugs In The Execution Protocol.................................................. 48

Twenty-Second Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of Severe Mental Or Psychological Pain, Suffering And Agony Due To The Identity Of The Drugs In The Execution Protocol. .......................... 52

Twenty-Third Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of Severe Mental Or Psychological Pain, Suffering And Torturous Agony Due To The Source Of The Drugs In The Execution Protocol. ..... 56

Twenty-Fourth Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of A Lingering Death. ...................................................................................... 58

Twenty-Fifth Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of Being The Subject Of An Undignified, Spectacle Execution Or Attempted Execution. ............................................................................. 64

Twenty-Sixth Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm in the Form of Being Subjected to an Unwanted, Non-Consensual Human Experimentation of an Execution. ......................................................... 69

Twenty-Seventh Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm in the Form of Maladministration or Arbitrary Administration of the Execution Protocol.................................................................................. 72

Twenty-Eighth Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of Being Subjected To An Execution Protocol That Is Unconstitutional Because It Does Not Preclude The Execution Of An Inmate That Is Categorically Exempt From Execution.................................................. 80

    A.    Plaintiff will be subjected to execution with a facially unconstitutional execution protocol........................................... 80

    B.    No Alternative method required or, in the alternative, Plaintiff's alleged alternative. ..................................................... 81

Twenty-Ninth Cause of Action: Eighth Amendment Violation Based on Deliberate Indifference or Reckless Disregard of Substantial Risk of Harm to Plaintiff. ................................................................................. 81

Thirtieth Cause of Action: Fourteenth Amendment Due Process Violation For Failure To Comply With Federal Investigational New Drug Application Regulations With Respect To The Method And Choice Of Drug To Be Used In Plaintiff's Execution. ....................................... 87

Thirty-First Cause of Action: Equal Protection Violations Related To Defendants' Failures To Comply With The IND Application Laws. ........ 88

Thirty-Second Cause of Action: Religious Freedom Violation Under RLUIPA. ............................................................................................. 88

Thirty-Third Cause of Action: Eighth Amendment Violations Based On Sure Or Very Likely Exposure To Severe Needless Physical Or Mental/Psychological Pain And Suffering Due To Plaintiff's Unique, Individual Characteristics And Application Of The Execution Protocol. ............................................................................... 91

Thirty-Fourth Cause of Action: Equal Protection Violations Related To Plaintiff's Unique, Individual Characteristics And Application Of The Law, Including DRC Defendants' Execution Protocol and Ohio's Execution Statute. .................................................................. 93

Thirty-Fifth Cause of Action: Eighth Amendment Violation Based On Purposeful or Knowing Adoption of a Lethal Injection Protocol Using A Three-Drug Method With Midazolam As The First Drug That Will Cause Severe Physical Pain and Mental Anguish and Suffering. .............................................................................................. 97

Thirty-Sixth Cause of Action:  Eighth Amendment Violation Based On Purposeful or Knowing Adoption of a Lethal Injection Protocol Using Midazolam That Will Cause Severe Physical Pain and Torturous Mental Anguish and Suffering. ........................................... 99

Thirty-Seventh Cause of Action: Eighth Amendment Violations Based on DRC Defendants Resurrecting Their Abandoned Three-Drug Method Even Though They Know It Causes Needless Pain And Suffering, And Had Abandoned It, At Least In Part, For That Reason. ..................................................................................... 101

Thirty-Eighth Cause of Action: Eighth Amendment Violation Based On Devolving Standards of Decency. ....................................... 108

Thirty-Ninth Cause of Action: Eighth Amendment Violation Based On DRC Defendants' Use Of A Three-Drug Execution Method, Regardless Of The Identity Of The First Drug. ................................... 110

Fortieth Cause of Action: Eighth Amendment Violation Based On DRC Defendants' Use Of A Three-Drug Execution Method With Midazolam As The First Of The Three Drugs. .................................... 113

Forty-First Cause of Action: Eighth Amendment Violation Based On DRC Defendants' Use Of Midazolam In The Execution Protocol. ................ 119

Forty-Second Cause of Action: Eighth Amendment Violation Based On DRC Defendants Removal Of Any Required Concentration Of The Execution Drugs Which Is Removal Of A Safeguard That Makes It Sure Or Very Likely That Plaintiff Will Experience Severe Pain And Suffering.............................................................................. 119

Forty-Third Cause of Action: The Doctrines Of Judicial Estoppel And/Or Judicial Admission Bar DRC Defendants From Using The Three-Drug Method Against Plaintiff. .......................................... 123

Forty-Fourth Cause of Action: Administrative Procedures Act Claims. ........ 123

Forty-Fifth Cause of Action: Eighth and Fourteenth Amendment Violations—A three-drug midazolam method of execution violates the Eighth Amendment's prohibition against cruel and usual punishment because it no longer comports with prevailing standards of decency, and thus its use as a method of execution must be categorically barred............................................................ 123

Forty-Sixth Cause of Action: Ohio Corrupt Practices Act Claims Against Individual Defendants in Their Individual Capacity. ......................... 136

Forty-Seventh Cause of Action: Equal Protection Clause Violation based on violations of Administrative Procedures Act. ................................ 136

PRAYER FOR RELIEF.................................................................. 137

DEMAND FOR JURY TRIAL........................................................ 138

CERTIFICATE OF SERVICE ...................................................... 141

## INCORPORATION OF ALLEGATIONS IN THE FOURTH AMENDED OMNIBUS COMPLAINT BY REFERENCE

1892.    Plaintiff incorporates by reference each and every allegation in the Fourth Amended Omnibus Complaint (ECF No. 1252) as if fully rewritten here.

## ADDITIONAL RELEVANT FACTS

1893.    Plaintiff is alleging constitutional violations based on Defendants' current Execution Protocol effective October 7, 2016 and Defendants' intention to execute him via lethal injection as a manner of execution; he is not alleging that Defendants can never execute him by any manner of execution other than lethal injection.  As explained below, Plaintiff is refusing to identify any alternative method of execution as doing so would violate his religious beliefs.

## I.    Allegations related to Plaintiff's individual characteristics.

1894.    Upon information and belief, Plaintiff presents with individual physical characteristics that include, but are not limited to, Plaintiff's history of IV drug use, hospitalization requiring IV treatment, previous difficulty of medical personnel accessing veins and/or inserting an IV line, Hepatitis B and C, hyperlipidemia, high cholesterol, cardiac disease, liver disease, and obesity.

1895.    Plaintiff's individual physical characteristics increase the risk that he will experience a sure or very likely risk of serious harms of the type alleged throughout his Complaint if subjected to execution via DRC Defendants' Execution Protocol.

1896. Plaintiff's physical characteristics of cardiac disease, hyperlipidemia, high cholesterol, and obesity, along with his history of IV drug use, hospitalization requiring IV treatment, and previous difficulty of medical personnel accessing veins and/or inserting an IV line each make it significantly more difficult to achieve and/or maintain peripheral IV access on Plaintiff that is needed to ensure proper delivery of the protective drugs in the protocol. Thus, those characteristics demonstrate that there is a sure or very likely risk that Plaintiff will be subjected to serious pain as Defendants attempt to achieve peripheral IV access on him during the execution process, and when Defendants are unable to maintain peripheral IV access on him.

1897. Plaintiff's physical characteristics of being a male, over the age of 50, having a Body Mass Index of greater than 35, neck size greater than 40 cm. (15.7 inches), and hypertension demonstrate that he presents with several of the risk factors of the STOP-Bang test used to assess the risk of Obstructive Sleep Apnea (OSA). Having those characteristics creates a sure or very likely risk that Plaintiff will obstruct and begin to suffocate and experience the terrible and painful sensations of air hunger after the drugs in Defendants' lethal injection protocol are injected, while Plaintiff remains aware, conscious, or sensate.

1898.   Plaintiff's history of having been administered or using various prescription medications makes it likely that he will metabolize the execution drugs very rapidly, thereby creating a sure or very likely risk that he will not be rendered unaware, unconscious, and insensate throughout his execution, and thus be subjected to the extreme pain associated with the drugs used in Defendants' execution protocol.

1899.   Upon information and belief, Plaintiff presents with individual mental/psychological characteristics that include, but are not limited to, a history of mental illness and head trauma.

1900.   Plaintiff's individual mental/psychological characteristics increase the risk that he will experience a sure or very likely risk of serious harms of the type alleged throughout his Complaint if subjected to execution via DRC Defendants' Execution Protocol.

1901.   Plaintiff's individual mental/psychological characteristics alleged above create a sure or very likely risk that Plaintiff will have a paradoxical reaction to the execution drug(s), thereby increasing the already substantial risk that he will be aware of the physical pain and agony he will be suffering upon injection of the execution drug(s).

1902.   Plaintiff's individual characteristics of his age, his male gender, and his past history of alcohol abuse increase the risk that he will have a paradoxical reaction to the execution drug(s) as well.

1903.    Plaintiff's physical and mental characteristics will result in an unconstitutional execution.

1904.    Moreover, Plaintiff may develop or may currently have additional physical and/or psychological characteristics increasing the sure or very likely risk of serious harm caused by Defendants' Execution Protocol before his execution date.

1905.    Defendants' execution policy, including the written Execution Protocol, fails to account for any unique physical characteristics of Plaintiff that may affect the efficacy of or the risk of harm caused by Defendants' Execution Protocol.

1906.    Defendants' execution policy, including the written Execution Protocol, fails to account for any unique psychological/mental characteristics of Plaintiff that may affect the efficacy of or the risk of harm caused by Defendants' Execution Protocol.

1907.    Upon information and belief, in addition to failing to account for the individual physical characteristics of inmates in the execution policy, including the written Execution Protocol, DRC Defendants have failed to properly prepare or train for any of the unique challenges Plaintiff's physical characteristics may present while carrying out an execution.

1908.    Because Defendants do not account for any individual physical characteristics Plaintiff currently possesses or may develop before his scheduled execution date, his already sure or very likely risk of serious harm will be greatly increased.

## II. Allegations related to requirement to plead alternative execution methods or manners.

1909.   Plaintiff is refusing to allege any alternative methods of execution because doing so would violate his religious beliefs.  In addition, certain of Plaintiff's claims allege that the execution drug(s) planned to be used by Defendants in his execution or any other portion of the Execution Protocol will result in cruel and unusual punishment by making it sure or likely that Plaintiff will be subjected to severe pain and suffering, physically or mentally.  With respect to those claims, Plaintiff also alleges the following regarding a requirement that he must plead and prove a readily available and feasibly implemented alternative execution method or manner to prevail on such an Eighth Amendment challenge and vindicate his fundamental constitutional rights (the "alternative-method requirement").

1910.   The State of Ohio's adoption of the execution-secrecy provisions in Ohio Revised Code § 2949.221–222, as well as this Court's entry of the protective order dated October 26, 2015 (ECF No. 629), will substantially if not entirely impair Plaintiff's ability to allege and prove alternative execution methods and procedures.  To the extent the statute and order are applied in such a way, Plaintiff reserves the right to argue that any alleged defects in his allegations and/or proof with respect to such issues are the result of the secrecy imposed by the statute and order, and not any failure by Plaintiff.

**A.** **The alternative-method requirement violates Plaintiff's Fifth Amendment rights.**

1911.   Plaintiff asserts his Fifth Amendment right against self-incrimination insofar as said constitutional right may permit him to decline to affirmatively plead an alternative method or manner for execution that would not be cruel and unusual. *See United States v. Myers*, 123 F.3d 350, 359 (6th Cir. 1997) ("'[T]he privilege against self-incrimination can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory.'" (quoting *Maness v. Meyers*, 419 U.S. 449, 464 (1975))); *United States v. Rivera*, 201 F.3d 99, 101 (2d Cir. 1999) ("The Fifth Amendment provides a 'safeguard against judicially coerced self-disclosure,' and this safeguard extends to the sentencing phase of a criminal proceeding as well." (citation omitted) (quoting *Mitchell v. United States*, 526 U.S. 314, 322 (1999))).

**B.** **The alternative execution method requirement, if defined to be limited to just different methods of lethal injection, creates an impermissible irrebuttable presumption that ORC § 2949.22, and DRC Policy 01-COM-11 which amplifies it, are constitutional.**

1912.   Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully stated here.

1913.   Defendants, and/or their agents, acting under color of state law, intend to execute Plaintiff using a three-drug midazolam method of execution.

1914.   Plaintiff contends that executing him using a three-drug midazolam method of lethal injection is unconstitutional because that method of execution is a cruel and unusual punishment prohibited under the Eighth Amendment.  Plaintiff argues that Ohio's lethal injection protocol is unconstitutional under an analysis that does not require comparison to any other method or manner of execution.

1915.   Plaintiff's fundamental right to due process under the law, as well as his right to be free from cruel and unusual punishment, will be burdened if he is deprived of a meaningful opportunity to challenge the constitutionality of the method and/or manner of execution by which the state seeks to execute him.

1916.   Ohio exclusively carries out executions by lethal injection.  Ohio Rev. Code § 2949.22(A) provides, in patient part, that "a death sentence shall be executed by causing the application to the person, upon whom the sentence was imposed, of a lethal injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly cause death."

1917.   States may not impose a death sentence upon any inmate using an unconstitutional method of execution.  The "Eighth Amendment *categorically* prohibits the infliction of cruel and unusual punishments."  *Penry v. Lynaugh*, 492 U. S. 302, 330 (1989) (emphasis added).

1918. Accordingly, Ohio law provides for the possibility that lethal injection may be found categorically unconstitutional: "If a person is sentenced to death, and if the execution of a death sentence by lethal injection has been determined to be unconstitutional, the death sentence shall be executed by using any different manner of execution prescribed by law subsequent to the effective date of this amendment instead of by causing the application to the person of a lethal injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly cause death, provided that the subsequently prescribed different manner of execution has not been determined to be unconstitutional." Ohio Rev. Code § 2949.22(C).

1919. The Eighth Amendment forbids punishments of torture and all others in the same line of unnecessary cruelty. *Wilkerson v. Utah*, 99 U.S. 130, 136 (1878). Punishments are cruel when they involve torture or a lingering death, something inhuman and barbarous—more than the mere extinguishment of life. *In re Kemmler*, 136 U.S. 436, 447 (1890).

1920. Likewise, those punishments that no longer comport with prevailing standards of decency are deemed disproportionately cruel to the offender or the offense.

1921. Some methods of punishment themselves are so cruel and/or unusual as to be disproportionately cruel to both the offender and the offense. The Eighth Amendment places these methods of execution

beyond reach.  For example, those that are barbarously cruel such as burning at the stake or burying alive are impermissible sanctions.

1922.   Because the death penalty is the gravest sentence our society may impose, "[p]ersons facing that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution." *Hall v. Florida*, 134 S. Ct. 1986, 2001 (2014).

1923.   "An irrebuttable presumption is a presumption that as a matter of law can never be rebutted, regardless of the facts."  *Hamby v. Neel*, 368 F.3d 549, 567, (6th Cir. 2004) (Batchelder, J., dissenting.)

1924.   "[A] statute creating a presumption which operates to deny a fair opportunity to rebut it violates the due process clause of the Fourteenth Amendment."  *Heiner v. Donnan*, 285 U.S. 312, 329 (1932).  *See also, Vlandis v. Kline*, 412 U.S. 441, 446 (1973) ("Statutes creating permanent irrebuttable presumptions have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments.").

1925.   In *Baze v. Rees*, 553 U.S. 35 (2008), the petitioners' primary contention was that the risks of pain they had identified in the challenged method of execution could be eliminated by adopting certain alternative procedures.

1926.   A plurality of the Supreme Court held that, in the circumstances before the Court in that case alleging a risk of constitutional harm in

the form of pain, allowing the condemned prisoners to challenge a State's execution method merely by showing a slightly or marginally safer alternative would embroil the courts in ongoing scientific controversies beyond their expertise, and would substantially intrude on the role of state legislatures in implementing execution procedures. Therefore, if the constitutional harm being alleged is suffering of pain, then a "substantial risk of serious harm" must be presented by a challenged method of execution in order for a plaintiff to succeed.

1927.   To effectively challenge a protocol posing a substantial risk of pain, a proffered alternative procedure must be "feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain." *Baze*, 553 U.S. at 52.

1928.   In the Sixth Circuit, a method is "available," "feasible," and "readily implemented" if it can be done with "ordinary transactional effort." *Fears v. Morgan*, 860 F.3d 881, 891 (6th Cir. 2017) (en banc); *In re Ohio Execution Protocol Litig. (Campbell & Tibbetts)*, No. 2:11-cv-1016, 2017 U.S. Dist. LEXIS 182406, *70 (S.D. Ohio Nov. 3, 2017) (noting that Sixth Circuit has defined the alternative method "availability" requirement as "ordinary transactional effort").

1929.   A state's refusal to adopt such an alternative in the face of these documented advantages, without a legitimate penological justification for its current execution method, can be viewed as "cruel and unusual." *Baze*, 553 U.S. at 52.

1930.    As alleged in the Causes of Action that follow, using a paralytic drug in an execution is an unnecessary cruelty because more humane alternative manners of execution, including manners other than lethal injection, are available to the State with ordinary transactional effort.

1931.    As alleged in the Causes of Action that follow, using a three-drug midazolam method of execution is an unnecessary cruelty because more humane alternative manners of execution, including manners other than lethal injection, are available to the State with ordinary transactional effort.

1932.    A prisoner who challenges a method of execution as unconstitutionally painful must identify an alternative means by which he may be executed, so a failure to do so would result in the pleading of an incomplete *Baze/Glossip* challenge.  As a result, a federal court would either dismiss the claim or require him to amend his pleadings.  *In re Alva Campbell,* 874 F.3d 454, 465 (6th Cir. 2017).

1933.    As a result, an inmate raising a challenge under *Baze/Glossip* must propose an alternative method of execution that conforms to the requirements explained in those cases and their progeny.  Plaintiff nevertheless refuses to identify any alternative as doing so would violate his religious beliefs.

1934.    Lethal injection, as a manner of execution, can be deemed unconstitutional if: (1) it is found to no longer comport with prevailing standards of decency (*see* Forty-Fifth Cause of Action, below); or (2)

comparative analysis with a proffered alternative manner or method of execution demonstrates a legally sufficient reduction in pain by the available alternative, requiring the use of lethal injection be prohibited; or (3) if it can be shown to be of the type of punishment that is "manifestly cruel and unusual," without regard to any comparison to any other manner or method of execution, *see Baze*, 553 U.S. at 99–100 (citing *Wilkerson v. Utah*, 99 U.S. 130, 135–36 (1879), and *In re Kemmler*, 136 U.S. 436, 446–47 (1890)).

1935.  Nothing in *Baze* or *Glossip* requires that the State actually adopt or implement the inmate's proposed alternative execution method or manner before the inmate can prevail on his "cruel and unusual punishment" challenge to the current method or manner of execution. Rather, the result of a successful execution-method challenge is an injunction against the State's use of that current method or manner.

1936.  The Court in *Glossip* indicated that a condemned inmate could present alternatives not expressly permitted by statute.  Petitioners in that case had "not identified any available drug or drugs that could be used in place of those that Oklahoma is now unable to obtain[, n]or have they shown a risk of pain so great that *other acceptable, available methods must be used*."  135 S. Ct. at 2738 (emphasis added).  Accordingly, the *Glossip* Court indicated that petitioners could have pleaded not only alternative "drugs"—the only method of execution authorized by Oklahoma law, Okla. Stat. Tit. 22, § 1014—

but also "other acceptable, available methods" of execution.  The inescapable conclusion is that if a method or manner of execution creates a "risk of pain" that would violate the Eighth Amendment as compared to known and available alternatives, those alternatives need not be part of a state's existing legislative scheme.

1937. To meaningfully challenge lethal injection, as administered by the State, it must be the case that an inmate may propose non-lethal injection manners of execution to satisfy any burden to plead an alternative execution manner or method.

1938. Some methods of execution are unconstitutional; it follows that there must be a way to prove it.

1939. Likewise, some manners of execution are unconstitutional; it follows that there must be a way to prove it.

1940. If this were not so, and the bounds of an "available" alternative confined solely within that manner or method of execution that is statutorily established, the comparative analysis to other methods or manners would be artificially constrained so as to only compare within the same manner of execution, leading to logical absurdity.

1941. Such a scenario would also permit a State to legislatively insulate its manner and method of execution from any comparative Eighth Amendment challenge by prescribing in statute, down to great detail, not only the specific manner (lethal injection, firing squad, electric chair, etc.) of execution that must be used, but also the granular

details of the method by which such manner of execution must be carried out. By statutorily authorizing only a particular manner of execution performed by a specific method of identified drugs at certain dosages, a State would preemptively preclude an inmate from being able to allege any alternative, and any comparative Eighth Amendment challenge would be barred *per se*.

1942. When a lethal injection protocol is challenged as a method of execution, or when lethal injection is challenged as a manner of execution, due process, equal protection, and the Eighth Amendment do not tolerate artificial restraints on what alternative manners of execution an inmate may propose, nor what a court may consider, in the comparative analysis that is required for such a claim. Such a restraint would also implicate a violation of the Supremacy Clause, U.S. Const. art. VI, cl. 2, because it would elevate the particularities of state law over the Constitution's guarantee of freedom from cruel and unusual punishment.

1943. If the constitutionality of a lethal injection protocol method, or lethal injection as a manner of execution, can only be challenged by proposing an alternative method of lethal injection—*i.e.*, a different lethal injection protocol—than the greater question of whether lethal injection itself is constitutional can never be reached, and challenges to specific lethal injection methods (protocols) are tightly constrained as well, if not outright precluded.

1944.   Requiring that the proposed alternative method(s) must be within the same manner of execution assumes the manner of execution can be constitutionality administered at all.  Thus, such a pleading requirement forces an inmate to assume the constitutionality of lethal injection or have his complaint dismissed.

1945.   Any pleading requirement that prohibits alleging "non-statutory" alternatives contains an irrebuttable presumption that the statutorily authorized method is constitutional.

1946.   If an inmate is not permitted to propose non-lethal injection manners of execution, then Ohio Rev. Code § 2949.22, and DRC Policy 01-COM-11 which amplifies it, contains an irrebuttable presumption that lethal injection is categorically constitutional.

1947.   If an inmate is restricted to proposing only different methods of statutorily authorized manners of execution as alternatives, then regardless of the facts presented on his proposed alternative, he can never categorically challenge his manner of execution.  This creates an irrebuttable presumption the statutorily authorized method is constitutional.  This is unconstitutional.

1948.   Similarly, regardless of the fact that lethal injection may present a likely risk of pain, and that a non-lethal injection method may sufficiently reduce that risk, no amount of evidence or strength of fact would permit consideration of the alternative manner of execution if only different methods of the manner(s) of execution explicitly

authorized by statute qualify for comparison. This creates an irrebuttable presumption the statutorily authorized execution manner is constitutional. This is unconstitutional.

1949. Further, central tenets of due process and equal protection require inmates be permitted to propose alternative manners of execution given that their individual characteristics may make execution by any method of lethal injection impossible and/or any such attempt cruel and unusual.

1950. Without these protections, a Catch-22 is presented for those inmates whose unique medical and physical characteristics render lethal injection as a manner of execution categorically unfeasible.

1951. Such a condemned inmate cannot bring a challenge to lethal injection in habeas corpus, whether as a manner or as to a specific protocol method, because, the Sixth Circuit reasoned in *In re Campbell*, the existence of other, non-lethal-injection alternatives render habeas an inappropriate vehicle for bringing such a challenge because the inmate's execution can still be carried out by some other manner of execution. *See* 874, F.3d 454, 465 (6th Cir. 2017). Yet, if the alternative requirement is confined to permit solely those manners and methods of execution authorized by statute, the same inmate would also be prevented from bringing a satisfactory challenge in this § 1983 litigation, because Ohio law currently provides only for execution by lethal injection. (*See* Decision and Order, ECF No. 1356,

PageID 50499–500 (suggesting that a firing squad was not an "available" alternative because Ohio law requires using lethal injection as the manner of execution).)

1952. This creates a situation in which an inmate can never challenge the constitutionality of Ohio's manner and method of execution as it relates to his unique characteristics, giving rise to an irrebuttable presumption of constitutionality as to Ohio's manner and method of execution applied to him. This is unconstitutional.

1953. To be clear, neither *Baze* nor *Glossip*, nor any other Supreme Court authority, prohibits an inmate from proposing a manner of execution that is not explicitly statutorily authorized by state law.

1954. Likewise, nothing in Ohio state law prohibits the proposal of a non-statutory manner of execution. Ohio statutory law does not bar, prohibit, or otherwise make any method or manner of execution unlawful, other than those which have "been determined to be unconstitutional." *See* Ohio Rev. Code § 2949.22(C).

1955. The statute provides that, in the event lethal injection is determined to be unconstitutional, "the death sentence shall be executed by using *any* different manner of execution prescribed by law subsequent to the effective date of this amendment . . . provided that the subsequently prescribed different manner of execution has not been determined to be unconstitutional." *Id.* (emphasis added).

1956. Because no manner or method of execution has explicitly been found by the Supreme Court of Ohio or the United States Supreme Court to be unconstitutional, no manner or method of execution yet meets this restriction. Thus, under Ohio law, any and all manners of execution, and any and all methods of a particular manner of execution, are legally available until they are ruled unconstitutional.

1957. No alternative manners or methods of execution have been found by the Supreme Court of Ohio or the United States Supreme Court to be unconstitutional. Accordingly, under Ohio law any legitimate alternatives may be adopted by the legislature with ordinary transactional effort, "provided that the subsequently prescribed different manner of execution has not been determined to be unconstitutional."

1958. Additionally, the language of Ohio Rev. Code § 2949.22(C) contemplates that all lethal injection executions, regardless of the method implemented, may one day be ruled unconstitutional: "if the execution of a death sentence by lethal injection has been determined to be unconstitutional . . . ." Because "[a] prisoner who challenges a method of execution as unconstitutionally painful must identify an alternative means by which he may be executed," *In re Campbell*, 874 F.3d at 465 (citing *Glossip*, 135 S. Ct. 2739), failure to permit a non-lethal injection alternative results in the creation of an irrebuttable presumption that lethal injection, or any method thereof, is

constitutional.  In other words, requiring a death row prisoner to challenge the constitutionality of his execution by lethal injection with another lethal injection method creates an irrebuttable presumption that lethal injection, as a manner of execution, is always constitutional.  Likewise, requiring a death row prisoner to challenge the constitutionality of the State's specific lethal injection protocol method with only another lethal injection method, even if lethal injection is shown to be impossible for him, creates an irrebuttable presumption that the lethal injection protocol under challenge is constitutional.

1959. An amendment to Ohio's relevant statutes to permit a non-lethal injection manner of execution that in fact significantly reduces a substantial risk of severe pain is feasible, and also readily available and implemented with regular transactional effort.

1960. For example, in 2014, Ohio passed legislation with great speed and efficiency in order to facilitate the acquisition of lethal injection drugs and other provisions intended to expedite death sentences.

1961. The Lethal Injection Secrecy bill, Amended House Bill 663, which also included other substantive changes impacting death row inmates' appeals, completed the State's entire legislative process—from introduction of the bill text to signing by the Governor into law—in just 40 days.

1962.	Procedurally, Ohio laws allow bills unsigned by the Governor to automatically become law after 10 days, unless the Governor explicitly vetoes a law.  Therefore, the Governor does not have to sign the bill to make it state law.[1]

1963.	The Ohio constitution requires 90 days for a newly enacted law to take effect in order to permit any possible referendum petition to be circulated and filed by the electorate.  However, emergency laws necessary for the immediate preservation of the public peace, health, or safety go into immediate effect and are not subject to the referendum.

1964.	Therefore, even though non-lethal injection alternative manners of execution are not provided for at this time by Ohio law, such changes can easily, and completely, be made within just a few short weeks-i.e., with "ordinary transactional effort."  Consequently, all alternative methods and/or manners of execution are sufficiently available to Ohio through Defendants and/or their agents.

1965.	Finally, because Ohio's capital sentencing judgment entries include and/or incorporate the manner of execution to be used on a condemned inmate, any failure to permit a meaningful challenge to

_____

[1] A Guidebook for Ohio Legislators - Fifteenth Edition 2017-2018, Chapter 5: Enacting Legislation, https://www.lsc.ohio.gov/documents/reference/current/guidebook/chapter5.pdf.

the execution manner or method at the appropriate time violates due process and unconstitutionally infringes upon the right to be free from cruel and usual punishment.

1966.    Since both Ohio and federal courts have found this § 1983 litigation to be the appropriate vehicle for challenging that portion of an inmate's death sentence, and because it is the only opportunity to be heard on this issue, Plaintiff must now have a fair opportunity to show that the Constitution prohibits his execution.  *See, e.g.*, *Scott v. Houk*, 127 Ohio St. 3d 317, 2010-Ohio-5805 ("There is no state postconviction relief or other state-law mode of action to litigate the issue of whether a specific lethal-injection protocol is constitutional under *Baze v. Rees*, 553 U.S. 35, or under Ohio law."); *In re Campbell*, 874 F.3d at 464–65 (challenges to a manner or method of execution not cognizable in habeas).

1967.    In order to protect their constitutional rights, all inmates must, for those Eighth Amendment claims that require a comparative cruelty analysis, be permitted to raise non-lethal injection manners of execution to meaningfully challenge their lethal injection execution and/or their execution by Defendants' Execution Protocol.

C.    **Plaintiff is insufficiently competent to be able to constitutionally satisfy the alternative-method requirement.**

1968.    Notwithstanding any allegation of an alternative execution method or manner pleaded in this Individual Supplemental Complaint, Plaintiff asserts he is unable to constitutionally allege an alternative method or

manner of execution because he is insufficiently competent to be able to knowingly and willingly instruct DRC Defendants how to kill him, and/or he is insufficiently competent to assist his attorney to identify an alternative method or manner of execution because he has insufficient medical training and knowledge to be able to identify such an alternative.

**D.** **The alternative-method requirement violates Plaintiff's religious liberty rights because it substantially burdens his exercise of his sincerely held religious beliefs, does not further a compelling governmental interest, and is not the least restrictive way for the government to accomplish what it desires to do in method-of-execution cases.**

1969. Plaintiff cannot be required to plead or prove an alternative method of execution because such a requirement is a substantial burden on his sincerely held religious beliefs, does not further a compelling governmental interest, and is not the least restrictive means for the government to accomplish its stated interest.

1970. In *Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015), the Supreme Court held that the religious liberty protections in the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb-1 et seq., apply to prisoners through its "sister statute," the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq.

1971. The provisions of RLUIPA governing religious exercise by institutionalized persons "mirrors RFRA," such that RLUIPA "allows prisoners 'to seek religious accommodations pursuant to the same standard as set forth in RFRA.'" *Holt*, 135 S. Ct. at 860.

1972. RFRA/RLUIPA's protections and provisions apply to all Federal law, and the implementation of that law, whether statutory or otherwise. *See* 42 U.S.C. § 2000bb-3(a).

1973. A requirement that Plaintiff must plead or prove an alternative execution method or manner as part of some of his challenges to Defendants' Execution Protocol arises from Federal law in the form of the Supreme Court's ruling in *Glossip v. Gross*, 135 S. Ct. 2726 (2015), which interpreted the Court's ruling in *Baze v. Rees*, 553 U.S. 35 (2008).

1974. The alternative-method requirement—the suicide burden—burdens Plaintiff's exercise of religion.

1975. Plaintiff subjectively believes that pleading and proving an alternative execution method would make him complicit in his own death in a way that is akin to suicide or assisting suicide, which is contrary to his sincerely held Christian beliefs.

1976. Plaintiff is a devout, practicing Christian.

1977. He engages in prayer regularly, studies religious texts, attends congregant services as possible, and has met with a spiritual advisor.

1978. Suicide and assisting in suicide is a violation of Plaintiff's sincerely held religious beliefs.

1979. Plaintiff believes it to be a usurpation of God's prerogative as the creator and sustainer of life. He believes suicide is self-murder.

1980. Plaintiff believes it is sinful and immoral for him to assist or otherwise facilitate his own death.

1981. Furthermore, even assuming for the sake of argument the act of pleading or proving an alternative method of execution might, itself, be an "innocent" action, it is certainly an innocent act that "has the effect of enabling or facilitating the commission of" his death, and is thus a sinful and immoral act that presents a significant burden on Plaintiff's honest convictions. *See Burwell v. Hobby Lobby*, 134 S. Ct. 2751, 2778 (2014).

1982. Thus, being required to choose, or plead, or prove, the manner or method of his death or otherwise assist Defendants to kill him violates Plaintiff's sincerely held religious beliefs, and he cannot be compelled to do so.

1983. To be clear, Plaintiff's opposition to the suicide burden arises from his sincerely held religious beliefs.

1984. The alternative-method requirement does not further a compelling governmental interest.

1985. Because *Glossip* interprets and adds a pleading requirement to a claim raised under a federal statute, it is the federal government's interest, not states' interests, which must be examined.

1986. The federal government has no interest in allowing a state to carry out an execution in a manner that violates the Eighth Amendment.

1987.    The only role that the federal government can legitimately have with respect to a state judgment is determining whether that judgment and the method of carrying out that judgment comports with the Federal Constitution.

1988.    There is no compelling federal governmental interest in states carrying out executions other than requiring that they do so within the limits of the Constitution.

1989.    The pleading requirement, added to § 1983 actions asserting a certain type of Eighth Amendment claim and requiring plaintiffs challenging a method of execution to propose a feasible alternative method, does not further that governmental interest.

1990.    Therefore, applying that standard to Plaintiff violates his rights under RFRA/RLUIPA.

1991.    Even if the relevant governmental interest is the State of Ohio's interest in carrying out executions, that is classified under the law as an important interest, not a compelling one.

1992.    The alternative-method requirement is not the least restrictive means of furthering the governmental interest in question here.

1993.    Even if the federal government has a compelling governmental interest in the states' ability to carry out an execution, or even if the relevant governmental interest is the State of Ohio's interest in seeing criminal sentences and judgments finalized, the method used here—requiring an inmate to choose the manner or method of his death and to assist

the State by demonstrating that manner or method is available and readily implemented—is not the least restrictive method to achieve those interests.

1994. In creating the new pleading requirement for certain § 1983 challenges under the Eighth Amendment to a state's method of execution, the Supreme Court's justification was that capital punishment is legal and there must be a way to carry it out. Requiring Plaintiff to violate the fundamental tenets of his religion, however, and tell the State how to kill him is not the least restrictive means to accomplish the goal of executions that comply with the Eighth Amendment.

1995. There is no logical connection between the burden to prove that a method of execution is unconstitutional under *Baze*, and *Glossip*'s new requirement that it is up to the *inmate*, not the experts at departments of correction, to come up with a constitutionally sound method of execution.

1996. The new pleading requirement is not driven by a desire to ensure that executions are done in a manner compliant with the Eighth Amendment. It is driven by animus toward inmates who challenge methods of execution.

1997. It is also driven by animus toward those—not Plaintiff—who have successfully lobbied large corporations to stop providing execution

drugs to departments of correction. But it is *not* driven by facts or a logical connection to the standard set out in *Baze/Glossip.*

1998. There is no logic in requiring inmates and their attorneys to propose alternative methods of execution. They do not have the expertise to do so. They, particularly in Ohio, do not have access to all of the information about executions to be able to do so. The least restrictive alternative is also the most logical alternative; *i.e.*, requiring departments of correction to follow the Constitution and not use methods of execution that violate the Eighth Amendment by causing a sure or very likely risk of severe pain and needless suffering.

1999. Requiring the Defendants to propose to use an alternative execution method is also a less restrictive means of carrying out the relevant governmental interests.

2000. Plaintiff has alleged the alternative pleading requirement of *Glossip* burdens his exercise of religion by violating his sincerely held religious beliefs, does not further a compelling governmental interest, and even if it did further that interest, it is not the least restrictive method of furthering that interest.

2001. Applying the alternative-method requirement to Plaintiff therefore violates RFRA/RLUIPA, and cannot be enforced here.

2002. Consequently, under the religious freedom protection statutes, Plaintiff can sufficiently allege a *Baze/Glossip* Eighth Amendment

challenge without needing to plead or prove an alternative execution method or manner.

**III. Allegations of alternative execution method(s) or manner.**

2003. Plaintiff does not allege any alternative execution manner or method; doing so would violate his sincerely held Christian religious beliefs, and being forced to do so presents a severe burden on those religious beliefs.

2004. Upon information and belief, there exist alternative methods or manners of execution that are available, feasible, readily implemented, and that significantly reduce the substantial risk of severe harm posed by Defendants' current execution method as alleged in the following Causes of Action as applicable.

**FEDERAL LAW CLAIMS FOR RELIEF AGAINST DRC DEFENDANTS IN THEIR OFFICIAL CAPACITIES AND DRUG SOURCE DEFENDANTS**

**First Cause of Action: Eighth and Fourteenth Amendment Violations.**

2005. The First Cause of Action was previously moved from the Third Amended Omnibus Complaint to be, as applicable, re-alleged in parts or in whole in the various Plaintiffs' Amended Individual Supplemental Complaints. Claims alleging violations of the Eighth Amendment as incorporated against the states by the Fourteenth Amendment are now included below in Plaintiff's Amended Individual Supplemental Complaint.

**Second Cause of Action: Fourteenth Amendment Due Process Violations.**

2006.    Plaintiff's Second Cause of Action is alleged in the Fourth Amended

Omnibus Complaint.

**Third Cause of Action: Violations of First, Sixth, Eighth and Fourteenth Amendment Rights of Access to Counsel, Access to Courts, Ability to Petition for Redress of Grievances, Due Process, and Privileges or Immunities of United States Citizenship.**

2007.    Plaintiff's Third Cause of Action is alleged in the Fourth Amended

Omnibus Complaint.

**Fourth Cause of Action: Fourteenth Amendment Equal Protection Violations.**

2008.    Plaintiff's Fourth Cause of Action is alleged in the Fourth Amended

Omnibus Complaint.

**Fifth Cause of Action: Violations of Fundamental Rights Arising Under The Principles Of Liberty and/or Natural Law Which Are Protected By The Ninth Amendment.**

2009.    Plaintiff's Fifth Cause of Action is alleged in the Fourth Amended

Omnibus Complaint.

**Sixth Cause of Action: First Amendment Free Speech Clause Violations.**

2010.    Plaintiff's Sixth Cause of Action is alleged in the Fourth Amended

Omnibus Complaint.

**Seventh Cause of Action: Fourteenth Amendment Due Process Violation.**

2011.    Plaintiff's Seventh Cause of Action is alleged in the Fourth Amended

Omnibus Complaint.

**Eighth Cause of Action: Fourteenth Amendment Due Process Clause Violations For Experimenting On Non-Consenting Prisoners.**

2012.    Plaintiff's Eighth Cause of Action is alleged in the Fourth Amended

Omnibus Complaint.

**Ninth Cause of Action: Fourteenth Amendment Privileges or Immunities Clause Violations For Experimenting on Non-Consenting Prisoners.**

2013.    Plaintiff's Ninth Cause of Action is alleged in the Fourth Amended

Omnibus Complaint.

**Tenth Cause of Action: Ex Post Facto Violation.**

2014.    Plaintiff's Tenth Cause of Action is alleged in the Fourth Amended

Omnibus Complaint.

**Eleventh Cause of Action: Bill of Attainders Violation.**

2015.    Plaintiff withdrew his Eleventh Cause of Action in the Fourth

Amended Omnibus Complaint.

**Twelfth Cause of Action: Eighth Amendment Violation— Deliberately Indifferent and/or Reckless Denial of Resuscitative Health Care After The Execution Is To Be Completed.**

2016.    Plaintiff incorporates by reference each and every statement and

allegation set forth throughout this Amended Complaint as if fully

rewritten here.

2017.    Under Defendants' Execution Protocol, Defendants will announce the

point at which they believe the execution has been completed, *i.e.*,

when Defendant Warden declares Plaintiff dead by announcing a time

of death.  But Ohio Revised Code § 2108.40 provides the governing

definition of when death has legally occurred in Ohio, and it depends on an examination using "accepted medical standards" to "observe" *and* "conduct[] a test to determine that the irreversible cessation of all functions of the brain has occurred." Ohio Rev. Code § 2108.40. Defendants do not, have not, and will not conduct any such test using "accepted medical standards," because such a standard would require using technological means that neither Defendants nor the "appropriate medical professional" identified in 01-COM-11 actually use during the execution process. Section 2108.40 is found within the section of Ohio's Revised Code that comprises the Revised Uniform Anatomical Gift Act, and it thus appears to have been adopted for, among other reasons, to protect a variety of persons, including protecting one who is thought to be dead from the ultimate indignity of being treated as if he is dead while he remains yet still alive.

2018. There is a substantial risk, of which Defendants are aware but which they recklessly disregard and/or to which they are deliberately indifferent, that if Plaintiff is executed under Defendants' Execution Protocol he will not be clinically and statutorily dead when the execution has been declared completed.

2019. There is a substantial risk that Defendants will fail to plan, prepare for, or order medical treatment after heart and lung sounds are no longer detected and the inmate declared "dead" (and thus his death

sentence completed), but when the inmate will still be alive and able to be resuscitated with proper medical care.

2020. Defendants have had ample time in advance of any execution and in advance of adopting the Execution Protocol to fully consider the substantial possibility that a condemned inmate will not be clinically and statutorily dead when the execution has been declared completed pursuant to the Execution Protocol, but have taken no corrective actions in that regard.

2021. A person's breathing and circulatory functions, and a person's brain stem functions, the irreversible cessation of which defines death under Ohio law, may be resuscitated through appropriate medical care for some period of time after receiving the execution drugs contemplated in Defendants' Execution Protocol.

2022. Upon information and belief, Defendants will not provide resuscitative care to Plaintiff after the time when his execution is concluded under Defendants' understanding of the Execution Protocol and its administration.

2023. Defendants know but recklessly disregard and/or are deliberately indifferent to the fact that their Execution Protocol contains no provisions for the appropriate medical care of an inmate whose sentence of death has been carried out, but who remains clinically and statutorily alive.

2024. Defendants make no provisions for emergency resuscitative care measures in the Death House, whether required by the Execution Protocol or otherwise, even after Defendants were put on notice of a significant risk of problems in advance of an execution, such as occurred involving the lingering, spectacle executions of Dennis McGuire, Clayton Lockett, or Joseph Wood.

2025. Upon information and belief, Defendants are aware of the significant risk that problems may arise during an execution attempt, but they recklessly disregard and/or are deliberately indifferent to that risk by refusing to address the risk in their repeated revisions of the Execution Protocol.

2026. Upon information and belief, Defendants are aware of the significant risk that an inmate to whom they apply their Execution Protocol will remain clinically and statutorily alive even following completion of the Execution Protocol as to that inmate, and Defendants recklessly disregard and/or are deliberately indifferent to that risk because Defendants do not provide appropriate medical care to inmates whose sentences of death have been carried out in accordance with Defendants' Execution Protocol, even though they remain clinically and statutorily alive.

2027. Defendants' refusal to provide appropriate medical care to Plaintiff after he has been declared dead, but remains alive, constitutes deliberate indifference to unnecessary pain and suffering in violation

of the Eighth and Fourteenth Amendments.  *Estelle v. Gamble*, 429

U.S. 97, 104–05 (1976).

2028.    The need to resuscitate Plaintiff, after his sentence has been

completed but when he remains clinically and statutorily alive, is a

serious medical need Defendants are constitutionally obligated under

the Eighth Amendment to satisfy, but which they recklessly disregard

and with deliberate indifference fail to satisfy, thereby violating

Plaintiff's rights protected by the Eighth Amendment.

2029.    Plaintiff is not required to allege an alternative execution method for

this Cause of Action.

2030.    However, should he be required to plead an alternative, Plaintiff

incorporates by reference the Alternatives identified in the Twenty-

Fifth Cause of Action below, incorporated here by reference, which are

known, feasible, readily implemented and available alternative

execution method(s) and procedures that substantially reduce the

substantial risk of Plaintiff suffering the serious harms alleged in this

Cause of Action.  The foregoing alternative execution methods and

procedures are available to and could be readily implemented by

Defendants.  None of the alternative methods require a physician for

proper operation and implementation.

**Thirteenth Cause of Action: Eighth Amendment Violation—
Deliberate Indifference and/or Reckless Disregard Of Serious
Medical Needs.**

2031.   Plaintiff incorporates by reference each and every statement and
allegation set forth throughout this Amended Complaint as if fully
rewritten here.

2032.   Under Defendants' Execution Protocol, controlled substances will be
used to carry out a lethal-injection execution, namely pentobarbital
and/or thiopental sodium, and/or midazolam.

2033.   Dispensing a controlled substance such as pentobarbital or thiopental
sodium or midazolam requires a valid patient-specific prescription,
which may only be issued under federal and state law for a legitimate
medical purpose, in the best interests of the patient.

2034.   Upon information and belief, one or more Defendants will issue an
order to procure or dispense or distribute or administer execution
drugs.

2035.   Upon information and belief, Defendants know that a serious risk to
Plaintiff's serious medical needs will arise if Defendants issue an order
to procure or dispense or distribute or administer drugs that are
specifically intended to kill or help facilitate killing Plaintiff by causing
him to suffocate to death or by causing him a painful heart attack.

2036.   Defendants are deliberately indifferent to, and recklessly disregard,
Plaintiff's serious medical needs when Defendants issue an order to
procure or dispense or distribute or administer drugs that are

specifically intended to kill or facilitate killing Plaintiff by causing him to suffocate to death or by causing him a painful heart attack.

2037. Defendants are deliberately indifferent to, and recklessly disregard, the fact that such an order is not a valid order under federal and state law because the drugs will not be used to treat a legitimate medical need nor will they be used to protect the best interests of the patient.

2038. Defendants are deliberately indifferent to, and recklessly disregard, that issuing an order related to execution drugs that will be compounded creates a substantial risk that Plaintiff will experience severe harm, including torturous physical pain and/or mental suffering and agony.

2039. Defendants are deliberately indifferent to, and recklessly disregard, that issuing an order related to execution drugs that will be manufactured overseas and then illegally imported, i.e., smuggled, into Ohio creates a substantial risk that Plaintiff will experience severe harm, including torturous physical pain and/or mental suffering and agony.

2040. By facilitating procurement, dispensing, distribution or administration of execution drugs used to kill Plaintiff by issuing an order related to those drugs, Defendants demonstrate deliberate indifference and a reckless disregard for Plaintiff's serious medical needs, in violation of Plaintiff's Eighth Amendment rights. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

2041. Plaintiff is not required to plead an alternative execution method for this Cause of Action.

**Fourteenth Cause of Action: Fourteenth Amendment Due Process Clause Violation.**

2042. Plaintiff's Fourteenth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Fifteenth Cause of Action: Violation of Racketeer Influenced and Corrupt Organizations Act (RICO) alleged against Drug Source Defendants only.**

2043. Plaintiff's Fifteenth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**STATE LAW CLAIMS FOR RELIEF AGAINST DEFENDANTS**

**Sixteenth Cause of Action: Ohio Civil RICO claim against Drug Source Defendants.**

2044. Plaintiff's Sixteenth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Seventeenth Cause of Action: Claims for Declaratory Judgment Under Ohio Law Against All Defendants, and for Injunctive Relief Under Ohio Law Against Drug Source Defendants For Violations of Ohio Law.**

2045. Plaintiff's Seventeenth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Eighteenth Cause of Action: Violation of Ohio Product Liability Act (Ohio Revised Code § 2307.71 et seq.).**

2046. Plaintiff's Eighteenth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Nineteenth Cause of Action: Violation of Ohio Consumer Sales Practices Act (Ohio Revised Code § 1345.01 et seq.) Against Drug Source Defendants.**

2047. Plaintiff's Nineteenth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

## ADDITIONAL CAUSES OF ACTION AGAINST ALL DEFENDANTS

**Twentieth Cause of Action: Eighth Amendment Violation Based On Exposure To Sure Or Very Likely Serious Harm In The Form Of Severe, Needless Physical Pain And Suffering Due To The Identity Of The Drugs In The Execution Protocol.**

2048. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2049. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of severe, needless physical pain and suffering that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to the identity of the drugs called for in the Execution Protocol.

2050. Defendants know, or should know, or recklessly disregard that the drugs in their Execution Protocol create a sure or very likely risk of severe physical pain and suffering from suffocation, or from a heart attack, or from the searing physical pain upon injection of the drugs into Plaintiff.

2051. Plaintiff's individual physical and/or psychological characteristics and conditions create a substantial risk that employing Defendants'

Execution Protocol to execute him will subject him to a sure or very likely risk of serious harm in the form of severe, needless physical pain and suffering, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, as more specifically alleged in Section I above.

2052. Plaintiff's individual physical and/or psychological characteristics and conditions create a sure or very likely risk that achieving peripheral IV access on him will present a problematic situation analogous to achieving IV access in the previous situations in which Defendants were unable to readily obtain IV access, which, in turn, creates a sure or very likely risk that Plaintiff will suffer serious harm in the form of severe, needless physical pain and suffering as Defendants stab him with needles repeatedly, and that substantial risk is arbitrary and capricious, or the objectively intolerable risk of such harm that Defendants unjustifiably ignore, as more specifically alleged in Section I above.

2053. DRC Defendants typically and historically inject only a single 5-gram dose of the barbiturate execution drug required under the Execution Protocol Plan 1 or Plan 2.

2054. There is a sure or very likely risk that Plaintiff's brain will begin to regain consciousness or awareness of what is happening to him just minutes after injection of thiopental sodium or pentobarbital as

currently contemplated in the Execution Protocol and as currently administered by DRC Defendants.

2055. Upon information and belief, DRC Defendants will only inject a single 500 mg dose of midazolam required under the Execution Protocol Plan 3.

2056. There is a sure or very likely risk that Plaintiff's brain will begin to regain consciousness or awareness of what is happening to him just minutes after injection of midazolam as currently contemplated in the Execution Protocol and as administered by DRC Defendants.

2057. There is a sure or very likely risk that Defendants will inject the paralytic drug in their three-drug protocol within approximately one minute or less after completing injection of the midazolam, meaning the full 500 mg. of midazolam will not have had sufficient time to reach its necessary peak effectiveness before Defendants inject the paralytic into Plaintiff. That, in turn, makes it sure or very likely that Plaintiff will experience the sensations of paralysis and suffocation as the paralytic agent rapidly takes effect.

2058. There is a sure or very likely risk that Plaintiff will not be rendered fully unconscious, unaware and unable to feel or experience pain, and thus he will be aware at some level while he is experiencing the physical pain and suffering related to suffocating and/or suffering a heart attack following injection of execution drug(s) under DRC

Defendants' Execution Protocol and/or the pain and suffering associated with dying from a lethal injection of the drugs.

2059. Due to his individual physical and/or psychological conditions, there is a sure or very likely risk that Plaintiff will have a paradoxical reaction to the execution drug(s), thereby increasing the already substantial risk that he will be aware of the physical pain and agony he will be suffering upon injection of the execution drug(s), as more specifically alleged in Section I above.

2060. A rapid injection rate of midazolam (higher than 0.2 ml/s) has been shown to substantially increase the risk of paradoxical reactions to midazolam, even in the absence of other paradoxical reaction risk factors.

2061. DRC Defendants' typical injection rate, and the rate at which they will inject the execution drugs into Plaintiff, is greater than 0.2 ml/s. Accordingly, the rapid rate at which DRC Defendants will inject midazolam into Plaintiff further elevates the risk that Plaintiff will suffer a paradoxical reaction during his execution.

2062. The foregoing risks are substantial.

**Twenty-First Cause of Action: Eighth Amendment Violation Based On Exposure To Sure Or Very Likely Serious Harm In The Form Of Severe, Needless Physical Pain And Suffering Due To The Source Of The Drugs In The Execution Protocol.**

2063. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2064. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of severe, needless physical pain and suffering that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to the source of the drugs called for in the Execution Protocol.

2065. Defendants know, or should know, or recklessly disregard that using improperly compounded or illegally imported or otherwise illegally sourced execution drugs to administer their Execution Protocol creates a sure or very likely risk of serve physical pain and suffering.

2066. Plaintiff is subject to a sure or very likely risk of serious harm in the form of severe, needless physical pain and suffering, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to insufficient procedural protections related to and concerns about identity, purity, contamination, concentration, pH levels, sterility, adulteration, misbranding, expiration/beyond use date, improper storage or handling, manufacturer, dosage or administration method of the drugs to be administered to cause his death under the Execution Protocol.

2067. The recent amendments to Ohio statutory code, codified in Ohio Revised Code § 2949.221, create a sure or very likely risk of harm by themselves, and increase the risk of harm that is already substantial, by attempting to keep secret a broad range of information relevant to

what Defendants will subject Plaintiff to in the course of carrying out his execution.

2068.    Compounded pentobarbital and compounded thiopental sodium have a significant potential to be extremely alkaline, which causes extreme pain upon interaction with the blood in a person's circulatory system.

2069.    There is a substantial, objectively intolerable risk that Drug Source Defendants will, whether intentionally or recklessly, manufacture or compound execution drug(s) to a pH level that is either too high or too low.

2070.    There is therefore a substantial, objectively intolerable risk that DRC Defendants will inject compounded execution drugs of the improper pH level into Plaintiff's bloodstream, thereby causing Plaintiff to experience intense, burning physical pain.

2071.    There is a substantial, objectively intolerable risk that Defendants Pharmacies # 1–100 and Pharmacists # 1–100 will, whether intentionally or recklessly, compound execution drug(s) that particulate or fall out of solution, which DRC Defendants will inject into Plaintiff, and the injection of compounded execution drugs that have particulated or fallen out of solution will cause Plaintiff to experience intense, burning physical pain.

2072.    There is at least a sure or very likely risk—and certainly an objectively intolerable risk—that the Drug Source Defendants will, whether intentionally or recklessly, include contaminant or some additional or

unknown ingredient(s) in the execution drug(s) he or she manufactures or compounds which will not be visibly or otherwise detectable by analytical testing for potency or identity called for in the Execution Protocol, but which will, nevertheless, cause torturous physical pain and suffering to Plaintiff upon injection.

2073. There is at least a sure or very likely risk, and an objectively intolerable risk, that Defendants will improperly label, package, ship, store, and/or prepare execution drugs such that there is a substantial risk that the drugs as ultimately injected will cause Plaintiff torturous physical pain and suffering because they have become adulterated or are otherwise no longer precisely the product compounded or manufactured by Drug Source Defendants or no longer precisely the product tested by DRC Defendants.

2074. There is at least a sure or very likely risk, and an objectively intolerable risk, that Defendants will improperly package, ship, store, and/or prepare execution drugs such that the data obtained in analytical testing required approximately 30 days before execution by the Execution Protocol will be critically incorrect, and the drugs injected into Plaintiff will be sub-potent or super-potent or otherwise adulterated or not precisely the drugs required by the Execution Protocol, therefore subjecting Plaintiff to a substantial risk of severe torturous physical pain and suffering.

2075.   There is a sure or very likely risk that Plaintiff will not be rendered fully unconscious, unaware, and unable to experience or feel pain, and thus he will be conscious or aware at some level while he is experiencing the physical pain and suffering related to severe burning sensations following injection of improperly compounded or illegally imported or sourced execution drug(s) under DRC Defendants' Execution Protocol.

2076.   Due to his individual physical and/or psychological conditions, there is a substantial risk that Plaintiff will have a paradoxical reaction to the improperly compounded or illegally imported or sourced execution drug(s), thereby increasing the already substantial risk that he will be conscious, aware of or sensate to the physical pain and agony he will be suffering upon injection of the improperly compounded or illegally imported execution drug(s), as more specifically alleged in Section I above.

2077.   The foregoing risks are substantial.

**Twenty-Second Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of Severe Mental Or Psychological Pain, Suffering And Agony Due To The Identity Of The Drugs In The Execution Protocol.**

2078.   Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2079.  Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of severe mental or psychological pain, suffering and torturous agony that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants ignore, due to the identity of the drugs in the Execution Protocol.

2080.  Because consciousness or awareness of painful stimuli comes back rapidly, within a matter of minutes, after injection of pentobarbital or thiopental sodium or midazolam, there is a sure or very likely risk that Plaintiff will not be rendered fully unconscious, unaware, and unable to experience or feel pain while he is experiencing the agonizing, terrifying and horrific mental pain and suffering related to suffocating and/or suffering a heart attack and/or the pain associated with injecting the paralytic drug and potassium chloride following injection of execution drug(s) under Defendants' Execution Protocol, and thus that Plaintiff's brain will be aware of what he is experiencing.

2081.  There is a sure or very likely risk that Defendants will inject the paralytic drug in their three-drug protocol within approximately one minute or less after completing injection of the midazolam, meaning the full 500 mg. of midazolam will not have had sufficient time to reach its necessary peak effectiveness before Defendants inject the

paralytic into Plaintiff. That, in turn, makes it sure or very likely that Plaintiff will experience the sensations of paralysis and suffocation as the paralytic agent rapidly takes effect.

2082. Defendants know, or should know, or recklessly disregard that using the drugs required in the Execution Protocol creates a sure or very likely risk of severe, terrifying, torturous, horrifying and agonizing mental torture, suffering and mental or psychological pain from anticipating and being aware of suffocating to death or suffering a painful heart attack or other torturous physical pain.

2083. This awareness is distinct, and in addition to, a generalized awareness or fear that Plaintiff is being put to death. Rather, it is the specific and acute terror that accompanies an attempt to draw breath, and a desire to breathe, when one is unable to; as well as the awareness that one is completely paralyzed and unable to act, yet still conscious and sensate to the suffocation and attendant pain that is brought on by the drugs in Defendants' Execution Protocol.

2084. Plaintiff's individual physical and/or psychological characteristics and conditions create a sure or very likely risk that employing Defendants' Execution Protocol to execute him will subject him to serious harm in the form of severe mental or psychological pain, suffering and torturous agony that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants ignore, or an objectively

intolerable risk of such harm that Defendants unjustifiably ignore, as more specifically alleged in Section I above.

2085. Plaintiff's individual physical and/or psychological characteristics and conditions create a substantial risk that achieving peripheral IV access on him will present a problematic situation analogous to achieving IV access in the previous situations in which Defendants were unable to readily obtain IV access, which, in turn, creates a sure or very likely risk that Plaintiff will suffer serious harm in the form of severe mental or psychological pain, suffering and torturous agony as Defendants stab him with needles repeatedly, and that risk is arbitrary and capricious, or the objectively intolerable risk of such harm that Defendants unjustifiably ignore, as more specifically alleged in Section I above.

2086. There is a sure or very likely risk that Plaintiff will have a paradoxical reaction to the execution drug(s), thereby increasing the already substantial risk that he will be aware of the physical pain and agony he will be suffering upon injection of the execution drug(s), in turn elevating the substantial risk that Plaintiff will experience agonizing, terrifying and horrific mental pain and suffering as a result.

2087. Furthermore, Plaintiff's history of alcohol and substance abuse, mental illness, and head trauma place him at even greater risk of suffering a paradoxical reaction if he is executed using the drugs in the Execution Protocol, especially when Defendants inject the

execution drugs at too fast a rate, thereby significantly increasing the risk that he will be aware of suffering severe pain and needless suffering as the execution proceeds, as well as the accordant risk of severe, horrifying mental pain and suffering, as more specifically alleged in Section I above.

2088. The foregoing risks are substantial.

**Twenty-Third Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of Severe Mental Or Psychological Pain, Suffering And Torturous Agony Due To The Source Of The Drugs In The Execution Protocol.**

2089. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2090. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of severe mental or psychological pain, suffering and torturous agony that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants ignore, due to the source of the drugs in the Execution Protocol.

2091. Defendants know, or should know, or recklessly disregard that using drugs in the Execution Protocol that are improperly compounded or illegally imported or otherwise illegally sourced execution drugs creates a variety of substantial risks of serve physical pain and

suffering identified herein, of which Plaintiff is aware, thereby creating a sure or very likely risk of severe, terrifying, torturous, horrifying and agonizing mental torture, suffering and mental and psychological pain from anticipating and being aware of his impending death at Defendants' hands using such drugs.

2092.    Because consciousness or awareness of painful stimuli comes back rapidly, within a matter of minutes after injection of pentobarbital or thiopental sodium or midazolam, there is a sure or very likely risk that Plaintiff will not be rendered sufficiently unconscious, unaware and unable to feel or experience pain while he is experiencing the agonizing, terrifying and horrific mental pain and suffering related to severe burning sensations or anaphylactic shock caused by improperly compounded or manufactured execution drugs following injection of such drug(s) under Defendants' Execution Protocol, and thus that Plaintiff's brain will be aware of what he is experiencing.

2093.    There is a sure or very likely risk that Defendants will inject the paralytic drug in their three-drug protocol within approximately one minute or less after completing injection of the midazolam, meaning the full 500 mg. of midazolam will not have had sufficient time to reach its necessary peak effectiveness before Defendants inject the paralytic into Plaintiff.  That, in turn, makes it sure or very likely that Plaintiff will experience the sensations of paralysis and suffocation as the paralytic agent rapidly takes effect.

2094. This awareness is distinct, and in addition to, a generalized awareness or fear that Plaintiff is being put to death. Rather, it is the specific and acute terror that accompanies an attempt to draw breath, and a desire to breathe, when one is unable to; as well as the awareness that one is completely paralyzed and unable to act, yet still conscious and sensate to the suffocation and attendant pain that is brought on by the drugs in Defendants' Execution Protocol.

2095. The foregoing risks are substantial.

**Twenty-Fourth Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of A Lingering Death.**

2096. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2097. A lethal-injection execution carried out under Ohio law is explicitly required to cause death "quickly and painlessly." Ohio Rev. Code § 2949.22.

2098. The drugs in DRC Defendants' Execution Protocol create an objectively intolerable risk of causing a lingering death that is prohibited by the Eighth Amendment. *See Baze*, 553 U.S. at 49 ("Punishments are cruel when they involve torture or a lingering death . . . .") (internal quotation marks omitted); *see also In re Kimmler*, 136 U.S. 436, 447 (1890); *Wilkerson v. State of Utah*, 99 U.S. 130, 135 (1878).

2099. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiffs will suffer a sure or very likely risk of serious harm in the form of a lingering death that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants ignore.

2100. There is a sure or very likely risk under DRC Defendants' Execution Protocol that Plaintiff will remain alive for a significant period of time after his execution begins, constituting a lingering death prohibited by the Eighth Amendment.

2101. Defendants know, or should know, or recklessly disregard that administering Defendants' Execution Protocol, whether using Plan 1, Plan 2 or Plan 3, creates a sure or very likely risk of harm in the form of a lingering death.

2102. Defendants know, or should know, or recklessly disregard that using improperly compounded or illegally imported or otherwise illegally sourced execution drugs under the Execution Protocol creates a sure or very likely risk of harm in the form of a lingering death, as exemplified by recent executions by the State of Texas of several inmates that took 20 minutes or more following injection of compounded pentobarbital.

2103. Upon information and belief, the compounded pentobarbital used in recent Texas executions was not properly compounded in accordance with the regulations, statutes and standards to which an Ohio-

licensed 503A compounding pharmacy or 503B outsourcing facility is subject.

2104. Plaintiff is subject to a sure or very likely risk of serious harm in the form of a lingering death, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to the identity, sterility, concentration, manufacturer, dosage or administration method of the drugs to be administered to cause his death under the Execution Protocol.

2105. A death occurring over a period of ten minutes or more after administration of drug is a lingering death.

2106. A death in which a condemned inmate remains clinically alive and statutorily alive for 26 minutes, 45 minutes or 70 minutes after injection of the lethal drugs is a lingering death.

2107. Under DRC Defendants' current practices and Execution Protocol under Plan 1 or Plan 2, DRC Defendants use no more than 5 grams of pentobarbital or thiopental sodium from an unknown source, and then they wait until breathing and heart sounds are not discernable, without further administration of any additional doses of lethal drug even though one additional dose is contemplated, without using scientifically reliable methods to determine whether irreversible cessation of breathing and brain functions have occurred, and without administration of any resuscitation efforts if the condemned inmate is still alive after 10 minutes or more.

2108.  Under DRC Defendants' current practices and Execution Protocol under Plan 3, it is believed that DRC Defendants will use no more than 500 mg of midazolam from an unknown source, followed at an indeterminate time by injections of a paralytic drug and potassium chloride, and then they will wait until breathing and heart sounds are not discernable, without further administration of any additional doses of any of the three drugs, even though one additional dose is contemplated, without using scientifically reliable methods to determine whether irreversible cessation of breathing and brain functions have occurred, and without administration of any resuscitation efforts if the condemned inmate is still alive after 10 minutes or more.

2109.  Other than a change in the drugs used and some added steps as relevant, the procedures identified in the previous paragraph that will be used to administer DRC Defendants' Execution Protocol are the same or substantially similar procedures DRC Defendants employed during the execution of Dennis McGuire.

2110.  There is a sure or very likely risk that DRC Defendants' use of the procedures set out in the Execution Protocol, or substantially similar procedures, to execute Plaintiff will produce a lingering death. That risk is illustrated by the lingering death inflicted by DRC Defendants as they used essentially identical procedures when executing McGuire. That risk is also illustrated by the lingering death inflicted

on Lockett over 45 minutes using the same drugs Defendants will use in Plan 3. That risk is also illustrated by the lingering death inflicted on Wood using haphazardly timed bolus injections totaling at least 750 mg of midazolam (combined with a drug that allegedly caused the midazolam to act even faster than acting alone) over a two hour period.

2111. It is substantially likely that McGuire, by virtue of his heightened risk of obstruction, suffocated to death faster than one who does not present the same risk of obstruction.

2112. Thus it is substantially likely that if an inmate does not experience obstruction after being injected with the execution drugs, his death will be a lingering death taking even longer than what occurred with the McGuire execution.

2113. Because DRC Defendants believe that nothing noteworthy, abnormal, unexpected, inhumane, undignified, unlawful, or otherwise unconstitutional occurred during the McGuire execution, and that the process "worked well," there is a substantial risk that DRC Defendants will again administer their Execution Protocol procedures in a way that imposes a lingering death on Plaintiff.

2114. Defendants know or should know or recklessly disregard the evidence related to the McGuire, Lockett and Wood executions that implicate significant operative parts of their Execution Protocol.

2115.	Plaintiff's individual physical and/or psychological characteristics and conditions create a sure or very likely risk that employing Defendants' Execution Protocol to execute him will subject him to serious harm in the form of a lingering death that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, as alleged more specifically in Section I above.

2116.	Plaintiff's individual physical and/or psychological characteristics and conditions create a sure or very likely risk that achieving peripheral IV access on him will present a problematic situation analogous to achieving IV access in the previous situations in which Defendants were unable to readily obtain IV access, which, in turn, creates a sure or very likely risk that Plaintiff will suffer serious harm in the form of a lingering execution process leading to a lingering death as Defendants stab him with needles repeatedly, and that risk is arbitrary and capricious, or the objectively intolerable risk of such harm that Defendants unjustifiably ignore, as alleged more specifically in Section I above.

2117.	*Glossip* does not require an alternative execution method for a non-comparative execution method challenge, such as this Twenty-Fourth Cause of Action.

**Twenty-Fifth Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of Being The Subject Of An Undignified, Spectacle Execution Or Attempted Execution.**

2118. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2119. "Pain" is not the only harm that can constitute impermissible cruelty in a method of execution. "The Eighth Amendment also demands that a penalty accord with 'the dignity of man.'" *State v. Broom*, 146 Ohio St. 3d 60 (Ohio, 2016) (quoting *Hope v. Pelzer*, 536 U.S. 730, 738 (2002), in turn quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958) (lead opinion)).

2120. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of being the subject of an undignified, spectacle execution or attempted execution that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

2121. Defendants know, or should know, or recklessly disregard that their Execution Protocol, whether administered with Plan 1, Plan 2, or Plan 3, creates a sure or very likely risk of harm in the form of an undignified or spectacle execution.

2122. Defendants know, or should know, or recklessly disregard that using improperly compounded or illegally imported or sourced execution

drugs creates a sure or very likely risk of harm in the form of an undignified or spectacle execution.

2123. Plaintiff is subject to a sure or very likely risk of serious harm in the form of being the subject of an undignified, spectacle execution or attempted execution, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to the identity, sterility, concentration, manufacturer, dosage or administration method of the drugs to be administered to cause his death under the Execution Protocol.

2124. The foregoing risks of an undignified, spectacle death arising from Defendants' use of certain execution drugs that will cause Plaintiff to visibly react and struggle following injection because of the severe pain imposed are substantial.

2125. The death suffered by Dennis McGuire was an undignified, spectacle execution.

2126. The death suffered by Clayton Lockett was an undignified, spectacle execution.

2127. The death suffered by Joseph Wood was an undignified, spectacle execution.

2128. The death suffered by Joseph Clark was an undignified, spectacle execution.

2129. The death suffered by Christopher Newton was an undignified, spectacle execution.

2130. The attempted execution to which Romell Broom was subjected was an undignified, spectacle of an attempted execution.

2131. The attempted execution to which Alva Campbell was subjected was an undignified, spectacle of an attempted execution.

2132. The attempted execution to which Doyle Hamm was subjected was an undignified, spectacle of an attempted execution.

2133. Despite a change in execution drugs, DRC Defendants have not substantively changed the procedures used to carry out the execution of Dennis McGuire.

2134. Because DRC Defendants believe that nothing noteworthy, abnormal, unexpected, inhumane, undignified, unlawful, or otherwise unconstitutional occurred during the McGuire execution, and that the process "worked well," there is a sure or very likely risk that DRC Defendants will again administer their Execution Protocol procedures in a way that imposes an undignified death on Plaintiff.

2135. *Glossip* does not require an alternative execution method for a non-comparative execution method challenge, such as this Twenty-Fifth Cause of Action.

2136. Plaintiff's individual physical and/or psychological characteristics and conditions create a sure or very likely risk that employing Defendants' Execution Protocol to execute him will subject him to serious harm in the form of being the subject of an undignified, spectacle execution or attempted execution that is arbitrary and capricious, or an objectively

intolerable risk of such harm that Defendants unjustifiably ignore, as alleged more specifically in Section I above.

2137.   The foregoing risks of an undignified, spectacle death arising from Plaintiff's individual physical characteristics that make it sure or very likely he will suffer the horrifying and painful sensations of obstruction and resulting air hunger and, as a result, will fight and struggle to breathe for significant periods of time, as seen during the executions of McGuire, Lockett, Wood, and others, upon being injected with the midazolam in the three-drug Plan 3 are substantial.

2138.   The foregoing risks of an undignified, spectacle death arising from Plaintiff's other individual physical and/or psychological characteristics, such as his characteristics that make him likely to suffer a paradoxical effect or other such factors alleged in Section I above, are substantial.

2139.   Plaintiff's individual physical and/or psychological characteristics and conditions create a substantial risk that achieving peripheral IV access on him will present a problematic situation analogous to achieving IV access in the previous situations in which Defendants were unable to readily obtain IV access, which, in turn, creates a sure or very likely risk that Plaintiff will suffer serious harm in the form of being the subject of an undignified, spectacle execution or attempted execution as Defendants stab him with needles repeatedly, and that risk is arbitrary and capricious, or the objectively intolerable risk of

such harm that Defendants unjustifiably ignore, as alleged more specifically in Section I above.

2140. The foregoing risks of an undignified, spectacle death from being subjected to protracted but unsuccessful attempts to establish and maintain peripheral IV access are substantial.

2141. There is a sure or very likely risk that when Plaintiff is declared dead he will be clinically and statutorily alive, therefore suffering the ultimate indignity of being denied life-saving medical care and treated as dead while still alive.

2142. Defendants know, or should know, that designating Plaintiff's death be declared based upon a check for "breathing and heart sounds" shortly after the injection of execution drug(s) under the Execution Protocol will result in Plaintiff remaining clinically and statutorily alive after Defendants declare him dead, because a person will retain brain and/or heart electrical activity for some time after breath and a pulse cease.

2143. According to Defendants' Execution Protocol, should Defendants pronounce Plaintiff "deceased" by announcing a time of death, Plaintiff will be removed from the "execution bed" and his body will be disposed of.

2144. Treating Plaintiff as though he is dead, when he is still alive, is a form of disgrace and indignity prohibited by the Eighth Amendment. It denies his very humanity. *Wilkerson v. State of Utah*, 99 U.S. 130,

134–35 (1878); *see also Hope v. Pelzer*, 536 U.S. 730, 745 (2002)
(Eighth Amendment prohibits punishment that is humiliating or
"antithetical to human dignity"); *Trop v. Dulles*, 356 U.S. 86, 103–04
(1958) (Eighth Amendment prohibits the denial of citizenship as
punishment because of the dehumanizing effects of the punishment).

2145. The foregoing risks of an undignified, spectacle death from being
treated as if dead before Plaintiff is statutorily and clinically dead are
substantial.

**Twenty-Sixth Cause of Action: Eighth Amendment Violation
Based On Sure Or Very Likely Exposure To Serious Harm in the
Form of Being Subjected to an Unwanted, Non-Consensual Human
Experimentation of an Execution.**

2146. Plaintiff incorporates by reference each and every statement and
allegation set forth throughout this Amended Complaint as if fully
rewritten here.

2147. Defendants' execution policy and written Execution Protocol violate
the Eighth Amendment because Plaintiff will suffer a sure or very
likely risk of serious harm in the form of being subjected to an
unwanted, non-consensual human experimentation of an execution
that is arbitrary and capricious, or an objectively intolerable risk of
such harm that Defendants unjustifiably ignore, including for all the
reasons alleged in Plaintiff's other causes of action related to human
experimentation executions.

2148. Defendants know, or should know, or recklessly disregard that Plan 1,
using compounded or illegally imported execution drugs, creates a

sure or very likely risk of harm in the form of an impermissible human experimentation of an execution that is arbitrary and capricious.

2149.    Defendants know, or should know, or recklessly disregard that Plan 2, using compounded or illegally imported execution drugs, creates a sure or very likely risk of harm in the form of an impermissible human experimentation of an execution that is arbitrary and capricious.

2150.    Defendants know, or should know, or recklessly disregard that Plan 3, using compounded or illegally imported execution drugs, creates a sure or very likely risk of harm in the form of an impermissible human experimentation of an execution that is arbitrary and capricious.

2151.    Plaintiff's individual physical and/or psychological characteristics and conditions, as more specifically alleged in Section I above, create a sure or very likely risk that employing Defendants' Execution Protocol to execute him will subject him to serious harm in the form of being subjected to an unwanted, non-consensual human experimentation of an execution that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

2152.    Defendants fail to train for an execution scenario that contemplates Plaintiff's unique characteristics.

2153. Defendants fail to even recognize Plaintiff's unique characteristics as it relates to carrying out his execution.

2154. Plaintiff's individual physical and/or psychological characteristics and conditions, as more specifically alleged in Section I above, create a substantial risk that achieving peripheral IV access on him will present a problematic situation analogous to achieving IV access in the previous situations in which Defendants were unable to readily obtain IV access, which, in turn, creates a sure or very likely risk that Plaintiff will suffer serious harm in the form of being subjected to an unwanted, non-consensual human experimentation during his attempted execution as DRC Defendants stab him with needles repeatedly, and that risk is arbitrary and capricious, or the objectively intolerable risk of such harm that DRC Defendants unjustifiably ignore.

2155. Because of the scarcity of legally obtainable drugs for use in lethal-injection executions, when and whether Defendants will carry out Plaintiff's execution is a random, arbitrary, and capricious event.

2156. What drugs are used to conduct Plaintiff's execution and the efficacy of those drugs will be up to chance.

2157. Every execution of a death-row inmate will therefore be an individual experiment and each inmate, including Plaintiff, will therefore be subject to a sure or very likely, objectively intolerable risk of severe,

unnecessary pain, suffering, degradation, humiliation, and/or disgrace.

2158. The foregoing risks are substantial.

**Twenty-Seventh Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm in the Form of Maladministration or Arbitrary Administration of the Execution Protocol.**

2159. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2160. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of severe pain from the risk of maladministration or arbitrary administration of the Execution Protocol that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

2161. There is a sure or very likely risk that Defendants will fail to strictly apply their execution policy and written Execution Protocol properly or in accordance with the requirements of said written protocol or informal policies.

2162. If DRC Defendants use execution drugs compounded by Drug Source Defendants, there is a sure or very likely risk that Defendants will use execution drugs that are non-sterile, impure, adulterated, sub-potent, hyper-potent, or in any other way not precisely the drugs required by Core Element # 2 of the Execution Protocol.

2163. A compounded drug that is contaminated or is sub-potent, or hyper-potent, or adulterated, or not the correct identity, or in any other way not the precise drug(s) required by the Execution Protocol poses a sure or very likely risk of harm to Plaintiff when administered by Defendants.

2164. Defendants continue to use the same Medical Team members who have demonstrated an inability to consistently and reliably obtain peripheral IV access on condemned inmates in the execution context.

2165. Defendants' procedures for obtaining intravenous access under their overarching policy, including their written Execution Protocol, have proven to cause serious harm, including torturous physical and/or psychological pain and needless suffering and an undignified, spectacle and/or a lingering death over an extended period of time, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, as personnel attempt to obtain and maintain intravenous access.

2166. Defendants have failed to promulgate formal practices to respond to the numerous well-publicized problems and complications associated with administering their overarching execution policy and written Execution Protocol, and any practices that may have been promulgated are not formally part of the written Execution Protocol and thus subject to the subjective interpretations given to them by any given Director of the DRC.

2167.    These problems are repetitious and foreseeable, yet their prevalence in
         Ohio makes their subsequent occurrence highly likely, especially in
         light of the constant presence of the same problematic actors.

2168.    Defendants' consistent failures, and pattern of failures, to properly
         and competently administer the written Execution Protocol renders
         the constitutionally critical safeguards—safeguards that are essential
         to alleviate constitutional concerns—contained in Defendants'
         execution policy and written Execution Protocol null and
         functionally nonexistent.

2169.    Defendants' use of execution drugs of a different identity,
         concentration, purity, potency and other deviations from the drugs
         required by the Execution Protocol creates a sure or very likely risk of
         harm, including severe, needless physical pain and suffering, severe
         mental or psychological pain, suffering and torturous agony, a
         lingering death, and an undignified, spectacle execution or attempted
         execution that is objectively intolerable, or an objectively intolerable
         risk of such harm that Defendants unjustifiably ignore.

2170.    Defendants' consistent failures, and pattern of failures to properly and
         competently administer the written Execution Protocol, including
         Defendants' individual deviations and/or variations and Defendants'
         pattern of deviations and/or variations from the execution policy's
         and the written Execution Protocol's safeguards create a sure or very
         likely risk that Plaintiff and any and all others on whom Defendants

administer the Execution Protocol will not be sufficiently protected by those critical safeguards.

2171. DRC Defendants' previously admitted treatment of their written Execution Protocol's requirements as simple "guidelines," their unlimited, open-ended redefinition of the terms "Director" and "Warden" in the Execution Protocol that reinforces that mindset, and the dependence on individual actors' (such as the specific identity of the Incident Commander, which will change in the coming months with a new gubernatorial administration) interpretation of the protocol, creates a sure or very likely risk that Plaintiff and any and all others on whom Defendants administer their Execution Protocol will not be sufficiently protected by the Execution Protocol's critical safeguards.

2172. Defendants' consistent failures, and pattern of failures to properly and competently administer the written Execution Protocol, including Defendants' individual deviations and/or variations and Defendants' pattern of deviations and/or variations from the execution policy's and the written Execution Protocol's safeguards violate Plaintiff's Eighth and Fourteenth Amendment right to be free from cruel and unusual punishment because they create a sure or very likely risk of serious harm, including physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified and/or spectacle

death that is objectively intolerable, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

2173. Defendants' failure to abide by their execution policy and written Execution Protocol is a demonstrated reality rather than a mere possibility or attenuated speculation, as shown by the deviations and/or variations from key execution policy and/or written Execution Protocol requirements during executions regardless of the execution policy and written protocol effective at the time, including under the current execution policy and written protocol.

2174. Deviations and/or variations from the execution policy and written Execution Protocol demonstrate that problems with any one particular execution are not an unforeseeable isolated mishap or innocent misadventure for which no one is liable. A long line of problematic executions in Ohio makes future problems executing Plaintiff foreseeable and highly likely.

2175. DRC Defendants' inconsistent application of Incident Command Systems principles over time creates a sure or very likely risk that Plaintiff will not be sufficiently protected by application of ICS principles to prevent a violation of Plaintiff's Eighth Amendment rights.

2176. The deviations and/or variations, and the pattern of deviations and/or variations, from Defendants' execution policy and written Execution Protocol by many of the actors involved, whether

intentional or reckless, the amount of discretion that exists under the overarching execution policy and within the written protocol, DRC Defendants' demonstrated belief that the written Execution Protocol is not mandatory but is instead guidelines, the variability associated with different interpretations of the protocol's requirements held by varying Incident Commanders, the substantial evidence of Defendants' incompetence or inability to perform in the execution context, and the historical inconsistency in applying ICS principles in the execution context cumulatively point to a sure or very likely risk of serious harm and/or an objectively intolerable risk of harm, in violation of Plaintiff's Eighth and Fourteenth Amendment rights.

2177. This includes intentional and/or willful and/or reckless disregard for the Execution Protocol's requirements, as well as negligent, reckless, and/or willful failure to follow the written protocol's requirements in administration of Defendants' overarching execution policy.

2178. Defendants, while making arbitrary and reckless deviations, nonetheless fail to take into account Plaintiff's physical health, mental health, and other individual characteristics that make him vulnerable to experiencing a sure or very likely risk of serious pain and/or an objectively intolerable risk of harm.

2179. Defendants' overarching execution policy, including their pattern of deviations and/or variations from their written protocol and the unlimited discretion they claim, is arbitrary, capricious, cruel and

unusual, unjustifiably ignores an objectively intolerable risk of harm, and will violate Plaintiff's rights under the Eighth and Fourteenth Amendments.

2180. Plaintiff's individual physical and/or psychological characteristics and conditions create a substantial risk that employing DRC Defendants' Execution Protocol to execute him will subject him to a sure or very likely risk of serious harm in the form of maladministration or arbitrary administration of the execution protocol that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

2181. Plaintiff's individual physical and/or psychological characteristics and conditions, as alleged in Section I above, create a substantial risk that achieving peripheral IV access on him will present a problematic situation analogous to achieving IV access in the previous situations in which Defendants were unable to readily obtain IV access, which, in turn, creates a sure or very likely risk that Plaintiff will suffer serious harm in the form of maladministration or arbitrary administration of the execution protocol as Defendants stab him with needles repeatedly and deviate from strict compliance with the Execution Protocol in the high-stress context of an execution, and that risk is arbitrary and capricious, or the objectively intolerable risk of such harm that Defendants unjustifiably ignore.

2182. Defendants' Execution Protocol presents a sure or very likely risk of harm and/or an objectively intolerable risk of harm from maladministration that Defendants unjustifiably ignore and that will result in at least the substantial risk of infliction of serious harm, including physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified, spectacle death, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, in violation of Plaintiff's rights under the Eighth and Fourteenth Amendments.

2183. Defendants' overarching execution policy, including the broad discretion to deviate and/or to vary from Defendants' written Execution Protocol, their Incident Commander-specific interpretation of the protocol's requirements, their lengthy pattern of deviations and/or variations from the Execution Protocol and Defendants' informal policies, is arbitrary, capricious and presents a sure or very likely risk of serious harm, including physical and/or psychological pain, a torturous, lingering or spectacle death that does not accord with the dignity of man, and/or creates an objectively intolerable risk of harm that Defendants unjustifiably ignore, and/or fails to prevent Defendants from carrying out an unconstitutional execution.

2184. The foregoing risks are substantial.

**Twenty-Eighth Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of Being Subjected To An Execution Protocol That Is Unconstitutional Because It Does Not Preclude The Execution Of An Inmate That Is Categorically Exempt From Execution.**

2185.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2186.    The execution of one who is intellectually disabled or incompetent to be executed constitutes cruel and unusual punishment under the Eighth Amendment.

A.    **Plaintiff will be subjected to execution with a facially unconstitutional execution protocol.**

2187.    An execution protocol that would facially allow Defendants to execute one who is categorically exempt from execution fails to fully ensure adherence to the Eighth Amendment's cruel and unusual punishments clause, and thus facially violates the Eighth Amendment.

2188.    An execution subject to a facially unconstitutional Execution Protocol violates the Eighth Amendment and is an unconstitutional execution.

2189.    Defendants' execution policy and written Execution Protocol contain no procedural safeguards or mechanisms by which Defendants ensure that a condemned inmate whose execution is imminent is not intellectually disabled or incompetent to be executed.

2190.	Defendants' Execution Protocol is therefore facially unconstitutional, and any execution carried out pursuant to the Execution Protocol is an unconstitutional execution.

2191.	Defendants know, or should know, or recklessly disregard that the Execution Protocol and their execution policy contain no procedures or mechanisms to ensure that no execution will be carried out that is unconstitutional because execution of a particular inmate is constitutionally prohibited because of the inmate's intellectual disability or incompetence at the time of execution.

2192.	There is a sure or very likely risk of serious harm to Plaintiff that is arbitrary and capricious, or an objectively intolerable risk of serious harm that Defendants ignore, in the form of Plaintiff being subjected to execution using a facially unconstitutional and invalid execution protocol.

**B.	No Alternative method required or, in the alternative, Plaintiff's alleged alternative.**

2193.	This Cause of Action does not require Plaintiff to plead an alternative execution method.

**Twenty-Ninth Cause of Action: Eighth Amendment Violation Based on Deliberate Indifference or Reckless Disregard of Substantial Risk of Harm to Plaintiff.**

2194.	Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2195.   All of the risks alleged in Plaintiff's Amended Complaint are substantial, objectively intolerable, and foreseeable, including sure or very likely risks of suffering a severe physical pain; being subjected to agony and terror constituting severe mental or psychological suffering; suffering a lingering death; suffering an undignified, spectacle execution or attempted execution; and being subjected to unwanted, non-consensual human experimentation.

2196.   DRC Defendants have been and are on notice of the past failed, botched, and aborted executions with their own or substantially similar execution protocols, as well as of the risks posed by the operation of the execution protocol, and the drugs employed.

2197.   Specifically, DRC Defendants were on notice, and are aware, that:

   a.   their institutional policies and practices in the form of the Execution Protocol and associated policies are experimental and investigational by virtue of using unapproved new drugs and by using drugs for which no Investigational New Drug application has been submitted.

   b.   their institutional policies and practices in the form of the Execution Protocol and associated policies expose Plaintiff to significant risks of harm and to significant burdens on their fundamental rights based on the inclusion of compounded or imported execution drugs to carry out an execution.

c.    that the experimental execution of McGuire was likely to be a horrific, torturous, undignified spectacle of an execution, but DRC Defendants proceeded with that execution anyway.

2198.    DRC Defendants know, should know, or recklessly disregard, that the experimental executions of McGuire, as well as of Clayton Lockett on April 29, 2014, in Oklahoma, and the similarly horrific execution of Joseph Wood on July 23, 2014, were horrific, painful, undignified spectacle executions, but DRC Defendants now intend to go forward with Plaintiff's execution using drugs and procedures that are similar in virtually all key respects with the circumstances in those botched executions.

2199.    Drug Source Defendants have been, and are, aware and on notice about the deficiencies of their policies and practices, including specifically that:

a.    their institutional policies and practices as it relates to producing execution drugs to DRC Defendants violate federal and state laws as articulated throughout this Complaint.

b.    that they exhibit gross or systematic deficiencies in staffing, facilities, equipment and procedures for compounding, manufacturing, importing, shipping, storing, handling, packaging, labeling, dispensing, distributing, or administering execution drugs.

2200. Plaintiff is aware of the horrific outcome that awaits him when he is executed according to Defendants' Execution Policy. Specifically, he is aware:

a. of the spectacle that occurred during Defendants' efforts to execute Dennis McGuire on January 16, 2014 that included procedures that are unchanged in the 2016 Execution Protocol;

b. that Defendants do not believe that any problems or anything out of the ordinary occurred with the McGuire execution;

c. of the horrific, agonizing execution of Lockett and the similarly horrific execution of Wood, using an execution protocol and procedures that had received the input and positive assessment from some number of DRC Defendants and/or their counsel in this case;

d. that DRC Defendants have botched other previous executions, such as the executions of Joe Clark on May 2, 2006, Christopher Newton on May 24, 2007, and the attempted executions of Romell Broom on September 15, 2009 and Alva Campbell Jr., on November 15, 2017;

e. of other executions using midazolam that have involved the inmate demonstrating actions inconsistent with being rendered unconscious, unaware and insensate to pain;

f. of other executions using or attempting to use peripheral IV access on similarly physically compromised inmates and similarly

skilled/qualified/trained execution team personnel that were
unable to successfully establish and maintain proper peripheral IV
access, such as the circumstances involving the Lockett execution
in Oklahoma, the failed attempt to execute Doyle Hamm in
Alabama on February 22, 2018, the lengthy period of time
Defendants needed to obtain IV access on former Plaintiff Biros,
and the executions or attempted executions of Clark, Newton,
Broom, and Campbell;

g.     that DRC Defendants have deviated from the mandates of 01-
COM-11 in significant ways in past executions;

h.     that any Drug Source Defendants will likely know for whom a
particular batch of compounded execution drugs is being made,
that any such Drug Source Defendants will likely know that a
batch prepared in advance of Plaintiff's execution date is to be
used to execute Plaintiff, and that any such Drug Source
Defendants will likely know at least some basic facts about the
crime for which Plaintiff is to be executed;

i.     that there is a sure or very likely risk that he will be subjected to a
physically painful, horrifying death, including experiencing the
painful sensations of being unable to breathe, if Defendants
attempt to execute him using the Execution Protocol;

j.     that there is a sure or very likely risk that he will be subjected to a
lingering death that will take 30 minutes or more after conclusion

of injection under Ohio law, if Defendants attempt to execute him using the Execution Protocol;

k.     that there is a sure or very likely risk that he will be subjected to an undignified spectacle of an execution if Defendants attempt to execute him using the Execution Protocol;

l.     that Defendants have callously disregarded concerns about lawless activity related to execution drugs, and attempt or will attempt instead to hide such lawlessness through invocation of the secrecy provisions in Ohio Revised Code § 2949.221–222, for which Defendant Mohr aggressively lobbied and which Defendant Kasich signed into law;

m.    that Defendants have been made aware of significant deficiencies in Defendants' scheme to obtain and use compounded or imported executions drugs that will not prevent a substantial risk of subversion by Drug Source Defendants, as identified throughout this Complaint;

n.     that, over the course of the above-captioned litigation, Defendants have made representations and promises that were later discarded when abiding by those representations and promises became a hindrance to carrying out an execution;

o.     that Defendants, even in light of all of the above-alleged information, will intentionally apply their Execution Protocol to him in an attempt to execute him.

2201.    Because Plaintiff is aware of all of these matters, there is no longer just a substantial or objectively intolerable risk of severe mental or psychological pain, suffering, terror, and anguish; instead, there is the actual, current, objectively intolerable presence of severe mental or psychological pain, suffering, horrific anxiety, terror and anguish.

2202.    Plaintiff will be subject to the psychological pain and suffering of anticipating a horrific, painful death as alleged in this Amended Complaint, which is different than the ordinary mental pain from the anticipation of death or even the ordinary mental pain from anticipation of death by execution performed humanely.

2203.    By their actions, Defendants are deliberately indifferent to and/or recklessly disregard, in violation of the Eighth Amendment, a sure or very likely risk of subjecting Plaintiff to an unwanted, non-consensual human experimentation, severe, needless physical pain and suffering, severe mental or psychological pain, suffering and agony, a lingering death, or an undignified, spectacle execution.

2204.    Because this claim raises allegations of current and ongoing harm, not speculative or future risk of harm, the existence of an alternative execution method is irrelevant for this claim.

**Thirtieth Cause of Action: Fourteenth Amendment Due Process Violation For Failure To Comply With Federal Investigational New Drug Application Regulations With Respect To The Method And Choice Of Drug To Be Used In Plaintiff's Execution.**

2205.    Plaintiff's Thirtieth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Thirty-First Cause of Action: Equal Protection Violations Related To Defendants' Failures To Comply With The IND Application Laws.**

2206.    Plaintiff's Thirty-First Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Thirty-Second Cause of Action: Religious Freedom Violation Under RLUIPA.**

2207.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2208.    The Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc et seq. (RLUIPA) provides a prisoner such as Plaintiff with a private right of action to enforce his right to religious freedom and exercise.  § 2000cc-2(a).

2209.    Defendants' institutional agencies, ODRC and SOCF, receive federal funds.

2210.    With respect to Plaintiff's last words, the Execution Protocol contemplates that the Warden may "terminate a statement that he or she believes is intentionally offensive to the witnesses."  There is no further limitation on the Warden's discretion and power to terminate Plaintiff's last words.

2211.    In accordance with, and prompted by, Plaintiff's sincerely held religious beliefs, Plaintiff's last words may include prayer or similar religiously motivated statements directed at the witnesses who are present.

2212.   The microphone in the execution chamber is functionally the only way

for Plaintiff to communicate his last words to witnesses in accordance

with his sincerely held religious beliefs.  Cutting off the microphone,

therefore, eliminates Plaintiff's ability to do that which is motivated by

his sincerely held religious beliefs—communicate his last words

directly to witnesses.

2213.   Plaintiff's religiously motivated words are and will not be subjectively

intended to be offensive to witnesses.

2214.   The Warden may nevertheless subjectively find Plaintiff's words to be

intentionally offensive to the witnesses either because of the content

or because the witnesses' religion is different from Plaintiff's.

2215.   The Execution Protocol's restrictions therefore grant the Warden

power to infringe on Plaintiff's sincerely held religious beliefs without

regard to whether there is a compelling reason to cut off Plaintiff's last

words; under the Protocol, the Warden can cut off Plaintiff's last

words based on nothing more than the Warden's own subjective belief

of what *others* may believe.

2216.   This regulation imposes a substantial burden on Plaintiff's exercise of

his sincerely held religious beliefs, and is thus subject to strict

scrutiny review which the Supreme Court has explained is an

exceptionally demanding standard.  *Holt v. Hobbs*, 135 S. Ct. 853

(2015); *see also Burwell v. Hobby Lobby Stores*, 134 S. Ct. 2751

(2014).  Under those cases, state policies, practices, or procedures

must not infringe on Plaintiff's sincerely held religious beliefs absent a showing that such policies, practices, or procedures further a compelling state interest and are the least restrictive means of furthering that compelling state interest.

2217. Defendants are aware, or should be aware, of the decisions in *Holt*, *Burwell*, and others applying RLUIPA, and its analytical mirror, the Religious Freedom Restoration Act (RFRA).

2218. This regulation is not in furtherance of any identified compelling governmental interest as to Plaintiff.

2219. Upon information and belief, the execution protocols for the States of Florida, Louisiana, Nevada, Oklahoma, Tennessee, Texas, and Virginia do not include any content limitations on an inmate's last words, and there is no legitimate reason why Defendants must take a different course from those other jurisdictions.

2220. This regulation is not the least restrictive means of furthering any identified compelling governmental interest as to Plaintiff.

2221. The Execution Protocol provisions that permit the Warden to terminate Plaintiff's speech therefore imposes a substantial, unjustified burden on the Plaintiff's exercise of his sincerely held religious beliefs without being necessary to further a compelling governmental interest as to Plaintiff himself, in violation of RLUIPA and Plaintiff's rights to exercise his religious beliefs.

**Thirty-Third Cause of Action: Eighth Amendment Violations Based On Sure Or Very Likely Exposure To Severe Needless Physical Or Mental/Psychological Pain And Suffering Due To Plaintiff's Unique, Individual Characteristics And Application Of The Execution Protocol.**

2222.   Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2223.   In addition to the many ways alleged throughout Plaintiff's Fourth Amended Complaint in which Plaintiff's individual characteristics increase the risk he will experience several different types of serious harm if subjected to DRC Defendants' Execution Protocol, his individual characteristics also increase the risks, which Defendants unjustifiably ignore, that he will also suffer serious harm in the form of severe, needless physical and/or mental/psychological pain and suffering in the following ways, and those risks are arbitrary and capricious, or objectively intolerable, if DRC Defendants subject Plaintiff to their Execution Protocol.

2224.   Plaintiff presents with a history of IV drug use, hospitalization requiring IV treatment, previous difficulty of medical personnel accessing veins and/or inserting an IV line, Hepatitis B and C, hyperlipidemia, high cholesterol, cardiac disease, liver disease, and obesity.

2225.   Plaintiff's physical characteristics such as his history of IV drug use, hospitalization requiring IV treatment, and previous difficulty of

medical personnel accessing veins and/or inserting an IV line make it
sure or very likely that the execution team will be unable to
successfully establish and/or maintain peripheral IV access on him,
thereby subjecting him to severe, needless physical and
mental/psychological pain and suffering as Defendants stab him with
needles repeatedly.

2226. Additionally, because Plaintiff presents with several risk factors for
the STOP-Bang test, he is at a significant risk of suffering the
phenomenon known as "air hunger" upon injection of the lethal drugs
under the Execution Protocol. There will be at least a period of time
following administration of the drugs when Plaintiff will remain
conscious or aware of what he is enduring, including as he regains
consciousness or awareness after the initial injection.

2227. Furthermore, Plaintiff's history of psychiatric disorders or mental
health issues significantly increases the already-substantial risk that
Plaintiff will suffer extreme mental terror, anguish and suffering
before and during his experimental execution as he contemplates
experiencing each of the different types of serious harms alleged
herein, including a lingering, undignified, spectacle of an execution
that will be neither quick nor painless, and as he contemplates
experiencing the horrific, spectacular, undignified, and/or lingering
execution experiences endured by persons such as Romell Broom,
Joseph Clark, Christopher Newton, Dennis McGuire, Joseph Wood,

Clayton Lockett, Alva Campbell, Jr., Doyle Hamm, or those inmates executed using compounded execution drugs who have reported feeling that they were being burned from the inside upon administration of the lethal drugs.

2228. Accordingly, Defendants' use of the Execution Protocol will create a situation in which it is sure or very likely that Plaintiff *will* suffer severe physical and psychological pain and suffering at DRC Defendants' hands in the execution process, let alone a "substantial risk" of that.

2229. Because this Cause of Action alleges the certainty that severe harm will occur, rather than a quantum of risk of harm, Plaintiff is not required under the law to plead an alternative execution method.

**Thirty-Fourth Cause of Action: Equal Protection Violations Related To Plaintiff's Unique, Individual Characteristics And Application Of The Law, Including DRC Defendants' Execution Protocol and Ohio's Execution Statute.**

2230. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2231. Due to Plaintiff's unique, individual characteristics as alleged throughout this Complaint, Defendants will apply the Execution Protocol and Ohio Revised Code § 2949.22(a) disparately in a way that burdens his fundamental right to be free from cruel and unusual punishment.

2232. Plaintiff presents with individual physical characteristics that include, but are not limited to, Plaintiff's history of IV drug use, hospitalization requiring IV treatment, previous difficulty of medical personnel accessing veins and/or inserting an IV line, Hepatitis B and C, hyperlipidemia, high cholesterol, cardiac disease, liver disease, and obesity.

2233. Due to Plaintiff's unique physical characteristics, DRC Defendants will not administer to Plaintiff the professional, humane, sensitive and dignified execution which DRC Defendants have a duty to provide Plaintiff under the Execution Protocol.  Instead, Plaintiff's execution will be a spectacular, undignified execution.

2234. Due to Plaintiff's unique physical characteristics, DRC Defendants will not administer to Plaintiff the quick and painless execution which DRC Defendants have a duty to provide Plaintiff under § 2949.22(a). Instead, Plaintiff's execution will be a lingering, torturous and horrifying execution.

2235. DRC Defendants will deviate from Core Elements of the Execution Protocol by failing to use the drugs required by the Execution Protocol, and by failing to use "appropriately trained and qualified" persons.

2236. The Execution Protocol provides only for injection of 5 grams of the execution drug under Plans 1 and 2, and perhaps for one additional dose of 5 grams under those plans.  The Execution Protocol also

provides only for injection of 500 mg of midazolam under Plan 3, and perhaps for one additional dose of 500 mg of midazolam under that plan. Nowhere in the Execution Protocol are additional doses of execution drug permitted to be injected.

2237. But DRC Defendants will need to inject an additional 5-gram dose of thiopental sodium or pentobarbital every three minutes, or a continuous infusion of midazolam along with the other drugs in Plan 3, for 30 minutes or more to ensure that Plaintiff is legally and statutorily dead under Ohio law and to ensure Plaintiff never regains consciousness or awareness as he is executed. Those dosages far surpass the maximum allowable amount—10 grams or 1000 mg, respectively under Plans 1, 2 and 3—that may be obtained, prepared or injected for an execution under the Execution Protocol.

2238. Injecting more than 10 grams of pentobarbital or thiopental sodium into Plaintiff deviates from Core Element # 2 of the Execution Protocol.

2239. Injecting more than 1000 mg of midazolam into Plaintiff deviates from Core Element # 2 of the Execution Protocol.

2240. Core Element # 4 of the Execution Protocol requires that all functions to be performed by Execution Team Members must be performed by appropriately trained and qualified members of the Execution Team.

2241. DRC Defendants will not be appropriately trained to administer the Execution Protocol to Plaintiff in light of his unique characteristics as

alleged herein and the need to use scientifically and medically reliable assessment methods beyond a stethoscope assessment.

2242. DRC Defendants' disparate treatment of Plaintiff burdens the fundamental rights against cruel and unusual punishment of a class of individuals that includes Plaintiff, namely those subject to execution at DRC Defendants' hands.

2243. Defendants must apply Ohio and federal laws equally to all similarly situated persons. They do not, and will not with Plaintiff.

2244. The disparate treatment of Plaintiff does not serve a compelling governmental interest, nor is it narrowly tailored to satisfy a compelling interest.

2245. Defendants' desire to execute its death-sentenced prisoners is only a "legitimate" or, at most, a "significant" state interest, not a compelling state interest.

2246. Defendants have no interest—not even a legitimate interest—in carrying out an unconstitutional execution.

2247. Thus, any deviations from the Core Elements of the Execution Protocol, even if directly related to Plaintiff's unique characteristics, cannot be said to be tailored to a compelling governmental interest. Nor can the deviations from § 2949.22(a), or the disparate impact on Plaintiff.

2248. Defendants' disparate application of the Execution Protocol and § 2949.22(a) based on Plaintiff's unique characteristics, including

their failure to actually assess and train to carry out an execution on Plaintiff in light of his unique characteristics, intentionally treats Plaintiff differently from others similarly situated—namely others subject to execution in Ohio—irrationally and arbitrarily, because that disparate treatment still involves unlawful state action which is, by definition under the law, irrational and arbitrary.

2249. Defendants' irrational and arbitrary disparate treatment of him as a class of one is to Plaintiff's detriment because it will decrease the procedural protections that are so important to protect his dignity, his humanity and his fundamental rights under the Eighth Amendment and others as alleged in Plaintiff's Complaint.

**Thirty-Fifth Cause of Action: Eighth Amendment Violation Based On Purposeful or Knowing Adoption of a Lethal Injection Protocol Using A Three-Drug Method With Midazolam As The First Drug That Will Cause Severe Physical Pain and Mental Anguish and Suffering.**

2250. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2251. Defendants know, or should know, or recklessly disregard that injecting Plaintiff with the paralytic drug will cause horrific, severe physical pain and mental suffering and anguish if he is not rendered unconscious, unaware, and insensate before the paralytic drug is injected and throughout the duration of the paralytic drug's effects on Plaintiff.

2252. Defendants know, or should know, or recklessly disregard that injecting Plaintiff with potassium chloride drug will cause horrific, severe physical pain and mental suffering and anguish if he is not rendered unconscious, unaware, and insensate before the potassium chloride is injected and throughout the duration of the potassium chloride's effects on Plaintiff.

2253. Defendants know, or should know, or recklessly disregard that midazolam is so completely incapable of preventing the extreme and needless severe physical pain and mental anguish and suffering that Plaintiff will experience if he injected with the second and/or third drugs in Defendants' three-drug execution method that such pain is essentially certain.

2254. Defendants know about, should know, or recklessly disregard the horrific execution of Joseph Clark using a three-drug method. Defendants also know about, should know, or recklessly disregard the events of executions like that of Clayton Lockett in which midazolam has been used as the critical first drug in a three-drug execution method, as well as the various expert opinions that have been rendered regarding the suitability of using midazolam as the first in a three-drug execution method. That information which Defendants know, should know, or recklessly disregard, establishes that Plaintiff will almost certainly experience that same extreme, objectively intolerable pain and suffering.

2255.   Defendants know that this result will follow, or recklessly disregard that likelihood, and intentionally and purposefully chose to re-introduce the three-drug method using midazolam as the critical first drug anyway.

2256.   Defendants have thus adopted the three-drug execution method using midazolam as the critical first drug with the purpose or knowledge of causing severe pain, in violation of the Eighth Amendment under *Wilkerson*, *Kemmler* and *Farmer*.

2257.   The existence of an alternative execution method is irrelevant for this claim.  *See Baze*, 553 U.S. at 102 (Thomas, J., concurring in the judgment) (no "comparative analysis" in *Wilkerson* and *Kemmler*); *see also Warner v. Gross*, 135 S. Ct. 824, 826 (2015) (Sotomayor, J., dissenting); *Glossip*, 135 S. Ct. at 2795–97 (Sotomayor, J., principal dissent).

**Thirty-Sixth Cause of Action:  Eighth Amendment Violation Based On Purposeful or Knowing Adoption of a Lethal Injection Protocol Using Midazolam That Will Cause Severe Physical Pain and Torturous Mental Anguish and Suffering.**

2258.   Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2259.   Defendants know, or should know, or recklessly disregard that injecting Plaintiff with midazolam while he remains strapped supine on the execution gurney will cause horrific, severe physical pain and mental suffering and anguish.

2260.    Defendants know, or should know, or recklessly disregard that midazolam is so completely incapable of preventing the extreme and needless physical pain and severe mental anguish and suffering from suffocating or experiencing air hunger that Plaintiff will experience if he is injected with midazolam while strapped supine to the execution gurney that such pain and suffering is essentially certain.

2261.    Defendants know about, should know, or recklessly disregard the events of several botched executions like Dennis McGuire and Joseph Wood in which midazolam has been injected into an inmate strapped flat on an execution gurney, along with the various expert opinions that have been rendered regarding the suitability of using midazolam as part of a lethal injection execution method, including testimony offered during the McGuire preliminary injunction proceedings. They also know, should know, or recklessly disregard that using a wedge-shaped pillow to prop up the condemned inmate during an execution using midazolam is critical to protect Plaintiff from obstructing after injection of the midazolam. That information, which Defendants know, should know, or recklessly disregard, demonstrates that Plaintiff will almost certainly experience extreme, objectively intolerable pain and suffering if subjected to an execution using midazolam while strapped supine to the execution gurney.

2262.    Defendants know that this result will follow, or recklessly disregard that likelihood, and yet intentionally and purposefully chose to re-

introduce the use of midazolam without the simultaneous required use of a wedge pillow or similar protective measures to protect Plaintiff against obstruction and the air hunger to follow.

2263. Defendants have thus adopted an execution method using midazolam and the absence of any measures to protect against obstruction following injection, with the purpose or knowledge of causing severe pain, in violation of the Eighth Amendment under *Wilkerson*, *Kemmler* and *Farmer*.

2264. The existence of an alternative execution method is irrelevant for this claim. *See Baze*, 553 U.S. at 102 (Thomas, J., concurring in the judgment) (no "comparative analysis" in *Wilkerson* and *Kemmler*); *see also Warner v. Gross*, 135 S. Ct. 824, 826 (2015) (Sotomayor, J., dissenting); *Glossip*, 135 S. Ct. at 2795–97 (Sotomayor, J., principal dissent).

**Thirty-Seventh Cause of Action: Eighth Amendment Violations Based on DRC Defendants Resurrecting Their Abandoned Three-Drug Method Even Though They Know It Causes Needless Pain And Suffering, And Had Abandoned It, At Least In Part, For That Reason.**

2265. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2266. In adopting the Execution Protocol, and selecting the revised three-drug method to use for Plaintiff's execution, DRC Defendants made a

deliberate choice to follow a course of action from among various alternatives.

2267.    In making that choice, DRC Defendants know and/or are charged with knowing that the revised three-drug method in the Execution Protocol does, in fact, expose condemned inmates, like Plaintiff, to needless pain and suffering, including because it is dependent upon the successful delivery and maintenance of drug-induced unconsciousness, unawareness, and inability to feel or experience pain to a paralyzed person in circumstances of immense stress and where the state actors involved are known by DRC Defendants to lack the necessary experience, skill, judgment, and competence to reliably perform those difficult medical responsibilities.

2268.    DRC Defendants further know and/or are charged with knowing that the revised three-drug method in the Execution Protocol will subject Plaintiff, when executed by that method, and perhaps every inmate executed by that method, to a death that is terrifying, inhumane, undignified, and/or extremely painful.

2269.    Because the paralytic drug does not serve any therapeutic purpose, it is critical the first drug is properly administered with Plaintiff properly positioned/propped up to avoid the risk of obstruction, and that Plaintiff is rendered unconscious, unaware, and insensate to pain. DRC Defendants know and/or are charged with knowing that if Plaintiff is not properly rendered unconscious, unaware, and

insensate by the first drug, the paralytic will compound the terror and pain Plaintiff will experience during his execution by inducing an unnecessary paralysis of all his voluntary movements and, consequently, his ability to effectively communicate his internal distress. Though aware, conscious, and sensate at some level, Plaintiff will be trapped in his own body as the execution moves forward. This is a chemical entombment akin to being buried alive.

2270. DRC Defendants further know and/or are charged with knowing that if Plaintiff is not properly rendered unconscious, unaware, and insensate by the first drug, and then is paralyzed by the second drug, the third drug, potassium chloride, will burn as it courses through Plaintiff veins, until it reaches his heart, ultimately stopping it by inducing cardiac arrest. This searing pain, like liquid fire, is the chemical equivalent of being burned at the stake, and the heart attack Plaintiff will experience will likewise cause severe pain and agony.

2271. There is no governmental interest served by using a paralytic drug, and its use will deprive Plaintiff of his human dignity. The paralytic drug, as used and/or intended to be used in the Execution Protocol, does not serve the statutory function of quickly and painlessly causing death, nor does it protect against Plaintiff experiencing pain. The paralytic's suppression of breathing does not hasten the death subsequently caused by the potassium, nor does it protect against the prisoner's pain. Because midazolam is not effective at rendering and

maintaining unconsciousness and unawareness nor at rendering Plaintiff unable to feel and experience pain despite painful stimuli, the paralytic only serves a pernicious purpose—to mask the immense, burning pain caused by a lethal dose of potassium chloride, and the sensation of suffocation caused by the paralytic itself. The paralytic prevents a prisoner from alerting observers, through sound or movement, that he is experiencing pain. Alternatively, if midazolam, despite its ceiling effect, actually were effective at establishing and maintaining unconsciousness and unawareness and keeping the inmate insensate despite painful stimuli, then the paralytic would be an unnecessary, gratuitous, and arbitrary administration of an unwarranted and harmful chemical that has its own painful effects, amounting to an assault and a battery of the prisoner.

2272. The pattern of deviations and/or variations from DRC Defendants' execution policy and written execution protocol engaged in by many of the actors involved, combined with the amount of discretion that DRC Defendants claim under their overarching execution policy and under the written protocol, along with substantial evidence of incompetence or inability to perform in the execution context, cumulatively point to an undeniably high risk of violating an inmate's rights during any given execution under the three-drug method.

2273. It was in part because DRC Defendants, by November 2009, had actual knowledge of all of these foregoing problems and deficiencies

with the original three-drug method that they made the decision then to forever renounce any further use of the three-drug method in Ohio executions, and they abandoned that method of lethal injection going forward.

2274. The revised three-drug method DRC Defendants have resurrected in the Execution Protocol retains all of the problems of the original three-drug method they foreswore in 2009, but adds even greater problems, relevant to the known infliction of needless pain and suffering, because of its use of midazolam as the first drug without proper protections against obstruction, its allowance of compounded drugs, and its tolerance of beginning an execution with only one IV site, all as previously addressed in this Amended Complaint.

2275. In resurrecting the three-drug method for Plaintiff's execution, and making that method even worse than what they renounced in 2009, DRC Defendants have knowingly, intentionally and purposefully adopted a method of lethal injection known to cause needless pain and suffering to inmates subjected to it. Their chosen method for Plaintiff superadds layers of needless pain and suffering, and they know that it does so, and yet they are deliberately indifferent and/or consciously disregard that fact and/or possess a malicious or purposeful intent to inflict such needless pain and suffering upon Plaintiff.

2276.    As a result of their knowing resurrection of the previously renounced

three-drug method, and knowingly making it worse, DRC Defendants,

in addition to subjecting Plaintiff to the experience of being executed

by this unconstitutional method, are also forcing him to endure the

psychological torment of preparing for his execution to be inflicted by

that method.  It super-adds elements of terror and torment to

Plaintiff's punishment for DRC Defendants to knowingly and

purposefully subject him to a method Defendants themselves

previously renounced due in part to their own belief that it was too

difficult for their team and did not meet their duty to reliably and

consistently deliver a humane execution.

2277.    DRC Defendants' adoption for Plaintiff's execution of the three-drug

method they had previously renounced, and given their troubling

history of conducting executions by lethal injection with that method,

demonstrates Defendants' malicious intent and/or conscious

disregard and/or deliberate indifference and/or purposeful intention

for the consequences of that action, including but not limited to the

needless pain and suffering they know their chosen course of action

will inflict upon Plaintiff and other inmates executed by that method.

2278.    Plaintiff believes and therefore alleges that such an execution would

be inhuman and barbarous, akin in its level of pain and suffering to

being buried alive, burning at the stake, and other primitive methods

long since abandoned by civilized society.  It is beyond dispute that

being buried alive or burned at the stake are inherently cruel forms of punishment. So is suffocation to death. They are cruel for many reasons, including that the suffering they inflict is beyond what is necessary to cause death. Simply because these punishments can now be carried out in a more sophisticated manner—using chemicals—than their more primitive analogs, does not mean that the resulting pain and suffering is any less cruel or any less intolerable under the Eighth Amendment.

2279. For the foregoing reasons, DRC Defendants' revival of the abandoned three-drug method for Plaintiff's execution, including the paralytic and potassium chloride, and their use of midazolam (which has no pain-blocking properties) as the critical first drug, especially when the condemned inmate is not propped up to avoid obstruction, violates Plaintiff's constitutional rights under the Eighth and Fourteenth Amendments.

2280. DRC Defendants have no legitimate penological justification for their use of the revised three-drug method in the Execution Protocol, and its use at Plaintiff's execution will make it sure that Defendants will needlessly and gratuitously inflict severe pain and a lingering death on Plaintiff.

2281. Because DRC Defendants' constitutional violations alleged by Plaintiff in this Cause of Action involve at least in part Defendants' knowing and deliberate use against Plaintiff of a previously renounced method

known by Defendants to inflict needless pain and suffering, Plaintiff is not required to plead an alternative method of execution.

**Thirty-Eighth Cause of Action: Eighth Amendment Violation Based On Devolving Standards of Decency.**

2282. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2283. A state's punishment is assessed under the Eighth Amendment against the evolving standards of decency that mark the progress of a maturing society. An execution method can be unconstitutional if the method represents "devolution to a more primitive" method. *Glossip*, 135 S. Ct. at 2795–97 (Sotomayor, J., principal dissent).

2284. DRC Defendants, in sworn representations to this Court, the Sixth Circuit, the public and Plaintiffs, abandoned using a three-drug execution method using a paralytic as the second drug and potassium chloride as the third drug, averring that "going forward," neither a paralytic (including pancuronium bromide) nor potassium chloride "will be used as part of the lethal injection process" in Ohio.

2285. DRC Defendants intentionally and deliberately abandoned the three-drug method and the second and third drugs, in favor of moving to what they believed and what they argued to this and other courts to be a more humane execution method using a single drug.

2286. DRC Defendants knew that removing the paralytic and potassium chloride from a lethal injection method removes two sources of needless, unnecessary physical pain and torturous mental suffering and anguish from their execution protocol.

2287. No other state has moved forward to a purportedly more humane method of lethal injection by removing the three-drug method but then reintroduced the three-drug method again later, which makes DRC Defendants' new execution protocol and their adoption of that protocol "unusual."

2288. By reintroducing an execution protocol that permits them to use a three-drug protocol including a paralytic and potassium chloride, DRC Defendants have intentionally reneged on sworn representations that they would no longer use those dangerously unsafe drugs.

2289. By intentionally reintroducing the second and third drugs back into DRC Defendants' execution protocol, DRC Defendants have intentionally, knowingly or recklessly moved backward to an execution method that reinserts even greater levels of substantial risk of harm and needless pain and suffering than the previous three-drug protocol, thereby contravening the evolving standards of decency in violation of Plaintiff's Eighth Amendment rights.

2290. This Cause of Action does not require Plaintiff to plead an alternative method or manner of execution.

**Thirty-Ninth Cause of Action: Eighth Amendment Violation Based On DRC Defendants' Use Of A Three-Drug Execution Method, Regardless Of The Identity Of The First Drug.**

2291.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2292.    Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of severe, needless physical pain and suffering that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to Defendants' use of the revised three-drug method, regardless of whether the first drug is midazolam, sodium thiopental, or pentobarbital but even more so if the first drug is midazolam.

2293.    Defendants know, or should know, or recklessly disregard that the revised three-drug method, including as specified in the Execution Protocol, creates a sure or very likely risk of severe, needless physical pain and suffering, including because it is sure or very likely that Plaintiff will begin to obstruct and experience air hunger after being strapped supine to the execution gurney and then injected with midazolam; and because midazolam contains no pain-blocking properties at any dosage, thereby leaving Plaintiff exposed to the severe pain and suffering associated with injection of the paralytic

drug and suffocating from the paralytic drug's effects or from the searing fire in his veins caused by the potassium chloride.

2294. Defendants know that their revised three-drug method makes critical the reliable induction and maintenance of unconsciousness, unawareness, and insensation, so that Plaintiff will be unconscious, unaware, and insensate to pain throughout the process, and will not experience the excruciatingly painful effects of the midazolam if injected without the proper safeguards, the paralytic drug, and the potassium chloride.

2295. Defendants know that their three-drug method also makes it critical—because of the importance of achieving, assessing, and maintaining unconsciousness, unawareness, and insensation when the inmate is paralyzed by the paralytic drug or experiences the injection of potassium chloride—that any persons administering the drugs to Plaintiff and/or assessing his consciousness, awareness, and ability to experience and feel pain be capable of skillfully performing those responsibilities and of exercising informed judgment and discretion, including as to proper timing of the three drugs.

2296. Despite this actual knowledge, Defendants have knowingly and deliberately assigned these critical responsibilities to persons known by them to lack the necessary experience, skill, judgment, and competence to perform them, and for whom no amount of pre-

execution "training" will alleviate the inherent deficiencies in experience, skill, judgment, and competence.

2297.    Defendants have assigned these critical responsibilities to persons known to be unqualified to perform them even though Defendants also know that the use of the three-drug method places enormous additional stress on said persons during an execution, well beyond that attendant to a one-drug barbiturate-only method, and such stress makes worse the already serious problems caused by the lack of necessary experience, skill, judgment, and competence.

2298.    Defendants unconscionably permit an execution using the three-drug method to commence and proceed with only one IV site.

2299.    Defendants have failed to provide monitoring equipment necessary to ensure that Plaintiff is unconscious, unaware, and insensate to pain at all relevant times after the administration of the first drug, and before administration of the other two drugs, and continuing until death.

2300.    Defendants have no backup plan in the event IV access is lost midway through Plaintiff's execution and cannot promptly be reobtained.

2301.    Defendants know, or should know, or recklessly disregard that their revised three-drug method as specified in the Execution Protocol will subject Plaintiff to the sure or very likely risk that he will not be rendered fully unconscious, unaware, and unable to experience or feel pain throughout the process until death, that he will not be insensate

to pain at critical points in the process, that he will experience the excruciatingly painful effects of the midazolam while strapped supine to the execution gurney, the excruciatingly painful effects of the paralytic drug and/or potassium chloride, and that he will be forced to endure that excruciating pain while paralyzed and thus unable to signal his distress.

**Fortieth Cause of Action: Eighth Amendment Violation Based On DRC Defendants' Use Of A Three-Drug Execution Method With Midazolam As The First Of The Three Drugs.**

2302.   Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2303.   Defendants intend to use a three-drug protocol to execute Plaintiff, using midazolam as the first drug, a paralytic as the second, and potassium chloride as the third

2304.   Several recent executions using midazolam have seen the condemned inmate exhibit movements and other signs of consciousness, awareness, and/or sensation after being injected with 500 mg. of midazolam.

2305.   Every additional execution using midazolam in which the paralytic drug was not injected very rapidly after conclusion of injection of midazolam has provided additional evidence to show that signs of consciousness, sensation, and/or awareness after injection of 500 mg. of midazolam is the rule, rather than the exception.

2306. Defendants know that absent a successful administration of a drug and maintenance of that drug's effects to render Plaintiff unconscious, unaware, and insensate, administration of either and both of the paralytic drug and potassium chloride will unquestionably cause searing, torturous physical pain and horrific mental suffering and anguish.

2307. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of severe, needless physical pain and suffering and mental anguish that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to Defendants' use of the revised three-drug method with midazolam as the first drug.

2308. Defendants intend to deliberately conceal the effects of midazolam and potassium chloride behind a chemical curtain created by the paralytic drug.

2309. Defendants' use of midazolam in a three-drug protocol cannot reliably ensure that Plaintiff will remain in a state in which he will be unable to experience pain caused by the paralytic drug.

2310. It is sure or very likely that following IV injection of 500 mg midazolam under the Execution Protocol, Plaintiff will still be conscious, or aware, or at least sufficiently sensate to experience the

indisputably unconstitutional pain and mental suffering of suffocation and paralysis caused by injection of the paralytic agent.

2311.   It is sure or very likely that DRC Defendants will unsuccessfully inject the full 500 mg of midazolam into Plaintiff intravenously, and/or that DRC Defendants will inject the drug into Plaintiff too rapidly causing a paradoxical reaction, and/or that midazolam will cause a paradoxical reaction in Plaintiff due to his individual characteristics and history, or that Defendants will inject the paralytic drug before the midazolam can reach its peak effectiveness, making it even further likely that Plaintiff will be conscious, or aware, or sufficiently sensate to experience the effects of the paralytic agent.

2312.   Consequently, whether Defendants inject the full 500 mg of midazolam or a lesser amount, Defendants' intended and imminent use of the paralytic in Plaintiff's execution will violate his rights under the Eighth and Fourteenth Amendment to be free from severe pain, experimentation, and the gratuitous invasion of the body.

2313.   There is no governmental interest served by using a paralytic. The paralytic drug, as used in the state's protocol, does not serve the statutory function of causing death, nor does it protect against the prisoner's experience of pain. If midazolam is not effective at establishing and maintaining unconsciousness, unawareness, and insensation, despite painful stimuli, then the paralytic only masks the immense pain caused by the potassium chloride; if midazolam is

effective at those critical tasks, on the other hand, then the paralytic is, at best, a gratuitous and arbitrary administration of an unwarranted and harmful chemical that has its own, non-visible torturous effects.

2314. Defendants' use of midazolam in a three-drug protocol cannot reliably ensure that Plaintiff will remain in a state in which he will be unable to experience pain caused by the potassium chloride.

2315. It is sure or very likely that following IV injection of 500 mg midazolam under the Execution Protocol, Plaintiff will still be sufficiently conscious, or aware, or at least sufficiently sensate to experience the indisputably unconstitutional physical pain and mental suffering caused by injection of potassium chloride.

2316. It is sure or very likely that DRC Defendants will unsuccessfully inject the full 500 mg of midazolam into Plaintiff intravenously, and/or that DRC Defendants will inject the drug into Plaintiff too rapidly thus causing a paradoxical reaction, and/or that midazolam will cause a paradoxical reaction in Plaintiff due to his individual characteristics and history, or that Defendants will inject the potassium chloride before the midazolam can reach its peak effectiveness, making it even further likely that Plaintiff will be conscious, or aware, or sufficiently sensate to experience the effects of the potassium chloride.

2317. Consequently, whether Defendants inject the full 500 mg of midazolam or a lesser amount, Defendants' intended and imminent

use of potassium chloride in Plaintiff's execution will violate his rights under the Eighth and Fourteenth Amendment to be free from severe pain, experimentation, and the gratuitous invasion of the body.

2318. Defendant' use of the revised three-drug method with midazolam as the first drug creates a sure or very likely risk of serious harm because, among other reasons, there is a high likelihood that midazolam will fail to render Plaintiff insensate from the excruciatingly painful and agonizing effects of the second and third drugs in Defendants' revised three-drug method, including because:

2319. There is high likelihood the midazolam will fail to reliably induce and maintain the sustained state of unconsciousness, unawareness, and insensation necessary for Plaintiff not to feel the intolerable pain associated with the paralytic drug and potassium chloride, or will wear off before the second and third drugs are completely administered.

2320. Midazolam begins to lose effectiveness very rapidly, and much more quickly than barbiturates. There is a high likelihood the midazolam, if injected at a proper rate to reduce the risk of paradoxical reaction, will wear off before the paralytic drug and potassium chloride have been completely administered to Plaintiff.

2321. Midazolam's "ceiling effect" means that the administration of a large dose on Plaintiff—*i.e.*, anything above a dose in or about the range of 200 mg—will have no appreciable effect with respect to the use of

midazolam for consciousness or awareness purposes. And midazolam has no pain-blocking properties at any dosage; it is not an analgesic drug, and has no analgesic characteristics. It is thus not possible to overcome the inadequacy of midazolam's properties for its use in a three-drug protocol by giving Plaintiff a large dose, such as the 500 mg dose contemplated by the Execution Protocol.

2322. Administering 500 mg. of midazolam at the rate DRC Defendants will use creates a sure or very likely likelihood that Plaintiff will experience a paradoxical effect giving him heightened consciousness, awareness, and/or sensation, and that problems will develop with the IV during administration of the critical first drug, such that Plaintiff will be substantially likely to receive significantly less than the maximum effect dose. These will, in turn create a sure or very likely risk that Plaintiff will still be conscious, aware, and sensate to experience and feel the torturous pain that will follow injection of the first drug if strapped supine to the execution gurney, and the second and third drugs in the Execution Protocol.

2323. Defendants know, or should know, or recklessly disregard that their revised three-drug method as specified in the Execution Protocol will subject Plaintiff to the sure or very likely risk that midazolam will not function to deliver the effects necessary to render Plaintiff unconscious, unaware, and insensate to the pain of the paralytic drug and/or potassium chloride, and that he will thus be forced to endure

that excruciating pain while paralyzed and thus unable to signal his distress.

2324. The foregoing risks are substantial.

**Forty-First Cause of Action: Eighth Amendment Violation Based On DRC Defendants' Use Of Midazolam In The Execution Protocol.**

2325. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2326. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because, in all the ways alleged throughout this Amended Complaint, Defendants' use of midazolam in the revised Execution Protocol while strapped supine to the execution gurney will cause Plaintiff to suffer a sure or very likely risk of serious harm in the form of severe, needless physical pain and suffering and mental anguish that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

2327. The foregoing risks are substantial

**Forty-Second Cause of Action: Eighth Amendment Violation Based On DRC Defendants Removal Of Any Required Concentration Of The Execution Drugs Which Is Removal Of A Safeguard That Makes It Sure Or Very Likely That Plaintiff Will Experience Severe Pain And Suffering.**

2328. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2329. Defendants' planned use of the 2016 Execution Protocol creates a sure or very likely risk of serious harm because Defendants removed certain safeguards present in past execution protocols.

2330. Defendants' current Execution Protocol removes a prior safeguard that required Defendants to use a certain concentration of the execution drugs. For example, in the June 29, 2015 Protocol the Drug Administrator was required to prepare syringes containing five (5) grams of pentobarbital, 100 ml of a 50mg/ml solution. Alternatively, the Drug Administrator was required to prepare syringes containing five (5) grams of thiopental sodium, 200 ml of a 25 mg/ml solution. The execution protocols that included midazolam, a paralytic drug, and potassium chloride also included specific concentrations for each of those drugs.

2331. This requirement existed because drugs in solutions, like the execution drugs, have various different concentrations and potencies. Potency refers to the amount of drug required to produce an effect. Some drugs produce a powerful effect at minute doses and others need a large dose to have any effect.

2332. Every Ohio execution protocol since at least January 8, 2004 has included the concentration requirement for its execution drugs. Those protocols include the prior two protocols using pentobarbital or thiopental sodium and the prior protocols using midazolam and hydromorphone.

2333.	The current Execution Protocol omits any reference to the concentration of the solution from which any of the execution drugs are obtained.  (October 7, 2016 Protocol, VI.F.4.b–d.)

2334.	Under the current Execution Protocol if an execution drug is in a very weak solution, a large amount of solution may be required to obtain the desired effect.  Injecting a larger amount of solution will take longer or risk blowing out the IV.

2335.	If the Drug Administrators measure the amount of drug to be injected based solely on the volume of solution, but the concentration is incorrect, the incorrect amount of the drug will be injected.

2336.	If the execution drugs are obtained from a very strong solution requiring much less of the solution to obtain the designated amount of the drug, a very minute amount of solution may be required but Drug Administrators will likely still inject the mandated volume.

2337.	It is likely that Drug Administrators will inject a subpotent injection of the first drug, but a superpotent injection of the second or third drug. Thus the alleged effect of the midazolam may wear off if it is in a strong solution before the paralytic is injected, or alternatively the paralytic may take effect if it is in a strong solution after the midazolam wears off.

2338.	These are but two of numerous severely painful scenarios permitted by the failure of the protocol to specify the concentration of the solution from which the drugs are obtained.

2339. The concentration of the lethal injection drug in the required syringes alters the total volume of the lethal injection dose. This in turn affects the rate of delivery (the push rate) used for the IV administration, and make it substantially likely that Drug Administrators will use too high of a push rate for the execution drugs.

2340. Because it is sure or very likely that Drug Administrators will use too high of a push rate for the execution drugs, there is a substantial likelihood that they will blow out a vein in the IV administration process, or that a significant amount of any midazolam injected will precipitate at the injection point, thus preventing the required amount of midazolam from reaching Plaintiff's brain before he will be injected with the second and third drugs, or that Plaintiff will suffer a paradoxical effect, thereby increasing his level of awareness, consciousness, and/or sensation such that he will fully experience the severe pain and suffering to follow.

2341. The removal in Defendants' revised Execution Protocol of any concentration of execution drugs in the solution creates a sure or very likely risk of serious harm in the form of severe, needless physical pain and suffering and mental anguish that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

2342. The foregoing risks are substantial.

**Forty-Third Cause of Action: The Doctrines Of Judicial Estoppel And/Or Judicial Admission Bar DRC Defendants From Using The Three-Drug Method Against Plaintiff.**

2343.    Plaintiff does not allege a Forty-Fourth Cause of Action.

**Forty-Fourth Cause of Action: Administrative Procedures Act Claims.**

2344.    Plaintiff does not allege a Forty-Fourth Cause of Action.

**Forty-Fifth Cause of Action: Eighth and Fourteenth Amendment Violations—A three-drug midazolam method of execution violates the Eighth Amendment's prohibition against cruel and usual punishment because it no longer comports with prevailing standards of decency, and thus its use as a method of execution must be categorically barred.**

2345.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully stated here.

2346.    Defendants, and/or their agents, acting under color of state law, intend to execute Plaintiffs using a three-drug midazolam method of execution.

2347.    Executing Plaintiffs using a three-drug midazolam method of lethal injection is unconstitutional because that method of execution is a cruel and unusual punishment prohibited under the Eighth Amendment.

2348.    The use of a three-drug midazolam method of execution violates the Eighth Amendment's prohibition against cruel and usual punishment because its use is increasingly rare and permitted only in a minority of states, making it an "unusual" punishment.

2349.    The use of a three-drug midazolam method of execution violates the Eighth Amendment's prohibition against cruel and usual punishment because it no longer comports with prevailing standards of decency, and thus its use as a method of execution is categorically prohibited.

2350.    States may not impose a death sentence upon any inmate using an unconstitutional method of execution. The "Eighth Amendment *categorically* prohibits the infliction of cruel and unusual punishments." *Penry v. Lynaugh*, 492 U. S. 302, 330 (1989) (emphasis added).

2351.    Accordingly, there is no requirement to plead an alternative method of execution when making a claim, such as this, that a method of punishment is categorically unconstitutional. "Irrespective of the existence of alternatives, there are some risks 'so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to' them." *Glossip v. Gross*, 135 S. Ct. 2726, 2793 (2015) (Sotomayor, J., dissenting) (quoting *Helling v. McKinney*, 509 U. S. 25, 36 (1993) (emphasis in original)).

2352.    For purposes of this claim, Plaintiff does not concede there is a way to constitutionally carry out a lethal injection execution that uses a three-drug midazolam method. Plaintiff believes that such an execution is *per se* unconstitutional. This distinguishes Plaintiff from the inmate in *Baze*.

2353.   Plaintiff, thus, is not required to plead or prove any alternative
        method of execution in order to prevail on this claim.

2354.   In order to determine which punishments are so disproportionate as
        to be cruel and unusual, the Supreme Court has "established the
        propriety and affirmed the necessity of referring to 'the evolving
        standards of decency that mark the progress of a maturing society.'"
        *Roper v. Simmons*, 543 U.S. 551, 560–61 (2005) (quoting *Trop v.
        Dulles*, 356 U.S. 86, 100-101 (1958) (plurality opinion)). "This is
        because '[t]he standard of extreme cruelty is not merely descriptive,
        but necessarily embodies a moral judgment. The standard itself
        remains the same, but its applicability must change as the basic
        mores of society change.'" *Kennedy v. Louisiana*, 554 U.S. 407, 419
        (2008) (quoting *Furman v. Georgia*, 408 U.S. 238, 382 (1972) (Burger,
        C.J., dissenting)).

2355.   The Court has taken the following approach in cases adopting
        categorical rules: first, it "considers objective indicia of society's
        standards, as expressed in legislative enactments and state practice,
        to determine whether there is a national consensus against the
        sentencing practice at issue. Next, guided by the standards
        elaborated by controlling precedents and by the Court's own
        understanding and interpretation of the Eighth Amendment's text,
        history, meaning, and purpose, the Court must determine in the
        exercise of its own independent judgment whether the punishment in

question violates the Constitution." *Graham v. Florida*, 560 U.S. 48, 61 (2010) (internal citations and quotation marks omitted).

2356. The Court also considers and is guided by scientific knowledge or other expertise that bear upon the issue. *See Hall v. Florida*, 134 S. Ct. 1986 (2014) (relying upon informed assessment of medical experts consistent with the views of the medical community); *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (relying upon scientific and sociological studies regarding juvenile and adolescent development).

2357. A national consensus can exist against a punishment even though it is statutorily permitted by a majority of states. The mere infrequency of a particular punishment suffices to establish a national consensus against the practice. *Graham*, 560 U.S. at 62–67.

2358. When deciding whether a punishment practice is "unusual" in the constitutional sense, the Court has looked to the number of States engaging in that practice. *See, e.g., Atkins v. Virginia*, 536 U.S. 304, 313-16 (2002); *Roper*, 543 U.S. at 564-66. *See also Glossip*, 135 S. Ct. at 2777 (Breyer, J., dissenting).

2359. The "consistency of direction of change" away from a particular punishment is also a relevant factor in evaluating whether our society, as a whole, still tolerates the punishment. *See Roper*, 543 U.S. at 566.

2360. A State's decision to bar the death penalty altogether necessarily demonstrates a judgment that the death penalty is a disproportionate

punishment. *Roper*, 543 U.S. at 574. Thus, these states are to be counted in favor of a consensus against the challenged punishment. *Id.*

2361. And while community consensus is "entitled to great weight," it is not itself determinative of whether a punishment is cruel and unusual. *Graham*, 560 U.S. at 67. The Court also considers whether the challenged punishment serves legitimate penological goals. *Id.*

2362. In addition, Ohio's Execution Protocol itself mandates that all execution process and methods shall be performed in a professional, humane, sensitive, and dignified manner. Human dignity must be respected by the State in carrying out executions. *See, e.g., Atkins*, 536 U.S. at 311 ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man"). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Roper*, 543 U.S. at 560.

2363. When *Atkins* was decided, 30 states prohibited the death penalty for the intellectually disabled. This number comprised 12 that had abandoned the death penalty altogether, and 18 that maintained it but excluded the intellectually disabled from its reach. *Roper*, 543 U.S. at 564.

2364. By a similar calculation by the time of the Court's decision in *Roper*, 30 states prohibited the juvenile death penalty, comprised of 12 that

had rejected the death penalty altogether and 18 that maintained it
but, by express provision or judicial interpretation, excluded juveniles
from its reach.  *Id.*

2365.    Likewise, at least 30 states prohibit the use of midazolam as the first
drug in a three-drug execution method.

2366.    Currently, nineteen (19) states have abolished the death penalty.

2367.    Thirty-one states retain the death penalty as a sentencing option but,
in practice, the majority of these states have abandoned carrying out
those executions.  As a result, only a minority of states actively
execute death row prisoners.

2368.    Of those 31 states that still formally retain the death penalty, 12
states have not executed an inmate in almost ten years or longer:
Kentucky (2008); California (2006); Montana (2006); Nevada (2006);
North Carolina (2006); Pennsylvania (1999); Colorado (1997);
Nebraska (1997); Oregon (1997); Wyoming (1992); Kansas (no
executions since the death penalty was reinstated in 1976); and New
Hampshire (no executions since the death penalty was reinstated in
1976).

2369.    None of these 12 states permit execution by the three-drug midazolam
method.

2370.    Thus, while 19 states have formally abolished the death penalty, at
least another 12 have done so in practice.

2371.    As a result, similar to the calculations by the Court in *Atkins* and
         *Roper*, 31 states have rejected the challenged punishment.

2372.    Only 10 states—Alabama, Arizona, Arkansas, Florida, Georgia,
         Missouri, Ohio, Oklahoma, Texas, and Virginia—have carried out an
         execution in the last five years.

2373.    Although all states that permit capital punishment provide for lethal
         injection as a manner of execution, only a small fraction of those
         states actually carry out their executions using a three-drug
         midazolam method.

2374.    Of all 31 the state that still retain the death penalty as a valid
         sentencing option, only five (5) states currently allow midazolam to be
         used as the first drug in a three-drug method of execution:  Alabama;
         Arkansas; Ohio; Tennessee; and Virginia.  Thus, only 16% of death
         penalty states—which account for less than 10% of all state and
         federal jurisdictions—sanction the use of the midazolam three-drug
         method in executions.

2375.    As of July 2017, the total population of those 5 states is estimated to
         be 34,723,639: Alabama (4,874,747); Arkansas (3,004,279); Ohio
         (11,658,609); Tennessee (6,715,984); and Virginia (8,470,020).  As of
         July 2017, the United States population is estimated to be
         325,719,178.

2376.    Thus, almost 90% of the U.S. population lives in a state that does not
         condone using a midazolam three-drug method to execute inmates.

2377.   The consistency of direction of change away from the three-drug midazolam method of execution demonstrates it is disfavored under current standards of decency.

2378.   With the exception of Tennessee, which has adopted but not implemented a three-drug midazolam method, states are turning away from using midazolam in a three-drug method.

2379.   Arizona and Florida announced the removal of the drug as an option from their respective execution protocols in 2016 and 2017, respectively.

2380.   Kentucky, prior to any use, denounced midazolam and publicly stated its intentions to remove the drug from its available options.

2381.   Nebraska, who recently reinstated the death penalty, did not include midazolam as part of their lethal injection protocol.

2382.   Oklahoma recently has announced it will abandon lethal injection as the preferred method of execution altogether, opting instead for nitrogen gas.

2383.   Alabama and Mississippi have also approved the use of nitrogen gas as an alternative to lethal injection.

2384.   At the time of *Baze*, 36 States had adopted lethal injection as their exclusive or primary means of execution.  Of those 36 States, at least 30 used the same combination of three drugs in their lethal injection protocols.  *Baze v. Rees*, 553 U.S. 35, 42–44 (2008).

2385.   No such uniformity exist today.

2386. For example, the execution protocol proposed in California only permits the use of barbiturates as the lethal drugs. Over 25% of all death row inmates are in California.[2]

2387. Florida and Texas, the states with the next largest death row populations, do not provide for the use of a midazolam three-drug method in their protocols.

2388. Collectively, just these three states—Florida, Texas, and California—account for almost half of all death row inmates.

2389. Because only five states sanction its use, the majority of death row inmates, like the majority of U.S. citizens, live in a place that does not condone midazolam as the first drug in a three drug execution.

2390. Additionally, no other state but Ohio has moved forward to a purportedly more humane method of lethal injection, by removing midazolam from its execution protocol, but then reintroduced midazolam into the protocol again later as the first drug in a three-drug protocol. That makes Defendants' challenged Execution Protocol and their adoption of that protocol "unusual." Ohio is the first to devolve in such a way.

2391. Community consensus is entitled to great weight when determining whether a punishment is cruel and unusual. The proper analysis

---

[2] https://deathpenaltyinfo.org/death-row-inmates-state-and-size-death-row-year (last accessed Apr. 4, 2018).

also requires that the Court apply its "own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose," to "determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution." *Graham*, 560 U.S. at 61 (internal citations and quotation marks omitted).

2392. The penological justifications for the sentencing practice are also relevant to the analysis. This is, in part, because a sentence lacking any legitimate penological justification is by its nature disproportionate to the offense.

2393. Use of a three-drug midazolam method of execution, involving a paralytic and potassium chloride, lacks any legitimate penological justification and, thus, is by its nature disproportionate to the offense.

2394. Use of a three-drug midazolam method of execution is not a deterrent to prospective offenders.

2395. Use of a three-drug midazolam method of execution is not permissible as retribution because that method of execution is disproportionally cruel and unusual.

2396. All relevant scientific and other expertise, applied to the three-drug midazolam method, confirms its cruelty, as addressed throughout this Fourth Amended Complaint.

2397. The paralytic ceases all movement within the inmate's control, and his ability to breathe or open and close his eyes. If not rendered

insensate to pain by the midazolam, he will experience the severe pain

and fear caused by the paralysis, which includes, but it not limited to,

suffocation induced by the arresting of his respiratory system.  To be

conscious of this paralysis creates a condition where Plaintiff will be

trapped within his own body, akin to being buried alive.  This is a

cruel punishment.  It is also unusual.

2398.   The use of a paralytic drug, under any circumstances, in a human

execution is cruel and unusual punishment.  Its use also no longer

comports with prevailing standards of decency.

2399.   Paralyzing drugs, like those permitted under Ohio's Execution

Protocol, are derived from a poison called curare.  In 1868, Swedish

physiologist A.F. Holmgren described the use of curare as changing

one "instantly into a living corpse, which hears and sees and knows

everything, but is unable to move a single muscle, and under its

influence no creature can give the faintest indication of its hopeless

condition."

2400.   The American Veterinary Medical Association's Guidelines for the

Euthanasia of Animals explains that "[a]gents and methods that

prevent movement through muscle paralysis, but that do not block or

disrupt the cerebral cortex or equivalent structures (*e.g.*,

succinylcholine, strychnine, curare, nicotine, potassium, or

magnesium salts), are not acceptable as sole agents for euthanasia of

vertebrates because they result in distress and conscious perception of pain prior to death."[3]

2401. The AVMA Guidelines specifically condemn the use of neuromuscular blocking agents even with powerful barbiturates: "Mixing of pentobarbital with a neuromuscular blocking agent in the same injection apparatus is not an acceptable approach to euthanasia because of the potential for the neuromuscular blocking agent to induce paralysis prior to onset of unconsciousness."

2402. Similarly, the Humane Society of the United States has stated that it is the "moral and ethical duty" of its members to end the practice of "injecting animals with curare-based or paralytic substances."

2403. Consequently, 42 of 50 states—including Ohio—bar the use of paralytic drugs in animal euthanasia because if something goes wrong and the animal is not properly rendered unconscious, it is impossible to know given the effects of the drug.

2404. Ohio Rev. Code § 4729.532, governing the performance of euthanasia by means of lethal injection on animals, mandates that "[n]o agent or employee of an animal shelter shall perform euthanasia by means of lethal injection on an animal by use of any substance other than

---

[3] https://www.avma.org/KB/Policies/Documents/euthanasia.pdf

combination drugs that contain pentobarbital and at least one noncontrolled substance active ingredient. . . . "

2405. Ohio allows the use of paralytic drugs to execute of humans but not animals. In other words, the known risk that a neuromuscular blocking agent may induce paralysis prior to onset of unconsciousness if sufficient to prohibit the use of those paralytic agents in animal executions, but not in those of humans.

2406. If not properly rendered insensate to pain by the midazolam—which cannot accomplish that task, because it has no analgesic properties— the paralytic compounds the substantial risk that the inmate will suffer severe pain and needless suffering during his execution by inducing an unnecessary paralysis of all his voluntary movements and, consequently, his ability to effectively communicate his internal distress to anyone. Though conscious and aware and sensate, the paralyzed inmate will be trapped in his own body as the execution progresses. The paralytic does not serve any therapeutic purpose. Therefore, if the inmate remains sensate after injection of midazolam—which he will, because midazolam has no analgesic properties—the potassium chloride will burn as it courses through the inmate's veins, until it reaches and ultimately stops his heart by inducing cardiac arrest. This will be the chemical equivalent of being burned at the stake. This is a cruel punishment. It is also unusual.

2407.   To avoid subjecting a condemned inmate to the known excruciating pain of the paralytic and potassium chloride, it is essential that midazolam work as an effective drug to render the inmate insensate to pain throughout the process.  But, as addressed throughout this Amended Complaint, midazolam is unsuitable for that crucial purpose.  Its unsuitability is demonstrated by reliable medical and scientific expertise, and by the many botched executions that have resulted from its use.  Midazolam will not reliably, if ever, render the inmate insensate to the pain of the paralytic and potassium chloride.

2408.   These risks of being exposed to primitive forms of punishment constitute wanton exposure to objectively intolerable risk.

2409.   The "Eighth Amendment categorically prohibits the infliction of cruel and unusual punishments." *Penry v. Lynaugh*, 492 U. S. 302, 330 (1989).  Therefore, because the use of a three-drug midazolam method of execution is cruel and unusual punishment, the Eighth Amendment bars its application against Plaintiff, and categorically, against all death row inmates.

**Forty-Sixth Cause of Action: Ohio Corrupt Practices Act Claims Against Individual Defendants in Their Individual Capacity.**

2410.   Plaintiff does not allege a Forty-Sixth Cause of Action.

**Forty-Seventh Cause of Action: Equal Protection Clause Violation based on violations of Administrative Procedures Act.**

2411.   Plaintiff does not allege a Forty-Seventh Cause of Action.

## PRAYER FOR RELIEF

G.   Plaintiff's Prayer for Relief for the entirety of his Complaint in this suit is

alleged in the Fourth Amended Omnibus Complaint.  Out an abundance

of caution, he fully incorporates that Prayer for Relief (Fourth Am.

Omnibus Compl., ECF No. 1252, PageID 45866–877) here by reference.

H.   Additionally, Plaintiff requests that this Court grant him declaratory

relief under federal law in the form of the following:

a.   An Order declaring that Defendants' execution policy and written

execution protocol will subject him to a sure or very likely risk of

serious physical and/or psychological pain and needless suffering,

as well as the sure or very likely risk of other types of

unconstitutional harm including a lingering execution or

attempted execution, an undignified execution or attempted

execution, or a spectacle execution or attempted execution, or an

objectively intolerable risk of such harm that Defendants

unjustifiably ignore, resulting in cruel and unusual punishment,

whether that method is through the policy's Plan 1, Plan 2, or Plan

3, and that Defendants' execution policy and written execution

protocol fails to ensure against an execution that would constitute

cruel and unusual punishment, and thus will violate Plaintiff's

rights under the Eighth and Fourteenth Amendments to the United

States Constitution.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,

**Deborah L. Williams**
Federal Public Defender

by


*/s/ Allen L. Bohnert*
Allen L. Bohnert (0081544)
Assistant Federal Public Defender
Office of the Federal Public Defender
for the Southern District of Ohio
Capital Habeas Unit
10 West Broad Street, Suite 1020
Columbus, Ohio 43215
614-469-2999
614-469-5999 (fax)
Email: Allen_Bohnert@fd.org
Trial and Lead Counsel for Plaintiff
Chinn

and

*/s/ Carol A. Wright (per*
*authorization)*
Carol A. Wright (0029782)
Assistant Federal Public Defender
Office of the Federal Public Defender
for the Southern District of Ohio
Capital Habeas Unit
10 West Broad Street, Suite 1020
Columbus, OH 43215
614-469-2999
614-469-5999 (fax)
Email: Carol_Wright@fd.org
Co-Counsel for Plaintiff Chinn

*/s/ Erin G. Barnhart (per*
*authorization)*
Erin G. Barnhart (0079681)
Assistant Federal Public Defender
Office of the Federal Public Defender
for the Southern District of Ohio
Capital Habeas Unit

10 West Broad Street, Suite 1020
Columbus, OH 43215
614-469-2999
614-469-5999 (fax)
Email: Erin_Barnhart@fd.org
Co-Counsel for Plaintiff Chinn

**_/s/ Rachel Troutman (per
authorization)_**
Rachel Troutman (0076741)
Assistant State Public Defender
Office of the Ohio Public Defender
250 E. Broad Street, Suite 1400
Columbus, Ohio 43215
614-466-5394
614-644-0708 (fax)
Email: Rachel.Troutman@opd.ohio.gov
Co-Counsel for Plaintiff Chinn


**_/s/ Randall L. Porter (per
authorization)_**
Randall L. Porter (0005835)
Assistant State Public Defender
Office of the Ohio Public Defender
250 East Broad St., Suite 1400
Columbus, OH 43215
614-466-5394
Fax: 614-644-0708
Email: randall.porter@opd.ohio.gov
Co-Counsel for Plaintiff Chinn

**_/s/ James A. King (per authorization)_**
James A. King (0040270)
Porter, Wright, Morris & Arthur LLP
41 South High Street
Columbus, Ohio 43215
614-227-2051
614-227-2100 (fax)
Email: jking@porterwright.com
Co-Counsel for Plaintiff Chinn

**CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2018, I filed the foregoing **Plaintiff**

**Davel Chinn's Second Amended Individual Supplemental Complaint**

electronically with the Clerk of the United States District Court for the

Southern District of Ohio using the CM/ECF system, which will send

notification of such filing to e-mail addresses for opposing counsel that are on

file with the Court.


_/s/ Allen Bohnert_____
**Trial Counsel for Plaintiff Davel
Chinn**