Steven Knight

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

--|--

Case No. 2:11-cv-1016

--|--

In Re: Ohio Execution Protocol Litigation,

--|--

Deposition of:   STEVEN KNIGHT

Date and Time:   Wednesday, August 7, 2019
                 10:01 a.m.

Place:           Federal Public Defender's
                   Office
                 10 West Broad Street
                 Suite 1020
                 Columbus, Ohio

Reporter:        Julieanna Hennebert, RPR, RMR
                 Notary Public - State of Ohio

--|--

Steven Knight

Page 2

```
 1    APPEARANCES:

 2    On behalf of Plaintiff Cleveland Jackson:

 3          MR. ALLEN L. BOHNERT
            MR. ADAM RUSNAK
 4          Federal Public Defender's Office
            Southern District of Ohio
 5          10 West Broad Street, Suite 1020
            Columbus, Ohio  43215
 6          614.469.2999

 7    On behalf of the State:

 8          MS. ANNE BERRY STRAIT
            Principal Assistant Attorney General
 9          for Dave Yost, Ohio Attorney General
            Court of Claims Defense
10          150 East Gay Street, 18th Floor
            Columbus, Ohio  43215
11          614.644.6925

12    On behalf of Ohio Pharmacy Service Center:

13          MS. TIFFANY L. CARWILE
            MR. ANDREW FRASER
14          Assistant Attorneys General
             for Dave Yost, Ohio Attorney General
15          Constitutional Offices
            30 East Broad Street, 16th Floor
16          Columbus, Ohio  43215
            614.466.2872
17
      On behalf of Mental Health and Addiction Services:
18
            MS. JANICE R. FRANKE
19          Ohio Department of Mental Health and Addiction
               Services
20          30 East Broad Street, 36th Floor
            Columbus, Ohio  43215
21          614.466.8288

22                          --|--

23

24

25
```

Steven Knight

Page 3

```
 1   APPEARANCES (Continued):

 2   On behalf of DRC Employee No. 1:

 3        MR. STEPHEN C. GRAY
          Ohio Department of Rehabilitation & Correction
 4        Division of Legal Services
          4645 Fisher Road, Suite D
 5        Columbus, Ohio  43228
          614.752.1773

 6

 7   Also present:

 8        DRC Employee No. 1
          Mr. Brendan Haas
 9        Ms. Katelyn A. Lee Phadke

10                     --|--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Steven Knight

Page 4

1                          INDEX

2                         --|--

3    STEVEN KNIGHT                                    PAGE
      Examination by Mr. Bohnert                        6
4     Examination by Ms. Strait                        130

5                         --|--

6                    DEPOSITION EXHIBITS

7    NUMBER DESCRIPTION                           IDENTIFIED

8     1    Subpoena                                    12

9     2    Knight's hand diagram                        29

10    3    Bohnert's hand diagram                       29

11    4    Top 50 drugs for Department of               89
           Corrections 2nd Quarter 2019
12
      5    ODRC Formulary Drugs Bates stamped           91
13         OPS_000264 - 266

14    6    ODRC Formulary Drugs Bates stamped           92
           OPS_000267
15
      7    ODRC Top 50 Spend 1st Quarter 2019           94
16
      8    9/5/2018 email Bates stamped                 94
17         OPS_000770

18    9    ODRC Top 60 Spend 3rd Quarter 2019           97

19    10   10/10/2018 email Bates stamped               97
           OPS_006873
20
      11   10/25/2018 email chain Bates stamped         99
21         OPS_0084550

22    12   Contract Monitoring Checklist Bates          99
           stamped OPS_025463 - 468
23
      13   OhioMHAS invoices Bates stamped             102
24         OPS_025562 - 564

25

Steven Knight

Page 5

1                    DEPOSITION EXHIBITS

2    NUMBER DESCRIPTION                          IDENTIFIED

3    14    Packing slips Bates stamped              104
           OPS_025469 - 487
4
     15    Purchase orders Bates stamped            107
5          OPS_025488 - 507

6    16    OhioMHAS Invoices Bates stamped          122
           OPS_000740 - 757
7
     17    Vendor invoices Bates stamped            122
8          OPS_025508 - 529

9    18    OhioMHAS Invoices Bates stamped          123
           OPS_025530 - 547
10
     19    Purchase order with backup Bates         124
11         stamped OPS_025548 - 561

12   20    Master Selection Listing Items           126
           Bates stamped OPS_015155 - 224
13

14                      --|--

15

16

17

18

19

20

21

22

23

24

25

Steven Knight

Page 6

```
 1                    STEVEN KNIGHT,

 2    being by me first duly sworn, as hereinafter

 3    certified, deposes and says as follows:

 4                    EXAMINATION

 5    BY MR. BOHNERT:

 6        Q.     Good morning, sir.

 7        A.     Morning.

 8        Q.     My name's Allen Bohnert and with me here

 9    today is Adam Rusnak.  We represent Cleveland Jackson

10    who is a plaintiff in the litigation with Ohio's

11    legal injection litigation.  You know you're here to

12    give a deposition today, correct?

13        A.     Correct.

14        Q.     And you know you've been identified and

15    designated under Civil Rule 30(B)(6) to provide

16    answers in a deposition today on behalf of Ohio

17    Department of Mental Health and Addiction Services,

18    correct?

19        A.     Correct.

20        Q.     So for today's purposes you are speaking

21    as if you are the Ohio Department of Mental Health

22    and Addiction Services.  You understand that, right?

23        A.     I do.

24        Q.     Have you been deposed before?

25        A.     No.
```

Steven Knight

Page 7

```
 1     Q.     So just kind of, I assume that your
 2   attorneys or others have kind of explained to you
 3   what today will entail, right?
 4     A.     Yes.
 5     Q.     I don't want to ask what they said but
 6   just that they have gone over with you kind of what
 7   we're going to do today?
 8     A.     Yes.
 9     Q.     So basically as I view it we're just going
10   to have a conversation.  We are trying to get an idea
11   of some things, some factual information, that kind
12   of thing, and we're hoping that you can help kind of
13   educate us on a bunch of these different things.
14          So it's not adversarial things, I'm not
15   trying to trick you, not trying to play games, I'm
16   trying to learn today and hoping that you can help
17   me.  Is that okay?
18     A.     Absolutely.
19     Q.     So just a couple basic kind of preliminary
20   things since you haven't been deposed before so that
21   we're both on the same page, okay?
22     A.     Uh-huh.
23     Q.     So I will assume that you understand the
24   question unless you tell me you don't understand the
25   question.
```

Steven Knight

Page 8

1      A.      Okay.

2      Q.      Okay?

3      A.      Uh-huh.

4      Q.      And I will assume that you understand the

5   question when you answer that question.  Is that all

6   right?

7      A.      Yes.

8      Q.      Please answer all questions with an oral

9   response rather than a nod or a shake of the head; is

10   that okay?

11      A.      (Nods head.)

12              Yes.

13      Q.      And that's just, the court reporter can't

14   write down a nod or shake or whatever, so just a

15   verbal response to something would be helpful.

16      A.      Okay.

17      Q.      And because there's only one of her and

18   there's two of us, if we're both talking at the same

19   time it makes it exceedingly difficult for her to

20   produce an accurate record of what we said here

21   today, so I'll just ask that we both kind of respect

22   each other and only one of us talk at a time.

23              So if I'm asking a question, wait till I'm

24   finished asking the question and then answer it.  At

25   that point if you don't understand, that's where you

Steven Knight

Page 9

1    say I don't understand, or can you help me understand

2    what the question is.

3             And there may be some of those, I'm not

4    going to lie.  So at that point just if you could

5    just make sure that we're not both talking at the

6    same time, that would be great, okay?

7        A.    Absolutely.

8        Q.    Perfect.  If at any point, and I realize

9    it gets warm in here, if you need to take a break, if

10   you need to use the restroom or anything like that,

11   you can just let us know and we'll try to accommodate

12   that.  The only thing I ask is that you don't ask to

13   take a break while there's a question pending.  Just

14   finish the question and then we'll address the break

15   issue, okay?

16       A.    Sure.

17       Q.    Now, just to be clear on a couple things

18   regarding identities and things of that nature.  So

19   there's a couple things.  One that shouldn't really

20   affect matters here today and that is that in this

21   case going back many, many years now several people

22   have been identified not by their names but only by

23   identifying numbers, Execution Team Member whatever.

24   Okay?

25             I don't anticipate that that's going to be

Steven Knight

Page 10

1    an issue here today because I don't know that I

2    anticipate asking any questions that would go to the

3    Execution Team members.  But if I do somehow, please

4    understand I'm not asking for their names, I'm asking

5    for their reference by number.

6              In that case you probably would need to

7    consult with counsel from the Attorney General's

8    Office who have been litigating the lethal injection

9    case.  As I said, I don't anticipate that's going to

10   be a problem.

11       A.    Okay.

12       Q.    Corollary to that is that your counsel

13   here today Ms. Carwile and I have kind of worked out

14   what I think is hopefully an understanding and

15   agreement that while Plaintiff Jackson doesn't

16   concede that persons who would be potentially

17   discussed here today who are, say, employees or

18   agents of the, can I say ODMH, is that still the

19   accurate acronym?

20             MS. FRANKE:  It's actually MHAS because

21   we're Mental Health and Addiction Services as of

22   2013.

23             MR. BOHNERT:  Is there like a shorter?

24             MS. CARWILE:  You could say OPS, Ohio

25   Pharmacy Services since that's where he's from.

Steven Knight

Page 11

1     Q.     We'll just use "OPS" then, is that okay?
2   Plaintiff Jackson doesn't necessarily agree or
3   concede that anybody that you would talk about from
4   OPS would be entitled to anonymity or
5   confidentiality.
6              That being said, for purposes of today's
7   deposition we've agreed that if at any point you need
8   to discuss names that are not on documents or
9   whatever, then let's make sure that you're going to
10  consult with your counsel to make sure that the
11  person you're referring to is identified consistently
12  by a number or something along those lines, okay?
13    A.     Absolutely.
14             MR. BOHNERT:  Is that, Ms. Carwile,
15  acceptable to you?
16             MS. CARWILE:  Yes.  And I want to let you
17  know after our conversation the Department of
18  Rehabilitation and Corrections let me know that an
19  individual with them that wants confidentiality that
20  I don't think has a number because the statute does
21  put civil liability on people that disclosed that
22  name and we haven't had time to resolve that issue,
23  he's going to identify that person as DRC Employee
24  No. 1.
25             If you need that person's identification

Steven Knight

Page 12

1   we would prefer you try to get that from DRC since

2   they're one of the parties in the case.

3                MR. BOHNERT:  So just so I'm understanding

4   you clearly, this person is not an Execution Team

5   member and is an employee in some other capacity with

6   DRC; is that correct?

7                MS. CARWILE:  I don't know their status on

8   the Execution Team.  I know that they don't have a

9   number but they do want confidentiality.

10               MR. BOHNERT:  So if they don't have a

11  number then -- yeah, okay.  Well, certainly we

12  obviously wouldn't necessarily agree or concede to

13  that but for purposes of today's deposition and the

14  interest of not bringing things to a grinding halt

15  over something that may not be an issue, let's

16  proceed and we'll operate under RC, what did you say

17  DRC Employee No. 1?

18               MS. CARWILE:  Yes.  Thank you.

19       Q.     (By Mr. Bohnert) Steve, right?

20       A.     Yes.

21       Q.     Steve, let's talk a little bit about what

22  you did to prepare for today's deposition.  I'm

23  handing you what I guess we may as well mark as

24  Deposition Exhibit 1.

25               (DEPOSITION EXHIBIT 1 MARKED.)

Steven Knight

Page 13

```
 1      Q.      What we'll do when we work with an exhibit
 2  is I'll hand it first to the court reporter, she'll
 3  mark it so that we're all on the same page about
 4  what's what, and she'll hand it to you, and generally
 5  have a courtesy copy for your counsel as well.
 6      A.      Okay.
 7      Q.      So I've handed you what's now been marked
 8  Deposition Exhibit 1.  Do you recognize what this
 9  particular document is?
10      A.      I do.
11      Q.      And can you tell me what it is?  What do
12  you recognize it to be?
13      A.      A subpoena to be here today.
14      Q.      Okay.  And you received this subpoena; is
15  that right?
16      A.      Yes.
17      Q.      And if you turn to I guess it would be
18  page -- 1, 2, 3 -- 4 and thereafter, is it accurate
19  to say that this Attachment 1 starting around on
20  page 9 or so sets out deposition subject matters that
21  are to be fair game here for today?  Is that right?
22      A.      Yes.
23      Q.      And so have you reviewed the deposition
24  subject matters list?
25      A.      Yes.
```

Steven Knight

Page 14

1     Q.     So tell me what else that you did to

2  prepare for today's deposition.  Other than just

3  simply reading through the list of topics on

4  Attachment 1.

5     A.     There were requests of documentation that

6  was provided, that we provided to, I guess to you.

7     Q.     "You" meaning your counsel?

8     A.     Yes.

9     Q.     And then they provided them to us.

10    A.     Yes.

11    Q.     So were you involved in actually obtaining

12 or searching for those documents?  Or you're just

13 saying you knew that it happened?  Kind of describe a

14 little bit for me what you mean by that.

15    A.     For part of the documents that was in our

16 systems I searched for those documents myself.

17    Q.     And did you do anything else to prepare

18 for today's deposition?

19    A.     I had a couple meetings with my counsel.

20    Q.     Okay.  And how long would you say that in

21 total, not getting into the substance of what you

22 talked about but just in general how long would you

23 say you spent meeting with your counsel to prepare

24 for the deposition here today?

25    A.     All meetings total?

Steven Knight

Page 15

1      Q.      Correct.

2      A.      Five hours.

3      Q.      Okay.  Did you talk with or interview with

4  anybody else for today's deposition other than you

5  identified your counsel here today?

6      A.      Just Department of Mental Health counsel

7  also.

8      Q.      And who is that?

9      A.      Janice Franke.

10      Q.      Anybody else?

11      A.      The CEO for Office of Support Services.

12      Q.      The office of what, I'm sorry?

13      A.      Pharmacy Services, sorry.

14      Q.      And who is that?

15      A.      Brandon Haas.

16      Q.      And are those two meetings included in

17  that total aggregate of five hours that you mentioned

18  a moment ago?

19      A.      Yes.

20              MS. CARWILE:  I want to object.  He seems

21  to be having a little question about names so I just

22  want to instruct him, if you don't mind.

23              If it's in relation to the execution drugs

24  and pertaining to them, that's where we're going to

25  use Person No. 1 and Person No. 2.  If we're just

Steven Knight

Page 16

1   talking about personnel in general and who you spoke

2   with and who is in the Department, you are allowed to

3   give those names.

4           THE WITNESS:  Okay, thank you.

5       Q.      So to be clear, I'm not asking right now

6   about anything related to obtaining drugs of any

7   kind, I'm simply trying to lay the foundation or get

8   an understanding of what you did to prepare for

9   today.

10      A.      Okay.

11      Q.      So you mentioned meeting with your

12  counsel, meeting with OPS counsel and the CEO of OPS.

13  Anybody else that you met with in preparation for

14  today's deposition?

15      A.      Not to my recollection, no.

16      Q.      And you said you spent approximately five

17  hours in those meetings; is that right?

18      A.      Total.

19      Q.      And did you review any, I mean you

20  mentioned that you were involved in initial review

21  for production of documents in response to the

22  subpoena.  In preparation for today's deposition did

23  you actually review any of the documents themselves

24  that have been identified and produced?

25      A.      I didn't specifically go over any of that

Steven Knight

Page 17

1  particular data or anything like that.

2      Q.      But are you prepared to discuss, explain,

3  testify about any of those documents that were

4  produced to us?

5      A.      Absolutely.

6      Q.      Did you, so we've got the meetings with

7  counsel, meetings with the CEO, you testified about

8  having been involved in production or review for

9  production of the documents.  Is there anything else

10  that you did to prepare for today's deposition that

11  you can think of?

12      A.      Not that I can remember.

13      Q.      So let's talk about some background a

14  little bit so I can get an idea of how you came to be

15  here with all of us in this wonderful stifling room.

16              Steve, can you tell me what is your

17  position within OPS?

18      A.      I'm the supervisor of the procurement and

19  warehouse.

20      Q.      And what does that mean?  Like what are

21  your job duties in that capacity?

22      A.      So I manage the day-to-day operations of

23  the warehouse operations and procurement staff, part

24  of the leadership team of our whole operation.

25      Q.      Now you'll have to forgive me because I

Steven Knight

Page 18

1  feel like I don't have a good understanding of what

2  exactly OPS entails, what it is, and we'll get kind

3  of some drilling down into some of those specifics

4  here in a little bit, but just in terms of your

5  statement about management of the warehouse, explain

6  that a little bit more.

7         What do you mean by the warehouse and

8  managing the employees there and that kind of thing?

9  What is it that you do on a daily basis I guess?

10  Help me understand that a little more.

11     A.    So the warehouse is a typical distribution

12  type warehouse that receives orders from customers,

13  those orders are sent out to the warehouse to be

14  picked, packed, and shipped and delivered.

15         And as questions arise, data evaluation,

16  you know, evaluating how the operation's going, are

17  we as productive as we should be, are we not as

18  productive as we should be for a typical distribution

19  type business.

20         And then the procurement operation is

21  obviously the procuring of all the items that we

22  carry and ensuring that it's following the proper

23  procedures, answering questions and things like that

24  how to stock products and so on.

25     Q.    Just so I'm clear, when you say "we" and

Steven Knight

Page 19

1    "our" and that kind of thing, specifically who is

2    "we"?

3         A.     "We" being, from the way I was meaning it

4    was "we" being OPS as an operation.

5         Q.     And so I guess let's talk about some of

6    that basic kind of organizational stuff then so I

7    have a better understanding of what everything is,

8    what all is going on.

9              So I know that there's the Ohio Department

10   of Mental Health and Addiction Services, I know

11   there's the Ohio Pharmacy Service Center, no S,

12   right?

13        A.     Uh-huh.

14        Q.     Am I correct in that?

15        A.     Service you're saying "center" versus

16   "centers"?

17        Q.     I don't know.  You tell me.

18        A.     I mean that's what you're saying no S?

19        Q.     No, it's not Ohio Pharmacy Services

20   Center, it's Ohio Pharmacy Service Center, not to be

21   confused with as I understand it the Ohio Pharmacy

22   Services; is that right?

23        A.     To my knowledge we're talking about the

24   same people.

25        Q.     Okay.  So as I understood it there is the

Steven Knight

Page 20

1    Department of Mental Health and Addiction Services

2    and my understanding was there was sort of the

3    umbrella sub-office of the Ohio Pharmacy Service

4    Center within which then there's the Ohio Pharmacy

5    Services and there's the Central Pharmacy Inpatient

6    and Central Pharmacy Outpatient.

7        A.    Sorry, I misunderstood you.

8        Q.    Do I have that?

9        A.    I did misunderstand your previous

10   question.  That is correct.

11       Q.    So I just want to make sure that we're

12   precise in our language because at times there's been

13   discussions of the Ohio Pharmacy Services Center and

14   I think my read on that is that kind of confuses

15   whether we're talking about Ohio Pharmacy Service

16   Center or Ohio Pharmacy Services.  And I understand

17   them to be kind of two subtly distinct terms.

18       A.    To clarify that I think.

19       Q.    Please.

20       A.    Ohio Pharmacy Services is the

21   encompassing, Pharmacy Service Center is the

22   warehouse.

23       Q.    Tell you what, let's do this.  Can you

24   draw me a diagram so I can understand kind of like an

25   organizational flowchart I guess if you would.  At

Steven Knight

Page 21

1    the top we'll start with ODMA -- at the top start

2    with Ohio Department of Mental Health and Addiction

3    Services and then help me understand how it goes from

4    there.

5        A.    That's Ohio Pharmacy Services.

6        Q.    When you say "OPS" on your diagram?

7        A.    Yes.  And within here is the CPIP, Central

8    Pharmacy Inpatient, as you said.

9        Q.    Okay.

10       A.    CPOP, Central Pharmacy Outpatient.

11       Q.    Okay.

12       A.    PSC, Pharmacy Service Center.  And then

13   I'll just kind of lump everything else into

14   administrative transportation, that type of stuff.

15       Q.    Okay.

16       A.    And there's obviously more within the ODMH

17   side.

18       Q.    So in looking at the diagram then when you

19   are talking about the warehouse, for instance, that

20   is the warehouse run by OPS the sort of umbrella

21   office for Central Pharmacy Inpatient, Central

22   Pharmacy Outpatient, Pharmacy Service Center, and the

23   administrative operations, correct?

24       A.    Correct.

25       Q.    And what is it that OPS does when you say

Steven Knight

Page 22

1  stock product or procure product, help me understand

2  that a little bit more, please.

3      A.     We buy the product in what I'll call is a

4  bulk form and take customer orders and we'll break

5  that bulk form down into order level quantities and

6  deliver that to them.

7      Q.     When you say "product," what do you mean?

8  Are we talking about just pharmaceuticals, are we

9  talking about not pharmaceuticals?  Help me

10 understand that.  Assume that I know nothing, as many

11 of the other folks in this room do, just assume that

12 I know nothing and help me understand that on like a

13 second grade level.

14     A.     Pharmaceuticals obviously, medical

15 supplies, personal care items.  Small amount of

16 office type supplies; pencils, papers, that type of

17 thing.

18     Q.     Okay.

19     A.     Over-the-counters which could be under the

20 pharmaceutical side.

21     Q.     And who are the customers?  Like who

22 purchases -- I assume if somebody wants something

23 from OPS they have to purchase it from OPS; is that

24 right?

25     A.     Correct.

Steven Knight

Page 23

1    Q.    So even if it's the State of Ohio moving

2  money from one pocket to another from, for instance,

3  Department of Rehabilitation and Corrections, do they

4  have to then exchange money to obtain a product from

5  OPS?

6    A.    Yes.

7    Q.    Who else are the customers?

8    A.    So it's defined by the Ohio Revised Code

9  that states who is allowed to purchase product from

10  us.

11    Q.    And is it like all Ohio agencies, is it

12  like if I as a private citizen were to come and speak

13  with you:  Hey, Steve, I'd like to get my hands on

14  blank product?  Can I do that as a private citizen?

15    A.    No.

16    Q.    So what is sort of the requirement in

17  order to be able to purchase from OPS?

18    A.    Generally speaking, I'm not quoting the

19  Ohio Revised code.

20    Q.    Sure.

21    A.    But it states state agencies that are

22  nonprofit agencies.  There are some free clinics,

23  like I said the Department of Corrections, Department

24  of Mental Health, Department of Youth Services.  What

25  I'll call opiate addiction clinics.  But everything

Steven Knight

Page 24

1   is a nonprofit type of organization.  It definitely

2   cannot be a for profit type organization.

3        Q.     So OhioHealth can't come to you guys and

4   say we'd like to buy product from you.

5        A.     Absolutely not.

6        Q.     So in terms of the Pharmacy Service

7   Center, explain kind of the specifics of what is it

8   that PSC does specifically.

9        A.     I would guess I would say there's two

10  pieces to that.  There's the procurement side of the

11  product, and there is what I term as the warehouse

12  side of the product.  Again, for a general view of

13  how this looks would be a standard typical

14  distribution business.

15            So a purchase order would be created to a

16  vendor, the product would be received in our

17  warehouse, it would be put away into stock.  The

18  customer order would come in, the order would be

19  placed in the system, it would tell them, the store

20  keepers staff, this is the items on that order.  They

21  would walk through the warehouse, pick each item

22  that's on there, it's packed, what we call shipped or

23  delivered.

24       Q.     So if I'm understanding you correctly it

25  sounds to me that PSC is the part of the procurement

Steven Knight

Page 25

1  operation where you, PSC, would go out in the

2  marketplace to say AmeriSourceBergen or Cardinal

3  Health, any of these main distributors to obtain drug

4  products not necessarily on demand but just that you

5  would maintain a stock of a certain list of drug

6  product that you would go and get and bring in to PSC

7  and just have in inventory in your warehouse; is that

8  right?

9      A.      Correct.  Based on a systematic use of

10  setting inventory levels and what you're going to

11  sell in that amount of time.

12      Q.      Now, does PSC also act -- let me back up.

13          My understanding of what we just talked

14  about was that that is sort of a prearrangement.  In

15  other words, when the customer comes to you you've

16  already got the product in stock in theory at PSC and

17  you just process it from there, send it out the door,

18  and it doesn't involve PSC at that point having to go

19  out and look for it in the broader open marketplace,

20  right?  Assuming you have it in stock.

21      A.      Yeah, assuming it's available in stock.

22  We do receive special requests.  I wouldn't call

23  necessarily special requests, new medication might

24  come on the market or there's a particular something

25  that needs to be treated and the prescription would

Steven Knight

Page 26

1  have been maybe written for a particular drug or

2  something like that.  So what we stock is all based

3  on movement.

4      Q.    So you actually I guess anticipated my

5  next question, which was if somebody or an agency or

6  if somebody who's allowed to purchase from PSC comes

7  to PSC and says I would like to get this product, you

8  look in your inventory and no, we don't carry it, can

9  you then go out and look for it in the broader open

10 marketplace?

11     A.    Yes.

12     Q.    So we have OPS the broader umbrella, we

13 have Pharmacy Services Center, "center," right?  Not

14 "centers"?

15     A.    Not "centers."

16     Q.    Not like Centers for Disease Control?

17     A.    Yeah, no.

18     Q.    Help me understand where Central Pharmacy

19 Inpatient fits in this web of things in the drug

20 procurement process.

21     A.    Central Pharmacy Inpatient is a customer

22 of the warehouse, or PSC.  They place orders from us

23 and we follow that same process of getting the

24 product to them.  We again, as I stated earlier, we

25 buy the product in bulk, which could be a bottle or a

Steven Knight

Page 27

1    package of in the pharmaceutical world pills.  Could

2    be a hundred count bottle, could be a thousand count

3    bottle.  So that's where we call it bulk.  And we

4    would deliver to the Central Pharmacy Inpatient.

5              They are a patient label filling operation

6    versus we are not patient labeled, we are just the

7    bulk product.

8        Q.    Help me understand that a little bit more.

9    When you say "patient labeling" because I've heard a

10   lot of terms in the course of this litigation and

11   that is one that I have never heard.  Help me

12   understand that a little bit.  I suspect it's fairly

13   simple but again treat me like a dummy, help me

14   understand.

15       A.    If you went to your local pharmacy and got

16   a prescription, that would be the same.  So the

17   prescription would come in to the Central Pharmacy

18   Inpatient and they would fill the prescription.

19   Which is to a particular person, not bulk.

20       Q.    And they in turn would come to Pharmacy

21   Service Center as the first stop -- well, I shouldn't

22   assume.  They would come to Pharmacy Service Center

23   to fill that need of a product.

24       A.    From a bulk perspective, correct.

25       Q.    Now just to be clear because the term

Steven Knight

Page 28

1    "bulk" can sometimes be a little confusing, did

2    you -- I appreciate that you kind of defined it

3    somewhat.  To be clear when you say "bulk," you're

4    not necessarily just referring to say like the raw

5    powder form of a product that might then be

6    compounded or anything, right?

7        A.    No.

8        Q.    But could you obtain like if an order came

9    in that somebody wanted the raw active pharmaceutical

10   ingredient, the API of something powder, could you at

11   Pharmacy Service Center go out and look to purchase

12   it?

13       A.    I guess the best way to describe it would

14   be, yes, I can search for anything.

15       Q.    Okay.

16       A.    Whether it's available to us or not is a

17   separate question.

18       Q.    Right, of course.  But in other words,

19   you're not, PSC, you are not limited to just

20   purchasing product that is manufactured by an

21   FDA-approved manufacturer, correct?

22       A.    To answer the question I can't imagine us

23   purchasing anything that would not be approved

24   medication.

25       Q.    Well, I guess like, for instance, the

Steven Knight

Page 29

1    active pharmaceutical ingredient in a drug that might

2    want, that might ultimately be compounded, right,

3    that's not necessarily a manufactured product,

4    manufactured by an FDA-approved manufacturer.  You

5    see what I'm saying?

6         A.    Uh-huh.

7         Q.    But it's still something that say a

8    customer might want and might come to you to look to

9    get it.  I guess my question is would you guys be

10   able to go out and look to purchase the API in that

11   situation?

12        A.    We would.

13        Q.    There's no restrictions on you being able

14   to do that.

15        A.    Not that I -- anything that would be out

16   of the ordinary type process I'm sure we would check

17   with any pharmacy laws or anything like that to

18   ensure it's, as long as I guess the statement is if

19   you're talking about legal type products that are,

20   yes, we could go find that type of thing.

21        Q.    So if I were to make a, if I were to

22   modify your diagram just a little bit, make sure I'm

23   using the right terms.  I'm handing you, let's mark

24   this diagram that you made as Deposition Exhibit 2.

25             (DEPOSITION EXHIBITS 2 - 3 MARKED.)

Steven Knight

Page 30

1    Q.    Steve, I'm going to hand you my crudely

2    drawn diagram here.  On the diagram we've got a

3    handful of boxes in sort of a flowchart order.  On

4    the bottom there's a box that says "customer," one

5    level up from there there are a couple boxes, one

6    that says CPIP, which stands for Central Pharmacy

7    Inpatient, another box at the same level that says

8    CPOP, Central Pharmacy Outpatient, and box above that

9    that says PSC or Pharmacy Service Center.  Did I

10   accurately describe that?

11        A.    Yes.

12        Q.    Now, if you could, using a pen can you

13   just, I think it should be fairly common sense but I

14   want to make sure I understand the sort of flow, if

15   you could help me diagram the flow of a request for a

16   purchase of a drug product and then the flow of that

17   drug product from the bottom to the top and then back

18   down again.  All right?

19             I realize the diagram's crude but is it,

20   at its basic level would an order start with the

21   customer on the bottom?

22        A.    Yes.

23        Q.    And then go to say Central Pharmacy

24   Inpatient if the customer was say Ohio Department of

25   Rehabilitation and Corrections?

Steven Knight

Page 31

1      A.      Yes.  There could be different paths based

2  on which customer.

3      Q.      Okay.  Let's say we're talking

4  specifically about ODRC.

5      A.      Okay.

6      Q.      So if you could draw an arrow that would

7  indicate the flow of the request.  Would it go

8  directly from the customer to PSC or would it go from

9  the customer to CPIP?

10      A.      And I'm going to throw another twist here.

11      Q.      That's fine, please.

12      A.      It depends on the product.

13      Q.      Okay.  Help me understand that, what do

14  you mean?

15      A.      So if the Department of Corrections is

16  asking for a personal care item, shampoo, a brush, a

17  medical supply, things of that nature, it would come

18  directly to Pharmacy Service Center.

19      Q.      So things that would not ordinarily

20  require a prescription.

21      A.      Correct.

22      Q.      What if we're talking about a particular

23  controlled substance, for instance?  I mean I assume

24  PSC doesn't just hand those out to anybody.

25      A.      Not at all.

Steven Knight

Page 32

1      Q.      So let's imagine that it's DRC is the

2  customer and they are wanting to get a controlled

3  substance that would be used specifically for an

4  individual, okay?

5      A.      Uh-huh.

6      Q.      Illustrate on that Exhibit 3 here for me

7  the direction of how the request would go and then

8  communicate back down with downward arrows the chain

9  of that drug product back to the customer.

10     A.      Okay.

11     Q.      Does that make sense?

12     A.      It does.  Can I ask a clarifying question?

13     Q.      Absolutely, please.

14     A.      You're saying a request from the

15 Department of Corrections for I'm going to say a

16 prescription whether it's controlled or prescription

17 based medication.

18     Q.      Sure.

19     A.      For a particular individual.  You want me

20 to draw a line how the request gets processed and how

21 it gets shipped back to them.

22     Q.      Yes.

23     A.      Okay.

24     Q.      So the upward arrows are the request.

25     A.      Yes.  So to explain my delay here, there

Steven Knight

Page 33

1   is medications that are stored, they're not ordering

2   for an order for order type basis typically.

3        Q.      "They" being CPIP.

4        A.      Right.

5        Q.      They wouldn't necessarily, so you're

6   saying if I understand you correctly that CPIP

7   themselves might have some stock of medications that

8   they wouldn't even need to come to you at PSC to get?

9   They could just handle the order?

10       A.      Let me clarify that just a little bit.

11  But at some point in time if it was even sitting on

12  their shelf, it did come from us.  So at some point

13  in time this process is a hundred percent.

14       Q.      When you say "this," you're pointing to

15  the document that is Exhibit 3 with the arrows up and

16  down, right?

17       A.      Correct.

18       Q.      Just for purposes of the record.

19              So let's talk specifically, and I guess to

20  clarify, your position specifically, you Steve, you

21  are near the top of this chain there at PSC, right?

22       A.      Correct.

23       Q.      And so you're in fact the one who's

24  responsible for all the procurement operations by

25  PSC, correct?

Steven Knight

Page 34

1      A.     Correct.

2      Q.     So if we were to add an additional, say

3  we'll do this, AmeriSourceBergen, Cardinal Health, et

4  cetera.  So I've just added a couple boxes above

5  Pharmacy Services Center.

6             If my understanding of the system is

7  correct, there would be arrows going up from PSC out

8  to these drug sources or drug distributors that would

9  be the places where Pharmacy Services Center would

10  procure the drugs; is that correct?

11      A.     Correct.

12      Q.     So if you could just draw the same kind of

13  thing, I mean again I think it's common sense but I

14  just want to make sure because my wife says I don't

15  have any.

16             If we go up from PSC out into the

17  marketplace and those drugs then come back on PSC.

18  In other words, the drugs don't come from say

19  Cardinal Health or AmeriSourceBergen all the way

20  directly to the customer, right?

21      A.     Correct.

22      Q.     I just want to make sure I have a visual

23  understanding of that.

24      A.     And those lines represent the et cetera, I

25  wasn't pointing to a particular one.

Steven Knight

Page 35

1      Q.      And this is just a hypothetical and I'm
2   not specifically saying any particular drug product.
3   Just in general trying to understand the ordinary
4   sort of transactional kind of flow --
5      A.      Sure.
6      Q.      -- of how things would work.
7              So let's talk specifically now as it
8   relates to drugs that would be used for executions.
9   You with me?
10     A.      Uh-huh.
11     Q.      Yes?
12     A.      Yes.  Sorry.
13     Q.      So describe for me the process, and you
14  can feel free to indicate there on Exhibit 3 as you
15  need.  Using a different color than blue if you
16  could, if you could describe for me and walk through
17  for me the process by which ODRC obtains drugs to be
18  used for executions, please.
19     A.      So to my knowledge I have not been, has
20  not been said to me or to our operations that this
21  particular medication is for an execution process.
22     Q.      Okay.  You anticipated one of my questions
23  here later on down.  I like where you're thinking.
24              So to make sure I understand, you're
25  saying that when ODRC is purchasing -- or, let me

Steven Knight

Page 36

1   rephrase.

2           When a drug to be used, intended to be

3   used for execution is being procured, purchased with

4   the idea that it's going to go back down to the

5   customer level of DRC, the information of what that

6   drug's going to be used for is not conveyed to the

7   people at PSC?

8       A.    Correct.

9       Q.    I guess I should actually include one

10  other kind of clarification within PSC.

11      A.    Okay.

12      Q.    I presume, although maybe I shouldn't,

13  that you, Steve, are not the sole person who's

14  actually sitting down at a terminal, computer

15  terminal or a telephone and actually going out into

16  the marketplace and finding and purchasing all these

17  drug supplies; is that correct?

18      A.    That is a correct assumption, yes.

19      Q.    Help me understand how that happens.

20      A.    So we have other purchasing agents --

21      Q.    Within PSC?

22      A.    Within PSC that are responsible for

23  procuring anything from, any of those products that

24  I've talked about that we carry; pharmaceuticals,

25  medical supplies, personal care, any of that.

Steven Knight

Page 37

1      Q.      Okay.  And so their job is to go out and

2    get the product.

3      A.      Correct.

4      Q.      And you're the supervisor of those, can I

5    call them buying agents?  What's the term you use?

6      A.      Technical term is sourcing analyst.

7      Q.      Okay.  So the sourcing analysts are the

8    ones who take an order and then say do we have it in

9    stock, if so yes, sell it, if we don't have it in

10   stock, can I go find it out in the marketplace; is

11   that accurate?

12     A.      Close but I'm going to clarify it a little

13   differently.

14     Q.      Please do.

15     A.      Orders from our customers are placed to

16   the Pharmacy Service Center, our sourcing analyst.

17   We use a sophisticated requirements planning system

18   that looks at history, seasonality, lead time, all of

19   those type of things that it takes into consideration

20   for us to have the product on the shelf.

21     Q.      Okay.

22     A.      Prior to the customer placing the order.

23     Q.      Okay.

24     A.      So it is a quick turnaround.  It's

25   possible out of stocks happen and it would pop up an

Steven Knight

Page 38

1   alert and hey, this is something you need to buy, so

2   they would go out and buy it.

3           Does that make, clarify the difference?

4   We don't specifically look at every customer order

5   and say do you have it, do I need to buy it.

6       Q.    Okay.  So if an order comes in, the

7   computer will tell you hey, we got it in stock,

8   process it, send it out.

9       A.    Absolutely.

10      Q.    But if it's not in stock then the sourcing

11  analyst?

12      A.    There you go.

13      Q.    The sourcing analyst would be the ones who

14  would then go out in the marketplace and look for

15  where they could obtain it from, correct?

16      A.    Correct.

17      Q.    And it might sound rudimentary but tell me

18  how they do that.  On the telephone, are we talking

19  computer, are we talking carrier pigeons?

20      A.    We've recently stopped the carrier pigeon.

21      Q.    Yay progress.

22      A.    Yes.  We have, we follow all the State

23  procurement laws so we can't just go to necessarily

24  anybody but we have state contracts, we have a direct

25  spending authority, there are laws around that we

Steven Knight

Page 39

1    have to have special, looking for the best price and

2    those type of things.  But following those contracts

3    we would go to that particular source and look for

4    that medication.

5         Q.    So two things there, when you say follow

6    the best price, what do you mean by that?

7         A.    So there's a state contract that states

8    this is who your primary vendor is for this

9    particular type of product that we carry.  So we have

10   pharmaceutical, we have medical supplies, we have

11   this.  And that contract says that you need to buy

12   that product from this particular person -- or, not

13   person, excuse me, company.

14        Q.    Okay.

15        A.    Now, if that company is out of that

16   product, we would look somewhere else.

17        Q.    Someplace that might not be contracted.

18        A.    That is possible, yes.  And we would use

19   different kinds of spending authority to do so but

20   it's all within the state procurement laws to do

21   that.

22        Q.    If you need to purchase a product, you

23   being PSC need to purchase a product because you

24   don't have it, is that required to be, like are there

25   a minimum number of bids that you need to identify

Steven Knight

Page 40

1    and then you're bound to take the lowest bid?  Is it

2    just can you go wherever if the contracted typical

3    source doesn't have it?  I mean explain that process

4    a little bit for me.

5         A.    First step would be if there is a

6    contract, if that product is not available on a

7    contract which could be a primary contract or

8    potentially like a backup contract, we would have to

9    get three bids.

10        Q.    Okay.

11        A.    And I'm not talking about a specific

12   product, I'm just talking state policy on buying

13   something.

14        Q.    Just any product.

15        A.    Yes, exactly.  We would get three bids,

16   three competitive bids and we would take into

17   consideration the price, could be availability, could

18   be delivery time.

19              So just because somebody is 2 cents

20   cheaper and it's going to take them six weeks to get

21   it and I'm paying 2 cents more and I can get it

22   tomorrow and it meets what my customer needs, we

23   might pay the 2 cents more because we had to wait six

24   weeks.  So there are other things just than lowest

25   price.

Steven Knight

Page 41

1    Q.    Gotcha.  What if there's not three bids
2  that you can obtain?  Let's say you can only get two
3  because nobody else has the product but two people or
4  two entities do.  Is there a way that that three bid
5  requirement falls by the wayside or are you just kind
6  of out of luck?
7    A.    If you can only obtain two bids, which I'm
8  just trying to think back if we've had that situation
9  where we haven't, because another, you can use
10  something as simple as Google to go find people that
11  supply that item.
12         If it was something that we could not
13  obtain three bids on, we would probably go through
14  the process of like a sole source, that this can only
15  be provided by one particular person.  And that would
16  require a letter from the manufacturer saying we are
17  the only ones that provide this.
18    Q.    What I hear you saying is that even if
19  there's not three bids that can be obtained, there is
20  a way that a product could be purchased by PSC?  Is
21  that a nutshell accurate statement?
22    A.    I'm going to say generally, yes.  There
23  are always other laws that come into consideration
24  about who you're buying product from and things of
25  that nature.

Steven Knight

Page 42

1    Q.    Right.  And in terms of the sole source

2    you mentioned a letter from the manufacturer saying

3    we're the sole source.  Typically how quick would

4    that process work in terms of going to the

5    manufacturer saying we need a letter, we'd like to

6    buy this product from you but we need a letter saying

7    that you're the only manufacturer of it?  Like what's

8    the turnaround time for that whole process typically?

9    A.    This is something that is very, very

10   infrequent.  I mean very infrequent.  But to answer

11   your question, I would say it would be a one- to

12   two-week process because of the approval process

13   through the State to ensure that it is a sole source.

14   Q.    So we're not talking like a year or

15   anything like that in general to do that?

16   A.    Generally speaking, no.

17   Q.    And you also mentioned that your source

18   analysts could use Google to try to find a product.

19   Did I understand that correctly?

20   A.    That is correct.  Depending on the product

21   again.

22   Q.    If they're not using Google but to circle

23   back to kind of the methodology so to speak of

24   procurement, the nuts and bolts of the actual

25   procurement, let's say that PSC doesn't have a

Steven Knight

Page 43

1    product in stock that's been requested from a

2    customer, source analyst needs to go out into the

3    marketplace to purchase it.

4              Literally how does that happen, how does

5    the source analyst find the product from one of these

6    on Exhibit 3, the boxes like the drug sources from

7    AmeriSourceBergen, Cardinal Health, others?

8    A.      So I guess I want to be clear that

9    depending on the type of product determines the

10   particular path we would go.

11   Q.      If we're talking -- I'm sorry, go ahead.

12   A.      That's okay.  I can buy a shampoo from

13   Amazon.

14   Q.      Sure.

15   A.      I am not going to find a pharmaceutical

16   product on Amazon.

17   Q.      I mean you might, but.

18   A.      Well.

19   Q.      Whether you can purchase it is probably a

20   different issue.

21   A.      Potentially.

22   Q.      Who knows.  But if we're talking about

23   pharmaceuticals, do -- I guess what I'm asking in not

24   so many words is do the source analysts have access

25   to realtime inventories for these drug distributors

Steven Knight

Page 44

1  where they can just sit down at their computer and

2  say well, let's see what Cardinal Health has, they

3  have so many units in stock they can go there?  Do

4  they need to get on the phone and call these

5  different entities?  Help me understand how that

6  process works.

7      A.    To help clarify that, yes, we can go

8  online, look at their inventory, I hate to say

9  realtime because it's updated twice a day, but in the

10 loose terms of realtime, that is correct.

11     Q.    When you say "they" you mean the drug

12 sources out in the marketplace.

13     A.    Correct.

14     Q.    And you can, your source analysts can do

15 that from their offices.

16     A.    Correct.

17     Q.    Can they pick up the phone and call

18 somebody if it's something that they are looking for?

19     A.    That's always an option.

20     Q.    I mean that wouldn't be unheard of to make

21 a phone call from a source analyst to, again to use

22 an example, Cardinal Health, we're looking for

23 such-and-such pharmaceutical product, do you have it

24 in stock or do you have it in inventory.

25     A.    Correct.

Steven Knight

Page 45

1      Q.      Not an unusual thing?

2      A.      Not unusual.  But for efficiency sake we

3   try to take advantage of the online system.

4      Q.      Certainly, okay.  And if the online

5   inventory doesn't yield results, then you can go to

6   Google potentially?

7      A.      We would not do that for a prescription

8   type medication because it wouldn't be available for

9   us out there to buy.

10     Q.      If it was a drug product that was being

11  offered by the manufacturer in, I hesitate to say

12  "bulk amount" because that phrase gets blurry here.

13  If for instance I as an individual Allen Bohnert sits

14  down at a computer and Google where to find a

15  particular drug and there's a source that pops up,

16  assuming that it's a manufacturer source and not like

17  a Dark Web kind of source.

18     A.      Sure.

19     Q.      I Allen can't typically go and buy from

20  that manufacturer, I don't have the account, I don't

21  have the licensure, et cetera, et cetera, et cetera.

22     A.      Right.

23     Q.      But would PSC then be able to purchase

24  from that entity?

25     A.      Generally I'm going to say yes, but there

Steven Knight

Page 46

1   are some steps in that process that would have to

2   happen, such as what you started to say or you said

3   about yourself was we may not, chances are we do not

4   have an account with that manufacturer.

5           We would have to apply to be a customer.

6   We would have to have them set up in the State of

7   Ohio system for them to be a vendor.  So there's a

8   lot of steps of creating that relationship for the

9   first time.

10      Q.    Okay.

11      A.    So but generally speaking, yes, we should

12  be able to establish that relationship.

13      Q.    And setting that kind of relationship up,

14  how would you characterize it?  Very difficult, not

15  difficult at all, fairly easy?

16      A.    I certainly wouldn't clarify, if we were

17  talking manufacturers I would certainly say it would

18  not be very, very easy.  Typically manufacturers do

19  not want to sell directly to us.  They'll want to,

20  not always, but will want to supply it through a

21  channel.  They're good at manufacturing, not

22  distribution.

23      Q.    So if it's a drug distributor, sort of

24  somebody, an entity akin to AmeriSourceBergen or

25  Cardinal Health, is establishing that relationship a

Steven Knight

Page 47

1  more streamline process?

2      A.      It would be.

3      Q.      Fairly easy in that situation?

4      A.      I'm not going to say it's extremely

5  difficult but I'm not going to say it's an hour

6  thing.  It would be a bit time consuming.

7      Q.      When you say time, like are we talking

8  about that's something that generally could be done

9  in a week, a month, a year?  Help me understand just

10  as a general kind of thing.

11      A.      Depending on the vendor anywhere from a

12  week to a month.

13      Q.      So circling back to the issue of drugs as

14  they're requested by DRC when we're talking about

15  drugs that will be used for an execution, taking as a

16  given that your source analysts, if I understand you

17  correctly the source analysts don't know, are not

18  informed that the particular drug request that they

19  are being asked to fill is going to be used for an

20  execution.

21      A.      That is correct.

22          MS. CARWILE:  And I want to interrupt and

23  don't use names when talking about the execution, use

24  identifying numbers.

25          MR. BOHNERT:  I guess I would also I think

Steven Knight

Page 48

1    DRC Employee No. 1's role in all of this stuff is

2    fairly well publicized at this point so I guess I

3    would want to make sure that we're not carving out

4    something, unduly complicating things if it's talking

5    about DRC Employee No. 1.

6              MR. GRAY:  I don't necessarily agree with

7    your characterization as been "well publicized."

8              MR. BOHNERT:  Published in a Federal Court

9    docket.

10             MR. GRAY:  Certainly some of his testimony

11   is on the Court docket.  I would agree with that.

12             MR. BOHNERT:  And in that testimony he has

13   described his role in this drug procurement process

14   for execution drugs.

15             MR. GRAY:  Partially he has, I would agree

16   with you.

17             MR. BOHNERT:  Bottom line is it is not a

18   confidential thing that DRC Employee No. 1 is the

19   individual on whose behalf or on DRC's behalf who

20   initiates the request for drugs to be used for

21   executions.  That is clearly established publicly

22   available on the Federal Court docket.

23             MR. GRAY:  Okay.

24             MR. BOHNERT:  So I guess if we're talking

25   about, you know, an individual at the bottom of this

Steven Knight

Page 49

1   chain being the DRC customer being DRC Employee

2   No. 1, I don't know that we need to unduly complicate

3   matters that throwing in an anonymizing name here.

4   Because that is replowing old ground and trying to

5   put the toothpaste back in the tube.

6           So I just want to make sure that we're

7   clear it's not my expectation or my understanding

8   that DRC Person No. 1 is in fact DRC Employee No. 1,

9   that is a different person.  Can we confirm that?

10          MR. GRAY:  I am willing to engage in this

11  conversation with you, I just want to make sure that

12  it is not -- can we mark the transcript here so that

13  we can review some of the conversation that we have

14  with Judge Merz to determine whether or not it would

15  become a public document?

16          MR. BOHNERT:  I mean, yeah, we can mark

17  the transcript I guess.

18          MR. GRAY:  Let me suggest this, Allen,

19  let's take five minutes, let me speak with my

20  counsel, let counsel speak with counsel for

21  Mr. Knight to make that we're all in agreement, then

22  we can get back to you and discuss how we're going to

23  address this.

24          MR. BOHNERT:  Sure, we'll take a break for

25  five minutes and we'll reconvene.

Steven Knight

Page 50

1          (Recess taken.)

2     Q.     (By Mr. Bohnert) Just to clarify, during

3   the break here did you confer with anybody about your

4   testimony here today?

5     A.     Absolutely not.

6     Q.     So when we took a break we were starting

7   to get into the issue of the specifics of the drug

8   procurement process for drugs to be used for

9   executions, right?

10    A.     Yes.

11    Q.     And for purposes of today we're going to

12  refer to a particular individual who would be at the

13  bottom of the drug chain as DRC Employee No. 1.

14    A.     Okay.

15    Q.     Do you have an understanding of who this

16  individual is?

17    A.     Yes.

18    Q.     I just want to make sure that we have it

19  on record that we both are under the understanding,

20  we have a common understanding who we're talking

21  about.

22           So on the diagram here that's Deposition

23  Exhibit No. 3, the typical chain is highlighted there

24  with blue arrows, right?

25    A.     Correct.

Steven Knight

Page 51

1    Q.    So if you could use, let's use maroon, I
2    don't know why, just because.  Help me, like walk me
3    through the process of how drugs are procured by DRC
4    to use for executions.
5    A.    So again when -- I am not told -- not I.
6    We are not as an operation told specifically I am
7    buying this medication for an execution.
8    Q.    Okay, so let's back up then.  A request
9    for, have you been informed about what the typical
10   procurement process is for drugs to be used for an
11   execution?
12   A.    Can you ask me that again?  Sorry.
13   Q.    Have you been informed, advised, told,
14   explained to you what the process is for DRC to
15   procure drugs to be used in an execution?
16   A.    Yes, I understand that process.
17   Q.    So taken it as a given that people, the
18   source analysts who would be responsible for pulling
19   the drug off the shelves, I mean not literally but
20   would be responsible for filling an order at PSC
21   whether from inventory or going outside, taking it as
22   a given they don't know that these drugs are to be
23   used for an execution, that's an assumption that
24   pervades all of what we're going to talk about.
25   A.    Yes.

Steven Knight

Page 52

1     Q.     Does the same also apply to the
2   individuals at CPIP who might be involved in this as
3   it relates to execution drugs?
4     A.     So for that process as you term them CPIP
5   are not involved in that process.
6     Q.     CPIP is not involved in the supply chain
7   for execution drugs?  Is that what you're saying?
8     A.     That is correct.
9     Q.     It's been my understanding that they are,
10  so help me understand when that changed.
11    A.     I'm not going to know exact date but
12  approximately 2014.
13           MS. STRAIT:  I'm sorry, was that 2015?
14           MR. BOHNERT:  '14 he said.
15    Q.     So help me understand then the supply
16  chain as it applies to drugs to be used for an
17  execution with again the understanding that you're
18  not saying that the people at PSC know that they're
19  to be used for executions.
20    A.     So, sorry, what are you asking for again?
21  Do you want me to draw?
22    Q.     Yeah, use the maroon pen there if you
23  could to draw the upward direction of the request for
24  the particular medications and then however high up
25  those requests go, and then draw the downward arrow

Steven Knight

Page 53

1    to show the flow of the actual drug product.

2         A.     (Witness complies.)

3                And I'm going to include up into.

4         Q.     So for the record if you could help me

5    understand the customer, if you want to put in

6    parentheses there "DRC" with the maroon so we know in

7    our execution drug situation we're talking about

8    DRC's request.

9         A.     (Witness complies.)

10        Q.     Explain for us if you could for the record

11   in words what you just drew.

12        A.     I drew a line from the customer directly

13   to the Pharmacy Service Center and then a line from

14   the Pharmacy Service Center to a distributor, back

15   down from the distributor to PSC and then to the

16   customer.

17        Q.     From PSC to the customer being DRC.

18        A.     Correct.

19        Q.     And the person who is the one responsible

20   for making that initial request by the customer being

21   DRC is DRC Employee No. 1; is that correct?

22        A.     Correct.

23        Q.     Are there any others?  Any other

24   individuals that occupy that role to your knowledge?

25        A.     No.

Steven Knight

Page 54

1              THE WITNESS:  Can I speak to you or is

2    that not something I can do?

3              MS. CARWILE:  No, you can.

4              (Off the record.)

5    Q.    Back on the record.

6              So when we broke we were talking about the

7    drug procurement chain or supply chain for drugs to

8    be used for executions by DRC.  Now we said that DRC

9    Employee No. 1 is the one on behalf of DRC who makes

10   the request for drugs to be used for executions,

11   correct

12   A.    Yes.

13   Q.    And I know he makes that request under

14   your diagram on Exhibit 3 directly to PSC.  Who

15   individually, without naming a name unless it's you,

16   right, like who does he make that request to?

17             MS. CARWILE:  And I just instruct using

18   numbers at this time for all of this.

19   Q.    Yes.

20   A.    Okay.  So that would be OPS No. 1, sorry,

21   yes.

22   Q.    And I want to make sure I'm being as

23   thorough as I can without breaching confidentiality

24   issues.  I guess my next question would be is OPS

25   Person No. 1 a source analyst?

Steven Knight

Page 55

1                MS. CARWILE:  I would like to object.
2      There's very few people in OPS and if we start
3      getting into their titles it will be easy to identify
4      those individuals.
5          Q.     How many, when you say there's very few
6      people, like can you give me a ballpark range?
7          A.     At OPS?
8          Q.     Yeah, at PSC.
9          A.     Probably, let me think, 30.
10         Q.     So that request comes in from DRC Employee
11     No. 1 to PSC.  At some point then what happens?  Tell
12     me what happens once that request comes in.
13         A.     The order would be entered into our
14     system, the process out into the warehouse, pick,
15     pack, like a normal order.
16         Q.     And then what happens?
17         A.     The product is picked up.
18         Q.     When you say "picked up," what do you mean
19     by that?
20         A.     Customer pickup, somebody comes and picks
21     the product up from our warehouse.
22         Q.     Do you know who that person is?  Who comes
23     and picks up the product?
24         A.     I do.
25         Q.     And is that DRC Employee No. 1?

Steven Knight

Page 56

1      A.      Yes.

2      Q.      And then what to your knowledge happens

3  after DRC Employee No. 1 picks up the drug products

4  from the warehouse?  What happens to the drugs next?

5              MS. CARWILE:  I'm going to object, outside

6  the scope of the 30(B)(6).

7      Q.      Where do the drugs go?  I guess presumably

8  he doesn't just keep them.

9              MS. CARWILE:  I would, continuing

10  objection.

11             If you know you can answer.

12             But it's outside the 30(B)(6) because DRC

13  Employee No. 1 is not an OPS employee so he may or

14  may not know.

15     Q.      I guess the 30(B)(6) included like the

16  entire supply chain and I'm, this seems to me like

17  the last link in the supply chain before the drugs

18  come to be in a safe at SOCF.  So I want to make sure

19  I can confirm that that's actually what happens.

20     A.      I would say yes, DRC Employee No. 1 picks

21  them up and takes them to SOCF.

22     Q.      So you mentioned that CPIP was cut out of

23  the supply chain in approximately, according to your

24  testimony, 2014.  Did I remember that correctly?

25     A.      Correct.

Steven Knight

Page 57

1    Q.    Why?

2    A.    Pharmacy Services or OPS in general reacts

3  to our customers' requests and needs.  Specific why

4  that change was made we were not part of that here's

5  why we're doing this change.  It was just this is the

6  new process we would like to follow.

7    Q.    Okay.  So the new supply chain for drugs

8  for executions was implemented by DRC or by PSC?

9    A.    The direction was given and probably part

10  of their process on their side, which I can't

11  testify, I don't know what specifically they did, but

12  the direction was given from DRC to us this is the

13  way we want to process.  So we accommodated it, is

14  the way to say it.

15    Q.    Does DRC as a customer purchase any other

16  pharmaceuticals other than drugs to be used for

17  executions directly from PSC?

18    A.    Yes.

19    Q.    And what circumstances were those just in

20  general?

21    A.    There is a, at Franklin Medical Center

22  Zone A there is a pharmacy specifically in there for

23  that particular location and we sell the product

24  directly to Department of Corrections.

25    Q.    For drugs other than stuff destined for

Steven Knight

Page 58

1  Franklin Medical Center does DRC purchase drugs

2  directly from PSC in any other context other than

3  drugs to be used for executions?

4      A.    If we're specifically talking about

5  pharmaceuticals, no.

6      Q.    So you mentioned earlier that when DRC

7  Employee No. 1 makes the request to PSC for certain

8  drugs, that goes directly to PSC and then the order I

9  believe you said was picked and packed and then

10  shipped.

11      A.    Correct.  "Shipped" being a terminology

12  we, in our system.

13      Q.    Out the door from your hands, sent off to

14  somebody else's hands, DRC Employee No. 1.

15      A.    Correct.

16      Q.    While the order is at PSC if the request

17  is for a drug that PSC does not have in stock,

18  explain for me if you could what happens at that

19  point.

20      A.    In general or regards to specifics?

21      Q.    Specifically for drugs that DRC Employee

22  No. 1 has requested from PSC.

23      A.    In most -- to my knowledge of this time we

24  have never been out of a medication that he has

25  requested.

Steven Knight

Page 59

1     Q.    And how long have you been the supervisor
2    at, for procurement at PSC?
3     A.    Approximately seven years now.
4     Q.    So that goes back to 2012 approximately?
5     A.    Yes.
6     Q.    Are you aware of instances in the past
7    where DRC has requested supplies of certain
8    pharmaceuticals that PSC did not have in stock?
9     A.    I guess can you clarify for me
10   "requested"?
11    Q.    I mean --
12    A.    Order placement?  Or inquiry?
13    Q.    A good point.  And the inquiry is a
14   different issue and we'll get to that but right now
15   we're just talking about like there is a request to
16   purchase, not just simply an inquiry whether
17   something might be purchased, a request to purchase
18   made from DRC that ends up at PSC and PSC doesn't
19   have the drug.  Are you aware of instances in the
20   past where that has happened?
21    A.    Not to my recollection.
22    Q.    So nobody has made you aware of instances
23   in the past where execution drugs were no longer
24   available and PSC was being asked to provide them?
25    A.    Can I have just a minute to think through

Steven Knight

Page 60

1    that process?

2       Q.    Sure.

3       A.    Trying to give you a hundred percent

4    accurate information, not just on I think I remember

5    specifically.  So to my knowledge that has not

6    happened.

7       Q.    So you have no knowledge of requests to

8    purchase, for instance, sodium thiopental to be used

9    for executions?

10      A.    I believe but I don't think it's testified

11   that was something that was used a long time ago.

12   But not to recent knowledge.

13      Q.    And do you have any knowledge of what PSC

14   would have done to try to find that drug if it didn't

15   have it in stock?

16      A.    Yes.

17      Q.    And what would that be?

18      A.    We would have gone to our typical

19   pharmaceutical sources to see if that product was

20   available and if it was available I'm sure we would

21   have purchased it.  If it was not available we would

22   have returned the statement of product's not

23   available.

24      Q.    And you had mentioned earlier about that

25   there would be contracts with certain suppliers for

Steven Knight

Page 61

1    certain products.

2        A.    Correct.

3        Q.    And is that, are those contracts specific

4    to particular medications or how does that work?

5        A.    It's considered a primary vendor.  So all

6    medications would be purchased through this as our

7    primary contract based on a bidding process to come

8    up with that particular primary vendor.

9        Q.    And is there a single holder of that

10   contract at any given time?

11       A.    There is.  So there would be a primary

12   vendor for the pharmaceuticals, there might be a

13   primary vendor for the medical supplies.  From

14   pharmaceuticals, yes, there's a single vendor.

15       Q.    And does that change from time to time?

16       A.    At some point, yes, there will be an end

17   of the contract and it will be rebid.

18       Q.    How frequently do those contracts come up

19   for rebid?

20       A.    This one was like a three-year contract

21   with four or five mutually agreeable renewals.

22       Q.    And who is that contract with currently?

23       A.    AmeriSourceBergen.

24       Q.    And how long has AmeriSourceBergen had

25   that exclusive contract with PSC?

Steven Knight

Page 62

```
1      A.      Approximately a year.

2      Q.      Who was it before them?

3      A.      So to give the process, it was HG Smith

4   who was awarded the original contract.  And

5   AmeriSourceBergen acquired HG Smith.

6      Q.      So wasn't a new contract, then was

7   AmeriSourceBergen took over the entity that had the

8   contract.

9      A.      Correct.

10     Q.      And who before HG Smith had that supplier

11  contract with PSC?

12     A.      So prior to the HG Smith was a completely

13  different contract method, this was our first with HG

14  Smith as a primary vendor.  Prior to that the

15  medications were bid out by maybe a group of

16  medications together or a specific one and different

17  people could be awarded different versus this is a

18  complete primary for all.

19     Q.      And so you mentioned it was about a year

20  ago that AmeriSourceBergen became the holder of that

21  contract.  Just for clarity did the contract -- how

22  long before AmeriSourceBergen took over that company

23  did that company actually have the sole single source

24  contract?

25     A.      Five to six years.
```

Steven Knight

Page 63

1      Q.      So if my math is correct we're talking

2   2013-2014 when that contract went into place?  Is

3   that right?

4      A.      That would be correct.

5      Q.      And so there's, is there a distinction

6   between a request to get drugs that will be used, a

7   request from DRC Employee No. 1 for drugs to be used

8   by DRC and any other pharmaceuticals when you need to

9   go to AmeriSourceBergen?

10           That's a really horrible question.

11     A.      I was just going to ask for clarification.

12     Q.      Let me try again.

13           When DRC Employee No. 1 makes a request

14   for drugs to PSC, directly to PSC, and PSC doesn't

15   have a drug in stock, is there any kind of a

16   distinction made to AmeriSourceBergen when presumably

17   a source analyst goes to AmeriSourceBergen and says

18   we would like to obtain X quantity of Y product?

19     A.      So because of contractible reasons any

20   time we are asked for a pharmaceutical, our first

21   step is to AmeriSourceBergen.

22     Q.      Okay.  And does the, I don't want to

23   assume the source analyst but the person from PSC who

24   is contacting AmeriSourceBergen to obtain these drugs

25   upon request, does that person identify to

Steven Knight

Page 64

1    AmeriSourceBergen that the drugs are intended to be

2    sent to DRC?

3        A.    I want to clarify contact because our

4    normal process is we are going to log online to their

5    system and look up to see if that product is

6    available.

7        Q.    So that information that the end user of

8    this is going to be Ohio DRC is not conveyed to

9    AmeriSourceBergen, right?

10       A.    Correct.

11       Q.    Nor is the actual use for those drugs

12   conveyed to AmeriSourceBergen, correct?

13       A.    Correct, because we don't know

14   specifically that that's what it's being used for.

15       Q.    So you clarified a moment ago about a

16   distinction between a request to purchase from DRC

17   Employee No. 1 versus an inquiry about availability.

18   Do you remember that?

19       A.    Yes.

20       Q.    Help me understand what the process would

21   be using Exhibit 3 if DRC Employee No. 1 is making an

22   inquiry about availability of a certain drug directly

23   to PSC.

24       A.    I guess it wouldn't be any different than

25   the ordering process other than the fact it wouldn't

Steven Knight

Page 65

1   be product exchange back and forth.  So request would

2   come to PSC, PSC would look on the website's

3   availability and report the information back, versus

4   shipping product.

5       Q.     Has that scenario actually happened at any

6   point in the last, well, since you've been the

7   supervisor?

8       A.     The inquiry?

9       Q.     Yes, the inquiry.

10      A.     Yes.

11      Q.     And tell me about those inquiries.

12      A.     PSC has received a request to see if a

13  particular medication is available in the market and

14  potential cost.

15      Q.     And how does DRC Employee No. 1 make those

16  requests to PSC in terms of how is that communication

17  made?

18      A.     Via phone call to PSC.

19      Q.     Any other means of communication by which

20  he would make a request?  Sorry, an inquiry, to be

21  clear.

22      A.     Thank you.  No.

23      Q.     Would he ever email an inquiry?

24      A.     I can't speak for would he ever but has

25  not.

Steven Knight

Page 66

1    Q.    Indeed.  My clarification was has he ever

2  emailed an inquiry.

3    A.    No.

4    Q.    And has he ever emailed a request for

5  drugs directly to PSC?

6    A.    No.

7    Q.    Any other method of communication other

8  than a phone call that DRC Employee No. 1 has used to

9  make a request for drugs to be used by DRC?

10   A.    No.

11   Q.    Same as to an inquiry.

12   A.    No.

13   Q.    Tell me the circumstances in which DRC

14  Employee No. 1 has made an inquiry that you were

15  aware of regarding drugs to PSC.

16   A.    Tell you how or?  Sorry.

17   Q.    Tell me when has it happened and tell me

18  the circumstances.  What was he asking for, when was

19  it, what was the result?  Help me understand that.

20   A.    So inquiries come into our operation all

21  the time, is something like that available.  And so

22  PSC receives a call, says can you check to see if

23  this particular product is available in this strength

24  or whatever and what's the price and what's the

25  availability.  And that's particularly what we would

Steven Knight

Page 67

1    get back to them.

2        Q.    Okay.

3        A.    So there's no process.

4        Q.    No, but I'm saying like specific instances

5    in which DRC Employee No. 1 has made that inquiry,

6    not the request but an inquiry about availability of

7    a certain drug product, when was it, what drugs were

8    requested, what was the search process, what was the

9    result of the search process, what was conveyed to

10   him, that kind of stuff.  Do you understand what I'm

11   asking about?

12       A.    I do.

13       Q.    Okay.  So I guess the first question --

14   let me help narrow it down.  How many times would you

15   estimate that DRC Employee No. 1 has made an inquiry

16   about drug availability to PSC?

17            MS. CARWILE:  Can we have a time frame,

18   please?

19       Q.    Since you've been the supervisor of PSC.

20   Or OPS, sorry.

21       A.    Five to ten times.

22       Q.    When was the first one to your knowledge?

23   And again to be clear we're talking about inquiries,

24   not requests to purchase drugs.

25       A.    Our process doesn't really have us record

Steven Knight

Page 68

1   down inquiries because we get inquiries all the time

2   about things that come to fruition or don't come to

3   fruition.  So I don't know if I would say -- and

4   again this is just an estimation on my part.  Would

5   have been right at the beginning of my, within the

6   first six months of me becoming the supervisor there.

7        Q.    Which would have been approximately 2013?

8        A.    '13 I believe, yeah, '13-'14.

9        Q.    You're not saying that you get lots and

10  lots and lots of requests from DRC Employee No. 1 for

11  inquiries, right?  You're just saying that in general

12  PSC gets lots of inquiries.

13       A.    Correct.

14       Q.    So you said there's approximately five to

15  ten times to your knowledge that DRC Employee No. 1

16  has made an inquiry directly to PSC.

17       A.    That is correct.

18       Q.    And you said the first was approximately

19  2014 or so?

20       A.    Yes.

21       Q.    Do you remember what it was that he was

22  asking about?

23       A.    I do not.

24       Q.    When was the next time to your

25  recollection?

Steven Knight

Page 69

1     A.      I guess what I was trying to imply maybe

2    is that there's no recollection or any record of any

3    time he's called and says what about this medication.

4     Q.      Right.

5     A.      The answer is just given and I don't

6    specifically try to or we don't specifically note

7    that that request was made or anything like that.

8    You understand?  I'm trying to say I just don't

9    specifically know dates or times or anything like

10   that.

11    Q.      Let's go back within the last 12 months.

12    A.      Okay.

13    Q.      Do you have a pretty good recollection of

14   any contacts from DRC Employee No. 1 regarding an

15   inquiry about drug availability to PSC?

16    A.      Yes.

17    Q.      Tell me about those contacts.

18    A.      The last contact I had would have been

19   again approximately six months ago.  Last contact PSC

20   had was approximately six months ago and it would

21   have been a request around the medication

22   secobarbital.

23    Q.      And what happened, tell me what happened

24   after the request, after the inquiry from DRC

25   Employee No. 1 about secobarbital came in to PSC.

Steven Knight

Page 70

1     A.     So in regards to the most recent one the

2  product was not available.

3     Q.     You made a distinction between "the most

4  recent" and I'm guessing that means that there's

5  another one where the situation might have been

6  different.  Tell me about that.

7     A.     Previous requests for the same medication

8  it was what we would term it's still available on the

9  website but the product was not available.  It was

10 saying it would be available on this particular date

11 or be available on this particular date.

12    Q.     And what were those particular dates to

13 your recollection?

14    A.     It was, it continued to keep moving for

15 like every three months.  So I think the last date

16 that it, where there was a date that it said would be

17 available was around in April.

18    Q.     And when was that particular inquiry that

19 we're talking about?

20    A.     Could have been around April time frame.

21           MS. STRAIT:  Would have been what?

22           THE WITNESS:  April.

23    Q.     Let me make sure I understand.  How many

24 times to your knowledge has DRC Employee No. 1 made

25 an inquiry to PSC regarding the availability of

Steven Knight

Page 71

1    secobarbital?

2         A.     Three to four times.

3         Q.     And the last one you said was

4    approximately six months ago; is that right?

5         A.     The last one would have been in the April

6    time frame.  I apologize, so not quite six months.

7         Q.     April of 2019?

8         A.     Correct.

9         Q.     And at the time of that inquiry what was

10   the ultimate result of the search by PSC?

11        A.     For the last search was it was not

12   available at all on online available to us to even to

13   pull up and find.

14        Q.     And was any effort made to, for instance,

15   contact the manufacturer?

16        A.     No.

17        Q.     Was any Google search made separate and

18   apart going beyond AmeriSourceBergen?

19        A.     We would have checked any other suppliers

20   that we have access to and/or contracts to.

21        Q.     So that one was in April.  When was the

22   time before that that DRC Employee No. 1 had made an

23   inquiry with regards to secobarbital?

24        A.     I'm guessing three to four months before

25   that.

Steven Knight

Page 72

1      Q.      So that's?

2      A.      January, December time frame.

3      Q.      When was the time before that?

4      A.      Approximately three to four months before

5   that.

6      Q.      So that puts us at October?

7      A.      October.

8      Q.      Of 2018?

9      A.      Correct.

10     Q.      So that's three.  Was there another

11  inquiry about secobarbital from DRC Employee No. 1 to

12  PSC that you're aware of?

13     A.      I would have said there would have been

14  one more three months prior to that.

15     Q.      So three months prior to the October 2018.

16     A.      Correct.  To clarify this is to my best

17  recollection.

18     Q.      Understood.

19     A.      We don't have any record of inquiries, we

20  just don't keep track of the inquiries.

21     Q.      So October, September, August -- July of

22  2018?

23     A.      Correct.

24     Q.      Okay.  And in each of those instances did

25  PSC check initially with AmeriSourceBergen?

Steven Knight

Page 73

```
 1       A.      Correct.

 2       Q.      And what happened upon that inquiry?  What

 3  was the information that was obtained?

 4       A.      So from a search standpoint the product is

 5  there for us to find.  But it would say product is

 6  not available until three months later.

 7       Q.      And was any search for availability for

 8  secobarbital done beyond AmeriSourceBergen --

 9       A.      Yes.

10       Q.      -- for each of those three to four

11  instances?

12       A.      Yes.

13       Q.      And what other potential entities were

14  consulted to your knowledge?

15       A.      Vendors?

16       Q.      Correct.

17       A.      McKesson, and Capital Wholesale.

18       Q.      Any others?

19       A.      No.

20       Q.      At any point in those, any of those four

21  inquiries was the manufacturer of secobarbital

22  consulted?

23       A.      No.

24       Q.      So that's inquiries regarding

25  secobarbital.  Any other inquiries regarding
```

Steven Knight

Page 74

1    secobarbital that you're aware of?

2        A.      No.

3        Q.      What about inquiries within the last 12

4    months for a drug called amitriptyline?

5        A.      You're speaking from DRC Employee No. 1?

6        Q.      Yes, sorry.  Thank you for the

7    clarification.  Inquiries by DRC Employee No. 1

8    directly to PSC seeking information on the

9    availability inquiry, not request but inquiry about

10   the availability of amitriptyline.

11       A.      No.

12       Q.      So I limited that to 12 months.  To your

13   knowledge have there been any inquiries about the

14   availability of amitriptyline by DRC Employee No. 1

15   to PSC?

16               MS. CARWILE:  And I'll ask for a date.

17   Starting date.

18       Q.      I mean just ever.  Because DRC Employee

19   No. 1 has only been in his job for since

20   approximately 2013-'14 and it specifically was a

21   request from DRC Employee No. 1 to PSC that you're

22   aware of.

23       A.      Not to my knowledge.

24       Q.      Has there been any request from DRC

25   Employee No. 1 to PSC, a request as opposed to an

Steven Knight

Page 75

1  inquiry to purchase secobarbital to your knowledge?

2      A.    No.

3      Q.    Has there been any request from DRC

4  Employee No. 1 to PSC to purchase amitriptyline to

5  your knowledge?

6      A.    No.

7      Q.    Has DRC Employee No. 1 in the last 24

8  months made any requests to purchase drugs to PSC to

9  your knowledge?

10     A.    Yes.

11     Q.    Tell me about those instances if you

12  would, please.

13           MS. CARWILE:  Do you know the question or

14  do you want to take a break?

15     A.    No, that's okay.

16           Could you ask your question again?

17     Q.    Anytime, the initial question was has DRC

18  Employee No. 1 anytime in the last 24 months made a

19  request to purchase drugs directly to PSC, and your

20  answer to that was yes.

21     A.    Correct.

22     Q.    And my question then is please describe

23  those, each of those instances for me.

24     A.    Okay.  The call would come from DRC

25  Employee No. 1 to PSC, the order would be entered

Steven Knight

Page 76

1    into the system, and it would go through our software

2    system to the warehouse to be picked, packed, and

3    picked up.

4        Q.    So specifically how many such requests in

5    the last 24 months has DRC Employee No. 1 made to PSC

6    to your knowledge?

7        A.    I believe one.

8        Q.    So one request in the last 24 months.  And

9    when was that?

10       A.    January 8, 9.

11       Q.    Of?

12       A.    2019.

13       Q.    And what did DRC Employee No. 1 request?

14   What drug?  Or drugs, I guess I shouldn't limit it.

15       A.    The potassium chloride, rocuronium

16   bromide, and midazolam.

17       Q.    And what was the result of that request?

18       A.    Would have fulfilled the complete request.

19       Q.    Would?

20       A.    Sorry, we did.

21       Q.    To circle back for a moment, DRC Employee

22   No. 1 may not have made any inquiries regarding the

23   availability of amitriptyline but as part of your

24   deposition here today I guess the question would be

25   what is your, have you made any inquiries about the

Steven Knight

Page 77

1    availability of specifically about amitriptyline but

2    we can drill down into the different formats of it.

3        A.    So to answer that, amitriptyline is used

4    by many of our clients in different strengths,

5    different pack size, all of that.  So it's almost a

6    day-to-day product that we would have.

7        Q.    So would you describe it as a problem in

8    any way to get however much amitriptyline you could

9    possibly obtain?  That's a broad.

10            Would it be a difficult endeavor for PSC

11   to obtain enough amitriptyline that would in

12   aggregate total up to say 10 grams?

13       A.    No.

14       Q.    20 grams?

15       A.    No.

16       Q.    30 grams?

17       A.    No.

18       Q.    A hundred grams?

19       A.    I'd have to do the calculation backwards

20   on that but generally speaking, no.

21       Q.    And if there was a request or an inquiry

22   regarding supplies of amitriptyline powder, not in

23   the tablet form but just still in the powder form,

24   what is your understanding of whether PSC would be

25   able to easily acquire that?

Steven Knight

Page 78

```
 1      A.      I wouldn't say the term "easily" but, yes,
 2   it could be obtained.
 3      Q.      And how do you know that?
 4      A.      PSC has researched that on
 5   AmeriSourceBergen or McKesson website and it is
 6   available for as drop ship.
 7      Q.      You said a "drum ship"?
 8      A.      Drop ship.
 9      Q.      And when you say that you're talking
10   specifically about the amitriptyline powder, correct?
11      A.      Correct.
12      Q.      And what is the -- couple things I guess.
13   With the drop ship, what is the cost to your
14   understanding to obtain amitriptyline powder say at
15   least 10 grams of it?
16      A.      Can I ask can I use my sheet?
17              MS. CARWILE:  Yes.
18      A.      5 grams would have been $10.25.  With a
19   little caveat that's the price that's presented to us
20   on the website.  Drop ship might add some additional
21   cost.
22      Q.      5 grams was what?  I'm sorry.
23      A.      $10.25.
24      Q.      And that was from which supplier?
25      A.      AmeriSourceBergen.
```

Steven Knight

Page 79

1      Q.     And AmeriSourceBergen is the one that
2  consistently supplies drug products to PSC.
3      A.     Correct.
4      Q.     And is there any indication that it would
5  be a problem for AmeriSourceBergen to drop ship
6  5 grams or more of amitriptyline powder to PSC?
7      A.     No.
8      Q.     Are there other quantities that
9  AmeriSourceBergen offers in the amitriptyline powder
10 for sale?
11     A.     25 grams, 100 gram, 500 gram.
12     Q.     25 grams, 100 gram, 500 gram, you said?
13     A.     Correct.
14     Q.     And what are the prices on those to your
15 knowledge from AmeriSourceBergen?
16     A.     25 grams $35.86; 100 grams, $80.94; and
17 500 grams, $327.85.
18     Q.     Very specific, not round number.
19     A.     No.
20     Q.     And of course I'm assuming that as you
21 mentioned does not include shipping and handling and
22 taxes, anything like that, correct?
23     A.     It actually does.
24     Q.     Okay.  So that $327.85 for 500 grams of
25 amitriptyline powder, for instance, is not going to

Steven Knight

Page 80

1   change pricewise significantly from that 327.85?

2       A.      I wouldn't say significantly.

3       Q.      And do you have any idea how long it would

4   take from submission of an order for any of these

5   quantities of amitriptyline powder in drum form until

6   that drug arrived in PSC's possession?

7       A.      A typical drop ship order, three to five

8   days.

9       Q.      Did you do your own assessment of the

10  availability of secobarbital supplies in preparation

11  for today's deposition?

12      A.      Yes.

13      Q.      And when did you do that and what did you

14  do and what was the result?

15      A.      The process of looking online at

16  AmeriSourceBergen, any of the contracted vendors that

17  we have, to see the availability and price.  Same

18  process.

19      Q.      Okay.  What was the result of that?

20      A.      The exact same results, this last time

21  would have been not even on the system as ability to

22  see it.

23      Q.      Did you personally check with the

24  manufacturer of secobarbital about availability?

25      A.      I did not.

Steven Knight

Page 81

1      Q.      Did not?

2      A.      Did not, correct.

3      Q.      So I guess to circle back to something we

4   were talking about earlier, you said DRC Employee

5   No. 1 has made one request to purchase drugs within

6   the last 24 months.  Has he made any other requests

7   to purchase drugs within that 24 months period other

8   than the one on approximately January 8 or 9, 2019?

9      A.      Not to my recollection in the last 24

10  months.

11     Q.      You hesitated there for a second.  Help me

12  understand why.

13     A.      Just I know documents have been provided

14  for everything that has transpired during that time

15  and I don't remember every single date on every

16  single document.  That's all.

17     Q.      Okay.  To your knowledge has there been

18  any kind of instruction given to any of the source

19  analysts or whoever else would go out into the

20  marketplace looking for drugs that have been

21  requested or inquired about by DRC Employee No. 1 to

22  not disclose the end user of those drugs?

23     A.      No.

24     Q.      Same question as to not disclosing the

25  purpose for those drugs.

Steven Knight

Page 82

1      A.      No.

2      Q.      But AmeriSourceBergen, the other contract

3  vendors are not told about any of that stuff,

4  correct?

5      A.      Correct.

6      Q.      When you mentioned there was a catchy

7  picked, packed, shipped.  Where is that done from?

8  The warehouse?

9      A.      Physically in our warehouse.

10      Q.      I mean where is the warehouse?

11      A.      Sorry.  2150 West Broad Street.

12      Q.      So here in Columbus.

13      A.      Yes.

14      Q.      And how long, well, DRC Employee No. 1

15  personally picks up the supplies of drugs to use for

16  execution; is that correct?

17      A.      Correct.

18      Q.      Have there ever been any other, would

19  execution drugs ever have been sent by private

20  courier, like FedEx or a delivery service like that?

21      A.      No.

22      Q.      Give me one second, I just want to make

23  sure I've covered my line of inquiry I need.

24          And just to be clear, because I don't

25  remember whether I was specific on requests to

Steven Knight

Page 83

1    purchase versus inquiry on availability, has anybody

2    other than DRC Employee No. 1 made any inquiries to

3    PSC about the availability of drugs, anybody from DRC

4    or on behalf of DRC made inquiries in the last 24

5    months?

6         A.    Can you be more specific on that?

7         Q.    So my understanding is that typical

8    process is that DRC Employee No. 1 is the one who

9    picks up the phone, no email, no fax, just the phone,

10   picks up the phone and calls somebody at PSC to

11   inquire about the availability of a certain drug or

12   drugs; is that right?

13        A.    Correct.

14        Q.    So anytime in last 24 months has anyone

15   from DRC or on behalf of DRC other than DRC Employee

16   No. 1 made that call directly to PSC asking about,

17   inquiring about the availability of certain drugs?

18        A.    Absolutely.

19        Q.    And who would those inquiries have been

20   from?

21        A.    Back to our description here about the

22   Franklin Medical Center.

23        Q.    Sorry, let me clarify.  Separate and apart

24   from Franklin Medical Center operations.

25        A.    Okay.

Steven Knight

Page 84

1     Q.     Has anybody else, same question, excluding

2  Franklin Medical Center?

3     A.     No.

4     Q.     And has anyone other than DRC Employee

5  No. 1, same thing as to a request to purchase drugs

6  directly to PSC?

7     A.     No.

8     Q.     So in your preparation for today did you

9  look at the availability of midazolam?

10    A.     Yes.

11    Q.     And what was the result of that inquiry?

12    A.     One supplier available to purchase, one

13  supplier was not.

14    Q.     Who was the supplier that was available

15  from?

16    A.     McKesson Pharmaceuticals.

17    Q.     One supplier was not listed?

18    A.     AmeriSourceBergen.

19    Q.     Do you know why it was not available from

20  AmeriSourceBergen?

21    A.     No.

22    Q.     And when you say was not available, do you

23  mean that they just had none to sell or that you

24  would not be able to purchase from them?

25    A.     We would not be able -- it was not on the

Steven Knight

Page 85

1   website to purchase from.

2       Q.    So anybody looking at that would have seen

3   the same thing, not something specific to PSC.

4       A.    I can't say specifically anybody because

5   anybody at PSC that would have looked at it would

6   have had the same thing.  I can't speak for another

7   customer necessarily.

8       Q.    But you said supplies were available from

9   McKesson to purchase?

10      A.    Yes.

11      Q.    What about same questions as to Diazepam?

12      A.    I might be able to speak generally but

13  without receiving specific strengths and sizes, that

14  can vary all over the place because you might be able

15  to get one particular strength that is not a problem

16  and another strength may be absolutely a problem.

17      Q.    So if we were wanting to, if we could

18  obtain 1 to 3 grams of Diazepam at whatever would be

19  the typical strength, and I apologize, I'm not sure

20  the ordinary strength of Diazepam, was that

21  particular drug property available when you did your

22  search?

23      A.    Yes.

24      Q.    Just to be clear, how long ago did you do

25  these searches?

Steven Knight

Page 86

```
 1       A.      Seven days ago.

 2       Q.      What about digoxin, at least a hundred

 3  milligrams of digoxin, was that available in your

 4  search?

 5       A.      I don't believe we did a search without

 6  having a particular strength because it makes a

 7  significant difference whether things are available

 8  or not.

 9       Q.      Is it fair to say digoxin is a fairly

10  common drug that is generally available in whatever

11  form that one wants?

12       A.      I believe so.

13       Q.      So typically not going to be a problem for

14  PSC to get supplies of digoxin.

15       A.      Typically not.

16       Q.      What about for propranolol, at least 2

17  grams of propranolol, would that be available?

18       A.      That should have been available also.

19       Q.      Should have been or was?

20       A.      I can't speak specific on my search on

21  that particular item.

22       Q.      Is that because you weren't able to tell

23  or because you just don't remember?

24       A.      I just don't remember.

25       Q.      Same questions as to morphine sulfate.
```

Steven Knight

Page 87

1   Would you have been able to obtain available at least

2   15 grams of morphine sulfate in your search?

3        A.    I have to say I don't remember

4   specifically on that one.

5        Q.    And I guess the last question on this

6   would be regarding nitrogen in liquid or gas.

7        A.    So that is one particularly PSC would not

8   provide because the nature of that product has

9   special requirements around storage or delivery of

10  that class.

11       Q.    Who is, in the same way that sort of PSC

12  would be the one to get pharmaceuticals, who might be

13  the sort of Ohio agency that would be able in your

14  knowledge to purchase nitrogen?

15       A.    Unfortunately, I have no idea.

16       Q.    Give me one second.

17             For to bring it back to your searches and

18  whatnot, same kind of questions whether you did a

19  search for availability of pentobarbital and if so

20  what was the result of that?

21       A.    It is available.

22             MS. STRAIT:  You said it is available?

23             THE WITNESS:  It is.

24       Q.    And from whom?

25       A.    I believe AmeriSourceBergen.

Steven Knight

Page 88

1    Q.    Now, we had previously excluded Franklin

2  Medical Center from our discussions about drug

3  inquiries and drug requests.  Has there ever been any

4  point where the people at, anybody at Franklin

5  Medical Center within the last 24 months would have

6  made inquiries about the availability of any of the

7  drugs that we talked about here today?

8    A.    Amitriptyline would have been a

9  possibility.

10   Q.    And did they inquire about availability of

11 amitriptyline powder?

12   A.    No.

13   Q.    Would you know whether drugs supplied to

14 Franklin Medical Center would then have been

15 transferred to Southern Ohio Correctional Facility to

16 be used for executions?

17   A.    No.

18         MS. CARWILE:  No, you don't know or you --

19   A.    No, that wouldn't have been.

20   Q.    So to clarify, to your knowledge would

21 drugs that have been supplied by PSC to Franklin

22 Medical Center ever be transferred to Southern Ohio

23 Correctional Facility to be used for executions?

24   A.    No.

25   Q.    So I think the only thing we have left to

Steven Knight

Page 89

1    do here is to go through some of these exhibits.

2              (Discussion off the record.)

3    Q.       We're back on the record.

4              This would be Deposition Exhibit 4.

5              (DEPOSITION EXHIBIT 4 MARKED.)

6    Q.       We've handed you what's been marked as

7    deposition Exhibit 4.  Do you recognize this

8    particular document, sir?

9    A.       I do not.

10   Q.       Based on -- do you have any idea what this

11   document is?

12   A.       Sure.

13   Q.       Tell me what the document is if you could.

14   A.       It would be the top 50 drugs for

15   Department of Corrections in the second quarter of

16   2019.  I'm sorry, excuse me, yeah, that's correct.

17   Q.       Second quarter fiscal year '19?

18   A.       Fiscal year, yeah.

19   Q.       And No. 36 on page 2, am I right that says

20   that amitriptyline is the 36th most purchased drug by

21   ODRC for that second quarter of fiscal year 2019?

22   A.       By dollar amount, correct.

23   Q.       That's what I was going to ask.  So by

24   dollar amount, and how many units of amitriptyline

25   was that involving just for that third or second

Steven Knight

Page 90

1  quarter of fiscal year 2019?

2      A.    1,266?

3      Q.    When it says "units," what does that mean.

4      A.    I did not create this document but I'm

5  guessing it's bottles.

6      Q.    So it's not capsule or not tablets, it's

7  packages of some sort?

8      A.    Yes.  If I can have a chance to think here

9  a second I may be able to figure it out specifically.

10     Q.    Absolutely.  And I'll just represent to

11 you this is one of the spreadsheets that was turned

12 over to us in discovery in native format so there's

13 no Bates number.

14           MS. CARWILE:  There would have been one

15 associated with it in the imaging cover file though.

16 The numbers should be the same as, so if you, the

17 file name should be the same.

18           MR. BOHNERT:  The digital file name?  I

19 apologize, I don't remember what the digital file

20 was.

21     A.    I would believe that would be bottles.

22     Q.    Of amitriptyline?

23     A.    Correct.

24     Q.    So the next document here is Deposition

25 Exhibit 5.

Steven Knight

Page 91

1                  (DEPOSITION EXHIBIT 5 MARKED.)

2        Q.      Steve, do you recognize this Exhibit 5?

3        A.      I do.

4        Q.      And can you describe it for us for the

5   record?

6        A.      It would be the formula of medications

7   that are approved, formulary of medications that are

8   approved for DRC.

9        Q.      And what does that mean?  Help us

10  understand what that means.

11       A.      Many times formularies are used to be a

12  cost containment method.  So you ensure that the

13  drugs on a formulary are what the prescribers are

14  using which is the most cost-effective of that

15  particular.

16       Q.      So would it be accurate to say that if

17  something shows up on a formulary, then that is a

18  drug that is going to be generally expected to be

19  acquired regularly?

20       A.      Yes.

21       Q.      And this list, the ODRC formulary was last

22  updated when?

23       A.      9 of 2017.

24       Q.      This particular document I should say.

25       A.      Yes.

Steven Knight

Page 92

1     Q.     Is Bates stamped in the corner OPS
2  underscore 000264?  And does this ODRC Formulary
3  Drugs include a list of amitriptyline?
4     A.     It does.
5     Q.     Does it include a listing for digoxin?
6     A.     It does.
7     Q.     Does it include --
8            (Discussion off the record.)
9     Q.     So for the record in this Exhibit 5
10 amitriptyline is there in first column, right?
11    A.     Correct.
12    Q.     And digoxin is there in the third column
13 on the first page, right?
14    A.     Correct.
15    Q.     Does it also include -- actually don't
16 have to ask about that.
17           On the second page does it include
18 propanolol?  On the third column, sorry.
19    A.     Yes.
20    Q.     Moving on.  This is Exhibit 6.
21           (DEPOSITION EXHIBIT 6 MARKED.)
22    Q.     Do you recognize this Exhibit 6?
23    A.     I don't specifically recognize it.
24    Q.     Do you know what it is?
25    A.     Yes.

Steven Knight

Page 93

1      Q.      And what is it?

2      A.      It's the Department of Corrections

3    formulary for drugs.

4      Q.      And was last updated on when?

5      A.      9 of 2017.

6      Q.      For the record what is the Bates number in

7    the lower right-hand corner?

8      A.      OPS underscore 000267.

9      Q.      So this is the ODRC formulary for drugs

10   updated 9/17.  Help me understand the difference

11   between Exhibit 5 that was the ODRC formulary for

12   drugs updated 9/17 and this Exhibit 6.  I was going

13   to say maybe this Exhibit 6 is brand names whereas

14   the others were not?

15     A.      No.

16     Q.      But that doesn't seem to hold true.

17     A.      No.  Appears that one has more than the

18   other.  But I don't specifically know the difference.

19     Q.      Okay.  I literally wanted to know kind of

20   what I was looking at here and knowing what the

21   difference is and doesn't sound like this is

22   something that I'm not the only dummy then that

23   doesn't know the difference.

24     A.      No, I'm included.

25     Q.      This is Exhibit 7.

Steven Knight

Page 94

1                (DEPOSITION EXHIBIT 7 MARKED.)

2       Q.      And do you recognize or do you know what

3    Exhibit 7 is?

4       A.      Yes.

5       Q.      And explain it for us for the record,

6    please.

7       A.      Department of Corrections top 50 spend for

8    the first quarter of fiscal year 2019 by dollar.

9       Q.      And does this list include amitriptyline?

10   No. 24.

11      A.      Thank you.  Yes, it does.

12      Q.      And approximately how much was spent on

13   amitriptyline by ODRC in the first quarter of 2019?

14      A.      $100,227.17.

15      Q.      For how many bottles?

16      A.      1559.

17      Q.      This is Exhibit 8.

18              (DEPOSITION EXHIBIT 8 MARKED.)

19      Q.      Do you recognize this Exhibit 8?

20      A.      I do.

21      Q.      And what is it?

22      A.      It was an email sent to us regarding

23   medications and/or strengths of products that were

24   added and that were taken off the formulary.

25      Q.      So added and taken off of which formulary,

Steven Knight

Page 95

1    to clarify?

2        A.      This would be the Department of

3    Corrections formulary.

4        Q.      And what's the date of this email?

5        A.      September 6, 2018.

6        Q.      And the Bates Stamp number in the lower

7    right-hand corner is what?

8        A.      OPS underscore 000770.

9            MR. BOHNERT:  And so just so you know kind

10   how we'll wrap things in here, I'm just going to want

11   a confirmation these are all documents that you guys

12   provided to us in discovery.  The reason I ask is

13   some of them are obvious because they have the OPS

14   Bates stamp in the corner but some of them are from

15   the native file format so they don't have that.  I

16   just want to make sure that we're not going to end up

17   with a fight with them later on down the road about

18   whether all of these are authentic.

19       Q.      (By Mr. Bohnert) So the two recipients on

20   Exhibit 8, Steven Knight is the first one, that's

21   you, right?

22       A.      Correct.

23       Q.      So have you seen this email before?

24       A.      Yes.

25       Q.      And under "Changes," do you see that?

Steven Knight

Page 96

1      A.     Yes.

2      Q.     What does the first line under Changes

3   say?

4      A.     Amitriptyline was removed from Mental

5   Health formulary for DRC but still can be used by

6   medical, by medical for pain, migraines, prevention,

7   so use might decrease.

8      Q.     And why was it that this decision was

9   made?

10     A.     I can't specifically speak to that because

11  that is part of the committee that manages the

12  formulary for the Department of Corrections which is

13  the Department of Corrections.

14     Q.     Was there a concern about amitriptyline

15  for some reason?  To your knowledge --

16     A.     Not to my knowledge.

17     Q.     -- that prompted this?

18     A.     Not to my knowledge.

19     Q.     Do you have any idea why DRC might have

20  been wanting to have use of amitriptyline decreased?

21     A.     Other than what it states here is removed

22  from Mental Health formulary.

23     Q.     So you don't have any idea why.

24     A.     No.

25     Q.     Exhibit 9.

Steven Knight

Page 97

1                    (DEPOSITION EXHIBIT 9 MARKED.)

2          Q.      Do you recognize Exhibit 9?

3          A.      I do.

4          Q.      And what is it?

5          A.      It is the Department of Corrections top 50

6    spend for fiscal year, third quarter of the fiscal

7    year 2019.

8          Q.      And on the row No. 44 on the second page

9    what do we see?

10         A.      Amitriptyline.

11         Q.      For how many bottles?

12         A.      1127.

13         Q.      And for how much?

14         A.      $44,127.54.

15         Q.      And this is money that DRC is spending for

16   these particular products in this chart, correct?

17         A.      That's correct.

18         Q.      And same with those other similar charts?

19         A.      Correct.

20                 (DEPOSITION EXHIBIT 10 MARKED.)

21         Q.      Sir, you've been handed Exhibit 10.  Do

22   you recognize this particular document?

23         A.      Yes.

24         Q.      And what is it, if you can give us a

25   description of it?

Steven Knight

Page 98

1     A.     It is an email just giving a particular

2  opinion based on some of the operations of DRC.

3     Q.     And dated when?

4     A.     October 10 of 2018.

5     Q.     And are you listed as a recipient of this

6  email?

7     A.     Yes.

8     Q.     And what is the Bates number in the lower

9  right-hand corner, please?

10    A.     OPS underscore 006873.

11    Q.     And there at the first line does that

12  first description, that first sentence there confirm

13  what you had said earlier about those three

14  spreadsheets that we've seen on the units talking

15  about bottles of amitriptyline?

16    A.     Yes.

17    Q.     And at No. 8, there's nine bullet points,

18  No. 8, do you see that one?

19    A.     Yes.

20    Q.     Can you read that for us?

21    A.     "We removed some mental health medications

22  from the formulary effective December 1, so might see

23  slight decrease next quarter on these medications

24  (amitriptyline/venlafaxine/mirtazapine).  Will follow

25  these to see what the difference might be."

Steven Knight

Page 99

1    Q.    Do you have any idea why those were, why
2    that amitriptyline was removed from the formulary
3    effective December 1?
4    A.    No.
5    Q.    That was effective December 1 of what
6    year?
7    A.    Would have been 2018 for fiscal year 2019.
8          (DEPOSITION EXHIBIT 11 MARKED.)
9    Q.    Do you recognize Exhibit 11?
10   A.    I do not.
11   Q.    Can you tell us what it is at least?
12         MS. STRAIT:  Objection.
13   Q.    To your knowledge.  What does it appear to
14   be?
15   A.    I'll have to read this.
16   Q.    Okay.
17   A.    To my knowledge it is an email chain
18   between people discussing the use of two medications
19   at the same time.
20   Q.    And what were those medications to your
21   knowledge?
22   A.    Amitriptyline and nortriptyline.
23   Q.    Nortriptyline, right?
24   A.    Yes.
25   Q.    And there in the top part of the email

Steven Knight

Page 100

1    there's a sentence where the person who appears to

2    be, would be Kathryn Burns.  Do I read that

3    correctly, that she would have been the person who

4    wrote that top section?

5        A.     It does appear so.

6        Q.     And what is her assessment of using both

7    nortriptyline and amitriptyline at the same time?

8               MS. STRAIT:  I'm going to object.  He's

9    simply reading the words, which we can all do.  The

10   witness has already said that he has no knowledge of

11   this document.

12              MR. BOHNERT:  But he's also the 30(B)(6)

13   representative who is here to talk about documents

14   that were produced by the Agency.  So, and this is a

15   document that was produced by the Agency.

16              MS. STRAIT:  Right, but he has no more

17   knowledge than the rest of us do about the words on

18   this paper.  The document speaks for itself.

19              MR. BOHNERT:  Okay.  I need to explore a

20   couple things with him about it so I need to have him

21   make sure we have in the record what the words are.

22              MS. STRAIT:  Continuing objection as to

23   this document.

24       Q.     (By Mr. Bohnert) I should have asked.

25   What is your education kind of professional

Steven Knight

Page 101

1    background?  Are you a pharmacist by training?

2        A.      No.

3        Q.      Do you, help me understand what your

4    education is so I know what your level of

5    understanding about these products pharmaceuticals

6    is.

7        A.      Business administration.

8        Q.      So if I just simply stated that it appears

9    that Ms. Burns in this email said that there would be

10   no reason to give, that there would be lots of

11   reasons to not continue to give both amitriptyline

12   and nortriptyline at the same time given the number,

13   given the number of antidepressant types available

14   that aren't lethal in OD.  Did I read that correctly?

15       A.      Correct.

16       Q.      Do you have any idea what that means?

17       A.      My assumption would be in an overdose.

18               (DEPOSITION EXHIBIT 12 MARKED.)

19       Q.      Do you recognize Exhibit 12, sir?

20       A.      I do not.

21       Q.      In the corner there do you see the Bates

22   stamp number?

23       A.      Yes.

24       Q.      And can you read that for us?

25       A.      OPS underscore 025463.

Steven Knight

Page 102

1    Q.    So you said you don't recognize it but do
2  you know what this document is?
3    A.    Yes.  It's a kind of a compliance
4  monitoring that is filled out by DRC, in this case
5  FMC A and B regards to Central Pharmacy Inpatient.
6    Q.    FMC A and B is what?
7    A.    Franklin Medical Center.
8    Q.    Is this something that is specific to
9  Central Pharmacy Inpatient?
10    A.    Correct.
11          (DEPOSITION EXHIBIT 13 MARKED.)
12    Q.    Do you recognize Exhibit 13, sir?
13    A.    I do.
14    Q.    And can you tell us what it is?
15    A.    It is an invoice from Pharmacy Services to
16  Department of Corrections.
17    Q.    Specifically which facility with the
18  Department of Corrections?
19    A.    Southern Ohio Correctional Facility.
20    Q.    And what is the Bates stamp number down
21  there in the lower right-ish corner?
22    A.    OPS underscore 025562.
23    Q.    And what is this invoice for?
24    A.    Midazolam, potassium chloride, potassium
25  chloride, and rocuronium bromide.

Steven Knight

Page 103

1    Q.    Just so I understand because I am seeing

2  three different dates on the invoices and three

3  different invoice numbers.

4    A.    Yes.

5    Q.    This was turned over to us as one file so

6  I just want to make sure I am understanding what I'm

7  looking at here.  Would these invoices, are these

8  three separate invoices?

9    A.    Yes.

10    Q.    So do these represent three separate

11  purchase transactions?

12    A.    Correct.

13    Q.    And are each of these transactions of

14  drugs to be provided from PSC to DRC Employee No. 1

15  for use in executions?

16    A.    Yes.

17    Q.    Yes?

18    A.    I don't specifically know what they're

19  used for but, yes, they were provided to DRC Employee

20  No. 1.

21    Q.    Now, just so I understand, the date on the

22  invoice, how did that correlate with the date of the

23  transaction typically in these situations?

24    A.    So the date of the transaction would be

25  the date that the product is actually picked in our

Steven Knight

Page 104

1    warehouse, picked, packed, what we consider shipped

2    in our warehouse.  The invoice would be invoiced at a

3    later date.

4        Q.    So the date that says shipped date, is

5    that the date of the actual transfer of the drugs

6    from PSC's possession to DRC Employee No. 1 then on

7    these documents?

8        A.    Not a hundred percent true.  This could

9    have been picked, packed, and done the night before

10   and actually picked up like the next morning.

11       Q.    But it's at least very close in time.

12       A.    Yes.

13       Q.    Would these kind of documents ever be

14   backdated for any reason?

15       A.    Never.

16       Q.    Would they ever be front-dated in any

17   situation?

18       A.    Never.

19             (DEPOSITION EXHIBIT 14 MARKED.)

20       Q.    Do you recognize Exhibit 14?

21       A.    Yes.

22       Q.    Take a second to flip through there and

23   make sure that you know everything that's in here.

24   Have you had a chance to look?

25       A.    Yes.

Steven Knight

Page 105

1    Q.    So tell me what it is that I'm looking at

2    here in the pages -- well, let me back up.

3          The Bates stamp in the corner starts at

4    what number?

5    A.    OPS underscore 025469.

6    Q.    And are the numbers consecutive all the

7    way through to the last page?

8    A.    Yes.

9    Q.    And that last page number is what?

10   A.    OPS underscore 025487.

11   Q.    Help me understand what it is that I'm

12   looking at in these pages on Exhibit 14.

13   A.    This is a packing slip from Ohio Pharmacy

14   Services for a particular pick operation that we did.

15   Q.    And looking through here the drugs that

16   are listed in here are all drugs that are used for

17   executions.  Is that your knowledge?  Or do you have

18   knowledge that these are all drugs that were used or

19   are used in Ohio's execution protocol?

20   A.    I have not been involved that these are

21   specifically used for that reason.

22   Q.    Are these all drugs that would have been

23   picked, packed, and shipped by Ohio Pharmacy Service

24   Center at DRC Employee No. 1's request?

25   A.    Yes.

Steven Knight

Page 106

```
 1      Q.     So one of the questions I did have is it
 2   says Carrier on all of these things, these packing
 3   slips says Carrier and says "Athens Carrier."  My
 4   understanding is that DRC Employee No. 1 is the one
 5   personally picking these things up so I just want to
 6   make sure I understand what Athens Carrier means.
 7      A.     So any delivery to that facility that we
 8   would have made would have been on what we call our
 9   Athens route.
10      Q.     So that's not like a private FedEx
11   competitor or a courier or anything like that.
12      A.     Oh, no.
13      Q.     Gotcha.  And so when DRC Employee No. 1
14   takes the drugs from the warehouse and then delivers
15   them to SOCF, is that for PSC's purposes considered a
16   delivery?
17      A.     Could you restate that?
18      Q.     I'm not trying to trick you or anything,
19   I'm just trying to understand.  Like it says Athens
20   Carrier and you said that means the route for
21   delivery.
22      A.     Yes.
23      Q.     But it's my understanding DRC Employee
24   No. 1 is the one who's actually literally driving
25   that route for these drugs listed here in Exhibit 14.
```

Steven Knight

Page 107

1    So I guess I'm just wondering in that situation is

2    DRC Employee No. 1 considered sort of delivering the

3    drugs for PSC?

4         A.    No.  We would consider that a customer

5    pickup and when it's picked up by that person there

6    was no true delivery done by us.

7         Q.    So I guess that was part of my confusion

8    why there would be a carrier listed if there's a

9    customer pickup.

10        A.    Just with technical system issues to

11   change that for something different.  It's just not

12   the most easy way to do.

13              (DEPOSITION EXHIBIT 15 MARKED.)

14        Q.    Same question I'll ask you to identify the

15   Bates number in the lower right-hand corner.

16        A.    Okay.

17        Q.    Do you recognize this Exhibit 15?

18        A.    I do.

19        Q.    And tell me what is comprised here in

20   Exhibit 15.

21        A.    This is a purchase order from Ohio

22   Pharmacy Services to AmeriSourceBergen.

23        Q.    That's what's on the first page, correct?

24        A.    Correct.

25        Q.    So the first page is Bates stamped number

Steven Knight

Page 108

1    what?

2        A.      OPS underscore 025488.

3        Q.      And this first purchase order is dated

4    when?

5        A.      July 8, 2016.

6        Q.      And it's for what product?

7        A.      Midazolam.

8        Q.      And it's from what vendor?

9        A.      AmeriSourceBergen.

10       Q.      Is West Ward Pharmaceuticals the

11   manufacturer of that particular batch of midazolam?

12       A.      That's correct.

13       Q.      Help me understand what it means when it

14   says "pack size 50."

15       A.      That would indicate that this had 50 vials

16   in that.  Actually I think would be 25 vials of

17   2 milligrams.  So, or milliliters, sorry.

18   50 milliliters.  Of that product.

19       Q.      So the 50 if we were to do units on it 2

20   would be 50 milliliters total, not the number of

21   vials.

22       A.      Correct.

23       Q.      And that was for July 8, 2016, for

24   midazolam.

25               Next page, what does that show us?

Steven Knight

Page 109

1    A.    Rocuronium bromide.

2    Q.    Purchased when?

3    A.    July 18 of 2016.

4    Q.    From whom?

5    A.    AmeriSourceBergen.

6    Q.    The next page, what does the next page

7    show us OPS underscore 025490?

8    A.    That's a purchase order from Ohio Pharmacy

9    Services to Gulf Coast Pharmaceuticals.

10   Q.    And what was the date on that?

11   A.    July 28, 2016.

12   Q.    And so which vendor?

13   A.    Gulf Coast Pharmaceuticals.

14   Q.    And for what product?

15   A.    Potassium chloride.

16   Q.    The next page, well, before we get to that

17   page let's stay on the one with Gulf Coast

18   Pharmaceuticals.  So we've got product here from

19   AmeriSourceBergen being sold at a time when my

20   understanding is AmeriSourceBergen had the sort of

21   sole contract with OPS; is that right?

22   A.    No, that is not correct.

23   Q.    Okay, help me understand why not.

24   A.    It would, the sole contract would have

25   been HG Smith at that time.

Steven Knight

Page 110

1    Q.    Premerger.

2    A.    Premerger.

3    Q.    Okay.  So then the next one there's a

4  purchase order on 7/28/2016 from Gulf Coast

5  Pharmaceuticals, that's not the company that had the

6  sole source contract either, is it?

7    A.    Correct.

8    Q.    So do you have any knowledge why these

9  purchases from AmeriSourceBergen in 2016 and Gulf

10  Coast Pharmaceuticals Plus were made, in 2016 were

11  made from those entities and not the --

12    A.    Available product from that vendor.

13    Q.    So the next page then on OPS underscore

14  025491 shows us what?

15    A.    Purchase order from Ohio Pharmacy Services

16  to Gulf Coast Pharmaceuticals.

17    Q.    On what date.

18    A.    8/24/2016.

19    Q.    And for what product?

20    A.    Potassium chloride.

21    Q.    So help me understand then when the

22  product is not one that's sitting on the shelf in the

23  warehouse but it's coming from Gulf Coast

24  Pharmaceuticals or AmeriSourceBergen and it says

25  date, what is that the date of?

Steven Knight

Page 111

1      A.     That is the date that the purchase order

2   was created.

3      Q.     So the date of the actual sale might be

4   something different?  Or I guess help me understand,

5   how do I know what the date of the sale is?  On these

6   documents.

7      A.     And the sale being from that vendor to us?

8      Q.     Correct.

9      A.     "Sale" is a little vague for me.

10     Q.     What would you use?

11     A.     Actual receipt of the product.

12     Q.     Okay.

13     A.     Actual shipment from them, actual when

14  they invoiced, when the invoice was due, those are

15  all different dates throughout this process.

16     Q.     That's why you're the manager and I am

17  just a lawyer asking you questions about this.

18            So the date of delivery it says 8/24/2016.

19  Is that the date on which OPS received the products

20  here on OPS underscore 025491?

21     A.     It should not be, no.

22     Q.     Should not be?

23     A.     The date that we received it?

24     Q.     No, down here below in the body that says

25  delivery 8/24/2016.

Steven Knight

Page 112

1      A.      Sorry.  So that date is actually

2   calculated automatically by the system based on the

3   lead time that was put in for that particular vendor.

4   So if a lead time was not put in for that vendor it

5   would assume the same day.

6      Q.      So the next page then, is that a similar,

7   kind of reflecting a similar kind of transaction

8   9/22/2016 from Gulf Coast Pharmaceuticals?

9      A.      Exactly.

10     Q.      Potassium chloride, rocuronium bromide.

11             The next page looks a little different but

12   that just might be the scan.

13     A.      Wow.

14     Q.      There's some handwriting on page OPS

15   underscore 025493.  Do you see that?

16     A.      I do.

17     Q.      Just in general what does this purchase

18   order reflect?

19     A.      The purchase order from Ohio Pharmacy

20   Services to AmeriSourceBergen.

21     Q.      Purchase from AmeriSourceBergen by Ohio

22   Pharmacy Services?

23     A.      Yes.

24     Q.      Of what product?

25     A.      Midazolam.

Steven Knight

Page 113

1     Q.     And approximately when?

2     A.     10/3/2016.

3     Q.     Now, down in the body of this document

4  there's some handwriting.  Do you see that?

5     A.     Yes.

6     Q.     And what does that handwriting say?

7     A.     $50 plus delivery fee.  Give a

8  confirmation number and a hot shot.

9     Q.     What does "hot shot" mean?

10    A.     Hot shot means that it was delivered the

11 same day.

12    Q.     Okay.  Delivered from whom to whom?

13    A.     AmeriSourceBergen to Pharmacy Service

14 Center.

15    Q.     Now, okay, the address I see on here for

16 AmeriSourceBergen is Chicago, right?

17    A.     Correct.

18    Q.     Help me understand, well, first of all,

19 was that product coming from Chicago?

20    A.     No.

21    Q.     And where was it coming from?

22    A.     Columbus area.

23    Q.     So does AmeriSourceBergen have like a

24 facility here in Columbus?

25    A.     Distribution center, yes.

Steven Knight

Page 114

1    Q.    Would there have been a particular reason

2    why that would have been requested to be a hot shot?

3    A.    The request would have been to have it in

4    stock right away.

5    Q.    And that was again on October 3, 2016, or

6    thereabouts?

7    A.    Yes.

8    Q.    And the next page there shows what?

9    A.    A purchase order to Capital Wholesale from

10   Ohio Pharmacy Service Center.

11   Q.    On approximately what date?

12   A.    10/24/2016.

13   Q.    For what product?

14   A.    Midazolam.

15   Q.    The next page shows us what?

16   A.    This is a purchase order to Capital

17   Wholesale from Pharmacy Service Center.

18   Q.    And what date?

19   A.    11/25/2016.

20   Q.    And do we know for what product?

21   A.    We do.

22   Q.    What product is that?

23   A.    Midazolam.

24   Q.    And how do we know that?  Because I don't

25   see the name there.

Steven Knight

Page 115

1      A.      Yeah.  If you see the 210282551V, that is

2   our internal product number.

3      Q.      So that's OPS's internal product number

4   for midazolam?

5      A.      Midazolam, that strength, that pack size,

6   all of that.  Specific.

7      Q.      And again at that time in 2016 Capital

8   Wholesale Drug was not the contract vendor with OPS,

9   correct?

10      A.      Correct.

11      Q.      So this would have been a special order

12   outside of the ordinary transaction procedures?

13      A.      Correct.

14      Q.      Next page shows us what?

15      A.      Purchase order from Ohio Pharmacy Service

16   to AmeriSourceBergen.

17      Q.      Dated when?

18      A.      12/30/2016.

19      Q.      Now I see it says revision number 1.  What

20   does that mean?

21      A.      Because of where this, because this was a

22   historical document that was printed, it had a format

23   showed revision 1 which would have been the very

24   first printing of it.

25      Q.      So the purchase date or date of this order

Steven Knight

Page 116

1    is 12/30/2016 for what product?

2         A.    I'll have to look back and see.

3               Potassium chloride.

4         Q.    And you know that based on what?

5         A.    The PSC internal part number.

6         Q.    Next page same kind of questions, explain

7    for us what we're seeing here, the date and the

8    product.

9         A.    Purchase order from Pharmacy Service

10   Center to Capital Wholesale on 12/30/2016 for

11   midazolam.

12        Q.    Next page, same questions.

13        A.    Purchase order from Pharmacy Service

14   Center to Capital Wholesale Drug January 3, 2017, for

15   midazolam.

16        Q.    Next page?

17        A.    Purchase order from Pharmacy Service

18   Center to AmeriSourceBergen on 4/11/2017 for I

19   believe that was potassium chloride.  Potassium

20   chloride.

21        Q.    Next page?

22        A.    Purchase order from Pharmacy Service

23   Center to Gulf Coast Pharmaceuticals on April 12,

24   2017, for rocuronium bromide from Gulf Coast.

25        Q.    Next page?

Steven Knight

Page 117

1      A.      Purchase order from Pharmacy Service

2   Center to AmeriSourceBergen for midazolam on

3   4/21/2017.

4      Q.      Now, 210282551V, that's midazolam?

5      A.      Let me verify.

6              No, it is midazolam.

7      Q.      But just a different size bottle,

8   different concentration maybe than the midazolam

9   shown on page 1 of Exhibit 15, because those numbers

10  don't seem to match up.

11     A.      Correct.  It's 10 milligrams for 2 ML and

12  2 ML vial.  2551 is also midazolam but it's

13  5 milligrams per ML.

14     Q.      Okay.  The next page same questions as to

15  what we're seeing here.

16     A.      Is that ending in 502?

17     Q.      Yes.

18     A.      Again, that would be a purchase order from

19  PSC to AmeriSourceBergen on 11/8/2017 for midazolam

20  again.

21     Q.      Next page?

22     A.      Purchase order from Pharmacy Service

23  Center to Gulf Coast for potassium chloride.

24     Q.      Next page, same thing.

25     A.      Correct.

Steven Knight

Page 118

1      Q.     Potassium chloride order from who?

2      A.     This would have been a credit card

3   payment.  On this document I can't tell you for sure

4   who it was.

5      Q.     Okay, fair enough.  But if we found

6   another document that showed a purchase on or about

7   11/27/2017 for a quantity of potassium chloride,

8   would we be able to accurately conclude that the

9   vendor for that would be whoever is listed on that

10  other document that was a vendor listed?

11     A.     Typically we're not going to have multiple

12  purchase orders for the same purchase.

13     Q.     A purchase order and invoice are two

14  different things, right?

15     A.     Correct.  A purchase order is the

16  commitment from us to the vendor that we are wanting

17  to buy it.  An invoice from the vendor would be that

18  you got this product, now you're going to pay for it.

19     Q.     So I guess I'm just trying to figure out

20  how we can be able to know who the vendor is on this

21  particular product, OPS underscore 025504, credit

22  card payment.  If, for instance, we found an invoice

23  that corresponds to this purchase would we be able to

24  accurately conclude that was the vendor?

25     A.     I would say if that invoice shows that

Steven Knight

Page 119

1    there is no payment due.

2         Q.    Okay.

3         A.    Because we would have paid this with a

4    credit card.

5         Q.    I gotcha.  Good point.

6               The next page here.

7         A.    Yes.

8         Q.    It shows us what?

9         A.    Purchase order from Ohio Pharmacy Services

10   to Gulf Coast on 8/1/2018 for rocuronium bromide.

11        Q.    And when you say Gulf Coast you mean that

12   is shorthand for Gulf Coast Pharmaceuticals Plus?

13        A.    Sorry, yes.

14        Q.    Next page?

15        A.    Purchase order from Ohio Pharmacy Services

16   to Gulf Coast Pharmaceuticals Plus on 9/19/2018 for

17   potassium chloride.

18        Q.    Last page?

19        A.    Purchase order from Ohio Pharmacy Service

20   Center to AmeriSourceBergen on 1/9/2019 for

21   midazolam.

22             MS. CARWILE:  Are you going to be going

23   through page by page of any of other ones?

24             MR. BOHNERT:  I think that will probably

25   solve this.

Steven Knight

Page 120

 1                 MS. CARWILE:  Because it's past 1:30 and

 2    there's multiple pages.  And we've skipped lunch.

 3                 MR. BOHNERT:  Let me go with this, I do

 4    want to make sure that I have a way that I can have

 5    confirmed that these are authentic and that they are

 6    what they show to be.

 7                 MS. FRANKE:  That's fine, we just want to

 8    break for lunch if you want to do that.

 9                 MS. STRAIT:  We can stipulate to that.  We

10    don't need you to go through page by page.

11                 MR. BOHNERT:  I'm not sure if you need to

12    stipulate to that or you need to stipulate to that.

13                 MS. CARWILE:  I just was going to say if

14    you want to go through them page by page, we need a

15    break and we need lunch.  I don't care if you want to

16    go through page by page.

17                 MR. BOHNERT:  I'd rather not.  We've got a

18    midnight deadline for a whole bunch of other stuff,

19    so every minute that we spend here I'm backing up

20    against a midnight deadline.

21                 If we can come up with a way to agree we

22    don't have to have him to identify that these are,

23    that they reflect purchases as they say they are and

24    they're authentic, we can.

25                 MS. CARWILE:  I think we can work

Steven Knight

Page 121

1    something out.  They're not my documents so I can say

2    I can let you know that I can note that these, if

3    they have a Bates stamp that these are what was

4    produced to you, what I had received from OPS and we

5    can probably work something out with OPS that these

6    are their documents.  We can work it out I think

7    after the deposition.

8                 MS. STRAIT:  So these documents were all

9    produced by OPS.

10                MS. CARWILE:  Correct.

11                MS. STRAIT:  And they're reflective of

12   Bates numbers then why can't we simply stipulate that

13   these are true and correct copies of documents that

14   were in the possession of OPS?

15                MR. BOHNERT:  That's what I say, I don't

16   know whether that's your stipulation or your

17   stipulation.

18                MS. STRAIT:  I would be happy to stipulate

19   to that, OPS is willing to stipulate to that.

20                MS. FRANKE:  I haven't looked through

21   them.

22                MS. STRAIT:  These are all Bates stamped

23   by OPS, what else would they be?

24                MS. CARWILE:  The only ones that I would

25   want to verify would be the Excel spreadsheets.  I'm

Steven Knight

Page 122

1  not saying you would have changed anything but to be

2  able to tell whether they are the same document we

3  would have to compare with what we had produced

4  because it was a native and could be changed.

5          MR. BOHNERT:  We can do an affidavit.

6          MS. CARWILE:  We can do an affidavit.

7          MR. BOHNERT:  We just did Exhibit 15.

8  This will be marked as 16.

9          (DEPOSITION EXHIBIT 16 MARKED.)

10     Q.    (By Mr. Bohnert) For purposes of the

11  record do you recognize what Exhibit 16 is?

12     A.    I do.

13     Q.    And does it contain, well, you tell me

14  what it contains just so we can make sure that we're

15  all on the same page on the record.  Not page by

16  page, just generally what is in this Exhibit 16.

17     A.    Okay.  Generally it is our invoice, Ohio

18  Pharmacy Services invoice to Department of

19  Corrections, Southern Ohio Correctional Facility for

20  products purchased by them just detail behind it.

21     Q.    And it is OPS underscore 000740 through

22  OPS under score on 000757, did I read that correctly?

23     A.    Correct.

24     Q.    So that's Exhibit 16.

25          (DEPOSITION EXHIBIT 17 MARKED.)

Steven Knight

Page 123

1      Q.      Do you recognize what the documents are

2    here in Exhibit 17?

3      A.      I do.

4      Q.      And just for the record can you tell us

5    what they are in general?

6      A.      They are invoices from our vendors to the

7    Ohio Pharmacy Services.

8      Q.      And is it for drugs that have been

9    requested by DRC Employee No. 1?

10     A.      Generally speaking, yes.

11     Q.      That's Exhibit 17.  So as I see it OPS

12   underscore 025508 through the last page of that

13   document, that exhibit is OPS underscore 025529, did

14   I read that correctly?

15     A.      Yes.

16             (DEPOSITION EXHIBIT 18 MARKED.)

17     Q.      Do you recognize what Exhibit 18 is?

18     A.      I do.

19     Q.      And just in general can you tell us what

20   that document appears to be?

21     A.      An invoice from Ohio Pharmacy Services to

22   Department of Corrections, Southern Ohio Correctional

23   Facility with backup documentation.

24     Q.      And is the first Bates number OPS

25   underscore 025530?

Steven Knight

Page 124

1     A.    Yes.

2     Q.    And the last one OPS underscore 025547?

3     A.    Yes.

4     Q.    Just had a quick question about a page in

5 the middle of it, OPS underscore 025537 appears to be

6 a check from ODRC Operations Support Center to Ohio

7 Pharmacy Services.  Do I understand that correctly?

8     A.    That's correct.

9     Q.    And how much did that appear to be?

10    A.    $20,000.

11    Q.    And there's a handwritten note on the

12 bottom there above a stamp and what does that

13 handwritten note say?

14    A.    "Front load."

15    Q.    What does that mean?

16    A.    Department of Corrections provides money

17 upfront to us that we, as we invoice against those,

18 against that so it's not a bill and pay and bill and

19 pay, bill and pay, it's just.

20    Q.    Advance?

21    A.    An advance.

22    Q.    Or an account they can draw on?

23    A.    Yes.

24            (DEPOSITION EXHIBIT 19 MARKED.)

25    Q.    Do you recognize the documents that are in

Steven Knight

Page 125

1    Exhibit 19?

2        A.      I do.

3        Q.      And what do they appear to be?

4        A.      These are purchase orders from Ohio

5    Pharmacy Service Center to vendors along with

6    invoices from that particular vendor for that

7    purchase order.

8        Q.      First page is OPS underscore 025548,

9    right?

10       A.      Yes.

11       Q.      And the last page is OPS underscore

12   025561; is that right?

13       A.      Yes.

14       Q.      Real quick on page OPS underscore 025554,

15   let me know when you're there.

16       A.      Okay.

17       Q.      There's a handwritten note that appears to

18   me to say "call me" on the bottom of this toward the

19   bottom of this document.  This purchase order is

20   regarding potassium chloride on 11/22/2017.  Do you

21   have any idea what that involves, that handwritten

22   note?

23       A.      I do not.

24       Q.      Do you have any idea who wrote that?

25               MS. CARWILE:  I'm going to instruct if

Steven Knight

Page 126

1    it's a name to use a person number designation.

2        Q.    Sorry, I should have clarified.

3        A.    And I don't know that I can make specific

4    even that it would have been a sourcing analyst's

5    handwriting.

6        Q.    And who would that have been a message to?

7    Same issues, don't give me the names specifically

8    unless it was to you.

9        A.    My speculation would have been this would

10   have been to the vendor.  This would have been a fax

11   or an email type purchase order.

12       Q.    And the last I believe is Exhibit 20.

13             (DEPOSITION EXHIBIT 20 MARKED.)

14       Q.    Do you recognize Exhibit 20, sir?

15       A.    I do.

16       Q.    And what is it for us?

17       A.    It's the Master Selection List of the, in

18   this case appears that it's just pharmaceuticals that

19   we offer for our customers to buy.

20       Q.    So would this be like sort of an

21   inventory, not an inventory but like a shopping

22   catalog if I were a potential customer?

23       A.    Yes.

24       Q.    And this was prepared as of when?

25       A.    6/26/2019.

Steven Knight

Page 127

1      Q.      And for the record it's OPS underscore

2   015155; is that right?

3      A.      Yes.

4      Q.      All the way through the backside last page

5   is OPS underscore 015224.  Did I read that correctly?

6      A.      Yes.

7      Q.      Now, rather than going through the drugs

8   in here, just as a general proposition if a drug, a

9   pharmaceutical is listed in this Master Selection

10  Listing Items, does that mean that OPS has it already

11  in stock?

12     A.      No.

13     Q.      Does it mean that OPS already has it in

14  stock or could go get it in the marketplace

15  relatively easily?

16     A.      Yes.

17     Q.      So in other words to say it differently,

18  if a drug is listed in this Master Selection Listing

19  Items it would be able, DRC would be able to easily

20  purchase any of these drugs.

21     A.      Yes.

22     Q.      The last is just questions about

23  confirming about searches.  So just to wrap up,

24  Steve, can you confirm under oath here for me today

25  that OPS conducted a diligent and volunteer search of

Steven Knight

Page 128

1    all documents and records in its possession, custody,

2    and control that would be responsive to the subpoena

3    that was served on you by us and it's understood that

4    includes a different state agency did the actual

5    email or did the off-site records searches for

6    documents that were already in their possession?

7              MS. CARWILE:  I'd like to caveat that a

8    little bit.  It would be based on the agreed-upon

9    search term list between counsel.

10             MR. BOHNERT:  Indeed.

11     A.     Yes.

12     Q.     And can you confirm under oath for us that

13   the documents and records produced by OPS in response

14   to the subpoena issued by Plaintiff Jackson are

15   authentic records maintained by OPS in the ordinary

16   course of its business?

17     A.     Yes.

18     Q.     And can you confirm that OPS has produced

19   all responsive emails including involving DRC

20   Employee No. 1 and any documents showing requests or

21   inquiries regarding drugs that would be used for

22   executions?

23     A.     Again, based on the search list that was

24   agreed upon?

25     Q.     I mean, yeah, that would be the list of.

Steven Knight

Page 129

```
 1            MS. CARWILE:  He was included in the list.
 2       A.    Yeah.
 3       Q.    So just to clarify, is it true that there
 4  are no emails from or to DRC Employee No. 1 and OPS
 5  in the discovery production that we received from
 6  you?
 7       A.    Correct.
 8       Q.    And just to state the obvious then, can
 9  you confirm that means there were no emails whether
10  as an inquiry or a request as we've used those terms
11  here today involving DRC Employee No. 1 and OPS
12  regarding amitriptyline?
13       A.    Yes.
14       Q.    And same as to secobarbital?
15       A.    Yes.
16            MR. BOHNERT:  One second to confer.
17            So believe it or not I don't have any
18  further questions at this time.  I mean per our
19  agreement if there are any questions or anything
20  based on, the way I'd like to leave it is if on
21  further review on those documents that we didn't go
22  through page by page if there's a question about what
23  something means so that something I can contact you,
24  Ms. Carwile, and get an explanation whether that
25  means that you can explain to me and I will take the
```

Steven Knight

Page 130

1    representation or speaking directly with your client?

2             MS. CARWILE:  We can work that out, yes.

3             MR. BOHNERT:  And then the only question

4    then would be the issue of the review.  My

5    understanding is you said you would like to still

6    retain your right to review.

7             MS. CARWILE:  Yes.

8             MR. BOHNERT:  So I have no further

9    questions.

10             MS. STRAIT:  I do have extremely briefly.

11                     --|--

12                  EXAMINATION

13   BY MS. STRAIT:

14    Q.    You were asked during this deposition

15   whether you had checked on the availability of

16   pentobarbital and you indicated, which is also known

17   as Nembutal and you indicated that you had checked

18   and it is available on the marketplace.

19             My question is is it available for OPS to

20   purchase on the, for the Department of Rehabilitation

21   and Corrections?  Do you remember or not know?

22    A.    To my response at that second I believe

23   that is true.

24    Q.    Let me rephrase the question.  Do you

25   recall back in 2014 or thereabouts, you said you've

Steven Knight

Page 131

1    been in your position since approximately 2013 or

2    2014?

3         A.     Correct.

4         Q.     Do you recall that there was an attempt to

5    purchase pentobarbital also known as Nembutal and the

6    manufacturer turned down OPS because it believed OPS

7    was going to be diverting those drugs to the

8    Department of Rehabilitation and Corrections?

9         A.     Not to my knowledge.

10        Q.     Then you're not familiar with what

11   happened at that time.

12        A.     That's correct.

13        Q.     Have you attempted to purchase

14   pentobarbital?

15        A.     I have not.

16        Q.     Are you aware that pentobarbital is, the

17   manufacturer has restricted the use for veterinary

18   purposes and in humans to only be distributed to

19   hospitals for treatment of epilepsy?

20        A.     I am not.

21        Q.     You're not familiar with that at all?

22        A.     No.

23        Q.     And have you made any attempt to actually

24   purchase pentobarbital?

25        A.     No.

Steven Knight

Page 132

1          MS. STRAIT:  I think that's it.

2          MR. BOHNERT:  I have no further questions.

3  Just want to thank you or your time today.  I know

4  it's warm, been a longer day that I anticipated but I

5  very much appreciate you helping me understand a lot

6  of this stuff that, frankly, I didn't know a lot of

7  this stuff, so very much appreciate it.

8          THE WITNESS:  Thank you.

9          (Whereupon, at 1:54 p.m., the deposition

10  was concluded and signature was not waived.)

11                    --|--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Steven Knight

Page 133

```
1                         AFFIDAVIT
2    State of Ohio              )
                              ) SS:
3    County of _____ )
4         I, STEVEN KNIGHT, do hereby certify that I
     have read the foregoing transcript of my deposition
5    given on Wednesday, August 7, 2019; that together
     with the correction page attached hereto noting
6    changes in form or substance, if any, it is true and
     correct.
7
8                         _____
                                    STEVEN KNIGHT
9
10        I do hereby certify that the foregoing
     transcript of the deposition of STEVEN KNIGHT was
11   submitted to the witness for reading and signing;
     that after he had stated to the undersigned Notary
12   Public that he had read and examined his deposition,
     he signed the same in my presence on the _____ day
13   of _____, 2019.
14
15                        _____
                                    Notary Public
16
17   My commission expires _____, _____.
18                         --|--
19
20
21
22
23
24
25
```

Steven Knight

Page 134

1                    CERTIFICATE

2   State of Ohio            )
                             )  SS:
3   County of Franklin       )

4        I, Julieanna Hennebert, RPR and RMR, the
    undersigned, a duly qualified and commissioned notary
5   public within and for the State of Ohio, do certify
    that, before giving his deposition, STEVEN KNIGHT was
6   by me first duly sworn to testify to the truth, the
    whole truth, and nothing but the truth; that the
7   foregoing is the deposition given at said time and
    place by STEVEN KNIGHT; that I am neither a relative
8   of nor employee of any of the parties or their
    counsel and have no interest whatever in the result
9   of the action.

10       IN WITNESS WHEREOF, I hereunto set my hand and
    official seal of office on this 8th day of August,
11  2019.

12

                    _Julieanna Hennebert_
13                  Julieanna Hennebert, RPR, RMR,
                    and Notary Public in and for the
14                  State of Ohio.

15  My commission expires February 19, 2023.

16  (3038-JLH)

17                    --|--

18

19

20

21

22

23

24

25

Steven Knight

Page 133

1                              AFFIDAVIT

2    State of Ohio            )
                              ) SS: *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*
3    County of *Franklin*     )

4          I, STEVEN KNIGHT, do hereby certify that I
     have read the foregoing transcript of my deposition
5    given on Wednesday, August 7, 2019; that together
     with the correction page attached hereto noting
6    changes in form or substance, if any, it is true and
     correct.

7

8                              _____
                                  STEVEN KNIGHT

9

10         I do hereby certify that the foregoing
     transcript of the deposition of STEVEN KNIGHT was
11   submitted to the witness for reading and signing;
     that after he had stated to the undersigned Notary
12   Public that he had read and examined his deposition,
     he signed the same in my presence on the *23rd* day
13   of *August*, 2019.

14                              _____

15                                Notary Public

16

17   My commission expires *17 July*, *2021*.

18

19

20

21

22

23

24

25

# ERRATA SHEET

Please list any changes to your deposition below.  Be sure to list the page, line, description of change and the reason for your change.  Please sign and date when complete.  While the changes are not physically made to the transcript, the errata sheet is forwarded to the ordering attorney and will be added as an addendum to your transcript.

| PAGE | LINE | DESCRIPTION OF CHANGE | REASON FOR CHANGE |
|------|------|----------------------|-------------------|
| 37 | 16 | ADD "Not" before our Source Analyst | "Not" was not in Transcript |
| 62 | 3 | Change from H"G" Smith to H"D" Smith | wRong Initial |
| 62 | 5 | HG Smith to HD Smith | wrong initial |
| 62 | 10 | HG Smith to HD Smith | wrong initial |
| 62 | 12 | HG Smith to HD Smith | wrong initial |
| 62 | 13 | HG Smith to HD Smith | wrong initial |
| 105 | 20 | involved to Informed | word error |
| 109 | 25 | HG Smith to HD Smith | wrong initial |

Signature

Date  8/23/2019