IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

--|--

Case No. 2:11-cv-1016

--|--

In Re: Ohio Execution Protocol Litigation,

--|--

30(B)(6)
Deposition of:  KARRIE SOUTHARD

Date and Time:  Tuesday, June 11, 2019
9:53 a.m.

Place:  Federal Public Defender's
Office
10 West Broad Street
Suite 1020
Columbus, Ohio

Reporter:  Julieanna Hennebert, RPR, RMR
Notary Public - State of Ohio

--|--

```
 1   APPEARANCES:
 2   On behalf of Plaintiff Cleveland Jackson:
 3         MR. ADAM RUSNAK
             MR. ALLEN L. BOHNERT
 4         MR. PAUL BOTTEI
             Federal Public Defender's Office
 5         Southern District of Ohio
             10 West Broad Street, Suite 1020
 6         Columbus, Ohio  43215
             614.469.2999
 7
     On behalf of State:
 8
             MR. CHARLES A. SCHNEIDER
 9         Section Chief
             Dave Yost, Ohio Attorney General
10         Criminal Justice Section
             150 East Gay Street, 16th Floor
11         Columbus, Ohio  43215
             614.995.3267
12
     On behalf of Board of Pharmacy:
13
             MR. HENRY G. APPEL
14         Assistant Attorney General
             Dave Yost, Ohio Attorney General
15         Health & Human Services
             30 East Broad Street, 26th Floor
16         Columbus, Ohio  43215-3428
             614.466.8600
17
             MS. NICOLE M. DEHNER
18         Chief Legal Counsel
             State of Ohio Board of Pharmacy
19         77 South High Street, 17th Floor
             Columbus, Ohio  43215
20         614.995.7496
21                           --|--
22
23
24
25
```

```
 1                      INDEX

 2                      --|--

 3   KARRIE SOUTHARD                          PAGE
        Examination by Mr. Rusnak                4
 4

 5                      --|--

 6               DEPOSITION EXHIBITS

 7   NUMBER DESCRIPTION                  IDENTIFIED

 8     1   Subpoena and attachments          12

 9     2   Application for Pharmacies         13

10     3   Initial Application, Terminal
           Pharmacy Category 2 and 3
11
       4   Initial Application, Terminal      13
12         Non-resident pharmacy Category
           2 and 3
13
       5   E-license Guide: Adding a New      15
14         License

15     6   Motion to Quash Subpoena Issued to 33
           Interested Party Ohio State Board
16         of Pharmacy

17     7   Reply in Support of Motion to Quash 33

18     8   Annual Report Fiscal Year 2018     37

19                      --|--

20

21

22

23

24

25
```

1               KARRIE SOUTHARD,

2  being by me first duly sworn, as hereinafter

3  certified, deposes and says as follows:

4                   EXAMINATION

5       Q.      Hi.  Can you start with your name, please.

6       A.      Karrie Southard.

7       Q.      Do you want to spell your last name?

8       A.      S-o-u-t-h-a-r-d.

9       Q.      Ms. Southard, my name is Adam Rusnak, I'm

10  an attorney for Mr. Cleveland Jackson.  With me are

11  my co-counsel Allen Bohnert, Paul Bottei.

12              Do you understand you're here to be

13  deposed today?

14      A.      Yes.

15      Q.      And that you're appearing as a 30(B)(6)

16  witness?

17      A.      Yes.

18      Q.      Do you know what that means?

19      A.      Means that I am speaking on behalf of the

20  Agency the Board of Pharmacy.

21      Q.      Have you ever been deposed before?

22      A.      Not deposed but I've testified in a public

23  hearing before the Board of Pharmacy.

24      Q.      So I think it's normal in depositions to

25  have a couple, sort of remind people of the rules.

1    If you don't understand any question I ask, please

2    just say so.  We have to try not to talk over each

3    other.  And we have to try to use words, not nod our

4    head, for the court reporter.

5        A.    Understood.

6        Q.    I want to start with what we'll say is

7    Exhibit 1, that's the subpoena in this case.

8              MR. RUSNAK:  Do you have that, Allen?

9        Q.    I would direct your attention to I guess

10   Attachment 1.

11             (EXHIBIT 1 MARKED.)

12       Q.    I suppose the start of the subpoena

13   notices what is marked as page 4.  Have you seen this

14   before?

15       A.    I have.

16       Q.    And on I guess two pages later Attachment

17   1, have you read this before?

18       A.    I have.

19       Q.    And in particular part 1 there, are you

20   familiar with that deposition topic?

21       A.    Yes.

22       Q.    And is that what you're prepared to talk

23   about today?

24       A.    Yes.

25       Q.    One question I meant to ask, I'm sorry I

1    skipped it.  The Board, the acronym for the Board is

2    the Ohio State Board of Pharmacy?

3         A.    State of Ohio Board of Pharmacy.

4         Q.    See, I already got it wrong.  State of

5    Ohio Board of Pharmacy.

6         A.    Yes.

7         Q.    So do you normally say SOBP or just Board?

8    Maybe we can go with "the Board"?

9         A.    "Board" would be.

10        Q.    I think "Board" would be easier to say.

11        A.    Yes.

12        Q.    I can see how that's an acronym that's

13   unfortunate.

14              So in preparing for the deposition today

15   on this topic, topic No. 1, did you review any

16   documents to get ready?

17        A.    I did.  Mostly the Ohio Revised Code, Ohio

18   Administrative Code, and documents publicly available

19   on our website.

20        Q.    Did you talk to anyone?

21        A.    I did, I spoke with our legal counsel

22   that's represented here.

23        Q.    How long do you think you spent preparing?

24        A.    Probably under four hours but over two.

25        Q.    And when did you do that preparation; this

1    week, last week maybe?

2        A.    It was the week before we were originally

3    scheduled.

4        Q.    Do you feel like that information is still

5    fresh in your mind now?

6        A.    Absolutely, yes.

7        Q.    And you said you have never done a

8    deposition before, so is it fair to say you've never

9    done a 30(B)(6) deposition before?

10        A.    That is correct.

11        Q.    But I think you indicated already that you

12    understand that you're speaking on behalf of the

13    Board.

14        A.    I do.

15            MR. APPEL:  May I represent that she is

16    the 30(B)(6) witness for Question No. 1 that you've

17    identified on Attachment 1 of the subpoena.

18            MR. RUSNAK:  Thank you.

19        Q.    And if there should come a time in our

20    questions where you find you're speaking on behalf of

21    yourself, please just say so.

22        A.    Understood.

23        Q.    In fact I do want to ask you a couple

24    questions about yourself before we go any farther,

25    which is just what is your current role with the

1    Board?

2        A.    My official title is Deputy Director 5,

3    unofficially at the Board of Pharmacy I'm Director of

4    Licensing.

5        Q.    How long have you been at that role?

6        A.    At that role just about a year.

7        Q.    And before that were you also with the

8    Board?

9        A.    I was as licensing administrator, which

10   reports directly to the Director of Licensing.

11       Q.    So what does your current role sort of

12   involve?

13       A.    I oversee the day-to-day functions of the

14   Licensing Department, which has a licensing

15   administrator and six licensing coordinators who

16   process the applications, involved in rule review,

17   answering questions from licensees and potential

18   applicants, and overall representing the Licensing

19   Department with the staff and overall duties of the

20   Board.

21       Q.    So I think we're here today mostly to

22   focus on a particular kind of license.  Could you

23   sort of tell me in brief what a TDDD, can I call it

24   that?

25       A.    You can, or we can refer to it just as a

 1  terminal distributor, whichever you prefer.

 2      Q.      I just wanted to avoid saying "terminal

 3  distributor dangerous drugs."  Terminal distributor

 4  license.

 5      A.      So a terminal distributor license is

 6  required for any entity in Ohio that possesses

 7  dangerous drugs or any entity outside of Ohio that is

 8  shipping dangerous drugs into Ohio patient specific.

 9      Q.      An entity outside of Ohio, would that be

10  like a mail order pharmacy?

11      A.      Potentially, yeah.

12      Q.      Can you tell me a couple other examples?

13      A.      Typically they are mailing it in.  Some do

14  have courier service into Ohio.  So technically they

15  wouldn't be mailing.

16      Q.      I understand.  But a terminal distributor

17  license is not just a pharmacy; is that right?

18      A.      That is correct.

19      Q.      What other kind of entities are there?

20      A.      An emergency medical service,

21  veterinarian, a doctor's office where you go to get

22  your flu vaccine, those are other types of terminal

23  distributors.

24      Q.      How is that different from a wholesale

25  distributor of drugs?

1     A.     So wholesale distributor is distributing

2  dangerous drugs at wholesale.  So they're not going

3  to the end user, the patient, they would be going to

4  other wholesale distributors or terminal

5  distributors.  A terminal distributor, dangerous

6  drugs are typically going to the end user, which is

7  what we refer to as a patient.

8     Q.     And I am aware that for at least the

9  terminal distributor license there are two

10  categories; Category 2 and Category 3.

11     A.     Correct.

12     Q.     Is there a similar distinction for the

13  wholesale distributor?

14     A.     It is the same distinction.

15     Q.     And can you explain that distinction?

16     A.     So Category 2 terminal distributor or

17  wholesale distributor allows any entity to possess,

18  distribute, sell dangerous drugs which are not

19  controlled substances.  And Category 3 allows the

20  distribution of all dangerous drugs including

21  controlled substances.

22     Q.     So is that all controlled substances?

23     A.     Correct.

24     Q.     All except Schedule 1.

25     A.     Sure.

1     Q.     And Schedule 1 is because those drugs are

2     illegal.

3     A.     Correct.

4     Q.     I think I knew that but I'm glad I got

5     that right.

6     A.     I will clarify, except now that we have

7     the Medical Marijuana Control Program in the state of

8     Ohio, that, but speaking directly to terminal and

9     wholesale distributors, it would be all except

10    Schedule 1.

11    Q.     So we talked a little bit about you

12    mentioned already instate and out of state.

13    A.     Correct.

14    Q.     Let's focus on terminal distributors.  In

15    what ways are their sort of applications different in

16    general?

17    A.     So one of the ways that the application is

18    different for an out-of-state terminal distributor,

19    the entity must first possess licensure in their

20    resident state or home state where the business

21    entity is actually located.

22    Q.     Licensure with their own state Board of

23    Pharmacy?

24    A.     Whichever state licensing authority.

25    Q.     As appropriate.

1     A.     Yes.

2     Q.     I see.  So I think we'll get into the

3   details here in a second.  How does an entity apply

4   for a terminal distributor license?

5     A.     So our license applications are all online

6   through E-license Ohio, which most of the boards and

7   commissions in Ohio use that system.  So they create

8   a profile and start the application which is all

9   submitted online.

10    Q.     Let me first draw your attention to,

11  Allen, if you could give me this one which I've

12  marked as No. 2.

13           (EXHIBIT 2 MARKED.)

14    Q.     So this is a document that the Board

15  produced to us, to Mr. Jackson in relation to this

16  subpoena.  Do you recognize this?

17    A.     I do.

18    Q.     Can you tell me what it is?

19    A.     It is our former paper application before

20  we went into the E-license Ohio system.  So this

21  would be the application for pharmacies, both instate

22  and out-of-state pharmacies.

23    Q.     And you say "former" meaning what?

24    A.     We no longer accept paper applications

25  since we are now on E-license Ohio.

```
 1      Q.     So for how long was this one relevant or
 2   until when?
 3      A.     We went live on E-license Ohio on
 4   April 21, I would have to look, it was late April of
 5   2018.  I would have to look back at the specific
 6   date.
 7      Q.     2018 though was the point.
 8      A.     April of 2018, yes.
 9      Q.     And so any entity applying for a terminal
10   distributor license now would not use this document
11   that I produced to you.
12      A.     That is correct.
13      Q.     I think they would use this document.
14             (EXHIBIT 3 MARKED.)
15      Q.     It's called Initial Application at the
16   top.
17             (EXHIBIT 4 MARKED.)
18      A.     Can you repeat your question, please?
19      Q.     Yeah, I will definitely ask the question
20   again.
21      A.     Thank you.
22      Q.     This document, these two documents
23   Exhibits 3 and 4 were also provided to us by the
24   Board.
25      A.     That is correct.
```

1       Q.      Can you tell me what these are?

2       A.      These are sample applications of the

3  questions and instructions that are included in

4  E-license Ohio.

5       Q.      So is it fair to say this is a reasonable

6  sort of facsimile of what it would look like, the

7  same questions I would answer if I went on the

8  website?

9       A.      Correct.

10      Q.      So if we talk about these questions, am I

11 correct in saying we're talking about the questions

12 that would be asked in the E-license process?

13      A.      Yes.

14      Q.      And I think Exhibit 3 is for an instate

15 pharmacy?

16      A.      That is correct.

17      Q.      And Exhibit 4 is for an out-of-state

18 pharmacy.

19      A.      That is correct.

20      Q.      So not to be repetitive, but if I were an

21 out-of-state pharmacy seeking an Ohio terminal

22 distributor license I would go on the E-license

23 online website and I would be asked questions that

24 are sort of encapsulated in Exhibit 4.

25      A.      If you selected the correct license type,

1    yes.

2        Q.    If I didn't make a mistake?

3        A.    Correct.

4        Q.    And I wanted to give you one important

5    exhibit before we sort of look at this one and that's

6    this one.  I don't think that we got this from you

7    but I think, well, you can tell me what it is.

8              (EXHIBIT 5 MARKED.)

9        Q.    So do you recognize what is Exhibit 5?

10       A.    I do.

11       Q.    And can you tell me who that is?

12       A.    It is an E-license Guide that is publicly

13   available on our website.  And we have a few of these

14   for the different license types, so this appears to

15   be pulled from our terminal distributor licensing

16   page.

17       Q.    And I see it says updated April 23, 2018.

18       A.    Correct.

19       Q.    Is that the most recent version?

20       A.    As far as I know.

21       Q.    So an out-of-state maybe in this case,

22   would this Exhibit 5 -- strike all that.

23             Would Exhibit 5 be for an instate or

24   out-of-state pharmacy seeking license?

25       A.    Yes.

Karrie Southard

Page 16

1    Q.    So if I were a pharmacy applying for a
2    license and I went to the E-license website this
3    would be the first thing I saw, Exhibit 5?
4    A.    No, you would not see this E-license Guide
5    on any license.  This is on the Board of Pharmacy's
6    website.  E-license is a separate web service
7    supported by the Department of Administrative
8    Services.
9    Q.    Why might I look at Exhibit 5 then?
10   A.    If you needed assistance in completing the
11   application, identifying what type of application you
12   needed in this step-by-step process to apply.
13   Q.    Is it fair to say this is sort of guidance
14   for completing?
15   A.    Correct.
16   Q.    I understand.  Is it right to say that
17   this document, Exhibit 5, sort of helps a pharmacy or
18   an applicant for a terminal distributor license
19   navigate the application process?
20   A.    Yes.
21   Q.    Let's look at Exhibit 4 then.
22   A.    Okay.
23   Q.    I just want to walk through a couple of
24   the steps here to make sure that we understand what
25   the application entails.

1      A.      Okay.

2      Q.      So on the top of the first page, I should

3 have highlighted your copy but I didn't, on the top

4 of the first page it says "Eligibility:  Is your

5 business a pharmacy located outside of Ohio that

6 ships, mails, or delivers, answer yes or no.

7      A.      Uh-huh.

8      Q.      So what does that question help us

9 determine?  Is that question if this is the right

10 thing for us?

11      A.      If it's the correct license type.

12      Q.      I see.  And so the answer is yes, this is

13 the correct license type.

14      A.      Correct.

15      Q.      And then down at the bottom of the page it

16 has Category 2 and 3, and these are the categories we

17 talked about previously?

18      A.      Yes.

19      Q.      I think the next couple pages are sort of,

20 well, maybe you can sort of describe the next couple

21 pages for us instead of me talking the whole time.

22      A.      So as you see at the end of the first page

23 where you just referenced "category," that is part of

24 the application instructions which are found on the

25 E-license screen below the eligibility question.

1          And the instructions include up to, the
2    pages aren't numbered but it's the second page
3    through the middle of the page, the complete the
4    instruction and then it begins the application, which
5    starts with basic business information.
6    Q.    And that includes the business name, what
7    they're registered as, on the next page what their
8    website is.
9    A.    Correct.
10    Q.    I think maybe the next section starts
11    where it says Background.
12    A.    That is correct.
13    Q.    And what is that section about?
14    A.    So these are the, a section where a
15    pharmacy or a business applicant, this applies to
16    more than just pharmacies, can add their applicant,
17    owners, and responsible person for their business in
18    their application.
19    Q.    So maybe you can help me understand the
20    difference between the applicant and the responsible
21    person.
22    A.    So the applicant is any individual who is
23    eligible to sign on behalf of the business.  It does
24    not necessarily always pertain to the person filling
25    out the application, they can be different people.

1           A responsible person is someone who is by

2    Ohio rule required to serve as, sorry for lack of

3    terminology, but who's responsible for the license,

4    which is required by Ohio Administrative Rule and the

5    Board determines who is eligible to serve as the

6    responsible person by license type.

7        Q.     So I don't want to oversimplify it but is

8    the responsible person often the pharmacist?  At a

9    pharmacy?

10       A.     It must be a pharmacist at a pharmacy.

11       Q.     But the applicant might be a different

12   person.

13       A.     Correct.

14       Q.     Such as the owner or CEO of the pharmacy?

15       A.     Could be.

16       Q.     So on page, I think they are numbered in

17   the upper right.

18       A.     Oh, yes.

19       Q.     Page 4 has some demographic but let's talk

20   about page 5.

21       A.     Yes.

22       Q.     These questions pertain to the pharmacy

23   business; is that right?

24       A.     Yes.

25       Q.     And can you explain some of these

1    questions for me?  Pharmacy function, what is this?

2        A.      So this is a drop-down list which helps

3    categorize what the majority of the business that the

4    pharmacy conducts are.  So they would select one of

5    those.

6        Q.      And then the next question is sort of an

7    open text box for business practice.

8        A.      Correct.

9        Q.      And what sort of information is the Board

10   looking for there?

11       A.      What types of medications they send,

12   you'll see that we ask some additional questions

13   later about that.  Typically they are expounding on

14   the former question and describing that further.

15       Q.      And same thing with patient population?

16       A.      Correct.

17       Q.      What kind of answers do we typically see

18   with patient population?  "We serve the elderly" for

19   example?

20       A.      Correct.  Another example would be we

21   service hospice patients in an end patient hospice

22   setting would be an example.

23       Q.      At the bottom of this page it asks a

24   couple other questions about the pharmacy business;

25   DEA registration, protocols and times, written

1    description.  Are these specific to out-of-state

2    pharmacies?

3         A.      Yes, they are.

4         Q.      And can you maybe help me understand what

5    some of these questions mean?  I think DEA

6    registration is pretty self-explanatory.  But what

7    does it mean a written description of normal delivery

8    protocols?

9         A.      So they have to have, the pharmacy must

10   have policies and procedures in place for how long it

11   takes a prescription or a dispensed medication to get

12   to the patient.

13        Q.      And sort of similar protocol in place for

14   packaging; is that right?

15        A.      Correct.

16        Q.      And then there's a big question at the top

17   of the next page.  Can you maybe explain that to me

18   about offer to counsel?

19        A.      Yes.  Ohio rule requires that pharmacies

20   must offer to counsel patients and so even

21   nonresident pharmacies have to follow that

22   requirement.  So the pharmacy must detail how they're

23   going to comply with that requirement.

24        Q.      Could you tell me in the sort of the

25   Board's experience most common ways out-of-state

1  pharmacies comply with this are?  By phone?

2      A.      I would say typically it is by phone since

3  they would be out of state.  Some offer a card in the

4  package that would be delivered with the dispensed

5  medication.

6      Q.      A card saying what?

7      A.      With information on how to contact the

8  pharmacy if the patient has any questions.

9      Q.      I see.  And then one last question in that

10  section, date of your last inspection.  This also is

11  a question sort of specifically for an out-of-state

12  terminal distributor.

13      A.      Correct.

14      Q.      And that's because the state regulatory

15  agency in their state sort of is responsible for

16  inspecting them?

17      A.      Correct.

18      Q.      The Ohio State Board of Pharmacy, do they

19  ever inspect an out-of-state terminal distributor?

20      A.      Not to my knowledge we never have.

21      Q.      I think it's fair to summarize the next

22  couple questions is about the applicant's sort of

23  background.  Can you sort of talk about these in

24  general for me?

25      A.      Correct.  So the next section through most

1    of the end of the application are legal and

2    disciplinary questions.  The first section would be

3    for the applicant which does not just include the

4    individual completing the application.

5         Q.    It also includes other people.

6         A.    Correct.

7         Q.    Such as?

8         A.    The business owners, any employee with

9    access to drug stock at the applied for location.

10        Q.    I'm sorry, can you say that again?  Any

11   employee with access to drug stock counts as an

12   applicant?

13        A.    Correct.

14        Q.    So does this include like pharmacy

15   technicians?

16        A.    It could.

17        Q.    Depending on.

18        A.    Right.

19        Q.    And then on the next page is sort of

20   similar questions but for the responsible person.

21        A.    Correct.

22        Q.    Are these questions, if an entity or an

23   applicant or responsible persons answers "yes" to any

24   of these, does that mean their application is

25   rejected?

1      A.      No.

2      Q.      And what happens if that happens?

3      A.      Well, there are several things that

4    happen.  One of the things would be if on the

5    application an affirmative answer to any of these

6    legal or disciplinary questions is answered, they

7    would be required to submit documentation supporting

8    their affirmative answer.

9      Q.      Affirmative answer means yes, I was

10   convicted of a crime of moral turpitude.

11     A.      Correct.

12     Q.      And has it been the case that the Board

13   has approved a license for an entity without

14   disclosing any specifics, has approved a license for

15   an entity even when a person there had previously

16   been convicted of one of these?

17     A.      Convicted of one of these?

18     Q.      Like for example, question:  Has the

19   responsible person ever been convicted of a felony

20   under state law?  That's about halfway down page 7.

21     A.      It's potential.  I can't recall a specific

22   example right now.

23     Q.      But if, for example, on that question the

24   entity answered yes, it wouldn't mean their

25   application was rejected automatically.

1     A.     Correct.

2     Q.     Would they have a hearing on this?

3     A.     Potentially.

4     Q.     And what goes into that potentiality?

5     A.     Depending on the facts of the case and the

6     materials submitted, our Compliance and Enforcement

7     Department would review to determine if further

8     action or a hearing were necessary.

9     Q.     Can you tell me what sort of goes into the

10    Board's view whether a hearing is necessary?

11    A.     I don't know all of the specifics but it's

12    like I said, investigating the facts that were

13    provided and the materials provided with the

14    application and a further background investigation.

15    Q.     Is there a hearing for every time someone

16    applies for a terminal distributor license?

17    A.     No.

18    Q.     Do you have a sense of what percentage

19    have a hearing?

20    A.     I don't.  You said "a sense"?

21    Q.     Yeah.  I don't need an exact percentage

22    but if you could tell me half of all applications.

23    A.     A majority, an overwhelming majority of

24    our applications do not have a hearing.

25    Q.     I understand.  I just want to ask a couple

1    other questions about the end of it starting on

2    page 9.  Looks like at the bottom half of that page

3    there are some requirements for verification,

4    inspection.  This is also something that applies to

5    the out-of-state terminal distributor applicant?  Or

6    does the instate have a similar requirement of

7    providing the most recent inspection report?

8        A.     This is only for out-of-state applicants.

9        Q.     When the Board receives an application

10   from the out-of-state applicant for a terminal

11   distributor, does the Board ever doublecheck that

12   these things are right?  Do they call the State Board

13   of Pharmacy in that other state and say is this

14   correct, is this the most recent one?  Or does it

15   sort of rely on the applicant to provide?

16       A.     It relies on the materials that the

17   applicant supplies.  I will say we can identify a

18   true record from another Board pretty easily, and

19   there are some, there is some information that we do

20   verify with that state board wherever that state is.

21   Or the licensing authority.

22       Q.     Sure.

23       A.     We verify some of that information.

24       Q.     I'm definitely using the shorthand

25   "pharmacy" even though I understand it's broader than

1    just pharmacy.

2         A.    Uh-huh.

3         Q.    So to summarize what you just said I

4    think, the Board verifies some of that information

5    but in large part feels it can identify things from

6    the documents.

7         A.    Correct.

8         Q.    Is that fair?

9         A.    Yes.

10        Q.    Now, I don't have a copy with me for the

11   application for the wholesale distributor.  Would you

12   say it's similar to the application we just went

13   through?

14        A.    Very similar.

15        Q.    I wanted to ask a couple questions for you

16   about sort of the processing of this application once

17   it's submitted.  So we've gone through filling it

18   out, the terminal distributor applicant has sent it

19   in.  First, do you have an idea how long it takes to

20   fill out an application like this?

21        A.    That really depends on the applicant.  If

22   you have all of the required materials gathered, it

23   doesn't take long at all, maybe 10-15 minutes.

24        Q.    And how long does the Board spend

25   processing this?

1    A.    All applications are reviewed within 30

2  days typically.  It varies depending on the

3  application how long it will take to review.

4    Q.    Could you, does the Board have a sense of

5  the average amount of time it takes to review an

6  application like this?

7    A.    The most complex reviews are under 30

8  minutes.  But again, we use an online system and

9  sometimes documents are slow to open, so that can

10  vary.

11    Q.    In sort of start to finish from submission

12  of the application until granting of the license in

13  the average case how long would that normally take?

14    A.    Can you repeat your question?

15    Q.    If I submit a license today and I want to

16  know how soon I can hope to get my license as a

17  terminal distributor in Ohio, on average how long

18  would that take?

19    A.    You would be informed at least within 30

20  days.  Typically we in the Licensing Department are

21  getting applications reviewed and notice of either

22  issuance of the license or incomplete or missing

23  documentation that wasn't supplied appropriately with

24  the application within about two weeks.

25    Q.    What happens if there's, if it's

1    incomplete, what does the Board do?

2        A.       We email the applicant, sometimes it's

3    followed up by a phone call with the specific

4    information that was incomplete or missing, and we

5    give them a 30-day timeline from the date that email

6    was sent to return the missing information.

7        Q.       And if they do, what happens then?

8        A.       We continue to process the application.

9        Q.       So it sounds sort of like maybe you

10   provide direction to the applicant you're missing

11   these things.

12       A.       Yes.

13       Q.       And before an application might be

14   rejected, is there a, I think you said there's

15   typically a hearing?

16       A.       Can you explain what you mean by

17   "rejected"?

18       Q.       Yeah, if the Board said we've reviewed

19   this and we just didn't think this person, we're not

20   certain this person should get a terminal distributor

21   license, or is that question not even the question

22   the Board asks?  Maybe I should take a step back.

23       A.       Yes, so if from the rejected that you are

24   discussing should the applicant get a license, there

25   would be a hearing on that form of your question.

1    Q.    Are there other forms, have I asked the
2  question wrong?

3    A.    I think it's important to clarify that
4  sometimes the application might be rejected because
5  the applicant does not meet the qualifications.  For
6  example, if the pharmacy is not licensed in their
7  home state and they're out of state and applying for
8  a nonresident pharmacy license, they don't meet the
9  minimum qualifications in rule.

10    Q.    I see.  And then there might be other
11  reasons though to reject it.

12    A.    Correct.  Such as past criminal
13  convictions or disciplinary action, that would get a
14  hearing before the full Board.

15    Q.    I see.  How does the Board sort of weigh
16  that stuff?  Is there a lot of discretion involved?

17    A.    I can't really say because that's between
18  our Board.

19        MR. APPEL:  I was going to object and say
20  ambiguous, if you're asking about the Board are you
21  asking about Board staff or Board members at a Board
22  hearing?

23    Q.    I'm asking about just whatever the Board
24  does as far as you're prepared to answer the
25  question.  I wasn't distinguishing parts of the

1    Board.

2              When the Board of Pharmacy or its

3    employees get one of these applications and are

4    reviewing it, what sort of factors guide the employee

5    review of the application?

6         A.    So the employee is reviewing the same

7    thing for every application, it does not vary between

8    applications.  They're looking for the minimum

9    requirements, looking at the legal and disciplinary

10   questions that were answered, were they answered in

11   the affirmative.

12             They're looking for verification of the

13   home state license, again that would be minimum

14   qualifications.  And we also look at the, to see if

15   we have any past or current investigations on the

16   responsible person, the applicants, or the business

17   entity themselves.

18        Q.    Do you know what percentage of such

19   applications like this are granted?  Is it most?

20        A.    Yeah, so as of like May of 2018, up until

21   a few weeks ago we granted over 75 percent of

22   applications that were submitted.

23        Q.    Would it -- I have a couple other

24   questions about that.  Is there any sort of limit in

25   Ohio in the number of these licenses that can be

1    issued?  Like we only issue a thousand a year or
2    something like that?
3        A.    Not at all.
4        Q.    And similarly no limit for an out-of-state
5    entity, we only allow a thousand out-of-state
6    terminal distributors a year?
7        A.    That requirement is not in place, or that
8    restriction, excuse me.
9        Q.    So I think we've, I want to make sure I
10    have sort of a good sense of all the reasons the
11    Board might not grant an application, and you
12    mentioned -- let me know if I've got all the right
13    things.
14            We have sort of the minimum requirements,
15    being licensed in the home state, ever been
16    disciplined before, answering yes to any of these
17    criminal background check questions.  Are there any
18    others that I've missed?
19        A.    Well, I did say we look at our case files
20    and our case investigations previous and current to
21    see if the business entity, responsible person, or
22    applicant have ever been a suspect in one of our
23    investigations.
24        Q.    I'm sorry, I meant to include that one.
25    So is that all of them then?

 1     A.     To my knowledge.

 2     Q.     And so if we can imagine an applicant who

 3   doesn't fall in any of those traps, is it fair to,

 4   for that person to imagine that they would get a

 5   license?

 6     A.     Absolutely.

 7     Q.     I wanted to ask you a couple questions

 8   about, I think along the same lines about some of the

 9   statements the Board made in its, your lawyer made

10   for you in the papers.

11            (EXHIBITS 6 - 7 MARKED.)

12     Q.     So Exhibit 6 is a motion filed by the

13   Board through its counsel.  I don't know if you've

14   ever seen this before.

15     A.     This is the first that I am reviewing it

16   in full.

17     Q.     I think one portion of it sort of relates

18   to what we're talking about here, so I want to direct

19   your attention to page 5.  And in about the third

20   paragraph down, paragraph beginning with "if," "If an

21   entity applies and meets all requirements, it is

22   entitled as a matter of law to receive a TDDD or WDDD

23   license."

24            Is that an accurate sentence?

25     A.     Yes.

1    Q.    And then a similar sentence on the next

2  document, Exhibit 7, which is the next thing your

3  counsel filed for the Board, and right on page 1 the

4  very bottom it says a similar thing, these provisions

5  establish that an entity will be eligible for a TDDD

6  license if it meets the minimum requirements and

7  there are no administrative prohibitions, and if

8  there's a question about these the TDDD will be

9  entitled to an administrative hearing.

10          Is that an accurate sentence?

11   A.    Yes.

12   Q.    "An entity desiring to be licensed in Ohio

13 as a TDDD need only apply and meet the minimum

14 qualifications, unlike other types of licenses that

15 are limited and competitive."  Accurate?

16   A.    Yes.

17   Q.    And lastly, there is no maximum number

18 that the Board can issue, I think you already

19 answered, but that's accurate?

20   A.    Yes.

21   Q.    So about this sentence, what does the

22 phrase "administrative prohibitions" mean to you in

23 this?

24   A.    So in Ohio Revised Code and Ohio

25 Administrative Code the Board of Pharmacy is granted

1    the ability to deny applications for several

2    different reasons.

3        Q.    Are those reasons we've already talked

4    about or are there others?

5        A.    There might be others.

6        Q.    Can you tell me what some of those would

7    be?

8        A.    I can't speak specifically to what's in

9    the statute or the rule, as having not memorized it,

10   but for example, if owners of a pharmacy were

11   convicted of drug trafficking, they're likely not

12   going to get a license.

13       Q.    I see.  Is it the case that typically

14   these administrative prohibitions are related to

15   crimes like this?

16       A.    I wouldn't say typical.  They could vary.

17       Q.    I'm just trying to get a sense of what are

18   the reasons a license could be denied.  So do you

19   have another example maybe?

20       A.    It would really depend.  And again what,

21   the ultimate denial falls to the full panel of the

22   Board, so, and those positions and the terms are

23   varied.  So depending on the feeling of the Board,

24   the hearing, the facts of the case, it could very

25   much defer from one application to another

1   potentially.

2       Q.      So let me unpack that a little bit.  You

3   talked about the Board, the feeling of the Board at a

4   hearing but not all applicants end up going to a

5   hearing.

6       A.      Correct.

7       Q.      So I guess I don't quite understand the

8   process.  Do all applicants end up in front of the

9   full Pharmacy Board or whatever licensing I guess the

10  pharmacy being the Pharmacy Board, are some approved

11  without ever having to go to the Board?

12      A.      Absolutely.

13      Q.      I see.

14      A.      As it states in Exhibit 6 and 7, if the

15  entity meets the minimum requirements and there are

16  no administrative prohibitions, they would be issued

17  their license.

18      Q.      Without having to go in front of the whole

19  Board.

20      A.      That's correct.

21      Q.      The reasons they might have to go in front

22  of the full Board would be these administrative

23  things you mentioned.

24      A.      Correct.

25      Q.      Such as the owner was convicted of drug

1  trafficking.

2      A.      That is one example.

3      Q.      And the others are listed in the statute?

4      A.      Yes.  I wouldn't say examples, reasons to

5  propose to deny or cite an entity would be listed in

6  the statute and rule.

7      Q.      So I guess maybe you just answered this

8  question, but my last question on this topic is am I

9  missing anything?  I mean I'm not an expert in

10  pharmacy law at all and I don't know if I've covered

11  all the sort of most common reasons that someone

12  might be prevented from getting a terminal

13  distributor license.  Do you think we've talked about

14  most of them?

15      A.      Yes.

16      Q.      There's nothing that I forgot to talk

17  about?

18      A.      Nothing that I can think of.

19      Q.      Okay.  Nothing that I can think of either,

20  which is why I didn't ask any more.

21      A.      Okay.

22      Q.      The last thing I wanted to point out, the

23  last exhibit we have is the Annual Report for 2018.

24              (EXHIBIT 8 MARKED.)

25      Q.      Do you recognize this?

1     A.     I do.

2     Q.     What is it?

3     A.     It's the Board of Pharmacy's Annual Report

4  from fiscal year 2018.

5     Q.     So I just wanted to turn your attention to

6  page 4.

7     A.     Yes.

8     Q.     Are these the most accurate numbers as of,

9  are these numbers accurate for 2018?

10     A.     Yes.

11     Q.     And is there, will there be another report

12  coming for '19?

13     A.     To my knowledge.

14     Q.     Do you know when that would be out?

15     A.     I'm unsure.  When did we release this

16  report last year?  It would be probably just after

17  the beginning of the new fiscal year.

18     Q.     And the new fiscal year starts in July?

19     A.     July 1.

20     Q.     So just a couple housekeeping questions I

21  guess.  All the, many of the documents we've looked

22  at I mentioned were turned over to us by the Board

23  through its counsel.  Were you aware of that?

24     A.     Yes.

25     Q.     Did you assist in gathering those

1    documents?

2        A.    Some of them, yes.

3        Q.    Do you feel like there are any that were

4    missing as far as an application for terminal

5    distributor license?

6        A.    Missing, no.  There might be, like you

7    pulled the E-license Guide for new applicants,

8    there's a lot of information on our website that's

9    publicly available that may assist an applicant in

10   completing the application.

11       Q.    But as far as the, I mean I understand

12   that, but as far as the like actual licensing

13   application requirements, we have all the documents?

14       A.    Yes.

15             MR. RUSNAK:  Can we just have a second to

16   talk.

17             (Off the record.)

18       Q.    So I'll try to be quick.

19       A.    Okay.

20       Q.    I just have a couple of follow-up

21   questions that my colleagues reminded me I didn't ask

22   all the questions.

23             At the end of our conversation before the

24   break we were talking about the statement from the

25   papers about administrative prohibitions.  Do you

1  remember that?

2      A.      I do.

3      Q.      And I just want to make sure that I

4  understand the whole universe of administrative

5  prohibitions.  You said, you gave me an example of

6  one problem like being convicted of drug trafficking,

7  right?

8      A.      I did.

9      Q.      And then you said you don't have the other

10  ones memorized but they're in the statute.

11      A.      And Ohio Administrative Code.

12      Q.      I understand.

13      A.      The statute and rule.

14      Q.      Could you just tell me what those are?

15  Could you consult and look at the papers and tell me

16  what the Administrative Code is section that you're

17  talking about?

18      A.      I could consult my legal counsel for the

19  appropriate section that we could provide to you.

20      Q.      Yeah.

21              MR. APPEL:  Do you remember them off the

22  top of your head?

23              MS. DEHNER:  For terminal it would be

24  Revised Code 4729.54.  And .55.  For the

25  Administrative Code you would look at 4729-9-19.  And

1    I'm trying to think if there are other specific.

2           MR. APPEL:  And obviously this is a

3    professional courtesy to you attorney to attorney,

4    I'm not expecting her to memorize every provision.

5           MR. RUSNAK:  I think it was in your

6    papers.  4729:5-2-02(B), and 4729:5-8 for a

7    nonresident were also mentioned in your papers.

8           MS. DEHNER:  Say those again.

9           MR. RUSNAK:  They have a sort of colon in

10   them.

11          MS. DEHNER:  So you're reading our rules.

12   Those are for the minimum quals then.

13          MR. RUSNAK:  4729:5-2-02(B).

14          MS. DEHNER:  Yes.

15          MR. RUSNAK:  And then 5-8 was the

16   nonresident one.

17          MS. DEHNER:  Yes.  Those were moved

18   recently from 4729-5 and it went to :5.

19          MR. RUSNAK:  There's a reason I don't do

20   admin law.

21          MS. DEHNER:  But the disciplinary code on

22   which a Board would base a proposal to deny would be

23   found in -9-19.  The minimum quals are the other code

24   sections that you referenced.

25          Q.    (By Mr. Rusnak) So do you feel that

1    covers all the things that are meant in the term

2    "administrative prohibitions"?

3        A.     Yes.

4        Q.     Got it.  Perfect.

5               Couple other things.  I'm sorry, I'm all

6    over the place.  We talked how an application might

7    normally be sort of reviewed and granted in 30 days

8    sometimes.

9        A.     Yes.

10       Q.     Is there a provision to ask for it to be

11   expedited?

12       A.     No.

13       Q.     So 30 days is the fastest?

14       A.     No, I believe I stated that our typical

15   turnaround is 30 days but often we are reviewing

16   applications and getting them, again that notice of

17   issuance or incomplete missing documentation within

18   about two weeks.

19       Q.     Oh, okay. I'm sorry.

20              Maybe I could ask you a little bit about

21   that reviewing process.  I don't mean to belabor the

22   point but I'm kind of slow on the uptake on this.

23   The initial review is by an employee; is that right?

24       A.     Correct.

25       Q.     Like an analyst?

1    A.    A licensing coordinator is their title.

2    Q.    Licensing coordinator.  And if everything

3  is shipshape at that point, since there's no standout

4  administrative prohibitions, where does the

5  application go next?  It just gets issued?

6    A.    It gets issued to the applicant.

7    Q.    So it doesn't have to go in front of a

8  whole Board.

9    A.    No.

10    Q.    When would it go to the whole Board?

11    A.    Only if it were being proposed to be

12  denied due to administrative prohibition.

13    Q.    Would it go to the full Board or sort of a

14  subpanel of the Board?

15    A.    So the process is that it doesn't go

16  straight to the Board, it would be referred to our

17  Compliance and Enforcement Department for further

18  investigation.  They would conduct interviews, pull

19  some certified court documents if that were

20  applicable.

21         After that our Compliance and Enforcement

22  Department would review the facts of the case with

23  our Legal Department and based on past precedent and

24  the administrative prohibitions that are in statute

25  and rule, they would make the determination if a

1    hearing needed to be had.  Meaning if they were going

2    to move forward with a proposal to deny the

3    application.

4            That then would be presented to a

5    committee called Citation Review which is typically

6    the Board president and sometimes the Board vice

7    president, where the facts of the case would be

8    presented to him or her and a determination of

9    proceeding or issuing a license would be made.

10           It would be after that determination if

11   proceeding would be the decision a notice of

12   opportunity for hearing would be issued to the

13   applicant to which there is a time period where the

14   applicant would need to formally request a hearing

15   before the full Board, which would then subsequently

16   be scheduled before the full Board for their hearing.

17       Q.    Maybe I already asked this, but do you

18   have a sense of what percentage of applications end

19   up running through this entire process?

20       A.    So I'd actually like to refer to one of

21   your exhibits, which is our Annual Report, which is

22   Exhibit 8.

23       Q.    Yeah.

24       A.    As I feel it is the best to, let me find

25   it.  So on page 6 you'll see Administrative Actions

1 in Fiscal Year 2018.  And you'll see that this

2 encompasses all of our license types, not just

3 terminal distributors and not just nonresident

4 pharmacies or even instate pharmacies.  That the

5 Board issued 48 citations, and proposals to deny,

6 this is new reciprocal pharmacists or renewal

7 applications was 25.

8      Q.     So would that 25 with the TDDD be included

9 in there?

10      A.     They would be included in there.  And too

11 for sake of clarification, that is a full proposal to

12 deny.  The Board may enter into a settlement

13 agreement, as you see, or which could include the

14 applicant withdrawing their application.

15      Q.     For most people who apply though is this a

16 pretty easy process?

17      A.     I would say so.

18      Q.     I just had a -- I wanted to come back to I

19 asked you earlier about the distinction between

20 terminal distributor which you've been talking about

21 most of the time and the wholesale distributor.  I

22 think I asked you how those licenses' application

23 processes are different.  And we talked about?

24      A.     The licenses.

25      Q.     Right.  That's what I meant to say, we

 1   talked about distributing to an end user versus to
 2   another wholesaler to a terminal distributor; is that
 3   right?
 4        A.    That is correct.
 5        Q.    Are there other differences that I'm not
 6   talking about that I haven't mentioned?
 7        A.    There are many.  One being in how they
 8   would, their recordkeeping that they have to keep; a
 9   wholesale distributor doesn't have prescription
10   records and dispensing records but yet a pharmacy
11   would.  So that would be one example.
12        Q.    Can you think of another one?
13        A.    Rules and regulations are different, so
14   for wholesale distributors the officers and owners
15   have to undergo a background check, whereas
16   pharmacies do not.
17        Q.    For their application are there, can you
18   tell me what the key differences are in how they
19   apply for those licenses?
20        A.    The process of applying is the same
21   through E-license.  Again, one of the main
22   differences in processing of the application is the
23   wholesale distributors have, their officers and
24   owners have to undergo a background check, a criminal
25   records check both BCI and FBI, that's Bureau of

1    Criminal Identification and Investigation, and

2    Federal Bureau of Investigation.

3            Wholesale distributors aren't asked a

4    compounding question because only a particular type

5    of wholesale distributor is eligible to compound and

6    that is known as an outsourcing facility.  Which is

7    defined by the FDA.

8            Similarity would be that both the

9    pharmacy, the terminal distributor that's out of

10   state and the wholesale distributor that's out of

11   state would have to have licensure in their states.

12           One caveat for the wholesale distributor

13   is if their home state doesn't license them, they

14   have a means to obtain that through the National

15   Association of Boards of Pharmacy through their

16   verified, called VAWD, V-A-W-D, and I'm trying to

17   remember the acronym.  I believe it's Verified

18   Accredited Wholesale Distributor program.

19   Q.     Even if they're not licensed in their

20   state.

21   A.     Correct.  Third-party logistics providers

22   and virtual wholesalers are required by

23   Administrative Code to obtain this VAWD accreditation

24   if their home state doesn't license them.  That does

25   not apply to terminal distributors.

1    Q.    For terminal distributors we talked about
2  out of state but I guess one thing I forgot to ask
3  about is are terminal distributor licenses to
4  distribute in Ohio issued to people outside the
5  country?
6    A.    I don't recall any that are currently
7  active.
8    Q.    But there's no prohibition on it.
9    A.    Not explicitly in statute or rule.
10    Q.    But it's not very common.
11    A.    Correct.
12    Q.    For the out of state, putting aside out of
13  country but for out-of-state terminal distributors we
14  talked about the requirement that they provide
15  counseling.
16    A.    Patient counseling.
17    Q.    And you said they have a phone number that
18  they could call, right?  Is that right?
19    A.    That, I believe that is one of the
20  acceptable forms of offering patient counseling.
21    Q.    Are there other ways that we haven't
22  talked about?  Could they have a person instate
23  sometimes?
24    A.    They could.  I would have to review that
25  requirement that's stated in the rule to see what

1    would be acceptable.

2        Q.    Okay.  What is it like if the

3    distributor's not really selling, not that frequently

4    selling to patients so there's no one that would be

5    needing to call, is it any different?

6        A.    The wholesale distributor would not be

7    selling to patients.

8        Q.    What if they were selling to the State.

9        A.    Well, the wholesale distributor doesn't

10   have the patient counseling requirements.

11       Q.    Right.  Does a terminal distributor ever

12   sell to the State of Ohio though?

13       A.    I couldn't say but a terminal distributor

14   making a wholesale sale would be to the State, not

15   the end patient, would not be required to offer

16   patient counseling because of the wholesale sale.

17       Q.    I guess what I'm kind of wondering about

18   is would the requirement to offer counseling be

19   different if the drugs were being sold to be used in

20   an execution?

21            MR. APPEL:  I'm going to object that's

22   beyond the scope of Paragraph 1 of the attachment.

23   She can answer if she knows.

24       A.    Can you repeat your question, please?

25       Q.    Yeah.  The process, one of the

1  requirements of having a TDDD license if you're out

2  of state is that you provide counseling to, you have

3  a system set up to provide counseling; is that right?

4      A.    I believe so, yes.

5      Q.    Would that requirement for getting a

6  license be different if the out-of-state entity

7  intended only to sell drugs to the State of Ohio for

8  use in an execution?

9          MR. APPEL:  Same objection.  You can

10 answer.

11     A.    At that point the terminal distributor is

12 making a wholesale sale to the State of Ohio.  So

13 again, the offer to counsel the patient would not be

14 required, would not be in play.

15     Q.    And terminal distributors are allowed to

16 make a wholesale sale?

17     A.    Some are allowed within rule.  Ohio allows

18 other states and federal law may oppose our rule or

19 may come into, may contradict our rule.  So the

20 business entity themselves has to, with consult of

21 legal counsel make that determination.

22     Q.    Last question I had, we talked about the

23 documents that we got from you guys, from the Board.

24 You said a lot of them are available on your website,

25 like the E-license Guide.

1      A.     Yes.

2      Q.     Are these like, the applications like this

3   sample Exhibit 3 and 4, are those available on your

4   website?

5      A.     The sample application has not yet been

6   posted to our website.  It's our plan to post samples

7   of all of our applications along with inspection

8   guides.  But that was produced for you all as part of

9   the subpoena.

10     Q.     So when these are posted if we can get one

11  from your website, those are the real version on your

12  website.  We can trust what we get from your website

13  is the real thing?

14     A.     Yes.

15     Q.     Okay.  I did have one thing.  I guess it

16  was just the thing you were just saying there at the

17  end when I was asking about wholesale and WDDD and

18  terminal distributors and I asked can a terminal

19  distributor make a wholesale sale.

20     A.     Uh-huh.

21     Q.     And you said it depends.  Can you talk a

22  little more about that?

23            MR. APPEL:  Same objection as before.

24  This is outside the scope of her role as a 30(B)(6)

25  witness because that's beyond what was identified,

1  but she can answer if she knows.

2      A.      So in Ohio rule a pharmacy is allowed I

3  believe the percentage is 5 percent of their total

4  sales to make wholesale transactions.  There are

5  allowances for intercompany transfers and transfers

6  between licenses of common ownership.  So to answer

7  your question, yes, a terminal distributor can make a

8  wholesale sale.

9      Q.      Let me ask another question, and this

10  might also be beyond what you've prepared to answer

11  today but I'm really curious.  I didn't think that a

12  sale to the State of Ohio for use in an execution

13  drug would be a wholesale sale.  Could you tell me

14  how I would know if a sale is a wholesale sale or a

15  terminal sale?

16          MR. APPEL:  Same objection, this is beyond

17  the scope as her role as a 30(B)(6) witness.  You can

18  answer if you know.

19      A.      One way that I know would be a wholesale

20  sale does not come by order of prescription and is

21  not dispensed patient specific.  A wholesale sale

22  comes as it came from the manufacturer.  So it

23  wouldn't have a patient's name or the dispensing

24  pharmacy, it wouldn't have a prescription label on

25  it.

1    Q.    Are there others?

2    A.    I'm sure there are others.  That's the
3    ones that I can think of right now.

4    Q.    Okay.

5    A.    The main distinction.

6    Q.    Sure.  Okay, great.  I think those are all
7    the questions I had.  I really appreciate your time.

8          MR. SCHNEIDER:  I have nothing on behalf
9    of the State.

10          MR. RUSNAK:  Do you think you could
11    provide us the fiscal year report for '19 when comes
12    out?

13          MR. APPEL:  Sure.

14    Q.    I think those were all the other documents
15    responsive to the subpoena.  Sounds like you looked
16    through most of the documents.  You said you were
17    involved in collecting these documents that I've been
18    showing that were produced to us.

19    A.    Some of them.

20    Q.    So I don't know, I guess I'm asking are
21    you aware of any documents that should have been
22    produced to us?

23    A.    That should have been?  No.  Could be,
24    yes.  Again, anything on our website we could provide
25    to you or you could gather yourself, as I'm sure, I

1   don't know if the E-license Guide, I think you said
2   it was not provided to you but you found it.
3        Q.    You did say if it's on your website that's
4   the correct version.
5        A.    That is correct.
6             MR. RUSNAK:  Thanks very much.
7             (Whereupon, at 11:05 a.m., the deposition
8   was concluded and signature was not waived.)
9                      --|--
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                        AFFIDAVIT

 2   State of Ohio             )
                               ) SS:
 3   County of _____  )

 4        I, KARRIE SOUTHARD, do hereby certify that I
     have read the foregoing transcript of my deposition
 5   given on Tuesday, June 11, 2019; that together with
     the correction page attached hereto noting changes in
 6   form or substance, if any, it is true and correct.

 7

 8                         _____
                           KARRIE SOUTHARD
 9

10        I do hereby certify that the foregoing
     transcript of the deposition of KARRIE SOUTHARD was
11   submitted to the witness for reading and signing;
     that after she had stated to the undersigned Notary
12   Public that she had read and examined her deposition,
     she signed the same in my presence on the _____
13   day of _____, 2019.

14

15                         _____
                           Notary Public
16

17   My commission expires _____, _____.

18                          --|--

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE
 2   State of Ohio          )
                            )  SS:
 3   County of Franklin     )

 4        I, Julieanna Hennebert, RPR and RMR, the
     undersigned, a duly qualified and commissioned notary
 5   public within and for the State of Ohio, do certify
     that, before giving her deposition, KARRIE SOUTHARD
 6   was by me first duly sworn to testify to the truth,
     the whole truth, and nothing but the truth; that the
 7   foregoing is the deposition given at said time and
     place by KARRIE SOUTHARD; that I am neither a
 8   relative of nor employee of any of the parties or
     their counsel and have no interest whatever in the
 9   result of the action.

10        IN WITNESS WHEREOF, I hereunto set my hand and
     official seal of office on this 14th day of June,
11   2019.

12
                       Julieanna Hennebert
13                     Julieanna Hennebert, RPR, RMR,
                       and Notary Public in and for the
14                     State of Ohio.

15   My commission expires February 19, 2023.

16   (2921-JLH)

17                      --|--

18

19

20

21

22

23

24

25
```

1                              AFFIDAVIT

2      State of Ohio              )
                                  ) SS:
3      County of Franklin         )

4            I, KARRIE SOUTHARD, do hereby certify that I
       have read the foregoing transcript of my deposition
5      given on Tuesday, June 11, 2019; that together with
       the correction page attached hereto noting changes in
6      form or substance, if any, it is true and correct.

7

8                        _Karrie Southard_
                         KARRIE SOUTHARD
9

10           I do hereby certify that the foregoing
       transcript of the deposition of KARRIE SOUTHARD was
11     submitted to the witness for reading and signing;
       that after she had stated to the undersigned Notary
12     Public that she had read and examined her deposition,
       she signed the same in my presence on the 25th
13     day of ___June_____, 2019.

14

15                       _Nicole Dehner_
                         Notary Public

16

17     My commission expires __N/A____ NICOLE DEHNER

18                                   Attorney At Law
                         -- | -- Notary Public, State of Ohio
19                             My commission has no expiration date
                                    Sec. 147.03 R.C.

20

21

22

23

24

25

# ERRATA SHEET

Please list any changes to your deposition below. Be sure to list the page, line, description of change and the reason for your change. Please sign and date when complete. While the changes are not physically made to the transcript, the errata sheet is forwarded to the ordering attorney and will be added as an addendum to your transcript.

| PAGE | LINE | DESCRIPTION OF CHANGE | REASON FOR CHANGE |
|------|------|----------------------|-------------------|
| 10 | 23-24 | A: Correct, all except Schedule 1 | Line 24 attributable to |

Karrie Southard, Answer in Line 25 "sure" was by Questioning attorney

| | | | |
|------|------|----------------------|-------------------|
| 20 | 21 | "…in in-patient hospice…" | change from "end patient" |

to "in-patient"

| | | | |
|------|------|----------------------|-------------------|
| 35 | 25 | change defer to "differ" | typo |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |

_Karrie Southard_
Signature

_6/25/19_
Date