**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: OHIO EXECUTION PROTOCOL LITIGATION**<br><br>**This document relates to: Plaintiff Melvin Bonnell** | **Case No. 2:11-cv-1016**<br><br>**CHIEF JUDGE EDMUND A. SARGUS, JR. Magistrate Judge Michael R. Merz**<br><br>**DEATH PENALTY CASE:**<br><br>**Execution Scheduled For February 12, 2020** |

**Plaintiff Melvin Bonnell's Motion for a
Stay of Execution, a Preliminary Injunction,
and an Evidentiary Hearing on his Individual Characteristics**

In accordance with this Court's Scheduling Order (ECF No. 2275), Plaintiff Melvin Bonnell moves this Honorable Court for a stay of execution, and, pursuant to Federal Rule of Civil Procedure 65(a), for a preliminary injunction on claims arising from his Second Amended Complaint, which is comprised of the Fourth Amended Omnibus Complaint (ECF No. 1252) and his Second Amended Individual Supplemental Complaint (ECF No. 2399).

Bonnell moves to stay the death warrant issued by the Supreme Court of Ohio and to bar Defendants and/or their agents, collectively and individually, from acting jointly or severally to implement or otherwise facilitate any part of the Defendants' Execution Protocol as to him.  Bonnell similarly seeks to bar the same from attempting to execute him on February 12, 2020, by means of Defendants' Execution Protocol and policies which will deprive him of his rights

in violation of the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

In light of Bonnell's imminent execution date, a preliminary injunction and stay of execution are necessary to allow Bonnell to litigate his claims before he is unconstitutionally executed. Bonnell further requests expedited discovery as needed for the eight-day consolidated evidentiary hearing that is set to commence in this Court on September 24, 2019. (Order ECF Nos. 2378, 2418). Bonnell further requests a supplemental evidentiary hearing on this Motion, to be held following the execution date of Kareem Jackson, of sufficient duration to accommodate any expert(s) and lay witnesses that Bonnell intends to present concerning any supplemental information that comes to light after the conclusion of the upcoming preliminary injunction hearing as well as any evidence concerning Bonnell's individual characteristics. The reasons supporting Bonnell's requests are explained in the attached memorandum.

The memorandum will first address the procedural background that informs this motion, including the recent Supreme Court decision in *Bucklew v. Precythe*, 139 S.Ct. 1112 (2019). Then Bonnell will explain why he can demonstrate a strong likelihood of success on the merits of his claims under the first prong of *Glossip v. Gross*, 135 S.Ct. 2726 (2015), building even further on the evidence this Court considered when it found that Ohio's three-drug midazolam protocol will subject the condemned to severe pain and suffering akin to the horrifying torturous sensations of waterboarding. Next Bonnell will explain why he can demonstrate a strong likelihood of success on the merits of

his claims under *Glossip*'s second prong, in the form of three different alternative execution methods, including two this Court has not yet considered. Then Bonnell will explain why he can satisfy the remaining injunctive relief factors. And finally, Bonnell will explain why this Court should grant a supplemental hearing, date to be set, on this motion.

Respectfully submitted,

Office of the Ohio Public Defender

/s/ *Kimberly S. Rigby*
Kimberly S. Rigby [0078245]
Supervising Attorney, Death Penalty Dept.
Kimberly.Rigby@opd.ohio.gov
TRIAL ATTORNEY FOR BONNELL

/s/ *Erika M. LaHote*
Erika M. LaHote [0092256]
Assistant State Public Defender
Erika.Lahote@opd.ohio.gov

250 East Broad St., Suite 1400
Columbus, Ohio 43215
614-466-5394/614-644-0708 (Fax)

Stephen Newman
Federal Public Defender, Northern District
of Ohio

/s/ *Alan C. Rossman*
ALAN C. ROSSMAN
Assistant Federal Public Defender
Director, Capital Habeas Unit
Alan_rossman@fd.org

/s/ *Vicki Werneke*
VICKI RUTH ADAMS WERNEKE
Assistant Federal Public Defender
Capital Habeas Unit
Vicki_werneke@fd.org

1660 W. 2nd Street, Suite 750

iii

Cleveland, Ohio 44113
(216) 522-4856/(216) 522-1951 (fax)

Counsel for Plaintiff Melvin Bonnell

---

**Memorandum in Support**

---

## TABLE OF CONTENTS

I.   Introduction ............................................................................................... 1

II.  Procedural Background ...................................................................... 11

    A.   Background specific to Melvin Bonnell ..................................... 11

    B.   The Supreme Court's *Bucklew* opinion provided guidance for
    how the *Baze-Glossip* requirements should be applied here. ...... 14

III. This Court Should Grant Bonnell A Stay Of Execution And A
    Preliminary Injunction. ................................................................... 21

    A.   Bonnell has a strong likelihood of success on the merits of
    his constitutional claims. ........................................................... 24

        1.   Plaintiff Bonnell satisfies *Glossip*'s first prong: this
        Court's finding that a condemned inmate is sure or
        very likely to suffer severe pain and needless suffering
        is fully supported by the consolidated record which
        should apply here, and by subsequently developed
        evidence Bonnell will present. .......................................... 24

        2.   Plaintiff Bonnell will show a likelihood of success on
        *Glossip*'s second prong, as further clarified
        by *Bucklew*. ................................................................... 32

            a.   The relevant "availability" standard........................ 32

            b.   The relevant "significant reduction" standard.......... 39

        3.   Plaintiff Bonnell satisfies *Glossip*'s second prong:
        Bonnell can show more than one alternative that is
        available and which would significantly reduce the
        substantial risks of severe pain that Bonnell alleges
        arise from Ohio's three-drug execution protocol. .............. 41

            a.   The firing squad alternative is available and
            would significantly reduce the substantial risks
            of severe pain that Bonnell alleges arise from
            Ohio's three-drug execution protocol. ..................... 44

            b.   The shooting alternative is available and would
            significantly reduce the substantial risks of
            severe pain that Bonnell alleges arise from
            Ohio's three-drug lethal injection
            execution protocol. .................................................. 53

      c.     The alleged alternative involving the secobarbital MAID method is available and would significantly reduce the substantial risks of severe pain that Bonnell alleges arise from Ohio's three-drug execution protocol. ..................... 62

      d.     A wedge pillow is available and would significantly reduce a substantial risk of serious pain posed by the risk of obstruction under the current protocol...................................................... 76

  B.    Plaintiff Bonnell can establish that due to his invidual physical characteristics he is sure or very likely to suffer severe pain and needless suffering. ........................................... 76

  C.    This Court should grant Bonnell injunctive relief on his claims that the use of expired execution drugs is unconstitutional....................................................................... 80

  D.    This Court should grant Bonnell injunctive relief on his equitable arguments against using expired drugs. ..................... 81

IV.    Bonnell can establish the remaining injunctive relief factors for consideration.............................................................................. 81

A.    There is a substantial threat that Bonnell will suffer an irreparable injury if injunctive relief is not granted. .............................................. 81

      1.     Bonnell will suffer irreparable injury as a matter of law. ................................................................................... 82

      2.     Bonnell will suffer irreparable injury as a matter of fact................................................................................... 82

  B.    Granting injunctive relief will not substantially harm other parties and, even if there was some harm, Bonnell's potential injury outweighs any such other harm. ................................................................... 83

  C.    The public interest would be served by issuing injunctive relief. ............................................................. 84

V.    There has been no undue delay in bringing Bonnell's claims, so there is no presumption against a stay. ............................................. 86

VI.    This Court Should Grant A Supplemental Hearing On This Motion. .... 87

VII.    Conclusion and Prayer for Relief........................................................ 88

## I.    Introduction

The question before this Court is not whether Melvin Bonnell will suffer severe pain and needless suffering if executed with Ohio's current three-drug execution protocol.  The Court has already found, on the best expert testimony available and to the full merits standard of proof, that an inmate like Bonnell will.  *In re Ohio Execution Protocol Litig. (Henness)*, No. 11-1016, 2019 U.S. Dist. LEXIS 8200, *252 (S.D. Ohio Jan. 14, 2019).  The best evidence available establishes that midazolam will not protect the condemned inmate from the horrific, severe pain and suffering associated with the second and third drugs in Ohio's protocol.  *Id.* at 251–52.  Similarly, the record evidence already establishes that IV injections of the large midazolam dose cause the torturous "waterboarding" effects of pulmonary edema—where the condemned not only feels the horrific pain of the second and third drugs but struggles to breathe and experiences panic associated with drowning.  *Id.*  The pain and suffering is nothing less than "inhuman and barbarous."  *In re Kemmler*, 136 U.S. 436, 447 (1890).

Furthermore, Bonnell will demonstrate that the accumulated evidence supporting that conclusion has, tragically, only grown; additional executions using large IV-injected doses of midazolam have produced witness observations and post-mortem findings that corroborate the record previously created in this case, further bolstering this Court's factual findings regarding Ohio's three-drug midazolam protocol.  Thus, although the record evidence is already

sufficient, Bonnell will provide further proof it is sure or very likely that condemned inmates will experience severe pain and suffering associated with Defendants' lethal injection protocol drugs and their application during execution, because the condemned remain sensate in the absence of an initiatory drug that blocks that severe pain.  Bonnell will add to the record even further proof that that midazolam is not, and never can be, an analgesic drug, and that an inmate who receives a 500 mg dose (or more) of midazolam is sure or very likely to be "conscious" enough to experience the serious pain and suffering from all three drugs, not just the second and third drugs in the protocol.  *See Campbell v. Kasich*, 881 F.3d 447, 450 (6th Cir. 2018); *Fears v. Morgan*, 860 F.3d 881, 886 (6th Cir. 2017) (en banc).

Bonnell thus satisfies the first prong from the Supreme Court's test articulated in *Baze v. Rees*, 553 U.S. 35, 50–52 (2008), *Glossip v. Gross*, 135 S.Ct. 2726, 2737 (2015), and reiterated in *Bucklew v. Precythe*, 139 S.Ct. 1112, 1121 (2019).  The only question that remains unanswered as to the *Glossip* inquiry before this Court, then, is whether Plaintiff Bonnell can provide sufficient evidence to demonstrate a likelihood of success on the merits of the second part of his proof burden under *Baze*, *Glossip*, and *Bucklew*.  He can, and he will.

To satisfy his burden under that second prong, Bonnell must show that any of his alleged alternatives are available, and that they would significantly reduce a substantial risk of severe pain posed by the current execution protocol.  This Court previously found insufficient evidence to demonstrate that

2

two alternative lethal injection methods would satisfy these two subparts of the second *Glossip* prong. Plaintiff Henness's appeal of that determination remains pending. But Bonnell will present evidence at the upcoming evidentiary hearing to build on that record and demonstrate that he satisfies *Glossip*'s second prong as further refined in *Bucklew*.

As to the first part, Bonnell alleges, and will show a likelihood of success that he can prove, several alternatives that are available. They are feasible and readily implemented with ordinary transactional effort, without any reasonable and legitimate penological reason for the State to refuse to use them. And on the second part, Bonnell will demonstrate that his alleged alternatives will significantly reduce the substantial risks of severe pain he alleges the State's current execution protocol poses.

Specifically, Bonnell will demonstrate that each of the following alternative execution manners and methods satisfies his burden:

1) execution by firing squad;

2) execution by shooting;

3) execution by oral injection of 10-15 grams of secobarbital mixed with four ounces of sweet liquid;

As to the first two of those alternatives, Bonnell will present documentary and witness testimony to meet his burden on availability: both alternatives should be available via ordinary transactional effort to the State. That is, both alternatives are feasible and readily implemented. In addition, the State has not "refused" to implement either alternative, and it cannot reasonably and legitimately do so. As such, there is no justified State-based impediment or

3

barrier to implementing either alternative.  Neither alternative is an experimental way of causing death, whether in an execution context or otherwise.  Both alternatives have a track record of being tried and successfully used to cause death in other jurisdictions, including in executions.  Both would preserve the dignity of the procedure—an interest that Defendants have already conceded is a subordinate concern to exposing the inmate to as little pain as possible.  And neither alternative presents any difficulties for the State, using good faith efforts, to obtain the necessary equipment, supplies, and trained personnel, nor any other difficulties in implementing an execution using those alternatives.  In short, both alternatives involving firearms should be available to Ohio.

Further, Bonnell will also present evidence to meet his burden on the comparative "reduction of risk" inquiry because both of his firearms-involved alternatives significantly—that is, clearly and considerably—reduce the substantial risks of severe pain and suffering Bonnell currently faces if executed with Ohio's current protocol.  Bonnell need only show that his alternatives would reduce the risks of severe pain he alleges the current protocol poses.  And although Bonnell need not present a pain-free alternative to satisfy his comparative burden, eliminating a risk of severe pain entirely would, by definition, satisfy that burden, as would alleging an alternative that would, in fact, be essentially pain-free.  Compared to Ohio's current method, both firearms-involved alternatives eliminate entirely *any* risk of serious pain and suffering that Bonnell alleges regarding Ohio's current protocol.  Neither

alternative poses any risk of severe pain from: acute pulmonary edema; severe burning sensations following IV injection of that much highly acidic midazolam; or problems obtaining and maintaining peripheral IV access.  Both alternatives, when measured against the identified risks of severe pain and suffering posed by the second and third drugs in Ohio's current protocol, clearly and considerably reduce those risks because they eliminate entirely *any* risk of serious pain and suffering associated with the second and third drugs. In fact, under the shooting alternative, Bonnell would sustain fatal wounds virtually instantly, even faster than signals of external stimuli can be relayed to the brain and processed, and thus death under that alternative would be virtually painless—eliminating and therefore significantly reducing the substantial risks in the current protocol that Bonnell has alleged.  Similarly, death by firing squad would occur rapidly and relatively painlessly, without any of the identified risks of severe pain Bonnell alleges Ohio's current lethal injection protocol poses.

As for Bonnell's lethal injection alternative, Plaintiff Henness presented this Court with evidence regarding this alternative (along with another that Bonnell is not pleading) to show that it is readily available with ordinary transactional effort.  Further, Bonnell will add new evidence demonstrating that his pled lethal injection alternative is available.  That is, the secobarbital lethal injection alternative is feasible and readily implemented with ordinary transactional effort, while the State has not "refused" to implement the alternative, and it cannot reasonably and legitimately do so.

Defendants have already conceded the medical supplies necessary to orally administer the lethal injection alternative are available.  (*See* Defs.' Answer, ECF No. 2232, PageID 107989-90.)  Bonnell intends to present evidence to establish that secobarbital can be obtained through ordinary transactional effort.  And, as this Court has already found, Defendants should be able to implement this lethal injection alternative to carry out an execution because this method can be administered by those with a level of training possessed by the Execution Team Member Defendants.  (*See* ECF No. 2133, PageID 105258–59, 105263–64.)

Additionally, Bonnell will demonstrate that this lethal injection alternative is available because the State has not genuinely or justifiably refused to implement the alternative, and it cannot reasonably and legitimately do so.  This lethal injection alternative does not pose an experimental way of causing death.  This alternative has an extensive track record of being tried and successfully used to cause death in other jurisdictions in the Medical Aid in Dying ("MAID") context, and the drug will act on the human body the same way in an execution chamber.  This method of lethal injection would preserve the dignity of the procedure—an interest that Defendants have already conceded is a subordinate concern to exposing the inmate to as little pain as possible.  And this alternative does not present any difficulties for the State, using good faith efforts, to obtain the necessary equipment, supplies, and trained personnel, and does not present any difficulties in implementing an

execution using that manner of causing death. In short, this lethal injection alternative should be available to Ohio.

Furthermore, Plaintiff Henness presented this Court with evidence regarding this lethal injection alternative to show that it would significantly reduce the risks of severe pain and suffering he alleged the current lethal injection method poses. This Court previously concluded, on that evidence, that any risk of pain from the insertion of the administration mechanism under the alternative—a feeding tube—would be "effectively mitigated by the application of a topical anesthetic," *Henness*, 2019 U.S. Dist. LEXIS, at *247, which is a significant reduction in the risk of pain caused by establishing peripheral IV access in the inmate. This Court also concluded that this lethal injection alleged alternative would likely render the inmate insensate and afford him a pain-free death. *Id.* When the current method poses several identified risks of severe, torturous pain and needless suffering that are sure or very likely to occur, providing a "pain-free death" is, by definition, a significant reduction in the identified and demonstrated substantial risks of severe pain posed by the current execution method.

Further, Bonnell will add new evidence to meet his burden on the comparative "reduction of risk" inquiry because his lethal injection alternative significantly—that is, clearly and considerably—reduces the substantial risks of severe pain and suffering Bonnell currently faces if executed with Ohio's current protocol. Like the firearms alternatives, the lethal injection alternative, when compared to Ohio's current protocol, eliminates entirely *any* risk of

7

serious pain and suffering that Bonnell alleges regarding Ohio's current protocol. The alternative does not pose any risk of severe pain from: acute pulmonary edema; severe burning sensations following IV injection of that much highly acidic midazolam; or problems obtaining and maintaining peripheral IV access. The alternative, when measured against the identified risks of severe pain and suffering posed by the second and third drugs in Ohio's current protocol, clearly and considerably reduces those risks because it eliminates entirely *any* risk of serious pain and suffering associated with the second and third drugs. In fact, the alleged lethal injection alternative eliminates *any* risk of experiencing severe pain and suffering at all, and therefore significantly reduces the substantial risks in the current protocol that Bonnell has alleged. Unlike the current three-drug midazolam protocol, this alternative contains a true pain-blocking drug: a barbiturate.

Bonnell will also present additional evidence to demonstrate that the alleged secobarbital alternative eliminates entirely the risk of severe pain and suffering from developing acute pulmonary edema after peripheral IV injection of a 500 mg dose of midazolam, thus significantly reducing that risk in comparison to the current protocol. Specifically, there is no risk of severe pain and suffering from developing pulmonary edema using the alternative lethal injection method. Administering the drug orally, rather than 500 mg or more of midazolam via peripheral IV injection, would ensure that the inmate is rendered insensate long before any pulmonary edema might possibly develop. Even if any pulmonary edema developed during an execution using this lethal

injection alternative, the inmate would not be sensate to it, unlike in the current protocol, because this alternative includes a large dose of a pain-blocking drug.

Further, any pulmonary edema that might develop following administration of the lethal injection alternative would be cardiogenic, an entirely different type of pulmonary edema, arising from a different cause, on a much slower timeline compared to the current protocol. By comparison, the acute pulmonary edema that develops following IV injection of high doses of midazolam is non-cardiogenic, caused by increased damage to the delicate capillaries and lung tissue directly by the acidic midazolam, allowing fluid to build rapidly. It is the effect of damage wrought by injecting a massive amount of acid directly into the blood stream, where it travels, unbuffered, to the heart and then quickly to the lungs where it immediately begins to destroy the capillaries and other lung tissue. The secobarbital alternative does not pose that problem, because it involves oral injection.

Any cardiogenic pulmonary edema that might develop after oral administration of the lethal injection alternative would develop on a much slower timeline as compared to the acute non-cardiogenic pulmonary edema caused by Ohio's current protocol, which begins to develop almost immediately after injection. And again, the alternative includes a pain-blocking drug, which would take effect before any cardiogenic pulmonary edema developed and keep the inmate insensate throughout the rest of the execution, unlike the current

protocol which will not render or keep the inmate insensate at any point, no matter how large the dose of midazolam.

As to the *Glossip* inquiry before this Court at the September 24, 2019 – October 3, 2019 preliminary injunction hearing, Bonnell will present evidence to demonstrate that his pled lethal injection alternative eliminates—and thereby significantly reduces—the risk of severe pain from acute pulmonary edema as compared to the current protocol.

Bonnell will also present evidence, at a supplemental hearing, if ordered by this Court, evidence concerning his individual physical characteristics. At that hearing, Bonnell will demonstrate there is a strong likelihood that due to an increased risk because of his individual characteristics, he can establish that he is sure or very likely to be subjected to severe pain and suffering associated with Defendants' three-drug midazolam lethal injection protocol. This will be expounded upon below.

Lastly, Bonnell will present evidence that the Defendant use of expired execution drugs or drugs past their use-by date violates the Eighth Amendment, and the Equal Protection Clause of the Fourteenth Amendment (*see e.g.*, Fourth Amended Omnibus Complaint (ECF No. 1252, ¶¶891-893, 910, PageID 45637-38, 45644; Fourth Cause of Action, ¶¶ 1329 *et seq.*), as well as equitable principles of judicial estoppel.

In sum, this Court has already found, on evidence previously admitted, that Ohio's current three-drug midazolam protocol will "almost certainly subject [a condemned inmate] to severe pain and needless suffering," satisfying

*Glossip*'s first prong. And Bonnell will present new, corroborating evidence that further bolsters that conclusion. Also, Bonnell will present evidence that his alleged execution alternatives are "feasible" and "readily implemented" with ordinary transactional effort, while the State has not genuinely refused to implement any of the alternatives, and it cannot reasonably and legitimately do so, leaving no justified State-based impediment to implementing any of Bonnell's alleged alternatives. Each alternative is thus "available" under *Baze*, *Glossip*, and *Bucklew*. And, finally, Bonnell will present evidence to establish that each of his alleged alternatives clearly and considerably reduces the identified risks of severe pain posed by the State's current execution protocol.

Accordingly, Bonnell can demonstrate it is likely that he will prevail on the merits of his claims that Ohio's three-drug midazolam execution protocol is cruel and unusual punishment barred by the Eighth Amendment. He can also satisfy the other equitable considerations to warrant injunctive relief.

This Court should therefore grant a preliminary injunction and stay of execution. This Court should further grant a supplemental hearing, date to be set following any of the previously scheduled executions, should they take place.

## II. Procedural Background

### A. Background specific to Melvin Bonnell

By order of the Supreme Court of Ohio issued April 14, 2015, as subsequently modified by Former Defendant Governor Kasich's warrants of reprieve, and a subsequent reprieve issued by Defendant Governor DeWine,

11

Defendants will attempt to execute Plaintiff Bonnell on February 12, 2020, at or about 10:00 a.m., at the Southern Ohio Correctional Facility ("SOCF"). Bonnell believes that Defendants will use the Execution Protocol effective October 7, 2016.[1]  Specifically, Bonnell believes that Defendants will use the three-drug option in the Execution Protocol that includes peripheral IV injection of midazolam, a paralytic, and potassium chloride.

Bonnell filed an Individual Supplemental Complaint on April 12, 2018. (ECF No. 1520).  The Defendant's Answered his Individual Supplemental Complaint on May 9, 2018. (ECF No. 1631). This Court ordered Bonnell's case to be consolidated with Plaintiffs Jackson and Hanna on August 20, 2019. (ECF No. 2378). As such, Bonnell filed a Motion for Leave to Amend his Individual Supplemental Complaint on August 22, 2019, which this Court granted via notation order the same day (ECF Nos. 2391, 2392). Bonnell then filed his Second Amended Individual Supplemental Complaint on August 23, 2019 (ECF No. 2399). Bonnell filed Objections to this Court's Scheduling Order on August 27, 2019. (ECF No. 2403). On August 29, 2019, this Court, again, ordered that Plaintiffs Bonnell, Hanna, and Jackson be consolidated as to the issues they hold in common. (ECF No, 2418). However, this Court rendered the scheduling order premature as to Bonnell and Hanna's individualized claims. *Id.* Now, in accordance with this Court's litigation schedule (ECF No. 2275, PageID 110817), which ordered Plaintiffs Hanna, Kareem Jackson, and Bonnell

---

[1] All references herein to Defendants' protocol shall mean the version of DRC Policy 01-COM-11 effective October 7, 2016, unless otherwise specified.

to file "any motions for preliminary injunction no later than September 3, 2019," Bonnell is hereby filing this instant motion.

Because the Court is familiar with the long history of this case, and in the interests of brevity, Bonnell does not repeat here the full history of this case as included in Plaintiffs Phillips, Tibbetts, and Otte's Motions for Preliminary Injunction (ECF Nos. 714, 715, 718), and in the Motions for Injunctive Relief subsequently filed by Plaintiffs Tibbetts and Campbell (ECF Nos. 1261, 1262), and by Plaintiff Henness (ECF No. 1929).  Rather, Bonnell will reference that history as necessary throughout this motion.

This Court denied injunctive relief to Plaintiffs Campbell and Tibbetts, *In re Ohio Execution Protocol Litig. (Campbell & Tibbetts)*, No. 2:11-cv-1016, 2017 U.S. Dist. LEXIS 182406 (S.D. Ohio Nov. 3, 2017), which the Sixth Circuit affirmed, *Campbell v. Kasich*, 881 F.3d 447 (6th Cir. 2018).  The Court also recently denied Plaintiff Henness's motion for injunctive relief, although the Court expressly found, to a trial level of proof, that the record evidence now demonstrates that executing an inmate using Defendants three-drug midazolam execution protocol will cause the inmate to certainly or very likely suffer severe pain and unnecessary suffering akin to torture such as waterboarding.  (ECF No. 2133, PageID 105266; *see also* ECF No. 2142, PageID 105755).  Nevertheless, the Court explained, it was constrained to deny relief based on the Supreme Court's decision in *Glossip v. Gross*, 135 S. Ct. 2726 (2015).  The Court believed that Plaintiff Henness had not produced enough evidence to demonstrate an alleged alternative execution method that was

13

available and which significantly reduced the substantial risk of severe pain and suffering posed by Defendants' three-drug protocol.  (ECF No. 2133, PageID 105267).  Plaintiff Henness appealed that decision to the Sixth Circuit, where it remains pending.  Plaintiff Bonnell will present additional, new evidence to further demonstrate his burden of proof on the availability and substantial reduction subparts of *Glossip*'s second prong, as well as additional, new evidence to further bolster his burden of proof about the risks of severe pain and suffering posed by Ohio's three-drug protocol.

**B.     The Supreme Court's *Bucklew* opinion provided guidance for how the *Baze-Glossip* requirements should be applied here.**

The Supreme Court in *Bucklew* reiterated that the *Baze-Glossip* test's second prong has two subparts: (1) a prisoner must "carry his burden of showing a readily *available* alternative"; and (2) he must "show that [the alternative] would significantly reduce a substantial risk of severe pain" that the prisoner alleges the current protocol poses.  139 S.Ct. at 1130 (emphasis added).[2]  At various points in *Bucklew*, the Court expounded on these two subparts, providing more clarity and guidance on what each part entailed.

First, the Court repeated throughout the opinion that whether an alleged alternative is "available" is the bottom-line inquiry for the first subpart of *Glossip*'s second prong.  *See, e.g., id.* at 1126 ("[I]dentifying an available

---

[2] Bonnell will refer to these two requirements, throughout this motion, as the "availability" subpart, and the "significant reduction of risk" (or "significant reduction") subpart, or words to that effect.

14

alternative is a 'requirement of all Eighth Amendment method-of-execution claims' alleging cruel pain."); *id.* at 1127 (noting comparison of current protocol to "available alternatives" or "other available methods"); *id.* at 1128–29 (cautioning that the burden under *Glossip*'s second prong should not be "overstated," because "we see little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative"); *see also id.* at 1135–36 (Kavanaugh, J., concurring (stating the test as "whether the inmate must identify an available alternative method of execution that would significantly reduce the risk of severe pain")); *id.* (twice repeating the majority's caution that the alternative-method requirement should not be "overstated" because there is "little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative"). Thus, "available" is the required showing.

Second, the Court further clarified that point by confirming that the standard announced in Chief Justice Roberts's *Baze* concurrence, was, following *Glossip*, the controlling test. *Bucklew*, 139 S.Ct. at 1125. Under that standard, an inmate must identify an available alternative. The Court then further unpacked that requirement, reiterating that an alleged alternative is "available" if it is a "feasible and readily implemented alternative method of execution" that "the State has refused to adopt without a legitimate penological reason." *Id.* (citing *Glossip*, 135 S.Ct. at 2732–38, and *Baze*, 553 U.S. at 52). That available alternative must also meet the comparative reduction subpart,

the Court reiterated, because it must be shown to "significantly reduce a substantial risk of severe pain" posed by the current protocol. *Id.*

Third, the Court provided further guidance on the *Baze-Glossip* second prong test in Section III of its opinion by applying that test to Mr. Bucklew's evidence. *Id.* at 1129. Once again, the Court stated the broad "availability" requirement in more granular terms, followed immediately by the "significant-reduction" requirement. Specifically, the Court asked, "[h]as he identified a feasible and readily implemented alternative method of execution the State refused to adopt without a legitimate [penological] reason" [*i.e.*, the availability test], "even though it would significantly reduce a substantial risk of severe pain?" [*i.e.*, the significant reduction test]. *Id.*

Along the same lines, a State's refusal to implement an alleged alternative might make the alternative unavailable. But the Court confirmed that a prisoner can show that an alleged alternative is readily implemented even if a State has actually refused to use it, if a State's refusal is not for a "legitimate penological reason," *id.* at 1125, or if the State's refusal was "unreasonable," *id.* (inquiring about whether a State "has unreasonably refused to alter its method of execution").

That is, if the State cannot reasonably and legitimately refuse to implement and alleged alternative, then the alternative would be available. Or, stated differently, the Court's analysis asks whether there is an impediment to implementing the alleged alternative based on a sufficiently justified State refusal to adopt it. If so, then an alleged alternative would not be "available,"

16

as *Bucklew* concluded based on the record evidence involving nitrogen hypoxia. 139 S.Ct. at 1129–30. Of course, if the State has not actually "refused" to use an alleged alternative, then there is no impediment to implementing it. Likewise, if the State has refused to use an alleged alternative but failed to provide any reasoned justification for that refusal, then that refusal would also not justifiably prevent implementing the alternative. Similarly, if the State refused to use an alleged alternative and gave a stated reason, but the explanation was unreasonable, or not actually related to a legitimate, penological interest, then, once again, that refusal would not be a reason why the alternative could not be implemented. *See id.* at 1129–33. Under any of those scenarios, there would be no State impediment to the alleged alternative.

The Court next provided guidance on how to assess these two subparts. In Section III.A, the Court analyzed whether Mr. Bucklew had satisfied the availability subpart. The Court once again reiterated that if an alternative execution manner or method is "theoretically feasible" and "readily implemented," and if there is no impediment to implementation posed by a justified State refusal to adopt the alternative, then the method is "available" under *Baze* and *Glossip*.[3] *See Bucklew*, 139 S.Ct. at 1129–30. The Court

---

[3] And of course, an alternative would be available if a State has in fact adopted it via applicable state law, because in such circumstances the State has not refused to use the alternative at all. *Price v. Comm'r, Alabama Dep't of Corr.*, 920 F.3d 1317, 1327–28 (11th Cir. 2019) (holding under *Bucklew* that "If a State adopts a particular method of execution . . . it thereby concedes that the method of execution is available to its inmates.").

faulted Mr. Bucklew for failing to present evidence to satisfy that test, thereby providing guidance for what evidence would.

A prisoner can satisfy the availability test, the Court explained, if he can show evidence that his alleged alternative could be carried out "relatively easily and reasonably quickly." *Id.* at 1129 (citation omitted). He can show his alleged alternative is "not just theoretically 'feasible' but also 'readily implemented'" by producing evidence to demonstrate that his alleged alterative is not experimental—is not "untried and untested"—at causing death. *Id.* at 1129–30. A prisoner can show that his alleged alternative would be similarly effective at causing death as the current protocol by showing a "track record of successful use" causing death. *Id.* Those matters can be shown by, for example, the alternative's use in another jurisdiction's execution protocol, or by some other evidence of its efficacy at causing death. *Id.* at 1130 (citing *Baze*, 553 U.S. at 57). A prisoner should also demonstrate that the State should be able to implement the alleged alternative and procure the necessary supplies, materials and personnel to carry it out with ordinary transactional effort. *Id.* at 1129; *Fears*, 860 F.3d at 891. Finally, a prisoner should show that there is no justified State-based impediment to using an alleged alternative. *Bucklew*, 139 S.Ct. at 1129–30.

The Court identified four examples of when, depending on the evidence, a State's refusal to adopt an alleged alternative might be considered sufficiently justified and reasonable as to make an alleged alternative "unavailable." First, if the alternative would be experimental in causing death in that there is no

evidence to demonstrate the efficacy of causing death.  *Bucklew*, 139 S.Ct. at 1129–30 (citing *Baze*, 553 U.S. at 57).  Second, if the State, having made demonstrated good faith efforts, cannot procure access to certain critical aspects of the alternative, such as necessary supplies.  *Id.* at 1125.  Third, if the alternative would not preserve the dignity of the procedure compared to the current protocol.  *Id.*  And fourth, if the alterative would require involvement of persons whose professional ethics rules or traditions would impede their participation.  *Id.*  Notably, the Court rejected the argument that a State's law limiting the scope of authorized manners of execution can be a legitimate penological justification for a State's refusal to adopt an alleged alternative.  *Id.* at 1128; *see also id.* at 1135–36 (Kavanaugh, J., concurring).

The Court then turned, in Section III.B, to the "significant reduction" subpart.  *See id.* at 1130–33; *see also id.* at 1125 (stating that the "risk of pain associated with the State's" current protocol must be "substantial when compared to a known and available alternative").

The Court emphasized that the inquiry is a comparative one, evaluating the risks of pain the prisoner has alleged the State's current protocol causes with the risks arising from the alleged alternative.  *Id.* at 1130.  The Court further explained that a "minor reduction in risk is insufficient; the difference must be clear and considerable."  *Id.*  That is, if the alleged alternative clearly and considerably reduces the identified and alleged risk(s) of severe pain posed by the current execution protocol, then it satisfies the "significant-reduction" subpart of *Glossip*'s second prong.

19

The Court then assessed Mr. Bucklew's alleged harms posed by the State's current protocol and concluded that the evidence showed those risks were extremely limited or not actually present under Missouri's execution protocol, or that using the alleged alternative would not actually reduce the identified alleged risks.  *Id.* at 1130–33.

The Court ultimately concluded that Mr. Bucklew had failed to provide sufficient evidence to satisfy the availability subpart, *id.* at 1129, and that "even if [Bucklew's alleged alternative] were a feasible and readily implemented alternative to the State's chosen method, [he] has still failed to present any evidence suggesting that it would significantly reduce his risk of pain" alleged under Missouri's current protocol, *id.* at 1133.

Even before *Bucklew*, this Court in its *Henness* opinion applied the two-part *Glossip* test, including the two sub-parts of the second *Glossip* prong.  (*See* ECF No. 2133, PageID 105263 (assessing whether the evidence demonstrated that Henness's proposed alternatives were "feasible, readily implemented, and in fact significantly reduce[d] a substantial risk of severe pain" (citing *Glossip*, 135 S. Ct. at 2737); *see also id.* at PageID 105264 (finding insufficient evidence to demonstrate alleged alternatives would significantly reduce the risk of severe pain caused by developing acute pulmonary edema, "precisely the pain that the Court has found midazolam is sure or very likely to cause").  The same test still applies following *Bucklew*, with additional guidance from the Supreme Court.

20

**III.    This Court Should Grant Bonnell A Stay Of Execution And A Preliminary Injunction.**

The purpose of preliminary injunctive relief is to preserve the status quo until the rights of the parties can be fairly and fully litigated through a final hearing or trial on the merits of a permanent injunction.  *See Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1378 (6th Cir. 1995).  A stay is warranted when the inmate seeks additional time to raise his claims beyond what his scheduled execution date allows.  *See Martiniano v. Bell*, 454 F.3d 616 (6th Cir. 2006).

In considering whether injunctive relief in the form of a preliminary injunction is justified, this Court must consider: (1) whether Bonnell has demonstrated a strong likelihood of success on the merits; (2) whether Bonnell will suffer irreparable harm in the absence of equitable relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest will be advanced by issuing the injunction.  *Miller v. City of Cincinnati*, 622 F.3d 524, 533 (6th Cir. 2010).  No single factor is determinative.  *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001).  The four factors are to be balanced; they are not prerequisites to be met.  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citing *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003) and *In re: De Lorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985)).  Accordingly, the degree of likelihood of success required to obtain a preliminary injunction may depend on the strength of the other three factors.  *De Lorean Motor Co.*, 755 F.2d at 1229.

21

The same factors apply for injunctive relief in the form of a stay of execution. *Hill v. McDonough*, 547 U.S. 573, 584 (2006). Additionally, in considering whether to grant a stay of execution, the Court may also consider whether an inmate has delayed unnecessarily in bringing a claim. *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004). Granting a stay of execution along with a preliminary injunction is proper. *See Nken v. Holder*, 556 U.S. 418, 428–29 (2009) (distinguishing between a stay, which suspends the source of authority to act and "operates upon the judicial proceeding itself," and an injunction, which prohibits persons from taking any action because it "is directed at someone, and governs that party's conduct").

Although Bonnell seeks a stay of execution and a preliminary injunction on a few of his claims, it is not necessary for him to demonstrate a likelihood of success on the merits of *each* of the claims in his complaint, or even on each of the claims in his injunctive relief motion; any of the asserted grounds, if sufficiently established at this juncture, entitles Bonnell to preliminary injunctive relief and a stay of execution. Nevertheless, Bonnell has a strong likelihood of success on the merits of his Eighth Amendment claims alleging a sure or very likely risk of suffering severe pain and suffering from Defendants' three-drug midazolam lethal injection protocol. Bonnell also has a strong likelihood of success on the merits of his supplemental claims alleging a sure or very likely risk of suffering severe pain and suffering from Defendant's three-drug midazolam lethal injection protocol due to, and exacerbated by, his individual physical characteristics.

Defendants intend to try to execute Bonnell using their 2016 Execution Protocol. That Protocol exposes Bonnell to serious constitutional violations in the course of carrying out his lethal-injection execution. Among the aspects of the Protocol that pose constitutional problems is the provision allowing Defendants to carry out an execution using a three-drug execution method requiring peripheral intravenous injection of a large dose of midazolam, a paralytic drug, and potassium chloride. Defendants have now carried out three executions using this three-drug midazolam protocol: Ronald Phillips, Gary Otte, and Robert Van Hook. Defendants have carried out one other execution using midazolam as well, that of Dennis McGuire. And they attempted—but failed—to carry out another execution using the peripheral IV-injected three-drug midazolam protocol in November 2017, that of Alva Campbell, Jr. Each of those executions presented evidence that put Defendants on notice of serious problems with the current protocol. Likewise, several other executions in other jurisdictions using the same or functionally similar protocols provided further evidence of unconstitutional problems.

If the Court permits Defendants to proceed with Bonnell's execution, the evidence already in the record of this consolidated case regarding a paralytic drug, potassium chloride, and use of peripherally injected large doses of midazolam as part of a lethal injection protocol sufficiently demonstrates that Defendants will subject Bonnell to unconstitutional pain and suffering.

A.     **Bonnell has a strong likelihood of success on the merits of his constitutional claims.**

"The preliminary injunction posture of the present case . . . requires [Bonnell] to establish a likelihood that [he] can establish both that [Ohio's] lethal injection protocol creates a demonstrated risk of severe pain and that the risk is substantial when compared to the known and available alternatives." *Glossip*, 135 S.Ct. at 2737. Bonnell can satisfy the first and most important of the injunctive relief factors for consideration; Bonnell's evidence will show a strong likelihood that he will prevail on the merits of his claims under the controlling standards. This Court should fully hear and consider that evidence, particularly in light of his new, confirmatory evidence on *Glossip*'s first prong, and his new evidence and arguments to satisfy *Glossip*'s second prong.

1.     **Plaintiff Bonnell satisfies *Glossip*'s first prong: this Court's finding that a condemned inmate is sure or very likely to suffer severe pain and needless suffering is fully supported by the consolidated record which should apply here, and by subsequently developed evidence Bonnell will present.**

This Court concluded: "If Ohio executes [a condemned inmate] under its present protocol, it will almost certainly subject him to severe pain and needless suffering" because midazolam "does not have any analgesic effect," will "cause the 'waterboarding' effects of pulmonary edema," and will also not block the excruciating pain from the paralytic and potassium chloride. (ECF No. 2133, PageID 105266–67.) This Court heard the extensive proof in this consolidated litigation and carefully considered the science of midazolam.

24

Plaintiff Henness presented proof that persons subjected to execution using a lethal injection protocol involving peripheral IV injection of large doses of midazolam manifest patent signs of severe pain and unnecessary suffering, and this Court concluded Henness's experts were more credible than Defendants' outliers who claimed the contrary.  Although Bonnell, like Plaintiff Henness, does not concede that he must prove his claims to the full level of a merits trial in this injunctive relief proceeding, the fact remains that Plaintiff Henness proved his burden under *Glossip*'s first prong to an extremely high level of proof—approaching and/or meeting that required for relief on the merits—and the same evidence should establish the same for Bonnell.  (*See* ECF No. 2142, PageID 105766 ("Because appellate courts seem to treat execution dates as sacrosanct, plaintiffs must prove their case on preliminary injunction.").)  That is, unlike in proceedings in which other inmates' challenges failed for lack of sufficient evidence, the Court has now found sufficient evidence exists in the record to satisfy *Glossip*'s first prong.

This Court has already ordered the evidence from the *Henness* record admitted for Jackson's injunctive relief proceedings.  (Order, ECF No. 2191.)  Since Plaintiffs Hanna and Bonnell are now consolidated (Order ECF Nos. 2378, 2491) in that action and hearing, that same evidence should also admitted on behalf of those Plaintiffs as well. Accordingly, the Court should either adopt its prior factual findings regarding that evidence as to Bonnell, or reach the same findings on the same evidence, and then provide any further findings as it sees fit.  *Cf.* Br. of State Appellees, *Henness v. DeWine*, 6th Cir.

25

Case No. 19-3064, Doc. No. 33, 56–74 (June 28, 2019) (accusing the Court in
*Henness* of clearly erring in its factual findings and reasoning on *Glossip* prong
1 when it relied on the established scientific consensus of pre-eminent experts).

But there is more.  As this Court previously noted, "science operates on
the accumulation of new data.  Indeed, it is the essence of the scientific method
to continue to test previously reached conclusions against newly accumulated
data."  (Order, ECF No. 2133, PageID 105252 (citations omitted).)  "A
hypothesis that survives testing against new data becomes thereby stronger."
(*Id.*)  And Bonnell will provide even more evidence on the first *Glossip* prong, on
which the Court should provide further factual findings, consistent with and
beyond its previous findings to eliminate any question about what the science
demonstrates, regardless of any attempts by Defendants to muddy the
complicated waters.  After repeatedly arguing that past Plaintiffs in this
consolidated case needed to demonstrate a scientific consensus about
midazolam to prevail on *Glossip*'s first prong, Defendants in their merit brief
recently filed in the Sixth Circuit faulted this Court's approach in a
breathtakingly brazen way—by criticizing the Court for acknowledging the
scientific consensus about midazolam:

> As an initial matter, the District Court's reasoning
> consists entirely of an appeal to authority.  The Court
> concluded that experts "preeminent in their fields"
> testified that the "consensus" about midazolam is that
> it will not work to make the inmate insensate.  *Id*,
> PageID#105252.  But it offered no analysis of why the
> "consensus" position (as opposed to the minority
> position) is in fact correct.  This democratic approach to
> science is indefensible.

26

Br. of State Appellees, *Henness v. DeWine*, 6th Cir. Case No. 19-3064, Doc. No. 33, 34 (June 28, 2019). The Court's findings were invalid, Defendants argued, because it relied just on a "show of hands" among experts and disregarded the conceded outlier position. *Id.* at 55. Defendants accused the Court of making factual findings simply by concluding that "more people agree with Henness's position, so he must be right." *Id.* In Defendants' view, the record evidence remains no different than it was before the *Henness* hearing. *See id.* at 55 ("The foregoing establishes that the District Court's 'findings . . . provide little support for its conclusions that Ohio's three-drug protocol creates an unconstitutional risk of pain.'" (citing *Fears*, 860 F.3d at 887)). But this Court rejected that core position already. (ECF No. 2133, PageID 105252–53.) And it recognized the crucial distinction—and the significance of that distinction—between sensation and consciousness that Defendants continue to ignore at best, and deliberately conflate in their *Henness* brief at worst. (*See id.* at 105251–52.)

This Court got the science on midazolam right in *Henness*, and it should do so again. Despite Defendants' contention that this Court premised its previous findings on fallacious assumptions regarding midazolam, the Court applied the scientific method when it continued to demand new data and scientific evidence—supported by expert opinion and authority—to reach the conclusions it did. (*Id.*)

To that end, Bonnell will add more evidence to the record that will, in accordance with the scientific method, strengthen the case against midazolam

even more.  He will present new data that further confirms the Court's previous finding "that it is certain or very likely that a 500 mg IV-injected dose of midazolam cannot reduce consciousness to the level at which a condemned inmate will not experience the severe pain associated with injection of the paralytic drug or potassium chloride or the severe pain and needless suffering that is certain or very likely to be caused by the pulmonary edema which is very likely to be caused directly by the midazolam." (*Id.* at PageID 105253.)

He will present new data to further confirm that "if Ohio executes [him] under its present protocol, it will almost certainly subject him to severe pain and needless suffering." (ECF No. 2133, PageID 105266-67.)

He will present new evidence to further confirm that "executing him by Ohio's current three-drug protocol will certainly or very likely cause him severe pain and needless suffering because the dose of midazolam intended to be used will not render him sufficiently unconscious as to prevent him from suffering the severe pain caused by injection of the paralytic drug or potassium chloride or the severe pain and needless suffering cause by pulmonary edema from the midazolam itself." (*Id.* at PageID 105266.)

Bonnell will present additional evidence to bolster the Court's finding that "midazolam cannot prevent the physical pain known to be caused by injection of the paralytic and the potassium chloride," and that "midazolam itself . . . certainly or very likely causes pulmonary edema, which is both physically and emotionally painful to a severe level." (*Id.* at PageID 105251.)

He will present newly created evidence that will further ratify the Court's findings that "midazolam at any dosage level has no analgesic properties," (*id.* at PageID 105249.); that midazolam "cannot prevent the pain incident to the second and third drugs from reaching the brain of the condemned inmate," (*id.*); that "midazolam at the 500 mg dose used by Ohio as an initiatory drug is certain or very likely to cause pulmonary edema," (*id.*); and that "pulmonary edema itself certainly or very likely causes severe pain and needless suffering," (*id.* at PageID 105250).

Since that Order, issued on January 14, 2019, there have been at least four additional executions using a midazolam-first three drug lethal injection protocol: Dominique Ray (Alabama, February 7, 2019); Donnie Johnson (Tennessee, May 16, 2019); Michael Samra (Alabama, May 16, 2019); and Christopher Price (Alabama, May 30, 2019).  The eyewitness accounts from those executions are consistent with the accounts of other midazolam executions this Court previously found significant to demonstrate that the prisoners are suffering severe pain during their executions.  Bonnell will present testimony from some of those eyewitnesses.  Autopsy evidence from those executions will provide additional confirmation that those inmates suffered from acute pulmonary edema during their executions involving IV injection of high doses of midazolam.[4]  Bonnell will present evidence from those

---

[4] To develop that evidence, Plaintiff Cleveland Jackson served Rule 45 subpoenas in Alabama and Tennessee.  Officials in those States have objected, on the basis that the "investigations" of those deaths remain open, no final report from any of those autopsies exists yet, and their relevant State open

autopsies, along with expert testimony from Dr. Mark Edgar, Dr. David Greenblatt, Dr. Exline, and/or other experts to explain that evidence and its significance, which will further bolster the record supporting this Court's previous findings related to midazolam's use in executions.  That, too, provides further proof that prisoners executed using a three-drug protocol with IV-injected high doses of midazolam as the initiatory drug will be sure or very likely to suffer the severe pain and terrifying sensations associated with acute pulmonary edema and the other risks of severe pain Bonnell alleges that Ohio's three-drug protocol poses.

Bonnell intends to present this additional confirmatory evidence that further strengthens this Court's previous conclusions on *Glossip*'s first prong. But even without any new evidence, the current record as admitted for the consolidated Plaintiffs—Jackson, Hanna, and Bonnell—is sufficient to sufficiently demonstrate *Glossip*'s first prong.  By introduction of evidence previously considered by this Court, and/or with additional evidence, Bonnell will establish, among other matters, that: (1) midazolam is not an analgesic; (2) midazolam cannot render (and has not rendered and cannot keep) inmates insensate to pain, regardless of the dose; (3) an inmate subjected to Ohio's Protocol will endure severe pain and needless suffering from the midazolam, the paralytic drug, and the potassium chloride; (4) an inmate subjected to Ohio's Protocol will endure severe pain and needless suffering from acute, non-

_____

records laws do not require production of documents pertaining to open homicide investigations.

cardiogenic pulmonary edema; (5) sensation is binary, even while consciousness lies on a spectrum, meaning that if the inmate is not insensate, he will experience the full measure of pain and suffering from pulmonary edema and the other severe pain caused by the second and third drugs in Ohio's three-drug protocol; (6) there are two routes by which insensation can be achieved—using an opioid analgesic that operates on the pain receptors, or using a drug like a barbiturate or general anesthetic drug than can produce unconsciousness at so deep a level that insensation occurs (*i.e.*, the depth of unconsciousness associated with General Anesthesia); and (7) midazolam can accomplish neither of those two routes to insensation.  He will also demonstrate that the acute pulmonary edema in question very likely arises from the IV injection of large doses of highly acidic midazolam.

Accordingly, there is a strong likelihood that Bonnell can establish that he is sure or very likely to be subjected to severe pain and suffering associated with Defendants' three-drug midazolam lethal injection protocol.  Based on the consolidated record already existing in this case, adopted and/or admitted as to Bonnell's motion for injunctive relief, and further supplemented at an evidentiary hearing, Bonnell has satisfied his injunctive relief burden of proof on *Glossip*'s first prong: Ohio's lethal injection protocol creates a demonstrated risk—indeed, several demonstrated risks—of severe pain and suffering.  *See Glossip*, 135 S. Ct. at 2737.

**2. Plaintiff Bonnell will show a likelihood of success on *Glossip*'s second prong, as further clarified by *Bucklew*.**

As explained in more detail in Section II.B above, the Supreme Court in *Bucklew* confirmed that the second *Glossip* prong has two subparts: the "availability" subpart and the "significant reduction" subpart.

To meet the second part of his burden under *Baze-Glossip*, therefore, Bonnell must show a likelihood that one or more of the risks of severe pain and suffering posed by Defendants' current execution protocol is substantial when compared to the known and available alternatives. *Glossip*, 135 S.Ct. at 2737. That is, he must show it is likely he can establish one (or more) alternative execution manners or methods that should be available and which would significantly reduce one or more of the substantial risks of severe pain he alleges that Ohio's current protocol poses. *See Bucklew*, 139 S.Ct. at 1130; *Fears*, 860 F.3d at 890; *Campbell*, 881 F.3d at 453.

Bonnell satisfies his burden on this second *Glossip* prong because he alleges, and will produce evidence to sufficiently demonstrate, that several alternatives should be available with ordinary transactional effort which, when compared to Ohio's current three-drug lethal injection protocol, significantly reduce the alleged substantial risks of serious pain posed by that protocol.

**a. The relevant "availability" standard**

The availability subpart involves the inquiry whether an alleged alternative is feasible and readily implemented. Bonnell can satisfy that standard for each of his alleged alternatives, any one of which is sufficient to satisfy his proof burden here in the injunctive relief context.

An alternative manner or method of execution is available if it is "not just theoretically 'feasible,' but also 'readily implemented.'" *See Bucklew,* 139 S.Ct. at 1129–30 (citing *Glossip,* 135 S.Ct. at 2737–38)).

For the "feasible" and "readily implemented" requirements, Bonnell can show evidence and procedural details sufficient to demonstrate that the alleged alternative is at least "an equally effective manner of imposing" death as the current protocol. *Baze,* 553 U.S. at 57; *Bucklew,* 139 S.Ct. at 1130. He can also provide evidence and sufficient details to demonstrate that an alleged alternative could be carried out "relatively easily and reasonably quickly." *Bucklew,* 139 S. Ct. at 1129–30 (citation omitted). That is consistent with how the Sixth Circuit, pre-*Bucklew,* previously defined "readily implemented" in this context. For an alleged alternative "to be 'available' and 'readily implemented,' Ohio need not already have the [supplies] on hand. But for that standard to have practical meaning, the State should be able to obtain the [supplies] with ordinary transactional effort." *Fears v. Morgan,* 860 F.3d 881, 891 (6th Cir. 2017) (en banc); *see also In re Ohio Execution Protocol Litig. (Tibbetts & Campbell),* No. 2:11-cv-1016, 2017 U.S. Dist. LEXIS 182406, *70 (S.D. Ohio Nov. 3, 2017) (noting the Sixth Circuit in *Fears* defined "available" to mean "ordinary transactional effort").

Similarly, Bonnell can show an alternative is feasible or readily implemented by showing that the State should "have access to the alternative." *McGehee v. Hutchison,* 854 F.3d 488, 493 (8th Cir. 2017). And *Bucklew* confirmed that the State, before it can claim a particular alleged alternative is

unavailable, must at least make "good faith efforts" to procure the necessary elements of the alternative. *See* 139 S.Ct. at 1125.

That is also consistent with the definition of "feasible" in Black's Law Dictionary: "[t]he *possibility* that something can be made, done, or achieved, or that it is reasonable; practicability." FEASIBLE, Black's Law Dictionary (10th ed. 2014). So too with Webster's Dictionary, which defines "feasible" as "capable of being done or carried out," or (for English learners) "possible to do." Webster's, https://www.merriam-webster.com/dictionary/feasible.

Further, Bonnell can show that an alternative is feasible and readily implemented by demonstrating that the State has not refused to implement the alternative, and it cannot reasonably and legitimately do so. As such, there would be no justified State-based impediment to implementing the alternative. *See Bucklew*, 139 S.Ct. at 1129–30 (citing *Glossip*, 135 S.Ct. at 2737–38)).

In sum, to show a "feasible and readily implemented alternative method of execution," Bonnell can provide evidence and sufficient procedural details to show that each of his alleged alternatives is effective, not "untried and untested," at causing death, along with showing *how* Ohio should be able to carry out any of his alleged alternatives and that it relatively easily and reasonably quickly can do so, without a justified State-based impediment. *See Bucklew*, 139 S.Ct. at 1128–30; *see also Price v. Comm'r, Ala. Dep't of Corr.*, 920 F.3d 1317, 1328–29 (11th Cir. 2019).

One logical way—but not the only way—Bonnell can do that is by, "for example, . . . point[ing] to a well-established protocol in another" jurisdiction

implementing the same alternative.  *Bucklew*, 139 S.Ct. at 1128; *see also Price*,
920 F.3d at 1326.  That would logically provide clear, direct evidence that the
alternative is effective at causing death and thus not an experimental way of
causing death.  Pointing to an execution in another jurisdiction—or, indeed, in
Ohio itself—using an inmate's alleged alternative would show that the
alternative is not "untried and untested" at causing death, because it would
have a "track record of success" causing death.  *Bucklew*, 139 S.Ct. at 1130
(citing *Baze*, 553 U.S. at 41).  Showing that another jurisdiction used the same
or similar execution protocol and procedures would also provide a roadmap of
procedures for the State to be able to carry out an execution using that
alternative relatively easily and reasonably quickly.  It would demonstrate that
the State should have relatively easy access to all necessary supplies and
materials with ordinary transactional effort.  It would readily answer the
"essential questions" that *Bucklew* identified, such as how to administer the
lethal mechanism of action; how rapidly; for how long; and how to protect
execution team members.  *Bucklew*, 139 S. Ct. at 1129.

But what the Supreme Court identified as an "example" is expressly just
that: an example.  Pointing to a specific execution protocol is not the *sole* way
an inmate can demonstrate that an alternative is theoretically feasible and
readily implemented.  *Bucklew* did not hem in a prisoner's choices of
alternatives to allege as a matter of law to just those that have been used to
carry out an execution in the United States as Defendants have argued.
Indeed, the Supreme Court specifically recognized that a prisoner like Bonnell

35

can allege and show sufficient details in other ways, including from contexts that are necessarily *not* from an execution, to successfully show an alternative is available.

For example, the Court noted that a prisoner could offer evidence such as a "study," to show that the proffered alternative is "an equally effective manner of imposing" death, and thus not an experimental, untried and untested, way of causing death.  *Baze*, 553 U.S. at 57.  In *Baze*, the Court focused on the then-unknown nature of a one-drug barbiturate lethal injection method, and that the "comparative efficacy" of the alleged alternative had not been established by evidence, either by its demonstrated use in another State *or* by other evidence.  *Id.*; *see also Bucklew*, 139 S.Ct. at 1130 (noting the *Baze* inmates' failure to offer evidence from any "'study showing' their one-drug protocol would be as effective and humane as the State's existing three-drug protocol").  Given that "studies" rarely, if ever, arise from executions, the Court's reference to a "study" as sufficient evidence to prove an alternative's availability undercuts the notion that an inmate must point to an alternative's prior use *in an execution* to establish availability of that alternative.

Similarly, a prisoner can offer evidence to demonstrate the "how," to show that the State could carry out an execution using the alleged alternative "relatively quickly and reasonably quickly."  *Bucklew*, 139 S.Ct. at 1129; *Price*, 920 F.3d at 1327.  For instance, he can offer evidence of a proposal that is

"sufficiently detailed," answering those "essential questions." *Bucklew*, 139 S.Ct. at 1129.[5]

Additionally, an alternative is readily implemented if the State has not refused to implement the alternative, and it cannot reasonably and legitimately do so. *See Bucklew*, 139 S.Ct. at 1125; *see also id.* at 1129–30 (noting that Missouri had a "legitimate" reason for declining to adopt Mr. Bucklew's proposed alternative, *i.e.*, not wanting to be the first to "experiment" with a different manner of causing death for an execution without evidence to show its efficacy); *Cf. Price*, 920 F.3d at 1327–28 (finding that even when there is no record evidence of use to cause death nor any protocol or procedures adopted to use an alternative, a method of execution is "available" if the State in question adopts it).

As explained in Section II.B above, there is no justified impediment to ready implementation if the State has not actually refused to implement the alternative. Nor is there any such impediment if the State has actually adopted the alternative, even if there is no evidence of that alternative having been used to carry out an execution or otherwise cause death in another jurisdiction,

_____

[5] Furthermore, Bonnell would also be able to satisfy his "availability" burden if Ohio adopted it by statute or regulation. *See Price*, 920 F.3d at 1327–28. The key point is simply that the panoply of available alternatives a prisoner might allege is not limited to only the specific, precise protocol that a U.S. State has adopted, let alone one that was used to carry out an execution. Rather, pointing to another State's execution protocol that has been used to carry out an execution is one way, among several, for a prisoner to satisfy his "availability" burden.

regardless of whether the State has propounded procedures to implement it. *See Price*, 920 F.3d at 1327–28.

Likewise, there is no bar to availability if the State has refused to use an alleged alternative but failed to provide a reason for that refusal.  Such a refusal would be arbitrary and, by definition, unreasoned, contrary to *Baze*, *Glossip*, and *Bucklew*'s instructions.  *See Bucklew*, 139 S.Ct. at 1125 (noting the State may not "*unreasonably* refuse[] to alter its method of execution" (emphasis added)).  Furthermore, even if the State provided a reason for its rejection, that reason must not be unreasonable, and is only justified if it is shown to be a "legitimate penological reason."  *Id.*  That is, there must be some evidence to show that the reason is both legitimate and genuinely connected to a true penological justification.  As noted in Section II.B above, the Court in *Bucklew* identified four examples of when, depending on the evidence, a State's refusal to adopt an alleged alternative might be considered sufficiently justified, including whether the alternative would be considered experimental in causing death, whether the State, after demonstrated good faith efforts, is unable to procure access to necessary supplies, if the alternative would not preserve the dignity of the execution compared to the current protocol, and if the alterative would require involvement of persons whose professional ethics rules or traditions would impede their participation.  *Bucklew*, 139 S.Ct. at 1125; *id.* at 1129–30 (citing *Baze*, 553 U.S. at 57).  A State law limiting the manner or method of execution is not a legitimate penological justification for a State's

refusal to adopt an alleged alternative.  *Id.* at 1128; *see also id.* at 1135–36 (Kavanaugh, J., concurring).

As discussed in more detail below, Bonnell can satisfy his burden on the "availability" subpart to *Glossip*'s second prong as to each of several alleged alternatives.

### b.  The relevant "significant reduction" standard

Bonnell can satisfy the "significant reduction" subpart by producing evidence to demonstrate any of his alleged alternatives would significantly reduce the alleged substantial risks of severe pain Ohio's current protocol causes.  *Bucklew*, 139 S.Ct. at 1130, 1133.  Bonnell alleges that Ohio's current execution protocol using midazolam as the initiatory drug in a three-drug combination will surely or very likely subject him to severe pain and needless suffering in several ways.  He will also present evidence to this Court to show that the alleged alternatives would each clearly and considerably reduce— indeed, eliminate—those risks of severe pain that Ohio's current protocol poses.  *Id.*

Notably, this is a comparative inquiry, pitting the risks of severe pain that Bonnell has identified in the current protocol against the risks posed by each of Bonnell's individual alleged alternatives.  Bonnell can independently satisfy his burden here with any or all of the alleged alternatives he discusses below.  Additionally, the comparative inquiry does not require Bonnell to demonstrate that an alleged alternative eliminates *entirely any and all* risk of severe pain; he need not allege a pain-*free* alternative to prevail.  To require

that would be contrary to the Court's instruction that the Eighth Amendment "does not demand the avoidance of all risk of pain carrying out executions." *Bucklew*, 139 S.Ct. at 1125 (citing *Baze*, 553 U.S. at 47). To be sure, an alternative that would be pain-*free* would, by definition, eliminate all the risks of severe pain Bonnell alleges under Ohio's current protocol, and thereby constitute a "clear and considerable" reduction in those risks. But Bonnell only need demonstrate 1) that the current execution protocol poses one or more sure or very likely risk(s) of severe pain, and 2) that an alleged alternative clearly and considerably *reduces* those identified risk(s) of severe pain posed by the challenged protocol. *Bucklew*, 139 S.Ct. at 1130–33.

Similarly, the Court's emphasis in *Bucklew* that the reduction of risk inquiry is comparative reiterates what *Baze* and *Glossip* had previously established: that the comparison analysis is between the levels of alleged risks of severe pain posed by the current method versus the level of those alleged risks of severe pain in the alternative. It is not a comparison in overall general levels of pain caused by the current protocol and the alleged alternative. In that way, even if some alternatives might still pose some other type of risk of some level of pain, that is immaterial. All that *Baze*, *Glossip*, and *Bucklew* require is showing that an alleged alternative clearly and considerably reduces, *in comparison to the current protocol*, the risk(s) of severe pain that the prisoner alleges the current protocol creates.

As discussed in more detail below, Bonnell can satisfy his burden on the "significant reduction" subpart to *Glossip*'s second prong as to each of several alleged alternatives.

> **3. Plaintiff Bonnell satisfies *Glossip*'s second prong: Bonnell can show more than one alternative that is available and which would significantly reduce the substantial risks of severe pain that Bonnell alleges arise from Ohio's three-drug execution protocol.**

For purposes of this injunctive relief motion, Bonnell alleges that three different types of alternatives are available and would, compared to Ohio's three-drug protocol, significantly reduce the substantial risks of severe pain he identifies and which this Court has already found supported by sufficient evidence.

This Court has already made findings regarding certain aspects of Bonnell's alleged lethal injection alternative.  (*See* Decision & Order, ECF No. 2133, PageID 105263–64).  Those findings should sufficiently establish that that alternative satisfies certain parts of the availability and significant-reduction requirements:

➢ The secobarbital MAID method, if implemented, would likely render a condemned inmate insensate and allow him to die in a pain-free manner;

➢ The pain from the insertion of a nasogastric or orogastric tube under the lethal injection alleged alternative could be effectively mitigated by the application of a topical anesthetic;

➢ Even assuming *arguendo* that an alleged alternative method must be statutorily authorized to be "available," the secobarbital alternative constitute a "lethal injection" as contemplated by Ohio law;

> ➢ Dr. Charles Blanke's expert conclusions about the MAID alternative is
>   credible and to be given particular weight, based on his significant MAID
>   experience and the empirical data that are available;
>
> ➢ The secobarbital alternative poses a "relatively short time from ingestion
>   to death of twenty-five minutes" that does not make that alternative
>   unavailable;

(*Id.*)

This Court found that the three-drug midazolam method will be sure or
very likely to cause severe pain and needless suffering.  (*See generally* ECF No.
2133); *see also Fears*, 860 F.3d at 886 (accepting that Plaintiffs in that
proceeding had proved a "substantial" risk of serious pain posed by Ohio's
three-drug midazolam protocol).  Nevertheless, Defendants aim to use their
current three-drug midazolam method notwithstanding the existence of alleged
alternatives that, Bonnell will demonstrate, are each available and each
eliminates—and thus "significantly reduces"—the substantial risks of severe
pain that Bonnell alleges the current method poses.

As for all the alternatives discussed below, the record evidence also
sufficiently demonstrates that the cost of obtaining the necessary supplies or
equipment is not a legitimate impediment to an alternative's availability.  As
Defendants have conceded, the Warden of Southern Ohio Correctional Facility,
where Ohio's executions take place, need only ask to purchase execution-
related materials and the funding is available.  (*See* Dep. Warden Cool, Hr'g Tr.,
ECF No. 1359, PageID 50794; Warden Erdos, Hr'g Tr., ECF No. 1360, PageID
51028.)  According to Defendant Warden Erdos, a request for such a purchase
has never been denied.  There is no evidence on which to conclude the

42

situation is any different regarding alternative execution method supplies.
Indeed, apart from secobarbital, Defendants have already conceded that they
possess or could easily obtain with ordinary transactional effort all the
necessary supplies and equipment to carry out the secobarbital alternative.

Defendants' own concessions confirm that, barring any inability to obtain
the necessary materials, supplies, and personnel through good-faith efforts,
there is no reasonable refusal to adopt the alternatives nor any legitimate
penological reason for the State to continue using the current method in light
of the clear advantages of the alleged alternatives.  Defendants have testified
that the highest priority is that the inmate not experience severe pain and
suffering.  (ECF No. 2117, PageID 104599–600 (Defendant Warden Erdos
agreed that if Plaintiff Henness's execution would be painful, "stopping" his
execution would be extremely important—"more important" to him than any
attempt to make the execution appear "dignified."); *see also In re Ohio Execution
Protocol* Litigation, S.D. Ohio No. 2:11-cv-1016 (Dec. 22, 2016 Deposition of
Gary Mohr, at 71–72) ("It is the priority, which doesn't get any higher than
that)).  Thus, when each of the alleged alternatives would eliminate—and thus
significantly reduce—the alleged risks of severe pain caused by the current
protocol, and each is otherwise available, any other justification for using the
current protocol is illegitimate or unreasonable.  And, as Judge Frost has
already explained, administrative convenience is not a legitimate justification
for using the current protocol.  *Cooey v. Kasich*, 801 F. Supp.2d 623, 653 (S.D.
Ohio 2011) ("Mere pursuit of administrative convenience that risks flawed

43

executions is not a legitimate state interest.").  In short, there is no reasonable and legitimate penological justification for adhering to the current method in light of the overwhelming advantages of each of the alleged, available alternatives; the State's refusal, if any, to use any of the alternatives is unreasonable or illegitimate, and thus no impediment to implementing the alternative.

> **a.  The firing squad alternative is available and would significantly reduce the substantial risks of severe pain that Bonnell alleges arise from Ohio's three-drug execution protocol.**

Bonnell can demonstrate that the firing squad alternative is available: it is feasible, and readily implemented with ordinary transactional effort, while the State has not refused to implement it, and it cannot reasonably and legitimately do so.  Additionally, Bonnell can demonstrate that the firing squad alternative would significantly reduce the identified and demonstrated substantial risks of severe pain posed by Ohio's three-drug lethal injection execution protocol.

> **i.  Several variations of the firing squad alleged alternative are feasible and readily implemented.**

Bonnell will demonstrate that there are several variations of the firing squad alleged alternative that are feasible, and readily implemented.  Dr. James Williams will present expert testimony about Bonnell's firing squad alternative.  Dr. Williams is a Board-certified, practicing emergency physician with more than 40,000 hours of Emergency Room and Intensive Care Unit experience, former police office and SWAT Team physician, firearms expert and

instructor, and gunshot victim.  He will testify that execution by firing squad should be feasible and readily implemented.  He will explain that Defendants should be able to carry out Bonnell's execution by firing squad following the same or similar procedures as defined in Section II, ¶¶ 10–12, Section VIII, ¶¶ 29–30, 32, and Figure 5, Army Regulations No. 633-15, Procedures for Military Executions (Apr. 7, 1959).  He will also explain that those procedures are substantively identical to the procedures for carrying out a firing squad execution provided in U.S. War Department Pamphlet No. 27-4, adopted June 12, 1944, and in U.S. Department of the Army Pamphlet No. 27-4, adopted December of 1947.  Accordingly, Defendants should be able to carry out the critical aspects of the U.S. Army's "musketry" execution procedures, regardless of whether those procedures are printed in the 1944 version, the 1947 version, or the 1959 version.

Dr. Williams will also testify that Defendants should be able to carry out Bonnell's execution by firing squad using the same or similar procedures as defined in the firing squad protocol used by the State of Utah's Department of Corrections.  And he will explain why Defendants should also be able to relatively easily and reasonably quickly implement and carry out the other procedures alleged in Paragraphs 1933–1993 of Bonnell's Second Amended Individual Supplemental Complaint, ECF No. 2399, PageID 115444-455, incorporated here by reference.

Bonnell will demonstrate that the firing squad alternative is feasible and readily implemented by pointing to its prior use in Ohio, as well as its use in

another jurisdiction.  *See Bucklew*, 139 S.Ct. at 1128.  Thus, he can satisfy that aspect of his *Glossip* burden by presenting evidence through witness testimony and documents that Ohio previously used a firing squad execution method on at least two occasions on record, and that the State of Utah used its firing squad procedures to execute Ronnie Lee Gardner on June 18, 2010. Similarly, he can satisfy his proof burden by showing that the United States Army used its firing squad procedures to execute at least eleven U.S. military servicemen, including Private Eddie Slovik on January 31, 1945, as well as members of the German Army such as General Anton Dostler, executed by firing squad on December 1, 1945.

The execution of General Dostler was officially filmed by the U.S. Army Signal Corps, and that film is now kept as an official U.S. Government record in the National Archives.  It will provide vivid evidence that Bonnell's firing squad alternative is not experimental, is tried and tested with a track record of successfully causing death, will cause death at least as effectively as Ohio's three-drug lethal injection method, and is otherwise theoretically feasible and readily implemented in all respects.  Documentary evidence will establish that Private Slovik was executed by firing squad after the date the U.S. Army adopted its firing squad protocol, and that will, as *Bucklew* explained, establish its availability.

As Dr. Williams will explain, the evidence from those executions, along with evidence that Ohio should be able to access the firing squad alternative in all other respects with ordinary transactional effort, and relatively easily and

reasonably quickly implement it without any justifiable State-based impediment provides a vivid demonstration that carrying out an execution via the firing squad alternative should be unquestionably available.

Evidence of prior use of the firing squad alternative also establishes sufficient answers to the "essential questions" identified in *Bucklew*, including the procedures for how to administer the execution and how to protect the execution team members.  Although they need not have been alleged in his Second Amended Individual Supplemental Complaint, Bonnell alleged specific procedures to answer those essential questions anyway.  Drawing on those previously used firing squad procedures, Bonnell can demonstrate how to administer the lethal mechanism of action (bullets to the cardiac branch); how rapidly (simultaneously and virtually instantly); for how long; and how to protect execution team members (with adequate safety measures), or any other similar questions.

Additionally, previous use of the firing squad alternative establishes that there is no justified State-based impediment to adopting that alternative. Defendants have not expressly refused to use the firing squad alternative, and their denials of Bonnell's allegations involving the firing squad are unreasoned or otherwise unreasonable or not related to a legitimate penological reason. They simply contend that they have never used it before and thus don't have any basis on which to admit or deny those allegations.[6]  But the firing squad's

---

[6] In their Answer to Cleveland Jackson's Second Amended Individual Supplemental Complaint, filed on June 20, 2019, Defendants failed to narrow

prior use to cause death, including in an execution context specifically, conclusively demonstrates that Ohio would not be the first jurisdiction to use the manner of execution, and thus it is not experimental.  Indeed, its prior use in Ohio itself suffices to demonstrate that.

Likewise, the firing squad's previous use demonstrates that there is no legitimate concern about being unable to procure or access, through good faith efforts and using ordinary transactional effort, the supplies, materials, or personnel needed to implement it.  As Dr. Williams will explain and other evidence will further demonstrate, Defendants should have little if any problem getting access to this alternative in all respects.  In a State with extremely limited firearms laws and with numerous law enforcement agencies with officials qualified as marksmen, there is no concern about involving persons whose professional ethics rules or traditions impede their participation.  And as Dr. Williams will explain, its prior use, particularly as seen in the Dostler film, demonstrates there are no legitimate concerns about the dignity of an execution using the firing squad alternative.

Although demonstrating that his alleged firing squad alternative has been used by other jurisdictions should adequately prove its availability here,

---

any of the issues in dispute regarding the firing squad and shooting alternatives, or even identify if they were refusing to use either alternative. Their entire answer to the numerous, very detailed allegations about the firing squad and shooting alternatives was as follows: "Because Defendants have never conducted an execution utilizing this proposed alternative, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations, and therefore deny them.  Defendants otherwise deny the allegations set forth in this Sub-Section."  (ECF No. 2232, PageID 107988–989.)

Bonnell can offer additional evidence to establish its availability. Dr. Williams will present expert testimony along with documentary evidence to help establish the allegations contained in Paragraphs 1933–1993 of Bonnell's Second Amended Individual Supplemental Complaint, ECF No. 2399, PageID 115444-455, incorporated here by reference. Bonnell will also present additional evidence as needed, including testimony from those with knowledge about Utah's firing squad protocol and procedures, Utah's construction and implementation of facilities to implement a safe firing squad execution protocol, and Utah's execution of Mr. Gardner. He will also offer testimony and/or stipulations from some number of Defendants if necessary, to demonstrate that his firing squad alleged alternative is available in all respects. (ECF 2389).

Such evidence will further demonstrate that Ohio should be able to carry out a firing squad execution relatively easily and reasonably quickly. Bonnell will demonstrate through documents, and testimony from Dr. Williams and others as needed, including Defendants, that Ohio should be able to relatively easily and reasonably quickly obtain all the necessary materials, supplies, and trained personnel with ordinary transactional effort, particularly because all the necessary materials and supplies are readily available for purchase on the open market. Dr. Williams will explain why this alternative would be effective at causing death, quickly and humanely. Dr. Williams will testify that the firing squad alternative is neither experimental nor untried and untested in causing death, but instead would be virtually 100% effective at causing death, quickly and humanely. He will explain that a .308 bullet or a .30-06 bullet

fired by a rifle as alleged in this Alternative would cause massive blood loss to Bonnell's cardiovascular bundle (the heart and the great vessels that lead to and from it), a catastrophic drop in blood pressure in the brain, and rapid loss of consciousness, awareness, and sensation, followed by death within a matter of minutes from lack of blood to the Central Nervous System (CNS). And, in the highly unlikely event that Bonnell remained alive after an initial volley, Dr. Williams will explain that a coup-de-grace pistol shot to the head or a second volley from the rifleman would ensure Bonnell's quick and painless death.

Because shooting to the cardiovascular bundle will quickly, effectively, and virtually painlessly cause death, particularly when hit simultaneously with 8-10 bullets of .308 or .30-06 caliber fired from rifles at a distance of 21-35 feet away, this alternative will be shown to be similarly—indeed, more—effective at causing death as compared to the current protocol. Dr. Williams will testify that there are no other questions that a firing squad alternative would be feasible and readily implemented; and that there are no justified State-based impediments to adopting this alternative. Bonnell will also present additional evidence on the matter of availability, as necessary, by way of testimony from Defendants and any other witnesses identified in his witness disclosures.

        **ii.**      **Several variations of the firing squad alleged alternative would significantly reduce the substantial risks of severe pain Bonnell has alleged as compared to Ohio's three-drug lethal injection execution protocol.**

The same variations of the firing squad alleged alternative would also significantly reduce the identified and substantial risks of severe pain posed by

50

Ohio's three-drug lethal injection execution protocol.  Dr. Williams will provide his uniquely suited expert testimony to establish that the firing squad alternative would clearly and considerably reduce, if not eliminate entirely, each of the many sure or very likely risks of severe pain that Bonnell has alleged Ohio's current three-drug lethal injection protocol creates.  Bonnell will establish through Dr. Williams's testimony the allegations in Paragraphs 1994-2035 of Bonnell's Second Amended Individual Supplemental Complaint, incorporated here by reference.  (ECF No. 2399, PageID 115455-462.)

First, the substantial risks of severe pain associated with the current method that Bonnell alleges can be generally summarized, in relevant part, to include the following:

1) the terrifying suffering related to pulmonary edema after IV injection of 500 milligrams of highly acidic midazolam;

2) the severely painful burning from IV injection of the large dose of highly acidic midazolam;

3) the severely painful burning from IV injection of a highly acidic paralytic drug;

4) the horrific feelings of suffocation and entombment as the paralytic takes effect;

5) the horrific feelings of having liquid fire poured into the veins associated with the IV injection of potassium chloride and the effects of that drug on the heart; and

6) the prospect of experiencing another failed execution attempt like Broom and Campbell, in which Defendants made multiple but ultimately unsuccessful needle sticks to obtain peripheral IV access.

Each of these sources of severe pain and suffering is sure or very likely to occur under Defendants' current execution protocol.  Notably, the *Glossip* test is a comparative one: *elimination* of a risk of severe pain and suffering,

51

particularly when that risk is substantial, is by definition a significant reduction in the risk of that harm occurring.

Applying that fundamental logical concept here, the firing squad alternative, by several different variations, more than satisfies *Glossip*'s comparative analysis.  This alternative eliminates—and thus clearly and considerably reduces—every single one of those identified risks posed by Ohio's current protocol.  As Dr. Williams will testify, execution by firing squad would not subject Bonnell to any of the risks of severe pain and suffering caused by the current three-drug protocol, including the risks of pain from IV injection of the three drugs, developing acute pulmonary edema, obstruction, air hunger, suffocation by paralysis, or the injection and operation of potassium chloride. There simply are no IV-injected drugs involved to burn, drown, suffocate, or sear Bonnell from the inside.  There are no repeated but unsuccessful needle sticks to establish an IV.  *None* of the risks of severe pain posed by Defendants' current execution protocol would exist using this Alternative.  *Eliminating* the substantial risks of severe pain posed by the current execution protocol will, by definition, *significantly, clearly, and considerably reduce* the substantial risks of severe pain to which Bonnell is subjected by the current execution protocol. And, in addition, the firing squad alternative would cause death nearly instantaneously and virtually without pain, as Dr. Williams will explain.

In short, Bonnell will provide evidence to demonstrate that his alleged firing squad alternative execution manner will satisfy both parts of *Glossip*'s second prong.

52

**b.    The shooting alternative is available and would
       significantly reduce the substantial risks of severe
       pain that Bonnell alleges arise from Ohio's three-
       drug lethal injection execution protocol.**

Bonnell can demonstrate that execution by shooting to the brain stem is

an available alternative as well: it is feasible, and readily implemented with

ordinary transactional effort, while the State has not refused to implement it,

and it cannot reasonably and legitimately do so, meaning there is no justified

State-based impediment to using it.  Additionally, Bonnell can demonstrate

that the shooting alternative would significantly reduce the identified and

demonstrated substantial risks of severe pain posed by Ohio's three-drug lethal

injection execution protocol.

**i.    Several variations of the shooting
       alleged alternative are feasible and
       readily implemented.**

Bonnell will demonstrate that there is more than one variation of the

shooting alleged alternative that is feasible and readily implemented.  As Dr.

Williams will testify, Defendants should be able to carry out Bonnell's

execution by shooting him with two to three rounds, one bullet per rifle, in the

side or back of the head, targeting the brainstem from a range of 1-5 yards (3-

15 feet), using the external auditory meatus as the visible aiming point if firing

from the side, or the occipital protuberance if firing from the rear.  He will

explain why Defendants should also be able to relatively easily and reasonably

quickly implement and carry out the other procedures alleged in Paragraphs

1994-2035 of Bonnell's Second Amended Individual Supplemental Complaint,

incorporated here by reference. (ECF No. 2399, PageID 115455-462.)  That

includes being able to achieve precise targeting by means of a projected laser aiming device on each rifle, calibrated for the distance involved.  It also includes a different variation of procedures to ensure precise targeting, such as constructing and using an engineered rifle stand precalibrated and aimed at a designated point, along with restraints to immobilize the inmate's head in conjunction with the rifle stand.

Bonnell can demonstrate that the shooting alternative is feasible and readily implemented by pointing to its use in another jurisdiction.  *See Bucklew*, 139 S.Ct. at 1128.  Thus, he can satisfy that aspect of his *Glossip* burden by presenting evidence from Dr. Williams that other jurisdictions have used shooting to the head as a manner of execution, including the former Soviet Union, Belarus, and China.  He will explain that the physical forces involving firearms, bullets, and their effects on the human body that are applicable to cause death in executions by shooting in the head in China, the former Soviet Union, and Belarus, among other places, apply equally to Bonnell here.

Use of shooting to the head from close range by those jurisdictions demonstrates a track record of successful use to effectively cause death, and that causing death by those procedures is not experimental, nor untried and untested.  Similarly, prior use of shooting to the head in an execution conclusively demonstrates that it can cause death as effectively as the State's current protocol, and that Ohio should be able to carry it out relatively easily and reasonably quickly, as Dr. Williams will testify.

Evidence of prior use of the shooting alternative also establishes
sufficient answers to the "essential questions" identified in *Bucklew*, including
the procedures for how to administer the execution and how to protect the
execution team members. Although they need not have been alleged in his
Second Amended Individual Supplemental Complaint, Bonnell alleged specific
procedures to answer those essential questions anyway. Drawing on those
previous shooting executions and Dr. Williams's testimony, Bonnell can
demonstrate how to administer the lethal mechanism of action; how rapidly;
for how long; and how to protect execution team members, or any other similar
questions.

Additionally, previous use of the shooting alternative establishes that
there is no justified State-based impediment to adopting that alternative. Like
with the firing squad alternative, Defendants have not expressly refused to use
the shooting alternative, and their denials of Cleveland Jackson's allegations,
which mirror Bonnell's, involving the shooting alternative are unreasoned or
otherwise unreasonable or not related to a legitimate penological reason. They
simply contend that they have never used it before and thus do not have any
basis on which to admit or deny those allegations. But shooting in the
brainstem to cause death, including in an execution context specifically,
demonstrates that Ohio would not be the first jurisdiction to use the manner of
execution, and thus it is not experimental—it will be 100% effective at causing
death, as Dr. Williams will testify. Defendants cannot reasonably decline to
use the shooting alternative by claiming that it is unknown whether firing three

55

bullets to the brainstem from close range will virtually instantly and effectively cause death 100% of the time.

Likewise, prior use of shooting to the head as an execution procedure demonstrates that there is no legitimate concern about being unable to procure or access, through good faith efforts and using ordinary transactional effort, the supplies, materials, or personnel needed to implement it. As Dr. Williams will explain and other evidence—including testimony from Defendants as necessary—will further demonstrate, Defendants should have limited if any problem getting access to this alternative in all respects. In a State with extremely limited firearms laws and with numerous law enforcement agencies with officials qualified as marksmen, there is no concern about involving persons whose professional ethics rules or traditions impede their participation. And as Dr. Williams will explain, its prior use, and the specific procedures Bonnell alleges for the shooting alternative, demonstrates there are no legitimate concerns about the dignity of an execution using the shooting alternative that Bonnell has alleged (particularly as compared to the undignified gasping, snorting, wheezing, struggling death frequently described with the three-drug midazolam lethal injection protocol).

Although demonstrating that his alleged shooting alternative has been used by other jurisdictions should adequately prove its availability here, Bonnell can offer additional evidence to establish its availability. Dr. Williams will testify that execution by shooting to the brain stem from close range should be feasible and readily implemented, and that there should be no

56

justified State-based impediment to adopting this execution alternative.  Dr. Williams will present expert testimony to help establish the allegations contained in Paragraphs 1994-2035 of Bonnell's Second Amended Individual Supplemental Complaint, incorporated here by reference. (ECF No. 2399, PageID 115455-462.)

Bonnell will also present additional evidence as needed, including testimony from those with knowledge about Utah's construction and implementation of facilities to implement a safe execution protocol involving firearms.  He will also offer testimony from some number of Defendants if necessary, to demonstrate that his shooting alleged alternative is available in all respects.

Such evidence will further demonstrate that Ohio should be able to carry out a shooting execution relatively easily and reasonably quickly.  Bonnell will demonstrate, though documents and testimony from Dr. Williams and others as necessary, including Defendants, that Ohio should be able to relatively easily and reasonably quickly obtain all the necessary materials, supplies, and trained personnel with ordinary transactional effort, particularly because all the necessary materials and supplies are readily available for purchase on the open market.  As Dr. Williams will testify, the shooting alternative is neither experimental nor untried and untested in causing death, but instead would be virtually 100% effective, and will indisputably cause death virtually instantaneously, before the sensory nerves can even communicate the impact of the bullets on the brain.

Dr. Williams will also testify that shooting to the brain stem will quickly, effectively, and virtually painlessly cause death. He will testify that using the caliber and type of firearm and bullet alleged in Bonnell's Second Amended Individual Supplemental Complaint will ensure that the three bullets fired into the brainstem under this Alternative would have more than sufficient energy to penetrate through to the brainstem, but dissipation of energy from those bullets occurs very quickly and as such the bullets would be unlikely to exit the skull on the opposite side, eliminating any concerns about dignity in the procedure. Furthermore, by targeting the brainstem, Dr. Williams will explain, Bonnell's death using the shooting alternative would be extremely rapid. The velocity of a .22WMR bullet (450 m/s, which is 1650 f/s) is more than adequate for the purposes of execution. The bullets would transect the brainstem several milliseconds after impacting the external surface of the head, faster than neural transmissions from the sensory nerves could communicate that event to the conscious brain. That velocity is both faster than the speed of sound and faster than the speed of neural transmission. Thus, Dr. Williams will explain, a condemned inmate would neither hear the reports of the rifles nor feel the bullets impacting his person prior to the bullets macerating his brainstem. While not *truly* instantaneous in effect, such a mechanism would be for all practical purposes *virtually* instantaneous. This Alternative would cause instant and catastrophic damage to Bonnell's brainstem, causing him to irreversibly and virtually instantly lose consciousness, awareness, and sensation, followed quickly by death.

58

Further, Dr. Williams will testify that the relatively lower energy of this bullet/ammunition would be insufficient to cause the explosive expansion of the cranial vault seen with high-velocity rifle rounds, and thus this Alternative would avoid the results produced by a pistol shot to the base of the skull or a rifle shot to the face, while yielding rapid destruction of the key components of the central nervous system at the brainstem.  He will also testify that there are no other questions that a shooting alternative like Bonnell alleges here would be feasible and readily implemented; and that there are no justified State-based impediments to adopting this alternative.  Bonnell will also present any additional evidence on the matter of availability, as necessary, by way of testimony from Defendants and any other witnesses identified in his witness disclosures.

> ii.     **Several variations of the shooting alleged alternative would significantly reduce the substantial risks of severe pain Bonnell has alleged as compared to Ohio's three-drug lethal injection execution protocol.**

The same variations of the shooting alternative would also significantly reduce the identified and substantial risks of severe pain posed by Ohio's three-drug lethal injection execution protocol.  Dr. Williams will provide his uniquely suited expert testimony on this alternative as well, to establish that an execution alternative involving shooting to the brain stem would clearly and considerably reduce, if not eliminate entirely, each of the many sure or very likely risks of severe pain that Bonnell has alleged Ohio's current three-drug lethal injection protocol creates.  Bonnell will establish through Dr. Williams's

testimony the allegations in Paragraphs 1994-2035 of Bonnell's Second
Amended Individual Supplemental Complaint, incorporated here by reference.
(ECF No. 2399, PageID 115455-462.)

First, the substantial risks of severe pain associated with the current
method that Bonnell alleges can be generally summarized, in relevant part, to
include the following:

1)  the terrifying suffering related to pulmonary edema after IV injection of 500 milligrams of highly acidic midazolam;

2)  the severely painful burning from IV injection of the large dose of highly acidic midazolam;

3)  the severely painful burning from IV injection of a highly acidic paralytic drug;

4)  the horrific feelings of suffocation and entombment as the paralytic takes effect;

5)  the horrific feelings of having liquid fire poured into the veins associated with the IV injection of potassium chloride and the effects of that drug on the heart; and

6)  the prospect of experiencing another failed execution attempt like Broom and Campbell, in which Defendants made multiple but ultimately unsuccessful needle sticks to obtain peripheral IV access.

Each of these sources of severe pain and suffering is sure or very likely to
occur under Defendants' current execution protocol.  Again, the *Glossip* test is
a comparative one: *elimination* of a risk of severe pain and suffering,
particularly when that risk is substantial, is by definition a significant
reduction in the risk of that harm occurring—which is all *Glossip* requires.

Applying that fundamental logical concept here, the shooting alternative,
by different variations, more than satisfies the *Glossip* comparative analysis.
This execution alternative eliminates—and thus clearly and considerably

reduces—every single one of those identified risks posed by Ohio's current protocol. As Dr. Williams will testify, execution by shooting to the brain stem as alleged in this alternative would not subject Bonnell to any of the risks of severe pain and suffering caused by the current three-drug protocol, including the risks of pain from IV injection of the three drugs, developing acute pulmonary edema, obstruction, air hunger, suffocation by paralysis, or the injection and operation of potassium chloride. There simply are no IV-injected drugs involved to burn, drown, suffocate, or sear Bonnell from the inside. There are no repeated but unsuccessful needle sticks to establish an IV. *None* of the risks of severe pain posed by Defendants' current execution protocol would exist using this Alternative. *Eliminating* the substantial risks of severe pain posed by the current execution protocol will, by definition, *significantly, clearly, and considerably reduce* the substantial risks of severe pain to which Bonnell is subjected by the current execution protocol. And, in addition, the shooting alternative would cause death nearly instantaneously and virtually without pain, as Dr. Williams will explain.

In short, Bonnell will provide evidence to demonstrate that his alleged shooting alternative execution manner will satisfy both parts of *Glossip*'s second prong.

c.  **The alleged alternative involving the secobarbital MAID method is available and would significantly reduce the substantial risks of severe pain that Bonnell alleges arise from Ohio's three-drug execution protocol.**

Bonnell can demonstrate that the secobarbital alternative he alleged is available: it is feasible, and readily implemented with ordinary transactional effort, while the State either has not refused to implement it or cannot reasonably and legitimately do so.  Additionally, Bonnell can demonstrate that this alternative would significantly reduce the identified and demonstrated substantial risks of severe pain posed by Ohio's three-drug lethal injection execution protocol.

Notably, the alleged alternative has been used hundreds of times in MAID situations and thus its efficacy is well-established, while the administration method and drugs involved drastically reduces the sure or very likely risks (and, by extension, the substantial risks) of suffering severe pain Bonnell has alleged the current protocol poses.

i.  **The secobarbital MAID alleged alternative is feasible and readily implemented.**

The secobarbital MAID alternative is available.  It is feasible, and readily implemented with ordinary transactional effort, and there is no justified State-based impediment to using it.

Based on the record already admitted for Bonnell, the only remaining question regarding availability of the secobarbital method is whether the State can access a supply of the drug.  In all other respects, it is theoretically feasible and readily implemented, without any legitimate State-based impediment to its

62

implementation.  Defendants have conceded, in evidence already admitted here, that the oral administration of the secobarbital alternative is available. They concede that they have the requisite skill and training to prepare the drug for oral injection, insert the feeding tube, and administer the drug through the feeding tube.  Defendants have conceded they possess or can obtain with ordinary transactional effort any other supplies or equipment needed to implement this alternative.  (Defs.' Answer, ECF No. 2232, PageID 107989.)

Bedside administration of the secobarbital alternative is also available. Defendants can administer the injections of the secobarbital alternative from bedside simply by inserting the syringe into the appropriate port on the feeding tube.  Although Defendants currently push the syringes of lethal drugs from a separate room through several feet of IV tubing, they are capable of pushing the same type of syringe plungers from a bedside position.  After all, Defendants at one time included in their execution protocol an intramuscular injection method, which required bedside injection as well.  (*See* DRC Policy 01-COM-11, *Cooey v. Strickland*, No. 2:04-cv-1156, ECF No. 607-1, PageID 13265 (requiring that a "medical team member shall enter the chamber at the direction of the Warden and shall administer an intramuscular injection" of the lethal drugs)).  There is no basis to believe the Drug Administrators are not able to push a plunger on a syringe connected to a feeding tube from bedside when they previously were capable of doing intramuscular injections from bedside.  Bedside injections are also feasible in that there are no additional concerns about identification of Defendant Drug Administrators.  Two Drug

Administrators currently enter the Death Chamber with the curtains open to do the "consciousness checks" and the additional assessment before the coroner enters the room, and the same disguising attire they wear for that procedure will be similarly sufficient to do the injections from bedside in the Death Chamber.

Additionally, placing the orogastric or nasogastric feeding tube is feasible.  Defendants also admitted this during sworn testimony in the *Henness* hearing.  (ECF No. 2117, PageID 104520.)  As Defendant Execution Team Member # 31 admitted, placing such tubes is within the scope of training for both members of the Drug Administrator team who are paramedics.  (ECF No. 2117, PageID 104511.)  Documentary evidence of that fact can also be found in the formal Scope of Practice document approved on June 20, 2018 by the Ohio State Board of Emergency Medical, Fire and Transportation Services, Division of EMS/Department of Public Safety, which lists nasogastric and orogastric tube placement within the scope of authorized services for Paramedics.  That document was admitted to the record in the *Henness* proceedings, and it thus already admitted into evidence for Bonnell.

Further, using the secobarbital method is feasible in that its efficacy is well established.  This Court, by finding that this alternative will likely cause the inmate to be insensate and allow him to die a pain-free death (ECF No. 2133, PageID 105263), has already found that it will effectively cause the inmate's death.  Bonnell can point to the secobarbital alternative's use to cause death in other jurisdictions, in the MAID context.  As Dr. Blanke previously

64

testified, and this Court recognized, the drugs will operate on the individual the same way, whether in the Death Chamber or in a MAID context. Thus, the evidence that shows the secobarbital alternative's effectiveness at causing death in MAID cases likewise establishes its effectiveness as an execution alternative. What the Court described as the "best evidence available" (ECF No. 2133, PageID 105266), already demonstrates that the secobarbital alternative effectively causes death essentially 100% of the time. That data demonstrates that the secobarbital method is not an experimental manner of causing death—instead, oral administration of 10-15 grams of secobarbital has an extensive track record of successfully causing death, making it tried and tested as a manner of causing death for purposes of an execution. Or, stated otherwise, use of the alternative in the MAID context establishes it is not untried and untested as a manner of causing death, nor is it an experimental way of causing death without a track record of success. As Dr. Blanke will testify on September 11, 2019, the data are clear: MAID deaths are more frequent than executions on a yearly basis at this point. Moreover, as Dr. Blanke has testified and will confirm, the MAID data from the secobarbital alternative continue to show a median time from ingestion to death of approximately 25 minutes.

The record evidence also demonstrates that there are no concerns about the "essential questions" from *Bucklew*, as Defendants have been conducting lethal injection executions for decades now.

As to the "access to supply" question, Bonnell intends to present evidence establishing that Defendants should be able to obtain a supply of secobarbital through ordinary transactional efforts.  Furthermore, Bonnell will present evidence, as necessary, to show that which Plaintiff Henness had offered, and which Cleveland Jackson's recent Rule 30(b)(6) deposition of the Ohio State Pharmacy Board confirmed.  Specifically, obtaining a Terminal Distributor of Dangerous Drugs license or a wholesale distributor of dangerous drugs license is a simple and straightforward process, applications are typically processed (and approved) within just a matter of weeks, and they are very rarely denied.  Bonnell will also present evidence, as necessary, to demonstrate that a potential drug source either has the requisite licensure or would be able to obtain it relatively easily and reasonably quickly.

Furthermore, Bonnell will present testimony from Dr. Blanke, Dr. Edgar, Dr. Greenblatt, and/or other experts, as well as documents and testimony from Defendants as necessary, to demonstrate that there is no State-based impediment to implementing the secobarbital alternative.  Once a new supply of secobarbital becomes available, Bonnell will present evidence to demonstrate that secobarbital is commonly available on the open market and available to Defendants with ordinary transactional efforts, meaning there are no legitimate concerns about inability to access the drugs or other necessary supplies to implement the secobarbital alternative.[7]  Bonnell will also demonstrate that

---

[7] Defendants have not provided any evidence of good-faith efforts to obtain secobarbital.  *Bucklew* clarifies, however, that a State must at least make good-faith efforts to obtain the necessary supplies before it can

there are no concerns about a reduction in dignity compared to the current
protocol, particularly when an anti-emetic drug can be given to prevent
regurgitation and when coma-level unconsciousness will rapidly follow
ingestion of the secobarbital mixture, but without (or at least no more than) the
struggling, straining, and breathing difficulties routinely described during
executions using Ohio's current protocol.  Bonnell will demonstrate the
evidentiary record already contains sufficient proof to show that the alternative
would not require the involvement of persons whose professional ethics rules or
traditions impede their participation.  Defendant Richard Theodore is a
licensed pharmacist, therefore fully licensed, trained and qualified to prepare
the drugs for administration, and willing and able to do so.  Likewise, the
professional ethics rules or traditions applicable to paramedics and EMTs do
not prevent Execution Team members with those qualifications from
participating in executions

Dr. Blanke previously testified to the median time from ingestion of the
secobarbital alternative to death of approximately twenty-five minutes.  This
Court found no problem with that time, rejecting Defendants' unexplained
complaint that the alternative would take too long, characterizing it as a
"relatively short time."  (ECF No. 2133, PageID 105264.)  Accordingly, and to
the extent Defendants have actually asserted that they could not feasibly

---

reasonably and legitimately claim that it cannot use an alleged alternative due
to lack of access to those supplies.  139 S. Ct. at 1125.

implement the secobarbital MAID alternative because it would take too long, this Court has already rejected that argument based on the record evidence already admitted here and should do so again.

Moreover, Bonnell can present evidence to demonstrate that any such argument Defendants might assert against his alleged secobarbital alternative is unreasonable and illegitimate, because it is contrary to Defendants' previously asserted positions.  Bonnell will demonstrate that 25 minutes is shorter than the 26 minutes it took for Defendants to execute Dennis McGuire—an execution that Defendants have continually asserted was not problematic in any way.  Bonnell will also demonstrate that is shorter than the time needed to carry out the executions of several other Ohio inmates.

Further, as the Court also previously found, Defendants could easily give the inmate an anti-emetic drug in advance of the final execution stages, which would reduce the risk of regurgitation (and the consequent risk of the time of death being prolonged due to the inmate receiving less than the full dose of medications).

In sum, Bonnell will establish through expert testimony and documentary evidence the allegations in Paragraphs 1919–1932 of Bonnell's Second Amended Individual Supplemental Complaint, incorporated here by reference.  (ECF No. 2399, PageID -115441-443.)  He will demonstrate that his proposed secobarbital alternative is available.

68

ii.    **The secobarbital MAID alleged alternative would significantly reduce the substantial risks of severe pain Bonnell has alleged as compared to Ohio's three-drug lethal injection execution protocol.**

The secobarbital alternative would also significantly reduce the identified and substantial risks of severe pain posed by Ohio's three-drug lethal injection execution protocol.  Again, this Court has already found that the secobarbital alternative would likely render the inmate insensate and allow him to die in a pain-free manner.  That finding should suffice to satisfy the significant reduction requirement.

Bonnell will also present additional expert testimony from Dr. Blanke, as well as Dr. Greenblatt, Dr. Edgar, Dr. Exline, and/or other experts, to more clearly establish that an orally injected secobarbital alternative would clearly and considerably reduce, if not eliminate entirely, each of the many sure or very likely risks of severe pain that Bonnell has alleged Ohio's current protocol creates.  Bonnell will establish through expert testimony the allegations in Paragraphs 1919–1932 of Bonnell's Second Amended Individual Supplemental Complaint, incorporated here by reference.  (ECF No. 2399, PageID -115441-443.)

The substantial risks of severe pain associated with the current method that Bonnell alleges can be generally summarized, in relevant part, to include the following:

1)    the terrifying suffering related to pulmonary edema after IV injection of 500 milligrams of highly acidic midazolam;

2)    the severely painful burning from IV injection of the large dose of highly acidic midazolam;

3)    the severely painful burning from IV injection of a highly acidic paralytic drug;

4)    the horrific feelings of suffocation and entombment as the paralytic takes effect;

5)    the horrific feelings of having liquid fire poured into the veins associated with the IV injection of potassium chloride and the effects of that drug on the heart; and

6)    the prospect of experiencing another failed execution attempt like Broom and Campbell, in which Defendants made multiple but ultimately unsuccessful needle sticks to obtain peripheral IV access.[8]

Plaintiff Henness presented evidence on the reduction of risk wrought by the secobarbital alternative.  The Court's only identified concern about the risk-reduction inquiry was what it believed to be a lack of evidence on a key point in light of testimony from the State's expert, Dr. Davis, that overdoses of opiates, benzodiazepines, and barbiturates can cause pulmonary edema.  (Order, ECF No. 2133, PageID 105264.)  Specifically, the Court concluded that there was no evidence presented to the contrary.  *Id.*  Thus, there was no evidence to demonstrate the secobarbital (a barbiturate) alternative reduced a substantial risk of severe pain posed by developing acute pulmonary edema after injection:

---

[8] There is also the sure or very likely risk posed by the current protocol that Bonnell will obstruct and thus suffer air hunger after Defendants inject the midazolam, but the wedge pillow portion of the secobarbital alternative satisfies the risk reduction requirement for that particular type of harm.  (*See* Bonnell Second Am. Individ. Supp. Compl., ECF No. 2399, PageID 115441-442.)

70

"precisely the pain that the Court has found midazolam [in Ohio's current protocol] is sure or very likely to cause." *Id.*

But evidence that would demonstrate the secobarbital alternative would *not* subject the inmate to a significant risk of severe pain caused by any acute pulmonary edema that developed would change the conclusion. And although Bonnell submits the record evidence is already sufficient to demonstrate that the secobarbital alternative would protect the inmate from suffering severe pain from any pulmonary edema—by virtue of containing a true pain-blocking drug in the secobarbital itself—Bonnell will present evidence to further establish that point.

He will present evidence from his experts to explain why the secobarbital alternative does, indeed, eliminate any risk of the inmate remaining sensate to severe pain from pulmonary edema. The secobarbital alternative involves an overdose of a barbiturate, which will render and keep the inmate at a depth of unconsciousness at which insensation occurs, *i.e.*, the level of unconsciousness for General Anesthesia. Unlike the midazolam in the current protocol, the secobarbital will keep the inmate insensate to the pain from any pulmonary edema that might develop with this alternative. It lowers the risk of severe pain posed by the current protocol. That is all *Glossip*'s comparative analysis requires.

Furthermore, Bonnell will show that the administration mechanisms are vitally different. Whereas the high dosage midazolam injections are given with peripheral IV, and thus route the caustic drug directly to the heart and then

71

the lungs within seconds, the same is not true as to the secobarbital administered by oral injection into the stomach. There, it must first pass through the digestive tract, before proceeding via the bloodstream—being buffered the entire time—to the heart and then on to the lungs. Accordingly, the risk of the delicate lung tissues and capillaries being compromised by the orally injected barbiturate—and thus the risk of non-cardiogenic pulmonary edema developing after injection of the drug(s)—is significantly less than the risk of the same caused by IV-injected high doses of midazolam. Again, that is all *Glossip*'s comparative analysis requires. Autopsies of MAID patients are not necessary to reach that conclusion; expert testimony such as that provided by Dr. Blanke and others should suffice.

Also, Bonnell will demonstrate that difference in administration methods means that if any pulmonary edema does develop following ingestion of the secobarbital method, it would be a different genesis (cardiogenic, rather than non-cardiogenic as caused by the current protocol), developing more slowly and well after the inmate would be rendered insensate from the secobarbital. Without peripheral IV injection, there is no risk of non-cardiogenic pulmonary edema developing like there is under the current protocol. Secobarbital injected orally will have sufficient time to act on the brain and prevent the inmate from remaining sensate to any pain from any cardiogenic pulmonary edema that might develop during an execution using the secobarbital alternative. Consequently, the risk of the inmate remaining sensate to the severe pain and suffering of any pulmonary edema during an execution using

72

the secobarbital method is significantly reduced, if not outright eliminated, as compared to the current protocol. Once again, that is all that *Glossip* requires.

Accordingly, Bonnell will present evidence to show why the Court need not be concerned about the risk of pain from developing pulmonary edema using the secobarbital alternative. That alternative will in fact significantly reduce, and likely outright eliminate, the substantial risk of severe pain and suffering from developing acute pulmonary edema after injection of Ohio's current protocol.

Bonnell will also present evidence to bolster the record evidence showing that the secobarbital alternative will eliminate the other alleged risks of severe pain that Bonnell has identified under the current protocol. Each of the other sources of severe pain and suffering is sure or very likely to occur under Defendants' current execution protocol. Notably, the *Glossip* test is a comparative one: *elimination* of a risk of severe pain and suffering, particularly when that risk is substantial, is by definition a significant reduction in the risk of that harm occurring.

Applying that fundamental logical concept here, the secobarbital alternative more than satisfies *Glossip*'s comparative analysis. This alternative eliminates—and thus clearly and considerably reduces—every single one of those identified risks posed by Ohio's current protocol. As Bonnell's experts will reiterate, injecting the secobarbital alternative would not subject Bonnell to any of the other risks of severe pain and suffering caused by the current three-drug protocol, including the risks of pain from IV injection of the three drugs,

obstruction, air hunger, suffocation by paralysis, or the injection and operation
of potassium chloride.  There simply are no IV-injected drugs involved to burn,
drown, suffocate, or sear Bonnell from the inside.  There is no risk of causing
severe pain from acute pulmonary edema caused by injecting a large amount of
acid directly into the blood stream and then immediately into the lungs; the
drug is injected into the stomach instead, and thus sufficiently buffered before
reaching the lungs.  There is no risk that midazolam (or another
benzodiazepine) will fail to protect the inmate from severe pain and suffering,
because a benzodiazepine is not being used as a pain-blocking drug in the
secobarbital alternative.  There are none of the long-established risks of severe
pain and suffering posed by the paralytic and potassium chloride, because
neither drug is administered under the secobarbital alternative.  There are no
repeated but unsuccessful needle sticks to establish an IV, because injection is
done via feeding tube, not peripheral IV.

And, although it is not relevant to the comparative assessment, any pain
associated with establishing the feeding tube can be eliminated by using a
topical anesthetic.  Similarly, while Bonnell need not prove his alternative
would provide a pain-free death to satisfy his burden of proof, injecting 10-15
grams of secobarbital will protect the inmate against any sensation and permit
a pain-free death, as this Court already found.[9]

_____

[9] Bonnell is also not asserting that any execution manner or method
must be pain-free to pass muster under the Eighth Amendment.  He is merely
noting that a pain-free alternative would satisfy his burden of showing that
there is an alternative that would significantly reduce a substantial risk of

*None* of the risks of severe pain posed by Defendants' current execution protocol would exist using this Alternative.  *Eliminating* the substantial risks of severe pain posed by the current execution protocol will, by definition, *significantly, clearly, and considerably reduce* the substantial risks of severe pain to which Bonnell is subjected by the current execution protocol.  And again, as the Court has already found, the secobarbital alternative would cause the prisoner to experience a pain-free death.

In short, Bonnell will provide evidence to demonstrate that his alleged secobarbital alternative execution method will satisfy both parts of *Glossip*'s second prong.

---

severe pain that the current protocol poses, and thereby satisfy his burden under *Glossip*'s second prong regarding the current execution method.

      **d.    A wedge pillow is available and would significantly reduce a substantial risk of serious pain posed by the risk of obstruction under the current protocol.**

As applicable to Bonnell's pled lethal injection alternative, it has previously been demonstrated or conceded in this case that using a wedge pillow to prop up the condemned inmate at an angle is available, because it is feasible and readily implemented, there is no justified State-based impediment to using it, and it would significantly reduce a substantial risk of serious pain posed by the risk of obstruction. *See, e.g.*, *Campbell*, 881 F.3d at 452 n.2; *see also Henness*, 2019 U.S. Dist. LEXIS 8200, at *232 ("Defendants have already used or agreed to use a wedge pillow in prior executions adjudicated in this consolidated case, so that element requires no analysis.") Defendants have used a wedge pillow or agreed to use a wedge pillow for other executions that involved midazolam, including those for McGuire, Campbell, and Van Hook.

Moreover, Defendants expressly conceded in their Answer that they possess or have within their control, or could obtain with ordinary transactional effort, a wedge-shaped cushion. (ECF No. 2232, PageID 107989–90.) Thus, Bonnell has satisfied that part of his injunctive relief burden as to the wedge pillow under his pled lethal injection alternative at issue here.

      **B.    Plaintiff Bonnell can establish that due to his invidual physical characteristics he is sure or very likely to suffer severe pain and needless suffering.**

As pled in his Second Amended Individual Supplemental Complaint, (ECF No. 2399, Paragraphs 1894-1906, PageID 115435-438), Bonnell presents with individual physical characteristics that include, but are not limited to:

Plaintiff's reoccurring frequent migraines and chronic headaches, multiple hospitalizations requiring IV treatment and anesthetics, chronic seizure condition and/or epilepsy dating back to 1987 requiring IV treatment and numerous medications to control seizures (including but not limited to Tegretol, Topamax, and Dilantin), serious closed head injury (a CAT scan [taken at Lutheran Hospital on 11/28/87 and 12/3/87] "reveal[ed] a small right sided acute subdural hematoma... with mild mass effect upon the right cerebral hemisphere. This is located in the frontal parietal area. There is very minimal shift of the midline structures to the left. There is effacement of the sulci in the right and is compared to the left consistent with either mass or cerebral edema."), chest pain, dyspnea, nasal obstruction subsequent to nasal trauma, chronic hypertension, eye problems, and back and hand injuries. Plaintiff also has an allergy to codeine and penicillin. (ECF 2404 Filed Under Seal).

Bonnell's individual physical characteristics increase the risk that he will experience a sure or very likely risk of serious harms of the type alleged throughout this Motion if subjected to execution via Defendants' Execution Protocol.

For instance, if this Court is willing to hear evidence at a supplemental hearing at a date to be set, Plaintiff Bonnell has reason to believe at this time that he will present evidence concerning his previous head injury and the effect that this injury could have upon the three-drug lethal injection execution protocol that Defendant's intend to use. It is Bonnell's belief that least one

expert in toxicology would present evidence that because of Bonnell's previous severe closed head injury, Bonnell has an increased likelihood of having a paradoxical reaction to the execution drug(s), thereby increasing the already substantial risk that he will be aware of the physical pain and agony he will be suffering upon injection of the execution drug(s). A rapid injection rate of midazolam (higher than 0.2 ml/s), like the Defendant's typically employ, has also been shown to substantially increase the risk of paradoxical reactions to midazolam.

It is further Bonnell's belief at this time that an expert in Neurology with a particularized knowledge of seizures and epilepsy, would present evidence concerning Bonnell's significant seizure disorder (*see* Bonnell's DRC Medical records, filed under seal at ECF 2404).  As a result of this disorder, it can be an expected the extreme stress that Bonnell would be experiencing could cause him to have a major seizure during the execution.

Bonnell has contacted his preferred expert—who is an expert in Neurology, with a specialization in seizures and epilepsy.  That expert though is not available to review the medical records and render a final opinion until after October 2019.  Further, counsel for Bonnell is unable to secure funding for that expert until after October 1, 2019. Bonnell anticipates that this expert will not only need to review records relevant to Bonnell's closed head injury, but that this expert will also need to evaluate Bonnell and/or request specific scans (MRI or PET) of Plaintiff Bonnell's brain in order to render an expert opinion.

78

It is also Bonnell's belief at this time that he will also present evidence that there is a potential interaction between the drugs that Bonnell took for years to control his frequent migraines and seizures and the drugs used as part of Defendant's three-drug protocol.  It is Bonnell's belief at this time that at least one expert in Pharmacology and Toxicology would testify that the three drugs that Bonnell took for at least twenty years—Topamax, Tegretol, and Dilantin—all have varying reactions with the drugs used in the three-drug protocol.  For instance, Tegretol would be expected to cause decreased levels of several drugs in the inmate's system; this list of drugs includes midazolam. Dilantin, on the other hand, impairs the efficacy of neuromuscular blocking agents, such as pancuronium and rocuronium. Bonnell has researched experts in this specialty and contacted three before ruling each of those out for varying reasons. Bonnell then contacted five potential experts, who Bonnell would consider as an expert that could effectively testify in this regard. One of these experts is unavailable due to a conflict. Bonnell received an email back from another and is awaiting calls back from the other three.

The potential of a paradoxical reaction to the medications could be significant.  *See e.g.*, Paton, Benzodiazepines and disinhibition: a review, *Psychiatric Bulletin* (2002), 26, 460-62; Bruining et al., Paradoxical Benzodiazepine Response: A Rationale for Bumetanide in Neurodevelopmental Disorders?, *Pediatrics* 136(2) e539 (2015) (paradoxical reaction characterized by restlessness, arousal, and talkativeness); Mohri-Ikuzawa, Delirium During Intravenous Sedation with Midazolam Alone and With Propofol in Dental

79

Treatment, *Anesth Prog* 2006(53): 95-97 (62-year-old man demonstrated "uncontrolled agitation, a state of excitement, and moaning"). *See e.g.*, Goldney, Paradoxical Reaction to a New Minor Tranquilizer, *Med. J. Aust.* 1977(1): 139-40.  Paradoxical Reaction to Midazolam and Control with Flumazenil, *Gastrointestinal Endoscopy*, 1994, 40(1): 86, 87 (71-year-old patient); Jordahn, Reversal of a Suspected Paradoxical Reaction to Zopliclone with Flumazenil, *Case Reports in Critical Care*, 2016 (Article ID 3185873) (81-year-old woman suffered paradoxical reaction).

Bonnell would request an evidentiary hearing to be set following the execution date of Kareen Jackson so that evidence concerning his individual characteristics as well as any supplemental evidence garnered following the conclusion of the September 24, 2019 - October 3, 2019 preliminary injunction hearing may be presented at such a time. Bonnell would request 1-2 days for such a presentation.

### C. This Court should grant Bonnell injunctive relief on his claims that the use of expired execution drugs is unconstitutional.

Bonnell also adopts and incorporates here by reference the analysis and arguments that Plaintiff Jackson alleges in his supplemental motion for injunctive relief, seeking injunctive relief prohibiting Ohio from using expired execution drugs to carry out Plaintiffs' executions because use of expired drugs is unconstitutional. (ECF 2437, PageID 117273-308).

### D. This Court should grant Bonnell injunctive relief on his equitable arguments against using expired drugs.

Bonnell also adopts and incorporates here by reference the analysis and arguments that Plaintiff Jackson alleges in his supplemental motion for injunctive relief, seeking injunctive relief prohibiting Ohio from using expired execution drugs to carry out Plaintiffs' executions because Defendants are judicially estopped from using expired drugs to carry out an execution. (ECF 2437, PageID 117273-308).

## IV. Bonnell can establish the remaining injunctive relief factors for consideration.

Bonnell can establish a strong likelihood of success on the merits of his claims.  And he can also satisfy the other injunctive relief considerations too.

### A. There is a substantial threat that Bonnell will suffer an irreparable injury if injunctive relief is not granted.

Bonnell will suffer irreparable harm as a matter of law, and as a matter of fact, if a stay of execution and preliminary junction are not granted. *See In re: Ohio Execution Protocol Litig. (Lorraine)*, 671 F.3d at 602; *In re: Ohio Execution Protocol Litig. (Lorraine)*, 840 F. Supp. 2d at 1058–59; *Cooey (Smith)*, 801 F. Supp. 2d at 656–58; *see also In re Ohio Execution Protocol Litig. (Phillips, Tibbets, Otte)*, 235 F. Supp. 3d 892, 958–60 (S.D. Ohio Jan. 26, 2017), reversed on other grounds, *Fears*, 860 F.3d 892.

### 1. Bonnell will suffer irreparable injury as a matter of law.

When, upon review of a motion for injunctive relief, it is found that a constitutional right is being threatened or impaired, "a finding of irreparable injury is mandated," and "a successful showing on the first factor mandates a successful showing on the second factor—whether the plaintiff will suffer irreparable harm." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010) (explaining that even "minimal infringement" on fundamental rights can be sufficient to justify injunctive relief); *KindHearts for Charitable Humanitarian Development, Inc. v. Geithner*, 676 F. Supp. 2d 649, 653 (N.D. Ohio 2009) (explaining that a plaintiff demonstrates irreparable harm if the plaintiff's claim is based upon a violation of the plaintiff's constitutional rights). As this Court has previously observed in this litigation, "the irreparable injury a constitutional violation presents is clear and favors a stay." *In re: Ohio Execution Protocol Litig. (Lorraine)*, 840 F. Supp. 2d at 1059 (citation omitted).

Because Bonnell has demonstrated a likelihood of success on his constitutional claims, a finding of irreparable harm exists as a matter of law.

### 2. Bonnell will suffer irreparable injury as a matter of fact

There is no doubt that failure to grant a stay of execution and preliminary injunction would cause Bonnell irreparable injury in fact, since Defendants will execute—or at least attempt to execute—him. Bonnell will be denied the protections of his constitutional rights. *See In re: Ohio Execution*

82

*Protocol Litig. (Lorraine)*, 671 F.3d at 602; *In re: Ohio Execution Protocol Litig. (Lorraine)*, 840 F. Supp. 2d at 1058–59; *Cooey (Smith)*, 801 F. Supp. 2d at 656–58; *see also In re Ohio Execution Protocol Litig. (Phillips, Tibbets, Otte)*, 235 F. Supp. 3d 892, 958–60 (S.D. Ohio Jan. 26, 2017), reversed on other grounds, *Fears*, 860 F.3d 892.

There is nothing more final and irreversible than death. Bonnell cannot be compensated adequately through money damages if or when Defendants violate his constitutional rights in executing him. For Defendants to unconstitutionally execute Bonnell before he has a chance to be heard on the merits of his claims would be irreparable harm for which he has no adequate remedy. A "final judgment" in the above-captioned case following a merits trial will be useless for Bonnell if his execution is not stayed and preliminarily enjoined. This factor weighs in Bonnell's favor.

### B. Granting injunctive relief will not substantially harm other parties and, even if there was some harm, Bonnell's potential injury outweighs any such other harm.

While admittedly the State of Ohio has an interest in seeing finality by imposing the sentence of death, substantial harm to the State will not follow from this stay of execution and preliminary injunction. *See In re: Ohio Execution Protocol Litig. (Lorraine)*, 840 F. Supp. 2d at 1059. Bonnell is seeking to prevent Defendants from violating his constitutional rights in the process of carrying out his sentence. Under these circumstances, this Court should not permit Bonnell's execution to proceed before the Court has the opportunity to review the full merits of his constitutional claims. The delay resulting from

granting the relief sought here will have little adverse effect on the State's interest and will ensure that it does not perform an unconstitutional execution. *See id.* And because Bonnell can show a substantial likelihood that the challenged state action is unconstitutional, "no substantial harm to others can be said to inhere its enjoinment." *Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012) (citation omitted). Additionally, Bonnell "has a strong interest in being executed in a constitutional manner." *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011). That interest outweighs the State's interest in carrying out an unconstitutional execution.

Accordingly, the risk that Bonnell will be subjected to an unconstitutional execution outweighs the State's interest in carrying out Bonnell's sentence on May 29, 2019. *See In re: Ohio Execution Protocol Litig. (Lorraine)*, 671 F.3d at 602; *In re: Ohio Execution Protocol Litig. (Lorraine)*, 840 F. Supp. 2d at 1058–59; *Cooey (Smith)*, 801 F. Supp. 2d at 656–58; *see also In re Ohio Execution Protocol Litig. (Phillips, Tibbets, Otte)*, 235 F. Supp. 3d 892, 958–60 (S.D. Ohio Jan. 26, 2017), reversed on other grounds, *Fears*, 860 F.3d 892.

### C. The public interest would be served by issuing injunctive relief.

The "public interest is served only by enforcing constitutional rights and by the prompt and accurate resolution of disputes concerning those constitutional rights." *In re: Ohio Execution Protocol Litig. (Lorraine)*, 840 F. Supp. 2d at 1059; *see also Bays*, 668 F.3d at 825; *Miller*, 622 F.3d at 540 ("[w]hen a constitutional violation is likely . . . the public interest militates in

favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." (internal quotation marks omitted))

The Eighth Amendment prohibits cruel and inhumane executions. *See Baze*, 553 U.S. at 48–50; *Glossip*, 135 S. Ct. at 2737. And the public has no interest in seeing its citizens' rights violated in the context of the execution process. *See In re: Kemmler*, 136 U.S. at 447; *see also In re: Ohio Execution Protocol Litig. (Lorraine)*, 840 F. Supp. 2d at 1059 (finding that "the public interest has never been and could never be served by rushing to judgment at the expense of a condemned inmate's constitutional rights"); *see also In re Ohio Execution Protocol Litig. (Phillips, Tibbets, Otte)*, 235 F. Supp. 3d 892, 958–60 (S.D. Ohio Jan. 26, 2017), reversed on other grounds, *Fears*, 860 F.3d 892.

Furthermore, Defendant Governor DeWine, in repriving the execution of Plaintiff Henness (*see* ECF No. 2146-3), has acknowledged that the public has no interest in executing someone in a torturous way. For this reason, he delayed Henness's execution and directed Ohio DRC to review the drugs used in Ohio's Protocol. In the same way, the public interest equally favors a stay of execution for Bonnell, rather than execute him under a Protocol that is almost certain to produce severe pain and needless suffering, and while Ohio is even now is considering more humane execution drugs.

Accordingly, this factor also weighs in Bonnell's favor.

**V.      There has been no undue delay in bringing Bonnell's claims, so there is no presumption against a stay.**

To the extent that there may be an additional equitable timing element involved in the consideration of whether to grant a stay of execution to Bonnell, that factor does not weigh against Bonnell here, because he has not been dilatory in bringing his claims.

Any presumption against a stay based on equity is a conditional one: "[T]here is a strong equitable presumption against the grant of a stay *where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.*" *Nelson v. Campbell*, 541 U.S. 637, 650 (2004) (emphasis added).  In other words, any equitable presumption against a stay only arises when the inmate could have received merits consideration of his claim without a stay by filing his suit earlier.

That is not the case here.  Former Plaintiff Richard Cooey filed the first case presenting a challenge to Ohio's lethal injection methods in 2004, numerous other inmates have intervened or otherwise joined, and other similar cases have been filed and consolidated with *Cooey* since.  Nevertheless, a genuine and proper merits consideration of the claims has not yet been possible.  Defendants have consistently promulgated new execution policies over the last several years, including with the most recent of those on October 7, 2016.  Those changes, the parties and this Court have agreed, necessitated filing the pleadings that constitute Bonnell's current Complaint, that is, the Fourth Amended Omnibus Complaint (ECF No. 1252, filed Sept. 22, 2017), and

Bonnell's most recent Second Amended Individual Supplemental Complaint (ECF No. 2399, filed August 23, 2019).

This case will ultimately go to trial on the merits, but not before Bonnell's scheduled execution date of February 12, 2020. He was not dilatory in filing his claims. Bonnell has adhered to all filing deadlines set by this Court. He could not have filed his claims at such a time as to allow consideration of the merits without requiring entry of a stay and injunctive relief. Consequently, no *Nelson* presumption against a stay applies here. This factor does not weigh against a stay of execution.

**VI.    This Court Should Grant A Supplemental Hearing On This Motion.**

Finally, this Court should grant a supplemental evidentiary hearing on this Motion. Although an evidentiary hearing is not required in every case where a preliminary injunction is requested, there are circumstances where a hearing must be granted. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552-53 (6th Cir. 2007). The key inquiry in determining if an evidentiary hearing is necessary is whether material facts are in dispute. *Id.* at 553. Material facts are in dispute in Bonnell's case, and an evidentiary hearing should accordingly be granted.

Specifically, Bonnell is prepared to demonstrate at the consolidated hearing, set to begin September 24, 2019, that he can satisfy both prongs of the two-part test required under *Glossip* to show a strong likelihood that Defendants' three-drug IV-injected midazolam lethal injection protocol violates the Eighth Amendment's ban on cruel and unusual punishment.

However, this Court should grant a supplemental hearing and permit argument on all grounds for relief presented in this Motion, including Bonnell's claims as to his individual characteristics and any supplemental evidence garnered following the September 24, 2019 – October 3, 2019 preliminary injunction hearing.

A supplemental hearing would be helpful for the Court. Bonnell intends to present new evidence, new arguments, and/or new witnesses, which this Court has not previously heard or considered, which will establish that Bonnell can satisfy his constitutional burden on his claims plead in his Second Amended Complaint, which is comprised of the Fourth Amended Omnibus Complaint (ECF No. 1252) and his Second Amended Individual Supplemental Complaint (ECF No. 2399). A hearing presents an opportunity for presentation and clarification of Bonnell's case in this life-or-death matter that cannot be approximated any other way. Consequently, this Court should grant a supplemental hearing, date to be set after Kareem Jackson's execution date, on this Motion.

## VII. Conclusion and Prayer for Relief

Like Henness argued before, Defendants will, intentionally or not, inflict severe pain and needless suffering on Bonnell as they attempt to end his life, putting various drugs to uses for which they are entirely unsuited, and failing to taking any steps to protect Bonnell from that immense pain. They will inject him with several ounces of extremely caustic acid that will be sure or very likely to burn like fire upon injection and immediately attack his lungs, rapidly

88

filling them with fluid.  That large volume of acid will sedate Bonnell, perhaps even to the point where he can no longer convey to communicate that he is in pain.  But pain is binary—one is either sensate or not.  The acid will not have any pain-blocking capabilities to protect Bonnell from the acute pulmonary edema and burning in his veins; in the absence of a pain-blocking drug, Bonnell will remain sensate to the full measure of pain imposed, regardless of his ability to communicate what he is experiencing.  Nor will that acid protect Bonnell from the indisputably severe pain and suffering that follows when Defendants inject the paralytic and potassium chloride.  It is sure or very likely that Bonnell will feel severe pain and suffering as a result.  That is objectively intolerable, particularly when, as Bonnell will demonstrate, there are alternatives that are available and which significantly reduce the substantial risk of serious harm posed by the current protocol's drugs.

Defendants will violate Bonnell's Eighth Amendment right against cruel and unusual punishment if he is executed using Ohio's current three-drug protocol.  This Court found sufficient evidence to establish, at a merits trial level of proof, that an Ohio inmate executed using that current protocol is certain or very likely to cause severe pain and suffering.  That same evidence applies equally to Bonnell, it has already been adopted as to this motion, and this Court should adopt its previous findings or reach the same findings on the same evidence, and then provide any further findings as it sees fit.  *Cf.* Br. of State Appellees, *Henness v. DeWine*, 6th Cir. Case No. 19-3064, Doc. No. 33, 56–74 (June 28, 2019) (accusing the Court in *Henness* of clearly erring in its

factual findings and reasoning on *Glossip* prong 1 when it relied on the established scientific consensus of pre-eminent experts). And Bonnell will provide even more evidence on that point, on which the Court should provide further factual findings. True, the Court found what it believed to be some flaws with the evidentiary picture that Plaintiff Henness painted on the second *Glossip* prong, and thus believed it could not grant him injunctive relief. But the Court made clear it is uncomfortable with that result.

While the *Henness* decision remains pending on appeal, Bonnell's February 12, 2020 execution date remains in effect after a warrant of reprieve was granted to Henness, even as Defendant Governor DeWine instructed DRC personnel to explore different execution protocol options. Recent discovery production confirms that a draft revised execution protocol was sent to the Governor's office in June 2019. (*See* ECF No. 2234-1, PageID 108014.) But barring any future developments to the contrary, the aggressive position Defendants asserted in their *Henness* brief, combined with their unwillingness to disclose their revised protocol, makes clear they intend to move forward with executions using the three-drug midazolam protocol, the evidence about the current protocol and this Court's discomfort notwithstanding. Thus, Bonnell is now forced to bring this injunctive relief motion.

To secure his constitutional rights, and aid the Court, Bonnell will demonstrate that a number of alleged alternative execution manners and methods should be available with ordinary transactional effort, because each of them is feasible, readily implemented, and there is no impediment to

implementation via a justified State refusal to adopt the alternative. Further, Bonnell will demonstrate that each of those alleged alternatives would significantly reduce the torturous harm he is facing under the State's current execution protocol. Defendants will violate Bonnell's Eighth Amendment right against cruel and unusual punishment if not enjoined from using their current execution protocol.

In sum, Bonnell has a strong likelihood of prevailing on the merits of his claims asserted above; there is a threat of irreparable harm to him that only injunctive relief and a stay of execution can remedy; an injunction will not cause substantial harm to others; and the public interest favors preventing an unconstitutional execution. Furthermore, as to any additional consideration for stays of execution, there is no failure of diligence on Bonnell's part.

For the reasons outlined in this memorandum, this Court should further:

1) grant Bonnell expedited discovery as needed;

2) grant Bonnell a multi-day evidentiary hearing on his motion, of sufficient duration to accommodate expert and/or lay witnesses regarding his individual characteristics;

3) grant Bonnell the opportunity to submit post-hearing briefing, if the Court deems it necessary;

4) grant Bonnell's motion, granting him a stay of execution staying enforcement of Bonnell's death warrant and a preliminary injunction prohibiting Defendants or anyone acting on their behalf from attempting to implement any element of Defendants' Execution Protocol as to him on or before his scheduled execution date of February 12, 2020, and until further order of the Court; and

5) grant any other relief as this Court deems appropriate

Respectfully submitted,

Office of the Ohio Public Defender

/s/ *Kimberly S. Rigby*
Kimberly S. Rigby [0078245]
Supervising Attorney, Death Penalty Dept.
Kimberly.Rigby@opd.ohio.gov
TRIAL ATTORNEY FOR BONNELL

/s/ *Erika M. LaHote*
Erika M. LaHote [0092256]
Assistant State Public Defender
Erika.Lahote@opd.ohio.gov

250 East Broad St., Suite 1400
Columbus, Ohio 43215
614-466-5394/614-644-0708 (Fax)

Stephen Newman
Federal Public Defender, Northern District
of Ohio

/s/ *Alan C. Rossman*
ALAN C. ROSSMAN
Assistant Federal Public Defender
Director, Capital Habeas Unit
Alan_rossman@fd.org

/s/ *Vicki Werneke*
VICKI RUTH ADAMS WERNEKE
Assistant Federal Public Defender
Capital Habeas Unit
Vicki_werneke@fd.org

1660 W. 2nd Street, Suite 750
Cleveland, Ohio 44113
(216) 522-4856/(216) 522-1951 (fax)

Counsel for Plaintiff Melvin Bonnell

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2019, I electronically filed the foregoing **Plaintiff Melvin Bonnell's Amended Motion for a Stay of Execution, a Preliminary Injunction, and an Evidentiary Hearing** with the Clerk of the United States District Court for the Southern District of Ohio using the CM/ECF system, which will send notification of such filing to counsel for all parties.


_/s/ Vicki Werneke_
Vicki Ruth Adams Werneke
Counsel for Plaintiff Melvin Bonnell