**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: OHIO EXECUTION PROTOCOL LITIGATION**<br><br>**This document relates to: Plaintiff James Hanna** | **Case No. 2:11-cv-1016**<br><br>**JUDGE EDMUND A. SARGUS, JR.**<br>**Magistrate Judge Michael R. Merz**<br><br>**DEATH PENALTY CASE**<br><br>**Execution Scheduled: December 11, 2019**<br><br>**Expedited consideration requested** |

**Plaintiff James Hanna's Objections to and Appeal From Magistrate Judge's
Decision and Order Vacating Evidentiary Hearing (ECF No. 2507)**

The Sixth Circuit in *In re Ohio Execution Protocol Litig. (Henness)*, No. 19-3064, ___ F.3d ___, 2019 U.S. App. LEXIS 27365 (6th Cir. Sep. 11, 2019) requires an inmate challenging Ohio's three-drug midazolam execution protocol to provide "evidence showing that a person deeply sedated by a 500 milligram dose of midazolam is still 'sure or very likely' to experience" the "severe pain" that a person who is "fully conscious" would experience.  2019 U.S. App. LEXIS 27365 at *5–7.

If that is the question,[1] then Plaintiff James Hanna, along with Plaintiffs Cleveland Jackson and Melvin Bonnell, can and would provide the required

---

[1] Plaintiff Hanna submits that *Henness* was wrongly decided and contrary to Supreme Court and prior published Sixth Circuit precedent for several reasons.

answer at an evidentiary hearing on their motions for injunctive relief. Nevertheless, on the eve of a long-planned, 8+ day evidentiary hearing for which the parties have been preparing since April of this year, the Magistrate Judge vacated the hearing in light of *Henness*.  (Decision and Order, ECF No. 2507.)

Plaintiff Hanna now appeals that decision because, even under *Henness*, he can satisfy the required showing to warrant injunctive relief.  To do that, however, he should be afforded an evidentiary hearing.  Live witness testimony, including from some of the world's foremost experts in their fields, should be taken to add to the sworn declarations and other paper evidence already in the record in support of their motions.  For the following reasons, this Court should reverse the Magistrate Judge's decision and reinstate the long-planned evidentiary hearing.

# TABLE OF CONTENTS

I. Plaintiff Hanna will present evidence at an evidentiary hearing that will directly answer the questions *Henness* found unanswered.............. 4

    A. Expert opinion evidence from the world's foremost expert in midazolam, Dr. David Greenblatt, will establish that the condemned inmates will be sure or very likely to subjectively experience an unconstitutionally high level of pain. ..................... 4

    B. Testimony from Dr. Matthew Exline, an expert in trauma, critical care, and pulmonary medicine, will establish that the condemned inmates will be sure or very likely to subjectively experience an unconstitutionally high level of pain. ..................... 8

    C. Testimony from Dr. Steven Shafer, a world-renowned expert in anesthesiology, will establish that the condemned inmates will be sure or very likely to subjectively experience an unconstitutionally high level of pain. ......................................... 12

II. The Magistrate Judge's order vacating an evidentiary hearing should be reviewed *de novo* because it is clearly erroneous and contrary to law. ................................................................... 17

    A. If the Magistrate Judge read *Henness* to preclude any further challenge to Ohio's midazolam execution protocol, that was an error of law........................................................... 18

    B. If the Magistrate Judge read *Henness* to conclude that no hearing was necessary because the record to be created for Hanna would not be different in a material way from the *Henness* record, that is clearly erroneous. ............................... 20

    C. *Henness* strongly weighs in favor of holding an evidentiary hearing................................................... 21

    D. The Magistrate Judge's reliance on *Henness* to vacate the long-planned evidentiary hearing is error for the additional reasons set forth in the responses to the Show Cause Order (ECF Nos. 2490 and 2491)........................................ 22

III. This Court should reinstate the long-planned evidentiary hearing because it is crucial to permit Hanna to develop a complete record on his subject claims, particlarly when the decision in *Henness* was so wrongly decided and thus vulnerable to further appellate review................................................................. 24

IV. Hanna appeals the Magistrate Judge's conclusions regarding his individualized paradoxical reaction claim because his counsel cannot be reasonably described as less than diligent for not asserting the injunctive relief claim earlier. ......................... 27

V.    Conclusion ........................................................................... 43

**I.    Plaintiff Hanna will present evidence at an evidentiary hearing that will directly answer the questions *Henness* found unanswered.**

At a hearing, Plaintiff Hanna (along with Plaintiffs Cleveland Jackson and Melvin Bonnell) will provide evidence that directly answers the questions that *Henness* found unanswered in that case.  Plaintiffs will offer opinion evidence from eminently qualified experts, including, among others, Dr. David Greenblatt, the world's foremost expert in midazolam, Dr. Matthew Exline, an expert in trauma, critical care and pulmonary medicine, and Dr. Steven Shafer, a world-renowned anesthesiologist.  Denying an evidentiary hearing will drastically limit the ability of those experts to provide the evidence that *Henness* requires.

**A.    Expert opinion evidence from the world's foremost expert in midazolam, Dr. David Greenblatt, will establish that the condemned inmates will be sure or very likely to subjectively experience an unconstitutionally high level of pain.**

Consider the following opinion evidence in the expert report of Dr. David Greenblatt, which would be presented via live testimony at a hearing and which provides the precise evidence the *Henness* court found lacking:

> The fact that an inmate was not insensate to pain does prove, by definition, that he was experiencing that pain. **It also proves that he was experiencing the full scope of the pain involved.  In the context of Ohio's execution protocol, that pain is severe.  Because midazolam does not stop the pain incident from the second and third drugs** (or from the pulmonary edema) **from reaching the brain of the condemned inmate,**

> **the experience of that inmate will be the same as any other person—that of severe pain and horrific suffering.**

(Greenblatt Expert Report, ECF No. 2463-1 as filed as Plaintiffs' Exhibit 14 for the impending hearing, ¶ 62, PageID 124496 (emphases added).)  At a hearing, Dr. Greenblatt would further testify that:

> Put simply, in the absence of either an opioid analgesic drug or unconsciousness to the depth at which unconsciousness and insensateness occur together—*i.e.*, unconsciousness at the depth of general anesthesia—**the inmate's subjective experience of pain is the same** as a "fully conscious, non-medicated person being exposed to constitutionally impermissible pain," because in that situation there is nothing to blunt the pain.

(*Id.* at ¶ 63, PageID 124496 (emphasis added).)  Dr. Greenblatt would also testify that an inmate subjected to Ohio's execution protocol, even deeply sedated by a 500 mg dose of midazolam, "**will experience the full scope of the severe pain and horrific suffering caused by the drugs in Ohio's protocol**." (*Id.* at ¶ 64, PageID 124496–97 (emphasis added).)  The only way to prevent the inmate from experiencing the *full, indisputably severe and unconstitutional* level of pain caused by Ohio's execution protocol, Dr. Greenblatt will explain, is to "administer an opioid analgesic drug," or to "suppress the inmate's consciousness so deeply that unconsciousness and insensateness occur, which is the state of general anesthesia." (*Id.*)  But, he will also testify, "[m]idazolam, regardless of the dose, is neither an analgesic drug nor capable of suppressing and keeping the consciousness to the depth associated with general anesthesia." (*Id.* at ¶ 65, PageID 124497.)  Dr.

5

Greenblatt would further testify "[t]hat means [the inmate] **will experience the full scope of severe pain and suffering**, regardless of whether his consciousness level is altered to be something other than fully conscious." (*Id.* (emphasis added).)

The *Henness* court speculated that midazolam "is capable of altering an inmate's ability to subjectively experience pain," 2019 U.S. App. LEXIS 27365, at *6. Dr. Greenblatt would provide expert opinion evidence to address that point too:

> Sedation at a higher level than the depth at which insensateness occurs does not alter the "subjective" experience of pain, regardless of whether one's consciousness is "altered." **Altering the consciousness** at the depth to which midazolam can produce might restrict the inmate's **ability to convey what he is experiencing**, such as his ability to respond to the "consciousness checks." **But that is an entirely different matter than whether the inmate is actually subjectively feeling the full scope of severe pain and suffering. He will, he just may not be able to express that**, due to the sedation or, later, the paralytic drug's effects.

(*Id.* at ¶ 66, PageID 124497 (emphases added).)

Again, the Sixth Circuit stated the "relevant inquiry is whether an inmate injected with 500 milligrams of midazolam would subjectively experience unconstitutionally severe pain." *Henness*, 2019 U.S. App. LEXIS 27365, at *5–7. Dr. Greenblatt will provide unparalleled expert opinion evidence to answer

that specific inquiry regarding the level of pain the inmate will

subjectively experience:

> Midazolam at any dose is not and cannot act as an opioid analgesic. Thus, the *only* way it might reduce the level of pain the condemned inmate will be sure or very likely to suffer from Ohio's current three-drug protocol is [if] midazolam can render and keep the inmate unconscious to the depth at which unconsciousness and insensateness occur together. It cannot do that either, regardless of the dose. **Consequently, that inmate will experience the full measure of severe pain caused by Ohio's three-drug midazolam protocol.** Will midazolam make a person "unconscious"? Yes, it will, but only to a certain level, and that level is not deep enough to effect insensateness. **The inmate's subjective experience of that severe pain, even if he is sedated at some level of unconsciousness, will be sure or very likely to be the same as if he were fully conscious . . . .**

(Greenblatt Expert Report, ECF No. 2463-1, at ¶ 67, PageID 124498 (emphases

added).) Dr. Greenblatt also would provide expert testimony to explain why

midazolam's use to accompany intubation does not demonstrate that it reduces

the level of pain associated with that (or any other) procedure by "altering" a

person's "subjective experience [of] pain":

> [W]hether midazolam is used alone for intubation is irrelevant to the question of whether Ohio's midazolam execution protocol causes the inmate to suffer severe pain. Midazolam is an anterograde amnestic drug, meaning it blocks the formation of memories. Thus, the fact that midazolam can be used to sedate and relax a patient enough to insert a breathing tube in limited situations, and **that patient will not remember the pain later**, **says nothing about whether the drug can actually block pain in the moment. It cannot**.

(*Id.* at ¶ 68, PageID 124498 (emphasis added).)

These are samples of the expert opinion evidence that Dr. Greenblatt would provide.[2] True, Dr. Greenblatt previously testified in the *Henness* proceedings, but his testimony in support of Hanna's injunctive relief motion would provide evidence to satisfy the newly (incorrectly) minted test from *Henness*.

> **B.** **Testimony from Dr. Matthew Exline, an expert in trauma, critical care, and pulmonary medicine, will establish that the condemned inmates will be sure or very likely to subjectively experience an unconstitutionally high level of pain.**

Similarly, testimony from Dr. Exline would also establish that the condemned inmates executed with midazolam protocols are sure or very likely to be experiencing severe pain—that is, an "unconstitutionally high level of pain—and suffering during their executions.

In particular, Dr. Exline reviewed eyewitness accounts of executions using 500mg of midazolam and arrived at the following conclusions:

> The execution of Domineque Ray in Alabama contains scant details on the events following initiation of the lethal injection protocol. However, **both witness accounts indicated that Mr. Ray was able to lift his head off the gurney and look at his arm "after the execution began." This clearly shows that he was both sensate and able to localize the pain associated with the IV injection. He also made a clenched fist on his left side. Muscle clenching is a classic sign of pain in an individual who is unable to communicate verbally.** As I noted in my earlier report, the Critical-Care Pain Observation Tool (CPOT)

---

[2] The Plaintiffs, in their response to the Magistrate Judge's Show Cause Order, provided a more extensive account of new evidence—that is, evidence that goes beyond the record created in *Henness*—to be presented at a hearing. (*See generally*, ECF No. 127573–665, incorporated here by reference.)

identifies body movement, muscle tension, and vocalization as signs of pain in an unconscious person.

(*Id.* at ¶ 25, PageID 124087 (emphasis added).)

The execution of Michael Brandon Samra, also in Alabama, provides more details on his ability to sense pain during the lethal injection process. According to the Montgomery Advertiser accounts, "Samra appeared alert for several minutes." "At 7:15 pm, his chest heaved three times in quick succession. After, his breathing appeared significantly labored, with his head slightly jerking with each breath." Labored breathing and use of accessory muscles as evidence by his head jerking are signs of respiratory distress. **These signs would not be associated with a patient who is insensate, but rather would indicate a patient with significant air hunger and pain.** According to the article, "Two minutes later, Samra stretched and drew his fingers outward, attempted to raise his right hand against his wrist restraints before curling his fingers inward." **Again, clenching muscles is a classic example of pain in an unresponsive patient.**

(*Id.* at ¶ 26, PageID 124087-88 (emphases added).)

**The execution of Christopher Lee Price in Alabama again provides witness accounts that are consistent with an individual struggling to breathe during the lethal injection process.** Mr. Price is described by witnesses in the Montgomery Advisor as having his "stomach heaving" and "his left fist remained clenched throughout the execution." **The heaving stomach is again a sign of accessory muscle use due to air hunger due either to developing pulmonary edema or upper airway closure secondary to the midazolam dose. The clenched hand is another non-verbal sign of pain in an unconscious individual.**

(*Id.* at ¶ 27, PageID 124088 (emphases added).).

In Tennessee, **the descriptions of the execution of Donnie Johnson again demonstrates an individual struggling to breathe and experiencing pain associated with air hunger.** Witnesses describe Mr. Johnson as "snoring, gurgling, and gasping" prior to a

consciousness check with his "tongue protruding out of his mouth." **These are all signs of upper airway obstruction which would be associated with a sensation of chocking and pain in a sensate individual.** Other witnesses described the "chest and stomach heaving up and down" **which again is consistent with an individual aware of and responding to the closure of their upper airway and attempting to overcome that obstruction.** One witness reported that Johnson "made a final high-pitched vocalization and fell silent." Another witness stated that Johnson "issued a sharp bark-like noise twice then fell silent." **Such vocalization is a classic sign of pain under the CPOT.**

(*Id.* at ¶ 28, PageID 124088-89 (emphases added).)

> **On autopsy Mr. Johnson was found to have pulmonary edema**, consistent with most autopsies performed on inmates subjected to lethal injection protocols similar to the state of Ohio and I cannot exclude that his chest heaving was a response to developing pulmonary edema. In either scenario, **Mr. Johnson was clearly manifesting the physiologic responses of an individual that was able to feel pain.**

(*Id.* at ¶ 29, PageID 124089 (emphases added).)

In sum:

> My review of the executions of Dominque Ray, Michael Samra, Christopher Price, and Donnie Johnson are consistent with eyewitness accounts discussed in my previous reports. **Based on my knowledge of the pharmacology of midazolam, paralytic agents, and potassium chloride and the body's response to the pain associated with injections of sclerotic agents via peripheral IV, upper airway obstruction, and pulmonary edema, I believe that it is very likely that these individuals were sensate and suffered severe pain and discomfort during the lethal injection procedure.**

(*Id.* at ¶ 31, PageID 124089-90 (emphasis added).)

Critically, Dr. Exline would also explain:

10

> **Most symptoms in these subjects do not appear directed at alleviating the source of the pain, but are non-specific manifestations of pain: crying, moaning, tensing facial muscles, or tensing arms and legs.**

(Dr. Exline Rebuttal Report, ECF No. 2462-12, as filed Plaintiff's Exhibit 11 for the impending evidentiary hearing, ¶ 15, PageID 124225 (emphasis added).)

Dr. Exline also offered the following expert opinion evidence in his rebuttal report, and provides critical evidence that addresses the *Henness* opinion and the assessment of pain.

> The CPOT [a pain measuring tool] is not the only validated assessment for pain.  Other assessments for pain could also be examined, such as the behavioral pain score (BPS).  This score again looks at non-verbal cues for pain such as grimacing, upper limb flexion/retraction, and non-specific vocalization such as moaning.  **The purpose of listing multiple clinical tools is not to emphasize any particular tool, but to demonstrate that the concept of heavily sedated patients experiencing pain is so widely accepted that there are multiple validated tools for assessing pain in unconscious subjects and national guidelines suggesting that these assessments need to be routinely done.  Clearly the concept of pain perception in patients, even deeply sedated patients, is well accepted in the medical literature.**

(*Id.* at ¶ 11, PageID 124223–24 (emphasis added).)

Dr. Exline's expert testimony would address the central question identified in the *Henness* opinion, which is whether "a person deeply sedated by a 500 milligram of midazolam is still 'sure or very likely' to experience an unconstitutionally high level of pain."  *Id.* at *6–7.  Although the *Henness* court found that Henness did not meet his burden on this issue, the additional evidence that Jackson has amassed, filed, and will present at his evidentiary

hearing will meet the burden. Dr. Exline cites to additional scientific literature to support his opinion that midazolam cannot protect against the unconstitutional pain from the second and third execution drugs, and his testimony directly answers the "relevant inquiry" as posed in *Henness*.

### C. Testimony from Dr. Steven Shafer, a world-renowned expert in anesthesiology, will establish that the condemned inmates will be sure or very likely to subjectively experience an unconstitutionally high level of pain.

Dr. Shafer would also provide testimony to answer the "relevant inquiry" from *Henness*.

The expert rebuttal report and anticipated testimony of Dr. Steve Shafer, a highly-renowned anesthesiologist and clinical pharmacologist, would also help to demonstrate how Hanna can meet the test articulated in *Henness*. None of Dr. Shafer's opinions or testimony has previously been heard by this Court. Evidence from Dr. Shafer further demonstrates that a person deeply sedated, even with 500 mg of midazolam, remains sure or very likely to experience an unconstitutionally high level of pain.

In short, Dr. Shafer's report, (Rebuttal Expert Report of Dr. Steven L. Shafer, M.D., ECF No. 2463-10 (Sept. 2019 PI Hr'g PX 20)), makes clear that an inmate subjected to Ohio's Execution Protocol will experience the full, severe pain associated with the drugs used in the Porotocol. Dr. Shafer's report explains this fact from its very beginning:

> Simply stated, both Drs. Antognini and Yun assert that 500 mg of midazolam induces sufficient depression of brain activity **to prevent the experience of pain**, in all individuals, since it is at least 100 times larger than a

typical clinical dose used for sedation. . . . **Simply stated, they are wrong:**

Their argument assumes that drug effect necessarily increases with increasing dose. However, there is a maximum effect with all drugs. The body cannot provide an infinite response to an infinite dose. There are limits to human physiology. In the case of thiopental, a drug previously used for lethal injection, the maximum effect is an isoelectric (flat) EEG. . . .

**This is not the case with midazolam. The maximum effect of midazolam is a state of intense brain activation, referred to as beta waves.** . . . **Increasing doses of midazolam never caused a state of isoelectricity, as seen in the previous figure for thiopental. As a result, there is no reason to believe that any dose of midazolam can suppress EEG activity.**

In a companion paper, Buhrer et al. looked at the EEG response in individual patients. In the figure to the right, the subject received 7.5, 15, and 25 mg of midazolam administered on three separate occasions. There is an increase in drug effect from 7.5 to 15 and 25 mg. However, there is no difference in maximum effect from 15 to 25 mg. The only difference is that the effect of 25 mg lasts longer, as would be expected. **Put simply, the fundamental belief that increasing doses of midazolam produce increasing levels of drug effect is directly disproven by this evidence**.

. . . **Other laboratories have confirmed that midazolam only activates the EEG in humans, without causing a profound suppression of the EEG**.

(*Id.* at PageID 126196–98 (emphases added).)

Dr. Schafer's Report repeatedly rebuts the fundamentally flawed premise that midazolam can suppress consciousness to a sufficient degree to prevent

13

the experience of severe pain:

> Increasing doses of midazolam result in increasing activation, until a plateau is reached. **No dose of midazolam can produce an isoelectric EEG. Thus, no dose can create an EEG that is unambiguously associated with loss of consciousness sufficient to prevent the experience of pain.** This disproves the fundamental assumption of the analyses by Drs. Antognini and Yun that increasing doses of midazolam necessarily produce increasing levels of drug effect.
>
> In short, as Dr. Greenblatt correctly explained in his report, **these studies show that the maximum effect of midazolam is still well short of the level of unconsciousness necessary to prevent the experience of pain.** Dr. Antognini and Dr. Yun are simply wrong when they suggest otherwise.

(*Id.* at PageID 126197 (emphases added).)

Explaining further, Dr. Shafer makes plain that midazolam has *no effect* on a person's subjective experience of pain, when that pain is severe and no other drugs (such as opioids) have been used:

> **Midazolam is virtually never used alone for painful procedures, precisely because it does not produce insensibility to pain.** This is clearly reflected in Dr. Greenblatt's report. **As a practicing anesthesiologist, as well as having spent 10 years as Editor-in-Chief of a major journal in our specialty, I can attest that when procedures are associated with pain (e.g., "very stimulating") then an opioid is always given concurrently. This is done precisely because midazolam has no analgesic properties. Indeed, neither the words "analgesic" nor "analgesia" are applied to midazolam in the FDA Package Insert.**
>
> * * *
>
> Midazolam produces sedation. **Midazolam cannot so deeply sedate a person so as to prevent the experience of severe pain.**

14

* * *

The statement that midazolam relieves anxiety and serves as a powerful sedative is correct when the drug is used for procedural sedation (e.g., colonoscopy). Similarly, it is correct that the sedation from midazolam can be used to induce anesthesia (i.e., sedate the patient enough so the patient does not respond to a spoken voice). However, **there is no evidence that midazolam would relieve the severe pain associated with surgery itself, such as a major surgical incision or manipulation of internal viscera. This is why midazolam is never used alone to maintain anesthesia during surgery: no physician has ever had enough confidence in the ability of midazolam to depress the brain enough to permit an entire surgical operation to be performed with midazolam alone.** I do not contest that midazolam can be used for uncomfortable procedures, such as colonoscopy, or that it can be used to begin an anesthetic by making the patient unresponsive to a spoken voice (i.e., "induce anesthesia"). **However, this is irrelevant to the use of midazolam to maintain brain depression sufficient to tolerate the pain of major surgery.**

(*Id.* at PageID 126199–200 (emphases added).)

Dr. Shafer also helped explain how inmates can appear to be sedated or "asleep," and yet do, in fact still feel severe pain:

In summary, it is correct that benzodiazepines can be used to induce a sleep-like state in the absence of painful stimulus. This state is clinically useful for sedation during procedures like colonoscopy, or for induction of anesthesia. **However, the state of the brain during procedural sedation, or after induction of anesthesia, is only a fraction of the brain depression required to render a person unable to perceive severe pain. Dr. Antognini implies that since midazolam can "induce anesthesia" the patient cannot perceive a massively painful stimulus. That is false. Sleep induces a similar state, but we readily regain awareness if our bodies are subjected to severe pain. None of these studies suggests that midazolam is appropriate for**

15

> **maintaining sufficient brain depression to permit major surgery without awareness.**
>
> Dr. Antognini's references to "induction of anesthesia" in his report is misleading. "Induction of anesthesia" is **the first step** in providing sufficient depression of brain function to tolerate the pain of surgery. The relationship between "induction of anesthesia" and "anesthesia" is similar to the relationship between "falling asleep" and "sleep." "Anesthesia" mean depression of brain activity sufficient to offset the pain of surgery. Only modest levels of brain depression, "anesthesia", are necessary if the stimulus is modest. **However, profound levels of "anesthesia", evident from profound depression of the electroencephalogram, are necessary when the stimulus is profound, as in major surgery. This distinction is especially relevant in Ohio's Execution Protocol. Midazolam is only capable of providing modest amounts of brain suppression, and the protocol provides no additional drugs to further depress brain activity or mitigate the painful administration of subsequent drugs.**

(*Id.* at PageID 126202–03 (emphasis added).)

Directly rebutting the studies relied upon by Defendants' expert Dr. Antognini, Dr. Shafer's report explains that, while it may be true that "sedative/anesthetic drugs remove the sensation of air hunger" that is only the case "if the sedation is sufficiently deep enough. **But midazolam alone cannot achieve that level of sedation, and it is not an anesthetic drug."** (*Id.* at PageID 126210 (emphasis added).) Dr. Shafer further counters any notion that since midazolam is used for "induction of anesthesia," it could be sufficient to reduce the pain experienced by an inmate to a level that is less than unconstitutionally severe:

> However, the state of the brain during procedural sedation, or after induction of anesthesia, is only a

16

fraction of the brain depression required to render a person unable to perceive severe pain. Dr. Antognini implies that since midazolam can "induce anesthesia" the patient cannot perceive a massively painful stimulus. **That is false. Sleep induces a similar state, but we readily regain awareness if our bodies are subjected to severe pain. None of these studies suggests that midazolam is appropriate for maintaining sufficient brain depression to permit major surgery without awareness.**

(*Id.* at PageID 126202–03 (emphasis added).)

Dr. Shafer concludes his report with his expert opinion that after 500 mg of midazolam has been administered under Ohio's lethal injection protocol that **"[i]t is very likely that the subjects experience severe pain following injection of the muscle relaxant and intravenous potassium."** (*See id.* at PageID 126218 (emphasis added).) This opinion is directly relevant to the central question this Court is to address under *Henness*: "whether an inmate injected with 500 milligrams of midazolam would subjectively experience unconstitutionally severe pain." 2019 U.S. App. LEXIS 27365, at *6.

## II. The Magistrate Judge's order vacating an evidentiary hearing should be reviewed *de novo* because it is clearly erroneous and contrary to law.

Under 28 U.S.C. § 636(b)(1)(A), the Magistrate Judge's order may be set aside if it is shown to be "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *see also* Fed. R. Civ. P. 72(a). The "contrary to law" standard requires *de novo* review by the District Court. *McKnight v. Bobby*, No. 2:09-cv-059, 2017 WL 1154119, at *1 (S.D. Ohio Mar. 28, 2017); *Gandee v. Glaser*, 785 F. Supp. 684, 686 (S.D. Ohio 1992), *aff'd Gandee v. Glaser*, No. 92–3304, 1994

WL 83265, 19 F.3d 1432 (6th Cir. Mar. 14, 1994) (Table). "This Court's review under the 'contrary to law' standard is plenary . . . and it may overturn any conclusions of law which contradict or ignore applicable precepts of law, as found in the Constitution, statutes, or case precedent." *Gandee*, 785 F. Supp. at 686 (citation and internal quotation marks omitted).

Accordingly, the Magistrate Judge's order vacating the evidentiary hearing is subject to *de novo* review to the extent that it resolves questions of law. *Id.* Mixed questions of law and fact are likewise subject to *de novo* review. *Robinson v. Allstate Ins. Co.*, No. 09–10341, 2011 WL 3111947, at *2 (E.D. Mich. Jul. 26, 2011). Only the Magistrate Judge's factual determinations are reviewed under the "clearly erroneous" standard. *Gandee*, 785 F. Supp. at 686; *Miami Valley Fair Housing Center Inc. v. Metro Development LLC*, No.: 2:16-cv-607, 2018 WL 558942, at *2 (S.D. Ohio Jan. 25, 2018).

An evidentiary hearing is needed on a preliminary injunction motion if "material facts are in dispute." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007).

### A. If the Magistrate Judge read *Henness* to preclude any further challenge to Ohio's midazolam execution protocol, that was an error of law.

The precise basis for the Magistrate Judge's decision to vacate the long-planned evidentiary hearing is not entirely clear. If the Magistrate Judge vacated the hearing because he read *Henness* as precluding any further attack on Ohio's midazolam protocol as a matter of law, and then concluded that it follows there were no longer any material facts in dispute, that was contrary to

law and subject to this Court's *de novo* consideration.  That interpretation

misapplies *Henness* (not to mention misapplying *Bucklew v. Precythe*, 139 S.

Ct. 1112 (2019), which is obviously binding authority here).  After all, as the

Sixth Circuit recognized, the decision in *Glossip v. Gross*, 135 S. Ct. 2726

(2015), was a review under the "abuse of discretion" standard in an injunctive

relief posture, which is the same procedural posture here.  *In re Ohio Execution*

*Protocol Litig. (Fears v. Morgan)*, 860 F.3d 881, 896 (6th Cir. 2017) (en banc).

As such, those decisions did not preclude further challenges to the same

protocol—they just required the inmate to create a more robust factual record.

Like in *Glossip* (and *Fears*), *Henness* was an opinion issued in the context of a

preliminary injunction proceeding, not a merits trial review.  What's more, it

was a decision predicated on the court's belief that there was insufficient

record evidence to establish an answer to what it believed to be the crucial

question.  Consequently, reading *Henness* to absolutely preclude any further

challenges to Ohio's midazolam protocol is contrary to law.

Doing so is also contrary to law because that fails to apply binding

precedent in *Bucklew*.  *Bucklew* expressly held that analysis of the first part of

the *Glossip* inquiry—the sure or likely risk of severe pain and suffering—must

be done in comparison to an alleged alternative.  *Bucklew*, 139 S. Ct. at 1126

(explaining that assessment of a State's current protocol "isn't something that

can be accomplished by examining" the method "in a vacuum, but only by

comparing that method with a viable alternative") (citations and quotation

marks omitted).  The court in *Henness* ultimately concluded that Henness

19

could not show a reduction in risk of severe pain created by his alleged alternative because, it reasoned, he had not shown sufficient evidence to establish the relevant question about the risk of pain posed by the midazolam protocol. *Henness*, 2019 U.S. App. LEXIS 27365 at *3-4. While Hanna does not concede that analysis is correct, that decision in *Henness* does not in any way preclude Hanna from obtaining an evidentiary hearing to establish the required showings. Even under that analytical framework, Hanna can 1) show he is sure or very likely to experience severe (that is, "unconstitutionally high") pain and suffering even if deeply sedated with 500 mg midazolam; and 2) his alleged firearms alternatives are available in all respects and will significantly reduce that substantial risk of severe pain.

In other words, regardless of whether Plaintiff Henness can or could satisfy the required standard, Plaintiff Hanna (and Jackson and Bonnell) have alleged other alternatives against which the (more robust) evidence of the risk of severe pain and suffering posed by Ohio's current protocol must be measured. Accordingly, the Magistrate Judge's decision to vacate the hearing in light of *Henness* was contrary to law for that reason as well.

> **B.  If the Magistrate Judge read *Henness* to conclude that no hearing was necessary because the record to be created for Hanna would not be different in a material way from the *Henness* record, that is clearly erroneous.**

Alternatively, if the Magistrate Judge concluded that the evidentiary record to be created for Plaintiffs Hanna, Jackson, and Bonnell would not be different in a material way from the record in *Henness*, that is clearly

erroneous.  Just the evidence cited above shows that the evidentiary record to be created in this proceeding will be materially different than in *Henness*— markedly so.  And there is a plethora of additional, material evidence to present at a hearing that does not appear in the *Henness* record.  (*See, e.g.*, ECF No. 2490, PageID 127573–675.)  Whether the evidentiary record would be materially different from the *Henness* record is a mixed question of law and fact, meaning this Court applies *de novo* review if that was the Magistrate Judge's basis for vacating the hearing.  At bottom, Plaintiff Hanna, like Plaintiff Jackson and Plaintiff Bonnell, are prepared to offer expert opinion testimony that answers the factual question the *Henness* court found unanswered.  Those factual matters are material, and they are very much in dispute.  Accordingly, this Court should grant an evidentiary hearing on the issues that are common to Hanna, Jackson, and Bonnell's motions for injunctive relief.

## C. *Henness* strongly weighs in favor of holding an evidentiary hearing.

Under *de novo* review, this Court should find that *Henness* does not preclude a hearing on Hanna's injunctive relief motion.  Indeed, *Henness* militates *in favor* of holding an evidentiary hearing here.  The allegations in the injunctive relief motions filed by Hanna, Jackson, and Bonnell, and the evidence to be offered at a hearing to establish those allegations, go well beyond the record in *Henness*.  Each of the flaws the *Henness* court identified in that proceeding are and will be satisfied at an evidentiary hearing on the currently pending motions.  The decision in *Henness*, at bottom, was rooted in

the determination of the Court of Appeals that there was insufficient evidence to support the Magistrate Judge's factual findings, or that that the Magistrate Judge made findings on the wrong question(s). It follows, therefore, that an evidentiary hearing is critically important for Hanna, Jackson, and Bonnell to be able to present the necessary evidence on the questions the Sixth Circuit identified as the relevant ones, thereby allowing the Magistrate Judge (and, as applicable, this Court) to make the relevant factual findings on that new record. The Magistrate Judge's decision otherwise is contrary to law.

**D.  The Magistrate Judge's reliance on *Henness* to vacate the long-planned evidentiary hearing is error for the additional reasons set forth in the responses to the Show Cause Order (ECF Nos. 2490 and 2491).**

Relying on *Henness* to preclude an evidentiary hearing for Hanna, Jackson, and Bonnell is also error because of the reasons further articulated in the responses to the Magistrate Judge's Show Cause Order (*see* ECF Nos. 2490 and 2491).

First, *Henness* is not final yet, because no mandate has issued. (*See* ECF No. 2490, PageID 127571–72, incorporated here by reference.) Indeed, the Magistrate Judge's discussion of *Campbell v. Jenkins*, 2016 U.S. Dist. LEXIS 194460 (S.D. Ohio Apr. 27, 2016), supports taking a cautious approach here, and thus his discussion of that point in the order vacating the hearing is puzzling. (*See* ECF No. 2507, PageID 127896.) A cautious approach would be to hold the hearing as planned and as the parties have spent months preparing for. If that evidence is ultimately unable to be considered for some reason,

22

then that can be addressed at that time, and it will be an unfortunate (but not prejudicial to any party) use of time and money.  But if the hearing is *not* held, then that evidentiary record cannot be developed at all; it would then be unavailable for consideration as necessary, a highly prejudicial state of affairs to Hanna, Jackson, and Bonnell, particularly given that their respective execution dates continue to draw closer every day.  For that reason alone, the evidentiary hearing should be reinstated, particularly when the Magistrate Judge, all the parties, and the witnesses have arranged the complicated puzzle pieces to accommodate that undertaking as scheduled.  The Magistrate Judge noted that "this Court's caution" in *Campbell* "was appropriate, given what the Sixth Circuit eventually did on the motion for clarif[ication]."  (ECF No. 2507, PageID 127896.)  And that is precisely Hanna's point: the *Henness* decision is not final, it is wrongly decided in light of *Bucklew*, and thus it is still subject to change.  Consequently, the cautious approach is to hold the hearing as previously scheduled, not to vacate it.

Second and relatedly, *Henness* should not preclude an evidentiary hearing because it is so wrongly decided that it is subject to change on further reasoned appellate review.  (*See* ECF No. 2490, PageID 127675–91, incorporated here by reference.)

And third, *Henness* should not preclude Hanna, Jackson, and Bonnell from creating a record on their detailed alleged alternatives beyond those that Plaintiff Henness alleged, particularly when Ohio has no legitimate reason to

23

decline to use some of their alleged alternatives.  (*See* ECF No. 2490, PageID 127665–75, incorporated here by reference.)

III.     **This Court should reinstate the long-planned evidentiary hearing because it is crucial to permit Hanna to develop a complete record on his subject claims, particlarly when the decision in *Henness* was so wrongly decided and thus vulnerable to further appellate review.**

This Court should also grant a hearing because Hanna must be afforded an opportunity to develop as complete a record on his injunctive relief motion as possible, particularly in light of the serious errors in *Henness* that make it vulnerable to further reasoned appellate review.

For example, *Henness* did not overturn the Magistrate Judge's findings that 500 mg of IV-injected midazolam is sure or very likely to cause pulmonary edema, or that pulmonary edema is sure or very likely to cause the inmate to experience horrific pain and suffering akin to waterboarding torture.  Rather, *Henness* simply concluded that the Supreme Court in *Bucklew* "reasoned that the fact that an inmate sentenced to death by hanging might slowly suffocate to death is not constitutionally problematic," thus death by "suffocation does not qualify as 'severe pain and needless suffering.'"  2019 U.S. App. LEXIS 27365, *5 (quoting *Bucklew*, 139 S. Ct. at 1124).  The court then reasoned that causing pulmonary edema "i.e., suffocation . . . is not constitutionally inappropriate."  *Id.*

But that is an unquestionably incorrect reading of *Bucklew*'s analysis of death by hanging, and death by suffocation, as Hanna, Jackson, and Bonnell explained at some length in their response to the Show Cause Order.  (*See, e.g.,*

ECF No. 2490, PageID 127686–88.)  The Supreme Court did not conclude that death by suffocation was "not constitutionally inappropriate"; it simply reasoned that, *by comparison to* other available methods in the Nineteenth Century like disemboweling and burning, the risk of death by suffocation posed by a botched hanging execution was presumably acceptable.  *Bucklew*, 139 S. Ct. at 1127.  The pain and suffering posed by death by suffocation *in that comparative analysis* was not considered "superadded" (and thus constitutionally prohibited) precisely because it was not considered to be more than was necessary to carry out the death sentence as compared to the disemboweling or burning options.  *Id.*  Those are not the relevant comparisons for Hanna, however, making inapplicable that analysis of death by suffocation posed by pulmonary edema.

Moreover, Hanna must be permitted to develop his record involving pulmonary edema because the severe pain and suffering caused by that condition matters in the overall inquiry, regardless of whether it is, itself, unconstitutional.  *Henness* did not vacate the findings that the pain and suffering caused by pulmonary edema and its symptoms is severe.  Thus, an evidentiary hearing should be permitted to develop a further record on that issue, for two additional reasons.

First, the evidence will demonstrate that acute, non-cardiogenic pulmonary edema is developing as a result of large IV-injected doses of acid, and that it is starting almost immediately after the injections commence.  As such, the evidence will further demonstrate that the pulmonary edema causes

severe pain and horrific suffering that begins before the midazolam's sedative effects begin, and that severe pain and suffering is sure or very likely to break through the subsequent sedative effects of 500 mg midazolam.  That makes the (non-existent) protective effects of that sedation against the subsequent severe pain of the paralytic and the potassium chloride even less able to protect the inmate from severe pain.  The additional evidence to be presented at a hearing on Hanna's injunctive relief motion regarding pulmonary edema, therefore, goes directly to establishing that the inmate will be sure or very likely to experience pain at the severe (unconstitutionally high) level following injection of the paralytic and then injection of the potassium chloride.

And second, the ultimate issue is the level of risk of severe pain and suffering posed *by the entire protocol*, not just each individual facet of the protocol.  *Glossip*, 135 S. Ct. at 2737 (a plaintiff must "establish[] that the State's lethal injection protocol creates a demonstrated risk of severe pain," (quoting *Baze*, 553 U.S. at 61); *see also id.* at 2738 (inquiring whether "the use of midazolam will [] result in severe pain and suffering"); *see also In re Ohio Execution Protocol Litig. (Campbell)*, 881 F.3d 447, 453 (6th Cir. 2018) (noting lack of "scientific evidence" meant plaintiffs could not prove a "risk that *the protocol as a whole* is sure or very likely to cause serious pain") (emphasis added); *cf. Bucklew*, 139 S. Ct. at 1121 (explaining that "an inmate cannot successfully challenge *a method of execution* under the Eighth Amendment unless he identifies an alternative that . . . significantly reduces a substantial risk of severe pain." (internal quotation marks omitted, emphasis added).

26

Accordingly, the severe pain and suffering resulting from acute pulmonary edema caused by the midazolam injections must be taken into consideration in the Court's analysis of the entire protocol.  Thus Hanna should be permitted to develop his full record related to the midazolam causing acute, non-cardiogenic pulmonary edema.  Relying on *Henness* to preclude presentation of that evidence is an error of law.

IV.    **Hanna appeals the Magistrate Judge's conclusions regarding his individualized paradoxical reaction claim because his counsel cannot be reasonably described as less than diligent for not asserting the injunctive relief claim earlier.**

Plaintiff Hanna's execution date is nearly three months away, on December 11, 2019.

Hanna has alleged that—assuming Ohio would actually use the midazolam protocol that the Governor has publicly repudiated and for which the Defendants have no drugs—he will suffer a paradoxical reaction that will heighten his experience of pain from the protocol, in violation of the Eighth Amendment.  (*See* Hanna's Third Amended Individual Supplemental Complaint, ¶¶ 1899-1901, ECF No. 2396, PageID 115223–24.)

The Magistrate Judge has for months questioned uncertainty surrounding whether the midazolam protocol that is the subject of Hanna's complaint will again be used for executions in Ohio, based on repeated public statements by Governor Mike DeWine.  The Governor has publicly repudiated the protocol and a new protocol has been drafted, but the new protocol has remained on the Governor's desk since June, 2019.  It is also now clear that

Defendants' entire supply of execution drugs needed to implement the three-drug midazolam protocol is expired and will be destroyed.  (*See* Defs.' Motion for Disposal of Expired Drugs, ECF No. 2487, PageID 127459; Notation Order Granting Motion for Disposal of Drugs, ECF No. 2488; *see also* Order, ECF 2509, PageID 127906 (discussing the same).)

Thus, even today, it is not clear that Hanna's request for injunctive relief is ripe, for there are many contingencies that would have to fall into place before his claim would actually be ripe.  *See Texas v. United States*, 523 U.S. 296 (1998).  Defendants would have to elect to use the three-drug midazolam protocol (of the three methods contained in the current execution protocol), then secure a new supply of the drugs for that method, and announce that use at least 30 days before Hanna's execution date of December 11, 2019.

In fact, just today, the Magistrate Judge issued an order formalizing his conclusion that "in the absence of any execution drugs fitting within a promulgated protocol, the State is unable to carry out any executions."  (Order, ECF No. 2509, PageID 127906.)  Further, the Magistrate Judge recognized that unless Defendants notify the Court and Plaintiff Cleveland Jackson by October 14, 2019 (30 days prior to Cleveland Jackson' execution date of November 12, 2019) of a new protocol and possession of the drugs to implement it, or notify the Court and Jackson that the State intends to use of the current (but repudiated) protocol and that it has the drugs to implement that protocol, "there will be no need for further litigation of any request for preliminary injunctive relief by Cleveland Jackson with respect to his currently scheduled

date of execution," because Defendants options at that point would be to seek a reprieve or let the execution warrant expire.  (*Id.*, PageID 127907.)  The Magistrate Judge further stated that "[p]arallel calculations would apply to all Plaintiffs in the case."  (*Id.*)

Nevertheless, while recognizing the numerous "complicating factors" attendant to this litigation (which in Hanna's case includes the absence of ripeness), the Magistrate Judge had previously ordered that because Hanna has a scheduled execution date for December 11, 2019, he was required to file any motion for preliminary injunction not later than September 3, 2019. (Scheduling Order, ECF No. 2275, PageID 110814, 110817.)

*Hanna fully complied with that order*, filing his motion on September 3, 2019, requesting preliminary injunctive relief on, *inter alia*, his paradoxical reaction claim.  (*See* Motion for Preliminary Injunction, ECF No. 2435, PageID 117017-25.)  That is, he filed his motion more than three months before his scheduled execution date.

Earlier, on August 16, 2019, the Magistrate Judge ordered that Hanna identify a proposed schedule for litigating his motion for preliminary injunction. (Scheduling Order, ECF No. 114634.)  Again, *Hanna fully complied with the Magistrate Judge's Order*, explaining to the Court that a hearing could be scheduled for late October, 2019 on his unique issues.  (*See* Hanna's Scheduling Proposal, ECF No. 2372, PageID 114686.)

On August 29, 2019, the Magistrate Judge agreed that a schedule for the litigation of Hanna's unique preliminary injunction issues (his paradoxical

reaction claim) was premature and vacated the schedule for proceedings on Hanna's paradoxical reaction claim. (Decision on Objections by Plaintiffs Hanna and Bonnell, ECF No. 2418, PageID 116415.) The Magistrate Judge said he would determine the time for litigating that claim in light of "more supportive information" from Hanna, which the Magistrate Judge ordered to be filed with Hanna's impending September 3, 2019 motion for preliminary injunction. The Magistrate Judge also ordered Hanna to inform the Court about potential experts, what efforts Hanna had made to present their testimony and "how long they will need to prepare, etc." (*Id.* at PageID 116416.)

Once again, Hanna fully complied with the Magistrate Judge's Order. On September 3, 2019, Hanna explained the precise information that he expected to present at a preliminary injunction hearing which, as he earlier maintained, could (as necessary) be held by the end of October, 2019. (*See* Hanna's Mot. for Injunctive Relief, ECF No. 2435, PageID 117017–25.) Hanna explained in great detail the science behind paradoxical reactions, and the risk factors for such a reaction. (*Id.*) He explained that paradoxical reactions occur with persons who have a "vulnerable brain," which perfectly describes James Hanna. (*Id.* at PageID 117019.) Hanna cited numerous peer-reviewed articles that discuss the paradoxical reaction caused by midazolam, and the risk factors for such a reaction. (*Id.*, PageID 117018–19 & nn. 2–10.) Hanna also made clear that he has a constellation of risk factors that make a paradoxical reaction likely, especially where persons with but one risk factor have such

30

reactions.  As Hanna explained at length, his risk for a paradoxical reaction was severe, given that he presents with a host of relevant factors: his advanced age, his diagnosis of post-traumatic stress disorder, his suffering major depression, having a cognitive disorder, having borderline personality disorder, suffering brain damage, and a history of alcohol abuse.  (*Id.*, PageID 117019–21.)

Complying with the Magistrate Judge's Order, Hanna also identified his proposed expert testimony to prove that he would suffer a paradoxical reaction to the midazolam protocol.  He identified four potential experts.  First, he identified Dr. Howard Fradkin, Ph.D., who would testify that Hanna has Post-Traumatic Stress Disorder, Major Depression, and Borderline Personality Disorder—all risk factors for a paradoxical reaction.  (Dr. Fradkin's sworn declaration was attached).  (*See id.*, PageID 117023; Sworn Declaration, ECF No. 2435-1, PageID 117034, et seq.[3])  Hanna explained that Dr. Fradkin had already completed a report.

Second, Hanna identified Dr. Douglas Scharre, M.D., who would testify about Hanna's brain damage, and that neuroimaging was warranted to support Hanna's claim about paradoxical reactions.  (Motion for Preliminary Injunction, PageID 117022; Declaration of Douglas Scharre, ECF No. 2435-4, PageID 117121-23 (explaining need for neuroimaging given already extant proof that

---

[3] In denying a hearing, the Magistrate asserted that Dr. Fradkin's sworn declaration did not comport with 28 U.S.C. §1746, because it was not dated. The Magistrate is incorrect on that point. Dr. Fradkin's report is signed and dated and sworn under the penalty of perjury on ECF 2435-1, PageID 117085.

Hanna is brain damaged).)  Hanna made clear, in response to the Magistrate Judge's prior order, that Dr. Scharre would be able to testify at a hearing in late October, 2019.  (*See id.* at PageID 117023.)

Hanna emphasized that he had been constrained by budget limitations in his ability to hire and pay experts—especially where it was then (and still is now) uncertain whether the three-drug midazolam protocol would be used. (Motion for Preliminary Injunction, ECF No. 2435, PageID 117022 n. 2.)

Third, Hanna identified anesthesiologist Dr. David Lubarsky, M.D., an expert in intravenous anesthetics and benzodiazepines, who will also testify about Hanna's likelihood of suffering a paradoxical reaction and how that would cause Hanna to experience a heightened level of pain.  (*Id.*, PageID 117023–24.)  Again, Hanna made clear that Dr. Lubarsky would be expected to testify by October 28-29, 2019—*i.e.*, Hanna's proposed dates for a hearing on his individualized claim.

Fourth, Hanna identified Dr. Craig Stevens, an expert in pharmacology who would testify about midazolam and its effects on the brain, particularly the paradoxical reaction to midazolam and associated risk factors.  (*Id.* at PageID 117023.)

In sum, therefore, there was (and still is) great uncertainty about whether Defendants will even be able to attempt to use the three-drug midazolam protocol; there is similarly great uncertainty about whether Defendants would use that protocol even if they can get additional drugs to do so; there were funding concerns regarding significant expenditures on experts

to demonstrate a claim that is arguably unripe; and Hanna provided clear responses to the Magistrate Judge's inquiries that he expected to be able to present his evidence by late October, well before his scheduled execution date.

Nevertheless, the Magistrate Judge has now vacated the scheduled evidentiary hearing, thus preventing Hanna the opportunity to prove that injunctive relief is warranted on his paradoxical reaction claim.  (Order, ECF No. 2507, PageID 127899–900.)

The Magistrate Judge concluded that "none of Hanna's proposed evidence would be properly before the Court." (*Id.*, PageID 127900.)  That is clearly erroneous and manifest error.  Fed. R. Civ. P. 72(a).

The Magistrate Judge faulted Hanna for not presenting reports from Drs. Lubarsky and Stevens at this juncture.  Yet in the controlling scheduling order (ECF No. 2418, PageID 116415), the Magistrate Judge did not require Hanna to present expert reports with his motion for preliminary injunction.  (ECF No. 2418, PageID 116416.)  Indeed, that has never been the requirement in any of the many injunctive relief proceedings in this consolidated litigation.  Hanna explained that he needed funding to have Drs. Stevens and Lubarsky prepare their expert reports, but that Hanna expected to secure their reports after October 1, 2019 (the start of the new federal fiscal year), and that he would have them available for a hearing in late October, 2019—the approximate date he had suggested, and one that is far in advance of Hanna's December 11, 2019 execution date.  Under these facts, it was clearly erroneous for the

Magistrate Judge to conclude that expert opinion evidence from Dr. Lubarsky and Dr. Stevens would not be "properly before the Court" at a hearing.

Similarly, the Magistrate Judge concluded that Dr. Fradkin would not be able to establish that Hanna would suffer a paradoxical reaction.  (Order, ECF No. 2507, PageID 127900.)  The Magistrate Judge reasoned that Dr. Fradkin could not "offer any evidence in support of Hanna's underlying claim that midazolam will cause a paradoxical reaction due to the drug's pharmacology and Hanna's neurological issues."  (*Id.*)  But Hanna had not and does not argue that Dr. Fradkin would testify about the paradoxical reaction.  Dr. Fradkin would testify that Hanna suffers three risk factors for that reaction, factors that increase the likelihood that Hanna would experience it during his execution after injection of 500 mg midazolam: Post-Traumatic Stress Disorder, Major Depression, and Borderline Personality Disorder.  The province of Dr. Fradkin's testimony would be to establish the presence of risk factors, not to explain the paradoxical reaction itself.  The Magistrate Judge's conclusion to the contrary is clearly erroneous.  Without Dr. Fradkin's testimony to establish that Hanna suffers from the risk factors for a paradoxical reaction, Hanna would be limited in his ability to present evidence regarding the likelihood of that paradoxical reaction occurring.

In that way, the testimony of Dr. Fradkin would complement the expert opinion evidence offered by Dr. Stevens (as a pharmacologist), Dr. Lubarsky (as an anesthesiologist), and Dr. Scharre (as a neurologist) to establish Hanna's claim that the risk of a paradoxical reaction subjected him to a sure or very

likely risk of experiencing severe pain and suffering if executed using Ohio's midazolam protocol.  All of their evidence would be "properly before the Court," contrary to the Magistrate Judge's conclusions, so long as this Court provides Hanna the minimal time he needs to present their testimony.

At bottom, the Magistrate Judge essentially concluded that because Hanna has not yet proven his case on his pleadings, he should be denied a hearing on his injunctive relief motion—and executed without such a hearing—even though Hanna can and would be able to present the necessary proof in support of his claims by late October, 2019.  This is well in advance of his scheduled execution date, and he requires that time to secure expert assistance and then present his expert proof to the Court.

The Magistrate Judge's willingness to allow Hanna's execution to go forward three months from now without an evidentiary hearing on this claim is contrary to law, for any number of reasons.

A motion for preliminary injunction may be litigated only when a risk of harm is imminent.  That risk of harm is still months away, so it is unfair for the Magistrate Judge to assert that Hanna must somehow prove his case long before December 11, 2019.  As noted earlier, given the numerous contingencies that must occur before Hanna has a ripe claim for injunctive relief, it is manifestly contrary to law and unfair to hold that Hanna is somehow too late to litigate an unripe claim.

The Magistrate Judge's conclusion is also especially unfair where Hanna—like the Magistrate Judge himself—has been proceeding with caution

35

and with appropriate speed on any challenge to the three-drug midazolam protocol, because that protocol has been repudiated by Governor DeWine, there are no drugs to implement it, and the midazolam protocol is expected to be superseded by a new protocol.

Moreover, this Court should also consider that Hanna has complied with every scheduling order of the Magistrate Judge; that Hanna has sought injunctive relief months before his scheduled execution date; and that Hanna has repeatedly explained that he requires time and funding to present his claim at a hearing.

It is an abuse of discretion for the Magistrate Judge to deny Hanna a hearing under these circumstances.

In fact, the Magistrate Judge earlier vacated a potential hearing on these claims, recognizing that it would be "premature" to rule on Hanna's request for a hearing before knowing what Hanna's proof would be.  (Decision on Objections by Plaintiffs Hanna and Bonnell, ECF No. 2418, PageID 116415.) That was August 29, 2019.  Yet now, a mere three weeks later, the Magistrate Judge has concluded that denying a hearing is appropriate for lack of diligence. Those two conclusions are mutually exclusive.  The latter decision is contrary to law and the Magistrate Judge's prior conclusion: the Magistrate Judge has not allowed Hanna to secure the necessary expert assistance and marshal his proof to show, via an evidentiary hearing, that injunctive relief is warranted.

What's more, by denying a hearing and cutting off Hanna's ability to seek injunctive relief literally *months before a scheduled execution date*, the

Magistrate has acted contrary to the longstanding practice in this consolidated litigation. In denying Hanna a hearing on his individual characteristics, the Magistrate Judge took issue with the timing of Hanna's claims, noting that "there is no indication that he attempted to develop any evidence prior to August 3, 2019." (Order, ECF No. 2507, PageID 127900.) Given the longstanding custom and practice in this case, however, Hanna's claims for injunctive relief should be considered timely raised, and there is sufficient time to proceeding to a hearing.

As shown in a table below, and as Hanna explained in his adopted response to the Show Cause Order, this Court has properly granted evidentiary hearings to plaintiffs seeking injunctive relief when they have sought relief *just days or weeks* before a scheduled execution date. (*See* ECF No. 2490, PageID 127662-63.)

For example, Former Plaintiff Dennis McGuire's Motion for a Stay of Execution, a Temporary Restraining Order, and a Preliminary Injunction (ECF No. 379) was filed on January 6, 2014—**just 10 days before his execution** was scheduled to take place on January 16, 2014. A two-day preliminary injunction hearing was held January 10 & 12, 2014 (ECF No. 432 & 433), and the motion was denied by a decision issued January 13, 2014 (ECF No. 390).

The preliminary injunction hearing immediately prior to that was that of Ronald Phillips. **Former Plaintiff Phillips's first motion for preliminary injunction was filed on October 28, 2013, when his execution date was scheduled at that time for November 14, 2013.** A preliminary injunction

hearing was also held over the course of two days—November 1 & 4, 2013—
and his motion was denied on November 7, 2013 (ECF No. 363).

 In fact, since this litigation was consolidated in 2011, it has been the
norm—not the exception—that cases were litigated on a very tight timeframe
consistent with the emergency nature of preliminary injunction proceedings in
general.  A review of the past litigation timelines indicates that when
circumstances necessitate, evidence in support of a preliminary injunction can
be developed and presented rapidly:

| Plaintiff/ Former Plaintiff | Preliminary Injunction Motion filing date | Hearing date(s) | Execution date/then-scheduled execution date | Time between filing Motion and scheduled hearing |
|---|---|---|---|---|
| Charles Lorraine | Nov. 23, 2011 (ECF No.10) | Jan. 3, 2012 (ECF No. 42) | Jan. 18, 2012; date stayed by granting of preliminarily injunction (ECF No. 57) | **41 days** |
| Michael Webb | Jan. 24, 2012 (ECF No. 67) | No hearing held; Defendants did not oppose the motion for preliminary injunction; preliminary injunction issued on Jan. 26, 2012 (ECF No. 71) | Feb. 22, 2012 (ECF No. 67) | N/A |
| Mark Wiles | Feb. 15, 2012 (ECF No. 84) | March 20-22, 2012; April 9-11, 2012 (ECF Nos. 96, 98, 99; 437, 441, 442, 443, 444, 445) | April 18, 2012 (ECF No. 84) | **34 days** |
| Brett Hartman | Oct. 25, 2012 (ECF No. 130) | Nov. 1, 2012 (ECF No. 136, PageID 6089 | Nov. 13, 2012 (ECF No. 130) | **19 days** |

| Plaintiff/ Former Plaintiff | Preliminary Injunction Motion filing date | Hearing date(s) | Execution date/then-scheduled execution date | Time between filing Motion and scheduled hearing |
|---|---|---|---|---|
| Ronald Post | Nov. 19, 2012 (ECF No. 139) | Scheduled for Dec. 17, 2012, *but vacated after clemency was granted to Plaintiff Post* (ECF No. 148) | Jan. 16, 2013 (ECF No. 139) | **28 days** |
| Abdul Awkal | May 18, 2012 (ECF No. 111) | No hearing held, motion denied (ECF No. 116) | June 6, 2012 (ECF No. 111); execution stayed by state court in competency proceedings (see EFC No. 74213, PageID 74213) | N/A |
| John Eley | May 18, 2012 (ECF No. 111) | No hearing held, motion denied (ECF No. 116) | June 6, 2012 (ECF No. 111); clemency was granted to plaintiff (ECF No. 153) | N/A |
| Ronald Phillips | Oct. 28, 2013 (ECF No. 339) | Nov. 1 & 4, 2013 (ECF No. 363, PageID 10414) | Nov. 14, 2013 (ECF No. 363) | **4 days** |
| Dennis McGuire | Jan. 6, 2014 (ECF No. 379) | Jan. 10 & 12 (ECF No. 432 & 433) | Jan. 16, 2014 (ECF No. 390) | **4 days** |

| Plaintiff/ Former Plaintiff | Preliminary Injunction Motion filing date | Hearing date(s) | Execution date/then-scheduled execution date | Time between filing Motion and scheduled hearing |
|---|---|---|---|---|
| Ronald Phillips, Raymond Tibbetts, Gary Otte (consolidated hearing) | Oct. 26, 2016<br><br>(ECF Nos. 692, Phillips, first in line) | Jan. 3 – 6 & 9, 2017<br><br>(ECF Nos. 922, 923, 924, 925, 924 & 940) | February 15, 2017 (Phillips, first in line)<br><br>(ECF No. 848) | **2 months, 8 days** |
| Raymond Tibbetts & Alva Campbell | Sept. 27. 2017<br><br>(ECF No. 1261 – Tibbetts; ECF No. 1262 - Campbell) | Oct. 23-27, 2017 | Nov. 15, 2017 (Alva Campbell) | **26 days** |
| Gary Otte | Aug. 22, 2017<br><br>(ECF No. 1168) | Sept. 6, 2017<br><br>(ECF No. 1226, PageID 45232) | Sept. 13, 2017<br><br>(ECF No. 1226) | **15 days** |

For instance, two recently executed Plaintiffs were allowed to be heard on their motions for preliminary injunction just four days after filing those motions. And a major consolidated preliminary injunction lasting nearly a full week was permitted to proceed to hearing after only 2 month and 8 days. The Magistrate Judge recently permitted Former-Plaintiff Gary Otte to have a *second* preliminary injunction hearing after the appellate court overturned the

Court's initial grant of a preliminary injunction. Plaintiff Otte filed his second Motion for Preliminary Injunction on August 22, 2017. (ECF No. 1168.) Just 15 days later, the Court presided over a hearing for Plaintiff Otte and permitted him to present the evidence on his claim. Plaintiff Tibbetts likewise was permitted a second evidentiary hearing and injunctive relief proceeding after the appellate court overturned this Court's grant of injunctive relief.

In sum, Hanna should not be denied a hearing when this Court has consistently recognized that Plaintiffs may need to bring their claims to be heard mere *days* before their scheduled execution. Hanna filed his Motion for Preliminary Injunction on September 3, 2019 with supportive evidence—***over three months*** before his currently scheduled execution date of December 11, 2019. It is fundamentally unfair to deny Hanna an opportunity to be heard on the same (or even longer) timeline on which other Plaintiffs were permitted to proceed. Due process and the interests of justice require Hanna be given the equal opportunity afforded to other Plaintiffs in this litigation. Denying Hanna a hearing is denying him an opportunity to be heard on facts which he contends will show he will be subjected to a sure or very likely risk of severe pain and suffering—a point of fact that Defendants dispute. Consequently, an evidentiary hearing is both necessary and appropriate to be heard on these material but disputed facts.

This Court, therefore, should overrule the Magistrate Judge's denial of an evidentiary hearing and either grant a hearing, or recommit this matter for

further consideration.  The Magistrate Judge's findings and denial of a hearing are clearly erroneous and contrary to law.

## V.      Conclusion

For all the reasons articulated above, this Court should consider the Magistrate Judge's Decision and Order Vacating Evidentiary Hearing *de novo*, explain that the Sixth Circuit's decision in *Henness* does not preclude building a record that would demonstrate that condemned inmates have satisfied the applicable standard, and reverse the order, reinstating the long-planned evidentiary hearing.

**Respectfully submitted this 19th day of September 2019.**

**Deborah L. Williams**
Federal Public Defender

by

*/s/ Allen L. Bohnert*
**Allen L. Bohnert (0081544)**
Trial Attorney for Plaintiff Hanna

Paul R. Bottei
Co-Counsel for Plaintiff Hanna

Assistant Federal Public Defenders
Office of the Federal Public Defender
for the Southern District of Ohio
Capital Habeas Unit
10 West Broad Street, Suite 1020
Columbus, Ohio 43215
Telephone: 614.469.2999
Fax:  614.469.5999
Allen_Bohnert@fd.org
Paul_Bottei@fd.org

David L. Doughten
4403 St. Clair Avenue
Cleveland, Ohio 44103
(216) 361-1112
Co-Counsel for Plaintiff Hanna

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2019, I electronically filed the foregoing **Plaintiff James Hanna's Objections to and Appeal From Magistrate Judge's Decision and Order Vacating Evidentiary Hearing (ECF No. 2507)** with the Clerk of the United States District Court for the Southern District of Ohio using the CM/ECF system, which will send notification of such filing to counsel for all parties.

*/s/ Allen L. Bohnert*
Trial Attorney for Plaintiff James Hanna