# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION AT COLUMBUS

| | |
|---|---|
| IN RE: OHIO EXECUTION PROTOCOL LITIGATION : | Case No. 2:11-cv-1016 |
| : | District Judge Edmund A. Sargus, Jr.<br>Magistrate Judge Michael R. Merz |
| This document relates to:<br>  Plaintiffs Cleveland Jackson,<br>  James Hanna, and Melvin Bonnell    : | |

## DECISION AND ORDER REGARDING CONTINUED ANONYMITY OF DRC EMPLOYEE #1

This consolidated method of execution case is before the Court on Plaintiffs' Motion to Admit Deposition Testimony of DRC Employee No. 1 (ECF No. 2506). Defendants' oppose the Motion (ECF No. 2530).

Previously Defendants moved for a protective order to require the redaction of the name of DRC Employee No. 1 from the transcript of his deposition (ECF No. 2430).[1] Plaintiffs opposed the Motion (ECF No. 2468), but the Court granted it on the basis that the deposition had, at that point, only been filed on court order as an exception to Fed.R.Civ.P. 5(d)(1)(A) as a discovery management matter (ECF No. 2481). The instant Motion seeks to have the deposition of DRC Employee No. 1 used as part of the evidence supporting the motions for preliminary injunction.

Having read the transcript of the deposition, the Court finds it contains much testimony relevant to the issues before the Court, including, *inter alia,* a description of the process for

---

[1] The same motion sought redaction of the name of Warden Ron Erdos, but that request was later withdrawn by Defendants.

1

obtaining and transporting execution drugs to Southern Ohio Correctional Facility in Lucasville, Ohio ("SOCF" or "Lucasville"), where executions are carried out, investigation of sources for secobarbital (a drug formerly used in Medical Assistance in Dying in Oregon and proposed as part of an alternative method of execution by Plaintiff Warren Henness (Henness Motion for Preliminary Injunction, ECF No. 1929), and the fact that all execution drugs enumerated in 01-COM-11 in the possession of the Ohio Department of Rehabilitation and Corrections ("DRC" or "ODRC") on the date of the deposition were past their expiration dates. Since DRC Employee No. 1 is a party-Defendant in this case, his deposition is usable by Plaintiffs for supporting their motions for preliminary injunction. Fed.R.Civ.P. 32(a)(3). Accordingly, the Motion of Plaintiff to Admit the Deposition Testimony is GRANTED.

In granting sealing of the deposition while it was still only a discovery document, the Court cautioned Defendants as follows:

> This Order should not be read, however, as accepting the State Defendants' argument that the State has protected confidentiality interest in the identity of DRC Employee No. 1. Nor should it be read as accepting the argument that DRC Employee No. 1 himself or herself has such an interest which would be protected by a sealing order if the deposition transcripts or other documents disclosing his or her identity should come to be used as a basis for a court decision. The Court notes that DRC Employee No. 1's assertion of fear of annoyance, etc., is purely conclusory; there is even less evidence cited to substantiate that claim than was presented to Judge Frost in justifying the prior protective order. Perhaps more importantly, the Motion suggests that the State of Ohio asserts an interest in being able to purchase execution drugs without disclosing to the seller the intended use of the drugs. While Ohio plainly has constitutional authority to execute by use of lethal drugs, no court (at least to the knowledge of the undersigned) has held the State has the right to purchase such drugs anonymously, much less a right that overcomes the strong presumption of public access set forth in *Shane Grp.*[ *Inc., v. Blue Cross Blue Shield of Michigan,* 825 F.3d 299, 306 (6th Cir. 2016)]. Defendants are cautioned that any renewed motion seeking protection of that sort will require much more justification than has been given to date.

(Decision and Order on Defendants' Motion for Protective Order, ECF No. 2481, PageID 127429-30).

DRC Employee No. 1 was deposed in this case on August 21, 2019. The transcript of his deposition is filed at ECF No. 2457-2 and Plaintiffs seek to admit the entirety of it. *Id*. at PageID 120449-64.[2] At the outset of the deposition, when DRC Employee No. 1 was asked his name, Defendants' co-counsel Katherine Mullin objected: "So we're going to object to any identifying information as to him as to previous orders.. . . So that would be ECF 629 and ECF 838." (ECF No. 2457-2, PageID 120449).[3]

Defendants assert DRC Employee No. 1's name is protected by protective orders entered by this Court at ECF Nos. 629, 838, and 1052. During the preliminary injunction hearing on September 24, 2019, they also asserted it was protected by the provisions of Ohio Revised Code §§ 2949.221 and .222 (Transcript pending). The Court considers these in chronological order.

**Protection Under Ohio's Execution Drugs Secrecy Bill**

Ohio Revised Code § 2949.221, which codifies H.B. 663, effective March 23, 2015, provides:

---

[2] Because the transcript has been prepared in minuscript format (four pages of transcript to one 8.5x11 sheet), only sixteen pages of that size paper comprise sixty-three pages of transcript. The Court notes that the copy at ECF No. 2457-2 is neither signed by the deponent nor certified by the court reporter. Because the court reporter furnished the transcript for review on August 26, 2019, DRC Employee No. 1's time to correct has expired. Fed.R.Civ.P. 30(e)(1).

[3] At two later places in the deposition Ms. Mullin again objected, once to inquiry into deliberative process (ECF No. 2457-2, PageID 120453) and once to an inquiry where she apparently expected the answer to reveal information protected by the attorney-client communication privilege, work product protection, or the deliberative process privilege. *Id*. at PageID 120460. In neither of those instances did Plaintiffs' counsel, Adam Rusnak, pursue the inquiry. Thus the sole objection made at the deposition was to DRC Employee No. 1 stating his name.

**Confidentiality of Information Concerning Lethal Injections**

(A) As used in this section:

> (1) "Person" has the same meaning as in section 1.59 of the Revised Code.
>
> (2) "Licensing authority" means an entity, board, department, commission, association, or agency that issues a license to a person or entity.
>
> (3) "Public office" has the same meaning as in section 117.01 of the Revised Code.

(B) If, at any time prior to the day that is twenty-four months after the effective date of this section, a person manufactures, compounds, imports, transports, distributes, supplies, prescribes, prepares, administers, uses, or tests any of the compounding equipment or components, the active pharmaceutical ingredients, the drugs or combination of drugs, the medical supplies, or the medical equipment used in the application of a lethal injection of a drug or combination of drugs in the administration of a death sentence by lethal injection as provided for in division (A) of section 2949.22 of the Revised Code, notwithstanding any provision of law to the contrary, all of the following apply regarding any information or record in the possession of any public office that identifies or reasonably leads to the identification of the person and the person's participation in any activity described in this division:

> (1) The information or record shall be classified as confidential, is privileged under law, and is not subject to disclosure by any person, state agency, governmental entity, board, or commission or any political subdivision as a public record under section 149.43 of the Revised Code or otherwise.
>
> (2) The information or record shall not be subject to disclosure by or during any judicial proceeding, inquiry, or process, except as described in division (B)(4) of this section or in section 2949.222 of the Revised Code.
>
> (3) The information or record shall not be subject to discovery, subpoena, or any other means of legal compulsion for disclosure to any person or entity, except as described in division (B)(4) of this section or in section 2949.222 of the Revised Code.

(4)

    (a) If the information or record pertains to the manufacture, compounding, importing, transportation, distribution, or supplying of any of the items or materials described in division (B) of this section, the person or entity that maintains the information or record shall disclose the information or record to the Ohio ethics commission and the commission may use the information or record, subject to division (B)(1) of this section, only to confirm the following:

        (i) That the relationship between the person and the department of rehabilitation and correction is consistent with and complies with the ethics laws of this state;

        (ii) That at the time of the specified conduct, the person has all licenses required under the laws of this state to engage in that conduct and the licenses are valid.

    (b) If the Ohio ethics commission receives any information or record pursuant to division (B)(4)(a) of this section, the commission shall complete its use of the information or record for the purposes described in that division within fourteen days of its receipt and shall promptly report its findings to the director of rehabilitation and correction.

(C)

    (1) If, at any time prior to the day that is twenty-four months after the effective date of this section, an employee or former employee of the department of rehabilitation and correction or any other individual selected or designated by the director of the department participates or participated in the administration of a sentence of death by lethal injection, as provided for in division (A) of section 2949.22 of the Revised Code, subject to division (C)(2) of this section and notwithstanding any other provision of law to the contrary, the protections and limitations specified in divisions (B)(1), (2), and (3) of this section shall apply regarding any information or record in the possession of

5

any public office that identifies or reasonably leads to the identification of the employee, former employee, or other individual and the employee's, former employee's, or individual's participation in the administration of the sentence of death by lethal injection described in this division.

(2) Division (C)(1) of this section does not apply with respect to information or a record that identifies or reasonably leads to the identification of the director of rehabilitation and correction or the warden of the state correctional institution in which the administration of the sentence of death takes place.

(D) The protections and limitations specified in divisions (B)(1), (2), and (3) of this section regarding information and records that identify or may reasonably lead to the identification of a person described in divisions (B) or (C) of this section and the person's participation in any activity described in the particular division are rights that shall be recognized as follows:

(1) With respect to a person that is an individual, without any requirement for the person to take any action or specifically apply for recognition of such rights.

(2) With respect to a person that is not an individual, the rights do not exist unless the person requests to have the rights recognized by applying in writing to the director of rehabilitation and correction.

The director of rehabilitation and correction by rule shall establish the procedure according to which a person who is not an individual may apply in writing for the rights described in divisions (B)(1), (2), and (3) of this section. The director shall approve an application that is submitted in compliance with the rules. A person whose application is approved is entitled to the rights for twenty years after the person ceases the qualifying activity as contemplated by the first paragraph of division (B) of this section. The director shall notify any person, who is not an individual and who is entitled to the rights, of the application procedures.

(E) If a person or entity that, at any time prior to the day that is twenty-four months after the effective date of this section, participates in, consults regarding, performs any function with

respect to, including any activity described in division (B) of this section, or provides any expert opinion testimony regarding an execution by lethal injection conducted in accordance with division (A) of section 2949.22 of the Revised Code is licensed by a licensing authority, notwithstanding any provision of law to the contrary, the licensing authority shall not do any of the following as a result of that participation, consultation, performance, activity, or testimony by the person or entity:

> (1) Challenge, reprimand, suspend, or revoke the person's or entity's license;
>
> (2) Take any disciplinary action against the person or entity or the person's or entity's licensure.

(F) **A person may not, without the approval of the director of rehabilitation and correction, knowingly disclose the identity and participation in an activity described** in the particular division of any person to whom division (B) of this section applies and that is made confidential, privileged, and not subject to disclosure under that division or of an employee, former employee, or other individual to whom division (C)(1) of this section applies and that is made confidential, privileged, and not subject to disclosure under that division. Any person, employee, former employee, or individual whose identity and participation in a specified activity is disclosed in violation of this division has a civil cause of action against any person who discloses the identity and participation in the activity in violation of this division. In a civil action brought under this division, the plaintiff is entitled to recover from the defendant actual damages, punitive or exemplary damages upon a showing of a willful violation of this division, and reasonable attorney's fees and court costs.

(G) If division (B), (C), or (D) of this section applies to a person with respect to any conduct or activity of the person occurring at a time prior to the day that is twenty-four months after the effective date of this section, the expiration of that twenty-four month period does not affect, add to, or diminish the protections and limitations specified in division (B) or (C), division (D), and division (E) of this section with respect to their application to that person.

(Emphasis added.) At the time H.B. 663 was adopted, the principal concern was the expected desire for anonymity of manufacturers or other suppliers or potential suppliers of execution drugs

to the State. (See Sealed Transcript of Motion for Protective Order Proceedings before the Honorable Gregory L. Frost, ECF No. 548).[4] There was at that time no discussion of protecting the identity of DRC Employee No. 1 or of anyone in his or her position.

Nevertheless, the text of the statute covers DRC Employee No. 1 because he is "a person [who] . . . transports, distributes, supplies, prescribes, [or] prepares, . . . any of the . . . drugs or combination of drugs, . . . used in the application of a lethal injection of a drug or combination of drugs in the administration of a death sentence by lethal injection. . . ." Ohio Revised Code § 2949.221(B). The identity of such a person is not to be publicly disclosed "without the approval of the director of rehabilitation and correction." Ohio Revised Code § 2949.221(F).

The identity of DRC Employee No. 1 was publicly disclosed on July 24, 2019, in Defendants' Identification of Hearing Witnesses and Precis of Expected Lay Witness Testimony for the September 24, 2019, hearing, in which they represented:

> [Actual name of DRC Employee No. 1] will testify briefly as to his education and training as a pharmacist and his role as responsible pharmacist for SOCF. He will testify regarding ODRC procedures for procurement, licensing, handling, transfer, transportation, delivery, storage and maintenance of drugs used in executions. He will testify about his professional knowledge and experience regarding the general practice of pharmacy or pharmacy care, including dispensing, mixing, and compounding drugs, and the relevant state licensing requirements to do so. [Actual name of DRC Employee No. 1] will testify regarding Plaintiff Jackson's alleged alternative methods of execution involving oral administration of drugs and the availability, feasibility and ODRC's ability to implement each of those alternatives. Specifically, he will testify about his understanding of the proposed alternative methods, specifically the proposed process for the dispensing, preparation, mixing and/or administration of the proposed execution drugs. He will also testify about the feasibility of the ORDC to obtain the drugs needed for execution, whether the current 3-drug protocol or other alternatives, and the availability of, and process for obtaining, such drugs for ODRC. He may also testify about matters contained in the

---

[4] Upon motion by former Plaintiff Ronald Phillips (ECF No. 631), the transcript of those proceedings was unsealed on December 17, 2015 (Order, ECF No. 639).

> State Defendants' responses to any of Plaintiff's discovery if permitted in this case, and any additional relevant matters on which he may have knowledge.

(ECF No. 2293, PageID 111801-02.). During the September 24, 2019, hearing Defendants' co-counsel Katherine Mullin confirmed that filing of the witness list was done with the approval of Defendant Annette Chambers-Smith (Transcript pending). Thus, any interest of either the State Defendants collectively or of DRC Employee No. 1 personally in maintaining his identity in confidence that was protected by Ohio Revised Code § 2949.221 was waived no later than the filing of Defendants' Witness List.[5]

**Protection Under Prior Protective Orders in this Case.**

Defendants also rely on the protective order issued by Judge Frost (ECF No. 629). Although he discussed H.B. 663, Judge Frost did not rely on it in granting relief, but instead relied on Fed.R.Civ.P. 26(c). He noted that to justify a protective order under that rule, "one of Rule 26(c)(1)'s enumerated harms 'must be illustrated with a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.'" (ECF No. 629, 2015 WL 6446093, at *1 (S.D. Ohio Oct. 26, 2015) (Frost,J.), quoting *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012); *Nemir v. Mitsubishi Motors Corp.*, 381 F.3d 540, 550 (6th Cir. 2004) (additional internal quotation marks omitted), aff'd, *Fears v. Kasich*, 845 F.3d 231 (6th Cir. 2016). The focus of the inquiry that produced the protective order was the supposed necessity for anonymity of possible compounding pharmacies; nothing was said by any witness about the need

---

[5] The Court pretermits any discussion of other places in the record (now at almost 130,000 pages) where the name of DRC Employee No. 1 may have been publicly disclosed so as to effect a waiver under Ohio Revised Code § 2949.221, as the waiver by filing the Witness List is sufficient.

to protect the anonymity of any person in the position of DRC Employee No. 1. Nevertheless, Judge Frost ordered that

> any information or record in Defendants' possession, custody, or control that identifies or reasonably would lead to the identification of any person or entity who participates in the acquisition or use of the specific drugs, compounded or not, that Ohio indicates in its execution protocol it will use or will potentially seek to use to carry out executions is protected and not subject to discovery. This protective order is intended to extend to those persons who or entities that have not waived or forfeited its protection and who manufacture, compound, import, transport, distribute, supply, prescribe, prepare, administer, use, or test the compounding equipment or components, the active pharmaceutical ingredients, the execution protocol drugs or combination of drugs, the medical supplies, or the medical equipment used in carrying out any execution under Ohio Revised Code § 2949.22.

*Id*. at *9. That language, which mirrors the language in H.B. 663, is broad enough to cover DRC Employee No. 1, although no evidence was offered at the hearing to show that he was threatened with any harm specified in Fed.R.Civ.P. 26(c). Without such a showing, the protective order is not properly applied to him, as Judge Frost held in the opinion supporting its issuance. That is to say, although the language of the order is broad enough to apply to DRC Employee No. 1, he is not entitled to its protection without making a satisfactory showing under Fed.R.Civ.P. 26(c), which he has neither done nor attempted to do until his Declaration discussed below (ECF No. 2457-1).

After the undersigned assumed management of the case upon promulgation of the present version of 01-COM-11, Defendants filed a new Motion for Protective Order (ECF No. 705). At that time the State had acquired a sufficient quantity of the drugs the State intended to use to execute former Plaintiffs Phillips, Otte, and Tibbetts, to wit, midazolam, rocuronium bromide[6], and potassium chloride. They asked the Court to read Judge Frost's protective order as applying

---

[6] Rocuronium bromide is one of three paralytic drugs authorized for use in the present version of 01-COM-11.

to these new drugs "because the same rationale exists for protecting them as existed for protecting the identities of potential suppliers of thiopental sodium or pentobarbital, whether compounded or manufactured, before the Protective Order was entered." (Decision, ECF No. 838, PageID 24912), reported at 2016 WL 7368187 (S.D. Ohio Dec. 20, 2016) (Merz, Mag. J.)). In those circumstances, the Court decided several issues regarding privilege:

1. "Federal law, not state law, governs the recognition of any privilege to refuse to provide discoverable information in this case." *Id.*. at *2

2. Defendants were not entitled to the so-called state secrets privilege. *Id*.

3. The Court recognized as a matter of comity the confidentiality interests sought to be protected by Ohio Revised Code § 2949.221 and also recognized a qualified privilege for that information, "defeasible by the needs, if any, of Plaintiffs in this case to obtain necessary discovery." *Id*.

4. Although "Judge Frost's Protective Order d[id] not by its terms apply to drugs" other than pentobarbital and thiopental sodium, the Court extended the same protection to suppliers of the drugs named in the new protocol. *Id.* at *3.

Nothing in that Decision referred to DRC Employee No. 1.

Finally, Defendants rely on the Decision and Order Granting in Part and Denying in Part Defendants' Motion for Partial Redaction of Depositions (ECF No. 1052, May 24, 2017). The Court found that the depositions in question were all discovery depositions filed only for discovery management purposes under the November 2016 Scheduling Order referenced above. The Court found that Defendants had waived any confidentiality interest they might have had in "what they themselves have revealed to the public" and noted that, *inter alia*, Defendants had cited pages from the deposition of DRC Employee No. 1 in their Merit Brief on appeal of this Court's order granting

preliminary injunctive relief to Phillips, Otte, and Tibbetts. *Id.* at PageID 40667, citing *Fears v. Morgan* Appellant Brief, 6th Cir. Case No. 17-3076, ECF No. 28, PageID 49-51. Nothing in the referenced Decision and Order (ECF No. 1052) supports continuing to provide anonymity to DRC Employee No. 1.

In sum, none of the Court's prior protective orders supports maintaining the anonymity of DRC Employee No. 1.

**Request During Preliminary Injunction Hearing**

During the preliminary injunction hearing on September 24, 2019, Plaintiffs made three arguments as to why the transcripts of the deposition of DRC Employee No. 1 should be a matter of public record without preserving his anonymity. The first was that his "role is well-known, and therefore, any interests he had in any confidentiality was [sic] waived long ago," e.g. by not objecting when his December 2016 deposition was taken (Transcript pending). The second argument was that Judge Frost's Protective Order (ECF No. 629) did not apply at all to DRC Employee No. 1. The third was that H.B. 663 did not protect DRC Employee No. 1 any longer if it ever did (Transcript pending).

Defendants responded by relying on the Declaration of DRC Employee No. 1 filed in support of their most recent Motion for Protective Order (ECF No. 2457-1). In the Declaration, DRC Employee No. 1 expresses a "sincere belief that I would be exposed to risks of actual harm or threats of personal harm to my safety and well-being." *Id.* at PageID 120447, ¶ 4. This statement is conclusory; DRC Employee No. 1 gives no supporting facts of any actual threats to himself or anyone else in a comparable position in other States. Since DRC Employee No. 1 has testified

12

publicly, in open court, in this case and the transcripts of those proceedings are part of the public record, one would expect that, if someone were assiduously seeking his identity in order to make threats, they would have done so by now.

Thus, the factual support for Defendants' position is thinner even than it was in 2015 when Judge Frost issued his Protective Order. In the hearing that preceded that order, the Court heard testimony about an actual threatening email to a drug provider and expert testimony on threat assessment. Nothing of that sort has been offered here. Moreover, Judge Frost's order was made under Fed.R.Civ.P. 26(c) with regard to discovery requests, and was not a request to seal records on which the Court relied in making a decision.

DRC Employee No. 1 additionally avers

> 6. In addition, if my name is publicly disclosed as described above, it will be exceedingly difficult and probably impossible for me to lawfully obtain drugs for DRC to use in executions because potential drug sources have publicly stated--and informed DRC- that they will not sell drugs to DRC for use in executions. If drug suppliers know of my identity and my activities in acquiring drugs for DRC to use in executions, they will not sell drugs to DRC. Such disclosure will make drugs unavailable to the State for executions and burden Defendants' important interests in carrying out criminal judgments.

*Id.* at PageID 120447-48.

Defendants admit this is the real reason they seek anonymity for DRC Employee No. 1. In their Reply Memorandum in Support of Motion for Protective order, they state:

> The Court need look no further than United States Supreme Court precedent to understand why a protective order is necessary. Writing for the Court in *Glossip v. Gross,* 135 S.Ct. 2726, Justice Alito summarized why states have not been able to secure certain drugs to be used in court-ordered executions:
>
> > *Baze [v. Reese* (sic)*,* 553 U.S. 35 (2008)] cleared any legal obstacle to use of the most common three-drug protocol that had enabled States to carry out the death penalty in a

13

quick and painless fashion. But a practical obstacle soon emerged, as anti-death-penalty advocates pressured pharmaceutical companies to refuse to supply the drugs used to carry out death sentences. The sole American manufacturer of sodium thiopental, the first drug used in the standard three drug protocol, was persuaded to cease production of the drug. After suspending domestic production in 2009, the company planned to resume production in Italy. Koppel, Execution Drug Halt Raises Ire of Doctors, Wall Street Journal, Jan. 25, 2011, p. A6. Activists then pressured both the company and the Italian Government to stop the sale of sodium thiopental for use in lethal injections in this country. Bonner, Letter from Europe: Drug Company in Cross Hairs of Death Penalty Opponents, N. Y. Times, Mar. 30, 2011; Koppel, Drug Halt Hinders Executions in the U.S., Wall Street Journal, Jan. 22, 2011, p. A1. That effort proved successful, and in January 2011, the company announced that it would exit the sodium thiopental market entirely. See Hospira, Press Release, Hospira Statement Regarding PentothalTM (sodium thiopental) Market Exit (Jan. 21, 2011).

After other efforts to procure sodium thiopental proved unsuccessful, States sought an alternative, and they eventually replaced sodium thiopental with pentobarbital, another barbiturate. In December 2010, Oklahoma became the first State to execute an inmate using pentobarbital. See Reuters, Chicago Tribune, New Drug Mix Used in Oklahoma Execution, Dec. 17 2010, p. 41. That execution occurred without incident, and States gradually shifted to pentobarbital as their supplies of sodium thiopental ran out. It is reported that pentobarbital was used in all of the 43 executions carried out in 2012. The Death Penalty Institute, Execution List 2012, online at www.deathpenaltyinfo.org/execution-list-2012 (all Internet materials as visited June 26, 2015, and available in Clerk of Court's case file). Petitioners concede that pentobarbital, like sodium thiopental, can "reliably induce and maintain a comalike state that renders a person insensate to pain" caused by administration of the second and third drugs in the protocol. Brief for Petitioners 2. And courts across the country have held that the use of pentobarbital in executions does not violate the Eighth Amendment. See, e.g., *Jackson v. Danberg*, 656 F. 3d 157 (CA3 2011); *Beaty v. Brewer,* 649 F. 3d 1071 (CA9 2011);

> *DeYoung v. Owens,* 646 F. 3d 1319 (CA11 2011); *Pavatt v. Jones,* 627 F. 3d 1336 (CA10 2010).
>
> **Before long, however, pentobarbital also became unavailable. Anti-death-penalty advocates lobbied the Danish manufacturer of the drug to stop selling it for use in executions. See Bonner, supra. That manufacturer opposed the death penalty and took steps to block the shipment of pentobarbital for use in executions in the United States.** Stein, New Obstacle to Death Penalty in U.S., Washington Post, July 3, 2011, p. A4. **Oklahoma eventually became unable to acquire the drug through any means.** *Glossip* at 2733-2734. (Emphasis Added).

(ECF No. 2457, PageID 120438-39 (emphasis in original).

This is an oft-repeated tale. Although it is based almost entirely on hearsay, the Court does not doubt its accuracy. Anti-death-penalty advocates have largely been successful in eliminating the use of sodium thiopental and pentobarbital in American executions[7]. But the narrative does not suggest any unlawful behavior – "pressure" -- by these advocates. More importantly, it does not suggest any unlawful behavior by the pharmaceutical companies in ceasing to supply execution drugs. Producers of the controlled substances used in executions are not public utilities, bound to sell to any willing buyer.[8]

A free market posits voluntary exchanges between willing buyers and willing sellers. When buyers and sellers have different amounts of information about the proposed transaction,

---

[7] But not in Texas, which executed Robert Sparks using pentobarbital on September 25, 2019 (Associated Press, *Texas executes man for stabbing attack that killed two stepsons and wife*, CBS NEWS, https://www.cbsnews.com/news/texas-execution-robert-sparks-fatally-stabbing-stepsons-lethal-injection-today-2019-09-25/ (Sept. 25, 2019). In doing so, anti-death-penalty advocates have substantially increased the risk that their clients, when executed, will suffer considerably more in being executed because sodium thiopental and pentobarbital produce general anesthesia and midazolam does not.

[8] Contrast the situation of an electric utility who attempted to refuse to provide electricity to a state prison where executions were carried out by electrocution.

economists refer to the situation as information asymmetry.[9]  A key aspect of informational asymmetry can be lack of knowledge of the identity of the buyer.  For example, the law does not permit sale of alcohol or tobacco to an underage person and punishes criminally those who do so. To prevent the transaction, the law permits sellers of these goods to "card" potential buyers. Obviously the sale of execution drugs to the State of Ohio is not an unlawful transaction, but it would be an unfree transaction if a seller had announced its intention not to have its products used for executions and then were deceived in a sale to the State because the drugs were being bought by an anonymous agent.

The frustration of the Defendants is understandable.  They are under lawful orders to execute persons on death row; the federal courts have repeatedly held that capital punishment is constitutional.  Furthermore, the federal courts have repeatedly held that lethal injection is not per se an unconstitutional method of execution and have also upheld use of particular drugs to accomplish that end only to have approved drugs become unavailable.  But it is not the duty of the federal courts to assist in the obtaining of those drugs by deception, by allowing a state agent to attempt to acquire those drugs by remaining anonymous.

The Court also is not under any duty to interfere with efforts of the State to acquire execution drugs.  No Plaintiff in this case has asked for a court order to require DRC Employee No. 1 to identify himself to potential suppliers.  The Court is, however, under a duty to respect and enforce the presumptive right of public access to court proceedings.  *Press-Enterprise Co. v. Superior Court of California, Riverside Cnty.*, 478 U.S. 1 (1966) (*Press-Enterprise I*); *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002).  The public right of access is both constitutional, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), and a traditional common law right.

---

[9] See "The Market for Lemons: Quality Uncertainty and the Market Mechanism" by George Akerlof (1970) for which Akerlof was awarded the Nobel in Economics in 2001.

*Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 597-98 (1978). That right of access to judicial records extends to all material filed in connection with non-discovery pretrial motions, whether dispositive or not, but not to discovery motions and supporting documents. *Leucadia, Inc. v. Applied Extrusion Tech., Inc.*, 998 F.2d 157 (3rd Cir. 1993). The difference between sealing discovery materials and judicial records was recently detailed by the Sixth Circuit:

> By way of background, there is a stark difference between so-called "protective orders" entered pursuant to the discovery provisions of Federal Rule of Civil Procedure 26, on the one hand, and orders to seal court records, on the other. Discovery concerns the parties' exchange of information that might or might not be relevant to their case. "Secrecy is fine at the discovery stage, before the material enters the judicial record." *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002). Thus, a district court may enter a protective order limiting the use or disclosure of discovery materials upon a mere showing of "good cause[.]" Fed. R. Civ. P. 26(c)(1). These orders are often blanket in nature, and allow the parties to determine in the first instance whether particular materials fall within the order's protection. The district court entered several such orders here.
>
> "At the adjudication stage, however, very different considerations apply." *Joy v. North*, 692 F.2d 880, 893 (2nd Cir. 1982). The line between these two stages, discovery and adjudicative, is crossed when the parties place material in the court record. *Baxter*, 297 F.3d at 545. Unlike information merely exchanged between the parties, "[t]he public has a strong interest in obtaining the information contained in the court record." *Brown & Williamson Tobacco Corp. v. F.T.C.,* 710 F.2d 1165, 1180 (6th Cir. 1983). That interest rests on several grounds. Sometimes, the public's interest is focused primarily upon the litigation's result—whether a right does or does not exist, or a statute is or is not constitutional. In other cases—including "antitrust" cases, *Id.* at 1179—the public's interest is focused not only on the result, but also on the conduct giving rise to the case. In those cases, "secrecy insulates the participants, masking impropriety, obscuring incompetence, and concealing corruption." *Id*. And in any of these cases, the public is entitled to assess for itself the merits of judicial decisions. Thus, "[t]he public has an interest in ascertaining what evidence and records the District Court and this Court have relied upon in reaching our decisions." *Id*. at 1181; *see also, e.g., Baxter,* 297 F.3d at 546.

The courts have long recognized, therefore, a "strong presumption in favor of openness" as to court records. *Brown & Williamson,* 710 F.2d at 1179. The burden of overcoming that presumption is borne by the party that seeks to seal them. *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001). The burden is a heavy one: "Only the most compelling reasons can justify non-disclosure of judicial records." *In re Knoxville News-Sentinel Co.*, 723 F.2d 470, 476 (6th Cir. 1983). Moreover, the greater the public interest in the litigation's subject matter, the greater the showing necessary to overcome the presumption of access. See *Brown & Williamson*, 710 F.2d at 1179. For example, in class actions—where by definition "some members of the public are also parties to the [case]"—the standards for denying public access to the record "should be applied . . . with particular strictness." *Cendant*, 260 F.3d at 194. And even where a party can show a compelling reason why certain documents or portions thereof should be sealed, the seal itself must be narrowly tailored to serve that reason. *See, e.g., Press-Enter. Co. v. Superior Court of California, Riverside Cnty.,* 464 U.S. 501, 509-11, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984). The proponent of sealing therefore must "analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations." *Baxter*, 297 F.3d at 548.

In like fashion, a district court that chooses to seal court records must set forth specific findings and conclusions "which justify nondisclosure to the public." *Brown & Williamson*, 710 F.2d at 1176. That is true even if neither party objects to the motion to seal, as apparently neither did in *Brown & Williamson*. (There, our court "reach[ed] the question" of the district court's seal "on our own motion." *Id*.) As our decision there illustrates, a court's obligation to explain the basis for sealing court records is independent of whether anyone objects to it. And a court's failure to set forth those reasons—as to why the interests in support of nondisclosure are compelling, why the interests supporting access are less so, and why the seal itself is no broader than necessary—is itself grounds to vacate an order to seal. *Id.; see also United States v. Kravetz,* 706 F.3d 47, 60 (1st Cir. 2013) ("Appellate courts have on several occasions emphasized that upon entering orders which inhibit the flow of information between courts and the public, district courts should articulate on the record their reasons for doing so"); *SEC v. Van Waeyenberghe*, 990 F.2d 845, 849 (5th Cir. 1993) (reversing because "[w]e find no evidence in the record that the district court balanced the competing interests prior to sealing the final order").

> We review the court's orders to seal its records for an abuse of discretion—although, "[i]n light of the important rights involved, the district court's decision is not accorded" the deference that standard normally brings. *Knoxville News-Sentinel*, 723 F.2d at 476.

*Shane Grp., Inc., v. Blue Cross Blue Shield of Michigan,* 825 F.3d 299, 305-06 (6th Cir. 2016) (Kethledge, J.).

Defendants have not begun to make the showing required by *Shane Group* to seal the deposition of DRC Employee No. 1. Moreover, his name appears 885 times in the record in this case, the vast majority of times in public filings before any request for anonymity was made. He testified publicly in the Henness preliminary injunction hearing (Transcript, ECF No. 2117, PageID 104532 et seq.) and the intention to have him testify was disclosed without anonymity in Defendants' Witness List, ECF No. 1975, Page ID 88068). Thus, sealing the August 2019 deposition would be a vain act insofar as protecting his anonymity.

Defendants appeal to the practice of this Court of maintaining the anonymity of Defendant Execution Team Members. Since assuming management of the case in October 2016, the undersigned has followed the practices begun by Judge Frost to protect their anonymity, e.g. by permitting them to proceed pseudonymously and allowing them to testify from behind a screen during preliminary injunction hearings. Plaintiffs have never objected to this practice.

Accordingly, as ordered on the record on September 24, 2019, the request to maintain the anonymity of DRC Employees No. 1 is DENIED.

Recognizing that an asserted privilege is involved and that this may give rise to a right to appeal[10], the Court asked Defendants' counsel if they intended to appeal. They in turn requested forty-eight hours from the filing of this decision to decide that question. Accordingly, if

---

[10] To the United States Court of Appeals for the Sixth Circuit in the Cleveland Jackson matter because the reference there is under 28 U.S.C. § 636(c); to District Judge Sargus as to Plaintiffs Hanna and Bonnell, because the reference as to them is under 28 U.S.C. § 636(b).

19

Defendants desire to appeal, they shall file a motion to stay this order pending appeal not later than Tuesday, October 1, 2019.

September 27, 2019.

s/ *Michael R. Merz*<br>United States Magistrate Judge