**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: OHIO EXECUTION PROTOCOL LITIGATION** <br><br> **This document relates to:** **PLAINTIFF** **CARON MONTGOMERY** | **Case No. 2:11-cv-1016** <br><br> **JUDGE EDMUND A. SARGUS, JR.** **Magistrate Judge Michael R. Merz** <br><br> **DEATH PENALTY CASE** <br><br> **No Execution Date Currently Scheduled** <br><br> **DEMAND FOR JURY TRIAL** |

**Plaintiff Caron Montgomery's**
**Second Amended Individual Supplemental Complaint**

Plaintiff **Caron Montgomery**, by and through counsel and pursuant to Rules 15(a) and 15(d) of the Federal Rules of Civil Procedure and with leave of this Court, hereby files this Second Amended Individual Supplemental Complaint (the "Amended Individual Supplemental Complaint") pursuant to 42 U.S.C. § 1983 for injunctive and declaratory relief, attorney fees, and costs of suit against the Defendants in the above-captioned consolidated matter.

This Amended Individual Supplemental Complaint fully incorporates by reference each and every statement, allegation, and claim set forth in the Fourth Amended Omnibus Complaint (ECF No. 1252, PageID 45405–45877). **The totality of this Second Amended Individual Supplemental Complaint and the Fourth Amended Omnibus Complaint comprises Plaintiff's entire Amended Complaint in this case.** Thus, references to "Amended Complaint" herein encompass the contents of both portions of Plaintiff's entire Amended

Complaint.  The statements, allegations, and claims alleged within this Amended Individual Supplemental Complaint are those that are particular to Plaintiff and they supplement—not supplant—the joint statements, allegations, and claims in the Fourth Amended Omnibus Complaint.  Accordingly, for convenience and efficiency of the Court, any statements, allegations, and claims included in the Fourth Amended Omnibus Complaint are not generally repeated here, but they apply to Plaintiff, nonetheless.  This includes, but is not limited to, the prayer for relief, the statement of the case, and the allegations in the Fourth Amended Omnibus Complaint establishing subject matter jurisdiction, venue, the Defendants as Parties, the claimed Causes of Action alleged therein, exhaustion of administrative remedies, the demand for jury trial, and myriad other factual allegations.  For purposes of Plaintiff's individual Amended Complaint in this case, the contents of the Fourth Amended Omnibus Complaint are incorporated by reference here, and the allegations in this Second Amended Individual Supplemental Complaint are incorporated by reference into the Fourth Amended Omnibus Complaint.

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................... III

INCORPORATION OF ALLEGATIONS IN THE FOURTH AMENDED
OMNIBUS COMPLAINT BY REFERENCE .............................. 1

ADDITIONAL RELEVANT FACTS ................................................. 1

I. Allegations related to Plaintiff's individual characteristics. ................... 4

II. Allegations related to requirement to plead alternative execution
methods or manners................................................................... 8

  A. The alternative-method requirement violates Plaintiff's Fifth
  Amendment rights................................................................ 9

  B. Plaintiff is insufficiently competent to be able to
  constitutionally satisfy the alternative-method requirement....... 10

III. Allegations of alternative execution method(s) or manner. ................... 11

  A. Alternative No. 1 – Execution by Shooting to Death
  With Bullets ................................................................... 14

  B. Alternative No. 2 – Execution by Oral Injection of a Four-
  Drug Mixture, Including a Benzodiazepine, Digoxin,
  Morphine Sulfate, and Amitriptyline, or Similar Combination
  Used In The Medical-Aid-In-Dying Context. ............................. 40

  C. Alternative No. 3 – Execution by Nitrogen Hypoxia.................... 55

  D. Alternative No. 4 – Execution By Hanging ................................. 72

FEDERAL LAW CLAIMS FOR RELIEF AGAINST DRC DEFENDANTS IN
THEIR OFFICIAL CAPACITIES AND DRUG SOURCE DEFENDANTS.... 83

First Cause of Action: Eighth and Fourteenth Amendment Violations. .......... 83

Second Cause of Action: Fourteenth Amendment Due Process Violations. .... 83

Third Cause of Action: Violations of First, Sixth, Eighth and Fourteenth
Amendment Rights of Access to Counsel, Access to Courts, Ability
to Petition for Redress of Grievances, Due Process, and Privileges
or Immunities of United States Citizenship. ....................................... 84

Fourth Cause of Action: Fourteenth Amendment Equal Protection
Violations. ................................................................................ 84

Fifth Cause of Action: Violations of Fundamental Rights Arising Under
The Principles Of Liberty and/or Natural Law Which Are Protected
By The Ninth Amendment................................................................ 84

Sixth Cause of Action: First Amendment Free Speech Clause Violations. ....... 84

Seventh Cause of Action: Fourteenth Amendment Due Process Violation...... 84

Eighth Cause of Action: Fourteenth Amendment Due Process Clause
    Violations For Experimenting On Non-Consenting Prisoners. .............. 84

Ninth Cause of Action: Fourteenth Amendment Privileges or Immunities
    Clause Violations For Experimenting on Non-Consenting Prisoners. ... 85

Tenth Cause of Action: Ex Post Facto Violation............................................... 85

Eleventh Cause of Action: Bill of Attainders Violation. .................................. 85

Twelfth Cause of Action: Eighth Amendment Violation—Deliberately
    Indifferent and/or Reckless Denial of Resuscitative Health Care
    After The Execution Is To Be Completed............................................. 85

Thirteenth Cause of Action: Eighth Amendment Violation—Deliberate
    Indifference and/or Reckless Disregard of Serious Medical Needs. ...... 90

Fourteenth Cause of Action: Fourteenth Amendment Due Process
    Clause Violation. ................................................................................. 93

Fifteenth Cause of Action: Violation of Racketeer Influenced and Corrupt
    Organizations Act (RICO) alleged against Drug Source Defendants
    only. ...................................................................................................... 93

STATE LAW CLAIMS FOR RELIEF AGAINST DEFENDANTS .......................... 93

Sixteenth Cause of Action: Ohio Civil RICO claim against Drug
    Source Defendants. .............................................................................. 93

Seventeenth Cause of Action: Claims for Declaratory Judgment Under
    Ohio Law Against All Defendants, and for Injunctive Relief Under
    Ohio Law Against Drug Source Defendants For Violations of Ohio
    Law. ....................................................................................................... 94

Eighteenth Cause of Action: Violation of Ohio Product Liability Act (Ohio
    Revised Code § 2307.71 et seq.). .......................................................... 94

Nineteenth Cause of Action: Violation of Ohio Consumer Sales Practices
    Act (Ohio Revised Code § 1345.01 et seq.) Against Drug Source
    Defendants. ........................................................................................... 94

ADDITIONAL CAUSES OF ACTION AGAINST ALL DEFENDANTS................. 94

Twentieth Cause of Action: Eighth Amendment Violation Based On
    Exposure To Sure Or Very Likely Serious Harm In The Form Of
    Severe, Needless Physical Pain And Suffering Due To The Identity
    Of The Drugs In The Execution Protocol............................................... 94

Twenty-First Cause of Action: Eighth Amendment Violation Based On
    Exposure To Sure Or Very Likely Serious Harm In The Form Of
    Severe, Needless Physical Pain And Suffering Due To The Source
    Of The Drugs In The Execution Protocol............................................. 101

iv

Twenty-Second Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of Severe Mental Or Psychological Pain, Suffering And Agony Due To The Identity Of The Drugs In The Execution Protocol. ...................... 106

Twenty-Third Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of Severe Mental Or Psychological Pain, Suffering And Torturous Agony Due To The Source Of The Drugs In The Execution Protocol. .. 110

Twenty-Fourth Cause of Action: Eighth Amendment Violation. ................... 113

Twenty-Fifth Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of Being The Subject Of An Undignified, Spectacle Execution Or Attempted Execution. ....................................................................... 114

Twenty-Sixth Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm in the Form of Being Subjected to an Unwanted, Non-Consensual Human Experimentation of an Execution. ..................................................... 127

Twenty-Seventh Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm in the Form of Maladministration or Arbitrary Administration of the Execution Protocol. ............................................................................ 130

Twenty-Eighth Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of Being Subjected To An Execution Protocol That Is Unconstitutional Because It Does Not Preclude The Execution Of An Inmate That Is Categorically Exempt From Execution. .............................................. 138

    A.    Plaintiff will be subjected to execution with a facially unconstitutional execution protocol. ........................................ 138

    B.    No Alternative method required or, in the alternative, Plaintiff's alleged alternative. .................................................... 139

Twenty-Ninth Cause of Action: Eighth Amendment Violation Based on Deliberate Indifference or Reckless Disregard of Substantial Risk of Harm to Plaintiff. ............................................................... 141

Thirtieth Cause of Action: Fourteenth Amendment Due Process Violation For Failure To Comply With Federal Investigational New Drug Application Regulations With Respect To The Method And Choice Of Drug To Be Used In Plaintiff's Execution. .................................... 148

Thirty-First Cause of Action: Equal Protection Violations Related To Defendants' Failures To Comply With The IND Application Laws. ....... 148

Thirty-Second Cause of Action: Religious Freedom Violation Under RLUIPA....................................................................................... 148

Thirty-Third Cause of Action: Eighth Amendment Violations Based On Sure Or Very Likely Exposure To Severe Needless Physical Or Mental/Psychological Pain And Suffering Due To Plaintiff's Unique, Individual Characteristics And Application Of The Execution Protocol............................................................................. 148

Thirty-Fourth Cause of Action: Equal Protection Violations Related To Plaintiff's Unique, Individual Characteristics And Application Of The Law, Including DRC Defendants' Execution Protocol and Ohio's Execution Statute. .................................................................. 152

Thirty-Fifth Cause of Action: Eighth Amendment Violation Based On Purposeful or Knowing Adoption and Use of a Lethal Injection Protocol Using A Three-Drug Method With Midazolam As The First Drug That Will Cause Severe Physical Pain and Mental Anguish and Suffering.................................................................................. 156

Thirty-Sixth Cause of Action:  Eighth Amendment Violation Based On Purposeful or Knowing Adoption of a Lethal Injection Protocol Using Midazolam That Will Cause Severe Physical Pain and Torturous Mental Anguish and Suffering. ......................................... 161

Thirty-Seventh Cause of Action: Eighth Amendment Violations Based on DRC Defendants Resurrecting Their Abandoned Three-Drug Method Even Though They Know It Causes Needless Pain And Suffering, And Had Abandoned It, At Least In Part, For That Reason. .................................................................................. 166

Thirty-Eighth Cause of Action: Eighth Amendment Violation Based On Devolving Standards of Decency. ......................................... 175

Thirty-Ninth Cause of Action: Eighth Amendment Violation Based On DRC Defendants' Use Of A Three-Drug Execution Method, Regardless Of The Identity Of The First Drug. ................................... 178

Fortieth Cause of Action: Eighth Amendment Violation Based On DRC Defendants' Use Of A Three-Drug Execution Method With Midazolam As The First Of The Three Drugs. .................................... 182

Forty-First Cause of Action: Eighth Amendment Violation Based On DRC Defendants' Use Of Midazolam In The Execution Protocol. ................ 190

Forty-Second Cause of Action: Eighth Amendment Violation Based On DRC Defendants Removal Of Any Required Concentration Of The Execution Drugs Which Is Removal Of A Safeguard That Makes It Sure Or Very Likely That Plaintiff Will Experience Severe Pain And Suffering............................................................................. 191

Forty-Third Cause of Action: The Doctrines Of Judicial Estoppel And/Or Judicial Admission Bar DRC Defendants From Using The Three-Drug Method Against Plaintiff. ............................................. 195

Forty-Fourth Cause of Action: Administrative Procedures Act Claims. ........ 195

Forty-Fifth Cause of Action: Eighth and Fourteenth Amendment Violations—A three-drug midazolam method of execution violates the Eighth Amendment's prohibition against cruel and usual punishment because it no longer comports with prevailing standards of decency, and thus its use as a method of execution must be categorically barred. ............................................. 195

Forty-Sixth Cause of Action: Ohio Corrupt Practices Act Claims Against Individual Defendants in Their Individual Capacity. .......................... 210

Forty-Seventh Cause of Action: Equal Protection Clause Violation based on violations of Administrative Procedures Act. ................................. 211

PRAYER FOR RELIEF................................................................. 212

DEMAND FOR JURY TRIAL......................................................... 213

CERTIFICATE OF SERVICE ....................................................... 214

## INCORPORATION OF ALLEGATIONS IN THE FOURTH AMENDED OMNIBUS COMPLAINT BY REFERENCE

1892. Plaintiff incorporates by reference each and every allegation in the Fourth Amended Omnibus Complaint (ECF No. 1252) as if fully rewritten here.

## ADDITIONAL RELEVANT FACTS

1893. Plaintiff is alleging constitutional violations based on Defendants' current Execution Protocol effective October 7, 2016 and Defendants' intention to execute him via lethal injection as a manner of execution; he is not alleging that Defendants can never execute him by any manner of execution other than lethal injection.

1894. The paralytic drug in Ohio's lethal injection protocol will paralyze the inmate's musculature, including his breathing muscles and all other muscles in the body, leaving the inmate unable to move once the paralytic has taken effect.

1895. If the inmate is not first successfully given a sufficient and fully effective initiatory prophylactic drug before being injected with the paralytic drug, he will quickly feel as if he is being buried alive, unable to draw in oxygen or expel carbon dioxide, and unable to communicate as he feels and experiences the physical and mental pain and suffering from suffocating.

1896. The paralytic drug will inflict serious, severe, excruciating, horrific physical and/or mental pain and suffering that is unconstitutionally high, constitutionally problematic, and constitutionally excessive if the

inmate is not first protected from that pain and suffering by an initiatory prophylactic drug.

1897. The potassium overdose injected intravenously in Defendants' lethal injection protocol is extremely acidic.

1898. If the inmate is not first successfully given a sufficient and fully effective initiatory prophylactic drug before being injected with the potassium chloride overdose, he will feel as if Defendants are pouring liquid fire into his veins. The pain will be searing as he feels like he is being burned alive from the inside.

1899. The potassium chloride injected intravenously will inflict serious, severe, excruciating, horrific physical and/or mental pain and suffering that is unconstitutionally high, constitutionally problematic, and constitutionally excessive if the inmate is not first protected from that pain and suffering by an initiatory prophylactic drug.

1900. The midazolam overdose injected intravenously in Ohio's lethal injection protocol is highly acidic when in injectable form.

1901. The large amount of acidic midazolam injected intravenously will travel immediately from the injection site to the heart and then to the lungs while still in a highly acidic form.

1902. Once the acidic midazolam reaches the delicate lung tissues, it will immediately begin wreaking havoc on those cells, causing fluid to escape the pulmonary capillaries and being to accumulate in the air spaces, the alveoli, in the lungs.

1903. That, in turn, will cause the lungs to rapidly begin to fill with fluid that cannot be cleared. That condition is called pulmonary edema. And because it will develop rapidly and will be caused by damage to the pulmonary capillaries from the overdose of acid, it is most accurately categorized as acute, non-cardiogenic pulmonary edema.

1904. The speed at which the midazolam causes damage to the lung tissues and thus causes acute, non-cardiogenic pulmonary edema to develop, and the speed at which the acute, non-cardiogenic pulmonary edema develops and fills the lungs, is faster than the sedative effects of the midazolam on the brain.

1905. Under Defendants' lethal injection protocol, there is no prophylactic drug given to the inmate before the midazolam overdose is injected intravenously.

1906. Thus, the inmate will not be given a sufficient and fully effective initiatory prophylactic drug before the acute, non-cardiogenic pulmonary edema develops.

1907. When the acute, non-cardiogenic pulmonary edema develops in the inmate's lungs, he will quickly feel as if he is being drowned or suffocated, unable to draw in oxygen or expel carbon dioxide. The pain and suffering associated with that suffocation or drowning has been described as akin to the horrific, severely painful sensations of being subjected to waterboarding torture.

1908. The midazolam overdose injected intravenously will inflict serious, severe, excruciating, horrific physical and/or mental pain and suffering that is unconstitutionally high, constitutionally problematic, and constitutionally excessive, and the inmate will not first be protected from that pain and suffering by an initiatory prophylactic drug.

## I.     Allegations related to Plaintiff's individual characteristics.

1909. Upon information and belief, Plaintiff presents with individual physical characteristics that include, but are not limited to, Plaintiff's history of obesity and/or other factors that will affect accessibility of his veins or the viability of his veins to support an IV catheter; of diabetes; of high cholesterol; of hypertension; of hyperthyroidism; of risk factors suggesting probable sleep apnea[1] and/or other breathing difficulties; severe emotional and mental health problems, including Depressive Disorder, childhood Post Traumatic Stress Disorder, Dissociative Disorder, and substance (drug and alcohol) abuse; and of current or previous usage of medications that will affect the application and/or effect of Defendants' execution drugs on him or otherwise indicate problematic physical characteristics, such as Chlorpromazine,

---

[1] The risk factors for Obstructive Sleep Apnea (OSA) are gender (males more likely); over 50 years old; Body Mass Index of greater than 35; neck size greater than 40 cm (15.7 inches); hypertension; daytime sleepiness; snoring; observed apnea. The more factors present the greater the likelihood of OSA.

Perphenazine, Metformin, Mirtazapine, Levothyroxine, Atorvastatin, Hydrochlorothiazide, Lisinopril and Vistaril.

1910. Plaintiff's individual physical characteristics increase the risk that he will experience a sure or very likely risk of serious harms of the type alleged throughout his Amended Complaint if subjected to execution via DRC Defendants' Execution Protocol.

1911. Plaintiff's physical characteristics of a history of obesity and/or other factors that will affect accessibility of his veins or the viability of his veins to support an IV catheter; of diabetes; of high cholesterol; of hypertension; and of hyperthyroidism each make it significantly more difficult to achieve and/or maintain peripheral IV access on Plaintiff that is needed to ensure proper delivery of the protective drugs in the protocol. Veins degrade with age, elevating the risk that Defendants will be unsuccessful in establishing and/or maintaining IV access during the execution process. Obesity also increases those risks. Thus, those characteristics demonstrate that there is a sure or very likely risk that Plaintiff will be subjected to serious pain as Defendants attempt to achieve peripheral IV access on him during the execution process, and when Defendants are unable to maintain peripheral IV access on him.

1912. Plaintiff's physical characteristics of being a male, over the age of 50, neck size greater than 40 cm. (15.7 inches), demonstrate that he presents with several of the risk factors of the STOP-Bang test used to

assess the risk of Obstructive Sleep Apnea (OSA). Having those characteristics creates a sure or very likely risk that Plaintiff will obstruct and begin to suffocate and experience the terrible and painful sensations of air hunger after the drugs in Defendants' lethal injection protocol are injected, while Plaintiff remains aware, conscious, and sensate.

1913. Upon information and belief, Plaintiff presents with individual mental/psychological characteristics that include, but are not limited to, the following: severe emotional and mental health problems, including Depressive Disorder, childhood Post Traumatic Stress Disorder, Dissociative Disorder, and substance (drug and alcohol) abuse.

1914. Plaintiff's individual mental/psychological characteristics increase the risk that he will experience a sure or very likely risk of serious harms of the type alleged throughout his Amended Complaint if subjected to execution via DRC Defendants' Execution Protocol. This is particularly a risk because of the great likelihood that mental fear, made worse by Plaintiffs' mental health conditions during an execution, will act synergistically with the physical pain inflicted by Ohio's execution protocol to leave Plaintiff even more likely to subjectively experience severe or serious pain and suffering, regardless of the sedative effects of 500 mg midazolam.

1915. Plaintiff's individual mental/psychological characteristics alleged above create a sure or very likely risk that Plaintiff will have a paradoxical reaction to the execution drug(s), thereby increasing the already substantial risk that he will be aware of the physical pain and agony he will be suffering upon injection of the execution drug(s).

1916. Plaintiff's individual characteristics of his age, his male gender, his past history of severe mental health conditions, and his past history of alcohol abuse increase the risk that he will have a paradoxical reaction to the execution drug(s) as well.

1917. Moreover, Plaintiff may develop or may currently have additional physical and/or psychological characteristics increasing the sure or very likely risk of serious harm caused by Defendants' Execution Protocol before his execution date.

1918. Defendants' execution policy, including the written Execution Protocol, fails to account for any unique physical characteristics of Plaintiff that may affect the efficacy of, or the risks of harm caused by Defendants' Execution Protocol.

1919. Defendants' execution policy, including the written Execution Protocol, fails to account for any unique psychological/mental characteristics of Plaintiff that may affect the efficacy of, or the risks of harm caused by Defendants' Execution Protocol.

1920. Upon information and belief, in addition to failing to account for the individual physical characteristics of inmates in the execution policy,

including the written Execution Protocol, DRC Defendants have failed to properly prepare or train for any of the unique challenges Plaintiff's physical characteristics may present while carrying out an execution.

1921. Because Defendants do not account for any individual physical characteristics Plaintiff currently possesses or may develop before his scheduled execution date, his already sure or very likely risk of serious harm will be greatly increased.

## II. Allegations related to requirement to plead alternative execution methods or manners.

1922. Certain of Plaintiff's claims allege that the execution drug(s) planned to be used by Defendants in his execution or any other portion of the Execution Protocol will result in cruel and unusual punishment by making it sure or likely that Plaintiff will be subjected to severe or serious pain and suffering, physically or mentally. With respect to those claims, Plaintiff alleges the following regarding a requirement that he must plead and prove a readily available and feasibly implemented alternative execution method or manner to prevail on such an Eighth Amendment challenge and vindicate his fundamental constitutional rights (the "alternative-method requirement").

1923. The State of Ohio's adoption of the execution-secrecy provisions in Ohio Revised Code § 2949.221–222, as well as this Court's entry of the protective order dated October 26, 2015 (ECF No. 629) and subsequent similar orders issued on Defendants' request, will substantially if not entirely impair Plaintiff's ability to allege and prove alternative

8

execution methods and procedures. To the extent the statute and order are applied in such a way, Plaintiff reserves the right to argue that any alleged defects in his allegations and/or proof with respect to such issues are the result of the secrecy imposed by the statute and order, and not any failure by Plaintiff.

A. **The alternative-method requirement violates Plaintiff's Fifth Amendment rights.**

1924. Notwithstanding any allegation of an alternative execution method or manner pleaded in this Amended Individual Supplemental Complaint, Plaintiff asserts his Fifth Amendment right against self-incrimination insofar as said constitutional right may permit him to decline to affirmatively plead an alternative method or manner for execution that would not be cruel and unusual. *See United States v. Myers*, 123 F.3d 350, 359 (6th Cir. 1997) ("'[T]he privileges against self-incrimination can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory.'" (quoting *Maness v. Meyers*, 419 U.S. 449, 464 (1975))); *United States v. Rivera*, 201 F.3d 99, 101 (2d Cir. 1999) ("The Fifth Amendment provides a 'safeguard against judicially coerced self-disclosure,' and this safeguard extends to the sentencing phase of a criminal proceeding as well." (citation omitted) (quoting *Mitchell v. United States*, 526 U.S. 314, 322 (1999))).

1925. In addition, Plaintiff asserts that any requirement that he plead an alternative method of execution likewise violates the Eighth Amendment itself, because there was no such requirement when the

Eighth Amendment was ratified in 1791 nor when the Fourteenth Amendment was ratified in 1868, and thus no such requirement can, and does, exist now.

1926. Further, any alternative pleading requirement violates the due process clauses of the Fifth and Fourteenth Amendments, because imposition of such a requirement in a free nation shocks the conscience and offends principles of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, where no such requirement existed at common law or at the founding of the Nation.

**B.** **Plaintiff is insufficiently competent to be able to constitutionally satisfy the alternative-method requirement.**

1927. Notwithstanding any allegation of an alternative execution method or manner pleaded in this Individual Supplemental Complaint, Plaintiff asserts he is unable to constitutionally allege an alternative method or manner of execution because he is insufficiently competent to be able to knowingly and willingly instruct DRC Defendants how to kill him, and/or he is insufficiently competent to assist his attorney to identify an alternative method or manner of execution because he has insufficient medical training and knowledge to be able to identify such an alternative or because his mental health impairments or cognitive deficiencies or intellectual disabilities render him unable to do so now, and may worsen over time, making him virtually certain to be incompetent to assist his counsel in this way when any future scheduled execution date becomes imminent.

10

### III.    Allegations of alternative execution method(s) or manner.

1928. Notwithstanding Plaintiff's objections to pleading alternatives, and the constitutionally repugnant choice to give up one core constitutional right to vindicate other constitutional rights, *Simmons v. United States*, 390 U.S. 377, 394 (1968), if Plaintiff is required to plead an alternative, he alleges the following alternative execution method(s) or manner(s) that are available, feasible, and should be readily implemented with ordinary transactional effort, and which significantly reduces the risk of pain to which he will be subjected by Defendants' selected method of execution under the Execution Protocol.

1929. Defendants have refused to adopt any of the following alternative methods or manners of execution, without a legitimate or reasonable justification, penological or otherwise, for rejecting any such alternatives, and in fact, Defendants have failed to or refused to evaluate any such alternatives in light of their belief that Ohio law would only allow them to consider alternatives involving some form of lethal injection.

1930. Plaintiff, by alleging any of these alternatives, alleges only that the alternative in question is available in all relevant respects and subjects him to substantially less risk of experiencing severe or serious pain and needless suffering than the risk posed by the current execution method Plaintiff challenges.

11

1931. The reduction in risk of severe or serious pain and suffering created by each alternative is clear and considerable in comparison to the level of risk of severe pain and suffering created by the current execution method.

1932. Similarly, the reduction in level of severity of pain and suffering created by each alternative is clear and considerable in comparison to the level of severity of pain and suffering created by the current execution method.

1933. Plaintiff also alleges that each of the following manners and methods of execution renders unnecessary and needless any suffering and pain associated with the drugs in Defendants' three-drug midazolam protocol and their effects. The pain and suffering inflicted by Defendants' current protocol is more than necessary to carry out a death sentence and is, therefore, "superadded" pain and suffering that the Eighth Amendment forbids.

1934. An inmate injected intravenously with 500 mg midazolam as the protective drug in Ohio's execution protocol, and then injected with the second and third drugs, will surely or very likely subjectively experience unconstitutionally severe or serious pain and suffering. The midazolam's sedative effects will do nothing to attenuate or reduce the level of pain and suffering the inmate subjectively experiences.

1935. That level of pain and suffering the inmate will be sure or very likely to subjectively experience under Ohio's current protocol is the full level

of pain caused by the protocol drugs, which is constitutionally excessive or an unconstitutionally high level of pain and suffering.

1936. The degree of risk of pain and suffering to which the condemned inmate will be subjected by Ohio's current execution protocol is particularly constitutionally inappropriate, constitutionally problematic, unconstitutionally severe or serious, constitutionally excessive, and unconstitutionally high when compared to the degree of risk of pain and suffering posed by each of the following alleged alternatives.

1937. The level of pain and suffering to which the condemned inmate will be sure or very likely subjected by Ohio's current execution protocol is particularly constitutionally inappropriate, constitutionally problematic, unconstitutionally severe or serious, constitutionally excessive, and unconstitutionally high when compared to the level of pain and suffering posed by each of the following alleged alternatives.

1938. All actions that Plaintiff alleges DRC Defendants should be able to do within the following alternatives are actions that DRC Defendants should be able to do feasibly, readily, relatively easily, reasonably quickly, and with ordinary transactional effort as applicable.

1939. For any of the alleged alternatives that follow which is contemplated to be conducted outdoors, DRC Defendants should be able to take sufficient measures to resolve any purported concerns about safety or observation from above the execution site by drone or other similar

13

apparatus. Among the measures that DRC Defendants should be able to implement to remedy any such purported concerns would be erection around and above the execution site of a tent-like structure or other barrier to visible observation from above, which would not affect DRC Defendants' ability implement the alleged alternative.

**A.** **Alternative No. 1 – Execution by Shooting to Death With Bullets**

1940. DRC Defendants should be able to carry out an execution by shooting the condemned inmate to death with bullets using execution procedures that are the same or similar procedures as defined in Section II, ¶¶ 10–12, Section VIII, ¶¶ 29–30, 32, and Figure 5, Army Regulations No. 633-15, Procedures for Military Executions (Apr. 7, 1959) (as admitted to the record in this consolidated litigation, seen at ECF No. 2464-10); or by the substantively identical procedures for carrying out an execution as provided in U.S. War Department Pamphlet No. 27-4, adopted June 12, 1944 (ECF No. 2464-8); or by the substantively identical procedures for carrying out an execution as provided in U.S. Department of the Army Pamphlet No. 27-4, adopted December of 1947 (ECF No. 2464-9); or by using the same or similar procedures as defined in the execution protocol involving shooting to death with bullets used by the State of Utah's Department of Corrections (ECF No. 2464-3); or by shooting to death with bullets using procedures used by other jurisdictions, as discussed in more depth in the expert report submitted in this consolidated litigation by

14

Dr. James Williams and admitted into the evidentiary record already. (*See* ECF No. 2463-9.) The procedures outlined in the above-referenced documents are incorporated here by reference as applicable.

1941. The manner of execution alleged here, including all procedures outlined in all alleged alternatives involving shooting to death with bullets is available, meaning it is feasible and readily implemented, and there is no other State-based impediment to adopting that method. There are no reasonable or otherwise justifiable reasons for Defendants to refuse to implement this alternative.

1942. DRC Defendants should be able to identify the necessary qualifications for a person or persons to successfully carry out an execution by use of bullets as alleged here.

1943. Upon information and belief, DRC Defendants employ or have within their control, or should be able to obtain with ordinary transactional effort the services of, the personnel necessary to carry out an execution by shooting to death with bullets.

1944. DRC Defendants should be able to secure any training for the execution team members necessary to successfully carry out an execution by shooting to death with bullets as alleged in this alternative.

1945. DRC Defendants should be able to prepare a safety backdrop to be positioned behind and to the sides of the condemned inmate in a semi-

circle or U-shaped enclosure or other configuration as necessary, consisting of ballistically absorbent material such sandbags and wood 2x4's in the same way that the Utah Department of Corrections constructed its execution mechanisms, and, behind that, an impervious ballistic barrier such as an armor steel plate, or any other safety backdrop DRC Defendants believe to be necessary to carry out an execution by shooting the inmate with bullets in the grassy area directly adjacent to the current Death House, identified in the red circle in the image found in ECF No. 2693-1, PageID 133240 (hereinafter "SOCF Image 1").

1946. If DRC Defendants are using the U.S. Army execution procedures for execution by shooting the condemned inmate with bullets contained in the 1944, 1947, or 1959 protocols, they should be able to erect a post in front of such a safety backdrop, with rings placed therein for securing the inmate in an upright position at the waist, ankles, and torso.

1947. If DRC Defendants are using the Utah DoC execution procedures, they should be able to construct a chair and other safety measures similar to those used in Utah, as seen in ECF No. 2693-2, PageID 133242, and explained in more depth on the video depositions of Utah Department of Corrections officials, already admitted to the record in this case. (ECF No. 2516-1 through 2516-24, admitted to record, ECF No. 2546.)

1948. DRC Defendants should also be able to provide for witness viewing, whether on the grass or on the pavement seen adjacent to the red-circled area in SOCF Image 1, with witnesses either standing in a configuration of DRC Defendants' choosing or seated on chairs that DRC Defendants should be able to provide.

1949. To ensure the personal auditory and eye safety of DRC personnel and any witnesses, DRC should be able to provide ear protection such as disposable ear plugs or protective earphones, and protective safety glasses for all to wear.

1950. Using a safety backdrop as alleged here will virtually eliminate any chance of bullet ricochets, thereby essentially eliminating any concerns about the safety of witnesses or execution team personnel.

1951. Several days in advance, DRC Defendants should be able to offer Plaintiff the choice of whether to be blindfolded, to have a dark hood placed over his head, or to remain without a blindfold or hood during the final stage of his execution, to ensure the dignity of the process.

1952. DRC Defendants should be able to use rifles chambered for .308 (7.62 x 51mm) or .30-06 bullets; a rapid-expanding, soft-point jacketed bullet of 150-155 grains would be best suited.

1953. DRC Defendants should also be able to provide to the Warden or his designee a handgun capable of firing a 9mm or larger bullet, to administer a coup-de-grace shot to the head if necessary.

1954. Under either set of basic procedures, DRC Defendants should be able to have an execution party of 8-10 rifleman.

1955. DRC Defendants should be able to achieve precise targeting by means of a projected laser aiming device on each rifle, calibrated for the distance involved.

1956. On the day of the execution, DRC Defendants should be able to load eight to ten rifles with two rounds each of the applicable ammunition. The rack of rifles should be able to be placed in the vicinity of the execution site.

1957. On the day of execution using the outdoor setting, DRC Defendants should be able to carry out Plaintiff's execution by walking Plaintiff to the area of grass adjacent to the current Death House identified in SOCF Image 1, and permitting him to give his last words to the gathered witnesses.

1958. If DRC Defendants use the execution procedures similar to those provided in the U.S. Army execution documents, then DRC Defendants should be able to firmly secure Plaintiff to a post with rings placed therein, using straps at the waist, ankles, and torso.

1959. If DRC Defendants use the execution procedures similar to those provided in the Utah DoC execution protocol, then DRC Defendants should be able to firmly secure Plaintiff to the chair using straps at the chest, head, and ankles.

1960. After securing Plaintiff under either type of restraint setup, DRC Defendants should be able to do the following:

a. apply a blindfold over Plaintiff's eyes or a dark hood over his head, if he made either election previously or if he makes that choice on the spot;

b. place a 4-inch round paper target over Plaintiff's center chest area, in the vicinity of the heart, over the lower 1/3 of the sternum, overlapping the left sternal border, but not overlapping the lower or right border of the sternum. The target should be black if Plaintiff is dressed in light colored clothing, or white if he is dressed in dark colored clothing;

c. those persons who will be firing (the execution party of eight to ten rifleman) shall remove the rifles from the storage rack and assume positions 21-35 feet away from Plaintiff, with the Warden five paces to the right of and five paces to the front of the execution party;

d. commands for the execution should be given orally by the Warden as follows:

    i. At the command READY, the execution party will take that position and unlock rifles;

    ii. At the command AIM, the execution party will take that position with rifles aimed at the target on Plaintiff's body;

    iii. At the command FIRE, the execution party will fire simultaneously;

    iv. The Warden will then bring the execution party to "Order Arms."

19

e. At that time, the Warden will join the medical officer who will examine Plaintiff and identify if Plaintiff remains alive. If the medical officer determines that Plaintiff remains alive, or if Plaintiff shows obvious signs of life or consciousness, the Warden or his designee will administer a "coup-de-grace" shot with the pistol in his possession, holding the muzzle just above the ear and one foot from the head;

f. Alternatively, if the medical officer determines that Plaintiff remains alive after the first volley, or if Plaintiff shows obvious signs of life or consciousness, the Warden shall immediately return to his place five paces in front and to the side of the execution party, and the sequence of commands given again for a second volley.

g. If a second volley is fired, the Warden will join the medical officer again, who will examine Plaintiff and identify if Plaintiff remains alive. If the medical office determines that Plaintiff remains alive after the second volley, the Warden or his designee will administer a "coup-de-grace" shot with the pistol in his possession, holding the muzzle just above the ear and one foot from the head.

h. Upon confirmation of Plaintiff's death, the execution party will proceed to the firearms rack from which they obtained the rifles used during the execution and replace the rifles in the rack;

i. Plaintiff's body shall be cared for from there as provided for in the current version of DRC Policy 01-COM-11.

1961. DRC Defendants should also be able to carry out an indoor execution by shooting the condemned inmate with bullets, including by using the applicable procedures in the large, high-ceilinged room in which the inmate is currently permitted to have attorney visits on the eve of execution (the approximate location of that room is circled in yellow in SOCF Image 1) or in another chamber modified or created for such purpose. DRC Defendants should be able to prepare a security backdrop as alleged above, in front of which to secure either a post or a chair to which DRC Defendants would secure Plaintiff. All other procedures alleged above for an outdoor execution by shooting the inmate with bullets would be similarly feasible and readily implemented to carry out an indoor execution using the same alternative method.

1962. Upon information and belief, DRC Defendants possess or have within their control, or should be able to obtain with ordinary transactional effort, relatively easily and reasonably quickly, all the equipment necessary to carry out an execution by shooting the inmate with bullets as alleged in this alternative.

1963. Defendants have already admitted, conceded, or stipulated that they have in their possession or could relatively easily and quickly obtain with ordinary transactional effort all necessary supplies to carry out an execution by shooting the condemned inmate with bullets, in any of the variations alleged here.

1964. Defendants have already admitted, conceded, or otherwise stipulated that they have in their employ or should be able to obtain with ordinary transactional effort the services of, all personnel necessary to carry out an execution by shooting the condemned inmate with bullets, in any of the variations alleged here. (*See id.*)

1965. Upon information and belief, DRC Defendants possess or have within their control, or should be able to obtain with ordinary transactional effort, relatively easily and reasonably quickly, rifles chambered to fire .308 or .30-06 bullets.

1966. Rifles capable of firing .308 or .30-06 bullets are generally available for purchase on the open market, and thus readily available to DRC Defendants with ordinary transactional effort.

1967. DRC Defendants are able to purchase .30-06 rifles on the open market for less than $1000.[2]

1968. DRC Defendants are able to purchase a .308 rifle on the open market for a similarly comparable cost.[3]

1969. Upon information and belief, DRC Defendants possess or have within their control, or should be able to obtain with ordinary transactional

---

[2] *See, e.g.,* https://www.vanceoutdoors.com/category.cfm/outdoors/rifles/of3/30-06-springfield/order_by/min_price; https://www.ohioguns.us/rifles/bolt-action-rifles?caliber=123&page=1.

[3] *See, e.g.,* https://www.vanceoutdoors.com/category.cfm/outdoors/law-enforcement-rifles; https://www.ohioguns.us/rifles/bolt-action-rifles?caliber=10&page=1.

effort, relatively easily and reasonably quickly, pistols that are capable of firing a 9mm or larger bullet.

1970. Pistols capable of firing a 9mm or larger bullet are generally available for purchase on the open market, and thus readily available to DRC Defendants with ordinary transactional effort.

1971. DRC Defendants are able to purchase a pistol firing 9mm bullets on the open market for less than $1000.[4]

1972. DRC Defendants are able to purchase a pistol firing larger caliber ammunition for a comparable cost.[5]

1973. Neither federal nor Ohio law requires a permit or license to purchase or possess a handgun or a rifle of the kinds alleged in this Alternative, and thus neither federal nor Ohio law poses any substantial restriction on DRC Defendants' ability to purchase such a handgun or rifles to use in an execution.[6]

1974. Upon information and belief, DRC Defendants possess or have within their control, or should be able to obtain with ordinary transactional effort, .308 bullets or .30-06 bullets.

---

[4] *See, e.g.*, https://www.vanceoutdoors.com/category.cfm/outdoors/handguns/of3/9-mm; https://www.ohioguns.us/handguns/semi-automatic-handguns?caliber=18&page=1.

[5] *See, e.g.*, https://www.vanceoutdoors.com/category.cfm/outdoors/handguns/of3/357-sig; https://www.ohioguns.us/handguns/semi-automatic-handguns?caliber=86&page=1.

[6] *See* https://www.nraila.org/gun-laws/state-gun-laws/ohio/.

1975. Ammunition of this type is generally available for purchase on the open market, and thus readily available to DRC Defendants with ordinary transactional effort.

1976. Ammunition of this type is cheap and plentiful, often less than $2.00 per round.[7]

1977. Upon information and belief, DRC Defendants possess or have within their control, or should be able to obtain with ordinary transactional effort, ammunition to use for a pistol that is 9mm or larger.

1978. Ammunition of this type is generally available for purchase on the open market, and thus readily available to DRC Defendants with ordinary transactional effort.

1979. Ammunition of this type is cheap and plentiful, often less than $1.00 per round.[8]

1980. Upon information and belief, numerous Ohio state agencies, including but not limited to ODRC, the Ohio State Highway Patrol, the Ohio National Guard, and various county SWAT teams, already have in their possession rifles capable of firing .308 or .30-06 bullets, and the highly

---

[7] *See, e.g.,*
https://www.vanceoutdoors.com/category.cfm/outdoors/308-winchester-762x51mm; https://www.ohioguns.us/ammo/rifle-ammunition?caliber=10&page=1;
https://www.vanceoutdoors.com/category.cfm/outdoors/30-06-springfield;
https://www.ohioguns.us/ammo/rifle-ammunition?caliber=123&page=1.

[8] *See, e.g.,*
https://www.vanceoutdoors.com/category.cfm/outdoors/9mm-luger;
https://www.ohioguns.us/ammo/handgun-ammunition?caliber=18&page=1.

lethal ammunition for them, as well as pistols capable of firing 9mm or larger bullets and the associated ammunition, such that DRC Defendants would be able to easily procure the necessary number of such rifles and pistols, and the necessary ammunition, with ordinary transactional effort without even needing to purchase the equipment on the open market.

1981. Upon information and belief, DRC Defendants possess or have within their control, or should be able to obtain with ordinary transactional effort, the materials necessary to build a suitable safety backstop.

1982. Upon information and belief, DRC Defendants possess or have within their control, or should be able to obtain with ordinary transactional effort, the laser sights to be affixed to the rifles to ensure precise aiming.

1983. Upon information and belief, DRC Defendants possess or have within their control, or should be able to obtain with ordinary transactional effort, the necessary post or chair restraint systems to be used to firmly secure Plaintiff under this alternative.

1984. This manner and method of execution is an available, feasible alternative that is readily implemented because it is virtually 100% effective, will indisputably cause death almost instantly, and has a track record of successful use to cause death in other jurisdictions.

1985. At least one recent study that analyzed contemporaneous news reports of all executions in the United States from 1900 to 2010 found that

7.12% of the 1,054 executions by lethal injections were "botched," while, by way of comparison, it found that 0 of the 34 executions by firing squad had been botched. *See* Austin Sarat, <u>Gruesome Spectacles: Botched Executions and America's Death Penalty</u> 5, App. A, 177 (2014).

1986. DRC Defendants would not be the first jurisdiction to carry out an execution by shooting the condemned inmate with bullets. It is not a new manner of execution.

1987. Other states—Mississippi, Oklahoma, and Utah—include execution by shooting the inmate with bullets among their statutory manners of execution. *See* Miss. Code Ann. § 99-19-51; Okla. Stat. Ann. tit. 22 § 1014; Utah Code Ann. § 77-18-5.5.

1988. This alternative manner of execution is neither untried nor untested. It would not be an experiment. There is a proven track record of success in causing death by shooting a person with bullets, as well as an extensive track record of death caused by one or more bullets fired into the cardiovascular bundle.

1989. Ohio itself has used a firing squad to cause death by the use of bullets, making death by shooting the inmate with bullets an already established, available, feasible, and readily implemented alternative that is not an experiment in causing death.

1990. Utah executed Ronnie Lee Gardner by shooting him with bullets in 2010. Dozens of prisoners have been executed in the United States

alone by this method, the United States military has carried out numerous executions by shooting the condemned with bullets, and countless more have been executed similarly around the world, in the civilian and military execution context. Additionally, countless more persons have been killed in armed combat after being shot in the cardiovascular bundle with a .308 or .30-06 bullet or bullets as alleged in this alternative.

1991. The bullets fired into the cardiovascular bundle under this alternative would have more than sufficient energy to penetrate through to that bundle, but dissipation of energy from those bullets would occur quickly and any bullet that exits Plaintiff's body would be absorbed by the safety backdrop behind him.

1992. Using a rapid-expanding, soft-point jacketed bullet of 150-165 grains would be highly likely to result in the bullets expanding rapidly on striking the anterior aspect of Plaintiff's chest, and most if not all of the bullets' fragments would remain within the chest rather than exiting the posterior body wall.

1993. The handgun bullet fired in the unlikely event of a coup-de-grace being administered by pistol would have sufficient energy to penetrate through to the brain, but dissipation of energy from that bullet would occur quickly and as such the bullet would be unlikely to exit the skull on the opposite side in a dramatic way, if at all.

1994. Accordingly, this alternative would avoid the results produced by rifle shots to the face or rifle shots using hollow point or armor piercing bullets, while yielding rapid and massive destruction of the key components of the central nervous system in the cardiovascular bundle.

1995. This alternative as alleged would significantly reduce a substantial risk of severe pain as compared to that posed by DRC Defendants' current execution protocol.

1996. The reduction in risk compared to Ohio's current execution manner and method is clear and considerable.

1997. Affixing the target as alleged in this alternative will place the riflemen's bullets in the upper half of the heart, where the pacemaking structures of the heart reside, or in the aorta and other great vessels, where the outflow of blood from the heart is contained.

1998. A .308 bullet or a .30-06 bullet fired by a rifle as alleged in this alternative would cause massive blood loss to Plaintiff's cardiovascular bundle (the heart and the great vessels that lead to and from it), a catastrophic drop in blood pressure in the brain, and rapid loss of consciousness, awareness, and sensation, followed by death within a matter of minutes from lack of blood to the Central Nervous System (CNS).  *See Wood v. Ryan*, 759 F.3d 1076, 1102 (9th Cir. 2014) (Kozinski, C.J., dissenting from denial of rehearing *en banc*) (observing that "large-caliber rifle bullets fired at close range can inflict massive

damage, causing instant death every time. There are plenty of people employed by the state who can pull the trigger and have the training to aim true. The weapons and ammunition are bought by the state in massive quantities for law enforcement purposes, so it would be impossible to interdict the supply.").

1999. And the coup-de-grace pistol shot would be fired from virtually point blank range, causing Plaintiff, upon information and belief, to irreversibly and virtually instantly lose consciousness, awareness, and sensation, followed quickly by death, in the unlikely event that he remained conscious, aware, or sensate following the initial volley.

2000. Alternatively, a second volley from the riflemen would ensure that Plaintiff has sustained irreversible loss of consciousness, awareness, and sensation, followed quickly by death, in the unlikely event that he remained conscious, aware, or sensate following the initial volley.

2001. Targeting the cardiovascular bundle will cause death with minimal pain sensed by Plaintiff. The level of pain potentially posed by this alternative is significantly less, a clear and considerable reduction, as compared to the level of pain almost certainly inflicted by the current three-drug lethal injection protocol.

2002. Execution by this manner and method does not subject Plaintiff to any of the risks of severe pain and suffering caused by IV injection of the three drugs, developing acute pulmonary edema, obstruction, air hunger, suffocation by paralysis, or the injection and operation of

29

potassium chloride, as posed by Defendants' currently selected 3-drug method of lethal injection.

2003. None of the risks of severe pain posed by DRC Defendants' current execution protocol would exist using this alternative.

2004. *Eliminating* the substantial risks of severe pain posed by the current execution method will, by definition, *significantly, clearly, and considerably reduce* the substantial risks of severe pain to which Plaintiff is subjected by the current execution method.

2005. DRC Defendants should also be able to carry out an execution by shooting the condemned inmate to death with bullets using different procedures, such as shooting the bullets into the condemned inmate's brain stem from close range, using the procedures described in Dr. Williams's previously admitted expert report, incorporated here by reference. (ECF No. 2463-9.)

2006. The manner of execution alleged in this variation of shooting to death by bullets is also available, feasible, and readily implemented.

2007. DRC Defendants should be able to identify the necessary qualifications for a person or persons to successfully carry out an execution by shooting as alleged here.

2008. Upon information and belief, DRC Defendants have conceded, admitted, or stipulated that they employ or have within their control, or should be able to obtain with ordinary transactional effort, all the

necessary supplies, equipment, and services of trained personnel necessary to carry out an execution by shooting as alleged here.

2009. DRC Defendants should be able to secure any training for the execution team members necessary to successfully carry out an execution by shooting the condemned inmate in the side of the head to macerate the brain stem as alleged here.

2010. All the safety measures and other procedural details alleged above regarding shooting an inmate to death using the U.S. Military or Utah DoC procedures are likewise applicable, similarly feasible, readily implemented, whether for an indoor or outdoor execution proceeding, and are otherwise available in all respects regarding shooting the inmate to death by shooting him in the brain stem as alleged here.

2011. Several days in advance of the scheduled execution date, DRC Defendants should be able to offer Plaintiff the choice of whether to be blindfolded or to remain without a blindfold during the final stage of his execution.

2012. On the day of execution using the outdoor setting, DRC Defendants should be able to carry out Plaintiff's execution by walking Plaintiff to the area of grass adjacent to the current Death House identified in SOCF Image 1, and permitting him to give his last words to the gathered witnesses.  Then DRC Defendants should be able to apply a blindfold over Plaintiff's eyes, if he made that election previously or if

he makes that choice on the spot, and then proceed to carry out the final stage of his execution.

2013. DRC Defendants should be able to secure Plaintiff in a restrained position and immobilize his head as necessary to ensure accurate aim by the execution party.

2014. On command from the Warden, DRC Defendants or those selected to carry out the execution, should be able to shoot Plaintiff with two to three rounds, one bullet per rifle, in the side or back of the head, targeting the brainstem from a range of 1-5 yards (3-15 feet), using the external auditory meatus as the visible aiming point if firing from the side, or the occipital protuberance if firing from the rear.

2015. Plaintiff's body should be cared for from there as provided for in the current version of DRC Policy 01-COM-11.

2016. DRC Defendants should be able to use a firearm in the 22 Winchester Magnum Rimfire (WMR) rifle class, of which there are several options, firing a bullet of 40-60 grains.

2017. DRC Defendants should be able to achieve precise targeting by means of a projected laser aiming device on each rifle, calibrated for the distance involved, and/or by using other mechanical or engineered measures to ensure precise targeting and ensure against operator error.

2018. DRC Defendants should also be able to carry out an indoor execution by shooting, by using the large, high-ceilinged room in which the

inmate is currently permitted to have attorney visits on the eve of execution. The approximate location of that room is circled in yellow in SOCF Image 1.

2019. DRC Defendants should be able to carry out an indoor execution by shooting to death with bullets to the brainstem using all other procedures alleged above for an outdoor execution carried out by shooting the inmate to death with bullets.

2020. Upon information and belief, DRC Defendants possess or have within their control, or should be able to obtain with ordinary transactional effort, relatively easily and reasonably quickly, at least three .22 WMR-class rifles.

2021. 22 caliber WMR-class rifles are generally available for purchase on the open market, and thus DRC Defendants should be able to obtain them easily with ordinary transactional effort.

2022. DRC Defendants should be able to purchase a .22 WMR-class rifle on the open market for less than $700.[9]

2023. Neither federal nor Ohio law requires a permit or license to purchase or possess a rifle like the 22 WMR-class rifles, and thus neither federal nor Ohio law poses any substantial restriction on DRC Defendants' ability to purchase such rifles to use in an execution.[10]

---

[9] *See, e.g.,*
https://www.vanceoutdoors.com/category.cfm/outdoors/rifles/of3/22-wmr;
https://www.ohioguns.us/rifles/bolt-action-rifles?caliber=216&page=1.

[10] *See* https://www.nraila.org/gun-laws/state-gun-laws/ohio/.

2024. Upon information and belief, DRC Defendants possess or have within their control, or should be able to obtain with ordinary transactional effort, suitable ammunition for 22 caliber WMR-class rifles.

2025. Such ammunition is generally available for purchase on the open market, it is cheap and plentiful, often less than $0.50 per round, and thus readily available to DRC Defendants with ordinary transactional effort.[11]

2026. Upon information and belief, numerous Ohio state agencies, including but not limited to ODRC, the Ohio State Highway Patrol, the Ohio National Guard, and various county SWAT teams, already have in their possession rifles in the .22 WMR class and the suitable ammunition for them, such that DRC Defendants should be able to easily procure at least three such rifles and the necessary ammunition with ordinary transactional effort without even needing to purchase the equipment on the open market.

2027. Upon information and belief, DRC Defendants possess or have within their control, or should be able to obtain with ordinary transactional effort, the materials necessary to build a suitable safety backstop.

2028. Upon information and belief, DRC Defendants possess or have within their control, or should be able to obtain with ordinary transactional

---

[11] *See, e.g.,* https://www.vanceoutdoors.com/category.cfm/outdoors/22-wmr-ammunition-for-sale.

effort, the laser sights to be affixed to the rifles to ensure precise aiming.

2029. Upon information and belief, DRC Defendants possess or have within their control, or should be able to obtain with ordinary transactional effort, any engineered or designed restraint system necessary to immobilize Plaintiff's head to ensure precise aiming.

2030. This manner and method of execution is an available, feasible alternative that is readily implemented because it is virtually 100% effective, and will indisputably cause death virtually instantaneously, before the sensory nerves can even communicate the impact of the bullets on the brain. Additionally, even using less precise procedures, execution by shooting in the head has a track record of successful use in other jurisdictions. It is essentially the method of execution used by the former Soviet Union, and it is still used by the former Soviet republic of Belarus. Shooting to the back or side of the head from close range with a rifle (or even smaller firearm) is also used or has been used effectively in China.

2031. The physical forces involving firearms, bullets, and the human body that are applicable to cause death in executions by shooting the condemned inmate in the head with bullets in China, the former Soviet Union, and Belarus, among other places, apply equally to Plaintiff here.

35

2032. DRC Defendants would not be the first jurisdiction to use shooting to death with bullets to the head as a manner of execution. It is not a new manner of execution.

2033. This manner of execution is neither untried nor untested. It would not be an experiment. There is a proven track record of success in causing death by gunshot to the head from close range.

2034. Three bullets fired into the brainstem under this alternative would have more than sufficient energy to penetrate through to the brainstem, but dissipation of energy from those bullets occurs very quickly and as such the bullets would be unlikely to exit the skull on the opposite side.

2035. Likewise, the relatively lower energy of this bullet/ammunition would be insufficient to cause the explosive expansion of the cranial vault seen with high-velocity rifle rounds. As such, this alternative would avoid the results produced by a pistol shot to the base of the skull or a rifle shot to the face, while yielding rapid destruction of the key components of the central nervous system at the brainstem.

2036. This alternative as alleged would also significantly reduce a substantial risk of severe pain as compared to that posed by DRC Defendants' current execution protocol.

2037. The reduction in risk compared to Ohio's current execution manner and method is clear and considerable.

2038. By targeting the brainstem, Plaintiff's death would be extremely rapid. The velocity of a .22 WMR bullet (450 m/s, which is 1650 f/s) is more than adequate for the purposes of execution. The bullets would transect the brainstem several milliseconds after impacting the external surface of the head, faster than neural transmissions from the sensory nerves could communicate that event to the conscious brain. That velocity is both faster than the speed of sound and faster than the speed of neural transmission. Thus, Plaintiff would neither hear the reports of the rifles nor feel the bullets impacting his person prior to the bullets macerating his brainstem. While not *truly* instantaneous in effect, such a mechanism would be for all practical purposes *virtually* instantaneous, and it would also be genuinely pain*less*.

2039. This alternative will cause instant and catastrophic damage to Plaintiff's brainstem, causing him, upon information and belief, to irreversibly and virtually instantly lose consciousness, awareness, and sensation, followed quickly by death.

2040. Execution by this manner and method does not subject Plaintiff to any of the risks of severe or serious pain and suffering caused by IV injection of the three drugs, developing acute, non-cardiogenic pulmonary edema, waterboarding-like torture, obstruction, air hunger, suffocation by paralysis, or the injection and operation of

potassium chloride, as posed by Defendants' currently selected 3-drug method of lethal injection.

2041. None of the risks of severe or serious pain posed by DRC Defendants' current execution protocol would exist using this Alternative.

2042. *Eliminating* the substantial risks of severe pain posed by the current execution method will, by definition, *significantly, clearly, and considerably reduce* the substantial risks of severe or serious pain to which Plaintiff is subjected by the current execution method.

2043. Using this alternative will leave the inmate virtually or literally unable to subjectively experience any pain or suffering and allow him to die in a virtually or literally pain-free and humane manner.

2044. When this alleged alternative would virtually eliminate, and therefore significantly reduce, the risk posed by Ohio's current execution method that the inmate will subjectively experience severe pain and suffering, that makes the pain and suffering caused by Ohio's current execution protocol needless and well beyond what is necessary to cause death. That makes the pain and suffering caused by Ohio's current execution protocol superadded by comparison to the alleged alternative.

2045. Because Ohio's current execution protocol imposes pain and suffering that is superadded, it therefore imposes pain and suffering that is constitutionally unacceptable, constitutionally inappropriate,

constitutionally problematic, constitutionally excessive, and unconstitutionally high.

2046. There are no reasonable or legitimately justifiable reasons for Defendants to refuse to adopt a method of execution involving shooting the inmate to death with bullets.

2047. Any purported concerns about preserving the dignity of the proceeding are belied by Ohio's continued use of a lethal injection protocol that causes overt suffocation as the inmate fights and struggles to breathe as he is essentially tortured to death by filling his lungs with fluid.

2048. Any such dignity concerns are also disproven by testimony that Utah's execution of Mr. Gardner was a highly dignified process, as was the U.S. Army's execution of German General Anton Dostler.

2049. Any such dignity concerns are also allayed by actions that Defendants could take to minimize overt trauma inflicted on the condemned inmate, such as covering his head with a dark hood, or by having him wear dark clothing, or by constructing the execution chair and safety backdrop with such concerns in mind, as Utah corrections officials described in their deposition testimony.

2050. Defendants have already admitted that they should be able to implement any procedures or safety measures that Utah DoC implements for a firearms execution, and Utah DoC representatives testified that their firearms executions are solemn affairs carried out

with the utmost dignity and humanity for all involved, inmate and witnesses. Accordingly, Defendants should be able to do likewise.

2051. Defendants can carry out an execution by shooting to death with bullets using any of the noted variations of this method, all of which are available, feasible, and readily implemented, including but not limited to the 1944 army firing squad protocol, the 1947 army firing squad protocol, the 1959 firing squad protocol, the Utah firing squad protocol, any similar firing squad protocol, or shooting to death with bullets to the back of the head and brainstem, each of which significantly reduces a substantial risk of severe pain and suffering attendant to Defendants' current execution protocol by ensuring virtually instantaneous insensation and death.

### B. Alternative No. 2 – Execution by Oral Injection of a Four-Drug Mixture, Including a Benzodiazepine, Digoxin, Morphine Sulfate, and Amitriptyline, or Similar Combination Used In The Medical-Aid-In-Dying Context.

2052. DRC Defendants should be able to carry out a condemned inmate's execution using oral injection of a mix of the following drugs: a benzodiazepine, 50 to 100 mg digoxin, 15 grams morphine sulfate, and 2 grams propranolol.

2053. Under one variation of this alternative, DRC Defendants should be able to use 1-2 grams of diazepam as the benzodiazepine.

2054. DRC Defendants should also be able to carry out a condemned inmate's execution using oral injection of any other similar drug combination that has been identified and used successfully to cause

humane and painless death in Medical Aid In Dying ("MAID") jurisdictions, such as a variation of this alternative including using 100 mg digoxin, 1 gram diazepam, 15 grams morphine sulphate, and 8 grams amitriptyline.

2055. DRC Defendants should be able to prepare the lethal drug mixture by mixing the medications together to form a liquid, dissolving any powdered medications in that liquid, and then drawing that liquid up into syringes.

2056. DRC Defendants should be able to prepare the digoxin by mixing the powder with approximately 2 ounces of a sweet liquid such as apple juice. At an appropriate time before escorting the condemned inmate into the death chamber, and thus in advance of injecting the other drug mixture, DRC Defendants should be able to administer the digoxin to the inmate by injecting the syringe directly into the inmate's oral/mouth cavity.

2057. Administering the digoxin in advance of the other three medications will help expedite the execution process when the other medications are injected.

2058. Upon escorting the condemned inmate into the death chamber, DRC Defendants should be able to put into place on the execution bed a wedge-shaped cushion of sufficient height to prevent obstruction by propping the inmate up at an angle during his execution.

41

2059. At an appropriate time before inserting either the nasogastric or orogastric tube (hereinafter a "feeding tube" unless otherwise specified), DRC Defendants should be able to apply a topical anesthetic by, for example, spraying the back of the inmate's throat with Lidocaine, to ensure relatively painless insertion.

2060. Before inserting the feeding tube, DRC Defendants should be able to give the inmate the opportunity to state his last words.

2061. DRC Defendants should be able to insert a feeding tube while the inmate is on the execution bed, from bedside.  It is a simple process that at least some DRC Defendants are already trained to do.

2062. DRC Defendants should be able to insert an orogastric tube by inserting a narrow, lubricated tube in the mouth, down the esophagus, and into the stomach.

2063. DRC Defendants should be able to insert a nasogastric tube by inserting a narrow, lubricated tube up the nose and down the esophagus into the stomach.

2064. DRC Defendants should be able to verify successful placement of a feeding tube into the inmate's stomach by using a stethoscope.

2065. Plaintiff presents no medical complications that would make it difficult for DRC Defendants to insert a feeding tube.

2066. Once DRC Defendants have verified successful placement of a feeding tube, DRC Defendants should be able to attach the syringes to the

feeding tube, and then, from bedside, inject the contents of the syringes into the inmate's stomach.

2067. Ten minutes after completing the administration of the four-drug mixture, DRC Defendants should be able to assess whether the inmate remains alive. If so, they can continue to recheck the inmate's status every five minutes. If, after 25 minutes, the inmate still remains alive, a second dose of the four-drug mixture can be administered orally.

2068. When DRC Defendants determine that the inmate has died, the inmate's body should be cared for from there as provided for in the current version of DRC Policy 01-COM-11.

2069. This alternative method of causing death by oral administration of a four-drug mixture is an available, feasible alternative execution method that is readily implemented which Ohio should be able to carry out with ordinary transactional effort.

2070. Upon information and belief, DRC Defendants possess or have within their control, or should be able to obtain with ordinary transactional effort, relatively easily and reasonably quickly, all the equipment, supplies, and materials necessary to carry out an execution as alleged in this alternative.

2071. Defendants possess or have within their control, or could obtain with ordinary transactional effort, the medical supplies necessary to inject the lethal drugs orally rather than through peripheral IV access.

2072. DRC Defendants should be able to apply lidocaine or other similar topical anesthetic to the back of the inmate's throat; it takes no special skills or training to do so.

2073. Applying the topical anesthetic before inserting the feeding tube will eliminate or at least effectively mitigate any pain from the insertion of the feeding tube.

2074. DRC Defendants should be able to administer an oral, over-the-counter anti-emetic drug to the inmate; it takes no special skills or training to do so.

2075. Administering an oral, over-the-counter anti-emetic (anti-nausea) drug in advance of injecting the four-drug mixture will virtually eliminate any concerns about the inmate becoming nauseous or regurgitating the drugs following injection, and thus eliminate any concerns that the inmate will not receive the full dose of lethal drugs.

2076. Preparing the lethal drug mixture under this alternative does not require any specialized skill or training, and DRC Defendants should be able to easily prepare the drugs for injection.

2077. DRC Defendants have the training to insert a feeding tube or can easily obtain the services of persons with the necessary training, and thus should be able to easily insert a feeding tube as required under this alternative.

2078. Administering the lethal drug mixture under this alternative does not require any specialized skill or training, and DRC Defendants should

be able to easily administer the drug by injecting the contents of the syringes into the feeding tube and, as applicable for the digoxin, directly into the inmate's mouth.

2079. Administration of the medication via a feeding tube does not require swallowing or any physical action by the inmate to convey the medication from the syringe into the stomach via the feeding tube.

2080. Insertion of a feeding tube is generally less invasive and less time-consuming than inserting a peripheral or central intravenous line, and the success rate is also higher.

2081. DRC Defendants should be able to use a wedge-shaped cushion to prop up the inmate during his execution, because they already agreed to use for the planned execution of Plaintiff Kenneth Smith and for the planned execution of Plaintiff Raymond Tibbetts, and they used one for the attempted execution of former Plaintiff Alva Campbell, Jr.

2082. Using a wedge-shaped cushion is available, feasible, and readily implemented, because Defendants possess or have within their control, or could obtain with ordinary transactional effort, the wedge-shaped cushion that they already agreed to use for Plaintiffs Smith and Tibbetts, and used for former Plaintiff Campbell.

2083. Additionally, DRC Defendants should be able to place the wedge-shaped cushion on the execution bed and implement it during the execution process with minimal effort.

2084. Defendants possess or have within their control or should be able to obtain with the ordinary transactional effort by which they already obtain drugs to use for executions, a sufficient supply of the drugs needed to carry out an execution under this alternative.  DRC Defendants have already conceded this fact.

2085. The drugs in this alternative are sold on the open market and are available for purchase by DRC Defendants.

2086. Thus, this manner and method of execution is an available, feasible alternative because Defendants possess or have within their control, or should be able to obtain with the ordinary transactional effort by which they already obtain drugs to use for executions, a supply of the drugs sufficient to carry out a condemned inmate's execution using this alternative method of lethal injection

2087. The method of causing death as alleged in this alternative is virtually 100% effective in causing death, virtually 100% effective at causing a pain-free death, and there is a proven track record of success in causing pain-free death by this method in other jurisdictions.  It is not a new method of causing death.  It is neither untried nor untested.  It would not be an experiment.

2088. This manner and method of execution is an available, feasible, and readily implemented alternative as demonstrated by its use as a primary method by which persons in Oregon and Washington states have brought about their own deaths under those states' respective

Death With Dignity laws using what is called Medical Aid In Dying ("MAID").

2089. Some variant of the four-drug method alleged in this alternative has been used regularly to cause death in MAID jurisdictions in hundreds of cases.

2090. Death by oral administration of the four-drug method is also painless and the drug mixture would render the inmate insensate to pain. It would also not cause him to subjectively experience severe or serious pain and suffering during his execution.

2091. Death under this alternative is caused by suppression of respiration. Death is also aided by the effects of the digoxin and the amitriptyline to cause irregular beating and/or stop the heart.

2092. Morphine sulfate is an opioid analgesic, which means it acts as an effective pain-blocking agent, thereby rendering the inmate insensate to pain and suffering as the dying process progresses.

2093. Also, none of the drugs in either version of the four-drug method has a paralytic effect that renders the inmate incapable of expressing pain.

2094. The median time from ingestion to unconsciousness for MAID cases in Oregon between 2008 and 2017 using a similar four-drug method is approximately 7 minutes.

2095. Death typically follows relatively shortly thereafter.

2096. The drug combination and administration method alleged here will act in the same or analogous fashion to cause the inmate's death painlessly in an execution context as in MAID cases.

2097. In the highly unlikely event that an initial dose of the four-drug mixture as alleged in this alternative does not cause death, it will not cause permanent harm to the inmate, nor cause the inmate to experience pain. DRC Defendants should be able to administer a second dose of the drug mixture if necessary.

2098. There are no safety concerns for any execution team members or witnesses or others involved in the execution process using this alternative, and thus no special safety measures that might need to be taken beyond any protective measures DRC Defendants already implement for their current lethal injection execution method.

2099. Administration of this alternative constitutes "a lethal injection" under Ohio Revised Code § 2949.22(A).

2100. This alternative as alleged would also significantly reduce a substantial risk of severe pain as compared to that posed by DRC Defendants' current execution protocol.

2101. The reduction in risk compared to Ohio's current execution manner and method is clear and considerable.

2102. Execution by the method of lethal injection alleged in this alternative using an orally injected four-drug combination will cause the inmate's

48

death while providing analgesic protection against the inmate remaining sensate to any pain and suffering following injection.

2103. Accordingly, execution by this alleged alternative would eliminate any risk of the condemned inmate subjectively experiencing severe or serious pain and suffering after being injected with the drugs.

2104. Execution by this method of lethal injection using oral injection of the four-drug combination will cause the inmate's death while significantly minimizing, if not eliminating, the risk of developing acute, non-cardiogenic pulmonary edema, and the risk of developing acute, non-cardiogenic pulmonary edema while still the inmate remains sensate to severe pain and unprotected against pain by the sedation caused by 500 mg midazolam, and thus able to subjectively experience the full measure of severe and serious pain and suffering caused by Ohio's current three-drug lethal injection protocol.

2105. This alternative does not pose a risk of causing acute, non-cardiogenic pulmonary edema during the execution, and thus eliminates the risk the inmate will experience the severe or serious pain and horrific suffering of being suffocated or drowned to death.

2106. This alternative does not pose a risk of discomfort from the administration of the medication.

2107. This alternative, by providing for oral injection into the stomach, would also eliminate the sure or very likely risk of severe, serious, burning pain upon peripheral IV injection of 500 mg of acidic midazolam.

49

2108. This alternative would also eliminate the sure or very likely risk of the inmate developing acute, non-cardiogenic pulmonary edema while remaining sensate and after peripheral IV injection of 500 mg or more of midazolam, thus eliminating the sure or very likely risk of the inmate subjectively experiencing the full measure of severe or serious pain and suffering caused by death by suffocation or drowning akin to waterboarding torture caused by Ohio's current protocol.

2109. This alternative, in contrast to Ohio's current protocol, does not pose any risk that the inmate will remain sensate and subjectively experience the full measure of severe or serious pain associated with the drugs in Ohio's current protocol and the effects of those drugs.

2110. Unlike the current protocol, this alternative has no paralytic, and thus poses no risk of severe or serious pain and suffering associated with injection and suffocation by the paralytic drug's effects.  Accordingly, this alternative significantly reduces the sure or very likely risk of severe or serious pain and suffering caused by the use of the paralytic drug in Ohio's current protocol.

2111. Unlike the current protocol, this alternative has no potassium chloride, and thus poses no risk of severe or serious pain and suffering associated with IV injection and action of potassium chloride. Accordingly, this alternative significantly reduces the sure or very likely risk of severe or serious pain and suffering caused by the use of the IV-injected potassium chloride overdose in Ohio's current protocol.

50

2112. Unlike the current protocol, this alternative does not rely on peripheral IV-injected 500 mg doses of midazolam to protect the inmate from the severe or serious pain and suffering associated with the paralytic drug and potassium chloride and their effects and eliminates those three drugs entirely.  This alleged alternative thus eliminates (and therefore significantly reduces) the substantial risks of severe pain and suffering associated with those drugs as used in the current execution protocol.

2113. Using the wedge-shaped cushion, by propping the inmate up at an angle, will significantly reduce the sure or likely risk under the current protocol that the inmate will obstruct after injection of the drugs.  This alternative would significantly reduce that risk by helping to ensure that the soft tissues in the back of the inmate's throat will not collapse into his airway when he loses muscle tension after injection of the drugs, like they would if he was lying supine as currently required by Defendants' execution protocol and procedures.

2114. Execution by the method alleged in this alternative, when injected into a condemned inmate who is propped up with a wedge cushion, does not subject that inmate to any of the severe or serious pain and suffering caused by obstruction, air hunger, suffocation by paralysis, or the injection and operation of potassium chloride, as posed by Defendants' currently selected 3-drug method of lethal injection.

2115. The four-drug method as alleged in this alternative does not involve peripheral IV administration, and thus poses no risk of experiencing a

failed execution attempt with multiple, severely painful but ultimately unsuccessful needle sticks.

2116. Inserting a feeding tube involves much less risk resulting from any inmate non-cooperation than attempting to insert a needle for intravenous administration of drugs, in which a small movement by a recalcitrant inmate could cause the IV infusion to be ineffective and even dangerous.

2117. Under this alternative, there is virtually no risk of administering the lethal injection into tissue, unlike the risk of painful infiltration posed by the peripheral IV injection method DRC Defendants use for their current protocol.

2118. Accordingly, this alternative will also significantly reduce the substantial risk of severe or serious pain and suffering the condemned inmate is sure or very likely to subjectively experience if subjected to the current execution method's requirement to carry out the injections via peripheral IV and Defendants' demonstrated history of difficulty related thereto as well as Plaintiff's unique characteristics alleged herein that increase the risk that Defendants will not be able to successful achieve and maintain peripheral IV access.

2119. The four-drug method as alleged in this alternative includes a pain-blocking opioid analgesic in the morphine, and thus poses no risk that the inmate will subjectively experience severe or serious pain and suffering during his execution.

52

2120. The opioid analgesic in this alternative will render the inmate insensate during the dying process, thus eliminating (and thereby significantly reducing) the substantial risks of subjectively experiencing severe or serious pain and suffering associated with the drugs injected via peripheral IV in Ohio's current three-drug execution protocol.

2121. None of the risks of severe or serious pain and suffering posed by DRC Defendants' current execution protocol would exist using this alternative.

2122. *Eliminating* the substantial risks of severe pain posed by the current execution method will, by definition, *significantly, clearly, and considerably reduce* the substantial risks of severe pain to which Plaintiff is subjected by the current execution method.

2123. Even if this alternative poses an extremely limited risk of causing Plaintiff to develop pulmonary edema by its use of an overdose of benzodiazepine, that pulmonary edema would be cardiogenic and much slower to develop, and the degree of risk of that condition posed by this alternative is clearly and considerably less than the sure or very likely risk of suffering severe or serious pain and suffering from horrifying sensations akin to waterboarding to which Plaintiff is subjected by the current three-drug protocol.

2124. The degree of risk of developing acute, non-cardiogenic pulmonary edema itself under this alternative is significantly reduced, if not

outright eliminated, by using oral injection instead of peripheral IV injection. The drug mixture will be injected into the stomach, which is quite adept at processing highly acidic contents, and will be buffered into a relatively neutral state before reaching the lungs, rather than being injected into the peripheral veins, and then traveling quickly to the heart and then the lungs while still in a highly acidic state.

2125. The degree of risk posed by this alternative (if any) of developing pulmonary edema while still remaining sensate to and subjectively experiencing the severe pain and suffering that condition causes is significantly reduced, if not outright eliminated, by using (a) oral injection rather than peripheral IV injection of (b) an opioid analgesic (a true analgesic drug) to block pain, rather than relying on a benzodiazepine which has no analgesic properties, as the current protocol does.

2126. Using this alternative will render Plaintiff unable to subjectively experience any pain or suffering and allow him to die in a pain-free and humane manner.

2127. When this alleged alternative would virtually eliminate, and therefore significantly reduce, the risk posed by Ohio's current execution method that the inmate will subjectively experience severe pain and suffering, that makes the pain and suffering caused by Ohio's current execution protocol needless and well beyond what is necessary to cause death. That makes the pain and suffering caused by Ohio's

current execution protocol superadded by comparison to the alleged alternative.

2128. Because Ohio's current execution protocol imposes pain and suffering that is superadded, it therefore imposes pain and suffering that is constitutionally unacceptable, constitutionally inappropriate, constitutionally problematic, constitutionally excessive, and unconstitutionally high.

## C. **Alternative No. 3 – Execution by Nitrogen Hypoxia.**

2129. Defendants should be able to carry out a condemned inmate's execution by nitrogen hypoxia, using one of three potential applications to carry out that alternative.

2130. The manner of execution alleged in this alternative is available, feasible, and readily implemented.

2131. DRC Defendants should be able to carry out Plaintiff's execution by causing nitrogen hypoxia using a mask application.

2132. DRC Defendants should be able to place a comfortable chair in the death chamber, secured to the floor or otherwise stable, with restraints for the inmate's chest, torso, and limbs. Alternatively, DRC Defendants should be able to use the current execution bed and restraints.

2133. DRC Defendants should be able to have, directly adjacent to that chair or bed, a sufficient number of tanks of nitrogen gas, whether pure or at a concentration high enough to cause death rapidly.

2134. DRC Defendants should also be able to procure a mask of sufficient size to cover Plaintiff's face, including his mouth and nose, without restrictions, and with sufficient ability to seal to the sides of Plaintiff's face.

2135. DRC Defendants should also be able to procure the necessary straps affixed to the mask that would go over the head to ensure that the mask stays securely fixed in place throughout the entire execution process.

2136. DRC Defendants should be able to procure the proper valves and hose necessary to force the nitrogen gas from the tanks through the hose into a connection into the mask, with a breathing apparatus and regulator as necessary to ensure the uninterrupted and necessary rate of flow of nitrogen into the mask throughout the execution process.

2137. DRC Defendants should be able to escort Plaintiff into the death chamber and secure him to the chair or the bed.

2138. Upon giving Plaintiff his opportunity to state his last words, DRC Defendants should be able to proceed to position the mask over Plaintiff's face, secured and affixed in place with the straps and then held in place by the execution team leader's hands.

2139. With the mask affixed securely in place and held there throughout the remainder of the execution, DRC Defendants should be able to open the valves on the nitrogen gas tanks to ensure an uninterrupted flow

of nitrogen gas into the mask at an appropriate rate for its intended purpose.

2140. DRC Defendants should be able to instruct Plaintiff to breathe deeply at that point.

2141. DRC Defendants should be able to wait a period of time for Plaintiff to inhale the nitrogen gas inside the mask sufficiently to displace the oxygen in his brain, at which point death should occur rapidly and without pain.

2142. DRC Defendants should be able to assess Plaintiff for signs of continued life at an appropriate and sufficient period of time after commencing the flow of nitrogen gas into the mask.  If Plaintiff remains alive at the time of that assessment, DRC Defendants should be able to wait for another period of time, and then reassess.  DRC Defendants should be able to repeat that cycle of waiting periods and assessments as long as necessary to confirm Plaintiff's death.

2143. DRC Defendants should also be able to carry out Plaintiff's execution by causing nitrogen hypoxia using a hooded application.

2144. DRC Defendants should be able to place a comfortable chair in the death chamber, secured to the floor or otherwise stable, with restraints for the inmate's chest, torso, and limbs.

2145. DRC Defendants should be able to have, directly adjacent to that chair, a sufficient number of tanks of nitrogen gas, whether pure or at a concentration high enough to cause death rapidly.

2146. DRC Defendants should also be able to procure a hood made of plastic that is large enough to fit over Plaintiff's head and extend to his neck, and a band of elasticized material that would allow for securing the hood at the base of Plaintiff's neck without otherwise causing Plaintiff discomfort.

2147. DRC Defendants should also be able to procure the proper valves and hose necessary to force the nitrogen gas from the tanks through the hose into the hood. They should also be able to secure in an appropriate fashion the open end of the hose to the inside of the hood.

2148. DRC Defendants should be able to escort Plaintiff into the death chamber and secure him to the chair.

2149. Upon giving Plaintiff his opportunity to state his last words, DRC Defendants should be able to proceed to position the hood at the top of Plaintiff's forehead, and then open the valves on the nitrogen gas tanks to ensure a flow of nitrogen gas at an appropriate rate for its intended purpose.

2150. After running the nitrogen gas through the hose for a sufficient time to inflate the hood and displace the oxygen inside the hood as it rests on the top of Plaintiff's head, DRC Defendants should be able to instruct Plaintiff to exhale forcefully a few times, to purge the lungs of as much oxygen as possible.

2151. Then DRC Defendants should be able to draw the hood down over Plaintiff's head, and ensure that the elasticized band secures the open

end of the hood around the base of Plaintiff's neck, while the flow of nitrogen gas through the hose remains ongoing and unimpeded.

2152. DRC Defendants should be able to instruct Plaintiff to breathe deeply at that point.

2153. DRC Defendants should be able to wait a period of time for Plaintiff to inhale the nitrogen gas inside the hood sufficiently to displace the oxygen in his brain, at which point death should occur rapidly and without pain.

2154. DRC Defendants should be able to assess Plaintiff for signs of continued life at an appropriate and sufficient period of time after drawing the hood down over Plaintiff's head. If Plaintiff remains alive at the time of that assessment, DRC Defendants should be able to wait for another period of time, and then reassess. DRC Defendants should be able to repeat that cycle of waiting periods and assessments as long as necessary to confirm Plaintiff's death.

2155. Regardless of whether DRC Defendants use the hood or mask applications, when DRC Defendants determine that Plaintiff has died, Plaintiff's body should be cared for from there as provided for in the current version of DRC Policy 01-COM-11.

2156. Although there should not be any concerns about execution team member safety because the air in the death chamber will be virtually unaffected by any leaks of nitrogen gas using either method, any such concerns can be easily reduced or eliminated because DRC Defendants

should be able to provide supplemental oxygen gas tanks and breathing apparatus for the execution team members to wear and use at any time the nitrogen gas valves are open.

2157. DRC Defendants should also be able to carry out Plaintiff's execution by causing nitrogen hypoxia using a self-contained device such as the Sarco, which DRC Defendants should be able to print out and construct ahead of time using a 3-D printer and supplies following plans that can be downloaded for free.[12]

2158. DRC Defendants should be able to install such a device in the death chamber, which should include a transparent door or opening so that DRC Defendants can observe Plaintiff's upper body and head at all times during the execution.

2159. DRC Defendants should be able to obtain liquid nitrogen to use in the device.

2160. DRC Defendants should be able to escort Plaintiff into the death chamber, and then secure him in a reclining or seated position inside the device, either before or after giving Plaintiff an opportunity to state his last words.

2161. At the appropriate time, and once Plaintiff is secured inside the device and the last words concluded, DRC Defendants should be able to

---

[12] *See* https://exitinternational.net/sarco/.

60

instruct Plaintiff to begin breathing deeply, and then close and secure the door to the device.

2162. At that point, DRC Defendants should be able to release into a basin on the floor of the device an amount of liquid nitrogen, which will boil upon reaching -196° C, and turn into a gas.

2163. It only takes 28 g of liquid nitrogen to displace 22.4 L of air at standard temperature and pressure.

2164. DRC Defendants should be able to release enough liquid nitrogen into the device to displace, relatively silently and rapidly, all of the air inside the device once that liquid nitrogen becomes invisible nitrogen gas.

2165. As the air in the device is displaced by nitrogen gas, Plaintiff will still be able to breathe deeply, without pain or suffering of any kind. He will still be able to exhale carbon dioxide normally. Thus, there is no buildup of carbon dioxide inside the body. As a result, the burning sensation that one typically experiences when asphyxiating, such as when holding one's breathe too long or when drowning, is absent.

2166. DRC Defendants should be able to wait a period of time for the device to fill entirely with nitrogen gas, displacing the air inside, and for Plaintiff to inhale the nitrogen gas sufficiently to displace the oxygen in his brain, at which point death should occur rather rapidly and without pain.

2167. Throughout the entire procedure, DRC Defendants should be able to observe Plaintiff for visible signs of consciousness and life.

2168. After a sufficient period of time for death to occur, DRC Defendants should be able to slowly open the door to the device, harmlessly venting the nitrogen gas, and then assess Plaintiff for signs of continued life. If Plaintiff remains alive at the time of that assessment, DRC Defendants should be able to close the door and secure it, and then repeat the process with additional quantities of liquid nitrogen, wait for another period of time, and then reassess using the same procedures. DRC Defendants should be able to repeat that cycle as long as necessary to confirm Plaintiff's death.

2169. Alternatively, DRC Defendants should be able to use wireless monitoring devices to measure and assess Plaintiff's vital signs to confirm Plaintiff's death without opening the device.

2170. When DRC Defendants determine that Plaintiff has died, DRC Defendants should be able to care for Plaintiff's body as provided for in the current version of DRC Policy 01-COM-11. Alternatively, if DRC Defendants have used the Sarco, the entire portion of the device in which Plaintiff is restrained can be disconnected from the base into which the liquid nitrogen was poured, and that top section then removed from the death chamber to be used as a burial coffin if Plaintiff had previously so requested.

2171. Although there should not be any concerns about execution team member safety because the air in the death chamber will be virtually unaffected by any leaks of nitrogen gas using this application of

nitrogen execution, and there should similarly not be any concerns about venting of the nitrogen if opening the device to assess Plaintiff, any such concerns can be easily reduced or eliminated because DRC Defendants should be able to provide supplemental oxygen gas tanks and breathing apparatus for the execution team members to wear and use at any time after the door to the device has been closed and secured.

2172. This Alternative method of causing death by nitrogen hypoxia is an available, feasible alternative execution method that is readily implemented which Ohio should be able to carry out with ordinary transactional effort.

2173. Upon information and belief, DRC Defendants possess or have within their control, or should be able to obtain with ordinary transactional effort, relatively easily and reasonably quickly, all the equipment, supplies, and materials necessary to carry out an execution by nitrogen hypoxia as alleged in this Alternative.

2174. Upon information and belief, DRC Defendants employ or have within their control, or should be able to obtain with ordinary transactional effort the services of, the personnel necessary to carry out an execution by nitrogen hypoxia.

2175. Upon information and belief, DRC Defendants possess or have within their control, or could obtain with ordinary transactional effort,

nitrogen gas, liquid nitrogen, and any other materials needed to carry out an execution via nitrogen hypoxia as alleged here.

2176. DRC Defendants possess or have within their control, or could obtain with ordinary transactional effort, the supplies necessary to administer an execution using nitrogen gas via the hood or mask applications.

2177. DRC Defendants can sufficiently eliminate any concerns about safety of execution team members inside the death chamber by having those team members wear and use personal supplemental oxygen systems, which would take minimal if any training.

2178. DRC Defendants should be able to easily and readily obtain any necessary training for execution team personnel if they are not already trained in the use of such systems.

2179. Upon information and belief, at least some number of DRC execution team personnel are first responders who already have training using personal supplemental oxygen systems.

2180. Upon information and belief, at least some number of DRC execution team personnel are currently trained to apply, operate, interpret, and assess vital signs monitoring devices on a human being to determine, for example, a person's blood pressure, whether a person is respiring, has a heartbeat, and/or brain electrical activity.

2181. DRC Defendants should be able to obtain the training to be able to apply, operate, interpret, and assess wireless vital signs monitoring

devices to assess Plaintiff's blood pressure, whether Plaintiff is respiring, has a heartbeat, and/or brain electrical activity.

2182. Upon information and belief, DRC Defendants possess or have within their control, or could obtain with ordinary transactional effort, a wireless blood pressure monitor, pulse oximeter, EKG monitor, and EEG machine.

a. A wireless blood pressure monitor which can be worn on the wrist and is compatible to be read on Apple and Android handheld devices such as a phone or tablet is readily available for purchase on the open market via ordinary transactional effort. One example can be purchased for less than $100.[13]

b. A wireless pulse oximeter which can be worn on the finger and is compatible to be read on Apple and Android handheld devices such as a phone or tablet is readily available for purchase on the open market via ordinary transactional effort. One example can be purchased for less than $100.[14]

c. A wireless medical-grade EKG monitor that can be worn strapped across the chest and is compatible to be read on Apple devices such as a phone or tablet is available for purchase with the same ordinary

---

[13] *See, e.g.,* https://ihealthlabs.com/blood-pressure-monitors/wireless-blood-pressure-wrist-monitor/.

[14] *See, e.g.,* https://ihealthlabs.com/fitness-devices/wireless-pulse-oximeter/.

transactional effort that DRC Defendants have used to seek execution drugs.[15]

d. A wireless EEG headset that can be easily placed on the head and connected wirelessly to record and produce data on the electrical activity in Plaintiff's brain can be obtained on the open market with ordinary transactional effort.[16] Any other hardware necessary to read real-time EEG data collected wirelessly can also be obtained on the open market with the ordinary transactional effort by which DRC Defendants have obtained execution drugs and other equipment for use in executions.

2183. Upon information and belief, DRC Defendants possess or have within their control, or could obtain with ordinary transactional effort, a sufficient quantity of portable tanks of nitrogen gas.

2184. Upon information and belief, DRC Defendants possess or have within their control, or could obtain with ordinary transactional effort, sufficient supplies of liquid nitrogen.

2185. Upon information and belief, DRC Defendants possess or have within their control, or could obtain with ordinary transactional effort, all the other equipment necessary to administer nitrogen gas to Plaintiff in the manners alleged here.

---

[15] *See, e.g.*, https://www.getqardio.com/qardiocore-wearable-ecg-ekg-monitor-iphone/.

[16] *See, e.g.*, https://imotions.com/blog/eeg-headset-prices/.

2186. All materials necessary to carry out an execution by nitrogen hypoxia as alleged in this Alternative are readily available for purchase on the open market without significant, if any, restrictions.

2187. DRC Defendants should be able to open the valves on the nitrogen gas tanks and read a regulator gauge to ensure an ongoing flow of gas through the tube into the hood or mask; it takes no special skills or training to do so.

2188. DRC Defendants should be able to pull the hood down over Plaintiff's head and secure it comfortably around his neck; it takes no special skills or training to do so.

2189. DRC Defendants should be able to put the mask on Plaintiff and secure it in place with straps and/or the hands of the execution team leader; it takes no special skills or training to do so.

2190. DRC Defendants should be able, without needing to take any affirmative actions on their part, to ensure that Plaintiff breathes in the nitrogen gas to displace the oxygen in his brain and blood stream.

2191. DRC Defendants do not need to rely upon a manufacturer to sell them a gas delivery device for use in an execution; each of the applications in this Alternative are able to be constructed as necessary and implemented by DRC Defendants themselves, using readily available materials and supplies.

2192. If DRC Defendants use the Sarco, that device is a portable, personal chamber, with a controlled atmosphere, which DRC Defendants should be able to print themselves using 3-D printing technology.

2193. DRC Defendants should be able to obtain the plans for the 3-D printing of the Sarco because they are or will be available for free as open source information, easily found on the internet for download by any interested party.

2194. Upon information and belief, DRC Defendants could obtain with ordinary transactional effort the materials and supplies necessary to carry out a nitrogen hypoxia execution using the Sarco, including an industrial-sized 3-D printer and the related materials.

2195. Defendants recently spent over $5,000 to purchase medical equipment for use in executions, and they have spent thousands of dollars to purchase lethal injection drugs.

2196. Upon information and belief, an industrial sized 3-D printer and materials are similarly priced or would not be appreciably greater in price, and Defendants should be able to purchase said machines on the open market with ordinary transactional effort in the same way they recently purchased their AccuVein AV400 vein illuminator.

2197. The manner and method of causing death as alleged in this Alternative is virtually 100% effective in causing death, virtually 100% effective at causing a pain-free death, and for the mask and hood applications, there is a proven track record of success in causing pain-free death by

this manner and method in other jurisdictions.  For the Sarco application of this Alternative, there will soon be a proven track record of success in causing pain-free death by that manner and method in other jurisdictions.  Death by nitrogen hypoxia is not a new manner or method of causing death.  It is neither untried nor untested.  It would not be an experiment.

2198. This manner and method of execution is an available, feasible, and readily implemented alternative as demonstrated by its use by numerous persons who have brought about their own deaths through assisted dying protocols in different jurisdictions.

2199. The physics, chemistry, and biology of nitrogen gas causing death by hypoxia will work the same in an execution in Ohio or in any other context in which nitrogen hypoxia has caused death.

2200. Alabama, Mississippi, and Oklahoma have recently adopted nitrogen hypoxia in their execution protocols.

2201. The hood and mask methods of nitrogen hypoxia (or using to the same effect other inert gas such as helium) have been frequently used to cause painless and peaceful death in places such as the Netherlands, Switzerland, and other countries that have laws permitting persons to end their own lives.  The Sarco will soon be used to cause painless and peaceful death in other jurisdictions as well.

2202. This Alternative as alleged would also significantly reduce a substantial risk of severe pain as compared to that posed by DRC Defendants' current execution protocol.

2203. The reduction in risk compared to Ohio's current execution manner and method is clear and considerable.

2204. Death by nitrogen hypoxia as alleged in this Alternative is completely painless.

2205. Death is caused by the nitrogen purging the brain of oxygen, thus depriving the brain of the oxygen it requires to remain alive.

2206. Death by nitrogen hypoxia is a relatively gradual although still sufficiently rapid process, which may produce feelings of intoxication and euphoria while eliminating the build-up of carbon dioxide.

2207. If executed using nitrogen hypoxia as alleged in this Alternative, Plaintiff would, upon information and belief, be quickly, painlessly, and humanely rendered unconscious, followed rapidly by death.

2208. Because there is no paralytic involved, there will be no risk of the terrifying and severe pain and suffering of not being able to draw a breath as there is in the current execution protocol.

2209. Because the inmate would continue breathing and exhaling carbon dioxide, there is no build-up of carbon dioxide in the blood and in the brain, and thus there is no severe pain and suffering associated with death by nitrogen hypoxia as alleged in this Alternative.

70

2210. Because there is no peripheral IV injection of 500 mg or more of midazolam, there is no risk of severe pain and suffering caused by injection of that drug or from development of pulmonary edema following injection as there is in the current execution protocol.

2211. Because there is no potassium chloride involved, there is none of the severe pain and suffering cause by a peripheral IV injection of an overdose of that drug as there is in the current execution protocol.

2212. Execution by the manner and method alleged in this Alternative does not subject Plaintiff to any of the risks of severe pain and suffering caused by IV injection of the three drugs, developing acute pulmonary edema, obstruction, air hunger, suffocation by paralysis, or the injection and operation of potassium chloride, as posed by Defendants' currently selected 3-drug method of lethal injection.

2213. None of the risks of severe pain posed by DRC Defendants' current execution protocol would exist using this Alternative.

2214. *Eliminating* the substantial risks of severe pain posed by the current execution method will, by definition, *significantly, clearly, and considerably reduce* the substantial risks of severe pain to which Plaintiff is subjected by the current execution method.

2215. Using this alternative will leave the inmate unable to subjectively experience any pain or suffering and allow him to die in a virtually pain-free and humane manner.

2216. When this alleged alternative would virtually eliminate, and therefore significantly reduce, the risk posed by Ohio's current method that the inmate will subjectively experience severe pain and suffering, that makes the pain and suffering caused by Ohio's current execution protocol needless and well beyond what is necessary to cause death. That makes the pain and suffering caused by Ohio's current execution protocol superadded by comparison to the alleged alternative.

2217. Because Ohio's current execution protocol imposes pain and suffering that is superadded, it therefore imposes pain and suffering that is constitutionally unacceptable, constitutionally inappropriate, constitutionally problematic, constitutionally excessive, and unconstitutionally high.

### D. <u>**Alternative No. 4 – Execution By Hanging**</u>

2218. DRC Defendants should be able to carry out an execution by hanging the condemned inmate by the neck using the "long drop" or "measured drop" method, following similar procedures as defined in Section III, ¶¶ 13–16; Section V, ¶¶ 21–23; Section VI, ¶¶ 24–25, Section VII, ¶¶ 26–28, Section VIII, ¶¶ 29, 31, and Figures 2.1–2.4, 3.1–3.3, 4, and 7.1–7.4, Army Regulations No. 633-15, Procedures for Military Executions (Apr. 7, 1959); or the same or similar procedures as defined in Section III, ¶¶ 16–19; Section IV, ¶¶ 20–22; Section V, ¶¶ 23; Section VI, ¶¶ 25–27; Section VII, ¶¶ 28, 30, and Figures 2.1–2.4, 3.1–3.3, 4, and 7.1–7.4, United States Department of the Army Pamphlet

No. 27-4, Procedure for Military Executions, December 1947; or the same or similar procedures outlined in the United States War Department Pamphlet No. 27-4, Procedure for Military Executions, June 12, 1944, all as modified as necessary to account for updated information regarding the weight of the condemned inmate and the distance necessary to carry out a long drop hanging execution.

2219. DRC Defendants should also be able to implement an execution using a long drop/measured drop hanging method using the procedures set out in the British Prison Commission's Memorandum of Instructions for Carrying Out the Details of An Execution, as revised in 1932 (¶¶ 1–11), or as revised in 1959 (¶¶ 1–11). *See* The evolution of the "long drop" in the 20th century, available at http://www.capitalpunishmentuk.org/longdrop2.html.

2220. The long drop method involves breaking and rupturing the spinal cord causing deep virtually instant unconsciousness and rapid death.

2221. DRC Defendants should be able to implement an execution using approximately 1,100 foot pounds of force, which is effectively the data contained in the British Prison Commission's "drop chart" issued in 1913 plus an extra nine inches (a development that occurred in approximately 1939).

2222. The British Prison Commission 1913 drop chart for the long drop

hanging execution method is as follows:

| Weight of culprit lbs. | Drop in Feet & inches | Energy developed ft. lbs. |
|---|---|---|
| 118 | 8' 6" | 1003 |
| 120 | 8' 4" | 1000 |
| 125 | 8' 0" | 1000 |
| 130 | 7' 8" | 996 |
| 135 | 7' 5" | 1001 |
| 140 | 7' 2" | 1003 |
| 145 | 6' 11" | 1003 |
| 150 | 6' 8" | 999 |
| 155 | 6' 5" | 995 |
| 160 | 6' 3" | 1000 |
| 165 | 6' 1" | 1004 |
| 170 | 5' 10" | 992 |
| 175 | 5' 8" | 991 |
| 180 | 5' 7" | 1005 |
| 185 | 5' 5" | 1002 |
| 190 | 5' 3" | 998 |
| 195 | 5' 2" | 1008 |
| 200 | 5' 0" | 1000 |

2223. That chart is generally similar to the drop chart contained in the U.S.

military execution manuals, which appears as follows:

| | | | | |
|---|---|---|---|---|
| 120 lbs or less | 8' 1" | 170 lbs | 6' 0" |
| 125 lbs | 7' 10" | 175 lbs | 5' 11" |
| 130 lbs | 7' 7" | 180 lbs | 5' 9" |
| 135 lbs | 7' 4" | 185 lbs | 5' 7" |
| 140 lbs | 7' 1" | 190 lbs | 5' 6" |
| 145 lbs | 6' 9" | 195 lbs | 5' 5" |
| 150 lbs | 6' 7" | 200 lbs | 5' 4" |
| 155 lbs | 6' 6" | 205 lbs | 5' 2" |
| 160 lbs | 6' 4" | 210 lbs | 5' 1" |
| 165 lbs | 6' 2" | 220 lbs and over | 5' 0" |

2224. Upon information and belief, DRC Defendants possess or have within

their control, or could obtain with ordinary transactional effort, all

materials necessary to construct the scaffolding, and to prepare the

rope and any other items required to carry out an execution by hanging as alleged in this alternative in accordance with the specifications provided in the military regulations cited above.

2225. DRC Defendants should be able to obtain and prepare a sufficient supply of rope of the type described in the U.S. military execution manuals, to wit, manila hemp rope, at least 0.75 inches and not more than 1.25 inches in diameter and approximately 30–40 feet in length, measured to accommodate the drop charts above, along with the requirements to tie the noose according to the military manuals.

2226. DRC Defendants should be able to boil and then stretch the rope while drying it, to eliminate any spring, stiffness, or tendency to coil.

2227. DRC Defendants should be able to tie a noose using a hangman's knot as shown in Figure 7 of the military manuals in preparation of a noose.

2228. DRC Defendants should also be able to prepare the rope, the noose, the hangman's knot, the trap door platform mechanisms, and all other aspects necessary to carrying out an execution under this alleged alternative, by following the procedures set out in the British Prison Commission's 1932 (¶¶ 1–9) or 1959 revisions (¶¶ 1–9) of the Memorandum of Instructions for Carrying Out an Execution.

2229. Upon information and belief, DRC Defendants employ or have within their control, or could obtain with ordinary transactional effort the services of, the personnel necessary to carry out an execution by hanging as alleged in this alternative.

2230. DRC Defendants should be able to instruct the execution team in their duties to implement this alleged alternative.

2231. DRC Defendants should be able to arrange for the presence of persons such as a medical offer, a Spiritual Advisor, and witnesses.

2232. DRC Defendants should be able to provide for the construction of a proper gallows, which should be able to be erected outdoors in the area directly adjacent to the current Death House, identified in the red circle in the image found in SOCF Image 1.

2233. DRC Defendants should be able to provide a black hood to cover the head of the inmate.

2234. DRC Defendants should be able to provide a collapse board for use if necessary and as further explained in the military execution manuals cited above.

2235. DRC Defendants should be able to secure the inmate's wrists either behind the back or in front, fastened to a belt around the inmate's waist.

2236. DRC Defendants should be able to use the measurements provided in the U.S. military execution manuals cited above or in the British drop table as modified by the additional nine inches of drop, to calculate the applicable measures of how high the gallows much extend to permit the desired drop below the trap door, how long the rope measures, and other applicable measurements.

2237. DRC Defendants should be able to escort the condemned inmate to the gallows platform and, after permitting the inmate to give his last words, place the hood over the inmate's head, bind the prisoner's ankles, and then place the noose over the head and adjust the noose around the prisoner's neck to ensure that it lies below the left ear, or below the angle of the jaw.

2238. At that point, and upon the signal from the Warden or execution team leader, DRC Defendants should be able to spring the trap door.

2239. After a suitable period of time, DRC Defendants should be able to have their medically trained person assess the inmate to confirm death.

2240. DRC Defendants should also be able to implement the final procedures for carrying out an execution via this alleged hanging alternative using the long drop/measured drop, as set out in the British Prison Commission's Memorandum of Instructions for Carrying Out an Execution, revised 1932 (¶¶ 9–11), or revised 1959 (¶¶ 9–11).

2241. After death has been confirmed, DRC Defendants should be able to handle and dispose of the inmate's body in accordance with procedures outlined in the current DRC Policy 01-COM-11.

2242. DRC Defendants should be able to implement any other similar but different procedures listed in the British Prison Commission's 1932 or 1959 versions of the Memorandum of Instructions for Carrying Out an Execution, as desired to carry out an execution using the long drop/measured drop hanging alleged alternative.

2243. Death by hanging by the neck using the long drop/measured drop method, if properly carried out by DRC Defendants, will, upon information and belief, cause death by breaking the neck, thereby causing the condemned inmate to irreversibly and virtually instantly lose consciousness, awareness, and sensation, followed quickly by death.

2244. Using the long drop/measured drop method of this alleged alternative will avoid risks of strangulation or decapitation associated with the standard drop hanging methods typically practiced in the United States during the latter part of the 19th century and into the early 20th century.

2245. Using the long drop/measured drop method of this alleged alternative will also avoid the potential for decapitation or strangulation at risk with suspension hanging in which the inmate would be raised off the platform by weights connected to the rope.

2246. Accordingly, execution by this alleged alternative, if properly carried out, would not permit the inmate to experience any of the severe pain and suffering caused by drowning or suffocating feelings or waterboarding torture, obstruction, air hunger, suffocation by paralysis, or the injection and operation of potassium chloride, as posed by Defendants' currently selected 3-drug method of lethal injection. Eliminating the substantial risk of severe or serious pain posed by the current execution method will, by definition, significantly

reduce the substantial risk of severe or serious pain to which the inmate is subjected by Ohio's current execution method.

2247. The risk of a botched hanging resulting in death by suffocation or strangulation is quite limited if the long drop/measured drop procedures are properly implemented. The risk of death by suffocation or strangulation using this alleged alternative is associated only with a botched execution attempt; it will be a significantly lower risk than the sure or very likely risk—indeed, the certainty—that the condemned inmate will subjectively experience severe or serious pain and suffering if subjected to Ohio's lethal injection protocol.

2248. With the long drop/measured drop method, there is little to any risk of the inmate suffocating to death while still conscious, aware, and sensate.

2249. Thus, the risk of pain and suffering caused by death by suffocation from a botched hanging execution using the long drop/measured drop method is significantly lower than the sure or very likely risk of severe or serious pain and suffering inflicted by Ohio's current execution protocol.

2250. This hanging alleged alternative is available in all respects. It is feasible and readily implemented, would not be an experimental way of carrying out a death sentence, and would, if carried out correctly, cause death almost instantly, as established by the use of this alleged alternative in numerous jurisdictions, including several U.S. states

and the U.S. military, as well as countries such as Britain, Australia, Canada, and others.

2251. The United States military has carried out numerous executions using this alleged alternative, including numerous executions conducted from 1945 onward at Ft. Leavenworth, Kansas.

2252. Other states, including New Hampshire and Washington, previously included hanging by the neck among their statutory manners of execution. N.H. Rev. Stat. Ann. § 630.5; Wash. Rev. Code Ann. § 10.95.180. And there is a long history in the United States of execution by hanging by the neck: hundreds or more prisoners have been executed in the United States alone by hanging by the neck, and countless more have been executed by the same manner and method around the world.

2253. Furthermore, Ohio has no justifiable, reasonable, legitimate reason to decline to use this alleged alternative. Ohio has already used this alleged alternative to carry out dozens of executions. *See* Ohio Dep't of Rehabilitation & Correction, http://www.drc.ohio.gov/capital-punishment. Between 1792 and 1925, Ohio executed approximately 120 persons using hanging of some sort. *See* https://deathpenaltyusa.org/usa1/state/ohio1.htm.

2254. Upon information and belief, procedures that DRC was able to previously implement could be readily implemented again, with any necessary improvements to reflect updated knowledge about the dying

80

process involved in a hanging execution and to carry out the long drop/measured drop procedures as alleged herein.

2255. This manner and method of execution is also available by ordinary transactional effort, because "[t]he Ohio legislature could, tomorrow, enact a statute reinstating [sic]" something other than lethal injection, including hanging by the neck, "as an alternative method of execution. . . . The State of Ohio could still execute [Plaintiff]—it would simply need to find a method that comports with the Eighth Amendment." *In re Campbell*, 874, F.3d 454, 465 (6th Cir. 2017). In the same way that Defendants obtained the lethal injection secrecy bill from the Ohio General Assembly via ordinary transactional effort, so too could Defendants be able to employ this alleged alternative manner of execution by ordinary transactional effort.

2256. This manner and method of execution is also available because it can be carried out under Ohio Revised Code § 2949.22(B) with ordinary transactional effort within the walls of a state correctional institution, within an "enclosure to be prepared for that purpose," because such an "enclosure" could be easily built by Defendants, whether indoors in the Death House, or outdoors beside the Death House.

2257. Regardless of the risk of a botched hanging execution that causes the strangulation of the inmate rather than the broken neck that the long drop/measured drop hanging method will almost certainly produce, the risk of severe or serious pain and suffering that unlikely

81

occurrence poses is still significantly lower than the risk of severe or serious pain and suffering posed by Ohio's lethal injection protocol.

2258. Additionally, the hanging alleged alternative using the long drop/measured drop method would inflict significantly less pain and suffering, even in a botched execution scenario, because it eliminates entirely the searing, fiery pain inflicted by the IV potassium chloride injection in Ohio's current execution protocol.

2259. It is a certainty or very likelihood that the condemned inmate will subjectively experience severe or serious pain and suffering if Ohio uses its three-drug lethal injection method on him. On the other hand, the risk of even a botched execution by this hanging alleged alternative is significantly lower than the risk of severe or serious pain and suffering inflicted by Ohio's current protocol.

2260. Using this alleged alternative would significantly reduce the substantial risk that the inmate will subjectively experience severe or serious pain or suffering that Ohio's current lethal injection method poses.

2261. When this alleged alternative would significantly reduce the risk posed by Ohio's current method that the inmate will subjectively experience severe pain and suffering, that makes the pain and suffering caused by Ohio's current execution protocol needless and well beyond what is necessary to cause death. That makes the pain and suffering caused

by Ohio's current execution protocol superadded by comparison to the alleged alternative.

2262. Because Ohio's current execution protocol imposes pain and suffering that is superadded, it therefore imposes pain and suffering that is constitutionally unacceptable, constitutionally inappropriate, constitutionally problematic, constitutionally excessive, and unconstitutionally high.

**FEDERAL LAW CLAIMS FOR RELIEF AGAINST DRC DEFENDANTS IN THEIR OFFICIAL CAPACITIES AND DRUG SOURCE DEFENDANTS**

**First Cause of Action: Eighth and Fourteenth Amendment Violations.**

2263. The First Cause of Action was previously moved from the Third Amended Omnibus Complaint to be, as applicable, re-alleged in parts or in whole in the various Plaintiffs' Amended Individual Supplemental Complaints. Claims alleging violations of the Eighth Amendment as incorporated against the states by the Fourteenth Amendment are now included below in Plaintiff's Amended Individual Supplemental Complaint.

**Second Cause of Action: Fourteenth Amendment Due Process Violations.**

2264. Plaintiff's Second Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Third Cause of Action: Violations of First, Sixth, Eighth and Fourteenth Amendment Rights of Access to Counsel, Access to Courts, Ability to Petition for Redress of Grievances, Due Process, and Privileges or Immunities of United States Citizenship.**

2265. Plaintiff's Third Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Fourth Cause of Action: Fourteenth Amendment Equal Protection Violations.**

2266. Plaintiff's Fourth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Fifth Cause of Action: Violations of Fundamental Rights Arising Under The Principles Of Liberty and/or Natural Law Which Are Protected By The Ninth Amendment.**

2267. Plaintiff's Fifth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Sixth Cause of Action: First Amendment Free Speech Clause Violations.**

2268. Plaintiff's Sixth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Seventh Cause of Action: Fourteenth Amendment Due Process Violation.**

2269. Plaintiff's Seventh Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Eighth Cause of Action: Fourteenth Amendment Due Process Clause Violations For Experimenting On Non-Consenting Prisoners.**

2270. Plaintiff's Eighth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Ninth Cause of Action: Fourteenth Amendment Privileges or Immunities Clause Violations For Experimenting on Non-Consenting Prisoners.**

2271. Plaintiff's Ninth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Tenth Cause of Action: Ex Post Facto Violation.**

2272. Plaintiff's Tenth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Eleventh Cause of Action: Bill of Attainders Violation.**

2273. Plaintiff withdrew his Eleventh Cause of Action in the Fourth Amended Omnibus Complaint.

**Twelfth Cause of Action: Eighth Amendment Violation—Deliberately Indifferent and/or Reckless Denial of Resuscitative Health Care After The Execution Is To Be Completed.**

2274. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2275. Under Defendants' Execution Protocol, Defendants will announce the point at which they believe the execution has been completed, *i.e.*, when Defendant Warden declares Plaintiff dead by announcing a time of death.  But Ohio Revised Code § 2108.40 provides the governing definition of when death has legally occurred in Ohio, and it depends on an examination using "accepted medical standards" to "observe" *and* "conduct[] a test to determine that the irreversible cessation of all functions of the brain has occurred."  Ohio Rev. Code § 2108.40.

Defendants do not, have not, and will not conduct any such test using "accepted medical standards," because such a standard would require using technological means that neither Defendants nor the "appropriate medical professional" identified in 01-COM-11 actually use during the execution process. Section 2108.40 is found within the section of Ohio's Revised Code that comprises the Revised Uniform Anatomical Gift Act, and it thus appears to have been adopted for, among other reasons, to protect a variety of persons, including protecting one who is thought to be dead from the ultimate indignity of being treated as if he is dead while he remains yet still alive.

2276. There is a substantial risk, of which Defendants are aware but which they recklessly disregard and/or to which they are deliberately indifferent, that if Plaintiff is executed under Defendants' Execution Protocol he will not be clinically and statutorily dead when the execution has been declared completed.

2277. There is a substantial risk that Defendants will fail to plan, prepare for, or order medical treatment after heart and lung sounds are no longer detected and the inmate declared "dead" (and thus his death sentence completed), but when the inmate will still be alive and able to be resuscitated with proper medical care.

2278. Defendants have had ample time in advance of any execution and in advance of adopting the Execution Protocol to fully consider the substantial possibility that a condemned inmate will not be clinically

and statutorily dead when the execution has been declared completed pursuant to the Execution Protocol, but have taken no corrective actions in that regard.

2279. A person's breathing and circulatory functions, and a person's brain stem functions, the irreversible cessation of which defines death under Ohio law, may be resuscitated through appropriate medical care for some period of time after receiving the execution drugs contemplated in Defendants' Execution Protocol.

2280. Upon information and belief, Defendants will not provide resuscitative care to Plaintiff after the time when his execution is concluded under Defendants' understanding of the Execution Protocol and its administration.

2281. Defendants know but recklessly disregard and/or are deliberately indifferent to the fact that their Execution Protocol contains no provisions for the appropriate medical care of an inmate whose sentence of death has been carried out, but who remains clinically and statutorily alive.

2282. Defendants make no provisions for emergency resuscitative care measures in the Death House, whether required by the Execution Protocol or otherwise, even after Defendants were put on notice of a significant risk of problems in advance of an execution, such as occurred involving the lingering, spectacle executions of Dennis McGuire, Clayton Lockett, or Joseph Wood.

2283. Upon information and belief, Defendants are aware of the significant risk that problems may arise during an execution attempt, but they recklessly disregard and/or are deliberately indifferent to that risk by refusing to address the risk in their repeated revisions of the Execution Protocol. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; *see also* Decision and Order, ECF No. 2680, PageID 132717–20 (discussing this Court's factual findings regarding midazolam's inability to protect the inmate from the full scope of all the severe pain and suffering inflicted by Defendants' current execution protocol, and reiterating that those factual findings remain intact following the Sixth Circuit's *Henness II* decision).)[17]

2284. Upon information and belief, Defendants are aware of the significant risk that an inmate to whom they apply their Execution Protocol will remain clinically and statutorily alive even following completion of the Execution Protocol as to that inmate, and Defendants recklessly disregard and/or are deliberately indifferent to that risk because Defendants do not provide appropriate medical care to inmates whose sentences of death have been carried out in accordance with

---

[17] The factual findings Judge Sargus reiterated in his Decision and Order, ECF No. 2680, remain intact following both the Sixth Circuit's decision in *Henness v. DeWine* ("*Henness II*"), 937 F.3d 759 (6th Cir. 2019), *overruling in part In re: Ohio Execution Protocol Litig. (Henness)* ("*Henness I*"), 2019 U.S. Dist. LEXIS 8200, at *223-31 (S.D. Ohio Jan. 14, 2019), and the Sixth Circuit's subsequent amended opinion, *Henness v. DeWine* ("*Henness III*"), No. 19-3064, 2019 U.S. App. LEXIS 37261 (6th Cir. Dec. 17, 2019).

Defendants' Execution Protocol, even though they remain clinically and statutorily alive.

2285. Defendants' refusal to provide appropriate medical care to Plaintiff after he has been declared dead, but remains alive, constitutes deliberate indifference to unnecessary pain and suffering in violation of the Eighth and Fourteenth Amendments. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

2286. The need to resuscitate Plaintiff, after his sentence has been completed but when he remains clinically and statutorily alive, is a serious medical need Defendants are constitutionally obligated under the Eighth Amendment to satisfy, but which they recklessly disregard and with deliberate indifference fail to satisfy, thereby violating Plaintiff's rights protected by the Eighth Amendment.

2287. Plaintiff should not be required to allege an alternative execution method for this Cause of Action alleging deliberate indifference by DRC Defendants. However, should he be required to plead an alternative, Plaintiff incorporates by reference the Alternatives identified in Section III above, incorporated here by reference, which are known, feasible, readily implemented and available alternative execution method(s) and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2288. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution

manners, method(s), and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2289. The foregoing alternative execution methods and procedures are available to and could be readily implemented by Defendants. None of the alternative methods requires a physician for proper operation and implementation.

**Thirteenth Cause of Action: Eighth Amendment Violation—Deliberate Indifference and/or Reckless Disregard of Serious Medical Needs.**

2290. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten here.

2291. Under Defendants' Execution Protocol, controlled substances will be used to carry out a lethal-injection execution, namely pentobarbital and/or thiopental sodium, and/or midazolam.

2292. Dispensing a controlled substance such as pentobarbital or thiopental sodium or midazolam requires a valid patient-specific prescription, which may only be issued under federal and state law for a legitimate medical purpose, in the best interests of the patient.

2293. Upon information and belief, one or more Defendants will issue an order to procure or dispense or distribute or administer execution drugs.

2294. Upon information and belief, Defendants know that a serious risk to Plaintiff's serious medical needs will arise if Defendants issue an order to procure or dispense or distribute or administer drugs that are specifically intended to kill or help facilitate killing Plaintiff by causing him to suffocate to death or by causing him a painful heart attack.

2295. Defendants are deliberately indifferent to, and recklessly disregard, Plaintiff's serious medical needs when Defendants issue an order to procure or dispense or distribute or administer drugs that are specifically intended to kill or facilitate killing Plaintiff by causing him to suffocate to death or by causing him a painful heart attack.

2296. Defendants are deliberately indifferent to, and recklessly disregard, the fact that such an order is not a valid order under federal and state law because the drugs will not be used to treat a legitimate medical need nor will they be used to protect the best interests of the patient. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266.)

2297. Defendants are deliberately indifferent to, and recklessly disregard, that issuing an order related to execution drugs that will be compounded creates a substantial risk that Plaintiff will experience severe harm, including torturous physical pain and/or mental suffering and agony. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; *see also* Decision and Order, ECF No. 2680, PageID 132717–20 (reiterating that condemned inmate will be exposed

to full range of alleged pain and suffering if subjected to execution using Defendants' current execution protocol).)

2298. Defendants are deliberately indifferent to, and recklessly disregard, that issuing an order related to execution drugs that will be manufactured overseas and then illegally imported, i.e., smuggled, into Ohio creates a substantial risk that Plaintiff will experience severe harm, including torturous physical pain and/or mental suffering and agony. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266.)

2299. By facilitating procurement, dispensing, distribution or administration of execution drugs used to kill Plaintiff by issuing an order related to those drugs, Defendants demonstrate deliberate indifference and a reckless disregard for Plaintiff's serious medical needs, in violation of Plaintiff's Eighth Amendment rights. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

2300. Plaintiff should not be required to plead an alternative execution method for this Cause of Action alleging deliberate indifference by DRC Defendants. However, should he be required to plead an alternative, Plaintiff incorporates by reference the Alternatives identified in Section III above, incorporated here by reference, which are known, feasible, readily implemented and available alternative execution method(s) and procedures that significantly reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2301. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2302. The foregoing alternative execution methods and procedures are available to and could be readily implemented by Defendants.  None of the alternative methods require a physician for proper operation and implementation.

**Fourteenth Cause of Action: Fourteenth Amendment Due Process Clause Violation.**

2303. Plaintiff's Fourteenth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Fifteenth Cause of Action: Violation of Racketeer Influenced and Corrupt Organizations Act (RICO) alleged against Drug Source Defendants only.**

2304. Plaintiff's Fifteenth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**STATE LAW CLAIMS FOR RELIEF AGAINST DEFENDANTS**

**Sixteenth Cause of Action: Ohio Civil RICO claim against Drug Source Defendants.**

2305. Plaintiff's Sixteenth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Seventeenth Cause of Action: Claims for Declaratory Judgment Under Ohio Law Against All Defendants, and for Injunctive Relief Under Ohio Law Against Drug Source Defendants For Violations of Ohio Law.**

2306. Plaintiff's Seventeenth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Eighteenth Cause of Action: Violation of Ohio Product Liability Act (Ohio Revised Code § 2307.71 et seq.).**

2307. Plaintiff's Eighteenth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Nineteenth Cause of Action: Violation of Ohio Consumer Sales Practices Act (Ohio Revised Code § 1345.01 et seq.) Against Drug Source Defendants.**

2308. Plaintiff's Nineteenth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**ADDITIONAL CAUSES OF ACTION AGAINST ALL DEFENDANTS**

**Twentieth Cause of Action: Eighth Amendment Violation Based On Exposure To Sure Or Very Likely Serious Harm In The Form Of Severe, Needless Physical Pain And Suffering Due To The Identity Of The Drugs In The Execution Protocol.**

2309. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2310. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of severe, needless physical pain and suffering that is arbitrary and capricious, or an objectively intolerable

risk of such harm that Defendants unjustifiably ignore, due to the identity of the drugs called for in the Execution Protocol.

2311. Defendants know, or should know, or recklessly disregard that the drugs in their Execution Protocol create a sure or very likely risk of severe physical pain and suffering from suffocation (including from the development of acute pulmonary edema caused by the IV-injected dose of 500 mg of acidic midazolam, and from the subsequent paralysis of breathing musculature caused by the paralytic), or from a heart attack, or from the searing physical pain upon IV injection of the drugs into Plaintiff. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; *see also* Decision and Order, ECF No. 2680, PageID 132717–20).)

2312. Defendants know, or should know, or recklessly disregard that the 500 mg midazolam injected intravenously as the initiatory, prophylactic drug in the three-drug protocol will not attenuate or reduce the level of pain and suffering subjectively experienced by the condemned inmate, leaving the inmate sure or very likely to subjectively experience the entire, full measure of severe or serious pain and suffering caused by Ohio's three-drug protocol. (*See* Decision and Order, ECF No. 2680, PageID 132717–20.)

2313. Plaintiff's individual physical and/or psychological characteristics and conditions create a substantial risk that employing Defendants' Execution Protocol to execute him will subject him to a sure or very

likely risk of serious harm in the form of severe, needless physical pain and suffering, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, as more specifically alleged in Section I above.

2314. Plaintiff's individual physical and/or psychological characteristics and conditions create a sure or very likely risk that achieving peripheral IV access on him will present a problematic situation analogous to achieving IV access in the previous situations in which Defendants were unable to readily obtain IV access, which, in turn, creates a sure or very likely risk that Plaintiff will suffer serious harm in the form of severe, needless physical pain and suffering as Defendants stab him with needles repeatedly, and that substantial risk is arbitrary and capricious, or the objectively intolerable risk of such harm that Defendants unjustifiably ignore, as more specifically alleged in Section I above.

2315. DRC Defendants typically and historically inject only a single 5-gram dose of the barbiturate execution drug required under the Execution Protocol Plan 1 or Plan 2.

2316. There is a sure or very likely risk that Plaintiff's brain will begin to regain consciousness or awareness of what is happening to him just minutes after injection of thiopental sodium or pentobarbital as currently contemplated in the Execution Protocol and as currently administered by DRC Defendants.

2317. There is a sure or likely risk that Plaintiff will develop severely painful and terrifying sensations of acute, non-cardiogenic pulmonary edema while he remains sensate to severe pain for a period of time following peripheral IV injection of 5 grams of pentobarbital or sodium thiopental because of the pH level of either of those drugs to be injected.

2318. Upon information and belief, DRC Defendants will inject a single 500 mg dose of midazolam required under the Execution Protocol Plan 3.

2319. It is sure or very likely that Plaintiff will remain sensate regardless of the amount of midazolam administered to him via IV injection under DRC Defendants' three-drug midazolam protocol.

2320. There is a sure or very likely risk that Plaintiff will remain sensate to severe or serious pain at all times under Plan 3 following IV injection and operation of 500 mg midazolam, even if that dose of midazolam were to reach maximum/peak sedative effect.

2321. There is a sure or very likely risk that Plaintiff will remain able to subjectively experience the full scale of the severe and serious pain and suffering inflicted by the drugs in Ohio's lethal injection protocol. (Decision and Order, ECF No. 2680, PageID 132717–20.)

2322. The presence of psychological fear and suffering caused by the acute, non-cardiogenic pulmonary edema or, indeed, any other source of psychological fear and suffering, has a synergistic effect that elevates and enhances the sensations of severe physical pain to which Plaintiff

will be subjected, making it even more likely that he will subjectively experience fully severe and serious, unconstitutionally high pain and suffering if subjected to Ohio's lethal injection execution protocol.

2323. There is a sure or very likely risk that Plaintiff's brain will begin to regain consciousness or awareness of what is happening to him just minutes after injection of midazolam as currently contemplated in the Execution Protocol and as administered by DRC Defendants.

2324. Even while sedated to the maximum level by 500 mg midazolam, Plaintiff's brain will remain nociceptive and able to encode, process, and register for Plaintiff's subjective experience the full measure of each of the severely noxious stimuli posed by Defendants' current execution protocol, including the drowning, suffocating, waterboarding torture of acute, non-cardiogenic pulmonary edema, the suffocation caused by the paralytic, and the searing, fiery sensations caused by IV-injected potassium chloride.

2325. There is a sure or very likely risk that Defendants will inject the paralytic drug in their three-drug protocol within approximately one minute or less after completing injection of the midazolam, meaning the full 500 mg of midazolam will not have had sufficient time to reach its peak effectiveness before Defendants inject the paralytic into Plaintiff. That, in turn, along with the fundamental inability of midazolam to cause insensation in the first place, makes it sure or very

likely that Plaintiff will experience the sensations of paralysis and suffocation as the paralytic agent rapidly takes effect.

2326. There is a sure or very likely risk that Plaintiff will not be rendered fully unconscious, unaware and unable to feel or experience pain, and he will remain sensate to the physical pain and suffering related to suffocating and/or suffering a heart attack following injection of execution drug(s) under DRC Defendants' Execution Protocol and/or the pain and suffering associated with dying from a lethal injection of the drugs.  (Decision and Order, ECF No. 2680, PageID 132717–20.)

2327. Due to his individual physical and/or psychological conditions, there is a sure or very likely risk that Plaintiff will have a paradoxical reaction to the execution drug(s), thereby increasing the already substantial risk that he will remain sensate to the physical pain and agony he will be suffering upon injection of the execution drug(s), as more specifically alleged in Section I above.

2328. A rapid injection rate of midazolam (higher than 0.2 ml/s) has been shown to substantially increase the risk of paradoxical reactions to midazolam, even in the absence of other paradoxical reaction risk factors.

2329. DRC Defendants' typical injection rate, and the rate at which they will inject the execution drugs into Plaintiff, is greater than 0.2 ml/s. Accordingly, the rapid rate at which DRC Defendants will inject

midazolam into Plaintiff further elevates the risk that Plaintiff will suffer a paradoxical reaction during his execution.

2330. Defendants' use of IV-injected midazolam also creates a sure or very likely risk that the drug will create hyperalgesia—a heightened sense of the severe pain to which Plaintiff will be subjected as a result of injection and operation of the drugs in Ohio's Execution Protocol.

2331. Defendants' use of IV-injected, supra-clinical doses of midazolam also creates a sure or very likely risk that the inmate will rapidly begin to develop acute pulmonary edema as a result, thereby subjecting the inmate to the horrific pain and suffering of drowning and suffocation sensations and struggling to breathe as his lungs fill with fluid and prevent the exchange of air. (Decision and Order, ECF No. 2680, PageID 132717–20.)

2332. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2333. These alternatives include the Alternatives identified in Section III above, incorporated here by reference.

2334. The foregoing alternative execution manners, methods and procedures are available to and could be readily implemented by Defendants.

None of the alternative manners and methods require a physician for proper operation and implementation.

**Twenty-First Cause of Action: Eighth Amendment Violation Based On Exposure To Sure Or Very Likely Serious Harm In The Form Of Severe, Needless Physical Pain And Suffering Due To The Source Of The Drugs In The Execution Protocol.**

2335. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2336. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of severe, needless physical pain and suffering that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to the source of the drugs called for in the Execution Protocol.

2337. Defendants know, or should know, or recklessly disregard that using improperly compounded or illegally imported or otherwise illegally sourced execution drugs to administer their Execution Protocol creates a sure or very likely risk of serve physical pain and suffering.

2338. Plaintiff is subject to a sure or very likely risk of serious harm in the form of severe, needless physical pain and suffering, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to insufficient procedural protections related to and concerns about identity, purity, contamination, concentration, pH levels, sterility, adulteration, misbranding, expiration/beyond use date, improper

storage or handling, manufacturer, dosage or administration method of the drugs to be administered to cause his death under the Execution Protocol.

2339. The recent amendments to Ohio Revised Code § 2949.221, create a sure or very likely risk of harm by themselves, and increase the risk of harm that is already substantial, by attempting to keep secret a broad range of information relevant to what Defendants will subject Plaintiff to in the course of carrying out his execution.

2340. Compounded pentobarbital and compounded thiopental sodium have a significant potential to be extremely alkaline, which causes extreme pain upon interaction with the blood in a person's circulatory system. Upon information and belief, that extreme alkalinity also causes development of acute pulmonary edema while the inmate remains sensate for some period of time under Defendants' Plan 1 or 2.

2341. To be made into injectable form, manufactured midazolam must be made highly acidic, which causes extreme pain upon interaction with the blood in the person's circulatory system, and causes development of acute pulmonary edema while the inmate remains sensate under Defendants' Plan 3. Compounded midazolam carries the same type of risk, enhanced by the risks of improper compounding identified herein.

2342. There is a substantial, objectively intolerable risk that Drug Source Defendants will, whether intentionally or recklessly, manufacture or

compound execution drug(s) to a pH level that is either too high or too low.

2343. There is therefore a substantial, objectively intolerable risk that DRC Defendants will inject compounded execution drugs of the improper pH level into Plaintiff's bloodstream, thereby causing Plaintiff to experience intense, burning physical pain.

2344. There is a substantial, objectively intolerable risk that Defendants Pharmacies # 1–100 and Pharmacists # 1–100 will, whether intentionally or recklessly, compound execution drug(s) that particulate or fall out of solution, which DRC Defendants will inject into Plaintiff, and the injection of compounded execution drugs that have particulated or fallen out of solution will cause Plaintiff to experience intense, burning physical pain.

2345. There is at least a sure or very likely risk—and certainly an objectively intolerable risk—that the Drug Source Defendants will, whether intentionally or recklessly, include contaminant or some additional or unknown ingredient(s) in the execution drug(s) he or she manufactures or compounds which will not be visibly or otherwise detectable by analytical testing for potency or identity called for in the Execution Protocol, but which will, nevertheless, cause torturous physical pain and suffering to Plaintiff upon injection.

2346. There is at least a sure or very likely risk, and an objectively intolerable risk, that Defendants will improperly label, package, ship, store,

and/or prepare execution drugs such that there is a substantial risk that the drugs as ultimately injected will cause Plaintiff torturous physical pain and suffering because they have become adulterated or are otherwise no longer precisely the product compounded or manufactured by Drug Source Defendants or no longer precisely the product tested by DRC Defendants.

2347. There is at least a sure or very likely risk, and an objectively intolerable risk, that Defendants will improperly package, ship, store, and/or prepare execution drugs such that the data obtained in analytical testing required approximately 30 days before execution by the Execution Protocol will be critically incorrect, and the drugs injected into Plaintiff will be sub-potent or super-potent or otherwise adulterated or not precisely the drugs required by the Execution Protocol, therefore subjecting Plaintiff to a substantial risk of severe torturous physical pain and suffering.

2348. There is a sure or very likely risk that Plaintiff will not be rendered fully unconscious, unaware, and unable to experience or feel pain, so he will remain sensate to severe pain, and be conscious or aware at some level while he is experiencing the physical pain and suffering related to severe burning sensations following injection of improperly compounded or illegally imported or sourced execution drug(s) under DRC Defendants' Execution Protocol.

2349. Due to his individual physical and/or psychological conditions, there is a substantial risk that Plaintiff will have a paradoxical reaction to the improperly compounded or illegally imported or sourced execution drug(s), thereby increasing the already substantial risk that he will be conscious, aware of or sensate to the physical pain and agony he will be suffering upon injection of the improperly compounded or illegally imported execution drug(s), as more specifically alleged in Section I above.

2350. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2351. These alternatives include the Alternatives identified in Section III above, incorporated here by reference.

2352. The foregoing alternative execution manners, methods and procedures are available to and could be readily implemented by Defendants. None of the alternative manners and methods require a physician for proper operation and implementation.

**Twenty-Second Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of Severe Mental Or Psychological Pain, Suffering And Agony Due To The Identity Of The Drugs In The Execution Protocol.**

2353. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2354. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of severe mental or psychological pain, suffering and torturous agony that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants ignore, due to the identity of the drugs in the Execution Protocol.

2355. Because consciousness or awareness of painful stimuli comes back rapidly, within a matter of minutes, after injection of pentobarbital or thiopental sodium or midazolam, and because no amount of midazolam will ever render the inmate insensate to severe pain, there is a sure or very likely risk that Plaintiff will not be rendered fully unconscious, unaware, and unable to experience or feel pain while he is experiencing the agonizing, terrifying and horrific mental pain and suffering related to suffocating and/or suffering a heart attack and/or the pain associated with injecting the 500 mg of IV-injected midazolam, the paralytic drug, and the potassium chloride following injection of execution drug(s) under Defendants' Execution Protocol,

and thus that Plaintiff's brain will be aware of what he is experiencing. (Decision and Order, ECF No. 2680, PageID 132717–20.)

2356. There is a sure or very likely risk that Defendants will inject the paralytic drug in their three-drug protocol within approximately one minute or less after completing injection of the midazolam, meaning that even if the full 500 mg of IV-injected midazolam could cause the inmate to be insensate—which it cannot—the full 500 mg of midazolam will not have had sufficient time to reach its peak effectiveness before Defendants inject the paralytic into Plaintiff. That, in turn, makes it sure or very likely that Plaintiff will experience the sensations of paralysis and suffocation as the paralytic agent rapidly takes effect, and the burning from IV injection of 500 mg of midazolam and the severe pain and suffering that accompanies the rapid development of acute pulmonary edema.

2357. Defendants know, or should know, or recklessly disregard that using the drugs required in the Execution Protocol creates a sure or very likely risk of severe, terrifying, torturous, horrifying and agonizing mental torture, suffering and mental or psychological pain from anticipating and being aware of suffocating to death or suffering a painful heart attack or other torturous physical pain. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; *see also* Decision and Order, ECF No. 2680, PageID 132717–20.)

2358. This awareness is distinct, and in addition to, a generalized awareness or fear that Plaintiff is being put to death. Rather, it is the specific and acute terror that accompanies an attempt to draw breath, and a desire to breathe, when one is unable to; as well as the awareness that one is completely paralyzed and unable to act, yet still conscious and sensate to the suffocation and attendant pain that is brought on by the drugs in Defendants' Execution Protocol.

2359. Additionally, all these sources of fear and suffering will act synergistically to enhance Plaintiff's experience of the severe and serious pain and suffering associated with Defendants' lethal injection protocol, such that he will experience it at even greater certainty and to an even greater degree.

2360. Plaintiff's individual physical and/or psychological characteristics and conditions create a sure or very likely risk that employing Defendants' Execution Protocol to execute him will subject him to serious harm in the form of severe mental or psychological pain, suffering and torturous agony that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants ignore, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, as more specifically alleged in Section I above.

2361. Plaintiff's individual physical and/or psychological characteristics and conditions create a substantial risk that achieving peripheral IV access on him will present a problematic situation analogous to achieving IV

access in the previous situations in which Defendants were unable to readily obtain IV access, which, in turn, creates a sure or very likely risk that Plaintiff will suffer serious harm in the form of severe mental or psychological pain, suffering and torturous agony as Defendants stab him with needles repeatedly, and that risk is arbitrary and capricious, or the objectively intolerable risk of such harm that Defendants unjustifiably ignore, as more specifically alleged in Section I above.

2362. There is a sure or very likely risk that Plaintiff will have a paradoxical reaction to the execution drug(s), thereby increasing the already substantial risk that he will be aware of the physical pain and agony he will be suffering upon injection of the execution drug(s), in turn elevating the substantial risk that Plaintiff will experience agonizing, terrifying and horrific mental pain and suffering as a result.

2363. Furthermore, Plaintiff's history of alcohol and substance abuse and other psychiatric disorders and mental health issues identified herein and as may develop place him at even greater risk of suffering a paradoxical reaction if he is executed using the drugs in the Execution Protocol, especially when Defendants inject the execution drugs at too fast a rate, thereby significantly increasing the risk that he will be aware of suffering severe pain and needless suffering as the execution proceeds, as well as the accordant risk of severe, horrifying mental pain and suffering, as more specifically alleged in Section I above.

2364. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2365. These alternatives include the Alternatives identified in Section III above, incorporated here by reference.

2366. The foregoing alternative execution manners, methods and procedures are available to and could be readily implemented by Defendants. None of the alternative manners and methods require a physician for proper operation and implementation.

**Twenty-Third Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of Severe Mental Or Psychological Pain, Suffering And Torturous Agony Due To The Source Of The Drugs In The Execution Protocol.**

2367. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2368. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of severe mental or psychological pain, suffering and torturous agony that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants ignore, due to the source of the drugs in the Execution Protocol.

2369. Defendants know, or should know, or recklessly disregard that using drugs in the Execution Protocol that are improperly compounded or illegally imported or otherwise illegally sourced execution drugs creates a variety of substantial risks of serve physical pain and suffering identified herein, of which Plaintiff is aware, thereby creating a sure or very likely risk of severe, terrifying, torturous, horrifying and agonizing mental torture, suffering and mental and psychological pain from anticipating and being aware of his impending death at Defendants' hands using such drugs. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266.)

2370. Because consciousness or awareness of painful stimuli comes back rapidly within a matter of minutes after injection of pentobarbital or thiopental sodium or midazolam, and because no amount of IV-injected midazolam will cause insensation, there is a sure or very likely risk that Plaintiff will not be rendered sufficiently unconscious, unaware and unable to feel or experience pain while he is experiencing the agonizing, terrifying and horrific mental pain and suffering related to severe burning sensations or anaphylactic shock caused by improperly compounded or manufactured execution drugs following injection of such drug(s) under Defendants' Execution Protocol, and thus that Plaintiff's brain will be aware of what he is experiencing. (*See* Decision and Order, ECF No. 2680, PageID 132717–20.)

111

2371. Plaintiff will therefore subjectively and objectively experience the full brunt of severe and serious pain and suffering, of every type and caused by each of the drugs in Ohio's protocol and by the protocol cumulatively, that Plaintiff alleges herein that Ohio's lethal injection protocol will inflict.  (Decision and Order, ECF No. 2680, PageID 132717–20.)

2372. There is a sure or very likely risk that Defendants will inject the paralytic drug in their three-drug protocol within approximately one minute or less after completing injection of the midazolam, meaning the full 500 mg of midazolam will not have had sufficient time to reach its peak effectiveness before Defendants inject the paralytic into Plaintiff.  That, in turn, along with midazolam's inability to cause insensation at any dose, makes it sure or very likely that Plaintiff will experience the sensations of paralysis and suffocation as the paralytic agent rapidly takes effect, and as acute pulmonary edema rapidly develops after IV injection of a large amount of midazolam or a barbiturate.

2373. This awareness is distinct from, and in addition to, a generalized awareness or fear that Plaintiff is being put to death.  Rather, it is the specific and acute terror that accompanies an attempt to draw breath, and a desire to breathe, when one is unable to; as well as the awareness that one is completely paralyzed and unable to act, yet still

conscious and sensate to the suffocation and attendant pain that is brought on by the drugs in Defendants' Execution Protocol.

2374. Additionally, all these sources of fear and suffering will act synergistically to enhance Plaintiff's experience of the severe and serious pain and suffering associated with Defendants' lethal injection protocol, such that he will experience it at even greater certainty and even greater degree.

2375. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2376. These alternatives include the Alternatives identified in Section III above, incorporated here by reference.

2377. The foregoing alternative execution manners, methods and procedures are available to and could be readily implemented by Defendants. None of the alternative manners and methods require a physician for proper operation and implementation.

**Twenty-Fourth Cause of Action: Eighth Amendment Violation.**

2378. Plaintiff does not allege a Twenty-Fourth Cause of Action.

**Twenty-Fifth Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of Being The Subject Of An Undignified, Spectacle Execution Or Attempted Execution.**

2379. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2380. "Pain" is not the only harm that can constitute impermissible cruelty in a method of execution. "The Eighth Amendment also demands that a penalty accord with 'the dignity of man.'" *State v. Broom*, 146 Ohio St. 3d 60 (Ohio, 2016) (quoting *Hope v. Pelzer*, 536 U.S. 730, 738 (2002), in turn quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958) (lead opinion)).

2381. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of being the subject of an undignified, spectacle execution or attempted execution that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

2382. Defendants know, or should know, or recklessly disregard that their Execution Protocol, whether administered with Plan 1, Plan 2, or Plan 3, creates a sure or very likely risk of harm in the form of an undignified or spectacle execution. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266.)

2383. Defendants know, or should know, or recklessly disregard that using improperly compounded or illegally imported or sourced execution drugs creates a sure or very likely risk of harm in the form of an undignified or spectacle execution.

2384. Defendants know, or should know, or recklessly disregard that using IV-injected large doses of midazolam creates a sure or very likely risk of harm in the form of an undignified or spectacle execution as the inmate will develop acute pulmonary edema and struggle to breathe as his lungs fill with fluid and he suffocates, or as he reacts to the severe burning pain upon injection of large doses of IV-injected midazolam.  (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; *see also* Decision and Order, ECF No. 2680, PageID 132717–20.)

2385. Plaintiff is subject to a sure or very likely risk of serious harm in the form of being the subject of an undignified, spectacle execution or attempted execution, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to the identity, sterility, concentration, manufacturer, dosage or administration method of the drugs to be administered to cause his death under the Execution Protocol.

2386. The foregoing risks of an undignified, spectacle death arising from Defendants' use of certain execution drugs that will cause Plaintiff to visibly react and struggle following injection because of the severe pain

imposed are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) and procedures that significantly reduce the substantial risk of Plaintiff experiencing an undignified, spectacle death.

2387. The alternatives alleged above in Section III and incorporated here by reference that do not involve IV administration of midazolam without any accompanying analgesic drug, clearly and considerably reduce the risk that Plaintiff will be exposed to a drug administered in a dose and injection method that will cause him to develop pulmonary edema while he remains sensate to that condition and thus manifest the undignified spectacle of struggling to breathe. These alternatives also include those Alternatives alleged in Section III and incorporated here by reference that will cause Plaintiff's death without using lethal injection, thereby eliminating entirely the risk of an undignified, spectacle execution caused by the sure or very likely risk that Plaintiff will be exposed to drugs that will cause undignified, spectacle reactions upon injection.

2388. The death suffered by Dennis McGuire was an undignified, spectacle execution.

2389. The death suffered by Clayton Lockett was an undignified, spectacle execution.

2390. The death suffered by Joseph Wood was an undignified, spectacle execution.

116

2391. The death suffered by Joseph Clark was an undignified, spectacle execution.

2392. The death suffered by Christopher Newton was an undignified, spectacle execution.

2393. The attempted execution to which Romell Broom was subjected was an undignified, spectacle of an attempted execution.

2394. The attempted execution to which Alva Campbell was subjected was an undignified, spectacle of an attempted execution.

2395. The attempted execution to which Doyle Hamm was subjected was an undignified, spectacle of an attempted execution.

2396. Despite a change in execution drugs, DRC Defendants have not substantively changed the procedures used to carry out the execution of Dennis McGuire.

2397. Because DRC Defendants believe that nothing noteworthy, abnormal, unexpected, inhumane, undignified, unlawful, or otherwise unconstitutional occurred during the McGuire execution, and that the process "worked well," there is a sure or very likely risk that DRC Defendants will again administer their Execution Protocol procedures in a way that imposes an undignified death on Plaintiff.

2398. Pleading an alternative execution manner or method should not be required for this claim alleging harm other than the risk of severe pain and needless suffering. If, however, he is required to plead an alternative in this Cause of Action, Plaintiff alleges the alternatives

117

identified within this Cause of Action as to the different sources of indignity or spectacle to which Plaintiff will be subjected.

2399. Plaintiff also incorporates by reference the Alternatives identified in Section III above that are known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that substantially reduce the risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2400. The alternative execution manners, methods, and procedures alleged herein are available to and could be readily implemented by Defendants. None of the alternative manners and methods require a physician for proper operation and implementation

2401. Plaintiff's individual physical and/or psychological characteristics and conditions create a sure or very likely risk that employing Defendants' Execution Protocol to execute him will subject him to serious harm in the form of being the subject of an undignified, spectacle execution or attempted execution that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, as alleged more specifically in Section I above.

2402. The foregoing risks of an undignified, spectacle death arising from Plaintiff's individual physical characteristics that make it sure or very likely he will suffer the horrifying and painful sensations of obstruction and resulting air hunger and, as a result, will fight and struggle to breathe for significant periods of time, as seen during the executions

118

of McGuire, Lockett, Wood, and others, upon being injected with the midazolam in the three-drug Plan 3 are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) and procedures that significantly reduce the substantial risk of Plaintiff experiencing an undignified, spectacle death.

2403. These alternatives include the Alternatives alleged above in Section III and incorporated here by reference that include using a wedge-shaped cushion of a sufficient angle to ensure that Plaintiff will not suffer obstruction upon injection of the drugs. These alternatives also include those Alternatives alleged in Section III and incorporated here by reference that will cause Plaintiff's death without using lethal injection, thereby eliminating entirely the risk of an undignified, spectacle execution caused by the sure or very likely risk that Plaintiff will suffer from obstruction while still fighting to remain alive.

2404. The foregoing risks of an undignified, spectacle death arising from Plaintiff's other individual physical and/or psychological characteristics, such as his characteristics that make him likely to suffer a paradoxical effect or other such factors alleged in Section I above, are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) and procedures that significantly reduce the substantial risk of Plaintiff experiencing an undignified, spectacle death.

2405. These alternatives include the Alternatives alleged above in Section III and incorporated here by reference that do not require injection of drugs that are known to pose the risk of generating a paradoxical effect, thereby eliminating entirely the risk of an undignified, spectacle execution caused by the sure or very likely risk that Plaintiff will suffer from a paradoxical effect or other similar results following injection. These alternatives also include those Alternatives alleged in Section III and incorporated here by reference that will cause Plaintiff's death without using lethal injection, thereby eliminating entirely the risk of an undignified, spectacle execution caused by the use of those drugs to execute Plaintiff.

2406. Plaintiff's individual physical and/or psychological characteristics and conditions create a substantial risk that achieving peripheral IV access on him will present a problematic situation analogous to achieving IV access in the previous situations in which Defendants were unable to readily obtain IV access, which, in turn, creates a sure or very likely risk that Plaintiff will suffer serious harm in the form of being the subject of an undignified, spectacle execution or attempted execution as Defendants stab him with needles repeatedly, and that risk is arbitrary and capricious, or the objectively intolerable risk of such harm that Defendants unjustifiably ignore, as alleged more specifically in Section I above.

2407. The foregoing risks of an undignified, spectacle death from being subjected to protracted but unsuccessful attempts to establish and maintain peripheral IV access are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) and procedures that significantly reduce the substantial risk of Plaintiff experiencing an undignified, spectacle death.

2408. These alternatives include the Alternatives alleged above in Section III and incorporated here by reference that do not require peripheral IV access to carry out, thereby eliminating entirely any risk of an undignified or spectacle execution related to peripheral IV access.

2409. There is a sure or very likely risk that when Plaintiff is declared dead he will be clinically and statutorily alive, therefore suffering the ultimate indignity of being denied life-saving medical care and treated as dead while still alive.

2410. Defendants know, or should know, that designating Plaintiff's death be declared based upon a check for "breathing and heart sounds" shortly after the injection of execution drug(s) under the Execution Protocol will result in Plaintiff remaining clinically and statutorily alive after Defendants declare him dead, because a person will retain brain and/or heart electrical activity for some time after breath and a pulse cease.

2411. According to Defendants' Execution Protocol, should Defendants pronounce Plaintiff "deceased" by announcing a time of death, Plaintiff will be removed from the "execution bed" and his body will be disposed of.

2412. Treating Plaintiff as though he is dead, when he is still alive, is a form of disgrace and indignity prohibited by the Eighth Amendment.  It denies his very humanity.  *Wilkerson v. State of Utah*, 99 U.S. 130, 134–35 (1878); *see also Hope v. Pelzer*, 536 U.S. 730, 745 (2002) (Eighth Amendment prohibits punishment that is humiliating or "antithetical to human dignity"); *Trop v. Dulles*, 356 U.S. 86, 103–04 (1958) (Eighth Amendment prohibits the denial of citizenship as punishment because of the dehumanizing effects of the punishment).

2413. The foregoing risks of an undignified, spectacle death from being treated as if dead before Plaintiff is statutorily and clinically dead are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) and procedures that significantly reduce the substantial risk of Plaintiff experiencing an undignified, spectacle death.

2414. These alternatives include the following.

    a. DRC Defendants should be able to use accepted and scientifically reliable medical standards, equipment and techniques to assess the point at which irreversible cessation of circulatory and respiratory

functions and irreversible cessation of all functions of the brain has occurred and Plaintiff is clinically and legally dead.

b. DRC Defendants should be able to constantly monitor, from before first injection of the execution drug, Plaintiff's heart's electrical activity through an electrocardiogram. Irreversible cessation of heart electrical activity will necessarily indicate irreversible respiratory functions as well.

c. DRC Defendants should be able to constantly monitor, from before first injection of the execution drug, Plaintiff's brain's electrical activity using electroencephalography (EEG) with a product such as the StatNet™ headpiece or other similar mechanism in conjunction with an EEG monitor, as also alleged above in Section III's allegations involving vital signs monitoring, incorporated here by reference.

d. These assessments and equipment should be able to be employed by individuals who possess sufficient qualifications and experience to, and must, continuously engage them from within the execution chamber.

2415. The alternatives that would significantly reduce a substantial risk of serious harm in the form of an undignified execution for being treated as dead and denied necessary care while he is not dead would also include the Alternatives identified in Section III above, incorporated

123

here by reference, that would leave no uncertainty whether Plaintiff was statutorily and clinically dead.

2416. The foregoing alternative execution manners, methods, and procedures are available to and could be readily implemented by Defendants.

2417. Using monitoring devices and other Alternatives as alleged in Section III above will significantly reduce the substantial risk of suffering the indignities identified in this Twenty-Fifth Cause of Action, by ensuring that Defendants do not treat Plaintiff as if he is dead before he is clinically and statutorily dead.

2418. Upon information and belief, these alternative measures are available and feasible because at least some DRC Defendants have the training, knowledge, and ability to be able to use these monitoring measures for the above-stated purposes during an execution, and/or DRC Defendants employ or have within their control, or should be able to obtain with ordinary transactional effort the services of, the personnel with the training, knowledge, and ability to be able to use these monitoring measures for the above-stated purposes during an execution.

2419. Upon information and belief, DRC Defendants could operate the above-listed devices from within the execution chamber while still maintaining anonymity of those DRC Defendants if desired, in the same way that certain DRC Defendants remain anonymous despite

carrying out activities in the execution chamber that are observable through the witness room viewing glass with the curtain pulled back.

2420. Upon information and belief, DRC Defendants possess, or have within their control, or could obtain with ordinary transactional effort, the above-listed devices for use in an execution. Defendants recently spent over $5,000 to purchase medical equipment for use in executions. Upon information and belief, an EEG machine and an EKG machine would cost less than $5000 each, and Defendants can purchase said machines on the open market with ordinary transactional effort in the same way they recently purchased their AccuVein AV400 vein illuminator.

2421. See also the allegations regarding vital signs monitoring devices alleged in Section III, incorporated here by reference.

2422. Also as part of this alternative, DRC Defendants should be able to have on-site at SOCF a means to prepare and transport an inmate to an emergency health-care provider facility. Further, DRC Defendants should be able to have the following on hand in the Death House, as well as the means and personnel trained and capable of administering or applying them to Plaintiff in the event Plaintiff is not clinically and legally dead at the time the Warden declares him dead under the Execution Protocol:

    a.    supplies of oxygen;

    b.    resuscitative drugs;

c. ventilation equipment including a ventilation bag, valve and mask;

d. intubation equipment;

e. any and all means necessary to maintain a patent (uncompromised) airway and support of ventilation;

2423. Upon information and belief, DRC Defendants possess or have within their control, or should be able to obtain with ordinary transactional effort, the supplies identified above.  Likewise, upon information and belief, DRC Defendants should be able to, with ordinary transactional effort, ensure the presence of a means to prepare and transport an inmate to an emergency health-care provider facility; such plans are made as to the possibility of injury to any member of the Execution Team, as part of DRC Defendants' ICS planning, so the same could easily and with ordinary transactional effort be applied to Plaintiff as well.

2424. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2425. The foregoing alternative execution manners, methods and procedures are available to and could be readily implemented by Defendants. None of the alternative manners and methods require a physician for

126

proper operation and implementation. And upon information and belief, at least some members of the execution team are trained first responders who use these types of measures on a regular basis.

**Twenty-Sixth Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm in the Form of Being Subjected to an Unwanted, Non-Consensual Human Experimentation of an Execution.**

2426. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2427. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of being subjected to an unwanted, non-consensual human experimentation of an execution that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, including for all the reasons alleged in Plaintiff's other causes of action related to human experimentation executions.

2428. Defendants know, or should know, or recklessly disregard that Plan 1, using compounded or illegally imported execution drugs, creates a sure or very likely risk of harm in the form of an impermissible human experimentation of an execution that is arbitrary and capricious.

2429. Defendants know, or should know, or recklessly disregard that Plan 2, using compounded or illegally imported execution drugs, creates a

sure or very likely risk of harm in the form of an impermissible human experimentation of an execution that is arbitrary and capricious.

2430. Defendants know, or should know, or recklessly disregard that Plan 3, using compounded or illegally imported execution drugs, creates a sure or very likely risk of harm in the form of an impermissible human experimentation of an execution that is arbitrary and capricious.

2431. Plaintiff's individual physical and/or psychological characteristics and conditions, as more specifically alleged in Section I above, create a sure or very likely risk that employing Defendants' Execution Protocol to execute him will subject him to serious harm in the form of being subjected to an unwanted, non-consensual human experimentation of an execution that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

2432. Defendants fail to train for an execution scenario that contemplates Plaintiff's unique characteristics.

2433. Defendants fail to even recognize Plaintiff's unique characteristics as it relates to carrying out his execution.

2434. Plaintiff's individual physical and/or psychological characteristics and conditions, as more specifically alleged in Section I above, create a substantial risk that achieving peripheral IV access on him will present a problematic situation analogous to achieving IV access in the previous situations in which Defendants were unable to readily obtain IV access, which, in turn, creates a sure or very likely risk that Plaintiff

will suffer serious harm in the form of being subjected to an unwanted, non-consensual human experimentation during his attempted execution as DRC Defendants stab him with needles repeatedly, and that risk is arbitrary and capricious, or the objectively intolerable risk of such harm that DRC Defendants unjustifiably ignore.

2435. Because of the scarcity of legally obtainable drugs for use in lethal-injection executions, when and whether Defendants will carry out Plaintiff's execution is a random, arbitrary, and capricious event.

2436. What drugs are used to conduct Plaintiff's execution and the efficacy of those drugs will be up to chance.

2437. Every execution of a death-row inmate will therefore be an individual experiment and each inmate, including Plaintiff, will therefore be subject to a sure or very likely, objectively intolerable risk of severe, unnecessary pain, suffering, degradation, humiliation, and/or disgrace.

2438. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2439. These alternatives include the Alternatives identified above in Section III, incorporated here by reference.

2440. The foregoing alternative execution manners, methods, and procedures are available to and could be readily implemented by Defendants. None of the alternative manners and methods require a physician for proper operation and implementation.

**Twenty-Seventh Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm in the Form of Maladministration or Arbitrary Administration of the Execution Protocol.**

2441. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2442. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of severe pain from the risk of maladministration or arbitrary administration of the Execution Protocol that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

2443. There is a sure or very likely risk that Defendants will fail to strictly apply their execution policy and written Execution Protocol properly or in accordance with the requirements of said written protocol or informal policies.

2444. If DRC Defendants use execution drugs compounded by Drug Source Defendants, there is a sure or very likely risk that Defendants will use execution drugs that are non-sterile, impure, adulterated, sub-potent,

hyper-potent, or in any other way not precisely the drugs required by Core Element # 2 of the Execution Protocol.

2445. A compounded drug that is contaminated or is sub-potent, or hyper-potent, or adulterated, or not the correct identity, or in any other way not the precise drug(s) required by the Execution Protocol poses a sure or very likely risk of harm to Plaintiff when administered by Defendants.

2446. Defendants continue to use the same Medical Team members who have demonstrated an inability to consistently and reliably obtain peripheral IV access on condemned inmates in the execution context.

2447. Defendants' procedures for obtaining intravenous access under their overarching policy, including their written Execution Protocol, have proven to cause serious harm, including torturous physical and/or psychological pain and needless suffering and an undignified, spectacle and/or a lingering death over an extended period of time, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, as personnel attempt to obtain and maintain intravenous access.

2448. Defendants have failed to promulgate formal practices to respond to the numerous well-publicized problems and complications associated with administering their overarching execution policy and written Execution Protocol, and any practices that may have been promulgated are not formally part of the written Execution Protocol

and thus subject to the subjective interpretations given to them by any given Director of the DRC.

2449. These problems are repetitious and foreseeable, yet their prevalence in Ohio makes their subsequent occurrence highly likely, especially in light of the constant presence of the same problematic actors.

2450. Defendants' consistent failures, and pattern of failures, to properly and competently administer the written Execution Protocol renders the constitutionally critical safeguards—safeguards that are essential to alleviate constitutional concerns—contained in Defendants' execution policy and written Execution Protocol null and functionally nonexistent.

2451. Defendants' use of execution drugs of a different identity, concentration, purity, potency and other deviations from the drugs required by the Execution Protocol creates a sure or very likely risk of harm, including severe, needless physical pain and suffering, severe mental or psychological pain, suffering and torturous agony, a lingering death, and an undignified, spectacle execution or attempted execution that is objectively intolerable, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

2452. Defendants' consistent failures, and pattern of failures to properly and competently administer the written Execution Protocol, including Defendants' individual deviations and/or variations and Defendants' pattern of deviations and/or variations from the execution policy's and

the written Execution Protocol's safeguards create a sure or very likely risk that Plaintiff and any and all others on whom Defendants administer the Execution Protocol will not be sufficiently protected by those critical safeguards.

2453. DRC Defendants' previously admitted treatment of their written Execution Protocol's requirements as simple "guidelines," their unlimited, open-ended redefinition of the terms "Director" and "Warden" in the Execution Protocol that reinforces that mindset, and the dependence on individual actors' (such as the specific identity of the Incident Commander, which will change in the coming months with a new gubernatorial administration) interpretation of the protocol, creates a sure or very likely risk that Plaintiff and any and all others on whom Defendants administer their Execution Protocol will not be sufficiently protected by the Execution Protocol's critical safeguards.

2454. Defendants' consistent failures, and pattern of failures to properly and competently administer the written Execution Protocol, including Defendants' individual deviations and/or variations and Defendants' pattern of deviations and/or variations from the execution policy's and the written Execution Protocol's safeguards violate Plaintiff's Eighth and Fourteenth Amendment right to be free from cruel and unusual punishment because they create a sure or very likely risk of serious harm, including physical and/or psychological pain, needless

suffering, and a torturous, lingering, undignified and/or spectacle death that is objectively intolerable, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

2455. Defendants' failure to abide by their execution policy and written Execution Protocol is a demonstrated reality rather than a mere possibility or attenuated speculation, as shown by the deviations and/or variations from key execution policy and/or written Execution Protocol requirements during executions regardless of the execution policy and written protocol effective at the time, including under the current execution policy and written protocol.

2456. Deviations and/or variations from the execution policy and written Execution Protocol demonstrate that problems with any one particular execution are not an unforeseeable isolated mishap or innocent misadventure for which no one is liable. A long line of problematic executions in Ohio makes future problems executing Plaintiff foreseeable and highly likely.

2457. DRC Defendants' inconsistent application of Incident Command Systems principles over time creates a sure or very likely risk that Plaintiff will not be sufficiently protected by application of ICS principles to prevent a violation of Plaintiff's Eighth Amendment rights.

2458. The deviations and/or variations, and the pattern of deviations and/or variations, from Defendants' execution policy and written Execution

134

Protocol by many of the actors involved, whether intentional or reckless, the amount of discretion that exists under the overarching execution policy and within the written protocol, DRC Defendants' demonstrated belief that the written Execution Protocol is not mandatory but is instead guidelines, the variability associated with different interpretations of the protocol's requirements held by varying Incident Commanders, the substantial evidence of Defendants' incompetence or inability to perform in the execution context, and the historical inconsistency in applying ICS principles in the execution context cumulatively point to a sure or very likely risk of serious harm and/or an objectively intolerable risk of harm, in violation of Plaintiff's Eighth and Fourteenth Amendment rights.

2459. This includes intentional and/or willful and/or reckless disregard for the Execution Protocol's requirements, as well as negligent, reckless, and/or willful failure to follow the written protocol's requirements in administration of Defendants' overarching execution policy.

2460. Defendants, while making arbitrary and reckless deviations, nonetheless fail to take into account Plaintiff's physical health, mental health, and other individual characteristics that make him vulnerable to experiencing a sure or very likely risk of serious pain and/or an objectively intolerable risk of harm.

2461. Defendants' overarching execution policy, including their pattern of deviations and/or variations from their written protocol and the

unlimited discretion they claim, is arbitrary, capricious, cruel and unusual, unjustifiably ignores an objectively intolerable risk of harm, and will violate Plaintiff's rights under the Eighth and Fourteenth Amendments.

2462. Plaintiff's individual physical and/or psychological characteristics and conditions create a substantial risk that employing DRC Defendants' Execution Protocol to execute him will subject him to a sure or very likely risk of serious harm in the form of maladministration or arbitrary administration of the execution protocol that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

2463. Plaintiff's individual physical and/or psychological characteristics and conditions, as alleged in Section I above, create a substantial risk that achieving peripheral IV access on him will present a problematic situation analogous to achieving IV access in the previous situations in which Defendants were unable to readily obtain IV access, which, in turn, creates a sure or very likely risk that Plaintiff will suffer serious harm in the form of maladministration or arbitrary administration of the execution protocol as Defendants stab him with needles repeatedly and deviate from strict compliance with the Execution Protocol in the high-stress context of an execution, and that risk is arbitrary and capricious, or the objectively intolerable risk of such harm that Defendants unjustifiably ignore.

2464. Defendants' Execution Protocol presents a sure or very likely risk of harm and/or an objectively intolerable risk of harm from maladministration that Defendants unjustifiably ignore and that will result in at least the substantial risk of infliction of serious harm, including physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified, spectacle death, and/or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, in violation of Plaintiff's rights under the Eighth and Fourteenth Amendments.

2465. Defendants' overarching execution policy, including the broad discretion to deviate and/or to vary from Defendants' written Execution Protocol, their Incident Commander-specific interpretation of the protocol's requirements, their lengthy pattern of deviations and/or variations from the Execution Protocol and Defendants' informal policies, is arbitrary, capricious and presents a sure or very likely risk of serious harm, including physical and/or psychological pain, a torturous, lingering or spectacle death that does not accord with the dignity of man, and/or creates an objectively intolerable risk of harm that Defendants unjustifiably ignore, and/or fails to prevent Defendants from carrying out an unconstitutional execution.

2466. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that substantially reduce the

substantial risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2467. These alternatives include the Alternatives identified in Section III above, incorporated here by reference.

2468. The foregoing alternative execution manners, methods, and procedures are available to and could be readily implemented by Defendants. None of the alternative manners or methods require a physician for proper operation and implementation.

**Twenty-Eighth Cause of Action: Eighth Amendment Violation Based On Sure Or Very Likely Exposure To Serious Harm In The Form Of Being Subjected To An Execution Protocol That Is Unconstitutional Because It Does Not Preclude The Execution Of An Inmate That Is Categorically Exempt From Execution.**

2469. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2470. The execution of one who is intellectually disabled or incompetent to be executed constitutes cruel and unusual punishment under the Eighth Amendment.

A. **Plaintiff will be subjected to execution with a facially unconstitutional execution protocol.**

2471. An execution protocol that would facially allow Defendants to execute one who is categorically exempt from execution fails to fully ensure adherence to the Eighth Amendment's cruel and unusual punishments clause, and thus facially violates the Eighth Amendment.

138

2472. An execution subject to a facially unconstitutional Execution Protocol violates the Eighth Amendment and is an unconstitutional execution.

2473. Defendants' execution policy and written Execution Protocol contain no procedural safeguards or mechanisms by which Defendants ensure that a condemned inmate whose execution is imminent is not intellectually disabled or incompetent to be executed.

2474. Defendants' Execution Protocol is therefore facially unconstitutional, and any execution carried out pursuant to the Execution Protocol is an unconstitutional execution.

2475. Defendants know, or should know, or recklessly disregard that the Execution Protocol and their execution policy contain no procedures or mechanisms to ensure that no execution will be carried out that is unconstitutional because execution of a particular inmate is constitutionally prohibited because of the inmate's intellectual disability or incompetence at the time of execution.

2476. There is a sure or very likely risk of serious harm to Plaintiff that is arbitrary and capricious, or an objectively intolerable risk of serious harm that Defendants ignore, in the form of Plaintiff being subjected to execution using a facially unconstitutional and invalid execution protocol.

**B.**   **No Alternative method required or, in the alternative, Plaintiff's alleged alternative.**

2477. This Cause of Action should not require Plaintiff to plead an alternative execution method.

139

2478. To the extent Plaintiff must plead an alternative execution method as to this Cause of Action, however, he alleges the following.

2479. The foregoing risks are substantial when compared to the known and available alternatives which are feasibly implemented, and which significantly reduce a substantial risk of serious harm.

2480. Ensuring that the Execution Protocol expressly includes mandatory procedural safeguards and screening mechanisms by which DRC Defendants must affirmatively confirm that an inmate subject to execution is neither intellectually disabled nor incompetent, and that DRC Defendants will seek executive clemency intervention or a stay of execution from the Supreme Court of Ohio if there is any reason to believe that a condemned inmate to whom the Execution Protocol will be applied is either intellectually disabled or incompetent, will significantly reduce the sure or very likely risk of Plaintiff being subjected to execution pursuant to a facially or as-applied unconstitutional Execution Protocol.

2481. Because DRC Defendants are already subject to a statutory requirement to raise concerns about incompetence of a condemned inmate, implementing such alternative procedures in Defendants' efforts to administer the Execution Protocol in general and as to Plaintiff is available, feasible, and readily implemented.

2482. DRC Defendants are able to determine whether a Plaintiff has raised intellectual disabilities allegations that have not been resolved on the

merits by the courts; implementing alternative procedures in the Execution Protocol as alleged above to avoid executing one who has alleged intellectual disability but not had such a claim adjudicated on the merits is feasible and readily implemented.

**Twenty-Ninth Cause of Action: Eighth Amendment Violation Based on Deliberate Indifference or Reckless Disregard of Substantial Risk of Harm to Plaintiff.**

2483. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2484. All of the risks alleged in Plaintiff's Amended Complaint are substantial, objectively intolerable, and foreseeable, including sure or very likely risks of suffering severe physical pain; being subjected to agony and terror constituting severe mental or psychological suffering; suffering a lingering death; suffering an undignified, spectacle execution or attempted execution; and being subjected to unwanted, non-consensual human experimentation.

2485. DRC Defendants have been and are on notice of the past failed, botched, and aborted executions with their own or substantially similar execution protocols, as well as of the risks posed by the operation of the execution protocol, and the drugs employed.

2486. Specifically, DRC Defendants were on notice, and are aware, that:

a. their institutional policies and practices in the form of the Execution Protocol and associated policies are experimental and

investigational by virtue of using unapproved new drugs and by using drugs for which no Investigational New Drug application has been submitted.

b.   their institutional policies and practices in the form of the Execution Protocol and associated policies expose Plaintiff to significant risks of harm and to significant burdens on their fundamental rights based on the inclusion of compounded or imported execution drugs to carry out an execution.

c.   that the experimental execution of McGuire was likely to be a horrific, torturous, undignified spectacle of an execution, but DRC Defendants proceeded with that execution anyway.

2487. DRC Defendants know, should know, or recklessly disregard, that the experimental executions of McGuire, as well as of Clayton Lockett on April 29, 2014, in Oklahoma, and the similarly horrific execution of Joseph Wood on July 23, 2014, were horrific, painful, undignified spectacle executions, but DRC Defendants now intend to go forward with Plaintiff's execution using drugs and procedures that are similar in virtually all key respects with the circumstances in those botched executions.  (*See* Decision and Order, ECF No. 2133, PageID 105248– 53, 105266.)

2488. Drug Source Defendants have been, and are, aware and on notice about the deficiencies of their policies and practices, including specifically that:

a. their institutional policies and practices as it relates to producing execution drugs to DRC Defendants violate federal and state laws as articulated throughout his Amended Complaint.

b. that they exhibit gross or systematic deficiencies in staffing, facilities, equipment and procedures for compounding, manufacturing, importing, shipping, storing, handling, packaging, labeling, dispensing, distributing, or administering execution drugs.

2489. Plaintiff is aware of the horrific outcome that awaits him when he is executed according to Defendants' Execution Policy. Specifically, he is aware:

a. of the spectacle that occurred during Defendants' efforts to execute Dennis McGuire on January 16, 2014 that included procedures that are unchanged in the 2016 Execution Protocol;

b. that Defendants do not believe that any problems or anything out of the ordinary occurred with the McGuire execution;

c. of the horrific, agonizing execution of Lockett and the similarly horrific execution of Wood, using an execution protocol and procedures that had received the input and positive assessment from some number of DRC Defendants and/or their counsel in this case;

d. that DRC Defendants have botched other previous executions, such as the executions of Joe Clark on May 2, 2006, Christopher Newton

on May 24, 2007, and the attempted executions of Romell Broom on September 15, 2009, and Alva Campbell Jr., on November 15, 2017;

e. of other executions using midazolam that have involved the inmate demonstrating actions inconsistent with being rendered unconscious, unaware and insensate to pain;

f. of other executions using or attempting to use peripheral IV access on similarly physically compromised inmates and similarly skilled/qualified/trained execution team personnel that were unable to successfully establish and maintain proper peripheral IV access, such as the circumstances involving the Lockett execution in Oklahoma, the failed attempt to execute Doyle Hamm in Alabama on February 22, 2018, the lengthy period of time Defendants needed to obtain IV access on former Plaintiff Biros, and the executions or attempted executions of Clark, Newton, Broom, and Campbell;

g. that DRC Defendants have deviated from the mandates of 01-COM-11 in significant ways in past executions;

h. that any Drug Source Defendants will likely know for whom a particular batch of compounded execution drugs is being made, that any such Drug Source Defendants will likely know that a batch prepared in advance of Plaintiff's execution date is to be used to execute Plaintiff, and that any such Drug Source Defendants will likely know at least some basic facts about the crime for which Plaintiff is to be executed;

i.    that there is a sure or very likely risk that he will be subjected to a physically painful, horrifying death, including experiencing the painful sensations of being unable to breathe and sensations of being subjected to waterboarding torture, if Defendants attempt to execute him using the Execution Protocol;

j.    that there is a sure or very likely risk that he will be subjected to a lingering death that will take 30 minutes or more after conclusion of injection under Ohio law, if Defendants attempt to execute him using the Execution Protocol;

k.    that there is a sure or very likely risk that he will be subjected to an undignified spectacle of an execution if Defendants attempt to execute him using the Execution Protocol;

l.    that Defendants have callously disregarded concerns about lawless activity related to execution drugs, and attempt or will attempt instead to hide such lawlessness through invocation of the secrecy provisions in Ohio Revised Code § 2949.221–222, for which the Defendant DRC Director (at the time, Director Gary Mohr) aggressively lobbied and which the Defendant Governor (at the time, Governor John Kasich) signed into law;

m.    that Defendants have been made aware of significant deficiencies in Defendants' scheme to obtain and use compounded or imported executions drugs that will not prevent a substantial risk of

subversion by Drug Source Defendants, as identified throughout his Amended Complaint;

n.    that, over the course of the above-captioned litigation, Defendants have made representations and promises that were later discarded when abiding by those representations and promises became a hindrance to carrying out an execution;

o.    that Defendants, even in light of all of the above-alleged information, will intentionally apply their Execution Protocol to him in an attempt to execute him;

p.    that this Court assessed the best evidence available and concluded that DRC Defendants' three-drug midazolam protocol will be sure or very likely to subject inmates to a torturous, severely painful death that is akin to waterboarding, among other causes of severe pain and needless suffering.

2490. Plaintiff will and does suffer extreme mental terror, anguish and suffering before and during his experimental execution because Plaintiff is aware of these factors.

2491. Because Plaintiff is aware of all of these matters, there is no longer just a substantial or objectively intolerable risk of severe mental or psychological pain, suffering, terror, and anguish; instead, there is the actual, current, objectively intolerable presence of severe mental or psychological pain, suffering, horrific anxiety, terror and anguish.

2492. Plaintiff will be subject to the psychological pain and suffering of anticipating a horrific, painful death as alleged in his Amended Complaint, which is different than the ordinary mental pain from the anticipation of death or even the ordinary mental pain from anticipation of death by execution performed humanely.

2493. By their actions, Defendants are deliberately indifferent to and/or recklessly disregard, in violation of the Eighth Amendment, a sure or very likely risk of subjecting Plaintiff to an unwanted, non-consensual human experimentation, severe, needless physical pain and suffering, severe mental or psychological pain, suffering and agony, a lingering death, or an undignified, spectacle execution. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; *see also* Decision and Order, ECF No. 2680, PageID 132717–20.)

2494. Because this Cause of Action alleges the certainty that severe harm will occur, rather than a quantum of risk of harm against which an alternative is measured comparatively, and because this is a deliberate indifference claim, this is not a claim of future harm under that body of case law, and thus Plaintiff should not be required under the law to plead an alternative execution method.

2495. However, should he be required to plead an alternative, Plaintiff incorporates by reference the Alternatives identified in Section III above, which are known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that

substantially reduce the risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2496. The foregoing alternative execution manners, methods, and procedures are available to and could be readily implemented by Defendants. None of the alternative manners and methods require a physician for proper operation and implementation.

**Thirtieth Cause of Action: Fourteenth Amendment Due Process Violation For Failure To Comply With Federal Investigational New Drug Application Regulations With Respect To The Method And Choice Of Drug To Be Used In Plaintiff's Execution.**

2497. Plaintiff's Thirtieth Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Thirty-First Cause of Action: Equal Protection Violations Related To Defendants' Failures To Comply With The IND Application Laws.**

2498. Plaintiff's Thirty-First Cause of Action is alleged in the Fourth Amended Omnibus Complaint.

**Thirty-Second Cause of Action: Religious Freedom Violation Under RLUIPA.**

2499. Plaintiff does not allege a Thirty-Second Cause of Action here.

**Thirty-Third Cause of Action: Eighth Amendment Violations Based On Sure Or Very Likely Exposure To Severe Needless Physical Or Mental/Psychological Pain And Suffering Due To Plaintiff's Unique, Individual Characteristics And Application Of The Execution Protocol.**

2500. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2501. In addition to the many ways alleged throughout Plaintiff's Fourth Amended Complaint in which Plaintiff's individual characteristics increase the risk he will experience several different types of serious harm if subjected to DRC Defendants' Execution Protocol, his individual characteristics also increase the risks, which Defendants unjustifiably ignore, that he will also suffer serious harm in the form of severe, needless physical and/or mental/psychological pain and suffering in the following ways, and those risks are arbitrary and capricious, or objectively intolerable, if DRC Defendants subject Plaintiff to their Execution Protocol.

2502. Plaintiff presents with physical characteristics that include, but are not limited to, Plaintiff's history of obesity and/or other factors that will affect accessibility of his veins or the viability of his veins to support an IV catheter; of diabetes; of high cholesterol; of hypertension; of hyperthyroidism; of risk factors suggesting probable sleep apnea[18] and/or other breathing difficulties; severe emotional and mental health problems, including Depressive Disorder, childhood Post Traumatic Stress Disorder, Dissociative Disorder, and substance (drug and alcohol) abuse; and of current or previous usage of medications that will affect the application and/or effect of Defendants'

---

[18] The risk factors for Obstructive Sleep Apnea (OSA) are gender (males more likely); over 50 years old; Body Mass Index of greater than 35; neck size greater than 40 cm (15.7 inches); hypertension; daytime sleepiness; snoring; observed apnea. The more factors present the greater the likelihood of OSA.

execution drugs on him or otherwise indicate problematic physical characteristics, such as Chlorpromazine, Perphenazine, Metformin, Mirtazapine, Levothyroxine, Atorvastatin, Hydrochlorothiazide, Lisinopril and Vistaril.

2503. Plaintiff's physical characteristics such as his obesity and/or other factors that will affect accessibility of his veins or the viability of his veins to support an IV catheter make it sure or very likely that the execution team will be unable to successfully establish and/or maintain peripheral IV access on him, thereby subjecting him to severe, needless physical and mental/psychological pain and suffering as Defendants stab him with needles repeatedly.

2504. Additionally, because Plaintiff presents with several risk factors for the STOP-Bang test, he is at a significant risk of suffering the phenomenon known as "air hunger" upon injection of the lethal drugs under the Execution Protocol. There will be at least a period of time following administration of the drugs when Plaintiff will remain conscious or aware of what he is enduring, as well as sensate, including as he regains consciousness or awareness after the initial injection.

2505. Furthermore, Plaintiff's history of psychiatric disorders or mental health issues, including Depressive Disorder, childhood Post Traumatic Stress Disorder, Dissociative Disorder, and substance (drug and alcohol) abuse significantly increases the already-substantial risk that Plaintiff will suffer extreme mental terror, anguish and suffering

150

before and during his experimental execution as he contemplates experiencing each of the different types of serious harms alleged herein, including a lingering, undignified, spectacle of an execution that will be neither quick nor painless, and as he contemplates experiencing the horrific, spectacular, undignified, and/or lingering execution experiences endured by persons such as Romell Broom, Joseph Clark, Christopher Newton, Dennis McGuire, Joseph Wood, Clayton Lockett, Alva Campbell, Jr., Doyle Hamm, or those inmates executed using compounded execution drugs who have reported feeling that they were being burned from the inside upon administration of the lethal drugs.

2506. Additionally, Plaintiff will and does suffer extreme mental terror, anguish and suffering before and during his experimental execution because Plaintiff is aware of the Court's ruling in which the Court assessed the best evidence available and concluded that DRC Defendants' three-drug midazolam protocol will be sure or very likely to subject inmates to a torturous, severely painful death.

2507. Accordingly, Defendants' use of the Execution Protocol will create a situation in which it is sure or very likely that Plaintiff *will* suffer severe physical and psychological pain and suffering at DRC Defendants' hands in the execution process, let alone a "substantial risk" of that.

2508. Because this Cause of Action alleges the certainty that severe harm will occur, rather than a quantum of risk of harm against which an

alternative is measured comparatively, this is not a claim of future harm under that body of case law, and thus Plaintiff should not be required under the law to plead an alternative execution method.

2509. However, should he be required to plead an alternative, Plaintiff incorporates by reference the Alternatives identified in Section III above, which are known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that substantially reduce the risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2510. The foregoing alternative execution manners, methods, and procedures are available to and could be readily implemented by Defendants. None of the alternative manners and methods require a physician for proper operation and implementation.

**Thirty-Fourth Cause of Action: Equal Protection Violations Related To Plaintiff's Unique, Individual Characteristics And Application Of The Law, Including DRC Defendants' Execution Protocol and Ohio's Execution Statute.**

2511. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2512. Due to Plaintiff's unique, individual characteristics as alleged throughout his Amended Complaint, Defendants have a policy or practice such that they will apply the Execution Protocol and Ohio Revised Code § 2949.22(A) disparately in a way that burdens his fundamental right to be free from cruel and unusual punishment.

2513. Due to Plaintiff's unique physical characteristics, DRC Defendants will not administer to Plaintiff the professional, humane, sensitive and dignified execution which DRC Defendants have a duty to provide Plaintiff under the Execution Protocol.  Instead, Plaintiff's execution will be a spectacular, undignified execution.

2514. Due to Plaintiff's unique physical characteristics, DRC Defendants will not administer to Plaintiff the quick and painless execution which DRC Defendants have a duty to provide Plaintiff under § 2949.22(A). Instead, Plaintiff's execution will be a lingering, torturous and horrifying execution.

2515. DRC Defendants will deviate from Core Elements of the Execution Protocol by failing to use the drugs required by the Execution Protocol, and by failing to use "appropriately trained and qualified" persons.

2516. The Execution Protocol provides only for injection of 5 grams of the execution drug under Plans 1 and 2, and perhaps for one additional dose of 5 grams under those plans.  The Execution Protocol also provides for injection of 500 mg of midazolam under Plan 3, and perhaps for one additional dose of 500 mg of midazolam under that plan.  Nowhere in the Execution Protocol are additional doses of execution drug permitted to be injected.

2517. But DRC Defendants will need to inject an additional 5-gram dose of thiopental sodium or pentobarbital every three minutes, or a continuous infusion of midazolam along with the other drugs in Plan

153

3, for 30 minutes or more to ensure that Plaintiff is legally and statutorily dead under Ohio law and to ensure Plaintiff never regains consciousness or awareness as he is executed, and he will never be rendered insensate under Plan 3, regardless of the midazolam dose ultimately given. Those dosages far surpass the maximum allowable amount—10 grams or 1000 mg, respectively under Plans 1, 2 and 3—that may be obtained, prepared or injected for an execution under the Execution Protocol.

2518. Injecting more than 10 grams of pentobarbital or thiopental sodium into Plaintiff deviates from Core Element # 2 of the Execution Protocol.

2519. Injecting more than 1000 mg of midazolam into Plaintiff deviates from Core Element # 2 of the Execution Protocol.

2520. Core Element # 4 of the Execution Protocol requires that all functions to be performed by Execution Team Members must be performed by appropriately trained and qualified members of the Execution Team.

2521. DRC Defendants will not be appropriately trained to administer the Execution Protocol to Plaintiff in light of his unique characteristics as alleged herein and the need to use scientifically and medically reliable assessment methods beyond a stethoscope assessment.

2522. DRC Defendants' disparate treatment of Plaintiff burdens the fundamental rights against cruel and unusual punishment of a class of individuals that includes Plaintiff, namely those subject to execution at DRC Defendants' hands.

2523. Defendants must apply Ohio and federal laws equally to all similarly situated persons.  They do not, and will not with Plaintiff.

2524. The disparate treatment of Plaintiff does not serve a compelling governmental interest, nor is it narrowly tailored to satisfy a compelling interest.

2525. Defendants' desire to execute its death-sentenced prisoners is only a "legitimate" or, at most, a "significant" state interest, not a compelling state interest.

2526. Defendants have no interest—let alone a legitimate interest—in carrying out an unconstitutional execution.

2527. Thus, any deviations from the Core Elements of the Execution Protocol, even if directly related to Plaintiff's unique characteristics, cannot be said to be tailored to a compelling governmental interest. Nor can the deviations from § 2949.22(A), or the disparate impact on Plaintiff.

2528. Defendants' disparate application of the Execution Protocol and § 2949.22(A) based on Plaintiff's unique characteristics, including their failure to actually assess and train to carry out an execution on Plaintiff in light of his unique characteristics, intentionally treats Plaintiff differently from others similarly situated—namely others subject to execution in Ohio—irrationally and arbitrarily, because that disparate treatment still involves unlawful state action which is, by definition under the law, irrational and arbitrary.

2529. Defendants' irrational and arbitrary disparate treatment of him as a class of one is to Plaintiff's detriment because it will decrease the procedural protections that are so important to protect his dignity, his humanity and his fundamental rights under the Eighth Amendment and others as alleged in Plaintiff's Amended Complaint.

**Thirty-Fifth Cause of Action: Eighth Amendment Violation Based On Purposeful or Knowing Adoption and Use of a Lethal Injection Protocol Using A Three-Drug Method With Midazolam As The First Drug That Will Cause Severe Physical Pain and Mental Anguish and Suffering.**

2530. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2531. Defendants know, or should know, or recklessly disregard that injecting Plaintiff with 500 mg or more of peripheral-IV-injected midazolam will cause horrific, severe physical pain and mental suffering and anguish if he is not rendered unconscious, unaware, and insensate before the midazolam is injected and throughout the duration of the drug's effects on Plaintiff. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; Decision and Order, ECF No. 2680, PageID 132717–20.)

2532. Defendants know, or should know, or recklessly disregard that injecting Plaintiff with the paralytic drug will cause horrific, severe physical pain and mental suffering and anguish if he is not rendered unconscious, unaware, and insensate before the paralytic drug is

injected and throughout the duration of the paralytic drug's effects on Plaintiff. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; Decision and Order, ECF No. 2680, PageID 132717–20.)

2533. Defendants know, or should know, or recklessly disregard that injecting Plaintiff with potassium chloride drug will cause horrific, severe physical pain and mental suffering and anguish if he is not rendered unconscious, unaware, and insensate before the potassium chloride is injected and throughout the duration of the potassium chloride's effects on Plaintiff. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; Decision and Order, ECF No. 2680, PageID 132717–20.)

2534. Defendants know, or should know, or recklessly disregard that midazolam is so completely incapable of preventing sensation to the extreme and needless severe physical pain and mental anguish and suffering that Plaintiff will experience if he injected with IV-injected large doses of midazolam and from the second and/or third drugs in Defendants' three-drug execution method that such pain is essentially certain, as this Court recently found. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; Decision and Order, ECF No. 2680, PageID 132717–20.)

2535. Defendants know about, should know, or recklessly disregard the horrific execution of Joseph Clark using a three-drug method.

2536. Defendants also know about, should know, or recklessly disregard the events of executions like that of Clayton Lockett in which midazolam has been used as the critical first drug in a three-drug execution method, as well as the various expert opinions that have been rendered regarding the suitability of using midazolam as the first in a three-drug execution method.

2537. Defendants also know about, should know, or recklessly disregard the events of executions like that of Joseph Wood in which very large doses of IV-injected midazolam were given but no paralytic was administered, thus demonstrating what such large doses of IV-injected midazolam are causing in condemned inmates.

2538. Defendants also know about, should know, or recklessly disregard the data that establishes that 85% or more of inmates executed using IV-injected high doses of midazolam for whom autopsy reports are available developed acute pulmonary edema following injection of that drug.

2539. Defendants also know about, should know, or recklessly disregard the scientific consensus that suffering acute pulmonary edema is horrifying and severely painful.

2540. Defendants also know about, should know, or recklessly disregard the well-established scientific consensus that midazolam is not an analgesic drug, is not a general anesthetic drug, and cannot cause insensation to severe pain at any dose, each of which this Court has

now expressly found. (Decision and Order, ECF No. 2133, PageID 105248–53, 105266; Decision and Order, ECF No. 2680, PageID 132717–20.) That information which Defendants know, should know, or recklessly disregard, establishes that Plaintiff will almost certainly experience that same extreme, objectively intolerable pain and suffering. (*See id.*)

2541. Defendants know, should know, or recklessly disregard, that this Court has found that if "Ohio executes [an inmate] under its [three-drug midazolam] protocol, it will almost certainly subject him to severe pain and needless suffering." (Decision and Order, ECF No. 2133, PageID 105267; *see also* Decision and Order, ECF No. 2680, PageID 132717–20.)

2542. Defendants know that this result will follow, or recklessly disregard that likelihood, and intentionally and purposefully chose to re-introduce the three-drug method using a 500 mg dose of IV-injected midazolam as the critical first drug anyway. Defendants likewise choose to continue to use that protocol, despite having that knowledge. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; *see also* Decision and Order, ECF No. 2680, PageID 132717–20.)

2543. Defendants have thus adopted the three-drug execution method using a large dose of IV-injected midazolam as the critical first drug with that knowledge, and thus it cannot be other than with the purpose or knowledge of causing severe pain, in violation of the Eighth

159

Amendment. Likewise, Defendants choose to continue to use the three-drug execution method using a large dose of IV-injected midazolam as the first drug with that knowledge, and it cannot be other than with the purpose or knowledge of causing severe pain, in violation of the Eighth Amendment.

2544. The existence of an alternative execution method should be irrelevant for this claim. *See Baze*, 553 U.S. at 102 (Thomas, J., concurring in the judgment) (no "comparative analysis" in *Wilkerson* and *Kemmler*); *see also Warner v. Gross*, 135 S. Ct. 824, 826 (2015) (Sotomayor, J., dissenting); *Glossip*, 135 S. Ct. at 2795–97 (Sotomayor, J., principal dissent).

2545. However, should he be required to plead an alternative, Plaintiff incorporates by reference the Alternatives identified in Section III above, which are known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that significantly reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2546. The foregoing alternative execution manners, methods, and procedures are available to and could be readily implemented by Defendants. None of the alternative manners or methods require a physician for proper operation and implementation.

**Thirty-Sixth Cause of Action: Eighth Amendment Violation Based On Purposeful or Knowing Adoption of a Lethal Injection Protocol Using Midazolam That Will Cause Severe Physical Pain and Torturous Mental Anguish and Suffering.**

2547. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2548. Defendants know, or should know, or recklessly disregard that injecting Plaintiff with a large dose of IV-injected midazolam while he is in any position, especially while he remains strapped supine on the execution gurney, will cause horrific, severe physical pain and mental suffering and anguish from the severe burning upon injection, from the rapid development of pulmonary edema (*see* Decision and Order, ECF No. 2133, PageID 105248–53, 105266), and from development of obstruction that will be sure or very likely to occur in Plaintiff as well. (*See* Decision and Order, ECF No. 2680, PageID 132717–20.)

2549. Defendants know, or should know, or recklessly disregard that midazolam is so completely incapable of preventing the extreme and needless physical pain and severe mental anguish and suffering from suffocating or experiencing air hunger from developing acute pulmonary edema, or obstruction, or other breathing-related problems arising from IV injection of large amounts of midazolam that Plaintiff will experience if he is injected with midazolam, including while strapped supine to the execution gurney, that such pain and suffering is essentially certain. (*See* Decision and Order, ECF No. 2133, PageID

105248–53, 105266; Decision and Order, ECF No. 2680, PageID 132717–20.)

2550. Defendants know about, should know, or recklessly disregard the events of several botched executions like Dennis McGuire and Joseph Wood in which midazolam has been injected into an inmate strapped flat on an execution gurney, along with the many expert opinions that have been rendered regarding the unsuitability of using high doses of IV-injected midazolam as part of a lethal injection execution method. That includes testimony offered during the McGuire preliminary injunction proceedings, the preliminary injunction proceedings on behalf of former Plaintiffs Phillips, Tibbetts, and Otte, the preliminary injunction proceedings on behalf of former Plaintiffs Tibbetts and Campbell, and the preliminary injunction proceedings on behalf of Plaintiff Henness. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266.) That also includes the factual findings that this Court recently confirmed remain intact following the Sixth Circuit's *Henness* decision. (Decision and Order, ECF No. 2680, PageID 132717–20.) That also includes the evidence presented in support of motions for injunctive relief filed by Plaintiffs Cleveland Jackson, Melvin Bonnell, and James Hanna and admitted into the record on or about the time of the September 24, 2019 hearing on those motions.

2551. They also know, should know, or recklessly disregard that using a wedge-shaped pillow to prop up the condemned inmate during an

execution using midazolam is critical to protect Plaintiff from obstructing after injection of the midazolam. They also know, should know, or recklessly disregard that using IV-injected large doses of midazolam will cause the inmate to experience severely painful burning upon injection, and to rapidly develop acute pulmonary edema, subjecting the inmate to horrifying, severely painful sensations of drowning, suffocation, and being unable to breathe as the inmate's lungs fill with fluid. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; Decision and Order, ECF No. 2680, PageID 132717–20.) That information, which Defendants know, should know, or recklessly disregard, demonstrates that Plaintiff will almost certainly experience extreme, objectively intolerable pain and suffering if subjected to an execution using midazolam (*see* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; *see also* Decision and Order, ECF No. 2680, PageID 132717–20), including while strapped supine to the execution gurney.

2552. Defendants know that this result will follow, or recklessly disregard that likelihood, and yet intentionally and purposefully chose to re-introduce the use of large doses of IV-injected midazolam—and to continue using the same—as the first of three drugs, none of which causes insensation.

2553. Defendants also intentionally and purposely chose to introduce the large doses of IV-injected midazolam—and to continue using the

same—without the simultaneous required use of a wedge pillow or similar protective measures to protect Plaintiff against obstruction and the air hunger to follow.

2554. Defendants also intentionally and purposely chose to introduce the large doses of IV-injected midazolam—and to continue using the same—without the simultaneous use of an opioid analgesic or general anesthetic of sufficient dose to cause insensation to (and protection against the subjective experience of) the severe pain and suffering associated with the three drugs in Defendants' Plan 3. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; Decision and Order, ECF No. 2680, PageID 132717–20.)

2555. Defendants have thus adopted an execution method using large doses of IV-injected midazolam and the absence of any measures to protect against the inmate's subjective experience of severe pain and needless suffering from the effects of injection and operation of each of the three execution drugs, including pulmonary edema, suffocation, obstruction following injection, and severe burning pain upon injection of the drugs, (Decision and Order, ECF No. 2680, PageID 132717–20), with the purpose or knowledge of causing severe pain and needless suffering, in violation of the Eighth Amendment.

2556. Defendants have thus also adopted an execution method using large doses of IV-injected midazolam and the absence of any measures to protect against the inmate remaining sensate to and subjectively

experiencing the burning pain upon injection and the rapid development of acute, non-cardiogenic pulmonary edema and its associated horrifying, severe pain and suffering following injection and action on the lungs, (Decision and Order, ECF No. 2680, PageID 132717–20), with the purpose or knowledge of causing severe pain or serious pain and suffering, in violation of the Eighth Amendment.

2557. The existence of an alternative execution method should be irrelevant for this claim. *See Baze*, 553 U.S. at 102 (Thomas, J., concurring in the judgment) (no "comparative analysis" in *Wilkerson* and *Kemmler*); *see also Warner v. Gross*, 135 S. Ct. 824, 826 (2015) (Sotomayor, J., dissenting); *Glossip*, 135 S. Ct. at 2795–97 (Sotomayor, J., principal dissent).

2558. However, should he be required to plead an alternative, Plaintiff incorporates by reference the Alternatives identified in Section III above, which are available in all respects, including that they are known, feasible, readily implemented without any legitimate justification for the State's refusal to adopt them, and each of which significantly reduce the substantial risk of Plaintiff subjectively suffering the serious harms alleged in this Cause of Action.

2559. The foregoing alternative execution manners, methods, and procedures are available to and could be readily implemented by Defendants. None of the alternative manners or methods require a physician for proper operation and implementation.

**Thirty-Seventh Cause of Action: Eighth Amendment Violations Based on DRC Defendants Resurrecting Their Abandoned Three-Drug Method Even Though They Know It Causes Needless Pain And Suffering, And Had Abandoned It, At Least In Part, For That Reason.**

2560. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2561. In adopting the Execution Protocol, using it despite numerous warnings from several renowned experts about the severely painful effects, and nevertheless selecting the revised three-drug method to use for Plaintiff's execution, DRC Defendants have made a deliberate choice to follow a course of action from among various alternatives.

2562. In making that choice, DRC Defendants know and/or are charged with knowing that the revised three-drug method in the Execution Protocol does, in fact, expose condemned inmates, like Plaintiff, to severe, needless pain and suffering, including because it is dependent upon the successful delivery and maintenance of drug-induced unconsciousness, unawareness, and inability to feel or experience pain to a paralyzed person in circumstances of immense stress and where the state actors involved are known by DRC Defendants to lack the necessary experience, skill, judgment, and competence to reliably perform those difficult medical responsibilities, and where the critical first drug simply cannot cause insensation, at any dose, to protect against the severe pain and suffering from the second and third drugs, and where the IV-injected large dose of midazolam, itself, will be

virtually certain to cause severe burning pain upon injection and to cause rapid development of horrifying and severely painful acute pulmonary edema to which the inmate will remain sensate because midazolam, no matter how large the dose, cannot produce insensation to severe pain.

2563. DRC Defendants further know and/or are charged with knowing that the revised three-drug method in the Execution Protocol will subject Plaintiff, when executed by that method, and every inmate executed by that method, to a death that is terrifying, inhumane, undignified, and extremely painful.

2564. Because the paralytic drug does not serve any therapeutic purpose, it is constitutionally critical the first drug in a three-drug protocol is properly administered with Plaintiff properly positioned/propped up to avoid the risk of obstruction, and that the first drug not cause severe pain and needless suffering by itself, and that the first drug has the pharmacokinetic and pharmacodynamics properties to render and maintain Plaintiff insensate to severe pain.

2565. DRC Defendants know and/or are charged with knowing that IV-injected large doses of midazolam such as that used in Plan 3 of Ohio's execution protocol will cause the inmate to suffer severe pain from burning upon injection. DRC Defendants also know and/or are charged with knowing that IV-injected large doses of midazolam such as that used in Plan 3 of Ohio's execution protocol will cause the

inmate to rapidly develop acute pulmonary edema which will subject the inmate to severe pain and suffering as described throughout Plaintiff's Amended Complaint. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266.) DRC Defendants also know and/or are charged with knowing that IV-injected large doses of midazolam such as that used in Plan 3 of Ohio's execution protocol will not render or maintain the inmate insensate to severe pain and suffering, no matter how large the dose given, in the absence of an opioid analgesic drug or a general anesthetic drug. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266.)

2566. DRC Defendants know and/or are charged with knowing that if Plaintiff is not properly rendered unconscious, unaware, and insensate by the first drug, the paralytic will compound the terror and pain Plaintiff will experience during his execution by inducing an unnecessary paralysis of all his voluntary movements and, consequently, his ability to effectively communicate his internal distress. Though aware, conscious, and sensate at some level, Plaintiff will be trapped in his own body as the execution moves forward. This is a chemical entombment akin to being buried alive.

2567. DRC Defendants further know and/or are charged with knowing that if Plaintiff is not properly rendered unconscious, unaware, and insensate by the first drug, and then is paralyzed by the second drug, the third drug, potassium chloride, will burn as it courses through

Plaintiff veins, until it reaches his heart, ultimately stopping it by inducing cardiac arrest.  This searing pain, like liquid fire, is the chemical equivalent of being burned at the stake, and the heart attack Plaintiff will experience will likewise cause severe pain and agony.

2568. There is no governmental interest served by using a paralytic drug, and its use will deprive Plaintiff of his human dignity.  The paralytic drug, as used and/or intended to be used in the Execution Protocol, does not serve the statutory function of quickly and painlessly causing death, nor does it protect against Plaintiff experiencing pain.  The paralytic's suppression of breathing does not hasten the death subsequently caused by the potassium, nor does it protect against the prisoner's pain.  Because midazolam is not effective at rendering and maintaining unconsciousness and unawareness nor at rendering Plaintiff unable to feel and experience pain despite painful stimuli, the paralytic only serves a pernicious purpose—to mask the immense, burning pain caused by a lethal dose of potassium chloride, and the sensation of suffocation caused by the paralytic itself.  The paralytic prevents a prisoner from alerting observers, through sound or movement, that he is experiencing pain.  Alternatively, if midazolam, despite its ceiling effect, actually were effective at establishing and maintaining unconsciousness and unawareness and rendering and keeping the inmate insensate despite painful stimuli, then the paralytic would be an unnecessary, gratuitous, and arbitrary

administration of an unwarranted and harmful chemical that has its own painful effects, amounting to an assault and a battery of the prisoner.

2569. The pattern of deviations and/or variations from DRC Defendants' execution policy and written execution protocol engaged in by many of the actors involved, combined with the amount of discretion that DRC Defendants claim under their overarching execution policy and under the written protocol, along with substantial evidence of incompetence or inability to perform in the execution context, cumulatively point to an undeniably high risk of violating an inmate's rights during any given execution under the three-drug method.

2570. It was in part because DRC Defendants, by November 2009, had actual or constructive knowledge of numerous problems and deficiencies with the original three-drug method outline above that they made the decision then to forever renounce any further use of the three-drug method in Ohio executions, and they abandoned that method of lethal injection going forward.

2571. The revised three-drug method DRC Defendants have resurrected in the Execution Protocol retains all of the problems of the original three-drug method they foreswore in 2009, but adds even greater problems, relevant to the known infliction of needless pain and suffering, because of its use of midazolam as the first drug when that drug cannot produce the necessary insensation, and without protections against

170

pulmonary edema and severe burning following IV injection, and without proper protections against obstruction, as well as its allowance of compounded drugs, and its tolerance of beginning an execution with only one IV site.

2572. In resurrecting the three-drug method for Plaintiff's execution, and making that method even worse than what they renounced in 2009, and continuing to use the three-drug method even in the face of overwhelming evidence of the severe pain and needless suffering to which Plaintiff and other condemned inmates have or will experience under that protocol, DRC Defendants have knowingly, intentionally and purposefully adopted and continue to use a method of lethal injection known to cause needless pain and suffering to inmates subjected to it.  Their chosen method for Plaintiff adds layers of needless pain and suffering, and they know that it does so, and yet they are deliberately indifferent and/or consciously disregard that fact and/or possess a malicious or purposeful intent to inflict such needless pain and suffering upon Plaintiff. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266.)

2573. As a result of their knowing resurrection of the previously renounced three-drug method, and knowingly making it worse, and continuing to use that even-worse three-drug method, DRC Defendants, in addition to subjecting Plaintiff to the experience of being executed by this unconstitutional method, are also forcing him to endure the

psychological torment of preparing for his execution to be inflicted by that method. It super-adds elements of terror and torment to Plaintiff's punishment for DRC Defendants to knowingly and purposefully subject him to a method Defendants themselves previously renounced due in part to their own belief that it was too difficult for their team and did not meet their duty to reliably and consistently deliver a humane execution. It also adds elements of terror and torment to Plaintiff's punishment for DRC Defendants to knowingly and purposefully subject him to a method this Court has found will be certain or very likely to cause him severe pain and needless suffering, including (but not limited to) severe pain and needless suffering akin to that caused by waterboarding. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266.)

2574. DRC Defendants' adoption for Plaintiff's execution of the three-drug method they had previously renounced, along with Defendants' troubling history of conducting executions by lethal injection with that method, and Defendants' continued use of this method despite this Court having now found that the three-drug midazolam method is certain or very likely to subject a condemned inmate to severe pain and needless suffering, all individually and cumulatively demonstrate Defendants' malicious intent and/or conscious disregard and/or deliberate indifference and/or purposeful intention for the consequences of that action, including but not limited to the needless

pain and suffering they know their chosen course of action will inflict upon Plaintiff and other inmates executed by that method. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266.)

2575. Plaintiff believes and therefore alleges that such an execution would be inhuman and barbarous, akin in its level of pain and suffering to being waterboarded, being buried alive, burning at the stake, and other primitive methods long since abandoned by civilized society or otherwise condemned as torturous punishments. It is beyond dispute that being waterboarded, being buried alive, or burned at the stake are inherently cruel forms of punishment. So is suffocation to death. They are cruel for many reasons, including that the suffering they inflict is beyond what is necessary to cause death. Simply because these punishments can now be carried out in a more sophisticated manner—using chemicals—than their more primitive analogs, does not mean that the resulting pain and suffering is any less cruel or any less intolerable under the Eighth Amendment.

2576. For the foregoing reasons, DRC Defendants' revival of the abandoned three-drug method for Plaintiff's execution, and their continued use of that method, including the paralytic and potassium chloride, and their use of super-clinical doses of IV-injected midazolam (which has no pain-blocking properties) as the critical first drug, especially when that midazolam will cause additional severe pain and needless suffering on its own, and also when the condemned inmate is not propped up to

avoid obstruction, violates Plaintiff's constitutional rights under the Eighth and Fourteenth Amendments.

2577. DRC Defendants have no legitimate penological justification for their use of the revised three-drug method in the Execution Protocol, and its use at Plaintiff's execution will make it sure that Defendants will needlessly and gratuitously inflict severe pain on Plaintiff.

2578. Because DRC Defendants' constitutional violations alleged by Plaintiff in this Cause of Action involve at least in part Defendants' knowing and deliberate use against Plaintiff of a previously renounced method known by Defendants to inflict needless pain and suffering, or because DRC Defendants' constitutional violations alleged in this Cause of Action involve at least in part Defendants' knowing and deliberate use against Plaintiff of a method that Defendants indisputably know, should know, or recklessly disregard will be certain or very likely to cause a condemned inmate such as Plaintiff to be subjected to severe pain and needless suffering (*see* Decision and Order, ECF No. 2133, PageID 105248–53, 105266, Decision and Order, ECF No. 2680, PageID 132717–20), Plaintiff is not required to plead an alternative method of execution.

2579. However, should he be required to plead an alternative, Plaintiff incorporates by reference the Alternatives identified in Section III above, which are known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that

significantly reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2580. The foregoing alternative execution manners, methods, and procedures are available to and could be readily implemented by Defendants. None of the alternative manners or methods require a physician for proper operation and implementation.

**Thirty-Eighth Cause of Action: Eighth Amendment Violation Based On Devolving Standards of Decency.**

2581. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2582. A state's punishment is assessed under the Eighth Amendment against the evolving standards of decency that mark the progress of a maturing society. An execution method can be unconstitutional if the method represents "devolution to a more primitive" method. *Glossip*, 135 S. Ct. at 2795–97 (Sotomayor, J., principal dissent).

2583. DRC Defendants, in sworn representations to this Court, the Sixth Circuit, the public and Plaintiffs, abandoned using a three-drug execution method using a paralytic as the second drug and potassium chloride as the third drug, averring that "going forward," neither a paralytic (including pancuronium bromide) nor potassium chloride "will be used as part of the lethal injection process" in Ohio.

2584. DRC Defendants also intentionally and deliberately abandoned any use of midazolam as an execution drug when they adopted an

175

execution protocol that did not include any midazolam (*see* DRC Policy 01-COM-11, adopted January 9, 2015), and again when they adopted a revised execution protocol that likewise did not include midazolam (*see* DRC Policy 01-COM-11, adopted June 29, 2015).

2585. DRC Defendants intentionally and deliberately abandoned the three-drug method and the second and third drugs, in favor of moving to what they believed and what they argued to this and other courts to be a more humane execution method using a single drug barbiturate method.

2586. DRC Defendants knew that removing the paralytic and potassium chloride from a lethal injection method removes two sources of needless, unnecessary physical pain and torturous mental suffering and anguish from their execution protocol.

2587. DRC Defendants intentionally and deliberately abandoned using large doses of IV-injected midazolam in Ohio's execution protocol because they believed doing so made the execution protocol more humane.

2588. No other state has moved forward to a purportedly more humane method of lethal injection by removing the three-drug method, and then by removing IV-injected large doses of midazolam, but then reintroduced the three-drug method again later, and reintroducing large doses of IV-injected midazolam again later, which makes DRC Defendants' new execution protocol and their adoption of that protocol "unusual" on at least two fronts.

2589. By reintroducing an execution protocol that permits them to use a three-drug protocol including large doses of IV-injected midazolam, followed by a paralytic and then potassium chloride, DRC Defendants have intentionally reneged on sworn representations and/or overt actions demonstrating that they would no longer use those dangerously unsafe drugs.

2590. By intentionally reintroducing large doses of IV-injected midazolam as the first drug followed by the second and third drugs back into DRC Defendants' execution protocol, DRC Defendants have intentionally, knowingly or recklessly moved backward to an execution method that reinserts even greater levels of sure or likely risk of severe pain and needless suffering than the previous three-drug protocol or the previous one-drug barbiturate protocol, thereby contravening the evolving standards of decency in violation of Plaintiff's Eighth Amendment rights.

2591. This Cause of Action does not require Plaintiff to plead an alternative method or manner of execution. However, should the Court still find that an alternative manner or method is required, Plaintiff incorporates by reference as if fully set forth here the Alternative manners, methods, and procedures alleged in Section III above.

2592. The foregoing alternative execution manners, methods, and procedures are available to and could be readily implemented by

Defendants.  None of the alternative methods or manners require a physician for proper operation and implementation.

**Thirty-Ninth Cause of Action: Eighth Amendment Violation Based On DRC Defendants' Use Of A Three-Drug Execution Method, Regardless Of The Identity Of The First Drug.**

2593. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2594. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of severe, needless physical pain and suffering that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to Defendants' use of the revised three-drug method, regardless of whether the first drug is midazolam, sodium thiopental, or pentobarbital but even more so if the first drug is midazolam.

2595. Defendants know, or should know, or recklessly disregard that the revised three-drug method, including as specified in the Execution Protocol, creates a sure or very likely risk of severe, needless physical pain and suffering, including because it is sure or very likely that Plaintiff will begin to experience severe burning from injection of the first drug followed rapidly by developing acute pulmonary edema, and then to obstruct and experience air hunger after being strapped supine to the execution gurney; and because midazolam contains no pain-

178

blocking properties at any dosage, thereby leaving Plaintiff exposed to the severe pain and suffering associated with injection of large doses of IV-injected midazolam, and the severe pain and suffering from the paralytic drug and suffocating from the paralytic drug's effects or from the searing fire in his veins caused by the potassium chloride. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; Decision and Order, ECF No. 2680, PageID 132717–20.)

2596. Defendants know that their revised three-drug method makes critical the reliable induction and maintenance of unconsciousness, unawareness, and insensation, so that Plaintiff will be unconscious, unaware, and insensate to pain throughout the process, and will not experience the excruciatingly painful effects of the midazolam if injected without the proper safeguards, as well as the paralytic drug, and the potassium chloride.

2597. Defendants know that their three-drug method also makes it critical— because of the importance of achieving, assessing, and maintaining unconsciousness, unawareness, and insensation when the inmate is paralyzed by the paralytic drug or experiences the injection of potassium chloride—that any persons administering the drugs to Plaintiff and/or assessing his consciousness, awareness, and ability to experience and feel pain be capable of skillfully performing those responsibilities and of exercising informed judgment and discretion, including as to proper timing of the three drugs.

2598. Despite this actual knowledge, Defendants have knowingly and deliberately assigned these critical responsibilities to persons known by them to lack the necessary experience, skill, judgment, and competence to perform them, and for whom no amount of pre-execution "training" will alleviate the inherent deficiencies in experience, skill, judgment, and competence.

2599. Defendants have assigned these critical responsibilities to persons known to be unqualified to perform them even though Defendants also know that the use of the three-drug method places enormous additional stress on said persons during an execution, well beyond that attendant to a one-drug barbiturate-only method, and such stress makes worse the already serious problems caused by the lack of necessary experience, skill, judgment, and competence.

2600. Defendants unconscionably permit an execution using the three-drug method to commence and proceed with only one IV site.

2601. Defendants have failed to provide monitoring equipment necessary to ensure that Plaintiff is unconscious, unaware, and insensate to pain at all relevant times after the administration of the first drug, and before administration of the other two drugs, and continuing until death.

2602. Defendants have no backup plan in the event IV access is lost midway through Plaintiff's execution and cannot promptly be reobtained.

2603. Defendants know, or should know, or recklessly disregard that their revised three-drug method as specified in the Execution Protocol will subject Plaintiff to the sure or very likely risk that he will not be rendered fully unconscious, unaware, and unable to experience or feel pain throughout the process until death, that he will not be insensate to pain at critical points in the process, that he will experience the excruciatingly painful effects of the large dose of IV-injected midazolam starting immediately upon injection and especially while strapped supine to the execution gurney, the excruciatingly painful effects of the paralytic drug and/or potassium chloride, and that he will be forced to endure that excruciating pain caused by the second and third drugs while paralyzed and thus unable to signal his distress. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; *see also* Decision and Order, ECF No. 2680, PageID 132717–20.)

2604. Plaintiff incorporates by reference the Alternatives identified in Section III above, which are known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that substantially reduce the risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2605. The foregoing alternative execution manners, methods, and procedures are available to and could be readily implemented by Defendants. None of the alternative methods or manners require a physician for proper operation and implementation.

**Fortieth Cause of Action: Eighth Amendment Violation Based On DRC Defendants' Use Of A Three-Drug Execution Method With Midazolam As The First Of The Three Drugs.**

2606. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2607. Defendants intend to use a three-drug protocol to execute Plaintiff, using a large dose of IV-injected midazolam as the first drug, a paralytic as the second, and potassium chloride as the third

2608. Several recent executions using large doses of IV-injected midazolam have seen the condemned inmate exhibit movements and other signs of consciousness, awareness, and/or sensation after being intravenously injected with 500 mg of midazolam.

2609. Every additional execution using large doses of IV-injected midazolam in which the paralytic drug was not injected very rapidly after conclusion of injection of midazolam has provided additional evidence to show that signs of consciousness, sensation, and/or awareness after injection of 500 mg of midazolam is the rule, rather than the exception.

2610. Defendants know that absent a successful administration of a first drug and maintenance of that drug's effects to render Plaintiff unconscious, unaware, and insensate, administration of either and both of the paralytic drug and potassium chloride will unquestionably cause searing, torturous physical pain and horrific mental suffering

and anguish. (*See* Decision and Order, ECF No. 2680, PageID 132717–20.)

2611. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because Plaintiff will suffer a sure or very likely risk of serious harm in the form of severe, needless physical pain and suffering and mental anguish that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, due to Defendants' use of the revised three-drug method with a high dose of IV-injected midazolam as the first drug. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; *see also* Decision and Order, ECF No. 2680, PageID 132717–20.)

2612. Defendants intend to deliberately conceal the effects of the IV-injected midazolam and potassium chloride behind a chemical curtain created by the paralytic drug.

2613. Defendants' use of a high dose of IV-injected midazolam in a three-drug protocol cannot reliably ensure that Plaintiff will ever be in or remain in a state of insensation in which he will be unable to experience pain caused by midazolam, the paralytic drug, or the potassium chloride. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266.) He will not be: Plaintiff will never be protected from the pain and suffering inflicted by Defendants' lethal injection protocol, because midazolam's ability to suppress consciousness does

nothing to block any pain from the second and third drugs. (Decision and Order, ECF No. 2680, PageID 132717–20.).)

2614. It is sure or very likely that following IV injection of 500 mg midazolam under the Execution Protocol, Plaintiff will still be conscious, or aware, or at least sufficiently sensate to experience the indisputably unconstitutional pain and mental suffering of suffocation and paralysis caused by injection of the paralytic agent. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; Decision and Order, ECF No. 2680, PageID 132717–20.)

2615. It is sure or very likely that DRC Defendants will unsuccessfully inject the full 500 mg of midazolam into Plaintiff intravenously, and/or that DRC Defendants will inject the drug into Plaintiff too rapidly causing a paradoxical reaction, and/or that midazolam will cause a paradoxical reaction in Plaintiff due to his individual characteristics and history, or that Defendants will inject the paralytic drug before the midazolam can reach its peak effectiveness, making it even further likely that Plaintiff will be conscious, or aware, or sufficiently sensate to experience the effects of the paralytic agent.

2616. Consequently, whether Defendants inject the full 500 mg of midazolam or a lesser amount, Defendants' intended and imminent use of the paralytic in Plaintiff's execution will violate his rights under the Eighth and Fourteenth Amendment to be free from severe pain, needless suffering, experimentation, and the gratuitous invasion of the body.

2617. There is no governmental interest served by using a paralytic in Ohio's protocol. The paralytic drug, as used in the State's protocol, does not serve the statutory function of causing death, nor does it protect against the prisoner's experience of pain. If the IV-injected high dose of midazolam is not effective at establishing and maintaining unconsciousness, unawareness, and insensation despite painful stimuli—which this Court has now found is certain or very likely to be the case (*see* Decision and Order, ECF No. 2133, PageID 105248–53, 105266) in findings that remain intact following the Sixth Circuit's *Henness* decision (*see* Decision and Order, ECF No. 2680, PageID 132717–20)—then the paralytic only masks the immense pain caused by the potassium chloride; if the IV-injected midazolam is effective at those critical tasks, on the other hand, then the paralytic is, at best, a gratuitous and arbitrary administration of an unwarranted and harmful chemical that has its own, non-visible torturous effects.

2618. Defendants' use of a high dose of IV-injected midazolam in a three-drug protocol cannot reliably ensure that Plaintiff will be rendered or remain in a state in which he will be unable to experience pain caused by the IV-injected dose of midazolam. (Decision and Order, ECF No. 2680, PageID 132717–20.)

2619. Defendants' use of a high dose of IV-injected midazolam in a three-drug protocol cannot reliably ensure that Plaintiff will be rendered or remain in a state in which he will be unable to experience pain caused

by the potassium chloride. (Decision and Order, ECF No. 2680, PageID 132717–20.)

2620. It is sure or very likely that following IV injection of 500 mg midazolam under the Execution Protocol, Plaintiff will still be sufficiently conscious, or aware, or at least sufficiently sensate to experience the indisputably unconstitutional physical pain and mental suffering caused by injection of potassium chloride. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; *see also* Decision and Order, ECF No. 2680, PageID 132717–20.)

2621. It is sure or very likely that DRC Defendants will unsuccessfully inject the full 500 mg of midazolam into Plaintiff intravenously, and/or that DRC Defendants will inject the drug into Plaintiff too rapidly thus causing a paradoxical reaction, and/or that midazolam will cause a paradoxical reaction in Plaintiff due to his individual characteristics and history, or that Defendants will inject the potassium chloride before the midazolam can reach its peak effectiveness, making it even further likely that Plaintiff will be conscious, or aware, or sufficiently sensate to experience the effects of the potassium chloride.

2622. Consequently, whether Defendants inject the full 500 mg of midazolam or a lesser amount, Defendants' intended and imminent use of potassium chloride in Plaintiff's execution will violate his rights under the Eighth and Fourteenth Amendment to be free from severe pain, experimentation, and the gratuitous invasion of the body.

2623. Defendants' use of the revised three-drug method with a high dose of IV-injected midazolam as the first drug creates a sure or very likely risk of serious harm because, among other reasons, there is a high likelihood that the midazolam will fail to render Plaintiff insensate from the excruciatingly painful and agonizing effects of that midazolam itself, or from the second and third drugs in Defendants' revised three-drug method, including because:

2624. There is high likelihood the IV-injected high dose of midazolam will fail to reliably induce and maintain the sustained state of unconsciousness, unawareness, and insensation necessary for Plaintiff not to feel the intolerable pain associated with the injection of that midazolam, or of the paralytic drug, or of the potassium chloride, (Decision and Order, ECF No. 2680, PageID 132717–20), and any sedative effect of that midazolam will wear off before the second and third drugs are completely administered in any event.

2625. Midazolam begins to lose effectiveness very rapidly, and much more quickly than barbiturates.  There is a high likelihood the IV-injected midazolam, if injected at a proper rate to reduce the risk of paradoxical reaction, will wear off before the paralytic drug and potassium chloride have been completely administered to Plaintiff.

2626. Midazolam's "ceiling effect" means that the administration of a large IV-injected dose on Plaintiff will have no appreciable effect with respect to the use of midazolam as a pain-blocking drug—the manifest and

crucial purpose of the first drug in a three-drug protocol including a paralytic and potassium chloride.  Midazolam has no pain-blocking properties at any dosage; it is not an analgesic drug, and has no analgesic characteristics.  (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; Decision and Order, ECF No. 2680, PageID 132717–20.)  It is thus not possible to overcome the inadequacy of IV-injected midazolam's properties for its use in a three-drug protocol by giving Plaintiff a large dose, such as the 500 mg dose contemplated by the Execution Protocol.  (Decision and Order, ECF No. 2680, PageID 132717–20.)

2627. Administering 500 mg of IV-injected midazolam at the rate DRC Defendants will use creates a sure or very likely likelihood that Plaintiff will experience a paradoxical effect giving him heightened consciousness, awareness, and/or sensation, and that problems will develop with the IV during administration of the critical first drug, such that Plaintiff will be substantially likely to receive significantly less than the maximum effect dose.  These will, in turn create a sure or very likely risk that Plaintiff will still be conscious, aware, and sensate to experience and feel the torturous pain that will follow injection of the first drug, especially if strapped supine to the execution gurney, and the pain and suffering associated with the second and third drugs in the Execution Protocol.

2628. Defendants know, or should know, or recklessly disregard that their revised three-drug method as specified in the Execution Protocol will subject Plaintiff to the sure or very likely risk that the IV-injected large dose of midazolam will not function to deliver the effects necessary to render Plaintiff unconscious, unaware, and insensate to the pain of the IV-injected midazolam itself upon injection, the development of acute pulmonary edema, and from the paralytic drug and/or potassium chloride, and that he will thus be forced to endure any of that excruciating pain that follows injection of the paralytic while paralyzed and thus unable to signal his distress. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266; *see also* Decision and Order, ECF No. 2680, PageID 132717–20.)

2629. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that significantly reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2630. These alternatives include the Alternatives identified in Section III above, incorporated here by reference.

2631. The foregoing alternative execution manners, methods, and procedures are available to and could be readily implemented by Defendants. None of the alternative methods require a physician for proper operation and implementation.

**Forty-First Cause of Action: Eighth Amendment Violation Based On DRC Defendants' Use Of Midazolam In The Execution Protocol.**

2632. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2633. Defendants' execution policy and written Execution Protocol violate the Eighth Amendment because, in all the ways alleged throughout this Amended Complaint, Defendants' use of a high dose of IV-injected midazolam in the revised Execution Protocol, including while strapped supine to the execution gurney, will cause Plaintiff to suffer a sure or very likely risk of serious harm in the form of severe, needless physical pain and suffering and mental anguish that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore. (*See* Decision and Order, ECF No. 2680, PageID 132717–20.)

2634. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2635. These alternatives include the Alternatives identified in Section III above, incorporated here by reference.

2636. The foregoing alternative execution manners, methods, and procedures are available to and could be readily implemented by Defendants. None of the alternative methods require a physician for proper operation and implementation.

**Forty-Second Cause of Action: Eighth Amendment Violation Based On DRC Defendants Removal Of Any Required Concentration Of The Execution Drugs Which Is Removal Of A Safeguard That Makes It Sure Or Very Likely That Plaintiff Will Experience Severe Pain And Suffering.**

2637. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully rewritten here.

2638. Defendants' planned use of the 2016 Execution Protocol creates a sure or very likely risk of serious harm because Defendants removed certain safeguards present in past execution protocols.

2639. Defendants' current Execution Protocol removes a prior safeguard that required Defendants to use a certain concentration of the execution drugs. For example, in the June 29, 2015 Protocol the Drug Administrator was required to prepare syringes containing five (5) grams of pentobarbital, 100 ml of a 50mg/ml solution. Alternatively, the Drug Administrator was required to prepare syringes containing five (5) grams of thiopental sodium, 200 ml of a 25 mg/ml solution. The execution protocols that included midazolam, a paralytic drug, and potassium chloride also included specific concentrations for each of those drugs.

2640. This requirement existed because drugs in solutions, like the execution drugs, have various different concentrations and potencies. Potency refers to the amount of drug required to produce an effect. Some drugs produce a powerful effect at minute doses and others need a large dose to have any effect.

2641. Every Ohio execution protocol since at least January 8, 2004 has included the concentration requirement for its execution drugs. Those protocols include the prior two protocols using pentobarbital or thiopental sodium and the prior protocols using midazolam and hydromorphone.

2642. The current Execution Protocol omits any reference to the concentration of the solution from which any of the execution drugs are obtained. (October 7, 2016 Protocol, VI.F.4.b–d.)

2643. Under the current Execution Protocol if an execution drug is in a very weak solution, a large amount of solution may be required to obtain the desired effect. Injecting a larger amount of solution will take longer or risk blowing out the IV.

2644. If the Drug Administrators measure the amount of drug to be injected based solely on the volume of solution, but the concentration is incorrect, the incorrect amount of the drug will be injected.

2645. If the execution drugs are obtained from a very strong solution requiring much less of the solution to obtain the designated amount

of the drug, a very minute amount of solution may be required but Drug Administrators will likely still inject the mandated volume.

2646. It is likely that Drug Administrators will inject a subpotent injection of the first drug, but a superpotent injection of the second or third drug. Thus, the alleged effect of the midazolam may wear off if it is in a strong solution before the paralytic is injected, or alternatively the paralytic may take effect if it is in a strong solution after the midazolam wears off.

2647. These are but two of numerous severely painful scenarios permitted by the failure of the protocol to specify the concentration of the solution from which the drugs are obtained.

2648. The concentration of the lethal injection drug in the required syringes alters the total volume of the lethal injection dose. This in turn affects the rate of delivery (the push rate) used for the IV administration, and make it substantially likely that Drug Administrators will use too high of a push rate for the execution drugs.

2649. Because it is sure or very likely that Drug Administrators will use too high of a push rate for the execution drugs, there is a substantial likelihood that they will blow out a vein in the IV administration process, or that a significant amount of any midazolam injected will precipitate at the injection point, thus preventing the required amount of midazolam from reaching Plaintiff's brain before he will be injected with the second and third drugs, or that Plaintiff will suffer a

paradoxical effect, thereby increasing his level of awareness, consciousness, and/or sensation such that he will fully experience the severe pain and suffering to follow.

2650. The removal in Defendants' revised Execution Protocol of any concentration of execution drugs in the solution creates a sure or very likely risk of serious harm in the form of severe, needless physical pain and suffering and mental anguish that is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

2651. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution manners, method(s), and procedures that substantially reduce the substantial risk of Plaintiff suffering the serious harms alleged in this Cause of Action.

2652. These alternatives include reinserting the expressly required concentrations of the execution drugs into the Execution Protocol and adhering to those standards in application of the protocol as to Plaintiff. The alternatives would also include the Alternative manners, methods, and procedures alleged in Section III above, incorporated here by reference.

2653. The foregoing alternative execution manners, methods, and procedures are available to and could be readily implemented by

Defendants.  None of the alternative methods require a physician for proper operation and implementation.

**Forty-Third Cause of Action: The Doctrines Of Judicial Estoppel And/Or Judicial Admission Bar DRC Defendants From Using The Three-Drug Method Against Plaintiff.**

2654. Plaintiff does not allege a Forty-Third Cause of Action.

**Forty-Fourth Cause of Action: Administrative Procedures Act Claims.**

2655. Plaintiff does not allege a Forty-Fourth Cause of Action.

**Forty-Fifth Cause of Action: Eighth and Fourteenth Amendment Violations—A three-drug midazolam method of execution violates the Eighth Amendment's prohibition against cruel and usual punishment because it no longer comports with prevailing standards of decency, and thus its use as a method of execution must be categorically barred.**

2656. Plaintiff incorporates by reference each and every statement and allegation set forth throughout his Amended Complaint as if fully stated here.

2657. All references to "midazolam" in this Cause of Action mean "super-clinical doses of IV-injected midazolam" unless otherwise noted.

2658. Defendants, and/or their agents, acting under color of state law, intend to execute Plaintiff using a three-drug midazolam method of execution.

2659. Executing Plaintiff using a three-drug midazolam method of lethal injection is unconstitutional because that method of execution is a cruel and unusual punishment prohibited under the Eighth Amendment.

2660. The use of a three-drug midazolam method of execution violates the Eighth Amendment's prohibition against cruel and usual punishment because its use is increasingly rare and permitted only in a minority of states, making it an "unusual" punishment.

2661. The use of a three-drug midazolam method of execution violates the Eighth Amendment's prohibition against cruel and usual punishment because it no longer comports with prevailing standards of decency, and thus its use as a method of execution is categorically prohibited.

2662. States may not impose a death sentence upon any inmate using an unconstitutional method of execution. The "Eighth Amendment *categorically* prohibits the infliction of cruel and unusual punishments." *Penry v. Lynaugh*, 492 U. S. 302, 330 (1989) (emphasis added).

2663. Accordingly, there is no requirement to plead an alternative method of execution when making a claim, such as this, that a method of punishment is categorically unconstitutional. "Irrespective of the existence of alternatives, there are some risks 'so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to' them." *Glossip v. Gross*, 135 S. Ct. 2726, 2793 (2015) (Sotomayor, J., dissenting) (quoting *Helling v. McKinney*, 509 U. S. 25, 36 (1993) (emphasis in original)).

2664. For purposes of this claim, Plaintiff does not concede there is a way to constitutionally carry out a lethal injection execution that uses a three-

drug midazolam method. Plaintiff believes that such an execution is *per se* unconstitutional. This distinguishes Plaintiff from the inmate in *Baze*.

2665. Plaintiff, thus, is not required to plead or prove any alternative manner or method of execution in order to prevail on this claim. However, should the Court still find that an alternative manner or method is required, Plaintiff incorporates by reference as if fully set forth here the Alternative manners, methods, and procedures alleged in Section III above.

2666. In order to determine which punishments are so disproportionate as to be cruel and unusual, the Supreme Court has "established the propriety and affirmed the necessity of referring to 'the evolving standards of decency that mark the progress of a maturing society.'" *Roper v. Simmons*, 543 U.S. 551, 560–61 (2005) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-101 (1958) (plurality opinion)). "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.'" *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008) (quoting *Furman v. Georgia*, 408 U.S. 238, 382 (1972) (Burger, C.J., dissenting)).

2667. The Court has taken the following approach in cases adopting categorical rules: first, it "considers objective indicia of society's

standards, as expressed in legislative enactments and state practice, to determine whether there is a national consensus against the sentencing practice at issue. Next, guided by the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose, the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution." *Graham v. Florida*, 560 U.S. 48, 61 (2010) (internal citations and quotation marks omitted).

2668. The Court also considers and is guided by scientific knowledge or other expertise that bear upon the issue. *See Hall v. Florida*, 134 S. Ct. 1986 (2014) (relying upon informed assessment of medical experts consistent with the views of the medical community); *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (relying upon scientific and sociological studies regarding juvenile and adolescent development).

2669. A national consensus can exist against a punishment even though it is statutorily permitted by a majority of states. The mere infrequency of a particular punishment suffices to establish a national consensus against the practice. *Graham*, 560 U.S. at 62–67.

2670. When deciding whether a punishment practice is "unusual" in the constitutional sense, the Court has looked to the number of States engaging in that practice. *See, e.g., Atkins v. Virginia*, 536 U.S. 304,

313-16 (2002); *Roper*, 543 U.S. at 564-66. *See also Glossip*, 135 S. Ct. at 2777 (Breyer, J., dissenting).

2671. The "consistency of direction of change" away from a particular punishment is also a relevant factor in evaluating whether our society, as a whole, still tolerates the punishment. *See Roper*, 543 U.S. at 566.

2672. A State's decision to bar the death penalty altogether necessarily demonstrates a judgment that the death penalty is a disproportionate punishment. *Roper*, 543 U.S. at 574. Thus, these states are to be counted in favor of a consensus against the challenged punishment. *Id.*

2673. And while community consensus is "entitled to great weight," it is not itself determinative of whether a punishment is cruel and unusual. *Graham*, 560 U.S. at 67. The Court also considers whether the challenged punishment serves legitimate penological goals. *Id.*

2674. In addition, Ohio's Execution Protocol itself mandates that all execution process and methods shall be performed in a professional, humane, sensitive, and dignified manner. Human dignity must be respected by the State in carrying out executions. *See, e.g.*, *Atkins*, 536 U.S. at 311 ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man"). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Roper*, 543 U.S. at 560.

2675. When *Atkins* was decided, 30 states prohibited the death penalty for the intellectually disabled. This number comprised 12 that had abandoned the death penalty altogether, and 18 that maintained it but excluded the intellectually disabled from its reach. *Roper*, 543 U.S. at 564.

2676. By a similar calculation by the time of the Court's decision in *Roper*, 30 states prohibited the juvenile death penalty, comprised of 12 that had rejected the death penalty altogether and 18 that maintained it but, by express provision or judicial interpretation, excluded juveniles from its reach. *Id.*

2677. Of the states that use medicines in U.S. lethal injection protocols, only 9 use midazolam.

2678. Currently, twenty (21) states have abolished or overturned the death penalty, most recently the State of New Hampshire in 2019.

2679. Twenty-nine states retain the death penalty as a sentencing option but, in practice, the majority of these states have abandoned carrying out those executions. As a result, only a minority of states actively execute death row prisoners.

2680. Of those 29 states that still formally retain the death penalty, at least 4 states have not executed an inmate in ten years or longer: Wyoming (1992), Colorado and Oregon (both 1997), and Pennsylvania (1999). Executions have occurred somewhat more recently – though still more than a decade ago – in California, Montana, Nevada, and North

Carolina (all in 2006), Kentucky (2008), Indiana (2009), and Louisiana (2010).

2681. Of these states that have not executed an inmate in almost 10 years or longer, none permit execution by the three-drug midazolam method.

2682. Thus, while 21 states have formally abolished the death penalty, at least another 11 or more have done so in practice.

2683. As a result, similar to the calculations by the Court in *Atkins* and *Roper*, approximately 30 states have rejected the challenged punishment.

2684. Only 12 states—Alabama, Arkansas, Florida, Georgia, Missouri, Nebraska, Ohio, Oklahoma, South Dakota, Tennessee, Texas, and Virginia—have carried out an execution from 2015–2019.

2685. Although all states that permit capital punishment provide for lethal injection as a manner of execution, only a small fraction of those states actually carry out their executions using a three-drug midazolam method.

2686. Of all 29 states that still retain the death penalty as a valid sentencing option, only six (6) states currently allow midazolam to be used as the first drug in a three-drug method of execution: Alabama; Arkansas; Nevada; Ohio; Tennessee; and Virginia. Thus, only approximately 20% of death penalty states—which account for approximately 10% of all state and federal jurisdictions—sanction the use of the midazolam three-drug method in executions. Furthermore, although Nevada

includes midazolam as the first drug in its recently adopted execution protocol, the Nevada protocol also includes fentanyl, a potent opioid analgesic, in the lethal cocktail, a critical distinction that sets Nevada apart from the other five states that still retain midazolam in their protocols.

2687. As of July 2019, the total population of those 6 states is estimated to be 38,058,959: Alabama (4,903,185); Arkansas (3,017,825); Nevada (3,080,156); Ohio (11,689,100); Tennessee (6,833,174); and Virginia (8,535,519). As of July 2019, the United States population is estimated to be 328,239,523.

2688. Thus, almost 90% of the U.S. population lives in a state that does not condone using a midazolam three-drug method to execute inmates.

2689. The consistency of direction of change away from the three-drug midazolam method of execution demonstrates it is disfavored under current standards of decency.

2690. With the exception of Tennessee, which recently adopted a three-drug midazolam method and used it with the execution of Billy Ray Irick on August 9, 2018, and with Donnie Johnson on May 16, 2019, States are turning away from using midazolam in a three-drug method. And Tennessee used the electric chair rather than a three-drug midazolam method for the execution of Edmund Zagorski on November 1, 2018, David Miller on December 6, 2018, and in the executions that followed

202

Johnson's execution: Stephen West on August 15, 2019, and Lee Hall on December 5, 2019.

2691. Arizona and Florida announced the removal of the drug as an option from their respective execution protocols in 2016 and 2017, respectively.

2692. Kentucky, prior to any use, denounced midazolam and publicly stated its intentions to remove the drug from its available options.

2693. Nebraska, which recently reinstated the death penalty, did not include midazolam as part of their lethal injection protocol.

2694. Oklahoma announced in March of 2018 it would abandon lethal injection as the preferred method of execution altogether, opting instead for a method using inert gas inhalation.

2695. Alabama and Mississippi have also approved the use of nitrogen gas as an alternative to lethal injection.

2696. Notably, the federal government recently discarded the three-drug protocol after finding it "disfavored" and finding that a one-drug protocol "simplifies the procedure and therefore reduces the risk of administration mishaps." Ultimately, the federal government "determined that the single-drug pentobarbital protocol" was preferable to a three-drug protocol. The federal government therefore replaced the three-drug procedure. *See* Memorandum for the Attorney General, July 24, 2019, contained in the Administrative Record, at 869–71, *In the Matter of the Federal Bureau of Prisons' Execution*

203

*Protocol Cases*, No. 1:19-mc-145, ECF No. 39-1, Page 874–76 of 1075 (D.D.C. Nov. 13, 2019).

2697. At the time of *Baze*, 36 States had adopted lethal injection as their exclusive or primary means of execution. Of those 36 States, at least 30 used the same combination of three drugs in their lethal injection protocols. *Baze v. Rees*, 553 U.S. 35, 42–44 (2008).

2698. No such uniformity exists today.

2699. For example, the execution protocol proposed in California only permits the use of barbiturates as the lethal drugs. Over 27% of all death row inmates are in California.[19]

2700. Florida and Texas, the states with the next largest death row populations, do not provide for the use of a midazolam three-drug method in their protocols.

2701. Collectively, just these three states—Florida, Texas, and California— account for almost half of all death row inmates.

2702. Because only six states sanction its use, the majority of death row inmates, like the majority of U.S. citizens, live in a place that does not condone midazolam as the first drug in a three-drug execution.

2703. Additionally, no other state but Ohio has moved forward to a purportedly more humane method of lethal injection, by removing midazolam from its execution protocol, but then reintroduced IV-

---

[19] *See* https://deathpenaltyinfo.org/death-row-inmates-state-and-size-death-row-year.

injected large doses of midazolam into the protocol again later as the first drug in a three-drug protocol along with a paralytic and potassium chloride.  That makes Defendants' challenged Execution Protocol and their adoption of that protocol "unusual."  Ohio is the first to devolve in such a way.

2704. Yet even then, in 2019, Governor DeWine publicly stated that Ohio would not move forward with Ohio's current midazolam-based protocol, after the United States Magistrate Judge held that the protocol causes pain and suffering akin to waterboarding. Governor DeWine's statements confirm that there is an evolving standard of decency in Ohio that Ohio's current execution protocol is not acceptable and thereby constitutes cruel and unusual punishment, because it violates contemporary standards of decency in 2020.

2705. Community consensus is entitled to great weight when determining whether a punishment is cruel and unusual.  The proper analysis also requires that the Court apply its "own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose," to "determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution."  *Graham*, 560 U.S. at 61 (internal citations and quotation marks omitted).

2706. The penological justifications for the sentencing practice are also relevant to the analysis.  This is, in part, because a sentence lacking

any legitimate penological justification is by its nature disproportionate to the offense.

2707. Use of a three-drug midazolam method of execution, involving a large dose of IV-injected midazolam followed by a paralytic and potassium chloride, lacks any legitimate penological justification and, thus, is by its nature disproportionate to the offense.

2708. Use of a three-drug midazolam method of execution is not a deterrent to prospective offenders.

2709. Use of a three-drug midazolam method of execution is not permissible as retribution because that method of execution is disproportionally cruel and unusual by making it certain or very likely that the inmate will be subjected to severe pain and needless suffering.

2710. All relevant scientific and other expertise, applied to the three-drug midazolam method, confirms its cruelty, as addressed throughout Plaintiff's Fourth Amended Complaint and as this Court recently found. (Decision and Order, ECF No. 2133, PageID 105248–53, 105266.)

2711. The large dose of IV-injected midazolam will cause severe burning upon injection and rapid development of acute pulmonary edema, but the midazolam will do nothing to cause the inmate to be insensate to severe pain, thus making it certain or very likely the inmate will be subject to severe pain and needless suffering. This is a cruel punishment. It is also unusual. Thus, the use of large doses of IV-

injected midazolam as in Ohio's execution protocol no longer comports with the evolving standards of decency.

2712. The paralytic ceases all movement within the inmate's control, and his ability to breathe or open and close his eyes.  Because he will not be rendered and maintained insensate to severe pain by the midazolam, he will experience the severe pain and fear caused by the paralysis, which includes, but it not limited to, suffocation induced by the arresting of his respiratory system.  To be conscious of this paralysis creates a condition where Plaintiff will be trapped within his own body, akin to being buried alive.  This is a cruel punishment.  It is also unusual.

2713. The use of a paralytic drug, under any circumstances, in a human execution is cruel and unusual punishment.  Its use also no longer comports with prevailing standards of decency.

2714. Paralyzing drugs, like those permitted under Ohio's Execution Protocol, are derived from a poison called curare.  In 1868, Swedish physiologist A.F. Holmgren described the use of curare as changing one "instantly into a living corpse, which hears and sees and knows everything, but is unable to move a single muscle, and under its influence no creature can give the faintest indication of its hopeless condition."

2715. The American Veterinary Medical Association's Guidelines for the Euthanasia of Animals explains that "[a]gents and methods that

prevent movement through muscle paralysis, but that do not block or disrupt the cerebral cortex or equivalent structures (*e.g.*, succinylcholine, strychnine, curare, nicotine, potassium, or magnesium salts), are not acceptable as sole agents for euthanasia of vertebrates because they result in distress and conscious perception of pain prior to death."[20]

2716. The AVMA Guidelines specifically condemn the use of neuromuscular blocking agents even with powerful barbiturates: "Mixing of pentobarbital with a neuromuscular blocking agent in the same injection apparatus is not an acceptable approach to euthanasia because of the potential for the neuromuscular blocking agent to induce paralysis prior to onset of unconsciousness."

2717. Similarly, the Humane Society of the United States has stated that it is the "moral and ethical duty" of its members to end the practice of "injecting animals with curare-based or paralytic substances."

2718. Consequently, 42 of 50 states—including Ohio—bar the use of paralytic drugs in animal euthanasia because if something goes wrong and the animal is not properly rendered unconscious, it is impossible to know given the effects of the drug.

2719. Ohio Rev. Code § 4729.532, governing the performance of euthanasia by means of lethal injection on animals, mandates that "[n]o agent or

---

[20] *See* https://www.avma.org/KB/Policies/Documents/euthanasia.pdf.

employee of an animal shelter shall perform euthanasia by means of lethal injection on an animal by use of any substance other than combination drugs that contain pentobarbital and at least one noncontrolled substance active ingredient. . . . "

2720. Ohio allows the use of paralytic drugs to execute of humans but not animals. In other words, the known risk that a neuromuscular blocking agent may induce paralysis prior to onset of unconsciousness if sufficient to prohibit the use of those paralytic agents in animal executions, but not in those of humans.

2721. If not properly rendered insensate to pain by the midazolam—which cannot accomplish that task, because it has no analgesic properties— the paralytic compounds the substantial risk that the inmate will suffer severe pain and needless suffering during his execution by inducing an unnecessary paralysis of all his voluntary movements and, consequently, his ability to effectively communicate his internal distress to anyone. Though conscious and aware and sensate, the paralyzed inmate will be trapped in his own body as the execution progresses. The paralytic does not serve any therapeutic purpose. Therefore, if the inmate remains sensate after injection of midazolam— which he will, because midazolam has no analgesic properties—the potassium chloride will burn as it courses through the inmate's veins, until it reaches and ultimately stops his heart by inducing cardiac

arrest. This will be the chemical equivalent of being burned at the stake. This is a cruel punishment. It is also unusual.

2722. To avoid subjecting a condemned inmate to the known excruciating pain of the paralytic and potassium chloride, it is essential that midazolam work as an effective drug to render the inmate insensate to pain throughout the process. But, as addressed throughout this Amended Complaint, midazolam is incapable of accomplishing that crucial state. Its unsuitability is demonstrated by reliable medical and scientific expertise, and by the many botched executions that have resulted from its use. (*See* Decision and Order, ECF No. 2133, PageID 105248–53, 105266.) Midazolam will not reliably, if ever, render the inmate insensate to the severe pain caused by high doses of IV-injected midazolam, the paralytic, and the potassium chloride.

2723. These risks of being exposed to primitive forms of punishment constitute wanton exposure to objectively intolerable risk.

2724. The "Eighth Amendment categorically prohibits the infliction of cruel and unusual punishments." *Penry v. Lynaugh*, 492 U. S. 302, 330 (1989). Therefore, because the use of a three-drug midazolam method of execution is cruel and unusual punishment, the Eighth Amendment bars its application against Plaintiff, and categorically, against all death row inmates.

**Forty-Sixth Cause of Action: Ohio Corrupt Practices Act Claims Against Individual Defendants in Their Individual Capacity.**

2725. Plaintiff does not allege a Forty-Sixth Cause of Action.

**Forty-Seventh Cause of Action: Equal Protection Clause Violation based on violations of Administrative Procedures Act.**

2726. Plaintiff does not allege a Forty-Seventh Cause of Action.

**PRAYER FOR RELIEF**

G.   Plaintiff's Prayer for Relief for the entirety of his Amended Complaint in this suit is alleged in the Fourth Amended Omnibus Complaint. Out an abundance of caution, he fully incorporates that Prayer for Relief (Fourth Am. Omnibus Compl., ECF No. 1252, PageID 45866–877) here by reference.

H.   Additionally, Plaintiff requests that this Court grant him declaratory relief under federal law in the form of the following:

   a.   An Order declaring that Defendants' execution policy and written execution protocol will subject him to a sure or very likely risk of serious physical and/or psychological pain and needless suffering, as well as the sure or very likely risk of other types of unconstitutional harm including an undignified execution or attempted execution, or a spectacle execution or attempted execution, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore, resulting in cruel and unusual punishment, whether that method is through the policy's Plan 1, Plan 2, or Plan 3, and that Defendants' execution policy and written execution protocol fails to ensure against an execution that would constitute cruel and unusual punishment, and thus will violate Plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,

Office of the Ohio Public Defender

*/s/ Kimberly S. Rigby*
Kimberly S. Rigby [0078245]
**Trial Attorney**
*Kimberly.Rigby@opd.ohio.gov*

Death Penalty Department
250 East Broad Street, Suite 1400
Columbus, Ohio 43215
Phone: 614.466.5394
Fax: 614.644.0708

Counsel for Plaintiff
Caron Montgomery

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2020, I electronically filed the foregoing **Plaintiff Caron Montgomery's Second Amended Individual Supplemental Complaint** with the Clerk of the United States District Court for the Southern District of Ohio using the CM/ECF system, which will send notification of such filing to counsel for all parties.

_**/s/ Kimberly S. Rigby**_
Kimberly S. Rigby [0078245]
Trial Attorney for Plaintiff Caron
Montgomery